# Exhibit 21

Deposition of Jeremy Lappen
(February 28, 2017) (excerpted)

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon    )
Fitch, on behalf of            )
themselves and all others      )
similarly situated,            )
                               )
              Plaintiffs,      )
                               )
       v.                      ) Lead Case No.
                               ) 2:15-cv-01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate     )
Fighting Championship and      )
UFC,                           )
                               )
              Defendant.       )
_____)

VIDEOTAPED DEPOSITION OF JEREMY LAPPEN

LOS ANGELES, CALIFORNIA

February 28, 2017

11:13 a.m.

Reported By:
Tracy Mafi, CSR No. 11850
Job No. 48785

130

1  Mr. Couture had to sign a contract or there would be
2  negative consequences?
3     A   Well, I mean, there was the conversations
4  that were detailed in the letter that we sent.  I
5  would say that that falls into that -- into that
6  example; right?
7     Q   Yes.  Okay.
8         And do you recall any other instances where
9  he contacted you and threatened that there would be
10 negative consequences if Mr. Couture didn't agree to
11 some contract -- contractual clause?
12        MR. McSWEENEY:  Objection; lacks
13 foundation.
14        THE WITNESS:  In addition to the stuff that
15 I pointed out in that letter, I don't remember.  My
16 guess would be, yeah, probably.
17 BY MR. RAYHILL:
18    Q   Okay.  And when you say "yeah, probably,"
19 what's the basis for that statement?
20    A   My basis is --
21        MR. McSWEENEY:  Objection.
22        THE WITNESS:  My basis is I remember having
23 multiple communications with Dana over contract
24 negotiations where there was -- he did exchange from
25 his side saying that, you know, there will be

131

1  negative repercussions if this isn't agreed to.
2  BY MR. RAYHILL:
3     Q   And so when you negotiated a contract, not
4  all the negotiations took place in a written form;
5  is that correct?
6     A   No, there were many times just on the
7  telephone.
8     Q   Okay.
9         (Whereupon Plaintiff Exhibit 206 was
10        marked for identification by the court
11        reporter and is attached hereto.)
12 BY MR. RAYHILL:
13    Q   You've been handed what's been marked as
14 Exhibit 206.  And I welcome you to take a -- look at
15 as much of the document as you like, but I'm only
16 going to ask about one page, and that is -- there's
17 no individual Bates numbers on the document, but it
18 has a handwritten number 6 on the bottom.
19    A   Okay.
20    Q   Let me know when you're ready.
21    A   I'm ready.
22    Q   So this is -- the top of the document says
23 "Wrestling Observer Newsletter."  It has an address
24 in Campbell, California, and the date is August 4th,
25 2008.  And in the second paragraph, on the left --

132

1  well, I'll read starting from the beginning.  He
2  says:
3         "EliteXC put on a very good show on
4         CBS in prime time on 7/26," that being a
5         date, "and a few days later it was clear
6         just how little that meant.  The show
7         bombed in the ratings, doing a 1.7 rating
8         and 2.6 million viewers and actually drew
9         less viewers in the target male 18-24
10        demo than Spike TV's replay of UFC 84 from
11        5/24."
12        That's a date also, May 24th.
13        So do you recall -- first of all, so the
14 EliteXC event on July 26th, is this an event that
15 you remember?
16    A   I think so.  I think I know what event this
17 was.
18    Q   And do you recall -- it says here that
19 Spike TV ran a replay of UFC 84 from May 24th.
20        Do you recall whether that was the case?
21    A   I don't recall, but probably.
22    Q   If it were the case, would this be a case
23 of counter-programming?
24        MR. McSWEENEY:  Objection; calls for
25 speculation.

133

1         THE WITNESS:  Yeah.  Yeah, I think they did
2  that quite often.  If you look farther down in that
3  paragraph, it talks about doing the same thing for a
4  show before that.
5  BY MR. RAYHILL:
6     Q   Okay.  And I'll just read that sentence.
7  It says -- talking about a prior EliteXC event, it
8  says:
9         "And that show had similar head-to-head
10        competition of UFC putting on a first run
11        of Chuck Liddell versus Wanderlei Silva
12        match on Spike."
13        Are those names that you recognize, Chuck
14 Liddell and Wanderlei Silva?
15    A   Yes.
16    Q   Can you tell me are they -- are they
17 prominent MMA fighters?
18    A   Yes.
19    Q   Would that have been a popular match in
20 your estimation?
21        MR. McSWEENEY:  Objection.
22 BY MR. RAYHILL:
23    Q   Let me rephrase the question.
24        Given the notoriety and popularity of the
25 two players who were involved in that match, do you

134

1  think it's possible that the replay on Spike would
2  have drawn viewers away from the EliteXC event?
3      A   I don't know.
4      Q   Okay.  On the top of the second column on
5  the same page, the very first sentence at the top
6  there, very first full sentence reads:
7          "Jeremy Lappen seemed to be the
8          company's key front figure after the show
9          running the press conference and talking
10         about how he would match his champions in
11         the various weight classes against
12         champions from any other organization."
13         Did you ever get the opportunity to match
14 your champions against champions from other
15 organizations?
16     A   I don't think so.  I can't remember if we
17 fought Strike Force Champions or not.  We may have.
18 When Affliction -- I don't think Andrei Arlovski was
19 their champion when he came and fought on one of our
20 cards.  Maybe like a Cage Rage champion.
21     Q   As a promoter, is that something you would
22 have liked to have had the opportunity to do?
23     A   Sure, if it made sense, yeah.
24     Q   Do you think it would have been to the
25 benefit of the fighters to have a chance to fight

135

1  champions from other promotions?
2          MR. McSWEENEY:  Objection; calls for
3  speculation.
4          THE WITNESS:  I think it just depends on
5  the situation.
6  BY MR. RAYHILL:
7      Q   Fourth full paragraph in that second column
8  beginning with words "Shaw understood..."
9          First of all, do you know who he's
10 referring to when he says Shaw?
11     A   That is Gary Shaw.
12     Q   And who was Gary Shaw?
13     A   He was the president of EliteXC in the
14 beginning.
15     Q   Okay.  And it says:
16         "Shaw understood that from the start"
17         -- "Shaw understood that from the start
18         about the star power issue when Slice
19         wouldn't be ready for the show and was
20         against running the date."
21         Can you tell me who Slice is?
22     A   Kimbo Slice.
23     Q       "CBS felt they needed to capitalize on
24         the momentum built.  CBS didn't understand
25         that it was not MMA in prime time on CBS

136

1          that was the hit but two key personalities
2          who each drew one million new viewers for
3          their matches to carry them."
4      Q   Do you agree with the statement that --
5  that it's not MMA in its prime time that was the
6  hit, but the key personalities that each drew one
7  million new viewers?
8      A   Yes.
9      Q   Are fighters with notoriety like that
10 essential to building a successful MMA promotion?
11         MR. McSWEENEY:  Objection to form.
12         THE WITNESS:  Yeah, the fighters are what
13 draws.
14 BY MR. RAYHILL:
15     Q   Did EliteXC have difficulty attracting top
16 fighters that could draw viewers on the same level
17 as Kimbo Slice?
18     A   Kimbo Slice was an EliteXC fighter.
19     Q   Yes, I understand that.
20     A   Okay.
21     Q   But so --
22     A   Is it hard to find fighters of his caliber,
23 his fame --
24     Q   Yes.
25     A   -- ability to draw a crowd?

137

1      Q   Yes.
2      A   Yes, definitely.
3      Q   And do you have a sense of why that was?
4      A   It's trying to find a star.  I mean, it's
5  hard to find a star.  They have a certain X factor.
6  That's what the business is about, I think.  Most
7  promotions have difficulty finding somebody.  And he
8  still holds the record for the most watched fight in
9  the U.S., mixed martial arts fight.
10     Q   The contracts that you negotiated for your
11 fighters with Zuffa, were those contracts all
12 exclusive contracts, by which I mean were fighters
13 prevented from fighting for another promotor while
14 they were under contract with Zuffa?
15     A   Yes.
16         MR. McSWEENEY:  Objection to form.
17 BY MR. RAYHILL:
18     Q   And based on your experience running -- I
19 believe you said you were the president for fight
20 operations for EliteXC?
21     A   Yes.
22     Q   Okay.  So based on your experience as
23 president of fight operations for EliteXC, did the
24 fact that Zuffa signed its athletes to exclusive
25 contracts affect EliteXC's ability to attract

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

```
                                                    138
 1    fighters with that X factor that you were referring
 2    to?
 3         MR. McSWEENEY:  Objection; calls for
 4    speculation.
 5         THE WITNESS:  Well, assuming that UFC had
 6    people who would draw an audience that was under
 7    exclusive contract and we couldn't sign them, then
 8    yes, that would affect us.
 9    BY MR. RAYHILL:
10    Q    So were you familiar with many of the
11    fighters who fought for UFC at that time?
12    A    Yes.
13    Q    And taking Mr. Couture as an example, would
14    you say that Mr. Couture is a fighter with the X
15    factor that you referred to?
16    A    Yes.
17    Q    And could a promotion -- when you ran
18    EliteXC, were you able to sign fighters of
19    Mr. Couture's caliber?
20    A    Well, I wasn't able to sign a fighter if he
21    was under contract with UFC, I couldn't sign them.
22    But I signed many fighters that were very high-level
23    fighters.
24    Q    As high level as Mr. Couture, would you
25    say?
```

```
                                                    139
 1    A    It's debatable.
 2    Q    Okay.  I'm finished with that document.
 3         (Whereupon Plaintiff Exhibit 207 was
 4         marked for identification by the court
 5         reporter and is attached hereto.)
 6    BY MR. RAYHILL:
 7    Q    So you've been handed what's been marked as
 8    Exhibit 207.  This is an article that I downloaded
 9    from the Internet from the Web address that's listed
10    at the top of the article.
11         It was on a website called Fightline.com,
12    and it's an article written by Ryan Clark on August
13    30th, 2006, and the name of the file -- the article
14    is "Fighter Pay & Other Figures From UFC 62 'Liddell
15    versus Sobral.'"
16         Okay.  And turning to page -- the second
17    page of the document, the fourth paragraph from the
18    bottom beginning with your name, it says:
19         "Jeremy Lappen, chief executive officer
20         of the WFA, was escorted out of the
21         building at UFC 61 -- UFC 61:  Bitter
22         Rivals, despite having a ticket given to
23         him by Ken Shamrock, whom he used to manage
24         and who was fighting."
25         Quote, "'I think they're nervous.  They
```

```
                                                    140
 1    don't want competition,' Lappen said of the
 2    UFC.  'They want a monopoly.  They operate
 3    that way.'"
 4         Do you recall making those statements?
 5    A    I don't.  Sorry.
 6         MS. GRIGSBY:  And, Counsel, I think you
 7    skipped a few words.
 8         MR. RAYHILL:  Oh, did I?
 9         MS. GRIGSBY:  Yeah, "They want to be
10    a monopoly.'"
11         MR. RAYHILL:  Right.  So the full -- right.
12    So the record is good, then, on that one, yeah.
13    BY MR. RAYHILL:
14    Q    Do you have any reason to believe
15    you didn't make this statement?
16    A    No, I'm sure I made it.  I just don't
17    remember it.
18    Q    Okay.  So do you have a sense of what you
19    meant when you said "they don't want competition"?
20    A    Yeah, I think I meant that they don't want
21    competition.
22    Q    Thank you for clarifying.
23         I'm going to go ahead and ask anyways.  Do
24    you recall what you meant when you said "they want
25    to be a monopoly"?
```

```
                                                    141
 1    A    Basically it's the same thing to me, that
 2    they wanted to be the only game in town.
 3    Q    Do you have a sense of what caused you to
 4    have this -- these -- this thought?
 5    A    I think it was I'm sure just a whole bunch
 6    of experiences I had in dealing with them and
 7    hearing stuff that they were saying when I was
 8    launching another promotion and hearing what other
 9    people had gotten from them when they were doing
10    other things that were competitive.
11    Q    Can you give me some examples of things
12    they would have said, they being UFC?
13    A    Truthfully, I don't remember.  I don't
14    remember.  Sorry.
15    Q    That's fine.
16         Do you recall any statements that they
17    might have made?  You mentioned to other promoters.
18    Do you recall any of those statements?
19         MR. McSWEENEY:  Objection; lacks
20    foundation.
21         THE WITNESS:  I don't remember.
22    BY MR. RAYHILL:
23    Q    But would you say that you -- based on your
24    overall experience it sounded like the accumulation
25    of your experiences at the time led you to believe
```

142

1  -- led you to make this statement; is that true?
2    A   Yes.
3       MR. McSWEENEY:  Objection; mischaracterizes
4  testimony.
5  BY MR. RAYHILL:
6    Q   Okay.  At the top of the next page, it
7  says:
8       "Lappen who also once managed Randy
9       Couture says the WFA's vision calls for the
10      focus to be on the fighter rather than the
11      organization."
12      Do you have a sense of what you meant by
13 that statement?
14   A   Yeah, absolutely.  The UFC would advertise
15 the brand.  It was all about the brand, the UFC.
16 It's the NFL.  And I just felt differently; that
17 people tune in to individual combat sports because
18 of the individuals, the fighters.  I thought they
19 should build the brand through the fighters by
20 getting behind the fighters, telling their life
21 stories, making people more invested in the fighter
22 themselves, marketing the fighter.  And the UFC I
23 didn't believe shared that same vision --
24   Q   I see.  Okay.
25   A   -- at that time.

143

1    Q   So you go on -- you're quoted as going on
2  to say:
3       "'I would just bang my head against the
4       wall seeing what the other promotions were
5       doing.  They operate on the philosophy of
6       the brand is what sells, it's not the
7       fighter.  They do that because they are
8       afraid the fighters are going to become too
9       big and too powerful, and they'll have to
10      pay them too much money to keep them.'"
11      So I guess that's a little different than
12 the statement that it's about the fighter as opposed
13 to the organization.  It seems like in this -- well,
14 you stated explicitly, you say:
15      "They're afraid the fighters aren't
16      [sic] going to become too big and too
17      powerful, and they'll have to pay them too
18      much money to keep them."
19      Is that an accurate reflection of how you
20 felt at that time?
21   A   I'm sorry.  I didn't really understand the
22 question.  You said something about it contradicts
23 with what?
24   Q   We can ignore that part.
25   A   Okay.

144

1    Q   I just --
2    A   What I said in that quote, I believed what
3  I said.
4    Q   Okay.
5    A   Is that your question?
6    Q   Thank you.  That is my question.  Thank
7  you.
8    A   Yes.
9    Q   Okay.  So then there are some quotes from
10 some other people.  There's a person named
11 Salaverry.  Do you know who that is?
12   A   Yeah, Ivan Salaverry.
13   Q   Is he an MMA fighter?
14   A   Yes.
15   Q   Okay.  So Mr. Salaverry is quoted as
16 saying:
17      "'It's very difficult for guys to
18      negotiate their contracts because they are
19      the big show,' he said."
20      I'm going to back up just to give that a
21 little context.  So before the quote, the writer
22 says:
23      "Salaverry says fighters definitely
24      feel the might of the UFC when it comes to
25      purses."

145

1       And then the quote follows:
2       "'It's very difficult for guys to
3       negotiate their contracts because they are
4       the big show,' he said.  'For the amount of
5       money that they're,'" in parenthesis, "(the
6       UFC) making.  I think a lot of these
7       fighters are not getting their due, for
8       sure.'"
9       Do you agree with that statement?
10   A   I agree with some of it, and I disagree
11 with some of it.  I agree with the part that for
12 sure it's difficult for guys to negotiate contracts
13 if there's only one big show; right?  Because
14 they're the only ones paying any type of money and
15 you have nowhere else to go.  They know that, and
16 they're not going to pay you.  They're in a better
17 leverage position.
18      A lot of fighters not getting their due,
19 I've been on both sides of the table as a manager
20 and a promoter.  So as a promoter, I'd say, you
21 know, a lot of these guys, they're not -- they are
22 getting their fair amount because they don't -- they
23 don't move the needle.  Like whether this guy is
24 fighting on the card or some other guy is fighting
25 on the card, it makes no difference.  Like they're

37 (Pages 142 to 145)

146

1  going to sell the same amount of tickets. They are
2  going to do the same amount of ratings. They're not
3  worth a ton of money. So I would say some guys are
4  getting underpaid and some guys are getting fair or
5  overpaid depending on how you look at it and how you
6  value what somebody's worth.
7     Q   Well, so based on your experience as a
8  manager, how many fights would you say a fighter
9  usually fights in a year?
10    A   Three to five.
11    Q   Okay.
12    A   Bigger name guys, sometimes maybe two.
13 but --
14    Q   Okay.
15    A   -- smaller guys, sometimes more.
16    Q   Did you ever negotiate any contracts on
17 behalf of a fighter who was paid the UFC minimum?
18    A   Sure.
19       MR. McSWEENEY: Objection; lacks
20 foundation.
21 BY MR. RAYHILL:
22    Q   And do --
23    A   Actually, I would say "negotiate" may not
24 be the right word.
25    Q   Okay. And what do you mean by that

147

1  statement?
2     A   Usually somebody who's getting the minimum
3  for the UFC, there's not much, if any, negotiation.
4  You either sign the contract or you don't.
5     Q   Okay. And did you have more than one
6  fighter at that level -- at that level?
7     A   No.
8     Q   And do you recall how much -- but you have
9  experience with at least one fighter?
10    A   Yes.
11    Q   Yes. And do you recall how much that
12 fighter made to show and to win?
13    A   I think at the time it was like -- maybe it
14 was like three and three. 3,000 to show, 3,000 to
15 win I think at that time.
16    Q   And so if a fighter like that fought three
17 fights in a year, that would be a total of somewhere
18 between $9,000 and $18,000; is that your
19 understanding?
20    A   Well, normally the contracts escalate after
21 a win. So they -- at that time -- and I don't
22 remember for sure, but it was like 3 plus 3, going
23 to 4 plus 4 or 5 plus 5. Or it was 3, 3; 5, 5; 7,
24 7. I don't remember what it was, but they would
25 escalate. So if they won, then their next fight

148

1  would be for more money. So they would make more
2  than 18,000 at the end of the day for their fight
3  purses.
4     Q   So would a fighter at that level have to
5  pay a trainer?
6        MR. McSWEENEY: Objection; lacks
7  foundation.
8        THE WITNESS: It just depends.
9  BY MR. RAYHILL:
10    Q   Depends. Okay.
11       Okay. I'm finished with that document.
12 Can we go off the record, please.
13       VIDEOGRAPHER: Sure. We're now going off
14 the record. The time is 3:38 p.m.
15          (Recess taken.)
16       VIDEOGRAPHER: We are now to back on the
17 record. The time is 3:57 p.m.
18
19          EXAMINATION
20 BY MR. McSWEENEY:
21    Q   All right. Mr. Lappen, we have just a few
22 questions that we'd like to ask you. And the first
23 one is going to be regarding this document I'm
24 handing to the court reporter to be marked.
25 ///

149

1         (Whereupon Defendant Exhibit 97 was
2          marked for identification by the court
3          reporter and is attached hereto.)
4  BY MR. McSWEENEY:
5     Q   And it's been marked as Defendant's Exhibit
6  97. Can you take just a moment to review the
7  document and let me know when you've had a chance to
8  do so.
9     A   Okay.
10    Q   The document -- or rather Exhibit 97 is
11 Bates-stamped ZFL-0450016. Do you recognize this
12 document?
13    A   I recognize part of it. I don't recognize
14 all of it.
15    Q   Okay. It appears to be an agreement
16 between Sarah Kaufman and EliteXC; is that correct?
17    A   Well, part of it is, and then part of it is
18 an amendment to the agreement. The first several
19 pages are an amendment that I believe were done by
20 Strike Force --
21    Q   Okay.
22    A   -- maybe after they acquired the rights to
23 the contract from EliteXC, but I don't know anything
24 about that.
25    Q   Well, focusing on the amendment -- or