# Exhibit 22

Deposition of Lorenzo J. Fertitta
(March 23, 2017) (excerpted)

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

```
Cung Le, Nathan Quarry, Jon    )
Fitch, on behalf of            )
themselves and all others      )
similarly situated,            )
                               )
              Plaintiffs,      )
                               )
       v.                      ) Lead Case No.
                               ) 2:15-cv-01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate     )
Fighting Championship and      )
UFC,                           )
                               )
              Defendant.       )
_____)
```

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF LORENZO J. FERTITTA

Las Vegas, Nevada

March 23, 2017

9:09 a.m.

REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
JOB NO. 49608

LORENZO J. FERTITTA - CONFIDENTIAL

```
                                           22
 1   in those sanctioning organizations between the WBC,
 2   the WBA, the IBF, the WBO.  The list kind of goes on
 3   and on.  I can't name them all because I can't
 4   remember.
 5           Many of those organizations were also
 6   located offshore.  I believe the WBC was
 7   headquartered in Mexico.  I believe the WBC was
 8   headquartered in, I want to say, Argentina or one of
 9   the South American countries.
10           In addition to that, there had been widely
11   publicized, I would say, sting options that in fact
12   the FBI did with the IBF where there had been -- they
13   had been accused of accepting payment from promoters
14   to move their fighters into different rankings to get
15   title shots for some of their fighters.
16           So as you can see, boxing was kind of
17   wrought with problems and with corruption.  And I
18   believe that's what the Ali Act's real main role was
19   was to try to rid the sport of corruption.
20       Q.  And one of the ways it did that was by
21   legislating a determination of who got a fight?
22       A.  No.
23       Q.  If I understood you, you said that that was
24   one of the issues with boxing at the time you believe
25   that led to the Ali Act?
```

```
                                           23
 1       A.  Yes.  I believe that corruption overall was
 2   one of the issues because there was fairly
 3   well-documented cases where the accusations were that
 4   promoters would pay, or bribe, I guess, would be a
 5   stronger word, the sanctioning organizations to give
 6   their fighter an advantage versus other fighters.
 7       Q.  And as a result, an individual who received
 8   a fight might not receive it on the basis of their
 9   merit but on the basis of something else?
10       A.  Yes.
11       Q.  Okay.  You also mentioned there was an
12   issue with titles.  What was the issue with the
13   titles?
14       A.  No, I didn't say that there was an issue
15   with titles.  I said that there was a lot of titles.
16       Q.  There were a lot of titles?
17       A.  Yes.
18       Q.  And was the fact that there was more than
19   one title problematic from your point of view?
20       A.  No.  From my point of view as a
21   commissioner, it didn't really matter to me who the
22   sanctioning organization was or how many titles there
23   were.
24           In my personal opinion, I believe it
25   created confusion for the consumer.  But that's just
```

```
                                           24
 1   a personal opinion.
 2       Q.  Okay.  You also mentioned rankings.  I
 3   think you said that there was an issue with respect
 4   to, you tell me if I'm not characterizing this
 5   correctly, but essentially the reliability of
 6   rankings.
 7           Is that accurate?
 8       A.  Yes.  I believe that there was a
 9   credibility issue with the ranking systems of some of
10   the sanctioning organizations.
11       Q.  And was that because the rankings lacked
12   transparency?
13       A.  Yes.  I believe that there was a
14   transparency issue.
15           But I also think that part of the issue was
16   that there -- that the sanctioning organizations --
17   yeah, I guess because of lack of transparency, yes.
18       Q.  Okay.  All right.
19           Is it fair to say that you've started or
20   participated in the inception of a number of
21   different for-profit enterprises?
22       A.  Yes.
23       Q.  Okay.  And in doing so, have you risked
24   capital in each of those various entities?
25       A.  Yes.
```

```
                                           25
 1       Q.  Okay.  And is it fair to say that when most
 2   new businesses start, someone is risking capital?
 3       A.  Yes.
 4       Q.  And when you started new businesses, have
 5   you also given up opportunity costs, that is, the
 6   opportunity to do something else?
 7       A.  No.
 8       Q.  No?  So the theory that time is finite, and
 9   you only have so much time to devote to one issue or
10   one business or enterprise versus another?
11       A.  No, because I think it depends on what your
12   level of involvement is.
13           I mean, you can start a business just being
14   an investor, kind of a silent partner.
15       Q.  Okay.
16       A.  You can also start a business and be very
17   involved and be more of what I would call a hands-on
18   entrepreneur.
19       Q.  Okay.  And the various businesses that you
20   have -- well, let me withdraw that.
21           The various for-profit enterprises that you
22   have been involved with and that you have started, is
23   it fair to say, have been very successful
24   financially?
25       A.  Yes, some of them have.  Some of them
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

26

1  haven't.
2     Q.  Right.  And collectively, the success of
3  those various for-profit enterprises have enabled you
4  to become a billionaire, correct?
5     A.  Yes.
6     Q.  The fact that you're, say, one of the
7  thousand or so richest people on earth; is that
8  correct?
9     A.  Yes.  According to certain magazines, that
10 is the case.
11    Q.  Around the time your tenure as a Nevada
12 State Athletic Commissioner was coming to an end, you
13 became involved in the sport of mixed martial arts;
14 is that correct?
15    A.  No.
16    Q.  Okay.  Did there come a time when you
17 purchased an entity called UFC?
18    A.  Yes.
19    Q.  And what was the UFC?
20    A.  The UFC was a organization, a business,
21 that was started in 1993, I believe November of 1993.
22 It was originally conceived by the Gracie family in
23 Brazil.
24       Their interest was they had migrated from
25 Brazil to California, and they had -- excuse me.

27

1  They had developed a form and a style of fighting
2  called Brazilian jujitsu.
3        At the time, going back to the early '90s,
4  ground fighting, which Brazilian jujitsu is, that
5  technique was not very well-known by what I would
6  call the western culture or at least in America.
7        Historically, martial arts were what I
8  would call the traditional martial arts that included
9  stand-up fighting like Karate, Taekwondo, Judo,
10 things of that nature.
11       Their interest was to prove, at least in
12 their belief, that jujitsu was the dominant martial
13 art.
14       And in order to do that, they felt like
15 that they wanted to create a challenge that would pit
16 fighters from different disciplines, and they decided
17 to put in one of their family members, Royce Gracie,
18 into this tournament.
19       They partnered with some individuals that
20 had a background in, I guess you would call it
21 entertainment promotion, and they conceived this idea
22 called the Ultimate Fighting Championship.
23       They rented an arena in Denver, Colorado.
24 My understanding is that they went to Colorado
25 specifically because it was one of the few states

28

1  that did not have an athletic commission, which of
2  course is the regulatory body that would oversee
3  combat, unarmed combat in any given state.
4        So they essentially went in.  Nobody could
5  tell them not to do it.  The arena agreed to it.
6        ==They were able to secure a pay-per-view==
7  ==distribution with the help of a gentleman by the name==
8  ==of Bob Meyrowitz who was in the business of==
9  ==distributing pay-per-views.==
10       ==At the time, distributing pay-per-view was==
11 ==very complicated because, you know, in todays world==
12 ==you have maybe a handful of pay-per-view companies==
13 ==between the satellite and cable companies with all==
14 ==the consolidation.==
15       ==Back then my understanding was there was==
16 ==literally hundreds, if not a thousand, different==
17 ==cable companies each sitting around the==
18 ==United States.  So you needed someone to aggregate==
19 ==all of it for you, and that's what Bob's company did.==
20       ==They put the event on, and from what I'm==
21 ==told, they never even really intended to start a==
22 ==business.  The idea was to put on an event.  There==
23 ==was never an intention to do UFC 2 or 3 or 4 or, for==
24 ==that matter, 208.==
25       ==They were wildly successful.  They were==

29

1  ==actually profitable.==
2        ==And because of that, they decided to do==
3  ==UFC 2.  Obviously UFC 3, UFC 4, et cetera.==
4     Q.  And at some point, you participated with
5  others in the purchase of that business?
6     A.  I purchased the UFC along with my brother
7  Frank in January of 2001.
8     Q.  Did anyone -- that's Frank Fertitta,
9  correct?
10    A.  Yes.
11    Q.  Okay.  Did anyone other than you and your
12 brother Frank Fertitta participate in the purchase of
13 the UFC in January of 2001?
14    A.  At the creation and outset of the entity
15 that purchased the assets of the UFC, which is called
16 Zuffa, it was an LLC structure, the only shareholders
17 were myself and my brother Frank.  We were 50/50
18 partners.
19    Q.  So I want to understand the timing.  This
20 is January of 2001.
21       At the time that you purchased Zuffa with
22 your brother Frank, were you still a member of the
23 Nevada State Athletic Commission?
24    A.  No.
25    Q.  And I believe you testified that you became

Page 30

1  a member of the Nevada State Athletic Commission in
2  1996 or 1997 and were a member for approximately four
3  years?
4      A.  Yes.
5      Q.  Okay.  And so, do you recall how long you'd
6  been off of the Nevada State Athletic Commission
7  before you and your brother Frank purchased the UFC
8  in January of 2001?
9      A.  I believe it was roughly six months.
10     Q.  And did you leave the Nevada State Athletic
11  Commission in anticipation of your purchase of UFC?
12     A.  No.
13     Q.  And what did you and your brother pay for
14  the UFC when you purchased it in January of 2001?
15     A.  The original purchase price at closing was
16  $2 million.
17     Q.  And did you have a role at UFC -- at the
18  UFC and then ultimately Zuffa that was something
19  other than simply owner?
20     A.  I did not have an executive title or an
21  executive role.
22         Being the what I would call the controlling
23  shareholder along with my brother, we certainly
24  weren't silent partners.  We were involved in the
25  business.  But I would say not in a management,

Page 31

1  day-to-day, executive day-to-day role.
2      Q.  Is there a time when you came to take on
3  executive or day-to-day management duties at Zuffa?
4      A.  Yes.
5      Q.  Okay.  When was that?
6      A.  That was approximately 2007 or 2008.
7      Q.  And did you have a title at Zuffa?
8      A.  Yes.
9      Q.  And what was that title?
10     A.  Chief executive -- chairman and chief
11  executive officer.
12     Q.  That is chairman of the board?
13     A.  Yes.
14     Q.  And that was in 2007, you became chairman
15  of the board, approximately?
16     A.  Yes.  My testimony was 2007 or 2008.
17     Q.  Okay.
18     A.  I can't remember the exact month that I
19  went over there, but it was around that time.
20     Q.  Okay, understanding that.
21         At the time that you became chairman of the
22  board of Zuffa, who were the other board members?
23     A.  There were -- it was an LLC structure.
24         There was essentially me, my brother Frank,
25  and I believe Dana White would have been a board

Page 32

1  member as well.
2      Q.  Okay.
3      A.  And by that time, Dana would have been an
4  equity partner in the LLC.
5      Q.  And did the composition of the board of
6  directors of Zuffa change at some time thereafter?
7      A.  Yes.
8      Q.  And how did it change?
9      A.  When we took a minority investment from
10  Flash Entertainment, they were able to appoint
11  someone to the board.
12         Their nominee was Marty Edelman.
13     Q.  There came a time when you sold Zuffa, LLC;
14  is that correct?
15     A.  Yes.
16     Q.  And when was that?
17     A.  That transaction closed in August of 2016.
18     Q.  And at the time that Zuffa was sold in
19  August of 2016, did Flash Entertainment continue to
20  have an equity interest up to the time of the sale?
21     A.  Yes.
22     Q.  And did Mr. Edelman continue to serve on
23  the board of directors at least up until the time of
24  the sale?
25     A.  Yes.

Page 33

1      Q.  Okay.  Do you continue to hold any
2  position, either executive or nonexecutive position
3  with Zuffa?
4      A.  No.
5      Q.  Do you have a management or consulting
6  agreement with them?
7      A.  No.
8      Q.  Do you know if your brother, Frank
9  Fertitta, does?
10     A.  Yes.  I know that he does not.
11     Q.  Okay.  And how much was Zuffa sold for?
12     A.  The total closing value in debt plus equity
13  was 4,025,000,000.
14     Q.  4,025,000,000?
15     A.  Yes.
16     Q.  And who was the buyer?
17     A.  The buyer was a consortium of investors.
18  The lead investor and I would say I guess managing
19  investor was WME/IMG.
20         The balance of the investors that I'm aware
21  of, KKR, Silverlake Partners, and MSD Capital, which
22  is Michael Bell's family office invested in the form
23  of a preferred security.
24     Q.  In connection with the sale, did the
25  purchasers conduct due diligence?

LORENZO J. FERTITTA - CONFIDENTIAL

74

1  THE WITNESS: Yes.
2  BY MR. DELL'ANGELO:
3    Q. And let's begin with WEC.
4       Did Zuffa consider WEC to be a competitor
5  at the time that it acquired it?
6    A. The way that we looked at WEC was a little
7  bit different from this standpoint. WEC was a
8  regional promotion that was producing events that
9  primarily highlighted fighters in the lower weight
10 classes that the UFC -- that we at the time did not
11 have.
12      So that particular acquisition, we didn't
13 look at it as a competitive promotion inasmuch as we
14 looked at it as a strategic acquisition because it
15 was going to be additive and allow our company to
16 increase the output that we would generate.
17   Q. That is because it enabled the UFC to
18 acquire fighters in lower weight classes that at the
19 time of the acquisition that they didn't have?
20   A. No.
21   Q. Okay. Then why is it then?
22   A. When we originally purchased the WEC, we
23 decided that we were going to continue to operate the
24 WEC as a separate division maintaining the WEC brand.
25      We had an infrastructure, albeit not huge,

75

1  but we had full-time employees dedicating their time
2  solely to the promotion, marketing, operations of the
3  WEC.
4    Q. So let me ask again in a slightly different
5  way.
6       Did Zuffa's acquisition of the WEC enable
7  it to acquire fighters in lower weight classes that
8  Zuffa, LLC didn't promote fights for under any of its
9  brands?
10   A. Yes.
11   Q. Okay. And at the time of the WEC
12 acquisition by Zuffa, LLC, what, if any, competitors
13 existed in the weight classes that existed within the
14 WEC?
15   A. Can you give me a time frame reference.
16   Q. I'm talking about at the time of the
17 acquisition, the time that Zuffa acquired WEC.
18   A. Right. There were a number of promotions
19 around the world that promoted fights within the
20 lower weight classes.
21   Q. How about in North America?
22   A. I believe that there were, yes.
23   Q. Okay. And which of those did -- at the
24 time of Zuffa's acquisition of the WEC, did you
25 believe were competitors for the weight classes that

76

1  the WEC promoted fights in North America?
2    A. My recollection is that at that time, King
3  of the Cage, which was a well-run organization who
4  had distribution deals, I believe it was operated by,
5  maybe owned by Terry Treblecock.
6       And forgive me because we're talking about
7  a large time period, so we're talking about a big
8  span.
9       Possibly K-1 would have promoted files in
10 North America.
11      There was a number of promoters that
12 promoted fights in that weight class -- in those
13 weight classes.
14   Q. That you could --
15   A. And I know that because some of the
16 fighters that were in the WEC had fought for various
17 organizations. So the obvious conclusion there is
18 that there had to have been multiple other fight
19 promotions that promoted fights within those weight
20 classes.
21   Q. Okay. And just to be clear, though,
22 notwithstanding that there were other promotions
23 promoting fights in the weight classes that the WEC
24 promoted at the time that Zuffa, LLC acquired WEC,
25 did you view those other promotions to be -- such as

77

1  King of the Cage or K-1 to be competitors of WEC?
2    A. I did.
3       More importantly, I believed that there was
4  some very strong in competition in those weight
5  classes from promoters in Japan.
6       Mixed martial arts is an international
7  sport. Fighters, whether you're from -- whether
8  you're American, Japanese, Chinese, Brazilian, from
9  Europe, you fight all over the world. It's a global
10 sport.
11      So at that time, promotions like Shuto had
12 a very, very strong presence in the lower weight
13 classes.
14      Pancrase, very strong presence in the lower
15 weight classes.
16      Primarily because if you think about, you
17 know, even when you look at some of the Asian
18 countries in the Olympics, they tend to dominate and
19 do better in the lower weight categories and such.
20      A lot of Brazilians were dominating over in
21 Japan.
22      I know that some of the fighters that
23 fought in the WEC had long careers in Japan.
24      So you know, when we looked at that
25 competitive landscape, it wasn't just North America,

20 (Pages 74 to 77)

LORENZO J. FERTITTA - CONFIDENTIAL

78

1  it was everywhere around the globe.
2      Q. And at the time that Zuffa acquired WEC,
3  how many events was it promoting outside of
4  North America?
5      A. The WEC or UFC?
6      Q. The UFC.
7      A. The UFC. I'd have to be reminded what year
8  we bought the WEC. I can't recall the exact year.
9      Q. So it's fair to say, sitting here today,
10 you don't recall?
11     A. I don't recall.
12         I know that we did our first international
13 event under the ownership of Zuffa at the Royal
14 Albert Hall in London, England either in 2001 or
15 2002. That would have been prior to our acquisition
16 of WEC. And it's possible that we may have done four
17 or five international events, but I would have to go
18 back and look.
19     Q. Okay. So you identified as acquisitions
20 WEC, Pride, WFA, Affliction, and Strikeforce.
21         Did Zuffa acquire any of those entities in
22 part to benefit from the intellectual property
23 developed by those brands?
24     A. Yes.
25     Q. How so?

79

1      A. Well, as I mentioned before, we felt like
2  that WEC had a good brand, well thought of. We
3  thought that by acquiring it and continue to operate
4  it that we could elevate it, and I think any time any
5  company makes an acquisition, you don't make it
6  because you think you're going to make it worse. You
7  make the acquisition because you think you can make
8  it better.
9          Same with Pride Fighting Championships as
10 well.
11     Q. You've already testified with respect to
12 WEC.
13         So with respect to Pride, WFA, Affliction,
14 and Strikeforce, did Zuffa acquire each of them to
15 acquire fighters that were under contract with those
16 entities?
17     A. Some, we did.
18     Q. Okay.
19     A. Some, we did not.
20     Q. Okay. With respect to -- which entities
21 among Pride, WFA, Affliction, and Strikeforce did
22 Zuffa, LLC acquire in part to acquire the fighters
23 that were under contract with those brands?
24     A. Sure.
25         The acquisition of the WFA and Affliction

80

1  were primarily done because in each of those cases,
2  those companies were going out of business or out of
3  business. They were essentially bankrupt.
4          And both of those companies approached us
5  to acquire their companies and acquire their fighters
6  because I believe that they wanted to get those
7  liabilities off of their books, meaning that they had
8  contracted with fighters that they owed fights to,
9  and they were not able to deliver on those
10 contractual terms.
11         Therefore, they approached us, and we
12 acquired those two companies so that we could
13 continue to provide those fighters with fights and
14 could also allow us to operate our strategic plan,
15 which was to continually increase output every year.
16     Q. And so, are you then saying that the UFC --
17 or, excuse me -- Zuffa, LLC's acquisition of Pride
18 and Strikeforce were not, if only in part, motivated
19 by an attempt to acquire fighters that were under
20 contract with those entities?
21         MR. ISAACSON: Objection to form, compound.
22         THE WITNESS: The purpose of both the Pride
23 and Strikeforce acquisition was to buy those
24 companies and to operate the businesses going
25 forward.

81

1  BY MR. DELL'ANGELO:
2      Q. And in acquiring Pride, did Zuffa, LLC
3  nevertheless acquire the fighters that were under
4  contract with Pride?
5      A. Yes.
6      Q. And with respect to Strikeforce,
7  notwithstanding your testimony about the purpose at
8  the time, did Zuffa, LLC nevertheless acquire the
9  fighters that were under contract with Strikeforce at
10 the time that it acquired it?
11     A. The fighter contracts -- the answer is yes.
12         The fighter contracts were an asset on the
13 books of those companies, and we did asset
14 purchase -- we purchased the assets of the companies,
15 we did not purchase the corporations.
16         So yes, we did acquire those fighter
17 contracts as part of our acquisition.
18     Q. Okay. And with respect to the acquisition
19 of WFA, was one of the reasons for Zuffa's
20 acquisition to acquire the fighter Quinton Jackson
21 who was under contract with the WFA?
22     A. That was one of the fighters that we were
23 very interested in, yes.
24     Q. And are there any other fighters that you
25 can think of from the WFA that the UFC was

21 (Pages 78 to 81)

**82**

1  particularly interested in acquiring at the time that
2  it made the acquisition?
3      A.  Once again, it's going back a ways, but I
4  know that I was very interested in Lyoto Machida, who
5  I believe was under contract with the WFA.
6      Q.  Ultimately, Zuffa, LLC did not continue to
7  operate Pride, correct?
8      A.  Yes, that is correct.
9      Q.  And ultimately, notwithstanding the reason
10 for the acquisition that you've testified about
11 today, the UFC did not continue to operate
12 Strikeforce, correct?
13     A.  Yes.  Both had significant reasons for not
14 continuing to operate those, those entities.
15         I can tell you that in the instance of
16 Pride, my intention was to expand into the Asian
17 market and to continue on with the Pride brand.
18        They had built up a very nice business.
19 They had a lot of good fighters and a lot of fan
20 following, and I felt like that would be the best way
21 for the company of -- for Zuffa to be able to enter
22 the Asian market, particularly with a brand that was
23 well-recognized in that market.
24        However, as we continued to move forward
25 from the time that we signed the purchase agreement

**83**

1  with Pride and eventually closed, it became
2  impossible for us to operate that business.
3         We actually are very particular and careful
4  when we make an acquisition, or should I say, any
5  acquisition for that matter.  Both me and my brother
6  are both licensees we're in the State of Nevada for
7  gaming operations.  And we need to be very careful
8  about the individuals that we associate ourselves
9  with and that we do business with, which means the
10 burden is on us to make sure that we do appropriate
11 probity checks on individuals or entities that we're
12 going to be doing business with.
13        And there had been accusations about Pride
14 in some magazines, reports, newspapers that they had
15 associations with organized crime in Japan,
16 particularly the Yakuza.
17        And as part of the acquisition, one of the
18 conditions of the acquisition was that Mr. Sakikabara
19 and all of his executive team, which we were assuming
20 his executive team to become employees of the
21 subsidiary that we were creating to acquire the Pride
22 assets, would have to go through thorough probity
23 checks.
24        We actually went out and we hired a very
25 well-known and established investigative firm, all

**84**

1  made up of ex-gaming agents in the State of
2  New Jersey for the New Jersey State Gaming
3  Commission.
4         And we made it clear, it wasn't just you've
5  got to fill out a form and give us your Social
6  Security number; there are going to be extensive
7  background checks done.
8         As the process went forward, we had a
9  situation where there was a fight scheduled that was
10 upcoming, and in order to execute that fight, we
11 needed that executive team to pass those background
12 checks and to operate with us.
13        However, even though they gave us many
14 assurances that they could pass the background checks
15 and that they would comply with our requests, they
16 did not.  They would not fill out the forms
17 completely.  When the gaming agents would set up
18 times to do interviews and do background checks, they
19 would not show up.  They were not showing up to the
20 office.
21        We had actually taken Jamie Pollack, who
22 worked in our legal department, and made him
23 president of that entity.  He had made plans and had
24 already moved there, was moving his family there, had
25 done research to figure out where his daughter -- I

**85**

1  don't know if he had a daughter or a son -- was going
2  to go to school there.
3         So we were all in, and we were ready to
4  execute that event.
5         As time went on and it became clear that we
6  were not going to be able to operate with their team,
7  which by the way, was substantial, they had a ton of
8  experience, obviously, producing those events, we had
9  to cancel that event.
10        And we thought about, okay, the next event
11 will be, I think we had scheduled it for September.
12 That was in May.  That event was canceled.  We
13 scheduled it for September and hoping that we would
14 get through this process.
15        And when it became clear that we were not
16 and there was a risk of having to cancel the
17 September event, I was -- I had a complex decision to
18 make, and the decision was we have fighters under
19 contract with Pride that we owe fights for because we
20 purchased their contract.  So we have a contractual
21 obligation with those fighters.
22        And I had to make a decision, do I just not
23 get them fights, or do I take those fighters and
24 bring them into the UFC as soon as possible so that
25 we could give them fights because fighting is how

LORENZO J. FERTITTA - CONFIDENTIAL

286

1  experienced fighters.
2      That was just my way of trying to explain
3  to the media and to people who asked how fighters are
4  compensated, not necessarily any matrix or anything
5  like that.
6      Q.  So is it your testimony that no such matrix
7  existed at the company, that is, a matrix of fighter
8  pay?
9      A.  As a standard tool -- no, I'm not saying
10 that.
11     As a standard tool for management, we had
12 what we'll call minimums.  And what that would mean
13 was that most fighters when they first come in in
14 their first fight in the UFC -- once again, not all
15 but most fighters would sign for what we would call a
16 minimum amount, which I believe is 10,000 to show,
17 10,000 to win, it could be 12,000 to show, 12,000 to
18 win.  I don't know where it is right now.
19     Q.  Could you look at Exhibit 24, page 33 of
20 178.
21     Do you have that before you?
22     A.  I do.
23     Q.  Would you look in the middle of the page,
24 the row, it's a kind of wide row, and the "From" is
25 from your cellphone number, 1-702-769-6097 to

287

1  1-702-528-2341.
2      Do you see that row?
3      The timestamp is 11-14-2013 at 4:45:36 p.m.
4      A.  This is page 173?
5      Q.  I'm sorry.  Page 33 of 178.
6      A.  Okay, my bad.
7      Q.  In Exhibit 24.
8      A.  4:45:36 is the timestamp?
9      Q.  Yes.
10     A.  Okay.
11     Q.  Take a moment to read that text to
12 yourself, but in it, you refer to a pay scale for
13 fighters, correct?
14     A.  Let me read it first.
15     Okay.
16     Q.  In that text message, you refer to a pay
17 scale for fighters, correct?
18     A.  I'm referring to a scale relative to a
19 weight class, and I will tell you that we didn't have
20 pay scales for weight classes.
21     However, fighters tend to within certain
22 weight classes, certainly not all the time, tended to
23 have compensation that was in the same general, I
24 would say, general amounts, not specifically the same
25 by any means.

288

1      And you know, many times, you would have a
2  fighter, for instance, I believe this talks about --
3  I guess I don't know what weight class we're talking
4  about here, but in certain weight classes that varied
5  dramatically from the other fighters.
6      Q.  So what pay scale were you referring to?
7      A.  I'm not sure because I don't know what
8  fighter I'm talking about here, and I don't know what
9  weight class we're talking about, so I don't know.
10     Q.  Let me show you what I'm marking as the
11 next exhibit, 29, I believe.
12     (Exhibit 29 was marked for
13     identification by the reporter.)
14 BY MR. DELL'ANGELO:
15     Q.  Do you have Exhibit 29 before you?
16     A.  I do.
17     Q.  Do you recognize the document?
18     A.  I do.
19     Q.  What do you recognize it as?
20     A.  This document was an analysis that I had
21 asked for from Deni.
22     Q.  Batachvarova?
23     A.  Yes, from Deni Batachvarova.
24     I was interested in increasing the minimum
25 fighter pay, and what I wanted to see relative to the

289

1  minimum fighter pay was what the financial impact on
2  the company would be at various levels of minimum
3  fighter pay.
4      You know, typical financial analysis that I
5  think most companies do.
6      Q.  Could you look back at Exhibit 24, please.
7  Just get that in front of you.
8      Are you familiar with a fighter, I think we
9  mentioned him earlier today, Gilbert Melendez?
10     A.  Yes, I am.
11     Q.  Okay.  And did you engage in negotiations
12 with Mr. Melendez to contract to fight with the UFC?
13     A.  What was the last part of your question?
14     Q.  Did you engage in negotiations with
15 Mr. Melendez or his representatives to contract to
16 fight for the UFC?
17     A.  No, I don't remember contracting -- I
18 should say negotiating with him or his
19 representatives when he originally fought for the
20 UFC.
21     However, I was involved -- eventually, what
22 happened was Gilbert Melendez decided that he wanted
23 to fight out the term of his contract so that he
24 could go test the free agency market, free to deal.
25 And it was during that process that I remember, I

73 (Pages 286 to 289)

290

1  recall being mostly involved in was that process.  I
2  was very involved in that.
3     Q.  And how did that process conclude?
4     A.  It concluded with a very long, drawn-out
5  negotiation.
6        My recollection is that Gilbert -- you
7  know, we had made Gilbert offers before his contract
8  expired.  He decided he didn't want to do that.
9        So once again, he fought out his last
10 fight, he wanted to test free agency.  And he went
11 out and was looking for offers from other promoters.
12       I don't know all of the different
13 promotions that he talked to or that he received
14 offers from, but ultimately, my understanding is that
15 Bellator made him a significant offer that ended up
16 being very much to his advantage.
17    Q.  But he, nevertheless, ended up contracting
18 with UFC, correct?
19    A.  Yes.
20    Q.  Would you look at page 75 of Exhibit 24,
21 please.  That's at ZFL-1897726.
22    A.  Yes.
23    Q.  And if you go down to about the middle of
24 the page, in the first-hand column in the from,
25 there's a text from Dana White to your 6097 number,

291

1  that's February 25, 2014 at 7:00 and 4 seconds p.m.
2       Do you see that?
3     A.  I do.
4     Q.  And as you read across, it seems to refer
5  to negotiations that you had with a Melendez and
6  another dude.
7        Do you have an understanding of what
8  Mr. White is referring to there?
9     A.  Yes.
10    Q.  What is he referring to?
11    A.  He's referring to -- I believe he's
12 referring to Eddie Alvarez who was a Bellator
13 fighter.
14    Q.  He would be the other dude?
15    A.  Eddie, I'm assuming, was the other dude
16 because he had done the same thing but in Bellator
17 where he had decided to fight out the last contract
18 in Bellator and test the free agency market.
19    Q.  And Mr. White's text continues through the
20 next line.  Do you see that?
21    A.  Yes.
22    Q.  I'll read the two texts for you.  It says:
23       "Bro, you know I love you to
24        fuckin' death as it is, but what you
25        pulled off this week with Melendez

292

1         and 'other dude' is fuckin' badass.
2         Fuckin' cut throat nasty business
3         like you see in the movies.  Good
4         shit, homie.  Congrats."
5       And what's your response there?  Would you
6  read that, please.
7     A.   "We got to keep taking these
8         Fuckers' oxygen till they tap out.
9         We have --"
10       I don't see the end of that.
11    Q.  And who are the fuckers' oxygen that you
12 needed to keep taking, as you're referring to in that
13 text?
14    A.  I believe it was referring to Bellator.
15    Q.  All right.  I think -- why don't we take a
16 break.  We're coming to a close on our record time.
17       THE VIDEOGRAPHER:  We're going off the
18 record at approximately 5:26 p.m.
19       (A recess was taken.)
20       THE VIDEOGRAPHER:  We're going back on the
21 record.  The time is approximately 5:37 p.m.
22       MR. DELL'ANGELO:  So we'll note for the
23 record that in light of counsel's objections about
24 the introduction of publicly available documents that
25 were not produced in discovery, the fact that the

293

1  Mercer issue has not been resolved and that we have
2  not received a privilege log, we're not going to
3  close the deposition, but we don't have any further
4  questions subject to those issues.
5       MR. ISAACSON:  I will note that the
6  objection to which you referred to, I did not -- I
7  did not stop you from asking any of your questions on
8  the basis of that objection in all of your questions.
9  You had the ability to ask all of your questions.
10      Are you done?
11      MR. DELL'ANGELO:  Yes.
12      MR. ISAACSON:  Okay.
13      THE VIDEOGRAPHER:  No further questions
14 from anyone?
15      MR. ISAACSON:  I'm going to just ask a few
16 questions while we're here.
17
18              EXAMINATION
19 BY MR. ISAACSON:
20    Q.  Do you have Exhibit 29 -- actually,
21 Exhibit 27, sir?
22    A.  Yes.
23    Q.  Exhibit 27 was an article that you were
24 shown with comments about Dana White and Quinton
25 "Rampage" Jackson, and you were asked to look at the

LORENZO J. FERTITTA - CONFIDENTIAL

294

1  last paragraph of the article.
2      And the second-to-last paragraph says:
3      "Jackson," referring to Rampage
4      Jackson, "mad that White had been
5      critical of him for taking the role
6      said that he wasn't coming back."
7      So you talked about Rampage Jackson wanting
8  to be in the A Team movie rather than meeting his
9  commitment to be on the UFC television show.
10     Is that what is being discussed in that
11 paragraph?
12   A.  Yes.  That's my understanding is that
13 Rampage didn't fulfill his commitment to us and
14 instead decided to go off and film a movie.
15   Q.  All right.  Let me see if I can work
16 backwards through your pile to Exhibit 21.
17     Do you have Exhibit 21?
18   A.  I'm sure I have it somewhere here.  What
19 does it look like?
20   Q.  It says, "LexisNexis" in the upper left.
21   A.  There we go.
22   Q.  All right.  Exhibit 21 is a news article
23 dated September 29th, 2008.  So we're talking about
24 the year 2008.
25     And that's where you were shown on page 3

295

1  of this article a quote that was towards the bottom:
2      "UFC doesn't seem to worry much
3      about the other companies in the MMA
4      field, and" you, sir, "pull no
5      punches about the competition.  'No
6      one's ever successful except us, he
7      said, there is no No. 2'."
8      There's what you were saying in 2008,
9  right?
10   A.  Yes.
11   Q.  And on page 2 at the top, there's another
12 quote from you in the third paragraph.
13     Was this also something you said in 2008?
14     "People associate the sport with
15     UFC; we've had a very strong brand.
16     No one else has been successful with
17     this except us.  There is a long
18     list of tombstones."
19     Is that something else you said in 2008?
20   A.  Yes.
21   Q.  And then, the article says, "UFC almost
22 ended up in the same graveyard," and it talks about
23 your history.
24     Is that something that you agree with?
25   A.  Yes.

296

1   Q.  Would you explain why.
2   A.  As I mentioned previously in my testimony,
3  when we started the UFC, there really wasn't much to
4  it except for an idea.  We essentially bought some
5  trademarks, some IP.  We assumed some fighter
6  contracts and a couple of other commercial contracts
7  with some satellite providers.  I think there was a
8  DVD distribution deal in place.  It was a very small
9  business, and it was losing money.
10     From the time period of 2001 to roughly
11 about the beginning of or sometime in 2005, in order
12 to continue to operate the UFC, me and my brother had
13 to continue to fund operations through our own
14 capital.
15     And there was a point in time, probably
16 around 2004, where I actually made a conscious
17 decision to either shut down the UFC and cease
18 operations, or I thought maybe there was a
19 possibility that we could sell the UFC and get some
20 value, certainly not anywhere near what we had
21 invested but some value to help recoup some of our
22 investment.
23     And I had Dana go out into the marketplace
24 and talk to a few people in the market that he
25 thought would be interested.

297

1      Ultimately, I had a change of heart and
2  decided that I wasn't ready to quit.  That, at that
3  time in my career, I hadn't really had any big
4  business failures.
5      So it was very personal from my standpoint,
6  and really kind of made the decision that we were
7  going to try to figure out how to make this business
8  work one way or the other.
9      And we were very close to shutting down,
10 but we ended up deciding to take one more risk.
11     And back then at that time, media companies
12 wouldn't -- would barely take a meeting with us, let
13 alone pay us money for our product.  So --
14   Q.  Thank you.
15   A.  -- we decided to move forward.
16   Q.  All right.  Let me ask you two more things.
17     Exhibit 24, which is the large exhibit of
18 text messages, do you have that?
19   A.  Yes.
20   Q.  A few minutes ago, you were asked about
21 page 75.
22   A.  Yes.
23   Q.  And you indicated that the text message was
24 talking about Bellator.
25     Do you remember that?

75 (Pages 294 to 297)