# Exhibit 23

Deposition of Shannon Knapp
(April 11, 2017) (excerpted)

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon )
Fitch, on behalf of )
themselves and all others )
similarly situated, )
                             )
          Plaintiffs, )
                             )
     v.                      ) Lead Case No.
                             ) 2:15-cv-01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate   )
Fighting Championship and    )
UFC,                         )
                             )
          Defendant. )
_____)

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF SHANNON KNAPP

KANSAS CITY, MISSOURI

April 11, 2017

9:13 a.m.

Reported By:
Kay Merley, RMR, CRR
Job No. 49614

SHANNON KNAPP - CONFIDENTIAL

**Page 58**

```
 1    so for me, you know, I -- it doesn't, you
 2    know, up my profile of Invicta or anything
 3    like that, but it does make a difference for
 4    the women in the sport.  I mean, it's not
 5    putting more money in my bank account for
 6    Invicta.  It's not making us more lucrative,
 7    so -- but does it -- I would be sending those
 8    athletes anyway.  It's just kind of like an
 9    extended courtesy.
10 Q. Okay.
11        MR. RAYHILL:  So I guess we're going
12    to go -- in terms of exhibit numbers, we'll
13    just start with Knapp 1.
14        (Deposition Exhibit 1 was marked for
15    identification.)
16 A. Should have brought my glasses, huh?
17 Q. (By Mr. Rayhill) Not all of them -- the print
18    is particularly small in this one.
19 A. It's away -- it's like...
20        MR. DURBIN:  You want me to hold it?
21 A. Not that bad, not that clear over there.  So
22    this is an interview or something; right?
23        MR. WIDNELL:  Have you produced this
24    to us?
25        MR. RAYHILL:  No.
```

**Page 59**

```
 1        MR. WIDNELL:  I was under the
 2    understanding we produced documents that would
 3    be used in depositions.  Are you familiar with
 4    that?
 5        MR. RAYHILL:  I'm not familiar with
 6    that.  This is an article that I just had
 7    downloaded from the Internet.
 8        MR. WIDNELL:  I believe that we had
 9    an understanding that we would produce those
10    to the other side before using them in
11    deposition.  I'll just lodge the objection.
12    I'm not going to object to you using the
13    document.
14        MR. RAYHILL:  Fair enough.  Fair
15    enough.
16 Q. (By Mr. Rayhill) So this is an article that I
17    downloaded from the Internet.  It's dated
18    February 17th, 2012.
19 A. Okay.
20 Q. Do you recall speaking for this interview?
21 A. I mean, I do a lot of them, but, I mean, yeah,
22    I can look and see, yeah, this looks like
23    everything I'd say, probably.
24 Q. No reason to think you didn't?
25 A. Oh, yeah.  I mean...
```

**Page 60**

```
 1 Q. So I'd just like to talk about on the second
 2    page, the third full paragraph starts with the
 3    words "in keeping."  And it says, "In keeping
 4    with the goal of providing the best
 5    opportunities possible, Knapp will work in
 6    partnership with other promotions to ensure
 7    that fighters are able to stay busy.  Knapp
 8    states that Invicta FC fighters will all be
 9    paid a fair market value, but given that her
10    promotion will likely stick to four events per
11    year, she understands that that may not be
12    enough to get every fighter the fight that she
13    wants -- the fights, excuse me, that she wants
14    or needs."
15        So there's -- first of all, this
16    paragraph is paraphrasing you, but is there
17    any reason to believe you didn't -- that it
18    misrepresents your position or
19    misrepresents -- misrepresented your position
20    at that time.
21        MR. WIDNELL:  Objection, foundation.
22 A. So I think that when you read that paragraph,
23    I think that you definitely have to look at
24    the fact that I state, you know, I'm only
25    going to do about four events a year, so if I
```

**Page 61**

```
 1    sign talent, four events, I can't keep those
 2    athletes busy, so, you know, that was my basis
 3    for saying that, you know, I'm going to work
 4    with other promotions, but I work with other
 5    promotions anyway, so...
 6 Q. And so four events a year is not enough for a
 7    fighter to --
 8 A. No, I mean, not if you have a lot of athletes.
 9    And you have to remember, when I started
10    Invicta, I had a bunch of athletes that wanted
11    to fight.  I mean, there's no way I could keep
12    athletes busy with four fights a year.
13 Q. So in order to keep the -- get the athletes
14    enough fights, you would work with other
15    promotions?
16 A. Yeah.
17 Q. And Jewel was one of those promotions?
18 A. In 2012, I think.  I think that's when -- I'm
19    not sure in the beginning if we signed, like,
20    long-term contracts.  You know, I'm not sure
21    if we signed -- we might have done -- maybe
22    the first couple shows we did one-offs, you
23    know, which would just be one fight, so I
24    would have to look back, but...
25 Q. Okay.  That's all.  I'm finished with that
```

16 (Pages 58 to 61)

SHANNON KNAPP - CONFIDENTIAL

62

1  document.
2      MR. WIDNELL: Kevin, could we go off
3  the record just briefly?
4      MR. RAYHILL: Absolutely.
5      THE VIDEOGRAPHER: Stand by, please.
6  Going off record at 10:23 a.m.
7      (A recess was taken.)
8      THE VIDEOGRAPHER: Here marks the
9  beginning of Media 2. Resuming record at
10  10:37 a.m.
11  Q. (By Mr. Rayhill) Okay. Does Invicta have a
12     relationship with -- strike that. Does
13     Invicta have a financial relationship with
14     Zuffa?
15  A. What do you mean?
16  Q. Well, let me make it a more general question.
17     Does Invicta have a business relationship with
18     Zuffa of any kind?
19  A. Yes.
20  Q. Can you tell me about that?
21  A. Yes. We have a broadcast distribution deal
22     with the UFC, which means that we air on UFC
23     Fight Pass.
24  Q. And how long have you had that arrangement
25     with Zuffa?

63

1  A. I think I'm going on two years.
2  Q. And can you tell me what sort of content, what
3     sort of Invicta content gets -- let's back up.
4     Does some Invicta content get broadcast on
5     Fight Pass?
6  A. Yes.
7  Q. And Fight Pass is a subscription service that
8     UFC runs; is that correct?
9  A. Yes.
10  Q. Can you tell me what kind of content gets
11     broadcast, what kind of -- type of Invicta
12     content gets broadcast on Fight Pass?
13  A. Yeah, live events.
14  Q. And how many live events per year, let's say?
15  A. Six to eight, you know. I mean, this year
16     will be six.
17  Q. How many live events does Invicta typically do
18     in a year?
19  A. About six. We're looking to do eight this
20     year.
21  Q. Has Zuffa ever provided any financial support
22     for an Invicta event, a live MMA event?
23  A. Yeah.
24  Q. And can you tell me roughly how many times
25     Zuffa has provided financial support?

64

1  A. Oh, absolutely, once, yeah, one time.
2  Q. Can you tell me when that was?
3  A. It would be February of 2015, I believe.
4  Q. And can you tell me about -- so can you tell
5     me how much financial support they provided?
6  A. They just covered an event, so I'd have to
7     look at the figures, you know, to be exact,
8     but I know they just covered an event, a full
9     event once.
10  Q. So when you say they covered the full event,
11     do you mean they paid for all expenses related
12     to that event?
13  A. Yes.
14  Q. Do you recall where the event was?
15  A. Yes. At the Shrine in L.A.
16  Q. The Shrine is the Shrine Auditorium?
17  A. Uh-huh.
18  Q. Do you recall if Zuffa provided any logistical
19     support for that event?
20  A. In terms of?
21  Q. Did they help you find the venue?
22  A. Yes.
23  Q. Did they help you sell tickets?
24  A. What do you mean by that?
25  Q. Did they -- well, let's strike that question.

65

1     Did they help you determine the price for the
2     tickets?
3  A. Yes, because I asked for assistance.
4  Q. Did they help with advertising for the event?
5  A. I believe not, other than on the digital
6     platform.
7  Q. Was that event broadcast -- when you say the
8     digital platform, are you talking about Fight
9     Pass?
10  A. Yes.
11  Q. Okay. Was that event broadcast on Fight Pass?
12  A. Yes.
13  Q. So when you say they advertised on the digital
14     platform, do you mean that they did
15     promotional ads?
16  A. Right, correct.
17  Q. For the upcoming event?
18  A. Correct.
19  Q. And that was the only event that they provided
20     that sort of --
21  A. Yeah.
22  Q. -- financial support for?
23  A. Yes.
24  Q. And the same for the logistical support,
25     helping find a venue?

17 (Pages 62 to 65)

SHANNON KNAPP - CONFIDENTIAL

66

1  A. They did help me one other time with a venue.
2  Q. Do you remember when that was?
3  A. That would have been, I think, July of 2015.
4  Q. Okay. And where was that event?
5  A. The Cosmopolitan, the Cosmopolitan in
6     Las Vegas.
7  Q. In Las Vegas, okay. And they -- so when you
8     say they helped you with the venue, did they
9     speak to the venue on Invicta's behalf?
10 A. They introduced me, so -- but, you know, that
11    would be helping me, assisting me, so...
12 Q. Sure. But they did not provide financial
13    support?
14 A. No, no. Yeah, I took care of everything.
15 Q. Okay. Does Invicta hold its fights in an
16    octagon?
17 A. No.
18 Q. Can you tell me about the setting that the
19    fights are?
20 A. Hexagon.
21 Q. It's a hexagon?
22 A. Uh-huh.
23 Q. I see, okay. Has Invicta ever held an event
24    in an octagon?
25 A. Yes. I rented their cage once when I did a

67

1     show in Vegas.
2  Q. Do you recall when that show was?
3  A. 2015 or '16. '15. Wait, let me think, okay?
4     I think it was '16. Yeah. Well --
5  Q. That's fine.
6  A. -- it was at the Tropicana. It's easy to find
7     online.
8  Q. It was at the Tropicana?
9  A. Yeah.
10 Q. And was that -- you paid a licensing fee for
11    the octagon? Did you pay a licensing fee for
12    the use of the octagon?
13 A. No. I mean, I am licensed to use an octagon,
14    you know, and I didn't have to pay for that.
15    They authorized. You know, I asked and I just
16    haven't purchased an octagon yet or anything.
17 Q. Okay. But when you say you're licensed, can
18    you tell me what that means? Is it an
19    open-ended agreement that you can use the
20    octagon whenever you want, or tell me --
21 A. I'd have to look at it again, but I believe
22    it's definitely during the duration of my,
23    yeah, business relationship and being on Fight
24    Pass. I'd have to look at the document again
25    to answer that honestly and correctly, so --

68

1     but I do have a fighting license and -- have a
2     license or whatever.
3  Q. But the only time you did a promotion --
4  A. Yeah, to date, yeah.
5  Q. Has Zuffa ever acquired the contracts of any
6     Invicta fighters?
7  A. Acquired? You mean --
8  Q. Purchased.
9  A. Yes.
10 Q. Can you tell me how often that's happened?
11 A. Once.
12 Q. Okay. Can you tell me when that was?
13 A. December of 2013.
14 Q. Why did Invicta -- first of all, can you tell
15    me how many contracts Zuffa purchased at that
16    time?
17 A. Not -- not correctly. I mean, I can't
18    remember exactly. I mean, they purchased a
19    division from me.
20 Q. Okay. What division was that?
21 A. The strawweight, 115 pounds.
22 Q. Has Zuffa ever acquired the contract of any
23    other -- other than that one event you just
24    described, has Zuffa ever acquired the
25    contract of another Invicta fighter?

69

1  A. When you say acquire, what do you mean? Did
2     they purchase?
3  Q. Purchased it from Invicta.
4  A. No.
5  Q. Have you ever offered to provide fighters to
6     Zuffa?
7  A. Yes.
8  Q. Do you recall about how often?
9  A. Well, when I think -- if -- if I offered?
10    What do you mean by offered exactly?
11 Q. Did you communicate to Zuffa that you could or
12    would provide them with a fighter?
13 A. Yeah, if there's a particular athlete that's
14    ready -- wants to move on or something like
15    that, then, yeah, I'll speak to them about it.
16    They never approach my athletes without -- I
17    mean, nine times out of ten, it's my athlete
18    or management approaches them, and then they
19    will call me and let me know that one of my
20    athletes is approaching, but there have been
21    times that I think an athlete -- they're a
22    better home for an athlete, and I have made
23    that call and spoke with a matchmaker.
24 Q. And so when you say you've made that call,
25    you've allowed the athlete to move to the UFC?

18 (Pages 66 to 69)

SHANNON KNAPP - CONFIDENTIAL

126

1  designated -- if it's designated "attorneys'
2  eyes only," then only the attorneys can see
3  it.
4         THE WITNESS:  I mean, that's my issue
5  with discussing my business stuff is because
6  some of the plaintiffs Tweet stuff, say stuff.
7  I see it.  And I don't want my business, my
8  company business, because this has nothing to
9  do with me, so I don't want my company
10 business out there.  That's the only reason.
11        MR. WIDNELL:  Just for the record,
12 neither Mr. Rayhill nor I can offer you legal
13 advice about how this process works, so you
14 should really talk to your own attorney about
15 how this could be used.  There are some
16 wrinkles in terms of how it could be used in
17 terms of what's ultimately treated as
18 confidential.
19        THE WITNESS:  Okay, thank you.
20        MR. RAYHILL:  Agree.  Thank you,
21 Nick.
22        THE WITNESS:  Thank you.
23        MR. DURBIN:  But we certainly have
24 the 21-day right to review it and mark
25 anything that we think should be designated

127

1  either confidential or attorneys' eyes only.
2         MR. RAYHILL:  You do have that.
3         THE WITNESS:  And you're very aware
4  of what my concerns are?
5         MR. DURBIN:  Right, and if we
6  exercise that right, it will restrict access
7  accordingly.
8         THE WITNESS:  Perfect, thank you.
9  Q. (By Mr. Rayhill) Page 7982, Paragraph (b), it
10    says "recoupment revenue share," just looking
11    down to about the sixth line there, maybe
12    start with the fifth line -- well, all right,
13    let's start with the fourth line.  It says,
14    "Zuffa shall first and on ongoing basis recoup
15    any license fees paid to Invicta."  So based
16    on your experience, you know, having been
17    operating under this license agreement for
18    two-plus years now, does that mean when Zuffa
19    starts getting income from the use of this
20    content, they get the first -- recoup the
21    license fee they paid to you?
22 A. Yes.
23 Q. Is that your understanding?  After -- and then
24    it goes on, "After which distribution revenue
25    shall be split 65 percent to Zuffa and

128

1  35 percent to Invicta."  And I guess I was
2  just hoping, do you know when they refer to
3  distribution revenue, do you -- are you aware
4  the sources of that revenue?
5  A. What do you mean exactly?
6  Q. Well, let's go through a couple possibilities.
7  A. Okay.
8  Q. Are these -- is Invicta's content ever shown
9     on a Pay-Per-View basis?
10 A. Not Pay-Per-View, on other broadcast
11    platforms.
12 Q. Okay.  So your live events are never broadcast
13    on a Pay-Per-View basis?
14 A. Not that I'm aware of.
15 Q. Okay.  And they are broadcast on Fight Pass?
16 A. You know what, maybe I take that back, because
17    it has been aired on Sony, like the Play
18    Station thing, so I don't know if you have
19    to -- I'd have to -- yeah.
20 Q. Vague understanding.
21 A. I don't know what that deal is, but I received
22    compensation from them directly, from Sony,
23    and the UFC did not take anything out of that.
24 Q. I see.  And that was for an event that was --
25    occurred while this --

129

1  A. Yes.
2  Q. I see.  Do you remember when that event was?
3  A. The Sony thing?  No, I mean...
4  Q. It's okay.
5  A. 2015, I think it was during that.
6  Q. Okay.  Now I really am done with that.
7  A. Okay.
8         MR. RAYHILL:  How's everybody holding
9  up?  If everybody's doing okay?  I'm fine to
10 continue.
11        MR. DURBIN:  Do you want to take a
12 break?
13        THE WITNESS:  It's up to you guys.
14        MR. DURBIN:  Let's plow ahead for a
15 few more minutes.
16        MR. RAYHILL:  Okay.  Very good.
17 Q. (By Mr. Rayhill) Okay.  So when you put on an
18    Invicta event --
19 A. Uh-huh.
20 Q. -- can you tell me what the main expenses you
21    face in putting on an event are?
22 A. The main or the biggest?
23 Q. Yeah.
24 A. Fight cards, production, those are always the
25    biggest.  Well, travel, hotels.  I mean, it's

33 (Pages 126 to 129)

SHANNON KNAPP - CONFIDENTIAL

130

1  very expensive. Even at my level it's
2  incredibly expensive. I think people don't
3  realize how expensive that -- if you're not
4  really involved in it. It takes a lot of
5  money to do the events.
6  Q. Okay. And then when you put on a live event,
7     what are your main sources of revenue?
8  A. Would be my licensing fee, would be the main
9     source of revenue, ticket sales, some
10    sponsorship. That's pretty much it.
11 Q. Okay. But the licensing fee is the largest of
12    those three?
13 A. Yes. I mean, it's very important.
14 Q. Okay.
15 A. You know.
16       (Deposition Exhibit 7 was marked for
17    identification.)
18 Q. (By Mr. Rayhill) All set?
19 A. Yeah, good enough, yeah.
20 Q. Okay. So you've been handed what's been
21    marked as Exhibit 7?
22 A. Uh-huh.
23 Q. It has the Bates number ZFL- 0951222. Do you
24    recognize this document?
25 A. Uh-huh.

131

1  Q. Can you tell me what it is?
2  A. Like we spoke earlier, this is for that show I
3     did in February at the Shrine Auditorium, and
4     this is discussing where they helped me get
5     the venue.
6  Q. Okay. Is this an e-mail that you sent and
7     received in the ordinary course of business?
8  A. Yes.
9  Q. That's a question I have to ask for --
10 A. No, it's okay.
11 Q. All right. So looking at the first e-mail in
12    the chain, at the bottom of the page, it's an
13    e-mail from Marshall Zelaznik to you with a cc
14    to Peter Dropick. Do you see that?
15 A. Uh-huh.
16 Q. And Mr. Zelaznik writes, "Shannon, as
17    mentioned in text yesterday, we want to try to
18    get the next Invicta event in L.A. on Friday,
19    February 27th. As mentioned, Pete, copied
20    here, is working on locating a venue that
21    would meet your needs." So did you understand
22    Pete to be a reference to Pete Dropick?
23 A. Yes, I did.
24 Q. Do you know what Mr. Dropick's role was at
25    Zuffa?

132

1  A. I think he handled the venues, and I think
2     that was part of operations, however they
3     classify it there. I'm not sure.
4  Q. Did Mr. Dropick help you locate a venue?
5  A. Yes, he did. Yes, he did.
6  Q. Was it common for Zuffa to have someone help
7     you locate a venue for an Invicta event?
8  A. No, but I never need help. I mean -- I mean,
9     I'm going to just say that Zuffa's always been
10    good to me in the business, you know, that if
11    I need help, I will ask for it, and they would
12    help me if I asked. But I usually don't need
13    help. This is because we're going into L.A.,
14    and, you know, it's not someplace I'd done a
15    show before, so...
16 Q. Okay. And then the last sentence in that
17    e-mail, it says, "If we come up with a good
18    option, please let Pete work the deal to get
19    the best rates, but, of course, you will have
20    the final approval." Did Mr. Dropick
21    negotiate the venue agreement?
22 A. Yes. You know, the deal just came to me. You
23    know, I had made the decision. I always make
24    my own decisions. They don't do a lot of
25    hand-holding with me.

133

1  Q. Okay. Do you know why Zuffa wanted to do this
2     event -- this event in Los Angeles?
3  A. Yeah, I mean, I can only assume, you know, was
4     that they were doing an event on Saturday.
5     Fans love it when Invicta goes before them.
6     They love when you go into town, and you can
7     get Invicta and you can get the UFC. I mean,
8     it's a big deal to them because they got a
9     whole weekend of fights. And Cris Cyborg will
10    be on that card, which, you know, is a great
11    deal for them as well.
12 Q. And why is it a great deal to have Cris Cyborg
13    on the card?
14 A. At that time I believe she was a UFC athlete.
15 Q. Okay. Finished with that document. Thank
16    you.
17 A. Uh-huh.
18       (Deposition Exhibit 8 was marked for
19    identification.)
20 Q. (By Mr. Rayhill) Let me know when you're
21    ready.
22 A. I'm ready.
23 Q. Okay. You've been handed what's been marked
24    as Exhibit 8. It has the Bates number
25    ZFL1119496. Do you recognize this document?

34 (Pages 130 to 133)

SHANNON KNAPP - CONFIDENTIAL

### Page 134

1  A. Yes.
2  Q. Can you tell me what it is?
3  A. It's an e-mail between me and Marshall
4     regarding, once again, the February event I
5     had at the Shrine Auditorium in L.A.
6  Q. Is this an e-mail that you would have sent and
7     received in the ordinary course of business?
8  A. Yes.
9  Q. Thank you. Okay. So at the bottom of the
10    page, Mr. Zelaznik writes to you, this is on
11    January 19th, 2015, and he says, "When do you
12    think we can announce this event? Any chance
13    before this weekend so we can get into our on
14    air on Fox?" And you respond later the same
15    day, this is in the middle of the page now,
16    and you say, "They still haven't finalized
17    Cyborg's contract yet." Then you say, "I have
18    some big concerns about the costs associated
19    with this event." Can you tell me what you
20    meant by that statement?
21 A. Exactly what it says. I had some big concerns
22    about the cost of the event. You know, when
23    you go -- you pick an event up and you move it
24    to an area like Los Angeles, you know, when
25    you take the cost of the venue, your

### Page 135

1     advertising, your hotel, I mean, everything
2     increases, so that's what I'm conveying to him
3     is that, you know -- and the timeline. We
4     were getting really short on the timeline. If
5     you take a look, we're at -- the event was
6     supposed to be, I think, February -- I can't
7     remember. I just read it somewhere.
8     February 12.
9  Q. I believe it was February 27th.
10 A. Or something like that.
11 Q. The proposed date.
12 A. And this is dated on 1-20 or 1-19. I mean,
13    that window of -- you know, you're narrowing
14    down on your timeline, so that was a big
15    concern for me.
16 Q. But -- yeah, so the concern you expressed was
17    about the cost; is that correct?
18 A. Oh, yeah, absolutely.
19 Q. So Mr. Zelaznik responds, and he says, "Get me
20    the cost overages, and I will do my best to
21    take the pain away, and I will get you the
22    yearly calendar to see if it -- if meets your
23    needs." I assume that's a typo. Okay. Can
24    you tell me what you understood Mr. Zelaznik
25    to mean when he said, "I will do my best to

### Page 136

1     take the pain away"?
2  A. I think I had to call him and ask him what he
3     meant, to be honest with you. I was like --
4     you know, that they would in some way try to
5     help me cut those costs or, you know, do
6     something to help me with those costs.
7  Q. Okay. And just so I know, the next part of
8     that sentence says, I will get you the yearly
9     calendar to see if, presumably, it meets your
10    needs. Do you know what he meant by that?
11 A. No.
12 Q. That's fine. All done with that document.
13 A. Probably to pick my dates for the year, you
14    know, what dates are available, and that would
15    be my guess.
16 Q. Okay.
17        (Deposition Exhibit 9 was marked for
18    identification.)
19 A. I'm good.
20 Q. (By Mr. Rayhill) You've been handed what's
21    been marked as Exhibit 9. It has the Bates
22    number ZFL-0914088. That's actually three
23    documents. It's an e-mail with two
24    attachments. First attachment begins at 0 --
25    has the Bates number 091, and the second

### Page 137

1     attachment has the Bates number -- I've got
2     them in reverse on my -- in any event, the
3     attachments end in 090 and 091.
4         Okay, all right. Do you recognize
5     this document?
6  A. Yeah.
7  Q. Can you tell me what it is?
8  A. We're back to -- it's the same thing, dealing
9     with a February event at the Shrine
10    Auditorium. It's just us going back and forth
11    about what some of the costs are going to be
12    and things like that.
13 Q. Okay. And is this an e-mail that you sent and
14    received in the ordinary course of business?
15 A. Yes.
16 Q. Thank you. Okay. So the first e-mail in the
17    chain, bottom of the page, it says, "Hey,
18    Marshall, I apologize for the delay in getting
19    this over to you. This was hard to put
20    together with no information on actual hard
21    costs and not being able to reach all the
22    vendors." And the only reason I wanted to
23    bring that up is because there's two
24    attachments to the document, but I wanted to
25    establish that the two attachments are

214

1  relationship with Cyborg, the UFC benefited by
2  making sure that she had fights and even
3  though they couldn't provide --
4  A. Oh, yeah, for sure.
5      MR. RAYHILL: Objection, calls for
6  speculation. Sorry.
7  A. For sure, yeah, for sure.
8  Q. (By Mr. Widnell) We talked a little bit about
9  the sale of the 115-pound division, and I
10 think Mr. Rayhill asked you whether or not you
11 have a 115-pound division now.
12 A. Yes, I do.
13 Q. It sounds like when you sold the contracts,
14 you sold the contracts for a significant
15 portion of the 115-pound division to UFC. How
16 quickly were you able to bring in equivalent
17 fighters?
18 A. Like probably the next week. I think within
19 ten days I refilled the division.
20 Q. So would you say that there's no shortage of
21 fighters right now that you could -- at that
22 time that you could have gotten?
23 A. Yeah, I mean, yeah.
24 Q. When you're looking for fighters, what
25 criteria do you use to pick out fighters to

215

1  contract with?
2  A. Sign? First and foremost talent. You know,
3  that's always the biggest deals. I'm looking
4  for the most talented. You know, then you
5  apply everything else, you know, goes into it,
6  but talent is the major thing you're looking
7  for.
8  Q. I think Mr. Rayhill asked about rankings. Do
9  you consider a fighter's rankings as part of
10 your criteria for making a decision on whether
11 or not to sign a fighter?
12 A. Sometimes. It depends. You know, it's going
13 to depend, definitely depend. There are a lot
14 of athletes that are not ranked yet, but only
15 because they're young athletes, so I'm still
16 going to sign them based on the talent factor.
17 Q. So with a young athlete that you're going --
18 like that that you just described, could that
19 be an athlete that hasn't had a lot of fights
20 yet?
21 A. Absolutely, yeah.
22 Q. So do you feel you have the ability to pick
23 out fighters who are promising fighters even
24 if they haven't had a, you know, significant
25 number of fights in MMA -- professional MMA

216

1  fights?
2  A. Absolutely. That's what, you know, I'm good
3  at, is picking young talent, and because
4  Invicta is all female, you know, and
5  we're not -- you know, there's not a lot of
6  men on the card, it's all women, I can build
7  stars very quickly, so...
8  Q. So I think you just described a difference
9  between women's MMA fighting and men's MMA
10 fighting. Is that accurate? Would you say
11 that it's harder to build an MMA male fighter
12 as quickly as an MMA female fighter?
13     MR. RAYHILL: Objection, calls for
14 speculation.
15 A. In this day and age, it's -- you know, it's --
16 you know, it's easy to build men as well. You
17 know, I think they're about the same. The
18 difference is trying to build a female athlete
19 in an organization that has men and only a
20 couple divisions for women, you know, you're
21 going to have a ton of male fights on that
22 card and only a couple female fights, where
23 Invicta we're all women, so the women are
24 going to circle through more frequently and
25 get more exposure, therefore, making it easier

217

1  to build them faster.
2  Q. Are there differences between women's MMA
3  promotions and men's MMA promotions?
4      MR. RAYHILL: Objection. Calls --
5  A. Are there differences? Not to -- a little. I
6  mean, I provide a hair braider. I don't know
7  that they do that for the men, you know, so
8  there are certain differences and things like
9  that, but...
10 Q. (By Mr. Widnell) Would you say that MMA
11 promotions for men are -- are widely known and
12 are very successful?
13     MR. RAYHILL: Objection, calls for
14 speculation.
15 A. Yeah, I mean...
16 Q. (By Mr. Widnell) Would you say MMA promotions
17 for women are widely known and as successful
18 as men's divisions right now?
19 A. Well, I think they're getting there. I think
20 that they're not that many. There's me, you
21 know, that are all women.
22 Q. How long have there been women MMA promotions?
23 A. Oh, well, there haven't been where they're all
24 female. Women have competed on the cards, you
25 know, for ten, however many years, but when it

SHANNON KNAPP - CONFIDENTIAL

218

1  comes to all female, you know, I think there
2  was a promotion years -- you know, maybe five,
3  six years ago that threw a few fights here and
4  there, but nothing that's been steady, like
5  what we do at Invicta.
6  Q. And how long have men's MMA promotions been in
7     existence?
8  A. Oh, a long time, long time. I mean, early
9     '90s, maybe sooner. I wasn't involved back
10    then, so...
11 Q. Would you say that women's MMA promoters or
12    the business of promoting MMA fights for women
13    is more of a nascent industry right now?
14 A. Possibly, yeah.
15 Q. At one point I think you were talking about
16    the success of a recent Invicta event, and I
17    think you talked about how it had gone up
18    against March Madness.
19 A. Yeah, pretty cool.
20 Q. When you're competing for eyeballs for an
21    audience, do you compete with Sports Center
22    too?
23 A. I think you're competing with everybody when
24    you're trying to get the eyeballs, you know, I
25    mean, everything, even reality series. You

219

1  know, you're trying to get -- but to me,
2  you're kind of competing with everybody that's
3  got something going on that night.
4  Q. Is there a specific demographic that you're
5     targeting?
6  A. Not really. I mean, you've got your typical
7     18 to 35, but you kind of target everybody.
8     We're all over the board.
9  Q. When you were working at Strikeforce, was
10    there a demographic that you were targeting?
11 A. 18-to-35-year-old male.
12 Q. Would that be a difference between your
13    promotion and other promotions that tended to
14    have a focus on men's --
15 A. Yeah.
16 Q. -- men's MMA promotions?
17 A. Yeah.
18       MR. RAYHILL: Objection, calls for
19    speculation.
20 A. You know, I think that it's pretty standard
21    across the board on the male side of the
22    sport. I think for us, at Invicta, you know,
23    I can look at our audience, and I can see
24    that, you know, 18 to 35, the young kids, the
25    mature -- what I consider mature audience with

220

1  male and female, you know, my mother's --
2  women love it that are my mom's age, so, yeah,
3  I think it's all over the board.
4  Q. When you're competing for fighters to bring in
5     fighters, which promoters do you compete with
6     to -- when you're trying to sign a fighter?
7  A. Everybody a little bit to a degree, you know.
8     Some are more aggressive. You know, I have
9     more competition with certain ones. You know,
10    can maneuver and do things that are not so
11    nice, but, yeah, you compete a little bit
12    about everybody. Even a little bit with the
13    UFC, even though we're on Fight Pass, there's
14    still going to be an athlete that they see, I
15    see, and we're both going to try to sign the
16    athlete.
17 Q. So if you know that UFC is trying to sign an
18    athlete, that doesn't stop you from trying to
19    sign the athlete?
20 A. Heck, no. I don't put UFC out in my
21    contracts. I'm not a feeder. I -- you know,
22    I really want to make this clear. I run my
23    promotion differently than all the other
24    promotions out there. You know, I can't ask
25    my athletes to fight hard for me if I'm not

221

1  willing to fight hard for them and give them
2  the opportunities they're looking for. And I
3  assure you, every one of them wants to be in
4  the UFC. You know, it's not like anybody's
5  poaching or anybody's trying to take. This is
6  the dream, you know.
7  Q. When you say that everybody wants to be in the
8     UFC, is that because UFC has restricted the
9     ability of other promoters to compete, or is
10    it because of something unique to the UFC?
11 A. I think it's the Broadway, it's the Q-Tip,
12    it's the Kleenex, it's the big stage that we
13    all look at, you know. This day and age, I
14    mean, there's a lot of options out there these
15    days, a lot of options, a lot more than there
16    were years and years ago, but there are
17    definitely options, and, you know, I don't
18    know why each one wants to, but it's something
19    that's important to them, you know.
20 Q. So my question was is in any way UFC's ability
21    to be attractive to professional MMA fighters
22    a function of UFC doing things to hurt
23    other --
24 A. No.
25 Q. -- fighters?

56 (Pages 218 to 221)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

SHANNON KNAPP - CONFIDENTIAL

```
                                                      222
 1        MR. RAYHILL: Objection, calls for
 2     speculation.
 3  A. I mean, no, I don't see that. I mean, I don't
 4     see that.
 5  Q. (By Mr. Widnell) Has UFC ever done anything to
 6     harm Invicta's ability to compete?
 7  A. No. Actually, they've been really good, you
 8     know, in the business relationship, been
 9     really good. Never stopped me, you know --
10     yeah, I have nothing to complain. If I did, I
11     would tell you.
12  Q. Did UFC ever do anything to harm Strikeforce
13     while you were working at Strikeforce to your
14     knowledge?
15  A. Not that I saw. I mean, you always get that
16     rumor stuff, but never anything that, you
17     know, like a direct shot.
18  Q. Okay. Did UFC ever do anything to your
19     knowledge to harm Affliction while you were
20     working at Affliction?
21  A. Not that, you know, not that I'm -- both
22     companies bickered, but, like I told you
23     before, Todd would get drunk and do things.
24     It wasn't like, you know, I mean...
25  Q. And did UFC to your knowledge do anything to
```

```
                                                      223
 1     harm IFC while you worked at IFC?
 2  A. No, not that --
 3        MR. RAYHILL: Objection, IFL.
 4        THE WITNESS: It's IFL.
 5        MR. WIDNELL: I'm sorry, IFL.
 6        THE WITNESS: That's okay.
 7  Q. (By Mr. Widnell) I think you also -- you spoke
 8     about using Jewel fighters. When you have a
 9     fighter from Jewel that you use in an event,
10     does that fighter, then, typically go back to
11     fight for Jewel, or do you try to hire that
12     fighter?
13  A. No, I have a contract with them as well, but I
14     also -- they fight, you know, if the
15     opportunity comes there.
16  Q. When a fighter for Jewel fights for you at an
17     event, do you regard that as co-promoting?
18  A. Actually, no. I mean, once again, my
19     definition of co-promoting is more of the
20     billing. You know, that's what I think of is
21     you co-promote it like that, and I don't give
22     any kind of billing. Technically we are. You
23     know, if they have a contract there too, we're
24     co-promoting, but not...
25  Q. And you also spoke about your fighters would
```

```
                                                      224
 1     go to Bellator on occasion. Would that be --
 2     would they go and fight for Bellator while
 3     they were still under a contract with you?
 4  A. Uh-huh, I have a couple that are going to
 5     fight over there every once in a while.
 6  Q. So are those -- are those fighters who are
 7     fighting for Bellator currently under contract
 8     with you?
 9  A. Yeah, and what they are is, once again, it's
10     that regional thing where Bellator will go
11     into market, maybe one of my athletes are
12     there, so they'll compete on the card and sell
13     tickets or something.
14  Q. Do you regard that as co-promotion?
15  A. No, no.
16  Q. Would you describe yourself as someone who's
17     knowledgeable of the MMA industry?
18  A. Yeah.
19  Q. Is the term "elite professional MMA fighter"
20     widely understood within the MMA industry?
21        MR. RAYHILL: Objection. Calls for
22     speculation.
23  A. Repeat that just so I make sure I have a real
24     grasp of what you're saying.
25  Q. (By Mr. Widnell) Sure. Is the term "elite
```

```
                                                      225
 1     professional MMA fighter" widely understood
 2     within the MMA industry?
 3  A. I would think so.
 4  Q. Do you know what that term means?
 5  A. I know what I perceive it to mean. I mean, to
 6     me an elite professional is one of our
 7     top-tier MMA athletes.
 8  Q. Do you think that other people would share
 9     your perspective of what that term means?
10        MR. RAYHILL: Speculation, objection.
11  A. I mean, the educated, you know, part of the
12     sport, you know, would definitely say that. I
13     mean, a typical fan, I don't know if they'd
14     know the difference if you're an MMA fighter
15     or if you're an elite.
16  Q. (By Mr. Widnell) So using that term, would you
17     say that all UFC fighters are elite
18     professional MMA fighters?
19        MR. RAYHILL: Objection, calls for
20     speculation.
21  A. I would think that most people that compete
22     there, you know, are at a higher level. But
23     in my opinion, you know, it's going to be the
24     A level that I consider to be the elite MMA.
25  Q. (By Mr. Widnell) So if I heard you correctly,
```

57 (Pages 222 to 225)