# Exhibit 25

Deposition of John Mulkey
(April 19, 2017) (excerpted)

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
                              )
            Plaintiffs, )
                              )
      vs.                     ) Case No.
                              ) 2:15-cv-01045-RFB-(PAL)
                              )
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
                              )
            Defendant. )
_____)

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

JOHN MULKEY

Las Vegas, Nevada

April 19, 2017

9:07 a.m.

REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
Job No. 50021

86

1       We had growth desires in Asia, and their
2  brand would have been a great brand to lead that
3  growth objective in Asia.
4       Asia can be a difficult place to do
5  business and certainly a difficult place to establish
6  a brand for the first time.
7       Pride had achieved a lot of brand
8  recognition in Asia, and that was -- that was the
9  primary objective of this acquisition.
10  BY MR. WEILER:
11    Q.  So turning to the next page here of this
12  document, I'm reading from the first sentence.  It
13  says:
14       "Among Zuffa's three MMA brands,
15       if UFC holds the dominant market
16       position within the sport."
17       Do you see where it says that?
18    A.  Yes.
19    Q.  Was that an accurate statement as of the
20  time that it was drafted here in 2007?
21    A.  I believe so, yes.
22    Q.  And you see reference to "the sport" here.
23  Is that sport MMA?
24    A.  Most likely, yes.
25       MR. WEILER:  I'd like to mark as an

87

1  exhibit, Exhibit 16, a document bearing the Bates
2  label DB-ZUFFA-00020302, which is an email attaching
3  an attachment that runs consecutively starting at
4  DB-ZUFFA-00020303 and runs through 306.
5       (Exhibit 16 was marked for
6        identification by the reporter.)
7  BY MR. WEILER:
8    Q.  Do you recognize this document, Mr. Mulkey?
9    A.  It appears to be an FAQ sheet, possibly
10  sent to Amish in May of '07.
11    Q.  And this first page of the document here,
12  this email chain, is this an email chain that you
13  sent and received in your capacity as CFO of Zuffa?
14    A.  I'm sorry.  Can you repeat that.  Can I
15  what?
16    Q.  Yeah.  So on the first page of this
17  exhibit, there's an employee chain between, I think,
18  you and Amish Barot at Deutsche Bank.
19       Is this email chain something that you sent
20  and received as part of your duties as Zuffa's CFO?
21    A.  If I was interacting with Amish, yeah.  He
22  was the banker at Deutsche Bank.
23    Q.  And does this FAQ that's the back part of
24  the exhibit here, is this FAQ something that was
25  presented as part of the credit facility that

88

1  Zuffa -- that Zuffa took out in 2007?
2    A.  I don't know.
3    Q.  As you sit here today, do you know what
4  this FAQ was used for?
5    A.  I could speculate that it was a tool for --
6  based upon the date by which I sent it, in or around
7  our fund-raising, that it might have been a tool for
8  Amish to disseminate to his sales force, who
9  obviously like to know as much about a company as
10  possible before they interact with their buy-side
11  clients, who would may buy the loan.
12    Q.  Did you draft this FAQ here?
13    A.  Highly unlikely because I don't usually do
14  FAQs.
15    Q.  Did you revise or edit this FAQ?
16    A.  No recollection of such.
17       These typically are generated in a PR
18  context within our company.
19    Q.  And so, who within the PR context may have
20  drafted this FAQ, if you know?
21    A.  I do not know.
22    Q.  But as you sit here today, do you know one
23  way or the other whether this was something Zuffa
24  drafted or something Deutsche Bank drafted?
25    A.  Odds are UFC drafted this, and we were

89

1  providing it to the bank, like I mentioned before,
2  possibly for a sales force tool.
3    Q.  Turning to the document Bates labeled
4  20304, it's the second page of the FAQ.  Do you see
5  where it says, the very first line of the first
6  answer:
7       "Based on all comparable metrics,
8       UFC is clearly the 800-pound gorilla
9       in the MMA industry."
10       Do you see where it says that?
11    A.  Yes.
12    Q.  Was that an accurate statement as of May of
13  2007?
14    A.  That we were 800-pound gorillas?  Is that
15  your question?
16    Q.  Is the statement that is made there
17  accurate?
18    A.  It wouldn't have been a phrase that I would
19  have used, but the 800-pound gorilla slang, I
20  suppose, could have applied to UFC in a promotional
21  context.
22       So we are talking about our company to a
23  specific set of institutional investors who like
24  information dumbed down to them, in this case a sales
25  agent on the desk.  Possibly that was the basis for

23 (Pages 86 to 89)

90

1  such vernacular, but I would not have used such
2  words, no.
3     Q.  In your mind, is saying that the UFC is an
4  800-pound gorilla in the MMA industry another way of
5  saying that it's dominant?
6     A.  Well, again, "dominant" isn't a word I
7  would have used either.
8        I would have -- I would taken more of a
9  metric approach, like, you know, I think we --
10 there's probably information that we could derive on
11 this fragmented group, such as number of events and
12 output, thing like that, that's easily verifiable.
13       But I'm a finance guy, so I tend to want
14 things to not be slang; I want them to be accurate.
15       And I recall at this time that we were
16 hosting more events than any of our competitors at
17 that time.
18       Possible exception of IFL because I think
19 they had weekly stuff.  This is a rough comment, but
20 on an output metric, we were doing more events than
21 anybody else.
22    Q.  When you say "output metric," are you
23 referring to --
24    A.  Number of events.
25    Q.  -- number of events?

91

1     A.  Yes.
2     Q.  Would the same statement be true with
3  respect to the UFC's revenues vis-a-vis any of its
4  competitors?
5     A.  Well, again, while I know our revenues,
6  outside of the IFL, which was a public company and
7  probably had to produce public documents at some
8  point in their evolution, and outside of certain
9  states that publicly disclose ticket revenues,
10 there's no way for us to precisely know what any of
11 those companies' revenues were.
12    Q.  Fair enough.
13       Do you see where it says here, the last
14 sentence of this same paragraph:
15          "The UFC and top MMA athletes
16       generally view non-UFC associations
17       as the minor leagues for training
18       grounds for future UFC fighters."
19       Do you see where it says that?
20    A.  Yes.
21    Q.  Was that an accurate statement as of May
22 2007?
23    A.  Well, again, I would have maybe referred to
24 certain non-UFC, you know, associations as more
25 regionally focused than the verbiage that's used

92

1  here.
2        But perhaps they were trying to compare our
3  sport to more major league sports that have such
4  leagues as that.  So I don't know.  But that wouldn't
5  have been my phraseology that I would have used.
6     Q.  But do you think that phraseology is then
7  inaccurate?
8     A.  I don't think it's inaccurate; I just think
9  it's not precise as it could be.
10    Q.  Do you see where it says here on the third
11 question, the answer in the middle of the paragraph:
12          "Fighters that sign a contract
13       with the UFC are unable to fight in
14       any other MMA organization.
15       Notably, the UFC actively structures
16       contracts to limit fixed costs.
17       Generally, the UFC signs fighters to
18       one- to three-year contracts and
19       pays them an agreed upon amount each
20       time they fight."
21       Do you see where it says that?
22    A.  Yes.
23    Q.  Is any part of that statement inaccurate as
24 of the time it was written in May of 2007?
25    A.  I think it's accurate but lacking

93

1  precision, from a finance perspective.
2     Q.  And how from a finance perspective would
3  you improve upon the accuracy, if in fact you could?
4     A.  Well, you refer to the first sentence where
5  it says -- and I'll give you an example.  This is
6  what it says:
7           "Fighters that sign a contract
8        with UFC are unable to fight in any
9        other MMA organization."
10       So fighters that sign -- so reality is, to
11 be more precise, what I would have said as a finance
12 person speaking to other finance people is:
13          "While fighters are under
14       contract, they typically are
15       exclusive contracts, and while the
16       contract is in place, they cannot
17       fight in other MMA organizations
18       without our permission."
19       If you read that sentence in a vacuum, you
20 might interpret it to say that you are done fighting
21 if you're not fighting UFC, right?  That would be an
22 example of how I could make, again, finance talking
23 to finance, a more precise comment.
24    Q.  As of May 2007, did UFC have its fighters
25 under exclusive long-term contracts?

24 (Pages 90 to 93)

JOHN MULKEY - CONFIDENTIAL

94

1  A.  I know we had fighter contracts that had
2  duration in time and duration in number of bouts.
3      My recollection is that they were all
4  generally exclusive to us within that window of time.
5      Q.  Did you consider material for purposes of
6  UFC's disclosures to its lenders, such as this, that
7  the UFC had its fighters under the exclusive
8  contracts that you just described?
9      A.  I think that the audience that we were
10 speaking to when we prepared documents such as the
11 confidential information memorandum were catered to
12 the institute -- you know, the qualified
13 institutional buyers, savvy institutional investors,
14 but they're also credit investors.  So credit
15 investors want to know what their assets are, and
16 they like certain types of assets, and they dislike
17 other types of assets.
18     One of the things that we thought was
19 positive for our company and our creditworthiness was
20 the fact that our many fighters had -- they were
21 exclusive to us, so they couldn't just after this
22 borrowing is funded go fight for the WWE or boxing or
23 whatever competitor was out there.
24     So that would be one reason why we would
25 highlight the terms in those contracts because we

95

1  would get those questions a lot.  And the goal of
2  this memorandum is usually to explain to them how
3  your company operates, what business is it in, and
4  what are some of the assets.
5      Q.  Directing your attention here to the last
6  page, the question at the top:
7          "How does UFC balance the
8           retention of best MMA fighters
9           without overpaying?"
10         Do you see where it says that?
11     A.  Yes.
12     Q.  Was it your understanding that Zuffa's
13 lenders were concerned about fighter pay?
14     A.  Let me read this paragraph first and then
15 answer.  Is that okay?
16     Q.  Of course.  Take all the time.
17     A.  Okay, I've read the paragraph.  I'm sorry.
18 What was the question again?
19         MR. WEILER:  Could we please have that
20 question read back.
21         (The record was read by the
22         reporter as follows:
23          "Q.  Was it your understanding
24          that Zuffa's lenders were concerned
25          about fighter pay?")

96

1          THE WITNESS:  I don't recall any specific
2  concerns from lenders about fighter pay, other than
3  fighter pay as a component of all of our expenses and
4  our ability to run a profitable enterprise.
5  BY MR. WEILER:
6      Q.  And what do you recall about those concerns
7  as part of an overall picture of Zuffa's costs?
8      A.  I don't remember anything specific to it
9  either way.  I just know that, like any lender, they
10 would want to evaluate the creditworthiness of the
11 borrower before they would make an investment.  And
12 income is a fairly substantial variable in
13 creditworthiness.
14     Q.  For purposes of Zuffa's creditworthiness,
15 was it important that Zuffa had leverage over its
16 fighters with respect to fighter compensation?
17     A.  I don't think "leverage" is the right word.
18 When thinking about it, generally speaking, I think
19 they probably want to know, do we have control of our
20 expenses in general.  Are there things in the
21 marketplace that are changing.  Is this company's
22 growth prospects that they are showing us defensible.
23 Are rents in arenas going up or down.  Is the cost of
24 electricity at arenas going up or down.
25     I would think in that context would be the

97

1  type of questions that we might get from lenders
2  prior to them investing.
3      Q.  So is it important with respect to Zuffa's
4  creditworthiness that Zuffa had control over fighter
5  compensation?
6      A.  Well, it would certainly be a better
7  scenario than having no control over fighter
8  compensation.
9      Q.  So, yes?
10     A.  So, yes.  In that context.
11     Q.  Directing your attention to the text here
12 that's, I think, the third sentence, it starts:
13         "When no individual fighter can
14          dramatically affect the economics of
15          an event, the UFC believes that it
16          retains the leverage to contain
17          costs when needed."
18         Do you see where it says that?
19     A.  Yes.
20     Q.  Was that an accurate statement as of May of
21 2007?
22     A.  At the risk of reading that sentence
23 without the context before it, let me introduce the
24 context.
25     So there were -- so our audience for this

25 (Pages 94 to 97)

**214**

1  generically to our P and Ls for events, which is also
2  referred to as -- a pro forma is often referred to as
3  a budget. So he might either have been referring to
4  a specific fight budget or just general fight budget.
5     Q.  Now, what did you mean when you said, "We
6  probably lose money on them either way, UFC or
7  Strikeforce"?
8     A.  I was probably referring to fighters in
9  general on undercards.
10      Often, the undercards, certainly the
11 Strikeforce undercards are not televised and they
12 don't necessarily generate any revenues. So you have
13 obvious expenses because you're paying fighters to
14 fight, but you have no demand for that particular
15 fight from, say, a television standpoint.
16      I'm guessing, but I think that's probably
17 what I was referring to.
18    Q.  And so, the money that you're referring to
19 there would be money that would be generated by other
20 fighters who could attract pay-per-view audiences?
21    MS. GRIGSBY:  Objection, characterization.
22    THE WITNESS:  Yeah, that's not what I said.
23 BY MR. WEILER:
24    Q.  So what money -- what money would UFC lose
25 by paying these fighters who, in your words, aren't

**215**

1  cuttable?
2     A.  Well, I think, by definition, if we're
3  talking about filling out the prelims of a fight,
4  whether Strikeforce or UFC, we generally put less
5  marketable matchups lower on a card than higher on a
6  card. Fox pays us for the top part of the card and
7  doesn't pay us in many cases for the bottom part of
8  the card.
9       I don't recall Strikeforce's deal, but I
10 wouldn't be surprised if the preliminary fights on
11 Strikeforce weren't even televised at that point.
12      So if you take a UFC fighter -- now, I'm
13 generalizing, but if you took a 10 and 10 UFC fighter
14 and put him on a card when the prior owners of
15 Strikeforce were putting on a guy who made 500 bucks,
16 there's a Delta in that expense. That Delta, you
17 could argue, might be a loss for us because there's
18 no associated revenue increase other than the
19 fighter's parents who might have bought a couple
20 tickets to the fight.
21    MR. WEILER:  I'd like to mark as an exhibit
22 a document that consists of an email bearing the
23 Bates label ZFL1081152 and an attachment to that
24 email that bears the Bates label 1081154 running
25 through 1081158.

**216**

1     (Exhibit 36 was marked for
2     identification by the reporter.)
3  BY MR. WEILER:
4     Q.  Do you recognize this document, Mr. Mulkey?
5     A.  Yes.
6     Q.  And is this an email chain that reflects
7  emails that you sent and received as well as an
8  attachment something that you sent and received in
9  the ordinary course of your duties as Zuffa's CFO?
10    A.  Yes.
11    Q.  And turning to the attachment to this
12 email, what is this document?
13    A.  This document appears to be a draft of a
14 credit opinion that would have been generated by
15 Moody's Investors Service that is either -- oh, it's
16 their annual update of their credit opinion for
17 Zuffa.
18      So they would send these out annually, and
19 additionally, when we would do new credit facilities,
20 they would be -- they would update their reports that
21 were specific to those new facilities.
22    Q.  And are these your handwritten edits to the
23 draft credit report?
24    A.  They appear to be my edits to their draft.
25    Q.  And did you review this draft for accuracy

**217**

1  concerning statements that were made about Zuffa?
2     A.  I would have endeavored to do so. However,
3  they rarely give you a lot of time to review
4  documents, and they also remind you that I'm just
5  supposed to look for -- they just want me to correct
6  factual errors, this is their words, "and/or
7  inadvertent disclosure of confidential information."
8     Q.  So turning to the first page of the
9  attachment running into the second document that
10 says -- I'm sorry -- the last sentence on the page,
11 it starts:
12      "Since UFC's acquisition by Zuffa
13    in 2001, Zuffa has consolidated
14    other weaker performing industry
15    competitors under its umbrella, such
16    as WEC in October of 2006, WFA in
17    December of 2006, Pride in May 2006,
18    and Strikeforce in 2011, which has
19    further strengthened its market
20    position."
21    Do you see where it says that?
22    A.  Yes.
23    Q.  Is that an accurate statement as of
24 January 2014?
25    MS. GRIGSBY:  Objection to form.

JOHN MULKEY - CONFIDENTIAL

218

1  THE WITNESS: I wouldn't say it's
2  inaccurate. I think it's directionally accurate, but
3  it wouldn't have been my choice of words.
4  BY MR. WEILER:
5  Q. Now, what do you mean by "directionally
6  accurate"?
7  A. Meaning I sort of understand what she's
8  saying, that through a purchase of another company
9  that does events, the acquiror would, by definition,
10 do more events and hence be a bigger company.
11     I wouldn't have necessarily used the
12 language that she used, though, about strengthening
13 its market position.
14     I mean, it's not that it's -- it just
15 doesn't -- it just doesn't tell me anything.
16 Q. I'd like to direct your attention to the
17 third paragraph on the second page of the credit
18 report -- of the ratings report, draft ratings
19 report.
20     The very last sentence, it reads in part:
21     "Bellator Fighting Championships a
22     distant competitor of UFC."
23     Do you see that?
24 A. I'm sorry. What page are you on?
25 Q. I'm on the second page of the draft to

219

1  ratings report, ZFL1081155.
2  A. Oh, okay.
3     Okay, I see the paragraph you're referring
4  to.
5  Q. Did you interlineate the word "distant"
6  between the words "of" and "competitor" here on
7  page 2? Is that your handwriting?
8  A. It looks like my handwriting, yes.
9  MR. WEILER: I'd like to mark as an
10 exhibit -- 37, is that right -- Exhibit 37, a
11 document bearing the Bates label ZFL12535916 running
12 through 12535917.
13     (Exhibit 37 was marked for
14     identification by the reporter.)
15 BY MR. WEILER:
16 Q. Do you recognize this document, Mr. Mulkey?
17 A. Yes.
18 Q. And is this document an email chain in
19 which you sent and received email messages as part of
20 your duties as Zuffa's CFO?
21 A. Yes.
22 Q. Have you ever heard of an MMA promotion
23 called Invicta?
24 A. Yes.
25 Q. And what is Invicta?

220

1  A. I don't know what it is today. I recall
2  back when this email was going back and forth that it
3  was a -- an MMA promotion that I think was only women
4  fighters.
5  Q. So around the time of this email in
6  November 2013, did Zuffa have a business relationship
7  with Invicta?
8  A. My recollection from reading this email
9  suggests that we were discussing having a business
10 arrangement with Invicta in some form or fashion.
11 Q. Do you know what the outcome was of the
12 discussion that's reflected here in Exhibit 37?
13 A. Not the specifics, but my general
14 recollection was that we might have been acquiring
15 certain fights, the content of certain fights, and
16 that -- I really don't remember.
17     It would suggest that in this chain that we
18 were going to -- no, sounds like this chain is a
19 bunch of us asking what's going on with Invicta.
20 Q. Did Zuffa pay Invicta money around the time
21 of this email in November '13 to subsidize the costs
22 of MMA events that were promoted by Invicta?
23 A. I recall that arrangement being discussed,
24 but I don't recall the final negotiated settlement or
25 arrangement.

221

1  Q. So directing your attention to what appears
2  to be a message that you wrote dated November 20,
3  2013 that it says:
4     "This feels like a way for her to
5     monetize an asset that will be
6     worthless the moment she shuts her
7     doors which she probably knows is in
8     a few weeks. Do we really need the
9     aggravation in the meantime."
10     Do you see where it says that?
11 A. Yes.
12 Q. Who is the "she" that you're referring to
13 there?
14 A. Most likely, that was either the face of
15 the promotion or possibly the owner, a lady named
16 Shannon.
17 Q. And what were you referring to when you
18 said, "This feels like a way for Shannon to monetize
19 an asset that will be worthless the moment she shuts
20 her doors"?
21 A. I don't know precisely what I was referring
22 to, but I could have been referring to, she was
23 clearly struggling to make ends meet is my
24 recollection, and she might have had obligations
25 through fighter contracts that we could help her

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

JOHN MULKEY - CONFIDENTIAL

222

1  with, which, you know, has happened before, not with
2  her but other leads.
3      So I'm speculating, but that might be where
4  I was coming from on this.
5      Q.  And so, Kirk Hendrick responds to you, it
6  looks like the next day, on November 21, and he says:
7         "I think Lorenzo and Dana are
8         trying to help her out and trying to
9         keep the women's minor league
10        intact."
11     Do you see where it says that?
12     A.  Yes.
13     Q.  Is that an accurate statement?
14     MS. GRIGSBY:  Objection, foundation, calls
15  for speculation.
16     THE WITNESS:  Yeah, I see where he said
17  that, but I don't have specific knowledge of the
18  veracity of that comment.  No reason to believe it
19  wasn't true, but that sounds like he might have had a
20  conversation that I didn't have.
21  BY MR. WEILER:
22     Q.  Is Mr. Hendrick's characterization of
23  Invicta as the women's minor league accurate?
24     A.  I wouldn't be able to assess Kirk's
25  perspective on this accurately.

223

1      Q.  Do you have a view on the accuracy of that
2  statement of your own?
3      A.  I don't.
4      Q.  So I believe earlier today, you testified
5  that you resigned from Zuffa in 2016; is that
6  correct?
7      MS. GRIGSBY:  Objection, mischaracterizes
8  testimony.
9      THE WITNESS:  My last day at Zuffa was
10  December 31st of 2015.
11  BY MR. WEILER:
12     Q.  And why did you leave Zuffa in 2015?
13     A.  No specific reason other than my
14  resignation.
15     Q.  Did you meet with any current or former
16  Zuffa employees in connection with the testimony that
17  you're giving here today?
18     A.  No.
19     Q.  Now, other than materials that were
20  provided to you by your counsel at Boies Schiller or
21  other counsel that you may have, did you review any
22  materials in order to prepare for the testimony that
23  you've been giving here today?
24     A.  I don't recall so, no.
25     Q.  And I just want to know "Yes" or "No," I

224

1  don't want to know the substance of any
2  communications you may have had with attorneys from
3  Boies Schiller prior to today, but I just want to
4  know, "Yes" or "No," did you meet with attorneys from
5  Boies Schiller in order to prepare for the testimony
6  that you were giving here today?
7      A.  Yes.
8      Q.  And how many times did you meet with
9  attorneys from Boies Schiller?
10     A.  Once.
11     Q.  And how long did you meet with them?
12     A.  It was yesterday, so full, full day,
13  notwithstanding a delightful lunch.
14     Q.  They do have nice lunches here at
15  Boies Schiller.
16     MR. WEILER:  We're going to go off the
17  record briefly and confer with my colleague.
18     THE VIDEOGRAPHER:  We are now going off the
19  record.  The time is approximately 5:34 p.m.
20     (A recess was taken.)
21     THE VIDEOGRAPHER:  We are now back on the
22  record.  The time is approximately 5:42 p.m.
23     MR. WEILER:  I'd like mark as an exhibit,
24  Exhibit 38, a document bearing the Bates label, email
25  starting at DB-ZUFFA-00043106 and an attachment that

225

1  starts at DB-ZUFFA-00043107 and runs through 43125.
2      (Exhibit 38 was marked for
3       identification by the reporter.)
4  BY MR. WEILER:
5      Q.  Do you recognize this document, Mr. Mulkey?
6      A.  Yes.  This appears to be a draft
7  confidential information memorandum for a late 2009
8  financing with edits.
9      Q.  And so, is this email that appears at the
10  first page of the Exhibit 38 and the attachment, are
11  they documents that you sent in your capacity as
12  Zuffa's CFO?
13     A.  Yes.
14     Q.  And directing your attention to page of
15  the -- of the draft CIM, it bears the Bates label
16  DB-ZUFFA-00043116, there's a number of edits that
17  appear here.
18     My question to you, Mr. Mulkey, is whether
19  these are your edits?
20     A.  This appears to be my handwriting, so these
21  would be my edits.
22     Q.  And directing your attention back to page
23  of the CIM bearing the Bates label DB-ZUFFA-00043114,
24  the same question, Mr. Mulkey:  Are these your
25  handwritten edits?