# Exhibit 28

Deposition of Ike Lawrence Epstein (May 26, 2017) (excerpted)

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
)
       Plaintiffs, )
)
       vs. ) Case No.
) 2:15-cv-01045-RFB-(PAL)
)
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
)
       Defendant. )
_____)

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF

IKE LAWRENCE EPSTEIN

LAS VEGAS, NEVADA

MAY 26, 2017

9:07 a.m.

REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
Job No. 50641

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

206

1  A. I do.
2  Q. And it's dated May 29th, 2014.
3     Do you see that?
4  A. I do.
5  Q. And did you receive this email from
6  Mr. Mersch on or about the time that's indicated
7  here?
8  A. Looks like I did.
9  Q. And it refers to Jon Jones. Do you see
10 that?
11 A. I do.
12 Q. And I showed you a contract earlier in the
13 day.
14    That's the same Jon Jones that's referred
15 to in that contract, correct?
16 A. I don't know if it's the same contract, but
17 it's definitely the same fighter.
18 Q. Same guy?
19 A. Same guy.
20 Q. And do you recall what weight he fought at?
21 A. He fought at light heavyweight. 205.
22 Q. And was he a champion?
23 A. He has been a champion, yes.
24 Q. Did he fight for other promoters?
25 A. He may have fought for other promoters

207

1  before he came to the UFC, but he hasn't fought for
2  other promoters since he joined us.
3  Q. Now, at the beginning of the email chain,
4  you write:
5     "We need to -- we need to send him
6     a letter formally offering the
7     Gustafsson fight and giving him a
8     specific deadline to accept or
9     reject."
10    Do you see that?
11 A. Yes.
12 Q. Why did you offer him the Gustafsson fight?
13 A. Why did I offer him?
14 Q. Yeah.
15 A. I didn't offer him the Gustafsson fight.
16 Q. You're suggesting we need to send him a
17 letter formally offering the Gustafsson fight, right?
18 A. Correct. So what happened in this
19 situation is that Dana and/or Lorenzo were speaking
20 with the many managers that Jon Jones has, and they
21 may have spoken with Jon directly on those managers.
22 Jon has got a lawyer named Ofir, he's got a manager
23 named Blake Harriman, he's got a manager named
24 Malki Kawa, and there were a lot of discussions going
25 on between all of those parties, Fertitta, and Dana

208

1  White.
2     At some point, those guys offered him a
3  fight. I don't offer athletes fights, that's not
4  what I do. I will memorialize contracts, I will
5  formally do things after things have been offered,
6  and that's what this is all about. But the fights
7  are offered by those guys.
8     So my recollection is that they had talked
9  to him about fighting Gustafsson. Whether he agreed
10 to it or not, I don't specifically recall, but at
11 some point, they said we need to formally offer him
12 in writing this fight. And so, that's what we were
13 doing, and we talked about what happens if he doesn't
14 accept.
15 Q. Well, as indicated in this email, you are
16 recommending that we -- that Zuffa need to send Jones
17 a letter formally offering the Gustafsson fight,
18 right?
19 A. I don't know if it's a recommendation.
20    My recollection is that there were
21 discussions between the principals about putting this
22 fight on. There were a lot of different discussions.
23 At some point, somebody called me and said, listen,
24 we need to make this formal. So I send the email out
25 saying we need to send him a formal letter formally

209

1  offering the Gustafsson fight, not just informal talk
2  but a formal letter offering him the fight, giving
3  him a specific deadline, either accept it or reject
4  it.
5  Q. Now, you assumed he would say no, correct?
6  A. I didn't assume anything about it, no.
7  Q. Well, you write, "When he says no, we need
8  to extend it."
9  A. When or if he says no, we will extend it.
10 Q. Well, you didn't write "if," you wrote
11 "when," right?
12 A. Right.
13 Q. So when you wrote that, you were assuming
14 of intending that he would say no?
15 A. I wasn't --
16    MS. GRIGSBY: Objection, form.
17    THE WITNESS: I was not intending anything.
18 I was simply sending out a letter that would formally
19 offer him a fight, give him a deadline, and when, if
20 that's what he did, didn't accept it, we'd extend
21 him. If he decided to accept it, we would -- we
22 would put the fight on.
23 BY MR. SAVERI:
24 Q. Okay. Again, you didn't say "if," you said
25 "when," right?

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

```
                                                    210
 1     A.  I did say when.
 2     Q.  Now, if he did say no, as you indicated,
 3  you write you need to extend him.  What does that
 4  mean, "we need to extend him"?
 5     A.  We have a provision in the contract that if
 6  we make a bona fide offer to an athlete to fight and
 7  he or she refuses, we have the opportunity either to
 8  count that as a fight that we've delivered to them of
 9  we can extend the offer for the period of time it
10  takes to sort of get another fight made.
11     Q.  So when you say, "we need to extend him,"
12  what you're talking about is a trigger to another
13  provision in the fighter contract?
14     A.  I'm talking about something in the fighter
15  contract that if an athlete decides they want to
16  reject a fight that we have a choice to either deem a
17  fight satisfied or extend the contract for a period
18  of time that would be equal to what we've lost in our
19  inability to put on this fight we've offered.
20         He had just fought Alexander Gustafsson.
21  It was a great fight.  Everybody wanted to see it
22  again, the fans wanted to see it again.  We felt it
23  was the most marketable event that we could do.  And
24  so, it was clearly a reasonable event to put on.
25         Jon had won the fight, he hadn't lost.  It
```

```
                                                    211
 1  was a win for him, and we wanted to do it again.
 2         Ultimately, he definitely expressed he
 3  wasn't excited about it, but ultimately, we entered
 4  into a new agreement with him that actually paid him
 5  more money to fight Gustafsson.
 6     Q.  When you were dealing with this particular
 7  circumstance, you knew, as you just indicated, that
 8  Jones was resisting the idea to fight Gustafsson
 9  again, right?
10     A.  He was.
11     Q.  And when you said or indicated when he said
12  no, along those lines, we need to extend him, that
13  meant that you were indicating that, at that point,
14  Zuffa would trigger the extension provision in the
15  Zuffa contract, right?
16     A.  If he decided not to accept the fight or we
17  didn't negotiate a new deal like we did, we could
18  have extended him.
19     Q.  And at that point, if that provision had
20  been triggered, Zuffa would control or continue to
21  control who Jones fought?
22         MS. GRIGSBY:  Objection to form.
23  BY MR. SAVERI:
24     Q.  Right?
25     A.  One thing that we cannot do is force
```

```
                                                    212
 1  anybody to fight anybody.  So if you don't want to
 2  fight somebody, you don't have to fight them.
 3  There's nothing we can do to force a fighter to fight
 4  somebody.
 5     Q.  But you could under this provision prevent
 6  him from fighting anybody else?
 7         MS. GRIGSBY:  Objection to form.
 8         THE WITNESS:  That's not correct.  We could
 9  offer him another fighter, and you could fight, you
10  know, that other fighter.
11         We can't prevent him from never fighting
12  again.
13  BY MR. SAVERI:
14     Q.  Well, you could -- you could -- you had the
15  ability under the contract to make fights for Jones,
16  and by triggering this provision, he was not able to
17  arrange any other fights, he was limited to the ones
18  that Zuffa put in front of him, right?
19     A.  No.
20         MS. GRIGSBY:  Objection, form, foundation.
21         THE WITNESS:  That's false.  We offered him
22  a fight.  If he decided not to take it, we could
23  extend the agreement and offer him another fight.
24         We can't just, you know, prevent him from
25  fighting ever again.  If he turns down that fight, we
```

```
                                                    213
 1  give him an appropriate period of time to offer him
 2  another fight.
 3  BY MR. SAVERI:
 4     Q.  And under the contract, if he didn't accept
 5  that fight, what was the next step?
 6         MS. GRIGSBY:  Objection, form.
 7         THE WITNESS:  I mean, I guess
 8  theoretically, if we continue to offer him, we just
 9  went down the line and offer him every single fighter
10  on the roster and he just said no continually, I
11  mean, it's never happened before, but I guess at some
12  point, you say do you want to retire?  Do you want to
13  end this relationship?  Should we just release you
14  because obviously you don't want to fight.  I mean,
15  it's never happened before.
16         My point is we can't put him on the shelf.
17  If he doesn't want to fight, we have an appropriate
18  period of time to offer him another fight, and that's
19  what we've done time and time again.  Nobody can tell
20  a fighter they have to fight anybody.
21  BY MR. SAVERI:
22     Q.  So how frequently did you extend fighters
23  along the lines that you're suggesting here?
24         MS. GRIGSBY:  Objection, form.
25         THE WITNESS:  I didn't extend any fighters.
```

54 (Pages 210 to 213)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

### Page 214

BY MR. SAVERI:
Q. Okay. How many times did Zuffa extend fighters, as you describe here?
MS. GRIGSBY: Objection, foundation.
THE WITNESS: I don't know. As I described where? I mean, just -- we offered somebody a fight, they didn't accept it, we offered them another fighter and they accepted it? Or are we talking about the hypothetical I gave you where they just turn down every fight we ever offer them? That's never happened.
BY MR. SAVERI:
Q. Do you recall whether at this time Jones was a champion?
A. I don't.
Q. And so, do you know whether the champion's clause applied to him at this time?
MS. GRIGSBY: Objection, foundation.
THE WITNESS: I don't know whether he was champion or not. If it was, it would have. If he wasn't, it wouldn't have.
(Exhibit 17 was marked for identification by the reporter.)
THE WITNESS: Thank you.
///

### Page 215

BY MR. SAVERI:
Q. I've handed you what has been marked as Exhibit 17, and it has the Bates Nos. ZUF-00474087 through 4096.
A. Okay.
Q. Do you want to review that?
(Pause in proceedings.)
THE WITNESS: Okay.
BY MR. SAVERI:
Q. If you look at the document, there's a number of emails between you and Tracy Long and Michael Mersch regarding Dan Henderson.
Do you see that?
A. Yeah.
Q. A lot of this has been redacted, but let me ask you to look at the page that has the Bates number ending 090.
A. Okay.
Q. And on that page, there's an email from Jordan, is it Feagan?
A. Feagan.
Q. Feagan to yourself, dated September 11, 2011.
Do you see that?
A. Yep.

### Page 216

Q. And did you receive that email from Jordan Feagan?
A. I assume I did. I don't recall it.
Q. On or about that time?
A. I don't recall it.
Q. And at the time, was Mr. Feagan representing Dan Henderson?
A. I think he's always represented Dan Henderson, as far as I recall.
Q. But you were communicating with Mr. Feagan in the context of discussions regarding a fighter contract with Dan Henderson, correct?
A. Correct.
Q. And Mr. Feagan writes about a proposal to you about the subject of whether the fights under the contract would be fully guaranteed.
Do you see that?
A. Yes.
Q. And he writes:
"However, as you'll see, I have offered a solution he has okayed which I believe protects you if he unexpectedly and quickly loses his physical skills or is permanently injured."

### Page 217

Do you see that?
A. Yes.
Q. Under the standard UFC contract at the time, what was the consequence of a fighter become injured?
A. A fighter becoming injured?
Q. Yeah.
A. And they couldn't fight?
Q. Yeah.
A. Or just being injured?
Q. I'm sorry. What?
A. I don't understand your question. Just a fighter being injured? I mean, we have an accident insurance policy that covers our athletes' medical bills for injuries sustained in training or in a fight.
Is that what you're talking about?
Q. Well, under the UFC contract at the time, if Henderson was injured, could Zuffa terminate his contract?
MS. GRIGSBY: Objection to form.
THE WITNESS: If he was injured, no. If he was permanently disabled?
BY MR. SAVERI:
Q. If he was injured and could not fight.