# Exhibit 35

Deposition of Paul Oyer
(November 29, 2017) (excerpted)

**PUBLIC COPY**

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
                                   )
          Plaintiffs, )
                           )
       vs. ) Case No.
                           ) 2:15-cv-01045-RFB-(PAL)
                           )
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
                           )
         Defendant. )
_____)

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF PAUL OYER

Washington, D.C.

November 29, 2017

8:36 a.m.

REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No: 52564

PUBLIC COPY

98

1      PAUL OYER - HIGHLY CONFIDENTIAL
2   you do not need to answer questions -- and correct
3   me if you disagree -- about actual communication
4   with the -- that went into your preparing your
5   report.
6        MR. DAVIS:  I guess with the -- we can see
7   if we disagree, but with -- well, why don't we start
8   with that --
9        MR. WIDNELL:  Yeah.
10       MR. DAVIS:  -- and then we can move on to
11  what --
12       MR. WIDNELL:  There may just be nuances.
13  That's sort of a general overview.
14       MR. DAVIS:  Fair enough.
15  BY THE WITNESS:
16    A.  I believe I skimmed a copy of Topel's
17  report after I had drafted my own report.
18    **Q.  You skimmed it after you drafted your own**
19  **report?**
20    A.  Correct.
21    **Q.  And do you know whether it was the final**
22  **version of the Topel report or a draft of the Topel**
23  **report?**
24    A.  I would imagine it was a draft, but I don't
25  know for sure.

99

1      PAUL OYER - HIGHLY CONFIDENTIAL
2    **Q.  Did you communicate with any of the other**
3    **experts retained about the substance of your report**
4    **or of theirs?**
5    A.  No.
6    **Q.  And you say you reviewed the Topel report**
7    **only after you'd completed yours?**
8    A.  After I had drafted my own report.
9    **Q.  After you drafted your own report.  Did you**
10   **rely on anything in that report in your report?**
11   A.  I did not.
12   **Q.  You list materials on which you relied on**
13   **pages 26 and 27 of your report.  Did you review any**
14   **other materials on which you relied in your report?**
15   A.  No, I don't think so.
16   **Q.  Did you speak with any Zuffa employees or**
17   **executives in preparing your report?**
18   A.  No.
19   **Q.  Did you speak to any MMA fighters in**
20   **preparing your report?**
21   A.  No.
22   **Q.  Are you familiar with an article -- before**
23   **we change subjects, how did you obtain the materials**
24   **on which you relied in preparing your report?**
25        MR. WIDNELL:  I'm going to instruct you per

100

1      PAUL OYER - HIGHLY CONFIDENTIAL
2   the stipulation not to specifically address the back
3   and forth that you had with -- with outside counsel
4   in preparing.
5   BY THE WITNESS:
6    A.  Okay.  So I think I can pretty safely
7   address that by just saying that the court documents
8   were provided to me.
9    **Q.  Did you select them from a list made**
10   **available, or did -- did you simply receive them and**
11   **then review them once you'd received them?**
12   A.  Oh, I -- I selected -- I said I want this,
13  this, and this.
14   **Q.  What were you given that allowed you to**
15   **select them?  What list did you receive?**
16   A.  My decisions were mostly based on
17  reading -- reading the two expert reports that I was
18  asked to comment on and the complaint.
19   **Q.  Okay.**
20       MR. WIDNELL:  Are you asking for a
21  description of the list that he would have gotten
22  from us?
23       MR. DAVIS:  Just the nature of whether it
24  was a curated list or the full list of the documents
25  in the case.

101

1      PAUL OYER - HIGHLY CONFIDENTIAL
2        MR. WIDNELL:  That's a description, right?
3        MR. DAVIS:  Yes.
4        MR. WIDNELL:  I think that's not covered by
5   the stipulation.
6        MR. CRAMER:  He was moving on.
7        MR. WIDNELL:  Okay.  Just to be clear,
8   though.
9        MR. DAVIS:  Right.  When you say "not
10  covered by the stipulation" --
11       MR. WIDNELL:  Well, it would be helpful for
12  us to know because we'll have the same level of
13  questioning for your experts.  So are you taking the
14  position that you can ask for an actual description
15  of the kind of information that was provided as a
16  sort of menu to the experts?
17       MR. CRAMER:  If the expert relies upon it,
18  then the answer is yes.
19       MR. WIDNELL:  Only if the expert relies
20  upon it.
21       MR. CRAMER:  (inaudible)
22       MR. WIDNELL:  So you weren't asking for
23  information about stuff that Professor Oyer did not
24  rely on, is that right, just to be clear?
25       MR. DAVIS:  I guess what I'd say, since

26 (Pages 98 to 101)

**PUBLIC COPY**

PAUL OYER. - HIGHLY CONFIDENTIAL

102

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  we're moving on --
3      MR. WIDNELL: Well, the nature of the
4  questions you asked, I just want to make sure we're
5  all on the same page, that you're not going to be
6  using what's in any of his responses to suggest
7  that -- that he either did or did not fully consider
8  something based off of the questions you asked about
9  what we provided him.
10     MR. DAVIS: Well, I guess -- I think this
11 is a conversation best --
12     MR. WIDNELL: We can go off the record if
13 you want.
14     MR. DAVIS: Let's go off record.
15     THE VIDEOGRAPHER: Going off the record at
16 11:15.
17     (Whereupon a discussion was had
18      off the record.)
19     THE VIDEOGRAPHER: Going back on the record
20 at 11:16.
21 BY MR. DAVIS:
22     Q. Are you familiar with the article by Gerald
23 Scully, "Player Salary Share and the Distribution of
24 Player Earnings," 25: Managerial and Decision
25 Economics, page 77 is the first page, 2004?

103

1  PAUL OYER - HIGHLY CONFIDENTIAL
2      A. No.
3      MR. DAVIS: We're going to mark this as
4  Exhibit No. 4, I believe.
5      (Oyer Exhibit 4 was marked as
6      requested.)
7  BY MR. DAVIS:
8      Q. Okay. If you could turn to page 78. This
9  is, as I just indicated, an article by Gerald W.
10 Scully, "Player Salary Share and the Distribution of
11 Player Earnings," 25: Managerial and Decision
12 Economics, 77, year 2004; and on page 78, do you see
13 in the bottom of the left column table 1?
14     A. Yes.
15     Q. And do you see where it says "Player
16 compensation as a share of revenue in profession
17 team sports"?
18     A. Yes.
19     Q. Is it fair to say that Professor Scully is
20 analyzing professional athlete compensation using
21 what we have called wage shares?
22     MR. WIDNELL: Objection, form.
23 BY THE WITNESS:
24     A. I mean, do you want me to -- I'm going to
25 need some time to look this over and agree with

104

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  that.
3      Q. If you need a few -- if you need a bit of
4  time just to make sure that it's -- recall, all I'm
5  asking you is whether he's using wage shares.
6      (Witness reviewing document.)
7  BY THE WITNESS:
8      A. Okay. I would -- yep.
9      Q. Does he appear to be using wage shares in
10 his analysis?
11     A. I believe that's what he's doing.
12     Q. Okay. And without reviewing the paper any
13 further, are you aware that Professor Scully
14 analyzed compensation as a share of revenue for
15 Major League Baseball, the National Basketball
16 Association, the National Football League, and the
17 National Hockey League to assess monopsony power?
18     A. I was not aware of that.
19     Q. Okay. Where in your report, if at all, do
20 you discuss Dr. Scully's article?
21     A. I do not discuss Dr. Scully's article.
22     MR. DAVIS: Let's mark the next document as
23 Exhibit 5.
24     (Oyer Exhibit 5 was marked as
25      requested.)

105

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  BY MR. DAVIS:
3      Q. Are you familiar with the article by
4  Lawrence M. Kahn, "The Sports Business as a Labor
5  Market Laboratory," 14: Journal of Economic
6  Perspectives, 2000?
7      A. I am not familiar with this article.
8      Q. And that is the article that I just marked
9  as Exhibit 5. Okay. Please turn to page 81. If
10 you turn to the last sentence of the first full
11 paragraph, the second paragraph but the first full
12 paragraph. He says "Moreover, baseball salaries as
13 a percentage of team revenues rose from 17.6 percent
14 in 1974 to 20.5 percent in 1977 to 41.1 percent in
15 1982 further suggesting that free agency has had a
16 structural effect on baseball salary determination"
17 and cites Zimbalist 1992; do you see that?
18     A. I do.
19     Q. Okay. And then further down in the last
20 paragraph, in the middle of the paragraph, again,
21 beginning "Moreover," Professor Kahn writes
22 "Moreover, salaries as a percent of revenues fell
23 from about 40 percent in 1985 to 32 percent in 1989
24 during the collusion period," again citing
25 Zimbalist. "In 1989 arbitrators levied a

**PUBLIC COPY**

106

PAUL OYER - HIGHLY CONFIDENTIAL
200-million-dollar -- 280-million-dollar back-pay penalty on the owners to be paid out over the 1989 to 1991 period as compensation for the losses imposed by collusion," citing Staudohar. Is that how it's pronounced, do you know?
   A. I've never heard of this person.
   Q. Okay. "And salaries as a percent of revenue bounced back to 43 percent by 1991," again citing Zimbalist. "The collusion episode provides a further illustration of the potential impact on monopsony on salaries."
      Am I correct that Professor Kahn is analyzing professional athlete compensation using wage shares?
   A. Professor Kahn is quoting a book written for a lay audience by Andrew Zimbalist in which he cites facts about labor share.
   Q. When you say "quoting," he's not actually quoting is he?
   A. My mistake. He is paraphrasing and citing facts stated in a book for a lay audience written by Andrew Zimbalist.
   Q. And is he relying on those underlying facts in his analysis?

107

PAUL OYER - HIGHLY CONFIDENTIAL
   A. I would have to read the paper to let you know.
   Q. Why don't you take a couple moments to read those two paragraphs to see if, in fact, he's relying on those facts as opposed to merely --
      MR. WIDNELL: I'm going to instruct you read the entire paper -- or review the entire paper to the extent that you feel there may be more information that could be relevant.
      MR. DAVIS: I suggest you read the paragraphs briefly, and then if you feel like there's more information that needs to be -- that you would need to answer that narrow question, then we can go from there.
      MR. WIDNELL: I think he should be entitled to see the entire document, look through the entire document at least before he makes some sort of conclusion about what --
      MR. DAVIS: I haven't disputed that yet.
      MR. WIDNELL: Well, you're instructing him just to review two paragraphs rather than to consider the paper as a whole I think.
      MR. DAVIS: I'm asking him to see if he needs to read more to answer that narrow question.

108

PAUL OYER - HIGHLY CONFIDENTIAL
      (Witness reviewing document.)
BY THE WITNESS:
   A. So what's the question?
   Q. The question is just whether Professor Kahn is analyzing professional athlete compensation using wage shares in these two paragraphs.
   A. Well, let's be clear about the conclusion he draws here. He says "The current episode provides a further illustration of the potential impact of monopsony on salaries."
   Q. That seems to be -- is that an answer to my question?
   A. Well, I just want to be clear about what we're -- so is that the analysis and conclusions we're talking about?
   Q. Yes.
   A. Okay. I mean, sure. He states some facts, and he says they're consistent with monopsony as a potential illustration of that.
   Q. And are those facts wage-share facts?
   A. Yes, they are.
   Q. Without further reviewing the paper, are you aware that Professor Kahn is analyzing the effects of anticompetitive conduct on player

109

PAUL OYER - HIGHLY CONFIDENTIAL
compensation using wage shares?
      MR. WIDNELL: I'm going to object for completeness. I'm not sure how that -- it sounds like you're suggesting there's a conclusion about the entire paper by telling him not to consider the entire paper.
      MR. DAVIS: I'm asking if he's aware. If he's not aware without reading the paper, he could simply answer the question I'm not aware one way or the other.
BY THE WITNESS:
   A. So what's the question?
   Q. The question is, are you aware that in particular Professor Kahn is analyzing the effects of anticompetitive conduct on player compensation using wage shares?
   A. Among other -- he is using wage share among other means of -- among other methods and measures, sure.
   Q. Okay. And are you aware that Professor Kahn is analyzing wage shares for Major League Baseball to assess monopsony power?
   A. I -- now I think you've made it too strong. I mean, it's an illustration of potential impact.

28 (Pages 106 to 109)

**PUBLIC COPY**

110

PAUL OYER - HIGHLY CONFIDENTIAL

Q. Okay. Where in your report do you discuss Dr. Kahn's article?
A. I don't discuss Dr. Kahn's article.
Q. The next document should be -- is Exhibit 6. Are you familiar with the article by John Vrooman, "Theory of the Perfect Game: Competitive Balance -- excuse me -- Competitive Balance in Monopoly Sports Leagues," 34: Review of Industrial Organization beginning on page 52009?
A. Not that I know of.
MR. DAVIS: Could you please mark this as Exhibit 6.
(Oyer Exhibit 6 was marked as requested.)
BY MR. DAVIS:
Q. The very first page is page 5 and that has the abstract. In the middle of the abstract he says "Evidence of the sportsman effect is provided by erosion of monopsonistic exploitation in the four major American sports leagues where players now share about 60 percent of revenue." Am I correct that Professor Vrooman in that sentence is analyzing professional athlete compensation using wage shares?
A. I don't know what -- what is the sportsman

111

PAUL OYER - HIGHLY CONFIDENTIAL

effect?
Q. It's actually explained two sentences just above in the abstract.
(Witness reviewing document.)
BY THE WITNESS:
A. Okay. So I'm sorry. The question again?
Q. My question is just a very narrow one. Where he says in the third sentence -- he's talking about the erosion of monopsonistic exploitation in the four major sports leagues and says where players now share about 60 percent of revenues. My question is just that. When he speaks of 60 percent of the revenues in those leagues as what the players receive, is he using wage share as we've defined it?
A. I think so.
Q. Okay.
Are you aware just as you sit here without reviewing the article, that Professor Vrooman analyzed compensation as a share of revenue in the NFL, Major League Baseball, NBA, and NHL to assess monopsony power?
MR. WIDNELL: Objection, form.
BY THE WITNESS:

112

PAUL OYER - HIGHLY CONFIDENTIAL

A. Didn't I already answer that question?
Q. Not for this article.
A. You asked me if I was aware of this article before.
Q. That probably is a logical corollary that --
A. I was not aware of this article until you showed it to me.
Q. Okay. So of course, you were not aware that Professor Vrooman analyzes wage share for the four major sports to assess monopsony power; is that correct?
MR. WIDNELL: So you're not asking him whether or not he believes that's what he does. You're stating that's your belief about what he does, and you're asking if he's aware of that -- of whether or not that's the case; is that right?
MR. DAVIS: Yes.
MR. WIDNELL: Okay. Got it.
BY THE WITNESS:
A. I was not aware of this article until you showed it to me. I'm going to leave it at that.
Q. So you're not aware one way or another of any use that Professor Vrooman puts wage share to,

113

PAUL OYER - HIGHLY CONFIDENTIAL

including assessing monopsony power?
A. That's right.
Q. Okay. Where in your report did you discuss Dr. Vrooman's article?
A. I do not discuss Dr. Vrooman's article.
Q. Are you familiar with an article by John Twomey and James Monks with the title "Monopsony and Salary Suppression: The Case of Major League Soccer in the United States," 56: The American Economist, pages 20 to 28, and the year is 2011?
A. No.
MR. DAVIS: Let's mark this as Exhibit 7, which is the article I just described.
(Oyer Exhibit 7 was marked as requested.)
BY MR. DAVIS:
Q. If you could turn to page 20, and in the abstract starting with the third sentence discussing the monopsonistic structure of Major League Soccer, the authors write "This monopsonistic structure was designed to eliminate competition for players across teams within the league and thus allow the league to suppress player salaries. This paper investigates how effective the MLS has been in achieving this

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099

**PUBLIC COPY**

PAUL OYER. - HIGHLY CONFIDENTIAL

**114**

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  goal and finds that the MLS devotes only about 25
3  percent of its revenues to player salaries compared
4  to 50 to 60 percent in most other U.S. professional
5  sports and professional soccer leagues abroad."
6      My question is am I correct that Professors
7  Twomey and Monks are using wage share to analyze
8  athlete compensation?
9      A. It would appear so.
10     Q. Okay. And are you aware that Professors
11 Twomey and Monks analyzed wage share for MLS to
12 assess monopsony power?
13     A. Until you showed me this article, I had
14 never heard of John Twomey, James Monks, or The
15 American Economist.
16     Q. Is it fair to say that you are -- that
17 means you're unaware that they analyze wage share
18 for MLS to assess monopsony power?
19     A. That's correct.
20     Q. Okay. And where in your report do you
21 discuss this Twomey and Monks article?
22     A. I don't.
23     Q. Are you familiar with a paper by James
24 Monk -- Monks, "Revenue Shares and Monopsonistic
25 Behavior in Intercollegiate Athletics"? It's dated

**115**

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  on the paper itself September 2013.
3      A. No.
4      MR. DAVIS: Please mark this as Exhibit 8.
5      (Oyer Exhibit 8 was marked as
6         requested.)
7  BY MR. DAVIS:
8      Q. The paper I just described is Exhibit 8.
9  Please turn to the first page after the title page
10 where there's an abstract. In the last two
11 sentences he writes, comparing the four major
12 sports -- baseball, basketball, football and
13 hockey -- to NCAA athletics, that whereas the major
14 sports have negotiated aggregate salaries that
15 represent over 50 percent of league-wide revenues,
16 he then says "In comparison analyzing data from the
17 post -- from the Office of Post-Secondary Education,
18 OPE, of the Department of Education on 2,068
19 institutions of higher education reveals that
20 intercollegiate athletes receive payments in kind
21 via athletic scholarships that constitute less than
22 22 percent of total athletic department revenues.
23 Clearly the monopsonistic practices of the NCAA are
24 effective in restricting the compensation of
25 athletes."

**116**

1  PAUL OYER - HIGHLY CONFIDENTIAL
2      Looking at that, am I correct that
3  Professor Monks is using wage share to analyze
4  college athlete compensation?
5      A. I would guess so based on this.
6      Q. Based on that. Okay. And are you aware
7  that Professor Monks analyzes wage share for college
8  athletes to assess monopsony power?
9      A. Well, you've just made me aware of it.
10     Q. Okay. So you're now aware of it?
11     A. That's right.
12     Q. Where in your report do you discuss this
13 paper by Monks?
14     A. This unpublished working paper that I've
15 never heard of and that leaps to a grand conclusion
16 in the last line of the abstract that seems
17 completely unwarranted, I don't refer to it.
18     Q. Have you read the whole paper?
19     A. I have not.
20     Q. So do you know whether the contents of the
21 paper justify the --
22     A. Yeah. I mean, I can --
23     Q. -- conclusion?
24     A. The reason I say that in his abstract he
25 says "Clearly," which leads me to think he's saying

**117**

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  clearly based on what he's presented in the abstract
3  that he can draw that conclusion, and I don't think
4  that's valid.
5      Q. Okay. But based only on the abstract?
6      A. Agreed.
7      Q. Okay.
8      Let's look back at Exhibit 1. Can you find
9  that? So Exhibit 1 you'll recall is the textbook on
10 microeconomics, Robert S. Pindyck and Daniel
11 Rubinfeld, Microeconomics. The particular version
12 is 9th edition, 200- -- it's labeled 2018, but that
13 seems premature.
14     If you look at pages 540 and 541, there's
15 an example 14.4, and the heading, do you see where
16 it says "Monopsony Power in the Market for Baseball
17 Players"?
18     A. Uh-huh.
19     Q. Okay. And then if you turn to page 541,
20 the paragraph that spills over from the bottom of
21 this insert left column to the right column, it
22 begins "The result was an interesting experiment in
23 labor market economics. Between 1975 and 1980 the
24 market for baseball players adjusted to a new post
25 reserve clause equilibrium. Before 1975

30 (Pages 114 to 117)

**PUBLIC COPY**

118

PAUL OYER - HIGHLY CONFIDENTIAL
expenditures on player's contracts made up approximately 25 percent of all team expenditures. By 1980 those expenditures had increased to 40 percent."
     In those last two sentences where the authors are describing compensation to players as a percentage of all team expenditures, would you characterize that as a wage-share analysis?
     A.  It's interesting you chose those two sentences instead of anything else in this box; but yes, I would characterize those that way.
     Q.  You would characterize those that way. Okay.  And where in your report do you discuss this portion of the Pindyck and Rubinfeld book?
     A.  I don't discuss the Pindyck and Rubinfeld book.  I think it's fair to note for the record that you've shown me a 2018 book and asked me where I reference it.  It would be hard for me to reference a book that's not yet available.
     Q.  It is available, actually, to be clear.
     A.  We don't know that that was true when I wrote my report.
     Q.  If that insert was in the previous edition, then do you think it would have been possible for

119

PAUL OYER - HIGHLY CONFIDENTIAL
you to have reviewed it in drafting your report?
     A.  Then I can't -- anyway, no, because I didn't review that book, to be honest.
     Q.  Fair enough.
         Turning back to Exhibit 2, this is your report.  Do you have that before you?
     A.  I do.
     Q.  Okay.  In your report you discuss a particular book on monopsony power in the labor markets, Alan Manning, Monopsony In Motion --
         THE REPORTER:  I'm sorry.
         MR. DAVIS:  I'm sorry.  Yes.  Should I start from the beginning of that sentence?
         THE REPORTER:  No.  After labor markets.
     BY MR. DAVIS:
     Q.  Alan Manning, M-A-N-N-I-N-G, Alan is A-L-A-N, Monopsony In Motion, and suggests it does not contain analysis -- analyses using wage share; is that correct?
     A.  Where are you pointing me to?
     Q.  Pages --
     A.  It's consistent --
     Q.  -- 6 and 7 of your report.  I think you begin the discussion of Professor Manning's work on

120

PAUL OYER - HIGHLY CONFIDENTIAL
page -- on paragraph 22.
     A.  Okay.
     Q.  So is it correct that you discuss his book, the one I identified, Monopsony In Motion, and suggest it does not contain analyses using wage share?
     A.  That's right.
     Q.  Are you suggesting that Dr. Manning explicitly rejects wage share concluding it is an inappropriate basis for analyzing compensation in labor markets?
     A.  I have no recollection of him doing that.
     Q.  Okay.  And there's nowhere in your report that you're aware of where you cite him explicitly rejecting wage share for analyzing compensation in labor markets?
     A.  That's right.
     Q.  Okay.  Are you aware that there are numerous other books on monopsony power including in labor markets?
     A.  I -- there must --
         MR. WIDNELL:  Objection, form.
     BY THE WITNESS:
     A.  Am I aware that there are other books on

121

PAUL OYER - HIGHLY CONFIDENTIAL
monopsony in labor markets?
     Q.  Yes.
     A.  There are books on everything.
     Q.  Okay.
     A.  So I -- I can't say that I'm aware of other books on monopsony in labor markets.  I can tell you that I certainly would expect there are many other books on monopsony in labor markets.
     Q.  Okay.  Well, is there some reason you focus on Dr. Manning's books -- book as opposed to the others?
     A.  Yes.  It's a well-known, well-cited, highly regarded book among labor economists.
     Q.  Is it possible that there are other books on monopsony power in labor markets that are similarly well known and similarly broadly cited?
     A.  Is it possible?  I guess.  I mean, anything's possible, right?  I have not done a thorough search of all books on monopsony in the labor market.
     Q.  As a labor economist would you likely be familiar with this particular literature?
     A.  Sure.  I mean, yes and no.  I'm familiar with this literature.  Books are a different story.

31 (Pages 118 to 121)

122

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  This was written for -- the main goal of this book
3  is not really to sell to other academic economists.
4  It's to sell to students and lay people interested
5  in the topic.
6      Q. Well, so then would economists find
7  Professor Manning's book and his opinions
8  authoritative?
9      A. Sure.
10     Q. Oh, they would?
11     A. Yeah.
12     Q. Do you think this is a particularly
13  authoritative source on labor markets and monopsony
14  power?
15         MR. WIDNELL: Objection, form.
16  BY THE WITNESS:
17     A. Alan Manning is a recognized expert and
18  leader in the thinking of monopsony -- analysis of
19  monopsony in labor markets. So his book and his
20  handbook chapter are authoritative sources among
21  labor economists.
22     Q. So it's more that you would say Professor
23  Manning is particularly authoritative, or I guess
24  you could say both, he and his book?
25         MR. WIDNELL: Objection, form.

123

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  BY THE WITNESS:
3      A. So is there a question?
4      Q. Yeah. Are you saying that both Professor
5  Manning and his book are particularly authoritative?
6      A. Yes.
7      Q. Where in your report do you cite to any
8  publications that say it is inappropriate for a
9  labor economist to use wage share in conducting
10  microeconomic analysis?
11     A. I don't remember citing to that.
12     Q. Where in your report do you cite to any
13  publications that say it is inappropriate for a
14  labor economist to use wage share in assessing the
15  effects of monopsony power?
16     A. Is that different from the last question?
17     Q. The last question was about conducting
18  microeconomic analysis, and this second question was
19  more specifically addressing assessing the effects
20  of monopsony power. Should I read it back to you
21  just to be clear?
22     A. That would be great.
23     Q. Where in your report do you cite to any
24  publications that say it is inappropriate for a
25  labor economist to use wage share in assessing the

124

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  effects of monopsony power?
3      A. I don't think I cite to that.
4      Q. Where in your report do you cite to any
5  publication that says it is inappropriate for a
6  labor economist to use wage share in determining the
7  marginal product of labor of a worker?
8      A. I don't. There would be no reason to say
9  that.
10     Q. Okay. Where in your report do you cite to
11  any publications that use wage level as a measure of
12  the marginal product of labor of professional
13  athletes?
14     A. That use wage level as a measure of -- so
15  can you -- I'm sorry. I need that one again.
16     Q. Sure. Where in your report do you cite to
17  any publications that use wage level as a measure of
18  the marginal product of labor of professional
19  athletes?
20     A. I have to think about that one. I don't
21  think I do.
22     Q. Where in your report do you cite to any
23  publications that measure the marginal product of
24  labor of professional athletes at all?
25     A. I don't that I can recall.

125

1  PAUL OYER - HIGHLY CONFIDENTIAL
2      Q. Where in your report do you cite to any
3  publications that assess the effects of monopsony
4  power on the compensation of professional athletes?
5      A. Sorry. Can you read that back?
6      Q. Where in your report do you cite to any
7  publications that assess the effects of monopsony
8  power on the compensation of professional athletes?
9      A. And we're not counting the other expert
10  reports as relevant publications on which I comment?
11     Q. You didn't cite to them or rely on them,
12  you said.
13     A. The Singer report and the --
14     Q. Oh, the Singer -- oh, I misunderstood.
15     A. -- and the Zimbalist report?
16     Q. Oh, so the Singer report and the Zimbalist
17  report.
18     A. We're not counting those as whatever --
19  however -- whatever you termed it. Studies?
20     Q. I had said publications.
21     A. Okay. But other than those, no.
22     Q. We were talking over each over and, again,
23  I'm as much at fault at least as you.
24     A. Sorry.
25     Q. Just to clarify, you did not cite to any

**PUBLIC COPY**

126

PAUL OYER - HIGHLY CONFIDENTIAL
1 publications that assess the effects of monopsony
2 power on the compensation of professional athletes
3 with the possible exception of the Singer and
4 Zimbalist reports that you reviewed in this case?
5     A. That's correct.
6     Q. What publications have you written that
7 measure the marginal product of labor of
8 professional athletes?
9     A. I have not written a publication that does
10 that.
11     Q. What publications have you written that
12 assess the effect of monopsony power on the
13 compensation of professional athletes?
14     A. I have not written a paper on that.
15     Q. I think I'm just reaffirming what we've
16 already established, but it sets a predicate for my
17 next question. So let me just confirm. Your view
18 is that wage share is not an appropriate way to
19 evaluate worker compensation or to benchmark
20 competition in competitive labor markets; is that
21 correct?
22     A. That's correct.
23     Q. Do you think that's a standard view for
24 economists?

127

PAUL OYER - HIGHLY CONFIDENTIAL
1     A. For labor economists I believe that would
2 be a standard view.
3     Q. Do you think other economists would share
4 your view, other labor economists would share your
5 view?
6     A. I do.
7     Q. Do you think, for example, David Autor,
8 A-U-T-O-R, whom you cite, would share that view?
9     A. I do.
10    Q. How about Barry Hirsh or Edward Shumacher?
11    A. I do.
12    Q. You think they would share that view too?
13    A. I do.
14    Q. Alan Manning, do you think he would share
15 that view?
16    A. I do.
17    Q. Edward Leamer, do you think he would share
18 that view?
19    A. Edward Leamer is not a labor economist.
20 He's a very good economist. Based on the very
21 redacted version of his expert report in high-tech
22 workers, I would guess he would share that view.
23    Q. Okay. What about Suresh Naidu?
24    A. I would assume he would share -- I would

128

PAUL OYER - HIGHLY CONFIDENTIAL
1 guess that he would share that view.
2     MR. DAVIS: I am at a good breaking point.
3 On the other hand, I could go forward. What do
4 folks prefer?
5     MR. WIDNELL: Is lunch here?
6     MR. NAKAMURA: Lunch is here.
7     MR. DAVIS: Shall we take a break? Okay.
8 Let's go off the record.
9     THE VIDEOGRAPHER: Going off the record at
10 11:51.
11        (Whereupon, at 11:51 a.m., the
12         deposition was recessed, to
13         reconvene at 12:35 p.m., this
14         same day.)

129

PAUL OYER - HIGHLY CONFIDENTIAL
1        AFTERNOON SESSION
2         (12:41 p.m.)
3     THE VIDEOGRAPHER: We are going back on the
4 record at 12:41. This begins disk No. 4.
5        PAUL OYER,
6 the witness at the time of recess, having been
7 previously duly sworn, was further examined and
8 testified as follows:
9        EXAMINATION
10        (Resumed)
11       (Oyer Exhibit 9 was marked as
12        requested.)
13 BY MR. DAVIS:
14    Q. Okay. I'd like to introduce Exhibit No. 9,
15 I think is the next one. Yes. It should be Kevin
16 Murphy and Paul Oyer, "Discretion in Executive
17 Incentive Contracts, Theory and Evidence," a draft
18 marked June 2001. Do you recognize this document?
19    A. I have much less fond memories of this one;
20 but yes, I do.
21    Q. Okay. What is it?
22    A. It's a paper -- it's a working paper
23 version of a paper I wrote many years ago.
24    Q. Okay.

**PUBLIC COPY**

166

PAUL OYER - HIGHLY CONFIDENTIAL
other?
    A. I don't remember.
    Q. Do you know when this litigation was initiated?
    A. The exact date, no.
    Q. Do you know whether it was before 2016?
    A. It was before 2016, if I remember correctly.
    Q. Do you know whether it was before 2015?
    A. I don't. That sounds about when it really got going, but I don't know.
    Q. Do you know whether it began before 2014?
    A. I don't.
    Q. Let's say you wanted to test econometrically whether foreclosure share as Dr. Singer defines it has a relationship with fighter share and event revenue. Okay. As an econometrician would you just look at tables 4 and 5 and give your intuitive reaction?
    A. So can you read the first clause of your statement -- of your question back to me?
    Q. As an econometrician would you --
    A. Okay. Keep going.
    Q. Earlier?

167

PAUL OYER - HIGHLY CONFIDENTIAL
    A. No.
    Q. As an econometrician would you look at tables 4 and 5 and give your intuitive reaction?
        MR. WIDNELL: Objection --
BY THE WITNESS:
    A. Earlier.
        MR. WIDNELL: This is a slightly different question.
BY THE WITNESS:
    A. Earlier.
        THE REPORTER: One at a time, please.
        MR. WIDNELL: Objection to the question. That was a slightly different question than you asked earlier.
BY THE WITNESS:
    A. Can you start at the beginning?
    Q. Let's say you wanted to test econometrically whether foreclosure share as Dr. Singer defines it has a relationship with fighter share and event revenue.
    A. I don't want to test that.
    Q. Hypothetically if you did.
    A. Why would I do that?
    Q. Let's say -- I understand that you reject

168

PAUL OYER - HIGHLY CONFIDENTIAL
that approach. You've made that clear.
    A. Okay. Sure.
    Q. Let's say you wanted to test it econometrically, right. Would you just look at tables 4 and 5 and give your intuitive reaction?
    A. Is that how I would test it econometrically?
    Q. Yes.
    A. No.
    Q. No. Would you estimate a multiple regression analysis?
    A. Yes.
    Q. On page 17 in the three paragraphs you identified when we were talking about your evidentiary basis for drawing a distinction between the UFC and other sports I believe you provide three reasons why the UFC might pay a lower share of its revenues to its athletes than those other sports; is that fair to say?
    A. I don't remember. I'm going to have to look through it if you want me to agree to that.
    Q. Let's -- we're going to take a little time and you should -- you should feel free to look through it.

169

PAUL OYER - HIGHLY CONFIDENTIAL
        (Witness reviewing document.)
BY THE WITNESS:
    A. Okay.
    Q. So the question was kind of broad-brush. Are there three reasons you suggest for distinguishing these various other sports from the UFC?
    A. I mean, I would -- you're equating each of those reasons to one paragraph each?
    Q. Yes.
    A. I would argue paragraph 56 has more than one reason in it.
    Q. Three categories of reasons?
    A. Sure.
    Q. I'm just trying to set up a conversation where we're talking about the same thing. Is there a label we can use for those other sports so that it will be a little bit less clumsy? For example -- the sports I believe are boxing, baseball, football, hockey, and basketball; is that right?
    A. Yes.
    Q. Can we call them the major sports for this limited purpose?
    A. Why don't we call them the Zimbalist

43 (Pages 166 to 169)

**PUBLIC COPY**

170

1      PAUL OYER - HIGHLY CONFIDENTIAL
2  sports.
3      Q. That's a bit of a mouthful. I guess, sure,
4  if you prefer the Zimbalist sports. It doesn't trip
5  off the tongue like major sports.
6      A. Okay. We'll call them the major sports if
7  it means a lot to you.
8      Q. The major sports. Thank you. All right.
9      So I'm going to just give a very short
10 description of each category of reason to make sure
11 that we are on the same page, and then we can talk
12 more about each of those perhaps in depth.
13     In paragraph 56 you offer what might be
14 labeled the nascent business explanation, and that
15 says generally that nascent businesses often face
16 different cost and revenue structures than
17 established businesses with nascent sports leagues
18 possibly paying lower revenue share than established
19 sports leagues. Is that a fair summary?
20     A. Yes.
21     Q. Okay. And then in paragraph 57 you offer
22 what I -- what we might call the substitutability
23 explanation, that marginal fighters may be better
24 substitutes for top fighters compared to marginal
25 athletes in the major sports. Is that a fair

171

1      PAUL OYER - HIGHLY CONFIDENTIAL
2  summary?
3      A. Yes.
4      Q. Okay. And then in paragraph 58 you offer
5  the scale of revenue explanation, which broad-brush
6  is that the scale of revenue may explain the
7  difference such that leagues with greater -- greater
8  revenue may pay a higher share of their revenue to
9  athletes than leagues with lesser revenue. Is that
10 a fair broad-brush description?
11     A. Yes.
12     Q. Okay. So just to summarize, we have the
13 nascent business explanation, the substituted --
14 substitutability explanation, and the scale of
15 revenue explanation. Are you aware of any other
16 reasons why the UFC might pay a lower share of
17 revenue to its athletes than the major sports?
18     A. I mean, I guess there are other differences
19 that could affect the shares of revenue one way or
20 the other. I haven't thought off the top of my head
21 about whether it would -- which way -- which way it
22 would fall.
23     Q. Okay. So these are the only ones that
24 you've analyzed in your report and that you are
25 using -- that you're opining about in this

172

1      PAUL OYER - HIGHLY CONFIDENTIAL
2  litigation?
3      A. They're the ones that are in my report.
4      Q. Let's start with the nascent business
5  explanation. Is it your opinion that, all else
6  equal, if a league is earlier in its development it
7  would be expected to pay a lower share of its
8  revenue to its fighters than it would pay as it
9  matures?
10     A. Not necessarily.
11     Q. Not necessarily. So it's possible that you
12 have it exactly backwards, that nascent sports
13 businesses pay a higher share of revenue so that the
14 major sports are a conservative benchmark in this
15 regard?
16     A. That's empirically not true, right. So I
17 don't think that -- I don't think I have it exactly
18 backwards like as a general rule or something. I
19 don't think we know the general rule. I think that
20 we can't make a comparison about how things get done
21 in a nascent sport versus a not nascent sport, for
22 lack of a better way of saying it.
23     Q. So you have no idea one way or the other,
24 though?
25     MR. WIDNELL: Objection, form.

173

1      PAUL OYER - HIGHLY CONFIDENTIAL
2  BY THE WITNESS:
3      A. I have no idea one way or the other about
4  what?
5      Q. You have no idea whether a nascent sport or
6  a mature sport pays a higher revenue share or if, in
7  fact, a nascent versus mature sport, that
8  distinction doesn't matter at all?
9      A. I wouldn't say I have no idea. I mean,
10 we're looking at a bunch of nascent sports that have
11 very low shares. You've shown me a bunch of papers
12 that show that these other sports over time increase
13 the share that went to the players.
14     Q. Do you know whether that share increased
15 because the sport matured or whether it increased
16 because of the elimination of anticompetitive
17 practices?
18     A. I don't -- I mean, certainly my guess would
19 be some of the latter, but I don't know about -- you
20 know, would I guess some of the former too? Depends
21 on the timing, of course.
22     Q. Do you have any evidentiary basis in your
23 report that the distinction between a nascent and a
24 mature league actually matters for these purposes at
25 all?

44 (Pages 170 to 173)

**PUBLIC COPY**

174

PAUL OYER - HIGHLY CONFIDENTIAL

    A. I'm sorry. Can you say that again?
    Q. Do you have any evidentiary basis in your report, do you cite any evidentiary basis in your report that the distinction between a nascent league and a mature league matters at all for purposes of wage share?
    A. I do exactly what Zimbalist does. I come up with a few examples that support exactly that hypothesis just as he comes up with a few examples that support his.
    Q. I don't think that's responsive to my question. So my question is whether there's any evidentiary basis in your support -- in your report. Is there?
    A. That's the same level of evidentiary basis as Zimbalist's report.
    Q. I understand the argument you're making. I'm asking you for a yes or no answer.
    A. I don't have a yes or no answer.
    Q. What is -- so what's the evidentiary -- other than comparison to Zimbalist, where is the evidentiary basis in your report?
    A. Well, there's the discussion of the X games. Did I discuss any other nascent sports? I

175

PAUL OYER - HIGHLY CONFIDENTIAL

can't remember. There's the -- I guess the X games was the only example where I could find the actual revenue share. I mean, as you know, finding the revenue share is no easy task.
    Q. Okay. So it's -- the only evidentiary basis is the X games as an example. Okay.
    You had mentioned that you suspected that one of the reasons why wage share went up in the major sports was the elimination of certain anticompetitive practices. Why would the elimination of those anticompetitive practices potentially result in an increase in wage share?
    A. Because the outside options of the players were changed.
    Q. Just to clarify, so if an anticompetitive practice decreases the outside options for an athlete, one would then expect a league to pay lower compensation than it would in the competitive world; is that a fair summary?
    A. Yes.
    Q. In regard to the substitutability explanation, is it your opinion that, all else equal, if a league contracts only with lower-level athletes and fewer stars, it would be expected to

176

PAUL OYER - HIGHLY CONFIDENTIAL

pay a lower share of its revenues to its athletes than would a league -- would a league that contracts with higher-level fighters and more stars?
    A. I would never say that because you're asking me to speculate about a metric that I don't think is relevant. So do you want to ask --
    Q. So you had suggested that part of what might explain the difference in wage share was the substitutability of marginal athletes for top athletes. Are you now saying that that doesn't have any explanatory power in this context?
    A. No. What I say in my report is there are differences between the sports Zimbalist analyzes and MMA that lead the pay structures to be different, and as a result the particular metric he looks at might be affected by that.
    Q. And one of the potential difference is the relative substitutability of marginal athletes for top athletes?
    A. That's right.
    Q. Do you know in general whether major sports leagues -- the major sports leagues have relatively lower substitutability than the UFC?
    A. Well, in some sense you really can't

177

PAUL OYER - HIGHLY CONFIDENTIAL

compare that -- you can't compare that actual substitutability because the pay of the marginal player in those other leagues is determined not actually by the marginal revenue of their labor, but by the collective bargaining agreement.
    Q. How does that relate to the relative substitutability?
    A. So in a relatively competitive labor market the firm is deciding do I hire this person or my next best option and that's what the Major Leagues are doing as well, but we can't look at the differences in pay across those groups and determine anything in the case of Major League Baseball, for example, because the pay of the marginal player is collectively bargained. It's not an outcome of free labor market.
    Q. Is it your opinion that marginal product of labor of the athletes doesn't figure in the pay in sports like baseball because of the collective bargaining agreement?
    A. No, that is not my opinion.
    Q. That is not your opinion. Okay.
    And is it your opinion that the collective bargaining agreement, let's say in Major League

45 (Pages 174 to 177)

**PUBLIC COPY**