# Exhibit 36

Deposition of Robert Topel
(December 5, 2017) (excerpted)

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


CUNG LE; NATHAN QUARRY, JON      )
FITCH, on behalf of              )
themselves and all others        )
similarly situated,              )
                                 )
            Plaintiffs,           )
                                 )
        vs.                      )   Case No.
                                 )   2:15-cv-01045-RFB-(PAL)
                                 )
ZUFFA, LLC, d/b/a Ultimate       )
Fighting Championship and        )
UFC,                             )
                                 )
            Defendant.            )
_____)


HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF ROBERT TOPEL

Washington, D.C.

December 5, 2017

9:34 a.m.




REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No. 52568

ROBERT TOPEL - HIGHLY CONFIDENTIAL

18

1   would result in lower compensation for workers in
2   that market?
3       A. What was the preface to that?
4       Q. Higher levels of monopsony power in a
5   labor --
6       A. You say would I agree and then --
7       Q. All things equal.
8       A. All things equal. Sorry. We're talking
9   -- forgive us, Tina.
10      MR. ISAACSON: Maybe repeat the
11  question.
12      MR. CRAMER: Yes, I will.
13  BY MR. CRAMER:
14      Q. Would you agree that all things equal
15  higher levels of monopsony power in a labor market
16  would result in lower compensation for workers in
17  that market?
18      A. If we're in a market where everybody is
19  paid the same price, yes.
20      Q. What do you mean by that, where everyone
21  is same -- paid the same price?
22      A. Well, the -- just as in the usual case of
23  monopoly where we're talking about a single price
24  seller, then a greater degree of market power on
25  the output side will result in a higher price

19

1   because demand is more inelastic and every
2   seller -- every unit has to trade for the same
3   price. So if I want to expand at the margin --
4   sales at the margin I have to reduce price on every
5   unit. And the issue here is that if I want to
6   expand employment at the margin and I face rising
7   supply price, then I have to pay every unit more.
8       Q. When you say you face rising supply price,
9   is that the same as a downward sloping supply
10  curve -- I'm sorry -- upward sloping supply --
11      A. Yeah, you don't want a downward sloping
12  supply curve.
13      Q. Upward sloping supply curve.
14      A. Demand down, supply up.
15      Q. Okay.
16      A. Yeah. Yeah, upward sloping. The firm
17  itself faces an upward sloping supply curve.
18      Q. And when a firm faces an upward sloping
19  supply curve, that firm by definition has monopsony
20  power; is that correct?
21      A. Has some degree of -- the term "monopsony
22  power" is dangerous, as you know, the way the term
23  monopoly power is dangerous. It has some market --
24  some power some influence over the price at which
25  it transacts.

20

1       Q. Monopsony power is measured in degrees. A
2   firm can have a lot of monopsony power and a small
3   amount of monopsony power, correct?
4       A. I presume you're talking about different
5   firms, but, yes, okay.
6       Q. Or over time?
7       A. Yeah.
8       Q. Would you agree that the degree to which
9   firms in a market pay workers less than their
10  marginal revenue product depends on the elasticity
11  of labor supply?
12      A. To the firm.
13      Q. To the firm.
14      A. Yes.
15      Q. So the answer is yes.
16      Is it fair to say that even though a firm
17  with some degree of monopsony power pays its
18  workers below the worker's marginal revenue product
19  that the worker pay is nonetheless correlated with
20  the marginal revenue product?
21      A. You mean that you're moving up and down
22  along an upward sloping supply curve?
23      Q. Yes.
24      A. So in something that increases -- with
25  rising supply price something that increases

21

1   marginal revenue product would cause you to move
2   out along the -- along the average factor cost
3   curve; is that what you're saying?
4       Q. Well, let me ask it this way. Is it fair
5   to say that, all things equal, when marginal
6   revenue product of a firm's workers rise, a firm
7   with monopsony power will pay its workers more?
8       A. Yeah. Over the -- over some period of
9   time, yeah. There's contracts and things like
10  that. Some simple shocks are not going to do it.
11      Q. But over some period of time, all things
12  equal, when a firm's marginal revenue of product of
13  its workers rises, a firm with monopsony power will
14  pay its workers more; is that fair?
15      A. I think that's fair, yeah.
16      Q. And similarly, all things equal, when the
17  marginal revenue product of a firm falls over time
18  a firm with monopsony power will pay its workers
19  less; is that fair?
20      A. Moving along an average factor cost curve
21  which you've presumed to slope up. So that's
22  fair.
23      Q. And that condition that the supply curve
24  is presumed to slope up is another way of saying
25  that the firm has monopsony power; is that right?

6 (Pages 18 to 21)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

22

1    A. Well, we came -- we just came back to this
2  term "monopsony power." There always -- you know,
3  if this was a -- an antitrust case in the output
4  market. The term is a little dangerous.
5  There's -- there's some influence that the firm has
6  over the price because supply slopes up.
7    Q. And the textbook definition of monopsony
8  power is a -- is -- is where there's an upper
9  sloping supply curve, correct? I know you don't
10 like the term, but --
11   A. Yeah. If there's -- if -- I'm sorry,
12 Tina. If you have some influence over -- the
13 necessary condition for a firm with some monopsony
14 power that's paying a single price is to -- or with
15 some degree of market power in the input market is
16 a ris- -- a rising supply price, rising average
17 factor cost.
18   Q. And so all things equal, when marginal
19 revenue of product falls a firm facing an upper
20 sloping supply curve will pay its workers less; is
21 that fair?
22   A. Over some period of time all other things
23 equal and so on. So yes.
24   Q. Would you turn to paragraph 311 of your
25 report, please.

23

1    A. This is the appendix?
2    Q. It is the appendix, Appendix A.
3    A. Yes.
4    Q. The third -- third sentence of Appendix A
5  says "In other words, Zuffa is better than its
6  competitor at making its athletes more effective
7  revenue generators"; do you see that?
8    A. Yes.
9    Q. What do you mean by that?
10   A. Well, we have to read above. Let A be the
11 relative quality of Zuffa athletes, which Zuffa can
12 increase by incurring up cost according to the cost
13 function C of A. So that when A is bigger Zuffa
14 becomes -- that larger A makes those athletes more
15 effective revenue generators.
16   Q. What does it mean to say an athlete is a
17 more effective revenue generator?
18   A. That I've made some investments in the
19 person's, in the context of this case, notoriety,
20 reputation, the fighters he has fought against --
21 or he or she has fought against in the past, have
22 done advertising, and so on that makes a unit of
23 labor from this individual more productive.
24   Q. So when Zuffa makes its fighters more
25 effective revenue generators, they're able to

24

1  generate more revenues when they fight; is that
2  fair?
3    A. Yes. As you look down there to 313, A
4  multiplies L, where this is -- L is the employment
5  of factors by this firm called one, and larger A
6  means each unit of L produces more units of labor
7  service.
8    Q. So what you're saying is that Zuffa is
9  particularly good at causing the marginal revenue
10 product of its fighters to increase over time,
11 correct?
12   A. Well, let's just be careful. I'm making
13 an assumption above about A and the cost function C
14 of A. So this is in the context of this model --
15 and I'm letting Zuffa be firm 1 here. So in the
16 context of this model I'm not making a statement of
17 fact about Zuffa. I'm saying if Zuffa is this firm
18 and this is what Zuffa does, then that's the
19 outcome.
20   Q. Okay. So if what Zuffa does is makes
21 it -- make its fighters more effective revenue
22 generators, then what you were saying is that Zuffa
23 in this example is causing the marginal revenue
24 product of its fighters to increase, correct?
25   A. Yes.

25

1    Q. And is it your opinion that one of the
2  things that Zuffa is particularly good at is
3  causing its fighters to be more effective revenue
4  generators?
5    A. I think that's Zuffa's position and I
6  think that's what the evidence tends to show,
7  yes.
8    Q. Is it your opinion?
9    A. I just said yes.
10   Q. Please turn to paragraph 56, please. It's
11 on page 23. Here in the last sentence of paragraph
12 56 you say that "UFC sponsor Anheuser-Busch
13 considers White to be an 'A-level athlete' for
14 purposes of its premium marketing campaigns."
15 Mr. White in this paragraph is Dana White; is that
16 right?
17   A. That's my understanding, yes.
18   Q. Okay.
19     And this paragraph is talking about UFC's
20 purchase in 2016 by a consortium of investors,
21 correct?
22   A. Yes.
23   Q. And that consortium of investors is WME;
24 is that right?
25   A. That's my recollection. The initials

7 (Pages 22 to 25)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

26

1    don't stick with me.  So...
2        Q.  You can ask the person sitting over here.
3        So with reference to the -- what does the
4    term "A-level athlete" mean as it's used in that
5    paragraph?
6        A.  It's just used in the quote.  It's my
7    understanding that that's what Anheuser-Busch
8    considered Mr. White to be.
9        Q.  But extracting from what they considered
10   Mr. White to be, I want to have an understanding of
11   what you -- what you understand the term "A-level
12   athlete" to be.
13       A.  I took it only to mean that they think
14   Mr. White is important.
15       Q.  And they think he's as important to the
16   UFC as one of the UFC's top fighters; is that what
17   that's saying?
18       A.  All it says is that they think he's
19   important and they wanted to retain him.
20       Q.  And they're comparing him to an A-level
21   athlete, correct?
22       A.  Well, that's what the term says.  I don't
23   know if it's -- there could be a AA-level athlete
24   or AAA-level athlete.
25       Q.  Well, presumably the person writing this

27

1    believed that there were grades of athletes that
2    the UFC had, correct?
3        A.  Well, this says Anheuser-Busch considers
4    White to be an A-level athlete.
5        Q.  Correct.
6        A.  Anheuser-Busch could be -- you know, they
7    sponsor football games and all sorts of things.
8        Q.  Well, is it fair to say that one of the
9    things that the WME purchased when it bought Zuffa
10   for $4 billion was athlete talent?
11       A.  You can't purchase athlete talent.  What
12   is it, the 15th amendment or something.  You can
13   only rent these people for a period of time.  So --
14       Q.  I'm with you there.
15       A.  They -- they purchased a set of
16   contractual rights and a business model and so
17   on.
18       Q.  And one of the things that that was
19   valuable to WME was that Zuffa had certain
20   contractual rights with athlete talent, correct?
21       A.  Yes.
22       Q.  And one of the reasons why athlete talent
23   is valuable is because the athletes are capable of
24   generating revenues for the organization, correct?
25       A.  Correct.

28

1        Q.  Turn to paragraph 113.  I'd like you to
2    turn to the sentence beginning with "The
3    competitive value"; do you see that towards the
4    middle of the paragraph?
5        A.  Yes.
6        Q.  It says "The competitive value of a
7    successful athlete hinges on promotion that
8    generates consumer awareness of the athlete
9    contributing to what Dr. Singer refers to as an
10   athlete's human capital.  As explained above, if
11   athletes can freely switch to competing promoters
12   that pay 'competitive' compensation given the
13   athlete's human capital" -- I think I'm reading to
14   you the wrong part.  I'll withdraw that for the
15   moment.  I apologize.
16       A.  Okay.
17       Q.  Okay.  I'll go back to the part that I
18   read.  "The competitive value of a successful
19   athlete hinges on promotion that generates consumer
20   awareness of the athlete contributing to what
21   Dr. Singer refers to as an athlete's human
22   capital."  Is it fair to say that promotion
23   contributes to an athlete's human capital; do you
24   agree with that?
25       A.  Yes.

29

1        Q.  What is human capital?
2        A.  Human capital is the intangible set of
3    skills and attributes that end up being embodied in
4    an individual after investments or it could just be
5    because of innate talent.
6        Q.  And is fair to say that, all things equal,
7    the -- the more human capital an athlete has the
8    more revenues he's capable of generating when he
9    fights?
10       A.  Well, I mean --
11       Q.  Roughly.
12       A.  Roughly.  You're saying that -- there are
13   different types of human capital.  There's a whole
14   vector of skills that goes into this and some are
15   probably more productive at generating -- my human
16   capital wouldn't do much good in the octagon.
17       Q.  Fair enough, though it might be
18   interesting.
19       A.  I assure you it wouldn't be.
20       Q.  But with respect to MMA fighters the more
21   human cap- -- capital an MMA fighter has all things
22   equal the more revenues he's capable of generating
23   when he -- when he fights, right?
24       A.  If we define human capital, and we can, I
25   think, as the ability to generate revenues then

8 (Pages 26 to 29)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

30

1    you've stated sort of a tautology there.
2        Q. Okay.
3            Turn to paragraph 57 of your report,
4    please.
5        A. This comes to one of those -- I see the
6    first sentence.
7        Q. Yeah.
8        A. There's probably a missing verb there, but
9    go ahead.
10       Q. I'm going to ask you about the second
11   sentence where you write "These efforts by Zuffa
12   and Zuffa's skill in providing consumers with an
13   attractive MMA product grew the market for MMA to
14   the benefit of athletes, consumers, and competing
15   promoters"; do you see that?
16       A. Yes, I do.
17       Q. You opine here that Zuffa grew the market
18   for MMA for the benefit of athletes, consumers, and
19   committing -- competing promoters. Can you explain
20   how --
21       A. To, not for, but to. Sorry.
22       Q. To the benefit, yes. Understood. Can you
23   explain how Zuffa's efforts to grow the market for
24   MMA benefited MMA athletes?
25       A. Sure. Just take a simple example of the

31

1    television program they created back in, what was
2    it, 2005 that generated interest in MMA among the
3    public. That raised the demand for the services of
4    people who can perform in the octagon, let's say,
5    that benefited the athletes that fight for Zuffa
6    and other athletes as well.
7        Q. Did that promotional effort in creating
8    the show increase the marginal revenue product of
9    MMA fighters generally?
10       A. You mean -- when you say generally, you
11   mean like at other --
12       Q. Yes.
13       A. For other promoters and everything, yes.
14       Q. So it increased the marginal revenue
15   product of fighters at the UFC and increased the
16   marginal revenue product of other professional MMA
17   fighters, whether or not they fought at the UFC,
18   correct?
19       A. I would not expect it to be by similar
20   amounts or by similar proportional amounts, but so
21   long as it increased interest in the sport
22   generally it would have some impact on attendance
23   and willingness to pay for stuff associated with
24   MMA events promoted by others. Now, if -- if
25   aggregate supply was completely elastic, then it

32

1    wouldn't change in equilibrium marginal revenue
2    product.
3        Q. But aggregate supply of MMA fighters is
4    not completely elastic, correct?
5        A. Yeah. I don't know -- I don't know that
6    that's true in the long run actually. I don't
7    think we have any evidence that is true in the long
8    run.
9        Q. In the short run the -- that's not true,
10   correct?
11           MR. ISAACSON: Objection to form.
12   BY THE WITNESS:
13       A. In the short run as in, you know, almost
14   all industries short-run supply is less elastic
15   than long-run supply.
16       Q. Did you do any empirical analysis of the
17   long-run elasticity of supply of MMA fighters in
18   this case?
19       A. Are you asking whether I estimated the
20   long-run elasticity of supply?
21       Q. Did you?
22       A. I didn't -- I didn't estimate the long-run
23   elasticity of supply.
24       Q. Did you do any other empirical analysis of
25   the long-run elasticity of supply of MMA

33

1    fighters?
2        A. Well, we know that there are more MMA
3    fighters and more MMA events as demand has ground.
4    So there's been entry from other sports and young
5    people at the front end. So there's some evidence
6    of, yes, longer -- longer run higher elasticity of
7    supply.
8        Q. Is one of the reasons why there has been
9    entry by MMA athletes into the sport of MMA because
10   the compensation of MMA athletes has gone up over
11   time?
12       A. That's one reason, but if supply was
13   really highly elastic you'd get entry without --
14   you'd get transitory increases in compensation, but
15   equilibrium compensation wouldn't change.
16       Q. But you do agree that one of the things
17   causing athletes to go into MMA instead of, say,
18   football over time is that the compensation of MMA
19   athletes has gone up, correct?
20       A. I would say that the compensation of MMA
21   athletes has gone up.
22       Q. And that has --
23       A. But whether in the long run that's going
24   to raise MMA compensation in equilibrium remains to
25   be seen because entry -- it's just like wheat

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

ROBERT TOPEL - HIGHLY CONFIDENTIAL

34

1  farmers. If the surgeon general came on and said
2  eating wheat reduces heart disease and everybody
3  starts eating wheat, then there's a transitory
4  increase in the price of wheat as you move out
5  along a short-run supply curve, but more people
6  start producing wheat and if there's constant
7  returns at the industry level, the price of wheat
8  is going to return to what it was before.
9      Q. Are MMA athletes like wheat farmers?
10     A. No. They perform different functions than
11  wheat farmers.
12     Q. Are MMA athletes commodities?
13     A. Well, it's not --
14     MR. ISAACSON: Objection to form.
15  BY THE WITNESS:
16     A. -- it's not that they're commodities, no.
17  That's not the right term. The -- the question is,
18  you know, what's the abundance of the talents that
19  they have relative to the demand for them.
20     Q. Turn to paragraph 63 of your report,
21  please. The last sentence of that paragraph on
22  page 26 says "Zuffa's success at identifying MMA
23  athletes early on in their careers and promoting
24  them successfully into household names has been a
25  Cornerstone of its long-term value and success"; do

35

1  you see that?
2      A. Yes, I do.
3      Q. So in your opinion what has made Zuffa a
4  long-term value and success is that Zuffa has been
5  able to both identify MMA athletes early in their
6  careers and promote them successfully into
7  household names; is that right?
8      A. That's part of what Zuffa does.
9      Q. And that's one of the things that has made
10  Zuffa a long-term value and success, correct?
11     A. I think we referred to two things there.
12  Identify them and then promote them successfully.
13  Identify their talent --
14     Q. Okay.
15     A. -- so their -- their potential to be
16  promoted, and then promoting them.
17     Q. If all MMA athletes are the same, why
18  would it be important to identify talent?
19     A. But I didn't say they were all the same.
20  You know, you could have an industry where
21  different athletes have different amounts of talent
22  and then the more talented ones will earn more, but
23  the supply of more talented guys is highly elastic
24  and the supply of less talented guys is highly
25  elastic. It's like if you doubled the demand for

36

1  lawyers in the long run. You're still going to
2  have good lawyers and not-so-good lawyers and the
3  good lawyers will make more than the not-so-good
4  lawyers, but the whole distribution of earnings
5  doesn't necessarily have to change in the long
6  run.
7      Q. How does promoting fighters into household
8  names allow Zuffa to have long-term value and
9  success?
10     A. Because that's the type of thing that, as
11  I understand it, in this marketplace people are
12  willing to pay for.
13     Q. A key advantage of having fighters who are
14  household names is that more people know about
15  those fighters and want to pay to watch them,
16  right?
17     A. I think that's a fair statement.
18     Q. So due to the UFC's promotional efforts,
19  in your view, the UFC fighters can attract a wider
20  audience when they fight; is that right?
21     A. To the extent that those -- for the
22  fighters that are successful subjects of such
23  investment, that is true.
24     Q. What you're saying is that one of the ways
25  in which Zuffa has become successful is by boosting

37

1  the ability of its fighters to generate revenues
2  when they fight, correct?
3      A. Yeah. The point of investing is to
4  generate revenues.
5      Q. And the investments you're talking about
6  here have boosted the ability of their product, the
7  fighters, to generate revenues when they fight,
8  correct?
9      A. Well, the fighters, the other inputs used
10  by Zuffa all go into the act of generating
11  revenues. And so they've made a number of
12  successful investments and those tend to generate
13  revenues.
14     Q. And one of those successful investments,
15  in your view, is the investments they make in
16  identifying and promoting fighters which has become
17  successful by boosting the ability of those
18  fighters to generate revenues when they fight,
19  correct?
20     A. As I alluded to a minute ago I don't want
21  to convey the impression that it's every fighter,
22  but they make some successful investments and those
23  fighters generate revenues.
24     Q. Would you agree that a fighter who's a
25  household name because of Zuffa's investments and

10 (Pages 34 to 37)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

38

1  promoting that fighter all things equal would
2  generate more revenues for the UFC when he fights
3  than a fighter who is not a household name?
4       A.  Well, you know, you could -- one can
5  become a household name for a lot of reasons.  If
6  we assume that what you mean by a household name is
7  that he or she is well known and that people value
8  that notoriety, then yes.
9       Q.  Turn to paragraph 258 of your report,
10  please.  At the bottom of page 111 you say
11  "Further, MMA athletes benefit from the greater
12  exposure they receive on television broadcasts"; do
13  you see that?
14      A.  Yes, I do.
15      Q.  Explain the reasoning here.  How do MMA
16  athletes benefit from the greater exposure they
17  receive on television broadcasts?
18      A.  Because that increases their -- the
19  knowledge of the public about that athlete, it
20  increases the interest of the public so that that
21  benefits the -- the athlete both in terms of any
22  revenues they might collect from that and future
23  television broadcasts either for one promoter or
24  for another.
25      Q.  The more well known an athlete is, all

39

1  things equal, the more revenues that athlete will
2  generate when he or she fights, right?
3       A.  This comes back to what I said.  It
4  depends on whether that notoriety is positive or
5  negative, but if -- if by def- -- we're back to a
6  tautology.  If what you say is that positive
7  notoriety creates greater public interest and
8  people are willing to pay for that, then that
9  benefits the fighter.
10      Q.  And it benefits the fighter because if a
11  fighter generates more revenues when he or she
12  fights, that fighters' compensation will be higher,
13  all things equal, correct?
14      A.  It depends on -- it depends on market
15  conditions, but to the extent that -- as it does in
16  this market, that increases the market's
17  willingness to pay for that individual, then that
18  benefits the fighter.
19      Q.  You, in fact, found in this case that
20  there's a statistically significant relationship
21  between event revenues and fighter compensation,
22  correct?
23      A.  Yes.
24      Q.  As event revenues go up, all things equal,
25  fighter compensation goes up, correct?

40

1       A.  Well, we have to be careful.  To the
2  extent that -- highly compensated fighters generate
3  more revenue than -- which way the causation goes
4  there is -- is not crystal clear, right?  I've got
5  a good fighter -- I'm a good fighter, I'm already
6  well known, I'm prominent, then I'm going to
7  generate more revenue, but it is also the case
8  simply from the structure of compensation that I
9  think certain fighters get paid more and then it
10  increases the demand for you in the future.
11      Q.  Would you agree that the average WNBA game
12  generates less revenue than the average NBA game?
13      A.  I believe that's true.  And if you're
14  representing it to be true, I'll stipulate that it
15  is.
16      Q.  And that's because there's a larger pool
17  of potential people willing to pay to see the NBA
18  events than WNBA events, correct?
19      A.  I think that -- I think that's a fair
20  statement.
21      Q.  And the people that are -- the larger pool
22  of people that are willing to see --
23      A.  Or it could be the same pool of people who
24  are willing to pay more.
25      Q.  Okay.  Well --

41

1       A.  Yeah.
2       Q.  -- either -- either it's the same pool of
3  people willing to pay more or there's a larger pool
4  of people that want to see NBA versus WNBA,
5  correct?
6       A.  I think that's a fair statement.
7       Q.  And it's also fair to say that you would
8  expect NBA players on average to generate more
9  revenues when they play than WNBA players, correct?
10      A.  You said on average.  I think you said on
11  average.
12      Q.  Yes.
13      A.  So it's not true for every athlete.  I
14  believe that's -- I think I see where you're going.
15  I think it's right.
16      Q.  And it would be reasonable to conclude
17  that the average marginal revenue product of an NBA
18  player is greater than the average marginal revenue
19  product of a WNBA player, correct?
20      A.  I congratulate you for getting average and
21  marginal in the same sentence, but the marginal
22  revenue product of a typical NBA player properly
23  defined is probably bigger than the average
24  marginal revenue product of a typical WNBA
25  player.

11  (Pages 38 to 41)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

42

1   Q.  And in computing or determining the
2   marginal revenue product of either an NBA player or
3   a WNBA player, does it matter to you how the NBA
4   came to have a larger market than the WNBA?
5       MR. ISAACSON:  Objection to form.
6   BY THE WITNESS:
7       A.  For the -- could you read the beginning of
8   the sentence?
9       Q.  Yes.  In computing the marginal revenue
10  product or in determining the marginal revenue
11  product of an NBA player versus a WNBA player, does
12  it matter to you as an economist how it was that
13  the WNBA [sic] came to have a larger market than
14  the WNBA does?
15      A.  I mean, for simply the purpose of you're
16  assuming that he could compute this.
17      MR. ISAACSON:  You said WNBA having a
18  larger market than WNBA, which I don't think you
19  want.
20      MR. CRAMER:  Correct.  I'll stand
21  corrected.  I'll ask it again.
22  BY MR. CRAMER:
23      Q.  For the simple purpose of just determining
24  the marginal revenue product of an NBA player and a
25  WNBA player, does it matter to you how the NBA came

43

1   to have a larger market than the WNBA?
2       MR. ISAACSON:  Objection to form.
3       MR. CRAMER:  You can answer.
4       A.  Well, it can, but you've asked it in the
5   sense of if you were simply -- assuming I could do
6   this computation because marginal revenue product
7   is a concept, it's not something that I've --
8   you've just got a spreadsheet, you can press a
9   button and get it.  In certain context it would
10  matter, depends on what you're analyzing, and in
11  certain context it wouldn't.  But if all you wanted
12  to know is what's the marginal revenue product of
13  Lebron James if -- when he's added to the roster
14  of -- I'll change teams -- Oklahoma City, then as
15  opposed to -- and I can't remember the names of any
16  WNBA athletes and maybe that's your point -- when I
17  move one of those players from one franchise to
18  another what's the marginal revenue product,
19  conceptually I don't need to know what caused it.
20  But then it has different -- what caused it has
21  different implications for the form of contracts
22  and all sorts of things.
23      Q.  It's fair to say that in this case you
24  made no effort to compute the marginal revenue
25  product of any MMA fighters, correct?

44

1       A.  If what you're asking is did I compute the
2   addition to revenues that would come from adding a
3   marginal fighter to the stock of fighters holding
4   constant everything else about the organization,
5   no, no one's done that in this case.
6       Q.  Is it fair to say that the marginal
7   revenue product of MMA fighters as a whole is
8   roughly equivalent to the degree to which they
9   contribute to MMA event revenues?
10      MR. ISAACSON:  Objection to form.
11  BY THE WITNESS:
12      A.  I don't know what you mean by "as a
13  whole."
14      Q.  Is it fair to say that the marginal
15  revenue product of MMA athletes or a MMA fighter,
16  put it that way --
17      A.  Let's do a MMA fighter.
18      Q.  Okay.  All right.  Is it fair to say that
19  the marginal revenue product of a MMA fighter is
20  roughly equivalent to the degree to which he or she
21  contributes to event revenues?
22      A.  Well, I mean --
23      MR. ISAACSON:  Objection to form.
24  BY THE WITNESS:
25      A.  -- there's all sorts of revenue sources.

45

1   The way I described it a minute ago -- and I'm
2   going to prefer my definition to yours -- is that
3   the marginal revenue product of an individual is
4   the addition to the organization's revenues from
5   all sources when that individual is added to the
6   labor force of the organization holding constant
7   everything else that the organization does to
8   generate revenue.
9       Q.  And you made no effort in this case to
10  compute again the marginal revenue product of any
11  MMA athlete, correct?
12      MR. ISAACSON:  Asked and answered.
13  BY THE WITNESS:
14      A.  I don't think anybody in this case has --
15  has done that.  The marginal revenue product is a
16  concept.
17      Q.  Have you made an effort to estimate in any
18  way the marginal revenue product of MMA fighters in
19  your work in this case?
20      A.  As a -- as a measure of what they add to
21  revenues, no one's done that, but to the extent --
22  if the market was competitive, then the marginal
23  revenue product would be equal to what they get
24  paid.
25      Q.  So --

12  (Pages 42 to 45)

46

1      A.  It comes back to a sentence you asked me
2  about -- about 45 minutes ago.  So I'm just
3  restating the obvious.
4      Q.  So if the market's competitive, the
5  athlete will get paid equal to his marginal revenue
6  product; and if there's monopsony power in the
7  market, the athlete will get paid below his
8  marginal revenue product, correct?
9      A.  Yeah.  All athletes, not just Zuffa
10 athletes.
11     Q.  And are you assuming for your work in this
12 case that the MMA market is competitive?
13     A.  I don't know whether it's perfectly
14 competitive, but it's -- it's highly competitive.
15     Q.  Is that an assumption of yours or a
16 finding of yours?
17     A.  It's a finding because other people are
18 competing for athletes and Zuffa has to compete for
19 athletes.
20     MR. CRAMER:  The court reporter would like
21 us to take a break and she's in charge.
22     THE VIDEOGRAPHER:  Going off the record at
23 10:31.
24     (A short break was had.)
25     THE VIDEOGRAPHER:  We are going back on

47

1  the record at 10:43.  This begins disk No. 2.
2  BY MR. CRAMER:
3      Q.  The court reporter has told me that we
4  have a tendency to talk over each other.  So let's
5  really both do our best to try and stop doing that.
6  I will try to do my part.
7      All right.  Turn to paragraph 32, please.
8  The bottom of page 12, the last sentence begins
9  "Overall attendance at MMA events immediately
10 before and during the class period were broadly
11 consistent while television viewership of MMA
12 events increased from 27 million viewers in 2009 to
13 60 million viewers in 2016"; do you see that?
14     A.  Yes.
15     Q.  So from 2009 to 2016 the number of viewers
16 watching television broadcasts of MMA has more than
17 doubled; is that right?
18     A.  That's what it says.  That's an
19 implication of what it says.
20     Q.  Okay.  And you would agree that the growth
21 in viewership has increased the amount of revenue
22 that Zuffa generates from the average UFC event,
23 correct?
24     A.  Yes.
25     Q.  And this growth in revenues has also

48

1  increased the amount of revenues generated by UFC
2  fighters at each Zuffa event, right?
3      A.  It -- it increased the revenue that
4  generated by fighters.
5      MR. ISAACSON:  Object to form.
6  BY THE WITNESS:
7      A.  It's too vague.
8      Q.  Okay.  I will -- I will restate the
9  question.  The growth in revenues that flowed in
10 part from the growth in viewership during this
11 period also was a reflection of the increased
12 marginal revenue product of UFC fighters,
13 correct?
14     MR. ISAACSON:  Objection to form.
15 BY THE WITNESS:
16     A.  I think I understand what you're saying.
17 I'm going to agree with it, but I'm not quite sure
18 what you're saying, but go ahead.
19     Q.  Okay.  I don't want -- I don't want you
20 not to be sure.  I don't think Mr. Isaacson wants
21 you not to be sure either.  So let me ask it a
22 different way.  Is it fair to say that the
23 increased fighter marginal revenue product would be
24 correlated with the growth in UFC event revenues
25 over this period?

49

1      MR. ISAACSON:  Objection to form.
2  BY THE WITNESS:
3      A.  Well, not necessarily.  It depends on
4  what -- to what the increase in event revenues is
5  attributable.
6      Q.  Is it your opinion that fighter marginal
7  revenue product at the UFC did not increase from
8  2009 to 2016?
9      A.  No, that's not what I said.
10     Q.  So you do --
11     A.  But the mere fact -- sorry if we talked
12 over each other, but I think I'm completing a
13 thought.  The mere fact that more people watched
14 doesn't mean that the marginal revenue product of
15 any particular input has -- has increased.
16     Q.  If we assume for purposes of this question
17 that the marginal revenue product of fighters has
18 indeed increased from 2009 -- strike that.
19     Turn to paragraph 126, please.  At the
20 beginning of paragraph 126 you say "To state the
21 obvious, an athlete's pay as a share of event
22 revenue can easily decline even if pay measured as
23 it should be in dollars per athlete is increasing.
24 This is especially likely if Zuffa's promotional
25 investments drive greater interest in its MMA

13  (Pages 46 to 49)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

50

1   events so that Zuffa's revenues at each event
2   increased because the greater attendance -- because
3   of great attendance or viewership"; do you see
4   that?
5       A.  Yes.
6       Q.  So would you agree that in general the
7   share of UFC event revenues going to fighters did,
8   in fact, decline over time, say, from 2009 to 2016
9   even as fighter compensation measured in dollars
10  per fight increased?
11      A.  I'm not sure it declined in every year,
12  but I think that -- I think the evidence is that
13  fighter compensation increased at a different rate,
14  a slightly lower rate -- or somewhat lower rate
15  than the increase in revenues so that the ratio
16  would be lower.
17      Q.  So what is happening over time, in your
18  view, is that the UFC event revenue pie is
19  increasing while the UFC's share of event revenues
20  relative to the fighter's collective share is
21  increasing; is that fair?
22      MR. ISAACSON:  Objection to form.
23  BY THE WITNESS:
24      A.  Well, I don't know that.  You're defining
25  a pie.  The ratio of fighter compensation to total

51

1   event revenue in which they fight was on average
2   lower as those revenues increased.
3       Q.  Okay.  That's fair.  In other words, the
4   UFC as a business is keeping a larger share of
5   event revenues for itself over time as event
6   revenues increase; is that fair?
7       MR. ISAACSON:  Objection to form.
8   BY THE WITNESS:
9       A.  No.
10      Q.  In other words, the UFC is paying -- I'll
11  strike that.
12      And, in your view, the fact that UFC
13  fighter compensation is growing slower than UFC's
14  event revenues can be explained because Zuffa's
15  promotional investments drive greater interests in
16  MMA events?
17      A.  That would happen if the last part of your
18  sentence is true.
19      Q.  So one explanation, in your view -- one
20  possible explanation, in your view, for the fact
21  that growth in event revenues is outstripping
22  growth in fighter compensation is that Zuffa's
23  promotional investments drive greater interest in
24  MMA events; is that right?
25      A.  That could make it happen, yes.

52

1       Q.  Is it your opinion that Zuffa's
2   promotional investments drive greater interest in
3   MMA events that that explanation is what's causing
4   fighter compensation to grow more slowly than event
5   revenues?
6       A.  Well, that combined with the market
7   structure, yes.
8       Q.  And what is that opinion -- putting the
9   market structure part aside for the moment, what is
10  that opinion based upon?
11      A.  Well, I look at the -- these sort of
12  poster child for Zuffa investment is the ultimate
13  fighter television program that generated so much
14  interest and that grew interest in the -- in the
15  event, but advertising, choosing the right com- --
16  finding the right athletes, choosing the right
17  combinations of athletes to compete against each
18  other, designing the sequence of fights that a
19  fighter's going to be in, those are all activities
20  that Zuffa engages in to -- as part of its business
21  model.
22      Q.  Which one of those activities you just
23  described would enhance event revenues without also
24  enhancing fighter marginal revenue product, if any?
25      A.  Well, any one of them actually could do

53

1   that because the definition of marginal revenue
2   product is what this individual added to the stock
3   adds to my revenues holding everything else
4   constant.  And so the television program could have
5   increased the event revenues without for any
6   particular fighter changing that fighter's marginal
7   revenue product, because the marginal revenue
8   product does not identify the particular event.  I
9   mean, the firm's making a calculation of how much
10  it's going to sell and at what prices over time and
11  what all other investments it's going to make.  And
12  so marginal revenue product is far removed from
13  simply the event revenue which a fight -- fighter
14  is fighting.
15      Q.  Where in your report, if anywhere, do you
16  provide an analysis of those portions of Zuffa's
17  investments that do not contribute to fighter
18  marginal revenue product?
19      A.  Are you -- I'm confused as to what you're
20  asking.  Are you saying that certain inputs to the
21  process of producing Zuffa's product are
22  complementary with -- with the talents of athletes
23  so that if I advertise that raises the productivity
24  of an athlete, it's sort of what in technical
25  jargon it would be Q complements or something?

14 (Pages 50 to 53)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

54

1    They're all com- -- they can all be complementary
2    if that's what you're asking, but I don't know.
3        **Q.  So all of the investments that you have**
4    **discussed that have generated additional revenues**
5    **for Zuffa over time, event revenues for Zuffa over**
6    **time could well be complements to fighter talent,**
7    **correct?**
8        A.  Any of the inputs used could be
9    complements to fighter talent.
10       **Q.  And if those inputs used are complements**
11   **to fighter talent, then adding those inputs would**
12   **increase the marginal revenue product of the**
13   **fighter, all things equal, correct?**
14       A.  Well, holding constant all the other
15   things that happen, it can shift marginal product.
16   Whether in equilibrium it changes marginal revenue
17   product at the quantity that's actually employed is
18   another question.
19       **Q.  You do not in your report evaluate whether**
20   **any of the inputs that Zuffa has invested in over**
21   **time are complements to fighter talent or are not**
22   **complements to fighter talent, correct?**
23       A.  Well, since the event revenues that are
24   being generated are higher and some of that's
25   attributable to the investments that Zuffa has

55

1    made, that shifted the demand for talent and even
2    in a perfectly competitive labor market that would
3    raise compensation.  So in that sense we've --
4    we've analyzed that complementarity.
5        **Q.  So to the extent you've analyzed the**
6    **complementarity --**
7        A.  And let me -- I'm sorry to speak over you,
8    but let me just finish the thought.  You know, with
9    rising supply price at the industry label in a
10   perfectly competitive labor market it would
11   increase compensation.
12       **Q.  To the extent you've analyzed in your**
13   **report whether Zuffa's inputs to the growth in**
14   **event revenues over time are or are not complements**
15   **to athlete talent, you have shown that the inputs**
16   **are indeed complements to athlete talent, correct?**
17       A.  Complements in the sense of producing --
18   you've got to define the units of output by which
19   then you're multiplying by marginal revenue to get
20   marginal revenue product, and the -- it can be
21   raising marginal revenue product by raising the
22   marginal revenue product -- marginal revenue
23   product, or it can be making them as I did in that
24   example you showed them in the appendix -- you
25   showed in the appendix making each individual.  So

56

1    that appendix example was a complementarity [sic]
2    between the investments made by Zuffa and the
3    effective amount of entertainment that's being
4    provided by a Zuffa athlete.
5        **Q.  The example from the appendix was one in**
6    **which Zuffa's investments made its fighters better**
7    **at generating revenue when they fight, correct?**
8        A.  Yes.
9        **Q.  So that's an example of Zuffa's**
10   **investments enhancing the marginal revenue product**
11   **of its fighters, correct?**
12       A.  Yes.  Enhancing the product of its
13   fighters.
14       **Q.  Do you have any examples of Zuffa's**
15   **investments that add to event revenues without**
16   **enhancing the revenue-generating power of their**
17   **fighters in your report?**
18       Well, let's be careful about what I just
19   said.  In the appendix what happens is that the
20   number of units of entertainment or interest
21   generated by an athlete is increased by the
22   investments that Zuffa makes.  Whereas in that
23   example the price per unit of interest was given
24   and the -- the point of that example was even if
25   there was no market power downstream in the output

57

1    market or upstream in the input market, you'd get
2    the kind of pattern that we're talking about.  So
3    that's What I mean by Q complementarity, those
4    inputs raise the productivity of -- of an athlete.
5    It didn't necessarily change marginal revenue.
6    You're dancing around one with a -- a related
7    concept which is that the investments increase the
8    market's willingness to pay for the athlete for any
9    given amount of talent that the athlete has.
10   Zuffa's doing many complicated things that affect
11   both of those.
12       **Q.  Where in your report do you evaluate that**
13   **latter concept?**
14       MR. ISAACSON:  Objection to form.
15       MR. CRAMER:  By "latter concept" I mean
16   investments that increase the willingness to pay
17   for the athlete given the talent and revenue
18   generating power of that athlete.
19       A.  Well, I provide examples.  The television
20   show did that, increased willingness to pay for
21   what those athletes bring to the party.  Now, you
22   can view that as -- it's -- it's -- we're getting
23   down into the nuances of the models, that you can
24   view that as increase in the amount of
25   entertainment that they provide and entertainment

15  (Pages 54 to 57)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

58

1   has a -- units of entertainment have a fixed price,
2   or you can say it increases the price per unit of
3   entertainment to -- it's -- I mean, you could model
4   it either way or you could re-think about it either
5   way.
6        Q. Did you model it one way or the other?
7        A. Well, in the back I did it for the
8   purposes of that example as it increased the number
9   of units of entertainment.  You know, in the
10   report, you know, I think it would be easier to
11   think about it in terms of -- of -- like the
12   television show is increasing people's willingness
13   to pay to see athletes with a given amount of
14   talent.
15        Q. Let's switch topics slightly.  Is it fair
16   to say that if all you knew about a firm was that
17   worker compensation increased over time that you
18   could not determine as an economist that the firm
19   was or was not exercising monopsony power?
20        A. You would need to know more.
21        Q. What more would you need to know?
22        A. I can't infer that -- a firm with
23   monopsony power, I mean, you view -- I think you've
24   alluded to this in questions over an hour ago.  If
25   demand increase can move out along the average

59

1   factor cost curve and end up paying a higher
2   price.
3        Q. So one thing you would need to know is
4   whether or not demand had increased over time where
5   you saw worker compensation going up; is that fair?
6        A. No.  That wouldn't provide the evidence of
7   monopsony power.
8        Q. What would you need to know in order to
9   know -- if you saw a firm whose worker compensation
10   was increasing over time, what would you need to
11   know in order to determine that that firm was
12   exercising monopsony power?
13        A. You'd need to know relative to some
14   but-for world that compensation would have been
15   even higher.  So you'd need some kind of controlled
16   experiment about how a firm in similar
17   circumstances employed people and paid people or
18   maybe in some market in identifiably similar
19   circumstances where arguably the existence of that
20   market power you refer to did not exist or existed
21   at some lower level.
22        Q. Assume for this question that the market
23   is perfectly competitive.  Over some period of time
24   you then determine that the marginal revenue
25   product of that firm's workers in a hypothetical

60

1   labor market go up -- goes up about 50 percent, but
2   the wages only go up about 10 percent.  Could you
3   conclude from that that monopoly power -- monopsony
4   the power is being exercised over that period?
5        MR. ISAACSON:  Objection to form.
6   BY THE WITNESS:
7        A. No.
8        Q. What more would you need to know?
9        A. Well, the outcome that you've described is
10   consistent with a competitive labor market.  I
11   think you started by saying assume a perfectly
12   competitive labor market and then you switched in
13   the middle to the exercise of monopsony power,
14   which is --
15        Q. Fair enough.
16        A. -- a total contradiction.  So we can't --
17   but the facts you describe are consistent with the
18   operation of a competitive labor market.
19        Q. So let me reask the question.  Assume the
20   market is perfectly competitive at time T.  Then
21   over some period of time you determine that the
22   marginal revenue product of the firm's workers goes
23   up about 50 percent and you also determine that the
24   wages only go up about 10 percent.  Could you based
25   on those facts determine that monopsony power is

61

1   being exercised?
2        A. Absolutely not.
3        Q. Why not?
4        A. Well, your premise was that the market was
5   perfectly competitive.  In fact, this is -- this is
6   what the example in the appendix does.  The
7   marginal revenue product of some firm increases.
8   Let's define perfectly competitive here as, you
9   know, perfectly elastic supply at the industry
10   level.  Then wages aren't going to change.  The
11   revenues of the firm that got this technological
12   advance that raised its demand for labor are going
13   to be higher.  So the wage I pay each person didn't
14   change and revenues went up.  That would happen in
15   perfect competition.
16        Q. Right.  So in the example you just gave
17   the increased revenues resulted from some
18   technological advance?
19        A. Some investments, some -- something that
20   raised the marginal revenue product of labor in
21   this firm.  They hired Dana White, hey, and he's a
22   like a tech -- he's a walking, talking
23   technological advance.  I don't know.  So he makes
24   demand for the output of this firm or the
25   productivity of the fighters, whatever, goes up.

16  (Pages 58 to 61)

70

1  is. I haven't studied it.
2      Q. So your opinion is that Zuffa has some
3  degree of monopsony power but that degree is small;
4  is that fair?
5      A. If they have a degree of monopsony power,
6  there's been no evidence to indicate what it is or
7  that they've -- the evidence does not indicate that
8  they've exercised monopsony power in this market.
9  Whether they have some monopsony power or not is --
10  is another question. If they tried to hire a whole
11  bunch more athletes would they have to pay a higher
12  wage? Maybe.
13      MR. CRAMER: I'm marking as Topel
14  Exhibit 3 the next document. Oh, excuse me.
15      THE WITNESS: Same guys.
16      MR. CRAMER: Oh, yes, same guys.
17          (Topel Exhibit 3 marked as
18          requested.)
19  BY MR. CRAMER:
20      Q. So what you've been handed is Topel
21  Exhibit 3. It's a different chapter from the
22  Ehrenberg and Smith textbook that you cite in
23  footnote 205; is that right?
24      A. Is this the same footnote? Sorry. I
25  don't need to turn --

71

1      Q. Yes.
2      A. Okay. Go ahead.
3      Q. And this is chapter 5 of the Ehrenberg
4  text "Modern Labor Economics" and the chapter's
5  entitled "Frictions in the Labor Market"; do you
6  see that?
7      A. Yes.
8      Q. Okay. Please turn to -- before I ask you
9  to turn -- I'm sorry. Turn to page 131. All
10  right. I'd like you to look at the second full
11  paragraph, first sentence on page 131 beginning
12  with "Thus"; do you see that? It says --
13      A. Oh, we're above the monopsonistic page.
14  Okay.
15      Q. Correct.
16      A. "Thus the higher worker's mobility."
17      Q. Yes.
18      A. Okay.
19      Q. I'll read it to you. It says "Thus, the
20  higher worker's mobility costs are the steeper the
21  labor supply curve facing a firm will tend to be.
22  Conversely as mobility costs fall other things
23  equal, the labor supply curve to firms will flatten
24  and become more elastic"; do you see that?
25      A. Yes.

72

1      Q. Do you agree with that?
2      A. Well, it depends on a lot of things that
3  go on above that paragraph. I think I know what
4  they have in mind. So if there are --
5      Q. Well -- go ahead.
6      A. If there are -- just the mere existence of
7  mobility costs doesn't do it because -- I mean, if
8  there were constant mobility costs then -- then
9  there's kind of a wedge between here and there, so
10  to speak, but if what they mean is rising mobility
11  costs so that the more people I try to hire from
12  elsewhere the marginal person has to incur greater
13  mobility costs to get from there to me, me as
14  hiring somebody, then that, at least in the short
15  run, can -- would be sort of the -- the level of
16  compensation that I have to pay at the margin to
17  attract people.
18      Q. So am I right that decreasing worker
19  mobility, making worker mobility more difficult all
20  things equal makes the labor supply curve steeper?
21      A. Decreasing labor mobility.
22      MR. ISAACSON: Objection to form.
23  BY MR. CRAMER:
24      Q. Doing something to make it more difficult
25  for one worker to move from one firm to another,

73

1  raising the costs of a worker moving from one firm
2  to another, that's what I mean.
3      A. Then it just raises the cost of a
4  worker --
5      MR. ISAACSON: Objection to form.
6      THE WITNESS: Tina's getting frustrated
7  because we're all talking at once. So let's let
8  her catch up. Are you caught up? Okay.
9  BY THE WITNESS:
10      A. This sentence here refers to mobility
11  costs and it could be the mobility costs of going
12  from A to B or from B to A; and if it's from B to A
13  and I'm A, then I have to compensate people at the
14  margin for that mobility cost to get them to come
15  work for me. So I have to pay a higher wage than
16  if that wasn't there. And if we're talking about
17  going from B to A, then I can pay less than what
18  the other guys pay because the worker has to take
19  into account the mobility costs of going from A to
20  B.
21      Q. So if firm A raises the costs somehow of
22  moving from firm A to firm B, firm A can pay the
23  worker less than if he hadn't raised the cost of
24  mobility, right?
25      MR. ISAACSON: Objection to form.

19 (Pages 70 to 73)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

74

1    BY THE WITNESS:
2        A.  Can pay the worker less than firm B.
3    That's not what we see in this case, but that's
4    true.
5        Q.  By "this case" you mean the Zuffa case?
6        A.  Yes.
7        Q.  Okay.  Let's still talk about the -- about
8    the hypothetical.  It's fair to say that, all
9    things equal, if a firm is able to make it more
10   difficult and expensive for its workers to move
11   from its firm to another firm, the lower it is able
12   to pay its workers; is that right?
13       A.  No.
14       Q.  Why is that wrong?
15       A.  Well, the -- I mean, we're -- you're
16   sneaking up on the rules and -- and contract stuff,
17   and to the extent that those rules make investments
18   more valuable and allow the firm in question to
19   collect on the returns on its investment, those
20   rules can and generally will increase the amount
21   that workers pay.  I mean, if there were zero
22   mobility costs ex post and no restrictions on
23   going, then I -- I as firm A, I'm not investing in
24   these people because it raises their general
25   productivity.  It's like I don't want to train -- I

75

1    don't want to train -- incur the cost of training
2    plumbers for my firm because I make them into good
3    plumbers and they go work somewhere else for the
4    marginal product that I generated.
5        Q.  All right.  Well, I -- I'll move on.
6        Turn to paragraph 200 and in particular
7    I'd like to focus your attention on a part of
8    paragraph 200 that is on page 88.  The second
9    sentence -- or the first full sentence on the page
10   says "In particular the restrictions on athlete
11   mobility address potential market failures due to
12   transaction costs and the free rider problem"; do
13   you see that?
14       A.  Yes, I do.
15       Q.  And by "restrictions on athlete mobility"
16   in this sentence you're referring to the
17   contractual provisions that Plaintiffs are
18   challenging in this case, correct?
19       A.  Generally speaking, yes.
20       Q.  How is it that the -- strike that.
21       Turn to paragraph 68, please.  In
22   paragraph 68 you opine in the first sentence "It
23   may be true that eliminating the challenged
24   contract provisions could promote entry by
25   competing promoters, at least temporarily, because

76

1    new entrants could expropriate existing Zuffa
2    investments in athletes"; do you see that?
3        A.  Yes, I do.
4        Q.  Could you explain the mechanism by which
5    eliminating challenged contractual provisions could
6    promote entry by competing promoters?
7        A.  Sure.  Zuffa has invested in its athletes,
8    in their personas, in matching them with the right
9    opponents, and so on, things we've discussed
10   elsewhere.  Those are costly investments by Zuffa.
11   The challenged contract provisions partially
12   protect the returns on those investments.  So it
13   makes it worthwhile for Zuffa to makes those
14   investments in the first place.
15       Now, after the investments are made if
16   suddenly you change the rules and say, oh no, all
17   of these restrictions on, you know, right of first
18   refusal, champion's clause, the whole thing are out
19   the window and now you've got these athletes that
20   Zuffa made valuable, raised their productivity.  If
21   they can just leave because somebody else -- this
22   is the plumber example I just gave you -- then they
23   can go somewhere else.  So there would be a
24   transfer of wealth from Zuffa to the athletes, but
25   in equilibrium it's not going to last long because

77

1    now that everybody can just up and leave nobody's
2    going to invest.  That's what the paragraph is
3    saying.
4        Q.  Okay.  So you're postulating a change from
5    the current world to a world where none of the
6    challenged contractual provisions exist, is that
7    right, in this paragraph?
8        A.  Yes.  And it's -- it's not just a change
9    of two hypotheticals like what if it had been this
10   way forever on one planet and the other way forever
11   on the other planet.  It's in the middle of the
12   existence of this you say no, all the contracts you
13   wrote are out the window.
14       Q.  Okay.  And in that instance with the
15   challenge provisions out of the way, other MMA
16   promoters could immediately retain Zuffa's
17   athletes, right, if they wanted to?
18       A.  Well, they could as long as they're
19   willing to pay up to the value that's been created
20   by Zuffa.  Some of that value's going to be Zuffa
21   specific, but not all of it.
22       Q.  So, in your view, because Zuffa has
23   invested in promoting these athletes they as a
24   group are more valuable, all things equal, to a
25   rival promoter than unranked fighters sitting in an

20  (Pages 74 to 77)

78

1   MMA gym somewhere; is that right?
2       A. I think what you said is right, yeah.
3       Q. And what it means to be more valuable in
4   this context is that these fighters are capable of
5   bringing in more revenues when they fight, correct?
6       A. Yeah. The identification process and so
7   on raises their interest, the public's interest in
8   these particular fighters. Some of that return, as
9   I said, was Zuffa specific, some of it's totally
10  general like the plumbers.
11      Q. And in this instance where you had the
12  challenged provisions and then they're gone, a new
13  or another MMA promotion could, in your words,
14  expropriate existing Zuffa investments in its
15  athletes; is that right?
16      A. Yes. So Zuffa would have lost money on
17  its investments that it made in the past. It
18  wouldn't have -- it would not have gotten the
19  returns on its investments.
20      Q. So, in your view, at least in the short
21  run, eliminating the challenged contractual
22  provisions will enhance the mobility of the
23  fighters; is that fair?
24      A. I don't know if you would call it enhance
25  the mobility. More of them will move because

79

1   there's more subject to outside bidding. This is
2   kind of like expropriating a -- you know, declaring
3   a patent suddenly invalid and then anybody can make
4   that formula, whereas they couldn't before. That
5   helps for a little while, but nobody's going to
6   invest in the research and development again.
7       Q. So the athletes here are like a patent and
8   with respect to a patent, say a pharmaceutical
9   patent, once the patent expires or ends, the price
10  tends to drop dramatically, correct?
11          MR. ISAACSON: Objection to form.
12  BY THE WITNESS:
13      A. The generics -- now we're into patents.
14  The generics tend to sell for less than the
15  previous price of the brand name. As an aside,
16  whether the brand name drug actually sells for a
17  lower price is another more complicated question.
18      Q. Bill and I have been through that together
19  a long, long time ago.
20      A. Okay.
21      Q. All right. I'm going to move back to
22  Zuffa. It's fair to say that in the short
23  run -- strike that. Well, let me -- let me ask
24  this question again.
25          I think you said that the challenged

80

1   contracts are in effect restrictions on athlete
2   mobility in paragraph 200, right? We worked
3   through it.
4       A. I don't know if I agree with your phrase.
5   They are restrictions that protect the investments
6   that Zuffa has made in athletes.
7       Q. Turn to paragraph 200, please.
8       A. Okay.
9       Q. The second sentence or the first full
10  sentence on page 88 says "In particular the
11  restrictions on athlete mobility address potential
12  market failures" --
13      A. Okay. I'm referring to those challenged
14  business practices. So in that sense they are
15  restrictions on mobility that say you can't just up
16  and leave.
17      Q. And in your opinion, enhancing fighter
18  mobility by removing restrictions from the
19  contract -- that the contracts create in the short
20  run at least would in your view facilitate rival
21  entry; is that right?
22      A. It might facilitate rival entry depending
23  on fixed costs and things like that and what they
24  foresee about this market because they
25  can't -- well, it does get complicated. Forgive

81

1   me. If we say that Zuffa can't use these and other
2   people can, then rival entry will occur.
3       Q. So there are two options, either Zuffa
4   would pay its fighters more or the rivals will come
5   in and expropriate the value that Zuffa has created
6   by investing in its fighters; is that fair?
7       A. No. You're -- you're -- I said a little
8   while ago that when you get rid of these
9   restrictions Zuffa's not going to be able to invest
10  in fighters and the interest in fights and things
11  like that the way they did before because they
12  can't capture their returns. So the -- the
13  question I offer -- I just asked is what are you
14  assuming about the entry. Do they come in under
15  the same rules as Zuffa?
16      Q. Oh, I see.
17      A. Okay. Or are they allowed to do things
18  that Zuffa did from the beginning and now we turn
19  around and say Zuffa, you can't do that anymore but
20  everybody else can and that's -- that's my
21  question.
22      Q. Okay. In paragraph 68 -- and I believe
23  you referred to that in your answer earlier -- you
24  say in the sentence beginning with "Suppose"; do
25  you see that? I'd like you to look at that. It's

21 (Pages 78 to 81)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

82

1    the third sentence of paragraph 68; do you see
2    that?
3        A.  I'm not there yet.
4        Q.  "Suppose" is on the right-hand margin.
5        A.  Oh, here we are.  Okay.  Second
6    sentence.
7        Q.  Yeah.
8        A.  Third sentence.
9        Q.  Third sentence.  It says "Suppose Zuffa's
10   contract provisions are found to be
11   anticompetitive, then a potential competitor could
12   recruit and contract with the existing stock of
13   developed Zuffa athletes enjoying the fruits of
14   Zuffa's past investments in developing those
15   athletes.  This would create a transfer of wealth
16   to the stock of existing Zuffa athletes."  Do you
17   see that?
18       A.  Yes.  That's what I said a few minutes
19   ago.
20       Q.  You did.  And I just want to understand
21   what you mean here.  What you're talking about when
22   you talk about a transfer of wealth is from Zuffa
23   to its fighters; is that fair?
24       A.  Zuffa would be worse off by having lost
25   the returns on its investments.

83

1        Q.  And what you mean by "lost the returns on
2    its investments" is that in this situation, at
3    least in the short run, Zuffa would pay its
4    fighters more, correct?
5        A.  Well, I don't necessarily mean that at
6    all.  I mean that those athletes would go -- we've
7    defined this now as a reduction in mobility costs.
8    Some of these guys go somewhere else because
9    somebody else pays for the productivity that Zuffa
10   produced with its investments.  It's the plumbers
11   problem again.  And, you know, whether Zuffa stays
12   in business after this I don't even know because
13   the premise of much of this is that these
14   competitors -- I think we had it in this
15   paragraph -- these competitors get to use rules
16   that are now prohibited for Zuffa.  So Zuffa's
17   definitely at a competitive disadvantage in that
18   world.
19       Q.  Okay.  But I just want to understand what
20   you mean by transfer of wealth.  Presumably the
21   Zuffa fighters who now are free of the contractual
22   restrictions would move if they could get paid
23   more, right, and that's what you mean by the
24   transfer --
25       A.  Move -- the -- the amount that someone is

84

1    willing to pay -- I can leave immediately because
2    we've assumed away these contractual restrictions
3    and somebody's bid the value of what Zuffa created
4    for my services, at least the value of what Zuffa
5    has created to that firm for my services.  So to
6    the extent that I go I will be paid more ex post
7    than I would have been paid, and so that is a
8    transfer of wealth from one party to another.
9    You've expropriated the investments that Zuffa
10   made.
11       Q.  It's a transfer of wealth, in your view,
12   from Zuffa to the fighters because in this instance
13   Zuffa would either have to pay the fighters more or
14   someone else would pay the fighters more, right?
15          MR. ISAACSON:  Objection to form.
16   BY THE WITNESS:
17       A.  I think I see where you're going with it
18   and yes.
19       Q.  So at least in the short run enhancing
20   fighter mobility by removing the challenged
21   contracts would lead to higher UFC fighter
22   compensation, right?
23       A.  For people who have already been invested
24   in, but Zuffa's not going to invest again.
25       Q.  So for the existing stock of Zuffa

85

1    athletes eliminating the challenged contracts, at
2    least in the short run, would enhance fighter
3    mobility and lead to higher fighter compensation,
4    correct?
5        A.  It could do that.
6           MR. ISAACSON:  Objection to form.
7    BY THE WITNESS:
8        A.  As I said, it depends on what we're
9    assuming about what other firms can do.  I mean, if
10   we had a world where nobody could do this, then the
11   other firms probably aren't going to want to hire
12   them either because in equilibrium this business
13   model's not going to work.
14       Q.  But the transfer of wealth occurs --
15   presumably the transfer of wealth only occurs if
16   someone is willing to pay the fighters more,
17   correct?
18       A.  You have to have some market structure in
19   place where someone is willing to pay more, but if
20   the more is just a -- a -- the more relies on the
21   fact that, hey, we get to hire these guys that we
22   didn't have to invest in, great, and then we can
23   write multi-contract -- multi-fight contracts with
24   them and everything else.  So it could be Bellator,
25   terrific, they invested and we get to get him.

22  (Pages 82 to 85)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

86

1    Q. Is it fair to say in the short run if we
2  eliminate the challenged contractual provisions,
3  one immediate effect is that fighters get paid
4  closer to the amount of event revenues that they
5  generate for the promotion; is that fair?
6         MR. ISAACSON: Objection to form.
7  BY THE WITNESS:
8    A. They'll get paid more than they would have
9  because they're getting some of the returns on the
10  investment that were previously shared with -- with
11  the investing firm.
12    Q. So in your view, the challenged
13  contractual provisions are what is allowing Zuffa
14  to pay the fighters below the marginal revenue
15  product of those fighters, correct?
16         MR. ISAACSON: Objection to form.
17  BY THE WITNESS:
18    A. No. I mean, it's -- in the long run --
19  when you think about investments you have to think
20  about the costs and the returns. So anybody who's
21  making investments in -- any firm that's paying for
22  some of the investments in human capital has to
23  get, you know, at least a competitive return on
24  those investments. So it's not a one-period thing.
25  It's a multi-period thing. There's a kind of

87

1  before and -- period 1 and period 2 and the firm
2  invests and it gets the returns. So even under
3  competition if you turned around to firms and said,
4  look, you don't get the returns, that would be a
5  transfer of wealth to -- in the second period to
6  the people who are invested in the first period.
7  So getting more of your marginal revenue product
8  you're thinking about it like at a single point in
9  time whereas the relevant thing is it's dynamic.
10  It's -- it's how many periods are you going to be
11  here and what I do -- what I do with you when
12  you're young and a novice and unknown and how do I
13  get the returns on what I just did for you to make
14  you more productive.
15    Q. Okay. I understand you're making a
16  dynamic long-run argument. I'm just trying to
17  understand how it works in the short run for the
18  existing stock of Zuffa athletes. And for the
19  existing stock of Zuffa athletes in the short run
20  what is allowing Zuffa to pay fighters below their
21  marginal revenue product are the challenged
22  contractual restrictions, correct?
23         MR. ISAACSON: Objection to form, asked
24  and answered.
25  BY THE WITNESS:

88

1    A. They're getting a return. So their
2  marginal revenue product over the -- I can't answer
3  this outside of the context of two periods because
4  I have to take the costs into account. Now, if
5  what you're trying to say -- let me just phrase it
6  so we're on the same page. Come back to my example
7  of the plumbers. For the marginal plumber in two
8  periods the return -- the investment cost is going
9  to be equal to -- what I pay has to be compensated
10  by a wedge between what his productivity would be
11  somewhere else and what I have to pay him in the
12  second period. Okay. So I might have some
13  restriction on whether he can leave right away and
14  all that. And now you tell me that restriction's
15  gone. So, yeah, somebody else will pay up to what
16  that guy's worth in the second period, but that
17  doesn't mean his marginal revenue product doesn't
18  take into account what I paid for him in the first
19  period, but -- but that's in the past now and it's
20  gone and we let him go, he's gone. I'll never make
21  that investment again, but he's gone and he'll get
22  paid more, and that's the sense in which there's a
23  transfer of wealth relative to the outcome that we
24  had when we had a contract that protected the
25  investments.

89

1    Q. Turn to paragraph 113, please.
2         MR. CRAMER: Do you need a break?
3         THE REPORTER: After this.
4         MR. CRAMER: We'll take a break after
5  this.
6  BY MR. CRAMER:
7    Q. Towards the end of that paragraph,
8  paragraph 113, you have a sentence that begins "As
9  explained above, if athletes"; do you see that?
10    A. Yes.
11    Q. This says "As explained above, if athletes
12  can freely switch to competing promoters that pay
13  'competitive compensation' given the athlete's
14  human capital, human capital that was largely
15  developed by an initial promoter, then there is
16  little incentive for the initial promoter to make
17  the investments that contribute to that human
18  capital in the first place"; do you see that?
19    A. Yes.
20    Q. So here you're positing a world without
21  the challenged contracts, right? In other words,
22  if athletes can freely switch; is that right?
23    A. I think that's a fair statement, yeah.
24    Q. And in this world you are opining
25  that -- strike that.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

ROBERT TOPEL - HIGHLY CONFIDENTIAL

90

1        And the premise of your argument is that
2  if all of a sudden athlete mobility were enhanced,
3  then other promoters would be willing to pay UFC --
4  UFC fighters up to the value of their human
5  capital; is that right?
6        A. Well, I'm -- I'm positing that -- you can
7  interpret this in two ways.  One, you had me in
8  paragraph something, 68 or something.
9        Q. 68.
10       A. And we're talking about removing the
11  contract restrictions and having a but-for world
12  where either everybody else can use those contract
13  restrictions or nobody else can and the outcomes in
14  those two worlds are different.  Here we can -- if
15  I say -- if athletes can freely switch, then these
16  investments are not going to occur.  I'm sort of
17  comparing two but-for worlds.  How would this
18  industry operate absent the contract restrictions,
19  and the -- to the extent that it takes the business
20  acumen of the promoter and so on to develop those
21  personas and value, there would be a lot less of
22  that development.  And it says there's little
23  incentive for the initial promoter to make the
24  investments that contribute to human capital in the
25  first place.  So we'd have an -- we'd have an

91

1  equilibrium with less investment in that type of
2  human capital.
3        Q. All right.  I understand your dynamic
4  argument.  I'm asking about now the short run and
5  the premise of your point that if athletes can
6  freely switch to competing promoters, competitive
7  comp- -- those promoters would pay athletes
8  compensation given the athlete's human capital is
9  that these competing promoters would be willing to
10  pay more than the UFC would given the athlete's
11  human capital, right?
12       MR. ISAACSON:  Objection to form.
13  BY THE WITNESS:
14       A. No, that's not what I'm saying here.
15  You're addressing a different problem.  Let's just
16  be explicit about what I'm saying here.  If
17  athletes can freely switch -- and I'm making a
18  statement about the market and if athletes can
19  freely switch in this market, then initial
20  promoters wouldn't be making the investments in
21  human capital in the first place.
22       Q. I understand that.
23       A. Okay.  And so, I mean, read the next
24  sentence.  "Reducing promotional investments would
25  make athletes as well as the promoter -- I could

92

1  have said promoters -- and consumers worse off."
2        Q. Right, but --
3        A. So is this statement about two different
4  market -- the equilibrium under two different
5  market structures either these kinds of
6  restrictions are allowed or they're not allowed,
7  and I'm talking about well, if they're not allowed
8  the world's going to be a lot different than it
9  is.
10       Q. What did you mean when you said "If
11  athletes can freely switch to competing promoters
12  that pay competitive compensation given the
13  athlete's human capital"?
14       MR. ISAACSON:  Asked and answered.
15  BY THE WITNESS:
16       A. It means that if there's free mobility I
17  can switch to anybody who will pay "competitive
18  compensation," but, you know, that -- in the
19  equilibrium that level of compensation, that value
20  is going to be lower.
21       Q. I'm asking not -- not at the long-run
22  equilibrium, but in the short run.
23       A. But that's not what this sentence is
24  about.
25       Q. I know, but the sentence is premised on

93

1  the notion -- and tell me if I'm wrong -- that if
2  you enhanced athlete's mobility in the short run
3  competing promoters would pay a higher amount of
4  the athlete's human capital than the UFC would be
5  willing to pay, correct?
6        A. Well, that's not what this sentence is
7  about.  I mean, we -- we can talk about -- if you
8  want to talk about that problem I'm happy to talk
9  about it, but that's not what this sentence is
10  about.  This is about what would the industry look
11  like in a world where you can't do this.
12       Q. Right.  I understand that.  You're making
13  a dynamic long-term argument, but it seems to me
14  that your dynamic long-term argument is premised on
15  something happening in the short run.
16       A. No.  Let me explain.  I've got two
17  worlds --
18       MR. ISAACSON:  I'm going to object to
19  form.
20  BY THE WITNESS:
21       A. Okay.  I have two worlds.  World -- east
22  of the Rockies we can have -- and there's -- and
23  nobody goes from one side to the other.  East of
24  the Rockies I'm going to have one set of rules and
25  the industry develops the way it develops, and the

24  (Pages 90 to 93)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

110

1  during the right-to-match period some bidders
2  would, all things equal, be more reluctant to bid
3  when a fighter is under a right to match because
4  the bidding -- by bidding to Zuffa you're
5  disclosing internal financial information about
6  your willingness to pay for the fighter; is that
7  fair?
8      MR. ISAACSON:  Objection to form.
9  BY THE WITNESS:
10     A.  I don't know how much -- how secret the
11 financial information is.  So I've never thought
12 about whether it's just oh, you're showing what
13 this guy's worth.  If you have inside
14 information -- let's put it that way -- put it this
15 way.  Suppose that some fighters, say Mr. Melendez
16 just so we can have a name, is unusually valuable
17 to Bellator, then the offer that -- that
18 Mr. Melendez gets from Bellator reveals something
19 about his value to Bellator and symmetrically this
20 offer that Zuffa has reveals something about his
21 value to Zuffa and it would go the other way too
22 because Bellator has these contracts so that if
23 some guy got an offer from Zuffa it would reveal
24 something.
25     Q.  So let's assume for purposes of this

111

1  question that Zuffa is highly secretive of its
2  contractual negotiations with its fighters.  Would
3  it be fair to say that all things equal the
4  willingness of a third party to bid for a UFC
5  athlete during the right-to-match period would be
6  less than in a world where the right-to-match
7  period had been expired because the bidding party
8  would need to disclose some information to Zuffa;
9  is that fair?
10     MR. ISAACSON:  Objection to form.
11 BY THE WITNESS:
12     A.  I got -- I'm sorry.  Your sentence went on
13 a long time and it had a lot of hypotheticals in it
14 and I lost the train.
15     Q.  Okay.  Let's start again.  There's a
16 right-to-match period --
17     A.  Yes.
18     Q.  -- during which Zuffa has matching
19 rights?
20     A.  Yes.
21     Q.  And during that period if the athlete goes
22 out and gets a bid from another MMA promoter --
23     A.  Yes.
24     Q.  -- that athlete is required, then, to
25 bring that bid to Zuffa, correct?

112

1      A.  If he's considering taking it, yeah.
2      Q.  Right.  And by showing this bid from a
3  rival MMA promoter to Zuffa, Zuffa is learning some
4  information about the value of this athlete to the
5  rival promoter, correct?
6      A.  Well, yeah.  I mean, they -- they learn
7  what Bellator's offering the athlete.  That's what
8  they learn.
9      Q.  And my question is simply as compared to
10 an athlete during a right-to-match period as
11 opposed to an athlete who is beyond his
12 right-to-match period a rival MMA promoter would be
13 less likely to bid during a right-to-match period
14 than after the right-to-match period is expired,
15 correct?
16     MR. ISAACSON:  Objection to form.
17 BY THE WITNESS:
18     A.  I mean, I -- your -- I think your question
19 is -- forgive me for saying so, but it's a little
20 confused.  I don't -- you know, I'm agreeing with
21 you on this, agreeing with you on this because it's
22 all premises, and then it's about the
23 right-to-match period.  If there was no right to
24 match and Mr. Melendez brings in an offer from
25 whomever, Bellator, I learn something and the --

113

1  the athlete has the incentive to, if it's a really
2  good offer, show it and say -- forget about right
3  to match, you know.  It's just like, okay, we're
4  going to have competitive bidding at this point in
5  time and the guy comes in with his Bellator offer
6  and he says here's my Bellator offer.  Now, he
7  might -- or maybe he makes up stuff about his
8  Bellator offer, I don't know, but he's putting --
9  let's say he puts the Bellator offer there.  I
10 mean, that's how it works in my business.  You
11 know, you get an offer from some other university,
12 you take it down to the dean, and say there it is.
13 So they learn what I'm worth to Princeton or
14 Harvard or Pasadena City College or something and
15 they can match it if they want to.  The difference
16 in the right of first refusal is that for the
17 objectively verifiable elements of the offer, which
18 are a little -- can be a little vague I understand,
19 that if I match them you've -- you stay, but none
20 of the information revealing stuff that you talked
21 about is particular to the right of first refusal.
22     Q.  Would you agree that, all things equal, an
23 athlete is less likely -- strike that.
24         Why would an athlete want to bring a rival
25 bid -- an athlete at Zuffa who has -- who's beyond

29 (Pages 110 to 113)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

114

1 his right to match, why would that athlete want to
2 bring Bellator's bid to Zuffa?
3    A.  Because he says, look, you beat this offer
4 I might stay.
5    Q.  If you beat this offer I might stay, and
6 that would benefit the athlete if Zuffa beat the
7 offer, right?
8    A.  Well, yeah.  I mean, there's nothing wrong
9 with that.  I'm going to bring in offers.
10    Q.  And what would happen if after Zuffa said
11 I'll beat that offer by a dollar the athlete went
12 back to Bellator and said would you beat this
13 offer, would that benefit the athlete?
14    A.  Well, in the hypothetical you're giving,
15 yeah, which means that Bellator didn't make its
16 best offer, but that's okay.
17    Q.  Is it fair to say that because a rival
18 bidder when an athlete is constrained by a
19 right-to-match period knows that Zuffa could just
20 accept the offer that a rival bidder would be less
21 reluc-- more reluctant, all things equal, to make
22 a bid in the first place?
23    A.  That could happen in equilibrium.  You
24 know, you're saying all other things the same.
25    Q.  Yes.

115

1    A.  I think what you're -- what you're talking
2 about is there's a range of values for this
3 athlete -- I'd have to work it out, but there's a
4 range of values for this athlete to the other firm
5 and it has to make a decision about whether to make
6 it a bid.
7    Q.  Yes.
8    A.  So there could be a lower probability of a
9 bid.
10    Q.  Are you familiar with restricted free
11 agency in basketball?
12    A.  Yeah, somewhat.
13    Q.  And are you aware that athletes during the
14 restricted free agency period tend to get less bids
15 than when athletes are no longer during the
16 restricted free agency period?
17    A.  I've not studied that, but it doesn't
18 surprise me.
19    Q.  And is it also fair to say that athletes
20 during a restricted free agency period as compared
21 to athletes after the restricted free agency period
22 is over tend to get paid less during -- get lower
23 bids during the restricted free agency period than
24 after the restricted free agency period, all things
25 equal?

116

1    A.  My answer's the same.
2    Q.  All right.  Turn to paragraph --
3    A.  Let's be -- let's be careful.  I mean,
4 that's an equilibrium -- again, that's an
5 equilibrium and the reason they have the restricted
6 free agency period is because there's specific
7 value that has been invested in by the franchise.
8 And so the equilibrium is that with the existence
9 of restricted free agency there is a period
10 where -- let us presume all the premises of -- that
11 you've talked about are true where offers are less
12 likely to arrive, but that's within the context of
13 restricted free agency.  If you didn't have
14 restricted free agency, period, then players and
15 franchises would all be less valuable.  So
16 that's -- that's a completely different market than
17 what this is.  So you can't -- this is always true
18 in economics.  You have to figure out what's the
19 equilibrium and you can't take a contract that
20 exists and say, okay, in this part of the contract
21 this many offers arrive, in that part of the
22 contract that many offers arrive, and then say,
23 well, the net -- then the second part is just like
24 what the world would be if there's no contract.
25 That's not the way it works.  You've got to say if

117

1 we took away the contract people would invest less,
2 basketball players would be less popular,
3 basketball would be less popular.  It's the whole
4 thing and that's why the contract's there.
5    Q.  Turn to paragraph 101 -- 101, please.
6    A.  Yes.
7    Q.  All right.  You offer -- on page 44 you
8 offer a hypothetical at the top, do you see that,
9 "Consider an athlete" --
10    A.  Yes.
11    Q.  -- "who has reached the end of his
12 contract with Zuffa"?
13    A.  Yes.
14    Q.  And then you say "Assume that the
15 athlete's talents and reputation are worth $100,000
16 to Bellator and Bellator offers that amount.
17 Because some aspects of the athlete's Zuffa-created
18 development are specific to Zuffa, the athlete is
19 worth more to Zuffa, say $150,000, than to
20 Bellator."  Do you see that?
21    A.  Yes.
22    Q.  Then you go on to say "In negotiation with
23 Zuffa the athlete has an incentive to overstate the
24 value of other unmeasured aspects of its Bellator
25 offer forcing Zuffa to pay more and thus capturing

30  (Pages 114 to 117)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

118

1    some of the returns on Zuffa's investment.  The
2    right to match provision -- provision avoids this
3    'holdup' problem allowing Zuffa to retain the
4    athlete by matching the observable and verifiable
5    elements of his Bellator offer."  Do you see
6    that?
7        A.  Yes.
8        Q.  So here you're positing an athlete that is
9    worth $100,000 to Bellator; is that right?
10       A.  After investments have been made, yes.
11       Q.  After Zuffa's investments have been
12   made?
13       A.  Yes.
14       Q.  Okay.  And that is because Bellator
15   presumably believes it can earn at least a hundred
16   thousand dollars in additional event revenues when
17   that athlete fights, correct?
18       A.  I don't know if it's event revenues.  He's
19   worth a hundred thousand dollars to Bellator.
20       Q.  Because Bellator believes he is going to
21   generate at least a hundred thousand dollars in
22   earnings, correct, for Bellator?
23       A.  Not his -- for Bellator, yeah.  It could
24   come from selling bobblehead dolls.  I don't care
25   what it comes from.

119

1        Q.  Okay.  Is what you're saying that the
2    athlete's marginal revenue product at Bellator is
3    at least a hundred thousand dollars; is that the
4    same concept?
5        A.  Well, if what we're talking about is that
6    everybody at -- you know, all the other things at
7    Bellator are held constant and we add this person,
8    then willingness to pay by Bellator is a hundred
9    thousand dollars.
10       Q.  Okay.  And in this example the fighter's
11   revenue generating power is greater at Zuffa than
12   at Bellator?
13       A.  In this example, that's correct.
14       Q.  Why?  What explains that?
15       A.  Because I've been fighting Zuffa athletes
16   and, you know, whatever rivalries have been built
17   up, Zuffa has a fan base the way lots of branded
18   firms have a customer base that has some
19   differential loyalty to them.  They're a -- they're
20   a differentiated product and they -- they found a
21   target audience that values what UFC does.  So all
22   the firms are not just generics in this market.  So
23   I've made these investments and I would design the
24   investments so that they increase the value to me,
25   but some of that's -- some of that human capital is

120

1    portable and that's the hundred thousand dollars to
2    Bellator.
3        Q.  Is it fair to say that this athlete's
4    marginal revenue product at Zuffa in your example
5    is at least $150,000?
6        A.  Well, you know, with all the other stuff
7    that's going on at Zuffa -- look, willingness to
8    pay by Zuffa is $150,000.
9        Q.  And so Zuffa must think that the athlete's
10   marginal revenue product is at least $150,000,
11   correct?
12       A.  I'm saying that's the -- that's the upper
13   limit.  So if -- I'm not sure how you're using
14   marginal -- willingness to pay is the largest
15   amount that Zuffa would pay to have this athlete.
16       Q.  Okay.
17       A.  And that's $150,000.
18       Q.  Now, you say that the right to match
19   allows Zuffa to avoid being, as you say, held up by
20   the fighter who will force Zuffa to pay more; is
21   that right?
22       A.  Are you just reading what I -- what I
23   said?
24       Q.  I'm paraphrasing.
25       A.  Okay.  Well, let's read.  "The athlete has

121

1    an incentive to overstate the value of the other
2    unmeasured aspects of the Bellator offer" -- that's
3    one of the tactics he could use -- "forcing Zuffa
4    to pay more and thus capturing some of the returns
5    on Zuffa's investment."
6        Q.  Well, the holdup, in your view is the
7    fighter demanding Zuffa to pay him more than a
8    hundred thousand dollars; is that right?
9        A.  Yeah, because the $150,000 is the amount
10   that helps to cover the investments that Zuffa
11   previously made in the fighter.
12       Q.  And so what the right to match is allowing
13   the fighter to do is to cause the fighter to be
14   paid -- I'm sorry.  What the right to match is
15   allowing Zuffa to do is to pay the fighter less
16   than the fighter would be paid without the right to
17   match; is that right?
18       A.  Well, again, it comes down to are you
19   taking away the rules, are you not taking away the
20   rules.  If -- if the rule is that Zuffa invested in
21   this -- let's -- suppose it costs $110,000 to
22   invest in this person.  And so Zuffa calculates
23   that if the person stays he's worth $150,000 with
24   some probability.  Okay.  And so ex post he's worth
25   the 150,000.  And the person can just go to

31 (Pages 118 to 121)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

122

1    Bellator for -- he's only worth it if I can pay him
2    in the second period a hundred thousand dollars.
3    Okay.  So if -- but if he gets more than that
4    hundred thousand dollars the initial investment
5    wasn't worthwhile, then I'm not going to invest in
6    him ex post if I know he's going to be able to hold
7    me up for that surplus that was generated to cover
8    the cost of the investment in the first place.
9        **Q.  Okay.  Let's assume now that you're Zuffa**
10   **and you don't know, right?  You're assuming that**
11   **there's a world with a right to match and you make**
12   **the investments that you make in the fighter that**
13   **you just identified.  If we immediately and all of**
14   **a sudden remove the right to match, you would agree**
15   **that that fighter would be paid more than if the**
16   **right to match would not have been eliminated,**
17   **correct?**
18       A.  Yeah.  We've danced around this question
19   over and over again.  Are we --
20       MR. ISAACSON:  Objection to form.
21   BY THE WITNESS:
22       A.  Are we taking away the right to match
23   universally or for this particular fighter?
24       **Q.  Let's just say for this particular**
25   **fighter.**

123

1        A.  Okay.  So this guy -- the Melendez
2    question we talked about a few minutes ago.  I'm
3    giving this person a unique ticket that says the
4    rules don't apply to you.
5        **Q.  Let's -- here's the hypothetical, assume**
6    **that Melendez does not have a right to match in his**
7    **contract, he negotiated it away.**
8        A.  Somebody forgot.
9        **Q.  Somebody forgot.**
10       A.  Somebody forgot.  Okay.  But that's
11   important.
12       **Q.  Okay.**
13       A.  That's actually really important because
14   if somebody forgot, then they're going to invest in
15   this dude and -- like they've got it and then
16   they're going to realize ex post he's going to come
17   in and say ha ha, you invested in me but there's no
18   restriction on what I can do because you forgot to
19   check the box and he brings in some lawyer that
20   said -- and -- and Zuffa says we give up.  Yeah, we
21   can collect the returns on Zuffa's investment then,
22   but that's a very specific thing, they forgot to
23   check the box, because if you negotiate it away,
24   then Zuffa knows what's going to happen and they're
25   going to invest less.

124

1        **Q.  Okay.  So in the situation where Zuffa**
2    **forgot and didn't know that the right to match was**
3    **not in the contract of this fighter, you would**
4    **agree that Zuffa would make those investments**
5    **thinking that the fighter was subject to a right to**
6    **match and then as a result of not having the right**
7    **to match that fighter would be able to be paid more**
8    **than in a world where that fighter had a right to**
9    **match, correct?**
10       MR. ISAACSON:  Objection to form.
11   BY THE WITNESS:
12       A.  He can then expropriate Zuffa's
13   investments, that's true.  So -- I mean, I don't
14   know why this is an interesting problem, but maybe
15   we'll figure it out later.
16       MR. ISAACSON:  Do you want to take a break
17   at this point?
18       MR. CRAMER:  One minute.
19   BY MR. CRAMER:
20       **Q.  Is it your opinion that any -- strike**
21   **that.**
22       **Have you seen any fighters that were able**
23   **to negotiate away the right to match in their**
24   **contracts?**
25       A.  You know, I don't recall.  I might have.

125

1    I've seen lots of stuff.
2        **Q.  It's fair to say that the vast majority of**
3    **Zuffa's contracts have the right to match provision**
4    **in it, correct?**
5        A.  Yes.  I think we have a table to that
6    effect.
7        MR. CRAMER:  Okay.  All right.  We can go
8    off the record.
9        THE VIDEOGRAPHER:  Going off the record at
10   12:52.
11       (Whereupon, at 12:52 p.m., the
12       deposition was recessed, to
13       reconvene at 1:30 p.m., this
14       same day.)
15
16
17
18
19
20
21
22
23
24
25

32  (Pages 122 to 125)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

126

1    AFTERNOON SESSION
2         (1:41 p.m.)
3    THE VIDEOGRAPHER:  We are going back on
4  the record at 1:41.  This begins disk No. 4.
5    ROBERT TOPEL,
6  the witness at the time of recess, having been
7  previously duly sworn, was further examined and
8  testified as follows:
9         EXAMINATION
10         (Resumed)
11  BY MR. CRAMER:
12    Q.  Please turn to paragraph 87 of your
13  report, page 36.  You say there at the beginning of
14  the paragraph "Both athletes and promoters make
15  considerable investments that increase the value of
16  the product offered to the public, athletes through
17  their training and promoters through promoting MMA
18  events and athletes."  Do you see that?
19    A.  Yes.
20    Q.  Okay.  And then you go on to say that
21  "Investments and training are borne" -- I'm sorry.
22  "Investments and training borne by the athletes are
23  not subject to free riding because training is
24  embodied in the individual athlete"; do you see
25  that?

127

1    A.  Yes.
2    Q.  And the point you're making there is that
3  athletes can take the skills they created through
4  their training investments to other promoters?
5    A.  Yes.  And the skills they develop are
6  general in that sense.
7    Q.  So it's your understanding that the UFC
8  does not, as a general matter, invest in fighter
9  training or pay for fighter training or
10  development?
11    A.  I'm not saying that.  It says "Investments
12  in training borne by the athletes themselves are
13  not subject to free riding because the training's
14  embodied in the individual athlete."
15    Q.  All right.  Well, let me just ask you
16  that.  Is it -- is it or is it not your
17  understanding that UFC does not as a general matter
18  invest in fighter training?
19    A.  I don't recall if they pay for like gym
20  time or something like that.  I don't think they
21  do, but it's not really material to my opinions.
22    Q.  So you don't know one way or another
23  whether the UFC pays athletes for time they spend
24  in gyms; is that fair?
25    A.  I don't recall.  If I knew at some point,

128

1  I've forgotten.
2    Q.  You're aware that UFC athletes aren't paid
3  salaries, correct?
4    A.  Yes.
5    Q.  So it's your understanding that if an
6  athlete goes to a gym he could submit that for
7  reimbursement to the UFC?
8    A.  I didn't say that.
9    Q.  So how in your understanding is an athlete
10  paid for going to a gym to train?
11    A.  I didn't say that either.
12    Q.  Okay.  So you just don't know one way or
13  another?
14    A.  I said if I knew at some point whether
15  there was anybody who got any reimbursement for
16  training time or paying for the coach or anything
17  like that, I don't recall it.
18    Q.  All right.  I'm not asking you about
19  whether any person ever at the UFC was paid for
20  training.  My question is do you know one way or
21  another whether the UFC in general pays its
22  fighters for training expenses?
23    A.  I don't recall it.
24    Q.  Do you have an understanding one way or
25  another about whether the UFC pays for fighter's

129

1  trainers?
2    A.  I don't recall.
3    Q.  Do you know one way or another whether the
4  UFC pays for a fighter's sparring partners?
5    A.  I don't recall.
6    Q.  Do you know one way or another whether the
7  UFC pays for a UFC's business manager -- I'm
8  sorry -- a UFC's fighter's business manager?
9    A.  I have no recollection.
10    Q.  Do you know one way or another whether the
11  UFC pays for a fighter's meals while they're
12  training?
13    A.  Well, see, you dropped in the "while
14  they're training."  I think there's -- there are
15  certain things that are paid for around the time of
16  an event, I know that.  I don't recall seeing in a
17  contract anything about paying for meals while
18  they're training.
19    Q.  So you're aware that in UFC fighter
20  contracts the UFC agrees to pay for certain things
21  around an event; is that right?
22    A.  Yes.
23    Q.  Have you ever seen a UFC fighter contract
24  in which the UFC agreed to pay for training
25  expenses that were not around an event?

33 (Pages 126 to 129)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

---

130

1      A. I haven't seen it in a contract, but I'm
2  not in a position to say it never happened.
3      Q. It might happen, but you don't know one
4  way or another; is that your opinion?
5      A. That's correct.
6      Q. Do you know one way or another whether the
7  UFC pays for a fighter's travel when they're
8  training, not around an event?
9      A. I've never seen such an expense in a
10  contract. If I have, I don't remember.
11      Q. Do you know one way or another whether the
12  UFC pays for a fighter's general medical care
13  separate and apart from anything that might happen
14  in a bout?
15      A. That's different. I recall something
16  about medical care. I can't remember what it is.
17  Injuries in a bout might be taken care of. I can't
18  remember.
19      Q. Do you know one way or another whether the
20  UFC provides fighters who are fighters for the UFC
21  general medical insurance?
22      A. I'm trying to remember and I don't as I
23  sit here.
24      MR. ISAACSON: Objection to form.
25  BY MR. CRAMER:

---

131

1      Q. You're aware that UFC fighters are
2  independent contractors, correct?
3      A. Yes.
4      Q. And are you familiar -- strike that.
5      Have you in your work in this case
6  computed or quantified anywhere the amount of money
7  that the UFC has paid fighters for training?
8      A. No. I think you know that. Yeah.
9      Q. So in paragraph 87 you referred to
10  "Returns on a fighter's training investments"?
11      A. Yes.
12      Q. You would agree that all things equal, the
13  more training a fighter does the better an athlete
14  that fighter will be?
15      A. If the training is rational, yeah. That
16  would be the point of training.
17      Q. And, all things equal, the more rational
18  training fighters do generally the better MMA
19  product they will be, correct?
20      A. Yes.
21      Q. And, all things equal, the better MMA
22  product the more demand there will be for it,
23  correct?
24      A. Yes.
25      Q. So, all things equal, if more money is

---

132

1  spent on MMA training in a rational way the sport
2  will benefit generally, right?
3      A. Are you saying that there's spill-overs
4  from my training onto other people?
5      Q. Correct. Yes.
6      A. Then there would be too little training
7  because I don't get all the returns to my training.
8  That could be true. There could be an
9  externality.
10      Q. And putting aside the externality issue,
11  all things equal, the more money that fighters
12  spend on rational training for MMA, the more
13  consumers of the sport will benefit, correct?
14      MR. ISAACSON: Objection to form.
15  BY THE WITNESS:
16      A. You think you're saying -- you said
17  there's no externality and I think you said there
18  is an externality but -- now, but that -- the more
19  people train the more -- I think what you're trying
20  to get at is that the more people train the more
21  people are willing to pay to watch them battle it
22  out in the octagon. Is that what you're trying to
23  say?
24      Q. Well, put it this way. The more people
25  train the higher quality fights there will be, all

---

133

1  things equal; is that right?
2      A. Well, that could be true. I don't know
3  the answer because it could be a war of attrition
4  where, you know, you train -- given my level of
5  training you train harder than me and given your
6  level of training I choose how to -- how hard to
7  train and we don't really get anywhere. I mean, it
8  could be that kind of world where the training
9  itself is even excessive, I guess, but I think I
10  see where you're going. If these guys are
11  investing in their own general human capital it's
12  going to raise their value not only to Zuffa, but
13  to anyone else in the -- in this business.
14      Q. Right. What do you mean "in this
15  business"?
16      A. In the MMA business.
17      Q. So if they spend money investing in their
18  human capital by training to be a better MMA
19  fighter, those skills are going to be -- are going
20  to help them in the MMA business; is that right?
21      A. I think that's why they train.
22      Q. Are you familiar with the reserve clause
23  in baseball?
24      A. Generally speaking, yes.
25      Q. Fair to say that that clause was once part

---

34 (Pages 130 to 133)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

134

1    of Major League Baseball player contracts, right?
2    You're generally familiar with that?
3        A. Yes.
4        Q. And the clause in general stated something
5    to the effect of that the rights of the player were
6    retained by the team even after the contract
7    expired; is that fair?
8        A. The rights to the player playing baseball?
9        Q. Yes, playing baseball.
10       A. Okay. There might have been geographic
11   restrictions and things like that. I can't
12   remember, but yes, in playing Major League
13   Baseball.
14       Q. It was a strict limitation on the
15   athlete's mobility in baseball, right?
16       A. In Major League Baseball.
17       Q. In Major League Baseball.
18           Would you agree that the reserve clause
19   was a means by which the major --
20       A. Hold -- hold -- hold on. You said
21   mobility.
22       Q. Yes.
23       A. It might not have affected mobility at
24   all. It was a matter of who does the competing to
25   move the resource from team A to team B.

135

1        Q. Explain that.
2        A. Prior to -- and -- and prior to the
3    elimination of the reserve clause the rights in --
4    over a long period of time to the baseball-playing
5    services of the baseball player resided with the
6    original contracting team that signed the kid. And
7    so just like in -- think back to Babe Ruth who was
8    on the Red Sox. He was on the Red Sox under the
9    reserve clause and the Yankees -- he was more
10   valuable as a Yankee than as a Red Sox. So the
11   Yankees bought his contract from -- from the Red
12   Sox and he played out his career there until he
13   went to the Dodgers and other places at the end of
14   his career. So the competition for the resource
15   was still there and -- but who owned the rights was
16   changed.
17       Q. Okay.
18       A. So that mobility -- I think the evidence
19   is mobility didn't change much at all -- much, if
20   at all. It's just the competition was taking place
21   between different parties for the same valuable
22   resource and the resource generally ended up where
23   it was most valuable. Hence, Babe Ruth to the
24   Yankees.
25       Q. So, in your view, the reserve clause was

136

1    efficient?
2        A. I didn't say it was efficient. I just --
3    I don't know how you got so out of that. I just
4    said that they transferred the property rights, the
5    ownership rights over the resource or over the
6    services and the -- the allocation of the resource
7    may not have changed and I think a lot of people
8    claim that it didn't change, but there was a
9    transfer of wealth over to -- from one side of the
10   market to the other.
11       Q. So the allocation as between which team a
12   player would play on did not change, but by
13   transfer of wealth you mean that instead of the
14   player getting paid more the teams kept more of the
15   player's human capital, correct?
16           MR. ISAACSON: Objection to form.
17   BY THE WITNESS:
18       A. They kept more of the -- the returns on
19   the general human capital that they had.
20       Q. The teams kept more or the players kept
21   more?
22       A. Prior to the elimination of the reserve
23   clause.
24       Q. The teams kept more of the general human
25   capital that the players had?

137

1        A. The returns.
2        Q. The returns.
3        A. They didn't keep the human capital. They
4    couldn't hold onto it or eat it or anything like
5    that.
6        Q. They made more money from it, correct?
7        A. Then that gets complicated too because
8    they had to buy the franchises and -- they got a
9    competitive rate of return. There was a loss,
10   let's put it that way. When the reserve clause was
11   eliminated there was a loss to the team owners who
12   had bought teams based on the premise that this is
13   what the rules were.
14       Q. Is your view that the reserve clause
15   increased the incentive of baseball teams to invest
16   in their players as between a world without the
17   reserve clause?
18       A. Well, I've never thought about it. I've
19   never studied that in that context. In some sense,
20   yeah, that's definitely going to be true because --
21   to the extent there was specific capital that only
22   raised their value in one place, then other teams
23   were not going to be willing to pay for that to the
24   -- so no, no. In that case the -- I'd have to
25   think it through because if it was purely specific

35 (Pages 134 to 137)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

138

1   capital it would -- there's the holdup problem like
2   we would -- like we encountered in here that we
3   talked about a while ago that the -- the players
4   might be more able to collect some of the specific
5   capital investment. So maybe there was less human
6   capital investment after the end of the reserve
7   clause. I haven't studied it.
8       Q. Oh, after the end of the reserve clause
9   you believe -- well, strike that.
10      Do you believe that Major League Baseball
11  used the reserve clause as a means to prevent free
12  riding.
13      MR. ISAACSON: Objection to form, calls
14  for speculation.
15  BY THE WITNESS:
16      A. I haven't studied the reserve clause. I
17  don't know the answer to your question. I don't
18  know what you mean by "prevent free riding." There
19  was probably -- given the structure of the reserve
20  clause there was less free riding than there
21  otherwise would have been.
22      Q. Why?
23      A. Because the team owners got the returns on
24  anything specific they did. I don't know how much
25  specific they did and I haven't studied the

139

1   performance of baseball teams before and after.
2       Q. Well, it's fair to say that since the team
3   owners controlled the rights to a player, the team
4   owners could be sure that they could obtain the
5   returns on any specific investments they make in
6   that player or more sure than without the reserve
7   clause, correct?
8       A. I guess you'd say -- I think the end of
9   your premise was more sure than without the reserve
10  clause. I remember Drysdale and Koufax held out
11  for a hundred thousand dollars back in 1967. They
12  held out together. It was bargaining, you know,
13  bargaining over their specific value to the
14  Dodgers.
15      Q. Right, but you would agree that a player
16  has more bargaining power when he has the ability
17  to sell his human capital to another team than when
18  his only choices are play for the Dodgers or don't
19  play at all, correct?
20      A. Bargaining power over -- look, over just
21  his salary?
22      Q. Yeah.
23      A. Well, if somebody else is going to pay for
24  him and if the reserve clause -- and they've got
25  total free agency, let us say, which they don't but

140

1   let us say, then the resource in question, all
2   other things the same, is going to capture -- I
3   mean, you saw higher salaries in baseball after the
4   end of the reserve clause.
5       Q. Why?
6       MR. ISAACSON: Sorry.
7   BY THE WITNESS:
8       A. Because the person being paid for the --
9   for the resource was different than it was
10  before.
11      Q. I don't under --
12      A. Doesn't mean people are paying less for
13  the resource. So, I mean, look at it. The
14  efficiency of that market could have gone down, it
15  could have gone up. I don't know, I haven't
16  studied it, but it went up because it was a
17  transfer of property rights to the baseball
18  players.
19      Q. Baseball player compensation went up
20  because property rights were transferred from the
21  team to the players, correct?
22      A. That's what the reserve clause did.
23      Q. Is it your view that the reserve clause
24  was procompetitive?
25      A. No.

141

1       Q. Is it your view that the reserve clause
2   was -- why wasn't it procompetitive?
3       A. Because it was permanent, and so it
4   existed -- I mean, you're asking me things about
5   the institutional features of Major League Baseball
6   that, you know, I'm not a lawyer. So they had an
7   antitrust exemption and all sorts of other things
8   that went back in time, but the contracts were in
9   effect for the entire -- the obligation was for
10  the -- for the baseball players' entire baseball --
11  at least Major League Baseball career. We don't
12  see that in this case.
13      Q. So there's something about the permanence
14  of the restriction on mobility that will lead you
15  to believe that it's procompetitive or not
16  procompetitive?
17      MR. ISAACSON: Objection to form.
18  BY THE WITNESS:
19      A. Whether it's procompetitive or not I'm not
20  offering an opinion on because I haven't studied
21  Major League Baseball, as I said, but there's a
22  major difference between the contracts here and the
23  contracts there and that is that the contracts here
24  one becomes a free agent at the end of one's
25  contract.

36 (Pages 138 to 141)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

142

1    Q.  And by becoming a free agent -- well, so
2  is it your view that the contracts that the UFC has
3  are more procompetitive than the reserve clause
4  because the term is shorter?
5         MR. ISAACSON:  Objection, misstates the
6  testimony.
7  BY THE WITNESS:
8    A.  Like I said, I haven't determined how
9  noncompetitive they are.  I'm telling you that
10  there's a major difference in the contracts -- when
11  I say "they are," I meant the baseball contracts.
12  There's a major difference in the contracts in that
13  here the contracts have many of the current
14  elements of Major League Baseball, so that right of
15  first refusal and all that other jazz during the
16  period, but they got rid of the reserve clause and
17  that had consequences for the earnings of baseball
18  players, but there's no -- nothing here that's
19  similar to the reserve clause.  That's my point.
20    Q.  Would you agree that the baseball teams
21  continued to invest in promoting players after the
22  reserve clause was eliminated?
23    A.  You mean is there a positive amount?
24    Q.  Yeah.
25    A.  I don't know.  I assume so.

143

1    Q.  Would it be -- do you know one way or
2  another whether baseball teams' investment in
3  baseball players went up or down after the
4  elimination of the reserve clause?
5    A.  Now, that's impossibly complicated because
6  the technology of marketing sports in general
7  changed throughout the 1970s after the baseball --
8  after reserve clauses was eliminated.  You know,
9  baseball teams started televising, they started
10  televising globally, the value of franchises
11  changed so dramatically.  900 other things changed.
12  So whether they invested more in terms of total
13  dollars I don't know.
14    Q.  Okay.  So hold everything else equal.
15  What hypothesis would you have about the effect on
16  investment in promotion of baseball players with
17  the elimination of the reserve clause have had?
18         MR. ISAACSON:  Objection to form.
19  BY THE WITNESS:
20    A.  Repeat your question.
21    Q.  Yeah.  So I'm just trying to understand
22  your -- what your economic hypothesis would be,
23  what would your opinion be if you had to come up
24  with a hypothesis about whether the elimination of
25  the reserve clause increased or decreased the

144

1  investments in promotion of baseball players.  All
2  things equal, what would you say?
3         MR. ISAACSON:  Objection to form,
4  compound, calls for speculation.
5  BY THE WITNESS:
6    A.  Well, first of all, they were investing in
7  baseball players and -- in the sense of the Minor
8  Leagues and things like that that they could
9  collect the returns on.  Some of that investment
10  may have been reduced.  I haven't studied it.  I
11  don't -- I don't know.  I also don't know how much
12  investment in developing personas and stuff like
13  that went on in -- in Major League -- by teams.  So
14  how much of the value of Nellie Fox was specific to
15  the White Sox.  I don't know, but to the extent
16  that there was investment in -- the situation was
17  different because, you know, the American League
18  was a league of teams.  And so a lot of the
19  investment inured to the league in a sense.  And I
20  don't know how -- I don't know how they changed
21  their behavior.  I haven't studied how much
22  promotion they did.  I don't know if they came up
23  with a TV show about baseball players that piqued
24  the interest of fans in a particular -- in a
25  particular organization.  I just don't know.  I

145

1  haven't studied it.
2    Q.  Is it your opinion that absent the -- in a
3  world without the challenged contracts that Zuffa
4  would not have produced the Ultimate Fighter
5  television show?
6         MR. ISAACSON:  Objection to form.
7  BY THE WITNESS:
8    A.  Well, no.  All I know is that it increased
9  the value of -- you know, I can't say for certain
10  that there would have been no TV show, but the
11  returns to that TV show would certainly have been
12  reduced.  So the incentive to produce that TV show
13  would have been lessened.
14    Q.  But you don't have an opinion one way or
15  the other about whether that TV show would have
16  been produced in a word absent the challenged
17  contracts, correct?
18    A.  Could it have existed; is that your point?
19    Q.  Yes.
20    A.  Well, I think they would have done a
21  calculation that says our return on this TV show is
22  materially lower.  So whether a TV show or a TV
23  show with the same amount of resources devoted to
24  it would have been -- would have been produced, it
25  wouldn't have been the same amount of resources

37  (Pages 142 to 145)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

146

1 because they would calculate that we're less likely
2 get those returns.
3    Q. Did you, yourself in this case do that
4 computation?
5    A. I just did it as we sat here.
6    Q. But you don't in your report have any
7 computation about the expected returns of the
8 Ultimate Fighter in a world absent the challenged
9 contracts, correct?
10    A. Well, it's a general principle of
11 economics that if you -- if a firm invests in
12 something on which it can't collect the returns or
13 on which everybody else gets to collect the returns
14 it's less likely to occur. So, you know, we
15 farmers don't advertise, that sort of thing.
16    Q. Why don't we farmers advertise?
17    A. Because if I advertise -- if I spend a lot
18 of money advertising the benefits of eating wheat,
19 the benefits inure to all the other wheat farmers
20 and only a very small portion to me. So producing
21 the Ultimate Fighter was -- you know, had a
22 combination of specific value to -- to UFC, but it
23 also had an effect on the value -- value of other
24 promoters.
25    Q. So there -- there are two different

147

1 effects that investment of the Ultimate Fighter
2 had. One was to enhance the value of the UFC brand
3 and one was to enhance the value of the fighters
4 who could then walk without the challenged
5 contracts; is that fair?
6    A. I don't know what you -- what fighters?
7 It enhanced the market for all fighters. It
8 doesn't have particularly --
9    Q. I understand.
10    A. It might have had a different impact on
11 Zuffa fighters than for Strike Force fighters or
12 something, but it was a -- to the extent that --
13 you pointed to two effects, you said it affected
14 MMA and it affected Zuffa. And the MMA part -- or
15 it affected Zuffa fighters and MMA fighters in
16 general and the MMA part in general helped the
17 Zuffa fighters and it helped the whoever
18 fighters.
19    Q. And your opinion --
20    A. And the promoters.
21    Q. Right. And your opinion is that in a
22 world without the challenged contracts in order to
23 determine whether Zuffa would have invested in the
24 ultimate fighter television show they would have
25 had to do some kind of computation about the

148

1 returns to that investment resulting from the part
2 of the investment that enhanced the value of the
3 UFC brand versus the -- versus the part of that
4 investment would enhance MMA generally; is that
5 fair?
6       MR. ISAACSON: Objection to form.
7 BY THE WITNESS:
8    A. Whether they did a formal calculation of
9 here's what the spill-over effect is I don't know.
10 I'm telling you a general principle that when you
11 can't collect the returns on your investment you're
12 less likely to do it.
13    Q. It's fair to say that in this case you did
14 not do any such spill-over computation, correct?
15    A. Well, what we see is that -- I mean, you
16 can look at the charts, that after the Ultimate
17 Fighter revenues per event went way up. And so --
18 for Zuffa events. So some of that was decidedly
19 specific, in my opinion.
20    Q. And that means that it's possible that in
21 the but-for world absent the challenged contracts
22 Zuffa might have made some investments in the
23 Ultimate Fighter, correct?
24    A. Well, some, yeah.
25    Q. And you haven't computed the amount of

149

1 diminished investments in the Ultimate Fighter that
2 Zuffa would have done absent the challenged
3 contracts, correct?
4    A. Beyond saying the returns are affected in
5 the way I indicated and that it's likely to be
6 less, no.
7    Q. You do not quantify the total amount of
8 dollars that the UFC spends on promoting fighters
9 anywhere in your report, correct?
10    A. No, I don't think I do.
11    Q. And you don't quantify the total amount of
12 dollars that the UFC spends per fighter in any
13 particular year on promotions, correct, in your
14 report?
15    A. No, not in my report.
16    Q. And you don't, in fact, quantify the
17 amount that the UFC spends on promoting any fighter
18 at all in your report, correct?
19    A. Well, it would be difficult to do so. So
20 in the extent -- to the extent that promoting means
21 matching and all those other things, I don't know
22 how I would match that to any particular fighter.
23 So they're making strategic decisions with regard
24 to the assets with whom they have contracts and
25 those are costly things to do.

38 (Pages 146 to 149)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

150

1    **Q.  You don't in your report quantify the**
2    **total amount of promotional investment in athletes**
3    **that you believe would be lost if the challenged**
4    **contractual provisions were eliminated, do you?**
5        **A.  You mean do I have a dollar amount on it?**
6    **Q.  Correct.**
7        **A.  We didn't put a dollar amount, no.**
8    **Q.  You don't quantify in your report the**
9    **total amount of promotion dollars that the UFC**
10   **invested in its brand during the class period, do**
11   **you?**
12       **A.  Not in my report, no.**
13   **Q.  And you don't quantify the total amount of**
14   **promotion dollars that the UFC invested in**
15   **promoting its fighters separate and apart from**
16   **promoting its brand in your report, correct?**
17       A.  I'm confused by your question.  Are you
18   asking whether I have a number?
19   **Q.  Correct.**
20       A.  For the amount of promotional resources
21   devoted to augmenting the -- reputations of
22   fighters as -- as Zuffa fighters?
23   **Q.  During the class period.**
24       A.  I don't have that number.
25   **Q.  And you don't quantify the total amount of**

151

1    **investments in fighters that would have been**
2    **foregone in the but-for world, correct, a number?**
3        A.  What's the but-for world?
4    **Q.  Absent the challenged contracts and**
5    **challenged conduct.**
6        A.  Okay.  We're going in circles again.  So
7    is the but-for -- you need to define the but-for
8    world.  And is it that Zuffa can't do this and
9    every- -- these things and everybody else can or
10   that nobody can do this?  And I think the only
11   thing you're arguing here is that the but-for world
12   is that only Zuffa can't do it; is that correct?
13   **Q.  I'm asking about your report.  What did**
14   **you assume about the but-for world in your report?**
15   **Which two scenarios did you assume?**
16       A.  I assumed that either one of them could be
17   the but-for world that you're talking about because
18   it's not my job to determine what the but-for world
19   is.  What is it that -- you've brought this case
20   and I understand your arguments.  What is it that
21   you see as the but-for world?  Is it that these
22   contracts, call them contract restrictions, the
23   challenged conduct, are they challenged conduct for
24   Zuffa so that only -- so that if these things are
25   found to have had the impact that you claim that

152

1    Zuffa can't do it but Bellator can and everybody
2    else can, or is it that in general you want to have
3    a rule for the entire MMA market that nobody can
4    have these kinds of contract restrictions, that
5    nobody can write contracts like this?  And
6    that's -- that's important.  That's the point I've
7    been making before lunch too, that's important.
8    **Q.  I understand you think it's important.**
9    **And I'm trying to understand what assumption you**
10   **made about the but-for world in your report.  Which**
11   **one of those did you assume, if either?**
12       MR. ISAACSON:  Objection, asked and
13   answered.
14       MR. CRAMER:  I don't think I got an
15   answer.
16       MR. ISAACSON:  Yeah, you did.
17   BY THE WITNESS:
18       A.  I've given you my answer with regard to
19   both of those worlds which seem to be the two that
20   you might specify as the way -- you have a view, I
21   think, of how the industry ought to be organized
22   that's different than the way it's organized, and I
23   can't give you a completely specific answer to that
24   question without knowing what that view is.  So if
25   you tell me that in the but-for world all other MMA

153

1    promoters get to use these contract restrictions,
2    that's one but-for world.  Or you might say in the
3    but-for world no MMA promoters get to use these
4    contract restrictions.  The -- the implications for
5    the industry, for Zuffa, for Bellator, for fighters
6    are all different in those two but-for worlds.
7    **Q.  And it's fair to say that you didn't**
8    **quantify the amount of promotion dollars that would**
9    **have been foregone in either of those but-for**
10   **worlds in your report, correct?**
11       A.  I've given you the analysis that says if
12   you can't collect the returns, you're not going to
13   invest.  So the -- there would have been more
14   promotional dollars in a world -- by Bellator in a
15   world where Bellator got to use those contracts and
16   Zuffa didn't than in a world where nobody gets to
17   use the contracts.
18   **Q.  Can you show me a table in your report**
19   **where you quantify the amount of additional**
20   **promotional dollars that -- I'm sorry -- the amount**
21   **of promotional dollars that would be lost in either**
22   **of those two but-for worlds?  Is there a table in**
23   **your report where I can find that?**
24       **A.  No.  That's not part of my analysis or**
25   **part of my opinions.**

39  (Pages 150 to 153)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

154

1    Q.  Did you evaluate whether in the but-for
2  world, in either of the two but-for worlds if MMA
3  promoters reduce the amount they spent on promoting
4  fighters that fighters or their management would
5  spend more on promoting themselves?
6    A.  So did I analyze substitution; is that
7  what you're talking about?
8    Q.  Yes.  Did you?
9    A.  Well, the -- the promotional activities
10 of -- you'll have to explain what you mean by
11 promoting themselves.  So would an individual
12 fighter and his manager hire an advertising agency
13 or -- or something like that or develop their own
14 TV show; is that what you have in mind?
15   Q.  Are you aware that individual MMA fighters
16 do spend money on promoting themselves through
17 social media and otherwise?
18     I understand that, but how much they
19 spend -- you know, I've not studied how much
20 they've spent, but are you asking me whether there
21 would be their own TV shows and things like that?
22 They would not invest in things that were specific
23 to the value of a particular promoter.  They would
24 invest in things that just had to do with their
25 persona generally and to the extent that promoters

155

1  have a comparative advantage in developing those
2  things, because, after all, the individual fighters
3  don't control with whom they fight, they don't
4  control the sequencing of the -- they don't
5  internalize all those things, which is why they
6  have multi-bout contracts with the promoters.  So
7  that how much would occur depends on who has a
8  comparative advantage in producing that type of
9  capital, in making those investments, and the
10 evidence in this market is that promoters -- I'm
11 not just saying Zuffa, I'm saying promoters have a
12 comparative advantage in making those types of
13 investments.
14   Q.  And --
15   A.  And that's why the contracts look like
16 what they do.
17   Q.  And you would agree that the fighters have
18 a comparative advantage in promoting their own
19 image to the public, correct?
20   A.  You know, you can't even say that.  It's
21 that if they promoted their own image to the
22 public, they would -- they are way less likely to
23 invest in aspects of that image that inure to
24 Bellator or to Pride or something like that.
25 Pride's out of business.  One.  So who's got the

156

1  comparative advantage of -- in investing is
2  determined by the way the market works, and the
3  evidence is, as I said a minute ago, that the
4  nature of these contracts that are used by all the
5  major promoters is that the comparative advantage
6  in investing resides disproportionately on the
7  promoter's side because of all the things they do
8  to promote interest in matches and athletes.
9    Q.  What I hear you saying is that a fighter
10 doesn't have an interest in promoting a promoter --
11 or advertising a promoter.  My question is whether
12 a fighter has more of an interest in promoting and
13 advertising himself in his own image than a
14 promoter would have in investing in a fighter's
15 image, all things equal?
16   A.  Forgive me for putting it this way, asked
17 and answered.  I -- I --
18   Q.  I don't think I got an answer.
19   A.  Well, you did.
20   Q.  Is it -- all right.  Is it fair to say
21 that you don't in your report evaluate the question
22 about whether in the but-for world where fighters
23 are -- strike that.
24     You understand that Plaintiffs' experts
25 claim that in the but-for world during the class

157

1  period fighters as a whole would be paid more than
2  a billion dollars more than they actually were paid
3  by UFC or MMA promoters generally?
4    A.  I've seen that estimate.
5    Q.  Okay.  Did you evaluate in your report
6  whether as a result of that additional compensation
7  fighters would themselves invest more money than
8  they currently invest in their own images and
9  identities?  Is that in your report anywhere?
10   A.  You mean if they had a billion dollars
11 between them or 1.6 billion I think is the upper
12 end of what Dr. Singer claims would they invest
13 more in their images?
14   Q.  Yes.
15   A.  Maybe they would, maybe they wouldn't, but
16 it's not something that was part of my analysis.
17   Q.  Okay.  It's fair to say that it's also not
18 part of your analysis to compute the total amount
19 of output of MMA events that might have flown from
20 any foregone promotional dollars, right?  Let me
21 ask -- let me -- strike that.  Let me ask it
22 another way.
23     Do you in your report in any place compute
24 the reduced revenues to MMA events that would have
25 occurred in either of the but-for worlds that you

40 (Pages 154 to 157)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

158

1 discussed a moment ago?
2     A. Well, I mean, I couldn't because you never
3 told me what the but-for world is.
4     Q. And if you couldn't, you didn't, right?
5 You did not compute the lost output --
6     A. Well, if you don't tell me what the
7 but-for world is, then -- then I don't know what
8 the but-for world is, do I?
9     Q. So it's fair to say that in doing your
10 report you didn't know what the but-for world was,
11 correct?
12     A. I only know that Dr. Singer specifies a
13 but-for world where his misbegotten foreclosure
14 share would have been 30 percent rather than what
15 it is, but behind that he never says what the
16 but-for world would be. He never explains how that
17 share would come to be what it is and which parts
18 of the contract restrictions would lead to it being
19 30 percent rather than what it is. So, you know,
20 one of the weaknesses of Dr. Singer's report is he
21 never says -- he gives all this opinion about what
22 competition would do, but he doesn't tell us what
23 competition would look like.
24     Q. You don't compute in your report the
25 amount of revenues from MMA events that would be

159

1 lost in either of the but-for worlds that you
2 believe might be relevant in this case, correct?
3     A. Well, I don't know if those are the only
4 two --
5     MR. ISAACSON: Objection, asked and
6 answered.
7 BY THE WITNESS:
8     A. -- but-for worlds.
9     THE REPORTER: I'm sorry.
10     THE WITNESS: I'm sorry. We spoke --
11     MR. ISAACSON: Objection, asked and
12 answered.
13 BY MR. CRAMER:
14     Q. Let me ask it this way. You don't compute
15 the amount of MMA revenues that would be lost in
16 any possible but-for world in your report in this
17 case, correct?
18     A. As I said, without knowing what you think
19 the but-for world should be, it's impossible for me
20 to understand or for anybody to understand the
21 market structure and the market -- the way this
22 market would -- would play out. I can give you
23 directions of magnitudes, I can say what incentives
24 would look like if there was -- if there were no
25 contracts whatsoever, but, you know, you can think

160

1 of the myriad ways that Dr. Singer's foreclosure
2 share, as he calls it, could have gotten from what
3 it is to 30 percent and the different ways that
4 could happen have implications. So there's -- and
5 I don't know how many different ones there are. So
6 I just don't know what the market -- I need some
7 guidance from the Plaintiffs to say this is what we
8 think the world's going to look like and you just
9 haven't said. You just haven't said it's not
10 that.
11     Q. And it's fair to say that given that you
12 didn't compute the amount of loss revenues in any
13 potential but-for world, you didn't compute the
14 amount of what you believe would be lost
15 compensation to MMA fighters in the but-for world;
16 am I correct about that?
17     MR. ISAACSON: Objection to form.
18 BY THE WITNESS:
19     A. I don't even know if it's going to be lost
20 compensation in some but-for world. There's no
21 evidence that -- in this record that the earnings
22 of MMA fighters have been adversely affected in any
23 way by the challenged conduct.
24     Q. My question is you have said that in the
25 but-for world that directionally MMA revenues would

161

1 be lower, correct?
2     A. Directionally? Which but-for world? I
3 mean, if you said, look it, the but-for world is
4 one where the only thing we're going to do is, I
5 don't know, make the right of first refusal two and
6 a half months -- excuse me -- the exclusive
7 negotiation period two and a half months instead of
8 three months, that's one thing. If you're going to
9 say I'm going to get rid of them all for Zuffa,
10 that's another thing. If I'm going to get rid of
11 them all for everybody, that's another thing. Am I
12 going to take different combinations of the
13 contract restrictions and say they're okay, but
14 those aren't okay, you've got to tell me. So
15 directionally if you got rid of some of these the
16 returns on investment by promoters are lower.
17 That's what I can tell you and that's what -- and
18 that's what the promoters have in mind that, you
19 know, we want to invest in these things, we've got
20 to make sure that we get our returns.
21     Q. All right. I understand, you've made the
22 point repeatedly that you don't understand what
23 Plaintiffs are saying the but-for world would have
24 looked like. I'm just asking whether in your
25 report you quantified certain things. So would you

41 (Pages 158 to 161)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

234

1      Q.  Yes.
2      A.  Depends on what I relied on it for.  So
3  you said footnote 34?  That's the Singer report.
4      Q.  Footnote 84.
5      A.  Oh.  I have to remember what I relied on
6  here.  84.
7      Q.  You relied on page 14 of the document.
8      A.  Hold on.  Okay.  Where's 84?  So
9  footnote 84 merely refers to the fact that
10  Mr. White was thought to be part of the talent they
11  acquired in the sale of the company.  And I haven't
12  looked at this in ages.  I assume that statement is
13  in there somewhere.  What was the other one?
14      Q.  Footnote 365 on page 108.
15      A.  I've got to look at what we said that
16  refers to.
17          (Witness reviewing document.)
18  BY THE WITNESS:
19      A.  Okay.  That refers to residential buys.
20      Q.  So you rely in your report in two
21  occasions on information that's in this memo,
22  correct?
23      A.  Yes.
24      Q.  Do you know who prepared this memo?
25      A.  Was this Deutsche Bank?  I can't remember.

235

1      Q.  Do you know whether WME used this document
2  in the course of their evaluating whether to
3  purchase Zuffa?
4      A.  I believe they did, but I don't recall the
5  specifics.
6      Q.  All right.  Turn to page 11 of this
7  document, please.  Page 11 is a page that's
8  entitled "Risk of fighter compensation inflation";
9  do you see that?  Do you see the title?
10      A.  Yes, I see that.
11      Q.  Look at the first bullet point on the
12  left.  It says historically fighters have earned
13  between 16 to 19 percent of revenues, although 2016
14  is projected by the UFC at 22.7 percent largely
15  driven by one-time Brock cost and overly stacked
16  UFC 200"; do you see that?
17      A.  Yes, but I can't remember what one-time
18  Brock cost is.
19      Q.  Brock Lesnar?
20      A.  Okay.  And I don't know what "stacked"
21  means, but that's okay.
22      Q.  Okay.  Do you -- is it fair to say that in
23  the course of its business Zuffa or its parent
24  analyzed fighter compensation in terms of fighter
25  share of revenue?

236

1      A.  They calculated this and they thought the
2  information was relevant.
3      Q.  Look at the bottom of the chart on the
4  right -- sorry -- the bottom of the chart to the
5  right of the summary entitled "UFC fighter costs";
6  do you see that?
7      A.  No.
8      Q.  There's a chart on the right that's
9  entitled "UFC fighter costs."  It's a bar graph.
10      A.  I thought you meant bottom right.  Sorry.
11      Q.  I'm sorry.  Top right.
12      A.  Yeah.
13      Q.  And it charts fighter compensation as a
14  percentage of revenue, correct?
15      A.  No.  It has -- it lists it at the
16  bottom.
17      Q.  It lists fighter compensation as a
18  percentage of revenue, correct?
19      A.  Correct.
20      Q.  Please turn to the table on the
21  bottom-right corner of that page entitled "League
22  comps"; do you see that?
23      A.  Yes.
24      Q.  What this chart is doing is comparing the
25  percentage of revenue that Zuffa pays its athletes

237

1  to the percentage of revenue that other sports
2  leagues pay their athletes, correct?
3          MR. ISAACSON:  Objection, no foundation.
4  BY THE WITNESS:
5      A.  Could you read the full question back,
6  please.
7      Q.  Yes.  Well, why don't I ask it this way.
8  What is the chart on the bottom right depicting?
9      A.  Various -- some of them are a little odd,
10  but it's various calculations about labor -- what
11  people earn as a -- you know, on a per-minute basis
12  as a fraction of the total revenue of the league,
13  how much the top players make as a fraction of
14  revenue, whatever that means.  So that's what it
15  is.
16      Q.  Okay.  Why do you think WME and/or Zuffa
17  used a wage share comparison in a document
18  assessing the potential value of Zuffa as an
19  investment?
20      A.  Maybe because the -- it's a relevant
21  calculation for knowing the value of the
22  organization, I assume.
23      Q.  Turn to the bottom left.  There's a chart
24  entitled "Bouts remaining"; do you see that?
25      A.  Yes.

60  (Pages 234 to 237)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

238

1  Q.  And in the left-hand column there's a
2  chart entitled "Ranking," right?  Correct?
3  A.  Yes.
4  Q.  And in the right-hand column there's a
5  chart -- there's a column entitled "Average
6  remaining bouts," correct?
7  A.  Correct.
8  Q.  And what this shows is that the average
9  remaining bouts on a champion's contract is 6.5,
10  correct?
11  A.  That's what it says.
12  Q.  And the average remaining bouts on
13  fighters ranked 1 to 5 is 5.5, correct?
14  A.  Correct.
15  Q.  And the average remaining bouts on fighter
16  contracts ranked 6 to 10 is 3.6, right?
17  A.  Yes.
18  Q.  And the average remaining bouts on fighter
19  contracts ranked 11 to 15 is 3.2, correct?
20  A.  Yes.
21  Q.  So it's fair to say that as the ranking
22  goes from low to high, the average remaining bouts
23  falls, correct?  Or let me ask it this way.  It's
24  fair to say --
25  A.  We're not on the same page about low to

240

1  don't, then on average the guys ranked 11 to 15
2  have 3.2 bouts left.  So this doesn't surprise
3  me.
4  Q.  Okay.
5  Is there a logical connection between the
6  degree to which Zuffa has its top fighters signed
7  to long-term deals and Zuffa's ability to maintain
8  its fighter wage share at or below current levels?
9  A.  Not that I know of.
10  Q.  Why is it on this chart, then?  I mean,
11  this chart is entitled "Risk of fighter
12  compensation inflation."  What's the relationship
13  between the amount of bouts left on fighter
14  contracts and the risk of fighter compensation
15  inflation?
16  A.  Well, I don't know the full context of
17  this document, but one would expect that, you know,
18  they've been successful in -- in getting their
19  champions to reup.  These are the guys who make
20  millions, for example, and one would expect this
21  pattern from the fact that for champions it's
22  turned out to be a good marriage; and so expected
23  remaining duration of the relationship in a
24  contract is -- is higher.  So that's what this
25  is -- is saying.  By the same token, I don't know

239

1  high --
2  Q.  Yes.
3  A.  -- but I know what you're saying.
4  Q.  It's fair to say that the better ranked an
5  athlete is the more likely that athlete has longer
6  bouts remaining on their contract with Zuffa,
7  correct?
8  A.  The average remaining bouts of champions
9  is higher than the average remaining bouts of
10  fighters in other ranking intervals.  That's what
11  the chart shows.
12  Q.  And that's consistent with your
13  understanding of UFC contracts generally, right?
14  A.  When you say "generally," I don't know if
15  it's true in all cases.
16  Q.  Just --
17  A.  I have no reason to believe that this
18  calculation is inaccurate.
19  Q.  In other words, the better ranked a
20  fighter is the -- all things equal, the longer the
21  contract -- the bout requirement in the Zuffa
22  contract; is that fair?
23  A.  No.  It says remaining bouts.  So if
24  champions reup early and extend their contracts,
25  then -- and the guys that are ranked 11 to 15

241

1  what cost per minute or compensation per minute has
2  to do with the risk of inflation.  These things are
3  relevant things that WME would be looking at.
4  Q.  So one thing that WME would want to know
5  before it invests $4 billion in Zuffa is that Zuffa
6  has its top-ranked fighters under long-term
7  exclusive contracts, right?
8  A.  Yeah.  You want to know you're not going
9  to lose them in the short run.
10  Q.  Why is that?  Why would you want to know
11  that?
12  A.  Because that's the human capital that's
13  going to produce revenue for you over the short run
14  and the champions are more valuable than the guys
15  ranked 11 to 15.  And if we went down to the people
16  ranked 50, they'd be less valuable still.
17  Q.  And we're not just talking about champions
18  here, right?  Fighters ranked 1 to 5 have more
19  bouts left than fighters ranked 6 to 10, correct?
20  A.  Yes.  That's exactly what you'd expect to
21  see.
22  Q.  All right.  Turn to page 4, internal
23  page 4 of this document, please.  There's a bullet
24  point --
25  A.  Page 4?

61 (Pages 238 to 241)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

242

```
1         Q.  Page 4.  The pen ultimate bullet point is
2    "Live events"; do you see that?  The second to last
3    bullet point on the page.
4         A.  Sorry.
5         Q.  Do you see that?
6         A.  Yes.
7         Q.  The last sentence under that bullet point
8    says "Like Pay-Per-View expect some volatility with
9    fight card quality"; do you see that?
10        A.  Yes.
11        Q.  Is it fair to say that because all things
12   equal the higher the quality of the fighter the
13   more revenue the fight will bring in?
14        A.  Are you saying it has something to do with
15   that sentence?
16        Q.  Well, why would revenue from live events
17   experience volatility with fight card quality?
18        A.  I assume that if quality is volatile then
19   revenues from the events could be volatile.
20        Q.  Why?
21        A.  Because people like to watch quality
22   fighters.
23        Q.  All things equal, the higher quality
24   fighter the more revenues an event is likely to
25   generate for Zuffa, correct?
```

243

```
1         A.  That sounds right.
2         Q.  All right.  You can put that document
3    aside.
4         MR. CRAMER:  I'd like to mark as the next
5    document Topel Exhibit --
6         THE REPORTER:  7.
7         MR. CRAMER:  -- 7.  Thank you.
8             (Topel Exhibit 7 was marked as
9              requested.)
10   BY MR. CRAMER:
11        Q.  Topel Exhibit 7 is a document entitled
12   "UFC Company Overview."  It bears the Bates range
13   ZFL-2677898 through 7967, and I will represent to
14   you that you listed this document on your materials
15   relied upon.
16        A.  Okay.
17        Q.  Do you recall sitting here today what in
18   this document you relied upon?
19        A.  No.
20        MR. ISAACSON:  He'd have to go through it
21   page by page to answer that.
22   BY MR. CRAMER:
23        Q.  All right.  You don't need to do that.
24   That's fine.  If you can't -- if you don't remember
25   just looking at it, that's fine.
```

244

```
1         You recall seeing this document.
2         A.  You know, I recall seeing a lot of
3    documents and I recall documents like this.  I'm
4    looking at a page here with check marks and X's and
5    things and I recall seeing something like that.
6    And I recall some of these photos.  Whether this is
7    the exact document I'm recalling, I can't -- I
8    can't say.
9         Q.  Turn to page 3 of the document.  There's a
10   title "Notice and undertaking by recipients."
11        A.  Page 3.
12        Q.  It says "This presentation has been
13   prepared by Zuffa, LLC for the exclusive use of the
14   party to whom the company delivers this
15   presentation.  Although the company believes the
16   information is accurate in all material
17   respects..."  Do you see that?
18        A.  Yes.
19        Q.  So Zuffa prepared this document and Zuffa
20   believed or at least represented in the document
21   that the information was accurate; is that fair?
22        MR. ISAACSON:  You're misstating the
23   document because you just said the opposite of what
24   that says in the next sentence.
25   BY MR. CRAMER:
```

245

```
1         Q.  I'll read the whole sentence.  "Although
2    the company believes the information is accurate in
3    all material respects, the company does not make
4    any representation or warranty either express or
5    implied as to the accuracy, completeness, or
6    reliability of the information contained in this
7    presentation"; do you see that?
8         A.  Yes.
9         Q.  It's fair to say that Zuffa said in the
10   document that it believed the information to be
11   accurate in all material respects, correct?
12        A.  Well, it believed, but it also said, you
13   know, we're not warranting the reliability of this
14   information.
15        Q.  But it believed it to be accurate and you
16   relied upon it in this case, correct?
17        A.  It's in my -- the list of things relied
18   upon and I would have to look through the whole
19   thing and search through my memory to find out how
20   we relied upon it.
21        Q.  Turn to the last paragraph on this page.
22        A.  Okay.
23        Q.  The second sentence says "The recipient
24   acknowledges that the company considers this
25   presentation and all information contained herein
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

246

1    to include confidential, sensitive, and proprietary
2    information"; do you see that?
3        A. Yes.
4        Q. Turn to page 59 of the document, please.
5    It's fair to say that on page 59 Zuffa uses wage
6    share, among other metrics, to evaluate fighter
7    compensation, correct?
8        A. Well, I don't know what you mean by
9    "evaluate fighter compensation."
10        Q. Zuffa's using wage share in this -- on
11    this page, correct?
12        A. Well, it's in there. It's also got all
13    the other expenses they use.
14        Q. So it has a number of different expenses,
15    athlete's production, marketing, and other COS
16    expense?
17        A. Yeah. It's got marketing in there. This
18    is all in black and white. I can't tell who's who.
19    I assume -- maybe they go up. So it's athletes,
20    production, marketing, other cost of sales. Yeah.
21    Okay.
22        Q. All right. Look to the left-hand side in
23    the first bullet under "Costs of sales drivers."
24    The first bullet says "Athletes"; do you see that?
25        A. Yes.

247

1        Q. And the second sentence begins "With the
2    increase in content revenue in 2019 conservatively
3    projecting a step change in fighter compensation in
4    line with the revenue increase"; do you see that?
5        A. Yes.
6        Q. Is it fair to say what Zuffa is projecting
7    here is that fighter compensation will increase in
8    relation to the projected revenue increase; is that
9    right?
10        A. Well, subject to me saying I don't know
11    what they mean by "a step change in fighter
12    compensation in line with." I don't know if that's
13    the same rate as, what the same sign as, but in any
14    case, this -- this metric here is not the same as
15    what Dr. Singer uses.
16        Q. In making this projection that fighter
17    compensation would increase in line with the
18    increase in Zuffa's content revenues in 2019, is
19    there any evidence from this document that Zuffa
20    looked to the wages paid by other MMA promotions?
21        MR. ISAACSON: You want him to go through
22    each page of this and --
23        MR. CRAMER: Just on this page do you
24    see --
25    BY THE WITNESS:

248

1        A. On this page?
2        Q. Yes.
3        A. Why would you? All right. I just --
4    I'm -- I'm mystified by your question. I'm sorry.
5        Q. Okay. It's fair to say that you don't
6    mention this document's -- this -- strike that.
7    Withdraw the question. You can put it aside.
8        MR. CRAMER: I'm going to mark the next
9    document as Topel Exhibit 8.
10        (Topel Exhibit 8 was marked as
11        requested.)
12    BY MR. CRAMER:
13        Q. Exhibit 8 bears the Bates range
14    ZFL-1484034 through 4037, and the first page of the
15    document is an E -- a series of e-mails between
16    John Mulkey and Steven Tecci and they're all in
17    August of 2013 and then there's some attachments.
18    Have you seen this document before?
19        A. I've seen charts like this. I don't
20    remember if it was this document. I'm sure if I
21    cited it you're about to tell me.
22        Q. As far as I know, you didn't cite it.
23        A. Okay. I mean, you see a lot of charts in
24    a case like this. I could have seen this.
25        Q. Do you know who John Mulkey is?

249

1        A. I don't recall.
2        Q. Does it jog your recollection if I tell
3    you that Mr. Mulkey is the -- or was the CFO of
4    Zuffa?
5        A. How about if I just take your word for it?
6        Q. Okay.
7        Turn to the first page, the first
8    attachment, page 1484035, and look to the bottom of
9    the page.
10        A. Yes.
11        Q. There's a chart entitled "Fighter comp as
12    a percentage of UFC event revenues"; do you see
13    that?
14        A. Yes.
15        Q. Did you refer to this document or this
16    page in your report?
17        A. I could have. I mean, I remember seeing a
18    chart that's got those zeros down there, but I
19    don't recall the context in which I would have
20    referred to it.
21        Q. Is it fair to say that Zuffa kept track
22    internally of fighter compensation as a percentage
23    of event revenue?
24        A. Evidently.
25        Q. And by Mr. Mulkey's account here fighter

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

ROBERT TOPEL - HIGHLY CONFIDENTIAL

250

1    share of revenues fell from 2007 to 2008, right?
2        A.  Well, yeah.  You're choosing the -- from
3    the high that it ever achieved in 2007 it fell.
4        Q.  And then it rose slightly from 2008 to
5    2010, right?
6        A.  Yes.
7        MR. ISAACSON:  Objection to form.
8    BY MR. CRAMER:
9        Q.  And then it fell --
10       A.  No.  Yes.  Yes.  Yes.  Okay.
11       Q.  And then from 2010 through 2013 -- put it
12   this way, fighter share of revenue is lower in 2013
13   or projected to be lower in 2013 than it was in
14   2010, correct?
15       MR. ISAACSON:  Objection to form.
16   BY THE WITNESS:
17       A.  Than it was in 2010.
18       MR. ISAACSON:  And then foundation.
19   BY THE WITNESS:
20       A.  Okay.  Yeah.  You're talking about 2 --
21   2 percent there, yeah.  That's right.
22       Q.  So fighter share of revenue on
23   Mr. Mulkey's account was 22 percent in 2010; am I
24   right?
25       A.  That's what he calculated.

251

1        Q.  And then in 2011 it was 18.45 percent; is
2    that right?
3        A.  That's what the number says.
4        Q.  Do you know what happened in 2010, any
5    significant event in this case?
6        A.  This is when they got Strike Force I
7    think.
8        Q.  Strike Force was purchased in 2010 --
9        A.  Yes.
10       Q.  -- correct?
11       A.  Yes.
12       Q.  And we just talked about the decrease in
13   fighter share of revenue between 2007 and 2008.
14   That decrease was from 25.85 percent to
15   20.48 percent on Mr. Mulkey's account, correct?
16       MR. ISAACSON:  You keep saying revenue.
17   You're looking at the event revenue chart?
18       MR. CRAMER:  Event revenue.  Thank you.  I
19   mean of event revenue.
20       MR. ISAACSON:  Okay.  And you keep saying
21   it's Mr. Mulkey's chart.  I mean, he's on the
22   e-mail.  I don't think it's been established this
23   is Mr. Mulkey's chart.
24       MR. CRAMER:  Fair enough.
25   BY MR. CRAMER:

252

1        Q.  On this chart that we have that was
2    attached to Mr. Mulkey's series of e-mails,
3    Mr. Mulkey or whoever created this chart shows that
4    fighter compensation as a percentage of UFC event
5    revenues fell from 25.85 percent in 2007 to
6    20.48 percent in 2008, correct?
7        A.  Yes.
8        Q.  And do you -- are you aware of events
9    significant to this case that occurred between 2006
10   and 2007?
11       A.  I probably am, but as I sit here today --
12   as I sit here now, I can't remember which events
13   occurred when.
14       Q.  Are you aware that between 2006 and 2007
15   Zuffa purchased WEC, WFA, and Pride?
16       A.  Yes.
17       Q.  All right.  You can put that document
18   aside.
19       A.  By the way, then, revenues constant,
20   bringing in those lower paid athletes would have
21   caused the average to go down because you bought
22   the contracts.
23       Q.  Did you -- strike that.
24          Is it your understanding that revenues
25   were constant between 2006 and 2007?

253

1        A.  Well, total revenues wouldn't have been
2    because you probably were putting on more events.
3        Q.  I'd like to talk for my last 20 minutes of
4    the day about the Strike Force preacquisition bout
5    data.  Do you recall issues surrounding that data
6    in your report?
7        A.  Yes, I do.
8        Q.  Okay.  You say in your report that when
9    you removed the Strike Force preacquisition bout
10   data from Dr. Singer's foreclosure regression the
11   negative correlation between foreclosure and
12   compensation share disappears in two of
13   Dr. Singer's three measures of foreclosure; do you
14   recall that?
15       A.  Yes.
16       Q.  And it's your opinion that it's
17   appropriate to remove that data because of certain
18   statistical tests that you ran; is that right?
19       A.  Yes.
20       Q.  And the statistical tests that you ran are
21   called the Chow test; is that right?
22       A.  It's an F test.
23       Q.  A Chow test is a version of an F test; is
24   that right?
25       A.  Yes.

64  (Pages 250 to 253)

ROBERT TOPEL - HIGHLY CONFIDENTIAL

254

1      Q. Okay. Turn to paragraph 155, please.
2   Okay. The Chow test, in your view, determines
3   whether factors that contribute to the differences
4   in UFC and Strike Force athletes' compensation have
5   been controlled for; is that right?
6      A. Where are you reading?
7      Q. The first sentence. "I used a statistical
8   test to evaluate whether Dr. Singer has adequately
9   controlled for all factors that contribute to the
10   differences in UFC and Strike Force athletes'
11   compensation"; do you see that?
12      A. Yes.
13      Q. And am I right that the null hypothesis
14   that you tested was whether all of the 63
15   regression coefficients from Dr. Singer's
16   regression for pre-Strike Force acquisition bouts
17   were identical to those coefficients for the Zuffa
18   bouts?
19      A. It's a joint hypothesis test. So we
20   tested the hypothesis whether all of the
21   interactions involving Strike Force were zero, were
22   jointly zero.
23      Q. Am I right that the null hypothesis does
24   not mean that all regression coefficients are
25   different as between Zuffa and Strike Force,

255

1   correct?
2      A. Yeah. That was the point I was making.
3      Q. The null hypothesis would be rejected even
4   if only one out of the 63 coefficients was
5   different between Strike Force bouts and UFC bouts,
6   correct?
7      A. No. No. It would -- the F test tests
8   whether all -- you can reject the hypothesis that
9   they're all simultaneously zero. It could be that
10   some of them are significant or nonzero, some of
11   them are zero. It's just the nature of a
12   hypothesis test that --
13      Q. But the hypothesis is whether all of the
14   63 regression coefficients between the Strike Force
15   preacquisition bouts were identical to the
16   coefficients on the Zuffa bouts, right?
17      A. Yeah. We're testing whether the
18   structures of the two models are identical.
19      Q. But the hypothesis is whether all of them,
20   all of the coefficients as between the Zuffa data
21   and the Strike Force data are the same, right?
22      A. As I said, we're testing the joint
23   hypothesis whether all the Strike Force -- they're
24   included in the model as interactions between
25   Strike Force and the regressor in the question and

256

1   we're testing the joint hypothesis that they're all
2   zero. So does Strike Force have a material
3   impact -- does accounting for differences in the
4   structure of the model at Strike Force -- between
5   Strike Force and Zuffa have a material impact on
6   the fit of the regression, and the answer was
7   yes.
8      Q. Let me ask it this way. Your running of
9   the Chow test allowed for no differences at all in
10   the way in which fighter compensation is determined
11   between the Strike Force data and the Zuffa bout
12   data; is that right?
13      MR. ISAACSON: Objection to form.
14   BY THE WITNESS:
15      A. Differences at all? It tested what I just
16   said. I don't think I can say yes to your
17   question. We tested whether the effects -- the
18   difference in the effects of these variables at
19   Strike Force were jointly significant, and the
20   answer was yes.
21      Q. All right. Turn to paragraph 155. You
22   cite the ABA section of antitrust law, second
23   edition, 2010 at 1 -- page 179 in footnote 221; am
24   I right?
25      A. Yes.

257

1      Q. And you cite that for the appropriate
2   statistical response to finding that there are
3   different coefficients for different sets of data
4   on the explanatory variables, right?
5      A. Yes.
6      Q. And that's your basis for excluding the
7   Strike Force data, right?
8      A. We tested whether they came from the --
9   they were generated by the same model, and the
10   answer was no.
11      THE VIDEOGRAPHER: Five minutes on disk.
12      MR. CRAMER: Okay.
13   BY MR. CRAMER:
14      Q. The ABA manual that you relied upon --
15   look at the last sentence of footnote 221 which is
16   quoting from the ABA manual. It's on page 68. It
17   says "If the regression model fails a Chow test
18   'the appropriate model needs to adequately control
19   for such differences'"; do you see that?
20      A. I do.
21      Q. Did you try and run a model that allowed
22   the coefficients to vary as a means of controlling
23   for the differences between the Strike Force data
24   and the UFC data?
25      A. Well, by definition when you put in the

65 (Pages 254 to 257)