# Exhibit 37

Deposition of Robert Topel
(December 6, 2017) (excerpted)

267

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


CUNG LE; NATHAN QUARRY, JON      )
FITCH, on behalf of              )
themselves and all others        )
similarly situated,              )
                                 )
            Plaintiffs,           )
                                 )
            vs.                   )   Case No.
                                 )   2:15-cv-01045-RFB-(PAL)
                                 )
ZUFFA, LLC, d/b/a Ultimate       )
Fighting Championship and        )
UFC,                             )
                                 )
            Defendant.            )
_____)


HIGHLY CONFIDENTIAL

CONTINUED VIDEOTAPED DEPOSITION OF

ROBERT TOPEL, VOL. II

Washington, D.C.

December 6, 2017

8:39 a.m.




REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No. 52570

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

292

1    So they'd have to be -- there would be competition
2    for this exclusive upfront, but information is not
3    fully played out yet on who's who.  So I doubt
4    that -- I doubt that fighters would want to sign
5    that contract.  So you -- you have a hypothetical
6    contract there.  Zuffa's not going to get any
7    fighters with that contract.
8        Q.  So in your view it's -- is it your view --
9    I'm just trying to understand.  Is your view that
10   it's anticompetitive because no one could sign it
11   or that it's anticompetitive for other reasons or
12   both?
13       A.  Well, you asked me --
14           MR. WIDNELL:  Objection, form.
15   BY THE WITNESS:
16       A.  Technically speaking, you asked me if it
17   was procompetitive, so like it was efficient,
18   right?
19       Q.  Yes.
20       A.  Well, it's not going to be an efficient
21   contract if fighters come along and say I'm not
22   signing that and they go somewhere else.  A
23   procompetitive contract is one that maximizes,
24   loosely speaking, the value of output, and there's
25   not going to be out -- well, Zuffa's not going to

293

1    participate in the output if they offer that
2    contract.  Somebody else would because they
3    wouldn't be offering that contract.
4        Q.  Assume for the question that fighters so
5    much wanted to fight for the UFC because the UFC
6    currently has most of the top fighters that they
7    were willing to make that deal going in.  Would it
8    then be procompetitive?
9            MR. WIDNELL:  Objection, form.
10   BY THE WITNESS:
11       A.  Well, you know, I don't know because now
12   you're telling me that other people can offer
13   similar contracts.  Other people can offer any
14   contract they want and implausibly Zuffa offers
15   this contract that says you're going to fight for
16   us forever and I don't know all the other forms of
17   the contract that you're talking about and
18   everybody lines up with Zuffa, then, I mean, one
19   could imagine that that has some value-producing --
20   you know, salubious value-producing consequence
21   that makes everybody want to go there, but I don't
22   know what it is.  So I've not had to consider that
23   in the context of this matter.
24       Q.  Would you agree that under that contract
25   Zuffa would have more incentive to invest in

294

1    promotion than it does under its existing
2    contracts?
3        A.  Well, under its existing contracts they
4    might lose people who move.  In that sense -- in
5    that sense only that would be one effect, but
6    you've also posited a world where everybody wants
7    to fight for Zuffa anyway.  So maybe they don't
8    have to promote so much because everybody wants
9    to -- wants to watch Zuffa anyway.
10       Q.  Turn to paragraph 95 and 96 -- or turn to
11   95 first, please.
12       A.  Okay.  We're back in my report, right?
13       Q.  We are.
14       A.  Yeah.
15       Q.  In paragraphs 95 and 96 you're talking
16   about --
17       A.  I'm sorry.  I'm on page 95.
18       Q.  Page 41.
19       A.  Yes.
20       Q.  There you're talking about co-promoted
21   matches.  What are copromoted matches?
22       A.  Where two promoters, say Bellator and
23   Zuffa, say let's have a match that mixes your guys
24   and our guys.
25       Q.  And you say there in the first sentence of

295

1    paragraph 95 towards the end that copromoted
2    matches are apparently nonexistent; do you see
3    that?
4        A.  I recall the sentence.  I'm looking for
5    the -- it's towards the end.
6        Q.  Of the first sentence.
7        A.  Oh, the first sentence?
8        Q.  I'm sorry.  The second sentence.
9        A.  Yes.
10       Q.  You understand that the UFC --
11           MR. WIDNELL:  Objection, misstates, but go
12   ahead.
13   BY MR. CRAMER:
14       Q.  The second sentence says "Copromoted
15   matches in which athletes from different MMA
16   promoters compete against one another are
17   apparently nonexistent."  Did I read that
18   correctly?
19           MR. WIDNELL:  I'm sorry.  I'm not --
20   you're in paragraph 95?
21           MR. CRAMER:  Yes, second sentence.
22           MR. WIDNELL:  I apologize.  Yes.  I see.
23   I was looking at a different sentence.  My
24   mistake.
25   BY THE WITNESS:

8 (Pages 292 to 295)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

296

1     A. We're all on the same page.
2     Q. All right. I read that correctly?
3     A. Yes.
4     **Q. You understand that UFC refuses to**
5     **copromote with other MMA promoters, correct?**
6          MR. WIDNELL: Objection, form.
7     BY THE WITNESS:
8     A. Whether that's a binding policy or not I
9     don't know. I just know that they don't.
10    Q. Have you seen evidence in the record where
11    Dana White has said he will not copromote with
12    other promoters?
13    A. I don't recall that statement. I wouldn't
14    be surprised that it's made.
15    Q. Are you aware that other MMA promotions
16    haven't engaged in co-promotion?
17         MR. WIDNELL: Objection, form.
18    BY THE WITNESS:
19    A. Could you read -- I think you --
20    Q. I'll restate the question.
21    A. I think you said haven't when you probably
22    meant have.
23    Q. Thank you. Are you aware that other MMA
24    promotions have indeed engaged in co-promotion?
25         MR. WIDNELL: Objection, form.

297

1     BY THE WITNESS:
2     A. You said -- could you read -- I think
3     you --
4     Q. I'll restate the question.
5     A. I think you said haven't when you probably
6     meant have.
7     **Q. Thank you. Are you aware that other MMA**
8     **promotions have indeed engaged in procopromotion?**
9     **A. You know, I recall that there are a few**
10    **instances of copromotion and I can't remember what**
11    **they -- I can't remember the context or who did**
12    **it.**
13    Q. Are you aware that Pride used to do bouts
14    with fighters from different MMA promotions before
15    it was bought up by Zuffa?
16    A. I don't recall what Pride did.
17    Q. Are you aware that Strike Force before it
18    was bought by Zuffa allow some of its
19    fighters to go fight with other promotions?
20         MR. WIDNELL: Objection, form.
21    BY THE WITNESS:
22    A. That's a different thing.
23    Q. Are you aware of that?
24    A. Yeah.
25    Q. And you know that Zuffa recently engaged

298

1     in copromotion, correct?
2     A. With whom?
3     Q. Does Zuffa have market power in the boxing
4     promotion world?
5     A. Not that I'm aware of.
6     Q. And would you agree that if Zuffa engaged
7     in copromotion in boxing in a market in which it
8     does not have market power that that would be
9     efficient?
10    A. Well, you have to define copromotion
11    now.
12    Q. Promoting a bout with a fighter signed by
13    the UFC against a fighter that wasn't signed by the
14    UFC.
15    A. Are we -- are we talking about Conor
16    McGregor and his fight with -- what's his name?
17    Merryweather Lewis?
18    Q. Money Mayweather.
19    A. Yeah. Okay. All right. So that's what
20    we're talking about? Is that what we're talking
21    about, that's the question.
22    Q. Yes.
23    A. Okay.
24    Q. You're aware that Zuffa copromoted a
25    boxing match between its own fighter, Conor

299

1     McGregor, and Mayweather?
2          MR. WIDNELL: Objection, foundation.
3     BY THE WITNESS:
4     A. I'm not sure that it was copromotion in
5     the sense that we've been talking about here, but
6     I'm aware that Conor McGregor fought in that match
7     and it was okay with UFC for him to do it.
8     Q. The UFC promoted that match, correct?
9          MR. WIDNELL: Objection, foundation.
10    BY THE WITNESS:
11    A. When you say promoted, promote means that
12    they advertise the existence of the match going on
13    and that Conor McGregor is a UFC athlete and he's
14    fighting in this match or that they put the match
15    on?
16    Q. The former.
17    A. Yeah, I'm aware they did that.
18    Q. And you're aware that Mayweather is not
19    under contract with the UFC, correct?
20    A. Of course, yes.
21    Q. And you would agree -- strike that.
22    Have you done an analysis in your
23    report -- strike that.
24    Do you know whether the UFC intends to
25    copromote in the sense that it copromoted the match

9 (Pages 296 to 299)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

300

1    between McGregor and Mayweather in boxing -- other
2    boxing matches in the future?
3         A. It would depend on whether it's in the,
4    you know, management of UFC judges that it's in
5    their business interest and whether someone comes
6    along who's got the talents to compete at that
7    level and whether they want to risk it.
8         Q. And you understand that the fight between
9    Mayweather and McGregor was profitable, correct?
10        A. One assumes for the promoter of that
11   fight.
12        Q. And for the fighters, correct?
13        A. One assumes.
14        Q. All right. Back to Strike Force data.
15   You testified yesterday relating to the Chow test
16   and I have some follow-up questions.
17        A. Okay.
18        Q. You testified that when you ran your Chow
19   test that Zuffa and Strike Force data did not come
20   from the identical data-generating process,
21   correct?
22        A. I recall saying something like that, yeah.
23        Q. And you testified that your Chow test
24   could tell you if there was any reason to put these
25   guys, the Strike Force guys in your words, in the

301

1    regression, correct?
2         A. I don't know if -- I would never have
3    phrased it that way, but --
4         Q. I'm quoting you.
5         A. I don't remember saying it that way, but
6    go ahead.
7         Q. So your testimony is that your Chow test
8    can tell you whether to include some observations
9    in regression -- in a regression but not others?
10        A. No. No. The preacquisition Strike Force
11   data -- think about what Dr. Singer's regression
12   for all its flaws is -- is doing. It's -- it's
13   saying that given the business model and
14   compensation model that Zuffa runs that there's
15   this relationship between the so-called foreclosure
16   share however calculated and the share of a
17   particular athlete's pay in the event in which he
18   or she competes, and that's specific to the way
19   Zuffa runs its business. And then -- fine, you
20   want to run that regression, run that regression on
21   Zuffa. And then somebody comes along and
22   effectively says, hey, we found this box of data
23   that fell off the back of a truck and it's got
24   some -- it's got some MMA fighter data in it from a
25   different company that's operating independently.

302

1    It's not managed by Zuffa people, the contracts
2    were not written by Zuffa people, nothing. They
3    say we're going to put them in with Zuffa and say
4    this -- and we're going to calculate the damages
5    for -- for Zuffa fighters using those guys. And so
6    you say, well, you know, did they have the same
7    data-generating process? Answer, no, but the first
8    premise is why are those people in there in the
9    first place. And then the Chow test or the F test
10   says, you know, it actually was a different world
11   over there for those -- for those fighters. So
12   you're using the parameters that are affected by a
13   firm that doesn't -- that wasn't owned by Zuffa
14   to -- to construct these parameters to predict some
15   so-called damage. It's a different company.
16        Q. You've heard of the term "yardstick,"
17   right?
18        A. Yeah.
19        Q. You testified I think earlier this morning
20   that the contracts at other MMA promotions look
21   very much like the contracts at Zuffa, right?
22        A. The contracts look like them.
23        Q. And you inferred from the fact that the
24   contracts at other MMA promotions are similar to
25   the contracts at Zuffa that the business practices

303

1    would be similar this morning, correct?
2         A. Sure, they're similar. The business
3    practices are similar.
4         Q. All right. You believe that your Chow
5    test justifies the discarding of the Strike Force
6    data unless the data-generating process for Strike
7    Force is identical to the data-generating process
8    for Zuffa; is that right?
9         A. The point I'm making is that this is a
10   different company and the Chow test demonstrates
11   that it was different. Why you would put it in in
12   the first place escapes me.
13        Q. All right.
14        A. So having said -- this is a different
15   company, this is -- these athletes were not under
16   management of Zuffa, their compensation was not
17   determined by Zuffa, the contracts they signed were
18   not signed by anybody from Zuffa, and yet they're
19   being used for this. And what the Chow test
20   demonstrated was, you know, not only shouldn't you
21   put them in there in the first place, but they
22   really are different. That's what the Chow test is
23   demonstrating.
24        Q. Strike Force was in the same market as
25   Zuffa, correct?

10 (Pages 300 to 303)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

---

328

1    Q. Do you know whether or not there is a
2 relationship between the standard bout contract and
3 the actual bout contracts?
4    A. A relationship?
5    Q. Yeah.
6    A. There might be.
7    Q. Have you studied whether there are
8 differences in terms of the term between the
9 standard bout contract and the actual bout
10 contracts that were executed?
11    A. Some contracts are different than the --
12 than the standard bout contract.
13    Q. How many?
14    A. I don't know the number.
15    Q. What percentage?
16    A. I don't know.
17    Q. It's fair to say that if we assume that
18 Zuffa's bout contracts were for a shorter term and
19 fewer bouts when they had less market power, that
20 that would be -- that that circumstance would be
21 efficient?
22        MR. WIDNELL: Objection, form.
23 BY THE WITNESS:
24    A. Well, you've -- you've inserted that when
25 they had less market power.

---

329

1    Q. Yes.
2    A. And I'm not -- I'm not opining that they
3 had -- they have more market power now, but there's
4 no allegation that they had market power back in
5 those earlier days. That's your premise.
6    Q. Okay. Fair enough. You agree that they
7 had a smaller share of the MMA market in the early
8 2000s than the late 2000s, right?
9    A. That's my recollection, at least
10 calculated in certain ways.
11    Q. Okay. And if we assume for purposes of
12 this question that share of the MMA market
13 correlates with market power, you would agree with
14 me that when Zuffa had less market power it had
15 shorter-term contracts with fewer bouts, correct?
16    A. Well, again, you're asking me to assume
17 something in your hypothetical, that they had some
18 substantive increase in market power, and all we
19 really know is that they had a larger share, which
20 is what they would get if they had just been --
21 competitive market if they had just become more
22 successful as promoting and creating these kinds of
23 shows. So what I will agree to is that given the
24 facts that you've stated, when they -- earlier on
25 they had shorter contracts and later on they had

---

330

1 reasons to have longer contracts, but those
2 contracts are still not very long.
3    Q. The contracts that were shorter earlier on
4 when Zuffa had a smaller market share, were those
5 efficient?
6    A. In the context of the industry at the time
7 I suspect that they were.
8    Q. Were those procompetitive?
9    A. There's -- the -- there has -- remember
10 what my -- what my analysis said. When firms that
11 have no evident market power are using a practice,
12 one can generally infer that there's a
13 procompetitive rationale for the elements of those
14 contracts.
15    Q. Turn to paragraph 7, please. The
16 second-to-last line on the page, on page 2, in
17 paragraph 7 reads "Immediately following the
18 acquisition of UFC Zuffa expended significant
19 resources in legitimizing MMA. Zuffa was a prime
20 mover in creating a unified set of rules for the
21 sport and in convincing state athletic commissions
22 to sanction MMA." Do you see that?
23    A. Yes.
24    Q. You would agree that during the early
25 2000s Zuffa invested substantial resources in

---

331

1 developing the sport of MMA, right?
2    A. Yes.
3    Q. And in promoting MMA athletes, correct?
4    A. Yes.
5    Q. And it did so even with no evident market
6 power, correct?
7    A. Yes.
8    Q. And it did so with contracts of shorter
9 duration, correct?
10    A. That's your representation, yes.
11    Q. Do you provide any evidence in your report
12 that Zuffa would not have made these investments or
13 do the promotion in the early 2000s that they
14 did -- strike that.
15        Is it your representation that -- strike
16 that.
17        Turn to paragraph 82, please. You say
18 "Many of the provisions that Dr. Singer considers
19 to be exclusionary have been included in Zuffa
20 contracts since 2001, long before the start of the
21 class period and at a time when Zuffa could not
22 have plausibly exercised either monopoly or
23 monopsony power"; do you see that?
24    A. Yes.
25    Q. So at what date would you say it was at

---

17 (Pages 328 to 331)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

340

now you've inserted firm.  So no.

    **Q.  All right.  Firms in a market, if I change the -- the -- all right.  I'll reask the question this way.  A market can have an infinite number -- in order for a market to have a horizontal supply curve there would need to be an infinite number of equivalent workers at exactly the same wage; is that right?**

    A.  No.

    **Q.  What was wrong with that?**

    A.  Infinite.  Does the -- the supply curve needs to be -- can be perfectly elastic over a relevant range where demand in this market is shifting and there will be no material effect on prices.  I mean, there's not an infinite number of workers anywhere.

    **Q.  Okay.  So a firm would need to have a substantial material number of equivalent workers -- I mean, a market would need to have a substantial number of equivalent workers at exactly the same wage in order for there to be a horizontal supply curve; is that right?**

    A.  I said over the relevant range.

    **Q.  Over the relevant --**

    A.  So if we -- if we have -- there needs to

341

be enough to prevent the wage from rising when demand shifts.

    **Q.  All right.**

    A.  And enough depends on the circumstances.

    **Q.  Is it fair to say that when mobility of workers is -- becomes restricted or is costly firms in that market could obtain some monopsony power?**

    A.  Your statement is so broad and vague that -- you know, I'll come back to my taco stands.  And there's some costs of going to the next taco stand so that people who live closest to my taco stand prefer my taco stand to the taco stand that's further away even though our tacos are in all other respects identical.  That means that if I cut the price of my tacos more people come to me.  If I raise the price of my tacos fewer people come to me.  That is not a completely horizontal demand curve.  So in that sense -- and that's the sense in which George is using it here in a lot of this discussion -- one might say that there's a degree of monopsony power if we define -- if we define monopsony power to mean that if I cut my price I sell more and if I raise my price I say monopsony power in that case.  And you can do the same thing on the other side of the market.  So, you know, my

342

firm's here and there's other firms and I'm going to hire -- instead of trying to attract people to my taco stand I'm going to hire people from along the road between my firm and another firm and they're all uniformly distributed.  I'm making up this model.  And I'll get the same taco stand kind of thing on the input side.  If I want to hire more I have to reach further down the road and it's costly to drive.  So I'll increase the marginal price that I pay -- I'll have to increase the marginal price that I pay.

    **Q.  Okay.  So let's take your taco stand example.  You have to taco stand A on one side of the road and then a mile away you have taco stand B.**

    A.  Yeah.

    **Q.  Now let's say somebody puts a toll on that road and all of a sudden in order to get from taco stand A to taco stand B it costs a hundred dollars and before it used to cost zero dollars.  All things equal, would that toll increase the mobility costs of workers?**

    MR. WIDNELL:  Objection, form.

BY THE WITNESS:

    A.  So now I'm -- just -- just so I'm clear,

343

now I'm hiring workers for my taco stand?

    **Q.  Yes.**

    A.  So there's a toll that prevents people from the other side of town getting to my taco stand?

    **Q.  Yes, and vice-versa.**

    A.  Okay.  So yeah, there's fewer people that I can hire from the other side of town.

    **Q.  So now as compared to a world with the hundred-dollar toll and the world without the hundred-dollar toll, the two taco stands in the world with the hundred-dollar toll have more monopsony power than the world without the hundred-dollar toll, correct?**

    MR. WIDNELL:  Objection, form.

BY THE WITNESS:

    A.  I think what you're trying to say is that -- let's say here's A and B taco stands and the middle of town is halfway in between, and then I build a wall, okay, the Berlin Wall there so people can't get across from -- from -- so people between halfway and my taco stand and the percentage -- there's nobody else in town -- can only work for my taco stand.  They can't go work for the other taco stand.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

344

1     **Q. Correct.**
2     A. Is that what we're saying?
3     **Q. Yes.**
4     A. Yeah. So these people have fewer options.
5 I got it.
6     **Q. And when you compare the world with the**
7 **Berlin Wall in your example in the world without**
8 **the Berlin Wall, the firm with the Berlin Wall has**
9 **more monopsony power, correct?**
10     A. The firm with the -- the firm -- I -- I
11 won't be competing as aggressively to get people
12 from across the place where the border is now. So,
13 you know, I don't know how things played out in the
14 output market. I mean, I understand what you're
15 trying to say and you're saying the same thing
16 here, and you're saying the same thing that I said.
17 There's a degree of monopsony power. You didn't
18 need the wall. I already said there's a degree of
19 what some people would call monopsony power there
20 by the fact that it is -- it is costly to move from
21 A to B.
22     **Q. And --**
23     A. So if it became more costly to move from A
24 to B, that degree of -- of control over price would
25 increase a little bit.

345

1     **Q. So all things equal, the higher the**
2 **mobility costs in your example the higher the**
3 **monopsony power of the firms, correct?**
4     MR. WIDNELL: Objection, form.
5 BY THE WITNESS:
6     A. Yeah. It depends on how we make the
7 mobility costs and things like that. It depends on
8 what we do with the mobility costs.
9     **Q. We raise the costs. So go back to my toll**
10 **example. Assume that the Berlin Wall costs $100 to**
11 **get from one side to the other and now assume it**
12 **costs a thousand dollars to get from one side to**
13 **the other. As compared to the world where it costs**
14 **a hundred dollars to the world where it costs a**
15 **thousand dollars, the firms in the world where it**
16 **costs a thousand dollars would have a higher degree**
17 **of monopsony power than the -- all things equal,**
18 **than the firms in the world where it costs a**
19 **hundred dollars.**
20     A. I think what you're trying to establish is
21 that the people on my side of the wall have fewer
22 places -- because there's only two places, have
23 fewer places at which they can work and that
24 affects the wage that I have to pay to get them to
25 work for me, and I agree with that.

346

1     **Q. So all things equal, the higher the**
2 **mobility costs in the example the more monopsony**
3 **power the firms in that example have, all things**
4 **equal; is that right?**
5     MR. WIDNELL: Objection, form.
6 BY THE WITNESS:
7     A. It was important that you said twice "in
8 that example." So I agree.
9     Q. And in that example we're talking about
10 taco stands, right? These aren't Taco Bell, right?
11 It could be a small firm that has some degree of
12 monopsony power; is that right?
13     A. Yes. Well, as the term -- as we're using
14 the term. It's just a dangerous term on both sides
15 of the market.
16     Q. Is it fair to say that one reason why
17 non-Zuffa firms employ some of the challenged
18 contractual provisions that we've talked about is
19 to restrain the mobility of the fighters that work
20 for them?
21     A. It's to do all the things we've discussed
22 before that -- you know, to see to it that they get
23 the returns on their investments and that their
24 ability to manage a multi-bout career progression
25 is not interfered with.

347

1     Q. And one way in which they achieve those
2 ends is by restricting the mobility of the workers,
3 correct?
4     A. In the sense that I just used, yes.
5     Q. And so in that sense even these smaller
6 promotions can use these contracts to gain some
7 measure of monopsony power; is that right?
8     A. No.
9     Q. Are you aware of evidence in the record
10 that Strike Force or Bellator said -- or the
11 executives at Strike Force or Bellator said that
12 they based their contracts with their athletes in
13 part on the fact that the UFC used similar
14 contracts with its athletes?
15     A. You know, I recall some discussion similar
16 to that.
17     Q. You're aware, are you not, of record
18 evidence showing that smaller MMA promotions like
19 Strike Force or Bellator have said that they impose
20 some of the contractual provisions because the UFC
21 did, right?
22     A. I don't know if the word "because" was
23 used. I wouldn't be surprised if they went out and
24 copied some contract provisions from UFC or someone
25 else.

21 (Pages 344 to 347)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

348

1        MR. CRAMER:  All right.  I'd like to mark
2   as the next exhibit a piece of the testimony from
3   Scott Coker in this case.  What exhibit?
4        THE REPORTER:  10.
5           (Topel Exhibit 10 was marked
6             as requested.)
7   BY MR. CRAMER:
8        Q.  What you've just been handed is
9   Exhibit 10.
10       A.  Yep.
11       Q.  It is a portion of the transcript of the
12   deposition of Scott Coker that was taken August
13   3rd, 2017 and it was taken in this case.
14       A.  This is the Bellator fellow?
15       Q.  And Strike Force.  He was at both.
16       A.  Okay.
17       Q.  Did you have an opportunity to review this
18   deposition transcript?
19       A.  Not in its entirety.
20       Q.  You read some of it?
21       A.  Some of it, yeah.  I believe so.
22       Q.  Turn to page 245 of the transcript which
23   is on the third -- it's the third page of the
24   exhibit.  Do you see that on the bottom right-hand
25   corner?

349

1        A.  You said 245, right?
2        Q.  Yes.
3        A.  245 is the bottom right of the second
4   page.
5        Q.  Yes.
6        A.  Okay.
7        Q.  After the title page.
8            All right.  I'm going to draw your
9   attention to the testimony beginning at line 3 on
10   page 245, and I'll read it into the record and then
11   we can discuss it.
12           "Now, let's go back a little bit to the
13   right to match clause.  You mentioned that some of
14   the Strike Force contracts had a matching right; is
15   that right?"
16           Answer:  "Yes."
17           Question:  "You didn't think having a
18   matching right or right to match clause was unfair
19   to the fighters, did you?"
20           And the witness says "There's two sides.
21   There's two answers to that.  One is this is
22   something that really came from the UFC and it was
23   like an industry standard when I got into the
24   business, right?  So they are the first ones to put
25   it in there.  And so for us to be competitive we

350

1   had to put it in there as well."
2           And then on line 25 he's asked "Would you
3   have put that clause -- the matching rights clause
4   in there if you thought it was detrimental to the
5   fighters."
6        A.  Where's that?
7        Q.  On the top of 246.
8           And then Mr. Coker answers "I mean, we
9   treat our fighters extremely well, but this is also
10   a business side where I have -- it's my job to
11   protect the company, and if one company out there
12   that's the industry leader is doing it and you're
13   not doing it, then it's not creating a fair playing
14   field."
15           Do you see that?
16       A.  Yes.
17       Q.  So is it fair to say from that testimony
18   that one of the reasons why Mr. Coker implemented
19   the right to match was as a strategic response to
20   the fact that the UFC also had the right to match
21   in its contracts?
22       A.  Well, that's one reason.  He's noticed
23   that UFC has this and UFC's able to -- the
24   operative word down here at the end of his first
25   answer is "For us to be competitive we had to put

351

1   in there as well."
2        Q.  All right.  You can put that aside.
3           Have you seen evidence that -- in the
4   record that certain MMA promotions other than
5   Zuffa, smaller MMA promotions have said that they
6   would abandon certain of the contractual provisions
7   if the UFC would?
8        A.  That sounds like something that might get
9   you in antitrust trouble anyway, but the -- I
10   haven't seen statements to that effect, but I'm
11   sure you'll show me.
12           MR. CRAMER:  Okay.  All right.  I'm going
13   to have the court reporter mark as the next exhibit
14   a series of e-mails.
15           (Topel Exhibit 11 was marked
16             as requested.)
17   BY MR. CRAMER:
18       Q.  The court reporter has marked as
19   Exhibit 11 a two-page document bearing the Bates
20   range ZFL-1904802 through 4803, and I'd like to
21   draw your attention to the e-mail at the bottom of
22   the page from Michael Chiappetta to Anthony Evans
23   at the UFC.
24       A.  And then I'm particularly talking about

22  (Pages 348 to 351)

352

1  the run -- one at 4:43 p.m. from Chiappetta who is
2  talking about a conversation he had with Bjorn
3  Rebney.  Bjorn Rebney was the head of Bellator at
4  the time and this is dated September 25th, 2012.
5  And I'd like to turn your attention to the next
6  page where Chiappetta, who is a reporter, is
7  reporting a conversation that Chiappetta had with
8  Rebney to the UFC.
9      A. Can I -- can I just read the rest of
10  this.
11     Q. Please do.
12         (Witness reviewing document.)
13  BY THE WITNESS:
14     A. Remind me who Mike is because you've only
15  got a Gmail address.
16     Q. Mike Chiappetta is an MMA reporter.
17  Anthony Evans is an executive at the UFC.
18     A. So he's conveying some conversation that
19  he had with somebody at Bellator; is that what he's
20  doing?
21     Q. Correct.  Chiappetta communicated with
22  Bjorn Rebney, who was the President of Bellator at
23  the time, and then he's communicating a
24  conversation that Chiappetta had with Rebney to the
25  UFC.  And on the second page of the e-mail --

353

1      A. He says "Eventually"; is that sentence
2  you'd like me to read?
3      Q. Yes.  Chiappetta says "Eventually he" --
4  referring to Rebney -- said "he would be willing to
5  do away with the section that allows them to
6  release a fighter and retain matching rights if
7  Zuffa would also do the same"; do you see -- do you
8  see that?
9      A. I see that.
10     Q. Do you know whether Zuffa eliminated the
11  right to match clause in response to Rebney's
12  challenge?
13         MR. WIDNELL:  Objection, form.
14  BY THE WITNESS:
15     A. Well, you know, I don't know if there was
16  an actual challenge.  This is being relayed by a
17  reporter.  We know how sometimes that can get
18  muddled.  But I don't know if this is in -- this
19  sounds like it's in the context of a particular
20  transaction, but, you know, one wouldn't be
21  surprised if some competitor would say, hey, you've
22  invested a lot in all these folks, wouldn't you
23  like to get rid of this clause because then, you
24  know, it would give us greater access to the people
25  you've invested in.  That's the point of having

354

1  these clauses is to protect the investments that
2  have already occurred.
3         Now, on the first page here it says that
4  "The matching rights clause for fighters that have
5  been released, Bellator has in their contracts
6  and Dana" -- I take it that's Dana White -- "said
7  last week that UFC has in their contracts too.
8  Although he said it's never been used."  So this
9  is -- it's an equilibrium where this contract
10  restriction has not been used.  It could be still
11  binding, but it hasn't been used.
12     Q. Is it your opinion that the right to match
13  clause has never been, quote/unquote, used?
14     A. I didn't offer that opinion.  I'm just
15  saying that that's what it says here.
16     Q. Is it your opinion that if the UFC has
17  never during -- had never during a right to match
18  period matched a rival's bid that that would mean
19  the right to match clause had no effect in the
20  marketplace?
21     A. That was the implication that I was trying
22  to convey at the end of my answer.  That doesn't
23  mean that it's not binding.  It doesn't mean that
24  it doesn't have an effect.  It's not -- it's not
25  put into the contracts for nothing.  It serves a

355

1  purpose.
2      Q. So even if the right to match clause has
3  never been, quote/unquote, used, it's still having
4  an effect in the marketplace, correct?
5      A. It could be having an effect in the
6  marketplace even if they've never had to invoke.
7      Q. And why is that?
8      A. Because -- because they've never had to
9  match, for one reason, is that they've always been
10  paying more would be a good reason.  They have --
11  people haven't been able to get as good an offer.
12  It might be also in this equilibrium that, say,
13  Bellator realizes that Zuffa has a right to match
14  and because of past investments the athlete is more
15  valuable to Zuffa than to Bellator.  So it's
16  unlikely to win in the bidding process.
17     Q. Sounds to me like that answer said the
18  right to match is not doing any work.  How is the
19  right to match doing any work, procompetitive work
20  or anticompetitive work, economic work if Zuffa
21  would just outbid any potential rival?  Why doesn't
22  Zuffa just get rid of the right to match, then, if
23  it knows it can just outbid any rival?
24     A. Well, we go through this in my report.
25  The -- the right to match gives Zuffa the right to

23 (Pages 352 to 355)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

356

1  match the relevant elements of a contract that's
2  been offered from a competitor.  And so if you --
3  if it came down to, oh, why don't they just -- why
4  don't they just outbid, well, if Bellator makes its
5  best offer and it knows that Zuffa will match,
6  then, you know, the returns to making its best
7  offer aren't as high as otherwise.  Now, take
8  that -- take away the right to match and you come
9  back to the example that I have in my report about
10  the holdup problem where you're more valuable to
11  Zuffa, the athlete knows it.  So now you've got a
12  bilateral negotiation where there's no determinant
13  solution in economics except that it's going to be
14  somewhere in between and depends on the relative
15  intransigence of the two parties where you're going
16  to end up.
17      Q.  So you just said --
18      A.  Let me finish.  So I said that the -- what
19  I've just described is the holdup problem that's in
20  my report that the right of first refusal is
21  designed to avoid.
22      Q.  One of the things you said is that if
23  Bellator makes its best bid during a UFC right to
24  match period the returns to Bellator to making that
25  bid aren't as high as they would be without the

357

1  right-to-match period in place; is that right?
2      A.  No.  I just said given that the right to
3  match is there, Bellator has to make a calculation
4  that says here's what this athlete is worth to us
5  and let us assume -- and that's the assumption of
6  my example -- that the athlete is worth more
7  because of past investments to Zuffa than to
8  Bellator.  So in making this offer you're not
9  certain of what the value to Zuffa is, but it's
10  very likely to be higher.  So I put all the -- I
11  put all the numbers into a contract, the athlete
12  takes the contract to Zuffa, and Zuffa says done,
13  we'll pay that, and that's our right of first
14  refusal.  And so we can invoke that.
15      Q.  So what effect, in your view, does that
16  have Bellator's incentives to make a bid?
17      A.  Bellator may have -- well, relative to
18  what because I don't -- if -- if it's -- I think we
19  went over this yesterday.  Suppose we canceled the
20  right -- in one guy's contract, everybody else's
21  contract stays the same.  I know we did this --
22      Q.  I think I can make it easier.
23      A.  I know we did this yesterday.
24      Q.  We did.  I think I can just make it
25  easier.  The right to -- a fighter during the right

358

1  to match period or a fighter who has waited a year
2  and we're a day after the right to match period is
3  over, would Bellator's incentives to make a bid be
4  different once the right to match period expires
5  than during the match period to match?
6      A.  They could be, though there's a question
7  of why Bellator make an offer in the right to match
8  period and they're gaining information about this
9  fighter from the fact that -- it's your
10  hypothetical.  There's no contract between Zuffa
11  and the fighter a year after the end of his
12  contract.  So you're -- Bellator's looking at that
13  at the end and saying, you know, winner's curse
14  might be operative here.  So if we win what is it
15  that Zuffa knew about this fighter that we don't.
16      Q.  Well, assume that Zuffa made a bid and the
17  fighter didn't accept it.
18      A.  Okay.
19      Q.  I'll withdraw it.  I'm going to move on.
20      Would you agree with me that the conduct
21  engaged in by a firm without market power could
22  be -- could have anticompetitive effects when that
23  same conduct is engaged in by a firm with market
24  power?
25      A.  That's conceivable.

359

1      Q.  How is that conceivable?
2      A.  Well, take the -- I mean, often in
3  contract disputes under section 2, like exclusive
4  dealing or loyalty discounts or something like
5  that, under certain prerestrictive conditions
6  things that have procompetitive effects can also
7  have anticompetitive effects if certain conditions
8  are satisfied.
9      Q.  Well, is bundling -- product bundling one
10  of those examples?  Product bundles has many
11  procompetitive effects and when engaged in by a
12  firm without market power in any of the markets in
13  which the products they're bundling --
14      MR. WIDNELL:  Objection, form.
15  BY MR. CRAMER:
16      Q.  I'll rephrase.  Could bundling be one of
17  those examples where product bundling can be
18  anticompetitive when engaged in by a firm with
19  market power and procompetitive when engaged in by
20  a firm without market power?
21      A.  Yes, that's -- I mean, that and a myriad
22  of other examples under section 2.
23      MR. WIDNELL:  I just want to make clear,
24  you're asking for an economic opinion here, not a
25  legal opinion; is that right?

24 (Pages 356 to 359)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

360

1      MR. CRAMER:  Yes.  I'm not asking for any
2   legal opinion.
3      MR. WIDNELL:  Okay.  I just want to
4   avoid --
5      THE WITNESS:  Yep, that's fine.
6      MR. WIDNELL:  -- making that objection
7   over and over.
8      THE REPORTER:  Guys.
9   BY MR. CRAMER:
10     Q.  Turn to paragraph 43, please.  All right.
11  In paragraph 43 you quote a document.  I believe
12  it's the Deutsche -- one of the Deutsche Bank
13  documents and I'm just looking for that.  All
14  right.  Towards the middle of paragraph 43 you say
15  "As one document quoted by Dr. Singer states"; do
16  you see that?
17     A.  Yes.
18     Q.  "UFC holds the dominant market position
19  within the sport and continues to do so even as a
20  highly fragmented group of competitors have entered
21  the market in an attempt to emulate UFC's success";
22  do you see that?
23     A.  Yes.
24     Q.  Do you agree with that characterization of
25  UFC's position in the market versus other

361

1   competitors?
2      A.  I'm just offering it as somebody's
3   opinion.  You can have different definitions of
4   dominant, but Zuffa is the largest and most
5   successful firm in the market.
6      Q.  All right.  I'm going to show you the
7   document that Dr. Singer was quoting and have it
8   marked as Exhibit 12.
9         (Topel Exhibit 12 was marked
10           as requested.)
11  BY MR. CRAMER:
12     Q.  And I'll note that you cite this document
13  in footnote 45.
14     A.  Okay.
15     Q.  It is entitled "UFC/Zuffa, LLC DBA
16  Ultimate Fighting Championship, Confidential
17  Information Memorandum."  It's dated October 2009
18  and it was put out by Deutsche Bank.  You've seen
19  this document before, correct?
20     A.  Yes.
21     Q.  And you recognize that Zuffa management
22  had input into this document, correct?
23     A.  One would assume.
24     Q.  All right.  Turn to page 16 internally to
25  the document.

362

1      MR. WIDNELL:  I just want to briefly note
2   an objection for completeness.
3      MR. CRAMER:  Okay.
4   BY MR. CRAMER:
5      Q.  If there's something as you read through
6   this document that you think is missing, please let
7   me know.  Okay?
8      A.  Okay.  Sorry.
9      MR. WIDNELL:  Just to be clear, it's not
10  in the document.  The document was an attachment to
11  an e-mail.
12     MR. CRAMER:  Oh, okay.  Fair enough.
13  BY MR. CRAMER:
14     Q.  Fair to say in your report you don't cite
15  any e-mail that attaches this document, right?
16     A.  Not that I'm aware of.
17     Q.  Okay.
18     All right.  On page 16 under the heading
19  "Overview of world's leading MMA brands" the
20  document states "Zuffa owns three of the largest
21  and most recognized MMA brands in the world, the
22  Ultimate Fighting Championship, World Extreme Cage
23  Fighting, and Pride Fighting Championships"; do you
24  see that?
25     A.  Yes.

363

1      Q.  And this is about a year before Zuffa
2   purchased Strike Force; is that right?
3      A.  That's correct.
4      Q.  And in the first bullet point Deutsche
5   Bank says "Among Zuffa's three MMA brands, the UFC
6   holds the dominant market position within the sport
7   and continues to do so even as a highly fragmented
8   group of competitors have entered the market in an
9   attempt to emulate UFC's success."  That's the
10  portion you quoted in your report; is that right?
11     A.  Yes.  Quoted from Dr. Singer, but he's
12  quoting from the report.
13     Q.  And is it your view that -- strike that.
14     I believe you testified that it is your
15  opinion that Zuffa is the market leader among MMA
16  promoters; is that right?
17     A.  Yes.
18     Q.  And would you agree that that was the case
19  since 2001?
20     A.  I don't recall the circumstances
21  completely in 2001.  The market was pretty small.
22  They might been the largest producer back then.
23     Q.  And that remained the case from the date
24  of this document, October 2009, to the present,
25  correct?

25  (Pages 360 to 363)

372

1    **present a competitive threat to the UFC?**
2         A. They might have. I think all firms in
3    this market present a competitive threat to UFC.
4         **Q. So when Zuffa purchased Strike Force, for**
5    **example, it was eliminating, in your opinion, a**
6    **competitive threat; is that right?**
7         A. Well, no. The -- take Strike Force, for
8    example. You know, everybody in the -- if they
9    bought some small firm there's some competition
10   from that firm, that's all I'm saying. I mean, we
11   wouldn't want to say that these firms are in the
12   market and they don't compete with Zuffa. They
13   were competing for athletes, they were competing
14   for eyeballs, they were competing, and the question
15   is whether it was addressed by antitrust
16   authorities and the like is whether these
17   acquisitions materially affected competition in the
18   market. Evidently they found that they didn't.
19   So -- but these were -- these were firms operating
20   and there are always benefits and potential costs
21   of allowing acquisitions.
22        **Q. At the time that Strike Force was**
23   **purchased in 2010, did Strike Force, in your**
24   **opinion as an economist, present a significant**
25   **economic threat to the UFC?**

373

1         MR. WIDNELL: Objection, form.
2    BY THE WITNESS:
3         A. Not such a threat that the acquisition
4    would have -- would have materially affected
5    competition to the detriment of consumers and --
6    and fighters.
7         **Q. Did Pride at the time it was purchased**
8    **present a significant economic competitive threat**
9    **to Zuffa at the time it was purchased?**
10        A. And my answer's the same.
11        **Q. Would it be the same for all of the**
12   **entities?**
13        A. Yes.
14        **Q. Is it fair to say that even if we put the**
15   **promoters that Zuffa acquired aside --**
16        A. Let me finish -- let me say -- I should
17   have put the word "adversely" affect competition.
18        **Q. Is it fair to say, putting the promoters**
19   **that Zuffa acquired aside, that your report does**
20   **not identify a single MMA promotion other than**
21   **Zuffa that does business in the United States that**
22   **had substantial market share and was profitable?**
23        MR. WIDNELL: Objection, form.
24   BY THE WITNESS:
25        A. Are we -- are we saying that Bellator's

374

1    not profitable and doesn't do business in the
2    United States?
3         **Q. Is it your opinion that Bellator has**
4    **substantial market share and is profitable?**
5         A. It's -- it's got a substantial position in
6    the market and it seems to be surviving.
7         **Q. Is it your opinion that Bellator is**
8    **profitable currently?**
9         A. Well, it's an ongoing entity. So the
10   present discounted value of what those investors
11   think that this project is worth must be
12   positive.
13        **Q. Is it your opinion that the revenues that**
14   **Bellator brings in in any year exceed the costs of**
15   **running the organization in that year?**
16        A. I've not looked at the balance sheets of
17   Bellator, but given that they're still in business,
18   there must be some anticipation of positive cash
19   flow even if it's negative today.
20        **Q. So you're saying that it's your**
21   **understanding that there's an anticipation that**
22   **Bellator will one day be profitable, but you don't**
23   **understand that Bellator's profitable today; is**
24   **that right?**
25        MR. WIDNELL: Objection, form.

375

1    BY THE WITNESS:
2         A. Well, I'm not -- I'm not offering an
3    opinion of whether they have positive cash flow
4    today.
5         **Q. When in your --**
6         A. Just as Zuffa did not have positive cash
7    flow when it was a young and nascent participant in
8    this market.
9         **Q. When, in your opinion, did Bellator come**
10   **to have significant market share in the United**
11   **States?**
12        A. I don't recall the time series on
13   Bellator's market share. I recall that they have
14   television contracts. They're backed by Viacom and
15   so on.
16        **Q. Putting Bellator aside for the moment, can**
17   **you identify another MMA promotion that does**
18   **business in the United States that has significant**
19   **market share, in your opinion, and is profitable?**
20        A. Well, a lot of these must be profitable.
21   King of the Cage has been around putting on dozens
22   of events every year for many years. There's a
23   long list of promoters that are -- that are doing
24   this and -- you know, the market share you're
25   referring to is very limited in its scope because

28 (Pages 372 to 375)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

376

1    it only focuses on a certain identified group of
2    fighters, but on any given weekend there are
3    hundreds -- or any given month, let's say,
4    hundreds, maybe thousands of these events going on
5    across the country that have nothing to do with
6    Zuffa.
7        Q.  Is it your opinion that King of the Cage
8    has a -- earns a substantial share of the revenues
9    brought in by MMA events in the United States?
10       A.  That's not what I said.  I just said it's
11   out there, it's surviving, it must be making
12   money.
13       Q.  Do you know whether King of the Cage
14   copromotes events for other MMA promoters?
15       A.  They might.
16       THE REPORTER:  Can we take a break?
17       MR. CRAMER:  Yes.  Let's go off the
18   record.
19       THE VIDEOGRAPHER:  Going off the record at
20   11:19.
21       (A short break was had.)
22       THE VIDEOGRAPHER:  We're going back on the
23   record at 11:35.  This beginnings disk No. 3.
24   BY MR. CRAMER:
25       Q.  You testified about certain MMA promotions

377

1    like King of the Cage a moment ago; do you recall
2    that?
3        A.  Yes.
4        Q.  Are you aware that there's evidence that
5    Zuffa considered some of these MMA promotions,
6    quote/unquote, minor leagues?
7        A.  Yes.
8        Q.  What did it mean to be a minor league in
9    the MMA business?
10       A.  I don't think there's a formal definition.
11   I could only give you what, you know, somebody
12   might extend from baseball to -- because that's
13   where it -- the term is generally used, to some
14   other sport.
15       Q.  So what does it mean to you in baseball?
16       A.  That, you know, the Minor Leagues like AAA
17   or Pacific Coast Leagues or places where -- where
18   athletes play either because they like playing or
19   because they hope to make it to the Major Leagues.
20   You can have a career there, that it's in the
21   business, and the teams are viable.
22       Q.  And basketball has the G league; is that
23   right?  Used to be the D league.
24       A.  I don't know whether it's called the
25   G league.  The Continental Basketball Association

378

1    and other stuff.
2        Q.  Well, let's talk about the Minor Leagues
3    in baseball.  Is it fair to say that one purpose to
4    which NBA -- I'm sorry -- Major League Baseball
5    clubs use the Minor Leagues is to develop talent
6    that ultimately would make it to the Major Leagues
7    correct?
8        A.  Of course.
9        Q.  And is there a similar purpose in MMA for
10   Minor Leagues?
11       MR. WIDNELL:  Objection, form.
12       THE REPORTER:  I'm sorry.  I can't hear
13   you.
14       MR. WIDNELL:  Objection, form.  Can you
15   hear me?
16   BY THE WITNESS:
17       A.  First of all, I don't think there are any
18   Minor Leagues.  Maybe the better analogy is to
19   soccer where one can aspire to be premiere league
20   and might move up over time.  Whereas I don't think
21   the -- I've got to remember a team that's in the
22   Pacific.  The Albuquerque whatevers are not
23   aspiring to be a major league franchise.
24       (Topel Exhibit 13 was marked
25       as requested.)

379

1    BY MR. CRAMER:
2        Q.  All right.  I've had the court reporter
3    mark as Topel Exhibit 13 the next document.  I'm
4    going to put it in front of you.  This is a
5    document written by Zuffa's lawyers, Axinn Veltrop
6    Harkrider, LLP.  It's entitled "The FTC's
7    Investigation of Zuffa's Conduct Should be Closed."
8    It bears the Bates range ZFL-1212232 through 259,
9    and I'll note for the record that you cite this
10   document in paragraph 79, footnote 134.  You can
11   verify that.  Page 34.
12       (Witness reviewing document.)
13   BY THE WITNESS:
14       A.  Okay.
15       Q.  The document you're citing is in
16   paragraph -- footnote 134.
17       A.  Yes.
18       Q.  Okay.  So you recall this document?
19       A.  I recall elements of this document.  As I
20   look at the cover of it, I don't recall the
21   cover.
22       Q.  And it was written by Zuffa's lawyers
23   relating to the UFC's acquisition of Strike Force;
24   is that right?
25       A.  Yeah.  Roman numeral I up here, the Strike

29  (Pages 376 to 379)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

380

1   Force acquisition has already led to more
2   compensation, this, that, and the other thing.
3        Q. And do you know what the Federal Trade
4   Commission was doing investigating Zuffa after this
5   Strike Force acquisition?
6        A. My recollection was it was looking to see
7   whether the acquisition had procompetitive effects
8   and whether contract terms also had procompetitive
9   or -- balancing procompetitive and any potential
10  anticompetitive effects.
11       Q. So this document is from 2010; is that
12  right?  I'm sorry.  2011.
13       A. It would have to be from around that date
14  I assume, but I don't see any date on this.  So...
15       Q. It discusses on, for example, page 4 and 5
16  some documents from 2011.
17       A. Unless they had a time machine, then
18  they --
19       Q. So it had --
20       A. I'll stipulate for the purpose of this
21  discussion that it's from sometime after November
22  of 2011.
23       Q. Late 2011, early 2012; is that fair?
24       A. Let's see where we can go with that.  If
25  it turns out to be false, I'm sure that the

381

1   gentleman to my left will have something to say
2   about it.
3        MR. WIDNELL:  Just for the record, you've
4   introduced a textbook that's dated 2018.
5        MR. CRAMER:  It's true, we have.  So there
6   was some time travel.
7   BY MR. CRAMER:
8        Q. All right.  Please turn to page 10 of the
9   document.  There's a caption under the number 7
10  that says "Other strong potential competitors are"
11  --
12       THE REPORTER:  I'm sorry.  I'm having hard
13  time hearing.  Can you start over?
14       MR. CRAMER:  Yeah.
15  BY MR. CRAMER:
16       Q. There's a caption entitled "Other strong
17  potential competitors are particularly well poised
18  to enter."
19       MR. WIDNELL:  Objection.
20  BY MR. CRAMER:
21       Q. And then it says "World Wrestling
22  Entertainment, WWE, is perfectly positioned to
23  enter MMA promotion.  It already has ready access
24  to athletes and media outlets.  Publicly traded
25  with a .7 billion market capitalization, WWE also

382

1   has the advantage of being a powerful established
2   brand.  Indeed WWE was strong enough to foreclose
3   UFC content from getting broadcast on the USA
4   Network."  Do you see that?
5        A. I see the sentence, yes.
6        Q. So Zuffa's lawyers were telling the FTC in
7   or about early 2012 that the WWE was perfectly
8   positioned to enter the market for MMA promotion,
9   right?
10       MR. WIDNELL:  Objection, misstates.
11  BY THE WITNESS:
12       A. Well, I don't know who -- who wrote this
13  paragraph.  I'll accept your representation that it
14  was somebody and those are the -- these are the
15  words, "Perfectly positioned to enter MMA
16  promotion."
17       Q. You don't know whether Zuffa's lawyers
18  wrote this document?  You cited it.
19       A. This is Axinn Veltrop Harkrider.  I don't
20  know that they represented Zuffa in this.  They
21  must have.  So I'm just assuming that they did, but
22  I've never met those lawyers.
23       Q. Turn to page 1 of the document under
24  "Introduction."
25       A. Okay.

383

1        Q. It says "This paper is respectfully
2   submitted on behalf of Zuffa, LLC"; do you see
3   that?
4        A. Yes.
5        Q. So this was submitted by lawyers working
6   on Zuffa's behalf, correct?
7        A. I assume that's who these people are, LLP,
8   and -- I don't know who these guys are.  It says
9   it's respectfully submitted and it's being
10  submitted to the FTC I think.  So I'm willing to
11  stipulate that it was submitted by somebody
12  representing the interests of Zuffa.
13       Q. And the paper in the first paragraph
14  references in footnote 3 a declaration of Andrew
15  Dick and Rodney Fort, correct?
16       A. Yes.
17       Q. Andrew Dick works for the same
18  organization that you work for, correct?
19       A. I believe he's a CRA employee.
20       Q. What is a CRA employee?
21       A. Charles River Associates.
22       Q. And you're associated with CRA?
23       A. Yeah.  I'm a senior consultant there.
24  We're not in the same office.  I don't interact
25  with Mr. Dick.

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

388

1      Q. It was in early 2010, I believe March.
2      A. It doesn't matter for anything I've -- any
3   of my answers.
4      Q. Fair enough.
5      All right. In the next sentence you say
6   "Invicta has also succeeded by promoting only
7   women's MMA in five weight classes."
8      A. Yes.
9      Q. In your opinion, was Invicta a competitive
10   threat to the UFC?
11      MR. WIDNELL: Objection, form.
12   BY THE WITNESS:
13      A. My answer is the same. Invicta is another
14   firm in the business. So the totality of all the
15   firms in the market are substitutes for what UFC
16   offers. So if you look up there at the top,
17   Dr. Singer measures a market share, flawed and
18   overstated Zuffa's actual market share. This is
19   the point I was making before we took our break,
20   that -- that there's all kinds of firms recruiting
21   athletes and putting on events and they all aspire
22   to differentiate their product in just a little
23   way -- in some way just like the taco stand that we
24   talked about and they're competing. So I don't
25   have to think about a single firm as the

389

1   competitive constraint on what Zuffa does or on
2   what other firms do, what Bellator does. It's the
3   integral, if you will, the totality of it that
4   matters. As I said, there are thousands of events
5   going on across the country and across the world in
6   this sport.
7      Q. All right. I move to strike that as
8   nonresponsive.
9      You know that Invicta's president
10   cooperates with the UFC and releases its fighters
11   to the UFC, correct? Or at least did at one
12   time.
13      MR. WIDNELL: Objection, form.
14   BY THE WITNESS:
15      A. I don't recall.
16      Q. Have you read documents in which the
17   executive in charge of Invicta told the UFC that it
18   would release its fighters to the UFC?
19      A. I don't recall.
20      Q. Do you know whether the UFC considers
21   Invicta a major league MMA promoter or a minor
22   league MMA promoter?
23      A. I don't recall. It doesn't matter to my
24   opinions.
25      MR. CRAMER: All right. I'd like to have

390

1   the court reporter mark the next document as -- oh,
2   this is not the one I want. I'm sorry. Excuse me.
3   All right. I'd like to have the court reporter
4   mark as Exhibit 14 the next document.
5      (Topel Exhibit 14 was marked
6         as requested.)
7   BY MR. CRAMER:
8      Q. All right. Exhibit 14 that the court
9   reporter just marked is a two-page series of
10   e-mails bearing the Bates range ZFL-12535916 and
11   917. And the cover e-mail is from Kirk Hendrick to
12   John Mulkey dated November 21, 2013. Have you seen
13   this document before?
14      A. I might have. I recognize names.
15      Q. Mr. Mulkey is the UFC's CFO; is that
16   right?
17      A. That's my recollection, yes.
18      Q. And Kirk Hendrick was one -- was the UFC's
19   general counsel at one time?
20      A. I don't remember that, but that could
21   be -- I'll accept that for the purpose of this
22   discussion.
23      Q. He was an executive at the UFC; is that
24   right?
25      A. That's my recollection.

391

1      Q. And he was there for a very long time,
2   correct?
3      A. I don't know how long he was there.
4      Q. All right. Mr. Mul- --- Mr. Hendrick says
5   to Mr. Mulkey in the e-mail at the top of the page
6   "I think Lorenzo and Dana are trying to help her
7   out and trying to keep the women's minor league
8   intact." Now, Lorenzo is Lorenzo Fertitta and Dana
9   is Dana White and the "her" is Shannon Knapp who
10   runs Invicta.
11      Is it fair to say that if I represent to
12   you -- if you accept my representations about those
13   things that Mr. Hendrick at least believed that the
14   UFC believed that Invicta was a minor league?
15      MR. WIDNELL: Objection, form.
16   BY THE WITNESS:
17      A. Who -- wait a minute. You're saying who
18   believed what? Say that again.
19      Q. That Hendrick --
20      A. Hendrick is writing this thing?
21      Q. Yes.
22      A. He says "I think Lorenzo and Dana are
23   trying to help her out and trying to keep the
24   women's minor league intact."
25      Q. Yes.

32 (Pages 388 to 391)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

392

1    A.  Okay.
2        Q.  And assuming that this refers to Invicta
3    and the "her" is Shannon Knapp who ran Invicta,
4    it's fair to say that someone at the UFC believed
5    that Invicta was the women's minor league.
6        MR. WIDNELL:  Objection, form.
7    BY THE WITNESS:
8        A.  I mean, the person who believes that might
9    have been her in this sentence, but I acknowledge
10   that women's minor league is in the sentence.
11       Q.  Is it fair to say that Zuffa purchased
12   Invicta's entire straw weight division?
13       THE REPORTER:  Straw?
14       MR. CRAMER:  Straw weight, S-T-R-A-W.
15   BY THE WITNESS:
16       A.  I believe that that's true.
17       Q.  Do you know one way or another whether
18   Zuffa believed that Invicta was in essence a
19   women's minor MMA league?
20       MR. WIDNELL:  Objection, form.
21   BY THE WITNESS:
22       A.  Beyond this I have no recollection of
23   whether they -- somebody there, everybody there, or
24   whether Invicta thought they were a women's minor
25   league.  I just don't know.

393

1        Q.  Okay.  You can put that aside.
2        Turn to paragraph 74 of your report,
3    please.  In paragraph 74 through 76 you identify
4    fighters who competed in UFC who then went on to
5    compete for other MMA promotions; is that right?
6        A.  Yes, I do.
7        Q.  Do you have any evidence that -- with
8    respect to any of the fighters that you discuss in
9    these paragraphs that Zuffa wanted to keep them?
10       A.  You mean do I have some e-mail that says
11   we want to keep this person?  No.  Only that
12   they've gone on to fight elsewhere and they've --
13   they've -- they've demonstrated some success.
14       Q.  All right.  So with respect to the
15   fighters you identify in paragraph 74, 75, and 76,
16   you don't know one way or another whether Zuffa cut
17   the fighters and then they went on to have success
18   at other promotions or whether Zuffa -- or whether
19   these fighters went to other promotions against the
20   will of Zuffa?
21       MR. WIDNELL:  Objection, form.
22   BY THE WITNESS:
23       A.  Against the will of Zuffa?
24       Q.  Do you know when -- I'll withdraw the
25   question.

394

1        A.  Okay.
2        Q.  Have you seen any evidence that any of the
3    fighters you discuss in paragraph 74, 75, or 76
4    that Zuffa wanted to keep any of them?
5        A.  I haven't -- I haven't examined the
6    details of any negotiations between the fighters or
7    their agents and Zuffa representatives.
8        Q.  Are you aware that Zuffa has told
9    consultants like Deutsche Bank and others that it
10   virtually never lost a fighter it wanted to keep?
11       MR. WIDNELL:  Objection, form.
12   BY THE WITNESS:
13       A.  I wouldn't be surprised by that.
14       Q.  Why wouldn't you be surprised by that?
15       A.  Because it's a very desirable place to be.
16   You've pointed out already today that other smaller
17   entities sometimes include an out clause in their
18   contracts, in their multi-bout contracts that say
19   that if you get an offer from Zuffa you can go
20   there and that's got to be because the athletes are
21   demanding it.  Zuffa's a good place to go.
22       MR. CRAMER:  I'd like to have the court
23   reporter mark as Exhibit 15 the next document.
24       (Topel Exhibit 15 was marked
25       as requested.)

395

1    BY MR. CRAMER:
2        Q.  So Exhibit 15 is a document that was
3    produced to us by Raine, R-A-I-N-E, and the top of
4    the document is entitled "Produced in native format
5    Basquiat" -- there's that word again -- "FV
6    diligence tracker"; do you see that?
7        A.  Yes.
8        Q.  And it bears the Bates No. Raine,
9    R-A-I-N-E, 0020633.
10       A.  Yes.
11       Q.  Are you aware of what Raine is?
12       A.  I don't recall anything about Raine.
13       Q.  Raine was a consultants that did some work
14   relating to the WME acquisition of Zuffa.  Does
15   that refresh your recollection?
16       A.  It doesn't refresh my recollection with
17   respect to a name, but I would not be surprised if
18   they -- they retained outside consultants for
19   purposes of doing things.
20       Q.  All right.  So this document is dated as
21   of 6/15/2016 and it's basically a spreadsheet where
22   there are various columns.  The first column is
23   "Diligence request," presumably by Raine, and then
24   on the right-hand column there's a "Formal
25   response," presumably by Zuffa.

33  (Pages 392 to 395)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

396

1   So Raine is trying to get information
2   relating to Zuffa so that it can include it in its
3   evaluation of Zuffa for the WME.  And I'd like you
4   to turn to page 14 of this document under item 204
5   and there's a diligence request from Raine.
6   "Athlete retention rate for fighter who have 3/5"
7   -- went three out of five -- "wins in his or her
8   five or seven bouts or other analysis angle
9   management used."  And then if you look to the
10  right-hand column, Zuffa's formal response is, and
11  I quote, "Management does not have this analysis as
12  they do not view it as relevant.  Reminder that no
13  athlete has left the UFC that the company wanted to
14  retain."  Do you see that?
15       A.  I see that.
16       Q.  Yeah.  And does that -- is that consistent
17  with your understanding of Zuffa's retention rate
18  with athletes?
19          MR. WIDNELL:  Objection, form.
20  BY THE WITNESS:
21       A.  I have no knowledge of any precise number
22  of Zuffa's retention rate.
23       Q.  Can you identify --
24       A.  I will tell you that I've heard phrases
25  like this a thousand times at -- where I work that

397

1   we've never let a faculty member go that we wanted
2   to keep, and often that means is he wanted to go so
3   we didn't want to keep him because, you know, he's
4   part of the specific capital here or he's not.  So
5   we're kind of proud of ourselves where I work and a
6   lot of the guys take it as, hey, if he didn't want
7   to be here we didn't want him to be here.  I've
8   heard these kinds of phrases a million times.  It
9   doesn't mean anything here in the context of, oh,
10  we made guys an offer to stay and they left.  I
11  don't know.
12       Q.  Can you identify a single MMA fighter in
13  history that left the UFC that Zuffa wanted to
14  keep?
15          MR. WIDNELL:  Objection, form.
16  BY THE WITNESS:
17       A.  Well, I can't because I don't know whether
18  they wanted to keep them.
19       Q.  And your testimony here is that when Zuffa
20  is responding to a diligence request from an entity
21  working for WME, Zuffa essentially lied when it
22  said "Reminder that no athlete has left the UFC
23  that the company wanted to retain"; is that your
24  testimony?
25          MR. WIDNELL:  Objection, form.

398

1   BY THE WITNESS:
2        A.  Absolutely not.  None of my colleagues who
3   say that are lying.  They actually believe that we
4   didn't want to keep them and -- I mean, I have no
5   idea what the context for this is, I don't know who
6   wrote this.  Maybe it's true that everybody who got
7   an outside offer and they decided that we'll let
8   them go or we cut them, we didn't want them.  It
9   could be true.  All I see is the words in front of
10  me and I've heard this in a lot of different
11  contexts.
12       Q.  Someone in Zuffa wanted someone at WME who
13  was thinking of spending $4 billion for Zuffa to
14  know that Zuffa never lost a fighter that Zuffa
15  wanted to keep, right?
16       A.  Yes.  And put that in the context of what
17  I just said.  If the guy doesn't want to be part
18  of -- I could see how management says the people
19  who don't want to be here are the ones that we
20  don't want to keep because we're working on the
21  value of the brand.  I'm not trying to argue with
22  you.  I'm just trying to see this -- interpret what
23  this thing says in context.
24       Q.  All right.  You can put that aside.
25          Turn to paragraph 103, please.  Actually,

399

1   you don't need to look at 103.  I'm going to ask it
2   separately from 103.  I don't think 103 helps for
3   you to understand the question.
4        All right.  I'd like you to assume for
5   purposes of this question that a fighter under
6   contract with the UFC no longer wants to be
7   promoted by the UFC.  Understand?
8        A.  Okay.
9        Q.  Assume also that with respect to this
10  particular fighter the UFC did not want the fighter
11  to compete with another MMA promotion, it wanted to
12  re-sign the fighter.  Is that fair as an
13  assumption?
14          MR. WIDNELL:  Objection, form.
15  BY THE WITNESS:
16       A.  That could happen.
17       Q.  Okay.  In that circumstance in order for
18  the fighter to be able to compete for another MMA
19  promotion he or she would need to fulfill the terms
20  of his contract, correct?
21       A.  That's my understanding.
22       Q.  So in that circumstance one thing the
23  fighter would need to do is compete in all of the
24  bouts required under the promotional and ancillary
25  rights agreement that he or she signed, right?

34  (Pages 396 to 399)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

400

1      MR. WIDNELL:  Objection, form.
2  BY THE WITNESS:
3      A. Unless released by Zuffa, but I think
4  we're -- I think we're understanding each other.
5      Q. And if the fighter turned down any fight
6  for some reason -- strike that.
7          And another thing the fighter would need
8  to do would be to reject any offers of a renewed
9  agreement from the UFC before the final fight or
10  fights, right?
11      A. You mean they couldn't reup?
12      Q. Right.
13      A. Okay. I think I'm with you so far.
14      Q. He would need to effectively tell the UFC
15  that he no longer wanted to fight for the UFC while
16  the UFC still had control over him and when and
17  against whom and at what placement of the card his
18  last fight or fights would be, right?
19      MR. WIDNELL:  Objection, form.
20  BY THE WITNESS:
21      A. I -- I don't know what he has to tell the
22  UFC. If he doesn't want to be there he just
23  doesn't sign a new contract.
24      Q. Well, let's say the UFC comes to this
25  fighter, as it frequently did I think you pointed

401

1  out in your report, before the last bout in his
2  contract and says I have a new contract for you,
3  it's got four more bouts, it will include higher
4  compensation, sign it. In order for the fighter to
5  leave the UFC he'd have to turn that down,
6  correct?
7      MR. WIDNELL:  Objection, form.
8  BY THE WITNESS:
9      A. Well, I don't know if he has to turn it
10  down or not. The university puts a contract in
11  front of me and I say I'm not signing it yet.
12      Q. Okay.
13      A. You know, it's a -- I don't know what the
14  fuse is. I don't know anything about this
15  negotiation so far except what you're telling me.
16      Q. At minimum he would have to say I'm not
17  signing it yet, correct?
18      A. Yeah. He wouldn't sign it yet because you
19  have -- you've assumed that he was really hoping to
20  go somewhere else.
21      Q. All right. And then the fighter would
22  need to wait the 90 days for the exclusive
23  negotiation period, right?
24      MR. WIDNELL:  Objection, form.
25  BY MR. CRAMER:

402

1      Q. So he fights out the end of his term, he
2  fights all of his bouts, and then in most of the
3  promotional and ancillary rights agreements there's
4  a 90-day period in which the fighter can only
5  negotiate with Zuffa, right?
6      MR. WIDNELL:  Objection, form.
7  BY THE WITNESS:
8      A. There is a 90-day negotiation period. I
9  don't know when it starts in this particular
10  instance because there's been -- because
11  negotiations have already commenced.
12      Q. All right. But presumably if there is
13  such a period in the contract and the fighter
14  wanted to leave, that fighter would need to wait at
15  least the 90 days in order to leave, correct?
16      MR. WIDNELL:  Objection, misstates.
17  BY THE WITNESS:
18      A. I don't -- I don't know in this particular
19  instance. Can this -- are we in the period where
20  he's -- it would be interference for someone else
21  to come along and put an offer before his agent or
22  to talk to his agent and the whole thing?
23      Q. Yes. That's the exclusive negotiation.
24  Right.
25      A. Okay. Well, but somebody can talk to his

403

1  agent as I understand things, but he's -- I'm going
2  to accept what you're saying. It might not be
3  entirely accurate, but let's say that this is true.
4      Q. Okay. So he would have to wait the 90
5  days and then he gets into the one-year right to
6  match period and under the conditions that I'm
7  talking about where Zuffa wants the fighter and the
8  fighter wants to leave, in order for that fighter
9  to be free and clear that fighter would need to
10  wait the 12 months of the right to match period in
11  order to be sure that he could end up at another
12  promotion, correct?
13      A. No.
14      Q. How could he end up at another promotion
15  during the right to match period in a circumstance
16  where Zuffa wanted to keep the fighter and the
17  fighter wanted to leave?
18      A. Oh, you're saying how does he move if --
19  if Zuffa has the right to match?
20      Q. Yes.
21      A. You didn't say that. So he goes and he
22  gets his offer from Bellator or his agent
23  consummates the offer put before him by Bellator
24  and he brings it to Zuffa and they've got, what, 15
25  days to respond, and if they say we're matching

35 (Pages 400 to 403)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

404

1   those terms, then under his contract he fights for
2   Zuffa.  If they don't match all the terms that are
3   in there, then he -- he goes somewhere else.
4       Q.  Now, in order to be sure to be able to be
5   free and clear of Zuffa the athlete can't present a
6   contract from a rival promoter because Zuffa could
7   accept it, right?
8       MR. WIDNELL:  Objection, form.
9   BY MR. CRAMER:
10      Q.  If I as an athlete want to leave Zuffa --
11      A.  Yes.
12      Q.  -- and I present Zuffa with a rival bid
13  during the right to match period where Zuffa has
14  the right to match, I risk --
15      A.  Has a right to match the material
16  financial stuff?
17      Q.  Yes.
18      A.  Yes.
19      Q.  I risk Zuffa agreeing it, presenting it to
20  me, and then I'm stuck with the Zuffa contract,
21  right?
22      A.  Yeah.  That's the contract I signed.
23      Q.  So the only way to be free and clear from
24  Zuffa in a circumstance where the fighter wants to
25  leave and Zuffa wants to keep him is to wait the 12

405

1   months where Zuffa has the right to match,
2   correct?
3       MR. WIDNELL:  Objection, form.
4   BY THE WITNESS:
5       A.  I don't -- I don't know if it's the -- if
6   Zuffa has the right to match -- I don't know how we
7   undo the right to match by waiting the 12 months.
8   I don't know.  I'm not familiar with that
9   circumstance.  I have -- I have the right to
10  match.
11      Q.  For 12 months.
12      A.  I have the right to match.  It happened
13  within -- we said the day he brought the thing in,
14  we said done.  All right.  They had 15 days to do
15  it, right?  Am I misunderstanding?
16      Q.  Assume that the right to match period
17  starts on January 1, 2017.
18      A.  Yes.
19      Q.  Okay.  It starts on some date.  We're
20  going to assume it starts on January 1, 2017.
21  Okay?
22      A.  Yes.
23      Q.  Okay.  Now, the right to match period ends
24  365 later, right?
25      A.  My understanding of the right to match

406

1   period is Zuffa has the right to match within 15
2   days of the guy presenting the contract.  If the
3   guy says after that tough luck, even though you
4   matched these terms I still don't want to fight for
5   you, I don't know how Zuffa responds to that
6   circumstance.
7       Q.  That's not what I'm talking about.
8       A.  Okay.
9       Q.  All right.  You understand that the time
10  period with which Zuffa has the right to match is
11  limited, it doesn't last forever, right?
12      A.  Oh, yes.
13      Q.  Okay.  How long is it limited to?
14      A.  It's -- it's a -- it's a period where if I
15  bring an offer in in a period of time, within that
16  window -- this is my understanding.  So correct me
17  if I'm wrong.  If the guy brings that offer in
18  within that period of time, Zuffa has 15 days to
19  match from the time the offer is presented.
20      Q.  Correct.  And that window is a year,
21  correct?
22      A.  Yes.
23      Q.  Okay.  So if it starts on January 1, 2017,
24  it ends on January 1, 2018, right?
25      A.  Yes.

407

1       Q.  Okay.  That's the window.  If I bring a
2   rival bid to Zuffa at any point during that
3   window --
4       A.  Yes.
5       Q.  -- and I want to leave Zuffa I risk Zuffa
6   matching and I can't leave, correct?
7       A.  If I abide by the terms of the contract as
8   I understand it.  Now, like I said, I don't know
9   what Zuffa says if you say well you matched these
10  terms and you didn't match those terms, so I want
11  to go.  And so I don't know how Zuffa responds in
12  that sort of case.  Maybe there's litigation, maybe
13  there isn't.  I don't know.
14      Q.  I don't -- is it fair to say that in order
15  to avoid the risk of Zuffa agreeing to match a
16  rival bid the fighter whose right to match period
17  begins on January 1, 2017 would need to wait until
18  January 1, 2018 when the right to match window
19  expires?
20      MR. WIDNELL:  And just to be clear, your
21  hypothetical assumes that Zuffa will do anything it
22  can to try and maintain the fighter, right?  It's
23  not that Zuffa can change its mind and let the
24  fighter go?
25      MR. CRAMER:  No.  My question is in order

36  (Pages 404 to 407)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

408

1  to avoid the risk -- a fighter has a risk if he
2  brings a rival bid to Zuffa that Zuffa will match
3  it, right?
4      MR. WIDNELL:  My point is you're assuming
5  that negotiations with Zuffa to move to a different
6  promotion are not a possibility in your
7  hypothetical as you've described it; is that right?
8      MR. CRAMER:  I don't know what you're
9  saying.
10      MR. WIDNELL:  So --
11  BY THE WITNESS:
12      A.  That was my question too.
13      Q.  So what's your question?
14      A.  My question was what he just said.
15      Q.  I don't understand his question.
16      A.  I don't know how Zuffa responds when the
17  guy makes it clear I don't want to work here
18  anymore, and you're assuming that -- that it's not
19  a negotiation process.  So when you refer to "avoid
20  the risk," if you what you mean by "avoid the risk"
21  is just avoid the event occurring with some
22  positive probability that Zuffa will match this
23  offer --
24      Q.  Yes.
25      A.  -- no matter how small that probability is

409

1  and saying there's no discussion between agent and
2  everything that says, look, we're not working here
3  anymore even if -- no matter what.
4      Q.  Yes.
5      A.  Okay.  Then, you know, maybe that's true
6  that you have to wait that long to avoid this thing
7  that you're calling risk, but it's predicated on
8  all the things that I just said because -- you
9  know, contracts -- contracts are contracts.  They
10  don't -- they never, ever cover all contingencies,
11  and so those contingencies are always what leads to
12  negotiation.
13      Q.  Have you seen documents in this case where
14  a fighter's representative said to Zuffa, look, you
15  don't intend to give us another contract, my guy
16  would like to go fight for another promotion, will
17  you release him from the right to match and Zuffa
18  said no?
19      A.  There might be a case like that.  There's
20  a lot of -- there's a lot of situations that I've
21  seen.
22      Q.  Have you seen a situation regarding a
23  fighter named Congo?
24      A.  Congo, that name rings a bell, but I can't
25  say that I recall the situation of Congo.

410

1      Q.  Cheick Congo.  So Cheick Congo was 38
2  years old and time was precious to him and he said
3  to Zuffa, you know what, I want -- the management
4  said to Zuffa, you know what, can you release him
5  from the right to match, you guys don't intend to
6  sign him again --
7      A.  Can I see what you're reading?
8      Q.  Sure.  We'll mark it as the next exhibit.
9
10      (Topel Exhibit 16 was marked
11      as requested.)
12  BY MR. CRAMER:
13      Q.  What's been marked as Exhibit 16 is a
14  two-page series of e-mails bearing the Bates range
15  ZFL-1000978 through 979.  The top has an e-mail
16  from Lawrence Epstein to Michael Mersh CC'g Joe
17  Silva dated May 2nd, 2013.
18      A.  Let me just read the document.
19      I guess I -- should I be reading this in
20  reverse order?
21      Q.  Yes.
22      A.  Does it begin at the -- okay.
23      Q.  The first e-mail's at the bottom.
24      A.  Okay.
25      Q.  I'll walk you through it.  The first

411

1  e-mail at the bottom from --
2      A.  No.  Let me walk me through it.  So...
3      (Witness reviewing document.)
4  BY THE WITNESS:
5      A.  So who's McGann?
6      Q.  He is Congo Cheick's representative.
7      A.  Okay.  Thank you.
8      (Witness reviewing document.)
9  BY THE WITNESS:
10      A.  Okay.  Got it.  So the answer is -- to
11  this question up at the top from Michael Mersh and
12  he's copying Silva and his answer is very short.
13  It says "No."
14      Q.  Right.  So what's going on here is Congo's
15  representative -- Congo Cheick's representative
16  says "Can you give me a position on Congo, his
17  contract's up, he has the nonnegotiation period,
18  but someone from the UFC released a position that
19  you guys would not be seeking to renew his
20  contract.  Is he free of any obligation?"  And then
21  Mersh says to McGann "I'm not aware of anyone from
22  the UFC releasing any position on Cheick.  However,
23  the contract provisions concerning our right to
24  match we consider to be in effect.  As a favor,
25  however, I will consult with Dana and Lorenzo and

37 (Pages 408 to 411)

412

1   get back to you." And then Cheick's representative
2   says back to Mersh in May of 2013 "We're not asking
3   for anything, but if you guys are happy to cut him
4   loose, then we can start looking for stuff for him.
5   Mike, he's 38 and time is precious to him." And
6   then Mersh takes it up the chain to Epstein and
7   says "What are your thoughts on Congo? McGann's
8   asking they be outright released from the right to
9   match." And Mersh -- Mersh's answer -- I'm
10  sorry -- Epstein's answer to Mersh is "No." Is
11  that right?
12      A. Yes.
13      Q. So this is an instance of a fighter that
14  wanted to leave the UFC, the UFC didn't want him to
15  leave. Is it fair to say that in order for Cheick
16  to leave the UFC he would need to wait -- in order
17  to have no risk of being re-signed with the UFC
18  during the right to match period he would need to
19  wait the 12 months of the right to match period?
20      A. That may be --
21      MR. WIDNELL: Objection, misstates.
22      MR. CRAMER: Go ahead.
23  BY THE WITNESS:
24      A. That may be the case under his contract.
25      Q. All right. You can put that aside.

413

1       A. Let me just point out if you -- the point
2   of the contract is to -- the point of any contract,
3   all contracts restrict, and this contract
4   restricts. And if you make a policy of releasing,
5   then the contract doesn't do what it's supposed to
6   do, which is all the things that I described in my
7   report.
8       Q. Well --
9       A. Then it's not binding at all.
10      Q. Well, in this instance we have a situation
11  where Mr. Cheick -- where Zuffa doesn't want to
12  re-sign Mr. Cheick and doesn't want to have
13  Mr. Cheick fight anymore fights. So Zuffa doesn't
14  want to get anymore promotional -- anymore return
15  on its promotional investment.
16      A. Does it state that they're never going to
17  offer him anything?
18      Q. Do you know whether they offered him
19  another contract?
20      A. I don't know.
21      Q. You don't know one way or the other, do
22  you?
23      A. No. As I sit here, I don't know.
24      Q. It's possible that Zuffa used its right to
25  match period in its contract to force Mr. Cheick to

414

1   sit out from his chosen profession when he was 38
2   years old, correct?
3       MR. WIDNELL: Objection, form.
4   BY THE WITNESS:
5       A. I just don't know.
6       Q. Okay. You can put that aside.
7       Turn to paragraph --
8       MR. CRAMER: Well, it's about 12:20. Why
9   don't we go off the record.
10      THE VIDEOGRAPHER: Going off the record at
11  12:22.
12          (Whereupon, at 12:22 p.m., the
13          deposition was recessed, to
14          reconvene at 1:00 p.m., this
15          same day.)

415

12          AFTERNOON SESSION
13              (1:13 p.m.)
14      THE VIDEOGRAPHER: We are going back on
15  the record at 1:13.
16          ROBERT TOPEL,
17  the witness at the time of recess, having been
18  previously duly sworn, was further examined and
19  testified as follows:
20          EXAMINATION
21          (Resumed)
22  BY MR. CRAMER:
23      Q. Now, we did touch on this a little
24  yesterday, but I just want to make sure the record
25  is clear. Would you agree with me that as the

38 (Pages 412 to 415)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

416

1    marginal revenue product of MMA fighters rises,
2    event revenues rise, all things equal?
3        MR. WIDNELL:  Objection, form.
4    BY THE WITNESS:
5        A.  You're not saying the other way around.
6    Is it -- is it like something that causes marginal
7    revenue product to rise -- I mean, it doesn't have
8    to come through events.  So -- I mean, you -- we're
9    selling stuff, all kinds of things.  The marginal
10   revenue product of a fighter is conceptually adding
11   a fighter to the group of other fighters and all
12   the other resources that the firm has and how much
13   revenue goes up.  Whether that's realized in event
14   revenue I don't know and so -- an increase in the
15   revenues of the firm attributable to fighters would
16   cause the marginal revenue product of any given
17   fighter to be higher.
18       Q.  So, all things equal, increase in event
19   revenues would cause the marginal revenue product
20   of any given fighter to rise; is that right?
21       A.  No.  No.  I mean, revenues can increase
22   without for any given fighter his marginal revenue
23   product going up.
24       Q.  The collective marginal -- the collective
25   marginal revenue product of MMA fighters generally,

417

1    is that a concept that makes sense to you?  The
2    productivity of MMA fighters increases for some
3    reason.
4        MR. WIDNELL:  Objection, form.
5    BY MR. CRAMER:
6        Q.  Let's say --
7        A.  I just need -- I just need to think what
8    could be meant by the collective --
9        Q.  Let's say Zuffa over time invests
10   resources in promoting its fighters so that they
11   can bring in more event revenues over time.
12       A.  Well, this is something we did talk about
13   in some detail yesterday, and some -- we even had a
14   picture that we worked on yesterday.  Do you
15   remember that?
16       Q.  I do, yes.
17       A.  And there's a difference between the
18   marginal revenue product of a fighter at any given
19   level of fighters in equilibrium marginal revenue
20   product of a fighter.  So if the marginal revenue
21   product of fighters in the industry went up but
22   supply's highly elastic, you could have no change
23   in the marginal revenue product of a fighter in
24   equilibrium because employment expands and so on.
25       Q.  All right.  Let's not talk about

418

1    equilibrium.  Let's talk about the short term.
2        A.  All you're saying -- when you say "short
3    term," you're still talking about equilibrium.
4    You're just telling me that you -- what you want to
5    assume now is that supply's kind of inelastic in
6    the marketplace.
7        Q.  Over the short run.
8        A.  Whatever run you want.  Okay.  Yeah.
9        Q.  With that assumption, with supply
10   inelastic in the short run, is it fair to say that
11   as fighter marginal revenue product increases, all
12   things equal, you would expect event revenues to
13   increase?
14       A.  Boy, now we're on -- if -- if -- I think I
15   understand what you're asking.  If that's the
16   avenue through which marginal revenue product went
17   up, then, I mean, it could.
18       Q.  Well, let's -- let's hold all revenue
19   streams constant other than revenue streams --
20   other than event revenue streams for this question.
21   So the only revenues that -- strike that.  I'll
22   withdraw the question and move -- I'll withdraw
23   that last question and move on.
24       Would you agree that one determinant of
25   event revenues is fighter marginal revenue product?

419

1        A.  One -- we keep framing this in terms of
2    marginal revenue product.  One determinant of event
3    revenues is the popularity and therefore, let's
4    say, willingness to pay of customers to watch.
5        Q.  Okay.  So one determinant of event
6    revenues is the popularity and willingness of
7    customers to pay to see fighters fight; is that
8    right?
9        A.  Sure.
10       Q.  And is it also fair to say that --
11       A.  Again, given the -- I don't want to call
12   it short run, but given the elasticity of supply of
13   events.
14       Q.  Okay.  And is it also fair to say that
15   fighter compensation is in part determined by the
16   willingness of people to spend money to watch
17   fighters fight?
18       A.  It --
19       MR. WIDNELL:  Objection, form.
20   BY THE WITNESS:
21       A.  Sorry.  It depends on how elastic the
22   supply of fighters is.
23       Q.  And if we make the same assumption for
24   this question that there's an upward sloping supply
25   curve, would you agree with me that fighter

39 (Pages 416 to 419)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

420

1  compensation is, in part, determined by the
2  willingness of people to pay to see fighters fight?
3      A.  To the extent that we're talking about
4  things that change the demand for fighters and in
5  moving along a supply curve, then greater
6  willingness to pay downstream raises the demand for
7  fighters and compensation should rise to the
8  extent -- depending on the elasticity of supply of
9  fighters.
10     Q.  So it's fair to say that both fighter
11 compensation and event revenues are both, in part,
12 determined by the willingness of individuals to pay
13 to see fighters fight; is that right?
14     A.  Would you -- can you read that back?
15     Q.  I'll say it again.  That fighter
16 compensation and event revenues are both, in part,
17 determined by the willingness of people to pay to
18 watch fighters fight; is that fair?
19     A.  Yeah, subject to the conditions I gave.
20     Q.  Okay.
21         Turn to paragraph 200.  Now, in paragraph
22 200 you're criticizing Dr. Singer's damages
23 analysis in part, and in particular in the fourth
24 line -- I'll read the whole sentence.  You say "In
25 addition to failing to do any analysis of the

421

1  foreclosure share in the but-for world absent the
2  challenged conduct, Dr. Singer errs by assuming the
3  only change in the but-for world would be a
4  reduction in the foreclosure share and then
5  projecting the impact that would have on athlete
6  compensation as measured by share of revenues,
7  holding revenues constant."  Did I read that right?
8      A.  Ah, I'm trying to understand my own
9  language.  I got it.
10     Q.  All right.  So one of the things you're
11 criticizing Dr. Singer for in his damages analysis
12 is holding revenues constant, right?
13     A.  That's one of the things in here, yeah.
14     Q.  In your view, in assessing the competitive
15 effects of the challenged conduct on UFC fighter
16 compensation, it's inappropriate, in other words,
17 it's not appropriate to hold revenues constant; is
18 that right?
19         MR. WIDNELL:  Objection, form.
20 BY THE WITNESS:
21     A.  The -- the point of that, if we read the
22 whole thing in context, is that I'm pointing out
23 that the -- there are procompetitive reasons for
24 the contractual provisions.  I think this is,
25 again, a point we discussed yesterday in this

422

1  context.  So removing the restrictions makes it
2  more difficult to generate revenues.
3      Q.  So, in your view, the challenged conduct
4  alters the amount of UFC's revenues and that would
5  in turn alter the total amount of dollars that
6  would be paid to UFC fighters in the but-for world,
7  right?
8      A.  You're connecting things from all other
9  the place now.
10     Q.  It's my job.
11     A.  I know, and I'm -- my job is to listen
12 carefully.
13     Q.  It is.
14     A.  Zuffa's producing a product and it's
15 putting on what they call shows, and these -- the
16 challenged conduct here or the restrictions enable
17 them to increase the valuable of those shows and
18 produce a more valuable product.  So when we talk
19 about holding revenues constant, you can't take --
20 you can't take one piece away and leave the other
21 piece intact.
22     Q.  So, in other words, when you're
23 determining damages you can't just assume that the
24 revenues would be what they were in the actual
25 world because the revenues, in your view, might be

423

1  less, right?
2      A.  Yeah.  If we took these things away from
3  the entire industry, the whole industry might be
4  less valuable.
5      Q.  So it's not appropriate, in your view, to
6  hold revenues constant because the challenged
7  conduct alters the amount of UFC's revenues, right?
8      A.  I'm trying to figure out where you're
9  going here, but that's a fact.  If you're
10 holding -- he's holding revenues constant.
11     Q.  Okay.  And, in your view, it's not
12 appropriate in evaluating the total possible
13 damages to fighters in this case to use the amount
14 of revenues that UFC actually brought in in the
15 actual world, right?
16         MR. WIDNELL:  Objection, form.
17 BY THE WITNESS:
18     A.  Yes.  Let me put it another way.  You
19 referred to the pie yesterday and changing the
20 contract restrictions doesn't mean -- just mean
21 that the same pie is divided up in a different way.
22     Q.  Okay.  So your view is that if in the
23 but-for world we would expect the UFC to bring in
24 lower levels of revenues from their events, that
25 would likely lead to lower athlete compensation,

40 (Pages 420 to 423)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

424

1    right?
2        A.  Depending on how everything else plays
3    out, yeah.
4        Q.  I mean, you say in paragraph 200 -- we
5    looked at this before in the same paragraph on page
6    88 -- "Lower revenues would likely lead to lower
7    athlete compensation," right?
8        A.  Yes.
9        Q.  Okay.  So just so I understand, it's your
10   view that in computing damages in this case the
11   appropriate pool of total event revenues is the
12   amount of event revenues that the UFC would have
13   brought in in the but-for world, not the actual
14   world; am I right about that?
15       A.  Well, I mean, I don't want you to sneak in
16   some sort of back-handed endorsement of the way
17   Dr. Singer's performing the whole analysis, that
18   it's based on some division of some share of
19   revenues because I think that's a major critical
20   mistake.
21       Q.  All right.  I'm not trying to sneak that
22   in.
23       A.  Well, I just -- but I've got to be careful
24   here because you're getting me to endorse some
25   concept that's -- you know, endorsing some aspect

425

1    of a -- of a -- an inappropriate procedure.  But
2    the only point I'm making here is that the value
3    produced is going to be different in the but-for
4    world than in the world we're in, and -- because,
5    remember, my opinion is there aren't any damages.
6    So what it means to calculate those damages by the
7    procedures that Dr. Singer's using is kind of a --
8    let's just put it this way, a very vague concept.
9        Q.  I understand you have your critiques of
10   Dr. Singer's analysis.  I'm just trying to
11   understand the principles behind this particular
12   criticism, and as I understand it the particular
13   criticism is that to the extent Dr. Singer is
14   assuming that revenues are constant in the actual
15   world, that is not an appropriate assumption
16   because what he should be focused on in computing
17   damages are the revenues in the but-for world; is
18   that right?
19       A.  Let's just say that you -- if I read back
20   your entire sentence there, it was kind of long,
21   and I just stopped with "because" -- I put a period
22   before the "because" and if you'll read back what
23   that says, I think I can agree with that
24   statement.
25       Q.  Dr. Singer is assuming that revenues are

426

1    constant in the actual world that is not an
2    appropriate assumption?
3        A.  Yes.
4        Q.  Okay.  And the reason why that's not
5    appropriate is because what an economist should do
6    in computing damages in an antitrust trust is take
7    into account all of the differences that would
8    occur in the but-for world, including the total
9    amount of revenues available to pay damages, right?
10       A.  Well, you're assuming -- you're assuming
11   the appropriateness in that statement of
12   Dr. Singer's damage calculation that's based on a
13   share of revenues, and I'm -- so I'll just put it
14   in the context of his damage calculation, which is
15   just wrong, even within that context if you assumed
16   arguendo it was a way to calculate damages, you'd
17   still have to take into account that the world's
18   going to be different when those contract
19   restrictions are removed.
20       Q.  Okay.  Let's assume that we're talking
21   about an economist that didn't use share in his or
22   her damages analysis.  They used wage level.  So we
23   don't have the share problem that I think we're
24   getting hung up on.  In that situation in
25   attempting to compute the effect of challenged

427

1    conduct on compensation one would need to assess
2    the total amount of revenues in the but-for world,
3    not the actual world; is that right?
4        MR. WIDNELL:  Objection, form.
5    BY THE WITNESS:
6        A.  Now I don't know -- where do revenues come
7    into this now?  We just took it out of the
8    left-hand side.  Maybe -- you know, if I wanted to
9    do a proper analysis I might have to compute the
10   market equilibrium in a world where revenues have
11   changed, but for the purposes of some -- if all
12   we're changing is the regression and saying we're
13   going to put compensation on the left-hand side or
14   the log of compensation on the left-hand side
15   rather than the share of revenues of -- the wage of
16   an athlete divided by event revenue, well, now
17   revenues aren't in the model, correct?  They just
18   disappeared.
19       Q.  Well, let's say that the regression
20   produced a percentage by which compensation was
21   reduced as between the actual world and the but-for
22   world.  That's something that could happen with a
23   regression, right?
24       MR. WIDNELL:  Objection, form.
25   BY THE WITNESS:

41 (Pages 424 to 427)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

428

1      A.  Let's suppose we had a case that -- let me
2   see if I can help you out or you can help me out or
3   we can help each other out.
4      Q.  Good.
5      A.  Suppose there's a regression of wages on
6   some all-agreed-upon conduct indicator.  Okay?  So
7   there's -- and there's a before and after.
8      Q.  Okay.
9      A.  And we say that wages were 2 percent lower
10  controlling for other stuff in the conduct period,
11  okay, and we're not doing anything about the --
12  forget critiques of whether the conduct -- and
13  suppose it was a really good controlled experiment
14  before and after.
15     Q.  Fair enough.
16     A.  Then there's a 2 percent impact of the
17  conduct, okay, which, as I just said, we're all
18  going to agree that this is right -- the right way
19  to measure the conduct.
20     Q.  Understood.
21     A.  Then one would need the stipulation along
22  with that that the practices in question didn't
23  have some offsetting impact that would have raised
24  pay because -- but we have a before and after
25  that's the conduct period.  So we've really taken

429

1   that into account.
2      Q.  So let's say in your example with the
3   well-specified regression showing a 2 percent
4   decrease in wages after when compared to before
5   that revenues were different in the after period
6   and the before period.  Would you multiply the 2
7   percent times the amount of revenues that you
8   thought would be existing in the but-for world or
9   the amount of revenues that would be existing in
10  the actual world?
11        MR. WIDNELL:  Objection, form.
12  BY THE WITNESS:
13     A.  Okay.  Well, see, you know, I didn't
14  succeed in getting us on the same page because you
15  just multiplied by revenues.  So revenues just came
16  sneaking in through the back door.  It was a
17  2 percent change in their pay, their compensation,
18  their salary.
19     Q.  Okay.  I understand.
20     A.  Revenues is gone.
21     Q.  All right.  Understood.  Okay.  So do you
22  multiply, then, by the total amount of compensation
23  paid to the workers in the actual world or the
24  total amount of compensation you believe would have
25  been paid to the workers in the but-for world?

430

1      A.  For the experiment we just did, you know,
2   we controlled for growth and other stuff and it was
3   just the -- I think if we understand each other,
4   it's a 2 percent reduction in wages.  So give them
5   2 percent of their wages.
6      Q.  Let's say that the conduct in question had
7   another effect -- strike that.  I get it.  I'll
8   move on.
9         Paragraph 108, please.  You state in
10  paragraph 108 on page 47 -- I think I have the
11  wrong paragraph here.  Oh, I mean paragraph 109.
12        You quote or paraphrase something from
13  Dr. Singer.  You say "As Dr. Singer notes, athletes
14  value the opportunity to develop their careers by
15  fighting against highly-ranked opponents and
16  audiences are drawn to fights among highly ranked
17  opponents"; do you see that?
18     A.  Yes.
19     Q.  Do you agree with Dr. Singer's
20  observation?
21     A.  That people want to fight highly ranked
22  opponents?
23     Q.  Yes.
24     A.  Well, they want to fight highly-ranked
25  opponents when they think they're ready to fight

431

1   highly-ranked opponents.
2      Q.  And are audiences drawn to fights among
3   highly-ranked opponents?
4      A.  I think -- I think ratings are higher.  I
5   think there was some evidence that ratings are
6   higher when highly-ranked people fight against each
7   other.
8      Q.  Do you agree that MMA fighters value the
9   ability to develop their careers by fighting
10  against highly-ranked opponents when they're ready
11  to fight them?
12     A.  Yeah.  I think that's why they sign up.
13  That's one of the reasons they sign up.
14     Q.  Is it fair to say that a fighter can't --
15  cannot advance in the rankings unless that
16  fighter's able to fight other fighters that are
17  ranked higher than them, right?
18        MR. WIDNELL:  Objection, form.
19  BY THE WITNESS:
20     A.  I don't think that's literally true, but
21  you don't have to fight somebody higher than you to
22  move up.
23     Q.  But in order to substantially move up in
24  the rankings, all things equal, it would be better
25  for you to fight higher ranked fighters, correct?

42 (Pages 428 to 431)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

432

1          MR. WIDNELL:  Objection, form.
2    BY THE WITNESS:
3          A.  Since I don't know exactly how the ratings
4    or the rankings happen, let's assume they're like
5    college football rankings, then you take into
6    account the types of opponents you've had and how
7    you did and somebody has a formula that tries to
8    take that into account.  Same thing with golf
9    rankings and all sorts of things.
10          Q.  All things equal, consumers will be
11    willing to pay more to see highly-ranked opponents
12    fight than lower-ranked opponents fight; is that
13    fair?
14          MR. WIDNELL:  Objection, form.
15    BY THE WITNESS:
16          A.  In every instance, no, but on average
17    probably yes.
18          Q.  Higher ranked fighters, all things equal,
19    generate more revenues when they fight than
20    lower-ranked fighters, correct?
21          MR. WIDNELL:  Objection, form.
22    BY THE WITNESS:
23          A.  Not always, but on average that's probably
24    true.
25          Q.  Turn to paragraph 96, please.  In the

433

1    first sentence after the dash you state "There is a
2    natural tendency for a leading promoter to attract
3    a significant share of the top athletes"?
4          A.  Yes.
5          Q.  "This follows," you say, "from the
6    complimentarity of athlete talents in producing
7    high-quality bouts" --
8          A.  That's the point we just made.
9          Q.  -- "and the desire among athletes to fight
10    against the best"; do you see that?
11          A.  Yes.
12          Q.  And you agree with that?
13          A.  Yes.
14          Q.  Can you please explain the natural
15    tendency for a leading promoter to attract a
16    significant share of the top athletes.  What does
17    that mean?
18          A.  It means that athletes -- their talents
19    are complementary, that the good athletes want to
20    be in the places where the -- where the other good
21    athletes are so they can fight them.  And then
22    it's -- it's kind of a feedback system that you
23    attract some of the good athletes, they fight well,
24    it makes it more attractive for the other good
25    athletes, and so on.  So Zuffa kind of runs a

434

1    platform that has been successful in attracting the
2    top athletes and that complementarity plays a
3    role.
4          Q.  How do you define "significant share" as
5    you use that term in this sentence?
6          A.  All other things equal, a firm that is
7    attracting the top athletes will see its share
8    among the top athletes rise.
9          Q.  And that's because fighters generally have
10    an interest in competing against the best fighters,
11    right?
12          A.  Well, that's part of it, but the
13    complementarity is there's more energy created when
14    you put the good fighters against each other.  So
15    the -- the customers like that too.
16          Q.  And those are the fights that would likely
17    lead to career advancement and higher compensation
18    ultimately, correct?
19          MR. WIDNELL:  Objection, form.
20    BY MR. CRAMER:
21          Q.  The ones with higher energy.
22          A.  Broadly speaking.
23          Q.  Broadly speaking, yes?
24          A.  Broadly speaking, if I -- if I'm
25    successful against higher-ranked people, I will

435

1    probably advance more and get paid more and so on,
2    as I understand the process.
3          Q.  You can put that paragraph aside.
4          Would you agree with me that by
5    restricting fighter mobility used the challenged
6    contracts Zuffa's made it more difficult for other
7    MMA promotions to access UFC's top fighters, all
8    things equal?
9          A.  No.
10          Q.  Are you aware that Zuffa and banks working
11    with Zuffa have seen the challenged contracts and
12    describe the challenged contracts as barriers to
13    entry to rivals?
14          A.  I think I know what you're -- to what you
15    are referring and I wouldn't characterize it that
16    way.
17          Q.  All right.  Would you take a look at what
18    has been marked as Exhibit 12.  We marked it
19    earlier today.  It was in the pile in front of you.
20          A.  Exhibit --
21          Q.  12.  It is the --
22          A.  It's the Deutsche Bank?
23          Q.  Correct.
24          A.  What page do you want?
25          Q.  I would like you to turn to page 7 of the

43 (Pages 432 to 435)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

436

1  Deutsche Bank document.
2      A. Yep.
3      Q. It's entitled "Key Investment
4  Considerations."
5      A. Yes.
6      Q. And then there's boxes of highlights and
7  I'd like you to look at the second highlight on the
8  left.  Do you see what that says?
9      A. I see it.
10     Q. What does it say?
11     A. The left-hand box?
12     Q. Yes.
13     A. It says "High barriers to entry."
14     Q. And then if you look at the third bull- --
15  bullet to the right of the "High barriers to entry"
16  highlight, one of the rationales is "Vast majority
17  of top fighters under multi-fight exclusive
18  contracts"; do you see that?
19     A. Yes.
20     Q. So Deutsche Bank and Zuffa's executives
21  who put this document together for people who are
22  interested potentially in loaning money to Zuffa
23  wanted to convey that they saw the fact that Zuffa
24  had the vast majority of top fighters under
25  multi-fight exclusive contracts as a high barrier

437

1  to entry; is that right?
2      MR. WIDNELL:  Objection, form.
3  BY THE WITNESS:
4      A. Well, let's just go over barriers to
5  entry.  First of all, economists and others use the
6  term "barriers to entry" in -- in different ways.
7  So to an economist a cost advantage, being better
8  at something can be considered a barrier to entry.
9  It's not an anticompetitive barrier to entry, but
10  it's a barrier to entry because entrants are less
11  likely to be successful.  So in exactly the way I
12  talked about a minute ago, because of this
13  complementarity we were talking about, having the
14  vast majority of top fighters, whether vast --
15  whatever vast means there, under -- under your
16  contracts, whether they be multi-fight contracts or
17  what, if people want to be there together, that
18  creates a -- an advantage, a competitive advantage
19  that, all other things the same, make -- an
20  entrant's going to have to overcome that in order
21  to come in and compete head-to-head and have the
22  same success as Zuffa.  That's all it says.
23     Q. Well, it's doesn't --
24     THE REPORTER:  Hang on one second.
25  BY MR. CRAMER:

438

1      Q. It's fair to say that it says more than --
2  it refers more to than -- strike that.
3      It refers more to than merely that Zuffa
4  has the vast majority of top fighters.  It says
5  that Zuffa has the vast majority of top fighters
6  under multi-fight exclusive contracts, right?
7      A. Yes.
8      Q. What work is multi-fight exclusive
9  contracts doing in that bullet point?
10     A. Fist of all, I said that.  So -- they have
11  -- that's because they have them under multi-fight
12  exclusive contracts and that makes it valuable
13  because I can be guaranteed that when I go to Fox
14  and I sell the television rights to be -- to be --
15  to UFC fights, I know who's going to be there in
16  the future because, you know, you're going to be
17  committing to a five-year, seven-year, ten-year, I
18  can't remember how long the Fox deal is, and they
19  can look at the stock they have now and say, yeah,
20  well, most of those guys -- not even most -- will
21  be here for three or four years.  That's a valuable
22  thing when you're selling those rights and that's
23  what the -- that's what the audience here, which is
24  Fox, they're going to be interested in that.
25     Q. Well, the audience of this document are

439

1  people who are thinking of lending UFC up to a
2  hundred million dollars, right?
3      A. Well, yeah, but what's that got to do with
4  it?
5      Q. Well, one of the things that people who
6  might want to lend a company money would want to
7  know is whether that company is going to be able to
8  sustain its revenues into the future, correct?
9      A. I think we just said the same thing.
10     Q. Okay.  And high barriers to entry don't
11  merely mean that Fox is willing to give me a
12  long-term contract.  It also means that it would be
13  difficult for another MMA promoter to get access to
14  the top fighters that I have under multi-fight
15  exclusive contracts, right?
16     MR. WIDNELL:  Objection, form.
17  BY THE WITNESS:
18     A. Well, first of all, not all at once they
19  couldn't get them.  They can't just sign all of the
20  fighters on the same day.
21     Q. Correct.
22     A. But every year a substantial number of
23  fighters are coming off contract and they're open
24  to competition from others.
25     Q. The document doesn't say that, does it?

44 (Pages 436 to 439)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

440

1      A.  But this is referring to the stock of
2   fighters they have under contract in the actual
3   world in which we live.  That doesn't contract --
4   that doesn't contradict this.
5      Q.  Turn to page 31 of this --
6      A.  People are -- just let me finish.  People
7   are coming off of contract and they're open to
8   other competitors.  That's the way the whole thing
9   is set up.
10      Q.  Turn to page --
11      A.  31?
12      Q.  -- 31.  Page 31 has a heading
13   "Competition" and the first sentence reads "To
14   effectively compete with the UFC a competitor would
15   need proper infrastructure, substantial content to
16   market upcoming fights, effective television
17   distribution, a deep lineup of marquee fighters,
18   and adequate resources to satisfy the costs of a
19   UFC-level production"; do you see that?
20      A.  Yes.
21      Q.  Do you have any basis to disagree with
22   that?
23      A.  No.  I think it's consistent with what I
24   just said.
25      Q.  If you look down into the second

441

1   paragraph, in the second sentence Deutsche Bank
2   writes "Substantial capital would also be required
3   for a competing organization to attract the talent
4   necessary to stage a successful event.  While good
5   matchmaking from a deep roster of talented fighters
6   under contract is essential"; do you see that?
7      A.  Yes.
8      Q.  Do you have any basis to disagree with
9   that?
10      A.  No.  It's going to take capital and modern
11   capital markets are remarkably good at raising
12   capital when there's a profit opportunity to be
13   had.  So that would seem to be a true statement.
14   In fact, Deutsche Bank is pretty good at finding
15   people who would like to get a little bit higher
16   return if the opportunity is there.  And let me
17   just point out that that thing says "Good match
18   making from a deep roster of talented fighters."
19   "Good match making from a deep roster of talented
20   fighters."  So when they come in, just as Zuffa did
21   at the beginning -- and no one is going to deny
22   there's a first mover advantage for Zuffa, but if
23   you want to come in and compete, hey, maybe you're
24   going to lose money for a little while, but if the
25   opportunity's there, the present value of such an

442

1   investment, the barriers are not high to coming in
2   and in the long term making such an investment.
3      Q.  So when Zuffa and Deutsche Bank were
4   representing to potential lenders who might loan
5   them up to a hundred million dollars that there
6   were high barriers to entry, were they misleading
7   the public and their potential lenders?
8      MR. WIDNELL:  Objection to form.
9   BY THE WITNESS:
10      A.  I -- I just referred to the first mover
11   advantage and that is in a technical sense to an
12   economist a cost advantage, it's a barrier to
13   entry.  It's something that makes entry more
14   difficult.  So all of these things.  The simple
15   fact that for procompetitive reasons they got the
16   majority of fighters fighting under their banner,
17   isn't anticompetitive and, yes, it makes it more
18   difficult for somebody to come in de novo and get a
19   bunch of fighters all at once.
20      MR. CRAMER:  All right.  I'd like to show
21   you -- or have marked as Exhibit 17 the next
22   document.
23          (Topel Exhibit 17 was marked
24          as requested.)
25   BY MR. CRAMER:

443

1      Q.  Exhibit 17 is a two-page series of e-mails
2   bearing the Bates range WME-Zuffa-00013978 through
3   979.  The cover e-mail is from Brent Richard to
4   Al Pfitzenmaier and its subject is "Risks and
5   mitigants" and it's dated --
6      A.  I'm a little confused.  This one says it's
7   from Brent Richard to Brent Richard.  So...
8      Q.  -- and it's dated March 20, 2016.  There's
9   an e-mail at the bottom that he must have been
10   sending it to himself --
11      A.  That's my --
12      THE REPORTER:  One at a time, please.
13      THE WITNESS:  Sorry.
14   BY MR. CRAMER:
15      Q.  Do you know who Brent Richards is?
16      A.  It says here he's the global head of M&A
17   at WME and IMG.
18      Q.  Okay.  And you've seen this document
19   before, right?
20      A.  Yeah, I probably saw this.  I've seen
21   thousands of documents.
22      Q.  Well, you rely upon it in your footnote 46
23   and 407; is that right?
24      A.  Let's take a look at it, footnote 46 and
25   407.  What is this supporting -- okay.  Okay.  And

45  (Pages 440 to 443)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

444

1    then what's the other footnote?
2        Q. 407.
3        A. Okay. Somewhere on there -- there it is.
4    Okay. Same quote. It appears twice.
5        Q. Okay.
6        A. Yes.
7        Q. So you -- you believe this document is a
8    reliable source of information about Zuffa; is that
9    fair?
10       MR. WIDNELL: Objection, form.
11   BY THE WITNESS:
12       A. I believe that Dr. Singer quoted it in the
13   context that it was used by him.
14       Q. And you quote from it too, right?
15       A. Well, I'm quoting -- didn't he quote that?
16       Q. I'm sure that he did, and you did as well.
17       A. That's his -- that's his quote. So I'm
18   quoting him.
19       Q. All right. Do you believe that this
20   document is a reliable source of information
21   regarding Zuffa's business practices?
22       A. I think it's a reliable source of
23   information for that quote that was provided by
24   Dr. Singer.
25       Q. Okay.

445

1        A. What -- what part are you pointing to?
2    And then we can talk about it.
3        Q. Let's look at the bottom of the first page
4    of the e-mail from the WME executive under
5    "Competition/barriers to entry"; do you see that?
6        A. Yes.
7        Q. Under the second bullet point it says
8    "While technical barriers to entry to host a fight
9    are relatively low, practically barriers to entry
10   are extremely high. UFC controls the best fighters
11   on staggered contracts and has the revenue model
12   providing ability to pay fighters the most in the
13   market by far." Do you see that?
14       A. Yes.
15       Q. Would you agree with Mr. Richards'
16   statement that while technical barriers to entry to
17   host a fight are relatively low, practical barriers
18   to entry are extremely high?
19       A. Well, no, because I don't know what he
20   means by "extremely high." There's -- we've
21   already established that UFC has a very successful
22   business model. It's not easy to replicate a very
23   successful business model, especially after there's
24   a first mover, and I've said that they have a
25   platform that attracts the best fighters because of

446

1    that complementarity. So are there -- are there
2    barriers to entry in the sense I have used the
3    word, that somebody's in there that already has a
4    cost and value advantage? Yeah. It's going to be
5    more difficult for the second person to come in
6    because of all those things.
7        Q. And what -- one of the things that
8    Mr. Richard refers to in addition to the first
9    mover advantage that you referenced is that the UFC
10   controls the best fighters on staggered contracts;
11   am I right?
12       A. "He controls the best fighters, on
13   staggered contracts, and has the revenue model
14   providing ability to pay fighters the most."
15       Q. What does it mean to control the best
16   fighters?
17       A. They have the best fighters on their
18   contracts -- many of the best fighters on their
19   contracts. They are, he points out
20   parenthetically, staggered contracts, which means
21   that some fraction of those people are coming up
22   every year, as I pointed out before. So if those
23   people are on three-year contracts, roughly a third
24   of the stock would be coming up and available for
25   entrants. If they are on four-year contracts, it

447

1    would be 25 percent every year.
2        Q. You're aware, as we looked at earlier
3    today and yesterday, what the evidence shows is
4    that the higher ranked a fighter is the longer term
5    Zuffa has the contract for, correct?
6        A. Yes.
7        MR. WIDNELL: Objection, form.
8    BY MR. CRAMER:
9        Q. All right. You can put that --
10       A. We looked at that -- we looked at that
11   yesterday as well and I pointed out that's exactly
12   what you'd expect from economics.
13       Q. You can put that aside.
14       A. Okay.
15       Q. Turn to footnote 233 on page 72 of your
16   report.
17       A. Footnote 233?
18       Q. Yeah. In the first sentence of footnote
19   233 you say "It is worth noting that Dr. Singer
20   weights all Zuffa athletes equally when he
21   calculates his revenue-weighted foreclosure
22   shares"; do you see that?
23       A. Hold on. Let me read it in context.
24   Okay?
25       (Witness reviewing document.)

46 (Pages 444 to 447)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

448

BY THE WITNESS:
1  BY THE WITNESS:
2      A. Yes.
3      Q. In your view -- and then you go on to say
4  in that footnote, "In other words, if a headliner
5  ranked in the top 15 departs Zuffa in the same
6  month that Zuffa contracts with an unranked athlete
7  with no record, Dr. Singer's revenue-weighted
8  foreclosure shares will not change."  Did I read
9  that right?
10     A. Yes, you did.
11     Q. So, in your view, it is not appropriate to
12 tread a headliner in the top 15 the same as
13 unranked -- an unranked athlete with no record in a
14 foreclosure analysis?
15     A. First of all, I completely disagree with
16 his foreclosure analysis.  All I'm saying is it's a
17 fact here.  That's the way it works.
18     Q. Is that appropriate or inappropriate, in
19 your view, to treat a headliner in the top 15 the
20 same as an unranked athlete with no record?
21         MR. WIDNELL:  Objection, form.
22 BY THE WITNESS:
23     A. Are you asking whether it would be
24 appropriate to give in some way greater weight to
25 the fact that -- that a top-ranked athlete is

449

1  working for -- is under contract to Zuffa?  Is that
2  what you're asking?
3      Q. Well, I'd like to know the answer to that
4  question.  All I'm asking is the logic behind your
5  criticism of Dr. Singer in this footnote.  You are
6  saying that in his revenue-weighted foreclosure
7  analysis he is treating a headliner in the top 15
8  the same as an unranked athlete with no record, and
9  I'm trying to understand why that is a critique of
10 his model?  In what sense is that problematic, if
11 it is?
12     A. It just -- this is the way it works.  It
13 just says this is worth noting.
14     Q. So you don't think that's a problem with
15 the model, treating a headliner in the top 15 the
16 same as an unranked athlete with no record; is that
17 right?
18     A. Well, it doesn't do that in every period.
19 It's just that this is the way it works within a
20 period.  So this is just a fact.
21     Q. Let's say that there was a model that, in
22 fact, did treat a headliner in the top 15 the same
23 as an unranked athlete with no record as part of a
24 foreclosure analysis.  Would that be inappropriate,
25 in your words -- in your view?

450

1      A. It depends --
2          MR. WIDNELL:  Objection, form.
3  BY THE WITNESS:
4      A. It depends on what the analysis is.
5      Q. A foreclosure analysis for this case.
6      A. Well, nobody's done such a foreclosure
7  analysis in this case.
8      Q. All right.  Would you agree with me that
9  not all fighters are exact substitutes for each
10 other?
11     A. I'll agree with that.
12     Q. Would you agree with me that some fighters
13 are more important to an MMA promotion than others?
14         MR. WIDNELL:  Objection, form.
15 BY THE WITNESS:
16     A. Yes.
17     Q. Some generate more revenues when they
18 fight than others; is that right?
19     A. Yes.
20     Q. And those that are capable of generating
21 more revenues when they fight, all things equal,
22 are more valuable to their promotion than other
23 fighters; is that right?
24     A. The operative word there is generate, but
25 go ahead.

451

1      Q. Is that right?
2      A. It depends on how the particular fighter
3  is -- is evaluated by the organization, but on
4  average you'd rather have people who are capable of
5  generating more revenue.
6      Q. Would it be fair to say that, all things
7  equal, the more a fighter is capable of generating
8  revenue, all things equal, the more important it is
9  for that promotion to ensure that that fighter
10 cannot freely leave the promotion to go to another
11 promotion?
12         MR. WIDNELL:  Objection, form.
13 BY THE WITNESS:
14     A. That was a complicated question.  Could
15 you read it back, please.
16     Q. Yeah.  Is it fair to say that, all things
17 equal, the more revenues a fighter is capable of
18 generating for a promotion the more important it is
19 for that promotion to ensure that that fighter does
20 not freely leave the promotion to go to another
21 promotion?
22     A. Well, no --
23         MR. WIDNELL:  Same objection.
24 BY THE WITNESS:
25     A. -- depends on what we're paying them.  I

47 (Pages 448 to 451)

452

1  shouldn't have said we. I'm thinking about a
2  generic firm here. I've got somebody that's got a
3  high marginal product but I pay that person a lot.
4  You know, my incentive to retain that person
5  depends on how profitable that person is to me. So
6  if you change your question and say if this person
7  is really profitable to me would I rather not lose
8  them.
9      Q. Yes.
10     A. Yes.
11     Q. Turn to footnote 237, please, on page 74.
12  In the third sentence there -- you're talking about
13  a regression you did, and in the third sentence you
14  say "On the right-hand side of the regression I
15  include variables that measure the athlete's
16  ranking"; do you see that?
17     A. Let me read the footnote and stuff.
18     Q. Please do.
19     A. And actually -- okay. Here we go.
20         (Witness reviewing document.)
21  BY THE WITNESS:
22     A. Yes, now I've got to read 2 -- you want me
23  to read 237?
24     Q. Yes. I just want to -- I'm just going to
25  ask you why you include variables that measure the

453

1  athlete's ranking in this analysis.
2      A. Oh, because we want to control for the
3  attributes of the fighter and some measure of the
4  quality.
5      Q. And that's because, all things equal, it's
6  possible that an athlete's ranking would bear upon
7  its compensation?
8      A. Well, to put it more broadly, the -- when
9  we're comparing the compensation across time, we
10  want to do as much as we can to hold constant the
11  composition of the fighters in different years.
12     Q. Would you agree that an athlete's
13  ranking -- that, all things equal, the higher an
14  athlete's rank the higher a compensation he will
15  make?
16         MR. WIDNELL: Objection, form.
17  BY THE WITNESS:
18     A. That should -- did you say on average
19  something?
20     Q. On average.
21     A. I wouldn't be surprised if that's true.
22     Q. Do you know whether or not Zuffa uses an
23  athlete's ranking in considering how much to pay a
24  fighter?
25     A. I haven't looked. If I have looked, I

454

1  don't remember any documents that say we're going
2  to -- we think -- we think of weighting or think
3  of ranking in the following way, but I guess I'd be
4  surprised if they weren't interested in that.
5      Q. Are you aware that state athletic
6  commissions use ranking in deciding whether or not
7  to approve fights that MMA promoters like Zuffa
8  propose to the commissions?
9      A. Let me just clarify. Are you -- first of
10  all, I'm not aware that they use ranking. Okay?
11     Q. Okay. Would that surprise you?
12     A. No.
13     Q. Why not?
14     A. I suppose it's because -- what immediately
15  came to mind, although this isn't part of my
16  opinion anywhere, I don't want to be thrown like me
17  in against some really accomplished guy, you know,
18  because I'm going to end up not feeling very good
19  at the end of it.
20     Q. And rankings would help determine whether
21  an unranked MMA fighter, and Conor McGregor
22  should be fighting against each other?
23         MR. WIDNELL: Objection, form.
24  BY THE WITNESS:
25     A. He could beat me with both hands tied

455

1  behind his back.
2      Q. And probably both legs tied behind his
3  back. All right.
4         Turn to paragraph 165, please. So as I
5  understand what you're doing here, you're
6  stratifying athletes based on rankings; is that
7  right?
8      A. Yes.
9      Q. And your system weights fighters by
10  grouping. So you have fighters 1 to 15 in one
11  group and 16 to 30 in another and so on; is that
12  right?
13     A. Correct.
14     Q. What's your basis for this weighting
15  system?
16     A. Here I'm just doing it within categories
17  to show that within these categories for this
18  particular set of regressions that show growing
19  compensation over time -- I actually think we did
20  talk about this yesterday -- that within these
21  categories the same sort of pattern occurs.
22     Q. Is it fair to say that your weighting
23  system treats the champion as having the same
24  weight as the fighter ranked 15?
25     A. For this regression, yes. Well, I've

48 (Pages 452 to 455)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

460

1    when you run this regression you're going to get
2    that.  Unless, as you say, they had some
3    mechanical -- another mechanical thing in there
4    that says every time our revenues go up by 10
5    percent we're going to increase compensation by 10
6    percent, okay, but we're doing a monopsony case
7    here where the allegation is that they reduce
8    compensation.  So even if they didn't reduce
9    compensation, even if they didn't change it, even
10   if they increased it by some smaller amount, a bump
11   on this side is going to cause a reduction on this
12   side.  It's kind of a teeter-totter.
13        Q.  Well, we did see documents yesterday where
14   Zuffa was assuming that its compensation of
15   athletes would go up at the same rate as the event
16   revenues grew, right?
17        MR. WIDNELL:  Objection, form, misstates.
18   BY THE WITNESS:
19        A.  I don't recall anything that said it's
20   going to rise at the same rate.  The fact is it
21   doesn't.
22        Q.  And if it did, then there would be no
23   negative correlation between this foreclosure
24   measure and athlete's share of revenue, right?
25        MR. WIDNELL:  Objection, form.

461

1    BY THE WITNESS:
2        A.  Then you don't need a regression because
3    you just told me the share never changes.  So
4    you're just putting a constant on the left-hand
5    side.
6        Q.  Assume for this question that Zuffa's
7    event revenues are increasing but at a slower rate
8    than event revenues at other MMA promotions.  Okay?
9        A.  Okay.
10        Q.  In that instance, all things equal,
11   Zuffa's foreclosure share would fall, right?
12        MR. WIDNELL:  Objection, form.
13   BY THE WITNESS:
14        A.  So -- okay.  So you keep the athletes the
15   same, but event revenues rise faster for others?
16   Yeah, that can happen.
17        Q.  So in order for Zuffa's foreclosure share
18   under the revenue-weighted measure to increase,
19   Zuffa must be earning a growing share of all MMA
20   event revenues, right?
21        A.  Yeah.  I think that's the point we made in
22   our appendix.
23        Q.  So rising Zuffa event revenues does not
24   automatically cause Zuffa's foreclosure shares to
25   mechanically increase, right?

462

1        A.  I was making a point about the comparative
2    advantage and success of Zuffa.  So as Zuffa
3    becomes more successful relative to other firms --
4    I think I even phrased it this way -- its
5    revenue-weighted share is going to rise.
6        Q.  But the mere fact that Zuffa's event
7    revenues are rising would not automatically cause
8    Zuffa's foreclosure shares to rise, right?
9        A.  If everybody's event revenues rose at the
10   same rate, that would leave Zuffa's -- what he
11   calls -- the share that Mr. Singer calculates
12   would -- if I recall correctly, would not change.
13        Q.  Turn to paragraph 227, please.  You say
14   there in the first sentence "The conceptual flaw in
15   Dr. Singer's use of revenue weighted input shares
16   is further illustrated by the following
17   implication.  Revenue weighted input shares imply
18   that firms with significant market power in the
19   output market also have a significant market
20   share -- or significant share of the input market."
21   Do you see that?
22        A.  Yes.
23        Q.  And then you say a little bit further on
24   on page 98 "This result is not supported by the
25   economic literature which recognizes that firms

463

1    with significant market power and share in an
2    output market can operate in and have a small share
3    of a highly competitive input market"; do you see
4    that?
5        A.  Yes.
6        Q.  It's fair to say you don't cite anything
7    for that proposition in this report, correct?
8        A.  Well, it's just -- you don't have to have
9    market power and inputs -- a firm that has market
10   power and inputs -- excuse me.  A firm that has
11   market power and output doesn't -- for most of its
12   inputs doesn't have any market power.  I mean,
13   Microsoft buys pencils.  It doesn't have any
14   market -- if we stipulate that Microsoft has market
15   power in the output market for the operating
16   systems, it buys pencils competitively.
17        Q.  Now, you're not saying that it's
18   impossible for a firm with monopoly power in the
19   output market to have monopsony power in an input
20   market, are you?
21        A.  No.
22        Q.  You're just saying that the former,
23   meaning monopoly power in the output market,
24   doesn't necessarily imply the latter, monopsony
25   power in the input market, right?

50 (Pages 460 to 463)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

464

1      A.  Correct.
2      Q.  So assume for this question that there's
3  an MMA promotion that has a monopoly on the
4  promotion of professional MMA events.  It's the
5  only one.  You would agree that by definition this
6  is the only place an MMA fighter could get paid to
7  compete as an MMA fighter, right?
8      MR. WIDNELL:  Objection, form.
9  BY THE WITNESS:
10     A.  Yeah.  I don't -- I don't disagree with
11  that if they've got a monopoly.  It takes -- it
12  takes fighters in the output market to sell
13  services and it takes fighters in the input market
14  to get those services.
15     Q.  So it's fair to say that if you control
16  the output market in a professional sport, you
17  control the input market for the athletes that play
18  that sport as well, correct?
19     A.  No.  No.  The input market for that --
20  you've assumed that there are no good substitutes
21  for the athletes themselves, and -- you know, I
22  might be the -- let's pick a sport.  I might be the
23  monopolist on Major League Soccer in the United
24  States, but I can still be hiring soccer players
25  from everywhere and not have much market power over

465

1  the price I pay for soccer players.
2      Q.  Let's say you're the global monopolist for
3  soccer.  You control it all.  You control the
4  output market for the sport.  The only place that
5  professional soccer players have to play is you,
6  right?
7      A.  And if there's an inelastic supply of -- I
8  mean, what's going to happen in the input market is
9  that in that instance it depends on the elasticity
10  of supply of soccer players and then --
11     Q.  In other words, whether players would come
12  from some other sport or could go to another sport?
13     A.  Well, they could do all kinds of things.
14  There's some elasticity of supply of soccer
15  players.  We know that's true, it's not zero.  And
16  so the pricing and I've got two decisions to make,
17  how I operate in the input market and how I operate
18  in the output market, and it's going to depend in a
19  kind of a complicated way on the elasticity of
20  demand in the output market and the elasticity of
21  supply in the input market what ends up happening,
22  the prices I charge and pay in two markets.
23     THE VIDEOGRAPHER:  Five minutes on disk.
24     MR. CRAMER:  Let's take a break and go off
25  the record.

466

1      THE VIDEOGRAPHER:  Going off the record at
2  2:33.
3      (A short break was had.)
4      THE VIDEOGRAPHER:  We are going back on
5  the record at 2:35.  This begins disk No. 4.
6  BY MR. CRAMER:
7      Q.  So turn to paragraph 234 of your report,
8  please.  So here you specify a regression where you
9  control for differences in athlete quality by
10  calculating shares by ranking group; is that right?
11     A.  Yeah.  So if you lead me read everything
12  in context, I have to remember what I did.
13     (Witness reviewing document.)
14  BY THE WITNESS:
15     A.  Yes.
16     Q.  And one of the things you do that
17  Dr. Singer didn't was you specify an athlete's rank
18  as of the time the athlete joined the promoter; is
19  that right?
20     A.  I don't recall phrasing it that way.  By
21  ranking group, dot dot dot.  Are you referring to
22  something in the footnote down here?
23     Q.  No.  It's in paragraph 234, third line
24  from the bottom of the paragraph.
25     A.  Oh.

467

1      Q.  You say "Where an athlete's rank is as of
2  the time the athlete joined a given promoter"; is
3  that right?
4      A.  Yes.  I see where you're point -- "Where
5  an athlete's rank is as of the time the athlete
6  joined a given promoter."
7      Q.  And you do that even if a fighter goes
8  from rank 150 to champion while at that promoter;
9  is that right?
10     A.  Yes.
11     Q.  And so if the athlete joined the promoter
12  as rank 150 and was a champion by the time you run
13  the regression, he would still treat that athlete
14  as if he was ranked 150; is that right?
15     MR. WIDNELL:  Objection, form.
16  BY THE WITNESS:
17     A.  I'd have to check the code.
18     Q.  Well, assuming that's what you do, under
19  your measure of foreclosure an MMA promotion could
20  in theory have a hundred percent of the top ten
21  fighters in every weight class with exclusive
22  contracts and you still might not consider it as
23  having a substantial foreclosure share, right?
24     A.  First of all --
25     MR. WIDNELL:  Objection, form.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

468

BY THE WITNESS:

A. -- I'm not advocating this as a measure of foreclosure. I'm saying that Dr. Singer's -- I've just recalculated some of the things that Dr. Singer did to show how they're sensitive to how things change. So in no way, shape, or form am I advocating any of these things as measuring anything to do with foreclosure.

Q. Okay. But presumably you believe that measuring an athlete's rank as of the time the athlete joined the promoter is an appropriate adjustment, right?

A. Given the problems with Dr. Singer's calculations, it's an adjustment that doesn't have the same problems that his does. So it's merely here to show the sensitivity of how things work.

Q. Right.

A. How things work in his -- in his world.

Q. Right. But I'm just trying to test that adjustment, and it's fair to say that that adjustment would treat someone who is a champion in the analysis as if he was ranked 150 if the person joined the promotion at 150 and became a champion five years later.

A. That can be true of this adjustment.

469

Q. All right. In Exhibit 28, if you turn to that, there, as I understand it, you calculate Zuffa's foreclosure share based on unweighted fighter counts within your stratified fighter categories, but otherwise leave Dr. Singer's methodology unchanged?

A. Yes.

Q. And then --

A. That's my recollection.

Q. Okay. And then in Exhibit 29 you impose certain of what you call corrections to Dr. Singer's foreclosure calculation that you mention in paragraph 234; is that right?

A. Is this in -- in what line does it say Exhibit 29? Ah, overlays the recalculated, dot dot dot. Yep, it just shows that his revenue shares are -- or his -- his so-called foreclosure shares are sensitive to how they're defined.

Q. So the difference between Exhibit 28 and Exhibit 29 is that Exhibit 29 you make the adjustments that you describe in paragraph 234; is that right?

A. That's my recollection, yes.

Q. Okay. So for Exhibit 29 you count athletes only once regardless of how many times

470

they may have fought in the 18-month window around an event; is that right?

A. Yes.

Q. And you only count a fighter as foreclosed if he or she has at least one month remaining --

A. Stop. I don't count fighters as foreclosed.

Q. Okay. You only count a fighter as part of this measure if he or she has one month remaining in his contract or her contract?

A. I don't recall. If we look back here -- where do you see the one month?

Q. So in the middle of paragraph 234 you say "As noted in the above, for a given month Dr. Singer's share calculation counts the number of athletes who participated in a bout for a given promoter for each month in an 18-month window around that month, which means some athletes are counted more than once. In my share calculation I count each athlete once."

A. Yes, but that doesn't say anything about the last month.

Q. Right. You don't recall one way or another whether you made that adjustment?

A. We wouldn't have been calculating

471

somebody, in my recollection, in the last month because of their contract because -- well, for one reason, those people would be open to -- to being hired by somebody else.

Q. So someone with one month left on their term would still have the 90 days of an exclusive negotiation period, correct?

A. Sure.

Q. And would have a 12-month right to match period, correct?

A. Subject to all the caveats about the right to match period, yes.

Q. All right.

Now, you say in paragraph 234 that when you compare exhibits -- I'm sorry. In 235 you say at the bottom of page 100 "A comparison of Exhibit 28 to Exhibit 29 shows that much of the difference between Dr. Singer's original shares and the recalculated shares is due to Dr. Singer's use of revenue weights"; do you see that?

A. Yep.

Q. And I'm trying to understand how you draw that conclusion from a comparison between Exhibits 28 and 29 given that the shares in both Exhibit 28 and 29 are not revenue weighted?

52 (Pages 468 to 471)

472

1    A. His are revenue weighed, the green line.
2    Q. Oh, the green line is revenue weighted?
3    A. Yeah.
4    Q. Okay. And that's what you mean?
5    A. Yeah.
6    Q. Okay. And just so I understand, in this
7  analysis you treat a fighter ranked 1 as the same
8  value as a fighter ranked 15; is that right?
9    A. Yes.
10   Q. For example, you would treat Nunez the
11 same as you treat Rousey; is that right?
12   A. I don't know whether I did that with those
13 two particular fighters, but within a category that
14 would be true. So we didn't inverse weight
15 according to -- we didn't treat 15 as 1/15th of 1.
16   Q. Okay.
17   Turn to paragraph 229. So here you
18 talk -- you point out that Nunez was the champion
19 when she fought Rousey in December of 2016; is that
20 right?
21   A. Yes. That's my recollection.
22   Q. And at that time Rousey was ranked 5th; is
23 that right?
24   A. Yes.
25   Q. And you point out further that Nunez

473

1  earned substantially less than Rousey for that
2  fight?
3    A. Yes.
4    Q. Do you know whether Nunez was fighting
5  that bout on a contract that had been signed before
6  Nunez became champion?
7    A. She could have been.
8    Q. Do you know whether Rousey was fighting
9  that rematch on a contract executed before Rousey
10 lost the championship to Nunez?
11   A. Well, since she's fighting Nunez since she
12 earned 3 million, it would have been a contract
13 before she fought Nunez.
14   Q. Do you understand that even in December
15 2016 Rousey had far more revenue-generating
16 potential than Nunez?
17   MR. WIDNELL: Objection, form.
18 BY THE WITNESS:
19   A. I think that's implied by what's in here,
20 yeah.
21   Q. The main reason that the fight had over
22 1 million Pay-Per-View buys is Rousey, not Nunez,
23 right?
24   A. Sure.
25   Q. All right. You can put that aside.

474

1    Turn to paragraph 65, please. You say in
2  the second sentence on page 26 "In addition to the
3  athletes identified by Dr. Singer in his input
4  market definitions, MMA athletes have come from,
5  among other places, collegiate or Olympic
6  wrestling, boxing programs, martial arts,
7  academies, the military, and other professional
8  sports." Can you identify any top-ranked MMA
9  athletes that were also in the elite ranks of other
10 professional sports?
11   A. I haven't looked at the elite ranks of
12 other professional sports to see who moved over. I
13 know that an elite wrestler tried to move over and
14 got his butt kicked, but --
15   Q. That's correct.
16   A. Yep.
17   Q. Can you identify any top-ranked MMA
18 athlete that was in any rank of another
19 professional sport?
20   MR. WIDNELL: Objection, form.
21 BY MR. CRAMER:
22   Q. Not an elite necessarily. Just someone
23 who played professional football, for example.
24   MR. WIDNELL: Same objection.
25 BY THE WITNESS:

475

1    A. Some of these guys -- some of these guys
2  played other sports, if that's your question, but
3  the facts of their background are that a lot of
4  people came over from other sports and they fight
5  in other sports.
6    Q. Would you agree with me that if -- all
7  things equal, if MMA fighter compensation generally
8  rose relative to the compensation in other
9  professional sports, more potential athletes that
10 would otherwise have gone into these other sports
11 would choose MMA instead?
12   MR. WIDNELL: Objection, form.
13 BY THE WITNESS:
14   A. I think that's likely. That's part of the
15 reason the sport itself has grown.
16   Q. Would you agree that the better -- strike
17 that.
18   That therefore, all things equal, if you
19 increase the compensation to MMA fighters generally
20 you'd attract more qualified athletes?
21   A. I think that's what's happened.
22   Q. And, all things equal, increased fighter
23 compensation --
24   A. I don't know if the average would go up or
25 not. Depends on whether you pull in more

53  (Pages 472 to 475)

476

1  high-ranked -- high-quality people or low-ranked
2  quality people, but the profession would become
3  more attractive relative to other professions.
4  **Q. And, all things equal, if you therefore**
5  **increase fighter compensation relative to other**
6  **sports, that would improve the quality of MMA for**
7  **consumers, right?**
8  **MR. WIDNELL: Objection, form.**
9  **BY THE WITNESS:**
10 **A. There would be some effect there, yeah.**
11 Q. Turn to paragraph 209. In this paragraph
12 you criticize Dr. Singer's use of the FightMetric
13 database as part of one of his tracked measures of
14 the relevant input market; is that right?
15 A. Yes.
16 Q. Can you identify by name or rank a single
17 MMA fighter who was excluded from this database
18 that you believe is appropriately in the relevant
19 input market?
20 A. I think we had some of those as examples.
21 I can't remember the names. I don't keep track of
22 fighters' names.
23 Q. So you believe you've identified in your
24 report fighters who are appropriately in the
25 relevant input market but who are not measured by

477

1  the FightMetric database; is that right?
2  A. My -- if I recall, my FightMetric versus
3  Fight Matrix databases, FightMetric was only
4  certain promoters for whom FightMetric was paid to
5  collect the information. So certain -- anybody who
6  was in a -- who was at a point in time not in -- if
7  that promoter was not in FightMetric, then they
8  wouldn't have been counted at that point in time in
9  the -- in the MMA market. Now, later on they might
10 have got in.
11 MR. CRAMER: For the court reporter there
12 have been two words, FightMetric,
13 F-I-G-H-T-M-E-T-R-I-C, and Fight Matrix, F-I-G-H-T,
14 M-A-T-R-I-X.
15 THE REPORTER: Thank you.
16 MR. CRAMER: You're welcome.
17 BY MR. CRAMER:
18 Q. Can you identify a single MMA promoter
19 that you believe was excluded from the FightMetric
20 database that has or had a material share of the
21 MMA promotion business?
22 A. I'm sorry.
23 MR. WIDNELL: Objection, form.
24 BY THE WITNESS:
25 A. I'm sorry. Could you say that again.

478

1  Q. Yeah. Can you identify any MMA promoter
2  that was not in the FightMetric database that had
3  or has a material share of the MMA promotion
4  business?
5  A. Well, if I don't have anybody in here,
6  we've talked about the identities before, but I
7  can't remember.
8  Q. So sitting here today, you cannot identify
9  a single MMA promoter with a material share of the
10 MMA market that was not in the FightMetric
11 database; is that right?
12 MR. WIDNELL: Objection, form.
13 BY THE WITNESS:
14 A. I don't recall the names of the promoters
15 that were not in there. I didn't keep track of
16 that.
17 Q. What business is FightMetric in, to your
18 understanding in?
19 A. My recollection is that FightMetric
20 collects information on -- on bouts and that
21 promoters may pay FightMetric to collect
22 information on those bouts.
23 Q. And Mr. Genauer who created it sells the
24 data tracking MMA fighters and their records to MMA
25 promoters; is that right?

479

1  A. That's my recollection.
2  Q. Did you speak to Mr. Genauer --
3  A. No.
4  Q. -- in the course of your work?
5  A. No.
6  Q. Do you know what MMA promoters use this
7  information for that they pay for from Fight
8  Matric -- FightMetric?
9  MR. WIDNELL: Objection, form.
10 BY THE WITNESS:
11 A. To keep track of perform -- my
12 recollection is to keep track of performance of
13 athletes in the octagon.
14 Q. And MMA promoters use the FightMetric
15 database in tracking fighters as part of the
16 regular course of their businesses, as far as you
17 understand it; is that right?
18 MR. WIDNELL: Objection, form.
19 BY THE WITNESS:
20 A. Some do and some don't.
21 MR. WIDNELL: Misstates.
22 BY MR. CRAMER:
23 Q. In paragraph 211 you quote Mr. Genauer,
24 we've got a declaration from him; is that right?
25 A. Well, I think this is a -- I can't

54 (Pages 476 to 479)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

480

1    remember.  There's a dec -- we have a declaration
2    and then this is an exchange.  Are you talking
3    about paragraph 211?
4         Q.  Yes.  I'm sorry.  Yes.  This was an
5    exchange --
6         A.  That's an exchange between Augie Urschel
7    at Economist, Inc. and Mr. Genauer.
8         Q.  Right.  I misspoke.
9         And in that exchange Mr. Genauer is
10   describing sort of who's in and who's out of
11   FightMetric, and he says "It's become whoever the
12   market is willing to pay for," right?
13        MR. WIDNELL:  Objection, form.
14   BY THE WITNESS:
15        A.  Yes.  I mean, he says -- yeah.  "In recent
16   years it has become whoever the market is willing
17   to pay for.  I don't have a perfectly consistent
18   answer for you."
19        Q.  In other words, Genauer tracks fighters in
20   this database that MMA promotions want to track in
21   the regular course of their businesses, right?
22        MR. WIDNELL:  Objection, form, misstates.
23   BY THE WITNESS:
24        A.  Well, it's whatever organizations pay him
25   to track.

481

1         Q.  If MMA promotions had wanted Mr. Genauer
2    to track other fighters and were willing to pay for
3    it, presumably FightMetric would track those
4    fighters as well, correct?
5         MR. WIDNELL:  Objection, form.
6    BY THE WITNESS:
7         A.  Repeat the question, please.
8         Q.  I'll withdraw the question.
9         A.  Some promoters didn't pay.
10        MR. CRAMER:  I'd like to mark as the next
11   exhibit the declaration of Abraham Genauer,
12   Exhibit 18.
13             (Topel Exhibit 18 was marked
14                as requested.)
15   BY THE WITNESS:
16        A.  Is this Rommey's --
17        THE REPORTER:  Hold on, please.
18   BY THE WITNESS:
19        A.  I take it this is Rommey's formal name?
20        Q.  Well, this document was produced to the
21   Plaintiffs by Zuffa.  It's signed by Abraham
22   Genauer.  And it was executed October 26, 2017.
23        A.  Got it.
24        Q.  Do you know how this came into your
25   possession?

482

1         A.  You just handed it to me.
2         Q.  Well, you rely upon it in at least three
3    places in your report; isn't that right?
4         A.  I'm sure it came from attorneys for Zuffa.
5         Q.  You've seen it before, right?
6         A.  I've read a lot of documents.  This looks
7    familiar.
8         Q.  Turn to paragraph 6 on page 1 of the
9    declaration, Exhibit 18.  It says "FightMetric
10   determined which MMA promotions bouts to track for
11   the purposes of collecting statistical information
12   about the promotions' bouts.  The decision was
13   influenced by factors such as the willingness of
14   third parties, including sports broadcasters, MMA
15   promotions, and fantasy sports gaming Websites to
16   pay for that information."  Do you believe that
17   that's accurate?
18        A.  Sure.  I believe -- I've -- I've read that
19   paragraph before.
20        Q.  So Mr. Genauer was attempting with his
21   FightMetric database to track the fighters and
22   promotions and bouts that third parties were
23   willing to pay for; is that right?
24        MR. WIDNELL:  Objection, misstates.
25   BY THE WITNESS:

483

1         A.  Well, he doesn't say which way the
2    causality goes, if he went out and collected data
3    and said, hey, you want to buy this or whether
4    people said we'd like to retain you to go out and
5    do it.  However he did it, it's not a random
6    sample.
7         Q.  Right.  Well, he said it was influenced by
8    the willingness of third parties to pay for it,
9    right?
10        A.  Well, factors such as, yes.  Go ahead.
11        Q.  And it's fair to say that if third parties
12   were willing to pay for tracking fighters at other
13   promotions that he wasn't tracking, that he might
14   have gone out and tracked those fighters and
15   promotions as well, right?
16        MR. WIDNELL:  Objection, form.
17   BY THE WITNESS:
18        A.  You've said something that it's impossible
19   to disagree with.
20        Q.  I like to hear that.
21        A.  It has to happen once.
22        Q.  Do you know what fantasy sports gaming
23   Websites do with regard to MMA?
24        A.  I suppose they probably have fantasy bouts
25   and then people can participate.

55 (Pages 480 to 483)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

484

1   Q. And it's fair to say that if --
2   A. That's my recollection.
3   Q. If these gaming Websites wanted to track
4   promotions and fighters that Mr. Genauer wasn't
5   tracking that he would go out and track them,
6   right?
7       MR. WIDNELL: Objection, form.
8   BY THE WITNESS:
9   A. Depends on how much they're willing to
10  pay.
11  Q. All right. You can put that aside.
12  Is it your opinion that MMA fighters could
13  easily substitute from professional mixed martial
14  arts to boxing?
15  A. No.
16  Q. Is it your opinion that MMA fighters could
17  easily substitute from MMA fighting to football?
18      MR. WIDNELL: Objection, form.
19  BY THE WITNESS:
20  A. You mean to NFL football?
21  Q. Yes.
22  A. No.
23  Q. Is it your opinion that MMA fighters could
24  easily substitute from MMA fighting to playing
25  tennis, professional tennis?

485

1       MR. WIDNELL: Objection, form.
2   BY THE WITNESS:
3   A. No.
4   Q. Other than Conor McGregor, can you
5   identify another MMA fighter who became a
6   successful professional boxer for more than one
7   fight?
8       MR. WIDNELL: Objection, form.
9   BY THE WITNESS:
10  A. No. Are you counting him as successful?
11  Q. You can determine that. Was he
12  successful, in your opinion?
13  A. He made money. He lasted longer than I
14  would have thought.
15  Q. Did you in your report do an analysis as
16  to whether there are other combat sports to which
17  professional MMA fighters could switch if their
18  compensation fell a small but significant agree?
19      MR. WIDNELL: Objection, form.
20  BY THE WITNESS:
21  A. Whether -- whether there are other sports?
22  Q. Yes.
23  A. Well, they surely could switch to some
24  degree. The magnitude, I didn't calculate it.
25  Q. Have you done an -- strike that.

486

1       Have you done any analysis of how much it
2   would cost to train to switch from professional MMA
3   fighting to another sport?
4       MR. WIDNELL: Objection, form.
5   BY THE WITNESS:
6   A. I've done no financial analysis of such
7   switching.
8   Q. Did you do any analysis of how much time
9   it would take for a professional MMA fighter to
10  switch from professional MMA to another sport?
11  A. My understanding it takes various amounts
12  of time.
13  Q. Would you agree that it takes a tremendous
14  amount of skill and training to be a top-level MMA
15  professional fighter?
16      MR. WIDNELL: Objection, form.
17  BY THE WITNESS:
18  A. I think it takes a lot of skill to be a
19  top athlete in any category.
20  Q. Is it fair to say that in order to be --
21  in order to be a top-level professional MMA fighter
22  one would need to be an extraordinary athlete; is
23  that fair?
24      MR. WIDNELL: Objection, form.
25  BY THE WITNESS:

487

1   A. They are athletic. Whether they're as
2   athletic as some other field, I don't know.
3   Q. Is it fair to say that in order to be a
4   top-level MMA fighter that athlete would need to be
5   knowledgeable about several martial arts
6   disciplines?
7       MR. WIDNELL: Objection, form.
8   BY THE WITNESS:
9   A. I think they use several martial arts
10  disciplines. That's why it's called mixed martial
11  arts.
12  Q. And in order to be a top-level MMA fighter
13  the athlete would need to be knowledgeable and
14  trained in more than one martial arts discipline,
15  correct?
16      MR. WIDNELL: Same objection.
17  BY THE WITNESS:
18  A. I suppose one could be successful using a
19  limited set of skills, but you say more than one.
20  You're probably able to use more than one. That's
21  why it's called mixed martial arts.
22  Q. Right. If a boxer tried to become a mixed
23  martial artist and all that professional boxer knew
24  was boxing, he would get his butt kicked, wouldn't
25  he?

56 (Pages 484 to 487)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

488

1      MR. WIDNELL:  Objection, form.
2   BY THE WITNESS:
3      A.  I don't know the answer to that.
4      Q.  In order to be a professional MMA fighter
5   at the top level the athlete needs to be in
6   incredible shape; is that true?
7      MR. WIDNELL:  Objection, form.
8   BY THE WITNESS:
9      A.  Incredible shape?  I mean, there's all
10  these adjectives flying around that -- it's rough
11  and tumble in that octagon and to last three rounds
12  to five rounds against somebody who's fighting you
13  in that weight takes stamina.  They have to be in
14  shape.  They have to be in better shape than I
15  am.
16     Q.  In order to be a top-level MMA fighter the
17  athlete must be willing to risk serious injury or
18  death in the ring, correct?
19     MR. WIDNELL:  Objection, form.
20  BY THE WITNESS:
21     A.  Well, I don't think -- what does it mean
22  to risk death?  I mean, people die in boxing.  I
23  don't know if anybody's ever died in mixed martial
24  arts.  I know it's regulated.  So it's not going to
25  be extraordinarily risky, but you can get hurt in

489

1   there and there are fights that I've watched people
2   get hurt.
3      Q.  And in order to be a top-level MMA fighter
4   you would need to be willing to risk serious injury
5   while fighting, correct?
6      MR. WIDNELL:  Same objection.
7   BY THE WITNESS:
8      A.  That's true in any sport, but keep
9   going.
10     Q.  You think it's more true in tennis that an
11  athlete will get seriously injured or mixed martial
12  arts, which one?
13     A.  Probably in mixed martial arts.
14     Q.  Turn to paragraph 304, please.  In
15  paragraph 304 you're talking about Zuffa's
16  acquisition of Pride, among other things, and in
17  the second -- in the third sentence you say "More
18  importantly, the Pride acquisition was intended as
19  a way for Zuffa to enter into the Asian MMA
20  market"; do you see that?
21     A.  Yes.
22     Q.  In what way did Zuffa's purchase of Pride
23  assist Zuffa in entering the Asian MMA market?
24     MR. WIDNELL:  Objection, form.
25  BY THE WITNESS:

490

1      A.  My understanding is that Pride was a
2   ongoing enterprise in the Asian MMA market.  So
3   they acquired Pride and along with it the contracts
4   of various athletes who are under contract to Pride
5   and also Pride management, although my recollection
6   is that didn't last long.
7      Q.  After Zuffa's acquisition of Pride it's
8   fair to say that Zuffa shut Pride down, correct?
9      MR. WIDNELL:  Objection, form.
10  BY MR. CRAMER:
11     Q.  It stopped running an MMA promotion under
12  the logo Pride, correct?
13     MR. WIDNELL:  Objection, form.
14  BY THE WITNESS:
15     A.  Well, I don't know what it means to be --
16  shut down would be to remove their assets from the
17  market and by the same -- in the same way that when
18  my consulting business was sold they kept the name
19  for a little while and then they folded us in under
20  the other brand name, but our assets and human
21  capital were still in the market.
22     Q.  You refer in the next sentence in
23  paragraph 304 "Without a noncompete with
24  Sakakibara" -- S-A-K-A-K-I-B-A-R-A -- "nothing
25  would prevent him from using his local connections,

491

1   including his alleged connections to Japanese
2   organized crime and Pride trade secrets, to
3   immediately start a new promotion in Jab- -- in
4   Japan, thereby undercutting Zuffa's
5   47-million-dollar purchase of Pride and intended
6   investment in the Japanese MMA market"; do you see
7   that?
8      A.  Yes.
9      Q.  What benefit are local connections to an
10  MMA promotion?
11     A.  They understood the Japanese market, and
12  my understanding is that when -- different markets
13  have different -- value different attributes of the
14  way the organization is run, value different
15  attributes of the athletes and the way the athletes
16  comport themselves.  So it would be good to know
17  what works and it would also be good to know one's
18  way around the market there and what connections
19  have been made.  So you're buying -- you're buying
20  not just the human capital of athletes, but
21  you're -- you're buying all the IP of the
22  organization in question.
23     Q.  Are you aware -- so the UFC bought Pride
24  in 2007; is that right?
25     A.  I think that's the year, but I don't

57 (Pages 488 to 491)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

492

1    remember.
2        Q.  So if the UFC -- are you aware about
3    whether the UFC put on an event in Japan between
4    2007 and 2012?
5        A.  I don't recall.
6        Q.  Would it surprise you to learn that after
7    the acquisition of Pride in 2007, which you say was
8    an effort to enter into the Asian MMA market, that
9    Zuffa did not put on an MMA event in Asia until
10   February of 2012?
11       MR. WIDNELL:  Objection to form.
12   BY THE WITNESS:
13       A.  Doesn't surprise me because this
14   investment didn't turn out so well, especially when
15   the connection with management to the Yakuza became
16   evident.
17       Q.  You mean that Zuffa did not know before it
18   paid $47 million to the owners of Pride that Pride
19   had a relationship with organized crime in Japan?
20       MR. WIDNELL:  Objection, form.
21   BY THE WITNESS:
22       A.  I don't know whether they had knowledge of
23   it, but it didn't play out the way they had
24   anticipated.
25       Q.  Well, wasn't it notorious that Pride's

493

1    owners had a relationship with organized crime in
2    Japan?
3        MR. WIDNELL:  Objection, form.
4    BY THE WITNESS:
5        A.  Well, I say here "Nothing would prevent
6    him from using his local connections, including his
7    alleged connections to Japanese organized crime."
8    So somebody had some suspicions and how those
9    played out I don't know, but I know that management
10   had to be replaced.
11       Q.  Turn to paragraph 60, please.
12       A.  Yes.
13       Q.  The third sentence -- or the sentence
14   beginning "One of Zuffa's key business
15   initiatives"; do you see that?  Starts about midway
16   through the paragraph.
17       A.  Yes.
18       Q.  It says "One of Zuffa's key business
19   initiatives was an expansion of its events to
20   include international offerings and for developing
21   new markets for MMA outside the United States"; do
22   you see that?
23       A.  Yep, that was one of their initiatives.
24       Q.  What new markets?
25       A.  Well, they tried to run some stuff in

494

1    Asia.  My understanding is they've tried to run
2    things in Europe.  How successful they've been I
3    don't know.
4        Q.  Turn to paragraph 96, please.
5        A.  Yes.
6        Q.  In the last sentence on -- of paragraph 96
7    on page 42 that begins "In this regard"; do you see
8    that?
9        A.  Uh-huh.
10       Q.  You write "In this regard it is noteworthy
11   that in Asia, which is one of the other geographic
12   market for MMA identified by Dr. Singer, he cites
13   one championship's claim that it has a 90 percent
14   market share"; do you see that?
15       A.  Yes.
16       Q.  Why is that noteworthy?
17       A.  Well, one has a 90 percent market share,
18   it's not as if nobody can compete against --
19   against Zuffa and Zuffa's actually tried to compete
20   in that marketplace and hasn't been so
21   successful.
22       Q.  The 90 percent figure is of the Asian MMA
23   market; is that right?
24       A.  Yes.
25       Q.  All right.  You can put that aside.

495

1        MR. WIDNELL:  When you say put that aside,
2    you mean the report?
3        MR. CRAMER:  Oh, no.  I still have more
4    from the report.
5        THE WITNESS:  Darn.  I was putting it
6    aside.
7        MR. CRAMER:  Yeah.  Yeah.
8        MR. WIDNELL:  That was cruel.
9    BY MR. CRAMER:
10       Q.  Well, before I go back to the report --
11   turn to paragraph 201.  In the first two sentences
12   you say "In his regression assessing common impact
13   Dr. Singer only considers the impact of the
14   contractual restrictions in PAR contracts that he
15   claims extend the period of exclusivity when an
16   athlete is under contract to Zuffa.  Similarly,
17   when computing damages using his foreclosure
18   regression benchmark, Dr. Singer only estimates the
19   harm due to the alleged foreclosure provisions."
20       What do you mean by that?
21       A.  I mean you have a list of challenged
22   conduct and not all of it goes into the calculation
23   of his -- his foreclosure shares.  You know, you
24   have to put all of the alleged conduct in front of
25   me because it's late in the day.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

496

1    Q. Well, you list some of them in the next
2    sentence.
3    A. Yeah.
4    Q. There's the horizontal acquisitions, the
5    counter programming; do you see that?
6    A. Yeah.
7    Q. And what you're saying is that the -- at
8    best the foreclosure analysis only considers the
9    impact from the challenged -- contractual
10   restrictions in the par contracts; is that right?
11   A. Yeah.
12   Q. All right. You can put that aside for a
13   minute.
14   Who's Joe Silva?
15   A. Isn't Joe Silva the --
16   Q. Well, I'll refresh your recollection.
17   Turn to paragraph 61.
18   A. Yeah. There are actually two people in
19   this case with the last name of Silva.
20   Q. That's true. There's a fighter. Turn to
21   paragraph --
22   A. What page?
23   Q. Paragraph 61, footnote 9 -- 94.
24   A. Paragraph 61, footnote 94.
25   Q. Right. In footnote 94 you cite the

497

1    deposition of Joe Silva, right?
2    A. Yes.
3    Q. Does it refresh your recollection that he
4    was the matchmaker for Zuffa?
5    A. Yes, it does.
6    Q. Does it sound right that he worked for
7    Zuffa from about 2001 to 2016?
8    A. That's familiar, but if you asked me to
9    verify that those are the dates, don't do that.
10   Q. Okay. Are you aware that he also
11   negotiated fighter contracts with some of the
12   fighters?
13   A. Yes.
14   Q. Are you aware that he worked for Zuffa
15   prior to the -- worked for the UFC prior to the
16   UFC's acquisition of Zuffa?
17   A. So he was carried over as an element of
18   management.
19   Q. Yes.
20   A. Yes.
21   MR. WIDNELL: I'm sorry. You mean prior
22   to Zuffa's acquisition of UFC?
23   MR. CRAMER: Yes.
24   THE WITNESS: Isn't that what he said?
25   MR. WIDNELL: He said UFC acquisition of

498

1    Zuffa.
2    THE REPORTER: One at a time, please.
3    BY MR. CRAMER:
4    Q. Let me ask the question again. Thank you.
5    Are you aware that Mr. Silva, Joe Silva worked for
6    the UFC prior to Zuffa's acquisition of the UFC?
7    A. I think I agreed to that.
8    Q. Okay. All right. And in paragraph 61 you
9    are citing Joe Silva as an authority about the
10   types of athletes necessary to run a successful MMA
11   promotion; is that fair?
12   MR. WIDNELL: Objection, form.
13   BY THE WITNESS:
14   A. It's more about a process of identifying
15   those athletes.
16   Q. And you believe he's a knowledgeable
17   resource on that topic?
18   A. He's a participant.
19   Q. And do you believe he's a reliable source
20   regarding the quality of MMA talent?
21   A. He's reliable for --
22   MR. WIDNELL: Objection, form.
23   BY THE WITNESS:
24   A. -- for the purposes that I used here.
25   Q. And one of the purposes for which you used

499

1    him here was what it takes to successfully run an
2    MMA promotion; is that right?
3    A. Yes.
4    Q. Turn to paragraph 76, please. In footnote
5    129 you'll see that you -- here again is the
6    deposition of Joe Silva, you cite him again; is
7    that right?
8    A. Yes.
9    Q. And you cite him here when discussing
10   Zuffa's competition for what you call,
11   quote/unquote, named fighters; is that right?
12   MR. WIDNELL: I'm sorry. What are you
13   referring to?
14   BY MR. CRAMER:
15   Q. The last sentence of paragraph 76 says
16   "Since Zuffa's inception it has been outbid for
17   what Joe Silva called 'named fighters' by other MMA
18   promotions"; do you see that?
19   A. Yes. Excuse me.
20   Q. And you cite Mr. Silva's deposition for
21   that proposition; is that right?
22   A. Yes.
23   Q. Would you agree that Mr. Silva's a
24   reliable source regarding MMA fighter talent
25   acquisition?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099