# EXHIBIT 4

**01/30/2018 - Transcript Excerpts from Second Deposition of Guy A. Davis**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEVADA

```
_____
                              )
CUNG LE, NATHAN QUARRY, JON   )
FITCH, BRANDO VERA, LUIS      )
JAVIER VAZQUEZ, and KYLE      )
KINGSBURY, on behalf of       )
themselves and all others     )   Case No.
similarly situated,           )
                              )   2:15-cv-01045-
        Plaintiffs,           )   RFB-(PAL)
                              )
vs.                           )
                              )
ZUFFA, LLC, d/b/a ULTIMATE    )
FIGHTING CHAMPIONSHIP and     )
UFC,                          )
                              )
        Defendants.           )
_____)
```

VOLUME 2

VIDEOTAPED DEPOSITION OF GUY A. DAVIS, CPA

Washington, D.C.

Tuesday, January 30, 2018

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 175

```
                January 30, 2018
                   10:56 a.m.


     Videotaped Deposition of GUY A. DAVIS, CPA,
held at the offices of Boies Schiller Flexner
LLP, 1401 New York Avenue, N.W., Washington,
D.C., pursuant to the Federal Rules of Civil
Procedure, before John L. Harmonson, a Registered
Professional Reporter and Notary Public of the
District of Columbia, who officiated in
administering the oath to the witness.
```

Page 176

```
              A P P E A R A N C E S

On behalf of the Plaintiffs:
     COHEN MILSTEIN SELLERS & TOLL, PLLC
     1100 New York Avenue, N.W.
     Suite 500, East Tower
     Washington, D.C.  20005
     BY:  RICHARD A. KOFFMAN, ESQ.


On behalf of the Defendants:
     BOIES SCHILLER FLEXNER, LLP
     1401 New York Avenue, N.W.
     Washington, D.C.  20005
     BY:  EVAN E. NORTH, ESQ.
          STACEY KAMYA GRIGSBY, ESQ.


ALSO PRESENT:
     THOMAS KARWACKI, Legal Video Specialist
```

Page 177

```
              EXAMINATION INDEX
WITNESS                               PAGE
GUY A. DAVIS, CPA
  Examination by Mr. North            179

                  * * *

              EXHIBIT INDEX
EXHIBIT NO.      DESCRIPTION         PAGE
Davis Exhibit 1  Expert Report of Guy Davis   180
Davis Exhibit 2  Rebuttal Expert Report of    180
                 Guy Davis
Bidarian Exhibit 12  Goldman Sachs            264
                 Confidential Memorandum
```

Page 178

```
---------------------------------------------------
              P R O C E E D I N G S
                  10:56 a.m.
---------------------------------------------------
          THE VIDEOGRAPHER:  We are now on the
record.  This begins disk number 1 in the
deposition of Guy Davis, in the matter of
Cung Le, et al. v. Zuffa, LLC, d/b/a
Ultimate Fighting Championship and UFC, in
the United States District Court for the
Eastern District of Nevada, Docket Number
2:15-cv-01045-RFB-(PAL).
          Today is Tuesday, January 30, 2018,
and the time is 10:56 a.m.  This deposition
is being taken at 1401 New York Avenue,
Northwest, Washington, D.C., at the request
of Bois Schiller Flexner, LLP.
          The videographer is Thomas Karwacki of
Magna Legal Services, and the court reporter
is John Harmonson of Magna Legal Services.
          Will counsel and all parties present
state your appearances and whom they
represent, please.
          MR. NORTH:  Good morning.  Evan North
```



Page 179

1  for defendant, Zuffa, LLC.
2      MS. GRIGSBY:  Stacey Grigsby, Boies
3  Schiller & Flexner, for Zuffa, LLC.
4      MR. KOFFMAN:  Rich Koffman, Cohen
5  Milstein, for plaintiffs.
6      THE VIDEOGRAPHER:  Will the court
7  reporter please swear in the witness.
8  Whereupon,
9           GUY A. DAVIS, CPA,
10 after having been first duly sworn or affirmed,
11 was examined and did testify under oath as
12 follows:
13               - - -
14           EXAMINATION
15 BY MR. NORTH:
16   Q.   Good morning, Mr. Davis.  You've been
17 deposed in this case before, so I'll skip a lot
18 of the formalities today.
19   A.   Okay.
20   Q.   But I'll just say that if you don't
21 understand a question, please let me know.  And
22 if you answer, I'll assume you understood the
23 question.  Is that fair?
24   A.   That's fair.

Page 180

1       (Exhibit 1, previously marked for
2   identification, is attached hereto.)
3       (Exhibit 2 marked for identification
4   and attached hereto.)
5  BY MR. NORTH:
6    Q.   So for reference today I have handed
7  you a document marked G. Davis Exhibit 1 that was
8  introduced at your first deposition.  It's your
9  original expert report in this case.
10      And I've also handed you your rebuttal
11 report which has been premarked G. Davis
12 Exhibit 2.
13      Do you have those documents?
14   A.   I do.  May I take a second to look at
15 them?
16   Q.   You may.
17   A.   Yes, these both appear to be complete
18 copies of both reports.
19   Q.   Are there any matters on which you
20 disagree with Elizabeth Davis that you don't note
21 in one of your reports?
22      MR. KOFFMAN:  Object to the form.
23      THE WITNESS:  I'm not -- I'm not sure
24 I can answer that with certainty.  She makes

Page 181

1  a lot of points in her lengthy original
2  report.  I think -- I think the counsel has
3  instructed me to address certain of her
4  points that she makes in her report in my
5  rebuttal.  But I can't think of any off the
6  top of my head.
7  BY MR. NORTH:
8    Q.   Can you turn to page 8 of your
9  original report, please.
10      Is this a complete list of the
11 assignments you received from plaintiffs' counsel
12 as of the date of your original report?
13   A.   Yes.  And it goes on to page 9.  Yes.
14   Q.   Let's look at page 9, Number 5,
15 entitled "Financial Capacity."
16      Is it correct that your assignment
17 here was to determine whether Zuffa had the
18 financial capacity to pay more compensation to
19 its fighters than the actual amounts paid?
20   A.   Yes.
21   Q.   And as part of your work in preparing
22 your original report, you didn't attempt to
23 determine how much more Zuffa could have paid
24 fighters, did you?

Page 182

1    A.   I did not.
2    Q.   Did you have all of the relevant data
3  available to you to perform such an analysis?
4    A.   Since the first report, there were a
5  few extra financial statements that were provided
6  to us between the date of the first report and
7  the second report.  I believe in particular they
8  related to 2016.  And there may have been one or
9  two other pieces of information that were relied
10 upon in preparing my second report that I may
11 have obtained through independent research.
12      But with the exception of those two, I
13 think a lot of the data that I had in connection
14 with my original report was much of the same data
15 that I used to prepare the second report.
16   Q.   You mentioned that there were a few
17 extra financial statements provided to us.  What
18 does the "us" refer to?
19   A.   To Protiviti; to my firm.
20   Q.   And why were those provided to
21 Protiviti?
22      MR. KOFFMAN:  Object to the form.
23      THE WITNESS:  We asked for them.  I
24 don't believe -- we asked for them -- I



Page 183

```
 1       think we asked for them in the original
 2       report as well, but I don't think they had
 3       been produced yet.  And then we asked for
 4       them again, and when we did the second
 5       report they were available.
 6   BY MR. NORTH:
 7       Q.   Do you know one way or another whether
 8   plaintiffs' counsel already had possession of
 9   those reports when you served your original
10   expert report?
11       A.   I do not know.
12       Q.   But you asked for the reports before
13   the original report and you did not receive them.
14   Is that fair?
15           MR. KOFFMAN:  Objection; asked and
16       answered.
17           You can answer it again.
18           THE WITNESS:  I believe it was more of
19       a general request in connection with the
20       original report, could we have all the
21       available audited financial statements for
22       Zuffa.
23           The two reports that I'm referring to
24       are kind of unique.  I don't believe -- I
```

Page 184

```
 1       mean, they're unique in the sense that there
 2       were two different financial statements.  It
 3       was a presale stub period in 2016 and then
 4       there was a separate report for the post
 5       sale.
 6           So, you know, I think the accounting
 7       reports were prepared in connection with the
 8       sale, so they were sort of outside the
 9       ordinary course of Zuffa's traditional audit
10       process.  So that may have distinguished
11       them from others.
12           But originally we asked for all the
13       audited financial statements that were
14       available.  We received through 2015.  And
15       then in connection with the second report we
16       were given a separate file.  I don't
17       honestly know or recall the timing or where
18       they came from, but we were given a separate
19       file that had presale data that was relevant
20       to the rebuttal report.
21   BY MR. NORTH:
22       Q.   Before your first deposition,
23   plaintiffs never asked you at any point to
24   determine how much more Zuffa could have paid
```

Page 185

```
 1   fighters as part of your assignment.  Is that
 2   correct?
 3       A.   That's correct.
 4       Q.   Before the date of your last
 5   deposition, you never performed computations in
 6   any way to determine how much more Zuffa could
 7   have paid fighters.  Is that correct?
 8       A.   Well, I made the determination as part
 9   of my original report that they could pay more.
10   So I did -- I did look at the amount of
11   distributions that were paid and the profits of
12   the company.  And it wasn't difficult to
13   determine that there was a capacity to pay more.
14   But I did not do a detailed analysis to determine
15   how much more they could have paid.
16       Q.   Do you recall testifying that the
17   reason you contemplated a hypothetical shift of
18   income from Zuffa's original equity holders to
19   the athletes was to rebut a possible argument on
20   behalf of Zuffa that they couldn't afford to pay
21   more?
22       A.   I do.
23           MR. KOFFMAN:  Object to the form.
24           Sorry.  Go ahead.
```

Page 186

```
 1           THE WITNESS:  Excuse me.  I do.
 2   BY MR. NORTH:
 3       Q.   But despite anticipating that argument
 4   from Zuffa before your last deposition, you did
 5   not seek to calculate how much more Zuffa could
 6   afford to pay.  Is that right?
 7           MR. KOFFMAN:  Objection; asked and
 8       answered.
 9           You can answer.
10           THE WITNESS:  Yes.
11   BY MR. NORTH:
12       Q.   Let's turn to the list of assignments
13   in your rebuttal report, Exhibit 2, starting on
14   page 7.
15           In Paragraph 5 you state that counsel
16   instructed you to determine how much more Zuffa
17   could have paid its fighters assuming alternative
18   but feasible expense and capital structures.
19           Is that correct?
20       A.   Yes.
21       Q.   Did you use any information for that
22   analysis that was not available to you at the
23   time you prepared your original report?
24           MR. KOFFMAN:  Object to the form.  I
```



Page 187

```
 1      believe he's answered that, but you can
 2      answer it again.
 3          THE WITNESS:  The only -- the only
 4      information that I had that was new was the
 5      2016.  All the other information from 2005
 6      to 2015 I had.
 7  BY MR. NORTH:
 8      Q.  And I think you testified previously
 9  that you didn't know one way or another whether
10  those documents were actually available to you.
11  Is that correct?
12          MR. KOFFMAN:  Objection; asked and
13      answered.
14          THE WITNESS:  I think my response was
15      we made a general request for audited
16      financial statements.  I had assumed we
17      received everything that was available, and
18      then subsequently, when they -- when I was
19      asked to do the analysis of how much more
20      they could pay, I asked again if there was
21      information available for 2016.
22  BY MR. NORTH:
23      Q.  Would you have been able to perform
24  the analysis in your rebuttal report when you did
```

Page 188

```
 1  your original report even though you didn't have
 2  those two additional financial statements?
 3          MR. KOFFMAN:  Object to the form.
 4          THE WITNESS:  I would have had to make
 5      assumptions about 2016 or I would have had
 6      to limit the analysis to the period ending
 7      December 31, 2015.  I could have done an
 8      analysis, but it wouldn't have been as
 9      thorough as the one that's done here.
10  BY MR. NORTH:
11      Q.  In Paragraph 4 of your rebuttal report
12  you state that "Zuffa's expert, Elizabeth Davis,
13  opined that Zuffa could not have afforded to pay
14  the damages as set forth in the Plaintiffs'
15  expert reports submitted by Drs. Zimbalist and
16  Singer."
17          Do you see that?
18      A.  Yes.
19      Q.  Is that the opinion you are responding
20  to in your rebuttal report?
21      A.  Yes.
22      Q.  Are you responding to any other
23  opinions from Zuffa's experts?
24      A.  I don't think so.
```

Page 189

```
 1      Q.  And Ms. Davis opined using the damages
 2  numbers provided by plaintiffs' experts.  Is that
 3  right?
 4      A.  Yes.
 5      Q.  And those numbers are 972 million from
 6  Dr. Zimbalist and 848 million from Dr. Singer for
 7  one model, and 1.6 billion from Dr. Singer for
 8  another model.  Is that generally accurate?
 9      A.  I'll take your word for it.  It seems
10  accurate to me.  I don't have the exact numbers
11  in front of me.
12      Q.  Okay.  Other than plaintiffs'
13  economists' numbers, is it your understanding
14  that Elizabeth Davis offered an opinion regarding
15  the financial effect of increasing fighter
16  compensation by some other amount?
17          MR. KOFFMAN:  Object to the form.
18          THE WITNESS:  I'm sorry.  Could you
19      repeat that question again?
20  BY MR. NORTH:
21      Q.  Sure.
22          So backing up a second.  Paragraph 4,
23  you acknowledged that Elizabeth Davis's opinion
24  regards whether Zuffa could have afforded to pay
```

Page 190

```
 1  the damages provided by plaintiffs' experts.  Is
 2  that right?
 3      A.  Well, to be clear, the next sentence
 4  makes it -- makes it more specific.  Ms. Davis
 5  said that if there is no increased market output,
 6  that Zuffa could not have afforded to pay the
 7  damages set forth by Dr. Zimbalist and
 8  Dr. Singer.
 9          My rebuttal report says that if you
10  assume no additional market output, this is what
11  Zuffa could have afforded to pay.
12          But in both her report and my report,
13  the assumption is that there is no increased
14  market output despite the fact that the
15  economists have said that there would be.
16      Q.  I see.  So setting aside increased
17  market output, does Ms. Davis opine on Zuffa's
18  ability to pay any amounts other than the damages
19  estimates provided by plaintiffs' experts?
20          MR. KOFFMAN:  Object to the form.
21          THE WITNESS:  I don't believe so.
22  BY MR. NORTH:
23      Q.  In Paragraph 6 of your rebuttal
24  report, under Opinion 1, you state that Zuffa
```



Page 191

1  could have paid its fighters between
2  525.2 million and 706.7 million more than the
3  amounts actually paid and remained a financially
4  healthy company providing certain changes were
5  made to the company's expense and capital
6  structure.
7      Is that right?
8      A.  I'm sorry, were you at page 6 or
9  Paragraph 6?
10     Q.  I'm sorry, page 10, Paragraph 6.  Your
11 summary of opinions.
12     A.  Yes.  Could you repeat the question,
13 please?
14     Q.  Certainly.
15     So under Opinion Number 1, you state
16 that Zuffa could have paid its fighters between
17 525.2 million, Scenario 1, and 706.7 million,
18 Scenario 6, more than the amounts actually paid
19 and remained a financially healthy company
20 offering substantial returns for its investors
21 without the benefit of any additional growth in
22 the MMA industry.
23     Did I read that right?
24     A.  Yes.

Page 192

1      Q.  You did not determine that Zuffa could
2  have afforded to increase athlete compensation by
3  more than 706.7 million.  Is that right?
4      MR. KOFFMAN:  Object to the form.
5      THE WITNESS:  I didn't put a scenario
6  in here that would allow Zuffa to pay more
7  than 706, but I was conservative in
8  constructing this.  There are other
9  scenarios where they could have paid more
10 than 706, but I limited my analysis to these
11 six scenarios.
12     The real point of the report is that
13 there's any number of scenarios wherein
14 Zuffa could have paid, you know, 500 to
15 $700 million more to its fighters.  And the
16 purpose of setting forth six different
17 scenarios is just to present some examples
18 of what some of those scenarios are.
19 BY MR. NORTH:
20     Q.  And Scenario 6 offers the highest
21 amount of increased compensation.  Is that fair?
22     A.  It's the highest amount that I
23 included in my report, yes.
24     Q.  Were there any additional amounts that

Page 193

1  you concluded that Zuffa could have afforded to
2  pay that you did not include in your report?
3      A.  There are other scenarios where you
4  could pay more than 706, as I mentioned.  I
5  elected not to put them in my report because I
6  wanted my report to be conservative.
7      Q.  And do you intend to offer an opinion
8  at trial on those scenarios?
9      A.  No.
10     Q.  So you, in this report, did not
11 determine that Zuffa could have afforded to
12 increase athlete compensation by more than
13 706.7 million.  Is that true?
14     MR. KOFFMAN:  Object to form.
15 BY MR. NORTH:
16     Q.  Is that correct?
17     A.  That is correct.
18     Q.  Would you agree that the increased
19 compensation amounts in all six of your scenarios
20 reflect amounts that are less than the damages
21 figures offered by Dr. Singer and Dr. Zimbalist?
22     A.  Mathematically, numerically they are
23 smaller numbers.  But these are not presented in
24 my report as alternative damage numbers.  These

Page 194

1  are -- the analysis here and the conclusions are
2  limited to the meaning that's associated with
3  them based on my instructions.  This is not an
4  alternative damages analysis.  This is a capacity
5  to pay analysis, which is what I was asked to do.
6      Q.  Did you attempt to determine the upper
7  bound of how much Zuffa could have increased
8  fighter compensation while remaining a
9  financially healthy company?
10     A.  Well, as I said before, I prepared the
11 analysis in a conservative fashion such that I
12 limited the analysis to Scenario 6, which is
13 38 percent of sales revenues.  But I did not
14 endeavor to calculate what the maximum possible
15 amount was.
16     If you -- as I mentioned, the analysis
17 I've done here is conservative so that the
18 financial health of the company is very strong
19 under any of these scenarios.  If I were less
20 conservative, the number would be higher.  And if
21 you assumed a higher market output, the number
22 would be higher as well.
23     So you could infer from this data that
24 with those two adjustments that these

Page 195

```
 1  compensations would fall within the range of what
 2  Dr. Singer and Dr. Zimbalist have opined.  But
 3  having said that, this is not an alternative
 4  damages analysis.
 5      Q.  In your report, did you analyze
 6  whether Zuffa could have afforded to pay the
 7  damages set forth by plaintiffs' experts Singer
 8  and Zimbalist?
 9          MR. KOFFMAN:  Object to the form.
10          THE WITNESS:  No.
11  BY MR. NORTH:
12      Q.  Did you analyze in any of your
13  scenarios, whether in your report or not, whether
14  Zuffa could pay $1.6 billion in additional
15  compensation to fighters?
16      A.  No.  But keep in mind the $1.6 billion
17  estimate assumes a larger output.  And I was
18  specifically instructed in the context of this
19  analysis to perform it based on an assumption of
20  no increased market output.
21      Q.  So your analysis -- is it fair to say
22  that your analysis does not address Elizabeth
23  Davis's opinion that Zuffa would have had a
24  cumulative operating loss and negative EBITDA
```

Page 196

```
 1  over the class period if it had increased athlete
 2  compensation by the amount of plaintiffs' damages
 3  estimates?
 4          MR. KOFFMAN:  Object to form.
 5          THE WITNESS:  I'm sorry.  Can you
 6      repeat that question?
 7  BY MR. NORTH:
 8      Q.  Sure.
 9          So is it fair to say that your report
10  does not address Elizabeth Davis's opinion that
11  Zuffa would have had a cumulative operating loss
12  and negative EBITDA over the class period if it
13  had increased athlete compensation by the amount
14  of plaintiffs' damages estimates?
15          MR. KOFFMAN:  Same objection.
16          THE WITNESS:  Well, it addresses it --
17      my report addresses that opinion in a sense
18      that her analysis and her conclusions do not
19      accurately reflect what the capacity of
20      Zuffa was or what capacity that Zuffa had to
21      pay additional fighters.
22          She did not alter the capital
23      structure within the -- within the means
24      that were available to the original equity
```

Page 197

```
 1      holders.  She did not consider the -- well,
 2      she did at one point consider the aviation
 3      expenses in a side note of her report.
 4          But I think the conclusion that she --
 5      that she has in her report is misleading
 6      because she's not really measuring the
 7      value -- the capacity of the company to pay
 8      additional fighter compensation.  She's
 9      merely subtracting the damage number that
10      the economists calculated from the status
11      quo financial statements of the business.
12          And there were many decisions that
13      were made by the original equity holders
14      that could have been made differently that
15      would have afforded anyone -- or enabled the
16      company to pay much higher compensation to
17      its fighters.
18  BY MR. NORTH:
19      Q.  Okay.  I appreciate that, but I think
20  I asked a slightly different question.  And that
21  is:  Is it fair to say that your report does not
22  address Elizabeth Davis's opinion that Zuffa
23  would have had a cumulative operating loss and
24  negative EBITDA over the class period if it had
```

Page 198

```
 1  increased athlete compensation by the amount of
 2  plaintiffs' damages estimates?
 3          MR. KOFFMAN:  Object to the form.
 4      That's exactly the question that he did
 5      answer.
 6          You can answer it again.
 7          THE WITNESS:  I addressed that
 8      specific issue in the sense that I have
 9      calculated what the profits would be and I
10      have calculated what the financial condition
11      of the company would be under alternative
12      capital structures for the amounts that are
13      in my -- the amounts that are set forth in
14      my report.
15          I do not in my report use the exact
16      same number that she has in hers, which I
17      didn't assess the $840 million number that
18      was in one of the economist's reports.  But
19      that wasn't my instruction.
20  BY MR. NORTH:
21      Q.  So looking back at Paragraph 4 of your
22  rebuttal report, you state that "Elizabeth Davis
23  did not address the portions of Dr. Singer's" --
24  "Dr. Zimbalist's and Dr. Singer's reports that
```



Page 199

1  explained the larger industry (larger output
2  market) that would have existed absent the
3  alleged anticompetitive behavior."
4        Did I read that right?
5     A.  Yes, you did.
6     Q.  Are you offering an opinion on the
7  size of the output market that plaintiffs'
8  economists contend would have existed absent the
9  alleged anticompetitive behavior?
10    A.  No.
11    Q.  Did plaintiffs ask you to perform any
12  work that is not described in your rebuttal
13  report?
14        MR. KOFFMAN:  I'm sorry.  Do you mean
15    excluding the original report?
16        MR. NORTH:  Yes.  Thank you.
17        MR. KOFFMAN:  So why don't you ask the
18    question again, I'm sorry, just to make it
19    clear.
20        MR. NORTH:  Sure.  I'll try to clean
21    that up.
22  BY MR. NORTH:
23    Q.  So for purposes of the work that you
24  did for your rebuttal report, did plaintiffs'

Page 200

1  counsel ask you to do any work for the report
2  that is not included in the report?
3     A.  No.
4     Q.  Setting aside what plaintiffs' counsel
5  asked you to do, did you perform any additional
6  work that is not described in your rebuttal
7  report in preparing it?
8     A.  No.  I mean, there were -- there
9  were -- as you can see from the exhibits, we
10  created a comprehensive model, and that model was
11  an evolutionary process.  We created it and then
12  we performed quality controls.  We refined it.
13  So there were previous versions of that same
14  model that -- that existed.  I didn't put every
15  previous version of the model in the report.  But
16  when the model was complete, then our quality
17  control model was also complete.  Then we
18  developed the six scenarios in there in the
19  report.
20        But there is nothing -- there is
21  nothing substantive or there are no conclusions
22  that I have reached in connection with this
23  assignment that are not in my report.
24    Q.  So let's walk through the six

Page 201

1  hypothetical scenarios in the rebuttal report,
2  looking first at Paragraph 6.
3        So in Paragraph 6 at Opinion 1 you
4  state that all of your scenarios assume Zuffa
5  would not have borrowed $320 million in 2007 and
6  2009.  Correct?
7     A.  Yes.
8     Q.  Why do you make that assumption?
9     A.  The underpinnings of this analysis and
10  the point that I had made from the beginning is
11  that Zuffa could afford to pay more money to its
12  fighters by paying less money to its
13  shareholders.  And the $320 million that was
14  borrowed in 2007 and 2009 was used specifically
15  to pay distributions to shareholders.
16        So if I'm doing an analysis to reduce
17  the amount of money to shareholders, you would
18  need to remove that debt from the books in order
19  to determine what the company could afford to pay
20  its shareholders under -- under this analysis.
21  So when you -- when you remove that debt from the
22  books, the interest expense obviously and the
23  principal payments during the class period are
24  much lower, which frees up cash which could be

Page 202

1  paid to fighters, which was the purpose of the
2  analysis that I was doing.
3     Q.  Are you offering an opinion that the
4  loans harmed Zuffa in any way?
5        MR. KOFFMAN:  Object to the form.
6    Ambiguous.
7        THE WITNESS:  They reduced Zuffa's
8    capacity to pay fighters because they had to
9    pay interest expense on those loans.
10  BY MR. NORTH:
11    Q.  But you're not offering an opinion
12  that the loans harmed Zuffa in any way?
13        MR. KOFFMAN:  Object to form.
14        THE WITNESS:  The loans created a cash
15    drain, a cash burden on the company for the
16    entire class period.  And if that is -- if
17    that is -- I don't know that I would
18    characterize that as financial harm, but
19    it's a financial burden.  It's an increased
20    requirement to pay interest expense on those
21    loans.
22  BY MR. NORTH:
23    Q.  Did you examine how the results of
24  these scenarios would have changed if you had not



Page 207

1  column it says $185 million distributed to the
2  equity holders during the class period?
3      Q.  Yes.
4      A.  In my original report I testified that
5  the -- the distribution during the class period
6  was $370 million.  That only went through 2015.
7  So if you add I think it's another $63 million or
8  so for 2016, it's roughly $400 million were
9  distributed -- was distributed in the actual
10 world.  And in the Scenario 3 $185 million is
11 distributed during that comparable period.
12         So that's the -- that's the magnitude
13 of the difference for Exhibit 3 -- I mean for
14 Scenario 3.  And I can go through the other
15 scenarios and give you a range.  But the -- the
16 Scenarios 4, 5 and 6 are going to be --
17 actually --
18     Q.  Why don't we just limit it to
19 Exhibit 3.
20     A.  Okay.  I will say in 4, 5 and 6 a lot
21 more money is distributed.  It's complicated, but
22 I can explain that if you need me to.  In
23 Exhibit 3, the difference is somewhere between
24 the low 400s that was actually paid and

Page 208

1  $185 million that was paid in this hypothetical
2  scenario.
3      Q.  ==But would you agree that your==
4  ==hypothetical distributions are substantially==
5  ==lower than the actual distributions?==
6         MR. KOFFMAN:  Object to the form.
7         ==THE WITNESS:  Yes.  And that's the==
8  ==whole premise of the analysis, is to -- I've==
9  ==taken the -- or I've approached the==
10 ==assignment to say we're paying the==
11 ==shareholders less in distributions and we're==
12 ==paying more to the fighters, and how much==
13 ==more can you do that -- how much can you do==
14 ==that -- how much more can you pay the==
15 ==fighters without creating a financial issue==
16 ==for the company.==
17 BY MR. NORTH:
18     Q.  Did you make any other assumptions
19 that apply to all of your hypothetical scenarios?
20        MR. KOFFMAN:  Object to the form.
21        THE WITNESS:  I believe
22 Paragraph 6 was -- or Paragraph 6 we talk
23 about a few of those.  Those are the two.
24 I'm sure there are many assumptions

Page 209

1  that are saying that would apply to all, but
2  these are the most -- these are the most
3  relevant or the most -- the ones that have
4  the most impact.
5  BY MR. NORTH:
6      Q.  If they appear in some other part of
7  the report, could you direct my attention to
8  where -- what those other assumptions are or tell
9  me what other assumptions are?
10        MR. KOFFMAN:  Object to the form.
11        THE WITNESS:  One second, please.
12 Okay.  One assumption, additional assumption
13 that applies to all the scenarios is that
14 there's several ways that you can get more
15 money to the shareholders.  There's
16 generally three.  You can pay -- excuse me,
17 to the fighters.
18     You can pay the shareholders less
19 money.  You can avoid paying interest on
20 debt that you didn't need to borrow.  And
21 you can shift excess aviation expenses and
22 management fees to the fighters as well.
23     So that third one applied to all six
24 scenarios where excess aviation expenses

Page 210

1  were assumed to be paid to the fighters
2  first and then -- and once that condition
3  was satisfied, then the -- any additional
4  compensation that came to the fighters
5  either came from interest savings or a
6  reduction in shareholder distributions.
7  BY MR. NORTH:
8      Q.  Okay.  And are there any other
9  assumptions that apply to all six scenarios?
10     A.  There's an assumption that there is no
11 increased market, output market; there is no
12 change in the revenues of the company; there's no
13 change in expenses of the company other than
14 fighter comp and aviation and interest.
15        Those are the only ones I can think
16 of.
17     Q.  Okay.  Did you consider making any
18 other assumptions?
19     A.  Well, in the -- in the process of
20 developing the six different scenarios there
21 were -- you know, the reason you build a model is
22 so that you can test different assumptions.  So
23 there were other assumptions that were tested.
24     I tested -- you know, for example in

Page 227

```
 1  fair?
 2      A.  Yes.
 3      Q.  Are you offering an opinion on when
 4  Zuffa's alleged anticompetitive conduct began?
 5      A.  No.
 6      Q.  Are you offering an opinion on when
 7  the alleged anticompetitive conduct harmed
 8  Zuffa's competitors?
 9      A.  No.
10      Q.  You state in Paragraph 12 that in
11  Scenarios 1 through 3 operating cash is used to
12  retire all outstanding long-term debt by December
13  31, 2009.  Correct?
14      A.  Are you referring to the sentence that
15  says, "The funds produced from operations..."?
16      Q.  I am, yes.
17      A.  That would be -- if the funds produced
18  from operations are accumulated from operations
19  without the excess of -- without the extra debt
20  and the excessive aviation expenses, so cash is
21  accumulating during this time period.  And then
22  at the end of 2009 the company had sufficient
23  cash to pay off all of its debt, even the debt
24  that it borrowed excluding the $320 million, so
```

Page 228

```
 1  what I call discretionary distribution debt.
 2      Q.  And how did you choose the date
 3  December 31, 2009?
 4      A.  That was the date on which the
 5  cumulative cash balance was sufficient to pay off
 6  all the debt.
 7      Q.  Is it your understanding that that
 8  date is prior to the beginning of the class
 9  period in this case?
10      A.  Yes.
11      Q.  Is it your opinion that Zuffa should
12  not have a capital structure that reflects debt?
13          MR. KOFFMAN:  Object to the form.
14          THE WITNESS:  It's my opinion that
15      they could have elected one.  They could
16      have chosen one that didn't have any debt.
17  BY MR. NORTH:
18      Q.  Are you offering an opinion --
19      A.  Let me restate that.
20          In Scenarios 1, 2 and 3, Zuffa,
21  because they were paying the higher compensation
22  beginning in 2005, required some level of debt in
23  order to complete the, I think it was the Pride
24  acquisition; it was $54 million in it might have
```

Page 229

```
 1  been 2007.  They needed the debt.  Because I
 2  began the increased fighter compensation earlier.
 3          In Scenarios 4 through 6 where I
 4  didn't increase fighter compensation until the
 5  beginning of the class period, they had enough
 6  cash on hand such that they didn't need to borrow
 7  any debt and they could still buy Pride and
 8  StrikeForce and meet all their other financial
 9  obligations.
10      Q.  So is it fair to say, based on your
11  analysis, that in Scenarios 1 through 3,
12  increasing fighter compensation by the amounts in
13  the scenarios partially required the company to
14  take on some debt?
15          MR. KOFFMAN:  Object to the form.
16          THE WITNESS:  In Scenarios 1 through
17      3, yes.  Which I've modeled in the report,
18      and then I modeled when they accumulated
19      enough cash to pay it off, they paid it off.
20  BY MR. NORTH:
21      Q.  Are you offering an opinion that
22  Zuffa's actual capital structure was improper?
23      A.  No.  I'm offering an opinion that the
24  original equity holders had the option, if they
```

Page 230

```
 1  chose to do so, to borrow a lot less money than
 2  they did.  And in Scenarios 4 through 6 they
 3  could have elected not to borrow any money.
 4      Q.  Are you offering an opinion that
 5  Zuffa's capital structure was indicative of
 6  anticompetitive conduct?
 7      A.  No.
 8          MR. KOFFMAN:  Object to the form.
 9          THE WITNESS:  No.
10  BY MR. NORTH:
11      Q.  Was Zuffa's capital structure simply
12  not as conservative as your models?
13      A.  That's one way of characterizing it,
14  yes.
15      Q.  Was there any requirement that Zuffa
16  had to retire its long-term debt by
17  December 2009?
18      A.  No.
19      Q.  In Paragraph 12 you also state that
20  "In the first three scenarios, funds produced
21  from operations without the burden of
22  discretionary distribution debt, excess aviation
23  expenses, and management fees are used to pay
24  shareholders the greater of 40 percent of pro
```

Page 243

```
 1      A.   Well, the company had the capacity to
 2   borrow money, particularly in 2010 right before
 3   the class period.  They had $160 million in
 4   normalized EBITDA and they could have borrowed
 5   money.
 6          But I chose to -- but to quantify how
 7   much more they could have borrowed would have
 8   required that I make assumptions about the risk
 9   thresholds and covenants and decision-makers of
10   other third-party creditors, and I didn't want to
11   do that.  I wanted to limit this analysis to -- I
12   wanted to make it more conservative and limit it
13   to scenarios where there was less debt rather
14   than more debt.  So I wasn't relying upon the
15   decision of a bank to put more money into the
16   company.
17      Q.   In each of your scenarios, isn't it
18   true that the pro forma purchase price of Zuffa
19   in 2016 is lower than the actual purchase price
20   of 3.775 million even after taking into account
21   the debt on Zuffa's balance sheet at the time of
22   the acquisition?
23      A.   Yes.
24      Q.   Zuffa's enterprise value was lower
```

Page 244

```
 1   under your pro forma calculations at least in
 2   part due to its higher expense structure.  Would
 3   you agree?
 4      A.   Yes, the majority was because of the
 5   higher expense structure.  And as you can see
 6   from the exhibits, we were holding the valuation
 7   multiple constant and recalculating what the
 8   proceeds would have been under the different
 9   scenarios.  I mean, it's the proper way to do it.
10          It's also the way that Ms. Davis
11   suggested that that type of adjustment be done as
12   well.  In her deposition, she acknowledged that
13   if there was a different EBITDA number, you would
14   hold the multiple constant and recalculate the
15   proceeds.
16          So I'm doing it the way it's supposed
17   to be done, but also consistent with the way
18   Ms. Davis did it.
19      Q.   So you agree there is a relationship
20   between the EBITDA and the valuation of the
21   company?
22      A.   Yes.
23      Q.   Let's turn to a separate section of
24   your report.  Are you aware of the
```

Page 245

```
 1   characteristics of the but-for world as
 2   constructed by plaintiffs' economists?
 3      A.   This is not in my report?
 4      Q.   I'm sorry.  That was a little bit of a
 5   misleading introduction.
 6          In general, are you aware of the
 7   characteristics of the but-for world as
 8   constructed by plaintiffs' economists?
 9          MR. KOFFMAN:  Object to the form.
10          THE WITNESS:  Generally but not
11   specifically.
12   BY MR. NORTH:
13      Q.   Have you considered how those
14   characteristics might affect the analysis in your
15   rebuttal report?
16      A.   No.
17      Q.   Are you aware that one of the elements
18   of the but-for world is increased fighter
19   compensation?
20      A.   Yes.
21      Q.   Do you agree that when you're
22   evaluating a scenario where the fighters are paid
23   more money, you've introduced a but-for world
24   wherein the MMA industry is larger, it has higher
```

Page 246

```
 1   output, and there are more competitors?
 2          MR. KOFFMAN:  Object to the form.
 3          THE WITNESS:  Generally speaking, I
 4   understand that to be the case.
 5   BY MR. NORTH:
 6      Q.   And you would agree that these
 7   characteristics would apply to any hypothetical
 8   involving paying fighters more money?
 9          MR. KOFFMAN:  Object to the form.
10          THE WITNESS:  I believe I testified to
11   this in my earlier deposition.
12   Specifically, I said that the -- in a world
13   where there's larger output, it was not --
14   it was not made clear to me whether Zuffa
15   would be a larger company or a smaller
16   company.  The analysis that I've done here,
17   as I testified before, assumes that there is
18   no change in the market output and there is
19   no change in Zuffa's revenues.  That was the
20   instructions that I was given.
21          But I'm not offering an opinion on
22   what a larger market output would look like
23   and how it would affect Zuffa or any other
24   competitor.
```

MAGNA LEGAL SERVICES

Page 247

```
 1  BY MR. NORTH:
 2      Q.  Could Zuffa be a smaller company in
 3  the but-for world?
 4      A.  I don't know.  I guess it could be.
 5  That would be a question for the economists.
 6      Q.  Could Zuffa's revenues be lower in a
 7  but-for world?
 8          MR. KOFFMAN:  Object to the form.
 9          THE WITNESS:  I'm not certain.
10  BY MR. NORTH:
11      Q.  Would you agree that to perform an
12  analysis of how much more fighters could be paid
13  by Zuffa, you would need to consider a number of
14  factors?
15          MR. KOFFMAN:  Objection; vague.
16          THE WITNESS:  Do you mean including or
17      excluding the larger output?
18  BY MR. NORTH:
19      Q.  I can be specific.
20          Would one factor that you would need
21  to consider be how much money could be paid by
22  foreclosed competitors in a but-for world?
23          MR. KOFFMAN:  Object to the form.
24          THE WITNESS:  If I wanted to calculate
```

Page 248

```
 1      what?
 2  BY MR. NORTH:
 3      Q.  If you wanted to perform an analysis
 4  of how much more fighters could be paid by Zuffa.
 5          MR. KOFFMAN:  Object to the form.
 6          THE WITNESS:  Well, I wouldn't
 7      characterize it that way.  I would say
 8      that you would -- if you are going to
 9      contemplate a larger industry, and you want
10      to know how much Zuffa could pay as it's
11      part of that larger industry, you would need
12      to know whether Zuffa was a larger or
13      smaller company.
14          I think that's different than the way
15      you characterized it, but that's how I would
16      characterize it.  Again, I wasn't asked to
17      make an assumption on whether the industry
18      would be larger or smaller.
19  BY MR. NORTH:
20      Q.  Would you agree that, leaving aside
21  the but-for world, Zuffa's EBITDA would decrease
22  if it increased athlete compensation and held
23  everything else constant?
24      A.  Yes.
```

Page 249

```
 1      Q.  In testing the effect of Zuffa paying
 2  higher fighter compensation, did you consider how
 3  Zuffa paying higher fighter compensation would
 4  affect the size of the MMA market?
 5      A.  No.
 6      Q.  Are you offering an opinion on whether
 7  the compensation Zuffa pays athletes would affect
 8  the size of the MMA market?
 9      A.  I'm sorry.  Could you repeat that
10  again?
11      Q.  Are you offering an opinion on whether
12  the compensation Zuffa pays athletes would affect
13  the size of the MMA market?
14      A.  I'm not offering an opinion on that.
15  I believe the economists are covering that topic.
16      Q.  Did you consider how Zuffa paying
17  higher fighter compensation would affect the
18  number of competitors in the market?
19      A.  No.
20      Q.  Are you offering an opinion on it?
21      A.  No.
22      Q.  You previously testified that you did
23  not know whether Zuffa would be larger or smaller
24  if it increased athlete compensation at your
```

Page 250

```
 1  previous deposition.  Do you recall that?
 2      A.  Yes.
 3      Q.  Did you consider how Zuffa paying
 4  higher fighter compensation would affect Zuffa's
 5  size in your rebuttal report?
 6      A.  I assumed that Zuffa's size would not
 7  change at all in my rebuttal report.  This is
 8  simply an analysis to determine at the same size
 9  how much more could they have paid.
10      Q.  And on page 10, at Paragraph 6, you
11  state that "Additional growth in the MMA industry
12  would be a benefit to Zuffa."
13          Do you see that on the third line of
14  Opinion 1?
15          MR. KOFFMAN:  Sorry.  Where are you?
16          MR. NORTH:  Page 10, Paragraph 6,
17      Opinion 1, the third line.
18  BY MR. NORTH:
19      Q.  The clause of that sentence states:
20  "without the benefit of any additional growth in
21  the MMA industry."
22          Do you see that?
23      A.  Yes.
24      Q.  In what way would additional growth in
```



20 (Pages 247 to 250)