# EXHIBIT 5

## 10/27/2017 - Expert Opposition Report of Elizabeth K. Davis

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case 2:15-cv-01045-RFB-PAL |
| Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, | ) ) ) | |
| Defendant. | ) | |

# EXPERT REPORT OF ELIZABETH KROGER DAVIS

Dated: October 27, 2017

Elizabeth Kroger Davis

# CONTENTS

I.     INTRODUCTION ...................................................................................................... 3

II.    PROFESSIONAL EXPERIENCE................................................................................ 3

III.   BACKGROUND ....................................................................................................... 4

IV.    SCOPE OF ASSIGNMENT ...................................................................................... 8

V.     SUMMARY OF OPINIONS ..................................................................................... 9

VI.    ALLOCATING PLAINTIFFS' DAMAGES TO THE BOUT CLASS RESULTS IN
       INCREASES TO ATHLETE COMPENSATION OF MANY MULTIPLES OF THEIR
       ACTUAL COMPENSATION .................................................................................... 13

VII.   APPLYING PLAINTIFFS' DAMAGES ESTIMATES TO ZUFFA'S FINANCIAL
       STATEMENTS RESULTS IN MILLIONS OF DOLLARS OF LOSSES DURING THE
       CLASS PERIOD........................................................................................................ 21

   A.   Zuffa's Financial Results .................................................................................... 22

   B.   Comparison of Zuffa's Financial Results to Dr. Zimbalist's Damages ......................... 23

   C.   Comparison of Zuffa's Financial Results to Dr. Singer's Damages .............................. 26

VIII.  STRIKEFORCE AND BELLATOR EACH LOST MILLIONS OF DOLLARS AS A
       RESULT OF THEIR COST STRUCTURES................................................................ 29

   A.   Bellator ........................................................................................................... 30

   B.   Strikeforce ....................................................................................................... 33

IX.    PLAINTIFFS' EXPERTS UNDERSTATE ZUFFA'S COMPENSATION OF
       ATHLETES ............................................................................................................. 34

X.     DR. ZIMBALIST UNDERESTIMATES COSTS INCURRED BY ZUFFA IN
       MARKETING AND PRODUCING ITS CONTENT FOR BROADCAST .................... 41

XI.    ZUFFA'S FINANCIAL RESULTS WERE HIGHLY DEPENDENT ON VARIABLE
       REVENUE STREAMS ............................................................................................. 45

XII.   THE LENDERS TO ZUFFA ON ITS TERM LOAN AND CREDIT FACILITIES
       RECOGNIZED THAT THE LOAN PROCEEDS WERE TO BE USED TO PAY A
       DIVIDEND TO OWNERS......................................................................................... 50

XIII.  MISCELLANEOUS ................................................................................................. 55

## I.      INTRODUCTION

1. I, Elizabeth Kroger Davis, have been retained by Boies Schiller Flexner LLP ("Counsel")
   on behalf of its client Zuffa, LLC ("Zuffa") in connection with the civil case filed in the
   United States District Court for the District of Nevada captioned as *Le et al. v. Zuffa,*
   *LLC*, Case 2:15-cv-01045-RFB-PAL.

## II.     PROFESSIONAL EXPERIENCE

2. I am a Managing Director with Berkeley Research Group, LLC ("BRG"), a financial and
   economic consulting firm with over 1,000 professionals in offices across the United
   States and internationally.

3. I am a Certified Public Accountant (CPA), registered in Illinois, and I am licensed as a
   Chartered Global Management Accountant.  I am a member of the American Institute of
   CPAs and the Illinois CPA Society.  I have a Master's in Business Administration from
   the University of Chicago Graduate School of Business (now known as the University of
   Chicago Booth School of Business) with a specialization in Finance.  I have a Bachelor's
   in Business Administration with a concentration in Accounting from the Cox School of
   Business at Southern Methodist University in Dallas, Texas.

4. I have provided expert consulting or forensic accounting services on disputes across a
   broad variety of issues and industries, including commercial damages, class certification,
   post-acquisition disputes, business valuation, security valuation, shareholder dilution,
   fraud, Ponzi schemes, contract disputes, and alleged violations of accounting, auditing
   and other professional standards.  My professional experience includes over 25 years of
   providing forensic accounting, expert consulting and expert testimony services, as well as
   serving as a partner at a large international accounting firm.

**HIGHLY CONFIDENTIAL**

5.   Appendix A includes my curriculum vitae, a list of all publications I have authored in the previous 10 years, and a list of all other cases in which, during the previous four years, I have provided a sworn statement or testimony.

### III.   BACKGROUND

6.   This is an antitrust putative class action brought by current and former athletes in professional mixed martial arts ("MMA") against Zuffa.  Zuffa, which does business as the Ultimate Fighting Championship ("UFC"), is a global sports and media company that promotes and produces MMA events.[1]  The plaintiffs purport to represent two classes: a "Bout Class" and an "Identity Class."  The Bout Class is defined as MMA athletes who have competed in one or more live professional UFC bouts, and the Identity Class includes MMA athletes who allegedly had their identities expropriated or exploited by Zuffa, from December 16, 2010 to the present (the "Class Period").[2]

7.   Zuffa purchased the UFC in 2001, at a time when MMA bouts were not sanctioned by most state athletic commissions.  Shortly after its acquisition, Zuffa secured licensing in Nevada and aired its first pay-per-view ("PPV") event on September 28, 2001.[3]   Since that time, Zuffa has transformed the UFC from a struggling business to the most popular MMA promotion in the world through its investments in the brand and the sport.[4]

---

[1] Zuffa Parent LLC – Predecessor Financial Statements – 3_31_17 – vFINAL.pdf.

[2] Consolidated Amended Antitrust Class Action Complaint, December 18, 2015, ¶¶ 3, 27.

[3] ZFL-2509465–518, at 493.

[4] 3/23/2017 Deposition of Lorenzo Fertitta, 147:15-25 ("You've got to understand, when we bought the UFC in 2001, it was probably the most tarnished brand in sports.  I mean, it's hard to get worse than Senator John McCain calling us human cockfighting and then living with that for a number of years as the moniker that when people hear the word UFC, the first thing that comes to mind is human cockfighting.  So through the work and the capital we invested and the business strategies that we put in place, yes, by 2010, I believe that the brand UFC represented something that was a positive."); *id.* at 67:24-25 ("I believe that UFC was the most identified brand in the sport of mixed martial arts.").

**HIGHLY CONFIDENTIAL**

8. Over this same period, regulation and public acceptance of MMA increased. The sport is now sanctioned in 50 states.[5] MMA has grown in popularity, contributing to organic growth of the UFC brand under Zuffa's ownership. Zuffa also has grown through acquisitions of MMA promotions or the assets of other promotions, most notably World Extreme Cagefighting ("WEC") and World Fighting Alliance in 2006, Pride Fighting Championship in 2007, and Strikeforce in 2011.[6]

9. Zuffa's business model has evolved significantly since its inception. In 2001, the Company distributed content predominantly through PPV in the United States, with limited international exposure. Zuffa now broadcasts its events throughout the world via PPV, free-to-air, and cable television, as well as digital media channels, although PPV sales continue to account for most of Zuffa's broadcast revenue.[7]

10. The UFC holds dozens of events a year, typically comprising 12 to 13 PPV bouts as well as numerous other televised events.[8] The athletes in these bouts enter into promotional agreements with Zuffa to participate in the events.[9] As part of these agreements, athletes are paid "Show" compensation, which is their base pay to participate in an MMA bout. Athletes also may be entitled to "Win" compensation, which is an additional payment for winning a bout. Athletes also may be paid performance bonuses and other discretionary

---

[5] ZFL-2649918–989, at 972.

[6] ZFL-1238033–070; ZUF-00374846; ZUF-00304127–171; ZUF-00172283–323.

[7] 4/19/2017 Deposition of John Mulkey, 52:4-7 ("So pay-per-view revenues would be residential pay-per-view on that line item, and that in a vacuum would have been our biggest individual revenue."); 3/23/2017 Deposition of Lorenzo Fertitta, 146:9-19.

[8] ZFL-2649918 – 989, at 939. [Goldman CIM, 2016]

[9] LEPLAINTIFFS- 0076636 – 653, at 649.

bonuses.  Certain athletes receive pay-per-view bonuses for events broadcast on pay-per-view.  Some athletes execute letters of agreement ("LOAs") with Zuffa that call for additional compensation, which may include additional show and/or win compensation or a share of PPV revenue.  Athletes also may receive signing bonuses that are not tied to performance in a particular bout.

11. Zuffa also compensates certain athletes with merchandise royalties, sponsorship payments, and Athlete Outfitting Policy (AOP) payments.

12. By 2015, the UFC had four primary product categories.  Financial results from 2015 reflect about $609 million in revenue—76% of this revenue is attributable to content, 12% to live events, 9% to sponsorships, and 3% to consumer products.[10]  Content revenues included three main categories of revenue:  PPV,[11] International Media Rights and Licensing Fees,[12] and UFC Fight Pass subscriptions.[13]  Live revenue is derived from ticket sales, premium experiences, and site fees for live events.[14] Sponsorship revenue is generated from sales of in-venue and broadcast assets, content/product integrations, rights

---

[10] 12'15 IS YTD Side by Side FINAL.xls

[11] PPV revenue includes:  Residential Linear PPV – consumer purchases through cable or satellite providers in a traditional linear PPV format (Dish, InDemand, DirecTV) per event; Residential Digital PPV – consumer purchases of Digital PPV as an Over-the Top ("OTT") PPV purchase on the company's wholly owned digital platform UFC.tv or a third party platform (Xbox, Apple TV); and Commercial PPV – revenue from events purchased from commercial establishments, like restaurants and bars.  Confidential Information Memorandum, undated, ZFL-2649918-9269989.

[12] Revenue derived from the UFC licensing of non-PPV events and associated programming to cable TV providers, such as Fox in the US.  Confidential Information Memorandum, undated, ZFL-2649918-9269989.

[13] Revenue from UFC Fight Pass, a subscription OTT platform that provides subscribers with exclusive live event access in addition to archived and other exclusive content with subscribers typically paying a monthly fee. Confidential Information Memorandum, undated, ZFL-2649918-9269989.

[14] Zuffa Consolidated and Combined Financial Statements for Years Ended December 31, 2014 and 2015, RAINE-0016847-0016880.  12'15 IS YTD Side by Side FINAL.xls.

to marks, and digital impressions.[15] Consumer products revenue is generated through intellectual property contracts, such as the AOP with Reebok, the video game partnership with EA Sports, merchandise sales, and e-commerce offerings.[16]

13. Zuffa's growth was largely financed from earnings and from various credit facilities.  On June 19, 2007, Zuffa entered into a $350 million senior secured credit facility with a syndicate of banks led by Deutsche Bank.[17]  On October 13, 2009, Zuffa entered into an add-on to the senior security credit facility in the form of a $100 million term loan,[18] and on June 7, 2012, Zuffa entered into an additional add-on in the amount of $60 million.[19] On February 25, 2013, Zuffa completed a refinancing of its senior secured credit facility with a syndicate of banks led by Deutsche Bank, replacing the existing term loan with a term loan of $450 million and a $60 million revolver.[20]  On March 18, 2014, Zuffa

---

[15] Zuffa Consolidated and Combined Financial Statements for Years Ended December 31, 2015 and 2014, RAINE-0016847-0016880. 12'15 IS YTD Side by Side FINAL.xls

[16] Zuffa Consolidated and Combined Financial Statements for Years Ended December 31, 2015 and 2014, RAINE-0016847-0016880. 12'15 IS YTD Side by Side FINAL.xls

[17] This facility consisted of a $325 million term loan and a $25 million revolver.  The proceeds were used to 1) pay the outstanding balance of an existing senior unsecured line of credit; 2) assist with the purchase of Pride/Dream Stage MMA assets; and 3) make a distribution to the Company's owners.  The facility had an interest rate of Libor plus 2% or 6.9375% as of December 31, 2007. The credit facility was secured by substantially all of the Company's assets.  Consolidated Financial Statements of Zuffa, LLC, Years Ended December 31, 2008 and 2007 (ZFL-0000064-0000087)

[18] The proceeds of this loan were used to pay the outstanding balance drawn on the June 19, 2007 revolver of $24.5 million, and to make a distribution to the Company's owners.  The loan had an interest rate of Libor plus applicable margins and Libor floor as defined, for a total rate of 7.5% as of December 31, 2009.  This loan was issued at a discount of $3 million which was recorded as a reduction in debt and amortized to interest expense over the term of the loan.  Consolidated Financial Statements of Zuffa, LLC, Years Ended December 31, 2009 and 2008. (ZFL-0000007-0000030)

[19] This add-on was in the form of a term loan set to Libor, involving a rate of 7.5% as of December 31, 2012. Consolidated Financial Statements of Zuffa, LLC, Years Ended December 31, 2012 and 2011. (ZFL-0000188-0000220)

[20] This refinanced term loan had an interest rate of Libor plus 3.5% with a 1% floor, for a total of 4.5% percent, as of December 31, 2013.  Consolidated Financial Statements of Zuffa, Years Ended December 31, 2013 and 2012 (ZFL-0000221-0000255).

**HIGHLY CONFIDENTIAL**

completed a refinancing of its senior secured credit facility with a syndicate of banks led by Deutsche Bank, replacing the $450 million term loan with a $479.5 million term loan.[21]

14. On July 9, 2016, a buyer group consisting of WME|IMG, SilverLake Partners, and Kohlberg Kravis Roberts signed an agreement to acquire Zuffa for an enterprise value of $4.025 billion.[22]

## IV.   SCOPE OF ASSIGNMENT

15. For this report, counsel asked me to:

    a.  calculate the hypothetical effect of increasing athlete compensation over the Class Period by amounts commensurate with Plaintiffs' damages claims, on (i) Zuffa's audited financial statements, and (ii) the bout compensation of individual athletes in the Bout Class;

    b.  analyze the financial statements of Bellator for the period January 1, 2010 through March 31, 2017, and Strikeforce for the period January 1, 2009 through March 31, 2011, to determine how the share of revenue those promotions paid to athletes impacted the profitability of their business models;

    c.  determine the amount of compensation paid to or on behalf of athletes by Zuffa, and compare to Plaintiffs' experts' calculations of Bout Class and Identity Class compensation;

---

[21] The new loan had a rate of 3.75% as of December 31, 2014.  Consolidated Financial Statements of Zuffa, Years Ended December 31, 2014 and 2013 (ZFL-0000136-0000168).

[22] Confidential Information Memorandum, undated, ZFL-2649918-9269989.

**HIGHLY CONFIDENTIAL**

d. determine whether Dr. Zimbalist's $90 million annual production cost estimate correctly reflects costs that were incurred by Zuffa in the production and promotion of its events during the Class Period;

e. review Zuffa's financial statements during the Class Period to analyze the variable or contracted nature of its main revenue sources; and

f. analyze documents created by Zuffa's lenders to determine whether the lenders understood the proceeds from certain financings would be used to pay a dividend to shareholders.

## V.   SUMMARY OF OPINIONS

16. The following statements constitute a summary of my primary opinions as of the date of this report:

17. **Opinion 1:** I have performed calculations using two of Plaintiffs' experts' estimates of Bout Class damages to determine the impact that such amounts would have on the compensation of individual athletes.  I have performed my calculations two ways: (1) based on the number of bouts fought by each athlete relative to the bouts fought by all athletes in the Bout Class, and (2) based on the athlete's pro rata share of bout compensation relative to the total bout compensation of all athletes in the Bout Class.  In my opinion, Dr. Singer's high-end Bout Class damages estimate of $1.598 billion[23] would have resulted in each athlete receiving, on average, an additional $269,358 for *each bout* fought over the Class Period.  By way of comparison, the median compensation paid per bout during the Class Period was between $21,000 and $36,000.

---

[23] Dr. Singer Report, Table 11, Impact Regression Model.

**HIGHLY CONFIDENTIAL**

Dr. Singer's low-end estimate of Bout Class damages[24] would have resulted in each athlete receiving, on average, an additional $136,778 for *each bout* fought over the Class Period. If allocating damages based on an athlete's pro rata share of bout compensation, my analysis shows that athlete bout compensation would increase on average by 285% using Dr. Singer's high damages estimate and by 145% using Dr. Singer's low damages estimate.

18. **Opinion 2:** I have performed an analysis to determine the hypothetical effect that the damages estimated by Plaintiffs' expert, Dr. Zimbalist, would have had on Zuffa's financial statements if athlete compensation costs had been increased by those amounts. In my opinion, if I account for Dr. Zimbalist's damages of $972 million as incremental athlete compensation, this adjustment would have wiped out Zuffa's net income over the Class Period and created a cumulative *net loss* of $695 million. Using operating income and EBITDA as alternative financial metrics for my analysis, Zuffa would have incurred a cumulative *operating loss* of $290 million and *negative* EBITDA of $199 million.

19. **Opinion 3:** I have performed an analysis to determine the hypothetical effect that the damages estimated by Plaintiffs' expert, Dr. Singer, would have had on Zuffa's net income, operating income, and EBITDA if athlete compensation costs had been increased by those amounts during the Class Period. I used both Dr. Singer's high estimate for total damages of $1.635 billion and his low estimate of $848 million. In my opinion, if I account for these amounts as incremental athlete compensation, the adjustment would have wiped out Zuffa's net income over the Class Period and created a cumulative *net loss* of either $1.400 billion (using the high damages estimate) or $614 million (using the

---

[24] Dr. Singer Report, Table 9, Bellator Benchmark.

low estimate). Using operating income as an alternative financial metric for my analysis, I have determined that Zuffa would have incurred a cumulative *operating loss* of either $897 million (using the high damages estimate) or $111 million (using the low damages estimate) during the Class Period. Zuffa's EBITDA would have been a *negative* $760 million (using the high damages estimate) or *positive* $26 million (using the low estimate) during the Class Period.

20. **Opinion 4:** Plaintiffs' experts use the financial statements of Bellator and Strikeforce to support their opinions. Dr. Singer relies upon these financial statements to compute damages, while Dr. Zimbalist claims the financial statements of Bellator and Strikeforce corroborate his "appropriate and conservative" yardstick for damages, which is based on athlete share of revenue. Both experts note that Bellator paid in excess of 44% of its revenue to athletes,[25] while Strikeforce paid about 63%.[26] But as the financial statements of Bellator and Strikeforce reflect recurring losses, it is my opinion that both entities compensated athletes at unprofitable levels given their respective revenues and cost structures. While Bellator historically has paid its athletes an average of 48% of revenue, its financial statements reveal that it generated *negative gross margins* in each year and *net losses* in every quarterly reporting period from January 1, 2010 to March 31, 2017, culminating in $98.7 million of cumulative *losses* over a seven-year plus period. And, unlike Zuffa, Bellator's financial results do not reflect any financing costs, such as

---

[25] Dr. Singer states that Bellator paid its athletes 44.7% of revenue (Singer Report, ¶ 247), while Dr. Zimbalist states that Bellator paid its athletes 48.5% of revenue (Zimbalist Report, ¶ 130). Dr. Zimbalist clarified in his errata that he calculated his Bellator benchmark for the period 2010 through the second quarter of 2017. Dr. Singer, on the other hand, calculated his Bellator benchmark for the period 2010 to 2015.

[26] Dr. Singer notes that Strikeforce paid its fighters 72.5% of total event revenue in 2010 and 63.7% in 2011. (Singer Report, ¶ 190)

interest or dividends, on the capital necessary to run its business and finance its losses. Similarly, Strikeforce's financial statements also show that it suffered recurring losses, even before taking into account any cost of its capital.

21. **Opinion 5:**   Plaintiffs' experts present alternative measurements of Zuffa's athlete compensation.  Based on my own calculation, it is my opinion that Mr. Davis, Dr. Singer, and Dr. Zimbalist each understate the compensation paid by Zuffa to or on behalf of athletes.   In addition, Plaintiffs' experts are inconsistent in their treatment of certain elements of compensation as Bout Class or Identity Class compensation.

22. **Opinion 6:**   Plaintiffs' expert Dr. Zimbalist states that Zuffa's production costs were approximately $90 million in 2014 and that this amount was the highest of three annual estimates.[27]  In my opinion, this amount reflects a definition of production costs that fails to include millions of dollars of expenditures that Zuffa incurred in each year of the Class Period in the promotion of its events.

23. **Opinion 7:** I have analyzed Zuffa's internal financial statements over the Class Period and, in my opinion, Zuffa's financial results were highly dependent on two variable revenue streams attributable to Content revenue, specifically, PPV events and ticket sales. Zuffa's largest category of Content revenue over the Class Period was PPV revenue, which comprised between 24% and 43% of Zuffa's total revenue in each year.  Ticket sales accounted for approximately 9% to 14% of total revenues in each year.

24. **Opinion 8:**  I have reviewed the Confidential Information Memoranda ("the Confidential Information Memoranda") created by Zuffa's lenders in conjunction with the May 2007 Senior Secured Credit Facilities and the October 2009 Incremental Term Loan to confirm

---

[27] Zimbalist Report, ¶¶ 131, 134.

**HIGHLY CONFIDENTIAL**

whether the lenders understood that one purpose of the financings was to pay a dividend to Zuffa's owners.  In my opinion, Zuffa's lenders recognized that the loan proceeds were to be used to pay a dividend to Zuffa's owners.  It is also my opinion that it would be inconsistent with the applicable financing documents to assume that Zuffa could have obtained financing on the same terms, or at all, if the loan proceeds were to be used to increase athlete compensation (and therefore finance Zuffa's hypothetical losses) rather than pay a dividend.

## VI.   ALLOCATING PLAINTIFFS' DAMAGES TO THE BOUT CLASS RESULTS IN INCREASES TO ATHLETE COMPENSATION OF MANY MULTIPLES OF THEIR ACTUAL COMPENSATION

25. I have performed an analysis using Plaintiffs' experts' calculations of damages to determine the impact that such amounts would have on the compensation of individual athletes if such damages were awarded in this case.  I used two different amounts for damages in my analysis: both the highest figure and the lowest figure that have been measured by Plaintiffs' experts.  I further allocated damages to athletes based on two methodologies: (1) based on the number of bouts fought (ignoring compensation for those bouts); and (2) based on each athlete's pro rata share of total bout compensation.

26. Plaintiffs' experts used different damages methodologies and applied those methodologies to different time periods.  Dr. Zimbalist's damages analysis addressed Bout Class Damages from December 16, 2010 through December 31, 2016 (the "Zimbalist Damages Period").  Dr. Singer's damages analyses addressed both Bout Class Damages and Identity Class Damages from December 16, 2010 through June 30, 2017 (the "Singer Damages Period").  Dr. Singer also provided four alternative methodologies for Bout Class Damages.

27. I first allocated damages to athletes based on the number of bouts fought by each athlete in each year of the Class Period[28] relative to the total number of bouts fought by all athletes in that year.[29]  For example, if there were a total of 500 bouts in a calendar year (meaning there were 1000 athletes who fought in bouts in that year), and Athlete X fought twice in that year, I allocated 2/1000, or .2% of that year's damages, to Athlete X. For purposes of this calculation, I only included Zuffa athletes who fought in a bout during the Class Period.[30]   For purposes of my computation, I relied on data in two spreadsheets that contained detailed compensation data by athlete.[31]

28. In Table 1 below, I summarize the damages per bout participant for each year during the Singer Damages Period, under Dr. Singer's high-end bout damages estimate of $1,597,560,000, which are the results of his Impact Regression Model.

---

[28] My approach is consistent with the methodology proffered by Dr. Zimbalist in deposition who testified that "if the Plaintiffs win this case and if there is a damages amount that's awarded, that the fighters could use that, along with some algorithm they decided upon, like the number fights that they were in or the aggregate attendance at the fights that they were in, to divide up the total damages amongst the fighters."  9/25/2017 Deposition of Dr. Zimbalist, 37:17-25.

[29] I counted as a bout any line item within that data that contained a result of win, loss, draw, DNF, N/A, and N/C, and where both the "Show" compensation and "Total" compensation were greater than zero.  ZFL-2603701; ZFL-2764800.

[30] I understand that the class definition of the Bout Class includes "All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States during the Class Period.  The Bout Class excludes all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought in the United States." Consolidated Amended Antitrust Class Action Complaint, ¶ 39.  For purposes of my calculations I did not consider geographic factors, such as the nationality of the athlete, whether a bout took place in the United States, or whether a bout that took place ex-United States was broadcast in the United States.

[31] ZFL-2764800 for UFC events, and ZFL-2603701 for Strikeforce and WEC events.  Total athlete compensation from these sources differs from the athlete compensation reflected in Zuffa's Internal Financial Statements produced in this matter.  These differences arise because the Internal Financial Statements include additional components of athlete compensation, such as participant insurance, payments under the Athlete Outfitting Policy (AOP), sponsorship payments, fighter royalty payments, and other fighter costs paid by Zuffa.

**Table 1: Damages Per Bout Participant – Dr. Singer's Impact Regression Model**

| | Damages Per Dr. Singer | Number of Bout Participants | Damages Per Bout Participant | Median Compensation Per Bout Participant | Damages as a Percentage of Median |
|---|---|---|---|---|---|
| 2010 | $ 7,960,000 | 22 | $ 361,818 | $ 22,000 | 1645% |
| 2011 | $ 172,300,000 | 795 | $ 216,730 | $ 21,000 | 1032% |
| 2012 | $ 211,600,000 | 809 | $ 261,557 | $ 26,000 | 1006% |
| 2013 | $ 273,900,000 | 805 | $ 340,248 | $ 28,000 | 1215% |
| 2014 | $ 199,800,000 | 1,025 | $ 194,927 | $ 25,000 | 780% |
| 2015 | $ 241,000,000 | 962 | $ 250,520 | $ 29,000 | 864% |
| 2016 | $ 327,300,000 | 1,002 | $ 326,647 | $ 36,000 | 907% |
| 2017 | $ 163,700,000 | 511 | $ 320,352 | $ 36,000 | 890% |
| Total | $ 1,597,560,000 | 5,931 | $ 269,358 | | |

29. Using Dr. Singer's high-end damages estimate of $1,597,560,000, as determined from his Impact Regression Model, and allocating those damages by the number of bouts fought by each athlete results in damages awards of approximately $195,000 to $360,000 *per bout*, depending on the year, with an overall damages average of $269,358 *per bout*. The median compensation per athlete per bout would increase between 780% and 1645%. For example, an athlete who fought one UFC fight in 2015, for which he was paid the median level of compensation of $29,000, would receive an additional $250,520 in compensation, representing an 864% increase. Had that same athlete fought two bouts in 2015, he would be allocated an additional $501,040 of the total damages.

30. Using Dr. Singer's low-end damages estimate of $811,232,000, athletes would be awarded between $100,000 and $230,000 *per bout*, depending on the year of the bout, increasing the median compensation per athlete per bout between 407% and 1058%. For example, an athlete who fought one bout in 2015 and received the median compensation of $29,000 would be awarded an additional $128,639, representing an increase of 444%

in per bout income.  The annual damages per bout using Dr. Singer's low-end damages

estimate, which are the result of his Bellator Benchmark model, is summarized in Table 2

below.

**Table 2: Damages Per Bout Participant – Dr. Singer's Bellator Benchmark**

|  | Damages Per Dr. Singer | Number of Bout Participants | Damages Per Bout Participant | Median Compensation Per Bout Participant | Damages as a Percentage of Median |
|---|---|---|---|---|---|
| 2010 | 5,122,000 | 22 | $ 232,818 | $ 22,000 | 1058% |
| 2011 | 103,164,000 | 795 | $ 129,766 | $ 21,000 | 618% |
| 2012 | 101,297,000 | 809 | $ 125,213 | $ 26,000 | 482% |
| 2013 | 121,657,000 | 805 | $ 151,127 | $ 28,000 | 540% |
| 2014 | 104,173,000 | 1,025 | $ 101,632 | $ 25,000 | 407% |
| 2015 | 123,751,000 | 962 | $ 128,639 | $ 29,000 | 444% |
| 2016 | 168,054,000 | 1,002 | $ 167,719 | $ 36,000 | 466% |
| 2017 | 84,014,000 | 511 | $ 164,411 | $ 36,000 | 457% |
| Total | $ 811,232,000 | 5,931 | $ 136,778 |  |  |

31. I also allocated Plaintiffs' damages based on each athlete's pro rata share of total bout

compensation paid in each year.  This allocation results in damages amounts that are

multiples of each athlete's actual bout compensation.[32]  This can be demonstrated by

comparing Dr. Singer's Bout Class damages to the actual amounts of bout compensation

paid each year.  As shown in Table 3 below, using Dr. Singer's highest estimate of bout

damages, athletes would receive, on average, 285% of their actual compensation.

---

[32] ZFL-2764800 for UFC events, and ZFL-2603701 for Strikeforce and WEC events.

**Table 3: Dr. Singer's High Damages Estimate as a Percentage of Actual Bout Compensation**

| | Damages Per Dr. Singer | | Total Bout Compensation | | Damages as a Percentage of Bout Compensation |
|---|---|---|---|---|---|
| 2010 | $ | 7,960,000 | $ | 362,500 | 2196% |
| 2011 | $ | 172,300,000 | $ | 71,763,165 | 240% |
| 2012 | $ | 211,600,000 | $ | 63,441,807 | 334% |
| 2013 | $ | 273,900,000 | $ | 83,381,874 | 328% |
| 2014 | $ | 199,800,000 | $ | 62,621,340 | 319% |
| 2015 | $ | 241,000,000 | $ | 97,650,091 | 247% |
| 2016 | $ | 327,300,000 | $ | 137,160,212 | 239% |
| 2017 | $ | 163,700,000 | $ | 43,202,400 | 379% |
| Total | $ | 1,597,560,000 | $ | 559,583,389 | 285% |

32. Using Dr. Singer's lowest damages estimate, athletes would receive, on average, 145% of their actual bout compensation over the Class Period, as shown in Table 4 below.

**Table 4: Dr. Singer's Low Damages Estimate as a Percentage of Actual Bout Compensation**

| | Damages Per Dr. Singer | | Total Bout Compensation | | Damages as a Percentage of Bout Compensation |
|---|---|---|---|---|---|
| 2010 | | 5,122,000 | $ | 362,500 | 1413% |
| 2011 | | 103,164,000 | $ | 71,763,165 | 144% |
| 2012 | | 101,297,000 | $ | 63,441,807 | 160% |
| 2013 | | 121,657,000 | $ | 83,381,874 | 146% |
| 2014 | | 104,173,000 | $ | 62,621,340 | 166% |
| 2015 | | 123,751,000 | $ | 97,650,091 | 127% |
| 2016 | | 168,054,000 | $ | 137,160,212 | 123% |
| 2017 | | 84,014,000 | $ | 43,202,400 | 194% |
| Total | $ | 811,232,000 | $ | 559,583,389 | 145% |

33. My calculations reflect two illustrative methodologies for allocating damages amongst the Class members and demonstrate that the more highly compensated athletes would

**HIGHLY CONFIDENTIAL**

receive a greater benefit from an allocation methodology based on the athlete's pro rata share of annual bout income while the lower compensated athletes would receive a greater benefit from the annual per bout allocation methodology.  Assuming that athletes will act in their own best interests, members of the class could disagree over which allocation methodology is appropriate.

34. For example, using the pro rata share of bout income as the allocation methodology, Anderson Silva (who received more than $31 million in bout compensation during the Class Period), would receive more than $90 million in damages using Dr. Singer's high damages estimate, or more than $45 million using Dr. Singer's low damages estimate. Using the per bout allocation methodology, Mr. Silva would receive a total of $2.9 million using Dr. Singer's high damages estimate, or approximately $1.4 million using Dr. Singer's low damages estimate.

35. Similarly, using the pro rata share of bout compensation as the allocation methodology, Conor McGregor (who received $26 million in bout compensation during the Class Period), would receive more than $64 million in damages using Dr. Singer's high damages estimate or $33 million using Dr. Singer's low damages estimate.  Using the per bout damages allocation methodology, Mr. McGregor would receive a total of $2.8 million or $1.4 million, under Dr. Singer's high and low damages estimates, respectively.

36. By contrast, using the pro rata share of bout compensation as the damages allocation methodology, Jonathan Meunier (who received $37,000 in bout compensation during the Class Period), would receive $88,000 using Dr. Singer's high damages estimate, or $45,000 using Dr. Singer's low damages estimate.   Using the per bout allocation

**HIGHLY CONFIDENTIAL**

methodology, Mr. Meunier would receive more than $650,000 using Dr. Singer's high damages estimate, or $335,000 using Dr. Singer's low damages estimate.

37. I have also determined damages that would be allocated to each of the named Plaintiffs in this matter under each allocation methodology and each damages estimate.  As demonstrated in Table 5 below, I have determined that Zuffa paid Plaintiff Cung Le $2.035 million in bout compensation during the Class Period.  He participated in four bouts during this period.  Using Dr. Singer's highest damages estimate, Mr. Le would be allocated $6.311 million in damages if allocated based on his pro rata compensation relative to all athletes (representing an increase of 310%), or $934,771 if allocated based on the number of bouts he fought (representing an increase of 46%).

**Table 5: Hypothetical Allocation of Bout Class Damages to Cung Le**

| Cung Le | | | | Damages Based on Compensation | | Damages Based on Number of Bouts | |
|---|---|---|---|---|---|---|---|
| | Actual Bout Compensation | Percentage of Total | Number of Bouts Fought | Singer - Low Estimate | Singer - High Estimate | Singer - Low Estimate | Singer - High Estimate |
| 2011 | $ 420,000 | 0.585% | 1 | $ 603,776 | $ 1,008,400 | $ 129,766 | $ 216,730 |
| 2012 | $ 1,040,000 | 1.639% | 2 | $ 1,660,559 | $ 3,468,754 | $ 250,425 | $ 523,115 |
| 2014 | $ 575,000 | 0.918% | 1 | $ 956,535 | $ 1,834,598 | $ 101,632 | $ 194,927 |
| Total | $ 2,035,000 | | | $ 3,220,870 | $ 6,311,752 | $ 481,823 | $ 934,771 |

38. Zuffa paid Plaintiff Jon Fitch $446,000 in bout compensation during the Class Period.  Mr. Fitch participated in four bouts during this period.  Using Dr. Singer's highest damages estimate, Mr. Fitch would be allocated $1.309 million in damages if allocated based on his pro rata share of bout compensation (representing an increase of 293%), or $1.035 million if allocated based on the number of bouts he fought (representing an increase of 232%).

**HIGHLY CONFIDENTIAL**

**Table 6: Hypothetical Allocation of Bout Class Damages to Jon Fitch**

| Jon Fitch | Actual Bout Compensation | Percentage of Total | Number of Bouts Fought | Damages Based on Compensation | | Damages Based on Number of Bouts | |
|---|---|---|---|---|---|---|---|
| | | | | Singer - Low Estimate | Singer - High Estimate | Singer - Low Estimate | Singer - High Estimate |
| 2011 | $ 187,000 | 0.261% | 2 | $ 268,824 | $ 448,978 | $ 259,532 | $ 433,459 |
| 2012 | $ 190,000 | 0.299% | 1 | $ 303,371 | $ 633,715 | $ 125,213 | $ 261,557 |
| 2013 | $ 69,000 | 0.083% | 1 | $ 100,673 | $ 226,657 | $ 151,127 | $ 340,248 |
| Total | $ 446,000 | | | $ 672,869 | $ 1,309,350 | $ 535,871 | $ 1,035,265 |

39. Zuffa paid Plaintiff Brandon Vera $408,000 in bout compensation during the Class Period.  Mr. Vera participated in four bouts during this period.  Using Dr. Singer's highest damages estimate, Mr. Vera would be allocated $1.175 million in damages if allocated based on his pro rata share of bout compensation (representing an increase of 288%), or $1.035 million if allocated based on the number of bouts he fought (representing an increase of 254%).

**Table 7: Hypothetical Allocation of Bout Class Damages to Brandon Vera**

| Brandon Vera | Actual Bout Compensation | Percentage of Total | Number of Bouts Fought | Damages Based on Compensation | | Damages Based on Number of Bouts | |
|---|---|---|---|---|---|---|---|
| | | | | Singer - Low Estimate | Singer - High Estimate | Singer - Low Estimate | Singer - High Estimate |
| 2011 | $ 195,000 | 0.272% | 2 | $ 280,325 | $ 468,186 | $ 259,532 | $ 433,459 |
| 2012 | $ 140,000 | 0.221% | 1 | $ 223,537 | $ 466,948 | $ 125,213 | $ 261,557 |
| 2013 | $ 73,000 | 0.088% | 1 | $ 106,509 | $ 239,797 | $ 151,127 | $ 340,248 |
| Total | $ 408,000 | | | $ 610,371 | $ 1,174,930 | $ 535,871 | $ 1,035,265 |

40. Zuffa paid Plaintiff Kyle Kingsbury $157,000 in bout compensation during the Class Period.  Mr. Kingsbury participated in six bouts during this period.  Using Dr. Singer's highest damages estimate, Mr. Kingsbury would be allocated $429,473 in damages if allocated based on his pro rata share of bout compensation (representing an increase of 274%), and $1.368 million if allocated based on the number of bouts he fought (representing an increase of 871%).

HIGHLY CONFIDENTIAL

**Table 8: Hypothetical Allocation of Bout Class Damages to Kyle Kingsbury**

| Kyle Kingsbury | Actual Bout Compensation | Percentage of Total | Number of Bouts Fought | Damages Based on Compensation | | Damages Based on Number of Bouts | |
|---|---|---|---|---|---|---|---|
| | | | | Singer - Low Estimate | Singer - High Estimate | Singer - Low Estimate | Singer - High Estimate |
| 2011 | $ 98,000 | 0.137% | 3 | $ 140,881 | $ 235,293 | $ 389,298 | $ 650,189 |
| 2012 | $ 41,000 | 0.065% | 2 | $ 65,464 | $ 136,749 | $ 250,425 | $ 523,115 |
| 2014 | $ 18,000 | 0.029% | 1 | $ 29,944 | $ 57,431 | $ 101,632 | $ 194,927 |
| Total | $ 157,000 | | | $ 236,289 | $ 429,473 | $ 741,356 | $ 1,368,230 |

41. Plaintiff Javier Vazquez fought in a single bout during the Class Period and received $24,000 in compensation. Using Dr. Singer's highest damages estimate, Mr. Vasquez would be allocated $57,623 in damages if allocated based on his pro rata share of bout compensation (representing an increase of 240%) and $216,730 if allocated based on the number of bouts he fought (representing an increase of 903%).

**Table 9: Hypothetical Allocation of Bout Class Damages to Javier Vasquez**

| Javier Vazquez | Actual Bout Compensation | Percentage of Total | Number of Bouts Fought | Damages Based on Compensation | | Damages Based on Number of Bouts | |
|---|---|---|---|---|---|---|---|
| | | | | Singer - Low Estimate | Singer - High Estimate | Singer - Low Estimate | Singer - High Estimate |
| 2011 | $ 24,000 | 0.033% | 1 | $ 34,501 | $ 57,623 | $ 129,766 | $ 216,730 |
| Total | $ 24,000 | | | $ 34,501 | $ 57,623 | $ 129,766 | $ 216,730 |

42. Of the named Plaintiffs who are members of the Bout Class, my calculations show that three athletes would benefit more from the pro rata share of bout income allocation methodology, while two would benefit more from the per bout allocation methodology.

**VII.   APPLYING PLAINTIFFS' DAMAGES ESTIMATES TO ZUFFA'S FINANCIAL STATEMENTS RESULTS IN MILLIONS OF DOLLARS OF LOSSES DURING THE CLASS PERIOD**

43. I have analyzed the effect of the annualized damages estimates of Dr. Singer and Dr. Zimbalist on Zuffa's financial statements using three different measures of Zuffa's profitability: net income, operating income, and EBITDA. In the sections that follow, I summarize Zuffa's financial results under each of the financial measures. I then address

**HIGHLY CONFIDENTIAL**

each of Plaintiffs' experts' opinions and the impact of their damages estimates on these three financial measures.[33]

**A. Zuffa's Financial Results**

44. One common measure of the profitability of a company is net income. As shown in Table 10 below, during the Class Period,[34] Zuffa reported approximately $277 million in net income, including positive net income nearly every year.

**Table 10: Zuffa Reported Net Income during Class Period (000's)**

| | | |
|---|---|---:|
| Dec. 16-31, 2010 | $ | 5,248 |
| 2011 | $ | 95,960 |
| 2012 | $ | 31,123 |
| 2013 | $ | 84,788 |
| 2014 | $ | 26,621 |
| 2015 | $ | 118,502 |
| 2016 | $ | (85,120) |
| Total | $ | 277,122 |

45. Another measure of profitability is operating income. Zuffa reported positive operating income throughout the Class Period. As shown in Table 11 below, Zuffa reported more than $680 million in operating income from December 16, 2010 through December 31, 2016.

---

[33] For the sake of argument, and for purposes of the following analyses, I have relied upon the plaintiffs' calculations of Net Income, Operating Income and EBITDA as reflected in the Expert Report of Mr. Davis at Exhibit 1a.

[34] Zuffa reported a net loss in 2016 when it had one-time charges related to acquisition and restructuring costs of $105.9 million.

**HIGHLY CONFIDENTIAL**

**Table 11: Zuffa Reported Operating Income during Class Period (000's)**

| | | |
|---|---|---|
| Dec. 16-31, 2010 | $ | 6,864 |
| 2011 | $ | 133,522 |
| 2012 | $ | 60,828 |
| 2013 | $ | 137,178 |
| 2014 | $ | 73,957 |
| 2015 | $ | 157,806 |
| 2016 | $ | 111,761 |
| Total | $ | 681,916 |

46. A third measure that I analyzed was earnings before interest, taxes, depreciation, and amortization ("EBITDA"). This financial measure is a common proxy for a company's cash flow from operations. Zuffa earned approximately $774 million in EBITDA from December 16, 2010 through December 31, 2016.

**Table 12: Zuffa EBITDA during Class Period (000's)**

| | | |
|---|---|---|
| Dec. 16-31, 2010 | $ | 6,829 |
| 2011 | $ | 131,114 |
| 2012 | $ | 72,447 |
| 2013 | $ | 131,631 |
| 2014 | $ | 69,242 |
| 2015 | $ | 160,172 |
| 2016 | $ | 202,218 |
| Total | $ | 773,653 |

**B. Comparison of Zuffa's Financial Results to Dr. Zimbalist's Damages**

47. Dr. Zimbalist concluded that the Bout Class suffered damages of approximately $972 million during the Zimbalist Damages Period.[35] The amounts by year are as follows:

---

[35] Dr. Zimbalist Errata to Expert Report, Dated September 19, 2017, Table 4-E.

**HIGHLY CONFIDENTIAL**

**Table 13: Summary of Damages as Determined by Dr. Zimbalist (000's)[36]**

| | |
|---|---:|
| Dec. 16-31, 2010 | $8,090 |
| 2011 | $148,475 |
| 2012 | $149,111 |
| 2013 | $166,107 |
| 2014 | $148,716 |
| 2015 | $151,502 |
| 2016 | $200,243 |
| | $972,243 |

48. For each year during the Zimbalist Damages Period, I adjusted the three financial metrics described above to reflect the impact of Dr. Zimbalist's Bout Class damages.  The results of this analysis are presented in Exhibit A and summarized below.

49. During the Zimbalist Damages Period, Zuffa reported cumulative net income of $277 million.  After subtracting Dr. Zimbalist's damages of $972 million, Zuffa has a pro-forma *net loss* of $695 million.  Put differently, had Zuffa paid athletes in the manner in which Dr. Zimbalist concludes they should have been paid, Zuffa would have suffered a *net loss* every year during the Zimbalist Damages Period, with full-year losses varying from a low of $33 million to a high of $285 million.[37]

50. Similarly, during the Zimbalist Damages Period, Zuffa reported cumulative positive operating income of $682 million.  After subtracting Dr. Zimbalist's damages of $972 million, Zuffa would be left with a cumulative *operating loss* of $290 million.  Zuffa would have had positive *operating income* of $6 million in one year (2015), and

---

[36] Column does not foot due to rounding.

[37] In the following paragraphs in this section where I refer to the range of results, I am excluding the December 16 to 31, 2010 results because in my opinion this 16-day period is too limited in time to be comparable to the other full-year periods.

**HIGHLY CONFIDENTIAL**

otherwise would have suffered full-year *operating losses* ranging from $15 million to $88 million.

51. Also, as demonstrated in Exhibit A, Zuffa recognized positive EBITDA of $774 million during the Zimbalist Damages Period.  After deducting Dr. Zimbalist's damages of $972 million, Zuffa's EBITDA would be negative $199 million, including *negative EBITDA* in all but two years.

52. Mr. Davis opines that Zuffa incurred certain expenses that he contends could have been paid to athletes.  Specifically, he identified what he calls "excess aviation expenses" and management fees.  I summarize Mr. Davis's "excess aviation expenses" and management fees in Table 14 below.[38]

### Table 14: Mr. Davis's "Excess Aviation" Expenses and Management Fees (000's)

|  | Excess Aviation Expenses | Management Fees | Total |
|---|---|---|---|
| Dec. 16-31, 2010 | $ 485 | $ 33 | $ 518 |
| 2011 | $ 10,027 | $ 500 | $ 10,527 |
| 2012 | $ 12,334 | $ 500 | $ 12,834 |
| 2013 | $ 13,363 | $ 500 | $ 13,863 |
| 2014 | $ 8,000 | $ 500 | $ 8,500 |
| 2015 | $ 5,000 | $ 500 | $ 5,500 |
| 2016 | $ 4,941 | $ - | $ 4,941 |
| Total | $ 54,150 | $ 2,533 | $ 56,683 |

53. I analyzed the impact of Dr. Zimbalist's damages on Zuffa's financial metrics assuming, only for the sake of argument, that the costs identified by Mr. Davis as "excess aviation expenses" and management fees could have been completely avoided, with those funds

---

[38] I present Mr. Davis's excess aviation expenses and management fees to determine their impact on my analysis.  I am not offering an opinion on the accuracy of his computation or his conclusion that certain aviation expenses were "excessive."

HIGHLY CONFIDENTIAL

redirected to increase athlete compensation.  As shown in Exhibit B, under this scenario, Zuffa still would have had $638 million in *net losses*, $234 million in *operating losses*, and $142 million in *negative* EBITDA during the Zimbalist Damages Period.

**C.  Comparison of Zuffa's Financial Results to Dr. Singer's Damages**

54. Dr. Singer's analysis includes Bout Class damages and Identity Class damages.  For the Bout Class damages, Dr. Singer provided four alternative damages models.  For purposes of my analysis of the impact on Zuffa's financial results, I have utilized his highest estimate of total damages ($1.635 billion under Dr. Singer's Impact Regression model – see Table 15) and his lowest damages estimate ($848 million under Dr. Singer's Bellator Benchmark model – see Table 16).

55. For his highest damages estimate, Dr. Singer provided a breakdown of Bout Class damages by year.  But for Dr. Singer's lowest damages estimate, he only provided total Bout Class damages. For purposes of my analysis, I allocated those damages across the Singer Damages Period based on Dr. Singer's computation of annual event revenue.

56. Dr. Singer divided his Identity Class damages into two groups.  For the first group he asserted damages of $32.6 million, for which he provided a breakdown by year, while for a second group he asserted damages of $4.5 million, without providing a breakdown by year.  For purposes of my analysis, I allocated the amounts for the second group in the same proportion as the first group.  Dr. Singer's high-end damages estimate that I used in my computations is summarized in Table 15 below.

**HIGHLY CONFIDENTIAL**

**Table 15: Dr. Singer's Total Damages – Impact Regression Model (000's)**

| | Bout Class Damages | Identity Class Damages | | Total Damages |
| | | Group 1 | Group 2 | |
|---|---|---|---|---|
| Dec. 16-31, 2010 | $ 7,960 | $ 10 | $ 1 | $ 7,971 |
| 2011 | $ 172,300 | $ 380 | $ 52 | $ 172,732 |
| 2012 | $ 211,600 | $ 3,760 | $ 519 | $ 215,879 |
| 2013 | $ 273,900 | $ 1,380 | $ 190 | $ 275,470 |
| 2014 | $ 199,800 | $ 900 | $ 124 | $ 200,824 |
| 2015 | $ 241,000 | $ 6,920 | $ 955 | $ 248,875 |
| 2016 | $ 327,300 | $ 12,840 | $ 1,772 | $ 341,912 |
| Thru June 30, 2017 | $ 163,700 | $ 6,420 | $ 886 | $ 171,006 |
| Total | $ 1,597,560 | $ 32,610 | $ 4,500 | $ 1,634,670 |

57. Dr. Singer's low-end damages estimate that I used for purposes of this analysis is summarized in Table 16 below.

**Table 16: Dr. Singer's Total Damages – Bellator Benchmark Model (000's)**

| | Bout Class Damages | Identity Class Damages | | Total Damages |
| | | Group 1 | Group 2 | |
|---|---|---|---|---|
| Dec. 16-31, 2010 | $ 5,122 | $ 10 | $ 1 | $ 5,133 |
| 2011 | $ 103,164 | $ 380 | $ 52 | $ 103,596 |
| 2012 | $ 101,297 | $ 3,760 | $ 519 | $ 105,575 |
| 2013 | $ 121,657 | $ 1,380 | $ 190 | $ 123,227 |
| 2014 | $ 104,173 | $ 900 | $ 124 | $ 105,197 |
| 2015 | $ 123,751 | $ 6,920 | $ 955 | $ 131,626 |
| 2016 | $ 168,054 | $ 12,840 | $ 1,772 | $ 182,666 |
| Thru June 30, 2017 | $ 84,014 | $ 6,420 | $ 886 | $ 91,320 |
| Total | $ 811,230 | $ 32,610 | $ 4,500 | $ 848,340 |

58. As discussed above, Dr. Singer utilized a slightly different Class Period than Dr. Zimbalist. While the Zimbalist Damages Period ends at December 31, 2016, the Singer Damages Period continues through June 30, 2017. To compute damages for the six months ended June 30, 2017, Dr. Singer utilized an estimate for event revenue equal to 50% of the actual 2016 event revenue. To be consistent with Dr. Singer's approach, I used 50% of 2016 actual net income as an estimate for the six months' net income ending

June 30, 2017.  My analysis using Dr. Singer's high end damages estimate is attached as Exhibit C, and my analysis using Dr. Singer's low end damages estimate is attached as Exhibit D.

59. Zuffa's reported net income for the Singer Damages Period was $235 million.  After considering the impact of Dr. Singer's high damages estimate, Zuffa would have had a cumulative *net loss* of approximately $1.4 billion over that same period, with annual losses ranging from $77 million to $427 million.  Using Dr. Singer's low-end damages estimate, Zuffa would have suffered a cumulative *net loss* of $614 million over the Singer Damages Period.

60. Similarly, Zuffa reported positive operating income over the Singer Damages Period of $738 million.  However, after reducing that operating income to account for Dr. Singer's increased athlete compensation based on his high-end damages estimate, Zuffa would have had $897 million in *operating losses*.  Zuffa would have suffered operating losses in every year, ranging from $39 million to $230 million.  Using Dr. Singer's low-end damages estimate, Zuffa's cumulative *operating losses* would have been $111 million.

61. Also, as demonstrated in Exhibit C, Zuffa recognized positive EBITDA over the Singer Damages Period of $875 million.  After deducting Dr. Singer's highest damages estimate, however, Zuffa's cumulative EBITDA over the Singer Damages Period would have been *negative* $760 million.   Using Dr. Singer's low-end damages estimate, Zuffa's cumulative EBITDA over the Singer Damages Period would have been reduced to $26 million, as demonstrated in Exhibit D.

62. As with my analysis of Dr. Zimbalist's damages, I analyzed the impact of Dr. Singer's damages on Zuffa's financial metrics assuming, only for the sake of argument, that the

**HIGHLY CONFIDENTIAL**

costs identified by Mr. Davis as "excess aviation expenses" and management fees could have been completely avoided, with those funds redirected to increase athlete compensation. Under this scenario, with Dr. Singer's high-end damages estimate, Zuffa still would have incurred approximately $1.3 billion in *net losses*, $838 million in *operating losses*, and $701 million of *negative EBITDA* during the Singer Damages Period.[39] Further, under Dr. Singer's low-end damages estimate, Zuffa would have had approximately $555 million in *net losses*, $51 million in *operating losses*, and *positive EBITDA* of $86 million.[40]

## VIII.   STRIKEFORCE AND BELLATOR EACH LOST MILLIONS OF DOLLARS AS A RESULT OF THEIR COST STRUCTURES

63. Dr. Zimbalist claims the "appropriate and conservative"[41] nature of his yardstick for damages—specifically, athlete share of revenue[42]—is corroborated by his analysis of financial statements from Strikeforce and Bellator. Dr. Zimbalist states that these two MMA promoters are Zuffa's closest competitors and that their business models are similar to Zuffa's.[43] Dr. Zimbalist notes that Bellator paid approximately 48.5% of its revenue to athletes, while Strikeforce paid 63% of its revenue to athletes.[44] He opines that "[t]he fact that [Bellator and Strikeforce's combined] athlete pay ratio, which has an unweighted mean of 55.75% during the Class Period (through the end of 2016), is in the

---

[39] See Exhibit E.

[40] See Exhibit F.

[41] Zimbalist Report, ¶ 130.

[42] Zimbalist Report, ¶ 130.

[43] Zimbalist Report, ¶ 130.

[44] Zimbalist Report, ¶ 130.

**HIGHLY CONFIDENTIAL**

ballpark of my benchmark estimates further bolsters the reasonableness of my benchmark."[45]

64. Similarly, Dr. Singer claims that Strikeforce is a reasonable proxy for the competitive compensation share in the MMA industry and that Strikeforce paid about 60 to 70 percent of its event revenue to athletes.[46] He also cites financial data provided by Bellator noting that it pays out approximately 45% of its revenue to athletes.[47]

65. In my opinion, both companies compensated athletes at levels that were unprofitable given their respective revenues and other costs. My opinion is based on the consistent financial losses of both promotions, as reflected in their respective financial statements, which were attributable in large part to athlete compensation costs.

## A. Bellator

66. I analyzed the financial statements produced by Bellator for the period January 1, 2010 through March 31, 2017[48] and reproduced those results on a calendar-year basis at Exhibit G. This analysis shows that Bellator paid an average of 48% of its revenue to athletes each year; the annual percentage ranged from 35% to 112%.

67. But the financial statements also show that Bellator lost money every quarter and every calendar year during this period. In other words, after paying its athletes an average of 48% of its revenue over more than seven years, the financial statements confirm that Bellator was an unprofitable venture. Bellator cumulatively *lost* a total of $98.7 million

---

[45] Zimbalist Report, ¶ 130.

[46] Singer Report, ¶ 190.

[47] Singer Report, ¶ 190.

[48] SBPCL00002101 – 102.

over approximately seven years, an amount equal to approximately 97% of its revenue over this period. In other words, for every dollar in revenue that Bellator generated, it incurred nearly two dollars in expenses. These financial losses, however, are not necessarily reflective of Bellator's sustainability as an enterprise, particularly if Bellator's losses are being financed by its parent company, Viacom.[49] Viacom's Spike TV network has broadcast Bellator events since Viacom acquired Bellator in 2011, and at least one MMA promoter has recognized that Bellator's backing by Viacom, a $10 billion media conglomerate,[50] has been an advantage for Bellator in the market.[51] Plaintiffs' experts consider only Bellator's financial statements and not those of Viacom, which may have reported revenue and profits from its ownership of Bellator. Unless the revenue and profits from Bellator at the parent company (Viacom) level are known, the percentage of revenue or profits actually paid to Bellator fighters cannot be assessed.

68. Another indicia of the unprofitable nature of Bellator's business model is derived from an analysis of its gross profit, subtracting the cost of sales from revenue. In its financial statements, Bellator subtracts from revenue numerous items which it calls production and programming expenses to arrive at its gross margin. My analysis of Bellator's gross margin indicates that its revenues could not cover its cost of sales. That is, Bellator

---

[49] According to one publicly available report, "Bellator [was] given the OK from its deep-pocketed parent company Viacom to wage war on the UFC by signing every big-name free agent available." http://www.bjpenn.com/mma-news/bellator/report-viacom-tells-bellator-officials-sign-every-single-big-name/   An ESPN.com article stated that "Viacom -- the media conglomerate that owns Bellator and Spike TV -- has invested a multi-million-dollar off-channel marketing strategy" and "[t]he overall financial investment will be '20 to 30 times' more than anything Viacom has put into Coker's previous 'tent pole' events."  http://www.espn.com/mma/story/_/id/19558519/bellator-scott-coker-best-mma-ppv-offered-2017.

[50] As of the date of this report, Viacom's market capitalization was $10.03 billion.

[51] 4/25/2017 Deposition of Jeff Aronson at 30:3-6 ("I think the issue is that you have companies like Bellator, who are backed by Viacom, who, you know, have more money than UFC.").  Mr. Aronson is the CEO of Titan FC, an MMA promotion.

recorded a negative gross margin each calendar year from 2010 through 2016, as well as for the first quarter of 2017. Due in large part to its high athlete compensation commitments relative to its revenue base, Bellator's financial statements indicate that it has not been able to earn a profit from its business model, even before including other overhead expenses. As a percentage of revenue, the gross profit (loss) averaged negative 39%.

69. While Dr. Zimbalist opines that Bellator and Zuffa have similar business models, Bellator's financial statements reveal an important distinction. Unlike Zuffa's financial statements, Bellator's financial statements do not reflect any costs associated with borrowings, such as interest expense. Put differently, Bellator's financial statements show that it lost nearly $100 million over a seven-year period without incurring borrowing costs. Had it been necessary for Bellator to borrow money to fund its losses, the losses on its financial statements would be even higher.

70. For Dr. Zimbalist and Dr. Singer to suggest that Zuffa athletes should have been paid a higher percentage of revenue, and to use Bellator to corroborate their conclusions, ignores the economic reality of Bellator's business. While Bellator paid its athletes a higher percentage of revenue than Zuffa, Bellator appears to have lost money over the entire period upon which Dr. Zimbalist and Dr. Singer rely.[52]

---

[52] Plaintiffs' expert, Mr. Davis, agrees that a company could not sustain a negative EBITDA indefinitely. 9/19/2017 Deposition of Guy Davis, 14:21-23.

**HIGHLY CONFIDENTIAL**

**B. Strikeforce**

71. Dr. Zimbalist stated, "During 2010 and 2011, the two years before it was acquired by Zuffa, Strikeforce paid approximately 63% of its revenues to its fighters."[53]  Dr. Singer points out that Strikeforce paid about 60 to 70 percent of its event revenue to athletes.[54]  I reviewed the Strikeforce financial statements upon which Dr. Zimbalist and Dr. Singer relied to reach their conclusions, which consists of two Excel files.[55]  One of those files only includes financial data for calendar year 2009,[56] but that year has been excluded from Dr. Zimbalist's analysis as he only relies on 2010 and 2011 results.  The second Excel file includes full-year financial information for 2010, but appears to contain a mix of actual event financial results and financial projections for 2011.[57]  A review of this file shows that, in 2011, many athletes are listed as "TBD" for many events, and further, limited revenue and expense line items are provided and reflect nearly all round numbers, indicating many of those amounts are likely estimates.  Further, I reviewed the Excel file properties and it contains a "last modified" date of April 26, 2011, providing support for my conclusion that much of the 2011 "results" are actually projections.

72. The 2010 and 2011 financial statements that Dr. Zimbalist and Dr. Singer rely upon only include event-related financial results for twelve months of events in 2010 and three months in 2011.  They do not reflect any indirect costs such as overhead or administrative

---

[53] Zimbalist Report, ¶ 130.  Dr. Zimbalist did not provide a detailed calculation to explain how he arrived at his revenue share estimate.

[54] Singer Report, ¶ 190.

[55] ZFL-1472337; ZFL-1472338.

[56] ZFL-1472337.

[57] ZFL-1472338.

expenses.[58]   Accordingly, the financial statements only measure the gross margin of the Strikeforce business (revenues minus cost of sales) and not the net income or loss of the business.   Even absent a full accounting of its expenses, the financial statements show that Strikeforce suffered losses over this period, including a *negative* event EBITDA of $665,000.   The 2009 financial statements include a more complete accounting of Strikeforce's activity, and they indicate a *net loss* of over $3.3 million on revenue of $8.9 million, a loss of 137% of revenue.[59]

73. Strikeforce's financial statements do not reflect any financing costs.   There are no expenses recorded in the financial statements that pertain to the cost of funds used to run the business, such as interest on debt.

74. As with Bellator, the Strikeforce financial results for 2009, 2010, and the first three months of 2011 indicate that Strikeforce paid its athletes a higher percentage of revenue than Zuffa, but they also show that Strikeforce lost money over this period, even before taking into account any selling, general, and administrative costs or any financing costs associated with the capital necessary to run the business.

## IX.   PLAINTIFFS' EXPERTS UNDERSTATE ZUFFA'S COMPENSATION OF ATHLETES

75. I have performed my own calculations of athlete compensation and determined that Dr. Zimbalist, Dr. Singer, and Mr. Davis all understate the compensation Zuffa paid to (or on behalf of) athletes during the Class Period.

---

[58] ZFL-1472338.

[59] ZFL-1472337.

**HIGHLY CONFIDENTIAL**

76. Plaintiffs' experts present several alternative measurements of Zuffa's athlete compensation for both the Bout Class and the Identity Class. All three of Plaintiffs' experts reach different conclusions regarding total athlete compensation and are inconsistent as to (1) the specific elements of athlete compensation included in their overall calculation and (2) their purported classification of certain elements of compensation as Bout Class compensation or Identity Class compensation.

77. For purposes of my analysis, I relied on internal financial statements produced by Zuffa (the "Internal Financial Statements") because the audited financial statements do not provide a sufficient level of detail. I reconciled the Internal Financial Statements to the audited financial statements for each year to ensure I took into consideration the effects of audit adjustments to the Internal Financial Statements, if any, on my computation of athlete compensation.[60]

78. I analyzed athlete compensation using two categories—bout compensation and identity compensation. I have included in bout compensation the following categories of costs, as reflected in the Internal Financial Statements: fighter purse; fighter bonus; letter of agreement payments; medical and medical claims; participant insurance; and other costs incurred on behalf of athletes. I have included in identity compensation the following categories of costs as reflected in the Internal Financial Statements: fighter royalty; fighter sponsorship; Athlete Outfitting Policy; and fighter exposure fees. Based on my

---

[60] Zuffa's Internal Financial Statements are ZFL-1514870; ZFL-1514933; ZFL-1514944; ZFL-2764799; 12'15 IS YTD Side by Side Final.xls; 12'12 Zuffa IS YTD Side by Side ref to financials NEW.xls; 2010 Final IS Referenced to FS – Restated.xls. Zuffa's audited financial statements are ZFL-0000221 – 255; ZFL-0000031 – 063; ZFL0000113 – 135; ZFL-0000188 – 220; ZFL-0000064 – 087; ZFL-0000007 – 030; ZFL-0000088 – 112; ZFL0000169 – 187; ZFL-0000136 – 168; RAINE0016835 – 7416.

HIGHLY CONFIDENTIAL

analysis, the following amounts were paid to or on behalf of athletes as bout compensation and identity compensation.

**Table 17: Bout Compensation and Identity Compensation**[61]

| Year | Bout Compensation | Identity Compensation | Total |
|------|------------------:|----------------------:|------:|
| Dec. 16, 2010 - Dec. 31, 2010 | $ 2,672,898 | $ 40,278 | $ 2,713,176 |
| 2011 | $ 78,257,542 | $ 481,802 | $ 78,739,344 |
| 2012 | $ 68,764,389 | $ 2,029,254 | $ 70,793,643 |
| 2013 | $ 90,131,287 | $ 869,789 | $ 91,001,077 |
| 2014 | $ 71,180,263 | $ 757,144 | $ 71,937,406 |
| 2015 | $ 106,077,929 | $ 5,647,291 | $ 111,725,220 |
| 2016 | $ 145,440,394 | $ 8,939,740 | $ 154,380,135 |
| Total | $ 562,524,703 | $ 18,765,298 | $ 581,290,000 |

79. My calculation of athlete compensation is conservative in that it does not include any amounts related to travel and entertainment expenses. Travel and entertainment expenses were included in the Internal Financial Statements as direct costs under the Content revenue and Live Event revenue expense categories. These costs include the expenses incurred when an athlete travels to an event, such as the athlete's airfare, lodging, per diem, and meal costs in accordance with the terms of the athlete's contract[62] and also may

---

[61] In order to allocate 2010 athlete compensation to the Class Period and the pre-Class Period, I first determined the amount of compensation paid directly to athletes from December 16, 2010 to December 31, 2010 as reflected in ZFL-2603701 and ZFL-2764800. I divided that result ($2,547,511) by the amounts reflected in Zuffa's 2010 Internal Financial Statements under PPV and Live Events for fighter purse, fighter bonus, and LOA payment ($76,599,743), to arrive at an allocation percentage of 3.33%. I applied that percentage to Zuffa's total athlete compensation of $81,581,025 from the Internal Financial Statements, to arrive at athlete compensation for December 16, 2010 to December 31, 2010 of $2,713,176. Alternatively, I could have performed an allocation based on the number of calendar days, which would have yielded total athlete compensation for the same period of approximately $3.6 million.

[62] 10/11/2017 Interview with Shane Kapral; LEPLAINTIFFS-0076636-653 at 642; LEPLAINTIFFS-0048763-781 at 769-770.

HIGHLY CONFIDENTIAL

include the travel-related expenses for the family or guests of athletes.  However, the Internal Financial Statements include in this expense category the costs of Zuffa employees, such as production crew members, who also traveled to specific events.[63] Because I lacked sufficient expense-level detail to allow me to make a reasoned allocation among athlete and non-athlete costs, I excluded travel and entertainment expenses from my calculation.

80.  As demonstrated in the following paragraphs, Plaintiffs' experts reach differing conclusions as to total athlete compensation, as well as the purported Bout Class compensation and Identity Class compensation categories.  Table 18 below reflects Dr. Zimbalist's athlete compensation by year.  Dr. Zimbalist provides an opinion on event athlete compensation,[64] but he does not include an opinion on Identity Class athlete compensation in his report.  His working papers, however, include his Identity Class computation, which I have therefore included in Table 18 below.[65]

---

[63] At his deposition, Mr. Lorenzo Fertitta confirmed that travel and entertainment expenses are paid to athletes, but that such amounts are commingled in the financial statements with the travel expenses of Zuffa employees. 3/23/2017 Deposition of Lorenzo J. Fertitta, 206:5-207:4.

[64] Zimbalist Report, Table 4.

[65] Zimbalist working paper, "Table 4.1.xls"

**HIGHLY CONFIDENTIAL**

**Table 18: Dr. Zimbalist Athlete Compensation Summary**

|  | Bout Class - Table 4-E | Identity Class - Working Paper [Table 4.1.xls] | Total |
|---|---|---|---|
| Dec. 16, 2010 - Dec. 31, 2010 | $ 3,094,374 | $ 424,126 | $ 3,518,500 |
| 2011 | $ 74,545,647 | $ 2,064,320 | $ 76,609,967 |
| 2012 | $ 65,170,816 | $ 2,562,289 | $ 67,733,105 |
| 2013 | $ 86,136,490 | $ 1,510,419 | $ 87,646,909 |
| 2014 | $ 66,574,297 | $ 743,715 | $ 67,318,012 |
| 2015 | $ 104,903,030 | $ 2,720,293 | $ 107,623,323 |
| 2016 | $ 148,013,103 | $ 2,073,133 | $ 150,086,236 |
|  | $ 548,437,757 | $ 12,098,295 | $ 560,536,052 |

81. Mr. Davis provides an analysis of "fight related compensation,"[66] a summary of "UFC Identity Payments,[67] and a summary of "Fighter Benefits."[68]   I have summarized Mr. Davis' athlete compensation and benefits in Table 19 below:

**Table 19: Mr. G. Davis Athlete Compensation Summary**

|  | Bout Class - Table 14 | Identity Class - Table 15 | Other Benefits - Exhibit 5 | Total |
|---|---|---|---|---|
| Dec. 16, 2010 - Dec. 31, 2010 | $ 363,000 | $ 31,000 | $ 362,000 | $ 756,000 |
| 2011 | $ 71,745,000 | $ 320,000 | $ 5,435,000 | $ 77,500,000 |
| 2012 | $ 63,069,000 | $ 2,380,000 | $ 4,844,000 | $ 70,293,000 |
| 2013 | $ 83,226,000 | $ 889,000 | $ 5,769,000 | $ 89,884,000 |
| 2014 | $ 62,198,000 | $ 643,000 | $ 7,981,000 | $ 70,822,000 |
| 2015 | $ 97,298,000 | $ 4,873,000 | $ 9,230,000 | $ 111,401,000 |
| 2016 | $ 136,583,000 | $ 9,034,000 | $ 8,237,000 | $ 153,854,000 |
|  | $ 514,482,000 | $ 18,170,000 | $ 41,858,000 | $ 574,510,000 |

---

[66] G. Davis Report, Table 14.

[67] G. Davis Report, Table 15.

[68] G. Davis Report, Exhibit 5.

82. Dr. Singer provides the results of his calculation of athlete share as a percentage of event revenue, but he does not provide a dollar amount for athlete bout compensation.[69]  I have therefore used his support files to derive the Bout Class compensation based on the results of his work.  Dr. Singer does provide a summary of Identity Class compensation.  In Table 20 below, I summarize Dr. Singer's conclusions on Bout Class compensation and Identity Class compensation.[70]

**Table 20: Dr. Singer Athlete Compensation Summary**

|  | Bout Class - Computed from Backup | Identity Class - Table 12 | Total |
|---|---|---|---|
| Dec. 16, 2010 - Dec. 31, 2010 | $     5,062,720 | $       10,000 | $     5,072,720 |
| 2011 | $   79,176,283 | $     320,000 | $   79,496,283 |
| 2012 | $   74,486,547 | $  2,380,000 | $   76,866,547 |
| 2013 | $   97,931,367 | $     890,000 | $   98,821,367 |
| 2014 | $   79,161,283 | $     640,000 | $   79,801,283 |
| 2015 | $   95,564,472 | $  4,870,000 | $ 100,434,472 |
| 2016 | $ 129,778,142 | $  9,030,000 | $ 138,808,142 |
|  | $ 561,160,815 | $ 18,140,000 | $ 579,300,815 |

83. As is evident from a comparison of the tables above, Plaintiffs' experts reach three different conclusions as to total athlete compensation—Zimbalist ($560,536,032), G. Davis ($574,510,000), and Singer ($579,300,815).   All three are lower than my computation of $581,290,000.

---

[69] Singer Report, Tables 10 and 11.

[70] While Dr. Singer includes compensation information through June 30, 2017, to be consistent across experts, I only included in my analysis data through December 31, 2016.  Further, Dr. Singer estimates athlete compensation for the six months ended June 30, 2017 at 50% of his full-year 2016 amount, and therefore the 2017 amount has no additional value as a comparator.

**HIGHLY CONFIDENTIAL**

84. Plaintiffs' experts are also inconsistent in their treatment of i) AOP payments, ii) participant insurance, iii) medical expenses, and iv) other fighter costs. Dr. Zimbalist treats AOP as Bout Class compensation,[71] while Mr. Davis treats it as Identity Class compensation.[72] While Dr. Singer does not provide a sufficient level of detail to determine how he computed athlete compensation, he does provide a general description of the elements of bout compensation and identity compensation, which indicates that he treats AOP as Identity Class compensation.[73]

85. Mr. Davis includes participant insurance and medical costs in "other value conferred by Zuffa to UFC Fighters,"[74] while Dr. Zimbalist excludes these amounts entirely.[75] Dr. Singer does not mention participant insurance or medical costs in his discussion of the elements of Bout Class compensation and Identity Class compensation, and therefore, also appears to exclude such amounts.[76]

86. Dr. Zimbalist includes other fighter costs in both his Bout Class and Identity Class compensation, while Mr. Davis includes all other fighter costs in either his "other benefits" category or Identity Class compensation.[77] It is unclear how Dr. Singer treats these amounts, if he addresses them at all.

---

[71] Zimbalist working paper, Table 4.1.xls.

[72] G. Davis Report, Table 15.

[73] Singer Report, ¶ 35.

[74] G. Davis Report, ¶ 49.

[75] Zimbalist working papers, Table 4.1.xls.

[76] Singer Report, pages 21-27.

[77] G. Davis Report, Exhibit 5a and Tables 15 and 16.

**HIGHLY CONFIDENTIAL**

87. Mr. Davis also excludes from his bout related compensation certain payments that Zuffa made to athletes, such as some, but not all, signing and other bonuses that were not tied directly to a specific event but amounts nonetheless paid to its athletes.

## X.   DR. ZIMBALIST UNDERESTIMATES COSTS INCURRED BY ZUFFA IN MARKETING AND PRODUCING ITS CONTENT FOR BROADCAST

88. Dr. Zimbalist states that Zuffa's production costs were approximately $90 million in 2014,[78] and further opines that this amount is the highest of three valuations of Zuffa's broadcasting production costs.[79]   Dr. Zimbalist cites to documentation prepared in connection with the 2016 sale of Zuffa indicating that production costs averaged about $90 million per year.   He states that the consolidated income statement for 2014 corroborates this figure "if one adds together the contract and non-contract production costs, equipment rentals, the announcers fees and advertising sales"[80] and further observes that "some of these items are not directly related to broadcasting cost,"[81] suggesting that these accounts overstate Zuffa's production costs.

89. I have reviewed Dr. Zimbalist's expert report, certain documents that describe the costs that Zuffa incurs in the production of its events,[82] Zuffa's 2014 Internal Financial Statement, and relevant deposition testimony.   In my opinion, the $90 million figure that Dr. Zimbalist adopts reflects a narrow definition of "production costs" that fails to

---

[78] Zimbalist Report, ¶ 131.

[79] Zimbalist Report, ¶ 134.

[80] In the 2014 Internal Financial Statement, there is no cost category under Content revenue titled "Contract Revenue."  I have assumed that the expense item that Dr. Zimbalist is referring to is a category called, "Production – Events."

[81] Zimbalist Report, ¶ 131.

[82] See, e.g., Project Basquiat Final Posting Memo, June 12, 2016, p. 30 (WME_00001149.00001-00001150.00039); Confidential Information Memorandum, undated, p. 62 (ZFL-2649918-2649988).

consider millions of dollars in expenditures that Zuffa incurs in the promotion of its events.

90. I analyzed Zuffa's 2014 Internal Financial Statement and identified the specific categories and amounts that Dr. Zimbalist characterizes as production costs. I was unable to find any category of costs that Zuffa describes as "Advertising Sales." In Zuffa's Internal Financial Statement there is no such expense item to be found in Content or Live Events expenses, although there are millions of dollars of differently labeled sales, marketing, branding, advertising and promotion costs, which I discuss further below. My calculation shows that before taking into consideration *any* type of sales, marketing, branding, advertising, and promotion expenditures reflected in the 2014 Internal Financial Statement, the costs Dr. Zimbalist recognizes as relating to production exceed $100 million.

### Table 21: 2014 Production Cost Categories Cited by Dr. Zimbalist[83]

| Description | Amount | |
|---|---|---|
| Production - Events | $ | 75,803,103 |
| Non-Contract Production | $ | 17,089,932 |
| Announcers | $ | 4,097,684 |
| Equipment Rental | $ | 3,460,360 |
| | $ | 100,451,079 |

91. It is my understanding that Zuffa differs from other professional sports organizations in that it bears all of the costs of producing and promoting its content for broadcast. Each year, Zuffa incurs the costs of producing and marketing hundreds of hours of domestic

---

[83] Zuffa's 2014 Internal Financial statements contain expenses for both "equipment rental" and "equipment." I have included a total of $183,529 of "equipment" expenses with the total for "equipment rental." Without "equipment" expenses, "equipment rental" expenses would be $3,276,831.

HIGHLY CONFIDENTIAL

and international live fight programming in a variety of formats, including free-to-air TV, closed-circuit TV, residential and commercial PPV, mobile apps and, in more recent years, through its own OTT content platforms, such as Fight Pass.[84]

92. Zuffa's former General Counsel and current Chief Operating Officer, Lawrence Epstein, has explained that Zuffa, unlike the NFL, bears the costs of marketing its broadcasts.[85] Similarly, Mr. Fertitta has described how UFC differs from other sports entities that license their events to TV networks, thus outsourcing the costs of promoting, marketing, and broadcasting events.[86] And, as explained by Denitza Batchvarova, Zuffa's Senior Vice President of Strategy, each PPV event that Zuffa promotes is a standalone product, meaning Zuffa starts from scratch each time it markets a new event to consumers.[87]

93. Accordingly, it appears that the $90 million estimate of production costs that Dr. Zimbalist cites excludes millions of dollars that Zuffa incurs in the promotion and marketing of its events. To demonstrate, I reviewed the expenditures associated with

---

[84] 3/23/2017 Deposition of Lorenzo Fertitta, 146:9-19.

[85] "When we do a pay-per-view event, … [w]e pay all of the marketing expenses. We have to go out and pay for all these expenses associated with marketing the event. All of them. When the NFL is on Sunday Night Football on NBC, what is the NFL—what kind of marketing expenses are they paying? It's all done by NBC Sports. They're marketing to their digital channels, they're putting people on the Today show, they're doing all this stuff to get people to come watch the NBC broadcast of the event. That's … not the way our business work[s]. We've got to pay the expenses." 7/21/2017 Deposition of Lawrence Epstein, 413:20-414:7.

[86] "UFC is very different from other sports entities and sport leagues. And what I mean by that is that we bear all the cost of production and marketing for an event compared to, say, other leagues which, typically what they do is they take a license from a network, and they essentially hand that network the responsibility of broadcasting that event, promoting that event, marketing that event. So there's significant built-in costs that we have to absorb which inflates our revenue number relative to other sports on an apples-for-apples basis." 3/23/2017 Deposition of Lorenzo J. Fertitta, 196:3-23.

[87] "There is much variation. Because, just like the Pay-Per-View events, we sell a very different product every time. Every one of our events is a different product from the previous event." 1/25/2017 Deposition of Denitza Batchvarova, 204:20-205:4. "We still—as I said, we always look at a Pay-Per-View event[s] as an event in which we have to – there is no subscription in Pay-Per-View. So for every single event we are starting from buy zero. You have to convince consumers to buy it." 1/25/2017 Deposition of Denitza Batchvarova, 202:6-11.

HIGHLY CONFIDENTIAL

Content revenue and Live Event revenue in Zuffa's 2014 Internal Financial Statement, and summarized all direct costs labeled as sales, marketing, branding, advertising, and promotion expenditures.   The specific expense categories that I identified and their respective amounts are as follows:

**Table 22: 2014 Additional Promotional Expenses**

| Description | Amount |
|---|---|
| PPV advertising | $ 14,534,916 |
| Broadcast advertising | $ 10,999,416 |
| Ticket advertising | $ 5,066,735 |
| Other/digital advertising | $ 3,351,965 |
| Closed circuit advertising | $ 1,625,282 |
| Graphics, posters and art | $ 1,215,113 |
| Branding | $ 199,722 |
| Other ad/broadcast | $ 72,596 |
| Event related promotions | $ 43,931 |
| Digital media | $ 1,200 |
| | $ 37,110,875 |

94. In other words, an accumulation of the promotion expenditures that Zuffa identifies as the direct costs associated with the events driving its Content revenue and Live Events revenue streams is about $37 million, and demonstrates that the $90 million amount that is referenced in certain documents in this case as "production costs"[88] reflects a definition that seems to exclude the bulk of the expenditures incurred by Zuffa to promote its events.

95. Dr. Zimbalist also excludes other categories of costs.  While I am not offering an opinion as to what categories of costs reflected in Zuffa's Internal Financial Statements represent

---

[88] *See, e.g.*, Project Basquiat Final Posting Memo, June 12, 2016, p. 30 (WME_ZUFFA_00001140.00001-00001150.00039); Confidential Information Memorandum, undated, p. 62 (ZFL-2649918-2649988).

**HIGHLY CONFIDENTIAL**

production costs that are unique to Zuffa relative to other professional sports organizations, it is the case that Zuffa's 2014 Internal Financial Statement contains many categories of expenditures that Zuffa has identified as being incurred in the direct production of is PPV and Live Events content, and Dr. Zimbalist does not appear to consider these categories in his determination of production costs. An example from the 2014 Internal Financial Statement includes "Payroll" expense of $10,979,356, which is recorded as a Content expense, and includes the salaries of some set of (or perhaps all of) Zuffa employees dedicated to the production and promotion of its events. Another example is the travel costs incurred by Zuffa employees in conjunction with the production of events. Lastly, Dr. Zimbalist does not appear to consider Zuffa's overhead costs. Over the Class Period, these indirect costs, excluding management fees and aviation costs, were almost 20% of revenues, and accordingly, I would expect that a large percentage of these indirect costs would be incurred as a result of Zuffa's largest revenue streams that are dependent on the production and advertising of events, such as PPV events.[89] Examples of such costs include the buildings and facilities used by its production crews, communications equipment, and computer hardware and software.

## XI.   ZUFFA'S FINANCIAL RESULTS WERE HIGHLY DEPENDENT ON VARIABLE REVENUE STREAMS

96. I reviewed and analyzed Zuffa's sources of revenue for the period January 1, 2011 through December 31, 2016 as reflected in Zuffa's Internal Financial Statements. Before relying on these amounts, I reconciled each year's information to Zuffa's audited

---

[89] As noted in the February 2013 Confidential Information Memorandum, "UFC operates two production facilities located in Las Vegas and one in Los Angeles, CA with over 45 full-time employees. UFC owns proprietary editing and digital asset management systems which allow UFC to efficient source and edit its over 56,000 hours of PPV and produced content."

HIGHLY CONFIDENTIAL

financial statements to ensure that I understood the impact of audit adjustments, if any, on the accounting information.  After performing this reconciliation, I reviewed each line item of revenue within Zuffa's Internal Financial Statements to ensure I understood Zuffa's categories of revenue and the types of accounting transactions that these revenue accounts captured.  I then performed an analysis to estimate the percentage of Zuffa's revenue in each year that involved transaction-based revenues versus recurring revenue.

97. I use the term "transaction-based revenues" to describe revenue streams that are generally short-term and benefit a narrow accounting period.  Conversely, recurring revenues involve predictability in the revenue stream and provide a reasonable assurance that in the future such amounts will occur at similar levels over a similar period of time.

98. Approximately half of Zuffa's revenues from January 1, 2011 to December 31, 2016 were associated with a transaction-based revenue stream.  This meant that Zuffa's revenues could be highly variable from year to year.  While Zuffa has diversified its revenue streams over time and grown its revenue from contracted sources,[90] its business model (and its profitability) remains heavily dependent on PPV sales, which are difficult to predict.[91]

---

[90] "So when we started out the business, there were basically two sources of revenue, and they were very limited sources, which were tickets to events and pay-per-view because we had no mainstream television distribution. Excuse me.  There was no sponsorship money.  There was no consumer products other than like event-related T-shirts, selfie T-shirts at the events.  So it was pretty much pay-per-view, very limited and tickets.  Over a period of time, the Spike TV deal came online, and so, there was some television revenue from a cable channel.  As we sit here today, we have Fox television, Fox Sports 1, you know, Fox Sports deal.  Pay-per-view is still the most important source of our revenue.  You know, we have sponsorship revenue, which we didn't have before, and some consumer products revenue."  5/26/2017 Deposition of Ike Lawrence Epstein, 47:7-48:2.

[91] 5/26/2017 Deposition of Ike Lawrence Epstein, 140:14-19.

99. Zuffa's largest category of revenue over the Class Period was PPV revenue, a single product category comprising between 24% and 43% of Zuffa's total revenue.[92]  PPV revenue is recognized in Zuffa's financial statements in the year when the event is aired. The amount of revenue recorded is based upon management's estimates of the number of customer buys; a revenue true-up is booked when actual purchase results are provided to Zuffa by the company's PPV distributor.[93]  Former Zuffa CFO John Mulkey testified that, from 2006 to 2014, there was no more important source of Zuffa's revenue than PPV.[94]

100. PPV revenue is transaction-based revenue.[95]  It is short-term in nature and fluctuates based on the number of PPV events sponsored by Zuffa, the strength of the fighter cards, the number of purchasers for each event, and the price established for each event.  As Zuffa COO Lawrence Epstein testified, "It's not contracted.  We don't know what we're going to get.  We could sell a million pay-per-view for the year, we could sell 5 million, we could sell zero.  It's a hundred percent unsure.  Every time we sell an event, every single one of our subscribers leave, and we have to resell them the next time around.  It's

---

[92] For purposes of determining these percentages, I have excluded any revenues from closed circuit TV, which are sometimes included as PPV revenue in the various Confidential Information Memorandums provided by the lenders.

[93] Zuffa Combined Financial Statements, Years Ended December 31, 2013 and 2012 (ZFL-0000221-0000255).

[94] Q: "So generally speaking, from 2006 when you started at Zuffa through 2014, was there any more important source of Zuffa's revenue than pay-per-view?" A: "No."  4/19/2017 Deposition of John Mulkey, 58:3-12.

[95] As Zuffa's current COO explained, "The vast majority of our revenue, all of our profitability, comes from a variable revenue sources which is pay-per view, that's how we make our money.  And we have no idea how many pay-per-views we're going to sell.  We try to sell as many as we can, but it's not guaranteed.  So that model is unique in the sports landscape when you start taking a look at comparisons to the NFL or to some of these other organizations." 5/26/2017 Deposition of Lawrence Epstein, 140:6-22.

**HIGHLY CONFIDENTIAL**

the business we're in."[96]   The financial consequences were significant when an event was

cancelled due to an athlete injury or for other reasons.

101.    The unpredictability of each live and PPV event is reflected in the event financial

analyses prepared by Zuffa.[97]   These financial reports compare pro forma estimates of

event profitability to actual results and measure the impact that both the revenue stream

and the content production and promotion costs, such as costs of the venue, production

crews, and advertising, had on profit margins.

102.    Zuffa's lenders highlighted the variable nature of PPV revenues.   As part of Zuffa's

credit facility assessments, the lenders required an explanation of variances in revenue

from year to year.   For example, the Confidential Information Memorandum in support

of the $1.45 billion senior secured credit facilities explains Zuffa's 2014 financial results,

which resulted in net income of $26.621 million—a year-over-year decrease of $58.167

million.   The document attributed Zuffa's 45% decline in PPV revenue in 2014 to a

decline in PPV buys and fewer PPV events,[98] further attributing the decrease in average

PPV buys to last-minute changes to marquee fight cards due to athlete injuries.[99]   The

document explains: "Given the nature of the PPV market, customers are able to purchase

PPV events real-time (post the lineup being confirmed) with the majority of PPV buys

occurring on the day of the event.   Since the company did not have marquee, physically

---

[96] 5/26/2017 Deposition of Lawrence Epstein, 141:10-17.

[97] ZFL-0000268; ZFL-0000389; ZFL-0000398: ZFL-0000267; ZFL-0003938

[98] Confidential Information Memorandum, undated, p. 66 (ZFL-2649918-2649989).

[99] Confidential Information Memorandum, undated, p. 66 (ZFL-2649918-2649989).

**HIGHLY CONFIDENTIAL**

fit athletes ready to fill in, customer interest declines coincided with lower PPV buys."[100] (One commentator dubbed 2014 "the Year of the Injury" for UFC.[101])  Similarly, in 2012, Zuffa was forced to cancel a PPV event for the first time due to a late injury to a main-event fighter.  For this and other reasons, PPV event revenue declined 21% in 2012 and PPV buys decreased by 31.8%.[102]

103.   Ticket sales represented another large category of revenue from 2011 to 2016, ranging from approximately 9% to 13% of total revenues over this period.  Revenue from ticket sales is also variable and short-term in nature.  It varies based on the number of events, venue size, ticket prices, and the customer draw to those events.[103]  For example, regarding Zuffa's 2016 year-to-date financial performance, Zuffa's lenders noted that live events revenue was down 4.5% because of fewer events, and while Zuffa sold more tickets on average at its PPV events compared to 2015, the average ticket price was $224 in 2016 compared to $256 in 2015.[104]  Similarly, Zuffa sold 26.2% fewer tickets in 2012

---

[100] Confidential Information Memorandum, undated, p. 66 (ZFL-2649918-2649989).

[101] Nick Gullo, *2014: Year of the Injury*, Fightland Blog (Oct. 7, 2014), http://fightland.vice.com/blog/2014-year-of-the-injury.

[102] Confidential Information Memorandum, February 2013, p. 56 (DB-ZUFFA-00006237-00006313).

[103] Q: "And when the UFC prices tickets for live events—and if I am using the wrong phasing for that—when people actually physically go to watch an event live, are there variations in the ticket prices, or are they the same across the board?"  A: "There is much variation.  Because, just like pay-per-view events, we sell a very different product every time.  Every one of our events is a different product from the previous event.  So we would price tickets according to—in particular to live events—we would price it according to what market we are in, what the competition is in the market, who the athletes on the card are, and how much interest we think there will be in attending the event."  1/25/2017 Deposition of Denitza Batchvarova, 204:15-205:4.

[104] Confidential Information Memorandum, undated, p. 63 (ZFL-2649918-2649989).

than in the prior period and the average ticket price declined 1.2%, causing an overall decrease of 27.1% of revenue compared to the prior period.[105]

104. A growing category of revenue over the time period I analyzed pertained to United States and International Rights revenue and sponsorship revenue, as Zuffa sought to become less dependent on its transaction-based revenue streams and sought longer term, contracted revenue from TV licensing and sponsorships. United States and International Rights comprised between 17% and 43% of total revenues during the Class Period.

105. Based on the foregoing analysis, I have concluded that Zuffa's revenues and, as a result, its profits, are heavily dependent on transaction-based revenues—in particular, revenue from PPV sales. These revenues are variable and difficult to predict from year to year.

## XII. THE LENDERS TO ZUFFA ON ITS TERM LOAN AND CREDIT FACILITIES RECOGNIZED THAT THE LOAN PROCEEDS WERE TO BE USED TO PAY A DIVIDEND TO OWNERS

106. Counsel asked me to examine loan documentation to confirm whether the payment of a dividend to shareholders was among the stated purposes of the loans. According to memoranda prepared in conjunction with the May 2007 Senior Secured Credit Facilities and the October 2009 Incremental Term Loan, Zuffa's lenders were aware that Zuffa intended to use a large portion of the loan proceeds to pay a dividend to its shareholders, among other uses.

107. Effective June 2007, Zuffa entered into an agreement with Deutsche Bank for a $300 million Senior Secured Credit Facility.[106] The Confidential Information Memorandum for this loan states that the proceeds will be used to repay the Company's existing credit

---

[105] Confidential Information Memorandum, February 2013, p. 56. (DB-ZUFFA-00006237-00006313).

[106] DB-ZUFFA-00006712-00006786.

**HIGHLY CONFIDENTIAL**

revolver, for general corporate purposes, and to fund a $199 million dividend to Zuffa's owners.[107]   Zuffa's 2007 audited financial statements confirm that the proceeds of the term loan were used to pay a distribution to Zuffa's owners.[108]

108.   The October 2009 Confidential Information Memorandum for the $100 million incremental term loan had similar disclosures.   The memorandum disclosed that the proceeds from the loan would be used to pay a dividend of $71 million to the company's shareholders, in addition to repaying a revolving loan and funding other corporate expenses.[109]   Zuffa's 2009 audited financial statements disclosed that some proceeds were distributed to Zuffa's owners.[110]

109.   These two documents show that Zuffa's lenders clearly understood that proceeds from both facilities would be used, in part, to pay a distribution to the shareholders—a financial transaction often referred to as a leveraged dividend recapitalization.[111]   A sophisticated financial institution such as Deutsche Bank would not have loaned the

---

[107] DB-ZUFFA-00006725.

[108] ZFL-00000064-087.

[109] ZFL-2509465-2509517.

[110] ZFL-0000007-030.

[111] As explained by Mr. John Mulkey in deposition, a dividend recapitalization is "when you modify the capitalization structure of your company and the dividend that precedes that word means that you're recapitalizing the company for purposes of dividend."

> Q: Is the purpose of dividend recapitalization to pay cash to the owners of an entity?
> A: As you asking me generally?
> Q: Yes.
> A: There probably a few different types of dividend recaps, but typically the dividend would go to equity holders.

4/19/2017 Deposition of John Mulkey, 109:3-14.

**HIGHLY CONFIDENTIAL**

proceeds if they thought a dividend was somehow inappropriate or excessively risky.[112] Former Zuffa CFO John Mulkey testified that Zuffa's quarterly financial reports to Deutsche Bank disclosed the distributions. He testified: "If we made them, they would have been in that particular reporting."[113]

110.    In each of the borrowing memoranda, the lenders analyze the impact of each financing on Zuffa's capital structure.  These analyses include a review of historical results and pro-forma projections of the impact of each borrowing on the financial condition and related financial ratios of Zuffa.[114]  These calculations are illustrative of analyses used to assess the risk premium a lender may charge to compensate for the degree of default risk in the loan.  For example, the analyses include pro-forma projections of the impact of additional debt and additional interest expense on EBITDA, among other measures. These calculations reflect different measures of how long it would take Zuffa to repay its debt based on the cash flow it generated from its business.

111.    Mr. Davis opines, with the benefit of hindsight, that Zuffa could have used these loan proceeds to pay additional athlete compensation instead of funding dividends to the owners.[115]  Mr. Davis hypothesizes that if the proceeds had been reallocated in this way, that would not have affected Zuffa's ability to honor its financial obligations.  He further

---

[112] My opinion is consistent with that offered by plaintiffs' expert, Mr. Davis, who testified in deposition that sophisticated financial institutions evaluated the loan deals for Zuffa from 2005 through 2016, and further agreed that at least some financial institutions thought it was appropriate to underwrite the lending of money to Zuffa for the purpose of paying a distribution to equity holders.  9/19/2017 Deposition of Guy Davis, 91:15-92:19.

[113] 4/19/2017 Deposition of John Mulkey, 38:4-11.

[114] *See* Confidential Information Memorandum dated May 2007, p. 10 (DB-ZUFFA-00006712-00006786); Confidential Information Memorandum dated October 2009, p. 4 (ZFL-2509465-2509518); Confidential Information Memorandum dated February, 2013, p. 2 (DB-ZUFFA-00006237-00006313); Confidential Information Memorandum, undated, pp. 25-26 (ZFL-2649918-2649989).

[115] G. Davis Report, ¶ 51.

**HIGHLY CONFIDENTIAL**

opines that Zuffa had the financial wherewithal to borrow funds to increase athlete compensation.[116]  Dr. Singer implies, with the benefit of hindsight, that paying additional compensation to athletes would not have affected the value of Zuffa's business: "Zuffa's owners sold the UFC in 2016 for $4 billion, indicating that a rational firm would have been willing to borrow or raise capital in order to spend more on [f]ighters so as to grow a business that could one day sell for that amount of money."[117]

112.   If one were to assume that athlete compensation could have been paid at levels higher than actual levels, then, as demonstrated in Section VII, Zuffa's EBITDA would be lower and the debt ratios such as those reflected in the Confidential Information Memoranda would be higher.  Thus, it is speculative of Mr. Davis to opine that had Zuffa paid more to its athletes and therefore had a business model reflecting a different cost structure, Zuffa could still have obtained the financing that it did.  To the contrary, when asked in his deposition whether Zuffa's ability to borrow or to obtain credit would be affected if Zuffa's earnings were lower, Mr. Davis replied, "Yes."[118]

113.   In my opinion, it is not certain that lenders would have approved the financings that they did, or that they would have offered similar terms, if Zuffa had a cost structure that reflected athlete compensation at the levels argued by Dr. Zimbalist and Dr. Singer. From a financial perspective, Zuffa would have been a different business, arguably an unprofitable business (if one assumes the damages computed by Plaintiffs' experts), and

---

[116] G. Davis Report, ¶ 22.

[117] Singer Report, footnote 572.

[118] 9/19/2017 Deposition of Guy Davis, 154:9-15.  Mr. Davis also agreed that a decrease in borrowing capacity can limit a company's ability to grow.

**HIGHLY CONFIDENTIAL**

lenders may have reached a different conclusion with regard to Zuffa's borrowing capacity.   For example, the October 2009 Confidential Information Memorandum notes Zuffa's earnings had reduced its leverage since the 2007 loan.[119]   The February 2013 Confidential Information Memorandum makes note of Zuffa's "conservative balance sheet with stable leverage profile"[120] and states in the term sheet that the loan has a mandatory pre-payment equal to 50% of annual excess cash flow.[121]   This statement demonstrates that the lender considered how Zuffa's prior earnings contributed to a reduction in leverage.   It is also speculative to assume that if Zuffa had a different cost structure resulting from higher athlete compensation that its lenders would have allowed the loan proceeds to be used for a purpose different than the express purposes set forth in the Confidential Information Memoranda.

114.   Additionally, if Zuffa had a cost structure that reflected athlete compensation at the levels argued by Dr. Zimbalist and Dr. Singer, it is not certain that Zuffa would have been acquired at the same price, or at all, in 2016.   A common business valuation methodology is the EBITDA multiple, a valuation metric which is equal to the market value of invested capital divided by EBITDA.[122]   In conducting its due diligence, Zuffa's buyers considered the EBITDA multiple in connection with the approximately $4 billion

---

[119] "As of June 30, 2009, UFC had $348 million of debt outstanding resulting total leverage of 3.3x on a LTM basis, compared to total leverage of 4.5x on June 30, 2007."  Confidential Information Memorandum dated October, 2009 at p. 4 (ZFL-2509465-2509517).

[120] See Confidential Information Memorandum dated February 2013, p. 5 (DB-ZUFFA-00006237-00006313).

[121] See Leveraged Finance Unit Report, undated, p. 67 (DB-ZUFFA-00006389-00006457).

[122] Shannon P. Pratt and Alina V. Niculita, *Valuing a Business, The Analysis and Appraisal of Closely Held Companies, Fifth Edition* (New York, NY: McGraw-Hill, 2008), Chapter 11.

HIGHLY CONFIDENTIAL

acquisition price.[123]   A *lower* hypothetical EBITDA resulting from applying Plaintiffs'
damages as athlete compensation would *increase* the EBITDA multiple at any given
enterprise value, making Zuffa less attractive from a buyer's standpoint.   Put another
way, holding the EBITDA multiple constant, a *lower* EBITDA would result in a *lower*
enterprise value.

### XIII. MISCELLANEOUS

115.   Appendix B contains a listing of the documents that I have relied upon in forming my
opinions.   My opinions are based on the facts of this case as I now understand them and
on the analyses described in this report.   I reserve the right to revise or augment the
findings and opinions set forth in this report in the event additional relevant information
becomes available, in response to questions raised in my deposition, to take into account
any report or analyses presented by experts retained by the Plaintiffs, or for other reasons.

116.   Charges for my services are based on my hourly rate of $650 per hour.   I have been
assisted by others at BRG working at my direction.   BRG's staff of employees includes
professionals with expert credentials in accounting, finance, valuation, and fraud
investigations.   Neither BRG's fees nor my compensation are contingent upon achieving
any particular outcome in this litigation.

---

[123] WME_ZUFFA_00001149 – 00001150.00039, at 00001150.00029.

# **<u>Appendix A</u>**

**Curriculum Vitae**



**ELIZABETH KROGER DAVIS, MBA, CPA, CGMA**
BERKELEY RESEARCH GROUP, LLC
70 West Madison, Suite 5000
Chicago, IL 60602

Direct: ████████████
Cell: ████████████
████████████████████

## OVERVIEW

For over 25 years, Elizabeth Kroger Davis has provided forensic accounting, expert consulting, and expert testimony services to law firms on complex matters that require expertise in finance, accounting, auditing, economics, and valuation. She has provided expert consulting or forensic accounting services on some of the largest financial market disputes of the past decades, matters involving damages, market manipulation, the fair value of financial instruments, post-acquisition disputes, alleged shareholder dilution, Ponzi schemes, fraud, and pre-arranged, unauthorized, and tax-motivated trading. She has consulted on disputes involving a variety of financial instruments including credit default swaps, interest rate swaps, futures, options, collateralized mortgage obligations, government securities, auction rate securities, repurchase agreements, commodities and other securitized assets and derivatives.

Ms. Kroger Davis has also consulted and testified on a variety of matters involving commercial damages related to alleged false advertising, IP, contract and employment disputes, and matters and issues pertaining to class certification.

On certain high profile disputes, Ms. Kroger Davis has been retained by counsel to provide strategic consulting advice on liability and damages issues, to direct the focus of interrelated teams of accountants, academics, financial experts, and other technical experts, and to provide trial support.

With a background in auditing and a half decade as a partner in the office of general counsel at a large public accounting firm, Ms. Kroger Davis has also advised counsel on dozens of civil and criminal litigation matters and regulatory investigations involving alleged violations of accounting, auditing, and other professional standards. She has also led management consulting practices dedicated to advising the legal departments of Fortune 500 companies on strategic restructuring, operational improvement, and litigation financial management strategies.

Ms. Kroger Davis received her MBA from the University of Chicago Graduate School of Business (now Booth School of Business) and BBA from Southern Methodist University. She is a Certified Public Accountant. She was notably named to the first listing of the Lawdragon 100 "Legal Consultants You Need to Know" (2009), which recognized leading providers of strategic and leadership advice to the legal profession.



**EDUCATION**

MBA (Finance)    University of Chicago Graduate School of Business, 1991
BBA (Accounting)    Southern Methodist University, Cox School of Business, 1984

**PRESENT EMPLOYMENT**

Berkeley Research Group, LLC
    Managing Director, 2013–present

**PREVIOUS POSITIONS**

Finance Scholars Group
    Managing Director, 2009–2013

Davis Consulting
    2009

CRA International
    Vice President, 2007–2008

Navigant Consulting
    Managing Director, 2005–2007

Arthur Andersen
    Partner, 1996-2002
    Manager, Senior, Staff Consultant, 1983–1996

**PROFESSIONAL CERTIFICATIONS**

Licensed as a Chartered Global Management Accountant, 2012

Licensed as a Certified Public Accountant, 1986 (Texas and Illinois). Currently registered as a CPA
    in the State of Illinois.

Named to the first-ever listing of Lawdragon 100 "Legal Consultants You Need to Know" (2009),
    showcasing the leading providers of strategic and leadership advice to the legal profession.

**TESTIMONY AND EXPERT REPORTS**

*In Re Credit Default Swaps Antitrust Litigation,* UNITED STATES DISTRICT COURT, SOUTHERN
DISTRICT OF NEW YORK. Declaration in support of class counsel's motion for award of attorneys'
fees, reimbursement of expenses, and incentive awards for class representations (2016).
Declaration describes work performed by BRG, and supervised by Davis, in regards to the
compilation and analysis of hundreds of millions of credit default swap transactions and billions of
related quotes, and the subsequent application of econometric models for purposes of estimating
bid-ask spread inflation on a class-wide basis and allocating claimant settlement proceeds.

2



*In Re Credit Default Swaps Antitrust Litigation,* UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK. Declaration in response to an appeal submitted by a claimant who sought to recover additional settlement proceeds.   Declaration explained the flaws and unusual characteristics in the claimant's submission, and described how the award of additional settlement proceeds would be inconsistent to the rigor applied to other submissions and create a windfall for claimant.  Judge Cote denied the appeal submitted by the claimant.

*Ross University School of Medicine, Ltd., vs. Brooklyn-Queens Healthcare, Inc., and Wyckoff Heights Medical Center*, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK. Expert report and deposition testimony on economic damages pertaining to breach of contract (2011). Of three components of damages, judge accepted Davis' computations on two elements prior to trial. The matter subsequently settled prior to trial for a confidential amount.

## PROFESSIONAL EXPERIENCE

### Litigation, Investigations, and Forensic Accounting Matters

*Retained on behalf of plaintiff's class (Quinn Emanuel Urquhart & Sullivan, LLP) in re: Credit Default Swaps Antitrust Litigation* to provide litigation support, mediation support, class certification analysis, damages analysis and post-settlement fund allocation analysis. Assignment involved the construction of an econometric model, incorporating hundreds of million transactions in the CDS market and over 1.8 billion quotes on such securities, to analyze the economic impact of allegations that the investment banks had conspired to block exchange trading in the credit default swaps market in order to keep trading prices artificially high. Following a series of mediations that incorporated the economic model, matter resulted in a favorable settlement of $1.86 billion to plaintiffs. At the concluding settlement conferences, Judge Cote recognized the work of BRG for its development of a settlement allocation model that would fairly allocate the proceeds associated with millions of transactions executed by over 14,000 class members, including banks, insurance companies, pension funds and hedge funds.

*Retained by Starr International Co. (Boies, Schiller and Flexner LLP, Skadden, Arps, Slate, Meagher & Flom LLP) in re: Starr International Company, Inc. v. The United States* as a strategic consultant to the law firms on liability and damages issues pertaining to the constitutional takings case against the United States brought by AIG shareholders in the Court of Federal Claims.  Advised on case experts and expert issues involving both the plaintiff and defendant experts (over a dozen experts), and coordinated expert testimony and expert trial support during the ensuing three-month 2014 trial. Court of Federal Claims found liability on behalf of the U.S. Government in July 2015.

*Retained by Hank Greenberg, CEO of AIG, and Howard Smith, CFO of AIG (Boies Schiller and Flexner LLP, Skadden Arps, Slate, Meagher & Flom LLP and Kaye Scholer LLP)* as a strategic consultant to the law firm on liability and damages issues pertaining to a securities litigation involving allegedly fraudulent reinsurance transactions.  Advised on case experts and experts issues involving both the plaintiff and defendant experts (over a dozen experts) and coordinated expert testimony and expert trial preparation.  After approximately a month of trial, matter favorably resolved on behalf of clients.

3



*Retained on behalf of the Corn Refiners Association (Winston and Strawn) in re: Western Sugar Cooperative et al. v. Archer-Daniels-Midland Company et. al.* to provide litigation support in response to allegations that the Corn Refiners Association and its member companies ran a multi-year, multi-media advertising campaign that induced consumers and food and beverage manufacturers to purchase or manufacture more products sweetened by high-fructose corn syrup ("HFCS") at the expense of sucrose sugar.  Developed a statistical model incorporating detailed stores sales scanner data to evaluate the effects of television, print and website challenged advertising on actual purchases of over 40 food and beverage products.  Parties reached a confidential settlement during trial.

*Retained by plaintiff class (Boies, Schiller & Flexner LLP) in re: Anwar, et al., v. Fairfield Greenwich Limited, et al.* as a strategic consultant to the law firm on liability issues pertaining to the demise of hedge funds operated and marketed by the Fairfield Greenwich Group that invested with Bernard Madoff.

*Retained on behalf of Bluestem Brands, Inc. (Faegre Baker Daniels LLP) in re: CIGPF I Corp. v. Bluestem Brands, Inc.,* to provide economic analysis related to the capital structure of Bluestem, allegations by plaintiff of damages associated with anti-dilution adjustments under a warrant agreement, and damages associated with alleged participation rights in a credit financing transaction.  Matter settled.

*Retained by Halliburton (formerly Godwin Ronquillo) in re: Oil Spill by the Oil Rig "Deepwater Horizon (DWH)"* to lead litigation support team in development of expert report in support of objections by Halliburton to class certification and final approval of the DWH Economic and Property Damages Settlement Agreement of $6.5 billion. Though the expert report was excluded on the basis that Halliburton had no legal standing with regard to the settlement, after its submission lawyers for BP filed an emergency motion contending that the settlement "systematically produces illogical and absurd compensation awards to claimants," and is paying "hundreds of millions of dollars, and perhaps billions, to claimants with 'losses' that do not exist in reality." These outcomes are a direct consequence of the fundamental flaws in the economic damages settlement that were derived and later described in the expert report involving Davis.

*Retained by Barclays Bank (Boies, Schiller & Flexner LLP) in re: Lehman Brothers Holdings, Inc. et al.* to lead litigation support team and six-month trial support initiatives related to 2008 bankruptcy of Lehman Brothers Inc. and the resulting $45 billion acquisition by defendant Barclays of its North American broker dealer business. Primary financial and economic consulting work streams included defending a $5 billion damages component sought by plaintiffs involving the fair value of thousands of purchased securities including mortgage backed securities, auction rate securities, collateralized loan obligations and other securitized assets. Of $5 billion valuation damages sought by plaintiffs, $0 damages were awarded in 2010 trial.

*Retained by the Official Committee of Unsecured Creditors of the LandAmerica Financial Group, Inc. et al. (formerly Bingham McCutchen LLP, LeClairRyan)* to lead litigation support team in development of expert report pertaining to liability and damages in breach of fiduciary duty litigation bought against directors and officers as a result of massive financial losses suffered by LandAmerica and its subsidiary, Land America 1031 Exchange Services, which ultimately led to its implosion and Chapter 11 filing 2009. Matter favorably settled with recovery of most of the available insurance proceeds.



*Retained on confidential matter on behalf of hedge fund (Hogan Lovells)* to lead expert work pertaining to losses incurred on close out of credit default swaps with certain counterparties in the wake of the Lehman Brothers Holdings bankruptcy.

*Retained by DaimlerChrysler Financial Services (Thompson Coburn LLP)* to lead litigation support and expert work in defense of claims of alleged lending discrimination sought by Chrysler's dealer network. Compilation of an analytical dataset and subsequent statistical analysis of tens of thousands of financing transactions led to significant settlement savings within nine months of retention.

*Various matters on behalf of Arthur Andersen LLP.* Advisory partner in dozens of litigation and investigation matters. Provided litigation consulting or investigatory role on legal and regulatory matters involving alleged audit failures and violations of professional standards (GAAP/GAAS). Responsibilities included working paper review, assessment of compliance with policies and procedures, engagement team interviews and matter resolution strategies. Illustrative cases include: a civil/criminal matter pertaining to the forward-looking financial statements issued by real estate limited partnerships; civil litigation involving the unauthorized trading of mortgage-backed securities by a governmental entity; civil and regulatory matters involving revenue recognition of bill and hold transactions for a public company; and civil litigation involving revenue recognition issues of a biotechnology company.

*Retained by Grant Thornton (Mayer Brown)* in its defense of a broker–dealer audit client that allegedly executed sham government securities transactions and conferred tax losses on professional athletes. Work involved forensic reconstruction and financial analysis of trading and re-estimation of tax liabilities. Matter resolved favorably on behalf of accounting firm.

*Retained by the Chicago Board of Trade (Kirkland & Ellis LLP)* in response to a CFTC enforcement action against the exchange's internal audit division. Led engagement team that reviewed the work papers of the Office of Investigations and Audits (OIA), and subsequently uncovered a fraudulent accounting scheme at a broker dealer that the OIA had been unable to unravel. Case was favorably resolved. Subsequently retained by the OIA to advise on improvements to its policies and procedures to reduce execution risks on future audits.

*Retained by Ferruzzi Finanziaria (Sidley Austin LLP) and Deloitte & Touche* to assist in an independent investigation initiated by a consortium of Italian banks regarding grain trading losses reported by an Italian subsidiary.

*Retained by Ferruzzi USA (Sidley Austin LLP)* to lead litigation support team in response to a $150 million deficiency notice issued by the IRS over the tax treatment of futures and options hedges. Work involved forensic reconstruction of trading models and strategies and was subsequently used by Ferruzzi's outside auditor and tax preparer, PricewaterhouseCoopers, in advantageous settlement with IRS.

*Retained by Ferruzzi Finanziaria (Sidley Austin LLP)* to lead engagement in response to a CFTC investigation into regulatory reporting issues. Matter favorably resolved based on analytical information and reports provided to regulators.



*Retained by Ferruzzi Finanziaria (Sidley Austin LLP)* to lead litigation support team in defense of a securities class action alleging market manipulation and hundreds of millions of dollars of damages on thousands of futures market participants. Performed forensic reconstruction of global trading positions in cash, futures and forwards for purposes of analyzing speculative versus hedging positions and testing allegations of inflated market prices given market events and defendant holdings. Work resulted in narrowing of class and favorable settlement on behalf of client.

*Retained by First Chicago (now JPMorgan Chase) (Sidley Austin LLP)* in litigation involving the "run" on a real estate investment fund stemming from sudden investor redemption requests. Led litigation support team that modeled effects of participants' net asset values under various redemption scenarios and provided strategic advice in settlement negotiations. Client settled at amount below expectations. Subsequently retained to assist in the settlement discussions with the Office of the Comptroller of the Currency (OCC), which were timely resolved.

*Retained by Ferruzzi Finanziaria (Sidley Austin LLP)* to lead litigation support and three-month trial support initiatives in defense of a regulatory investigation by the Chicago Board of Trade Business Conduct Committee over allegations of market manipulation and multi-million dollar market damages. Performed forensic reconstruction of multi-legged soybean spot, forward, futures, options and CIF/FOB market transactions, and macroeconomic analysis of underlying market fundamentals. Client prevailed against charges. No findings of market manipulation were brought against client.

*Retained by the Legal Department of First Chicago (now JPMorgan Chase)* to consult on the valuation of employee stock options in regards to pending employment litigation matters.

*Retained by Conagra/Armour Swift Eckrich (formerly Pretty Schroeder Brueggemann & Clark)* in its defense against patent infringement charges pertaining to the meat processing and packaging division. Led litigation support and trial support team addressing damages. Jury award against client less than one-third the amount requested by plaintiff.

*Retained by Commonwealth Edison (Sidley Austin LLP)* in response to an EEOC complaint alleging discrimination in the recruitment and hiring of employees. Led litigation support engagement that constructed an applicant flow database and models for over 80,000 prospective employees spanning a half decade. Analytical work used in successful resolution of matter.

*Retained by Continental Grain (Sidley Austin LLP)* in its corporate investigation of a failed arbitrage trading subsidiary and ensuing multi-district litigation involving the trading fraud perpetrated by this entity. Led litigation support team that performed forensic reconstruction of hundreds of thousands of government securities, repurchase agreements and futures market transactions, and built computer models to test hypotheses of fictitious, fraudulent, prearranged, and tax-motivated trading on customer accounts. Coordinated analytical support for numerous experts. Provided trial support in first counter claim tried against a primary dealer for facilitating the fraud and achieved $140 million verdict for client. Subsequently participated in settlement discussions with hundreds of investors and achieved favorable resolution of all outstanding matters.

*Retained by Drexel Burnham Lambert (Sidley Austin LLP)* in conjunction with massive governmental investigation of insider trading in junk bonds by Mike Milken and Ivan Boesky. Led litigation support team in forensic investigation that entailed the review of millions of documents.

6



**Other Consulting Assignments**

*Retained by the legal department of Walmart* to advise on strategic technology initiatives. Developed a benchmarking survey on technology utilization by leading corporate legal departments.

*Retained by the legal department of Walmart* to advise on attorney compensation in the wake of the 2008 market collapse.

*Retained by the general counsel of General Dynamics* to advise on organizational structure and knowledge management. Delivered cutting-edge research to a peer group of Fortune 200 law departments with the highest reputations for innovation. Reported on the impact of law department organizational design on the ability of lawyers to identify, communicate and respond to critical legal and risk-related information.

*Retained by legal department of Amgen* to perform legal technology benchmarking and make recommendations on investments in matter management and e-billing software. Scope of recommendations included advice on enhancements/modifications to business processes and information flows.

*Retained by the general counsel of Walmart* to advise on the transformation of its attorney compensation and performance platform. Repositioned client to attract and retain top talent thru revised career paths, compensation packages and performance structures.

*Retained by an international accounting firm* to advise on knowledge management and data mining processes to identify patterns in causation factors in litigation matters and other troubled engagements.

*Retained by the Association of Corporate Counsel* (Dallas, Fort Worth, Houston, Austin and San Antonio chapters) to provide legal compensation surveys compiling trends in salary, bonus and other employee benefits.

*Retained by the Association of General Counsels,* an organization of Fortune 200 general counsels, to provide law department compensation survey. Retained to create and analyze statistical information on thousands of domestic and international law department positions. Study became industry benchmark for leading law departments. Findings presented at annual conference.

*Retained by University of North Carolina Chapel Hill* to advise on Governmental Accounting Standards Board reporting and disclosure requirements related to derivative investments in its endowment and other funds.

*Retained by International Netherlanden Bank (ING)* to perform a surprise audit of a futures commission merchant, Quantum Financial Services, and assess compliance with financial covenants. Subsequently retained to perform a business diagnostics review of Quantum to identify opportunities to enhance revenue and reduce costs over payout structures and floor brokerage operations, and improve both its organizational structure and accounting and business information systems.

*Performed financial statement audits* of banks, savings and loans, hotels, and real estate developers and operators. Also specialized in performing information systems reviews in support of complex

7



audits. Illustrative clients included First City Bank of Houston, University of Chicago Hospital, Continental Airlines, University Savings and Loan, Ben Franklin Savings, the Houstonian Hotel, and Romanek Properties.

**Other Professional Experience**

Global Risk Management partner at Arthur Andersen with international responsibilities to drive strategic alignment, risk management and cost reduction strategies across matrix structure of functional groups, firm management and the business operators/partners. Delivered firm's first international knowledge management initiatives, including the creation of a data mining function to analyze litigation and other troubled client engagements, identify patterns in causation and recommend policies and procedures to reduce recurrence.

Partner seconded to Arthur Andersen's Global Risk Management Executive Committee to monitor risk management action plans of the business units to peer reviews and compliance audits.

Partner leading Arthur Andersen's firm wide initiative to analyze risks associated with dozens of international mergers, acquisitions, alliances, joint ventures, equity deals and new country expansions totaling about $420,000,000 in investments. Responsibilities varied, but typically included an emphasis on deal quality control, integration execution management and identification of best practices.

Interim CFO/COO responsibilities for Arthur Andersen's legal department, a $100 million to $250+ million, 100-person international law department. Implemented top-down enhancements to the department's organizational structure, technology solutions, financial reporting policies and procedures, and management of outside counsel. Migrated service model from outside counsel to dedicated, in-house support, tripling headcount about twelve months and creating cost savings by reducing law firm expenditures and strategically outsourcing non-core activities.

Arthur Andersen partner liaison between the legal department and professional indemnity insurance representatives regarding the litigation portfolio, costs, risk benchmarks, and firm-wide risk management initiatives. Liaison responsibilities extended to status/management of cases.

Advised on the wind-down of Arthur Andersen's insurance consortium, the startup of a captive program, and the solicitation of reinsurance bids for certain attest and non-attest risk portfolios. Accounted for the coverage and collection on matters and performed financial modeling on various loss scenarios for the firm's captive insurance company.

Selected to perform the Litigation Services Quality Review Program of Andersen's Washington D.C. Specialty Consulting Practice.

## ARTICLES/INSTRUCTOR/LECTURER/PANELIST

"Liability Hot Buttons for 2014." Baruch College National Association of State Boards of Accountancy Center for the Public Trust (CPT), December 6, 2013, New York, NY.



"Update: A Brief Overview of Trends in PCAOB Inspection Reports, What Every Practitioner Should Know" (with Joe Moravy), in PLI Course Handbook, Basics of Accounting for Lawyers 2013: What Every Practicing Lawyer Needs to Know (2013).

Article commentary. Kmet, Carolyn. "Illinois' Big Four." *Insight Magazine,* The Magazine of the Illinois CPA Society, Sep. 2013: 38–41. Print.

 "A Brief Overview of Trends in PCAOB Inspection Reports: What Every Practitioner Should Know" (with Joe Moravy), in PLI Course Handbook, Basics of Accounting for Lawyers 2011: What Every Practicing Lawyer Needs to Know (2011).

"Turning Litigation Data into Litigation Intelligence," National Organization of Women Lawyers Fourth Annual General Counsel Institute, November 6, 2008, New York, NY.

"Report on the Third Annual National Survey on Retention and Promotion of Women in Law Firms," National Association of Women Lawyers, November 2008.

"Managing Outside Counsel: From Bill Review to Benchmarking," Mitratech Interact Legal and Compliance Technology Forum, October 3, 2008, Marina del Rey, CA.

"Risk Management: How to Stay Ahead of the Next Big Development," Sixth Annual DELVACCA General Counsel Forum, 2008, Philadelphia, PA.

"Early Case Assessment and Preliminary Damages Analysis," Mitratech Interact Legal and Compliance Conference, September 9–11, 2007, Phoenix, AZ.

"Business Intelligence," Mitratech Interact 2007 Conference, September 9–11, 2007, Phoenix, AZ.

"Managing Matter Management," International Legal Technology Association, March 2, 2007, New York, NY.

"Risk Management is Good Management," National Association of Women Lawyers Third Annual General Counsel Institute, November 2007, New York, NY.

"2006 Association of General Counsel In-House Legal Department Survey," Association of General Counsel, October 2006, Washington, DC.

"How to Manage Document Retention and Destruction Issues in Illinois-Role of Inside Counsel," Lorman Education Series, June 22, 2006, Chicago, IL.

"10 Common Electronic Discovery Risks: How to Avoid Them, Fix Them and Learn from Them," Greenberg Traurig Annual Conference, May 19, 2006, Kohler, WI.

"Litigation Matter Management and Technology Trends," Jenner & Block (1999), Chicago, IL.

"Andersen Technology Platform and Litigation Case Assessment," DuPont In-House Legal Department, (1999), Wilmington, DE.



"Statistical Sampling and Regression Analysis," three-day course presented to Provident Life and Accident Insurance Company and the law firm of Steel, Hector and Davis LLP, St. Charles, IL.

"Partner/Manager Statistical Sampling"; developed and taught three-day sampling course for Andersen partners and managers (1993, 1994, 1995)

"Statistical Sampling and Regression Training"; developed and taught three-day sampling and regression analysis course for Andersen seniors and staff (1993, 1994).

## ELIZABETH KROGER DAVIS

## <u>SUMMARY OF PUBLICATIONS FOR LAST TEN YEARS</u>

| ARTICLE NAME | PUBLICATION/FORUM | YEAR |
|---|---|---|
| Update:  A Brief Overview of Trends in PCAOB Inspection Reports (with Joe Moravy) | PLI Course Handbook, Basics of Accounting for Lawyers 2013: What Every Practicing Lawyer Needs to Know | 2013 |
| Article Commentary, "Illinois' Big Four" | Carolyn, Kmet, "Illinois' Big Four", *Insight Magazine*, The Magazine of the Illinois CPA Society | 2013 |
| A Brief Overview of Trends in PCAOB Inspection Report (with Joe Moravy) | PLI Course Handbook, Basics of Accounting for Lawyers 2011: What Every Practicing Lawyer Needs to Know | 2011 |
| Turning Litigation Data into Litigation Intelligence | National Organization of Women Lawyers Fourth Annual General Counsel Institute | 2008 |
| Report on the Third Annual National Survey on Retention and Promotion of Women in Law Firm | National Association of Women Lawyers | 2008 |

## <u>SUMMARY OF TESTIMONY FOR LAST FOUR YEARS</u>

| TYPE | LAW FIRM | SUBJECT | MATTER NAME | VENUE | YEAR | TESTIFIED FOR |
|---|---|---|---|---|---|---|
| Declaration | Quinn Emanuel Urquhart & Sullivan, LLP | Respond to Class Action Challenge Submission | *In Re Credit Default Swaps Antitrust Litigation* | United States District Court for the Southern District of New York | 2016 | Plaintiff |
| Declaration | Quinn Emanuel Urquhart & Sullivan, LLP | Declaration in Support of Class Counsel for Fee Award & Reimbursement | *In Re Credit Default Swaps Antitrust Litigation* | United States District Court for the Southern District of New York | 2016 | Plaintiff |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and Documents Relied Upon**                    **APPENDIX B**

| | | BATES RANGE | |
|---|---|---|---|
| TTL | DESCRIPTION | BEGINNING | END |

**Pleadings**

Consolidated Amended Antitrust Class Action Complaint, Docket 208
Zuffa, LLC's Motion for Partial Summary Judgment, Docket 347
Zuffa, LLC's Consolidated Notice of Motion and Motion to Dismiss, Docket 64

**Expert Reports**

Expert Report of Hal J. Singer, Errata and Workpapers
Expert Report of Andrew Zimbalist, Errata and Workpapers
Expert Report of Guy A. Davis
Guy Davis Backup Support "Cung Le v Zuffa - Protiviti Discovery.xls"

**Depositions**

Deposition of Lorenzo Fertitta, March 23, 2017
Deposition of John Mulkey, April 19, 2017
Deposition of Ike Lawrence Epstein, December 2, 2016
Deposition of Ike Lawrence Epstein, July 21, 2017
Deposition of Ike Lawrence Epstein, May 26, 2017
Deposition of Dana White, August 9, 2017
Deposition of Dana White, August 10, 2017
Deposition of Andrew Zimbalist, September 25, 2017
Deposition of Guy Davis, September 19, 2017
Deposition of Hal Singer, September 27, 2017
Deposition of Scott Coker, August 3, 2017
Deposition of Denitza Batchvarova, January 25, 2017
Deposition of John Hertig, April 27, 2017
Deposition of Jeff Aronson, April 25, 2017

**Other Documents without Bates Stamps**

Fighter Comp Detail.xls
12'12 Zuffa IS YTD Side by Side ref to financials NEW.xls
12'15 IS YTD Side by Side FINAL.xls
2010 Final IS Referenced to FS - Restated.xls
Zuffa Parent LLC - Predecessor Financial Statements - 3_31_17 - vFINAL.pdf
Zuffa Parent LLC - Successor Financial Statements - 3_31_17 - vFINAL.pdf
Shannon P. Pratt and Alina V. Niculita, *Valuing a Business, the Analysis and Appraisal of Closely Held Companies* , Fifth Edition (New York, NY: McGraw-Hill, 2008), Chapter 11.
BJPenn.com, *Report: Viacom tells Bellator officials to 'sign every single big name out there'* April 3, 2017 [http://www.bjpenn.com/mma-news/bellator/report-viacom-tells-bellator-officials-sign-every-single-big-name/]
Bret Okamoto, "*Coker: '[Bellator NYC] is the best MMA PPV that's been offered in 2017'*" ESPN.COM, June 7, 2017 [http://www.espn.com/mma/story/_/id/19558519/bellator-scott-coker-best-mma-ppv-offered-2017]
Ron Borges, "It was the Ultimate save: Business plan by Fertittas and White took from UFC from the brink to the hieghts" Boston Herald, August 26, 2010

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and Documents Relied Upon**                                                    **APPENDIX B**

| | | BATES RANGE | |
|---|---|---|---|
| **TTL** | **DESCRIPTION** | **BEGINNING** | **END** |

**Bates Stamped Documents**                                                                    -

    **Bout Class Compensation**

| | | |
|---|---|---|
| | ZFL-2603701 | ZFL-2603701 |
| | ZFL-2764800 | ZFL-2764800 |
| | ZFL-0000003 | ZFL-0000003 |
| | ZFL-2458185 | ZFL-2458185 |
| | ZFL-2458186 | ZFL-2458186 |
| | ZFL-2603701 | ZFL-2603701 |
| | ZFL-2700520 | ZFL-2700521 |
| | ZFL-2700522 | ZFL-2700522 |
| | ZFL-2764800 | ZFL-2764800 |

    **Identity Class Compensation**

| | | |
|---|---|---|
| | ZFL-2603704 | ZFL-2603704 |
| | ZFL-2650184 | ZFL-2650184 |
| | ZFL-2650185 | ZFL-2650185 |
| | ZFL-2650186 | ZFL-2650186 |
| | ZFL-2650188 | ZFL-2650188 |
| | ZFL-2650189 | ZFL-2650189 |
| | ZFL-2679053 | ZFL-2679053 |

    **Zuffa Internal Financial Statements**

| | | |
|---|---|---|
| | ZFL-2764799 | ZFL-2764799 |
| | ZFL-1514712 | ZFL-1514712 |
| | ZFL-1381761 | ZFL-1381761 |
| | ZFL-1514900 | ZFL-1514900 |
| | ZFL-1514804 | ZFL-1514804 |
| | ZFL-1514966 | ZFL-1514966 |
| | ZFL-1514769 | ZFL-1514769 |
| | ZFL-1514933 | ZFL-1514933 |
| | ZFL-1514944 | ZFL-1514944 |
| | ZFL-1514713 | ZFL-1514713 |
| | ZFL-1472224 | ZFL-1472224 |
| | ZFL-1674096 | ZFL-1674096 |
| | ZFL-1514870 | ZFL-1514870 |
| | ZFL-1514770 | ZFL-1514770 |
| | ZFL-1514901 | ZFL-1514901 |
| | ZFL-1514837 | ZFL-1514837 |
| | ZFL-1053223 | ZFL-1053223 |
| | ZFL-1514836 | ZFL-1514836 |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**       **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| TTL | DESCRIPTION | BEGINNING | END |
| | **Strikeforce Revenues** | | |
| | | ZFL-1472337 | ZFL-1472337 |
| | | ZFL-1472338 | ZFL-1472338 |
| | | ZFL-2458185 | ZFL-2458185 |
| | | ZFL-2458186 | ZFL-2458186 |
| | **Event Level Financials** | | |
| | | ZFL-2603702 | ZFL-2603702 |
| | | ZFL-2650187 | ZFL-2650187 |
| | | ZFL-2764797 | ZFL-2764797 |
| | | ZFL-2764798 | ZFL-2764798 |
| | **Event Revenues** | | |
| | | ZFL-0000267 | ZFL-0000267 |
| | | ZFL-0000268 | ZFL-0000268 |
| | | ZFL-0000366 | ZFL-0000366 |
| | | ZFL-0000368 | ZFL-0000368 |
| | | ZFL-0000370 | ZFL-0000370 |
| | | ZFL-0000372 | ZFL-0000372 |
| | | ZFL-0000379 | ZFL-0000379 |
| | | ZFL-0000380 | ZFL-0000380 |
| | | ZFL-0000381 | ZFL-0000381 |
| | | ZFL-0000382 | ZFL-0000382 |
| | | ZFL-0000383 | ZFL-0000383 |
| | | ZFL-0000385 | ZFL-0000385 |
| | | ZFL-0000386 | ZFL-0000386 |
| | | ZFL-0000387 | ZFL-0000387 |
| | | ZFL-0000389 | ZFL-0000389 |
| | | ZFL-0000390 | ZFL-0000390 |
| | | ZFL-0000391 | ZFL-0000391 |
| | | ZFL-0000392 | ZFL-0000392 |
| | | ZFL-0000394 | ZFL-0000394 |
| | | ZFL-0000395 | ZFL-0000395 |
| | | ZFL-0000396 | ZFL-0000396 |
| | | ZFL-0000398 | ZFL-0000398 |
| | | ZFL-0000399 | ZFL-0000399 |
| | | ZFL-0000400 | ZFL-0000400 |
| | | ZFL-0000401 | ZFL-0000401 |
| | | ZFL-0000402 | ZFL-0000402 |
| | | ZFL-0000403 | ZFL-0000403 |
| | | ZFL-0000405 | ZFL-0000405 |
| | | ZFL-0000406 | ZFL-0000406 |
| | | ZFL-0000407 | ZFL-0000407 |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**                   **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| TTL | DESCRIPTION | BEGINNING | END |
| | | ZFL-0000409 | ZFL-0000409 |
| | | ZFL-0000411 | ZFL-0000411 |
| | | ZFL-0000412 | ZFL-0000412 |
| | | ZFL-0000413 | ZFL-0000413 |
| | | ZFL-0000414 | ZFL-0000414 |
| | | ZFL-0003919 | ZFL-0003919 |
| | | ZFL-0003920 | ZFL-0003920 |
| | | ZFL-0003921 | ZFL-0003921 |
| | | ZFL-0003935 | ZFL-0003935 |
| | | ZFL-0003936 | ZFL-0003936 |
| | | ZFL-0003937 | ZFL-0003937 |
| | | ZFL-0003938 | ZFL-0003938 |
| | | ZFL-0003939 | ZFL-0003939 |
| | | ZFL-0003940 | ZFL-0003940 |
| | | ZFL-0003941 | ZFL-0003941 |
| | | ZFL-0003942 | ZFL-0003942 |
| | | ZFL-0003943 | ZFL-0003943 |
| | | ZFL-0003944 | ZFL-0003944 |
| | | ZFL-0003945 | ZFL-0003945 |
| | | ZFL-0003947 | ZFL-0003947 |
| | | ZFL-0003948 | ZFL-0003948 |
| | | ZFL-0003950 | ZFL-0003950 |
| | | ZFL-0003952 | ZFL-0003952 |
| | | ZFL-0003953 | ZFL-0003953 |
| | | ZFL-0003954 | ZFL-0003954 |
| | | ZFL-0003955 | ZFL-0003955 |
| | | ZFL-0003956 | ZFL-0003956 |
| | | ZFL-0003957 | ZFL-0003957 |
| | | ZFL-0003958 | ZFL-0003958 |
| | | ZFL-0003959 | ZFL-0003959 |
| | | ZFL-0003960 | ZFL-0003960 |
| | | ZFL-0003961 | ZFL-0003961 |
| | | ZFL-0003962 | ZFL-0003962 |
| | | ZFL-0003963 | ZFL-0003963 |
| | | ZFL-0003964 | ZFL-0003964 |
| | | ZFL-0003967 | ZFL-0003967 |
| | | ZFL-0003968 | ZFL-0003968 |
| | | ZFL-0003969 | ZFL-0003969 |
| | | ZFL-0003970 | ZFL-0003970 |
| | | ZFL-0003971 | ZFL-0003971 |
| | | ZFL-0003972 | ZFL-0003972 |
| | | ZFL-1001246 | ZFL-1001246 |
| | | ZFL-1001247 | ZFL-1001247 |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**        **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| TTL | DESCRIPTION | BEGINNING | END |
| | | ZFL-1033791 | ZFL-1033791 |
| | | ZFL-1033792 | ZFL-1033792 |
| | | ZFL-1054659 | ZFL-1054659 |
| | | ZFL-1054660 | ZFL-1054660 |
| | | ZFL-1057705 | ZFL-1057705 |
| | | ZFL-1057706 | ZFL-1057706 |
| | | ZFL-1058008 | ZFL-1058008 |
| | | ZFL-1058009 | ZFL-1058009 |
| | | ZFL-1058999 | ZFL-1058999 |
| | | ZFL-1059000 | ZFL-1059000 |
| | | ZFL-1062694 | ZFL-1062694 |
| | | ZFL-1062695 | ZFL-1062695 |
| | | ZFL-1062696 | ZFL-1062696 |
| | | ZFL-1067455 | ZFL-1067455 |
| | | ZFL-1067456 | ZFL-1067456 |
| | | ZFL-1069205 | ZFL-1069205 |
| | | ZFL-1069206 | ZFL-1069206 |
| | | ZFL-1084338 | ZFL-1084338 |
| | | ZFL-1084339 | ZFL-1084339 |
| | | ZFL-1085023 | ZFL-1085024 |
| | | ZFL-1085025 | ZFL-1085025 |
| | | ZFL-1085026 | ZFL-1085026 |
| | | ZFL-1085223 | ZFL-1085223 |
| | | ZFL-1085224 | ZFL-1085224 |
| | | ZFL-1088469 | ZFL-1088469 |
| | | ZFL-1088470 | ZFL-1088470 |
| | | ZFL-1089627 | ZFL-1089627 |
| | | ZFL-1089628 | ZFL-1089628 |
| | | ZUF-00031995 | ZUF-00031995 |
| | | ZUF-00032038 | ZUF-00032038 |
| | | ZUF-00032039 | ZUF-00032039 |
| | | ZUF-00032040 | ZUF-00032040 |
| | | ZUF-00032043 | ZUF-00032043 |
| | | ZUF-00032044 | ZUF-00032044 |
| | | ZUF-00033613 | ZUF-00033613 |
| | | ZUF-00033614 | ZUF-00033614 |
| | | ZUF-00033633 | ZUF-00033633 |
| | | ZUF-00033634 | ZUF-00033634 |
| | | ZUF-00034209 | ZUF-00034209 |
| | | ZUF-00034210 | ZUF-00034210 |
| | | ZUF-00104684 | ZUF-00104685 |
| | | ZUF-00104686 | ZUF-00104686 |
| | | ZUF-00106615 | ZUF-00106615 |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**       **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| TTL | DESCRIPTION | BEGINNING | END |
| | | ZUF-00106616 | ZUF-00106616 |
| | | ZUF-00106617 | ZUF-00106617 |
| | | ZUF-00106618 | ZUF-00106618 |
| | | ZUF-00106619 | ZUF-00106619 |
| | | ZUF-00106620 | ZUF-00106620 |
| | | ZUF-00106621 | ZUF-00106621 |
| | | ZUF-00106622 | ZUF-00106622 |
| | | ZUF-00106848 | ZUF-00106848 |
| | | ZUF-00106849 | ZUF-00106849 |
| | | ZUF-00106850 | ZUF-00106850 |
| | | ZUF-00106851 | ZUF-00106851 |
| | | ZUF-00106852 | ZUF-00106852 |
| | | ZUF-00106853 | ZUF-00106853 |
| | | ZUF-00106854 | ZUF-00106854 |
| | | ZUF-00106855 | ZUF-00106855 |
| | | ZUF-00106856 | ZUF-00106856 |
| | | ZUF-00107337 | ZUF-00107337 |
| | | ZUF-00107338 | ZUF-00107338 |
| | | ZUF-00107339 | ZUF-00107339 |
| | | ZUF-00107340 | ZUF-00107340 |
| | | ZUF-00107341 | ZUF-00107341 |
| | | ZUF-00107342 | ZUF-00107342 |
| | | ZUF-00107343 | ZUF-00107343 |
| | | ZUF-00107344 | ZUF-00107344 |
| | | ZUF-00107653 | ZUF-00107653 |
| | | ZUF-00107654 | ZUF-00107654 |
| | | ZUF-00107655 | ZUF-00107655 |
| | | ZUF-00107656 | ZUF-00107656 |
| | | ZUF-00107657 | ZUF-00107657 |
| | | ZUF-00107658 | ZUF-00107658 |
| | | ZUF-00107822 | ZUF-00107822 |
| | | ZUF-00107823 | ZUF-00107824 |
| | | ZUF-00107825 | ZUF-00107825 |
| | | ZUF-00107826 | ZUF-00107826 |
| | | ZUF-00107827 | ZUF-00107827 |
| | | ZUF-00107936 | ZUF-00107936 |
| | | ZUF-00107937 | ZUF-00107937 |
| | | ZUF-00107998 | ZUF-00107998 |
| | | ZUF-00107999 | ZUF-00108000 |
| | | ZUF-00108001 | ZUF-00108001 |
| | | ZUF-00108002 | ZUF-00108002 |
| | | ZUF-00108003 | ZUF-00108003 |
| | | ZUF-00108653 | ZUF-00108653 |

**HIGHLY CONFIDENTIAL**       

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**                    **APPENDIX B**
**Documents Relied Upon**

|  |  | BATES RANGE | |
|---|---|---|---|
| TTL | DESCRIPTION | BEGINNING | END |
|  |  | ZUF-00108654 | ZUF-00108654 |
|  |  | ZUF-00109208 | ZUF-00109208 |
|  |  | ZUF-00109209 | ZUF-00109209 |
|  |  | ZUF-00109742 | ZUF-00109742 |
|  |  | ZUF-00109743 | ZUF-00109743 |
|  |  | ZUF-00109744 | ZUF-00109744 |
|  |  | ZUF-00109745 | ZUF-00109745 |
|  |  | ZUF-00109746 | ZUF-00109746 |
|  |  | ZUF-00109747 | ZUF-00109747 |
|  |  | ZUF-00111359 | ZUF-00111359 |
|  |  | ZUF-00111360 | ZUF-00111360 |
|  |  | ZUF-00111361 | ZUF-00111361 |
|  |  | ZUF-00111362 | ZUF-00111362 |
|  |  | ZUF-00111363 | ZUF-00111363 |
|  |  | ZUF-00111364 | ZUF-00111364 |
|  |  | ZUF-00111365 | ZUF-00111365 |
|  |  | ZUF-00111366 | ZUF-00111366 |
|  |  | ZUF-00111367 | ZUF-00111367 |
|  |  | ZUF-00111368 | ZUF-00111368 |
|  |  | ZUF-00111369 | ZUF-00111369 |
|  |  | ZUF-00268689 | ZUF-00268690 |
|  |  | ZUF-00268691 | ZUF-00268691 |
|  |  | ZUF-00268692 | ZUF-00268692 |
|  | **Zuffa Audited Financial Statements** |  |  |
|  |  | ZFL-0000221 | ZFL-0000255 |
|  |  | RAINE0016835 | RAINE0017416 |
|  |  | ZFL-0000031 | ZFL-0000063 |
|  |  | ZFL-0000113 | ZFL-0000135 |
|  |  | ZFL-0000188 | ZFL-0000220 |
|  |  | ZFL-0000064 | ZFL-0000087 |
|  |  | ZFL-0000007 | ZFL-0000030 |
|  |  | ZFL-0000088 | ZFL-0000112 |
|  |  | ZFL-0000169 | ZFL-0000187 |
|  |  | ZFL-0000136 | ZFL-0000168 |
|  | **Competitor Financial Statements** |  |  |
|  |  | SBPCL00002101 | SBPCL00002102 |
|  | **PPV Exemplar Contracts** |  |  |
|  |  | ZFL-0108084 | ZFL-0108093 |
|  |  | ZFL-0306658 | ZFL-0306822 |
|  |  | ZFL-0313388 | ZFL-0313590 |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**                              **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| TTL | DESCRIPTION | BEGINNING | END |
| | | ZFL-0357812 | ZFL-0357820 |
| | | ZFL-0359721 | ZFL-0359729 |
| | | ZFL-0360737 | ZFL-0360745 |
| | | ZFL-0370265 | ZFL-0370272 |
| | | ZFL-0379019 | ZFL-0379028 |
| | | ZFL-0387495 | ZFL-0387504 |
| | **Debt Financing & Valuation** | | |
| | | RAINE0018791 | RAINE0018809 |
| | | ZFL-2649918 | ZFL-2649989 |
| | | ZFL-1677117 | ZFL-1677189 |
| | | ZFL-2509465 | ZFL-2509518 |
| | | RAINE0017417 | RAINE0017717 |
| | | RAINE0016835 | RAINE0017416 |
| | | DB-ZUFFA-00006237 | DB-ZUFFA-00006313 |
| | | DB-ZUFFA-00006389 | DB-ZUFFA-00006457 |
| | | DB-ZUFFA-00006712 | DB-ZUFFA-00006786 |
| | | ZFL-1240584 | ZFL-1240591 |
| | **Miscellaneous** | | |
| | | ZFL-2700584.00001 | ZFL-2700584.00001 |
| | | LEPLAINTIFFS-0076636 | LEPLAINTIFFS-0076653 |
| | | LEPLAINTIFFS-0048763 | LEPLAINTIFFS-0048781 |
| | | LEPLAINTIFFS-0048947 | LEPLAINTIFFS-0048953 |
| | | ZFL-1238033 | ZFL-1238070 |
| | | ZUF-00304127 | ZUF-00304171 |
| | | ZUF-00172283 | ZUF-00172323 |
| | | ZUF-00374846 | ZUF-00374846 |
| | | WME_ZUFFA_00001149 | WME_ZUFFA_00001150.00039 |

**Cung Le, et al. v. Zuffa, LLC**                                                                                                    Exhibit A to Expert Report of Elizabeth Kroger Davis
**Pro-forma Financial Results Based on Zimbalist Damages as Fighter Compensation**
*(in thousands)*

| | Net Income (Loss) | | | Operating Income (Loss) | | | EBITDA | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Reported in Audited Financial Statements | Zimbalist Damages [1] | Pro-forma Results | As Reported in Audited Financial Statements | Zimbalist Damages [1] | Pro-forma Results | Per Guy Davis Report, Exhibits 1 and 1a | Zimbalist Damages [1] | Pro-forma Results |
| Dec. 16-31, 2010 [2] | $ 5,248 | $ (8,090) | $ (2,842) | $ 6,864 | $ (8,090) | $ (1,226) | $ 6,829 | $ (8,090) | $ (1,261) |
| 2011 | $ 95,960 | $ (148,475) | (52,515) | $ 133,522 | $ (148,475) | $ (14,953) | $ 131,114 | $ (148,475) | (17,361) |
| 2012 | $ 31,123 | $ (149,111) | (117,988) | $ 60,828 | $ (149,111) | $ (88,283) | $ 72,447 | $ (149,111) | (76,664) |
| 2013 | $ 84,788 | $ (166,107) | (81,319) | $ 137,178 | $ (166,107) | $ (28,929) | $ 131,631 | $ (166,107) | (34,476) |
| 2014 | $ 26,621 | $ (148,716) | (122,095) | $ 73,957 | $ (148,716) | $ (74,759) | $ 69,242 | $ (148,716) | (79,474) |
| 2015 | $ 118,502 | $ (151,502) | (33,000) | $ 157,806 | $ (151,502) | $ 6,304 | $ 160,172 | $ (151,502) | 8,670 |
| 2016 | $ (85,120) | $ (200,243) | (285,363) | $ 111,761 | $ (200,243) | $ (88,482) | $ 202,218 | $ (200,243) | 1,975 |
| Total | $ 277,122 | $ (972,243) | (695,121) | $ 681,916 | $ (972,243) | $ (290,327) | $ 773,653 | $ (972,243) | (198,590) |

[1] - Dr. Zimbalist Errata to Expert Report, Dated September 19, 2017, Table 4-E.
[2] - Allocation of 2010 net income, operating income, and EBITDA amounts to the Class Period are from Guy Davis Report.

Cung Le, et al. v. Zuffa, LLC

Exhibit B to Expert Report of Elizabeth Kroger Davis

**Pro-forma Financial Results Based on Zimbalist Damages as Fighter Compensation**

*(in thousands)*

| Class Period: | Net Income (Loss) | | | | Operating Income (Loss) | | | | EBITDA | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | As Reported in Audited Financial Statements | Zimbalist Damages [1] | Damages Paid from Aviation and Management | Pro-forma Results | As Reported in Audited Financial Statements | Zimbalist Damages [1] | Damages Paid from Aviation and Management | Pro-forma Results | Per Guy Davis Report, Exhibits 1 and 1a | Zimbalist Damages [1] | Damages Paid from Aviation and Management | Pro-forma Results |
| Dec. 16-31, 2010 [2] | $ 5,248 | $ (8,090) | $ 518 | $ (2,324) | $ 6,864 | $ (8,090) | $ 518 | $ (708) | $ 6,829 | $ (8,090) | $ 518 | $ (743) |
| 2011 | $ 95,960 | $ (148,475) | $ 10,527 | $ (41,988) | $ 133,522 | $ (148,475) | $ 10,527 | $ (4,426) | $ 131,114 | $ (148,475) | $ 10,527 | $ (6,834) |
| 2012 | $ 31,123 | $ (149,111) | $ 12,834 | $ (105,154) | $ 60,828 | $ (149,111) | $ 12,834 | $ (75,449) | $ 72,447 | $ (149,111) | $ 12,834 | $ (63,830) |
| 2013 | $ 84,788 | $ (166,107) | $ 13,863 | $ (67,456) | $ 137,178 | $ (166,107) | $ 13,863 | $ (15,066) | $ 131,631 | $ (166,107) | $ 13,863 | $ (20,613) |
| 2014 | $ 26,621 | $ (148,716) | $ 8,500 | $ (113,595) | $ 73,957 | $ (148,716) | $ 8,500 | $ (66,259) | $ 69,242 | $ (148,716) | $ 8,500 | $ (70,974) |
| 2015 | $ 118,502 | $ (151,502) | $ 5,500 | $ (27,500) | $ 157,806 | $ (151,502) | $ 5,500 | $ 11,804 | $ 160,172 | $ (151,502) | $ 5,500 | $ 14,170 |
| 2016 | $ (85,120) | $ (200,243) | $ 4,941 | $ (280,422) | $ 111,761 | $ (200,243) | $ 4,941 | $ (83,541) | $ 202,218 | $ (200,243) | $ 4,941 | $ 6,916 |
| Total | $ 277,122 | $ (972,243) | $ 56,683 | $ (638,438) | $ 681,916 | $ (972,243) | $ 56,683 | $ (233,644) | $ 773,653 | $ (972,243) | $ 56,683 | $ (141,907) |

[1] - Dr. Zimbalist Errata to Expert Report, Dated September 19, 2017, Table 4-E.

[2] - Allocation of 2010 net income, operating income, and EBITDA amounts to the Class Period are from Guy Davis Report.

[3] - G. Davis Report, Table 12.

**Cung Le, et al. v. Zuffa, LLC**                                                                                          Exhibit C to Expert Report of Elizabeth Kroger Davis
**Pro-forma Financial Results Based on Singer Damages as Fighter Compensation - Impact Regression Model**
*(in thousands)*

| | Net Income (Loss) | | | Operating Income (Loss) | | | EBITDA | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Reported in Audited Financial Statements | Singer Damages | Pro-forma Results | As Reported in Audited Financial Statements | Singer Damages | Pro-forma Results | Per Guy Davis Report, Exhibits 1 and 1a | Singer Damages | Pro-forma Results |
| Class Period: | | | | | | | | | |
| Dec. 16-31, 2010 [1] | $ 5,248 | $ (7,971) | $ (2,723) | $ 6,864 | $ (7,971) | $ (1,107) | $ 6,829 | $ (7,971) | $ (1,142) |
| 2011 | $ 95,960 | $ (172,732) | $ (76,772) | $ 133,522 | $ (172,732) | $ (39,210) | $ 131,114 | $ (172,732) | $ (41,618) |
| 2012 | $ 31,123 | $ (215,879) | $ (184,756) | $ 60,828 | $ (215,879) | $ (155,051) | $ 72,447 | $ (215,879) | $ (143,432) |
| 2013 | $ 84,788 | $ (275,470) | $ (190,682) | $ 137,178 | $ (275,470) | $ (138,292) | $ 131,631 | $ (275,470) | $ (143,839) |
| 2014 | $ 26,621 | $ (200,824) | $ (174,203) | $ 73,957 | $ (200,824) | $ (126,867) | $ 69,242 | $ (200,824) | $ (131,582) |
| 2015 | $ 118,502 | $ (248,875) | $ (130,373) | $ 157,806 | $ (248,875) | $ (91,069) | $ 160,172 | $ (248,875) | $ (88,703) |
| 2016 | $ (85,120) | $ (341,912) | $ (427,032) | $ 111,761 | $ (341,912) | $ (230,151) | $ 202,218 | $ (341,912) | $ (139,694) |
| Thru June 30, 2017 [5] | $ (42,560) | $ (171,006) | $ (213,566) | $ 55,881 | $ (171,006) | $ (115,125) | $ 101,109 | $ (171,006) | $ (69,897) |
| Total | $ 234,562 | $ (1,634,670) | $ (1,400,108) | $ 737,797 | $ (1,634,670) | $ (896,874) | $ 874,762 | $ (1,634,670) | $ (759,908) |

**Singer Damages**

| | Bout Class Damages [2] | Identity Class Damages | | Total Damages |
|---|---|---|---|---|
| | | Group 1 [3] | Group 2 [4] | |
| Dec. 16-31, 2010 | $ 7,960 | $ 10 | $ 1 | $ 7,971 |
| 2011 | $ 172,300 | $ 380 | $ 52 | $ 172,732 |
| 2012 | $ 211,600 | $ 3,760 | $ 519 | $ 215,879 |
| 2013 | $ 273,900 | $ 1,380 | $ 190 | $ 275,470 |
| 2014 | $ 199,800 | $ 900 | $ 124 | $ 200,824 |
| 2015 | $ 241,000 | $ 6,920 | $ 955 | $ 248,875 |
| 2016 | $ 327,300 | $ 12,840 | $ 1,772 | $ 341,912 |
| Thru June 30, 2017 | $ 163,700 | $ 6,420 | $ 886 | $ 171,006 |
| Total | $ 1,597,560 | $ 32,610 | $ 4,500 | $ 1,634,670 |

[1] - Allocation of 2010 net income, operating income, and EBITDA amounts to the Class Period are from Guy Davis Report.
[2] - Singer Report, Table 11
[3] - Singer Report, Table 12
[4] - Total Group 2 Identity Class Damages allocated consistently with Group 1.  Singer Report, para. 255.
[5] - Financial Results for the first half of 2017 were assumed to be 50% of full year 2016 results (consistent with Singer's assumption on Zuffa Event Revenue).

Cung Le, et al. v. Zuffa, LLC

**Pro-forma Financial Results Based on Singer Damages as Fighter Compensation - Bellator Benchmark Model**

*(in thousands)*

Exhibit D to Expert Report of Elizabeth Kroger Davis

| | Net Income (Loss) | | | Operating Income (Loss) | | | EBITDA | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Reported in Audited Financial Statements | Singer Damages | Pro-forma Results | As Reported in Audited Financial Statements | Singer Damages | Pro-forma Results | Per Guy Davis Report, Exhibits 1 and 1a | Singer Damages | Pro-forma Results |
| Class Period: | | | | | | | | | |
| Dec. 16-31, 2010 [1] | $ 5,248 | $ (5,133) | $ 115 | $ 6,864 | $ (5,133) | $ 1,731 | $ 6,829 | $ (5,133) | $ 1,696 |
| 2011 | $ 95,960 | $ (103,596) | $ (7,636) | $ 133,522 | $ (103,596) | $ 29,926 | $ 131,114 | $ (103,596) | $ 27,518 |
| 2012 | $ 31,123 | $ (105,575) | $ (74,452) | $ 60,828 | $ (105,575) | $ (44,747) | $ 72,447 | $ (105,575) | $ (33,128) |
| 2013 | $ 84,788 | $ (123,227) | $ (38,439) | $ 137,178 | $ (123,227) | $ 13,951 | $ 131,631 | $ (123,227) | $ 8,404 |
| 2014 | $ 26,621 | $ (105,197) | $ (78,576) | $ 73,957 | $ (105,197) | $ (31,240) | $ 69,242 | $ (105,197) | $ (35,955) |
| 2015 | $ 118,502 | $ (131,626) | $ (13,124) | $ 157,806 | $ (131,626) | $ 26,180 | $ 160,172 | $ (131,626) | $ 28,546 |
| 2016 | $ (85,120) | $ (182,666) | $ (267,786) | $ 111,761 | $ (182,666) | $ (70,905) | $ 202,218 | $ (182,666) | $ 19,552 |
| Thru June 30, 2017 [5] | $ (42,560) | $ (91,320) | $ (133,880) | $ 55,881 | $ (91,320) | $ (35,440) | $ 101,109 | $ (91,320) | $ 9,789 |
| Total | $ 234,562 | $ (848,340) | $ (613,778) | $ 737,797 | $ (848,340) | $ (110,544) | $ 874,762 | $ (848,340) | $ 26,422 |

**Singer Damages**

| | Bout Class Damages [2] | Identity Class Damages | | Total Damages | Zuffa Event Revenue [6] |
|---|---|---|---|---|---|
| | | Group 1 [3] | Group 2 [4] | | |
| Dec. 16-31, 2010 | $ 5,122 | $ 10 | $ 1 | $ 5,133 | $ 20,300 |
| 2011 | $ 103,164 | $ 380 | $ 52 | $ 103,596 | $ 408,900 |
| 2012 | $ 101,297 | $ 3,760 | $ 519 | $ 105,575 | $ 401,500 |
| 2013 | $ 121,657 | $ 1,380 | $ 190 | $ 123,227 | $ 482,200 |
| 2014 | $ 104,173 | $ 900 | $ 124 | $ 105,197 | $ 412,900 |
| 2015 | $ 123,751 | $ 6,920 | $ 955 | $ 131,626 | $ 490,500 |
| 2016 | $ 168,054 | $ 12,840 | $ 1,772 | $ 182,666 | $ 666,100 |
| Thru June 30, 2017 | $ 84,014 | $ 6,420 | $ 886 | $ 91,320 | $ 333,000 |
| Total | $ 811,230 | $ 32,610 | $ 4,500 | $ 848,340 | $ 3,215,400 |

[note: doesn't foot due to rounding]

[1] - Allocation of 2010 net income, operating income, and EBITDA amounts to the Class Period are from Guy Davis Report.
[2] - Bout Damages are allocated to each year based on Zuffa Event Revenue; Singer Report, Table 9.
[3] - Singer Report, Table 12
[4] - Total Group 2 Identity Class Damages allocated consistently with Group 1
[5] - Financial Results for the first half of 2017 were assumed to be 50% of full year 2016 results (consistent with Singer's assumption on Zuffa Event Revenue).
[6] - Singer Report, Table 10

Cung Le, et al. v. Zuffa, LLC

**Exhibit E to Expert Report of Elizabeth Kroger Davis**

**Pro-forma Financial Results Based on Singer Damages as Fighter Compensation - Impact Regression Model**

*(in thousands)*

| | Net Income (Loss) | | | | Operating Income (Loss) | | | | EBITDA | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | As Reported in Audited Financial Statements | Singer Damages | Damages Paid from Aviation and Management | Pro-forma Results | As Reported in Audited Financial Statements | Singer Damages | Damages Paid from Aviation and Management | Pro-forma Results | Per Guy Davis Report, Exhibits 1 and 1a | Singer Damages | Damages Paid from Aviation and Management | Pro-forma Results |
| Class Period: | | | | | | | | | | | | |
| Dec. 16-31, 2010 [1] | $ 5,248 | $ (7,971) | $ 518 | $ (2,205) | $ 6,864 | $ (7,971) | $ 518 | $ (589) | $ 6,829 | $ (7,971) | $ 518 | $ (624) |
| 2011 | $ 95,960 | $ (172,732) | $ 10,527 | $ (66,245) | $ 133,522 | $ (172,732) | $ 10,527 | $ (28,683) | $ 131,114 | $ (172,732) | $ 10,527 | $ (31,091) |
| 2012 | $ 31,123 | $ (215,879) | $ 12,834 | $ (171,922) | $ 60,828 | $ (215,879) | $ 12,834 | $ (142,217) | $ 72,447 | $ (215,879) | $ 12,834 | $ (130,598) |
| 2013 | $ 84,788 | $ (275,470) | $ 13,863 | $ (176,819) | $ 137,178 | $ (275,470) | $ 13,863 | $ (124,429) | $ 131,631 | $ (275,470) | $ 13,863 | $ (129,976) |
| 2014 | $ 26,621 | $ (200,824) | $ 8,500 | $ (165,703) | $ 73,957 | $ (200,824) | $ 8,500 | $ (118,367) | $ 69,242 | $ (200,824) | $ 8,500 | $ (123,082) |
| 2015 | $ 118,502 | $ (248,875) | $ 5,500 | $ (124,873) | $ 157,806 | $ (248,875) | $ 5,500 | $ (85,569) | $ 160,172 | $ (248,875) | $ 5,500 | $ (83,203) |
| 2016 | $ (85,120) | $ (341,912) | $ 4,941 | $ (422,091) | $ 111,761 | $ (341,912) | $ 4,941 | $ (225,210) | $ 202,218 | $ (341,912) | $ 4,941 | $ (134,753) |
| Thru June 30, 2017 [5] | $ (42,560) | $ (171,006) | $ 2,471 | $ (211,095) | $ 55,881 | $ (171,006) | $ 2,471 | $ (112,655) | $ 101,109 | $ (171,006) | $ 2,471 | $ (67,426) |
| Total | $ 234,562 | $ (1,634,670) | $ 59,154 | $ (1,340,955) | $ 737,797 | $ (1,634,670) | $ 59,154 | $ (837,720) | $ 874,762 | $ (1,634,670) | $ 59,154 | $ (700,755) |

**Singer Damages**

| | Bout Class Damages [2] | Identity Class Damages | | |
|---|---|---|---|---|
| | | Group 1 [3] | Group 2 [4] | Total Damages |
| Dec. 16-31, 2010 | $ 7,960 | $ 10 | $ 1 | $ 7,971 |
| 2011 | $ 172,300 | $ 380 | $ 52 | $ 172,732 |
| 2012 | $ 211,600 | $ 3,760 | $ 519 | $ 215,879 |
| 2013 | $ 273,900 | $ 1,380 | $ 190 | $ 275,470 |
| 2014 | $ 199,800 | $ 900 | $ 124 | $ 200,824 |
| 2015 | $ 241,000 | $ 6,920 | $ 955 | $ 248,875 |
| 2016 | $ 327,300 | $ 12,840 | $ 1,772 | $ 341,912 |
| Thru June 30, 2017 | $ 163,700 | $ 6,420 | $ 886 | $ 171,006 |
| Total | $ 1,597,560 | $ 32,610 | $ 4,500 | $ 1,634,670 |

[1] - Allocation of 2010 net income, operating income, and EBITDA amounts to the Class Period are from Guy Davis Report.

[2] - Singer Report, Table 11

[3] - Singer Report, Table 12

[4] - Total Group 2 Identity Class Damages allocated consistently with Group 1

[5] - Financial Results for the first half of 2017 were assumed to be 50% of full year 2016 results (consistent with Singer's assumption on Zuffa Event Revenue).

[6] - G. Davis Report, Table 12.

HIGHLY CONFIDENTIAL

Cung Le, et al. v. Zuffa, LLC
**Pro-forma Financial Results Based on Singer Damages as Fighter Compensation - Bellator Benchmark Model**
*(in thousands)*

Exhibit F to Expert Report of Elizabeth Kroger Davis

| | Net Income (Loss) | | | | Operating Income (Loss) | | | | EBITDA | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | As Reported in Audited Financial Statements | Singer Damages | Damages Paid from Aviation and Management | Pro-forma Results | As Reported in Audited Financial Statements | Singer Damages | Damages Paid from Aviation and Management | Pro-forma Results | Per Guy Davis Report, Exhibits 1 and 1a | Singer Damages | Damages Paid from Aviation and Management | Pro-forma Results |
| Class Period: | | | | | | | | | | | | |
| Dec. 16-31, 2010 [1] | $ 5,248 | $ (5,133) | $ 518 | $ 633 | $ 6,864 | $ (5,133) | $ 518 | $ 2,249 | $ 6,829 | $ (5,133) | $ 518 | $ 2,214 |
| 2011 | $ 95,960 | $ (103,596) | $ 10,527 | $ 2,891 | $ 133,522 | $ (103,596) | $ 10,527 | $ 40,453 | $ 131,114 | $ (103,596) | $ 10,527 | $ 38,045 |
| 2012 | $ 31,123 | $ (105,575) | $ 12,834 | $ (61,618) | $ 60,828 | $ (105,575) | $ 12,834 | $ (31,913) | $ 72,447 | $ (105,575) | $ 12,834 | $ (20,294) |
| 2013 | $ 84,788 | $ (123,227) | $ 13,863 | $ (24,576) | $ 137,178 | $ (123,227) | $ 13,863 | $ 27,814 | $ 131,631 | $ (123,227) | $ 13,863 | $ 22,267 |
| 2014 | $ 26,621 | $ (105,197) | $ 8,500 | $ (70,076) | $ 73,957 | $ (105,197) | $ 8,500 | $ (22,740) | $ 69,242 | $ (105,197) | $ 8,500 | $ (27,455) |
| 2015 | $ 118,502 | $ (131,626) | $ 5,500 | $ (7,624) | $ 157,806 | $ (131,626) | $ 5,500 | $ 31,680 | $ 160,172 | $ (131,626) | $ 5,500 | $ 34,046 |
| 2016 | $ (85,120) | $ (182,666) | $ 4,941 | $ (262,845) | $ 111,761 | $ (182,666) | $ 4,941 | $ (65,964) | $ 202,218 | $ (182,666) | $ 4,941 | $ 24,493 |
| Thru June 30, 2017 [5] | $ (42,560) | $ (91,320) | $ 2,471 | $ (131,410) | $ 55,881 | $ (91,320) | $ 2,471 | $ (32,969) | $ 101,109 | $ (91,320) | $ 2,471 | $ 12,259 |
| Total | $ 234,562 | $ (848,340) | $ 59,154 | $ (554,625) | $ 737,797 | $ (848,340) | $ 59,154 | $ (51,390) | $ 874,762 | $ (848,340) | $ 59,154 | $ 85,576 |

**Singer Damages**

| | Bout Class Damages [2] | Identity Class Damages | | | Zuffa Event Revenue [6] |
|---|---|---|---|---|---|
| | | Group 1 [3] | Group 2 [4] | Total Damages | |
| Dec. 16-31, 2010 | $ 5,122 | $ 10 | $ 1 | $ 5,133 | $ 20,300 |
| 2011 | $ 103,164 | $ 380 | $ 52 | $ 103,596 | $ 408,900 |
| 2012 | $ 101,297 | $ 3,760 | $ 519 | $ 105,575 | $ 401,500 |
| 2013 | $ 121,657 | $ 1,380 | $ 190 | $ 123,227 | $ 482,200 |
| 2014 | $ 104,173 | $ 900 | $ 124 | $ 105,197 | $ 412,900 |
| 2015 | $ 123,751 | $ 6,920 | $ 955 | $ 131,626 | $ 490,500 |
| 2016 | $ 168,054 | $ 12,840 | $ 1,772 | $ 182,666 | $ 666,100 |
| Thru June 30, 2017 | $ 84,014 | $ 6,420 | $ 886 | $ 91,320 | $ 333,000 |
| Total | $ 811,230 | $ 32,610 | $ 4,500 | $ 848,340 | $ 3,215,400 |

[note: doesn't foot due to rounding]

[1] - Allocation of 2010 net income, operating income, and EBITDA amounts to the Class Period are from Guy Davis Report.
[2] - Bout Damages are allocated to each year based on Zuffa Event Revenue
[3] - Singer Report, Table 12
[4] - Total Group 2 Identity Class Damages allocated consistently with Group 1
[5] - Financial Results for the first half of 2017 were assumed to be 50% of full year 2016 results (consistent with Singer's assumption on Zuffa Event Revenue).
[6] - Singer Report, Table 10
[7] - G. Davis Report, Table 12.

HIGHLY CONFIDENTIAL

**Cung Le, et al. v. Zuffa, LLC**
**Bellator Sports Worldwide, LLC**
Exhibit G to Expert Report of Elizabeth Kroger Davis
Profit and Loss Statements Summarized on a Calendar Year Basis

| ($ in thousands) | 2010 $ | 2010 % of Total Revenue | 2011 $ | 2011 % of Total Revenue | 2012 $ | 2012 % of Total Revenue | 2013 $ | 2013 % of Total Revenue | 2014 $ | 2014 % of Total Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| Advertising/Sponsorship Revenue | 987 | 36% | 103 | 1% | 415 | 4% | 935 | 6% | (5) | 0% |
| Affiliate/Pay Per View Revenue | - | 0% | - | 0% | - | 0% | - | 0% | 1,676 | 9% |
| TV Syndication | 544 | 20% | 5,585 | 76% | 9,132 | 78% | 13,052 | 78% | 15,157 | 79% |
| Consumer Products | 57 | 2% | 76 | 1% | 92 | 1% | 132 | 1% | 119 | 1% |
| Recreation & Events | 1,171 | 42% | 1,518 | 21% | 1,920 | 16% | 2,544 | 15% | 2,127 | 11% |
| Other | - | 0% | 62 | 1% | 121 | 1% | 51 | 0% | 49 | 0% |
| Ancillary Revenue | 1,772 | 64% | 7,241 | 99% | 11,265 | 96% | 15,779 | 94% | 17,452 | 100% |
| Total Revenue | 2,759 | 100% | 7,344 | 100% | 11,680 | 100% | 16,714 | 100% | 19,123 | 100% |
| Fighter Compensation | 3,098 | 112% | 3,779 | 51% | 4,606 | 39% | 6,105 | 37% | 6,639 | 35% |
| Above the Line Production Staff | 556 | 20% | 385 | 5% | 429 | 4% | 562 | 3% | 914 | 5% |
| Below the Line Production Staff | 19 | 1% | 311 | 4% | 216 | 2% | 230 | 1% | 429 | 2% |
| Staging, Lighting & Set | 4,136 | 150% | 301 | 4% | 426 | 4% | 891 | 5% | 1,199 | 6% |
| Tech Crews & Equipment | 680 | 25% | 4,012 | 55% | 5,040 | 43% | 5,268 | 32% | 5,396 | 28% |
| Post Production | 1,923 | 70% | 779 | 11% | 1,649 | 14% | 1,162 | 7% | 915 | 5% |
| Venue Costs | 218 | 8% | 106 | 1% | 102 | 1% | 225 | 1% | 163 | 1% |
| Travel and Transportation | 955 | 35% | 1,539 | 21% | 2,118 | 18% | 2,286 | 14% | 2,407 | 13% |
| Other Programming Expense | 2,131 | 77% | 337 | 5% | 489 | 4% | 122 | 1% | 3,486 | 18% |
| Total Production & Programming Expens | 13,716 | 497% | 11,549 | 157% | 15,075 | 129% | 16,851 | 101% | 21,548 | 113% |
| Gross Profit (Loss) | (10,957) | -397% | (4,205) | -57% | (3,395) | -29% | (137) | -1% | (2,425) | -13% |
| Other Operating Expense | 121 | 4% | 52 | 1% | 165 | 1% | 2,146 | 13% | 2,915 | 15% |
| Employee Compensation: SG&A | 786 | 28% | 2,291 | 31% | 3,273 | 28% | 3,505 | 21% | 5,313 | 28% |
| Advertising & Promotion Expenses | 375 | 14% | 43 | 1% | 67 | 1% | 1,795 | 11% | 2,493 | 13% |
| Other SG&A | 2,233 | 81% | 1,655 | 23% | 2,715 | 23% | 2,115 | 13% | 1,678 | 9% |
| Total Selling, General & Administrative | 3,394 | 123% | 3,989 | 54% | 6,055 | 52% | 7,415 | 44% | 9,484 | 50% |
| Depreciation | 89 | 3% | 119 | 2% | 160 | 1% | 190 | 1% | 283 | 1% |
| Total Operating Expenses | 3,604 | 131% | 4,160 | 57% | 6,380 | 55% | 9,751 | 58% | 12,682 | 66% |
| Operating Income (Loss) | (14,561) | -31% | (8,365) | 43% | (9,775) | 45% | (9,888) | 42% | (15,107) | 34% |
| Administrative Services - Payroll Process | - | 0% | - | 0% | - | 0% | - | 0% | 9 | 0% |
| Net Income (Loss) | (14,561) | -528% | (8,365) | -114% | (9,775) | -84% | (9,888) | -59% | (15,116) | -79% |

HIGHLY CONFIDENTIAL

**Cung Le, et al. v. Zuffa, LLC**
**Bellator Sports Worldwide, LLC**
Exhibit G to Expert Report of Elizabeth Kroger Davis
**Profit and Loss Statements Summarized on a Calendar Year Basis**

| ($ in thousands) | 2015 $ | 2015 % of Total Revenue | 2016 $ | 2016 % of Total Revenue | 3 Mos. 2017 $ | 3 Mos. 2017 % of Total Revenue | TOTAL $ | TOTAL % of Total Revenue |
|---|---|---|---|---|---|---|---|---|
| Advertising/Sponsorship Revenue | 2,684 | 19% | 1,871 | 8% | 747 | 10% | 7,737 | 8% |
| Affiliate/Pay Per View Revenue | 73 | 1% | - | 0% | - | 0% | 1,749 | 2% |
| TV Syndication | 7,718 | 56% | 16,492 | 74% | 5,281 | 68% | 72,961 | 72% |
| Consumer Products | 115 | 1% | 139 | 1% | 66 | 1% | 796 | 1% |
| Recreation & Events | 3,203 | 23% | 3,864 | 17% | 1,617 | 21% | 17,964 | 18% |
| Other | - | 0% | - | 0% | - | 0% | 283 | 0% |
| Ancillary Revenue | 11,036 | 81% | 20,495 | 92% | 6,964 | 90% | 92,004 | 92% |
| Total Revenue | 13,793 | 100% | 22,366 | 100% | 7,711 | 100% | 101,490 | 100% |
| Fighter Compensation | 7,576 | 55% | 11,843 | 53% | 5,564 | 72% | 49,210 | 48% |
| Above the Line Production Staff | 844 | 6% | 1,109 | 5% | 275 | 4% | 5,074 | 5% |
| Below the Line Production Staff | 499 | 4% | 477 | 2% | 143 | 2% | 2,324 | 2% |
| Staging, Lighting & Set | 2,506 | 18% | 2,322 | 10% | 576 | 7% | 12,357 | 12% |
| Tech Crews & Equipment | 4,346 | 32% | 4,759 | 21% | 1,379 | 18% | 30,880 | 30% |
| Post Production | 1,168 | 8% | 872 | 4% | 167 | 2% | 8,635 | 9% |
| Venue Costs | 493 | 4% | 314 | 1% | 270 | 4% | 1,891 | 2% |
| Travel and Transportation | 2,907 | 21% | 3,511 | 16% | 726 | 9% | 16,449 | 16% |
| Other Programming Expense | 1,506 | 11% | 3,980 | 18% | 2,256 | 29% | 14,307 | 14% |
| Total Production & Programming Expens | 21,845 | 158% | 29,187 | 130% | 11,356 | 147% | 141,127 | 139% |
| Gross Profit (Loss) | (8,052) | -58% | (6,821) | -30% | (3,645) | -47% | (39,637) | -39% |
| Other Operating Expense | 1,806 | 13% | 1,415 | 6% | 19 | 0% | 8,639 | 9% |
| Employee Compensation: SG&A | 4,332 | 31% | 4,813 | 22% | 1,181 | 15% | 25,494 | 25% |
| Advertising & Promotion Expenses | 654 | 5% | 1,650 | 7% | 566 | 7% | 7,643 | 8% |
| Other SG&A | 2,767 | 20% | 2,291 | 10% | 508 | 7% | 15,962 | 16% |
| Total Selling, General & Administrative | 7,753 | 56% | 8,754 | 39% | 2,255 | 29% | 49,099 | 48% |
| Depreciation | 208 | 2% | 194 | 1% | 44 | 1% | 1,287 | 1% |
| Total Operating Expenses | 9,767 | 71% | 10,363 | 46% | 2,318 | 30% | 59,025 | 58% |
| Operating Income (Loss) | (17,819) | 29% | (17,184) | 54% | (5,963) | 70% | (98,662) | 42% |
| Administrative Services - Payroll Process | 17 | 0% | 15 | 0% | - | 0% | 41 | 0% |
| Net Income (Loss) | (17,836) | -129% | (17,199) | -77% | (5,963) | -77% | (98,703) | -97% |

HIGHLY CONFIDENTIAL

**Cung Le, et al. v. Zuffa, LLC**
**Summary of Zuffa Income Statements - 2010 to 2016**

Exhibit H to Expert Report of Elizabeth Kroger Davis

| | 2010 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Jan. 1 - Dec. 15, 2010 | Dec. 16 - 31, 2010 | 2010 | 2011 | 2012 | 2013 |
| | G. Davis Report | G. Davis Report | ZFL-0000031-063 | ZFL-0000031-063 | ZFL-0000221-255 | ZFL-0000136-168 |
| Net revenues | $ 421,626,000 | $ 19,330,000 | $ 440,956,000 | $ 436,680,000 | $ 466,303,000 | $ 514,639,000 |
| Cost of revenues | 190,296,000 | 8,724,000 | 199,020,000 | 206,540,000 | 281,468,000 | 249,969,000 |
| Gross profit | 231,330,000 | 10,606,000 | 241,936,000 | 230,140,000 | 184,835,000 | 264,670,000 |
| Selling, general and administrative expenses | 78,240,000 | 3,587,000 | 81,827,000 | 91,818,000 | 113,601,000 | 121,240,000 |
| Depreciation and amortization | 3,390,000 | 155,000 | 3,545,000 | 4,800,000 | 5,918,000 | 6,252,000 |
| Gain on legal settlement | | | | | | |
| Impairment loss | | | | | 4,488,000 | |
| Operating income | $ 149,700,000 | $ 6,864,000 | $ 156,564,000 | $ 133,522,000 | $ 60,828,000 | $ 137,178,000 |
| Interest expense, net | 24,902,000 | 1,142,000 | 26,044,000 | 23,426,000 | 27,866,000 | 25,347,000 |
| (Increase)/Decrease in swap fair value | 1,367,000 | 63,000 | 1,430,000 | 4,229,000 | (3,614,000) | (2,744,000) |
| Foreign withholding tax | 6,006,000 | 275,000 | 6,281,000 | 7,047,000 | 3,786,000 | 15,381,000 |
| Debt transaction costs | | | | | | 4,235,000 |
| Loss on investment in joint venture | 2,762,000 | 127,000 | 1,980,000 | 2,979,000 | | |
| Loss on liquidation of investment | | | 909,000 | | | |
| (Gain)/Loss on trading security | | | | | 240,000 | 411,000 |
| Loss on equity method investments | | | | | 2,161,000 | 3,899,000 |
| Acquisition/Restructuring Cost | | | | | | |
| Other (income)/expense, net | 190,000 | 9,000 | 199,000 | (119,000) | 28,000 | 11,000 |
| Net loss from discontinued operations | | | | | | 5,998,000 |
| Net (gain) attributable to noncontrolling interest | | | | | (762,000) | (148,000) |
| Net income | $ 114,473,000 | $ 5,248,000 | $ 119,721,000 | $ 95,960,000 | $ 31,123,000 | $ 84,788,000 |

HIGHLY CONFIDENTIAL

**Cung Le, et al. v. Zuffa, LLC**
**Summary of Zuffa Income Statements - 2010 to 2016**

Exhibit H to Expert Report of Elizabeth Kroger Davis

| | 2014 | 2015 | 2016 |
|---|---|---|---|
| | ZFL-0000136-168 | RAINE0016847-880 | G. Davis Report |
| Net revenues | $ 449,008,000 | $ 608,629,000 | $ 702,510,000 |
| Cost of revenues | 285,755,000 | 342,116,000 | 359,050,000 |
| Gross profit | 163,253,000 | 266,513,000 | 343,460,000 |
| | | | |
| Selling, general and administrative expenses | 82,583,000 | 100,923,000 | 139,031,000 |
| Depreciation and amortization | 6,713,000 | 7,784,000 | 92,668,000 |
| Gain on legal settlement | | | |
| Impairment loss | | | |
| Operating income | $ 73,957,000 | $ 157,806,000 | $ 111,761,000 |
| | | | |
| Interest expense, net | 22,797,000 | 21,767,000 | 72,629,000 |
| (Increase)/Decrease in swap fair value | (1,365,000) | (1,473,000) | (1,442,000) |
| Foreign withholding tax | 13,040,000 | 11,939,000 | |
| Debt transaction costs | 1,097,000 | | 3,651,000 |
| Loss on investment in joint venture | | | |
| Loss on liquidation of investment | | | |
| (Gain)/Loss on trading security | (13,000) | (6,000) | |
| Loss on equity method investments | 6,255,000 | 6,897,000 | |
| Acquisition/Restructuring Cost | | | 105,907,000 |
| Other (income)/expense, net | 71,000 | 180,000 | 16,136,000 |
| Net loss from discontinued operations | 5,454,000 | | |
| Net (gain) attributable to noncontrolling interest | | | |
| **Net income** | $ 26,621,000 | $ 118,502,000 | $ (85,120,000) |

HIGHLY CONFIDENTIAL