# EXHIBIT 8

*Federal Antitrust Policy*

Case 2:15-cv-01045-RFB-BNW   Document 932-9   Filed 12/08/23   Page 2 of 4

# FEDERAL ANTITRUST POLICY

## THE LAW OF COMPETITION AND ITS PRACTICE

## Second Edition

By

**HERBERT HOVENKAMP**

*Ben V. & Dorothy Willie Professor*
*University of Iowa, College of Law*

HORNBOOK SERIES®



WEST GROUP

A THOMSON COMPANY

ST. PAUL, MINN., 1999

Hornbook Series, WESTLAW, and the West Group symbol are registered trademarks used herein under license.

COPYRIGHT © 1994 By WEST PUBLISHING CO.

COPYRIGHT © 1999 By WEST GROUP
610 Opperman Drive
P.O. Box 64526
St. Paul, MN 55164-0526
1-800-328-9352

All rights reserved
Printed in the United States of America
ISBN 0-314-23180-3


TEXT IS PRINTED ON 10% POST CONSUMER RECYCLED PAPER



1st Reprint — 2001

that the plaintiff would have invested far more in research and development than it had actually planned on investing, that the growth rate of AT & T's competitors in the terminal equipment market would be steadily upward, and that the plaintiff would continue to face the same costs that the defendant faced.[18] The Second Circuit found all these assumptions supportable in the record, and affirmed a jury verdict which, after trebling, amounted to some $92,000,000.

However, an equally complex lost profits study by the Southern Pacific Communications Co., which operated long-distance microwave systems that competed with AT & T's long distance service, foundered because it failed to account for the growing market share of satellite communication, and the increasing tendency of large purchasers of long distance service to build their own internal microwave systems. Furthermore, the study appeared to project a rate of growth that exceeded the plaintiff's capacity.[19]

### § 17.6b2. Yardstick Method

The "yardstick" method of estimating lost profits can sometimes simplify the court's calculations, although it can be used only in limited situations. Under the yardstick approach the plaintiff attempts to identify a firm similar to the plaintiff in all respects but for the impact of the antitrust violation. For example, in *Bigelow*,[20] the plaintiff compared its own revenue during the injury period with that earned by a comparable theater operated by one of the defendants. In such circumstances, *if* the markets of the two firms are identical, and *if* the plaintiff's firm and the firm used for comparison stand in the same relative position in those markets, offer the same product mix, have comparable managements and are comparable in all other respects, then the fact finder may infer that the two would have had comparable revenues or profits but for the violation.

The above statement of the "yardstick" methodology gives some indication of its inherent weaknesses. To the extent that either the markets or firms being compared are dissimilar, the yardstick theory will not produce a trustworthy estimate of what the plaintiff would have earned but for the defendant's conduct. The method therefore works best in markets that are both local and relatively homogeneous.[21]

Furthermore, the firm used as a basis for comparison ought not be owned by the defendant, as it was in *Bigelow*, unless such a firm is the only one sufficiently similar to the plaintiff *and* the inference is strong that the defendant-owned firm's profits do not reflect the consequences of the antitrust violation. Consider two examples. If the defendant was engaged in predatory pricing, it is likely that its own business will show lower profits or else losses during the predatory period. In that

---

18. *Litton*, 700 F.2d at 822–24.

19. Southern Pacific Communications Co. v. AT & T Co., 556 F.Supp. 825, 1060 (D.D.C.1982), affirmed, 740 F.2d 1011 (D.C.Cir.1984). Other courts have also been critical of speculative damage assumptions. See McGlinchy v. Shell Chem. Co., 845 F.2d 802, 806–807 (9th Cir.1988) (rejecting expert's damage study for not carefully examining underlying market conditions, and which projected that growth of sales would exceed 40% annually while expenses would remain constant); Olympia Equip. Leasing Co. v. Western Union Tel. Co., 797 F.2d 370, 382–383 (7th Cir.1986), cert. denied, 480 U.S. 934, 107 S.Ct. 1574 (1987) (severely criticizing expert damage study as nothing more than advocacy); Metrix Warehouse, Inc. v. Daimler–Benz Aktiengesellschaft, 828 F.2d 1033, 1044 (4th Cir.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1753 (1988) (expert damages study failed to separate out losses caused by lawful conduct).

20. Note 13. See R. Blair & A. Esquibel, An Econometric Approach to Constructing a Yardstick Model of Damages in Lost Profit Cases, 72 Den. Univ. L. Rev. 113 (1994).

21. See Home Placement Serv. v. Providence Journal Co., 819 F.2d 1199, 1205 & n. 7 (1st Cir.1987) (rejecting yardstick approach when there was inadequate evidence that the plaintiff firm and yardstick firm operated in similar situations and conducted their business in a similar manner); National Farmers' Org. v. Associated Milk Producers, 850 F.2d 1286, 1294–1298 (8th Cir.1988) (approving yardstick measure notwithstanding numerous differences in two markets, particularly since differences tended to underestimate, rather than overestimate, plaintiff's damages); *Metrix Warehouse* case, note 19 at 1044 n. 21 (approving method generally); Rose Confections, Inc. v. Ambrosia Chocolate Co., 816 F.2d 381, 393–394 (8th Cir. 1987) (rejecting study comparing West Coast market and dissimilar midwestern market); Jay Edwards, Inc. v. New England Toyota Distributor, 708 F.2d 814, 821 & n. 6 (1st Cir.), cert. denied, 464 U.S. 894, 104 S.Ct. 241 (1983) (approving use where jury apparently took differences between plaintiff and yardstick dealer into account).