# EXHIBIT 26
Excerpt of Deposition Transcript of
of Hal. J. Singer

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

| | | |
|---|---|---|
| IN RE: | : | Civil Action |
| | : | DOCKET NO. |
| CUNG LE, NATHAN QUARRY, | : | 2:15-cv-01045-RFB- |
| JON FITCH, BRANDON VERA, | : | (PAL) |
| LUIS JAVIER VAZQUEZ and | : | |
| KYLE KINGSBURG, on behalf | : | CLASS ACTION |
| of themselves and all | : | |
| others similarly | : | |
| situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ZUFFA, LLC, d/b/a | : | |
| ULTIMATE FIGHTING | : | |
| CHAMPIONSHIP and UFC, | : | |
| | : | |
| Defendants. | : | |

- - -
Wednesday, September 27, 2017
- - -

Videotaped deposition of
HAL J. SINGER, Ph.D., taken pursuant to
notice, was held at the law offices of
Berger & Montague, P.C., 1622 Locust
Street, Philadelphia, Pennsylvania 19103,
beginning at 9:24 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public in and for the Commonwealth
of Pennsylvania.
              *   *   *
           MAGNA LEGAL SERVICES
              (866) 624-6221
             www.MagnaLS.com



Page 8

1    Flexner also for defendant Zuffa.
2            MR. CRAMER:  And on the
3    phone is Augie --
4            THE WITNESS:  Augie Urschel.
5            MR. CRAMER:  Augie Urschel
6    from Economists, Inc.?
7            THE WITNESS:  Correct.
8            MR. CRAMER:  You can spell
9    his name for the court reporter.
10           THE WITNESS:  I don't know.
11   Maybe Augie can spell his last
12   name, Urschel.
13           MR. URSCHEL:  U-R-S-C-H-E-L.
14           THE WITNESS:  Thanks, Augie.
15           THE VIDEOGRAPHER:  All
16   right.  Will the court reporter
17   please swear in the witness.
18           HAL SINGER, having been
19   first duly sworn, was examined and
20   testified as follows:
21                   -  -  -
22         E X A M I N A T I O N
23                   -  -  -
24   BY MR. ISAACSON:



Page 38

1  of the question then.
2         For each of your models, you
3  have a but-for world where the
4  foreclosure share for Zuffa is either
5  zero percent, 20 percent or 30 percent.
6         Do I have that right?
7     A.  I think you've got that
8  right.
9     Q.  Okay. And that's regardless
10 for what foreclosure is specified in the
11 regression?
12    A.  I'm just -- I wish we could
13 use a different word than specified.
14    Q.  What word would you use?
15    A.  The regression doesn't get
16 to specify the foreclosure share, just as
17 the regression doesn't get to specify how
18 many punches a fighter threw, right, or
19 how many successful punches.
20    Q.  Tell me what word you want
21 me to use.
22    A.  So the regression takes the
23 data as the world presents it. The
24 regression doesn't get to specify.



Page 39

1      Q.    Foreclosure is an output of
2   the regression?
3      A.    No, it's an input. It's an
4   input.
5      Q.    Okay. So --
6      A.    But the regression doesn't
7   get to -- doesn't get to pick what
8   foreclosure is or specify it. Maybe I'm
9   misinterpreting what you mean by--
10     Q.    I'm just trying to find a
11  word that you're comfortable with.
12     A.    The regression takes the
13  data as the world presents it and looks
14  for relationships between those data.
15     Q.    Right.
16     A.    All right? So it doesn't
17  specify. The -- maybe what would be
18  helpful is that the market definition --
19  the market definition that I choose and
20  the weights that I apply generate a
21  measure of foreclosure share.
22     Q.    Okay.
23     A.    Right? And then I'm going
24  to apply a regression analysis. But the



Page 40

1   regression doesn't get to specify, the
2   regression takes the foreclosure share as
3   an input.
4           Q.    So regardless of the measure
5   of foreclosure share that's generated by
6   any specific model, the world -- you are
7   going to assume for purposes of
8   estimating impact or damages that the
9   actual foreclosure share of Zuffa will be
10  zero, 20 percent or 30 percent depending
11  on the model?
12              MR. CRAMER:  Objection to
13          form.
14  BY MR. ISAACSON:
15          Q.    That's correct?
16              MR. CRAMER:  Objection to
17          form.
18              THE WITNESS:  It was close.
19          You said the model to start the
20          question, and just again to be --
21          to be specific, the regression --
22          the regression doesn't get to pick
23          the foreclosure share.  The
24          foreclosure share flows from which



Page 41

```
 1    market definition and which
 2    weighting method I use, right?
 3    That -- that will generate a
 4    foreclosure share that gets spit
 5    out, I think, of a Microsoft Excel
 6    file, and that foreclosure share
 7    is going to be spit out alongside
 8    each observation in the dataset.
 9           The regression finds a
10    relationship between that
11    foreclosure share and the
12    fighters' wage share controlling
13    for all other things and then the
14    regression is done.
15           At that point, I -- I can
16    make use of the parameters that
17    come out of the regression to
18    project what a fighter's wage
19    share would be in a but-for world
20    in which the foreclosure share was
21    lower.
22           Sorry, I'm being -- I'm
23    being attacked here by a gnat.
24    And -- thank you.
```



Page 42

1                And I use three different
2           scenarios:  Zero percent,
3           20 percent and 30 percent.
4      BY MR. ISAACSON:
5           Q.    Now, when you use a world in
6      which there -- Zuffa has zero percent
7      foreclosure, how does that translate into
8      any -- a market share for Zuffa?
9           A.    Oh, it could accommodate
10     many different market shares for Zuffa.
11     It is -- one way of putting it is almost
12     agnostic to the market share.  It
13     could -- it could accommodate many.
14                You can have -- just to be
15     clear, you can have a high market share
16     and zero foreclosure share if all of your
17     fighters are under, say, 12-month
18     contracts.
19          Q.    And do I understand
20     correctly that if all the Zuffa fighters
21     were under 12-month contracts, you would
22     expect the foreclosure share of Zuffa to
23     be zero or close to zero?
24                MR. CRAMER:  Objection to



Page 43

1      form.
2              THE WITNESS:  So I -- I deem
3      a fighter to be foreclosed, or to
4      be working or employed pursuant to
5      an exclusionary contract if, as
6      you know, the contract is
7      exclusive and if the duration
8      exceeds a certain number of
9      months.  I use 30 months I think
10     as my -- my baseline approach.
11             And so if you -- if you
12     allow me to use that 30-month
13     baseline or cutoff as a measure
14     for whether a fighter is
15     foreclosed, and if your question
16     posits that every Zuffa fighter
17     under contract is -- is at
18     12 months, then by construction,
19     12 months is less than 30 months,
20     and therefore, under that
21     particular measure of foreclosure,
22     no fighter would be foreclosed.
23   BY MR. ISAACSON:
24         Q.   All right.  Is there any --



Page 111

1  go -- labor's share of its marginal
2  revenue product should go in a
3  competitive versus a noncompetitive
4  industry.
5         Q.    All right.  Maybe you're
6  misunderstanding me.  I understand that
7  you're saying that microeconomic
8  literature and textbooks would express
9  that labor should capture 100 percent of
10 their marginal revenue product.
11              What I'd like to know, is
12 there any actual literature that
13 discusses, for any specific industries,
14 what percentages of -- what percentages
15 of revenue are paid to labor in a
16 competitive industry as opposed to a less
17 competitive industry?
18       A.    I believe I cite to -- to
19 various articles in the literature, but
20 the notion of a wage share is commonly
21 used throughout labor economics.
22       Q.    And are there studies where
23 actual wage shares, as you say -- as you
24 call them, are discussed in specific



```
 1   industries?
 2           A.    I believe so.
 3           Q.    Okay.  Can you tell me any
 4   of those studies or industries that I
 5   should be looking for?
 6           A.    I don't know if sitting here
 7   I'm going to be able to tell you specific
 8   industries, but it's possible that I have
 9   some citations to it already.
10                 But I -- I think that the
11   concept of -- of labor's share of his or
12   her marginal revenue product is the
13   foundation of labor economics.  It's
14   going to be something that is widely
15   researched and studied in the abstract
16   and in particular industries.
17           Q.    Can you identify for me any
18   peer-reviewed literature that looks at
19   labor's share of revenues in estimating
20   damages, either for an antitrust case
21   or -- antitrust situation or any other
22   situation?
23                 MR. CRAMER:  Form.
24                 MR. ISAACSON:  Okay.  Let me
```



Page 118

1  opposed to as a percentage of revenue?
2              MR. CRAMER:  Objection to
3        form, to generally.  For what
4        purpose?
5              THE WITNESS:  A firm could,
6        if a firm bills -- if a law firm
7        bills an associate out at $400 an
8        hour, it could express what the --
9        what the young lawyer's salary on
10       an hourly basis is as a -- under
11       an assumed utilization rate as a
12       percentage of that young lawyer's
13       bill rate.
14 BY MR. ISAACSON:
15       Q.    And are you aware of any
16 studies which express the marginal
17 revenue product of labor in terms of the
18 percentage of revenue of the firm?
19       A.    I'm not aware, but as you've
20 expressed it, that's not quite what I'm
21 doing either.
22       Q.    Now, in terms of -- did you
23 make any effort to measure the marginal
24 revenue product of labor of UFC fighters?



```
 1              A.     Yes.
 2              Q.     Okay.  And what would you
 3     point to me for that?
 4              A.     What I did, which is I -- I
 5     calculated the average revenue per event,
 6     per fighter, and I'm using that as a
 7     proxy for the marginal revenue product.
 8              Q.     All right.  If the
 9     average -- when you look at the average
10     revenue per event, per fighter, how do
11     you determine what part of that revenue
12     is the contribution of the fighter as
13     opposed to, for example, marketing,
14     promotions, production or the work of the
15     overall firm?
16              A.     So for my purposes, I don't
17     need to figure out that -- that
18     decomposition.  I will note, however,
19     that I cite a study in my literature
20     review section that suggests that the
21     fighter is responsible for, if not all,
22     the vast majority of -- of the
23     pay-per-view revenues that are captured
24     and not the brand.
```



Page 120

1    Q.    Well, I didn't ask about the
2    brand.
3          The -- you would agree --
4    you would agree with me that effective
5    marketing and promotion could increase
6    the average revenue per event, correct?
7    A.    Yes.
8    Q.    And you would agree with me
9    that super- -- improving television
10   production can increase the average
11   revenue per event?
12            MR. CRAMER:  All things
13       equal?
14            MR. ISAACSON:  Yes.
15            THE WITNESS:  I'm not sure
16       what -- what you mean by improving
17       television production.
18   BY MR. ISAACSON:
19   Q.    A better production that
20   people enjoy more.
21            MR. CRAMER:  Objection to
22       form.
23            THE WITNESS:  And you're
24       asking me if I can conceive of



Page 121

1            this as a matter of theory?
2     BY MR. ISAACSON:
3            Q.    Yes.
4            A.    As opposed to whether it
5     actually happened?
6            Q.    Yes.
7            A.    I think I'm -- I'm going to
8     grant you that as a matter of theory one
9     could -- one could add value by
10    increasing the quality of the production.
11           Q.    Okay.  Now, in this case,
12    you did not do an actual study yourself
13    of the contribution of the UFC fighters
14    to the average revenue per event; is that
15    right?
16                 MR. CRAMER:  Asked and
17          answered.
18                 THE WITNESS:  I think that's
19          correct.  As I noted a few moments
20          ago, that was not necessary for my
21          purposes.
22    BY MR. ISAACSON:
23           Q.    By using the average revenue
24    per event, per fighter as a proxy, were



Page 333

```
 1
 2                      CERTIFICATE
 3
 4
 5              I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
 6  deposition is a true record of the
    testimony given by the witness.
 7
                It was requested before
 8  completion of the deposition that the
    witness, HAL J. SINGER, Ph.D., have the
 9  opportunity to read and sign the
    deposition transcript.
10
11
12  _____
    Constance S. Kent, CCR, RPR, CLR
13    Certified Court Reporter
      Registered Professional Reporter
14    Certified LiveNote Reporter
      and Notary Public in and for the
15  Commonwealth of Pennsylvania
    Dated:  October 1, 2017
16
17
18
19
20              (The foregoing certification
21  of this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)
```

