**EXHIBIT 34**
**-**
**REDACTED VERSION OF**
**ECF NO. 365-17**

# Exhibit 14

ZFL-1843874 2008-06-05

Topps License Agreement

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement") is made and entered into this 5th day of June, 2008 (the "Effective Date'), by and between ZUFFA, LLC, a Nevada Limited Liability Company with offices at 2960 W. Sahara Avenue, Suite 100, Las Vegas, Nevada 89102 (the "Licensor") and THE TOPPS COMPANY, INC. a Delaware corporation with offices at One Whitehall Street, New York, New York 10004 (the "Licensee").

### WITNESSETH:

WHEREAS, Licensor is the sole and exclusive owner of the Property or Properties identified more fully in Schedule A attached hereto (the "Property") including, but not limited to, those trademark and service marks identified in Schedule A attached hereto (the "Trademarks"); and

WHEREAS, Licensor has the power and authority to grant to Licensee the right, privilege and license to use, manufacture and sell those types of products that incorporate or are otherwise based on the Property as identified in Schedule A attached hereto (the "Licensed Products"); and

WHEREAS, Licensee has represented that it has the ability to manufacture, market and distribute the Licensed Products in the distribution channels (the "Channels of Distribution") and the countries both of which are identified in Schedule A attached hereto (the "Territory"); and

WHEREAS, Licensee desires to obtain from Licensor a license to use, manufacture, have manufactured, advertise, promote, distribute and sell Licensed Products in the Territory and to use the Trademark on or in association with the Licensed Products; and

WHEREAS, both Licensee and Licensor are in agreement with respect to the terms and conditions upon which Licensee shall use, manufacture, have manufactured, advertise, promote, distribute and sell Licensed Products and to use the Trademark on or in association with the Licensed Products.

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do promise and agree as follows.

1.   **License Grant.**
     (a)   Grant of Limited License. Licensor grants to Licensee for the term of this Agreement as defined in Schedule A attached hereto (the "Term"), subject to the terms and conditions herein contained, and Licensee hereby accepts, the exclusive right, license and privilege to utilize the Property and Trademarks solely and only in connection with the manufacture of the Licensed Products as well as for the advertising, promotion, distribution, offering for sale and sale of such Licensed Products within the Channels of Distribution and within the Territory to those Approved Customers identified in Schedule A attached hereto or who are otherwise approved in writing by Licensor under the terms and conditions stated herein.

     (b)   Individuals. Licensee expressly acknowledges that this license grant does not convey any rights to the Licensee with respect to the individuals and athletes who compete or participate in Licensor's events, whose rights are not controlled by Licensor. Licensee shall not use the names, images or likenesses of such individuals and athletes without first obtaining the prior written approval

100706                                            1

CONFIDENTIAL

from Licensor for the ability to seek permission to directly contact such individuals and athletes and understands that any potential rights granted for such individuals or athletes will be on a non-exclusive basis only unless such individuals or athletes and Licensee agree in a separate written document that such rights with respect to the Licensed Products are granted on an exclusive basis during the Term . Notwithstanding the preceding, Licensee shall obtain the prior written approval from Licensor before contacting any individuals or athletes who compete or participate in Licensor's events. Licensee shall consult with Licensor relating to any potential offers made to the individuals or athletes. Licensor shall use commercially reasonable best efforts to assist Licensee in obtaining such rights from these individuals or athletes.

(c)     No Sublicensing. Licensee may not grant any sub-licenses to any third parties without the prior express written permission of Licensor, which permission may be withheld in Licensor's sole discretion.

(d)     Non-Authorized Use. Licensee agrees that it will not utilize the Property in any manner not specifically authorized by this Agreement.

(e)     Grant of Other Rights. Nothing in this Agreement shall be construed to prevent Licensor from granting other licenses for the use of the Property in any manner whatsoever. Licensor specifically reserves all rights not herein granted, including, without limitation, premium and promotional rights.

(f)     Distribution Outside of Authorized Channels. It is understood and agreed that the Licensee may, with the prior express written approval of Licensor, manufacture and/or have manufactured the Licensed Products outside the Territory provided that all sales are within the Territory. Licensee agrees that it will not make, or authorize, any use, direct or indirect, of the Licensed Products or Property in any distribution channel other than the approved Channels or Distribution or in any country other than the Territory without the prior express written permission of the Licensor nor shall Licensee knowingly offer to sell or sell Licensed Products to persons who intend or are likely to resell them in distribution channels other than the approved Channels of Distribution or any country other than the Territory. Notwithstanding anything to the contrary in this Agreement, the parties acknowledge that if the Territory includes a European Economic Area ("EEA") country, Licensee may participate in sales from that country in response to unsolicited requests from customers located outside the Territory or outside the permitted channels of distribution in accordance with the rules and regulations relating to the EEA countries or other rules and regulations of the European Union.

(g)     Territory. In the event that Licensor permits or makes available distribution of the licensed articles similar to the Licensed Products in additional countries, Licensor shall permit or make available distribution in that country to Licensee and if Licensee agrees in its sole discretion, this Agreement shall be amended to reflect the additional territories.

2.     **Consideration.**
(a)     Royalty. In consideration for the licenses granted hereunder, Licensee agrees to pay to Licensor during the Term of this Agreement (as defined in Schedule A attached hereto), a royalty in the amount provided in Schedule A attached hereto (the "Royalty") based on Licensee Net Sales of Licensed Products. If any amount payable to Licensor is subject to any non-US tax, charge or duty, Licensee shall furnish to Licensor official proof of such payment, including official proof of receipt of

100706                                        2

Licensee's payment from the government entity imposing such tax, charge or duty. Licensee is not responsible for any income taxes in connection with the Royalty amount paid to Licensor. Notwithstanding the above, no royalties are due hereunder by Licensee for any Collector Devices as defined in Schedule A.

(b)     Royalty Period. The Royalty owed Licensor shall be calculated on a monthly calendar basis (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding month.

(c)     Advertising Fee. During each Royalty Period on the dates specified in Schedule A, upon mutual approval by the parties of the actual advertising which the Advertising Fee will be used for each quarter, Licensee shall pay to Licensor an Advertising Fee in the amount recited in Schedule A. Licensee's obligation to pay the Advertising Fee is absolute and independent of the Royalty. Licensee shall have no right to set off, compensate or make any deduction from payments of the Advertising Fee for any reason whatsoever. Any amount that Licensee may directly spend on advertising (as previously approved by Licensor) in excess of the amount required herein shall not be used to offset the required Advertising Fee for the subsequent Royalty Period. Licensor may use or expend all Advertising Fees paid by Licensee hereunder in its sole discretion.

(d)     Royalty Statement. With each Royalty payment, Licensee shall provide Licensor with a written Royalty Statement in a form acceptable to Licensor. Such Royalty Statement shall be certified as accurate by f Licensee, reciting: (a) gross sales of all Licensed Products for the applicable Royalty Period, itemized by SKU and accompanied with a description of the unique features of the Licensed Product; (b) Net Sales on which the Royalties are based; (c) all related party sales, employee sales, parking lot, warehouse or similar sales, and any other unusual sales transactions; and (d) allowed deductions or credits taken against gross sales. Failure to deliver statements and reports in a timely manner as provided by this Section shall constitute a material breach of this Agreement. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period.

(e)     Advance and Guaranteed Minimum Royalty. Licensee agrees to pay to Licensor a Guaranteed Minimum Royalty in accordance with the terms of Schedule A attached hereto (the "Guaranteed Minimum Royalty") and to be paid upon execution of the Agreement. As recited in Schedule A, a portion of the Guaranteed Minimum Royalty for the first year shall be payable as an Advance against royalties (the "Advance"). The actual royalty payments shall reflect the amount of all Guaranteed Minimum Royalty payments including any Advances made and shall be applied against actual royalty payments.

(f)     Royalty Reserves.     Licensee shall be entitled to withhold a reserve against projected returns of Licensed Products of up to twenty percent (20%) the gross units sold in any Royalty Period. Such reserve shall be separately reported and liquidated no later than the second Royalty Period after the close of the Royalty Period in which such reserve is just established (or the end of the Term, if earlier).

(g)     Net Sales Defined. "Net Sales" shall mean Licensee gross sales (the gross invoice amount billed customers) of Licensed Products, less allowances for damaged Licensed Products actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) and, further, less any *bona fide* returns (net of all returns actually made or allowed as supported by

100706                                             3

credit memoranda actually issued to the customers). In no event shall the total credits taken by Licensee for allowances, discounts or markdowns exceed 20% of the total gross sales for any Royalty Period. No other costs incurred in the manufacturing, selling, advertising, and distribution of the Licensed Products shall be deducted nor shall any deduction be allowed for any uncollectible accounts or allowances.

(h)      Sale of a Product.  A Royalty obligation shall accrue upon the sale of the Licensed Products regardless of the time of collection by Licensee.  For purposes of this Agreement, a Licensed Product shall be considered "sold" upon the date when such Licensed Product is billed, invoiced, shipped, or paid for, whichever event occurs first.

(i)      Invoices.  Upon the request of Licensor, Licensee shall submit to Licensor copies of invoices, credit memoranda, price lists, line sheets and customer lists related to the sale of Licensed Products.  All payment terms discounts and trade discounts must appear on the face of each invoice; each such discount must be itemized as a percentage reduction in Licensee's published wholesale list price.

(j)      Off-Sale Pricing.  If Licensee sells any Licensed Products to any party at a price less than the regular price charged to other parties, the Royalty payable Licensor shall be computed on the basis of the minimum Royalty dollar amounts as set forth in Schedule A of this Agreement.  In the event that Licensee combines or bundles any Licensed Product with non-licensed goods or services, the Royalty due Licensor will be based on the proportional value of the cost of goods of the Licensed Products as a percentage of the cost of goods of the bundled product including the Licensed Products. Notwithstanding the preceding, Licensee agrees to enter into good-faith discussions with Licensor before any of the Licensed Products are sold for less than 50% of the regular price.  In the event that the Licensed Products are contemplated to be sold for less than 50% of the regular price charged to other parties and after such consultation with Licensor, such Royalty paid will be based on a 50% discount.

(k)      No Bar.  The receipt or acceptance by Licensor of any Royalty Statement, or the receipt or acceptance of any royalty payment made, shall not prevent Licensor from subsequently challenging the validity or accuracy of such statement or payment.

(l)      Acceleration.  Upon expiration or termination of this Agreement, all Royalty obligations, including any unpaid portions of the Guaranteed Minimum Royalty, shall be accelerated and shall immediately become due and payable.

(m)      Survival of Termination.  Licensee obligations for the payment of a Royalty and the Guaranteed Minimum Royalty shall survive expiration or termination of this Agreement and will continue for so long as Licensee continues to manufacture, sell or otherwise market the Licensed Products.

(n)      U.S. Currency.  All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties.

(o)      Sale of Licensed Products to Licensor.  Upon the request of Licensor, Licensee agrees to sell Licensed Products (and Licensed Products exclusive to Licensor's owned or controlled retail outlets) to Licensor and Licensor's authorized agents at Licensee's best available wholesale price. Such sales may include, without limitation, sales by Licensor and its authorized agents via e-

100706                                    4

CONFIDENTIAL                                                                  ZFL-1843877

commerce (i.e. www.ufc.com), events, direct response campaigns and direct mail. In addition, it is understood that for the sale of Licensed Products to Licensor, Licensee will pay a Royalty based on the best available wholesale price.

3.    **Time of the Essence.**
        Time is of the essence with respect to timely delivery of Royalty Statements and payments as herein provided and Licensee's failure to comply shall constitute a material breach of the Agreement. If any such breach is not cured within five (5) business days of receiving written notice of such breach by Licensor, or if Licensee shall receive written notice of such breach more than twice in any twelve (12) month period, such shall be grounds for automatic termination without a further opportunity to cure.

4.    **Audit.**
        (a)    Right to Audit. Both during and after termination or expiration of this Agreement, Licensor shall have the right, upon at least five (5) days written notice and no more than once per calendar year, to inspect Licensee books and records and all other documents and material in the possession of or under the control of Licensee with respect to the subject matter of this Agreement at the place or places where such records are normally retained by Licensee. Licensee shall fully cooperate with the Licensor or its representative in connection with such audit and Licensor and/or its representative shall have free and full access thereto for such purposes and shall be permitted to make copies thereof and extracts there from at Licensor's sole cost.

        (b)    Discrepancies. In the event that such inspection reveals a discrepancy in the amount of Royalty owed Licensor from what was actually paid, Licensee shall pay such discrepancy, plus interest, calculated at the rate of ONE PERCENT (1%) per month. In the event that such discrepancy is in excess of the lesser of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00) or FIVE PERCENT (5%) of the monies owed Licensor, Licensee shall also reimburse Licensor for the cost of such inspection including any reasonable attorney's fees incurred in connection therewith. If it is determined that Royalty payments due are in excess of FIFTY PERCENT (50%) of the Royalties paid for the period covered by such audit, then, in addition to any and all other rights, legal and/or equitable, of Licensor, Licensor shall have the right to immediately terminate the Term upon notice to Licensee.

        (c)    Record Retention. This audit right shall survive termination or expiration of the Agreement. All books and records relative to Licensee obligations hereunder shall be maintained and kept accessible and available to Licensor for inspection for at least three (3) years after expiration or termination of this Agreement.

        (d)    Periodic Financial Statements. Within ninety (90) calendar days after the end of each of its fiscal years, Licensee shall provide Licensor (all in English) with an annual composite statement, certified by its chief financial officer, showing the aggregate gross sales, trade discounts, returns, allowances, payment term discounts and closeout discounts and any other deduction taken to arrive at the Net Sales price of all Licensed Products sold by Licensee.

100706                                    5

CONFIDENTIAL

**5.**    Marketing.

(a)    Commercially Reasonable Efforts. At all times during the Term, Licensee shall use commercially reasonable efforts to generate the maximum possible level of sales of the Licensed Products within the Channels of Distribution in the Territory. However, Licensee shall not be required to distribute, sell, advertise or promote the Licensed Products in countries in the Territory where Licensor is not actively marketing the Property. Licensee acknowledges that Licensor is entering into this Agreement not only in consideration of the payments to be made by Licensee, but also in consideration of the promotional value to Licensor of the widespread marketing, distribution, advertising, promotion, offer for sale and sale of the Licensed Products. Accordingly, Licensee shall use commercially reasonable efforts to seek to procure the greatest volume of sales of the Licensed Products consistent with high quality and shall diligently and continuously make and maintain timely and adequate arrangements for their manufacture, marketing, distribution, advertising, promotion, offering for sale and sale.

(b)    Sufficient Inventory. Licensee shall use commercially reasonable efforts to maintain sufficient on-hand inventory to support market demand for the Licensed Products.

(c)    Marketing Plan. No later than September 1st of each calendar year during the Term, Licensee shall provide to Licensor Licensee's proposed marketing plan and budget ("Marketing Plan") for the promotion and distribution of the Licensed Products for the ensuing calendar year.

(d)    Marketing Budget. Licensee shall establish a marketing budget, and shall expend an amount, for advertising and related sales promotion activities, for each year during the Term, equal to a percentage of all Net Sales in the amount recited in Schedule A attached hereto. Licensee shall provide Licensor within sixty (60) days after the end of each calendar year with an accounting signed and certified by an officer of Licensee, reflecting the amounts expended by Licensee on advertising the Licensed Products

(e)    Manner of Sale. Licensee shall sell and distribute the Licensed Products in the Territory and Channels of Distribution outright and not on approval, consignment, guaranteed sale or return basis, or as a premium, promotional tie-in, or give-away.

(f)    Licensor's Assistance in Marketing Efforts. Licensor shall provide reasonable assistance to Licensee in marketing the Licensed Products, at Licensee's request, but shall not be required to expend material amounts of time or money in doing so.

(g)    Promotions in Non-US Markets. Notwithstanding anything in this Agreement to the contrary, upon Licensor's prior written approval on a country-by-country basis within the Territory, Licensee shall have the right to give-away the Collector Devices (as defined in Schedule A) containing the Property and to do the following promotional activities with respect to the Licensed Products: (i) National Daily and Sunday newspaper coupon redemption programs; (ii) sampling with age appropriate magazines and comic titles; (iii) sampling with third parties; (iv) swap shop promotional tours and Merlin's Collector's Club give-aways and offers in Europe; (v) director mail to Licensee's customer base; (vi) promotions with regional radio and newspapers; and (vii) sampling at appropriate locations and events, such as shopping malls and sports stadiums. In addition, Licensee agrees not to directly market to children and tweens in the Territory.

100705            6

6. **Approval of Products and Promotional Materials.**

(a)    Quality of the Licensed Products.    The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices as reasonably required by Licensor.

(b)    Approval of Preliminary Material.    Licensee agrees to submit to Licensor, for final approval, sketches, prototypes and production samples of all Licensed Products and any and all advertising, promotional and packaging material related to said Licensed Products. Licensor shall provide Licensee with written approval or disapproval within five (5) business days after receipt of such sketches, prototypes and production samples. Licensor hereby agrees that any item submitted will not be unreasonably disapproved and, if it is disapproved, that Licensor will give the Licensee specific grounds therefore. Once such samples have been approved by Licensor, the Licensed Product shall not materially depart there from without Licensor's prior express written consent, which shall not be unreasonably withheld. Should Licensor fail to provide such written approval or disapproval within five (5) business days, such failure shall be deemed to be disapproval of such submission. Licensee shall thereafter have the right to demand, in writing, such written approval or disapproval from Licensor. Should Licensor fail to provide such written approval or disapproval within three (3) business days thereafter, such failure shall be deemed to be approval.

(c)    Compliance with Standards.    The Licensed Products manufactured by or for Licensee, shall comply in all respects with Licensor's standards, specifications, directions and processes as timely provided to Licensee by Licensor and shall be in substantial conformity with the production sample of the Licensed Product approved by Licensor. Once Licensor has approved the Production Sample(s), Licensee will manufacture Licensed Products only in accordance with such approved Production Sample(s) and will not make any changes without Licensor's prior written approval.

(d)    Pre-Production Samples.    Prior to the commencement of manufacture and sale of the Licensed Products, Licensee shall submit to Licensor, at no cost to Licensor two (2) sets of samples of all Licensed Products which Licensee intends to manufacture and sell and one (1) complete set of all promotional and advertising material associated therewith.

(e)    Annual Samples.    At least once during each calendar year, Licensor may require that Licensee shall submit to Licensor an additional fifteen (15) samples of each Licensed Product.

(f)    Compliance with Laws.    Licensed Products will, at all times, be manufactured, sold and distributed with labels, tags, packaging, and sales promotion materials that are appropriate for merchandise of such quality; and will at all times be manufactured, sold and distributed in accordance with all applicable federal, state and local laws and regulations, and shall in no manner reflect adversely upon the good name of Licensor.

(g)    Failure of Quality.    If the quality of a particular Licensed Product falls below such a production-run quality, as previously approved by Licensor, Licensee shall use commercially reasonable efforts to restore such quality. In the event that Licensee has not taken appropriate steps to restore such quality within thirty (30) days after notification by Licensor, Licensor shall have the right to delete such Licensed Product from the Agreement. Such deletion shall have no effect on the remaining terms of the Agreement and the Agreement shall remain in full force and effect.

100706                                         7

(h)    Seconds.  If, in the reasonable discretion of Licensor and Licensee, any Licensed Product(s) is not in conformity with Licensor's approval as set forth herein, but is suitable for sale as a non-first quality product ("Seconds"), then Licensee may sell such Seconds in a way which shall not reduce the value of the Trademarks or Property or detract from Licensor's reputation in any major respect, provided, however, that (a) Licensee's sales of Seconds shall not exceed five (5%) of its total Net Sales for any Royalty Period; (b) Licensor shall have a right to approve such Licensed Products sold as Seconds, such approval not to be unreasonably withheld; and (c) a full Royalty shall be due on all such sales of Seconds.

(i)    Inspections.  The Licensee agrees to permit Licensor or its representative to inspect the facilities where the Licensed Products are being manufactured and packaged.

(j)    Quality of Promotional Materials.  The quality, contents and workmanship of all promotional and advertising material containing the Property (the "Ancillary Materials") shall at all times be of a high standard, and of such style, appearance and quality as to be adequate and suited to their exploitation to the best advantage and to the protection and enhancement of the Licensor and the Trademarks and the goodwill pertaining thereto; no less than the best quality of similar ancillary material used by Licensee.

(k)    Approval of Ancillary Materials.  Licensee shall, in sufficient time for review and consideration, submit to Licensor, for Licensor's approval, all Ancillary Materials relating to the Licensed Products.  Licensor shall provide Licensee with written approval or disapproval within five (5) business days after receipt of such Ancillary Materials. Any submission not approved in writing by Licensor Group within such five (5) day period shall be deemed disapproved.  Licensee shall thereafter have the right to demand, in writing, such written approval or disapproval from Licensor. Should Licensor fail to provide such written approval or disapproval within three (3) business days thereafter, such failure shall be deemed to be approval.  Otherwise, Licensee shall not use or disseminate any Ancillary Materials without the prior express written approval of Licensor. Licensor hereby agrees that any item submitted will not be unreasonably disapproved and, if it is disapproved, that Licensor will give the Licensee specific grounds therefore.

(l)    Advertising Material and Placement.  All media advertising and media advertising placements with respect to the Licensed Products shall be mutually acceptable to both parties. Licensor hereby agrees that any item submitted will not be unreasonably disapproved and, if it is disapproved, that Licensor will give the Licensee specific grounds therefore.

(m)    Intellectual Property Notices.  Licensee agrees to affix to the Licensed Products, and to any Ancillary Materials which depict the Property and/or Trademarks, such legal notices as required and approved by Licensor in writing.  In addition, wherever appropriate and required by Licensor, Licensee shall affix the appropriate symbol ® or ™ as well as any such material, such other reasonable notice or notices of trademark and copyright as requested by Licensor.  The Licensed Products shall also contain the following copyright notice, which Licensor can change from time to time by notice to Licensee:

© 200_ (or year introduced) UFC
All Rights Reserved.

100706                    8

Such notices shall appear on the Licensed Products, or on any label or tag affixed to the Licensed Products, as Licensor may approve. The parties recognize and agree, however, that there will be instances where it will not be possible to contain a full copyright or trademark notice. In such event, they will agree upon an appropriate "short form" or abbreviated version of such notice.

     (n)    Compliance with Labor Compliance Rules. Licensee shall comply in all material respects with the LIMA Code of Business Practices attached hereto as Exhibit A.

**7.**    **Intellectual Property Rights.**
     (a)    No Challenges by Licensee. The parties agree that Licensee will not take any action or fail to take any action inconsistent with the ownership, title or any rights of Licensor in and to the Property or Trademarks or attack the validity of this Agreement or the Property or Trademarks.

     (b)    Trademark Registrations. The parties acknowledge and agree that Licensor has the right, but not the obligation, to apply for any and all registrations in the United States and elsewhere for the Trademarks under its own name. Licensee agrees to provide commercially reasonable assistance to Licensor with respect to filing such applications and obtaining and maintaining the resulting registrations for the Trademarks.

     (c)    Trademarks Unique and Original. Licensee acknowledges Licensor's rights in the Property and Trademarks and, further, acknowledges that the Property and Trademarks are unique and original to Licensor and that Licensor is the owner thereof. Licensor, however, makes no representation or warranty with respect to the validity of any trademark or copyright which may issue or be granted therefrom.

     (d)    Secondary Meaning. Licensee acknowledges that the Property and Trademarks have acquired secondary meaning.

     (e)    Trademarks Inure to Benefit of Licensor. Licensee agrees that its use of the Property and Trademarks inures to the benefit of Licensor and that the Licensee shall not acquire any rights in the Trademarks.

     (f)  Works Created by Licensee. All materials produced in connection with this Agreement, including all copyrights and other intellectual property rights in and to such materials (other than the underlying preexisting rights in the Property which remain the absolute and exclusive property of Licensor), will be and remain the absolute and exclusive property of Licensee forever subject to the restrictions contained in this Agreement. Licensor acknowledges that it does not now have nor will in the future assert any right, title or interest of any kind or nature whatsoever in such materials, or in or to any component part or element thereof (except to any publicity rights in the Property and Trademarks). Licensee acknowledges the value, goodwill and rights of Licensor in the Property and Trademarks. Licensee waives all claim of and to ownership of any rights in the Property or Trademarks it has or may obtain during the Term of this Agreement and agrees that it shall not during or after the Term of this Agreement, contest or assist others in contesting Licensor's rights in or to the Property or Trademarks.

100706             9

CONFIDENTIAL

8. **Representations and Warranties.**

(a) **Licensor Representations and Warranties.** Licensor represents and warrants that (1) no third party owns any right, title or interest in the Property and Trademarks; (2) the Property and Trademarks do not interfere with, infringe upon, misappropriate or otherwise conflict with any intellectual property rights of any third party; (3) it has full right, power and authority to convey the right, title and interest described herein: and (4) it has not taken, and will not take, any action in conflict with this Agreement.

(b) **Licensee Representations and Warranties.** Licensee represents and warrants that: (1) it shall comply with all applicable laws and regulations in connection with the manufacture, use, sale, distribution, advertising and promotion of the Licensed Products; (2) it will use its commercially reasonable efforts to promote, market, use, sell, and distribute the Licensed Products and will maintain sufficient inventories of Licensed Products to reasonably fulfill orders; (3) it shall be solely responsible for the manufacture, production, sale, and distribution of the Licensed Products and will bear all related costs associated therewith; and (4) it will manufacture or have manufactured all Licensed Products in compliance with the LIMA Code of Business Standards, a copy of which is attached hereto as Exhibit A.

(c) **Introduction of Licensed Products.** It is the intention of the parties that Licensee shall introduce the Licensed Products in the Territory on or within two months of the Product Introduction Date recited in Schedule A and commence shipment of Licensed Products in the Territory on or within two months of the Initial Shipment Date recited in Schedule A.

9. **Termination.**

The following termination rights are in addition to the termination rights provided elsewhere in this Agreement:

(a) **Immediate Right of Termination.** Licensor shall have the right to immediately terminate this Agreement by giving written notice to Licensee in the event that Licensee does any of the following:

(1) fails to introduce the Licensed Products within two months of the Product Introduction Date or the Initial Shipment Date as specified in Schedule A; or

(2) after having commenced sale of the Licensed Products, fails to continuously sell Licensed Products for three (3) consecutive Royalty Periods; or

(3) fails to obtain or maintain product liability insurance in the amount and of the type provided for herein; or

(4) files a petition in bankruptcy or is adjudicated a bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or if the Licensee discontinues its business or a receiver is appointed for the Licensee or for the Licensee business and such receiver is not discharged within thirty (30) days; or

(5) breaches any of the provisions of this Agreement relating to the unauthorized assertion of rights in the Trademarks; or

100705                                    10

CONFIDENTIAL

(6)    after receipt of written notice from Licensor, fails to immediately discontinue the distribution or sale of the Licensed Products or the use of any Ancillary Materials that do not contain the requisite legal legends; or

(7)    in accordance with Section 3, fails to make timely payment of Royalties more than two times during any twelve-month period;

(8)    fails to comply with the Marketing Requirements as provided for in Schedule A attached there; or

(9)    sells Licensed Products to an unapproved customer;

(10)    intentionally reports incorrect or false manufacturing, sales or financial information;

(11) itself, or any of its manufacturing subcontractors or sub-subcontractors, manufactures, offers for sale, distributes, uses or sells any Licensed Product or Ancillary Material incorporating the Property, without the express permission of Licensor as herein provided, or manufacture or sell any disapproved products; or

(12) offers to sell, sells or ships the Licensed Products to customers or distributors outside the Channels of Distribution or the Territory or to non-Approved Customers, or to customers or distributors whom Licensee knows or should know will resell or ship the Licensed Products outside the Channels of Distribution or the Territory;

Notwithstanding the foregoing, if Licensor elects to provide Licensee with notice and an opportunity to cure any breach described in this Sections (in Licensor's sole discretion), such action will not constitute a waiver of or bar to Licensor's right to strictly enforce immediate termination in the future, without any right to cure, in the event of the same or any other breach. However, with respect to Licensee's failure to make the Minimum Advertising Expenditure in any calendar year, Licensor agrees to allow for a thirty (30) day cure period commencing from Licensee's receipt of a breach notice.

(b)    Immediate Right to Terminate a Portion.  Licensor shall have the right to immediately terminate the portion(s) of the Agreement relating to any Trademark and/or Licensed Product(s) in the Territory if Licensee, for any reason, fails to meet the Product Introduction Dates or the Initial Shipment Dates specified in Schedule A or, after the commencement of manufacture and sale of a particular Licensed Product, ceases to sell commercial quantities of such Licensed Product for six (6) consecutive Royalty Periods. In the event that Licensor terminates a portion of the Agreement for any Trademark and/or Licensed Product in any Territory, Licensor and Licensee agree to engage in good faith discussions about reducing the Minimum Guarantee.

(c)    Right to Terminate on Notice.  This Agreement may be terminated by either party upon thirty (30) days written notice to the other party in the event of a breach of a material provision

100705                                                    11

of this Agreement unrelated to Licensee payment obligations by the other party, provided that, during the thirty (30) day period, the breaching party fails to cure such breach. With respect to Licensee payment obligations hereunder, Licensor may terminate this Agreement upon five (5) days written notice to Licensee in the event of a breach by Licensee of its payment obligations hereunder, provided that during this five (5) day period, Licensee fails to cure such breach.

**10.    Post Termination Rights.**
    (a)    Inventory upon Termination. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, Licensee shall provide Licensor with a complete schedule of all inventory of Licensed Products then on-hand (the "Inventory").

    (b)    Sell-Off Period. Upon expiration or termination of this Agreement except for reason of a breach of Licensee's duty to comply with the quality control or legal notice marking requirements, Licensee shall be entitled, for an additional period of sixty (60) days and on a continued nonexclusive basis, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days after the close of the said one (1) month period. Licensee shall not be permitted to sell Licensed Products during this period at a price point discounted more than 50% of its traditional wholesale selling price.

    (c)    Discontinuance of Use of the Property. Upon the expiration or termination of this Agreement, all of the rights of Licensee under this Agreement, except for Licensee rights under paragraph 10(b), shall forthwith terminate and immediately revert to Licensor and Licensee shall immediately discontinue all use of the Trademarks, at no cost whatsoever to Licensor.

    (d)    Return of Materials. Upon termination of this Agreement for any reasons whatsoever, Licensee agrees to immediately return to Licensor all material relating to the Trademarks including, but not limited to, all artwork, color separations, prototypes and the like, as well as any market studies or other tests or studies conducted by Licensee with respect to the Trademarks, at no cost whatsoever to Licensor.

**11.    Infringements.**
    (a)    Initiation of Infringement Actions. Licensor shall have the right, in its discretion, to institute and prosecute lawsuits against third persons for infringement of the rights licensed in this Agreement. In the event that Licensor should decline to prosecute such a lawsuit or fail to initiate prosecution with three (3) months from notice by the Licensee of such infringement, Licensee may initiate an action of its own against such infringer(s) at its own expense using counsel reasonably acceptable to Licensor. Licensor may be joined as a party to such action. Any recovery would be first applied to any expenses incurred in prosecuting such action and, should there be any remainder, the party initiating the lawsuit shall be entitled to 75% of the remainder and the other party shall be entitled to 25% of the remainder.

    (b)    Cost of Litigation. Any lawsuit shall be prosecuted solely at the cost and expense of Licensor and all sums recovered in any such lawsuits, whether by judgment, settlement or otherwise, shall be retained by Licensor.

    (c)    Cooperation of Parties. Upon request of Licensor, Licensee shall execute all papers, testify on all matters, and otherwise cooperate in every way reasonably necessary and desirable for

100706                    12

the prosecution of any such lawsuit. Licensor shall reimburse Licensee for the expenses incurred as a result of such cooperation.

**12. Indemnification.**

(a) <u>Licensee Indemnity.</u> Licensee agrees to defend, indemnify and hold Licensor, and its officers, directors, employees, agents, and advisors, harmless from and against any and all costs, loses, obligations, suits, judgments, damages and costs (including reasonable attorneys' fees and costs) incurred through claims of third parties against Licensor based on the manufacture, sale, marketing, distribution, advertising or promotion of the Licensed Products including, but not limited to, actions founded on product liability or infringement of any third party intellectual property rights except for those based on the Property or Trademarks. Licensor shall have approval rights over Licensee's counsel selection in connection with such actions, such approval not to be unreasonably withheld. No settlement for such action may contain equitable or injunctive relief without Licensor's prior express written approval.

(b) <u>Licensor Indemnity.</u> Licensor agrees to defend, indemnify and hold Licensee, and its officers, directors, employees, agents, and advisors, harmless from and against any and all costs, loses, obligations, suits, judgments, damages and costs (including reasonable attorneys' fees and costs) incurred through claims of third parties against Licensee based on any claim by any third party challenging Licensor's rights in the Property and/or Trademarks or its ability to enter into this Agreement including any claim for infringement of any third party rights based solely on Licensee's licensed use of the Property and/or the Trademarks on the Licensed Products. Licensee shall have approval rights over Licensor's counsel selection in connection with such actions, such approval not to be unreasonably withheld. No settlement for such action may contain equitable or injunctive relief without Licensee's prior express written approval.

**13. Insurance.**

(a) <u>Product Liability Insurance.</u> Licensee shall, throughout the Term of the Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business in Nevada with a Best rating of A- or better, standard Product Liability Insurance naming Licensor as an additional named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any bodily injury, property damage, blanket contractual liability, personal injury or advertising injury from the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be a minimum of Five Million Dollars (US $5,000,000) combined single limit for each single occurrence for bodily injury and Five Hundred Thousand Dollars ($500,000) for property damage. Licensee agrees to furnish Licensor a certificate of insurance within ten (10) days after execution of this Agreement and, in no event shall Licensee manufacture, distribute or sell the Licensed Products prior to receipt by Licensor of such certificate of insurance.

(b) <u>Advertiser's Insurance.</u> Licensee shall, throughout the Term of the Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business in Nevada with a Best rating of A- or better, standard Advertiser's Insurance naming Licensor as an additional named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any Advertising injury including and not limited to copyright and trademark infringement of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be a minimum of Five Million Dollars (US $5,000,000) each occurrence and Five Million Dollars (US $5,000,000) in the aggregate. Licensee agrees to furnish Licensor a certificate of insurance within ten (10) days after execution of this Agreement and,

CONFIDENTIAL

in no event shall Licensee manufacture, distribute or sell the Licensed Products prior to receipt by Licensor of such certificate of insurance.

**14.    Relationship of the Parties.**

This Agreement creates no agency relationship between the parties hereto, and nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers, and neither party shall have any power to obligate or bind the other party in any manner whatsoever.

**15.    Severability.**

If any provision of this Agreement is held by a court or arbitrator of competent jurisdiction not enforceable to its full extent, then such provision shall be enforced to the maximum extent permitted by law, and the parties hereto consent and agree that such scope may be modified by such court or arbitrator accordingly and that the whole of such provision of this Agreement shall not thereby fail, but that the scope of such provision shall be curtailed only to the extent necessary to conform to the law.

**16.    Assignment and Transfer.**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Licensee may not assign its rights or obligations hereunder without the prior written consent of Licensor; provided, however, that Licensee may assign its rights under this Agreement without the prior consent of Licensor to any entity controlled by or controlling Licensee. No assignment shall entitle any assignee to any greater rights hereunder than those to which the assignor was entitled. For purposes of this provision the following shall not be considered an assignment: any action by Licensee that involves a change of control of Licensee or transfer of more than 50% the outstanding stock of Licensee.

**17.    Waivers.**

The failure or delay of either party at any time to exercise any right under any provision of this Agreement shall not limit or operate as a waiver thereof.

**18.    No Third Party Beneficiaries.**

Nothing in this Agreement is intended, or shall be construed, to give any entity or individual other than the parties hereto any legal or equitable right, remedy or claim under or in respect of this Agreement or any of the provisions contained herein.

**19.    Equitable Relief.**

Without limiting the right of the parties to pursue all other legal and equitable rights available to it for violation of or failure of a party to comply with the terms of this Agreement, it is agreed that other remedies cannot fully compensate the parties for such a violation or failure and that each party shall be entitled to pursue injunctive or other equitable relief to prevent violation or continuing violation or to compel performance by the other party. The parties acknowledge that the restrictions in this Agreement are reasonable and that the consideration therefore is sufficient to fully and adequately compensate them therefore. The parties further acknowledge that the Trademarks and Licensed Products are special and unique property and cannot be replaced or otherwise substituted for by other property or by money damages. It is the intent and understanding of each party hereto that if, in any action before any court or agency legally empowered to enforce this Agreement, any term,

100706                                    14

CONFIDENTIAL

restriction, covenant or promise in this Agreement is found to be unreasonable and for that reason unenforceable, then such term, restriction, covenant or promise shall be deemed modified to the extent necessary to make it enforceable by such court or agency.

**20.    Notices.**
Any notice, consent or other communication required or permitted hereunder shall be in writing. It shall be deemed given when (a) delivered personally, (b) sent by confirmed facsimile transmission, (c) sent by commercial overnight courier with written verification of receipt, or (d) sent by registered or certified mail, return receipt requested, postage prepaid, and the receipt is returned to the sender. Names, addresses and facsimile numbers for notices (unless and until written notice of other names, addresses and facsimile numbers are provided by either or both parties) are as follows:

If to Licensor:

Zuffa, LLC
2960 W. Sahara Avenue, Suite 100
Las Vegas, Nevada 89102
    Attn.: Kirk D. Hendrick
        Chief Operating Officer

*With a copy to:*

Zuffa, LLC
2960 W. Sahara Avenue, Ste. 100
Las Vegas, Nevada 89102
Attn.: Ike Lawrence Epstein
    Executive Vice President & General Counsel

If to Licensee:

Warren Friss
Vice President and General Manager –
Entertainment
The Topps Company, Inc.
One Whitehall Street
New York, NY 10004

With copy to:

General Counsel
The Topps Company, Inc.
One Whitehall Street
New York, NY 10004

**21.    Confidentiality.**
(a)    Disclosure of Confidential Information. There may be occasions during the Term of this Agreement that either party discloses to the other certain confidential or proprietary information including, any information transmitted between the parties that relates to the transferring party's business, such as drawings, specifications, production schedules, test data, business practices and marketing strategies, prospective product concepts or ideas, or the like, or the terms of this Agreement ("Confidential Information").     The following will, however, not be considered Confidential Information:

(1)    Information that is explicitly approved for release by the transmitting party,
(2)    Information that is disclosed in a product marketed by the transmitting party,
(3)    Information that was already known by the receiving party prior to receiving the information from transmitting party or becomes known by the receiving party independently through no wrongful act on the part of the receiving party,
(4)    Information that is known or available to the general public, or
(5)    Information that is independently developed by the receiving party without use of Confidential Information.

100706                         15

(b)　Use by Receiving Party.　The receiving party agrees to maintain such Confidential Information received from the transmitting party in confidence, to use it only in a manner consistent with the purpose for which it was transmitted and to not disclose it to persons not having a need to know it. In the event that the receiving party needs to transmit such information to a third party, the receiving party shall safeguard the confidentiality of the information.

(c)　Property of Transmitting Party.　All materials transmitted between the parties and containing Confidential Information shall remain the property of the transmitting party and shall be returned upon request unless previously destroyed.

(d)　No License Grant.　The transmission of the material containing such Confidential Information shall not be construed to grant the receiving party a license of any type under any patents, know-how, copyrights or trademarks owned or controlled by the transmitting party.

(e)　Survival of Termination.　The obligations of the parties under this section regarding confidential information shall survive termination, expiration or non-renewal of this Agreement.

22.　**On-Going Cooperation.**
Each party to this Agreement agrees to execute and deliver all documents and to perform all further acts and to take any and all further steps that may be requested by the other party and are reasonably necessary to carry out the provisions of this Agreement and the transactions contemplated hereby.

23.　**Press Release.**　Except to the extent required under applicable law or regulation, the parties agree that all press releases or other publicity relating to this Agreement shall be coordinated between the parties and will not be released without mutual agreement.

24.　**Independent Contractor.**
Licensee shall be deemed an independent contractor and nothing contained herein shall constitute this arrangement to be employment, a joint venture, or a partnership. Licensee shall be solely responsible for and shall hold Licensor harmless for any and all claims for taxes, fees, or costs arising from the manufacture, marketing, distribution or sale of Licensed Product, including but not limited to withholding, income tax, FICA, and workmen's compensation.

25.　**Governing Law & Disputes.**
This Agreement will be governed by, and construed and enforced in accordance with the laws of New York without regard to conflicts of law principles. All disputes under this Agreement shall be resolved by the courts of the state of New York, including the United States District Court for the Southern District of New York.　The parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

26.　**Execution in Counterparts.**
This Agreement may be executed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. The parties may execute this Agreement and exchange counterparts of the signature pages by means of facsimile transmission, and the receipt of such executed counterparts by facsimile transmission will be binding

CONFIDENTIAL

on the parties. Following such exchange, the parties will promptly exchange original versions of such signature pages.

**27.**    **Force Majeure.**

If the performance of any part of this Agreement by either party is prevented, hindered, delayed or otherwise made impracticable because of an Act of God, riot or civil commotion, act of public enemy, terrorism, order or act of any government or governmental instrumentality (whether federal, state, local or foreign) or similar cause beyond the control of either party, that party shall be excused from such performance to the extent that performance is prevented, hindered or delayed by such causes.

**28.**    **Integration.**

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

      **IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Effective Date.

ZUFFA, LLC                   THE TOPPS COMPANY, INC.

By: _____      By: _____
Its: CHIEF OPERATING OFFICER   Its: CEO
Date: 6/18/08             Date: 6/4/08

100706            17

CONFIDENTIAL

## SCHEDULE A

### 1.   PROPERTY
Ultimate Fighting Championship

In furtherance to section 1(b) of this Agreement and for the avoidance of doubt, the Licensee acknowledges the following:

Unless otherwise directed in writing, Licensee is only allowed to use fighter shots from UFC events, as supplied solely by Licensor. All images are subject to Licensor's approval prior to Licensee's use. Licensee will be allowed to use fight poster images, as supplied solely by Licensor. Licensee must consult with Licensor before contacting fighters, trainers, Octagon Girls, announcers, and managers on negotiating fees for autograph and or appearances. Licensor will notify Licensee within thirty (30) days of signing any fighter to a merchandise contract. Any violation of the preceding shall be deemed a material breach of this Agreement by Licensee and shall be grounds for immediate termination of this Agreement by Licensor.

### 2.   TRADEMARKS

| Trademark | Reg. No. | Reg. Date | Serial No. | Filing Date | Class |
|---|---|---|---|---|---|
| UFC & Design | 2,981,638 | 8/2/2005 | | | 25 |
| UFC & Design | 3,052,007 | 1/31/2006 | | | 41 |
| UFC & Design | 3,044,208 | 1/17/2006 | | | 28 |
| UFC & Design | | | 76/454,054 | 9/30/2002 | 9,16,18,20, 25,28 |
| Ultimate Fighting | 3,022,840 | 12/6/2005 | | | 16 |
| Ultimate Fighting | 2,960,665 | 6/7/2005 | | | 16 |
| Ultimate Fighting | 2,925,669 | 2/8/2005 | | | 9,25 |
| Ultimate Fighting | 2,866,495 | 7/27/2004 | | | 9 |
| Ultimate Fighting | 3,047,189 | 1/24/2006 | | | 41 |
| Ultimate Fighting | | | 78/910,345 | 6/16/2006 | 5,28,32,41 |
| Ultimate Fighting | | | 76/380,007 | 3/8/2002 | 16 |
| Ultimate Fighting | | | 76/356,163 | 1/7/2002 | 9,25,28 |
| Ultimate Fighting | | | 75/983,542 | 1/7/2002 | 9 |
| Ultimate Fighting Championship | 2,985,736 | 8/16/2005 | | | 24 |
| The Ultimate Fighting Championship | 2,170,463 | 6/30/1998 | | | 9 |
| The Ultimate Fighting Championship | 2,576,367 | 6/4/2002 | | | 9,16,18,25 |
| The Ultimate Fighting Championship | 1,939,277 | 12/5/1995 | | | 41 |
| As Real As It Gets | 2,794,515 | 12/16/2003 | | | 25,41 |
| As Real As It Gets | 2,887,392 | 9/21/2004 | | | 9,16 |
| As Real As It Gets | | | 76/451,631 | 9/23/2002 | 9,16,25 |

CONFIDENTIAL                                                                              ZFL-1843891

## 3.   TERRITORY

| Albania | Armenia | Austria |
|---|---|---|
| Australia | Azerbaijan | Belgium |
| Belarus | Bulgaria | Bahrain |
| Channel Islands | Croatia | Czechoslovakia |
| Cyprus | Denmark | Egypt |
| Ireland | Estonia | Finland |
| Georgia | Germany | Gibraltar |
| Hungary | Israel | Isle of Man |
| Italy | Latvia | Japan |
| Liechtenstein | Lithuania | Luxembourg |
| Malta | Monaco | Netherlands |
| Norway | New Zealand | Oman |
| Poland | Portugal | Romania |
| Russia | Saudi Arabia | South Africa |
| Sweden | Slovenia | San Marino |
| Switzerland | Syria | Turkey |
| United Kingdom | Vatican State | United Arab Emirates |
| Spain | Qatar | Yugoslavia |
| France | Greece | Singapore |
| Thailand | Malaysia | Serbia |
| Hong Kong | India | Brazil |
| Argentina | Mexico | Chile |
| Peru | Uruguay | Turkey |
| United States | Canada | |

## 4.   LICENSED PRODUCTS

- Approved collectible cards, trading cards (including trading card games (TCGs)), and sticker products (the "Cards and Stickers") ~~of any size and kind~~;
- Approved digital and electronic representations or versions of the Cards and Stickers distributed, transmitted, downloaded, or otherwise exploited on Licensee's ETopps or Toppstown website or any successor website run by Licensee. The parties agree to have good faith discussions to discuss additional digital or electronic rights in the future; and
- The following collector devices for the Cards and Stickers: Albums (a printed booklet used for the insertion of Stickers and/or Cards), binders, tins and card sleeves (the "Collector Devices").

With the following Parameters:
- Exclusive rights for trading card Stickers that are 2 1/2" x 3 1/2" and 2 1/2" x 2 ";  and
- Non-exclusive rights to other approved Sticker Sizes and dimensions.

4/10/8
ZuffA
AF

100706

19

## 5.    CHANNELS OF DISTRIBUTION

- All Channels of Distribution.

- On-line: Any on-line e-tailer must be pre-approved in writing by Licensor, such approvals to be at Licensor's sole discretion.

- Notwithstanding the preceding and in furtherance to section 2(n) of this Agreement, approved Channels of Distribution do not include sales through the UFC branded e-commerce website (i.e., www.ufc.com), Licensor-affiliated websites, UFC events, direct response and direct mail campaigns. Additionally, all Licensed Products sold at UFC events or through other channels specified in this paragraph must be unique and exclusive and cannot be used for any other Channel of Distribution.

## 6.    APPROVED CUSTOMERS
To be mutually agreed upon by the parties.

## 7.    ROYALTY RATE
Domestic Sales Rate: 12% of net wholesale sales; FOB: 14% of net wholesale sales or:

For illustration purposes, the following are examples of royalty payments that may be made under the Agreement:

| Brand | SRP Per Unit | Wholesale Price Per Unit | Royalty Per Unit (12%) |
|---|---|---|---|
| Topps  (pack) | $1.99 | $.82 | $.098 |
| Topps (double blister) | $3.99 | $1.80 | $.216 |
| Topps (value box) | $9.99 | $4.50 | $.54 |
| Topps  (value box) | $19.99 | $9.00 | $1.08 |
| Topps Heritage (pack) | $2.99 | $1.19 | $.142 |
| Bowman (pack) | $2.99 | $1.19 | $.142 |
| Bowman Chrome (pack) | $2.99 | $1.19 | $.142 |
| Allen & Ginter (pack) | $2.99 | $1.19 | $.142 |
| Topps Triple Threads (pack) $100 | | $65.00 | $7.80 |

## 8.    GUARANTEED MINIMUM ROYALTY

THREE HUNDRED THOUSAND UNITED STATES DOLLARS (US$300,000.00), payable via bank wire as follows:

| | |
|---|---|
| Upon Execution | $150,000 (as an Advance) |
| On or before May 1, 2009 | $75,000 |
| On or before May 1, 2010 | $75,000 |

## 9.    ADVANCE

ONE HUNDRED FIFTY THOUSAND UNITED STATES DOLLARS (US$150,000.00)

100706                          20

CONFIDENTIAL                                                        ZFL-1843893

10.    **ADVERTISING FEE**

Licensee shall pay Licensor the sum of Five Thousand Dollars ($5,000) on the first day of each quarter under the Agreement.

11.    **PRODUCT INTRODUCTION DATE**

September 15, 2008

12.    **INITIAL SHIPMENT DATE**

October 15, 2008

13    **MINIMUM ANNUAL SALES**

| Year | Minimum Annual Sales |
|------|----------------------|
| 2009 | $1,000,000 |
| 2010 | $1,000,000 |
| 2011 | $1,000,000 |

14.    **MINIMUM ADVERTISING EXPENDITURE**

$50,000 per year, payable as mutually agreed by the parties with agreement not to be unreasonably withheld.

15.    **TERM**

Commences the Effective Date of this Agreement through May 1, 2011.

16.    **MARKETING REQUIREMENTS**

Licensee to prominently exhibit the Licensed Product at all industry trade shows attended by Licensee in Licensee's sole discretion.

CONFIDENTIAL         ZFL-1843894

EXHIBIT A



LIMA Code of Business Practices

The International Licensing Industry Merchandisers' Association, Inc. ("LIMA") is committed on behalf of its member companies to the operation of factories manufacturing licensed products in a lawful, safe, and healthful manner. It upholds the principles that no underage, forced, or prison labor* should be employed; that no one is denied a job because of gender, ethnic origin, religion, affiliation or association, and that factories comply with laws protecting the environment. Supply agreements with firms manufacturing licensed products on behalf of LIMA members should also provide for adherence to these principles.

The role of LIMA is to inform, educate, and survey its members so that individual member companies can adhere to its Code of Business Practices. As an Association, it also acts to encourage local and national governments to enforce wage and hour laws and factory health and safety laws. Specific operating conditions that member companies are encouraged to meet and obtain contractor agreement in advance are as follows:

1) LABOR

a) That wages and overtime pay practices comply with the standards set by law, including the payment of compensation for overtime hours at such premium rates as is legally required in that country, but not less than at a rate equal to their regularly hourly compensation rate.

b) That working hours must exceed prevailing local work hours in the country where the work is to be performed, except with respect to appropriately compensated overtime; must not require in excess of a 60 hour week on a regularly scheduled basis; and must permit at least one day off in every 7 day period.

c) That no one under the legal minimum age is employed in any stage of manufacturing; that a minimum age of 14 applies in all circumstances, but notwithstanding the foregoing, that C138 Minimum Age Convention (1973) and C182 Worst Forms of Child Labor Convention (1999) of the International Labor Organization apply.

d) That no forced or prison labor is employed*, that workers are free to leave once their shift ends, and that guards are posted only for normal security reasons.

e) That all workers are entitled to sick and maternity benefits as provided by law.

100706                             22

CONFIDENTIAL                                                                        ZFL-1843895

f) That all workers are entitled to freely exercise their rights of employee representation as provided by local law.

## 2) THE WORKPLACE

a) That factories provide a safe and healthy working environment for their employees and comply with or exceed all applicable local laws concerning sanitation and risk protection.

b) That the factory is properly lighted and ventilated and that aisles and exits are accessible at all times.

c) That there is adequate medical assistance available in emergencies and that designated employees are trained in first aid procedures.

d) That there are adequate and well-identified emergency exits, and that all employees are trained in emergency evacuation.

e) That protective safety equipment is available and employees are trained in its use.

f) That safeguards on machinery meet or exceed local laws.

g) That there are adequate toilet facilities which meet local hygiene requirements and that they are properly maintained.

h) That there are facilities or appropriate provisions for meals and other breaks.

i) If a factory provides housing for its employees, it will ensure that dormitory rooms and sanitary facilities meet basic needs, are adequately ventilated and meet fire safety and other local laws.

j) That all employees are treated with dignity and respect and that no employee shall be subjected to any physical, sexual, psychological or verbal harassment or abuse.

k) That no mental or physical disciplinary practices are employed.

l) That factories shall recognize and respect the rights of employees to associate, organize and bargain collectively in a lawful and peaceful manner, without penalty or interference.

m) That factories shall not discriminate on the basis of race, religion, age, nationality, social or ethnic origin, sexual orientation, gender, political opinion or disability.

100706                                   23

CONFIDENTIAL

## 3. COMPLIANCE

a) The purpose of this Code is to establish a standard of performance, to educate, and to encourage a commitment to responsible manufacturing, not to punish.

b) To determine adherence, LIMA member companies will evaluate their own facilities as well as those of their contractors. They will examine all books and records and conduct on-site inspections of the facilities and request that their contractors follow the same practices with subcontractors.

c) An annual statement of compliance with this Code should be signed by an officer of each manufacturing company or contractor.

d) Contracts for the manufacture of licensed products should provide that a material failure to comply with the Code or to implement a corrective action plan on a timely basis is a breach of contract for which the contract may be canceled.

e) Because of the great diversity in the kinds of licensed products manufactured and the manufacturing methods used, as well as the wide range in factory sizes and numbers of employees, a rule of reason must be used to determine applicability of these provisions.

f) This Code should be posted or available for all employees in the local language.

---

\* Many countries recognize that prison labor is essential to the rehabilitation process. This provision prohibits the exportation of prison-made goods to countries that prohibit or restrict the importation of such goods.

CONFIDENTIAL