# EXHIBIT 35
# -
# REDACTED VERSION OF
# ECF NO. 365-21

# Exhibit 18

## 2014-11-26 ZFL-2490106 - Reebok Licensing Agreement

*Execution Version*

**LICENSE AGREEMENT**

among

Reebok International Limited

and

Zuffa, LLC

Dated as of November 26, 2014

**TABLE OF CONTENTS**

**ARTICLE 1.** Definitions ......................................................................................... 1

**ARTICLE 2.** Grant of License ................................................................................ 13

**ARTICLE 3.** Term .................................................................................................. 15

**ARTICLE 4.** Distribution of Licensed Products ..................................................... 16

**ARTICLE 5.** Exclusivity ......................................................................................... 19

**ARTICLE 6.** Terms of Payment ............................................................................ 22

**ARTICLE 7.** Product Quality Control .................................................................... 28

**ARTICLE 8.** Advertising and Promotional Materials ............................................ 30

**ARTICLE 9.** Branding ............................................................................................ 34

**ARTICLE 10.** Outfitting; Brand Exposure ............................................................. 37

**ARTICLE 11.** Representations, Warranties and Covenants ................................... 40

**ARTICLE 12.** Code of Conduct ............................................................................. 45

**ARTICLE 13.** Third Party Relationships ................................................................ 45

**ARTICLE 14.** Sponsorships ................................................................................... 46

**ARTICLE 15.** Protection of Rights ........................................................................ 46

**ARTICLE 16.** Indemnification and Insurance ........................................................ 51

**ARTICLE 17.** Termination and Renewal ............................................................... 53

**ARTICLE 18.** Effect of Expiration or Termination of Agreement .......................... 55

**ARTICLE 19.** Confidentiality ................................................................................. 58

**ARTICLE 20.** Miscellaneous Provisions ............................................................... 59

SCHEDULES

| | |
|---|---|
| 1.1.8 | Authorized Brands |
| 1.1.25 | Distribution Channels |
| 1.1.33 | Derivative Fighter IP |
| 1.1.55 | Licensed Marks |
| 1.1.82 | Reebok Competitors |
| 1.1.121 | Octagon Crest and Typography |
| 2.1 | Zuffa Guidelines |
| 2.1A | In-Octagon Business Program |
| 2.1B | *The Ultimate Fighter* Business Program |
| 2.1C | Performance Business Program |
| 2.1D | Fan Apparel Business Program |
| 2.1E | UFC Gym Business Program |
| 2.1F | Headwear Business Program |
| 2.1G | Accessories Business Program |
| 2.1H | Footwear Business Program |
| 2.1I | New Business Programs |
| 4.5 | Event SKU Requirements |
| 5.1 | UFC Global Apparel Rights |
| 5.3.2 | Key Territories |
| 5.4 | Zuffa Licensees |
| 6.1.4 | Wheel of Fortune |
| 8.4 | Uses of Reebok Marks |
| 8.8 | Marketing and Social Media Activities |
| 11.1.1 | adidas Group Workplace Standards |
| 12.1 | UFC Code of Conduct |

ZFL-2490108

LICENSE AGREEMENT, dated as of November 26, 2014 (this "Agreement") among Zuffa, LLC, a Nevada limited liability company ("Zuffa") and Reebok International Limited, a corporation organized under the laws of England and Wales ("RIL" or "Reebok").

## INTRODUCTION

Zuffa owns, operates and promotes mixed martial arts sports activities and as part of that desires and has the right to license for commercial purposes the Licensed Marks and Fighter IP as more fully set forth in this Agreement.  Reebok desires to obtain, and Zuffa desires to grant to Reebok, a license to use the Licensed Marks and Fighter IP in connection with the design, creation, development, manufacture, distribution, promotion, advertising and sale of certain co-branded products in the Territory, as more fully set forth in this Agreement.

In consideration of the promises and mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and adequacy of which is acknowledged, the Parties hereby agree as follows:

## ARTICLE 1.
### Definitions

1.1.    Specific Definitions.    In addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below:

1.1.1.     "Accessories" shall mean the following items only:  Socks, headbands, towels, athletic bags, backpacks, luggage, wallets, phone cases, iPad/tablet covers and cases, watches, belts and sunglasses.

1.1.2.     "Accessories Business Program" shall mean the Zuffa marketing program for which specific terms and conditions are set forth on Schedule 2.1G (Accessories Business Program), as amended from time to time.

1.1.3.     "Affiliate" shall mean, with respect to a Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such first Person.  For purposes of this definition, "control" and, with correlative meanings, the terms "controlled by" and "under common control with" mean (a) the possession, directly or indirectly, of the power to direct the management or policies of a Person, whether through the ownership of voting securities, by contract relating to voting rights or corporate governance, or otherwise, (b) the ownership, directly or indirectly, of more than fifty percent (50%) of the voting securities or other ownership interest of a Person or (c) in the case of a partnership, control (as defined in clause (a) and (b)) of the general partner.

1.1.4.     "Apparel" shall mean t-shirts, fashion tops, performance tops, fleece, knits, wovens, outerwear, loungewear, performance underwear, sports bras / bra tops, and bottoms, to the extent such clothing and outerwear is not Headwear, Footwear, Accessories, or Fighter Equipment.

1.1.5.     "Applicable Law" shall mean all applicable provisions of all (a) constitutions, treaties, statutes, laws (including common law), rules, regulations, ordinances, codes or orders

of any Governmental Authority, and (b) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

1.1.6. "Approved Security Authentication Device" shall mean the security labels program of the adidas Group.

1.1.7. "Authentics" shall mean In-Octagon Kits that are worn by Fighters In-Octagon for Bouts.

1.1.8. "Authorized Brands" shall mean, subject to the provisions of Article 9 and the applicable Business Program, the Reebok-Affiliated brands and brands licensed to Reebok from a third party, approved by Zuffa pursuant to Article 9, each as set forth on Schedule 1.1.8 (Authorized Brands), as amended from time to time.

1.1.9. "Authorized Distribution Channel" shall mean for any Licensed Product, the Distribution Channels designated on Schedules 2.1A through 2.1I corresponding to the Business Programs for the Licensed Products. For the avoidance of doubt, the Parties agree that the Authorized Distribution Channels outside the U.S. Territory shall be analogous to those inside the U.S. Territory.

1.1.10. "Authorized Reebok Products" shall mean Reebok products other than Licensed Products within Reebok's product range (including LUTA and/or REEBOK branded products) that are either specific to MMA or not specific to any particular discipline.

1.1.11. "B-Grade" shall have the meaning ascribed thereto in Section 7.5.

1.1.12. "Bout" shall mean an officially sanctioned UFC mixed martial arts contest.

1.1.13. "Business Days" shall mean any day (other than a day that is a Saturday, Sunday or legal holiday in the State of Nevada) on which banks are open for business in Las Vegas, Nevada.

1.1.14. "Business Programs" shall mean each of the following product marketing programs used by Zuffa, and any extensions or replacements thereof: In-Octagon Business Program, The Ultimate Fighter Business Program, Performance Business Program, Fan Apparel Business Program, Headwear Business Program, Accessories Business Program and the UFC Gym Business Program and any additional product marketing programs added to this Agreement by Zuffa during the Term and added to Schedule 2.1I (New Business Programs).

1.1.15. "CAD" shall mean any computer-aided design.

1.1.16. "Catch-up Year" shall have the meaning ascribed thereto in Section 6.1.4.

1.1.17. "Change of Control" shall mean (a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934), directly or indirectly, of 50% or more of the capital stock of a Person entitled to vote for members of the board of directors or equivalent governing body of such Person on a fully

2

diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right); (b) a merger or consolidation of a Person in which the stockholders of such Person immediately prior to such transaction would own, in the aggregate, less than 50% of the total combined voting power of all classes of capital stock of the surviving entity normally entitled to vote for the election of directors of the surviving entity; or (c) the sale of all or substantially all a Person's assets in one transaction or in a series of related transactions.

1.1.18.    "Concept/Line Review" shall have the meaning ascribed thereto in Section 7.1.1.

1.1.19.    "Concepts" shall have the meaning ascribed thereto in Section 7.1.1.

1.1.20.    "Confidential Information" shall have the meaning ascribed thereto in Section 19.1.

1.1.21.    "Constitutive Documents" shall mean (i) with respect to a Person that is a corporation, such Person's certificate or articles of incorporation and by-laws, and (ii) with respect to a Person that is a limited liability company, such Person's certificate of formation and operating or limited liability company agreement.

1.1.22.    "Cornermen" shall mean the UFC-approved individuals that accompany and support a particular Fighter In-Octagon during Bouts and during Pre-Bout Events.

1.1.23.    "Discloser" shall have the meaning ascribed thereto in Section 19.1.

1.1.24.    "Distributor" shall mean any Person for which 10% or more of such Person's business consists of purchasing manufactured products from any other Person and shipping such products to retailers without changing such products.

1.1.25.    "Distribution Channels" shall mean all channels of trade, including those channels listed and defined on Schedule 1.1.25 (Distribution Channels).

1.1.26.    "ERRS" shall have the meaning ascribed thereto in Section 6.3.1.

1.1.27.    "Excess Royalty" shall have the meaning ascribed thereto in Section 6.1.4.

1.1.28.    "Exclusive Negotiation Period" shall have the meaning ascribed thereto in Section 3.2.

1.1.29.    "Fan Apparel" shall mean t-shirts, fashion tops, fleece, knits, wovens, outerwear, loungewear and bottoms that are not In-Octagon Kits, or Performance Apparel.

1.1.30.    "Fan Apparel Business Program" shall mean the Zuffa marketing program for which specific terms and conditions are set forth on Schedule 2.1C (Fan Apparel Business Program), as amended from time to time.

3

1.1.31.    "Fighter" shall mean, at any given time during the Term, any individual that is a UFC fighter and currently under contract with Zuffa or any of its Affiliates and who is an official participant in the applicable Bout, Pre-Bout Events or Other Bout Events.

1.1.32.    "Fighter Equipment" shall mean the protective or performance enhancing equipment that a Fighter wears, such as mouthpieces and protectors.

1.1.33.    "Fighter IP" shall mean the Trademarks, names, nicknames, domain names, social media identifiers or handles (including Twitter identifiers or handles), likenesses, pictures, photographs, voices, facsimile signatures and/or biographical information of Fighters and Retired Fighters (other than tattoos and tattoo designs), in each case that Zuffa has the right to license to Reebok and that Zuffa has approved in writing for use under this Agreement in accordance with the approval procedures set forth in Article 9.   In the event that Reebok proposes to use in connection with the rights licensed to it hereunder a Trademark, work or other item that is a variation or derivative of a Trademark, work or other item contained in Fighter IP or that is otherwise confusingly similar thereto, Reebok will propose such variation or derivative Trademark, work or element to Zuffa, and if Zuffa approves of the variation or derivative Trademark, work or element in writing in accordance with the approval procedures in Article 9, then the Parties will add such approved Trademark, work or element to Schedule 1.1.33 (Derivative Fighter IP) and each such approved Trademark, work or element will be deemed Fighter IP hereunder.

1.1.34.    "Fiscal Year" shall mean the period from January 1 through December 31 of any year.   "Fiscal Year 7" and "Fiscal Year 8" shall have the meanings ascribed thereto in Section 3.3.

1.1.35.    "Footwear" shall mean athletic and athletic-inspired footwear, including sneakers and slides.

1.1.36.    "Force Majeure Condition" shall mean any an Act of God, riot or civil commotion, act of public enemy, terrorism, embargoes, epidemics or quarantine restrictions, order or act of any government or governmental instrumentality (whether federal, state, local or foreign) or similar cause beyond the control of either Party (provided that the appropriate Parties shall timely pursue all reasonably available appellate remedies).

1.1.37.    "Fully Merchandized Product Collection" or "FMPC" shall mean a collection of at least six (6) Styles of Licensed Product(s) which (i) offers a coherent and reasonably varied selection of Licensed Products and (ii) is presented in a manner reasonably designed to set such Licensed Products apart from Reebok's other products and to identify such products as UFC-related products.

1.1.38.    "FY4 Catch-up Year" shall have the meaning ascribed thereto in Section 6.1.4.

1.1.39.    "Global Exposure Fee" shall have the meaning ascribed thereto in Section 6.2.

1.1.40.    "Gloves" shall mean gloves used for athletic training and MMA competition.

4

1.1.41. "Glove Exposure Notice" shall have the meaning ascribed thereto in Section 9.4.

1.1.42. "Governmental Authority" shall mean any government, or any commission, authority, board, agency, division, subdivision, or any court or tribunal, of the government of the United States or any State, territory, city, munici pality, county or town thereof or of the District of Columbia, or of any foreign jurisdiction, including the employees or agents thereof.

1.1.43. "Headwear" shall mean hats, structured and unstructured fitted caps, structured and unstructured flex-fit caps, structured and unstructured adjustable caps, skull caps, knitted hats, head bands, and visors, but excluding novelty headwear. By way of example and without limitation, novelty headwe ar would include something analogous to the Green Bay Packers fans' "cheese head" hats but would exclude the majority of the type of headwear found at Lids and similar retailers.

1.1.44. "Headwear Business Program" shall mean the Zuffa marketing program for which specific terms and conditions are set forth on Schedule 2.1F (Headwear Business Program), as amended from time to time.

1.1.45. "Hot Market Products" shall mean Licensed Products that by their nature may only be produced on a short turn-around time.

1.1.46. "Indemnified Party" shall have the meaning ascribed thereto in Sections 16.1 and 16.2.

1.1.47. "Indemnifying Party" shall have the meaning ascribed thereto in Sections 16.1 and 16.2.

1.1.48. "In-Octagon" shall mean, with respect to any Fighter and his or her respective Cornermen, in the Octagon, immediately prior to, during and immediately after such Fighter's Bouts and the walkout by a Fighter from the lo cker room to the Octa gon for such Fighter's Bouts, but excluding, for clarity, Pre-Bout Events and Other Bout Events.

1.1.49. "In-Octagon Business Program" shall mean the Zuffa marketing program for which specific terms and conditions are set forth on Schedule 2.1A (In-Octagon Business Program), as amended from time to time.

1.1.50. "In-Octagon Kits" shall mean active Fighter identified tops, bottoms and Headwear, which may be worn by Fighters In-Octagon for a Bout, as well as the corresponding Fighter-specific, non-Fighter specific and Personalized Authentics and Replicas.

1.1.51. "Joint Promotional Materi als" shall mean all Promotional Materials created jointly by the Parties; provided that Joint Promotional Materials excludes any Zuffa IP (including Zuffa Contributed Content) and Reebok IP (including Reebok Contributed Content). For clarity, comments and feedback made by Zuffa to any Promotional Materials created solely by or at the direction of Reebok do not render such materials Joint Promotional Materials, even if Zuffa's comments and feedback are incorporated into such materials, and any comments and feedback made by Reebok to any Promotional Materials created solely by or at the direction of

CONFIDENTIAL                                                                                          ZFL-2490113

Zuffa do not render such materials Joint Promotional Materials, even if Reebok's comments and feedback are incorporated into such materials.

1.1.52.    "Key Territories" shall mean the territories listed on Schedule 5.3.2.

1.1.53.    "Landing Page" shall have the meaning ascribed thereto in Section 4.4.

1.1.54.    "Legal Requirement" means any constitution, act, statute, law, ordinance, treaty, rule, regulation, by-law, license, permit, official inte rpretation, judgment, injunction, order, decision, decree, certification or authorization issued by any self-regulatory organization or Governmental Authority.

1.1.55.    "Licensed Marks" shall mean (a) th e Trademarks listed on Schedule 1.1.55 (Licensed Marks), and (b) such other Trademarks owned or controlled by Zuffa that are mutually agreed to by Zuffa and Reebok in writing and added to Schedule 1.1.55 (Licensed Marks).  For purposes of clarity, Reebok's ability to use the Licensed Marks in connection with Licensed Products in any Business Program is subject to the restrictions on the Schedule applicable to such Business Program.  In the event that Reebok proposes to use in connection with the license rights granted hereunder a Trad emark that is a variation or derivative of a Licensed Mark (e.g., a particular stylization of a Licensed Mark or a new composite mark that includes a Licensed Mark) or that is otherwise confusingly similar thereto, Reebok will propose such variation or derivative Trademark to Zuffa, and if Zuffa approves the variation or derivative Trademark in writing in accordance with the approval procedures in Article 9, then the Parties will add such a pproved Trademark to Schedule 1.1.55 and each such approved Trademark will be deemed a Licensed Mark hereunder.  For clarity, ornamental elements of a product design that appear near a Licensed Mark but do not function as a composite mark with the Licensed Mark do not constitute derivative Trademarks hereunder.

1.1.56.    "Licensed Product Requirements" shall have the meaning ascribed thereto in Section 7.1.1.

1.1.57.    "Licensed Products" shall mean the R eebok products in the categories set forth on Schedules 2.1A through 2.1I, as amended from time to time, that have been approved by Zuffa in accordance with Article 7.   For pur poses of clarity, the category of Licensed Products that Reebok is authorized to create, develop, manufacture, distribute, promote, advertise, or sell in any Business Program in any Fiscal Year are listed on the Schedule associated with such Business Programs.

1.1.58.    "Lien" shall mean any lien, pledge, ch arge, option, restriction on transfer, claim, mortgage, deed to secure debt, deed of trust, conditional sale or other title retention agreement, or other security interest, security title or encumbrance of any kind.

1.1.59.    "Lifestyle Apparel" shall mean Apparel and Headwear that is not performance apparel or core athletic but shall be any of the following: trend-right, lifestyle, fast fashion or casual apparel and niche in nature.

1.1.60.    "Losses" shall have the meaning ascribed thereto in Section 16.1.

6

1.1.61.    "Minimum Royalty Guarantee" shall have the meaning ascribed thereto in Section 6.1.

1.1.62.    "MMA" shall have the meaning ascribed thereto in Section 11.1.3.

1.1.63.    "Negotiation Period" shall have the meaning ascribed thereto in Section 12.1.

1.1.64.    "Net Sales" shall mean gross revenues from all sales of Licensed Products as invoiced by Reebok or its Affiliates to third party customers and reduced only by excise or indirect taxes (e.g. VAT and turn over taxes), returns as credited to third party customers, reasonable and customary cash, trade and sales discounts and allowances, insurance cover and freight out if invoiced separately.  Reebok shall report returns in any Fiscal Year by no later than March 31 of the subsequent Fiscal Year in order for Reebok to deduct such returns from Net Sales.  Reebok shall not credit any return at a rate greater than the original invoiced selling price for such Licensed Products.

1.1.65.    "Other Bout Events" shall mean official interviews, press conferences and behind the scenes footage pertaining to the Bout immediately before and after such Bout.

1.1.66.    "Outfitting Guidelines" shall have the meaning ascribed thereto in Section 10.6.

1.1.67.    "Party" shall mean any of Zuffa and Reebok, as the case may be.

1.1.68.    "Performance Apparel" shall mean athletic or performance Apparel primarily intended to be worn for athletic competition or training and which Apparel includes one or more performance-enhancing qualities, but excludes Fan Apparel and In-Octagon Apparel.

1.1.69.    "Performance Business Program" shall mean the Zuffa marketing program for which specific terms and conditions are set forth on Schedule 2.1C (Performance Business Program), as amended from time to time.

1.1.70.    "Person" shall mean an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity (governmental or private), and shall include any successor (by merger or otherwise) of any such entity.

1.1.71.    "Personalized" shall mean displaying a depiction of an individual's name or nickname, including a Fighter's name or nickname.

1.1.72.    "Premiums" shall mean any products, including any Style of the Licensed Products, bearing any of the Licensed Marks or Fighter IP that Reebok sells or gives away for the purposes of: (i) promoting, publicizing or increasing the sale of its own services or products other than the Licensed Products; or (ii) promoting, publicizing or increasing the sale of the products or services of any third party.  Premiums include combination sales, incentives for sales force, and trade or consumer promotions such as sweepstakes, other than exclusively in connection with the sale of Licensed Products.

7

1.1.73. "Pre-Bout Events" shall mean Pre-Bout Training and Pre-Bout Weigh-in pertaining to the Bout.

1.1.74. "Pre-Bout Training" shall mean an official UFC training of a Fighter prior to and pertaining to a Bout.

1.1.75. "Pre-Bout Weigh-in" shall mean an official UFC weigh-in of a Fighter prior to and pertaining to a Bout.

1.1.76. "Promotional Materials" shall mean all finished advertising, promotion, publicity, display and marketing materials, including videos, commercials, posters, and point of purchase materials, promoting the Licensed Products and/or the collaboration between Reebok and Zuffa hereunder, approved for use under this Agreement in accordance with the provisions of Article 8.

1.1.77. "Promotional Products" shall mean the Licensed Products Reebok manufactures pursuant to this Agreement that Reebok shall provide to Zuffa from time to time pursuant to this Agreement.

1.1.78. "Recipient" shall have the meaning ascribed thereto in Section 19.1.

1.1.79. "Records" shall have the meaning ascribed thereto in Section 6.11.

1.1.80. "Reebok" shall have the meaning ascribed thereto in the Recitals.

1.1.81. "Reebok Affiliate" shall mean any Person: (i) in which Reebok, any Person that has any direct or indirect beneficial or ownership interest in Reebok, or any officer or director of Reebok has any direct or indirect beneficial or ownership interest; or (ii) that has any direct or indirect beneficial or ownership interest in Reebok.

1.1.82. "Reebok Competitor" shall mean those Persons listed on Schedule 1.1.82 (Reebok Competitors); provided that Reebok may add substantially similar entities to Schedule 1.1.82 from time to time with Zuffa's consent, which will not be unreasonably withheld.

1.1.83. "Reebok Contributed Content" shall mean all artwork, computer artwork, graphics designs, photographs, videos, images and other works developed or created solely by or on behalf of Reebok and delivered to Zuffa for proposed inclusion in Zuffa Promotional Materials or Joint Promotional Materials, including any derivatives thereof (including comments and feedback made by Zuffa and modest revisions to finalize any "fully baked" or "substantially baked" concepts or works developed or created solely by or on behalf of Reebok); but excluding (a) any Zuffa IP and derivative works of pre-existing Zuffa IP and (b) comments and feedback made by Reebok during the approval process pursuant to Article 8 to any Zuffa Promotional Materials or Joint Promotional Materials.

1.1.84. "Reebok IP" shall mean all intellectual property and proprietary rights in and to (a) the Reebok Marks; (b) the Licensed Products (including patents, technologies, and designs and the Top 10 Graphics), but excluding any Zuffa IP contained therein; (c) shoe boxes and other Footwear packaging for the Licensed Products, but excluding any Zuffa IP contained

8

therein; (d) hang tags for the Licensed Products that are created by or on behalf of Reebok (including such hang tags incorporating Zuffa's comments and feedb ack during the approval process), but excluding any Zuffa IP contained thereon; (e) packaging for the Licensed Products other than Footwear that is created by or on behalf of Reebok (inc luding such packaging incorporating Zuffa's comments and feedback during the approval process), but excluding Zuffa IP contained therein; and (f) the Reebok Promotional Materials and Reebok Contributed Content; including, with respect to each of th e foregoing, all Trademark, copyright, right of publicity, moral rights, design rights and other intellectual property and proprietary rights therein and thereto, whether registered or unregistered.

1.1.85.   "Reebok Marks" shall mean all Trademarks that are used on or in connection with the design, manufacture, sale, advertising or promotion of (a) the Licensed Products or (b) other REEBOK branded products or LUTA brande d products, if any, that are provided by Reebok to Zuffa pursuant to this Agreement; including all model names, technology names, and advertising slogans related thereto and including all Authorized Brands, but excluding the Zuffa IP.

1.1.86.   "Reebok Promotional Materials" shall mean all Promotional Materials created solely by or on behalf of Reebok (including materials created by or on behalf of Reebok incorporating Zuffa's comments and feedback during the approval process), including derivatives thereof; provided that Reebok Promotional Materials excludes any Zuffa IP, including materials that are a derivative of any pre-existing Zuffa Promotional Materials, Zuffa Contributed Content, or Zuffa Works.

1.1.87.   "Replicas" shall mean In-Octagon Kits of the same Style as those worn by Fighters In-Octagon for Bouts but that may exclude third-party Trademarks or may have different sizing of the Trademarks or other branding from those that are included on Authentic In-Octagon Kits.

1.1.88.   "Retired Fighter" shall mean any individual who was formerly a UFC fighter under contract with Zuffa or any of its Affiliates.

1.1.89.   "Royalty" shall mean the per-Unit amount of Net Sales of Licensed Products set forth opposite the type of Licensed Product in the table below:

| | |
|---|---|
| Footwear | 5% |
| Licensed Products that include Fighter IP | 16% |
| All other Licensed Products | 12% |

1.1.90.   "Royalty Payment" shall mean any payment of a Royalty or Minimum Royalty Guarantee.

1.1.91.   "Royalty Shortfall" shall have the meaning ascribed thereto in Section 6.1.4.

1.1.92.   "Screen Printer" shall mean any indepe ndent screen printer, embroiderer or other decorator or manufacturing contractor.

9

                                              ZFL-2490117

1.1.93. "<u>Sell-Off Period</u>" shall mean the six-month period following the expiration or termination pursuant to <u>Sections 17.1</u> of this Agreement during which Reebok may have the right to sell any remaining inventory of the Licensed Products, subject to the terms of this Agreement.

1.1.94. "<u>SKU</u>" shall mean a stock keeping unit for a product or service.

1.1.95. "<u>Socks</u>" shall mean athletic socks.

1.1.96. "<u>Style</u>" shall mean a distinct rendition of a Licensed Product that differs from any other rendition of that same Licensed Product in any form or manner with respect to design, material, pattern, shape, Licensed Marks, Fighter IP or any other distinguishing characteristic involving the specifications for the production of all or any portion of that Licensed Product, other than merely the Licensed Marks or Fighter IP depicted thereon.

1.1.97. "<u>Sublicensee</u>" shall mean any non-Reebok Affiliate third party that manufactures any Licensed Product and invoices retailers directly.

1.1.98. "<u>Tax Authority</u>" shall mean a Governmental Authority or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or imposition of any Tax (including but not limited to the United States Internal Revenue Service).

1.1.99. "<u>Tax Return</u>" shall mean any return, declaration, report, claim for refund, or information return or statement or other form relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

1.1.100. "<u>Taxes</u>" shall mean taxes, duties and other governmental charges in the Territory relating to or arising under this Agreement, including any state or federal income taxes, any stamp or documentary taxes or duties, turnover, sales or use taxes, value added taxes, excise taxes, customs or exchange control duties and any other charges relating to or on any amounts payable by Reebok hereunder.

1.1.101. "<u>Term</u>" shall have the meaning ascribed thereto in <u>Section 3.1</u>.

1.1.102. "<u>Termination Fiscal Year</u>" shall have the meaning ascribed thereto in <u>Section 6.8</u>.

1.1.103. "<u>Territory</u>" shall mean worldwide.

1.1.104. "<u>*The Ultimate Fighter* Business Program</u>" shall mean the Zuffa marketing program for which specific terms and conditions are set forth on <u>Schedule 2.1B</u> (*The Ultimate Fighter* Business Program), as amended from time to time.

1.1.105. "<u>*The Ultimate Fighter* Kits</u>" shall mean In-Octagon Kits, Performance Apparel and Fan Apparel created for participants in *The Ultimate Fighter* show and approved in writing by Zuffa as *The Ultimate Fighter* Kits.

10

1.1.106.   "Third Party Claim" shall have the meaning ascribed thereto in Section 16.3.1.

1.1.107.   "Third Party Manufacturer" shall mean a third party manufacturer that is not an Affiliate of Reebok.

1.1.108.   "Trademark" means any word, name, symbol, color, shape, designation or any combination thereof, including any trademark, se rvice mark, trade name, trade dress, brand name, sub-brand name, product configuration right s, design rights, industrial design rights, certification mark, collective mark, logo, tagline, slogan or symbol, that functions as an identifier of source, quality, or origin, whether or not registered, and all statutory and common law rights therein, and all registrations and ap plications therefor, together with all goodwill associated with, or symbolized by, any of the foregoing.

1.1.109.   "UFC" shall mean the Ultimate Fighting Championship.

1.1.110.   "UFC E-Commerce" shall mean UFCStore.com and other websites relating to UFC that are directly or indirectly owned or controlled by or at the direction of Zuffa (including websites operated by Zuffa's third party website operators).

1.1.111.   "UFC Gym" shall mean the UFC-branded gyms owned or franchised by Ultimate NEV, LLC or its Affiliates.

1.1.112.   "UFC Gym Business Program" shall mean the Zuffa marketing program for which specific terms and conditions are set forth on Schedule 2.1E (UFC Gym Business Program), as amended from time to time.

1.1.113.   "UFC Gym Licensed Products" shall mean Licensed Products that bear a composite "UFC" and "Gym" graphic; provided that the word "Gym" is always of visible size relative to "UFC" and in close proximity (i.e., a shirt with "UFC" on the front and "Gym" on the back could not be produced).

1.1.114.   "UFC Links" shall have the meaning ascribed thereto in Section 4.4.

1.1.115.   "Uniform Design" shall mean the overa ll aesthetic design and ornamental appearance of each item of Apparel and Headwear (for clarity, excluding Footwear) included in the In-Octagon Kits, including the selection and arrangement of the ornamental and aesthetic elements contained thereon and all elements capable of copyright and/or trade dress protection; but excluding any specific Reebok Marks, technologies (including proprietary fabrics), elements capable of protection under a uti lity patent contained thereon or therein, and th e general cut, shape and functional aspects of such garments.

1.1.116.   "Unit" shall mean a single Licensed Product (e.g., one T-shirt).

1.1.117.   "U.S. Territory" shall mean the United States and its territories and possessions.

11

1.1.118.   "Version" shall mean a rendition of a Style that is identical to other renditions of such Style except with respect to the Licensed Marks or Fighter IP depicted on such Licensed Product (e.g., a t-shirt depicting Fighter A and an identical t-shirt depicting Fighter B, each represent a Version of the same Style of t-shirt).

1.1.119.   "Zuffa Guidelines" shall have the meaning ascribed thereto in Section 2.1.

1.1.120.   "Zuffa Contributed Content" shall mean all artwork, computer artwork, graphics designs, photographs, videos, images and other works developed or created solely by or on behalf of Zuffa and delivered to Reebok for proposed inclusion in Reebok Promotional Materials or Joint Promotional Materials, including any derivatives thereof (including comments and feedback made by Reebok and modest revisions to finalize any "fully baked" or "substantially baked" concepts or works developed or created solely by or on behalf of Zuffa); but excluding (a) any Reebok IP, including Reebok's rights in Licensed Products, and derivative works of pre-existing Reebok IP and (b) comments and feedback made by Zuffa during the approval process pursuant to Article 8 to any Reebok Promotional Materials or Joint Promotional Materials.

1.1.121.   "Zuffa IP" shall mean all intellectual property and property rights in and to (a) the Licensed Marks; (b) the Fighter IP; (c) the octagon crest graphic ("Octagon Crest") set forth on Schedule 1.1.121 (Octagon Crest and Typography), as amended from time to time, and all derivatives thereof; (d) the type font created by Reebok ("Typography") and set forth on Schedule 1.1.121, as amended from time to time; (e) the Zuffa Works; (f) the Uniform Designs; (g) hang tags that are created solely by or on behalf of Zuffa and furnished by Zuffa to Reebok for use with Licensed Products (including hang tags incorporating Reebok's comments and feedback during the approval process), but excluding any Reebok IP contained thereon; (h) packaging for the Licensed Products (other than Footwear) that is created solely by or on behalf of Zuffa and furnished by Zuffa to Reebok (i.e., in a digital file form) (including packaging incorporating Reebok's comments and feedback during the approval process), but excluding any Reebok IP contained thereon; and (i) the Zuffa Promotional Materials and Zuffa Contributed Content; including, with respect to each of the foregoing, all Trademark, copyright, right of publicity, moral rights, design rights and other intellectual property and proprietary rights therein and thereto, whether registered or unregistered.

1.1.122.   "Zuffa Licensees" shall mean those Persons set forth on Schedule 5.4.

1.1.123.   "Zuffa Promotional Materials" shall mean all Promotional Materials created solely by or on behalf of Zuffa (including materials created by or on behalf of Zuffa incorporating Reebok's comments and feedback during the approval process), including derivatives thereof; provided that Zuffa Promotional Materials excludes any Reebok IP, including materials that are a derivative of any pre-existing Reebok Promotional Materials, Reebok Contributed Content, or Reebok's rights in Licensed Products.

1.1.124.    "Zuffa Works" shall mean all artwork, computer artwork, graphics designs, photographs, videos, images and other works developed or created solely by or on behalf of Zuffa and delivered to Reebok, via the process agreed by the Parties for delivering and segregating such works, for proposed inclusion on Licensed Products other than Footwear,

12

ZFL-2490120

including any derivatives thereof (including comments and feedback made by Reebok and modest revisions to finalize a ny "fully baked" or "substantia lly baked" concepts or works developed or created solely by or on behalf of Zuffa). The Parties shall work with each other in good faith to develop a process for delivering a nd segregating such works for the purpose of facilitating the tracking of ownership rights in such works. Reebok and Zuffa will mutually decide whether to use such Zuffa Works in connection with Licensed Products. For clarity, Zuffa Works exclude (a) any Reebok IP, including Reebok's rights in Licensed Products, and derivative works of pre-existi ng Reebok IP and (b) comments and feedback made by Zuffa during the approval process pursuant to Article 7 to any Reebok IP.

1.1.125. "Zuffa Senior Executive" shall mean the Chief Executive Officer and President of Zuffa.

1.2. Distribution Channels Definitions. All capitalized terms set forth on Schedule 1.1.25 (Distribution Channels) but not explicitly defined in this Agreement are hereby incorporated into this Agreement by this reference.

## ARTICLE 2.

### Grant of License

2.1. License Rights. Subject to the terms and conditions contained in this Agreement, Zuffa hereby grants to Reebok during the Term, and Reebok hereby accepts, a license to use the Zuffa IP in connection with the design, creation, development, manufacture, distribution, promotion, advertising and sale of Licensed Products under the Authorized Brands in the Authorized Distribution Channels in the Territory, in accordance with (i) all Zuffa policies, standards (including quality and performance standards), rules and regulations provided to Reebok in writing during the Term, the current ver sion of which policies, standards, rules and regulations are set forth on Schedule 2.1 (Zuffa Gu idelines) and shall be deemed part of this Agreement (collectively, the "Zuffa Guidelines"), and (ii) the specific terms and conditions set forth on Schedules 2.1A through 2.1I for each applicable Business Program. Reebok acknowledges that its agreement to comply with the Zuffa Guidelines is a material inducement that Zuffa is expressly relying upon as a means to protect its brand in agreeing to grant this license.

2.2. Premiums. Reebok shall not use any of the Licensed Products as Premiums unless Reebok receives a separate written Premium license from Zuffa (or its applicable Affiliate) and pays Zuffa (or its applicable A ffiliate) an agreed upon royalty under such Premium license. For clarity, nothing in this Section 2.2 prevents Reebok from seeding Licensed Products to athletes, celebrities, and other ambassadors.

2.3. Reebok and Third Party Marks. Except as otherwise provided in this Agreement, Reebok shall not use any Trademarks owned by third parties on or in connection with the Licensed Products or the Promotional Materials during the Term of this Agreement without the prior written consent of Zuffa. For clarity, it will not be a breach of this Agreement for Reebok to create and use advertising and other materials that display multiple Reebok product offerings, including Licensed Products as well as other Reebok products bearing third party Trademarks,

13

provided that the context of such advertising and other materials does not create any confusion or false association between the Licensed Marks and the Licensed Products and such third party Trademarks.

      2.4.    <u>Change to the Zuffa Guidelines.</u>  Zuffa may amend the Zuffa Guidelines from time to time at any time during the Term; <u>provided</u>, that Zuffa may not, without Reebok's prior written consent, which shall not be unreasonably withheld, conditioned or delayed, amend the Zuffa Guidelines in a manner that materially adversely affects Reebok's licensed rights, or its ability to exploit such rights, hereunder. Furthermore, with respect to any amendment to the Zuffa Guidelines, Zuffa and Reebok shall, in good faith, negotiate a reasonable transition period in which Reebok must begin to comply with any such amended Zuffa Guidelines.

      2.5.    <u>Licenses to Zuffa.</u>  Subject to the terms and conditions in this Agreement, Reebok hereby grants to Zuffa during the Term a royalty-free, non-exclusive, worldwide license (including the right to sublicense pursuant to Section 13.2 and to grant permissions necessary to place the Reebok Promotional Materials in applicable media) to use Reebok Promotional Materials specific to Licensed Products (i.e. not depicting multiple Reebok products other than Licensed Products) as delivered by Reebok to Zuffa; subject to any restrictions (e.g. geographic scope of use) as may be communicated in writing to Zuffa. Subject to the terms and conditions in this Agreement, Reebok hereby grants Zuffa after the Term a perpetual, irrevocable, royalty-free, non-exclusive, non-assignable (except as allowed pursuant to this Agreement), fully sublicensable (notwithstanding Section 13.2), worldwide license to create substantially or confusingly similar variations of the slogans and/or graphics and/or other ornamental elements appearing on the top 10 selling Licensed Products (excluding In-Octagon Kits) globally over the course of the Agreement (the "<u>Top 10 Graphics</u>"), measured in Units sold, and to design, develop, manufacture, distribute, import, export, promote, advertise, offer for sale, sell, use or otherwise exploit products with such variations (and Reebok shall not assert any claim against Zuffa for such creation or other exploitation) worldwide; provided that the foregoing license applies only to slogans, graphics and/or other ornamental elements that were first introduced to market substantially on Licensed Products and excludes all Reebok Marks and all derivatives of pre-existing Reebok IP, and all other intellectual property in and to such Licensed Products (other than any Zuffa IP). For purposes of this Section 2.5, "first introduced to market substantially on Licensed Products" means the slogan, graphic, or element in question was either (a) first introduced to market exclusively on a Licensed Product (and no other Reebok branded products) or (b) first introduced to market on a Licensed Product simultaneously (in time) with only a substantially limited or "token" number of other Reebok branded products. For clarity, Zuffa has no right to, and will not, (i) use the Top 10 Graphics or substantially or confusingly similar variations thereof during the Term, or (ii) use identical or near identical versions of the Top 10 Graphics after the Term. Subject to the terms and conditions in this Agreement, as between Reebok and Zuffa, Reebok hereby grants to Zuffa during and after the Term a perpetual, irrevocable, royalty-free, non-exclusive, fully sublicensable (notwithstanding Section 13.2) and worldwide license to use the underlying (i.e. "raw footage") photographs or videos depicting any Zuffa Senior Executives or Fighters (to the extent that Zuffa substantially arranged for such Fighters to participate in the applicable photo or video shoot), excluding all Reebok Marks and all other Reebok IP therein, shot or produced by Reebok for use in Promotional Materials, and will provide Zuffa with such raw footage promptly upon completion of such photo or video shoot; provided that the foregoing license is subject to any third party rights or restrictions on

14

ZFL-2490122

Reebok (e.g., if Reebok only has limited rights to use the photograph) that Reebok gives Zuffa notice of in writing.

## ARTICLE 3.

### Term

3.1.   General.   This Agreement shall be in full force and effect for a period of six years, commencing on January 1, 2015 and expiring on December 31, 2020 unless earlier terminated in accordance with Article 17, or unless extended pursuant to Section 3.3 (the "Term").  The Term of this Agreement shall be comprised of numbered Fiscal Years, as follows:

| | |
|---|---|
| Fiscal Year 1: | January 1, 2015 through December 31, 2015, |
| Fiscal Year 2: | January 1, 2016 through December 31, 2016, |
| Fiscal Year 3: | January 1, 2017 through December 31, 2017, |
| Fiscal Year 4: | January 1, 2018 through December 31, 2018, |
| Fiscal Year 5: | January 1, 2019 through December 31, 2019, |
| Fiscal Year 6: | January 1, 2020 through December 31, 2020. |

Exposure of the Reebok brand will begin when Licensed Products are available for Fighters to wear during Bouts, but in no event earlier than July 2015.

3.2.   Right of First Negotiation.   If the Term has been extended to December 31, 2022 pursuant to Section 3.3, Reebok shall have exclusive negotiation rights for the period commencing on June 15, 2021 and ending on July 15, 2021 (the "Exclusive Negotiation Period") with respect to a further contract for all or a portion of the rights granted exclusively to Reebok hereunder following the Term.  During the Exclusive Negotiation Period, if any, Zuffa shall negotiate exclusively and in good faith with Reebok, and during the Term prior to the expiration of the Exclusive Negotiation Period, Zuffa will not engage in negotiations with any other Person with respect to such exclusive rights.  If the Parties have not reached a binding written agreement by the last day of the Exclusive Negotiation Period, Zuffa may then negotiate and enter into an agreement with another Person with respect to the rights (or any portion thereof) granted exclusively to Reebok hereunder without any further obligations to Reebok under this Agreement or in respect of such rights.  Reebok acknowledges and agrees that the first negotiation rights granted to it pursuant to this Section 3.2 apply only as expressly provided in this Section 3.2, and only to the rights granted exclusively to Reebok hereunder, and that neither such first negotiation rights nor any other provisions of this Agreement shall restrict Zuffa from, at any time, including during the Term, negotiating with third parties, or entering into any agreement, with respect to any other rights to create, develop, manufacture, distribute promote, advertise or sell Licensed Products or use for any goods or services in any manner and for any purpose the Licensed Marks or Fighter IP other than those rights granted exclusively to Reebok hereunder.

3.3.   Extension of Term.   Reebok shall have two consecutive options to extend the Term of this Agreement as follows: (a) if Royalties payable to Zuffa are reasonably expected to equal or exceed $3,250,000 during Fiscal Year 5 (as can be reasonably determined by July 15,

15

2019), then Reebok may extend the Term for one additional year from January 1, 2021 to December 31, 2021 ("Fiscal Year 7") by delivery of written notice to Zuffa on or before July 15, 2019; and (b) if (i) Royalties pa yable to Zuffa are reasonably expected to equal or exceed $4,400,000 during Fiscal Year 6 (as can be reasonably determined by July 15, 2020) and (ii) Reebok timely exercised its rights to extend the Term until December 31, 2021 pursuant to clause (a) of this paragraph, then Reebok ma y extend the Term of this Agreement for one additional year from January 1, 2022 to Decemb er 31, 2022 ("Fiscal Year 8") by delivery of written notice to Zuffa on or before July 15, 2020.

## ARTICLE 4.

### Distribution of Licensed Products

4.1.    Distribution Channels.    Reebok may dist ribute for sale and sell each Licensed Product only in the Authorized Distribution Channels for the applicable Business Program. Prior to the beginning of each Fiscal Year of the Term, Reebok shall deliver to Zuffa a written business plan for the Licensed Products with respect to the Key Territories. Prior to distributing Licensed Products in a country or region outside the U.S. Territory, Reebok and Zuffa shall meet to discuss the strategy for such region or country; provided that at Zuffa's request, Reebok shall not distribute Licensed Products in a particular country or region for a reasonable period of time to enable Zuffa to protect its right in the Licensed Marks, Fighter IP or Zuffa IP in such country or region. For any Fiscal Year, Zuffa may re quest that Reebok cease selling to a particular retailer for any reasonable business reason and R eebok shall comply with such request unless Reebok has a reasonable business reason for continuing to sell License Products to such retailer. If Reebok complies with such request, Reebok may fulfill any accepted orders outstanding at the time of the request. If Reebok has a reasonable business reason for conti nuing to sell to such retailer, then the Parties shall, in good faith, negotiate a strate gy for dealing with such retailer thereafter. The following are Authorized Distribu tion Channels provided that Zuffa shall have the right to reasonably approve the retailers within such Distribution Channels prior to distribution of Licensed Products in such Distribution Channels: (a) Catalogue/Direct Response; (b) Hypermarket; (c) Kiosks; (d) Toy Stores; and (e) Warehouse Clubs. Reebok may distribute Licensed Product closeouts in the Closeout/Discount Stores.

4.2.    Distribution of Licensed Products.    R eebok shall use commercially reasonable efforts to manufacture, distribute, sell and main tain inventory of suffici ent quantities of each Style and Version of each Licensed Product to meet the reasonabl y projected orders and fill-in requirements of approved retailers in the Authorized Distribution Channels.

4.3.    Prohibited Distribution.    Reebok shall not sell Licensed Products to any third party that Reebok knows or s hould reasonably know intends to sell the Licensed Products outside of the Authorized Distribution Channels or as Premiums. If Reebok knows that any third party has sold, is selling or intends to sell Licensed Products outside of the Authorized Distribution Channels or as Premiums, then, without limitation of any other remedies available to Zuffa, Reebok shall promptly notify Zuffa of su ch facts and shall cause such third party to cease such sales. For the avoidance of doubt, In-Octagon Kits may not be used as Premiums.

16

                                                                 ZFL-2490124

4.4.     Digital On-Line Distribution.  During the Term, (a) Reebok shall include a UFC category link in the "Men", "Women" and "Kids" drop down menus on the global navigation on the Licensee's Website (the "UFC Links"), to the extent Licensed Products are available for sale in such category, which UFC Links shall be separate from and in addition to any mixed martial arts or MMA link as reasonably approved by Zu ffa, (b) Reebok shall  create a landing page within the Licensee's Website th at features Licensed Products to the exclusion of other MMA merchandise ("Landing Page"), as reasonably appr oved by Zuffa, (c) if a visitor to Licensee's Website enters the search string (i) "UFC," "Ultimate Fighting," "Ultimate Fighting Championship," or "Ultimate Fighter" (whether fully or substantially spelled out), in the "Search" entry field of the home page (or any other page that search is available) of the Licensee's Website, the Licensee's Website will di rect that visitor to the Landing Page, (d) Reebok will not promote any other MMA website page on the Licensee's Website.  Reebok shall cause a Reebok e-commerce website selling a FMPC of Licensed Products to be publicly available to customers in Brazil no later th an January 1, 2016 and shall use commercially reasonable efforts to make such website publicly available to customers in Brazil in advance of such date.

4.5.     Event Retail.   During each Fiscal Year of the Term, so long as Reebok manufactures and delivers to the applicable arena in a timely manner a sufficient number of the approved Styles and Versions of Licensed Products for the applicable UFC event and in accordance with the event SKU requirements as set forth on Schedule 4.5 (Event SKU Requirements), as such Event SKU Requirements may be amended from time to time by Zuffa during the Term (the "Event SKU Requirements"), Zuffa shall use best efforts to ensure that 85% of all Headwear and Apparel SKUs available for sale for such event are Licensed Products; provided that (i) if Reebok notifies Zuffa (orally or in writing), or Reebok and Zuffa agree, that Reebok will not, cannot or does not expect to pr ovide, or does not provide, a sufficient number of Licensed Products meeting the Zuffa Guidelin es and in a timely manner for such event in accordance with the Event SKU Requirements for a particular location, then Zuffa may offer for sale Apparel and Headwear that are not Licensed Products at all UFC events at such location, (ii) Zuffa may authorize third parties the right to manufacture Apparel and Headwear for specific events if Reebok agrees that it cannot produce particular Licensed Products in accordance with the Event SKU Requirements for a particular  UFC event due to development or production constraints; and (iii) if Reebok fails to timely deliver Licensed Products meeting at least 75% of the Event SKU Requirements for five UFC events in any 12-month period, then Zuffa's obligations under this Section 4.5 shall termin ate. Notwithstanding the foregoing, Reebok will use commercially reasonable efforts to supply Licensed Products in accordance with the Event SKU Requirements, and in the event that Reebok fails altogether to deliver Licensed Products for a particular event Zuffa may authorize third parties to manufacture Apparel and Headwear for distribution at such event.  If Zuffa determines to use a third party to manage its event retail in any market, Zuffa and Reebok will discuss in good faith the opportunity for Reebok to operate event retail in connection with UFC events.  Furthermore, the Parties agree that no Royalty shall be due on Licensed Products which Reebok must liqui date as a result of the cancellation of an event because such Licensed Products are specific to such event or otherwise cannot reasonably be distributed or sold at full price.

4.6.     Retail Distribution.  Beginning no later th an July 1, 2015 and continuing at all times during the Term thereafter, Licensee's Retail Stores in markets where UFC has held in the

17

prior two years or reasonably expects to hold events within the coming 18 months and in cities which are geographically proximate to such events will offer for sale a FMPC of the Licensed Products (such markets outside North America and the scheduled events within North America for the preceding two years a nd the succeeding 6 months begi nning February 1, 2015 to be initially identified in writing to Reebok no later than February 1, 2015 and additional markets outside North America and, to the extent then scheduled, within North America to be identified in writing to Reebok at least six months prior to the event thereafter, provided that Reebok shall use commercially reasonable efforts to comply in markets identified fewer than six months prior to an event). Beginning no later than July 1, 2015 and continuing at all times during the Term thereafter, Reebok will offer an FMPC in Licensee's Retail Stores in Russia and South Korea. Beginning no later than July 1, 2015 and continui ng at all times during the Term thereafter, Reebok's full-price retail stores in the U.S. Te rritory will offer for sale a FMPC of Licensed Products that are Performance Apparel. Reebok shall make In-Octagon Kits generally available for sale to the general public in the Key Territory and for use In-Octagon in accordance with the Zuffa Guidelines by July 1, 2015.

4.7.   UFC Gyms.   During each Fiscal Year of the Term, Reebok will manufacture, distribute and sell Licensed Products and REEBOK branded products (including Apparel, Headwear and Footwear) to UFC Gym for use by UFC Gym trainers and staff and for resale in UFC Gym Stores at Reebok's wh olesale price minus 20%; provide d that no royalty shall be payable by Reebok with respect to such sales to UFC Gym. Reebok will also provide at no cost to such UFC Gym trainers as Reebok may from time to time identify in Reebok's discretion, Reebok-branded Footwear in such quantities as Reebok may from time to time determine to outfit such trainers in their em ployment. Apparel sold by UF C Gyms that is not Licensed Products shall not bear Trademarks of Reebok Competitors and shall not be Performance Apparel. During the Term, UFC Gyms shall not enter into a written agreement with any Reebok Competitor to manufacture or distribute Appare l or to permit Reebok Competitor branding of UFC Gyms.

4.8.   UFC Purchase of Licensed Products. In addition to the Promotional Products and Licensed Products provided at no cost by Reebok as set forth herein, Zuffa is authorized to sell Licensed Products in UFC-Affiliated Distribution Channels (including in UFC E-Commerce and at UFC events by Zuffa or Zuffa's third party retail event operators, as applicable). Reebok shall distribute to Zuffa and Zuffa's designees (inc luding, for the avoidance of doubt, Zuffa's third party website operators for sale s in UFC E-Commerce and to Zuffa's third party retail event operators) the quantities of each requested Style and Version of the Licensed Products for such sales and for any other purpose at Reebok's lowest wholesale price for the applicable country (and, for the avoidance of doubt, Royalties shall be payable by Reebok to Zuffa on such sales). Zuffa may sell UFC Gym License d Products in UFC E-Commerce so long as the applicable website has separate webpages for the UFC Gym Licensed Products and the non-UFC Gym Licensed Products. Zuffa employees will receive a 25% discount on all products purchased from Licensee's Website, including, for the avoidance of doubt, on Socks, and the Parties will mutually agree on a reasonable procedure to make such discount available to Zuffa employees.

4.9.   Retro Heritage Lifestyle Produc ts. If Zuffa intends to license a product line of Lifestyle Apparel that is retro and heritage in design to a third party in territories where Mitchell & Ness is distributed, Zuffa shall give Reebok written notice thereof and Zuffa agrees to

18

ZFL-2490126

negotiate with Mitchell & Ness in good faith for 30 days after Reebok's receipt of notice from Zuffa, and during such 30-day period, Zuffa shall not negotiate with any other third party with respect to such rights. If Zuffa and Mitchell & Ness do not reach an agreement with respect to such product line during such 30-day period, Zuffa shall be free to negotiate and enter into an agreement with a third party with respect to such product line.

**ARTICLE 5.**

**<u>Exclusivity</u>**

5.1.    <u>General</u>. Subject to the provisions set forth in this Article 5 and to the other terms and provisions set forth herein:

(A)    Zuffa shall not, and shall not authorize or grant any party other than Reebok the right to, use any of the Licensed Marks in connection with the manufacture of In-Octagon Kits, *The Ultimate Fighter* Kits (subject to Section 5.2), Performance Apparel, Footwear and Socks fo r sale and distributi on in the Territory during the Term.

(B)    Zuffa shall not, and shall not authorize or grant any party other than Reebok the right to, use any of the Licensed Marks in connection with the distribution of In-Octagon Kits, *The Ultimate Fighter* Kits, Performance Apparel, Footwear and Socks in any Distribution Channel in the Territory during the Term.

(C)    Zuffa shall not, and shall not authorize or grant any party other than Reebok the right to, use any of the Licensed Marks in connection with the distribution of Headwear and Fan Apparel in the Territory in Mid-Tier Department Stores and Mass-Market Stores, as such Distribution Channels are defined on <u>Schedule 1.1.25</u> (Distribution Channels) during the Term.

(D)    Zuffa shall not, and shall not authorize or grant any party other than Reebok the right to, use any of the Licensed Marks in connection with the distribution of youth Headwear and youth Fan Apparel in any Distribution Channel other than in e-commerce during the Term.

For the sake of clarity, the exclusivity describe d above is further illust rated in the attached Schedule 5.1.

5.2.    *<u>The Ultimate Fighter in the U.S. Territory</u>*. Reebok will supply Headwear and Apparel, including kits and Performance Apparel, that include the Licensed Marks and Fighter IP to be worn by participants on *The Ultimate Fighter* in the U.S. (the "<u>U.S. TUF Kits</u>"). Such U.S. TUF Kits will also include Reebok branding when and if permitted by the third party that owns the integration rights to *The Ultimate Fighter*, so long as such rights are held by a third party (either because no additional product placement fee to a third party is required or because Reebok is willing to pay such fee); provided that neither Zuffa nor its Affiliates shall bear any costs to permit such branding. If Reebok branding is not permitted to be included on U.S. TUF Kits on *The Ultimate Fighter* by the third party responsible for granting such permission

19

(including, for example, if Reebok is unwilling to pay a required product placement fee to a third party), then the Parties agree to enter into a manufacturing relationship whereby Reebok will manufacture and sell unbranded U.S. TUF Kits to Zuffa at Reebok's lowest U.S. wholesale price for retail purposes (provided that if Zuffa plans to use such U.S. TUF Kits solely for outfitting participants on *The Ultimate Fighter*, then Reebok shall sell to Zuffa such unbranded U.S. TUF Kits at Reebok's cost), and Zuffa will have the right to sell replicas of such unbranded U.S. TUF Kits in the U.S. Territory solely in UFC e-commerce and at UFC events. Regardless of whether or not the U.S. TUF Kits appear on *The Ultimate Fighter* show unbranded or whether or not such U.S. TUF Kits are manufactured by Reebok, Reebok will have the right to sell replica U.S. TUF Kits, with or without Reebok branding (including adding Reebok branding if Reebok had provided unbranded U.S. TUF Kits), as Licensed Products pursuant to this Agreement. If Reebok does not supply sufficient quantities of U.S. TUF Kits for use on *The Ultimate Fighter* show in the U.S. on the agreed upon delivery schedule or Reebok is prohibited from manufacturing U.S. TUF Kits by the third party then producing *The Ultimate Fighter* show in the U.S., then Zuffa and its licensees will have the right to grant to Persons other than Reebok and Reebok Competitors rights to manufacture (but not distribute, market or sell) U.S. TUF Kits and in such case Zuffa will have the right to sell replicas of such U.S. TUF Kits in the U.S. Territory solely in UFC e-commerce and at UFC events.

5.3.   Failure to Commercialize.

5.3.1. Mass Market. In the event that Reebok fails by December 31, 2018 to make a FMPC of the Licensed Products described by Section 5.1(C) above generally available for sale in Mass Market Stores in the U.S. Territory, Zuffa shall have the right to grant third parties the right to use the Licensed Marks and Fighter IP in connection with the creation, development, manufacture, distribution, promotion, advertising and sale of Fan Apparel, Headwear, Footwear and Socks in Mass Market Stores for the remainder of the Term of this Agreement; provided that (i) the Licensed Marks are only used on hangtags and interior labeling of such Licensed Products, (ii) the Licensed Marks are only used in a limited manner on in-store point of sale for such Licensed Products, and (iii) such Licensed Products may be branded on their exterior with a sub-brand of UFC that is created or acquired to serve as the Licensed Marks specifically for the Mass Market. UFC and Reebok will discuss the strategy to sell Licensed Product in Mass Market Stores. Notwithstanding the foregoing, Zuffa's rights to grant third party licenses under this Section 5.3.1 will not apply in the event that the applicable failure by Reebok is a result of Zuffa's unreasonable delay in approving Licensed Products to be sold in the Mass Market or otherwise unreasonably withholding approval of Licensed Products to be sold in the Mass Market.

5.3.2.   Key Territories In the event that Reebok (i) fails by July 1, 2016 to make a FMPC of Fan Apparel and Headwear generally available for sale to the general public in US, Canada, UK, Brazil and Mexico, or (ii) fails by July 1, 2017 to make a FMPC of Fan Apparel and Headwear generally available for sale to the general public in all Key Territories (all of which are listed on Schedule 5.3.2 (Key Territories)), then Zuffa may give notice to Reebok identifying the applicable Key Territory and Zuffa's rights under this Section. If within 90 days following Reebok's receipt of such notice, Reebok has not made a FMPC of Fan Apparel and Headwear generally available for sale to the general public in such Key Territory, then Zuffa shall have the right to grant third parties (other than a Reebok Competitor) the right to use the

20

Licensed Marks and Fighter IP in connection with the creation, deve lopment, manufacture, distribution, promotion, advertis ing and sale of Fan Apparel and Headwear for distribution, promotion, advertising and sale in such Key Territory until such time that Reebok has made a FMPC of Fan Apparel and Headwear generally available for sale to the general public in such Key Territory; provided that Zuffa will have a reasonable period of time to phase out such third party licenses after Reebok has regained exclusivity rights.  Notwithstanding the foregoing, this Section 5.3.2 will not apply in the event that, (a) with respect to clause (i), Reebok has used continuous best efforts to commercialize Fan A pparel and Headwear in the applicable Key Territories from the execution of this Agreement through July 1, 2016, and (b) with respect to clause (ii), Reebok has used continuous best efforts to commercialize Fan Apparel and Headwear in the applicable Key Territories from July 1, 2016 through July 1, 2017.

5.4.   Lifestyle Products.  Zuffa shall have the continuing right to grant to one men's Lifestyle Apparel licensee and one women's Li festyle Apparel licensee in each country or geographic region in the world (p rovided that such licensees ar e not Reebok Competitors) the right to use the Licensed Marks and Fighter IP in connection with the development, manufacture, distribution, promotion, advertising and sale of Lifestyle Apparel that is adult Headwear or adult Fan Apparel in any Distribution  Channel other than Mid-Tier  Department Stores and Mass Market Stores; provided that Mitchell & Ness sh all not count as a Lifestyle Apparel licensee under this Section 5.4.  For clarity, Zuffa's existing licensees as set forth on Schedule 5.4 are permitted to continue to manufacture, distribute, promote, advertise and sell Apparel and Accessories bearing the Licensed Marks and Fight er IP in accordance w ith the terms of the applicable license agreements.

5.5.   E-Commerce Partner.  Zuffa shall have the right to grant to e-commerce licensees (the number of such licensees is set forth in Schedule 5.1) the right to use the Licensed Marks and Fighter IP in connection with the creation, development, manufacture, distribution, promotion, advertising and sale of Fan Apparel and Headwear for youth and adults in UFC E-Commerce and the e-commerce licensees' affiliated websites.  As used in this Section 5.5, "affiliated website" means a website owned or operated by the licensee.

5.6.   UFC Events.  Zuffa shall have the right to grant to third parties the right to manufacture Apparel and Headwear for sale at UFC events in accordance with the terms of Section 4.5.

5.7.   Failure to Deliver.  If Reebok fails to timely deliver sufficient Licensed Products, including In-Octagon Kits and *The Ultimate Fighter* Kits, to Zuffa in accordance with Article 10 and the agreed upon delivery schedule, Zuffa shall have the right to grant to third parties the right to use the Licensed Marks and Fighter IP in connection with the design, creation, development, manufacture and distribution of Licensed Products as required by Zuffa for use in *The Ultimate Fighter* (subject to Section 5.2) and at a Bout In-Octagon and at Pre-Bout Events and Other Bout Events, including promotional materials with respect thereto.  For clarity, it is understood that at no time will Zuffa's exercise of its rights under th is Section 5.7 include the wholesale, retail or ecommerce distribution of Licensed Products to the general public.

5.8.   No Takedowns.  During the Term, Zuffa w ill use best efforts to not distribute, market, offer for sale, or sell any Apparel or  Headwear, and to not approve any Apparel or

21

Headwear submitted for approval by a Zuffa licensee (other than Reebok), that is a "takedown" or otherwise similar to any Uniform Design, the Octagon Crest, the Typography or any other Zuffa-approved Licensed Product manufactured or distributed by Reebok; provided that Zuffa and its licensees shall be free to use on any Apparel, Headwear or otherwise, any Licensed Marks, an octagon design or mark, any Fighter IP, and any wording that appears in the Typography on Licensed Products that Zuffa is otherwise free to use hereunder (provided that Zuffa uses such wording in a font or format that is not in the Typography). For clarity, a "takedown" would include replica t-shirts copying the Uniform Design. Further, Zuffa will use reasonable best efforts to enforce its contractual rights in the event that a licensee manufactures and sells such a takedown or knock-off product without Zuffa's approval or which was inadvertently approved by Zuffa.

     5.9.   <u>Other Rights</u>. Zuffa shall retain and hereby reserves all rights to use and to grant to other Persons the right to use the Licensed Marks and Fighter IP except as expressly provided hereunder. Except as expressly provided in this <u>Article 5</u>, all rights granted to Reebok hereunder are non-exclusive.

**ARTICLE 6.**

**<u>Terms of Payment</u>**

     6.1.   <u>Royalty Payment Terms</u>.

     6.1.1.   <u>Royalties</u>. In consideration of the commercial benefits provided to Reebok hereunder through the Business Programs and other UFC activities carried on by Zuffa, Reebok shall pay Royalties to Zuffa on sales of the Licensed Products for each Fiscal Year on or before February 15 after the end of each Fiscal Year as further specified in Section 6.1.3. Regardless of whether any sales occur during any Fiscal Year, Reebok shall also pay Zuffa the applicable Minimum Royalty Guarantee for each Fiscal Year during the Term. All Royalty Payments shall be paid in U.S. dollars. Royalties shall not be payable on (a) samples required to be provided to Zuffa hereunder; (b) Licensed Products seeded by Reebok to athletes, celebrities, and other ambassadors; (c) Licensed Products that are Excess Inventory sold at Closeout Prices; (d) sales of B-Grade seconds and irregulars; (e) sales to UFC Gyms pursuant to Section 4.7; (f) Promotional Products provided to Zuffa; or (g) sales of Excess Inventory of sports marketing promotional products; provided that, in the event that sales in sections (c) and (d) combined (closeout sales and B-Grades) exceed 10% of Net Sales in a given Fiscal Year, Royalties shall be payable on such sales in excess of the 10%. For purposes of this Section 6.1, "Excess Inventory" means any Licensed Product that is either no longer part of the next season offering or excess inventory (i.e. inventory produced for a given Fiscal Year that is remaining at the end of that Fiscal Year and that exceeds projected sales of that inventory in the following Fiscal Year due to substantially decreased demand). For purposes of this Section 6.1, "Closeout Prices" means a price less than the suggested wholesale price discounted by 36% or less than the suggested retail price discounted by 60%.

     6.1.2.   <u>Minimum Royalty Guarantee.</u> For purposes of this Agreement, the "Minimum Royalty Guarantee" for each Fiscal Year during the Term shall be the amount set forth below opposite such Fiscal Year:

22

| | |
|---|---|
| Fiscal Year 1: | $500,000 |
| Fiscal Year 2: | $1,500,000 |
| Fiscal Year 3: | $2,250,000 |
| Fiscal Year 4: | $3,000,000 |
| Fiscal Year 5: | $3,250,000 |
| Fiscal Year 6: | $4,000,000 |
| Fiscal Year 7*: | $5,750,000 |
| Fiscal Year 8*: | $6,500,000 |

* If the Term is extended beyond Fiscal Year 6 in accordance with Section 3.3.

On or before each April 1, July 1 and October 1 of each Fiscal Year, Reebok shall pay Zuffa the 25% of the Minimum Royalty Guarantee for such Fiscal Year.   Exposure of Reebok brand will begin in July 2015 when Fighters start to wear Licensed Products during Bouts.

    6.1.3.   <u>Minimum Guarantee True-Up</u>.  On or before February 15 following the end of such Fiscal Year, Reebok shall pay Zuffa the  greater of (i) the excess of (A) the sum of Royalties applicable to such Fiscal Year, ove r (B) the Minimum Royalty Guarantee for such Fiscal Year previously paid to Zuffa, and (ii) 25% of the Minimum Royalty Guarantee for such Fiscal Year.

    6.1.4.   <u>Wheel of Fortune</u>.  As set forth on Schedule 6.1.4 (Wheel of Fortune), if (a) in any of Fiscal Year 1, Fiscal Year 2 or Fiscal Year 3, the Royalties payable to Zuffa for such Fiscal Year are less than the Minimum Royalty  Guarantee for such Fis cal Year (a "<u>Royalty Shortfall</u>", and collectiv ely, "<u>Royalty Shortfalls</u>"), and (b) in each Fiscal Year through Fiscal Year 6 following the Fiscal Year with a Royalt y Shortfall (a "<u>Catch-up Year</u>"), the Royalties payable to Zuffa for any such Catch-up Year exceeds the Minimum Royalty Guarantee for such Catch-up Year (the amount of such excess, the "<u>Excess Royalty</u>"), then Reebok may deduct from the Royalties payable to Zuffa in such Catch-up Year with Excess Royalty the lesser of (1) the aggregate Royalty Shortfalls and (2) the Excess Royalty for such Catch-up Year, until the aggregate Royalty Shortfalls are eliminated.  If (i) Reebok extends the Term pursuant to Section 3.3 to December 31, 2021, (ii) there is a Royalty Shortfall in Fiscal Year 4, and (iii) in each of Fiscal Year 5, Fiscal Year 6 or Fiscal Year 7 (a "<u>FY4 Catch-up Year</u>"), the Royalties payable to Zuffa for any such FY4 Catch-up Year exceeds the Minimum Royalty Guarantee for such FY4 Catch-up Year, then Reebok may deduct from th e Royalties payable to Zuffa in such FY4 Catch-up Year with Excess Royalt y, as applicable, the lesser of (x) the Royalty Shortfall in Fiscal Year 4 and (y) the Excess Royalty for such FY4 Catch-up Y ear, until the Royalty Shortfall in Fiscal Year 4 is eliminated.

    6.2.   <u>Global Exposure Fee</u>.  In consideration of the exposure rights granted hereunder, Reebok shall pay Zuffa a "Global Exposure Fee" for each Fiscal Year during the Term in the amount set forth below opposite such Fiscal Year , which shall be payable in equal quarterly installments on January 1, April 1, July 1 and October 1 of such Fiscal Year:

| | |
|---|---|
| Fiscal Year 1: | $2,000,000 |
| Fiscal Year 2: | $4,000,000 |
| Fiscal Year 3: | $6,250,000 |

23

| | |
|---|---|
| Fiscal Year 4: | $7,250,000 |
| Fiscal Year 5: | $8,000,000 |
| Fiscal Year 6: | $8,000,000 |
| Fiscal Year 7*: | $8,250,000 |
| Fiscal Year 8*: | $8,500,000 |

\* If the Term is extended beyond Fiscal Year 6 in accordance with Section 3.3.

Exposure of the Reebok brand will begin when Licensed Products are available for Fighters to wear during Bouts, but in no event earlier than July 2015.

6.3.     Royalty Statements; Projections; Adverse Changes.

   6.3.1.     Royalty Statements.   On or before the 30th day following the end of each month, Reebok shall furnish full and accurate statements of the Net Sales of each Style of each Licensed Product sold during the preceding month on forms provided through the Zuffa electronic royalty reporting system ("ERRS") or such other format as reasonably requested by Zuffa or agreed to with Reebok.   The parties have agreed that, with respect to the ERRS requirement to include distribution method along with sales data, Reebok shall make a reasonable effort to provide information regarding distribution method but Zuffa acknowledges that such information may be incomplete.   On or before February 15th following the end of each Fiscal Year (and together with the Royalty Payment for such Fiscal Year), Reebok shall furnish full and accurate statements of the Net Sales of each Style of each Licensed Product sold during the preceding Fiscal Year on forms provided through the Zuffa ERRS or such other format as reasonably requested by Zuffa, together with a comparison of the actual Net Sales for such Fiscal Year to the results from the prior Fiscal Year and the projections for such Fiscal Year. The statements shall include all information required in the ERRS reports and otherwise as requested by Zuffa. The reports shall include the following information for each category of the Licensed Products (bottoms, knits, tee-shirts, etc.) (in addition to such other information relating to the sale of Licensed Products that may be reasonably requested by Zuffa: (i) the gross sales price, itemized by SKU; (ii) itemized deductions from the gross sales price; (iii) the gross price of any allowable returns made during the applicable month; (iv) all related party sales, employee sales, parking lot, warehouse or similar sales, and any other unusual sales transactions; (v) the resulting Net Sales on which Reebok calculated the Royalty amount; and (vi) quantity and dollar amount of Licensed Products sold to each customer by month, country and Distribution Channel. Reebok shall furnish such statements for each category of Licensed Product regardless of whether it sold any such category of the Licensed Products during the applicable month.   Notwithstanding the foregoing, the Parties acknowledge that Reebok is implementing a new, global reporting system which Reebok anticipates will permit it to meet the requirements of this Section 6.3.1 by the end of the second quarter of 2015.   In the meantime, the Parties agree that Reebok's provision of net sales and volume information on a per SKU and per country basis will satisfy its obligations hereunder.

   6.3.2.     Sales Reports.   On or before February 15th following the end of each Fiscal Year (and together with the Royalty Payment for such Fiscal Year), Reebok shall deliver to Zuffa (a) an annual composite statement, signed and certified by the Vice President of Finance for Brand Reebok, showing the aggregate gross sales, trade discounts, returns, allowances,

24

payment term discounts and closeout discounts and any other deduction or information taken to arrive at the Net Sales price of all Licensed Products sold by Reebok; and (b) with respect to In-Octagon Kits, to the extent such information is reasonably practicable to obtain using Reebok's then-current systems (i.e. to the extent the system in the applicable market is compatible with Reebok's global systems), an annual inventory report, signed and certified by Vice President of Finance for Brand Reebok, confirming actual inventory held by Reebok and its Affiliates and including computer reports summarizing inventory by SKU.  With respect to the annual inventory reconciliation for In-Octagon Kits in Section (b) above, the Parties hereby acknowledge that this information will not be available at all until the end of the second quarter of 2015.

6.3.3.      Projections. On or before November 1  of each Fiscal Year, Reebok shall provide Zuffa with Reebok's projections fo r sales and income, for each Licensed Product category, for the upcoming Fiscal Year. On or before July 15 of each Fiscal Year, Reebok shall provide Zuffa with a mid-year review summarizing actual results for the preceding six-months and comparing them to the results from the pr ior Fiscal Year and the projections for such preceding six-month period.

6.3.4.      Adverse Material Changes. Reebok shall notify Zuffa in writing of any adverse material change in Reebok's financial condition, business, results of operations, prospects, properties or liabilities that is reasonably expected to adversely affect its performance under this Agreement at the time such material change occurs or when Reebok learns of the possibility of such a change, whichever is sooner.  In any such event, Reebok shall continue to comply with its obligations hereunder and use best efforts to continue to manufacture, distribute and sell Licensed Products in compliance with the terms hereof in a manner consistent with past performance.

6.4.      Images.  All uses of images or photos of Fighters, Retired Fighters or Bouts must be licensed by Reebok directly from Zuffa's designated image or photo partner, or otherwise obtained lawfully by Reebok, at Reebok's sole cost, unless otherwise specified by Zuffa.

6.5.      Incorrect Statements.  Zuffa's receipt or acceptance of any statement or Royalty Payment or the cashing of a Royalty check  shall not preclude Zuffa from questioning the correctness of such statements or payments at any time during the Term and for three full Fiscal Years after the expiration or termination of this Agreement.  Upon discovery of any verifiable inconsistency or mistake in such statements or payments during such time period, Reebok shall immediately rectify such inconsistency or mistake.

6.6.      Payments Free and Clear of Withholdi ng.  All Royalty Payments and Global Exposure Fees paid to Zuffa pursuant to this  Article 6, including any  finance charges paid pursuant to Section 6.9, shall be made free an d clear of, and without deduction or withholding for or on account of any Taxes unless such deduc tion or withholding is required by Applicable Law.  If any such deduction  or withholding is required by Applicable Law, Reebok shall (i) promptly notify Zuffa of such requirement, (ii) pay the amount so required to be deducted or withheld to the applicable taxing authority on a timely basis, and (iii) pay to Zuffa such additional amounts ("Additional Amounts") as may be necessary in order that the net amount received by the Zuffa, after and free and clear of any required deduction or withholding for or on

25

account of Taxes (including any required deduction or withholding for or on account of Taxes with respect to such Additional Amounts), shall equal the amount Zuffa would have received had no such deduction or withholding for or on account of Taxes been required.  Zuffa shall cooperate with any reasonable request by Reebok in connection with any Tax credits, deductions, treaty claims or similar Tax benefits that are available to Reebok under Applicable Law with respect to amounts paid by Reebok pursuant to clauses (ii) and (iii) of the preceding sentence; provided, that in no event shall Zuffa or any of its Affiliates be required to submit any of its Tax Returns or any portion thereof to Reebok or to prepare its Tax Returns other than as Zuffa in its sole discretion shall determine.  All payments due hereunder shall be made in United States currency, unless otherwise agreed between the Parties.  In the event that changes to Zuffa's structure results in an increase in the withholding obligation, Reebok shall not be required to pay any additional amounts as a result of the withholding tax increase due to the structure changes.  The Parties shall pay any and all of their respective taxes or charges imposed on them by any law, ordinance, or requirement of any governmental body in connection with or by reason of the licensing, delivery, exhibition or other possession or use of any licensed products or remittance by Reebok of any fees hereunder.  If withholding tax is required by law, Reebok shall cooperate fully and assist Zuffa by gathering all documentation necessary for Zuffa to complete and file any withholding tax forms, as applicable.  Reebok agrees to cooperate with Zuffa's tax department to determine the correct rate of withholding and to withhold taxes at the determined rate.  Reebok is responsible for payment of penalties and interest resulting from failure to withhold the determined amount of tax.  Penalties and interest resulting from a failure to accurately determine the correct rate of tax shall be equally shared by both parties.  Zuffa will provide a certificate of residency for the U.S. owners and any additional tax documents required by Reebok for withholding tax upon request.  Reebok is responsible for providing assistance including informing Zuffa as to what documents are needed, how often they need to be completed and who must complete the documents.  Reebok will provide Zuffa with a copy of any annual tax withholding documents submitted to the tax authorities.  If the tax authorities do not require reporting and/or distribution of tax statements, then Reebok must provide a quarterly and or annual statement of account showing gross payments and the amount of tax withheld on a timely basis.  Reebok shall be solely responsible for and shall hold Zuffa and its Affiliates harmless for any and all claims for taxes, fees, or costs arising from the manufacture, marketing, distribution or sale of Licensed Products, including but not limited to withholding, income tax, FICA, and workmen's compensation.

6.7.   Notice of Payments.   Reebok shall notify Zuffa in writing if any forms or certificates are required in order that any Royalty Payments or Global Exposure Fee payments to be made by Reebok may be made free and clear of, and without deduction or withholding for or on account of, any Taxes, such notice to be given reasonably in advance of any affected Royalty Payment or Global Exposure Fee payment.  Zuffa agrees that, as soon as reasonably practicable after receipt of the written request referred to above, it shall deliver to Reebok, or to such Government Authority or Tax Authority as Reebok reasonably directs in writing, any such forms or certificates reasonably requested in writing by Reebok so long as (i) that Zuffa is legally entitled to complete, execute and deliver such form or certificate and (ii) such completion, execution or submission would not materially prejudice the legal, tax or commercial position of Zuffa.

CONFIDENTIAL                                                    ZFL-2490134

6.8.    <u>Termination Payments.</u>  In the event of termination of this Agreement, for the Fiscal Year in which termination occurs ("<u>Termination Fiscal Year</u>"), Reebok shall pay Zuffa (i) the greater of: (A) the Royalties on all sales of Licensed Products made during the Termination Fiscal Year at the time of termination; and (B) the pro-rated portion of the Minimum Royalty Guarantee for the Termination Fiscal Year, calcul ated on a per diem basis, (ii) the pro-rated portion of any unpaid Global Exposure Fee for the Termination Fiscal Year, calculated on a per diem basis, and (iii) any other amounts due to Zuffa under this Agreement.

6.9.    <u>Finance Charge on Late Payments</u>.  Reebok shall pay Zuffa an additional charge of 0.5% per month, calculated on the actual  days elapsed, on any payment due under this Agreement from the date such payments were originally due.

6.10.    <u>Losses</u>.  The obligations of Reebok under this Agreement shall not be diminished or affected by any losses that Reebok may incur.

6.11.    <u>Maintenance of Records.</u>  For  at  least  thre e  full  Fiscal  Years  after each Fiscal Year, Reebok shall keep, maintain and preserve complete and ·accurate books of accounts and records relating to sales of Licensed Products in such Fiscal Year of this Agreement, including invoices, correspondence and inventory accounting ("<u>Records</u>").  Reebok shall ensure that all invoices for the sale of Licensed Products to Distributors include the quantity and description of each Licensed Product itemized by Version and Style.

6.12.    <u>Audit</u>. During the Term and for at least two full Fiscal Years after the expiration or termination of this Agreement, Zuffa and it s duly authorized representatives shall have the right, at Zuffa's expense and no more than tw ice during any thirty-s ix month period, during business hours to inspect and audit all Record s, including normal audit tests of Reebok's non-Zuffa sales records by third-party auditors selected and paid for by Zuffa to verify that such sales are not covered by this Agreement, and conduct a physical examination of Reebok's premises, including its warehouses and manufacturing faciliti es and those of Distributors and Third Party Manufacturers. Zuffa shall provi de Reebok with no less than ten Business Days' written notice prior to such inspection, audit or examination. Reebok represents that it will fully cooperate with the inspection, audit or examination and will not cause or permit any interference with Zuffa or its representatives during any inspection, audit or examination. During an inspection, audit or examination, Zuffa shall have the right to make copies or extracts of Reebok's Records.

6.13.    <u>Payment Deficiency</u>. Any provision of <u>Section 6.12</u> notwithstanding, Reebok shall pay Zuffa for the cost of any audit that di scloses a payment deficien cy of more than 5% between the amount due to Zuffa pursuant to the audit and the amount Reebok actually paid or reported to Zuffa. Reebok shall pay Zuffa any such deficiency amount toget her with interest on the deficiency amount pursuant to <u>Section 6.9</u> (f rom either the date on which such payment should have been made hereunder or two years from the date of the audit, whichever period is shorter) and shall adjust its records of such Royalty amount to be consistent with the result of such audit.

27

## ARTICLE 7.

## Product Quality Control

7.1.    General Product Approval Process.

7.1.1.    Concept and Line Review.  Reebok and Zuffa representatives shall meet at least twice each Fiscal Year and as needed on mutually agreeable dates for concept and line reviews for each of the In-Octagon Kits, other Licensed Products and the designs for blanks for use as Hot Market Products (each, a "Concept/Line Review").  The initial Concept/Line Review for In-Octagon Kits shall be in September 2014 and those for other Licensed Products and the blanks for use as Hot Market Products (such blanks hereinafter referred to as "Concepts") shall be as soon as reasonably practicable thereafter.  Subsequent Concept/Line Reviews shall be scheduled so as to reasonably accommodate both the development process at Reebok and the event calendar and similar requirements for Zuffa.  At each Concept/Line Review, Reebok shall present preliminary designs, concept boards, sketches or other artwork sufficient to convey the intended appearance of the general line of proposed Licensed Products or Concepts being developed and samples of proposed Licensed Products and Concepts, as well as previously approved Licensed Products that Reebok intends to distribute in the following Fiscal Year.  If Zuffa does not approve in writing any Concept, any proposed Licensed Product, or any Version or Style of any proposed Licensed Product or Concept presented at the Concept/Line Review, Zuffa shall provide Reebok with a written notice within 10 days following the Concept/Line Review specifying in reasonable detail the reasons therefore; provided, that Zuffa shall only be entitled to withhold its approval of a proposed Licensed Product or Concept if (i) Zuffa reasonably determines that such Concept or proposed Licensed Product would negatively affect the reputation and integrity of Zuffa, its Affiliates, any Fighter, the UFC, MMA fighting, the Licensed Marks or Fighter IP in the marketplace, (ii) if such Concept or proposed Licensed Product fails to comply with Zuffa's commercially reasonable requirements concerning design and quality, (iii) such Concept or proposed Licensed Product fails to meet any of the Licensed Product Requirements, as defined below, (iv) if such Concept or proposed Licensed Product conflicts with an exclusive right granted by Zuffa to a third party or (v) if Zuffa determines in its reasonable business judgment that a Trademark proposed by Reebok in such Concept or proposed Licensed Product could expose Zuffa to a Trademark infringement, breach of contract, or other legal claim by a third party.  If Reebok chooses, Reebok may revise and resubmit any Concept not approved by Zuffa until such Concept has been approved in writing by Zuffa, or may withdraw such Concept (and any related proposed Licensed Products) from the development and approval process.  "Licensed Product Requirements" shall mean Zuffa's requirements for the use of the Licensed Marks or Fighter IP, which requirements shall be limited to: (A) the Zuffa Guidelines, as may be amended from time to time by Zuffa, and (B) requirements imposed by a Governmental Authority and applicable to Zuffa, any Licensed Product, the Licensed Marks or any Fighter IP, or pursuant to any Applicable Law.  Zuffa shall use commercially reasonable efforts to deliver to Reebok a written summary of material Licensed Product Requirements and shall use commercially reasonable efforts to provide written updates of such information designed to keep such information current in all material respects.

28

7.1.2.     <u>Follow-up Review</u>.  If Zuffa fails to approve any proposed Licensed Product at the Line Review or if Reebok materially alters any previously approved proposed Licensed Product, Reebok may revise such proposed Licensed Product to address the reason given for the withholding of such approval and may resubmit a revised sample of such proposed Licensed Product to Zuffa for approval.  Zuffa shall use commercially reasonable efforts to review such resubmitted Licensed Products as soon as reasonably practicable and to notify Reebok in writing no later than 10 Business Days following receipt of such sample of whether Zuffa is approving or withholding its approval of such proposed Licensed Product.  If Zuffa does not notify Reebok of such approval or the withholding of such approval within such 10 Business Day period, Reebok may notify Zuffa in writing of such failure.  If Zuffa does not notify Reebok of whether Zuffa is approving or withholding its approval from such proposal within five Business Days of receipt of such notice from Reebok, the proposed Licensed Product shall be deemed to have been approved by Zuffa.

7.2.     <u>Hot Market Product Approval Process</u>.  Reebok shall present all blank Styles and Versions to be used as Hot Market Products without graphics at the Line Review for approval by Zuffa in accordance with <u>Section 7.1.1</u>.  If Reebok submits to Zuffa graphics to be used on any Hot Market Product, Zuffa shall use commercially reasonable efforts to review such graphics as soon as is reasonably practicable and to notify Reebok in writing no later than five Business Days following receipt of such graphics of whether Zuffa is approving or withholding its approval of such graphics.  If Zuffa does not notify Reebok of such approval or the withholding of such approval within such five Business Day period, Reebok may notify Zuffa in writing of such failure.  If Zuffa does not notify Reebok of whether Zuffa is approving or withholding its approval of such graphics within two Business Days of receipt of such notice from Reebok, the graphics shall be deemed to have been approved by Zuffa.  Examples of Hot Market Products include Apparel or Headwear bearing slogans or sayings adopted by fans during the course of a season.

7.3.     <u>Ad Hoc Product Review Process</u>.  Reebok may submit to Zuffa samples of proposed Styles or Versions of Licensed Products or Concepts on an ad hoc basis.  Zuffa shall use commercially reasonable efforts to review such proposed Styles or Versions of Licensed Products or Concepts as soon as is reasonably practicable and to notify Reebok in writing no later than 15 Business Days following receipt thereof of whether Zuffa is approving or withholding its approval of such proposed Styles or Versions of Licensed Products or Concepts. If Zuffa does not provide Reebok with such notice within such 15 Business Day period, Reebok may notify Zuffa in writing of such failure.  If Zuffa does not notify Reebok of whether Zuffa is approving or withholding its approval of such proposed Styles or Versions of Licensed Products or Concepts within five Business Days of receipt of such notice from Reebok, the proposed Styles or Versions of Licensed Products or Concepts shall be deemed to have been approved by Zuffa.

7.4.     <u>Approval Required</u>.  Reebok shall not manufacture, distribute, promote, advertise or sell any Style or Version of Licensed Product or use any Trademark on or with a Licensed Product or Promotional Material that has not been approved in accordance with this Section 7.  Any proposed product approved by Zuffa in accordance with this <u>Article 7</u> shall be deemed to be a "<u>Licensed Product</u>" for the purposes of this Agreement.  Reebok shall not distribute for sale any Licensed Product that differs materially from any Licensed Product approved by Zuffa in

29

accordance with this <u>Article 7</u> or otherwise including, without any limitation, any special makeups, without obtaining the approval of Zuffa in accordance with this Section 7.

      7.5.    <u>Seconds/Irregulars</u>.  Reebok may distribute or sell B-Grade irregulars or seconds of the Licensed Products at Reebok outlet stores in the Territory with the prior written approval of Zuffa, such approval not to be unreasonably withheld.  For the purposes of this Section, "<u>B-Grade</u>" shall mean Licensed Products that do not conform in some material respect to the manufacturing specifications for such Licensed Product (and which are not specifically manufactured as an irregular or second), but which function as if conforming to such specifications and which are non-conforming only in ways which will not impair the reputation of the Licensed Marks or Fighter IP.  The foregoing notwithstanding, Reebok may only distribute or sell such B-Grade irregulars or seconds of Licensed Products at Closeout/Discount Stores in the Territory if (A) Reebok applies a substantially similar definition of B-Grade and employs substantially similar practices with regard to such B-Grade seconds and irregulars as Reebok does to its products, and (B) such B-Grade seconds and irregulars are displayed with signage clearly identifying them as irregular.

      7.6.    <u>In-Octagon Kit Designs</u>.  Reebok and Zuffa representatives shall meet at a mutually agreeable time and place to consider proposals for changes to the In-Octagon Kits.  In addition, the Parties shall agree to a timeline pursuant to which Reebok shall conform the design of the In-Octagon Kits following Zuffa's approval of the changes to such In-Octagon Kits.  Notwithstanding the foregoing, Zuffa shall provide Reebok with immediate written notice should Zuffa become aware of a change to Applicable Law that requires a change to the In-Octagon Kits and Reebok will cooperate with Zuffa to implement such change and to bring the In-Octagon Kits into compliance with such Applicable Law.

      7.7.    <u>Failure of Quality</u>.  If the quality of a particular Licensed Product falls below the production-run quality previously approved by Zuffa and/or as specified in any applicable Zuffa Guidelines in respect thereof, Reebok shall use commercially reasonable efforts to restore such quality upon receipt of notice from Zuffa.  In the event that Reebok has not taken appropriate steps to restore such quality within 30 days after notification by Zuffa, in addition to any and all other remedies, Zuffa shall have the right to require Reebok to immediately stop manufacturing, distributing or selling such Licensed Product until such time as the quality issue is resolved.

      7.8.    <u>Approval Notices</u>.  Notwithstanding the notice requirements in <u>Section 20.2</u>, notices to Zuffa under this <u>Article 7</u> shall be  delivered via the electronic approval system designated by Zuffa to Reebok, which system may be updated from time to time.

**ARTICLE 8.**

**<u>Advertising and Promotional Materials</u>**

      8.1.    <u>Promotional Materials Submission</u>.  Reebok and Zuffa representatives shall meet at least twice each Fiscal Year and as needed on a mutually agreeable date to review and approve any Reebok Promotional Materials and Joint Promotional Materials, and to review and approve Reebok Contributed Content or Zuffa Contributed Content proposed for use in Promotional Materials.  Reebok shall (A) submit to Zuffa all proposed Reebok Promotional Materials

30

depicting any Zuffa IP and/or any Style or Version of the Licensed Products for approval at the following applicable stages appropriate to the medium: (i) conceptual stage, pre-production art or rough cuts; (ii) layout, storyboard or script, and (iii) prior to the finalization or use, and (B) obtain Zuffa's approval of such concept/pre-p roduction art/rough cut, layout/storyboard/script and final version prior to utilizing any Reebok Promotional Materials. Joint Promotional Materials shall be jointly approved by Reebok and Zuffa. In the event Zuffa wishes to create Zuffa Promotional Materials apart from materi als depicting Licensed Pr oducts as provided in Section 8.4 below and the Reebok Marks will be used in such Zuffa Promotional Materials separate from the Licensed Products, Zuffa shall obtain Reebok's written approval prior to using any Reebok Marks separate from the Licensed Products in such Zuffa Promotional Materials. For the avoidance of doubt, without the written approval of Reebok, the Parties agree the Zuffa may use the Licensed Products (including the Reebok Marks displayed thereon) in Zuffa Promotional Materials if the Reebok Marks ar e not displayed separately from the Licensed Products.

8.2.   <u>Promotional Materials Approval</u>. Zuffa shall use commercially reasonable efforts to review any Reebok Promotional Materials su bmitted for approval as required under <u>Section 8.1</u> as soon as is reasonably practicable and to notify Reebok in writing no later than 10 Business Days following receipt of such Reebok Promotional Materials of whether Zuffa is approving or withholding its approval of such Reebok Promotional Materials. If Zuffa does not provide such notice to Reebok within such 10 Business Day period, Reebok may notify Zuffa in writing of such failure. If Zuffa does not notify Reebok of whether Zuffa is approving or withholding its approval of such Reebok Promotional Materials with in five Business Days of receipt of such notice from Reebok, the Reebok Promotional Materi als shall be deemed to have been approved by Zuffa. Reebok may use approved Reebok Promotional Materials only in conjunction with the Styles and Versions of Licensed Products that Zuffa has approved. Reebok acknowledges that Zuffa may withhold approval of any Reebok Promotional Material s that, in Zuffa's reasonable opinion, reflect unfavorably upon a ny of Zuffa, its Affiliates, any Fighter, the UFC, MMA fighting, the Licensed Marks or Fighter IP, in the marketplace, including materials involving any Reebok Promotional Materials that conflict with the Zuffa Guidelines or are inconsistent with the reputation of Zuffa or the Licensed Products.

8.3.   <u>Promotional Materials Approval Withdrawn</u>. Zuffa may withdraw its approval of any Reebok Promotional Materials or Joint Promotional Materials if (i) the Reebok Promotional Materials or Joint Promotional Materials have been altered without the prior written approval of Zuffa; (ii) the Style, Version and/or the Licen sed Product promoted in the Reebok Promotional Materials or Joint Promotional Materials ceases to be approved under this Agreement (other than for the reasons set forth in (iii) of this secti on), provided that in such case Reebok will not be required to remove or take down any such Ree bok Promotional Materials or Joint Promotional Materials that included approved Licensed Products at the time of its publication and will be given a reasonable period of time to phase out further use of such Reebok Promotional Materials or Joint Promotional Materials; or (iii) if Zuff a determines in its reasonable business judgment upon advice of counsel that any Reebok Promotional Materials or Joint Promotional Materials or any element thereof could reasonably be expected to expose Zuffa or Reebok to any intellectual property infringement, breach of contract, or other legal claim by a third party, provided that in such case Reebok will use its best efforts to remove or takedown all such Reebok Promotional Materials or Joint Promotional Materials to mitigate risk of further exposure of the Reebok

31

Promotional Materials or Joint Promotional Materials following notice of Zuffa's withdrawal of its approval of such Reebok Promotional Materials or Joint Promotional Materials for any such reason. For clarity, Zuffa's withdrawal of approval pursuant to this Section 8.3 will not affect Zuffa's indemnification obligations herein to the extent Reebok has complied with the terms of this Agreement.

8.4.    <u>Zuffa Promotional Programs/Product Placement</u>.    Reebok acknowledges that Zuffa has the right, in its sole discretion, to conduct promotions and special events and to create printed and electronic catalogs, sales sheets and brochures involving representative merchandise from Zuffa's licensees and Reebok grants to Zuffa a limited license during the Term to use the Reebok Marks in connection with the foregoing and in connection with the distribution and sale of the Licensed Products as permitted herein; provided that (a) Zuffa will use the Reebok Marks only as they appear on Licensed Products and will not alter or remove the Reebok Marks from Licensed Products or images thereof; (b) Zuffa will not use the Reebok Marks apart from Licensed Products without Reebok's prior written consent; and (c) no royalties or payments shall be due to Reebok in connection with the use of Licensed Products or Reebok Marks displayed on such Licensed Products in connection with any such promotion or special event. Further, Reebok grants Zuffa a limited license during the Term and, with respect to film, television, or other media content (other than video games) that is produced and released to the public or third parties during the Term, after the Term, to use the Reebok Marks appearing on Promotional Products in the event Zuffa wishes to place Promotional Products in film, television, or other media content (other than video games); provided that (i) Zuffa will comply, and will use reasonable best efforts to cause all third parties creating such film, television or other media content to comply, with the terms set forth on <u>Schedule 8.4</u> herein (or as otherwise expressly agreed by Reebok in writing); (ii) notwithstanding anything to the contrary herein, Reebok disclaims all representations and warranties, and provides no indemnification, with respect to use of the such Promotional Products bearing the Reebok Marks in such film, television or other media content, and (iii) without limiting any other remedies that may be available to Reebok, in the event Zuffa uses Promotional Products in a manner that, in Reebok's sole (but reasonable) discretion, is damaging to or otherwise inconsistent with Reebok's brand image, Reebok will provide notice to Zuffa and Zuffa will not make any future uses of Promotional Products bearing any Reebok Mark in such manner (provided that Reebok agrees that MMA fighting and training and activities reasonably related or incidental thereto and the biographical or semi biographical stories of Fighters are not damaging or otherwise inconsistent with Reebok's brand image). Each Fiscal Year, Reebok shall promptly supply at no charge to Zuffa a quantity of Licensed Products valued at $300,000, calculated at 17.5% below Reebok's U.S. wholesale price, for use by Zuffa to, *inter alia*, conduct promotions or special events or for product placement purposes. The amount of Promotional Products supplied by Reebok pursuant to this Section 8.4 may be greater if the Parties mutually agree. In addition, Zuffa shall cooperate with the Reebok product placement program as reasonably requested by Reebok. Notwithstanding the foregoing, this Section 8.4 shall not apply to any film, television, or other media content with respect to which Reebok directly licenses a Reebok Mark to a third party for use in such film, television, or other media content.

8.5.    <u>Hang Tags and Packaging</u>.    The Parties agree that Reebok is free to use two hang tags in connection with Licensed Products – a UFC hang tag provided by Zuffa, and a Reebok hang tag; provided that any use of Zuffa IP on the Reebok hang tag is subject to Zuffa's prior

32

approval in accordance with this Article 8; and provided further, that the Parties shall agree on the hang tags that are used on the Licensed Products. Any use of Zuffa IP on packaging for Licensed Products is subject to Zuffa's prior approval in accordance with this Article 8. Any use of Reebok IP on UFC hang tags or packaging provided by Zuffa for use hereunder is subject to Reebok's prior written approval.

8.6.    <u>Joint Promotional Materials</u>.   The Parties agree that all Joint Promotional Materials will be jointly owned by the Parties, with no obligation of notice or duty to account to the other Party other than as may be expressly provided in this Agreement and that all Joint Promotional Materials shall be approved in accordance with the terms of Section 8.1. During the Term, each Party grants the other a limited license to use such Party's underlying intellectual property (including the Reebok Contributed Content or Zuffa Contributed Content, as applicable) solely as contained in mutually approved Joint Promotional Materials for the purpose of promoting the Licensed Products and/or the collaboration between the Parties hereunder. After the Term, neither Party will use, publicly display, publicly perform, reproduce, distribute or otherwise exploit any Joint Promotional Materials other than for business archival purposes. However, Reebok is free to continue to use any underlying Reebok IP, and Zuffa is free to continue to use any underlying Zuffa IP, in each case, apart from the Joint Promotional Materials.

8.7.    <u>Retail Marketing Commitment</u>. Each Fiscal Year and at no cost to Zuffa, Reebok shall spend $250,000 for the purchase of mutually agreeable retail advertising and Promotional Materials to promote and advertise the Licensed Products, which retail advertising and Promotional Materials must predominantly use the Licensed Marks (subject always to the approval process of this Article 8). The amount spent by Reebok pursuant to this Section 8.7 may be greater if the Parties mutually agree.

8.8.    <u>Marketing and Social Media Assets</u>. Zuffa shall use its best efforts to utilize the marketing and social media assets set forth on Schedule 8.8 (Marketing and Social Media Activities) to promote a third party official retailer of the Licensed Products (mutually agreed upon by the Parties) and to promote the sale of the Licensed Products in the Authorized Distribution Channels in the Territory; provided that (i) the use of the Reebok Marks complies with terms set forth on <u>Schedule 8.4</u>, and (ii) if Zuffa uses the Reebok Marks in a manner that, in Reebok's sole (but reasonable) discretion, is damaging or otherwise inconsistent with Reebok's brand image, Reebok will provide notice to Zuffa and Zuffa will use its best efforts to promptly remove the Reebok Marks from the applicable social media post (to the extent it has the ability to do so) or otherwise promptly remove the applicable social media post (to the extent it has the ability to do so) and not make any future uses of Reebok Marks in such manner (provided that Reebok agrees that MMA fighting and training and activities reasonably related or incidental thereto are not damaging or otherwise inconsistent with Reebok's brand image).

8.9.    <u>Domain Names and Social Media Assets Incorporating any Zuffa IP</u>.   Reebok shall obtain Zuffa's prior written approval before registering or using any domain name or social media handle or other identifier incorporating any Licensed Marks.

8.10.   <u>Notices</u>. Notwithstanding the notice requirements in <u>Section 20.2,</u> notices to Zuffa under this Article 8 shall be delivered both (i) via the electronic approval system

33

designated by Zuffa to Reebok from time to time, and (ii) to its Senior Vice President of Global Consumer Products, at the addresses set forth in Section 20.2 or through any reasonable means agreed to by the Parties, including email or other electronic transmission. Either Reebok or Zuffa may change the individual(s) to whom such notices are to be sent by providing written notice to the other of such change.

**ARTICLE 9.**

**Branding**

9.1.    In-Octagon. All Licensed Products that Reebok provides to Zuffa for use In-Octagon shall be in accordance with the following Zuffa Guidelines:

9.1.1.    Kits. The size and placement of the Trademarks on each item in the In-Octagon Kits shall be in accordance with the Zuffa Guidelines. The size of the Reebok Mark mutually agreed by the Parties on the front of the short that is part of the In-Octagon Kit shall be no greater than 6 inches by 6 inches for men's sizes medium and large. The size of the Reebok Mark mutually agreed by the Parties on the back of the short that is part of the In-Octagon Kit shall be no greater than 4 inches by 4 inches for men's sizes medium and large. The size of the Reebok Mark mutually agreed by the Parties on the front of the walk-out tops that are part of the In-Octagon Kit shall be no greater than 4 inches by 4 inches for men's sizes medium and large. The foregoing dimensions shall be reduced as appropriate for smaller garments. The dimensions for women's In-Octagon Kits shall be mutually agreed by the Parties.

9.1.2.    Third Party Trademarks. Zuffa reserves the right (a) to place Trademarks owned by Zuffa or a Zuffa Affiliate on each item in the In-Octagon Kits, and (b) to place one additional third-party Trademark on each item of the In-Octagon Kit for each Fighter (and such third-party Trademarks on such items in the In-Octagon Kits may vary by Fighter and by region, but there shall not be more than 10 different third-party Trademarks placed on In-Octagon Kits at any one time) and to receive the revenue generated from such exposure; provided, that such third-party Trademarks (1) are not Trademarks of Reebok Competitors or companies that are primarily associated with alcohol, tobacco, religious or political products, weapons or services, and (2) are Trademarks of recognizable brands that do not materially conflict with Reebok's footwear and/or apparel brand positioning or materially detract from the retail potential of the Licensed Products. The size and placement of any such third-party Trademarks shall be mutually agreed by Reebok and Zuffa.

9.1.3.    Other Licensed Products. The size, appearance and placement of Trademarks on other Licensed Products to be used In-Octagon and at other official UFC events shall be mutually agreed by Reebok and Zuffa and shall be in accordance with the Zuffa Guidelines. Zuffa reserves the right (a) to place Trademarks owned by Zuffa or a Zuffa Affiliate on other Licensed Products used In-Octagon, and (b) to place additional third-party Trademarks on Licensed Products used In-Octagon and to receive the revenue generated from such exposure; provided, that such third-party Trademarks (1) are not Trademarks of Reebok Competitors or companies that are primarily associated with alcohol, tobacco, religious or political products, weapons or services, and (2) are Trademarks of recognizable brands that do not materially conflict with Reebok's footwear and/or apparel brand positioning or materially detract from the

34

retail potential of the Licensed Products. The size, design and placement of any such third-party Trademarks shall be determined by Zuffa after good faith consultation with Reebok.

9.2.  Retail.

9.2.1.  Retail Branding.  The Authorized Bra nd may appear on the exterior and interior of In-Octagon Business Program, Performance Business Program and Fan Apparel Business Program Licensed Products in all Fiscal Years. The Authorized Brand may appear on the interior of *The Ultimate Fighter* Business Program Licensed Products in the Territory in all Fiscal Years and on the exterior of *The Ultimate Fighter* Business Program Licensed Products in the Territory other than the U.S. Territory (except as allowed pursuant to Section 5.2) in all Fiscal Years. The Parties shall mutually ag ree on the size of the Authorized Brand on the Licensed Products other than the In-Octagon Kits.

9.2.2.  Third Party Trademarks.  In the event that Zuffa authorizes the display of any third-party Trademark on Licen sed Products worn In-Octagon pursuant to Sections 9.1.1 and 9.1.3 above, Reebok will distribute and offer for sale in Authorized Distribution Channels an Authentic version of the In-Octag on Kit (with or without all th ird-party Trademarks that are authorized by Zuffa, in Reebok's sole discretion). Zuffa will secure, at its sole cost, all rights necessary for Reebok to use such third-party Trademarks as provided herein. Reebok may distribute and offer for sale in Authorized Distribution Channels a Replica version of the In-Octagon Kit without such third-party Trademarks. No royalty shall be payable by Reebok to any such third party in connection with the use of such third party Trademark on such Licensed Products. The size and placement of any such third-party Trademarks on Licensed Products sold at retail shall be mutually agreed by Reebok and Zuffa.

9.3.  Authorized Brands.  Reebok shall not use any brand names other than the Authorized Brands as the primary branding in connection with the design, manufacture, distribution, promotion, advertising, offer for sale, or sale of any Licensed Product without the prior written approval of Zuffa. Any brand name so approved shall be deemed to be an "Authorized Brand" for the purposes of this Agreement for use in connection with the Business Programs for which it is approved as specified on Schedule 1.1.8 (Authorized Brands). Notwithstanding anything in this Agreement to the contrary, Reebok may, with the prior consent of Zuffa (such consent with respect only to whic h substitute Authorized Brand is used), use an Authorized Brand other than LUTA, FIGHT FOR PEACE, or LUTA PELA PAZ with respect to Licensed Products in a particular geographic market, in the event that Reebok determines in its reasonable business judgment upon the advice of counsel that use of the LUTA, FIGHT FOR PEACE, or LUTA PELA PAZ mark in such ma rket could reasonably be expected to expose Reebok or Zuffa to third party intellectual property infringement claims. Reebok shall not use any Trademarks other than the Licensed Marks, Fighter IP, or Author ized Brands on or in connection with the Licensed Prod ucts, without the cons ent of Zuffa, such consent not to be unreasonably withheld. Zuffa will not unreasonabl y withhold its consent of model names or technology names proposed for use by Reebok on Licensed Products; provided that Zuffa may withhold its consent in its sole discretion if (a) Zuffa determines in its reasonable business judgment upon advice of counsel that use of such model name or technology name on Licensed Products could reasonably be expected to expose Zuffa to an intellectual property infringement, breach of contract or other legal claim by a third party; or (b) Zuffa reasonably believes that use

35

of such Trademark on Licensed Products will disparage or otherwise materially impair the reputation of Zuffa, its Affiliates, the UFC, or the Licensed Marks or will materially tarnish the Fighter IP. Notwithstanding anything to the contrary herein, Reebok has the right to substitute an Authorized Brand with updates / modernizations thereof without the prior consent of Zuffa; provided that Reebok shall give Zuffa notice of any such proposed substitution 120 days prior to the use of such update/modernization on Licensed Products in the marketplace. In addition, with the prior consent of Zuffa not to be unreasonably withheld and not to be withheld for aesthetic reasons, Reebok has the right to include on and in connection with Licensed Products any new Trademark adopted by Reebok as primary branding (including branding that is secondary to the REEBOK word mark) and used for multiple Reebok product lines (not just Licensed Products), where the use of such new Trademark on Licensed Products is important for the consistency of Reebok's marketing strategy; provided that the size and placement of such new Reebok Mark will be subject to Zuffa's prior reasonable approval.

9.4.    Gloves.  If Zuffa authorizes the display of any third-party Trademark on Gloves In-Octagon ("Glove Exposure Rights"), Zuffa shall notify Reebok in writing of its intent to grant such rights.  If, within 30 days of Reebok's receipt of such notice, Reebok provides an offer for such Glove Exposure Rights, then for 15 days following the receipt by Zuffa of such offer, Zuffa and Reebok shall negotiate in good faith any terms and conditions (including any incremental payment terms) that the Parties may deem appropriate in connection with such offer, it being understood that Zuffa shall be under no obligation to approve any such offer.  Glove Exposure Rights may not and shall not be granted to a Reebok Competitor but may be granted to an Other Reebok Competitor (as defined in Schedule 1.1.82).

9.5.    Other Reebok Products.  During the Term, Reebok and its Affiliates (to the extent such Affiliates are selling products under the Reebok brand) will use best efforts to not distribute, market, offer for sale or sell, or authorize the distribution, marketing, offering for sale or selling of, any Reebok products other than Licensed Products ("Non-UFC Products") that are identical or near identical to or that are substantially or confusingly similar to the Uniform Designs or to the In-Octagon Kits (excluding any specific Reebok Marks, technologies (including proprietary fabrics), elements capable of protection under a utility patent contained thereon or therein, and the general cut, shape, and functional aspects of such In-Octagon Kits). After the Term, Reebok and its Affiliates (to the extent such Affiliates are selling products under the Reebok brand) will not distribute, market, offer for sale or sell, or authorize the distribution, marketing, offering for sale or selling of, any products that are identical or near identical to the Uniform Designs.  As used in this Section 9.5, "identical or near identical" means the identical product or a product with minor or immaterial variations such that a reasonable observer upon a casual glance would consider it to be the same product.  Otherwise, subject to the restrictions with respect to the Last Uniform Design in Section 15.11, Reebok is free after the Term to design, develop, manufacture, distribute, import, export, market, offer for sale, sell, use and otherwise exploit products (and designs thereon) that are substantially and/or confusingly similar to the Uniform Designs (but, for clarity, excluding other Zuffa IP such as Licensed Marks and the Fighter IP) and Zuffa hereby grants Reebok a perpetual, irrevocable, royalty-free, non-exclusive, non-assignable (except as allowed pursuant to this Agreement), fully sublicensable (notwithstanding Section 13.2), worldwide license to do so (and Zuffa shall not assert any claim against Reebok for such creation or other exploitation).  Further, during the Term, Reebok (and its Affiliates to the extent such Affiliates are selling products under the Reebok brand) agrees

36

that it will not distribute, market, offer for sale or sell, or authorize the distribution, marketing, offering for sale or selling of, any Non-UFC Product that (a) is identical or (prior to July 1, 2017) near identical to a Version or Style of a Licensed Product (other than Uniform Designs and In-Octagon Kits) with respect to ornamental graphics thereon (for clarity, excluding Trademarks, commonly used wording and graphics in the sports apparel industry (e.g., "property of," paint brush graphics), cut, shape and functional aspects of the garment, and color and excluding graphics first used on products created by Reebok not in connection with this Agreement or Reebok's other fighting apparel lines) but for the removal of Zuffa IP or (b) prior to July 1, 2017 displays an individual athlete's name (in whole or in part) or nickname in a vertical orientation.

## ARTICLE 10.

### Outfitting; Brand Exposure

10.1.  Kits and Other Licensed Products for Fighters, Cornermen and Senior Executives.

10.1.1.  In-Octagon Kits.  During each Fiscal Year of the Term, Reebok shall manufacture and deliver Licensed Products (including In-Octagon Kits) and other Reebok Apparel, Headwear and Footwear to Zuffa in sufficient quantities, Styles and Versions, and otherwise in accordance with the Zuffa Guidelines, for use by Fighters and Cornermen In-Octagon and at Bouts, Pre-Bout Events and Other Bout Events at no cost to such individuals or Zuffa except as provided in Section 10.1.3.  The Parties agree that the initial In-Octagon Kits will contain the following uniforms for Fighters:  (i) two colorways of representing home and away; (ii) country-specific via colorways for USA, Canada, United Kingdom and Brazil; and (iii) champions via special design or colorways.

10.1.2.  _The Ultimate Fighter_.  During each Fiscal Year of the Term, Reebok shall manufacture and deliver Licensed Products (including _The Ultimate Fighter_ Kits) and other Authorized Reebok Products Apparel and Headwear and Reebok-branded Footwear in sufficient quantities, Styles and Versions, and otherwise in accordance with the Zuffa Guidelines, for use by the participants of _The Ultimate Fighter_ television series wherever it may be filmed worldwide, subject to the provisions of Section 5.2 and 10.1.3; provided that use of Reebok Marks in connection with such television series is subject to the terms set forth in Schedule 8.4.

10.1.3.  Product Quantities.  With respect to the products provided by Reebok pursuant to Sections 10.1.1 and 10.1.2, the products will be provided to Zuffa at no cost up to the total Units (collectively for both Sections) set forth below for the applicable Fiscal Year. Any excess units will be sold to Zuffa at Reebok's cost.  In the event of a contract extension, the Parties will mutually agree on the number of Units to be provided during Fiscal Years 7 and 8.

| Fiscal Year | Apparel Headwear/Bags | Footwear | Socks/Underwear | Total Units |
|---|---|---|---|---|
| 2015 | 41,592 | 3,156 | 11,112 | 55,860 |
| 2016 | 89,550 | 6,792 | 23,952 | 120,294 |
| 2017 | 92,730 | 7,032 | 24,816 | 124,578 |
| 2018 | 95,916 | 7,272 | 25,680 | 128,868 |
| 2019 | 99,096 | 7,512 | 26,544 | 133,152 |
| 2020 | 102,276 | 7,752 | 27,408 | 137,436 |

37

10.1.4.   <u>UFC Produced Content</u>.  During each Fiscal Year of the Term, Reebok shall manufacture and deliver Licensed Products and other Authorized Reebok Products Apparel and Headwear and Reebok-branded Footwear in sufficient quantities, Styles and Versions, and otherwise in accordance with the Zuffa Guidelines, for use by Zuffa in promotional materials associated with Bouts, Pre-Bout Events and Other Bout Events (which, for the avoidance of doubt, shall be in addition to the quantities specified in Section 10.1.3).  Subject to Reebok delivering to Zuffa at the applicable arena or location reasonably in advance of the production sufficient quantities of Apparel, Footwear and Headwear, Zuffa shall use commercially reasonable efforts to cause Fighters to wear Licensed Products in substantially all planned production of official UFC media content produced by Zuffa (e.g., Fighter vignettes) or productions for which Zuffa has reasonable prior notice; provided that the foregoing obligations shall not apply to UFC media content or productions similar to Embedded or in those instances of production wherein the Fighter being filmed is not reasonably accessible to Zuffa reasonably prior to filming (e.g., filming a fighters arrival at an airport).  Reebok's failure to supply sufficient product pursuant to this Section 10.1.4 will not be a breach of this Agreement but rather will result in Reebok products not appearing in the applicable UFC produced content.

10.1.5.   <u>Apparel for *The Ultimate Fighter*</u>.  During each Fiscal Year of the Term, Reebok shall provide Zuffa with Performance Apparel and Fan Apparel bearing Reebok Marks valued at $100,000, calculated at 17.5% below the U.S. wholesale price for such products, for use by participants of *The Ultimate Fighter* television series.  The amount of Promotional Products supplied by Reebok pursuant to this Section 10.1.5 may be greater if the Parties mutually agree.

10.2.   <u>Delivery Dates</u>.  Reebok shall deliver to Zuffa the Licensed Products described in this Article 10, including In-Octagon Kits and *The Ultimate Fighter* Kits, in accordance with the delivery schedules upon which the Parties shall from time to time agree.

10.3.   <u>No Other Suppliers</u>.  During the Term, and subject to Reebok timely delivering to Zuffa the agreed upon quantities of In-Octagon Kits, Footwear or Headwear for use In-Octagon, Zuffa shall not permit any entity other than Reebok to supply In-Octagon Kits, Footwear or Headwear (excluding, for the avoidance of doubt, Gloves) to Fighters and Cornermen for use In-Octagon.

10.4.   <u>Restrictions on Competitors.</u>  During the Term, Zuffa shall use best efforts to prevent any Fighter from wearing any Apparel, Footwear or Headwear visibly bearing the Trademark of any Reebok Competitor In-Octagon and during Bouts, Pre-Bout Events and Other Bout Events, in each case, in which such Fighter is an official participant.  In the event that (a) Reebok has not timely delivered the necessary products to Zuffa prior to the applicable event, and (b) it is not reasonably practicable to cover branding on substitute third party products using commercially reasonable efforts, then Zuffa may allow a Fighter to wear an MMA-specific Competitor brand (as identified on <u>Schedule 1.1.82</u>) for such event.

10.5.   <u>Fighter and Cornermen Exposure</u>.  During the Term, and subject to Reebok timely delivering to Zuffa sufficient quantities and types of the Apparel, Headwear and Footwear set forth in the chart below and otherwise in accordance with the Zuffa Guidelines, Zuffa shall use

38

its best efforts to cause participating Fighters and Cornermen to wear Apparel, Headwear and Footwear during the events and from the categories specified in the chart below:

| | |
|---|---|
| Bouts: | Licensed Products |
| Pre-Bout Weigh-in: | Licensed Products<br>Authorized Reebok Products performance<br>Reebok-branded Footwear |
| Pre-Bout Training: | Licensed Products<br>Authorized Reebok Products performance<br>Authorized Reebok Products lifestyle<br>Reebok-branded Footwear |
| Other Bout Events: | Licensed Products<br>Authorized Reebok Products lifestyle<br>Apparel or Headwear not visibly bearing<br>the name, brand or logo of any Reebok<br>Competitor |

10.6.  <u>Outfitting Guidelines</u>.  Zuffa, in consultation with Reebok, shall develop "Outfitting Guidelines" relating to the wearing of Licensed Products by Fighters and Cornermen In-Octagon and for Bouts, Pre-Bout Events and Other Bout Events.  Such Outfitting Guidelines may not be amended without the written consent of Reebok, such consent not to be unreasonably withheld, if such amendment adversely alters Reebok's rights hereunder.  A material failure (as such a material failure is mutually agreed and defined between Reebok and Zuffa in writing) by a participating Fighter or his or her Cornermen to comply with the Outfitting Guidelines other than due to a breach by Reebok hereunder (including because the Licensed Products were not delivered or did not meet the Zuffa Guidelines) shall result in a fine of 25% of such Fighter's purse with respect to such event, which shall be payable first, to reimburse Reebok for the direct costs it incurred as a result of such non-compliance and second, to the charity Fight for Peace.

10.7.  <u>Senior Executives</u>.  Zuffa shall use reasonable best efforts to prevent any Zuffa Senior Executive at Bouts, Pre-Bout Events and Other Bout Events and during any televised interview immediately before or after any Bout from wearing any Apparel or Headwear visibly bearing the Trademark of any  Reebok Competitor.  The Zuffa Senior Executives shall not execute a promotional or sponsorship agreement with any Reebok Competitor.

10.8.  <u>Video Games</u>.  Zuffa shall use commercially reasonable efforts to cause UFC video games authorized by Zuffa during the Term to display current or retired UFC fighters in In-Octagon Kits to the extent that the designs of the In-Octagon Kits are finalized and available within the video game development parameters and timeline.  Reebok shall use commercially reasonable efforts to license the Reebok Marks used on the In-Octagon Kits from time to time to a video game company identified by Zuffa on customary and commercially reasonable terms and reasonably consistent with the terms that Reebok has agreed to historically with video game companies, including those terms set forth in  <u>Schedule 8.4</u>;  provided that Reebok shall not

39

demand, require or receive any compensation or other fees for such license.  Reebok shall keep Zuffa reasonably informed of discussions and  negotiations with video game companies with respect to a UFC-related video game.

10.9.  Exposure Opportunities.   Reebok and Zuffa shall collaborate on ways to maximize the exposure opportunities for Licensed Products during Bouts, Pre-Bout Events and Other Bout Events.

10.10.  Work Stoppage.   If (i) the UFC cancels more than 35% of the UFC Fight Events originally scheduled in any Fiscal Year solely due to a Fighter strike, management lockout or comparable work stoppage event (a "Work Stoppage") and (ii) the cancellation of such UFC Fight Events reduces the number of UFC Fight Events held by the UFC in such Fiscal Year to less than 65% of the UFC Fight Events originally scheduled in such Fiscal Year, then (A) the Global Exposure Fee payable by Reebok for such  Fiscal Year shall be equal to the Global Exposure Fee for such Fiscal Year set forth in Section 6.2 multiplied by a fraction, the numerator of which is the number of UFC Fight Events held in such Fiscal Year and the denominator of which is the number of UFC Fight Events originally scheduled in such Fiscal Year and (B) the Minimum Royalty Guarantee payable by Reebok for such Fiscal Year shall be equal to the Minimum Royalty Guarantee for such Fiscal Y ear set forth in Section 6.1.2 multiplied by a fraction, the numerator of which is the number of UFC Fight Events held in such Fiscal Year and the denominator of which is the number of the UFC Fight Events originally scheduled in such Fiscal Year.  "UFC Fight Event" means an officially sanctioned UFC event consisting of a series of Bouts.

## ARTICLE 11.

### Representations, Warranties and Covenants

11.1.  Reebok Covenants.

11.1.1.   Compliance with Applicable Law.  R eebok covenants that it shall comply, and shall use commercially reasonable efforts to cause its approved Third Party Manufacturers, Distributors, Screen Printers, a nd Sublicensees in connection with this Agreement to comply, with Applicable Law and with the adidas Gr oup Workplace Standards attached as Schedule 11.1.1.   Reebok further covenants that it shall manufacture, and shall use commercially reasonable efforts to cause all Sublicensees, Screen Printers and Third Party Manufacturers to manufacture, the Licensed Products in accordance with the Zuffa Guidelines and all Applicable Law, including the rules and regulations of the United States Department of Labor and state Departments of Labor, or equivalent foreign agencies including the Federal Fair Labor Standards Act or foreign equivalents.  Reebok shall ensure that it will not distribute, and shall use commercially reasonable efforts to cease the distribution of, Licensed Products that Reebok knows or should reasonably know were manufactured in violation of any Applicable Law.  Upon a determination by any Government Author ity that the Licensed Products have been manufactured in violation of any Applicable Law, Reebok sha ll take all reasonably necessary steps to correct such violation including, if required to do so by such Government Authority, paying all applicable back wages found due to workers who manufactured the Licensed Products or any portion thereof.

40

11.1.2.   <u>Zuffa's Reputation.</u>   Reebok covenants th at it and its executives shall not engage in any activity th at could reasonably be  expected to materially and adversely affect public respect for and trust in the reputation and integrity of Zuffa, its Affiliates, any Fighter, the UFC, professional MMA fighting, the Licens ed Marks or Fighter IP; provided, however, that nothing in this Section 11.1.2 will prevent  Reebok from including morals clauses in its sponsorship agreements with Fighters or making any truthful statements regarding any Fighter.

11.1.3.   <u>Other MMA-Related Products.</u>   Reebok c ovenants that, during the Term of this Agreement and any extensions to this Agreement, Reebok will not negotiate, enter into, or otherwise establish a relationship or agreemen t with any mixed martial arts ("<u>MMA</u>") event other than the UFC or with the talent or fighters associated with such event, other than an MMA event which consists of a single discipline or technique.  "MMA" shall be defined as unarmed combat involving the use of any single technique or combination of techniques from any of the different disciplines of the martial arts, including grappling, kicking, and striking, but not, for the avoidance of doubt, unarmed combat involving a single discipline of martial art. Any such relationship or agreement which violates this provision shall constitute material breach of this Agreement.  Except as set forth in Article 14, during the Term of this Agreement, Reebok will not approach or contract with any MMA fighters, any Person or brand affiliated with UFC without the prior written consen t of Zuffa, the consent of which shall not be unreasonably withheld.

11.1.4.   <u>Change of Control.</u>   Reebok shall use reasonable best efforts to notify Zuffa 30 days prior to, and Reebok shall notify Zuffa immediately upon, the exec ution of definitive documentation for the Change of Control of Reebok.  This section 11.1.4 shall not apply to any Change of Control in which Reebok remains a me mber of the adidas Group.  Should a change of control occur with regard to Reebok (a "<u>Reebok COC</u>") a nd at any time following such Reebok COC, Reebok no longer have access to the services previously provided to it by Sports Licensed Division of the adidas Group, LLC (SLD) in connection with this Agreement then, on the 12 month anniversary of no longer having access to the services previously provided to it by (SLD), Zuffa will have a 30 day window to make the decision to, in its sole discretion (i) reduce Reebok's SKU level with respect to event apparel and headwear in North America (exclusive of youth products) and (ii) remove Reebok's exclus ivity with respect to any category of Hot Market Fan Apparel and Fan gear headwear in North America.  Should Zuffa exercise its rights under this Section, then the Minimum Royalty Guarantee will be reduced by an amount equal to the average of the actual royalties earned during th e Term to date with respect to the affected categories.

11.1.5.   <u>Luta.</u>   From and after the date that Reebok uses LUTA, FIGHT FOR PEACE or LUTA PELA PAZ or stylized versions thereof on or in connection with a Licensed Product during the Term, Reebok shall have the right to use such mark on and in connection with such Licensed Products and in connection with the marketing and promoting such Licensed Products for the remainder of the Term.

11.1.6.   <u>Products in Reebok Advertising.</u>   Reebok shall not use or display any products in its advertising, imagery, point of sale or promotional materials featuring MMA fighters other than UFC-branded, Reebok-branded, Luta-branded or non-branded products.

41

11.2.   <u>Reebok Representations and Warranties</u>.   Reebok represents and warrants to Zuffa as follows:

11.2.1.   <u>Organization and Standing.</u>   RIL is a corporation duly or ganized, validly existing and in good standing under the laws of the jurisdiction of its organization. RIL has all requisite corporate power and authority to own and operate its properties and assets and to carry on its business as now being conducted. RIL is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character or location of the properties and assets owned or operated by it or the nature of the busine ss conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or in good standing would not reasonably be expected to have a material adverse effect on its and its subsidiaries' business, assets, condition (financial or otherwise), financial position or results of operations, taken as a whole.

11.2.2.   <u>Authorization; Enforceability</u>.   RIL has the power and authority to enter into this Agreement to which it is or will be a party, to perform its obligati ons hereunder, and to consummate the transactions contemplated hereby.   The execution and delivery of this Agreement to which it is or will be a party and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of RIL and constitutes the valid and binding obligation of RIL enforceable against RIL in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally.

11.2.3.   <u>Reebok Marks.</u>   Reebok has the right to grant Zuffa a license to use the Reebok Marks as set forth in this Agreement, including in connection with the distribution, marketing and sale of Licensed Products bearing such Reebok Marks in the applicable Authorized Distribution Channels during the Term.

11.2.4.   <u>Non-Infringement</u>.   To Reebok's knowledge and subject to Reebok's right to use a brand other than LUTA, FIGHT FOR PEACE, or LUTA PELA PAZ pursuant to Section 9.3, the use of the Authorized Brands in accordance with the terms of this Agreement does not infringe any Trademark or copyright of any third party in the Territory except to the extent that any such infringement would not reasonably be likely to materia lly adversely affect the rights granted to Zuffa in this Agreement.

11.2.5.   <u>Material Litigation</u>.   Reebok has provided to Zuffa a true and complete list of all material litigation to which it is currently a party related to the Reebok name and delta logo and the LUTA stylized name logo. With respect to the Territory, there are no material judicial or administrative actions, claims, suits, proceedings or, to Reebok's knowledge, investigations to which Reebok is a party pending or, to R eebok's knowledge, threatened, that would be reasonably likely to materially affect Reebok's performance of its obligations or Zuffa's rights, in each case, under this Agreement.

11.2.6.   <u>No Conflicts</u>.   The execution, delivery and performance of this Agreement by Reebok and the consummation of the transactions contemplated hereby does not and will not (i) violate or conflict with the C onstitutive Documents of Reebok, (ii) violate in any material respect any Legal Requirement applicable to Reebok or to which any of its assets or properties

42

CONFIDENTIAL                                                                          ZFL-2490150

are subject that would be reasona bly likely to materi ally affect Reebok's performance of its obligations or Zuffa's rights, in each case, under this Agreement, or (iii) result in any breach of or default (or give rise to any right of termination, cancellation or acceleration) under or conflict with, any of the terms, conditions or provisions of any material note, bond, mortgage, indenture, warrant or other similar instrument or any material license, permit, agreement or other material obligation to which Reebok is a party or by which Reebok or any of its properties or assets may be bound.

    11.3.   <u>Zuffa's Covenants</u>.

    11.3.1.   <u>Compliance with Applicable Law</u>.  Zuffa covenants that it shall comply with Applicable Law in the conduct of Events.

    11.3.2.   <u>Reebok's Reputation.</u>  Zuffa covenants th at it and its executives shall not engage in any activity th at could reasonably be  expected to materially and adversely affect public respect for and trust in the reputation and integrity of Reebok, its Affiliates, the Licensed Products or the Authorized Brands.  In connecti on with the initial rollout of the first Reebok branded In-Octagon Kits under this Agreement,  the Parties will cooperate in good faith to mitigate any disparaging statements made by Fighters against Reebok, its Affiliates, the Licensed Products or the Authorized Brands.   After the initial rollout, Zuffa will use commercially reasonable efforts to prevent, st op, and, as appropriate under UFC's rules and agreements with Fighters, discipline Fighters to the extent that Zuffa has the contractual rights under then-existing contracts to do so, who enga ge in any activity that could reasonably be expected to directly, materially and adversely affect public respect for and trust in the reputation and integrity of Reebok, its Affiliates, the Licensed Products, or the Authorized Brands; and in any event such efforts will be at least the same level of effort employed by Zuffa to protect against similar actions which cause damage to the reputation of Zuffa and the Licensed Marks (except, for clarity, to the extent that Zuffa has greater contractual rights to protect against such damage).  For clarity, nothing in this Sec tion 11.3.2 will require Zuffa to amend existing contracts or enter into new contracts with Fighters but Zuffa will use commercially reasonable efforts to amend the UFC Code of Conduct (as  defined below) to provi de that remarks by Fighters specifically about Reebok that undermine or put at risk the integrity and reputation of Reebok are misconduct under such UFC Code of Conduct.

    11.3.3.   <u>Change of Control</u>.  Zuffa shall use reasonable best efforts to notify Reebok 30 days prior to, and Zuffa shall notify Reebok immediately upon, the execution of definitive documentation for the Change of Control of Zuffa.

    11.4.   <u>Zuffa's Representations and Warranties</u>.  Zuffa represents and warrants to Reebok as follows:

    11.4.1.   <u>Organization and Standing</u>.  Zuffa is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada.  Zuffa has all requisite corporate power and authority to own and operate its properties and assets and to carry on its business as now being conducted.

43

11.4.2.    <u>Authorization</u>.    Zuffa has the power and authority to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.   The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (i) have been duly authorized by all necessary limited liability company action on the part of Zuffa and (ii) constitutes the valid and binding obligation of Zuffa enforceable against them in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally.

11.4.3.    <u>Zuffa IP</u>.   Zuffa has the right to grant Reebok a license to use the Licensed Marks in accordance with the terms and conditions of this Agreement, including in connection with the manufacture, distribution, marketing and sale of Licensed Products bearing such Licensed Marks in the Authorized Distribution Channels during the Term.

11.4.4.    <u>No Previous Grants</u>.   Except as set forth on <u>Schedule 5.1</u> (Zuffa Third Party License Agreements), or as permitted by <u>Section 5.1</u>, Zuffa has not granted any third party any rights described in paragraphs (A), (B), (C) or (D) of <u>Section 5.1</u>.

11.4.5.    <u>No Infringement</u>.   To Zuffa's knowledge, the use of the Licensed Marks in accordance with the terms of this Agreement does not infringe any Trademark or copyright of any third party in the Key Territories, except to the extent that any such infringement would not reasonably be likely to materially adversely affect the rights granted to Reebok in this Agreement.

11.4.6.    <u>Material Litigation</u>.   With respect to the Territory, Zuffa has provided to Reebok a true and complete list of all material litigation to which it is a party related to the Licensed Marks.   With respect to the Territory, Zuffa has provided to Reebok a true and complete list of all material judicial or administrative actions, claims, suits, proceedings or, to Zuffa's knowledge, investigations to which Zuffa is a party pending or, to Zuffa's knowledge, threatened, that would be reasonably likely to materially affect the license of the Licensed Marks to Reebok under this Agreement.

11.4.7.    <u>No Conflicts</u>.   Subject to the disclosures made herein, the execution, delivery and performance of this Agreement by Zuffa and the consummation of the transactions contemplated hereby and thereby does not and will not (i) violate or conflict with the Constitutive Documents of Zuffa, (ii) violate in any material respect any Legal Requirement applicable or relating to Zuffa or to which any of its assets or properties are subject that would be reasonably likely to materially affect Reebok's performance of its obligations under this Agreement, or (iii) result in any material breach of or material default (or give rise to any right of termination, cancellation or acceleration) under or conflict with, any of the terms, conditions or provisions of any material note, bond, mortgage, indenture, warrant or other similar instrument or any material license, permit, agreement or other material obligation which Zuffa is a party or by which Zuffa or its properties or assets may be bound.

44

## ARTICLE 12.

### Code of Conduct

12.1.   UFC Code of Conduct.  If (a) a Fighter commits a material violation of the "UFC Code of Conduct" set forth on  Schedule 12.1 (UFC Code of C onduct), as the same may be amended from time to time in accordance with Section 12.2, (b) such violation has or is reasonably expected to have a material adverse impact on the Reebok brand, and (c) Zuffa fails to enforce the UFC Code of C onduct with respect to such violation after (1) a reasonable investigation of such violation by Zuffa or (2) a final sentencing order, if any, is entered by the applicable court of jurisdiction with respect to such violation, and such failure is not cured within 10 days after notice by Reebok to Zuffa of such failure, then:

(i)      senior executives from each of the Parties will discuss in good faith an appropriate remedy for a period of 7 days (or such other time as the Parties may agree in writing; such period, the "Negotiation Period"); and

(ii)     if the Parties have not agreed on a remedy on or prior to the end of the Negotiation Period, then Reebok's exclusive remedy will be to terminate this Agreement immediately upon notice to Zuffa.

Notwithstanding anything in this Agreement to the contrary, if Zuffa terminates the Fighter that committed the material violation of the UFC Code of Conduct prior to the end of the Negotiation Period, then Reebok shall not have any right to terminate this Agreement with respect to such violation.

12.2.   Changes to Code of Conduct.  Zuffa may amend the UFC Code of Conduct from time to time at any time during the Term; provided, that Zuffa shall consult with Reebok in good faith prior to any such amendment that materially affects Reebok's In-Octagon and retail branding rights set forth in Article 9 or Article 10.

12.3.   Public Statements.  Nothing in this Agreement shall prevent Reebok from, at any time, making public statements regarding a violation of the Code of Conduct, provided that such statements are similar in character to the following: "We trust our partner, the UFC, to conduct a thorough investigation and we are awaiting the resu lts of that investigation before taking any further action or making further comment."

## ARTICLE 13.

### Third Party Relationships

13.1.   No Assumption, Assignment, or Transfer.     Except as otherwise expressly provided herein, neither Party shall assume (including assumption under Bankruptcy Code section 365), assign, transfer, convey or sublicense (except in accordance with Section 13.2) any of its rights under this Agreement to any Person without the other Party's prior written consent. For purposes of this Section 13.1, an assignment, transfer or conveyance of this Agreement or any rights granted to a Party hereunder shall be defined to include the applicable Party's

45

commencement, participation or agreement to commence or participate in any bankruptcy, voluntary liquidation, dissolution, winding up, examinership, insolvency or similar proceedings. Notwithstanding anything to the contrary and subject to the notice requirements provided herein, a Change of Control of either Party does not require the consent of the other Party and will not be deemed a breach of this Section 13.1.

13.2.   <u>Screen Printers, Distributors, Third Party Manufacturers and Sublicensees</u>. Reebok may delegate its obligatio ns and sublicense its rights he reunder to any Affiliate of Reebok, including Mitchell & Ness, a division of Sports Licensed Division of the adidas Group, LLC, but may only sublicense any if its rights he reunder to a third-party licensee with Zuffa's prior written consent.  Reebok shall remain primarily obligated to Zuffa under this Agreement notwithstanding Reebok's use of an Affiliate, Screen Printer, Distributor, Third Party Manufacturer or Sublicensee, and Reebok shall ensu re that any Affiliate or third-party Screen Printer, Distributor, Third Party Manufacturer or Sublicensee complies with all applicable terms and conditions of this Agreement.  Reebok shall cause any Affiliate or third party Screen Printer, Distributor, Third Party Manufacturer or Sublicensee to cease promptly any conduct that would be a breach of this Agreement if Reebok engaged in such conduct.  Zuffa or its nominee shall be entitled at any time on reasonable notice to Reebok to enter, during regular business hours, any premises used by the Reebok or its manufacturers for the manufacture, packaging or storage of the Licensed Products, to inspect such premises, all plant, workforce and machinery used for manufacture, packaging or storage of Licensed Products and all other aspects of the manufacture, packaging and storage of Licensed Products; <u>provided</u> that if the premises are owned by a third party, Reebok shall use best efforts to arrange such access for Zuffa.  Zuffa may delegate its obligations and sublicense its ri ghts hereunder to any Affiliate of Zuffa.  Zuffa shall remain primarily obligated to Reebok under this Agreement notwithstanding Zuffa's use of an Affiliate, and Zuffa shall ensure that any Affiliate complies with all applicable terms and conditions of this Agreement. Zuffa shall cause any Affiliate to cease promptly any conduct that would be a breach of this Agreement if Zuffa engaged in such conduct.

## ARTICLE 14.

### Sponsorships

14.1.   <u>Sponsorships</u>.   Each Fiscal Year during the Term, Reebok shall sponsor a minimum of 10 Fighters.  Reebok and Zuffa will mutually agree on the strategy for such sponsorships, including the timing and announcement of such signings.   In addition, Reebok shall be free to use Luke Dowdney as an ambassador for and promoter of the LUTA/Reebok/UFC relationship and the Licensed Products.

## ARTICLE 15.

### Protection of Rights

15.1.   <u>Zuffa Ownership.</u>   Reebok acknowledges that, as between Zuffa and Reebok, subject to the licenses granted herein, Zuffa exclusively owns all rights, title and interests in and to the Zuffa IP worldwide, together with all Trademark, copyrights, rights of publicity, design rights, moral rights and other intellectual property and proprietary rights therein and thereto and

46

ZFL-2490154

all goodwill symbolized by or associated therewith.  Reebok acknowledges that all use of, and all goodwill symbolized by or associated with the use of, the Zuffa IP is for Zuffa's benefit and Reebok shall not acquire any rights in any of the foregoing by such use.  During the Term, Reebok shall not attack the Trademarks, copyrights and other intellectual property and proprietary rights of Zuffa in and to the Zuffa IP or otherwise challenge Zuffa's exclusive rights in or ownership of, or Zuffa's right to use or authorize others to use, the Zuffa IP, in all forms and media, now known or hereafter developed, other than with respect to a breach or alleged breach by Zuffa of its exclusivity obligations hereunder.  Reebok has no right to use the Zuffa IP except as expressly provided herein.  After the Term, Reebok shall not attack the Trademarks, copyrights, design rights and other intellectual property and proprietary rights of Zuffa in and to the Uniform Designs, Octagon Crest, or Typography, or otherwise challenge Zuffa's exclusive rights in or ownership of, or Zuffa's right to use or authorize others to use, the Uniform Designs, Octagon Crest, or Typography, in all forms and media, now known or hereafter developed. Reebok has no right to use the Zuffa IP except as expressly provided herein.

15.2.  <u>Assignment of Rights in the Zuffa IP</u>.  Reebok hereby acknowledges and agrees that all items included in the Zuffa IP that Reebok creates (or causes to be created) in whole or in part ("<u>Zuffa Created Works</u>") shall be deemed  works made for hire as defined in the U.S. copyright laws.  To the extent any such Zuffa Created Works does not qualify as a work made for hire or any intellectual property and proprietary rights therein or thereto does not automatically vest in Zuffa by operation of law or otherwise, or any Zuffa IP is otherwise deemed owned by Reebok or a third party commissioned by Reebok to create such work, Reebok agrees to assign, and hereby irrevocably assigns and transfers, and shall use its best efforts to cause the third party that it commissioned to create such work to assign and transfer, to Zuffa all worldwide rights, title and interests, including all Trademark, copyrights, rights of publicity, design rights, moral rights and other intellectual property rights, that it or such third party may hold in and to the Zuffa Created Works and the Zuffa IP (or any portion thereof) along with the goodwill associated therewith and in and to any Trademark, copyright, or other intellectual property registrations or registration applications therefor.  At the request of Zuffa and at Zuffa's expense, Reebok shall execute all documents, including any confirmatory assignments and powers of attorney, in form and substance satisfactory to Zuffa, and take all other actions, as Zuffa may reasonably request, to perfect, confirm and record Zuffa's (or, as applicable, Zuffa's licensor's) rights in and to the Zuffa IP, including in and to all copyright, Trademark and other intellectual property and proprietary rights therein and thereto.

15.3.  <u>Display of Certain Trademarks and Other Materials</u>.  Unless otherwise expressly provided herein, Reebok shall only display or use the Licensed Marks, Fighter IP and any other Trademarks included in the Zuffa IP in the form and manner that Zuffa has specifically approved in writing.  At Zuffa's reasonable direction, Reebok shall cause the following to be irremovably and legibly printed or affixed in a clearly visible location approved by Zuffa on, to the extent practicable, all Promotional Materials and product tags, hang tags and packaging: (i) trademark and copyright notices and markings as directed and specified by Zuffa; (ii) an Approved Security Authentication Device (and Zuffa will not remove such Approved Security Authentication Device in connection with Zuffa's sale of Licensed Products as authorized hereunder); and (iii) all other notices and identifying materials as the Parties mutually agreed upon.  Notwithstanding the foregoing, (a) if Reebok does not include a trademark or copyright notice with respect to Reebok intellectual property incorporated in Promotional Materials or product tags, hang tags or

47

packaging because it is not reasonably practi cable to do so (e.g. due to space constraints or aesthetic considerations), then Reebok is not required to include a notice for Zuffa intellectual property on that particular product tag, hang tag, packaging or that particular Promotional Material; and (b) Reebok will not be required to produce multiple versions of trademark and copyright notices for materials used in more than one jurisdiction (i.e., the TM symbol will be used if the applicable Licensed Mark is not registered in all relevant jurisdictions).

15.4.   Use of Trademarks.  Reebok shall not use any trademark or copyright notices on the Licensed Products or in Promotional Materials that conflict with, negate or cause confusion with any notices required under this Article 15.  Reebok shall not use any of the Licensed Marks, the Fighter IP or any other Zuffa IP on any business sign or business card, or as part of the name of Reebok's business, except as authorized by Zuffa in writing prior to such usage.

15.5.   Trademark and Copyright Registration for Zuffa IP.  As between Reebok and Zuffa, Zuffa shall have the sole right to secure Trademark and/or copyright and/or other intellectual property registrations both in the United States and abroad for the Licensed Marks, the Fighter IP, and any other item included in the Zuffa IP.  Upon Zuffa's request, in addition to any other quantity of Licensed Products that Reebok shall furnish to Zuffa under this Agreement, Reebok shall deliver to Zuffa, at Zuffa's expense, a reasonable number of Units of each Licensed Product and/or of any other specimens of use  for such registration  purposes; provided, that Reebok shall not owe any Royalty  for such Units of Licensed Products.  At Zuffa's request, Reebok shall provide Zuffa with the dates of first use of each Licensed Product bearing any of the Licensed Marks, the Fighter IP or any other  Trademarks included in the Zuffa IP in U.S. interstate, U.S. intrastate and foreign commer ce and such other information regarding use as Zuffa may reasonably request in connection with the registration of such Trademarks and the maintenance of any resulting registrations thereof.

15.6.   Reebok's Assistance in Trademark Protection.  Reebok shall cooperate with, and shall use commercially reasonable efforts to assist, Zuffa, at Zuffa's expense, in the registration, procurement, enforcement, defense, protection, and maintenance of Zuffa's rights in and to the Licensed Marks, the Fighter IP and any other Trademarks included in the Zuffa IP with respect to Licensed Products.  Reebok's assistance shall include (i) allowing Zuffa reasonable access to Reebok's files and documents and to Reebok's personnel who may have possession of relevant information, to the extent not protected by atto rney/client privilege or otherwise subject to confidentiality obligations; and (ii) promptly making available to Zuffa, as commercially reasonable, all information in its possession or control that it is aware would assist Zuffa in any such action, claim or suit, to the extent such information is not protected by attorney/client privilege or otherwise subject  to confidentiality obligations.  During the Term, Reebok shall promptly notify Zuffa in writing of any infringement, imitations, or unauthorized use of the Zuffa IP by others as applicab le to Licensed Products (collect ively, "Infringement Claims"); provided that Zuffa shall have the first right, in its discretion, to bring any enforcement actions with respect to the Zuffa IP.  Reebok shall not institute any suit or take any action on account of an Infringement Claim unless it receives Zuffa's prior written consent; provided that Zuffa shall not unreasonably withhold its consent if the alleged third party infringer is a Reebok Competitor and Zuffa has not taken action within a reasonable period of time after having knowledge of such Infringement Claim.  If Zuffa consents to Reebok initiating any such suit or action, Zuffa will provide reasonable assistance, at Reebok's expense, and Reebok shall provide Zuffa with

48

reasonable advance notice of its proposed strategy with respect to such suit or action (including any proposal for settlement, compromise or stipulation), Zuffa shall have the right to review and provide comments with respect to such proposed strategy, and Reebok shall reasonably implement Zuffa's comments with respect thereto. If Reebok initiates any such suit or action, Reebok shall obtain Zuffa's approval before entering into any compromise, settlement, or stipulation with any third party, which approval shall not be unreasonably withheld. In no event shall Reebok take any position or submit any arguments or enter into any compromise, settlement, or stipulation in connection with any such suit or action that would reasonably be expected to in any way lessen, impair or undermine the Zuffa IP for any products, or Zuffa's rights therein. Zuffa shall receive the full amount of any settlement made or damages awarded in connection with any action taken with respect to an Infringement Claim, except that Reebok shall receive such amount in any action taken at Reebok's expense. For the avoidance of doubt, subject to Article 16, as applicable, nothing in this Agreement will prevent Reebok from bringing suit or other enforcement actions against third parties, and (subject to Sections 16.1 and 16.3) defending third party claims, solely with respect to the Reebok IP, without notice to or consent from Zuffa and, subject to Article 16, nothing in this Agreement will prevent Zuffa from bringing suit or other enforcement actions against third parties, and (subject to Section 16.2 and 16.3) defending third party claims, solely with respect to the Zuffa IP, without notice to or consent from Reebok.

15.7. <u>Reebok Ownership</u>. Zuffa acknowledges that, as between Zuffa and Reebok, subject to the licenses granted herein, Reebok exclusively owns all rights, title and interests in and to the Reebok IP worldwide, together with all Trademark, copyrights, rights of publicity, design rights, moral rights and other intellectual property and proprietary rights therein and thereto and all goodwill symbolized by or associated therewith. Zuffa acknowledges that all use of and all goodwill symbolized or associated with the use of, the Reebok IP is for Reebok's benefit and Zuffa shall not acquire any rights in any of the foregoing by such use. During the Term, Zuffa shall not attack the Trademarks, copyrights and other intellectual property and proprietary rights of Reebok in and to the Reebok IP or otherwise challenge Reebok's exclusive rights in or ownership of, or Reebok's right to use or authorize others to use, the Reebok IP, in all forms and media, now known or hereafter developed. Zuffa has no right to use the Reebok IP except as expressly provided herein. During the Term, Zuffa shall promptly notify Reebok in writing of any infringement, imitations, or unauthorized use of the Reebok Marks by others as applicable to Licensed Products; provided that Reebok shall have the sole right, in its discretion, to bring any enforcement actions with respect to the Reebok IP.

15.8. <u>Assignment of Rights in the Reebok IP</u>. Zuffa hereby acknowledges and agrees that all items included in the Reebok IP that Zuffa creates (or causes to be created) in whole or in part ("<u>Reebok Created Works</u>") shall be deemed works made for hire as defined in the U.S. copyright laws. To the extent any such Reebok Created Works does not qualify as a work made for hire or any intellectual property and proprietary rights therein and thereto does not automatically vest in Reebok by operation of law or otherwise, or any Reebok IP is otherwise deemed owned by Zuffa or a third party commissioned by Zuffa to create such work, Zuffa agrees to assign, and hereby irrevocably assigns and transfers, and shall use its best efforts to cause the third party that it commissioned to create such work to assign and transfer, to Reebok all worldwide rights, title and interests, including all Trademark, copyrights, rights of publicity, design rights, moral rights and other intellectual property rights, that it or such third party may

49

hold in and to the Reebok Created Works and the Reebok IP (or any portion thereof) along with the goodwill associated therewith and any Trademark, copyright, or other intellectual property registrations or registration applications therefor.  At the reasonable request of Reebok and at Reebok's expense, Zuffa shall execute all documents, including any confirmatory assignments and powers of attorney, in form and substance satisfactory to Reebok, and take all other actions, as Reebok may reasonably request, to perfect, confirm and record Reebok's (or, as applicable, Reebok's licensor's) rights in and to the Reebok IP, including in and to all copyright, Trademark and other intellectual property and proprietary rights therein and thereto.

15.9.   Reebok Trademark Clearance and Registration.  Reebok shall be responsible for all expenses related to the clearance of Reebok Marks.  As between Reebok and Zuffa, Reebok shall have the sole right to secure Trademark and/or copyright and/or other intellectual property registrations both in the United States and abroad for any item included in the Reebok IP.

15.10.  Use of Similar Marks.  Reebok shall not use any Trademark in a manner that infringes, dilutes or otherwise violates Zuffa's rights in the Zuffa IP or any portion thereof under the U.S. trademark law (15 U.S.C. Chapter 22, §1051 et. seq.) or foreign trademark law.  Zuffa shall not use any Trademark in a manner that infringes, dilutes or otherwise violates Reebok's rights in the Reebok IP or any portion thereof under the U.S. trademark law (15 U.S.C. Chapter 22, §1051 et. seq.) or foreign trademark law.

15.11.  Non-Protectable Elements.  The Parties acknowledge and agree that, given the nature of the Licensed Products, the Promotional Materials and the other products and services created, designed, manufactured or shared under this Agreement, there are likely to be some elements of products and materials designed, manufactured and/or created under the terms of this Agreement and/or shared pursuant to this Agreement that are in the public domain or that are otherwise not afforded or capable of being afforded any intellectual property protection under applicable law.  Except with respect to the Last Uniform Design (defined below), neither Party shall use the rights acknowledged or granted under this Article 15 to prevent the other Party from making use of any such non-protectable elements, either during or after the Term of this Agreement, and none of the rights acknowledged or granted under this Article 15 and none of the defined terms under this Agreement shall be read, as between the Parties, as giving one Party protectable or exclusive ownership rights, over the other Party, in any such public domain or non-protectable elements.  Without limiting the foregoing, nothing in this Agreement prevents Reebok from using the words *fight*, *fighter*, or *fighting* in connection with Reebok products and services separate from the Licensed Marks.  Notwithstanding the foregoing, the Parties agree that this Section 15.11 will not apply to public domain or non-protectable elements included in the Uniform Design used In-Octagon during the last Fiscal Year of the Term (the "Last Uniform Design"), which shall be deemed, as between Reebok and Zuffa, as protectable elements, subject to intellectual property protection, and owned exclusively by Zuffa; provided that even with respect to the Last Uniform Design, nothing will prevent Reebok from using general design concepts (such as, by way of example, a color or the concept of asymmetry generally).

CONFIDENTIAL                                                      ZFL-2490158

## ARTICLE 16.

### Indemnification and Insurance

16.1.   _Indemnification by Reebok_.   During the Term and thereafter Reebok (in its capacity as an indemnifying party, an "_Indemnifying Party_") shall be solely responsible for, defend, indemnify and hold harmless Zuffa, its Affiliates and their respective officers, directors, agents and employees (each in its capacity as an indemnified party, an "_Indemnified Party_") from and against any claims, demands, causes of action, damages, liabilities, losses, costs and expenses including expert witness fees and reasonable attorneys' fees and expenses, judgments, and settlements ("_Losses_") incurred by such Indemnified Party arising out of or pertaining to (a) claims by third parties against Zuffa based on Reebok's (including by any Affiliate, Screen Printer, Distributor, Third Party Manufacturer or Sublicensee of Reebok) manufacture, offer for sale, sale, marketing, distribution, advertising or promotion of the Licensed Products including actions founded on product liability or infringement of any third party Trademark, copyright, right of publicity or other intellectual property rights to the extent not covered by Zuffa's indemnity obligations set forth below, (b) claims by third parties against Zuffa for infringement or alleged infringement of any third party Trademark, copyright, right of publicity or other intellectual property rights arising out of Zuffa's licensed use of the Reebok IP in accordance with this Agreement or Zuffa's use of the Uniform Designs and Typography during the Term, but excluding claims arising out of Zuffa's use of substantially similar or confusingly similar versions of the Top 10 Graphics after the Term; or (c) Reebok's breach or alleged breach of any of its representations, warranties, covenants or obligations owed to Zuffa contained in this Agreement, except to the extent the cause of such breach constitutes a Force Majeure Condition and except for those Losses which Zuffa has an obligation to indemnify any Reebok Indemnified Party pursuant to Section 16.2, as to which Losses each Party shall indemnify each Reebok Indemnified Party and each Zuffa Indemnified Party, as applicable, to the extent of its respective liability for such Losses relative to the other Party.

16.2.   _Indemnification by Zuffa_.   During the Term and thereafter Zuffa (in its capacity as an indemnifying party, an "_Indemnifying Party_") shall be solely responsible for, defend, indemnify and hold harmless Reebok, its Affiliates and their respective officers, directors, agents and employees (each in its capacity as an indemnified party, an "_Indemnified Party_") from and against any Losses incurred by such Indemnified Party arising out of or pertaining to (a) claims by third parties against Reebok challenging Zuffa's rights in the Licensed Marks or its ability to enter into this Agreement, (b) claims by third parties against Reebok for infringement or alleged infringement of any third party Trademark, copyright, right of publicity or other intellectual property rights arising out of (i) Reebok's licensed use of Zuffa IP in accordance with this Agreement, but excluding claims arising out of Reebok's use of the Uniform Designs, Typography, and Octagon Crest during the Term and Reebok's use of substantially similar or confusingly similar versions of the Uniform Designs after the Term; or (ii) Reebok's use of third party Trademarks or Trademarks of Zuffa Affiliates during the Term pursuant to Section 9.1 of this Agreement, or (c) Zuffa's breach or alleged breach of any of its representations, warranties, covenants or obligations owed to Reebok contained in this Agreement, except to the extent the cause of such breach constitutes a Force Majeure Condition; and except for those Losses which Reebok has an obligation to indemnify any Zuffa Indemnified Party pursuant to Section 16.1, as to which Losses each Party shall indemnify each Reebok Indemnified Party and each Zuffa

51

Indemnified Party, as applicable, to the extent of its respective liability for such Losses relative to the other Party.

16.3.   Matters Involving Third Parties.

16.3.1.   If any third party shall notify any Indemnified Party with respect to any matter (a "Third Party Claim") which may give rise to a claim for indemnification against any Indemnifying Party under this Article 17, then the Indemnified Party shall promptly notify each Indemnifying Party thereof in writing; provided, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless, and then solely to the extent, the Indemnifying Party thereby is prejudiced.

16.3.2.   Any Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (a) the Indemnifying Party notifies the Indemnified Party in writing within 15 days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (b) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief, (c) settlement of, or an adverse judgment with respect to, the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice adverse to the continuing business interests of the Indemnified Party, (d) the Third Party Claim does not involve any antitrust or intellectual property matter or any matters which could reasonably be expected to have an adverse effect on the reputation of Zuffa, Reebok or their Affiliates and (e) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently.

16.3.3.   (a) The Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (b) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party, which consent shall not unreasonably be withheld, and (c) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim unless written agreement is obtained releasing the Indemnified Party from all liability thereunder.

16.4.   Reebok Insurance Coverage.   During each Fiscal Year of the Term, Reebok shall obtain and maintain at its own expense, from a licensed and admitted insurance carrier with a rating not less than A from Best, product liability, commercial general, umbrella, and/or excess liability insurance policy that provides general coverage of $10,000,000 for each occurrence and $10,000,000 in the aggregate, which shall provide protection against claims, demands and causes of action arising out of bodily injury and property damage, any form of defamation or other tort related to disparagement; infringement of copyright, trademark, trade dress, trade name, slogan, service mark or service name; any infringement or interference with rights of privacy, of the Licensed Products or any material used in connection therewith or any use thereof.  Reebok shall ensure that each such policy: (i) lists Zuffa, LLC and its subsidiaries, affiliated entities, and their respective directors, members, managers, officers, shareholders, employees, contractors and

52

agents as an additional insured; (ii) is primary and non-contributory with any coverage in place in favor of Zuffa; and (iii) provides that such policy cannot be canceled without at least 30 days written notice to Zuffa. Reebok shall submit to Zu ffa the fully paid polic ies or certificates of insurance by no later than the execution of this Agreement, and prior to expiration each coverage term thereafter.  Compliance with this Section 16.4 shall not relieve Reebok of its other obligations under this Article.

16.5.   Zuffa Insurance Coverage.   During each Fi scal Year of the Term, Zuffa shall obtain and maintain at its own expense, from a licensed and admitted insurance carrier with a rating not less than A from Best, Errors and Om issions insurance that provides coverage of $10,000,000 arising out of each occurrence and $10,000,000 in the aggregate, which shall provide protection against claims, demands and causes of action arising out of any form of defamation or other tort related to disparagement; infringement of copyright, trademark, trade dress, trade name, slogan, service mark or servi ce name; any infringement or interference with rights of privacy, of the Licensed Products or any material used in connection therewith or any use thereof.  Zuffa shall ensure that such policy: (i) lists Reebok as an additional insured; (ii) is primary and non-contributory with any coverage in place in favor of the other Party; and (iii) provides that such policy cannot be canceled without at least 30 days written notice. Zuffa shall submit to Reebok the fully paid policies or certificates of insurance by no later than the execution of this Agreement, and prior to expiration each coverage term thereafter. Compliance with this Section 16.5 shall not relieve Zuffa of its other obligations under this Article.

## ARTICLE 17.

### Termination and Renewal

17.1.   Zuffa Termination. Without prejudice to a ny other rights it may have in law, equity or otherwise, Zuffa shall have the right to immediately termin ate this Agreement upon written notice to Reebok at any time if:

(A)     Reebok fails to obtain Zuffa's written approval prior to attempting to assign this Agreement and fails to correct such default within 30 days of notice of such default.

(B)     Reebok fails to make any payment or deliver any statement required under this Agreement and fails to correct such default within 30 days of written notice of such default.

(C)     Reebok fails to make timely payment of Royalties for three consecutive fiscal quarters.

(D)     Reebok materially breaches any of the provisions of this Agreement relating to the unauthorized asserti on of rights in the Zu ffa IP and fails to correct such breach within 30 days of notice of such breach.

(E)     Reebok or its respective officers or executives directly disparages Zuffa or its Affiliates and repeats such disparaging statements after receiving written notice from Zuffa that Zuffa reasonably cons idered the statements described in such

53

notice to be disparaging as determined by Zuffa in its sole, but reasonable, discretion, and fails to correct such actions within 30 days after receipt of written notice from Zuffa of Zuffa's exercise of its rights under this Section 17.1(E).

        (F)    Reebok knowingly reports materially incorrect or false manufacturing, sales or financial information.

        (G)    Reebok fails to comply with any other material term or condition of this Agreement or breaches any representation or warranty in this Agreement and fails to correct such default or breach within 30 days of written notice of such default or breach.

        (H)    Reebok files a petition in bankruptcy or is adjudicated a bankrupt or insolvent, or makes an assignment for th e benefit of creditors, or an arrangement pursuant to any bankruptcy law, or if Reebok discontinues its business or a receiver is appointed for the Reebok business and such receiver is not discharged within 30 days.

Notwithstanding the cure periods specified above, such cure pe riods shall not apply to any violation or default that is non-curable, or to a material violation or material default if substantially the same material violation has occurred twice or more in the past. Upon the occurrence of any event specified in this Section 17.1, Zuffa shall have the right in its sole discretion to terminate the license granted hereunder on a Licensed Product-by-Licensed Product or country-by-country basis, upon written notice thereof to Reebok. Any partial termination under this Section 17.1 shall not affect Reebok's obligation through the end of the Term to pay Zuffa the Minimum Royalty Guarantee.

    17.2.   <u>Reebok Termination.</u> Without prejudice to an y other rights it may have in law, equity or otherwise, Reebok shall have the right to immediately terminate this Agreement upon written notice to Zuffa at any time if:

        (A)    Zuffa fails to comply with any ma terial term or condition of this Agreement or breaches any representation or warranty in this Agreement and fails to correct such default or breach within 30 days of receiving written notice of such default or breach from Reebok.

        (B)    Zuffa materially breaches any of the provisions of this Agreement relating to the unauthorized assertion of rights in the Reebok IP and fails to correct such breach within 30 days of notice of such breach.

        (C)    Zuffa fails to obtain Reebok's written approval prior to attempting to assign this Agreement and fails to correct such default within 30 days of notice of such default.

        (D)    Zuffa or its respective officers or executives directly disparages Reebok or its Affiliates and repeats such disp araging statements after receiving written notice from Reebok that Reebok reasonably cons idered the statements described in such notice to be disparaging as determined by R eebok in its sole, but reasonable, discretion,

54

        

and fails to correct such actions within 30 days after receipt of written notice from Reebok of Reebok's exercise of its rights under this Section 17.2(D).

Notwithstanding the cure periods specified above, such cure pe riods shall not apply to any violation or default that is non-curable, or to a material violation or material default if substantially the same material violation has occurred twice or more in the past.

      17.3.   <u>Additional Zuffa Termination</u>. Without prejudice to any other rights it may have in law, equity or otherwise, Zuffa shall have the right to terminate the license granted by this Agreement with respect to a particular Licensed Mark or a particular item o f Zuffa IP or with respect to a specific Licensed Product, in each case, on a country-by-country basis if Zuffa determines in its reasonable business judgment upon advice of counsel that such use in accordance with this Agreement could reasonably be expected to infringe the Trademark, copyright, right of publicity, or other intellectual property or proprietary rights of a third party; provided that, in the event of such termination, the Minimum Royalty Guarantee will be adjusted accordingly, provided further that any use or sales after the termination of rights by Zuffa in such country in accordance with this Section, other than with respect to Reebok's obligation to fulfill non-cancellable orders or for uses by third parties authorized to do so (and permitted hereunder) prior to termination by Zuffa, in each case, for 30 days after any such termination by Zuffa so long as Reebok is using best efforts (and in any event the same efforts as if Reebok's intellectual property was infringing a third party's intellectual property) to mitigate any infringement in connection therewith, will be at Reebok's risk and not covere d by Zuffa's indemnification obligations hereunder.  Reebok shall promptly notify any third party authorized to use the applicable Zuffa IP of Zuffa's termination and e ither request or, if cont ractually able to do so, require that such third party cease such usage.  Without prejudice to any other rights it may have in law, equity or otherwise, Reebok shall have the right to terminate the licenses granted to Zuffa by this Agreement with respect to a particular Reebok Mark or a particular item of Reebok IP or with respect to a Licensed Product, on a country- by-country basis if Reebok determines in its reasonable business judgment upon advice of counsel that such use could reasonably be expected to infringe the Trademark, copyright, right of publicity, or other intellectual property or proprietary rights of a third party, provided that notwithstanding the foregoing, this section shall not prohibit Zuffa from using In-Octagon Kits in any country in the Territory (and Zuffa may remove the Reebok IP from the In-Octagon Kits in any such country), provided further that use of the In-Octagon Kits in a country after the termination of rights by Reebok in such country in accordance with this Section will be at Zuffa's risk and not covered by Reebok's indemnification obligations hereunder.

**ARTICLE 18.**

**<u>Effect of Expiration or Termination of Agreement</u>**

      18.1.   <u>Inventory List</u>.  Not less than 30 days prior to the expiration of the Term or within 60 days after termination of this Agreement or, if earlier, within 60 days upon providing written notice of termination to Zuffa, Reebok shall provide Zuffa with a statement showing the number of Units and description of such Units for each Style and Version of each Licensed Product on hand or in process in Reebok's inventory.

55

ZFL-2490163

18.2.   Reversion of Rights and Sell-Off Period.   After expiration of the Term or termination of this Agreement for whatever reason, except as otherwise provided herein, (a) all rights granted to Reebok under this Agreement shall revert to Zuffa and all rights granted to Zuffa under this Agreement shall revert to Reebok, (b) Reebok shall immediately cease and desist from any further creation, manufacture, advertising, sale, distribution or other use and/or exploitation of the Licensed Products and the Promotional Materials (other than the Reebok Promotional Materials and Reebok Contributed Content) and the use of any and all of the Zuffa IP, except as otherwise expressly provided in this Agreement and Zuffa shall immediately cease and desist from any further advertising, sale or distribution or other use and/or exploitation of the Licensed Products and the Promotional Materials (other than the Zuffa Promotional Materials and Zuffa Contributed Content) and the use of any and all Reebok IP, except as otherwise expressly provided in this Agreement (provided that, without limiting Zuffa's other rights under this Agreement, Zuffa shall have the right to dispose of Licensed Products for six months following expiration or termination of this Agreement), and (c) both Parties shall ensure that all third parties who are licensed or granted rights in respect of the Zuffa IP, Reebok IP, or the Licensed Products or Promotional Materials immediately cease and desist from any further creation, manufacture, advertising, sale, distribution or other use and/or exploitation of the Licensed Products and the Promotional Materials and the use of the Zuffa IP and Reebok IP (as applicable), except as otherwise expressly provided in this Agreement.  Except in the event of termination of this Agreement by Zuffa (other than a termination under Section 17.3), Reebok shall have the right to dispose of the Licensed Products that are on hand or in process at the time of such expiration or termination during the Sell-Off Period through all of the Authorized Distribution Channels for such Licensed Products on a non-exclusive basis; provided, that (i) all statements and payments then due to Zuffa are first made; (ii) Reebok is otherwise in compliance with all terms and conditions of all this Agreement; (iii) such disposal occurs at a price point discounted by no more than the percentage Reebok normally disposes of similar Reebok-branded products and within the Authorized Distribution Channels; and (iv) during the Sell-Off Period, Reebok shall submit all payments and statements required under this Agreement in accordance with the terms and conditions of this Agreement, including Royalty Payments on all sales made during the Sell-Off Period. Royalty Payments made during the Sell-Off Period shall not apply towards any Minimum Royalty Guarantee payable under this Agreement.  In addition, during such Sell-Off Period Reebok shall be permitted to continue to use all approved Promotional Materials in existence on the date of expiration or termination of this Agreement. Notwithstanding any to the contrary herein, unless Reebok has terminated this Agreement for cause pursuant to Section 17.2, Zuffa shall be permitted to use In-Octagon Kits held in inventory by Zuffa at the time of termination during Bouts, Pre-Bout Events and Other Bout Events after the Term.

18.3.   Remaining Inventory After Termination or Expiration.   If Reebok has any remaining inventory of the Licensed Products upon the termination or expiration of this Agreement or after the Sell-Off Period, if applicable, Zuffa may, at its option: (a) purchase such inventory at Reebok's cost; (b) require Reebok to deliver such inventory to Zuffa for destruction at Reebok's expense; (c) require Reebok to destroy such inventory at Reebok's expense and furnish Zuffa with an affidavit signed by an officer of Reebok attesting to such destruction; or (d) require Reebok to donate such inventory, at Reebok's expense, to the charity of Zuffa's choice. Zuffa shall have the right at any time before expiration or termination of this Agreement and during the Sell-Off Period, if any, to conduct a physical inventory to, among other things, verify

56

the quantity and Style and Version of the Licensed Products in Reebok's inventory. If Reebok refuses to permit such physical examination of the inventory or fails to provide Zuffa with the statement required in <u>Section 18.1</u> above, Reebok shall forfeit its right to any Sell-Off Period.

18.4.   <u>Promotional Materials.</u>   Upon termination or expiration of this Agreement or immediately after the Sell-Off Period, if applicable, Reebok shall destroy or deliver to Zuffa all Zuffa Promotional Materials (including all originals and copies) in Reebok's possession; provided that Reebok shall be entitled to retain one copy of each for business archival purposes only. Upon termination or expiration of this Agreement, Zuffa shall destroy or deliver to Reebok all Reebok Promotional Materials (including all originals and copies) in Zuffa's possession provided that Zuffa shall be entitled to retain one copy of each for business archival purposes only.

18.5.   <u>Purchase of Inventory by Zuffa</u>.   In the event that Zuffa purchases inventory from Reebok as provided in <u>Section 18.3,</u> Zuffa shall have the right to remove any identification of Reebok from such inventory and following such removal to use such inventory in any way that Zuffa desires, including display of such inventory In-Octagon during UFC events; <u>provided</u>, that Zuffa shall not apply any third-party manufacturer's name or logo to any such inventory. If Zuffa does not remove all identification of Reebok from such inventory, then Zuffa shall not use such inventory in any manner which could be reasonably expected to adversely affect Reebok's reputation or the reputation of its products. For the avoidance of doubt, nothing herein shall prohibit or restrict Zuffa from using, or granting others the right to use, the Uniform Design, including modifying, reproducing, manufacturing, causing to be manufactured, distributing, importing, exporting, marketing, offering for sale, displaying, selling and other exploiting or commercializing such Uniform Designs (and any derivatives thereof), in each case after expiration or termination of this Agreement and all such use shall not require the consent of, or any compensation to, Reebok.

18.6.   <u>Assignment of the Domain Names and Social Media</u>.   Upon expiration or termination of this Agreement, Reebok shall transfer, and cause each of its Affiliates and licensees to transfer, all domain names (including both gTLDs and ccTLDs) and all social media names or handles or similar identifiers that incorporate any of the Zuffa IP (including all accounts associated therewith), to be transferred to (and recorded in the name of) Zuffa (or to such other Person as Zuffa may designate), together with all intellectual property rights and all goodwill symbolized by or associated therewith. For clarity, Zuffa has no right during or after the Term to register or create domain names, social media names or handles or similar identifiers that incorporate any of the Reebok . To the extent Zuffa registers or uses any such name either with Reebok's prior written consent or in breach of this Agreement, upon expiration or termination of this Agreement (or sooner, if requested by Reebok), Zuffa shall transfer and cause each of its Affiliates and licensees to transfer, all such domain names and identifiers (including all accounts associated therewith), to be transferred to (and recorded in the name of) Reebok (or to such other Person as Reebok may designate), together with all intellectual property rights and all goodwill symbolized by or associated therewith.

18.7.   <u>Partial Termination</u>. Upon any partial termination of this Agreement in accordance with Section 17.1 on a Licensed Product-by-Licensed Product or country-by-country basis, then (a) this Agreement shall remain in full force and effect as to all Licensed Products

57

and/or countries, as applicable, that were not the subject of such partial termination, and (b) as to the Licensed Products and/or coun tries, as applicable , that were the subj ect of such partial termination, the preceding terms and provisions of this Article 18 (and any other terms of this Agreement applicable to termination hereof) shall apply *mutatis mutandis.*

## ARTICLE 19.

### Confidentiality

19.1*.*   General.   The Parties acknowledge that in course of negotiating the terms of this Agreement and in the performance of this Agreement during the Term, from time to time each Party has and will disclose confidential information (the "Discloser") and each has and will receive confidential information (the "Recipient"). For purposes of this Agreement: "Confidential Information" shall mean all information disclosed to Recipient by Discloser or its agents or employees specifically in connection with this Agreement in any manner, whether orally, visually or in tangible form (including documents, devices and computer readable media) and all copies thereof, whether created by Discloser or Recipient, and whether or not marked by Discloser as "Confidential," "Proprietary" or the substantial equivalent thereof. However, Confidential Information shall not include any in formation that Recipient can demonstrate: (a) was in Recipient's possession prior to disclosu re by Discloser hereunder; (b) was generally known, in the trade or business in which it is practiced by Discloser, at the time of disclosure to Recipient hereunder, or becomes so generally known after such disclosure, through no act of Recipient or its employees, agents or independent contractors; (c) has come into the possession of Recipient from a third party who is not known by Recipient to be under any obligation to Discloser to maintain the confidentiality of such information; or (d) was developed by Recipient independently of and without reference to Confidential Information or information that Discloser has disclosed in confidence to a ny third party. If a particular portion or aspect of Confidential Information becomes subject to any of the foregoing exceptions, all other portions or aspects of such information shall remain subject to all of the provisions of this Agreement.

19.2.   Disclosure and Use.   Except as expressly provided below or as required by law, Recipient shall not use or disclose Confidential Information and shall prevent the use or disclosure of such information by Recipient's employees, agents and independent contractors. Recipient shall disclose Confidential Informa tion only to those of its employees, agents and independent contractors who have a need to know such information for the performance of this Agreement or as necessary for any Party to exercise its rights hereunder and who are subject to a duty to keep such information confidential. Re cipient agrees not to reproduce or copy by any means Confidential Information without Discloser's prior written permission in each case, except as reasonably required to perf orm under this Agreement or to exercise its ri ghts hereunder. Except as provided in Section 20.11, in the event that Recipient is ordered to disclose Discloser's Confidential Information pursuant to a requirement or order of any Governmental Authority, Recipient shall notify Discloser and take reasonable steps itself or in cooperation with Discloser (at Discloser's cost) to contest such requirement or order or otherwise reasonably protect Discloser's Confidential Information.

58

## ARTICLE 20.

### Miscellaneous Provisions

20.1.   Information Transmission.   Reebok shall use commercially reasonable efforts to provide all statements and other information required to be provided to Zuffa pursuant to this Agreement in the format and medium reasonably requested by Zuffa.

20.2.   Notices.   Any notice, consent or other communication required or permitted hereunder shall be in writing. It shall be deemed given when (a) delivered personally, (b) sent by confirmed facsimile transmission, (c) sent by commercial overnight courier with written verification of receipt, or (d) sent by registered or certified mail, return receipt requested, postage prepaid, and the receipt is returned to the sender. Names, addresses and facsimile numbers for notices (unless and until written notice of other names, addresses and facsimile numbers are provided by either or both Parties) are as follows:

If to Reebok:

Reebok International Limited
4th Floor
11/12 Pall Mall
London SW1Y 5LU, England
Attention:  Managing Director

and

Reebok International Ltd.
1895 J.W. Foster Boulevard
Canton, Massachusetts 02021
Attention:  Business Unit Director, [Train Like a Fighter]

*With a copy to:*

Reebok International Ltd.
1895 J.W. Foster Boulevard
Canton, Massachusetts 02021
Attention:  Legal Department

59

CONFIDENTIAL

If to Zuffa:

Zuffa, LLC
2960 W. Sahara Avenue
Las Vegas, Nevada 89102
Attn.: Nakisa Bidarian, Executive Vice President, Strategy and Business Ventures

*With a copy to:*

Zuffa, LLC
2960 W. Sahara Avenue
Las Vegas, Nevada 89102
Attn.: Tracey Bleczinski, Senior Vice President, Global Consumer Products

Zuffa, LLC
2960 W. Sahara Avenue
Las Vegas, Nevada 89102
Attn.: Kirk D. Hendrick
Chief Legal Officer

20.3. Relationship of Parties. Reebok shall be deemed an independent contractor of Zuffa and nothing contained herein shall constitute this arrangement to be employment, a joint venture, a partnership, a franchisor- franchisee relationship or in any such relationship. Each of the Parties acknowledges: (i) that the rights granted under this Agreement in no way constitute a franchise; (ii) that it has made no substantial investment in connection with this Agreement that cannot be used for products, services or lines of business outside the scope of this Agreement; (iii) that Royalty Payments under this Agreement are not sales of products or services between Reebok and Zuffa; and (iv) the Licensed Products are the products of Reebok and not Zuffa. No Party shall have the power to obligate or bind any other Party in any manner whatsoever. Zuffa in no way endorses, certifies or guarantees the quality of the Licensed Products.

20.4. Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

20.5. Jurisdiction; Venue; Services of Process. EXCEPT AS SET FORTH IN SECTION 12.1, EACH PARTY HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENTS OR TRANSACTIONS CONTEMPLATED HEREBY MUST BE BROUGHT TO THE COURTS OF THE STATE OF NEW YORK, INCLUDING THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW YORK, AND

60

CONFIDENTIAL

HEREBY EXPRESSLY SUBMITS TO PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT SUCH COURTS ARE AN INCONVENIENT FORUM. EACH PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS BY NOTICE IN THE MANNER SPECIFIED IN SECTION 20.2.

20.6.   Waiver of Jury Trial.   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO HAVE A TRIAL BY A JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING IN CONNECTION WITH THIS AGREEMENT.   EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) IT MAKES THIS WAIVER INTENTIONALLY AND VOLUNTARILY; AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 20.6.

20.7.   Amendment and Waiver.   No failure or delay on the part of any Party in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Any amendment, supplement or modification of or to any provision of this Agreement or any Schedule or Exhibit and any waiver of any provision of this Agreement shall be effective (i) only if it is made or given in writing and signed by all Parties and (ii) only in the specific instance and for the specific purpose for which made or given. Reebok and Zuffa may amend or restate the Business Program Schedules (Schedules 2.1A through Schedule 2.1I) or may create new Business Program Schedules in addition to Schedule 2.1A through Schedule 2.1I at any time by executing any writing signed by both Reebok and Zuffa.

20.8.   Severability.   The terms of this Agreement shall be deemed severable and the invalidity, illegality, or unenforceability of any term shall not affect the validity, legality or enforceability of the other terms hereof.  If any term of this Agreement is found to be invalid, illegal or unenforceable, a suitable and equitable term shall be substituted therefor in order to carry out, so far as may be valid, legal and enforceable, the original intent and purpose of such invalid, illegal or unenforceable term and the remainder of this Agreement.

20.9.   Insolvency.   All rights and licenses granted under or pursuant to this Agreement by Zuffa to Reebok in and to Zuffa IP are and will otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code.  The Parties agree that Reebok and its authorized sublicensees of such rights under this Agreement will retain and may fully exercise all of their rights and elections under the U.S. Bankruptcy Code and any foreign counterpart thereto.

61

   ZFL-2490169

All rights and licenses granted under or pursuant to this Agreement by Reebok to Zuffa in and to the Reebok IP are and will otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code. The Parties agree that Zuffa and its authorized sublicensees will retain and may fully exercise all of their rights and elections under the U.S. Bankruptcy Code and any foreign counterpart thereto.

20.10. <u>No Exclusive Remedy</u>. Without limiting the right of a Party to pursue all other legal and equitable rights available to it for violation of or failure of the other Party to comply with the terms of this Agreement, it is agreed that other remedies may not fully compensate a Party for such a violation or failure and that such Party shall be entitled to injunctive or other equitable relief to prevent violation or continuing violation or to compel performance by the other Party. The Parties acknowledge that the restrictions in this Agreement are reasonable and that the consideration therefore is sufficient to fully and adequately compensate them therefore.

20.11. <u>Third Party Beneficiaries</u>. Nothing in this Agreement is intended, or shall be construed, to give any entity or individual other than the Parties hereto any legal or equitable right, remedy or claim under or in respect of this Agreement or any of the provisions contained herein.

20.12. <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns and permitted transferees of the Parties. No Person other than the Parties and their successors and permitted assigns is intended to be a beneficiary of this Agreement.

20.13. <u>Assignments</u>. Except as specifically set forth in this Agreement, neither Party may assign any of its rights or obligations under this Agreement without the prior written consent of the other Party, and any such purported assignment shall be void and of no effect.

20.14. <u>Entire Agreement</u>. This Agreement, the Schedules and the Exhibits attached hereto and the other agreements referenced in this Agreement constitute the entire agreement and understanding between the Parties with respect to the subject matter contained herein and therein and cancels, terminates, and supersedes any prior or contemporaneous agreement or understanding, whether oral or written, on such subject matter between the Parties. The headings in this Agreement are for reference purposes only and have no legal effect. In any construction of this Agreement, nothing shall be construed against any Party based upon the identity of the drafter of this Agreement or any provision contained in this Agreement.

20.15. <u>Foreign Corrupt Practices Act Adherence</u>. Reebok understands that a key aspect of Zuffa's business activities and corporate culture is conducting its business in a legal, honest and ethical manner. Reebok agrees that Reebok and its employees and representatives shall, in the performance of this Agreement and all related activities, comply in all respects with all applicable multilateral international conventions dealing with bribery and corrupt practices (as they may be amended from time to time); and all Applicable Law dealing with bribery and corruption including the United States Foreign Corrupt Practices Act, as may be amended from time to time ("<u>FCPA</u>"). Without limiting the generality of the foregoing, Reebok agrees that Reebok and all of its employees or representatives will not, except as permitted under the FCPA,

62

in order to obtain or retain an advantage in the course of business, directly or indirectly give, offer to give or offer a loan, reward, advantage or benefit of any kind to a public official: (a) as consideration for an act or omission by the official in connection with the performance of the official's duties or functions or (b) to induce the official to use his or her position to influence any acts or decisions of the foreign state or public international organization for which the official performs duties or functions. For the purposes of this Section, "public official" includes an employee of a governmental or regulatory authority, a member of a political party, and or an officer or employee of a state-owned enterprise.

20.16.  Counterparts.  This Agreement may be executed in any number of counterparts and by the Parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

20.17.  Rules of Interpretation.  Except as otherwise expressly provided in this Agreement, the following rules of interpretation apply to this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" and "any" are not exclusive and "include" and "including" are not limiting; (iii) a reference to any agreement, schedule or other contract includes permitted supplements and amendments; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder; and (v) a reference in this Agreement to an Article, Section, Annex, Exhibit or Schedule is to the Article, Section, Annex, Exhibit or Schedule of this Agreement.  Any omission of the terms "include," "including" or "limited" or any failure to reference any amendment or modification shall not affect the interpretation of this Agreement. The terms of each Exhibit or Schedules to this Agreement are incorporated herein by reference. Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

20.18.  Survival. Neither the expiration nor termination of this Agreement shall affect any rights that shall have accrued to the benefit of a Party prior to such termination.  Such expiration or termination shall not relieve a Party from obligations that are expressly indicated to survive the termination of this Agreement, including the right to payment which may have accrued prior to such termination.  For the sake of clarity, and without limitation, the following sections shall survive the expiration or termination of this Agreement: Section 2.5, Section 6.11, Section 6.12, Section 6.13, Section 8.4, Section 8.6, Section 9.5, Article 11, Article 15, Article 16, Article 18, Article 19 and Article 20.

[*Signature pages follow*]

63

IN WITNESS WHEREOF, the Parties hereto have signed this Agreement as of the day and year first above written.

**REEBOK INTERNATIONAL LIMITED**

By: _____

Name: M H O'TOOLE

Title: PRESIDENT.


By: _____

Name:

MARTIN O'BRIEN

Title:

DIRECTOR


**ZUFFA, LLC**

By: _____

Name: LORENZO J. FERTITTA

Title: CHAIR + C.E.O.


*[Signature page to License Agreement]*

CONFIDENTIAL

Schedule 1.1.8
to Reebok/Zuffa License Agreement

Authorized Brands

REEBOK

LUTA*





MITCHELL & NESS

FIGHT FOR PEACE*

LUTA PELA PAZ*

including all stylized versions and combinations of the foregoing

*Subject to Reebok obtaining rights to use such marks.

CONFIDENTIAL

Schedule 1.1.25
to Reebok/Zuffa License Agreement

Distribution Channels

1. Airport Retailer: A separate retail store in an airport, including, without limitation, Hudson News and WH Smith. This does not include Airplane Retailers.

2. Arcade/Amusement Distributer: A distributor who sells product to arcade and amusement venues including restaurants, gas stations, movie theatres, theme parks and any other business venue in which the sale of the Licensed Products would constitute a subsidiary business. An example would be a distributor who sells UFC licensed product for use in an Arcade Claw Machine.*

3. Athletic Specialty Store: A retail store that carries athletic apparel, athletic footwear and licensed apparel as its primary retail items. Examples include, without limitation, Finish Line and Foot Locker stores.

4. Automotive Store: A retail store that carries automotive supplies and accessories as its main retail assortment. Examples include, without limitation, Autozone and Big O Tires.*

5. Better Department Store: A retail store that operates several departments carrying higher-priced, national brands of apparel and hardgoods. Examples include, without limitation, Bloomingdale's, Lord & Taylor, Macy's and Nordstrom.

6. Book Store: A retail store that carries books as its primary items. An example is, without limitation, Barnes & Noble.*

7. Hotel/Casino Shop: A retail store in a hotel or casino that carries as its primary items the following: beverages, snacks, newspapers, magazines, location specific apparel, and souvenirs, primarily sold to tourists or visitors to the area.

8. Catalog/Direct Response: A business that markets products directly to consumers through a catalog or direct response advertising, excluding the Internet and on-line services. For the avoidance of doubt, a business that operates a physical retail store shall not be considered a Catalog/Direct Response organization. This includes mail order catalogs as well as airplane catalogs, including, without limitation, SkyMall.

9. Closeout/Discount Store: A retail store with limited services and displays that carries closeout inventory and irregular merchandise as its primary retail stock. Examples include, without limitation, Century 21, Last Call, Marshall's, T.J.Maxx, Nordstrom Rack and Ross Stores. **

10. Computer/Electronics Store: A retail store that carries computers, computer accessories or electronic equipment as its primary retail items. Examples include, without limitation, Best Buy and Fry's.*

   ZFL-2490174

11. Convenience Store: A retail store with a sales area of up to 3,000 square feet that carries a combination of fast-moving products including food, staple products, lottery tickets and gasoline as its primary retail items. Examples include, without limitation, Circle K and 7-Eleven.*

12. Dojo: A retail store or area located within a school, whose specific reason for being is to train students in various arts of self-defense.

13. Drug Store: A retail store that carries a combination of over the counter medicines, health and beauty aids as its primary retail items. Examples include, without limitation, Rite Aid, CVS and Walgreens.*

14. Fan Shop: A retail store that carries sports Licensed Products as its primary retail items. Examples include, without limitation, Pro Image and Sports Avenue.

15. Furniture Store: A retail store that predominantly sells furniture for home or office. Examples include, without limitation, Pottery Barn, IKEA, Ethan Allen and Restoration Hardware.*

16. Grocery Store: A retail store that carries food and household products as its primary retail items. Examples include, without limitation, VONS, Publix, Albertsons, Ralphs and Smith's.*

17. Hardware Store: A retail store that carries hardware products as its primary retail items. Examples include, without limitation, Ace, Home Depot, Lowe's and True Value.*

18. Home Store: A retail store that carries (i) home products as its primary retail items and (ii) carries furniture as its secondary items. Examples include, without limitation, Bed Bath & Beyond, Crate & Barrel and Home Place.*

19. Hypermart: A large retail store that carries apparel and food as its primary retail items. Examples include, without limitation, Meijer and Wegmans.

20. Kiosk: A stand or small, often portable structure, used to sell products primarily found in mall locations, on walkable city streets or at street fairs.

21. Licensee's Retail Store or Licensee's Outlet Store: A retail store or outlet store owned by Reebok, adidas or their respective affiliates exclusively selling only those products produced by Reebok, adidas or their respective affiliates. This includes both the full price retail store as well as the lower priced outlet mall version of the retail store.

22. Licensee Managed E-Commerce on Third Party Website: A web store or online sales listings on the World Wide Web, whereby Reebok, adidas or their respective affiliates sells and ships licensed merchandise directly to consumers through a third party online retail website. Examples include, without limitation, eBay.com and Amazon.com.

CONFIDENTIAL                                                                                   ZFL-2490175

23. <u>Licensee's Website</u>: A website on the World Wide Web on which Reebok, Luta, adidas or their respective affiliates makes Licensed Products available for sale directly to consumers and is majority owned and operated by Reebok, adidas or their respective affiliates, or website is marked under the same brand name as the Authorized Brand(s) permitted pursuant to the License.

24. <u>Mass Market Store</u>: A retail store with several departments carrying lower-priced brands of apparel and non-apparel. Examples include, without limitation, Fred Meyer, Kmart, Target and Walmart.

25. <u>Mid-Tier Department Store</u>: A retail store that operates several departments selling mid-priced brands of apparel and non-apparel. Examples include, without limitation, JCPenney, Kohl's and Sears.

26. <u>Military Base Store</u>: A retail store located on a United States military base servicing United States military personnel.

27. <u>Non UFC GYM Stores</u>: A retail store or area located inside a brick and mortar non UFC branded gym.  Examples of this include 24 Hour Fitness, LA Fitness and Gold's Gym.

28. <u>Office Supply Store</u>: A retail store that carries office supplies as its primary retail items. Examples include, without limitation, Office Depot and Staples.*

29. <u>Specialty Store</u>: A brick and mortar retail store that specializes in women's and/or men's apparel and/or accessories, or specialty items. Examples include, without limitation, American Apparel, Anthropologie, Banana Republic, Urban Outfitters, Victoria's Secret, Pottery Barn Kids and Quiksilver.

30. <u>Sporting Goods Store</u>: A retail store that carries athletic apparel and footwear, sporting goods equipment and sports licensed products as its primary retail items. Examples include, without limitation, Academy Sports+Outdoors, Dick's Sporting Goods, Dunham's Sports, Sport Chalet, Modell's and The Sports Authority.

31. <u>Third Party Managed E-Commerce Site</u>: A website on the World Wide Web whereby a third party other than Reebok, adidas or their respective affiliates sells product at retail and does not have a physical store. Examples include, without limitation, Zappos.com and Bluefly.com.

32. <u>Toy Store</u>: A retail store that carries (i) toys as its primary retail items and (ii) apparel or other children's necessities on a limited basis. Examples include, without limitation, FAO Schwarz, Babies"R"Us and Toys"R"Us.

33. <u>TV Retail</u>: An organization that markets products directly to consumers without using retail space through the medium of television. Examples include, without limitation, the Home Shopping Network and QVC.

                                                        ZFL-2490176

34. <u>Warehouse Club Store</u>: A retail store that markets products to members only. Examples include, without limitation, BJ's Wholesale Club, Costco and Sam's Club.

35. <u>UFC GYM Stores</u>: A retail store or area located inside a brick and mortar  UFC Gym.

*No UFC licensed apparel, footwear or accessory products to be sold in these distribution channels by UFC or its licensees.

**Only excess inventory may be sold through this channel

Schedule 1.1.33
to Reebok/Zuffa License Agreement

Derivative Fighter IP

CONFIDENTIAL

Schedule 1.1.55
to Reebok/Zuffa License Agreement

Licensed Marks



Schedule 1.1.82
to Reebok/Zuffa License Agreement

## Reebok Competitors

| | | **MMA BRANDS** |
|---|---|---|
| 2Pood | Mitre | Affliction |
| 321 Apparel | Mizuno* | American Fighter |
| 361 | Moving Comfort | Bad Boy |
| Airwalk | New Balance | Bad Girl |
| American Sporting Goods | New Era | Cage Hero |
| And 1 | Nike | Contract Killer |
| Anta | North Face | Dethrone Royalty |
| ASICS | Peak | Dynasty MMA |
| Athleta | Penalty | Fighter Girl |
| Avia | Pony | Gawakoto |
| Bauer | Prince | Gorilla Combat |
| Bia Brazil | Puma | Hayabusa |
| Billabong | Qiaodan | Headrush |
| Brooks | Quicksilver | Jaco |
| Champion/Jogbra | Ranger Up | Jaded MMA |
| Champion C9 | Reef | Meerkatsu |
| Columbia | Rogue | Metal Mulisha |
| Converse | Respect Your Universe | MMA authentics |
| Descente | Rhumell | Red Arme |
| Erke | Rok Fit | RVCA |
| Etonic | Russell* | Scramble |
| Fila | Ryka | Tapout |
| Foot-Joy | Salomon | Tokyo five brand |
| Form Athletics | Saucony | Triumph United |
| Gilda Marx | Side 1 | Twins |
| Gildan Activewear | Silver Star Clothing Company | Venum |
| Goldwin | Skechers* | VXRSI |
| Head | Speedo | Xtreme couture |
| Hind | Spirit (*manufacturer team wear etc*) | |
| Hi-Tec | Spun Performance | |
| Hurley | Starter | |
| Hyde | Stride Rite | |
| Innov8 | Stronger RX | |
| IXSPA | STR/KE MVMNT | |
| K2 | Umbro | |
| Kaepa | Under Armour | |
| Kbird | Vans | |
| Keds/Pro Keds | Wod Addiction | |
| Keuka | Wodlife | |
| K-Swiss | Xtep | |
| L.A. Gear | | |
| Life as RX | | |
| LI-NING | | |
| Lotto | | |
| Lucy Apparel | | |
| Lululemon | | |
| Majestic Athletic | | |

**The following brands (the "Other Reebok Competitors") shall be considered Reebok Competitors solely with respect to Headwear, Apparel and Footwear (excluding, for clarity, Gloves). Zuffa shall be free to contract with such brands regarding marketing opportunities (other than appearance on In-Octagon Kits) and sponsorship unrelated to Headwear, Apparel and/or Footwear (but, for clarity, Zuffa shall be free to contract with such brands with respect to equipment and Gloves):**

Blitz Sport
Boon Sport
Casanova
Century
Cleto Reyes
Crunch Fitness
Deerway
Easton
Everlast
Fairtex
Fighting Sports
Hayabusa
Kinglike
Morales Boxing
MusclePharm
Oakley
Origin
Renzo Gracie Brazilian Jiu-Jitsu
Rev Gear
Reyes
Ringside
Rival
Tatami
Throwdown
Title
Wilson
Zepol

CONFIDENTIAL

Schedule 1.1.121
to Reebok/Zuffa License Agreement

Octagon Crest and Typography

Attached.

UFC - OCTAGON COUNTRY PATCHES



3.5"-4" HEAT SET PATCH

UFC
CONFIDENTIAL

ZFL-2490183



CONFIDENTIAL

ZFL-2490184

UFC - TYPE

PROVEN-REGULAR

ABCDEÉFGHIJKLM
NOPQRSTUVWXYZ
ACENORT
1234567890..-

PROVEN-EXTENDED

ABCDÉEFGHIJKLM
NOPQRSTUVWXYZ
ACENORT
1234567890.,-

PROVEN-CONDENSED

ABCDÉEFGHIJKLM
NOPQRSTUVWXYZ
ACENORT
1234567890..-

**UFC**
CONFIDENTIAL

ZFL-2490185

Schedule 2.1
to Reebok/Zuffa License Agreement

Zuffa Guidelines

Attached.

ZFL-2490186



# BRAND GUIDE

CONFIDENTIAL

ZFL-2490187



"It transcends all cultural barriers, all language barriers. I don't care what color you are, what country you come from or what language you speak, we're all human beings. **And fighting's in our DNA**. We get it, and we like it."

—**DANA WHITE**

CONFIDENTIAL

**WHO WE ARE**

# THE UFC IS A GLOBAL BRAND

We are a league, an event company, a broadcast company, a technology company,
a consumer-goods company and the leader in mixed martial arts, founded on principles of:

**DISCIPLINE**
**ATHLETICISM**
**TRAINING**
**RESPECT**

The following is an outline of our logo, design and copy guidelines to provide a clear and concise
vision of our brand. These guidelines are tools for UFC license groups, international distributors,
vendors and partners. They should be used for general event promotion, corporate identity and
events, advertising, retail, packaging, point-of-purchase and all other brand-related assets.

CONFIDENTIAL

ZFL-2490189

# TABLE OF CONTENTS

**BRAND LOGOS**     **5**
- BRAND HIERARCHY     6
- UFC LOGOS     7
- TAGLINE & URL     10
- WORDMARK     11
- PERFORMANCE LOGO     12

**TYPOGRAPHY & COLORS**     **14**
- TYPOGRAPHIC FAMILY     15
- COLOR STANDARDS     16
- BRAND COLOR GUIDE     17

**PHOTOGRAPHY**     **18**
- PHOTOGRAPHY GUIDE     19
- DO'S AND DON'TS     20
- EXAMPLES     21

**CREATIVE DEVELOPMENT**     **22**
- DO'S AND DON'TS     23
- COPY GUIDELINES     24
- REPEAT PATTERNS     25



BRAND GUIDE

CONFIDENTIAL

ZFL-2490190



ZFL-2490191

# BRAND HIERARCHY

HIERARCHY MUST BE RECOGNIZED TO RETAIN THE INTEGRITY OF THE BRAND & THE RELATIONSHIP TO THE MESSAGING   .





**PRIMARY LOGO** - The UFC logo is the primary mark.

**STACKED LOGO** - The UFC logo with wordmark (stacked) should be



**WORDMARK** - The UFC wordmark should only be used when impossible
to incorporate the primary or stacked logo.

# AS REAL AS IT GETS®

used in new markets and corporate executions.

**TAGLINE** - The primary tagline can be incorporated in

ONE COLOR - **UFC RED**

# UFC.COM

**URL** - The URL should be present

ONE COLOR - **UFC BLACK**

UFC® is a registered trademark owned exclusively by Zuffa, LLC in the United States and other jurisdictions.
All other marks referenced herein may be the property of Zuffa, LLC or other respective owners.

**LEGAL** - When using any UFC logo or mark, the legal line must be present.


CONFIDENTIAL

on all executions.

ZFL-2490192

# UFC LOGOS

THE UFC LOGO IS DESIGNED TO WORK ON BOTH LIGHT AND DARK BACKGROUNDS. WE HAVE CREATED A COHESIVE BRAND PRESENCE NO MATTER WHAT THE APPLICATION.
USE ONE-COLOR LOGOS ONLY WHEN TECHNICAL RESTRAINTS WARRANT THEIR USE.

**FULL COLOR -** CHROME PRIMARY LOGO



**FULL COLOR -** CHROME STACKED LOGO



**FULL COLOR -** RED CHROME PRIMARY LOGO



**FULL COLOR -** RED CHROME STACKED LOGO



**ONE COLOR -** PRIMARY LOGO



**ONE COLOR -** STACKED LOGO



**ONE COLOR -** PRIMARY LOGO



**ONE COLOR -** STACKED LOGO



BRAND GUIDE

**7**

CONFIDENTIAL

ZFL-2490193

## LOGO SPACING

MAINTAIN APPROPRIATE WHITE SPACE AROUND LOGO WHEN DISPLAYED WITH OTHER LOGOS AND/OR OBJECTS. THE MINIMUM SIZE OF THE UFC LOGO IS BASED ON MAINTAINING LEGIBILITY. THE UFC LOGO MUST BE CLEARLY RECOGNIZABLE AND LEGIBLE AT ALL TIMES.

### X = CLEARSPACE





WHEN USING THE LOGO SMALLER THAN 1/2-INCH, USE THE PRIMARY ONE-COLOR LOGO ONLY.
NO WORDMARK. NO GRADIENTS. THE STACKED LOGO
MAY NOT BE USED SMALLER THAN 1/2-INCH.

WHEN USING THE LOGO SMALLER THAN
1/2 INCH USE THE PRIMARY LOGO ONLY.
NO WORDMARK. NO GRADIENTS.

©2014 ZUFFA, LLC. ALL RIGHTS RESERVED.

CONFIDENTIAL

ZFL-2490194

# LOGO CONFIGURATION

THE UFC LOGO MUST NEVER BE ALTERED, MODIFIED OR RECREATED. ANY ATTEMPT TO MODIFY OR ALTER OUR LOGO IS A DIRECT VIOLATION OF OUR BRAND STANDARDS.
THIS APPLIES TO THE ENTIRE FAMILY OF UFC LOGOS AND MARKS.



**DO NOT** PINCH OR STRETCH LOGO.



**DO NOT** FILL LOGO WITH PHOTOS OR TEXTURES.



**DO NOT** FILL LOGO WITH NON-UFC COLORS.



**DO NOT** FILL LOGO WITH NON-UFC GRADIENTS.



**DO NOT** OVERLAP LOGOS.



**DO NOT** CONTAIN LOGO WITHIN SHAPES.



**DO NOT** DISTORT LOGO IN ANY WAY.



**DO NOT** APPLY FILTERS, EFFECTS, OR DROP SHADOWS.

©2004 ZUFFA, LLC. ALL RIGHTS RESERVED.

CONFIDENTIAL

ZFL-2490195

## TAGLINE AND URL

THE UFC TAGLINE SHOULD BE PRESENT WHEN APPROPRIATE. THE UFC URL SHOULD BE PRESENT IN ALL EXECUTIONS. BOTH REQUIRE KLAVIKA BOLD TYPE.

**ONE COLOR ·** TAGLINE LIVE TYPE

**AS REAL AS IT GETS**®

**ONE COLOR ·** URL LIVE TYPE

**UFC.COM**

**AS REAL AS IT GETS®**

**UFC.COM**

TAGLINE AND URL SHOULD NEVER BE SMALLER THAN   10-POINT TYPE.

CONFIDENTIAL

ZFL-2490196

# WORDMARK

THE UFC WORDMARK SHOULD BE USED AS A SECONDARY LOGO WHEN IMPOSSIBLE TO INCORPORATE THE UFC PRIMARY OR STACKED LOGO.

**ONE COLOR -** STACKED WORDMARK

*ULTIMATE FIGHTING CHAMPIONSHIP*

ONE COLOR - **UFC BLACK**

*ULTIMATE FIGHTING CHAMPIONSHIP*

ONE COLOR

ONE COLOR - **UFC RED**

**ONE COLOR -** LINEAR WORDMARK

ONE COLOR - **UFC RED**

ONE COLOR - UFC WHITE

*ULTIMATE FIGHTING CHAMPIONSHIP*

ONE COLOR - **UFC BLACK**

*ULTIMATE FIGHTING CHAMPIONSHIP*

ONE COLOR

ONE COLOR

## X = CLEARSPACE

ONE COLOR - UFC RED

ONE COLOR - UFC BLACK

X

*ULTIMATE FIGHTING CHAMPIONSHIP*

- UFC WHITE
ONE COLOR - **UFC BLACK**

[X]

*ULTIMATE FIGHTING CHAMPIONSHIP*

ONE COLOR - **UFC BLACK**

[X]

ONE COLOR - **UFC RED**

ONE COLOR - **UFC RED**

ONE COLOR - **UFC RED**



CONFIDENTIAL

ZFL-2490197

# PERFORMANCE LOGO

SYMBOLIZING ULTIMATE PERFORMANCE IN AND OUT OF THE OCTAGON, THIS LOGO WAS DEVELOPED SPECIFICALLY FOR ATHLETIC APPAREL AND EQUIPMENT.

**FULL COLOR -** CHROME PERFORMANCE LOGO



**THREE COLOR -** PERFORMANCE LOGO



**ONE COLOR -** SILVER PERFORMANCE LOGO



**ONE COLOR -** PERFORMANCE LOGO







WHEN USING THE PERFORMANCE LOGO SMALLER THAN 1/2-INCH,
USE ONE-COLOR PERFORMANCE LOGO ONLY. NO GRADIENTS.

©2014 ZUFFA, LLC. ALL RIGHTS RESERVED.
CONFIDENTIAL
ZFL-2490198

# UFC PERFORMANCE LOGO LOCK-UP

THE UFC PERFORMANCE LOGO LOCK-UP IS TO BE USED ON ATHLETIC APPAREL AND EQUIPMENT ONLY.

**FULL COLOR -** PERFORMANCE CHROME LOGO



**THREE COLOR -** PERFORMANCE LOGO



**ONE COLOR -** SILVER PERFORMANCE LOGO



**ONE COLOR -** PERFORMANCE LOGO







WHEN USING THE PERFORMANCE LOGO SMALLER THAN 1/2-INCH, USE ONE-COLOR PERFORMANCE LOGO LOCK-UP ONLY. NO GRADIENTS.



**BRAND GUIDE**
©2014 ZUFFA, LLC. ALL RIGHTS RESERVED.

CONFIDENTIAL

ZFL-2490199



CONFIDENTIAL

ZFL-2490200

## TYPOGRAPHIC FAMILY

KLAVIKA IS THE PRIMARY TYPEFACE FOR THE UFC. KLAVIKA SHOULD BE USED FOR ALL UFC EXECUTIONS WHERE TYPE IS REQUIRED. FULL FONT FAMILY CAN BE PURCHASED AT PROCESS TYPE FOUNDRY (processtypefoundry.com).

HEADLINE FONT

# KLAVIKA BOLD
# ABCDEFGHIJKLMNOPQRSTUVWXYZ
# abcdefghijklmnopqrstuvwxyz
# 1234567890

BODY FONTS

KLAVIKA REGULAR
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890

INFORMATIONAL FONTS

*KLAVIKA MEDIUM ITALIC*
*ABCDEFGHIJKLMNOPQRSTUVWXYZ*
*abcdefghijklmnopqrstuvwxyz*
*1234567890*

*KLAVIKA REGULAR ITALIC*
*ABCDEFGHIJKLMNOPQRSTUVWXYZ*
*abcdefghijklmnopqrstuvwxyz*
*1234567890*

CONFIDENTIAL

ZFL-2490201

# COLOR STANDARDS

THE UFC COLOR STANDARDS MUST BE FOLLOWED TO RETAIN THE INTEGRITY OF THE BRAND. DIFFERENT SCENARIOS, WITH NOTES, HAVE BEEN PROVIDED BELOW WITH THEIR CORRESPONDING BREAKDOWNS.

**NOTE:**
The colors in this chart should not be used for matching. Please refer to the universal Pantone color matching system (PMS).

## PMS COATED COLORS

| UFC BLACK | UFC WHITE | UFC RED | UFC SILVER | UFC MEDIUM GREY | UFC LIGHT GREY | UFC YELLOW |
|---|---|---|---|---|---|---|
| PANTONE 426C | WHITE | PANTONE 1797C | PANTONE 877C | PANTONE 423C | PANTONE 420C | PANTONE YELLOW C |

## PMS UNCOATED COLORS

| UFC BLACK | UFC WHITE | UFC RED | UFC SILVER | UFC MEDIUM GREY | UFC LIGHT GREY | UFC YELLOW |
|---|---|---|---|---|---|---|
| PANTONE 426U | WHITE | PANTONE 1797U | PANTONE 877U | PANTONE 423U | PANTONE 420U | PANTONE YELLOW U |

## PROCESS COLORS

| UFC BLACK | | UFC WHITE | | UFC RED | | UFC SILVER | | UFC LIGHT GREY | | UFC YELLOW | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CYAN | 0% | CYAN | 0% | CYAN | 0% | CYAN | 0% | CYAN | 0% | CYAN | 0% |
| MAGENTA | 0% | MAGENTA | 0% | MAGENTA | 100% | MAGENTA | 0% | MAGENTA | 0% | MAGENTA | 0% |
| YELLOW | 0% | YELLOW | 0% | YELLOW | 100% | YELLOW | 0% | YELLOW | 0% | YELLOW | 100% |
| BLACK | 99% | BLACK | 0% | BLACK | 0% | BLACK | 40% | BLACK | 15% | BLACK | 0% |

## RGB VALUES

| UFC BLACK | | UFC WHITE | | UFC RED | | UFC SILVER | | UFC LIGHT GREY | | UFC YELLOW | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RED | 38 | RED | 255 | RED | 227 | RED | 167 | RED | 220 | RED | 255 |
| GREEN | 35 | GREEN | 255 | GREEN | 27 | GREEN | 169 | GREEN | 221 | GREEN | 239 |
| BLUE | 36 | BLUE | 255 | BLUE | 35 | BLUE | 172 | BLUE | 22 | BLUE | 0 |

CONFIDENTIAL

ZFL-2490202

# BRAND COLOR GUIDE

COLOR SWATCHES SHOWN BELOW SHOULD NOT BE USED FOR MATCHING. PLEASE REFER TO THE UNIVERSAL PANTONE COLOR MATCHING SYSTEM FOR ACCURACY.

## PRIMARY COLORS

   

**UFC BLACK**
PANTONE 426C

**UFC WHITE**
WHITE

**UFC RED**
PANTONE 1797C

**UFC SILVER**
PANTONE 877C

## SECONDARY COLORS

   

**UFC YELLOW**
PANTONE YELLOW C

**UFC SILVER GRADIENT**
WHITE >> PANTONE 877C

**UFC RED GRADIENT**
BLACK >> PANTONE 1797C

**UFC MEDIUM GREY**
PANTONE 423C

**UFC LIGHT GREY**
PANTONE 420C

CONFIDENTIAL

ZFL-2490203



CONFIDENTIAL

ZFL-2490204

# PHOTOGRAPHY GUIDE

PHOTOGRAPHY SHOULD NOT BE USED IN ANY WAY THAT IMPLIES FIGHTER ENDORSEMENT WITHOUT PRIOR WRITTEN CONSENT. ALL PHOTOGRAPHY USED MUST BE APPROVED BY UFC.



## PLEASE SUBMIT CONTACT SHEET OF GETTY SELECTION FOR UFC APPROVAL BEFORE PURCHASE.

**CONTACT UFC FOR PHOTOGRAPHY APPROVAL:**
HEIDI NOLAND
VICE PRESIDENT, CREATIVE
hnoland@ufc.com

**CONTACT GETTY IMAGES FOR EDITORIAL AND COMMERCIAL USE:**
BRANDON LOPEZ
DIRECTOR, SPORT LEAGUES AND BUSINESS DEVELOPMENT
OFFICE 323-202-4061 // MOBILE 310-925-9418
www.gettyimages.com



BRAND GUIDE
©2014 ZUFFA, LLC. ALL RIGHTS RESERVED.

**19**

CONFIDENTIAL

ZFL-2490205

# PHOTOGRAPHY DO'S & DON'TS

ALL PHOTOS SHOULD BE CHOSEN AND COMPOSED TO CONVEY AS MUCH ACTION AND TENSION AS POSSIBLE. CROPPING SHOULD ELIMINATE CLUTTER TO DIRECT THE VIEWER TOWARD THE DESIRED FOCAL POINT. FOR FURTHER CLARIFICATION, PLEASE CONTACT UFC DIRECTLY.

**DO NOT** show fighters in defenseless positions.

**DO NOT** use images with an abundance of blood.

**DO NOT** flip fighter portraits.

**DO NOT** show fighters with bare knuckles in fighter stance.

**DO NOT** show champions in submissive positions in action shots.

**DO NOT** show fighters on the ground unless creative specifically calls for submissions.

**DO NOT** show fighter name without weight class in copy.

**DO NOT** use the UFC championship belt in creative without written permission from the UFC.

## WHEN FIGHTERS ARE SHOWN IN "FIGHTER A" vs "FIGHTER B" POSITIONING:

**DO** show champions with a belt.

**DO** show fighters wearing UFC gloves.

**DO** show fighters of same weight class.

**DO** show red corner fighter on the left, blue corner fighter on right.

**DO** show red corner fighter in front of blue corner, if fighters overlap.

**DO** show waistline of fighter shorts.

## ON LICENSED ARTWORK:

**DO NOT** show sponsor logos on fighters' shorts.

**DO NOT** use non-active fighters or unapproved Hall of Fame members.

**DO NOT** show champions with a belt if creative is "evergreen".

**DO NOT** use any imagery or likeness of UFC president Dana White without written permission from the UFC.

CONFIDENTIAL

ZFL-2490206

# PHOTOGRAPHY GUIDE EXAMPLES

 



Fighters must be shown wearing UFC gloves.

Red corner should always be shown on left.
Blue corner should always be shown on right.

If fighters overlap, red corner fighter must be in front.













Fighter's waistline must be visible.

Champions must be shown with a belt unless creative is "evergreen."

Fighters should not be shown in defenseless positions.

Do not use images with an abundance of blood.

CONFIDENTIAL



CONFIDENTIAL

ZFL-2490208

## DO'S AND DON'TS

WINGS, SKULLS, BARBED WIRE, BLOOD SPLATTER, TRIBAL DESIGNS, FLAMES, SWORDS AND DIAMOND PLATE DO NOT REPRESENT OUR BRAND.

NO WINGS            NO SKULLS            NO BARBED WIRE            NO BLOOD SPLATTER            NO TRIBAL DESIGNS            NO FLAMES

     

     

NO SWORDS                          NO DIAMOND PLATE                    NO OVERT CAGE          **VERY** SUBTLE USE OF CAGE
                                                                                              PATTERN IS PERMISSIBLE

    

# COPY GUIDELINES

THE FOLLOWING ADDRESSES COMMONLY REFERENCED TERMINOLOGY. A MORE EXTENSIVE COPY STYLEGUIDE MAY BE OBTAINED FROM THE UFC UPON REQUEST.

## BOUT LISTINGS
The champion or favored fighter is always listed first (red corner); the challenger goes second (blue corner). On fight nights, the blue corner walks to the Octagon first.

## HALL OF FAME
UFC Hall of Fame should be capitalized, as should fighters referenced as UFC Hall of Famers. Must include the UFC in front of the phrase "Hall of Fame."

## HYPERBOLE AND VIOLENCE
Do not include violent sentiments, such as referring to one fighter as another fighter's victim or other references of severe bodily injury.

## MMA
The sport is mixed martial arts (abbreviated MMA), not Mixed Martial Arts.

## NICKNAMES
Use quotation marks when listing a fighter's nickname alongside the real name. Do not use a nickname in place of a fighter name until you have first identified the fighter.

*These fighters should be referred to only by their nicknames in display type: Rampage Jackson, Shogun Rua, Minotauro Nogueira, Rony Jason, Mirko Cro Cop.*

## THE OCTAGON
The Octagon™ is capitalized (with a ™ symbol). Do not use the word "cage" in display copy.

## OCTAGON GIRLS®
Octagon Girls® should be capitalized. Names with proper spellings: Arianny Celeste, Brittney Palmer, Chrissy Blair, Vanessa Hanson.

## PAY-PER-VIEW
Pay-Per-View (abbreviated PPV), all three words capitalized, with hyphens. Not Pay Per View, pay per view or pay-per-view.

## PRE-SALE
Tickets go on pre-sale, not presale.

## TITLES
Championships and other titles do not need to be capitalized. For example, UFC light heavyweight champion Jon Jones met with UFC president Dana White to discuss the upcoming championship bout.

## VS
In creative, do not use a period after VS. It can be lower or upper case depending on application.

## WEIGHT CLASSES
Fighters must be referenced with their UFC weight classes. For example: UFC light heavyweight Jon Jones. Fighter names should not stand alone.

### STRAWWEIGHT
*Up to 115 lbs*

### FLYWEIGHT
*More than 115 to 125 lbs*

### BANTAMWEIGHT
*More than 125 lbs to 135 lbs*

### FEATHERWEIGHT
*More than 135 lbs to 145 lbs*

### LIGHTWEIGHT
*More than 145 lbs to 155 lbs*

### WELTERWEIGHT
*More than 155 lbs to 170 lbs*

### MIDDLEWEIGHT
*More than 170 lbs to 185 lbs*

### LIGHT HEAVYWEIGHT
*More than 185 lbs to 205 lbs*

### HEAVYWEIGHT
*More than 205 lbs to 265 lbs*

CONFIDENTIAL

ZFL-2490210

# REPEAT PATTERNS

THESE PATTERNS CAN BE USED TO BUILD FULL-BLEED BACKGROUNDS ON ADVERTISEMENTS, RETAIL PACKAGING AND POP. FOR EVENT-SPECIFIC ASSETS, PLEASE CONTACT UFC.



CONFIDENTIAL

ZFL-2490211



THE DESIGNS ON THE PREVIOUS PAGES SHOULD BE THE BASIS FOR ALL CREATIVE.
UFC REQUIRES FINAL APPROVAL. PLEASE EXPECT A 5-10 DAY RESPONSE TIME.

SEND ALL QUESTIONS AND APPROVALS TO:

HEIDI NOLAND
VICE PRESIDENT, BRAND & CREATIVE SERVICES
702.588.5567
hnoland@ufc.com

COPYRIGHT ©2014 ZUFFA, LLC. ALL RIGHTS RESERVED.
NO PART OF THIS PUBLICATION MAY BE REPRODUCED, STORED IN RETRIEVAL
SYSTEMS OR TRANSMITTED IN ANY FORM BY ANY MEANS, ELECTRONIC OR MECHANICAL, INCLUDING
PHOTOCOPYING, RECORDING OR ANY INFORMATION STORAGE RETRIEVAL SYSTEMS, WITHOUT THE
WRITTEN PERMISSION OF THE PUBLISHER.

ZFL-2490212

Schedule 2.1A[1]
to Reebok/Zuffa License Agreement

Authentics Business Program

| | |
|---|---|
| **Business Program:** | Authentics |
| **Fiscal Year:** | All |
| **Licensed Products** | In-Octagon Kits |
| **Authorized Brands for Licensed Products:** | REEBOK, the delta logo, LUTA, FIGHT FOR PEACE, LUTA PELA PAZ and stylizations and combinations thereof |
| **Authorized Distribution Channels for Licensed Products:** | Airport Retailer; Athletic Specialty Store; Better Department Store; Hotel/Casino Shop; Catalog/Direct Response; Closeout/Discount Store (only excess inventory may be sold through this channel); Dojo; Fan Shop; Hypermart; Kiosk; Licensee's Retail Store or Licensee's Outlet Store; Licensee Managed E-Commerce on Third Party Website; Licensee's Website; Mass Market Store; Mid-Tier Department Store; Military Base Store; Non UFC GYM Stores; Specialty Store; Sporting Goods Store; Third Party Managed E-Commerce Site; Toy Store; TV Retail; Warehouse Club Store; UFC GYM Stores |
| **Licensed Marks for Licensed Products:** | UFC, Ultimate Fighting Championship, AS REAL AS IT GETS and Octagon[2] Licensed Marks and specified Fighter IP including all logos and stylized versions thereof that are included on Schedule 1.1.55 |
| **Territory:** | Worldwide |

---

[1] NTD: Reebok review of the Business Programs is on hold until Reebok receives the list of Licensed Marks.

[2] Octagon Performance Logo, Octagon UFC Performance Logo Lockup and Octagon Shape, excluding Ulti-man with Octagon.

Schedule 2.1B
to Reebok/Zuffa License Agreement

*The Ultimate Fighter* Business Program

| | |
|---|---|
| **Business Program:** | *The Ultimate Fighter* |
| **Fiscal Year:** | All |
| **Licensed Products** | In-Octagon Kits, Performance Apparel, Fan Apparel and Headwear created for participants in *The Ultimate Fighter* show |
| **Authorized Brands for Licensed Products:** | REEBOK, the delta logo, MITCHELL & NESS, LUTA, FIGHT FOR PEACE, LUTA PELA PAZ and all stylizations and combinations thereof |
| **Authorized Distribution Channels for Licensed Products:** | Airport Retailer; Athletic Specialty Store; Better Department Store; Hotel/Casino Shop; Catalog/Direct Response; Closeout/Discount Store (only excess inventory may be sold through this channel); Dojo; Fan Shop; Hypermart; Kiosk; Licensee's Retail Store or Licensee's Outlet Store; Licensee Managed E-Commerce on Third Party Website; Licensee's Website; Mass Market Store; Mid-Tier Department Store; Military Base Store; Non UFC GYM Stores; Specialty Store; Sporting Goods Store; Third Party Managed E-Commerce Site; Toy Store; TV Retail; Warehouse Club Store; UFC GYM Stores |
| **Licensed Marks for Licensed Products:** | UFC, Ultimate Fighting Championship, Octagon[3] and The Ultimate Fighter Licensed Marks including all logos and stylized versions thereof that are included on Schedule 1.1.55 |
| **Territory:** | Worldwide |

---

[3] Octagon Performance Logo, Octagon UFC Performance Logo Lockup and Octagon Shape, excluding Ulti-man with Octagon.

Schedule 2.1C
to Reebok/Zuffa License Agreement

Performance Business Program

**Business Program:** Performance

**Fiscal Year:** All

**Licensed Products** Performance Apparel, Headwear

**Authorized Brands for** REEBOK, the delta logo, LUTA, FIGHT FOR PEACE, LUTA PELA
**Licensed Products:** PAZ and all stylizations and combinations thereof

**Authorized Distribution** Airport Retailer; Athletic Specialty Store; Better Department Store;
**Channels for Licensed** Hotel/Casino Shop; Catalog/Direct Response; Closeout/Discount Store
**Products:** (only excess inventory may be sold through this channel); Dojo; Fan
Shop; Hypermart; Kiosk; Licensee's Retail Store or Licensee's Outlet
Store; Licensee Managed E-Commerce on Third Party Website;
Licensee's Website; Mass Market Store; Mid-Tier Department Store;
Military Base Store; Non UFC GYM Stores; Specialty Store; Sporting
Goods Store; Third Party Managed E-Commerce Site; Toy Store; TV
Retail; Warehouse Club Store; UFC GYM Stores

**Licensed Marks for** UFC, ULTIMATE FIGHTING CHAMPIONSHIP and Octagon [4]
**Licensed Products:** Licensed Marks including all logos and stylized versions thereof that are
included on Schedule 1.1.55

**Territory:** Worldwide

---

[4] Octagon Performance Logo, Octagon UFC Performance Logo Lockup and Octagon Shape,
excluding Ulti-man with Octagon.

Schedule 2.1D
to Reebok/Zuffa License Agreement

Fan Apparel Business Program

| | |
|---|---|
| **Business Program:** | Fan Apparel |
| **Fiscal Year:** | All |
| **Licensed Products** | t-shirts, fashion tops, fleece, knits, wovens, outerwear, loungewear and bottoms |
| **Authorized Brands for Licensed Products:** | REEBOK, the delta logo, MITCHELL & NESS, LUTA, FIGHT FOR PEACE, LUTA PELA PAZ and all stylizations and combinations thereof |
| **Authorized Distribution Channels for Licensed Products:** | Airport Retailer; Athletic Specialty Store; Better Department Store; Hotel/Casino Shop; Catalog/Direct Response; Closeout/Discount Store (only excess inventory may be sold through this channel); Dojo; Fan Shop; Hypermart; Kiosk; Licensee's Retail Store or Licensee's Outlet Store; Licensee Managed E-Commerce on Third Party Website; Licensee's Website; Mass Market Store; Mid-Tier Department Store; Military Base Store; Non UFC GYM Stores; Specialty Store; Sporting Goods Store; Third Party Managed E-Commerce Site; Toy Store; TV Retail; Warehouse Club Store; UFC GYM Stores |
| **Licensed Marks for Licensed Products:** | UFC and Ultimate Fighting Championship Licensed Marks, AS REAL AS IT GETS, Octagon,[5] Pride and Ulti-Man[6] Licensed Marks (only in such jurisdictions approved by Zuffa) and specified Fighter IP including all logos and stylized versions thereof that are included on Schedule 1.1.55 |
| **Territory:** | Worldwide |

---

[5] Octagon Performance Logo, Octagon UFC Performance Logo Lockup and Octagon Shape, excluding Ulti-man with Octagon.

[6] Ulti-Man with globe and Ulti-Man with Octagon

Schedule 2.1E
to Reebok/Zuffa License Agreement

UFC Gym Business Program

| | |
|---|---|
| **Business Program**: | UFC Gym |
| **Fiscal Year:** | All |
| **Licensed Products** | t-shirts, fleece, Headwear, Accessories, outerwear, loungewear, bottoms, fashion tops, Performance Apparel |
| **Authorized Brands for Licensed Products:** | REEBOK, the delta logo, LUTA, FIGHT FOR PEACE, LUTA PELA PAZ and all stylizations and combinations thereof |
| **Authorized Distribution Channels for Licensed Products:** | Airport Retailer; Athletic Specialty Store; Better Department Store; Hotel/Casino Shop; Catalog/Direct Response; Closeout/Discount Store (only excess inventory may be sold through this channel); Dojo; Fan Shop; Hypermart; Kiosk; Licensee's Retail Store or Licensee's Outlet Store; Licensee Managed E-Commerce on Third Party Website; Licensee's Website; Mass Market Store; Mid-Tier Department Store; Military Base Store; Non UFC GYM Stores; Specialty Store; Sporting Goods Store; Third Party Managed E-Commerce Site; Toy Store; TV Retail; Warehouse Club Store; UFC GYM Stores |
| **Licensed Marks for Licensed Products:** | UFC Gym Licensed Marks including all logos and stylized versions thereof that are included on Schedule 1.1.55 [7] |
| **Territory:** | Worldwide |

---

[7] Both variations of the UFC Gym logo as noted in schedule 1.1.55

Schedule 2.1F
to Reebok/Zuffa License Agreement

Headwear Business Program

| | |
|---|---|
| **Business Program:** | Headwear |
| **Fiscal Year:** | All |
| **Licensed Products** | Headwear |
| **Authorized Brands for Licensed Products:** | REEBOK, the delta logo, MITCHELL & NESS, LUTA, FIGHT FOR PEACE, LUTA PELA PAZ and all stylizations and combinations thereof |
| **Authorized Distribution Channels for Licensed Products:** | Airport Retailer; Athletic Specialty Store; Better Department Store; Hotel/Casino Shop; Catalog/Direct Response; Closeout/Discount Store (only excess inventory may be sold through this channel); Dojo; Fan Shop; Hypermart; Kiosk; Licensee's Retail Store or Licensee's Outlet Store; Licensee Managed E-Commerce on Third Party Website; Licensee's Website; Mass Market Store; Mid-Tier Department Store; Military Base Store; Non UFC GYM Stores; Specialty Store; Sporting Goods Store; Third Party Managed E-Commerce Site; Toy Store; TV Retail; Warehouse Club Store; UFC GYM Stores |
| **Licensed Marks for Licensed Products:** | UFC, Ultimate Fighting Championship, AS REAL AS IT GETS, Octagon[8], Pride, and Ulti-Man[9] Licensed Marks and specified Fighter IP including all logos and stylized vers ions thereof that are included on Schedule 1.1.55 |
| **Territory:** | Worldwide |

---

[8] Octagon Performance Logo, Octagon UFC Perf ormance Logo Lockup and Octagon Shape, excluding Ulti-man with Octagon.

[9] Ulti-Man with globe and Ulti-Man with Octagon

CONFIDENTIAL                                                    ZFL-2490218

Schedule 2.1G
to Reebok/Zuffa License Agreement

Accessories Business Program

| | |
|---|---|
| **Business Program:** | Accessories |
| **Fiscal Year:** | All |
| **Licensed Products** | Socks, headbands, towels, athletic bags, backpacks, luggage, wallets, phone cases, iPad/tablet covers and cases, watches, belts and sunglasses |
| **Authorized Brands for Licensed Products:** | REEBOK, the delta logo, MITCHELL & NESS, LUTA, FIGHT FOR PEACE, LUTA PELA PAZ and all stylizations and combinations thereof |
| **Authorized Distribution Channels for Licensed Products:** | Airport Retailer; Athletic Specialty Store; Better Department Store; Hotel/Casino Shop; Catalog/Direct Response; Closeout/Discount Store (only excess inventory may be sold through this channel); Dojo; Fan Shop; Hypermart; Kiosk; Licensee's Retail Store or Licensee's Outlet Store; Licensee Managed E-Commerce on Third Party Website; Licensee's Website; Mass Market Store; Mid-Tier Department Store; Military Base Store; Non UFC GYM Stores; Specialty Store; Sporting Goods Store; Third Party Managed E-Commerce Site; Toy Store; TV Retail; Warehouse Club Store; UFC GYM Stores |
| **Licensed Marks for Licensed Products:** | UFC, Ultimate Fighting Championship, AS REAL AS IT GETS, Pride, Ulti-Man [10] and Octagon [11] Licensed Marks and specified Fighter IP including all logos and stylized versions thereof that are included on Schedule 1.1.55 |
| **Territory:** | Worldwide |

---

[10] Ulti-Man with globe and Ulti-Man with Octagon

[11] Octagon Performance Logo, Octagon UFC Performance Logo Lockup and Octagon Shape, excluding Ulti-man with Octagon.

Schedule 2.1H
to Reebok/Zuffa License Agreement

Footwear Business Program

| | |
|---|---|
| **Business Program:** | Footwear |
| **Fiscal Year:** | All |
| **Licensed Products** | Footwear |
| **Authorized Brands for Licensed Products:** | REEBOK, the delta logo, the vector logo, LUTA, FIGHT FOR PEACE, LUTA PELA PAZ and all stylizations and combinations thereof |
| **Authorized Distribution Channels for Licensed Products:** | Airport Retailer; Athletic Specialty Store; Better Department Store; Hotel/Casino Shop; Catalog/Direct Response; Closeout/Discount Store (only excess inventory may be sold through this channel); Dojo; Fan Shop; Hypermart; Kiosk; Licensee's Retail Store or Licensee's Outlet Store; Licensee Managed E-Commerce on Third Party Website; Licensee's Website; Mass Market Store; Mid-Tier Department Store; Military Base Store; Non UFC GYM Stores; Specialty Store; Sporting Goods Store; Third Party Managed E-Commerce Site; Toy Store; TV Retail; Warehouse Club Store; UFC GYM Stores |
| **Licensed Marks for Licensed Products:** | UFC and Ultimate Fighting Championship Licensed Marks and specified Fighter IP including all logos and stylized versions thereof that are included on Schedule 1.1.55 |
| **Territory:** | Worldwide |

CONFIDENTIAL                                                    ZFL-2490220

Schedule 2.1I
to Reebok/Zuffa License Agreement

New Business Programs

Schedule 4.5
to Reebok/Zuffa License Agreement

Event SKU Requirements

| Product Category | Commentary | Event Type | |
|---|---|---|---|
| | | Tier 1 | Tier 2 |
| Men's Event Tees | | 1 Design;  2 Colors | 1 Design |
| Men's Assortment | Walkout, UFC Branded, Fighter Specific | 10- 12 Designs | 7 - 9 Designs |
| Men's SMU Tee | Region Specific | 1 Design | 1 Design |
| Women's Event Tee | | 1 Design | 1 Design |
| Woment's Assortment | Walkout, UFC Branded, Fighter Specific | 8 - 10 Designs | 6 - 8 Designs |
| Women's SMU Tee | Region Specific | 1 Design | 1 Design |
| Men's Hoodie | | 2 Designs | 2 Designs |
| Women's Hoodie | | 2 Designs | 1 Design |
| Youth Assortment | Walkout, UFC Branded, Fighter Specific | 4 Designs | 4 Designs |
| Headwear | | 6 Designs | 6 Designs |
| **Total** | | **37 - 41** | **30 - 34** |

Notes:

Tier 1 events defined as Pay-per-view and Fight Night on FOX events (as broadcast in the U.S.)

Tier 2 events defined  as Fight Night  events  on FS1, FS2 and Fight Pass  (as broadcast  in the U.S.)

CONFIDENTIAL

Schedule 5.1
to Reebok/Zuffa License Agreement

UFC Global Apparel Rights

| Channel | Authentics | | | Performance | | | Fan Gear | | | Headwear | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Men's | Women's | Youth | Men's | Women's | Youth | Men's | Women's | Youth | Men's | Women's | Youth |
| Upper Tier | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | 1 other partner | 1 other partner | Exclusive | 1 other partner | 1 other partner | Exclusive |
| Mid Tier | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive |
| Mass Market | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive |
| Events | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | 85% of SKUs | 85% of SKUs | Exclusive | 85% of SKUs | 85% of SKUs | Exclusive |
| E-Commerce | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | Exclusive | 2 other partners | 2 other partners | 1 other partner | 2 other partners | 2 other partners | 1 other partner |

CONFIDENTIAL

Schedule 5.3.2
to Reebok/Zuffa License Agreement

Key Territories

Australia
Brazil
Canada
China
Ireland
Japan
Mexico
South Korea
UK
USA

***Schedule 5.***
to Reebok/Zuffa License Agreement

Zuffa Existing Licensees

| Name | Territory | Categories |
|---|---|---|
| Playcorp Pty, Ltd | Australia and NZ | Apparel, Socks, Underwear, Headwear, and Bags |
| Lojas Riachuelo, S.A. | Brazil | Apparel DTR |
| Marc 4, Ltda | Brazil | Apparel |
| Master Glasses, Ltda | Brazil | Sunglasses |
| MK3 Operacoes, Ltda | Brazil | Underwear and Socks |
| Xeryu's Importadora, Ltda | Brazil | Bags |
| Zico Export, S.A. | Central America | Apparel, Underwear, Headwear, and Bags |
| Distribuidora Tro, Ltda | Chile | Apparel, Socks, and Headwear |
| Confecciones Metro, S.A. | Ecuador | Apparel |
| Delivery Agent, Inc. (ecommerce only) | Europe | Apparel |
| Aurimoda, S.A. DE C.V. | Mexico | Apparel |
| Gafas Accesorios, S.A. DE C.V. | Mexico | Sunglasses |
| Grupo Gardea, S.A. DE C.V. | Mexico | Headwear |
| Imagina Tu Mesa, S.A. DE C.V. | Mexico | Apparel |
| Lyn De Mexico, S.A. DE C.V. | Mexico | Pajamas |
| Targmex | Mexico | Bags |
| Fanatics Box Seat Clothing (ecommerce only) | North America | Apparel and Headwear |
| The Antigua Group | US | Apparel, Headwear and Bags |
| Eagle Promotions, LLC (UFC Banners Only) | US and Canada | Apparel |
| Strider Apparel | US and Canada | Underwear |
| Ringstar, Inc. | US, Canada, and Brazil | Footwear (MMA Training Shoes) |

CONFIDENTIAL                                                                 ZFL-2490225

## Schedule 6.1.4
### to Reebok/Zuffa License Agreement

### Wheel of Fortune

| | Base Contract | | | | | | Extension | Extension |
|---|---|---|---|---|---|---|---|---|
| Fiscal Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Calendar Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| MRG | $0.50 | $1.50 | $2.25 | $3.00 | $3.25 | $4.00 | $5.75 | $6.50 |
| Exposure Fee | $2.00 | $4.00 | $6.25 | $7.25 | $8.00 | $8.00 | $8.25 | $8.50 |

Extension Decision
FY 7 / CY 2021 — 15-Jul-19
FY 8 / CY 2022 — 15-Jul-20

Wheel of Fortune Years: ShortFall ShortFall ShortFall
Wheel of Fortune Optional Years: ShortFall

Cure Years
Shortfall WFY1 — Excess Royalties to Cure
Shortfall WFY2 — Excess Royalties to Cure
Shortfall WFY3 — Excess Royalties to Cure
Shortfall WFOY4 — Excess Royalties to Cure

**Example 1 - Base Contract**

| | | | | | | |
|---|---|---|---|---|---|---|
| Actual Royalties | $5.00 | $0.25 | $2.25 | $3.00 | $3.50 | $4.75 |
| MRG | $0.50 | $1.50 | $2.25 | $3.00 | $3.25 | $4.00 |
| Paid Royalties | $5.00 | $1.50 | $2.25 | $3.00 | $3.25 | $4.00 |
| Annual Royalty Shortfall | $0.00 | $1.25 | $0.00 | $0.00 | $0.00 | $0.00 |
| Cumulative Royalty Shortfall | $0.00 | $1.25 | $1.25 | $1.25 | $1.00 | $0.25 |

**Example 2 - Base Contract**

| | | | | | | |
|---|---|---|---|---|---|---|
| Actual Royalties | $5.00 | $2.00 | $2.50 | $1.00 | $5.00 | $7.00 |
| MRG | $0.50 | $1.50 | $2.25 | $3.00 | $3.25 | $4.00 |
| Paid Royalties | $5.00 | $2.00 | $2.50 | $3.00 | $5.00 | $7.00 |
| Annual Royalty Shortfall | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Cumulative Royalty Shortfall | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

**Example 3 - Base Contract plus FY7 Extension Exercised**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Actual Royalties | $1.00 | $2.00 | $2.50 | $2.50 | $3.25 | $4.25 | $7.00 |
| MRG | $0.50 | $1.50 | $2.25 | $3.00 | $3.25 | $4.00 | $5.75 |
| Paid Royalties | $1.00 | $2.00 | $2.50 | $3.00 | $3.25 | $4.00 | $6.75 |
| Annual Royalty Shortfall | $0.00 | $0.00 | $0.00 | $0.50 | $0.00 | $0.00 | $0.00 |
| Cumulative Royalty Shortfall | $0.00 | $0.00 | $0.00 | $0.50 | $0.50 | $0.25 | $0.00 |

**Example 4 - Base Contract plus FY7 & FY8 Extension Exercised**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Actual Royalties | $1.00 | $2.00 | $2.50 | $2.50 | $3.25 | $4.00 | $5.75 | $7.00 |
| MRG | $0.50 | $1.50 | $2.25 | $3.00 | $3.25 | $4.00 | $5.75 | $6.50 |
| Paid Royalties | $1.00 | $2.00 | $2.50 | $3.00 | $3.25 | $4.00 | $5.75 | $7.00 |
| Annual Royalty Shortfall | $0.00 | $0.00 | $0.00 | $0.50 | $0.00 | $0.00 | $0.00 | $0.00 |
| Cumulative Royalty Shortfall | $0.00 | $0.00 | $0.00 | $0.50 | $0.50 | $0.50 | $0.50 | $0.50 |

**Example 5 - Base Contract plus FY7 & FY8 Extension Exercised**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Actual Royalties | $0.50 | $1.00 | $2.50 | $2.00 | $3.50 | $4.25 | $6.00 | $7.00 |
| MRG | $0.50 | $1.50 | $2.25 | $3.00 | $3.25 | $4.00 | $5.75 | $6.50 |
| Paid Royalties | $0.50 | $1.50 | $2.25 | $3.00 | $3.25 | $4.00 | $5.75 | $7.00 |
| Annual Royalty Shortfall | $0.00 | $0.50 | $0.00 | $1.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Cumulative Royalty Shortfall | $0.00 | $0.50 | $0.25 | $1.25 | $1.00 | $0.75 | $0.50 | $0.50 |

CONFIDENTIAL

Schedule 8.4
to Reebok/Zuffa License Agreement

Uses of Reebok Marks

1.  The Reebok Marks will be used in the film, television program, or other media ("Work") only as they appear on Promotional Products.  In all copies of the Work, the Reebok Marks and the Promotional Products will be accurately reproduced.  The Reebok Marks and/or the Promotional Products will not be used separately from one another.

2.  UFC will use reasonable best efforts to prevent the making of any derogatory comments in respect of the Reebok Marks or the Promotional Products or the Reebok business in general and to prevent the Reebok Marks or Promotional Products from being used in a context damaging to the reputation of Reebok, at the very least consistent in each case with UFC's protection of its own Trademarks and business.

3.  Appropriate trademark notices will be included for the Reebok Marks, as reasonably practicable.

4.  Use of the Reebok Marks and Promotional Products will not imply a false sponsorship or association with Reebok.

5.  The context in which the Reeboks Marks and the Promotional Products are shown will be in compliance with high ethical standards which standards shall be at least the same standards that UFC applies to the use of its Trademarks, it being understood that MMA fighting and training and activities reasonably related or incidental thereto are inherently violent and dangerous and references to such activities and the biographical or semi-biographical stories of Fighters will not be a breach of this provision.

6.  Zuffa will indemnify, defend and hold Reebok and its officers, directors, employees, agents, and representatives, harmless from and against any and all direct damages, costs, expenses (including reasonable attorney's fees), loss, demands, claims, or liability caused by or arising from the production, distribution, use, marketing or other promotion of the Work, with the exception of any claim which relates to the use of the Reebok Marks and/or Promotional Products in the Work in accordance with the terms of this Schedule 8.4.

Notwithstanding the foregoing, this Schedule 8.4 shall not apply to any film, television, video games or other media content if Reebok directly licenses a Reebok Mark to a third party for use in connection with such film, television, video games or other media content.

Schedule 8.8
to Reebok/Zuffa License Agreement

Marketing and Social Media Activities

Zuffa will use reasonable best efforts to utilize the below listed marketing activities to promote the Licensed Products. All marketing activities featuring Licensed Product will direct customers to UFCStore.com and/or a designated official brick and mortar retailer.

- In broadcast integration
    - o Graphics
    - o On-air mentions
    - o Vignettes
- In venue integration
    - o Vignettes
    - o Announcements
    - o Retail
- Banners on UFC.com and affiliated pages
- Banners on m.UFC.com and affiliated pages
- Banners on UFCStore.com and affiliated pages
- Social media channels actively utilized by Zuffa, including but not limited to
    - o Facebook
    - o Twitter
    - o Instagram
    - o Google+
- Licensed Product pre-roll ads on videos on UFC.com and videos controlled by UFC and appearing on other sites
- Mobile alerts for Licensed Products during hot markets
- Inclusion in newsletter and / or other communications to UFC's database
- TV ad inventory
- Promotions to Fight Club, UFC GYM members, UFC FIT members
- UFC.com homepage and site takeovers
- UFC Magazine ads and editorial

CONFIDENTIAL                                                                    ZFL-2490228

Schedule 11.1.1
to Reebok/Zuffa License Agreement

adidas Group Workplace Standards

**General Principle**

Business partners must comply fully with all legal requirements relevant to the conduct of their businesses.

**Employment Standards**

*Forced Labour*

Business partners must not use forced labour, whether in the form of prison labour, indentured labour, bonded labour or otherwise. No employee may be compelled to work through force or intimidation of any form, or as a means of political coercion or as punishment for holding or expressing political views.

*Child Labour*

Business partners must not employ children who are less than 15 years old, or less than the age for completing compulsory education in the country of manufacture where such age is higher than 15.

*Discrimination*

Business partners must not discriminate in recruitment and employment practices. Decisions about hiring, salary, benefits, training opportunities, work assignments, advancement, discipline and termination must be based solely on ability to perform the job, rather than on the basis of personal characteristics or beliefs, such as race, national origin, gender, religion, age, disability, marital status, parental status, association membership, sexual orientation or political opinion. Additionally, business partners must implement effective measures to protect migrant employees against any form of discrimination and to provide appropriate support services that reflect their special status.

*Wages & Benefits*

Wages must equal or exceed the minimum wage required by law or the prevailing industry wage, whichever is higher, and legally mandated benefits must be provided. In addition to compensation for regular working hours, employees must be compensated for overtime hours at the rate legally required in the country of manufacture or, in those countries where such laws do not exist, at a rate exceeding the regular hourly compensation rate.

Wages are essential for meeting the basic needs of employees and reasonable savings and expenditure. We seek business partners who progressively raise employee living standards through improved wage systems, benefits, welfare programmes and other services, which enhance quality of life.

### Working Hours

Employees must not be required, except in extraordinary circumstances, to work more than 60 hours per week including overtime or the local legal requirement, whichever is less. Employees must be allowed at least 24 consecutive hours rest within every seven-day period, and must receive paid annual leave.

### Freedom of Association & Collective Bargaining

Business partners must recognize and respect the right of employees to join and organize associations of their own choosing and to bargain collectively. Business partners must develop and fully implement mechanisms for resolving industrial disputes, including employee grievances, and ensure effective communication with employees and their representatives.

### Disciplinary Practices

Employees must be treated with respect and dignity. No employee may be subjected to any physical, sexual, psychological or verbal harassment or abuse, or to fines or penalties as a disciplinary measure.

Business partners must publicize and enforce a non-retaliation policy that permits factory employees to express their concerns about workplace conditions directly to factory management or to us without fear of retribution or losing their jobs.

### Health & Safety

A safe and hygienic working environment must be provided, and occupational health and safety practices which prevent accidents and injury must be promoted. This includes protection from fire, accidents and toxic substances. Lighting, heating and ventilation systems must be adequate. Employees must have access at all times to sanitary facilities which should be adequate and clean. Business partners must have health and safety policies which are clearly communicated to employees. Where residential facilities are provided to employees, the same standards apply.

### Environmental Requirements

Business partners must make progressive improvement in environmental performance in their own operations and require the same of their partners, suppliers and subcontractors. This includes: integrating principles of sustainability into business decisions; responsible use of natural resources; adoption of cleaner production and pollution prevention measures; and designing and developing products, materials and technologies according to the principles of sustainability.

Schedule 12.1
to Reebok/Zuffa License Agreement

UFC Code of Conduct

Attached.

CONFIDENTIAL                                    ZFL-2490231



### UFC Fighter Conduct Policy

As provided in the Promotional and Ancillary Rights Agreement entered into between each UFC fighter and Zuffa, LLC ("Zuffa" or "UFC"),

> fighters shall conduct themselves in accordance with commonly accepted standards of decency, social conventions and morals, and fighters will not commit any act or become involved in any situation or occurrence or make any statement which will reflect negatively upon or bring disrepute, contempt, scandal, ridicule, or disdain to the fighter or the UFC.

This contractual provision reflects the UFC's broad requirement that its contracted fighters act in a legal, ethical, and responsible manner and avoid conduct detrimental t o the integrity of the UFC organization.

The following Conduct Policy ("Policy") details the standards of conduct each fighter is required to meet and the process by which misconduct may result in disciplinary measures.

### Standards of Conduct:

This Policy applies to all fighters under contract with UFC or its affiliate organizations.

As the UFC's highest profile independent contractors and as ambassadors of the sport of mixed martial arts, UFC fighters are held to a high standard by the UFC, the media and the public. Responsible conduct advances the interests of the sport and the fighters. Conversely, irresponsible conduct by a fighter tarnishes the reputation of both the affected fighter and the UFC and undermines the positive image set by other fighters.

While criminal activity by a UFC fighter is clearly detrimental to the reputation of the UFC and therefore subjects the fighter to discipline, other conduct can also result in disciplinary action.

Discipline may be imposed for misconduct, which includes without limitation, the following examples:

V02.110514

1



∞ Criminal offenses including, but not limited to, those involving: the use or threat of violence; domestic violence and other forms of partner abuse; theft and other property crimes; sex offenses; obstruction or resisting arrest; disorderly conduct; fraud; racketeering; and money laundering;

∞ Criminal offenses relating to performance-enhancing and prohibited substances, or substance abuse;

∞ Unlawful possession of a gun or other weapon;

∞ Conduct, including but not limited to assault, stalking, bullying or domestic violence, that imposes inherent danger to the safety or well being of another person;

∞ Violent, threatening or harassing behavior;

∞ Derogatory or offensive conduct, including without limitation insulting language, symbols, or actions about a person's ethnic background, heritage, color, race, national origin, age, religion, disability, gender or sexual orientation;

∞ Inappropriate physical, verbal, and online behavior (such as inappropriate statements made via e-mail, text messaging or social networks);

∞ Conduct that undermines or puts at risk the organization or promotion of a UFC event, including without limitation, failure to deliver, engage in or otherwise execute any and all promotional responsibilities, or failure to return in a timely manner the accurate and complete documents or information for immigration, licensing, medical, tax or athletic commission purposes; and

∞ Conduct that undermines or puts at risk the integrity and reputation of the UFC and its partners.

**Disciplinary Process:**

Upon discovery of potential fighter misconduct, which may include allegations, arrest, or other formal or informal charges of misconduct, UFC will direct an investigation, which may include interviews and information-gathering from medical experts, law enforcement officers and other relevant professionals. In the case of potential fighter misconduct relating to violent conduct or domestic violence, the fighter may be referred to a third party for a required evaluation. As appropriate, the affected fighter and/or his/her designee will also have the opportunity to provide information on the conduct at issue. Upon conclusion of the investigation, UFC will have full authority to impose disciplinary measures on the fighter as warranted in its sole discretion.

V02.110514

CONFIDENTIAL                                                                    ZFL-2490233



Discipline may take the form of fines, suspension, and cessation of service and may include conditions to be satisfied prior to the resolution of the incident. Such discipline may also include suspension for a short period, suspension until resolution     of legal charges, or termination of contract.

Determination of the appropriate discipline for an incident will be based on the nature of the misconduct and other relevant factors.

Immediate disciplinary measures may be imposed, provided that following a full investigation of the incident, UFC may review the measures and make appropriate adjustments. Unless the incident involves significant harm, a first offense will generally not result in immediate  disciplinary measure until an investigation has been completed.

Previous violations of this Policy may be taken into consideration in making disciplinary determinations and may result in immediate disciplinary action. Misconduct occurring prior to a fighter's provision of service to UFC may also be considered.

**Appeal Process:**

**Notice**: Following the imposition of disciplinary measures by UFC, the affected fighter shall have the option to appeal the determination solely through binding arbitration ("Arbitration") administered by JAMS.

In order to file an appeal, a fighter must complete both of the following two steps  **within thirty (30) calendar days following the disciplinary determination**:

(i) notify the UFC Legal Department (via the contact information in the Contact Information section below); and

(ii) file a Demand for Arbitration with JAMS.

**Appeal**: The Arbitration will be conducted in accordance with the JAMS Comprehensive Arbitration Rules & Procedures effective as of the commencement of the Arbitration ("Rules"). The language of the Arbitration will be English. The Arbitration will be governed and determined by the laws of the State of Nevada without regard to conflict of laws principles. The Arbitration will be resolved by a single arbitrator appointed in accordance with the Rules ("Arbitrator"). The Arbitration will be held in Las Vegas, Nevada at a location selected by the Arbitrator. The Arbitration proceedings and the resolution thereof will be completely confidential, subject only to such disclosures as required by law. The Arbitration will be the sole and exclusive venue of appeal with respect to the subject matter of the arbitrated dispute.

V02.110514

3

CONFIDENTIAL

ZFL-2490234



**Evaluation, Counseling and Treatment:**

Fighters who engage in misconduct, including domestic violence, may be required to undergo clinical evaluation. Based on the results of such evaluation, participation in an education program, counseling or other treatment as recommended by a health professional may be required. While evaluation and treatment are not considered disciplinary measures, failure to comply with an evaluation and treatment process   may constitute a separate basis for discipline.

**Voluntary Evaluation, Counseling and Treatment Assistance:**

Fighters are encouraged to consult with the UFC Legal Department via the contact information (in the Contact Information section) below to obtain access to education, counseling, treatment, programs and resources that may assist in preventing misconduct.

**Reporting of Incidents:**

UFC must be notified immediately of any incident that constitutes fighter misconduct by contacting the UFC Legal Department (via the contact information in the Contact Information below). Failure to report an incident will constitute conduct detrimental to the integrity of the UFC and will be taken into consideration in making disciplinary determination under this Policy.

**Contact Information:**

Please contact Assistant General Counsel Michael Mersch of the UFC Legal Department **via email at mmersch@ufc.com or telephone at (702) 588-5532** regarding this Policy, including without limitation, to report an incident, seek voluntary treatment or appeal a disciplinary determination.

V02.110514

4

CONFIDENTIAL

ZFL-2490235