# EXHIBIT 64
-
# REDACTED VERSION OF ECF NO. 540-20

# EXHIBIT 16

# Excerpts from Deposition of Kyle Kingsbury

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon      )
Fitch, Brandon Vera, Luis Javier )
Vazquez, and Kyle Kingsbury on   )
behalf of themselves and all     )
others similarly situated,       )
                                 )
        Plaintiffs,              )
                                 )
  vs.                            ) Case No. 2:15-cv-
                                 ) 01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate       )
Fighting Championship and UFC,   )
                                 )
        Defendants.              )
                                 )

DEPOSITION OF KYLE KINGSBURY

Taken at the Offices of Boies, Schiller & Flexner
300 South 4th Street, Suite 800
Las Vegas, Nevada

On Friday, February 17, 2017
At 9:19 a.m.

Reported by: Jane V. Efaw, CCR #601, RPR



Page 46

1  to my final fight in King of the Cage and was just
2  waiting to finish my contract with them.  I'm not
3  sure at which point.
4      Q.  But it was sometime before your final fight
5  with King of the Cage?
6      A.  I believe so.
7      Q.  Did you decide to hire a new manager at that
8  point?
9      A.  I decided to hire a new manager after I
10 suffered my first loss against Tony Lopez, which is
11 my final fight in King of the Cage.
12     Q.  And who was that manager?
13     A.  The manager was Crazy Bob Cook and DeWayne
14 Zinkin from Zinkin Entertainment.
15     Q.  And how did you meet them?
16     A.  I grew up in San Jose, California, and
17 around that area and was familiar with American
18 Kickboxing Academy and the level of fighters that
19 they had.
20         When I was 17, a friend of mine and I
21 decided to go train at American Kickboxing Academy
22 briefly.  We played football and wrestled together,
23 but we didn't do a spring sport.
24         So to stay in shape and to learn new things
25 that would be applicable to football and wrestling,

Page 47

1  we decided to take mixed martial arts with Frank
2  Shamrock and Crazy Bob Cook at American Kickboxing
3  Academy.
4      Q.  Was your friend in -- did he also become an
5  MMA fighter?
6      A.  Yes.  His name was Daniel Puder.  And he
7  fought for Strikeforce.  And he ended up becoming a
8  pro wrestler.  He won the million-dollar Tough Enough
9  for WWE.
10     Q.  So when did you join AKA as an MMA fighter?
11     A.  I joined AKA as an MMA fighter after my loss
12 with Tony Lopez.  I moved back to California, which
13 is where I'm from.  My family's there.  And started
14 training at American Kickboxing Academy.
15     Q.  And it's that same time period that you also
16 retained Bob Cook and DeWayne Zinkin?
17     A.  That is correct.
18     Q.  And did one of them handle most of your
19 matters?
20     A.  Crazy Bob Cook was the -- between the two of
21 them, the person that I spoke with the most.  DeWayne
22 Zinkin had his offices in Fresno, California, which
23 is a few hours away.  And Bob trained and managed the
24 guys and was at American Kickboxing Academy
25 regularly.

Page 48

1      Q.  So after your last fight in King of the
2  Cage, did King of the Cage try and exercise its
3  option for another year?
4          MR. DELL'ANGELO:  Object to the form to the
5  extent it calls for a legal conclusion.
6          THE WITNESS:  I believe that King of the
7  Cage tried to exercise the option for a second year
8  because my manager at that time, I had a phone call
9  with him and let him know that I would not be
10 re-signing with them and that I was going to move to
11 California to train at AKA and have a new management
12 company represent me.
13         Obviously, that didn't sit well with him.
14 And I believe they called Bob Cook at some point
15 threatening that they still had me under contract and
16 that they wouldn't allow me to work with someone
17 else.
18         And if I recall correctly, DeWayne Zinkin
19 had his lawyers look at their contract, and they
20 determined that they did not have that right and that
21 there was a conflict with having my manager who got
22 me this contract be an employee of King of the Cage.
23 BY MR. WIDNELL:
24     Q.  Was there any litigation related to that?
25     A.  They had threatened to take us to court and

Page 49

1  have litigation, and that never came to fruition.
2      Q.  Was there ever any other litigation between
3  either King of the Cage and you or between you and
4  your prior manager?
5          MR. DELL'ANGELO:  Objection.  Compound.
6          THE WITNESS:  No, not to my knowledge, there
7  was no litigation.
8  BY MR. WIDNELL:
9      Q.  If you go back to Exhibit 81 and look at the
10 second page, Item 7.  Could you read that?
11     A.  "If Kyle should become injured and cannot
12 compete in scheduled fights, King of the Cage will
13 have the option to extend the term of the contract so
14 that Kyle may fulfill his time commitment."
15     Q.  What's your understanding of what that term
16 meant?
17     A.  This term, I believe, is King of the Cage's
18 ability to extend my contract during an injury.
19     Q.  Did that provision ever come into play?
20     A.  That provision --
21         MR. DELL'ANGELO:  Object to form to the
22 extent it calls for a legal conclusion.
23 BY MR. WIDNELL:
24     Q.  Let me ask it slightly differently.  Maybe
25 it's easier.  Were you ever injured during your time



Page 50

1  fighting for King of the Cage?
2     A.  I was not injured during my time fighting
3  for King of the Cage.
4     Q.  So if I'm reading this correctly, it looks
5  like the next thing that happened was that you ended
6  up becoming a contestant on the Ultimate Fighter; is
7  that correct?
8     A.  That is correct.
9     Q.  Can you tell me how that came to pass?
10    A.  After training at American Kickboxing
11 Academy, I had fought as a heavyweight in all my
12 previous matches.  And a couple of my teammates,
13 Bobby Southworth, who had fought as a heavyweight
14 prior and was the current light heavyweight for
15 Strikeforce, they mentioned that they think I should
16 try to drop the weight.  Instead of trying to gain
17 weight, I should try to lean out as much as I can and
18 be a bigger fighter at the 205 weight class.  And I
19 took that into consideration but still liked not
20 having to cut weight.
21       But it was when Bob Cook mentioned to me
22 there was an opportunity to be on the Ultimate
23 Fighter Season 8, which had split between
24 lightweights 155 class and light heavyweights 205
25 class.

Page 51

1        And then if I was able to drop my weight
2  that I could potentially be on that show.  And that
3  that could get my foot in the door for fighting at
4  the highest level in the UFC.
5     Q.  So you agreed to apply; is that right?
6     A.  Yeah.  Bob Cook and I sent in a video to
7  them.  They had already -- Bob had a history working
8  with the UFC.  Obviously, they already had fighters
9  on our team that were in the UFC.  But they also had
10 fighters that had gone through the Ultimate Fighter
11 as a pathway to make it into the UFC.
12    Q.  You say "as a pathway to make it into the
13 UFC."  Were you focused at that point on trying to
14 become a UFC fighter?
15    A.  I think the goal of every fighter is to
16 fight at the highest level and to become champion one
17 day.  And if you're trying to fight, it doesn't
18 matter if you're the champion, you know, big fish in
19 a small pond.  You could be the best of a small
20 community.  But really to test yourself and to know
21 that you're the best in the world, that takes
22 becoming champion of the UFC.
23    Q.  At the time, did you think it was
24 competitive to get a spot on the Ultimate Fighter?
25       MR. DELL'ANGELO:  Objection to the form.

Page 52

1  BY MR. WIDNELL:
2     Q.  Let me ask this a little differently.  Did
3  you feel like you had to compete with a lot of other
4  people to get that spot on the Ultimate Fighter?
5     A.  In my opinion, the Ultimate Fighter by
6  Season 8 time was wildly successful in that a lot of
7  people watched the show.  You had to have certain
8  credentials.  You had to have displayed yourself in a
9  manner that showed that you had real talent or at
10 least the possibility of growing into that talent.
11       And so they had to see something in you in
12 order to bring you on that show.  And it was hard --
13 it was quite competitive to get on the show.
14    Q.  So you'd say there were a lot of other
15 fighters who wanted to have the spot that you got; is
16 that accurate?
17       MR. DELL'ANGELO:  Object to the form.
18       THE WITNESS:  I think that's a fair
19 statement.
20 BY MR. WIDNELL:
21    Q.  Now, Mr. Fitch in his deposition -- I can't
22 recall if this was in the morning and you would have
23 heard it or not.  But at some point during his
24 deposition, he said that he thought that at the time
25 that he applied, the people who made it onto the

Page 53

1  Ultimate Fighter were all elite fighters.
2        But I think he said that later seasons that
3  may not have been the case.  Do you agree with that
4  statement?
5        MR. DELL'ANGELO:  Object to the form to the
6  extent it calls for a legal conclusion and
7  mischaracterizes the prior witness' testimony.  You
8  can answer.
9        THE WITNESS:  I think if I understand that
10 question correctly, Jon was stating that on the
11 Ultimate Fighter Season 1, because it was the first
12 one, there was a wealth of talent on that season and
13 that a lot of the fighters who fought on Ultimate
14 Fighter Season 1 eventually went on to have careers
15 in the UFC.
16       That wasn't the case for every Ultimate
17 Fighter.  There's been various seasons where only a
18 couple guys or women were kept after the show had
19 ended as opposed to the majority of them from
20 Ultimate Fighter Season 1.
21       On the Ultimate Fighter Season 8, we were
22 really a standout at that point because quite a few
23 of the fighters were kept from Ultimate Fighter
24 Season 8, which hadn't been the case in between
25 Season 1 and Season 8.



Page 54

```
 1   BY MR. WIDNELL:
 2      Q.  So would you say that all of the contestants
 3   for Season 8 were elite fighters?
 4          MR. DELL'ANGELO:  Object to the form to the
 5   extent it calls for a legal conclusion.
 6          THE WITNESS:  I'm not saying that at all.
 7   In fact, one of the ways that they would orchestrate
 8   the show is they would bring on some really talented
 9   fighters, and they would bring on some guys who had
10   bare minimal experience, sometimes with no fights or
11   a 1-and-0 record or a 1-and-1 record.
12          And it is my understanding that they wanted
13   that dynamic for the people who made it into the
14   house so that they would still have exciting fights,
15   meaning "exciting" they would still see big knockouts
16   and things like that as opposed to every fight going
17   to a decision.
18          So when you compete at the highest level,
19   it's not always guaranteed that you'll have a
20   knockout or an exciting fight for the fans.  I think
21   Jon Fitch has demonstrated that throughout his career
22   and was punished for it, winning a lot by decision
23   and not fighting the way the UFC would have wanted
24   him to.  Dana White specifically.
25          So Ultimate Fighter Season 8 did have quite
```

Page 55

```
 1   a wide-ranging gap of fighters who were extremely
 2   talented and had great records and fighters that had
 3   minimal experience.
 4   BY MR. WIDNELL:
 5      Q.  Were you an elite fighter at the point that
 6   you were participating in Season 8?
 7          MR. DELL'ANGELO:  Objection to the form.
 8   Calls for a legal conclusion.
 9          THE WITNESS:  I believed in myself and my
10   chances of winning the Ultimate Fighter Season 8.  I
11   did not believe I was an elite fighter until I've
12   made it into the UFC.
13   BY MR. WIDNELL:
14      Q.  Would you say that only the contestants on
15   the Ultimate Fighter who ultimately made it into the
16   UFC were elite fighters?
17          MR. DELL'ANGELO:  Objection to the form to
18   the extent it calls for a legal conclusion.
19          THE WITNESS:  I would say that if you've
20   made it into the UFC, you could consider yourself an
21   elite-level fighter, in my opinion.
22   BY MR. WIDNELL:
23      Q.  Okay.  But what I'm really trying to figure
24   out is if you're selected for the Ultimate Fighter,
25   does that also mean you're an elite fighter?  And it
```

Page 56

```
 1   sound like some are and some aren't.
 2          If you were going to try and identify or
 3   come up with an easy explanation for which are the
 4   most likely elite fighters of the season, how would
 5   you do that?
 6          MR. DELL'ANGELO:  Objection to the form to
 7   the extent it calls for a legal conclusion and
 8   speculation.
 9          THE WITNESS:  In my opinion, I think the
10   guys who were kept under contract -- or were given a
11   contract to fight in the UFC after the Ultimate
12   Fighter 8 had finished defined them as elite.  They
13   had made it to the highest level if they were
14   fighting against the best guys, and they had made it
15   to the highest level of the sport.
16   BY MR. WIDNELL:
17      Q.  So if you got a contract at the end, that
18   really is the best indicator that you actually are an
19   elite fighter among the members of the Ultimate
20   Fighter season; is that accurate?
21          MR. DELL'ANGELO:  Objection to the form to
22   the extent it calls for a legal conclusion.
23          THE WITNESS:  In my opinion, I believe there
24   are a number of factors that would go into making
25   somebody an elite fighter.  But probably the most
```

Page 57

```
 1   important, in my opinion, would be to fight in the
 2   UFC.
 3   BY MR. WIDNELL:
 4      Q.  Can you be an elite fighter if you don't
 5   fight in the UFC?
 6          MR. DELL'ANGELO:  Objection to the form to
 7   the extent it calls for a legal conclusion.
 8          THE WITNESS:  I think there have been some
 9   cases in the past where there were elite-level
10   fighters who did not fight in the UFC.
11   BY MR. WIDNELL:
12      Q.  Okay.  Thanks.  Could you just tell me how
13   it comes to pass that if you are a contestant on the
14   Ultimate Fighter, whether or not you ultimately
15   become a fighter in the UFC?  Do you know how that
16   process works?
17          MR. DELL'ANGELO:  Object to the form.
18   Foundation.  Calls for speculation.
19          THE WITNESS:  I don't know for sure what the
20   criteria is to make it into the UFC or why they pick
21   the certain people that they do.
22          But in my opinion, you would have to have
23   some form of notoriety.  You would have to be
24   somebody who's marketable and likable or at least
25   have the potential for that.
```

Page 110

```
 1  or for a period of six months, whichever is longer.
 2  So we can precisely modify the extension of your
 3  agreement, please let us know, in writing, when you
 4  have been cleared to compete in professional mixed
 5  martial arts events."
 6          So it sounds like from that letter that the
 7  letter is effectively saying, You have not been able
 8  to compete since your last fight and please let us
 9  know when you will be able to compete.  Does that
10  sound right to you?
11     A.   That sounds correct to me.
12     Q.   Okay.  And would you say that that's an
13  accurate representation of your -- the reason why you
14  could not fight during that time period?
15          MR. DELL'ANGELO:  Objection to the form.
16          THE WITNESS:  I think it might be, yeah.  It
17  could be an accurate assessment of why I wasn't
18  fighting.
19  BY MR. WIDNELL:
20     Q.   Is there anything during that time, that
21  you're aware of, that would suggest that Zuffa tried
22  to extend the contract inappropriately?
23          MR. DELL'ANGELO:  Objection to the form.
24  Calls for a legal conclusion.
25          THE WITNESS:  It's hard to answer because in
```

Page 111

```
 1  our contracts they can extend us.  And we're not
 2  fighting.  We're not being paid.  We only get paid to
 3  fight.
 4          And the fact that we aren't necessarily
 5  guaranteed to get all the fights on our contract.
 6  They can cut us at any time.  The fact that the
 7  longer my contract lasts, the less ability I have to
 8  see what I'd be able to make fighting elsewhere or
 9  doing any other combat sports, such as boxing.
10  BY MR. WIDNELL:
11     Q.   So for the period after your fight with
12  Manuwa, are you saying that there's a possibility
13  that any extensions in that period between the fight
14  with Manuwa and when you received this letter, that
15  there was an extension in that time period that was
16  inappropriate on Zuffa's part?
17          MR. DELL'ANGELO:  Objection to the form to
18  the extent that it calls for a legal conclusion.
19          THE WITNESS:  There's -- I think I can
20  answer your question in that there is nothing that
21  Zuffa did in extending my contract that was any
22  different from the extensions for other injuries, if
23  that's what you're asking.
24  BY MR. WIDNELL:
25     Q.   Okay.  And do you think that any of the
```

Page 112

```
 1  extensions of your contract for your injuries was
 2  inappropriate by Zuffa?
 3          MR. DELL'ANGELO:  Same objection.
 4          THE WITNESS:  I had already stated what I
 5  thought was inappropriate about the extension,
 6  extensions in general.  But I don't think it -- I was
 7  truly hurt in that time.
 8  BY MR. WIDNELL:
 9     Q.   And if your manager had requested additional
10  time between bouts because either he was concerned
11  about you having time to heal from an injury or
12  having more time to improve your skills as a fighter,
13  was it inappropriate of Zuffa to extend the time of
14  the contract after Mr. Cook asked for that extension?
15          MR. DELL'ANGELO:  Object to the form.
16          THE WITNESS:  I don't believe it was
17  inappropriate.
18  BY MR. WIDNELL:
19     Q.   Okay.
20          (Whereupon Defendant's Exhibit 88
21          was marked for identification.)
22  BY MR. WIDNELL:
23     Q.   I've just handed you or you were just handed
24  a document marked Exhibit 88.  This is a news story
25  that was run on mmafighting.com.  The date is
```

Page 113

```
 1  11/4/2012.  And the headline is "Kyle Kingsbury
 2  seriously considering MMA retirement after brutal
 3  fight."  Does this document look at all familiar to
 4  you?
 5     A.   It does look familiar, yes.
 6     Q.   So if you look at the second paragraph from
 7  the bottom that starts, "'I'm leaning toward not
 8  doing it again,' said the American Kickboxing
 9  Academy-based fighter.  'That's where I am right now.
10  There are a number of reasons why I won't say I'm
11  retiring.  Some of that has to do with medical bills
12  still being covered.'"  Is that a statement you made?
13     A.   That is a statement I made.
14     Q.   What did you mean by "Some of that has to do
15  with medical bills still being covered"?
16     A.   Well, I didn't want to open my mouth and say
17  everything that was on my mind and the way I was
18  being mistreated by the UFC.  I didn't want to talk
19  about the fact that they had bought up any legitimate
20  competition or that we were held in our contracts
21  exclusively and that we had no open and free market
22  to turn to.  I didn't want to talk about the threats
23  they were using and the ways that I had been treated.
24          There was a lot to that.  I wanted to have
25  my medical bills still covered for the injuries that
```



Page 114

1  I had. I didn't want them to say, Screw you. You're
2  on your own. You're just retired, or you talked bad
3  about us and, no, we're not going to take care of you
4  anymore, in that respect concerning my medical bills.
5       At this point in my career, I was pretty
6  upset by the matchmaking, being forced to take
7  certain fights, and I wasn't happy. But I didn't
8  want to speak badly about the UFC at that time
9  because I was still under contract and because I
10 wanted them to take care of my medical bills.
11    Q. And were they taking care of your medical
12 bills?
13    A. They took care of my medical bills for the
14 fights. And they had injury insurance, which I paid
15 a $1500 deductible to have ▮▮▮▮▮▮▮▮▮▮▮▮.
16    Q. And I think you also talked about the
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Was that covered by --
18    A. That was covered by Zuffa. That happened in
19 a fight, yes. They covered everything that happened
20 in fights.
21    Q. But you did say, "I'm leaning toward not
22 doing it again"; is that right?
23    A. I was leaning towards not doing it again,
24 but I wanted to leave the door open in case I got
25 that itch again. And, again, I restate here, "I

Page 115

1  could wake up a month or two from now and be as
2  hungry as I've ever been and think I shouldn't have
3  opened my mouth a month ago," referring to speaking
4  the truth about what was going on in the UFC with
5  buyouts, exclusive contracts and threats exclusive
6  contracts that had been made to me among other
7  fighters. And that would pretty much be the end of
8  my career if I had done so. So I said there's no
9  finite decision.
10    Q. So at this time, had you made comments about
11 those concerns publicly?
12    A. I had not made public -- not to my knowledge
13 at that time had I made any public statements in
14 terms of my dissatisfaction with the UFC. I had seen
15 firsthand with teammates Jon Fitch and Josh Koscheck
16 what that had done to their careers, and I did not
17 want to go that route if I was going to continue to
18 fight for them.
19    Q. Okay. Were you under the impression that
20 UFC was punishing you at that time?
21    A. Yes. In fact, there were articles written
22 that -- one article stated, "I don't know what
23 Kingsbury has done to piss off Joe Silva, but it is
24 clear and obvious." Or "Kingsbury gets thrown to the
25 wolves. What did he do to piss Jon Silva off?"

Page 116

1     Q. And how is it clear and obvious that you
2  were being punished?
3     A. Well, if you go through my fight history,
4  you can see right before my four-fight losing streak,
5  I was on a four-fight winning streak with two fight
6  of the nights and a 21-second knockout.
7        A lot of that competition was not well
8  known. And after I received my first ▮▮▮▮▮▮▮▮▮
9  in the fight of the night victory against Fabio
10 Maldonado, I spoke with my coaches and management.
11 And we realized that the competition in the UFC at
12 the highest level is so tough that you can be hurt
13 and have to take time off for who knows how long.
14 And that it was a detriment to fight people that were
15 that good but not well known.
16       So we had asked Joe Silva after the Fabio
17 Maldonado fight. I remember specifically walking on
18 eggshells in the statement. And I said, "I'm very
19 grateful with the matchups that you have given me in
20 the past. And I'm happy fighting the guys you put in
21 front of me. But I would like to fight a bigger
22 named opponent in my next fight because the level of
23 competition is so high that if I lose to an unnamed
24 guy, it would hurt me. As opposed to if I was to
25 fight a big name opponent, at least people would know

Page 117

1  who that person is if I was to lose. And you could
2  lose any fight. It could happen on any day. So I
3  just wanted to fight named opponents.
4        And in the very next fight they put me
5  against Stephan Bonnar. Not an opponent I would have
6  wanted. But because we had asked for a named
7  opponent, I took the fight anyways.
8        At that time I was a blue belt in Jiu-Jitsu.
9  Stephan Bonnar was a black belt. So there was a huge
10 discrepancy and one of his weaknesses. And the fight
11 went his direction because of that.
12       I wasn't too upset at that point. It's
13 really the fights that came after that that really
14 made me believe that I was being punished. Glover
15 Teixeira I knew very well. I had trained with his
16 coaches and teammates, Chuck Liddell and Coach John
17 Hackleman down at The Pit.
18       Glover Teixeira was a close friend and
19 training partner of Chuck Liddell's. Over the years
20 they said he could be champ. He was one of the best
21 in the world. And Joe Silva wanted me to fight him
22 on the undercard in Glover's first fight in the UFC.
23       And that is exactly the kind of thing that
24 hurts fighters. Nobody knew who he was. He was
25 extremely talented. It was a lose-lose. If I beat



Page 118

1  him, I'm supposed to beat him.  If I don't beat him,
2  I just got my ass kicked by a guy that nobody knows.
3       On top of that, being put on the undercard,
4  there was a great deal less in sponsorship money
5  because I wasn't guaranteed to be on TV.
6       They also rushed me to the cage in that
7  fight without playing my entrance music.  It was the
8  only fight they did this.  Yet they allowed Glover to
9  walk out with his entrance music.  They said it was a
10 TV time thing.
11      Yet they didn't account for the 30 seconds
12 it would take for me to walk to the cage.  So UFC
13 personnel was screaming at me to run to the cage in
14 an effort to rattle me.
15      After that fight against Jimi Manuwa, I had
16 another unknown opponent in his first fight in the
17 UFC.  I had to fly all the way to England for it.  It
18 was on the undercard, and it was against a guy who at
19 the time was 11 and 0, no losses, and not a single
20 opponent had made it out of the first round with him.
21 So he was highly decorated and not known.  Again, as
22 stated, a lose-lose for me.
23      And then I had received the damage that I
24 did in that fight.  And with my [redacted]
25 [redacted], I was really concerned for

Page 119

1  my high health [redacted] as well and was
2  just considering is it worth it?  I can't get out of
3  my contract.  There's nowhere else to go at this
4  point.  Strikeforce didn't exist anymore.  Pride
5  didn't exist anymore.  And I had no way of saying no.
6       When I got the fight with Glover Teixeira,
7  that was the only time that I had asked to not fight
8  a certain fighter because I knew how good he was and
9  I knew that he was an unknown.
10      And I spoke to Joe Silva face-to-face in
11 Tokyo, Japan, at one of the events.  He had overheard
12 me complaining to one of the fans about my next
13 opponent.  He said, "Kyle, what's the problem?"
14      And I said, "Joe, I'm glad you're here.  The
15 problem is that nobody knows who Glover is, and he
16 could easily be the UFC champ.  He could be the
17 champion of our division.  I know how good he is.
18 I've trained with his coaches.  The coaches know me
19 well.  They know my style.  And I would be happy
20 taking on anyone else."
21      And then he said to me the usual tag line,
22 "You've got to take the fight with Glover.  If you
23 don't like this fight, you're not going to like the
24 next one."
25      And I said, "I would take on Jon Jones or

Page 120

1  Shogun Rua, legends of the sport, before I'd want to
2  take on Glover Teixeira because at least people knew
3  who they were.  And he told me, "You've got to take
4  the fight anyways."
5  Q.  Who do you think should have fought Glover
6  Teixeira?
7  A.  It would be speculation on my part to say
8  who should have fought Glover Teixeira.  But if it's
9  an entry level fight in the UFC, he should have
10 fought somebody else that maybe had one fight in the
11 UFC.
12      Yeah, in my opinion, he should have fought
13 somebody else that was new to the UFC.  Because even
14 when they offered him to fight Shogun Rua after
15 beating me, Shogun turned down that fight.  And as a
16 former champion, he had a little bit more power than
17 I did.
18      And Dana White went on to barbecue Shogun
19 Rua saying that he was a pussy for not wanting to
20 take the fight and that he was going to take the
21 fight anyways, belittling Shogun and taking away from
22 his notoriety.
23 Q.  If you turn to the second page of
24 Exhibit 88.  Do you see the sentence, "'They haven't
25 cut me, and I'm very grateful for that,' he said.

Page 121

1  'If I decide to stick around, it will be in the
2  UFC'"?
3  A.  Yes, I see that statement.
4  Q.  Did you say that?
5  A.  I did say that statement.
6  Q.  Okay.  If you'd turn to the third page.  Do
7  you see the sentence that says, "I made the decision
8  to go to MMA for as long as it may last and go back
9  after to being a fireman again"?
10 A.  Yeah, I see that statement.
11 Q.  Did you make that statement?
12 A.  I did make that statement.
13 Q.  What did you mean by that?
14 A.  When I first got the contract to fight in
15 King of the Cage, I was living in Arizona.  And I had
16 a friend who was a firefighter/paramedic for Phoenix
17 Fire.  He was putting me through the process to
18 become a firefighter in Arizona.  I thought of that
19 as a great career.
20      And basically at the time, I had passed my
21 first interview with Phoenix Fire and was waiting to
22 do -- I was prepping for my second interview to get
23 in.  And we got the contract to fight in King of the
24 Cage.  And my friend told me, "Hey, fighting doesn't
25 last long.  Fire fighting will always be here.  You

Page 242

```
 1  the question.
 2       THE WITNESS:  Then I would say the
 3  attorney/client privilege applies, yes.
 4  BY MR. WIDNELL:
 5     Q.  I think just recently you said that you
 6  believe there are additional examples.  Is that
 7  correct?
 8     A.  That is correct.
 9     Q.  But you don't recall them now; is that
10  correct?
11     A.  That is correct.
12     Q.  But you might recall them in the future; is
13  that correct?
14     A.  That is correct.
15     Q.  Okay.  Are there any other examples of Zuffa
16  threatening or punishing fighters that you are aware
17  of?
18       MR. DELL'ANGELO:  Object to the form.
19       THE WITNESS:  As I stated earlier, I'm aware
20  of other examples of the way the UFC threatened to
21  punish fighters, but I don't recall any at this time.
22       MR. WIDNELL:  All right.  I think I'm
23  finished with my initial questions.  Do you have any
24  questions you want to conduct?
25       MR. DELL'ANGELO:  Let's go off the record
```

Page 243

```
 1  real quick.
 2       THE VIDEOGRAPHER:  We are now going off the
 3  record.  The time is approximately 4:35 p.m.
 4       (A brief recess was taken.)
 5       THE VIDEOGRAPHER:  We are now back on the
 6  record.  The time is approximately 4:30 p.m.
 7       MR. DELL'ANGELO:  Plaintiffs have no
 8  questions at this time.  We'll read and sign.
 9       THE VIDEOGRAPHER:  We're done?
10       MR. WIDNELL:  We're done.
11       THE VIDEOGRAPHER:  This concludes the video
12  deposition of Kyle Kingsbury.  We are going off the
13  record.  The time is approximately 4:40 p.m.
14       (Thereupon the taking of the
15        deposition was concluded at
16        4:40 p.m.)
17            *  *  *  *  *
```

Page 244

```
 1           CERTIFICATE OF DEPONENT
 2  PAGE   LINE   CHANGE           REASON
```

            *  *  *  *  *

```
17     I, KYLE KINGSBURY, deponent herein, do
hereby certify and declare the within and foregoing
transcription to be my deposition in said action;
that I have read, corrected and do hereby affix my
signature to said deposition.


                _____
                KYLE KINGSBURY, Deponent
```

Page 245

```
 1           REPORTER'S CERTIFICATE
 2  STATE OF NEVADA  )
                    ) SS:
 3  COUNTY OF CLARK  )
 4     I, Jane V. Efaw, CCR No. 601, do hereby certify:
 5     That I reported the taking of the deposition of
 6  the witness, KYLE KINGSBURY, at the time and place
 7  aforesaid;
 8     That prior to being examined, the witness was by
 9  me duly sworn to testify to the truth, the whole
10  truth, and nothing but the truth;
11     That I thereafter transcribed my shorthand notes
12  into typewriting and that the typewritten transcript
13  of said deposition is a complete, true and accurate
14  transcription of said shorthand notes taken down at
15  said time, and that a request has been made to review
16  the transcript.
17     I further certify that I am not a relative or
18  employee of counsel of any party involved in said
19  action, nor a relative or employee of the parties
20  involved in said action, nor a person financially
21  interested in the action.
22     Dated at Las Vegas, Nevada, this _____ day of
23  _____, 2017.
24
                _____
25              Jane V. Efaw, CCR #601
```

