# EXHIBIT 91
# -
# REDACTED VERSION OF
# ECF NO. 540-137

# EXHIBIT 133

## Sponsorship Agreement between Zuffa Marketing, LLC and MetroPCS Wireless, Inc.

## SPONSORSHIP AGREEMENT

**Business Terms and Schedules:**

I.  **First Schedule**

    A.  Contract Date:   December 13, 2011

II.  **Second Schedule**

    A.  Zuffa Marketing: Zuffa Marketing, LLC (a Nevada Limited Liability Company) ("Zuffa Marketing" or "UFC")
    2960 W. Sahara Avenue
    Las Vegas, NV 89102
    Phone: ( ███████████████████

III.  **Third Schedule**

    A.  The Sponsor:   MetroPCS Wireless, Inc. ("Sponsor")
    2250 Lakeside Blvd.
    Richardson, TX 75082

IV.  **Fourth Schedule**

    A.  The Event(s):  US and Puerto Rico ("Territory") events ("Events") conducted, and media platforms/properties licensed, by or on behalf of UFC and occurring during the Term.

V.  **Fifth Schedule:**

    A.  Sponsorship Benefits:

        i.  Marketing Rights

            1.  Designations – Official Wireless Partner of the UFC, Official Wireless Sponsor of the UFC, Exclusive Wireless Sponsor of the UFC, Exclusive Wireless Partner of the UFC, and other designations mutually agreed upon by the parties.

            2.  Use of the UFC logo

                a.  Includes the following UFC Marks: (i) UFC and Ultimate Fighting Championship; (ii) all UFC Event marks (e.g., UFC Numbered PPV Events); (iii) the Octagon Nation Tour marks; (iv) all other UFC Marks used in connection with the Events, telecasts and Sponsor's sponsorship benefits hereunder; and (v) additional, mutually agreed upon UFC Marks.

                b.  All Sponsor creative using the UFC Marks must be approved (with such approval to be effected in accordance with the terms of this Agreement) in advance by the UFC.

                    i.  UFC to provide UFC Guidelines for proper usage of UFC Marks.

            3.  Product Licensing

                a.  Sponsor will pay UFC a 3% royalty fee on Net Revenues for any officially licensed UFC merchandise sold by Sponsor; provided that UFC must approve all such merchandise in advance and in writing (with such approval to be effected in accordance with the terms of this Agreement).  (For purposes of the preceding sentence, the term "Net Revenues" shall mean gross revenues actually collected by Sponsor for the sale of any officially licensed UFC merchandise, less the following deductions:  discounts; any credits for returns; actual taxes;

ZFL-1560180

transportation, packaging and shipping costs; collection costs; credit card processing costs; and fees for returned checks.)

    b.  Sponsor will not be required to pay an upfront licensing fee for merchandise produced hereunder (i.e., an advance).

    c.  No royalty fees on co-branded premium items distributed without incremental charge (e.g., "gift with purchase") provided that UFC must approve all such merchandise in advance and in writing (with such approval to be effected in accordance with the terms of this Agreement).

4.   Pass Through Rights for Handsets

    a.  Any use of third-party marks or content in Sponsor creative using UFC Marks will not reasonably imply any official rights granted to or any implied endorsement between UFC and the handset OEM; provided that UFC must approve all such creative in advance and in writing (with such approval to be effected in accordance with the terms of this Agreement).

    b.  Inclusion of handset OEM in any Sponsor creative using UFC Marks must also feature handset itself.

    c.  Sponsor may not display the marks of handset OEMs in connection with Sponsor's In-Octagon sponsorship benefit inventory set forth below (Canvas and Bumpers).

    d.  Sponsor may display the marks of handset OEMs in connection with all Sponsor activation, with the exception of the In-Octagon sponsorship benefit inventory set forth below, subject to the following;

        i.  If UFC has not secured an Official Handset Partner, the marks of handset OEMs (including the mark of the handset OEM, as well as any mark of the handset itself) may be displayed in Sponsor creative, both as such marks are displayed on the handset itself, as well as separately from the handset itself; provided, however, that:

        ii.  If UFC has secured an Official Handset Partner, the marks of handset OEMs other than the Official Handset Partner (including the mark of the handset OEM, as well as any mark of the handset itself) may be displayed in Sponsor creative, but only as such marks are displayed on the handset itself, and not also separately from the handset itself (i.e., no stand alone or separate use of such marks).

    e.  Sponsor shall have the right to feature a handset OEM on all on-site/Event activations, with the exception of the In-Octagon sponsorship benefit inventory set forth below.

    f.  Sponsor shall have the right to feature a handset OEM with all fighters (as part of agreements between such fighters and Sponsor).

    g.  Sponsor, in its discretion, may activate its pass-through rights set forth herein with one or more handset OEMs during the Term.

    h.  Sponsor shall have the right to display the marks of handset OEMs in all executions of the mobile tour.

    i.  Sponsor shall have the right to display the marks of handset OEMs in all PPV broadcast media features.

        i.  UFC shall have the right to sell an official handset sponsorship to be activated during the Term only to an OEM, and only with respect to a handset, then-

2

ZFL-1560181

        offered by Sponsor, in which event all Sponsor PPV broadcast features must showcase such official UFC handset partner.

j.    Sponsor shall have the right to show any handset OEM in all online elements.

k.    Sponsor shall have the right to show any handset OEM in all promotional programs.

l.    Handsets are not included within Sponsor's exclusive Category (defined below); provided, however, that UFC will not sell or license (or permit the sale or license of) any sponsorship rights, content rights, or any advertisements within UFC-controlled media, to handset third party OEMs that do not provide equipment to Sponsor.  If UFC sells a sponsorship to a handset third party OEM, such OEM must only feature handsets on UFC controlled assets or using any UFC Materials that are available through Sponsor.

m.    Sponsor shall have the right, subject to the terms of this Agreement, to display the marks of handset OEMs in connection with any and all of its permitted activation pursuant to this Agreement, in any and all media and via any and all platforms, whether now known or hereafter developed, as well as via all sponsorship benefits to be provided hereunder (other than in connection with the In-Octagon inventory set forth herein).

5.    Pass Through Rights for Tablets

a.    UFC may sell the category of tablet computers separate from this Agreement, but the promotion of the wireless service of such tablets shall be excluded.

b.    If Sponsor begins to offer tablet products in the future and UFC does not then-currently have a tablet partner, Sponsor will have the rights to include such products in promotional executions (subject to the terms of this Agreement applicable to handset OEMs).

c.    If Sponsor begins to offer tablet products in the future and UFC has a tablet partner, and if such tablet partner is supported by Sponsor, then Sponsor shall have the right to include such tablet sponsor in Sponsor's permitted activation hereunder.

6.    Use of Additional Third-Party Marks in Approved Sponsor Creative

a.    Without limiting any other right of Sponsor hereunder, Sponsor shall have the right to use the following third-party marks in connection with Sponsor creative hereunder:  4G, LTE, Android, Rhapsody and any additional third-party marks approved by UFC in advance and in writing (with such approval to be effected in accordance with the terms of this Agreement); provided, however, that any such use of third-party marks by Sponsor will not reasonably imply any official rights granted to or any implied endorsement between UFC and the applicable third party.

ii.    Decision PPV Feature (all English- and Spanish-language telecasts/feeds)

1.    Broadcast feature to run during all domestic PPV Events each contract year.

2.    Includes logo display and sales tag line.

3.    Timing: Minimum of one (1) time  per domestic PPV Event.

iii.    Text to Vote PPV Feature (all English- and Spanish-language telecasts/feeds)

3

ZFL-1560182

       1. Broadcast feature to run during all domestic PPV Events each contract year.
       2. Includes logo display and sales tag line.
       3. Timing: Two (2) times per Event.

   iv. Open or Closing Billboards (all English- and Spanish-language telecasts/feeds)
       1. Broadcast feature to run during all domestic PPV Events each contract year.
       2. Includes logo display and sales tag line.

   v. Digital Media (all of the following impressions to be, as reasonably requested by Sponsor, (x) geotargeted, (y) targeted across dayparts, and (z) allocated among sites targeting English and Spanish speakers). Without limiting the foregoing, UFC shall deliver the following impressions in accordance with a media plan to be mutually agreed upon by the parties in writing.
       1. 12,000,000 display impressions (300x250 or 728x90) each contract year, to be displayed "above the scroll" on the following sites: UFC.com, UFC.tv and other mutually agreed upon and UFC controlled sites.
       2. Without limiting the foregoing, 5,000,000 additional display impressions on m.ufc.com (mobile UFC website) each contract year.
       3. Without limiting the foregoing, 2,000,000 additional impressions during :15 Pre-Roll videos on ufc.com each contract year.
       4. Homepage Takeovers
          a. Without limiting the foregoing, 2,250,000 total additional impressions
       5. Three (3) part Content Series during the Term
          a. Content Series produced by Sponsor or UFC (to be mutually agreed upon), however UFC must approve script and final product (such approval/disapproval to be effected in accordance with the terms of this Agreement).
          b. Featured in UFC.com homepage carousel.
          c. Promoted in a mutually agreed upon manner through UFC Twitter account and Facebook page a minimum of one time per Content Series.
          d. :15 Pre Roll Sponsor advertisement may be included, at Sponsor's election, in each video episode.
          e. UFC shall distribute such Content Series on UFC.com, and Sponsor shall have the right to distribute such Content Series via any Sponsor-controlled distribution platform, including on MetroPCS.com and internal content distribution systems. Content Series will run on UFC.com and MetroPCS.com for a mutually agreed upon period of time.
       6. Sponsor shall have the right to use mutually agreed upon UFC Content to create wallpapers, ringtones and promo codes. The use of these items by Sponsor will be royalty free provided they are distributed by Sponsor free of incremental charge (i.e., not including airtime charges, if any); otherwise the parties shall negotiate in good faith a license fee.
       7. Email Newsletter
          a. Sponsor logo and hyperlink exposure in all UFC Email Newsletters.
          b. Inclusion of mutually agreed upon Sponsor/UFC themed messaging or offer:
             i. Twelve (12) times each contract year; and
             ii. May include specific Sponsor offer.

   vi. Print Media Assets
       1. Full-page, four-color advertisement in all domestic PPV and FOX TV Event programs each contract year.

4

ZFL-1560183

a. Placement of ads to be as far forward as possible and right hand placement.

2. Two (2) full-page, four-color advertisements in each nationally distributed UFC special section of the USA Today each contract year.

a. Placement of ads to be as far forward as possible and right hand placement, unless unit is on front or back cover.

3. One (1) one-third (1/3) page, four-color advertisement in each nationally distributed UFC special section of the USA Today each contract year.

a. Placement of ads to be as far forward as possible and right hand placement, unless unit is on front or back cover.

vii. Octagon Canvas logos

1. Two (2) Octagon Canvas logos for seven (7) domestic PPV Events per contract year.

2. Two (2) Octagon Canvas logos for three (3) domestic FOX TV Events per contract year.

3. Two (2) Octagon Canvas logos for four (4) domestic FX TV Events per contract year.

4. Two (2) prominent Octagon Canvas logos for five (5) domestic FUEL TV Events per contract year.

5. Each of the two (2) Sponsor Octagon Canvas logo shall be approximately 40" x 70" and shall be displayed in the "peripheral" position on each Octagon Canvas (as UFC internally uses such term as of the execution of this Agreement), along with six (6) other comparably sized Octagon Canvas logos of UFC or third parties, but in no event displayed in a manner less prominent than the "peripheral" Octagon Canvas logos displayed on the outer perimeter, but still on the surface, of the representative Octagon Canvas, as indicated on Exhibit A to this Agreement.

viii. Octagon Bumper logos (vertical or horizontal, based on availability)

1. Two (2) Octagon bumper logos for seven (7) domestic PPV Events per contract year.

2. Two (2) Octagon bumper logos for three (3) domestic FOX TV Events per contract year.

3. Two (2) Octagon bumper logos for four (4) domestic FX TV Events per contract year.

4. Two (2) Octagon bumper logos for five (5) domestic FUEL TV Events per contract year.

5. Each of the two (2) Octagon bumper logos shall be, for vertical bumpers, no smaller than 57" (length) x 10" (width) and, for horizontal bumpers, no smaller than 60" (length) x 5 ½" (height), along with sixteen (16) other Octagon bumper logos of UFC or third parties, as indicated on Exhibit A to this Agreement.

ix. Text 2 Screen In-Arena Features

1. Feature to run two (2) times in-arena, during all domestic PPV Events each contract year.

2. Includes logo mention and sales tag line.

3. Occurs minimum of two (2) times per Event.

x. In-Venue jumbo screen commercials

1. Two (2) :30 commercials, during all domestic PPV, FOX, FX, and FUEL Events per contract year.

2. A minimum of one (1) commercial will run within main card.

xi. On-Site Display and Activation Space

1. 10' x 10' space available at all domestic PPV, FOX, FX, and FUEL Events each contract year; provided, however, that, based on availability, Sponsor shall have the right to increase reasonably the

5

ZFL-1560184

footprint space and/or the number of such spaces for Events held in metropolitan areas where Sponsor provides Category services on a direct basis and not through roaming agreements (such metropolitan areas, "Sponsor Markets").  Includes six (6) access credentials for Sponsor's vendors at such Events.

xii.  Event Announcements
1. One (1) announcement by Bruce Buffer in all domestic PPV Events to take place prior to the main or co-main event of the evening.

xiii.  Fan Phone Promotion
1. Sponsor shall have the right to provide Dana White and/or UFC fighters dedicated handsets during six (6) PPV or Live TV Events each contract year; provided, however, that all use of such handsets shall be subject to Sponsor's generally applicable terms and conditions.
2. The phone #s will be Tweeted out during a promotional window allowing fans to talk to Dana or the UFC fighters with the handsets.

xiv.  VIP Photographer or Videographer Promotion
1. Sponsor shall have the right to conduct retail promotions during all domestic Events held in Sponsor Markets each contract year.
2. Photos and videos will be displayed on UFC Facebook or Sponsor Facebook pages.
3. UFC to (x) provide the following prizing for the promotion – one (1) winner per Event will receive two (2) VIP seats to take photographs or videos of the Event (which prizing, for the avoidance of doubt, will not count against and shall be incremental to Sponsor's other sponsorship benefits to be provided hereunder) and (y) indemnify, defend and hold harmless Sponsor against any Claims arising out of such prizing provided by UFC.
4. Sponsor to (x) execute rules and regulations and (y) indemnify, defend and hold harmless UFC against any Claims arising out of Sponsor's conduct or operation of such promotion.

xv.  Ultimate UFC Sweepstakes Promotion
1. Sponsor will have the right to conduct a mutually agreed upon promotion one (1) time per contract year.
   a. UFC to (x) provide prizing to include hotel, airfare, Event tickets for two, VIP Tour and merchandise package and (y) indemnify, defend and hold harmless Sponsor against any Claims arising out of such prizing provided by UFC.
   b. Sponsor to (x) execute rules and regulations and (y) indemnify, defend and hold harmless UFC against any Claims arising out of Sponsor's conduct or operation of such promotion.

xvi.  PPV Event Presenting Sponsor
1. Sponsor will be designated (including, without limitation, in all English and Spanish-language materials, communications and other promotional messaging) as the Presenting Sponsor of two (2) domestic PPV Events located in Sponsor Markets during each contract year.
2. Sponsor will be included in all:
   a. Promotional media
   b. Collateral Materials
   c. Show Broadcast opens and similar integrations
   d. UFC.com

xvii.  UFC Tailgate Parties
1. UFC shall provide to Sponsor three (3) opportunities each contract year to set up an interactive marketing display on site at designated Official UFC PPV or Live TV Event "Tailgate Parties".

6

ZFL-1560185

- a. Sponsor will be designated (including, without limitation, in all English and Spanish-language materials, communications and other promotional messaging) as the "Presenting Sponsor" of one of the three Parties (date to be mutually agreed upon)
- b. Inclusion in all promotional mentions of the event
2. UFC shall provide to Sponsor 15' x 15' booth space and vendor access for the three (3) designated Events.
3. UFC will use commercially reasonable efforts to host Sponsor's Presenting Sponsor Tailgate Party at a UFC Event in a Sponsor Market designated by Sponsor.
4. If UFC holds more than three Tailgate Parties within the Territory, Sponsor will receive booth space and vendor access for these additional events at no additional fee.

xviii. Hospitality
1. VIP Access to Event Weigh-Ins
   - a. UFC will designate a minimum of fifty (50) VIP seats at Event weigh-ins for Sponsor invitees.
     - i. May be used as part of retail traffic driving promotions.
     - ii. UFC reserves the right to release the seats if they are un-occupied 30 minutes prior to the start of the Event.
2. UFC shall provide to Sponsor a UFC ticket bank of tickets with an aggregate face value of $100,000 each contract year.
   - a. Sponsor will coordinate with UFC to request tickets reasonably in advance to facilitate fulfillment.
   - b. Any unused ticket bank amounts cannot be carried over to subsequent contract years.

xix. Fighter Endorsement Fund
1. UFC shall provide to Sponsor a $250,000 credit each contract year to fund personal endorsements with individual UFC fighters and personalities (which such relationships shall be subject to the mutual written agreement between Sponsor and the applicable counterparty).
   - a. Sponsor and UFC to work together to select fighters and personalities and negotiate benefits to be provided by the fighter or personality to Sponsor.
   - b. Up to ten percent (10%) of any unused fund amounts will be carried over to subsequent contract years; provided, however, that Sponsor has endeavored in good faith to use the entirety of the fund amounts during the previous contract year.

xx. Content
1. MetroPCS Highlight of the Week (Exclusive Feature – UFC to produce and provide to Sponsor, and UFC shall not distribute or permit any third party to distribute such feature via any other distribution channel; provided, however, the foregoing shall not restrict the use by or on behalf of UFC of highlights included within such feature, so long as any such use (x) is not in connection with the advertising, promotion, distribution, sale or other offering of Category products or services or (y) does not reasonably create the impression of an advertising, sponsorship, endorsement, licensing or similar relationship between UFC and any third-party Category product or service)
   - a. Total of fifty-two (52) segments per contract year
   - b. Segment length of :15 - :30 seconds
   - c. MetroPCS branded highlight video will showcase UFC fighter on main fight card in upcoming event

7

ZFL-1560186

      d.   Forward facing segment can highlight key moment from fighter's recent performance and look forward at upcoming fight

      e.   In the event that there is a UFC off weekend, segment may focus on past highlight or relevant topic.

2.   MetroPCS UFC Personality Profile (Exclusive Feature – UFC to produce & provide to Sponsor, and UFC shall not distribute or permit any third party to distribute such feature via any other distribution channel; provided, however, the foregoing shall not restrict the use by or on behalf of UFC of highlights included within such feature, so long as any such use (x) is not in connection with the advertising, promotion, distribution, sale or other offering of Category products or services or (y) does not reasonably create the impression of an advertising, sponsorship, endorsement, licensing or similar relationship between UFC and any third-party Category product or service)

      a.   Total of twelve (12) segments per contract year

      b.   Segment length of 3:00-5:00 minutes in length

      c.   Feature may include fighters, UFC executives, broadcasters, Octagon Girls, etc. and will focus on providing an inside look at these personalities

      d.   MetroPCS will have the opportunity to include branding within production (e.g., background signage, backdrop)

      e.   Segment may utilize portion of UFC Fighter Endorsement fund to secure participation

3.   MetroPCS Battle Ready Segments (UFC to produce & provide to Sponsor)

      a.   Total of  twelve (12) segments per contract year

      b.   Segment length of approximately :90 seconds

      c.   Set to music, training clip segment focuses on UFC fighter's training regimen for upcoming battle

4.   MetroPCS Communication Segments (Exclusive Segments – UFC to produce & provide to Sponsor, and UFC shall not distribute or permit any third party to distribute such segments via any other distribution channel; provided, however, the foregoing shall not restrict the use by or on behalf of UFC of highlights included within such segments, so long as any such use (x) is not in connection with the advertising, promotion, distribution, sale or other offering of Category products or services or (y) does not reasonably create the impression of an advertising, sponsorship, endorsement, licensing or similar relationship between UFC and any third-party Category product or service)

      a.   Total of twelve (12) segments per contract year

      b.   Segment length of approximately :60 - :90 seconds

      c.   Segments will focus on the communication between UFC fighter and his trainer/corner men in-between rounds

5.   Fighter Profiles

      a.   UFC will provide fighter photo, bio, etc., for online profiles. This does not include video.

6.   UFC will provide to Sponsor Text Content as relevant, or at least (1) time per week

      a.   Includes select UFC news, press releases, etc.

7.   Sponsor will be able to use content on the following platforms:

      a.   MetroStudio (by whatever name such platform may be known)

      b.   MetroVision (by whatever name such platform may be known)

8

ZFL-1560187

       c. Sponsor-controlled social media, including Facebook, Google+, and Twitter.
       d. MetroPCS.com (English and Spanish versions), and other official Sponsor-controlled sites
       e. Wallpapers (exclusive to Category)
       f. Tones (exclusive to Category)
       g. Handsets
       h. Other Sponsor-controlled platforms approved by UFC in advance and in writing (with such approval to be effected in accordance with the terms of this Agreement)

xxi. Octagon Nation Tour

1. UFC Octagon Nation Tour (ONT) will make no fewer than the following appearances in Sponsor Markets: 15 in 2012; 16 in 2013 (if Sponsor launches an additional Sponsor Market incremental to those in existence as of 2012 and such market coincides with a UFC Event in that calendar year; otherwise total appearances will remain at 15); and 17 in 2014 (if Sponsor launches an additional Sponsor Market incremental to those in existence as of 2013 and such market coincides with a UFC Event in that calendar year; otherwise total appearances will remain the same as in 2013); such specific Sponsor Markets to be reasonably specified by Sponsor, subject to (x) the schedule for the ONT established in good faith by UFC with reference to then-current Sponsor Markets and (y) the following:

    a. Dates and length of stay to be determined by UFC based upon review of annual Event schedule dates, ONT scheduled dates and travel considerations.
    b. UFC shall integrate Sponsor into the ONT, including, without limitation, by the effecting the following:
       i. Interior and exterior branding of all vehicles used for the ONT
       ii. Sponsor custom interactive display integration
       iii. Sponsor street team and marketing staff to be credentialed to staff the Events
       iv. VIP access for Sponsor invitees
    c. In the event that Sponsor reallocates an ONT appearance from a Sponsor Market where UFC holds an Event, Sponsor may only reallocate such ONT appearance to another Sponsor Market where UFC holds an Event.
    d. In the event that Sponsor reallocates an ONT appearance from a Sponsor Market where UFC does not hold an Event, Sponsor may reallocate such ONT appearance to another Sponsor Market where UFC holds an Event or a Sponsor Market where UFC does not hold an Event.

2. UFC shall provide Sponsor with ONT annual integrations (i.e., for ONT events other than those in Sponsor Markets) each contract year to include:

    a. Interior and exterior branding of all vehicles used for the ONT.
    b. Sponsor custom interactive display integration.

xxii. Theatre Viewing Parties (subject to theatres' generally applicable approval policies with respect to in-venue activations); provided, however, that UFC shall not permit a theater to condition approval on the payment of additional amounts by Sponsor)

1. UFC shall provide Sponsor with rights to be included in four (4) UFC Cinedigm 3-D viewing parties in all Sponsor Markets where a Cinedigm experience is taking place.

9

ZFL-1560188

          a.    UFC shall provide to Sponsor twenty (20) tickets per Event per Sponsor Market where an Event is taking place.

          b.    UFC shall provide to Sponsor on-site activation rights at all theatre events in Sponsor Markets where an Event is taking place.

xxiii.   Fighter Appearances

      1.    UFC shall (x) provide to Sponsor one (1) fighter appearance for a minimum of one (1) hour in Sponsor Markets that coincide with UFC live Events and (y) indemnify, defend and hold harmless Sponsor against any Claims arising out of such fighter appearance provided by UFC.  Approved activities include photographs, autographs and Q&A.

xxiv.   UFC PPV Viewing Assets

      1.    UFC shall grant to Sponsor the right to offer customers purchasing Sponsor products and services a redemption off the cost of a UFC PPV Event.

          a.    All fees associated with setting up the production and software to execute this promotion will be paid by Sponsor.

          b.    All fees associated with the redemptions of the PPV Event will be paid by Sponsor (e.g., a 10% off coupon would require Sponsor to pay UFC the monetary equivalent for each redeemed coupon).

xxv.   Viewing Party with a UFC Fighter

          a.    UFC shall grant to Sponsor the right to conduct one (1) retail promotion per contract year that awards one winner the chance to have a UFC fighter come to his/her home to watch a UFC event.  This will occur in a Sponsor Market.

          b.    Sponsor to (x) execute all rules and regulations of the promotion and (y) indemnify, defend and hold harmless UFC against any Claims arising out of Sponsor's conduct or operation of such promotion.

          c.    UFC and Sponsor will mutually promote the sweepstakes.

          d.    UFC to (x) provide prizing, including: (i) Fighter appearance and travel accommodations; and (ii) VIP Prize package for up to ten (10) guests of the winner and (y) indemnify, defend and hold harmless Sponsor against any Claims arising out of such prizing provided by UFC.

## VI.   Sixth Schedule

A.   Term: January 1, 2012 through December 31, 2014 (the "Term").

B.   Renewal Rights:  UFC hereby grants to Sponsor an exclusive renewal negotiation window, beginning as of the execution of this Agreement and continuing through and including June 30, 2014, during which period UFC will not, directly or indirectly, solicit, initiate, encourage the submission of, furnish any information with respect to, respond substantively to, negotiate, facilitate or discuss with any other person or entity any proposal to effect a new, renewed or continued advertising, sponsorship or similar arrangement for UFC, or for any UFC fighter, participant or personality involving the use of any UFC Marks or other UFC-controlled intellectual property (subject to the Pre-Existing Competitive Agreement, defined below), in the Category.  After June 30, 2014, UFC is free to speak with all other companies in the Category, including Sponsor.

10

CONFIDENTIAL

ZFL-1560189

**VII.    Seventh Schedule**

    A.  Sponsor's Product: Mobile wireless services.

    B.  Official "Product" of the UFC:  _X_ Yes ___ N/A

    C.  Exclusive or Non-Exclusive: Exclusive in Territory, including fighters inside the Octagon or otherwise using any UFC Marks, UFC Content, UFC Materials or any other intellectual property of UFC; provided, however, that Sponsor acknowledges that the single fighter Category sponsorship agreement in existence as of the execution of this Agreement (including any renewal thereof) ("Pre-Existing Competitive Agreement") will not violate the exclusivity provision herein. For the avoidance of doubt, UFC shall not, nor shall UFC permit any third party to, (i) grant to any third party any right to use any UFC Marks, UFC Content, UFC Materials or any other intellectual property of UFC in connection with the advertising, promotion, distribution, sale or other offering of Category products or services or (ii) permit any third-party provider of Category products or services (a) to display any advertisements, promotions or other paid placements in connection with any UFC-controlled events or within any UFC-controlled media in connection with the advertising, promotion, distribution, sale or other offering of Category products or services or (b) to activate any sponsorship rights or benefits in connection with any UFC controlled-events or within any UFC-controlled media in connection with the advertising, promotion, distribution, sale or other offering of Category products or services.

    D.  Category: Mobile wireless services (the "Category").

    E.  Territory: USA and Puerto Rico.

**VIII.    Eighth Schedule:**  Sponsor shall pay via wire transfer to UFC a sponsorship fee (the "Sponsorship Fee") in an amount equal to $15,302,000 USD, with the following payments to be made by Sponsor within thirty (30) days of its receipt of invoices therefor sent no earlier than on the following dates (provided, however, that Sponsor shall be entitled to withhold from such payments, subject to the terms of Section 3(b) of the Agreement into which these Business Terms and Schedules are incorporated, amounts corresponding to the mutually agreed upon value of any material sponsorship benefit(s) that UFC failed to provide to Sponsor in accordance with the terms of this Agreement during the three (3) months prior to the invoice date):

    A.  THE INITIAL PAYMENT: $1,250,000 USD to be paid as follows:
        i.   $1,250,000 USD, invoiced upon January 1, 2012; and
    B.  ADDITIONAL PAYMENTS
        The remaining unpaid portion of the Sponsorship Fee shall be invoiced no earlier than on the following dates over the Term:

| | |
|---|---|
| • March 1, 2012 | $1,250,000 |
| • June 1, 2012 | $1,250,000 |
| • September 1, 2012 | $1,250,000 |
| • December 1, 2012 | $1,275,000 |
| • March 1, 2013 | $1,275,000 |
| • June 1, 2013 | $1,275,000 |
| • September 1, 2013 | $1,275,000 |
| • December 1, 2013 | $1,300,500 |
| • March 1, 2014 | $1,300,500 |
| • June 1, 2014 | $1,300,500 |
| • September 1, 2014 | $1,300,500 |

    C.  Bank Information for wire transfers: ███████████████████████

11



D.  VALUE IN KIND

Sponsor will provide UFC with twenty-five (25) Android handsets (the precise model of which shall be determined by Sponsor), with usage and coverage in accordance with Sponsor's then-current $50 rate plan, to be used by UFC staff each contract year. Sponsor will refresh such handsets each contract year.  Sponsor shall not be responsible for lost or damaged handsets.  Use of Sponsor's Category products and services shall be subject to Sponsor's standard terms and conditions, except for those regarding the payment of fees.

IX.   **Ninth Schedule: Law**

The rights and liabilities of the parties shall be determined in accordance with the laws of the State of New York, without regard to its principles of conflicts of laws.

X.    **Tenth Schedule: Address for Notice**

To Zuffa Marketing:        As Provided in the Second Schedule

With a copy to (which copy shall not constitute notice):

Kirk Hendrick, Chief Operating Officer
Lawrence Epstein, Executive VP and General Counsel
Zuffa Marketing, LLC Address in the Second Schedule

To Sponsor:                MetroPCS Wireless, Inc.
2250 Lakeside Blvd.
Richardson, Texas 75082
Attention:  President

With a copy to (which copy shall not constitute notice):

General Counsel (at the above address)

Either party may modify its address above by providing written notification to the other party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written by their respective and duly authorized officers.

**ZUFFA MARKETING, LLC**              **METROPCS WIRELESS, INC.**

By: _____        By: _____
Kirk D. Hendrick                     Name:  Thomas Keys
Chief Operating Officer              Title:  President & C.O.O.

Date:  12/26/2011                    Date   12/13/11

12

CONFIDENTIAL                                                     ZFL-1560191



**D.   VALUE IN KIND**

Sponsor will provide UFC with twenty-five (25) Android handsets (the precise model of which shall be determined by Sponsor), with usage and coverage in accordance with Sponsor's then-current $50 rate plan, to be used by UFC staff each contract year. Sponsor will refresh such handsets each contract year. Sponsor shall not be responsible for lost or damaged handsets. Use of Sponsor's Category products and services shall be subject to Sponsor's standard terms and conditions, except for those regarding the payment of fees.

**IX.   Ninth Schedule: Law**

The rights and liabilities of the parties shall be determined in accordance with the laws of the State of New York, without regard to its principles of conflicts of laws.

**X.   Tenth Schedule: Address for Notice**

To Zuffa Marketing:     As Provided in the Second Schedule

With a copy to (which copy shall not constitute notice):

Kirk Hendrick, Chief Operating Officer
Lawrence Epstein, Executive VP and General Counsel
Zuffa Marketing, LLC Address in the Second Schedule

To Sponsor:     MetroPCS Wireless, Inc.
2250 Lakeside Blvd.
Richardson, Texas 75082
Attention:  President

With a copy to (which copy shall not constitute notice):

General Counsel (at the above address)

Either party may modify its address above by providing written notification to the other party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written by their respective and duly authorized officers.

**ZUFFA MARKETING, LLC**          **METROPCS WIRELESS, INC.**

By: _____          By: _____
       Kirk D. Hendrick                          Name: Thomas Keys
       Chief Operating Officer                  Title: President & C.O.O.

Date: 12/26/2011                     Date 12/13/11

CONFIDENTIAL     ZFL-1560192

## SPONSORSHIP AGREEMENT

This agreement (the "Agreement") is entered into as of the date set forth on the First Schedule of the Business Terms and Schedules attached herein and made a part hereof, by and between the company described in the Second Schedule (hereinafter "Zuffa Marketing") and the company described in the Third Schedule (hereinafter "Sponsor").  For the avoidance of doubt, each of the Schedules included within such Business Terms and Schedules is hereby incorporated into this Agreement.

1.　　The Events:  Sponsor wishes to be a sponsor of the UFC, including, without limitation, for the Events as set forth in the Fourth Schedule, during the Term, as defined in the Sixth Schedule; and Zuffa Marketing wishes for Sponsor to be one of the sponsors of the UFC, including, without limitation, such Events.  Zuffa Marketing agrees Sponsor shall be an exclusive sponsor of the Events to the extent provided for herein (including, without limitation, as set forth in the Fifth Schedule and Seventh Schedule), and Sponsor understands and agrees that Zuffa Marketing, subject to such exclusive rights, retains all rights and abilities to grant other sponsorship rights to third parties.  Zuffa Marketing shall provide to Sponsor each of the Sponsorship Benefits set forth in the Fifth Schedule for each contract year during the Term of this Agreement.

2.　　Sponsorship Fee:  Subject to Zuffa Marketing's performance of its obligations hereunder, Sponsor shall pay Zuffa Marketing the Sponsorship Fee according to the terms and conditions set forth in the Eighth Schedule.

3.　　Advertising and Promotion:  Zuffa Marketing agrees to provide to Sponsor the benefits and to grant to Sponsor the rights set forth herein, including, without limitation, as stated in the Fifth, Sixth and Seventh Schedules for each contract year, as well as the following rights:

　　　　a.　　Sponsor has the exclusive right (to the extent set forth herein) to use the UFC trademarks, service marks, name and logo, as well as the name, image, likeness, biographical information and all other indicia of identity and rights of privacy and publicity of Individuals (x) with whom Sponsor enters into agreements pursuant to Schedule V(A)(xix) or (y) as depicted in any materials provided by UFC to Sponsor for promotional purposes hereunder (collectively, "UFC Marks"), in compliance with UFC's generally applicable and consistently applied guidelines, requirements and directions provided by UFC to Sponsor in writing (collectively, "UFC Guidelines"), for purposes of promoting Sponsor and its Category products and services, as well as publicity and promotion of the Events during the Term.  Sponsor has the right to use UFC Marks and pre-approved UFC imagery in compliance with UFC Guidelines for such purposes.  Sponsor acknowledges that all non-Event specific UFC imagery must be licensed directly from Getty Images, Inc..  All uses of the UFC Marks and imagery (including, without limitation, audiovisual clips, pictures and ads) (collectively, "UFC Content," along with the UFC Marks, the "UFC Materials") require prior written approval from (or the deemed approval of) Zuffa Marketing, as set forth herein.

　　　　b.　　In the event that Zuffa Marketing is unable to provide any of the benefits described hereunder ("Omitted Benefit"), Sponsor shall have the right, at Sponsor's election, (i) to require that Zuffa Marketing provide (and Zuffa Marketing shall thereafter be obligated to provide) a make-good benefit reasonably requested by Sponsor and mutually agreed upon by the parties to have a value substantially equivalent to the value of the benefit that Zuffa Marketing was unable to provide ("Mutually Agreed Upon Make-Good") (Sponsor and Zuffa Marketing agree that International UFC Events qualify as a Mutually Agreed Upon Make-Good for Pay-per-View and Live TV broadcast elements, including Octagon Canvas and Bumper logos, and other broadcast visible features.) or (ii) to reduce the Sponsorship Fee payments due by such mutually agreed upon value ("Mutually Agreed Upon Reduction").  Prior to June 30, 2013, Sponsor shall not be permitted to elect (ii) until six (6) months after the applicable benefit was not provided (i.e., Zuffa Marketing shall have six (6) months to provide make-good benefit).  In the event that either (x) the parties agree on a Mutually Agreed Upon Make-Good, and Zuffa Marketing thereafter provides such Mutually Agreed Upon Make-Good or (y) the parties agree on a Mutually Agreed Upon Reduction, and Sponsor thereafter receives the benefit of such Mutually Agreed Upon Reduction, then such Mutually Agreed Upon Make-Good or Mutually Agreed Upon Reduction, as the case may be, shall be in lieu of all other remedies available to Sponsor as a result of an Omitted Benefit.

13

c.      In granting rights hereunder, imposing obligations hereunder, or in granting or denying consent, approval or agreement required of Zuffa Marketing hereunder, Zuffa Marketing shall act in a reasonable manner and shall not, except as otherwise specifically set forth herein, restrict Sponsor's activation of UFC sponsorship benefits in connection with Sponsor's advertisement, promotion and offering of its products and services in the Category.  (For purposes of illustration only, and not by way of limitation, the foregoing covenant shall require Zuffa Marketing, if requested by Sponsor, to use best efforts to expedite its review of an item of Sponsor creative for which Sponsor must obtain Zuffa Marketing's prior written approval hereunder.)

4.      Termination:

a.      Either party may terminate this Agreement, effective upon the other party's receipt of written notice thereof, without prejudice to any legal or equitable rights to which such terminating party may be entitled, upon the occurrence of any one or more of the following:  (i) material default by the other party in performance of any of the provisions of this Agreement, which default is not cured within ten (10) business days following written notice of such default to the defaulting party; (ii) if any of the representations or warranties made by the other party in this Agreement shall prove to be untrue or inaccurate in any material respect; (iii) if the other party files a voluntary petition in bankruptcy; (iv) if the other party is adjudged bankrupt; (v) if a court assumes jurisdiction over the assets of the other under a federal reorganization act; (vi) if a trustee or receiver is appointed by a court for all or substantial portion of the assets of the other; (vii) if the other becomes insolvent or suspends its business; or (viii) if the other makes an assignment of its assets for the benefit of its creditors except as required in the ordinary course of business.  Should Sponsor terminate this Agreement as provided in this Section 4(a), Zuffa Marketing shall refund to Sponsor a portion of the Sponsorship Fee equal to the proportion of the Event(s) that have not occurred prior to the effective date of any such termination.

b.      Sponsor may terminate this Agreement, for any reason or for no reason, upon ten (10) business days prior written notice; provided, however, that, in the event that Sponsor terminates this Agreement pursuant to this Section 4(b), Sponsor shall remain obligated to make all Sponsorship Fee payments that would have been due and owing during the Term of this Agreement (i.e., if this Agreement had not been so terminated by Sponsor), minus only sponsorship fees that Zuffa Marketing receives in good faith from a third-party Category sponsor in respect of the period of time between the effective date of any such termination and December 31, 2014 (i.e., the date that the Term of this Agreement would otherwise have expired).

c.      Upon expiration or termination of this Agreement, the following provisions shall survive:  Section 4(a) (the final sentence), Section 4(b), Section 4(c); Section 5; Section 6(a) (the final sentence); Section 6(b) (the final sentence); Section 6(d) (the final sentence); Section 6(e); Section 6(f); Section 8; Section 9; and Section 20.

5.      Covenants, Representations and Warranties:

a.      Each party covenants to the other that it will comply with all laws and regulations applicable to the performance of its obligations hereunder and will obtain all applicable permits and licenses required of it in connection with its obligations hereunder.

b.      Each party represents and warrants that:  (a) it is a legal entity duly organized, validly existing and in good standing; (b) it has all requisite corporate or limited liability company power and authority to execute, deliver and perform its obligations hereunder; (c) except as otherwise disclosed in writing by a party to the other, to the best of such party's knowledge, there are no lawsuits pending that allege that its intellectual property licensed hereunder infringes upon the intellectual property rights of any third party ("Third Party IP Right") and to the best of such party's knowledge, there is no demand or threatened suit or claim against such party by any third party alleging violation or infringement of a Third Party IP Right related to such intellectual property; (d) it is not a party to any agreement with a third party, the performance of which is reasonably likely to affect adversely its ability or the ability of the other party

14

to perform fully its respective obligations hereunder; and (e) its performance of its obligations under this Agreement will not knowingly violate any other agreement between such party and any third party.

      c.    UFC represents and warrants that: (1) UFC owns or has all rights to the UFC intellectual property licensed hereunder necessary or required to grant the rights to Sponsor contained herein and such intellectual property and the use thereof by or on behalf of Sponsor as permitted by this Agreement does not violate or infringe any right of any third party, including, without limitation, any patent, copyright, trademark, trade secret or other intellectual property or proprietary right (including privacy and publicity rights) of any third party or any contractual rights of a third party granted by UFC; (2) UFC will not, without the prior written consent of Sponsor obtained in accordance with the terms hereof, include in any UFC intellectual property licensed hereunder, any content, software, marks and/or other intellectual property licensed from any third party, except for such third-party content, software, marks and/or other intellectual property that UFC identifies in writing to Sponsor and with respect to which UFC has the right to license to Sponsor; and (3) with respect to any third-party content, software, marks and/or other intellectual property included within UFC intellectual property licensed hereunder, UFC has all rights necessary to provide such content, software, marks and/or other intellectual property to and/or use such content, software, marks and/or other intellectual property for the benefit of Sponsor.

      d.    Sponsor represents and warrants that: (A) Sponsor owns or has all rights to the Sponsor intellectual property licensed hereunder necessary or required to grant the rights to UFC contained herein and such intellectual property and the use thereof by or on behalf of UFC as permitted by this Agreement does not violate or infringe any right of any third party, including, without limitation, any patent, copyright, trademark, trade secret or other intellectual property or proprietary right (including privacy and publicity rights) of any third party or any contractual rights of a third party granted by Sponsor; (B) Sponsor will not, without the prior written consent of UFC obtained in accordance with the terms hereof, include in any Sponsor intellectual property licensed hereunder, any content, software, marks and/or other intellectual property licensed from any third party, except for such third-party content, software, marks and/or other intellectual property that Sponsor identifies in writing to UFC; and (C) with respect to any third-party content, software, marks and/or other intellectual property included within Sponsor intellectual property licensed hereunder, Sponsor has all rights necessary to provide such content, software, marks and/or other intellectual property to and/or use such content, software, marks and/or other intellectual property for the benefit of UFC. Furthermore, if Sponsor holds any contests during the Term, Sponsor shall be responsible for the administration, promotion and winner determination of any contest. Zuffa Marketing shall provide prizing for contests in accordance with the terms of Schedule 4 of the Business Terms and Schedules incorporated herein and as otherwise mutually agreed upon by the parties, but shall not be responsible for the administration of such contests.

      e.    EXCEPT FOR A PARTY'S EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT, EACH PARTY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, OR STATUTORY, REGARDING ANY AND ALL MATERIALS PROVIDED HEREUNDER, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  EXCEPT WITH REGARD TO THE PARTIES' RESPECTIVE INDEMNIFICATION OBLIGATIONS SET FORTH HEREIN, NEITHER PARTY SHALL BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES (EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) AS A RESULT OF ANY BREACH OF ANY REPRESENTATION, WARRANTY OR OBLIGATION UNDER THIS AGREEMENT.

6.    <u>Marks and Content Licenses</u>:

      a.    Subject to the terms of this Agreement, Zuffa Marketing grants Sponsor a royalty-free license, exclusive in the Category and non-exclusive otherwise, to use the UFC Marks, alone and/or in association with the Sponsor Marks, in connection with Sponsor's activation of its rights or fulfillment of its obligations under this Agreement; provided, however, that Sponsor shall obtain Zuffa Marketing's written approval, to be granted or denied within five (5) days of Zuffa Marketing's receipt of a request for approval therefor and otherwise effected as set forth herein, prior to any public use by Sponsor of any UFC Mark. (Notwithstanding anything herein to the contrary, Sponsor shall have the right, in its sole discretion,

15

to exercise and activate its rights hereunder under any brand, sub-brand, or other Sponsor Mark in connection with which Sponsor offers to the public products and services in the Category.) Sponsor will display the appropriate proprietary rights notice (*e.g.*, the encircled "R" symbol ("®") and/or the letters "™" or "SM," as appropriate) in conjunction with Sponsor's display of the UFC Marks. All uses of the UFC Marks by Sponsor will inure to the benefit of Zuffa Marketing. Except for the license granted herein, Zuffa Marketing shall own all right, title, and interest in and to the UFC Marks.

b.      Subject to the terms of this Agreement, Zuffa Marketing grants Sponsor a royalty-free license, exclusive in the Category and non-exclusive otherwise, to use, reproduce, distribute, perform, display, and transmit the UFC Content. The term "UFC Content" shall also include, without limitation, all works of authorship, content, materials, and music to be provided or made available to Sponsor pursuant to the express terms of this Agreement. To the extent that any right in the UFC Content is vested in a third party, Zuffa Marketing shall, at no additional cost to Sponsor, cause such third party to grant the rights hereunder to Sponsor on a royalty-free basis. Subject to Zuffa Marketing's approval rights hereunder, Sponsor and its technical vendors shall have the right to modify, alter or format the UFC Materials to the extent necessary for Sponsor to fulfill its obligations or activate its rights hereunder (e.g., to format the UFC Materials for distribution via Category products and services); provided that no such modification, alteration, or formatting change shall affect the artistic integrity of the UFC Materials. During and after the Term, Sponsor shall have the right to refer to its prior association with the UFC.

c.      "Releases" means all rights, licenses, clearances, authorizations, permissions, and releases necessary or required in order for Sponsor to activate its rights or fulfill its obligations under this Agreement, including the use and distribution of UFC Materials herein described. Zuffa Marketing shall obtain all Releases, whether from any Individuals or any other third parties, for the benefit of Sponsor.

d.      Subject to the terms of this Agreement, Sponsor grants Zuffa Marketing a non-exclusive, royalty-free license to use the Sponsor trademarks, service marks and other corporate indicia designated by Sponsor (collectively, "Sponsor Marks"), alone and/or in association with the UFC Marks, in connection with Zuffa Marketing's activation of its rights or fulfillment of its obligations under this Agreement; provided, however, that (i) Zuffa Marketing shall obtain Sponsor's written approval, to be granted or denied within five (5) days of Sponsor's receipt of a request for approval therefor and otherwise effected as set forth herein, prior to any public use by Zuffa Marketing of any Sponsor Mark other than in a manner (x) identical to a use previously approved in writing by Sponsor hereunder and/or (y) precisely in the form, format and media with respect to which Sponsor provides such Sponsor Mark to Zuffa Marketing and (ii) in the event that Sponsor notifies Zuffa Marketing of an objection to the use by Zuffa Marketing of any Sponsor Mark hereunder, Zuffa Marketing's license to use such Sponsor Mark in such manner shall immediately terminate and Zuffa Marketing shall thereafter cease using such Sponsor Mark in such manner. Zuffa Marketing will display the appropriate proprietary rights notice (*e.g.*, the encircled "R" symbol ("®") and/or the letters "™" or "SM," as appropriate) in conjunction with Zuffa Marketing's display of any such Sponsor Marks. All uses of the Sponsor Marks by Zuffa Marketing will comply with Sponsor's branding requirements provided by Sponsor to Zuffa Marketing in writing and will inure to the benefit of Sponsor. Except for the license granted herein, Sponsor shall own all right, title, and interest in and to the Sponsor Marks.

e.      Any original work of authorship fixed in a tangible medium of expression pursuant to this Agreement by or on behalf of Zuffa Marketing, other than the display or performance of any Sponsor Marks or materials, shall be deemed to be "works made for hire" (as defined in the Copyright Act, as amended, 17 U.S.C. § 101 et seq.) and shall be owned exclusively by Zuffa Marketing ("Zuffa Marketing Works"). Should any such Zuffa Marketing Works be deemed, for any reason, not to be a "work made for hire," then Sponsor hereby assigns all right, title and interest, including the worldwide, perpetual copyright rights, in and to such Zuffa Marketing Works to Zuffa Marketing. At Zuffa Marketing's request and expense, Sponsor will complete and provide Zuffa Marketing with reasonable documentation requested by Zuffa Marketing to evidence Zuffa Marketing's ownership of such Zuffa Marketing Works. Any rights, including copyrights, that Zuffa Marketing may have in such original works do not extend to any portion or aspect of the Sponsor Marks or any derivatives thereof, and do not in any way dilute or affect the interests of Sponsor or its licensors in the Sponsor Marks or any derivatives thereof.

16

f.      Any original work of authorship fixed in a tangible medium of expression pursuant to this Agreement by or on behalf of Sponsor, other than the display or performance of the UFC Materials, shall be deemed to be "works made for hire" (as defined in the Copyright Act, as amended, 17 U.S.C. § 101 et seq.) and shall be owned exclusively by Sponsor ("Sponsor Works"). Should any such Sponsor Works be deemed, for any reason, not to be a "work made for hire," then Zuffa Marketing hereby assigns all right, title and interest, including the worldwide, perpetual copyright rights, in and to such Sponsor Works to Sponsor.  At Sponsor's request and expense, Zuffa Marketing will complete and provide Sponsor with reasonable documentation requested by Sponsor to evidence Sponsor's ownership of such Sponsor Works. Any rights, including copyrights, that Sponsor may have in such original works do not extend to any portion or aspect of the UFC Marks or any derivatives thereof, and do not in any way dilute or affect the interests of Zuffa Marketing or its licensors in the UFC Marks or any derivatives thereof.

g.      The rights of each party ("Licensor") to approve the use by the other party ("Licensee") of the Licensor's intellectual property hereunder shall be subject to the following: (a) such approval shall not be unreasonably withheld, delayed, or conditioned; and (b) such approval shall be limited by Licensor's reasonable determination of whether the form of Licensee's activation of its rights or the performance of Licensee's obligations hereunder complies with the terms of this Agreement, and shall not otherwise restrict, limit, or prohibit Licensee's activities hereunder.  In the event of any disapproval by Licensor hereunder, Licensor shall, (i) in communicating such disapproval, provide Licensee with a written explanation setting forth in reasonable detail the basis therefor, with specific reference to the applicable terms of this Agreement, and (ii) work with Licensee in a prompt and cooperative manner to develop or facilitate a resolution of or alternative to the objectionable matter, in order to be able to provide the required approval.

h.      Zuffa Marketing acknowledges that Sponsor's business may be subject in whole or in part to overview and regulation by various governmental agencies, including, but not limited to, the FCC. As such, Zuffa Marketing agrees to comply with the following content standards.  Zuffa Marketing shall not provide to Sponsor any UFC Content, in any format, that: (a) violates any applicable local, state, federal, or international law; or (b) in any way relates to any of the following: (i) illegal drugs; (ii) sexually explicit images, pornographic content, or child pornography; (iii) illegal activity, and (iv) unlawful violence, and/or discrimination based upon gender, ancestry, race, sexual orientation, religion, marital status, age, disability, national origin, veteran status, creed or color.

7.      Expenses:  Unless otherwise specified herein, each party shall be responsible for any expenses incurred by such party in connection with this Agreement.

8.      Confidentiality:  Unless with the prior written consent of the other party, during the Term and thereafter each party shall keep confidential and shall not use, save for the purposes of this Agreement, or disclose to any third party any information of a confidential nature (including trade secrets and information of commercial value) which may become known, unless such information is public knowledge or subsequently becomes public knowledge other than by breach of this Agreement.  To the extent necessary, the parties may also disclose the confidential information to such of its employees and professional advisors as may be reasonably necessary or desirable, as well as to their respective directors, officers, attorneys, actual or prospective lenders, financing sources, investors or acquirors, or accountants or as may be required by law or by the rules of any national stock exchange with respect to a party's publicly-traded securities.  Provided that before any such disclosure the disclosing party shall make such recipients aware of their obligation of confidentiality under this Agreement and shall at all times procure compliance therewith. The obligations of the parties under this section regarding confidential information shall survive termination, expiration or non-renewal of this Agreement.

9.      Indemnity:

a.      Each party (the "Indemnifying Party") shall indemnify, protect, defend and hold harmless the other party, its parent, subsidiary and affiliated entities, and their respective directors, members, managers, officers, shareholders, employees and agents (collectively, the "Indemnified Party"), from and

17

against any and all third-party claims, liabilities, losses, damages, injuries, demands, actions, causes of action, suits, proceedings, judgments and expenses, including, without limitation, reasonable outside attorneys' fees, court costs and other legal expenses, including, without limitation, those costs incurred at the trial and appellate levels (collectively, "Claims"), arising from or connected with any alleged or actual breach by the Indemnifying Party of any provision hereof, or from the inaccuracy of any warranty or representation made by the Indemnifying Party herein, or for libel, slander, invasion of privacy, or infringement or misappropriation of copyright, trademark, trade secret, privacy or publicity rights resulting from the use and/or display of any of the Indemnifying Party's intellectual property used herein in accordance with the terms of this Agreement.

b.     The Indemnified Party shall give prompt written notice of any Claim described above of which it is aware to the Indemnifying Party, provided the failure to give such notice shall not relieve the Indemnifying Party of its obligations under this Section, except to the extent that such failure results in the failure of actual notice and the Indemnifying Party is damaged as a result of such failure. The Indemnified Party shall allow the Indemnifying Party to direct the defense and settlement of any such Claim, with counsel of the Indemnifying Party's choosing, and shall provide the Indemnifying Party, at the Indemnifying Party's expense, with information and assistance as reasonably necessary for the defense and settlement of the Claim. The Indemnified Party shall have the right to retain separate counsel and to participate in (but not control) any such Claim, but the fees and expenses of such counsel shall be at the expense of the Indemnifying Party unless: (i) the retention of counsel by the Indemnified Party has been authorized in writing by the Indemnifying Party or Insurer; (ii) the Indemnified Party has been reasonably advised by its counsel in writing that there is a potential conflict of interest between the Indemnifying Party and the Indemnified Party in the conduct of the defense of the Claim (in which case the Indemnifying Party shall not have the right to direct the defense on behalf of the Indemnified Party); or (iii) the Indemnifying Party has not in fact retained counsel to assume the defense of the Claim within a reasonable period of time following receipt of the notice given pursuant to this Section, in which such case the fees and expenses of Indemnified Party's counsel shall be at the expense of the Indemnifying Party. The Indemnifying Party shall not be liable for any settlement of a Claim effected without its written consent (which shall not be unreasonably withheld, conditioned or delayed), nor shall the Indemnifying Party settle any Claim without the written consent of the Indemnified Party (which shall not be unreasonably withheld, conditioned or delayed). The Indemnifying Party shall not consent to the entry of any judgment or enter into any settlement that does not include an unconditional release of the Indemnified Party from all liability with respect to all applicable Claim. Termination or expiration of this Agreement shall not affect the continuing obligations of the Indemnifying Party to indemnify, protect, defend and hold harmless the Indemnified Party hereunder.

10.     Insurance:[1]

a.     Each party shall, at its sole expense, maintain in effect at all times during the Term, insurance coverage written on a per occurrence basis with limits not less than those set forth below and with insurers and under forms of policies reasonably satisfactory to the other party:

A.     Workers Compensation with Statutory limits; and Employer's Liability with limits of:
- $1,000,000 Bodily Injury by Accident
- $1,000,000 Bodily Injury by Disease-Each Employee
- $1,000,000 Policy Limit-Bodily Injury by Disease

B.     Commercial General Liability Bodily Injury/Property Damage
- $1,000,000 Per Occurrence
- $2,000,000 Aggregate
- $1,000,000 Personal and Advertising Injury
- $1,000,000 Products/Completed Operations Insurance

C.     Umbrella Coverage-

---

[1] Note to Draft: Subject to confirmation with MetroPCS risk management.

18

- $5,000,000 minimum- providing excess following the form of above liability coverages

D.  Professional Advertising Liability:
- $5M Aggregate

b.  Each party shall procure the insurance coverage set forth above from an insurance company eligible to do business in each state in or through which activities hereunder will be conducted and having and maintaining a financial strength rating of A-VII or better as rated by A.M. Best key rating guide for property and casualty insurance companies.

c.  Zuffa Marketing and Sponsor will cause their respective policies to name the other party, as applicable, as an additional insured (except workers' compensation) with waivers of subrogation (and upon request, Sponsor will name any applicable Venue or other Venue-related entity to its applicable policies). All such insurance shall be primary and non-contributory and shall include a severability of interest or cross-liability clause. Prior to fulfilling any of its obligations hereunder, the providing party shall furnish the other party with certificates of insurance as evidence of the above required insurance. Such certificates shall provide for thirty (30) days written notice to the non-insuring party prior to cancellation thereof. Failure to provide such certificates of insurance does not constitute a waiver by either party of the foregoing insurance requirements.

d.  None of the requirements contained herein as to types, limits, and approval of insurance coverage to be maintained by any party is intended to and shall not in any manner limit or qualify the liabilities and obligations assumed by such party hereunder.

11.  Compliance With the Law:  If a reasonable basis exists for believing that any provision of this Agreement violates any federal, state or local law or regulation (collectively, the "Law"), then the parties shall promptly modify this Agreement to the extent necessary to bring about compliance with such Law; provided, however, that if such modification would cause this Agreement to fail in its essential purpose or purposes, it shall be deemed terminated by mutual agreement of the parties.  If this Agreement is terminated pursuant to this provision, payment shall be made only to the extent of a party's performance to and including the date of termination, and any payments which shall have been made and which are applicable to future time periods shall be refunded pro rata to the effective date of termination.

12.  Failure to Object Not a Waiver:  The failure of either party to object to or to take affirmative action with respect to any conduct of the other party which is in violation of the terms hereof shall not be construed as a waiver thereof, nor of any future breach or subsequent wrongful conduct.
13.  Integration:  This Agreement together with all Schedules constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement.  It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement.  This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

14.  Independent Contractor:  Sponsor shall be deemed an independent contractor and nothing contained herein shall constitute this arrangement to be employment, a joint venture, or a partnership. Each party acknowledges and agrees that it neither has given nor will give the appearance or impression of having any legal authority to bind or commit the other party in any way.

15.  Counterparts:  This Agreement may be executed in two counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.  The parties may execute this Agreement and exchange counterparts of the signature pages by means of PDF or facsimile transmission, and the receipt of such executed counterparts by PDF or facsimile transmission will be binding on the parties.  Following such exchange, the parties will promptly exchange original versions of such signature pages.

19

16.     Advice of Independent Counsel:  Each party acknowledges that it has independently sought and received the advice of competent independent counsel regarding this Agreement and that each party has concluded independently on the advice of such independent legal counsel that all the terms of this Agreement are fair and reasonable and that each party has freely entered into this Agreement without duress or coercion by or from any person or entity.

17.     Severability:  If any term, clause, or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause, or provision and such invalid term, clause, or provision shall be deemed to be severed from this Agreement.

18.     Waiver:  The failure or delay of either party at any time to exercise any right under any provision of this Agreement shall not limit or operate as a waiver thereof.

19.     No Third Party Beneficiaries:  Nothing in this Agreement is intended, or shall be construed, to give any party, entity or individual other than the parties hereto any legal or equitable right, remedy or claim under or in respect of this Agreement or any of the provisions contained herein.

20.     Successors and Assigns:  Neither party may assign its rights or obligations under this Agreement without the prior written approval of the other party.  Notwithstanding the foregoing, either party may assign or transfer this Agreement or all of its rights and obligations under this Agreement without the other party's prior written consent (i) to a successor-in-interest as a result of a merger or consolidation or in connection with the sale or transfer of all or substantially all of it business or assets to which this Agreement relates, (ii) to an affiliate, or (iii) in connection with a Change of Control of the assigning/transferring party.   For purposes of this Agreement, "Change of Control" means (a) the consummation of a reorganization, merger or consolidation or sale or other disposition of substantially all of the assets of the assigning/transferring party; or (b) the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended) of beneficial ownership (within the meaning of Rule 13d-3 promulgated under such Act) of more than fifty percent (50%) of either (x) the then-outstanding shares of common stock of the assigning/transferring party; or (y) the combined voting power of the then-outstanding voting securities of the assigning/transferring party entitled to vote generally in the election of directors.  This Agreement and all of the terms and provisions hereof will be binding upon, and will inure to the benefit of, the parties hereto, and their respective successors and approved assigns.

21.     Force Majeure:  If the performance of any part of this Agreement by a party is prevented, hindered, delayed or otherwise made impracticable because of an Act of God, riot or civil commotion, act of public enemy, terrorism, order or act of any government or governmental instrumentality (whether federal, state, local or foreign) or similar cause beyond the control of such party, that party shall be excused from such performance to the extent that performance is prevented, hindered or delayed by such causes.  Notwithstanding the foregoing, if a force majeure event exists for greater than thirty (30) days and prevents a party from fulfilling its obligation hereunder, the other party shall have the right, but not the obligation, to terminate this Agreement.

22.     Public Statements:  Zuffa Marketing and Sponsor will jointly approve an initial press release announcing Sponsor's sponsorship of UFC.   The parties will ensure that no informal or formal announcement of the sponsorship will be made prior to this initial press release.  After the effective date, Sponsor's sponsorship rights extend to all other announcements, press releases and other media events, releases and statements relating to the UFC.

23.     Miscellaneous:  The rights and remedies set forth herein are intended to be cumulative, and the exercise of any one right or remedy by either party shall not preclude or waive its exercise of any other rights or remedies hereunder or pursuant to law or equity.  The paragraph headings set forth herein are for convenience only and do not constitute a substantive part of this Agreement.

CONFIDENTIAL

ZFL-1560200

Exhibit A

**1.  CANVAS PERIPHERAL LOGOS (logo position for illustration purposes only)**



**CANVAS PERIPHERAL LOGOS APPROXIMATELY 40" X 70"**

21

CONFIDENTIAL

ZFL-1560201

2.   **VERTICAL BUMPERS (logo position for illustration purposes only)**



**Vertical Bumpers 57" (length) x 10" (width)**

22

CONFIDENTIAL

ZFL-1560202

**3. HORIZONTAL BUMPERS (logo position for illustration purposes only)**



**Horizontal Bumpers 60" (length) x 5 ½" (height)**

23

CONFIDENTIAL

ZFL-1560203