1
2
3
4
5
6

WILLIAM A. ISAACSON (*Pro hac vice*)
wisaacson@paulweiss.com
JESSICA PHILLIPS (*Pro hac vice*)
jphillips@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, D.C.  20006
Tel: (202) 223-7300
Fax: (202) 223-7420

7
8
9
10
11
12

DONALD J. CAMPBELL #1216
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS #5549
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
710 South 7th Street,
Las Vegas, NV  89101
Tel: (702) 382-5222; Fax: (702) 382-0540

13

*Attorneys for Defendant Zuffa, LLC, d/b/a*
*Ultimate Fighting Championship and UFC*

14

[Additional Counsel Listed on Signature Page]

15
16
17

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

18
19
20
21
22
23
24
25
26

Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera,
Luis Javier Vazquez, and Kyle Kingsbury on behalf
of themselves and all others similarly situated,

Plaintiffs,

v.

Zuffa, LLC, d/b/a Ultimate Fighting Championship
and UFC,

Defendant.

Case No.: 2:15-cv-01045-RFB-(BNW)

**DEFENDANT ZUFFA, LLC'S**
**REPLY IN SUPPORT OF ITS**
**RENEWED MOTION FOR**
**SUMMARY JUDGMENT**

**HEARING REQUESTED**

27
28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ....................................................................................................................3

I.   Plaintiffs Cannot Show a Genuine Issue of Disputed Fact Concerning Zuffa's Monopsony Power. ...................................................................................................3

    A.   Plaintiffs Fail to Present Direct Evidence of Monopsony Power. ....................3

    B.   Plaintiffs Cannot Establish Monopsony Power Through Indirect Evidence Because Barriers to Entry and Expansion Are Low. .................................6

    C.   Zuffa Is Entitled to Summary Judgment on Plaintiffs' Monopolization Claim. ...............................................................................................................7

II.   Plaintiffs Fail to Rebut Evidence That Zuffa Did Not Engage in Exclusionary Anticompetitive Conduct. ......................................................................................9

    A.   Plaintiffs Fail to Raise a Genuine Issue of Disputed Fact That Zuffa's Procompetitive Contracts Did Not Foreclose Competition. .........................9

        1.   No Foreclosure of a Substantial Share of the Market. ...............................9

            a.   Undisputed Evidence Shows Only Minor Foreclosure...................9

            b.   Dr. Singer Does Not Prove Substantial Foreclosure.....................12

        2.   Plaintiffs Fail to Raise a Genuine Issue of Disputed Fact as to Whether Zuffa Had Legitimate Business Justifications for Its Contracts. ...............................................................................................13

    B.   The Challenged Conduct Is Not Anticompetitive.................................15

        1.   Plaintiffs Are Wrong as a Matter of Law that Monopsony Broth Can Be Based on Procompetitive Conduct.................................16

        2.   Plaintiffs' Allegations Fit Squarely Within a Predatory Hiring Claim.................................................................................................16

        3.   Plaintiffs Fail to Raise a Genuine Issue of Disputed Fact that Zuffa Paying Fighters More Was Anticompetitive.................................17

        4.   Plaintiffs Fail to Raise a Genuine Issue of Disputed Fact that Zuffa's Acquisitions of MMA Promoters Were Anticompetitive. ............18

III.   Plaintiffs Lack Article III Standing Because They Have Not Shown Antitrust Impact to Every Class Member.........................................................................19

IV.   Plaintiffs' Counterstatement of Facts Does Not Raise Genuine Factual Disputes and Relies on Improper and Inadmissible Evidence.........................................20

CONCLUSION................................................................................................................20

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*United States v. $133,420.00 in U.S. Currency*,
    672 F.3d 629 (9th Cir. 2012) ..............................................................18

5

6

*Airweld, Inc. v. Airco, Inc.*,
    742 F.2d 1184 (9th Cir. 1984) ............................................................20

7

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) .........................................................12, 18

8

9

*Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*,
    789 F. Supp. 2d 1201 (C.D. Cal. 2011) ..............................................18

10

*Baehr v. Creig Northrop Team, P.C.*,
    953 F.3d 244 (4th Cir. 2020) ..............................................................19

11

12

*Cent. Pines Land Co. v. United States*,
    274 F.3d 881 (5th Cir. 2001) ................................................................4

13

*City of Anaheim v. S. Cal. Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992) ............................................................16

14

15

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ................................................................................8

16

*Cornwell Quality Tools Co. v. C. T. S. Co.*,
    446 F.2d 825 (9th Cir. 1971) ..............................................................10

17

18

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
    2023 WL 2468742 (C.D. Cal. Feb. 23, 2023).......................................4

19

*Dreamstime.com, LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) .........................................................3, 16

20

21

*In re Ebay Seller Antitrust Litig.*,
    2010 WL 760433 (N.D. Cal. Mar. 4, 2010), *aff'd sub nom.* 433 F. App'x 504
    (9th Cir. 2011)......................................................................................20

22

23

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) .................................................................4

24

*Ferguson v. Greater Pocatello Chamber of Com., Inc.*,
    848 F.2d 976 (9th Cir. 1988) ..............................................................12

25

26

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) ..............................................................3

27

*United States v. Google LLC*,
    2023 WL 4999901 (D.D.C. Aug. 4, 2023) ..........................................16

28

ii

*Humana Inc. v. Mallinckrodt ARD LLC*,
  2020 WL 3041309 (C.D. Cal. Mar. 9, 2020) ............................................................................4

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ...............................................................................................9

*Image Technical Servs., Inc.* v. *Eastman Kodak Co.*,
  903 F.2d 612 (9th Cir. 1990) ...............................................................................................15

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979, 984 (9th Cir. 2000) .........................................................................................9

*Lacey v. Maricopa Cnty.*,
  693 F.3d 896 (9th Cir. 2012) .................................................................................................4

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
  801 F.3d 1150 (9th Cir. 2015) ...............................................................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
  475 U.S. 574 (1986)................................................................................................................8

*New York v. Meta Platforms, Inc.*,
  66 F.4th 288 (D.C. Cir. 2023)...............................................................................................18

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) (en banc) ................................................................................3

*Nationwide Power Sols. Inc. v. Eaton Elec. Inc.*,
  2008 WL 11408997 (C.D. Cal. Oct. 10, 2008)......................................................................4

*Netafirm Irrigation, Inc. v. Jain Irrigation, Inc.*,
  2022 WL 2791201 (E.D. Cal. July 15, 2022) ........................................................................4

*O'Bannon v. NCAA*,
  802 F.3d 1049 (9th Cir. 2015) ...........................................................................................4, 9

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ............................................................................................6, 19

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*,
  797 F.2d 370 (7th Cir. 1986) ...............................................................................................14

*Omega Env't, Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ..................................................................................... passim

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 914 (9th Cir. 2015) ...................................................................................10, 12, 20

*In re Optical Disk Drive*,
  2017 WL 6451711 ................................................................................................................20

*FTC v. Qualcomm, Inc.*,
  969 F.3d 974 (9th Cir. 2020) .........................................................................4, 13, 15, 17

*Quele-Navarro v. Holder*,
  560 F. App'x 662 (9th Cir. 2014) ..........................................................................................4

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
   614 F.3d 57 (3d Cir. 2010)......................................................................................14

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .........................................................................3, 4, 20

*Safeway Inc. v. Abbott Lab'ys*,
   761 F. Supp. 2d 874 (N.D. Cal. 2011) ......................................................................4

*Schwarzschild v. Tse*,
   69 F. 3d 293 (9th Cir. 1995) ....................................................................................2

*Scott v. Pasadena Unified Sch. Dist.*,
   306 F.3d 646 (9th Cir. 2002) ..................................................................................19

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004)........................................................................................9

*United States* v. *Syufy Enterprises*,
   903 F.2d 659 (9th Cir. 1990) ......................................................................1, 6, 8, 18

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961)................................................................................................12

*Ticketmaster Corp. v. Tickets.com Inc.*,
   127 F. App'x 346 (9th Cir. 2005) ...........................................................................12

*Ticketmaster Corp. v. Tickets.com, Inc.*,
   2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th
   Cir. 2005) ................................................................................................................11

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
   676 F.2d 1291 (9th Cir. 1982) .............................................................................9, 10

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp*,
   914 F.2d 1256 (9th Cir. 1990) .................................................................................16

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007)................................................................................................17

**Statutes**

Sherman Act..........................................................................................................4, 8

Fed. R. Civ. P. 56(c), (e)(2) ......................................................................................19

# INTRODUCTION

Plaintiffs' opposition underscores that their case is based primarily on rhetoric, not evidence. Rather than seriously engage with the record or governing Ninth Circuit precedent, Plaintiffs seek to convince this Court that it already decided this motion (it did not), that numerous lawful activities can be muddled together to create an anticompetitive "broth" (they cannot), and that, by offering *pro*competitive rationales for its exclusive contracts, Zuffa has somehow conceded those contracts are *anti*competitive (it has not). Based on the undisputed evidence and governing law, Zuffa is entitled to summary judgment for three reasons.

*First*, Plaintiffs have failed to raise any genuine dispute of material fact related to Zuffa's alleged monopsony power. A firm possesses monopsony power only when it can reduce compensation *by decreasing its consumption* of labor, thereby reducing output. But Plaintiffs do not dispute that Zuffa's own output *increased* throughout the class period (as did actual wages). Nor can Plaintiffs show monopsony power through indirect evidence of barriers to entry. Zuffa's competitors uniformly testified that they were not barred from entering the market, and the undisputed evidence shows that competitors routinely did so during the Class Period.  In addition, Plaintiffs' abandonment of their freestanding monopoly claim only underscores that Zuffa did not and does not have a monopsony over the market for fighter services. As the Ninth Circuit has recognized, it is "counterintuitive" for a firm to exercise monopsony, but not monopoly, power. *United States* v. *Syufy Enterprises*, 903 F.2d 659, 663 (9th Cir. 1990). Plaintiffs' failure to raise a dispute of fact as to monopsony power is reason alone to grant summary judgment.

*Second*, Plaintiffs have likewise failed to raise a dispute of material fact as to Zuffa's alleged anticompetitive conduct. Zuffa presented evidence that its exclusive contracts are procompetitive and do not foreclose competitors from a substantial share of the market for MMA fighters. Plaintiffs' only response is to manipulate evidence by weighting fighters by *promoter revenue* such that Zuffa's fighters are always worth more. But this statistical trick does not show any actual foreclosure of competitors, and the undisputed evidence shows that competitors had access to top athletes throughout the Class Period. In any event, Zuffa's exclusive contracts are industry standard because they address important free-riding concerns and help promoters expand

output by ensuring coverage for injured fighters. If Zuffa's contracts were not procompetitive, Zuffa's competitors would court athletes away from Zuffa by offering non-exclusive deals; yet Plaintiffs have identified no competitor who does so.

Plaintiffs have failed to show that any of the other challenged aspects of Zuffa's conduct were anticompetitive. Plaintiffs complain that Zuffa renegotiated contracts with fighters before they concluded, but fighters themselves frequently *asked* to renegotiate their contracts because such renegotiations resulted in greater pay bumps than they would have been entitled to under their original contracts. Plaintiffs likewise complain that Zuffa exercised its right-to-match provision to retain fighters, but Zuffa could keep a fighter only by paying him *as much or more than* a competitor. Finally, Plaintiffs complain about Zuffa's decades-old acquisitions of other promoters, but Plaintiffs have not shown that Zuffa improperly drove those promoters out of the market. Plaintiffs have not shown that any of Zuffa's individual acts were anticompetitive, and, as a matter of law, they cannot be anticompetitive in the aggregate.

*Finally*, Plaintiffs have failed to produce *any* evidence that shows that all class members were injured. Even assuming Dr. Singer's analysis is correct, it measures injury for the average fighter, not each individual fighter. Thus, Plaintiffs have not shown Article III standing for the vast majority of the class.

Rather than seriously dispute any of the above, Plaintiffs seek to convince this Court that it "already found compelling evidence supporting each element of Plaintiffs' Section 2 claim" at the class certification stage. Opp. 1. But as this Court previously acknowledged, a court "should not advance a decision on the merits at the class certification stage." Class Cert. Order at 11 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003)). And the Court carefully "reiterate[d] that its findings in this order are not meant to be dispositive as to any factual dispute beyond class certification." Class Cert Order at 21 n.21. On the merits, summary judgment is warranted because there is no dispute of material fact as to Zuffa's alleged monopsony power, alleged anticompetitive conduct, or procompetitive justifications for that conduct.[1]

---

[1] Under the "one-way intervention rule," district courts "generally do not grant summary judgment on the merits of a class action until the class has been properly certified and notified." *Schwarzschild v. Tse*, 69 F. 3d 293, 295 (9th Cir. 1995).

**ARGUMENT**

**I.**   **Plaintiffs Cannot Show a Genuine Issue of Disputed Fact Concerning Zuffa's Monopsony Power.**

Plaintiffs' opposition underscores that there is no record evidence establishing Zuffa's monopsony power. A firm possesses monopsony power in a labor market only when it can reduce wages *by decreasing its consumption* of labor, and thereby reduce output. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (a monopolist "has sufficient market power when, *by restricting its own output*, it can restrict marketwide output and, hence, increase marketwide prices.")[2] Plaintiffs do not dispute that Zuffa's "own output" increased throughout the Class Period (as did actual wages). That is fatal to their assertion that there is "direct evidence" of monopsony power. And Plaintiffs' half-hearted efforts at showing such power through indirect evidence fare no better. Summary judgment is therefore warranted.

**A.**   **Plaintiffs Fail to Present Direct Evidence of Monopsony Power.**

Direct evidence of monopsony or monopoly power is "only rarely available," *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc), and requires showings on *both* price and output that Plaintiffs have not made here.

Plaintiffs are wrong that "direct proof of *one* monopsonistic harm—such as wage suppression—establishes monopsony power even in the absence of other such harms." Opp. 21. The Ninth Circuit has repeatedly stated that a plaintiff must present evidence on *both* output and price in order to show monopoly/monopsony power. *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475-76 (9th Cir. 1997); *Rebel Oil Co.*, 51 F.3d at 1434. Absent a showing on both, it would be impossible to know whether the alleged monopolist has affected prices *through* its control of output. In *Forsyth v. Humana, Inc.*, even though plaintiffs submitted evidence that a defendant "routinely charged higher prices than" competitors "while reaping high profits," the Ninth Circuit found that "with no accompanying showing of restricted output," plaintiffs "failed to present direct

---

[2] With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability. All emphasis is added unless otherwise indicated.

evidence of market power."[3] District courts have routinely—and recently—applied this same principle.[4] 114 F.3d at 1175-76. *Forsyth* forecloses Plaintiffs' argument that showing an impact on wages is *alone* sufficient to establish monopsony power.[5]

Without that faulty legal premise, Plaintiffs' showing of monopsony power crumbles. It is uncontested that Zuffa significantly increased output—i.e., its consumption of labor—during the Class Period. Mot. at 16-18. During the Class Period, Zuffa increased the number of events it held by nearly 30 percent. SUF ¶ 7. Plaintiffs offer two arguments in response: (1) that "what matters is restriction of *market-wide* output compared to competitive levels, not *Zuffa's*," Opp. 25; and (2) that Zuffa, despite increasing output, may have nonetheless reduced its output "below the competitive level" by "shelving fighters," without providing any analysis about what the "competitive level" of output is. *Id*. 24-25. Neither argument holds water.

*First*, Plaintiffs are wrong to suggest that it is "marketwide" output that is the relevant metric for assessing direct evidence of monopsony power. A firm exercises market power "by *restricting its own output*" so that "it can restrict marketwide output and, hence, increase marketwide prices." *Rebel Oil*, 51 F.3d at 1434; *see also, e.g.*, *Nationwide Power Sols. Inc. v.*

---

[3] Plaintiffs assert (Opp. 21-22 n.68) that *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012), "overruled" *Forsyth*. But *Lacey* overruled a completely different proposition in *Forsyth*. *Id*. A case that overrules a specific holding in a prior case does not overturn all other unrelated holdings in that case. *Quele-Navarro v. Holder*, 560 F. App'x 662, 663 (9th Cir. 2014); *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 894 & n.57 (5th Cir. 2001). *Forsyth* has never been vacated, and is routinely cited in this Circuit. *E.g.*, *Netafirm Irrigation, Inc. v. Jain Irrigation, Inc.*, 2022 WL 2791201, at *7-8 (E.D. Cal. July 15, 2022).

[4] *E.g.*, *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 2023 WL 2468742, at *5 (C.D. Cal. Feb. 23, 2023); *Netafirm Irrigation*, 2022 WL 2791201, at *7-8 (noting that "deficiency" in allegations of restricted output "alone may preclude a finding of direct evidence of market power"); *Humana Inc. v. Mallinckrodt ARD LLC*, 2020 WL 3041309, at *6 (C.D. Cal. Mar. 9, 2020); *Safeway Inc. v. Abbott Lab'ys*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011).

[5] The citations Plaintiffs rely upon relate not to Section 2 (Opp. 21), but rather whether there were anticompetitive effects under Section 1. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983-84 (9th Cir. 2023); *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 989 (9th Cir. 2020); *O'Bannon v. NCAA*, 802 F.3d 1049, 1070-71 (9th Cir. 2015). That issue is a separate question relevant to a different section of the Sherman Act. Higher prices may be an anticompetitive effect—but they cannot alone demonstrate monopoly power, without a showing that those higher prices derived from the alleged monopolist's reduction in output. The Ninth Circuit in *Epic Games* affirmed district court findings that the defendant's conduct caused anticompetitive effects under Section 1, but lacked monopoly power under Section 2. *Epic Games*, 67 F.4th at 983-84, 999.

*Eaton Elec. Inc.*, 2008 WL 11408997, at *8 (C.D. Cal. Oct. 10, 2008) (rejecting argument that only "total output in the market" matters). That is because the relevant question for Section 2's first element is whether the defendant had the *power* to influence prices, which can only be judged based on the defendant's own restriction in output. If the same evidence of anticompetitive *effect* used at the second step of the Section 2 analysis were enough to establish monopoly power at the first step, then there would be no need for the first step. But, the Ninth Circuit could not be more clear that it is required.

*Second*, Plaintiffs' suggestion that Zuffa reduced its own output below "the competitive level" is baseless, and Plaintiffs provide no evidence (empirical or otherwise) that addresses what the "competitive level" of output should be. The reality is that Zuffa consistently increased the number of its events, from 18 events in 2006, to 32 events in 2010, to 41 events in 2016. SUF ¶ 7; Mot. 16-17.[6] Plaintiffs suggest that Zuffa "shelved" athletes, Opp. 25, but Dr. Singer admitted that he could not quantify that allegation. Instead, all of Plaintiffs' empirical evidence relates to the effect on wages of Zuffa's alleged "foreclosure"—which does not distinguish between whether athletes were used at events or "shelved."

Moreover, Plaintiffs concede that fighters were always placed in the agreed-upon bouts within the terms of their contracts. Opp. 25 n.74. Plaintiffs' argument is that Zuffa restricted output because some athletes would have *preferred* to participate in more bouts, but they cite no precedent for the notion that an employer "restricts output" because it does not give a particular fighter as much work as they might like. And Plaintiffs fail to present any analysis quantifying how many bouts *should* have been put on in a competitive market. Mot. 17. Thus, while Plaintiffs are correct that the question is whether "Zuffa reduced its output below the competitive level," it is *their* burden to make that showing. And by failing to even identify what that competitive level is, Plaintiffs have not satisfied that burden.

---

[6] Plaintiffs also incorrectly define "total industry output" in terms of "aggregate viewership of PPV events, non-PPV events, and live event attendance" and claim that these metrics "declined in absolute terms from 2011 to 2015." Opp. 18. But these metrics say nothing about how much of the fighters' labor UFC consumed or how many events it put on, which is the proper measure of output.

*Finally*, even if Plaintiffs were correct that all they need to do to establish monopsony power is to show an effect on wages, they have failed even that. Because wages increased during the Class Period, Plaintiffs rely on "wage share" as the "appropriate metric" to evaluate compensation. Opp. 23. But declining wage share shows that wages were not growing as fast as revenue, which does not establish that wages were being suppressed *below the competitive level*. Mot. 18-19; Singer *Daubert*, ECF No. 878 at 12-13, 16-21. Dr. Singer's argument is premised on the assertion that wage share is an "indirect" way of measuring marginal revenue product (MRP). Opp. 23. But the two metrics are fundamentally different. MRP measures the amount of revenue *attributable* to wages. Wage share says nothing about what percentage of revenue is actually attributable to wages (and thus what compensation should be); it just reflects the share of revenue that *is* being allocated to labor. That number may be declining for any number of reasons (including that less of the firm's revenue is attributable to labor, as opposed to promotion, branding, and other factors).[7] Plaintiffs' only response is that MRP is difficult to quantify. Opp. 23. But that does not mean that Plaintiffs can instead present a wholly deficient substitute.[8]

## B. Plaintiffs Cannot Establish Monopsony Power Through Indirect Evidence Because Barriers to Entry and Expansion Are Low.

There is no evidence in the record of the kind of barriers to entry necessary to find monopsony power based on indirect evidence. *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997). Plaintiffs primarily rely on the size of Zuffa's competitors to insist that barriers to entry and expansion must be high. Opp. 26-27. But size is irrelevant to the question of whether competitors *can* enter and expand. When a "dominant supplier acts consistent with a competitive market—out of fear perhaps that potential competitors are ready and able to step in— the purpose of the antitrust laws is amply served." *United States v. Syufy Enterprises*, 903 F.2d

---

[7] Plaintiffs claim to provide "devastating admissions" from Drs. Topel and Blair on the use of wage share, but the first citation is to testimony that says nothing about wage share (HT 3-55:1-56:5, ECF No. 730), and the second is to testimony from one of *Plaintiffs'* experts (HT 5-20:11-24:1, ECF No. 741).

[8] Plaintiffs rely on the Court's class certification order to support their use of wage share. Opp. 21-23. That order is limited to the question of whether "Plaintiffs' evidence is capable of showing class-wide impact," and does not "reach a conclusion on the merits." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 676 (9th Cir. 2022).

659, 668-69 (9th Cir. 1990). By the same token, "when a producer deters competitors by supplying a better product at a lower price, when he eschews monopoly profits, when he operates his business so as to meet consumer demand and increase consumer satisfaction, the goals of competition are served, even if no actual competitors see fit to enter the market at a particular time." *Id.* at 668.

Accordingly, Plaintiffs must show there were barriers to entry sufficient to "constrain the normal operation of the market." *Id.* at 663. On that front, Plaintiffs argue that Zuffa's contracts alone show significant barriers to entry. Opp. 26-27. But Plaintiffs make no effort to connect those contracts to the actual exclusion of competitors, competitors who in this case have uniformly testified that there is no such exclusion. Mot. 19-20, 24-25; SUF ¶¶ 21-22. Plaintiffs offer no evidence from any competitor corroborating their allegations. Plaintiffs do not dispute that competitors have a constant supply of athletes coming available, SUF ¶ 14, and competitors are able to regularly access talent, both from UFC and elsewhere, SUF ¶¶ 21-24. Moreover, Plaintiffs ignore the fact that there is a deep pool of up-and-coming talent. SUF ¶ 21. Simply positing the existence of an exclusive dealing relationship is not alone enough to establish barriers to entry warranting a finding of monopsony power. *Omega Env't*, 127 F.3d at 1164 (finding that alleged exclusive dealing was not "an entry barrier of any significance").

Plaintiffs primarily rely upon an email—completely deprived of context—from a WME-IMG employee prior to its acquisition of UFC. Opp. 26; CSF ¶¶ 21, 23. But this email provides no basis for the statement that barriers to entry are high, and notes that Zuffa's "revenue model provided ability to pay fighters *the most in the market, by far*." Pls. Ex. 118 at -978. This is competition on the merits that led to *increased* compensation for MMA, not a barrier to entry.

## C. Zuffa Is Entitled to Summary Judgment on Plaintiffs' Monopolization Claim.

Plaintiffs allege that "UFC possesses monopoly power in the Relevant Output Market - Elite Professional MMA bouts in the United States." CAC ¶ 166. Yet Plaintiffs have conceded that they do not seek damages based on monopolization, Opp. 2, and this Court has concluded that

"Plaintiffs have abandoned their theory. . . that liability flows from Defendant's monopoly power in the output market." Class Cert. Order, ECF No. 839 at 20 n.20.

Plaintiffs respond that Zuffa conflates damages and anticompetitive effects. Opp. 2. But Plaintiffs "must show an injury to them resulting from the illegal conduct," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 586 (1986), and the Sherman Act requires a "direct causal connection between the alleged violation and the alleged injury." *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1160 (9th Cir. 2015). Because Plaintiffs concede they seek damages based only on alleged monopsony power, Opp. 2, injury cannot possibly result from the abandoned monopolization claim, and it must be rejected. *Cf. Comcast Corp. v. Behrend*, 569 U.S. 27, 36 (2013) (requiring that damages "result[] from the particular antitrust injury on which petitioners' liability in this action is premised").

Plaintiffs' remaining monopsony theory is "counterintuitive" and does not "make economic sense." *Syufy*, 903 F.2d at 663. Having abandoned their monopolization theory and implicitly conceding they do not have evidence of monopoly power, Opp. 21, Plaintiffs argue that their monopoly allegations support their monopsony claim because "monopoly power often accompanies monopsony power." *Id.* But Plaintiffs have no evidence of monopoly conduct. SUF ¶¶ 28-30 (robust competition for venues, sponsors, and broadcasters). Dr. Singer offered *no opinions* as to whether any of the alleged monopolization conduct was anticompetitive. Ex. 16, Singer Dep. I 259:4-261:11 ("I can imagine how" monopolistic conduct "could trigger the mechanism that's causing the rate suppression in my models, but ***I don't really have an opinion beyond that***"); *see also* Ex. 4, Topel I ¶¶ 65-67, 70-73. With an undisputed record of competition for venues, sponsors and broadcasters and no factual or expert support to the contrary, Plaintiffs have not explained why, if Zuffa had market power, it would take advantage of that power in the monopsony market but not the monopoly market. *Syufy*, 903 F.2d at 663. Plaintiffs fail to show that Zuffa had the power to "exclude competition or control prices." *Id.* at 664. That Plaintiffs have

no proof of any exercise of monopoly power causing an antitrust impact only underscores how their theory of monopsony power is nonsensical.[9] Mot. 16-19.

## II.   Plaintiffs Fail to Rebut Evidence That Zuffa Did Not Engage in Exclusionary Anticompetitive Conduct.

Plaintiffs argue that Zuffa engaged in three forms of allegedly exclusionary anticompetitive conduct that they claim "cause anticompetitive effects" only when "combined": its exclusive contacts, its acquisitions, and its so-called "coercion." Opp. 28. Plaintiffs have not presented evidence that would allow a reasonable jury to find that Zuffa engaged in exclusionary anticompetitive conduct.

### A.   Plaintiffs Fail to Raise a Genuine Issue of Disputed Fact That Zuffa's Procompetitive Contracts Did Not Foreclose Competition.

Plaintiffs do not dispute that exclusive-dealing contracts are unlawful *only* when they (1) "foreclose competition in a substantial share" of the market, and (2) lack any legitimate business justification. *Omega Env't*, 127 F.3d at 1162; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997). Plaintiffs have shown neither.

#### 1.   No Foreclosure of a Substantial Share of the Market.

##### a.   Undisputed Evidence Shows Only Minor Foreclosure.

The undisputed evidence shows that Zuffa did not foreclose a "substantial share" of the market for fighter services. *Omega*, 127 F.3d at 1162. On the contrary, nearly 80% of the Ranked Market was available for contracting each year. SUF ¶ 21. "Foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004); *see* Mot. 22 (collecting cases). Plaintiffs cite *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982), for the proposition that contracts covering 24% of the market can be anticompetitive. Opp. 29. But the

---

[9] Plaintiffs' rely on *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070 (9th Cir. 2015) to argue that "proof of monopoly power is not necessary to prevail on a claim based on abuse of monopsony power." Opp. 21. But *O'Bannon* was a Section 1 price-fixing case, not a Section 2 monopoly power case. Likewise, *Knevelbaard Dairies v. Kraft Foods*, Inc. is inapt as it involved a price fixing claim made under state law. 232 F.3d 979, 984 (9th Cir. 2000).

contracts there lasted for "*10 years or more*," which was out of step with industry norms. *Twin City*, 676 F.2d at 1307-08; *Omega*, 127 F.3d at 1162 (*Twin City* involved contracts of "unreasonable length").[10]

Plaintiffs also contend that Zuffa foreclosed a higher share of the market ("at least 50%" and "as high as 99%," Opp. 29), but Plaintiffs' calculations weight fighters by *promoter revenue*—a method that is rigged to produce a finding of anticompetitive behavior against Zuffa (the highest-grossing promoter). Plaintiffs attempt to justify this stacking of the deck by appealing to the fact that some fighters are worth more than others. Opp. 29-30. But Plaintiffs could have weighed fighters by any number of other metrics like rank, skill, or experience.[11] They did not. Instead, Plaintiffs treat Zuffa athletes as significantly more valuable than non-Zuffa athletes merely because the former have contracted with Zuffa. Under Plaintiffs' method, a revenue-leading firm like Zuffa will *always* be found to have foreclosed a substantial share of the market because of its high revenues—and not because of any actual foreclosure. And, unsurprisingly, the results of this weighing are nonsensical—for example, treating the 183rd-ranked athlete (who fought for Zuffa) as *17 times more valuable* than the 3rd-ranked athlete (who fought for Bellator). Ex. 4, Topel I ¶¶ 162, 221; *see also id.* ¶¶ 221-23.

Plaintiffs act as if the only alternative to revenue-weighting is to treat all athletes as "interchangeable," Opp. 30, but that is not so. To account for differences in skill and experience, Dr. Topel stratified the athletes by ranking: those ranked 1 to 15, 16 to 30, 31 to 50, 51 to 100, and greater than 100. Ex. 4, Topel I ¶165. Dr. Topel found no statistically significant correlation between Zuffa's foreclosure share within any of those five categories and wage share. *Id.* ¶¶165-67 & Topel Ex. 16.

---

[10] Plaintiffs also cite *Cornwell Quality Tools Co. v. C. T. S. Co.*, 446 F.2d 825, 831 (9th Cir. 1971) for the proposition that a claim regarding contracts covering 10-15% of the market should go to the jury. Opp. 29. But that case was decided under an old view that "summary procedures should be used sparingly"; the Ninth Circuit has since clarified that "any presumption against the granting of summary judgment in complex antitrust cases has now disappeared." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 921 (9th Cir. 2015).

[11] Dr. Singer weights one of Plaintiffs' three markets (the Headliner market) by the inverse of an athlete's rank. Ex. 70, Singer I ¶¶ 1, 95, 128; Ex. 16, Singer Dep. I 140:19-141:8. But Dr. Singer provides no rationale for adopting this particular weighting system. *See* Mot. 24 n.6.

Because the contracts are staggered, there is always a "constant supply of athletes coming available" for competing promoters to hire, further reducing any possible foreclosure. *Id.* ¶ 118; *Omega*, 127 F.3d at 1164 (staggered end dates "allow effective entry"); *Ticketmaster Corp. v. Tickets.com, Inc.*, 2003 WL 21397701, at *2, 4 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346, 348 (9th Cir. 2005) (same). Plaintiffs argue that staggered end dates prevent a competing promoter from signing a "critical mass of top Fighters in one fell swoop." Opp. 30. But Plaintiffs do not explain why a competing promoter would need to hire a critical mass on a single day, instead of building such a mass over a matter of months or years, like Zuffa—which started with just over 60 fighters—did. Nor do Plaintiffs point to any evidence that promoters actually hire this way. Zuffa's contracts are staggered precisely because promoters do not hire all at once and instead "are continuously searching for and signing" new fighters. Ex. 4, Topel I ¶ 118.

Finally, Plaintiffs have no response to the real-world evidence showing that competing promoters are not foreclosed. Plaintiffs do not dispute that fighters frequently "move back and forth between the UFC and other promotions" or that at least 230 former UFC athletes went on to compete for other promotions each year during the Class Period. Opp. 31; *see* SUF ¶ 21. Instead, Plaintiffs suggest that the movement flows in only one direction: from the UFC to "minor league" promoters once the UFC is no longer interested. Opp. 31. But that argument contradicts the undisputed evidence, which shows that 182 of the athletes who left the UFC to fight for another promotion later *returned* to the UFC, SUF ¶ 21.[12] Moreover, Plaintiffs have no answer to the fact that the UFC's competitors do not believe they are foreclosed from hiring the best athletes. *Id.* Plaintiffs' only response is to disparage them as "minor league", but that characterization does not match the facts. SUF ¶ 25; Ex. 56, Coker Dep. 280:14-17 ("Bellator is not a minor league."); Ex. 88, Hume Decl. ¶ 4 (One is "not a minor league or feeder league for the UFC.").[13]

---

[12] Plaintiffs cite Zuffa executives boasting that "no athlete has left the UFC that the Company wanted to retain." Opp. 12; *id.* at 31. But to retain an athlete, Zuffa *must* match or exceed the athlete's competing offer. Thus, to the extent Zuffa was able to retain the fighters it valued, that is only because Zuffa offered them *as much or more money* than other promoters.

[13] Plaintiffs' citations to testimony from Kurt Otto (of the International Fight League) and Jeremy Lappen (of EliteXC) cannot create a dispute of material fact. Otto acknowledged that even with Zuffa's contracts, promoters could still "find" the next "Conor McGregor" and "build them up []" from scratch." Pls. Ex. 18, 246:19-247:19. And Lappen never testified that he was unable to hire

11

b.     Dr. Singer Does Not Prove Substantial Foreclosure.

Plaintiffs cannot rely on Dr. Singer's analysis to prove substantial foreclosure. "The mere proffering of unsupported expert testimony does not create a triable issue as to antitrust injury-in-fact." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 923. Dr. Singer's analysis is premised on an unsupported legal (not empirical) conclusion that 30-month contracts would not "be acceptable to a Court." Ex. 12, Singer Dep. II 375:7-376:12; Ex. 16, Singer Dep. I 152:1-17 ("I'm familiar with various case law that speaks to what constitutes a contract of sufficient duration to be considered exclusionary"). Yet the Ninth Circuit has found contracts of more than twice that length to be lawful. *E.g.*, *Ticketmaster Corp. v. Tickets.com Inc.*, 127 F. App'x 346, 347 (9th Cir. 2005); *Ferguson v. Greater Pocatello Chamber of Com., Inc.*, 848 F.2d 976, 982 (9th Cir. 1988).

Plaintiffs argue that Dr. Singer did not rely on a legal conclusion because he ran a "regression" that "tested" whether wage share decreased when the proportion of fighters subject to 30-month contracts increased. Opp. 32. But that regression does not answer whether Zuffa's staggered, 30-month contracts "foreclosed competition in a substantial share" of the market for fighter services. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) (question is whether "opportunities for other" competitors "to enter into or remain in that market" are "significantly limited"). Instead, it purports to show injury based on whether as such contracts increased, the share of revenue attributed to wages decreased. But that does not show that this purported effect resulted from any foreclosure. In other words, Dr. Singer *assumes*, but does not *prove*, that 30-month contracts prevent other promoters from hiring a critical mass of fighters.

Plaintiffs appear to suggest that 30-month contracts result in such foreclosure because they match the "mean length of a Fighter's career." Opp. 32. But Plaintiffs cite no case law in support of that conclusion. In any event, that conclusion is not supported by the facts. The mean length of a fighter's career is 8.7 years—more than three times the length of Zuffa's contracts. SUF ¶ 12. Plaintiffs object to the relevance of this calculation because it includes time fighting for other

---

a critical mass of fighters. He said only that "assuming that UFC had people who would draw an audience that were under exclusive contract and we couldn't sign them, then yes, that would affect us." Pls. Ex. 23, 137:22-138:8.

"minor league" promoters. But that objection hinges on Plaintiffs' unsupported contention that Zuffa is the "major league" and all other promoters are "minor leagues." Opp. 31-33.

Finally, to the extent that Plaintiffs attempt to justify Dr. Singer's legal conclusion by arguing that a contract cannot be longer than an athlete's career at Zuffa, that argument is inconsistent with Dr. Singer's concession that year-long contracts *would* be lawful, even though the median Zuffa career is just eight or nine months. Ex. 16, Singer Dep. I 46:20-47:21; Ex. 49, Singer II ¶ 198. If the relevant variable is how long most athletes stay at Zuffa, then Dr. Singer's distinction between year-long contracts and 30-month contracts makes no sense.[14]

### 2. Plaintiffs Fail to Raise a Genuine Issue of Disputed Fact as to Whether Zuffa Had Legitimate Business Justifications for Its Contracts.

Plaintiffs' allegations also fail to raise a material dispute that Zuffa's legitimate business justifications for its challenged conduct were pretextual.[15]

Plaintiffs claim that Zuffa "provided no evidence" that exclusive, multi-bout contracts promote investments in fighters by (1) reducing free-riding and (2) maintaining a large enough pool of fighters to grow output. Opp. 19. Incorrect. It is Plaintiffs who have failed to rebut the ample evidence Zuffa put forth that its exclusive contracts—also used by Zuffa's competitors,[16]

---

[14] Plaintiffs misunderstand this argument as objecting to Dr. Singer's assessment that "the median Fighter's career [in the UFC] lasts less than a year." Opp. 33. Not so. The point is that Dr. Singer's conclusion that 30-month contracts are unlawful—because they match "the mean length of a Fighter's career in the UFC," Opp. 32, is not consistent with his concession that one-year contracts—which are *longer* than the median length of a Fighter's career in the UFC—*are* lawful.

[15] Plaintiffs incorrectly assert that it is contradictory for Zuffa to put forth evidence that it lacked monopsony power and engaged in procompetitive conduct, while also showing it had legitimate business justifications for the challenged conduct. Opp. 1-4. Plaintiffs misunderstand how antitrust law works. Under *Qualcomm*, even if Plaintiffs could raise a genuine issue of material fact regarding Zuffa's market power or "anticompetitive" conduct (they cannot), Zuffa is still not liable if it "asserts a procompetitive justification"—in which case "the burden shifts back to the plaintiff to rebut that claim" and "demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Qualcomm Inc.*, 969 F.3d at 991, 996. Explaining Zuffa's legitimate business reasons does not "conflict" with the facts showing Zuffa's conduct was not anticompetitive and it lacked monopsony power.

[16] Plaintiffs do not dispute that Zuffa's competitors also deployed industry-standard exclusivity clauses. CSF ¶ 10. Plaintiffs cite Dr. Singer for the baseless proposition that "other promoters' contracts contained significant exceptions to exclusivity" and "other promoters included restrictive terms in their contracts because Zuffa did so, and would have removed them had Zuffa done so." *Id.* Dr. Singer fails to provide *any* evidence that UFC's exclusivity clauses differ in any substantive

13

SUF ¶ 15 (Bellator, ONE, Strikeforce, WSOF)—prevent free-riding by incentivizing Zuffa to make investments in fighters without fear that a competitor would then swoop in to capture benefits associated with Zuffa's investments in that fighter. Mot. 27-30. Zuffa executives provided evidence of this legitimate, procompetitive business reason for its exclusive contracts.[17] And competitor promotors provided evidence of this legitimate, procompetitive justification, which they also deploy in contracts with fighters.[18] Even Dr. Singer agreed that some exclusivity is needed to prevent free-riding. Ex. 70, Singer I ¶ 264.

Plaintiffs, on the other hand, provide no cognizable evidence for their conclusory claim that "the Fighters themselves, not Zuffa, do most of the investing." Opp. 19. On the contrary, Plaintiff Vera testified Zuffa "provided me with the best compensation and incentives" and "expanded [sic] the most resources in promoting me and the events that I have fought in."[19]

Plaintiffs also fail to rebut Zuffa's evidence that its contracts are essential to growing output and ensuring promoters have a sufficient pool of athletes to staff events. SUF ¶¶ 13-15. Plaintiffs do not dispute that Zuffa's output grew during the Class Period as a result of being able to staff a variety of exciting matchups. SUF ¶ 7. Plaintiffs also do not dispute that increasing the quantity and quality of events is a well-recognized business justification.[20] And Plaintiffs do not dispute that as many as 40% of Zuffa's athletes may be injured, on leave, or otherwise unavailable at any

---

[17] SUF ¶¶13-14 (citing Ex. 8, 98:5- 99:17, 103:6-105:7; Ex. 9, 177:14-178:5; Ex. 14, 104:19-25; Ex. 48, 97:23-98:10, 153:5-12, 243:23-244:13; Ex. 51, 119:15-120:18; Ex. 52, 247:10-248:10, 120:20- 121:20; Ex. 113, Epstein Decl. ¶¶ 4-5).

respect from its competitors. Ex. 70; SUF ¶ 15 (undisputed that Bellator, ONE, WSOF, and pre-acquisition Strikeforce all had exclusive contracts with no significant exceptions). Likewise, Dr. Singer's assertion that other promoters would have removed restrictive provisions if Zuffa did so is entirely speculative and does not raise a material factual dispute. *Supra* V.

[18] SUF ¶ 15 (citing Ex. 56, Coker Dep. 180:20-181:3; Ex. 57, C. Silva Dep. 196:3-198:1, Ex. 58-61 (Bellator, WSOF, ONE Championship, and pre-acquisition Strikeforce exclusive contracts)).

[19] SUF ¶ 10 (citing Ex. 20, Vera Dep. 233:1-17).

[20] Plaintiffs do not dispute that *Race Tires Am., Inc. v. Hoosier Racing Tire Corp*., 614 F.3d 57, 82 (3d Cir. 2010) and *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986) stand for the proposition that exclusive dealing arrangements can be justified by increased output and quality of events. Opp. 38, n.95. Instead, they deploy circular reasoning to argue those cases are "inapposite" because the defendants in those cases established procompetitive benefits from its conduct. *Id.* Zuffa has done so here, as Plaintiffs do not dispute fighter compensation rose and there was increased quality and output of MMA events. SUF ¶¶ 7-10.

given time.[21] Dr. Singer admits that "access to a broad stable of high-quality MMA Fighters" is "essential" because fighters "become unavailable due to injury, retirement, and so on." Ex. 70, Singer I ¶¶ 152, 158.

Faced with these undisputed facts, Plaintiffs are left to argue that Zuffa's legitimate business justification could be adequately achieved with "shorter contracts" of "12 months" to prevent free-riding, which is insufficient to meet Plaintiffs' burden under the rule of reason test. *See Image Technical Servs., Inc.* v. *Eastman Kodak Co.*, 903 F.2d 612, 620 (9th Cir. 1990) ("[T]here is no least restrictive alternative requirement in the context of a Section 2 claim."). And in any event, Plaintiffs fail to substantiate that claim with any evidence. Plaintiffs concede they calculate the typical time between bouts as eight months, that a 12-month contract would only cover a single fight, and that a single bout in a year would not induce sufficient promoter investment. Ex. 70, Singer I ¶ 264.[22] Plaintiffs' inability to substantiate its preference for shorter contract durations falls woefully short of rebutting Zuffa's legitimate business "procompetitive justifications for its challenged conduct" which "are reasonable and consistent with current industry practice." *Qualcomm Inc.*, 969 F.3d at 991, 996. The facts show that Zuffa's contracts are justified by its business imperatives of maintaining a deep bench of athletes in order to increase output and incentivize investments in fighters—both of which benefits the fighters—and that Zuffa used the athletes it hired, and met all contractual obligations for bouts, SUF ¶¶ 13-15; Mot. 30-32—again, as Dr. Singer concedes. Ex. 16, Singer Dep. I 316:19-318:24.

**B.      The Challenged Conduct Is Not Anticompetitive.**

The grab-bag of additional alleged conduct Plaintiffs tack on to their monopsony claim cannot salvage it.  A collection of perfectly legal conduct cannot create a "monopsony broth." And

---

[21] SUF ¶13; Ex. 57, C. Silva Dep. 196:25-197:14; Ex. 4, Topel I ¶¶ 87, 113; Ex. 113, Epstein Decl. ¶ 5; Ex. 107.

[22] Plaintiffs point to an isolated instance *after the Class Period*—an August 2017 Mayweather-McGregor boxing match—in which Zuffa allowed a fighter to compete in bouts organized by non-UFC entities. Opp. 38 (citing Pls. Ex. 1, Singer ¶ 102 n.276). This is immaterial because a single instance of Zuffa allowing a fighter to compete in a boxing match does not undermine that exclusivity is industry-standard and necessary for increased output across the board, as the market facts reflect. SUF¶¶13-15.

Zuffa did not engage in anticompetitive conduct when it (1) hired fighters and placed them into the contractually agreed-upon number of bouts; (2) gave fighters new contracts that increased their pay; and (3) engaged in acquisitions that allowed it to pay fighters more while increasing output.

### 1. Plaintiffs Are Wrong as a Matter of Law that Monopsony Broth Can Be Based on Procompetitive Conduct.

Plaintiffs insist it is "improper" for the Court to analyze each aspect of Zuffa's challenged conduct individually. Opp. 28-29. But Plaintiffs bear the burden to show "whether *each type of alleged exclusionary practice* has the requisite anticompetitive effect." *United States v. Google LLC*, 2023 WL 4999901, at *12, 14 (D.D.C. Aug. 4, 2023) (no case "supports the proposition that the court must combine the anticompetitive effects across different types of monopolistic behavior, when deciding whether any particular type of conduct has anticompetitive effects" because "the court must disaggregate the exclusionary conduct into its component parts before applying the relevant law"). Where, as here, "each individual action alleged does not rise to anticompetitive conduct in the relevant market, their collective sum likewise does not." *Dreamstime.com, LLC* v. *Google LLC,* 54 F.4th 1130, 1142 (9th Cir. 2022) (the "dispositive principle" is that "there can be no synergistic result from a number of acts none of which show causal antitrust injury to the plaintiff.").

Plaintiffs respond that *Dreamstime* requires courts to look at the "overall combined effect" of the conduct. Opp. 28-29 n.78. But such consideration occurs only *after* the court has analyzed each "specific claim" and cannot result in a finding of anticompetitive harm where each act alone is "perfectly legal." *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).

### 2. Plaintiffs' Allegations Fit Squarely Within a Predatory Hiring Claim.

Plaintiffs claim that Zuffa "locked up" and "shelved" fighters in order to harm competition. Opp. 33-34. That is a classic predatory hiring claim, where "talent is acquired not for purposes of using the talent but for purposes of denying it to a competitor." *Universal Analytics, Inc. v. MacNeal-Schwendler Corp*, 914 F.2d 1256, 1258 (9th Cir. 1990). Plaintiffs deny making a predatory hiring claim because they cannot show either that Zuffa hired the athletes solely "to harm the competition without helping itself," or Zuffa's "clear nonuse" of the athletes, as Ninth

Circuit precedent requires. *Id.* Dr. Singer recognized that "access to a deep pool of talented Fighters is a critical input" for any MMA promotion, including Zuffa. Ex. 70, Singer I ¶ 158. And Plaintiffs fail to identify any fighter who was "shelved." On the contrary, Plaintiffs concede fighters were always placed in the agreed-upon bouts within the terms of their contracts. Opp. 25 n.74.

### 3. Plaintiffs Fail to Raise a Genuine Issue of Disputed Fact that Zuffa Paying Fighters More Was Anticompetitive.

Plaintiffs argue that Zuffa "coerced" fighters to renew their contracts. Opp. 34. But the conduct that Plaintiffs identify—the negotiation of contracts before their expiration and the use of right-to-match clauses—is *procompetitive*.[23] Fighters who re-signed with Zuffa "early" were paid 21.2% more—a greater rate of increase than prior "within-contract" bouts. Ex. 4, Topel I ¶ 122. In other words, "compensation grew more rapidly in moving to their new contracts than it did in their prior contracts." *Id.* That is why fighters often sought to renegotiate their contracts before they expired. *E.g.*, Ex. 116, Fertitta Dep. 165:23-166:13; Pls. Ex. 29, Silva Dep. 386:8-387:7. And any fighters for whom Zuffa exercised the right-to-match clause were necessarily paid as much or more as they would have been paid by a competitor. Paying more to extend contracts is not an "anticompetitive abuse," which is required to show a violation of Section 2. *Qualcomm Inc.*, 969 F.3d at 990.

The Supreme Court has held that "higher bidding" for an input like fighter services can "*only*" serve "as a basis for liability" where that bidding "leads to below-cost pricing in the relevant output market." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 325 (2007). Plaintiffs concede Zuffa fighters' compensation increased during the Class Period, that Zuffa paid more than other promotions, and that there is no evidence its payments to fighters led to below-cost pricing of Zuffa's MMA events. CSF ¶ 26; *see* Ex. 12, Singer Dep. II 459:12-460:8. Plaintiffs ignore *Weyerhauser*'s bright-line rule to argue that pay was still "below levels that would have prevailed absent the Scheme," CSF ¶ 26. But Plaintiffs' cannot escape that the nature

---

[23] Plaintiffs make a conclusory allegation that if a fighter did not re-sign their contract, they would be punished "by facing dangerous but unprestigious opponents." Opp. 35. Plaintiffs do not provide a single example of any athlete, much less a broad group of athletes, being subject to the coercive conduct they claim occurred.

of their allegations—that Zuffa's higher-pay contracts foreclosed the market—amount to an allegation that Zuffa bid up the market price in the buy side of the market such that its "rivals cannot survive." *Weyerhaeuser*, 549 U.S. at 320. Thus, *Weyerhaeuser*'s bright-line rule applies: "*only* higher bidding that leads to below-cost pricing in the relevant output market will suffice as a basis for liability." 549 U.S. at 325. Because Plaintiffs cannot make that showing, their claim that Zuffa's contracts with fighters were anticompetitive fails as a matter of law. Mot. 34-35.

### 4. Plaintiffs Fail to Raise a Genuine Issue of Disputed Fact that Zuffa's Acquisitions of MMA Promoters Were Anticompetitive.

Plaintiffs do not dispute their complained-of acquisitions were made well before the Class Period and could not be challenged under the applicable statute of limitations. *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 299 (D.C. Cir. 2023). Plaintiffs also concede that "acquisitions are not necessarily anticompetitive when they occur in a competitive market." Opp. 36. All Plaintiffs muster is a claim that the acquisitions "form part of the Scheme," Opp. 36, but they produce no evidence that Zuffa's acquisitions were anticompetitive or connected to any other challenged conduct. Mot. 35-36.

There is no material dispute that during the relevant period athlete compensation increased; athletes remained available in large numbers to other promoters; and existing and new rival MMA promoters competed directly with Zuffa for highly-ranked and well-known athletes. SUF ¶¶ 8, 18-25. On these facts, Zuffa's acquisitions did not and could not cause anticompetitive harm. *Syufy*, 903 F.2d at 669 (finding no competitive impact where record "demonstrates that neither acquiring the screens of his competitors nor working hard at better serving the public gave Syufy deliverance from competition"). After each acquisition, Zuffa intended to and did use the contracts from the acquired promoter to compete. SUF ¶13. This is "vigorous competition on the merits of the type that the antitrust laws seek to promote." *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1210 (C.D. Cal. 2011); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir.2010) (acquisition lawful and procompetitive where defendant "intended to use the assets and has done so to more effectively compete for customers and to meet customer needs").

### III.     Plaintiffs Lack Article III Standing Because They Have Not Shown Antitrust Impact to Every Class Member.

Finally, dismissal is warranted because Plaintiffs have failed to produce *any* evidence that shows that all class members were injured. A class seeking to proceed past summary judgment "must set forth by affidavit or other evidence specific facts" demonstrating standing. *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012). Plaintiffs have not done so. Plaintiffs cannot rely on Dr. Singer's analysis because that analysis "measures injury for the *average* fighter," not each "*individual* fighter." ECF No. 932-28 (Leonard Decl.) ¶ 9. When Defendants' expert, Dr. Leonard, re-ran Dr. Singer's analysis at the individual level, he found that over 80% of fighters *were not* injured. *Id.* ¶ 19. Thus, even accepting Dr. Singer's revenue-share model as true, Plaintiffs have presented no evidence of anticompetitive impact for the vast majority of the class. *Id.* ¶¶ 18-21, Figs. 1, 2.

Plaintiffs argue that they do not need to show that Dr. Singer's analysis is correct or that they will "win on the merits" to have standing. Opp. 39-40. Zuffa agrees—the problem for Plaintiffs is that *even assuming Dr. Singer's analysis is correct*, Plaintiffs have presented *no* evidence of individual injury for most class members. That failure is dispositive. *E.g.*, *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 657 (9th Cir. 2002) (no standing because "no evidence" that any "particular plaintiff" would suffer harm); *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 253 (4th Cir. 2020) (dismissal where named plaintiff failed to "'set forth by affidavit or other evidence specific facts' that, when taken as true, establish each element of Article III standing" "in response to a summary judgment request").

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022), which Plaintiffs rely on, was a class-certification decision, not a summary-judgment decision. And the Court found standing based on the theory that the tuna suppliers' price-fixing had "raised the baseline prices for all buyers"—a theory that Plaintiffs cannot rely on here, given the fighters' wide-range in skills, experience, and negotiating power. *Id.* at 678.

## IV.     Plaintiffs' Counterstatement of Facts Does Not Raise Genuine Factual Disputes and Relies on Improper and Inadmissible Evidence.

Plaintiffs do not specifically indicate which paragraphs of Zuffa's SUF are disputed. Where Plaintiffs fail to address Zuffa's SUF, the Court should "consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(c), (e)(2). Accordingly, the Court should deem Zuffa's SUF ¶¶ 1, 2, 7-9, 16, 17, 19, 21, 26, and 27 undisputed. In addition, portions of other paragraphs in Zuffa's statement of facts (SUF ¶¶ 10, 12, 14, 15, 18-22) are also undisputed. *See* Ex. 115.

Moreover, Plaintiffs' opposition relies on "evidence" that is either inadmissible, insufficient to show a genuine issue of material fact, or both:

- **Expert Reports** (CSF ¶¶ 9-11, 17-18, 20, 22-23, 25-33): Plaintiffs improperly rely on their experts to support alleged facts without record evidence. Plaintiffs' CSF contain "facts" whose only support are expert assertions that are not supported by record evidence, but "an expert report cannot be used to prove the existence of facts set forth therein." *Citric Acid*, 191 F.3d at 1102; *In re Optical Disk Drive*, 2017 WL 6451711 at *3; *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 923 ("The mere proffering of unsupported expert testimony does not create a triable issue as to antitrust injury-in-fact.").

- **Pre-Class Period Evidence** (CSF ¶¶ 9, 13-16, 21, 23-26): Evidence from before the Class Period cannot create a genuine issue of material fact as to whether Zuffa possessed market power during the Class Period. *Rebel Oil*, 51 F.3d at 1140; *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1193 (9th Cir. 1984) (rejecting evidence that preceded the relevant timeframe).

- **Puffery Statements About Competitors** (CSF ¶¶ 6, 11, 12, 14, 19, 22-25) Plaintiffs rely on statements made by Dana White and Lorenzo Fertitta to promote UFC. These statements are immaterial for summary judgment because such puffery "fails to exhibit more than aggressive behavior among intense competitors." *Thurman*, 875 F.2d at 1379.

- **Unsupported Opinion Statements** (CSF ¶¶ 1-11, 13-16, 19-21, 23-26): Plaintiffs improperly rely on inadmissible, unsupported, and/or unverified hearsay statements made in public news articles, material drafted by third parties, and internal discussions between Zuffa employees to prove elements of their antitrust claims. *Indep. Ink*, 210 F.Supp. 2d at 1170-72, 1176 (statements in "marketing materials and investment reports" about the defendant's alleged dominance in a market do not establish market power); *In re Ebay Seller Antitrust Litig.*, 2010 WL 760433 at *4-5 (N.D. Cal. Mar. 4, 2010), *aff'd sub nom.* 433 F. App'x 504 (9th Cir. 2011).

Zuffa's responses to the full text of Plaintiffs' CSF, as described above, are attached in chart-form as Ex. 114.

### CONCLUSION

For the foregoing reasons, Zuffa respectfully requests that the Court grant summary judgment in its favor.

Dated: December 22, 2023

Respectfully Submitted,

*/s/ William A. Isaacson*

CHRISTOPHER S. YATES (*Pro hac vice*)
chris.yates@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: (415) 395-8095

SEAN M. BERKOWITZ (*Pro hac vice*)
sean.berkowitz@lw.com
LATHAM & WATKINS LLP
330 North Wabash Ave, Suite 2800
Chicago, IL 60611

LAURA WASHINGTON (*Pro hac vice*)
laura.washington@lw.com
LATHAM & WATKINS LLP
10250 Constellation Blvd, Suite 1100
Los Angeles, CA 90067

DAVID L. JOHNSON (*Pro hac vice*)
david.johnson@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004

WILLIAM A. ISAACSON (*Pro hac vice*)
wisaacson@paulweiss.com
JESSICA PHILLIPS (*Pro hac vice*)
jphillips@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006

BRETTE M. TANNENBAUM (*Pro hac vice*)
btannenbaum@paulweiss.com
YOTAM BARKAI (*Pro hac vice*)
ybarkai@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019

DONALD J. CAMPBELL (No. 1216)
djc@campbellandwilliams.com
J. COLBY WILLIAMS (No. 5549
jcw@campbellandwilliams.com
CAMPBELL & WILLIAMS
710 South 7th Street
Las Vegas, NV 89101
Tel: (702) 382-5222

*Attorneys for Defendant Zuffa, LLC, d/b/a*
*Ultimate Fighting Championship and UFC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Zuffa's Renewed Motion for Summary Judgment was served on December 22, 2023, via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list.


*/s/ William A. Isaacson*
William A. Isaacson