# EXHIBIT 114

## Full Text Chart of Plaintiffs' CSF and Zuffa's Response

**Plaintiffs' Counterstatement of Facts and Zuffa's Response**

| Pls' CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| 1 | Marquee Fighters are the most important input for MMA promoters because Fighters draw the audience—and therefore television deals and sponsor. [1] The UFC's longtime matchmaker Joe Silva testified that "it would devalue a promotion if the highest-level fighters in that organization are taken away" because "the highest-level fighters in an MMA promotion are a substantial component of the value of that organization." Silva Tr. 330:2-10.3. | This statement is immaterial because "marquee" fighters (or "top" or "highest level") is not a term defined in the Complaint or elsewhere, and because it is undisputed that MMA promoters had the ability to obtain talented MMA athletes during the Class Period. SUF ¶¶ 16-27. Plaintiffs have also not attempted to prove antitrust injury or damages for a class of "marquee" athletes. |
| 2 | Zuffa's claim that it had "an average of 18.1%" of Fighters in the Ranked Market under contract in any given year, ZSF ¶21, is not relevant or material. Fighters are not fungible, *see* SR1 ¶128; SR2 ¶¶23-24, 128-29, 140 & n.499; SR4 ¶48, and thus counting up Zuffa's raw share of athletes under contract absent some weighting is just noise. Rather, as Zuffa's economist admits, highly-ranked or better-known Fighters generate more Event Revenues. *See* Topel Tr. 432:10-24, 450:8-451:5 (admitting that "some fighters are more important to an MMA promotion than others" as "some generate more revenues"); *id.* 36:7-17; *id.* 431:2-7. Silva admitted, for instance, that "there is a group of fighters who, whether they're champions or not, . . . tend to separate themselves from the crowd as capable of being headliners;" and "an event will have difficulty succeeding without these top-level headline fighters." Silva Tr. 331:5-332:2. And this Court found "Fighters are not homogenous; they vary in their ability to attract viewers." CO at 29. Relative to Fighters, the promoter's role is limited. | These statements are immaterial because it is undisputed that promoters had the ability to obtain talented MMA athletes during the Class Period and that highly-ranked athletes voluntarily left Zuffa for other promoters, SUF ¶¶ 16-27, and that competitors had all of the inputs needed to compete. *Id.* ¶¶ 21, 25. Plaintiffs' reference to Joe Silva's testimony is misleading and does not support Plaintiffs' proposition. Pl. Ex. 29, Silva Tr. 332:4-333:16 ("popularity doesn't have anything necessarily to do with your accomplishments," and that it has more to do with "charisma"). Undisputed record evidence shows that rankings alone do not translate into "talented" or "household name" athletes. *E.g.* Pls. Ex. 30, Coker Dep. 90:7-18 ("low rank, to me, doesn't mean that you can't be a star. So you can be ranked 3 or 4 in the world, but -- the flip side of that is you can be ranked 3 or 4 in the world, doesn't mean you are a star"), 90:20-91:5 (athletes like Plaintiff Cung Le were unranked, but "drew big TV ratings"). Plaintiffs' statement that "relative to Fighters, the promoter's role is limited" is unsupported and immaterial to proving an antitrust injury. |
| 3 | Because Fighters are not fungible and because the top Fighters drive revenues, as Zuffa has conceded, a "deep roster of talented fighters" is "essential" to stage live MMA events successfully. Zuffa's economist also admitted, "To effectively compete with the UFC a competitor would need. . . a deep lineup of marquee fighters" and "good matchmaking from a deep roster of talented fighters under contract is essential." Topel Tr. 440:12-441:10; SR1 ¶158. Zuffa admits: "Without a sufficiently deep roster of athletes signed to long-term contracts, 'the ecosystem would crash.'" ZSF ¶13. | These statements are immaterial because it is undisputed that promoters had the ability to obtain talented MMA athletes during the Class Period and that highly-ranked athletes voluntarily left Zuffa for other promoters, SUF ¶¶ 16-27, and that competitors had all of the inputs needed to compete. *Id.* ¶¶ 21, 25. Undisputed record evidence shows that rankings alone do not translate into "talented" or "household name" athletes. *E.g.* Pl. Ex. 30, Coker Dep. 90:7-18 ("low rank, to me, doesn't mean that you can't be a star. So you can be ranked 3 or 4 in the world, but -- the flip side of that is you can be ranked 3 or 4 in the world, doesn't mean you are a star"), 90:20-91:5 (athletes like Plaintiff Cung Le were unranked, but "drew big TV ratings"). |
| 4 | Zuffa has conceded it has the "vast majority of top fighters" under multi-bout exclusive agreements—a barrier to entry and expansion for other promoters. SR1 ¶¶159-60 (quoting | Plaintiffs' statements are immaterial as undisputed evidence shows that new and existing promoters expanded during and after the Class Period. SUF |

---

[1] Plaintiffs' footnotes to the CSF are omitted from this chart.

| Pls' CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | Zuffa documents). And its economist conceded that "having the vast majority of top fighters. . . under your contracts, . . . that creates. . . a competitive advantage that, all other things the same, make—an entrant's going to have to overcome that in order to come in and compete head-to-head and have the same success as Zuffa." Topel Tr. 435:17-437:22. | ¶¶ 18-20. Plaintiffs' citation to Professor Topel is incomplete and does not support Plaintiffs' assertion. Pl. Ex. 37, Topel Dep. 437:4-11 (economists use the term "'barriers to entry' in -- in different ways. So to an economist a cost advantage, being better at something can be considered a barrier to entry. It's not an anticompetitive barrier to entry"); *Syufy*, 903 F.2d at 668 (rejecting theory that "Syufy's effectiveness as a competitor creates a structural barrier to entry"). Record evidence does not support Plaintiffs' statement about the number of Zuffa athletes under contract. It is undisputed MMA promoters had the ability to obtain talented MMA athletes during the Class Period. SUF ¶¶ 18-25. |
| 5 | Promoters need a deep roster of talented Fighters to compete with the UFC because:<br><br>a. **A promoter must supply multiple pairings of top Fighters**. SR1 ¶156. Not all top Fighters can be matched against each other because, inter alia, there are distinct weight classes, and repetitive pairings of the same top Fighters would have decreasing utility. *Id.; see also* Silva Tr. 130:18-131:16; Hendrick 30(b)(6) Tr. 217:17-218:10.<br><br>b. **To develop new top Fighters**, promoters require access to a broad stable of top Fighters, as Fighters rise in the rankings only by defeating other top Fighters. SR1 ¶157. As Silva put it, "beating guys with crappy records won't convince anyone [a Fighter] is ready for the big leagues," *i.e.*, the UFC. Silva Tr. 130:10-132:10; Ex. 124 at -15.<br><br>c. **Top Fighters and aspiring top Fighters require a promoter with a critical mass of top Fighters**. *See, e.g.*, Topel Tr. 431:8-13 (noting that "the ability to develop their careers by fighting against highly-ranked opponents" is "one of the reasons [why Fighters] sign up"); id. 434:9-15; TR1 ¶96. Zuffa principal Lorenzo Fertitta made this clear: "[F]or any aspiring athlete that wants to become a fighter, we're at the top of the food chain . . . [T]heir goal is eventually to get to the UFC. So the talent pool is kind of coming to us so we kind of have the pick of the best fighters that are potentially out there." In an environment in which Zuffa refuses, as part of the Scheme, to co-promote events with other MMA promoters, this makes Zuffa the only place to go. | These statements are immaterial because it is undisputed that promoters had the ability to obtain talented MMA athletes during the Class Period and that highly-ranked athletes voluntarily left Zuffa for other promoters, SUF ¶¶ 16-27, and that competitors had all of the inputs needed to compete. SUF ¶ 21. Plaintiffs' reference to Joe Silva's testimony is misleading and does not support Plaintiffs' proposition. Pl. Ex. 29, Silva Tr. 332:4-333:16 ("popularity doesn't have anything necessarily to do with your accomplishments," and that it has more to do with "charisma"). Undisputed record evidence shows that rankings alone do not translate into "talented" or "household name" athletes. *E.g.* Pl. Ex. 30, Coker Dep. 90:7-18 ("low rank, to me, doesn't mean that you can't be a star. So you can be ranked 3 or 4 in the world, but -- the flip side of that is you can be ranked 3 or 4 in the world, doesn't mean you are a star"); *id.* 90:20-91:5 (athletes like Plaintiff Cung Le were unranked, but "drew big TV ratings and put butts in the seats."). |
| 6 | Zuffa has conceded that by keeping top Fighters from other promoters the UFC will continue to be "the only viable alternative [for] a top tier fighter['s] career." SR1 ¶162; Ex. 143 at -60. Zuffa's executives acknowledge the importance of blocking other promoters' access to top Fighters to maintaining the UFC's dominance. In February 2014, for example, after exercising a provision of Zuffa's Exclusive Contracts to prevent top Fighter Gilbert Melendez from defecting to Bellator, Lorenzo Fertitta wrote to Dana White: "We gotta keep taking these [expletive]'s oxygen til they tap out. We have sacrificed too much to let anyone get traction now." *See* CO at 40. | These statements are immaterial because it is undisputed that promoters had the ability to obtain talented MMA athletes during the Class Period and that highly-ranked athletes voluntarily left Zuffa for other promoters, SUF ¶¶ 16-27, and that competitors had all of the inputs needed to compete. SUF ¶ 21. Undisputed record evidence shows that rankings alone do not translate into "talented" or "household name" athletes. *E.g.* Pl. Ex. 30, Coker Dep. 90:7-18 ("low rank, to me, doesn't mean that you can't be a star. So you can be ranked 3 or 4 in the world, but -- the flip side of that is you can be ranked 3 or 4 in the world, doesn't mean you are a star"), 90:20-91:5 (athletes like Plaintiff Cung Le were unranked, but |

| Pls' CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | | "drew big TV ratings"). |
| 7 | Zuffa admits that to fight in the UFC, a Fighter must agree to exclusivity.  ZSF ¶11. | This allegation is immaterial because it does not establish an antitrust violation.  Mot. 22-27. |
| 8 | Zuffa admits its Exclusive Contracts restrict Fighter mobility, preventing the best Fighters from moving to other promoters. Topel Tr. 75:6-19, 80:7-16, 78:20-79:1 (admitting its Exclusive Contracts "restrict[] ... athlete mobility"); CO at 34 (finding the contracts "effectively negated a fighter's mobility to competitors and their ability to meaningfully negotiate with rivals"). Zuffa restricts Fighter mobility through specific contractual provisions, such as:<br><br>a.  **The Exclusivity Clause** prevents UFC Fighters from working with other promoters, Hendrick 30(b)(6) Tr. 382:11-385:23 & 376:25-377:13; CO at 34, and the better the Fighter, the longer the term.<br><br>b.  **The Right to Match Clause** gives Zuffa the right to match any offer made to a Fighter by another promoter for 12 months after the Exclusive Contract "term" and after any Exclusive Negotiation period. As a result, "if there was a UFC fighter who no longer wanted to fight with the UFC for some reason and the UFC was determined to match any offer, that that fighter, in order to get out from under the contract, would need to wait. . . the 12 months of the right to match period." Silva Tr. 186:4-12.<br><br>c.  **The Exclusive Negotiation Clause** gives Zuffa the exclusive right to negotiate with the Fighter after the "term," typically for 3 months. CO at 35 ("[D]uring the crucial period of renegotiation of a new contract, fighters cannot even talk to rival promoters to meaningfully understand or know their value outside of what Zuffa is offering them.").<br><br>d.  **The Champions Clause** gives Zuffa the right to extend the contract of a Fighter who holds a championship for one year or three bouts. Ex. 105 at -912; SR1 ¶69. | This statement is immaterial because undisputed evidence shows that competing promoters had the ability to sign talented MMA athletes during the Class Period and that highly ranked athletes voluntarily left Zuffa for other promoters. SUF ¶¶ 16-27.  Plaintiffs misquote Prof. Topel's testimony. When asked whether "the challenged contracts in effect restrictions on athlete mobility," Prof. Topel testified, "I don't know if I agree with your phrase. They are restrictions that protect the investments that Zuffa has made in athletes." Pl. Ex. 36, Topel Dep. 79:25-80:6. Undisputed evidence shows that exclusive contracts enable Zuffa to have enough athletes available to compete in the dozens of UFC events Zuffa promotes each year and to maintain a high quality of events in the face of athlete injury or inability to compete. SUF ¶ 13.<br><br>Plaintiffs cite no record evidence to support that the terms of exclusivity clauses are longer for "the better" Zuffa fighters. The "Right to Match" clause does not provide Zuffa with 12 months to match any competing offer; the record is undisputed that the "right to match" clause lasts only until an athlete receives an offer from a competing MMA promoter, at which point Zuffa has 15 business days to match or beat the competing offer.  SUF ¶ 14; Ex. 47 § 12.1; Ex. 55 § 12.2; Ex. 8, Epstein Dep. 91:10-92:10; Ex. 79, Campbell Decl. ¶ 5. |
| 9 | Zuffa claims that it has used similar exclusionary provisions continuously since it purchased the UFC in 2001. ZSF ¶13. In fact, Zuffa added the exclusive negotiation clause in 2004 and the total duration of its contracts has increased along with its market power, doubling from an average of 18 months in 2004 to more than 36 months by 2015.  SR1 at Tbl.1 (p. 61). Contrary to Zuffa's contention about the average Fighter career length, ZSF ¶12, the effective term of Zuffa's Exclusive Contracts was longer than the average Fighter career. | Plaintiffs' statement that Zuffa added exclusivity clauses in 2004 is unsupported, *see* Ex. 53 § 2(a) (2001 contract) and is immaterial because it is irrelevant for the purposes of establishing Zuffa's market power during the Class Period.  Plaintiffs' assertion regarding athlete's average career length is supported only by citations to their expert and is contradicted by record evidence.  It is undisputed that a UFC athlete's professional career (*i.e.*, all paid bouts) is 8.7 years, roughly three times longer than Plaintiffs' calculation of Zuffa's contract term. SUF ¶ 12; Ex. 49, Singer Rep. ¶ 64. |
| ¶ 10 | That certain other MMA promoters may also have exclusivity provisions, ZSF ¶15, is disputed and irrelevant.  It is disputed in that the other promoters' contracts contained significant exceptions to exclusivity, often allowing Fighters to compete in other organizations, including the UFC.  SR1 ¶¶107, 135-36; SR2 ¶¶236-37; *see also* SR2 ¶193 (discussing Topel admission that smaller MMA promotions had single-bout | Plaintiffs' assertion that rival promoters' contracts contained "significant exceptions" is supported only by citations to their expert and is contradicted by undisputed market facts. SUF ¶ 15 (undisputed that Bellator, ONE, WSOF, and pre-acquisition Strikeforce all had exclusive contracts with no significant exceptions); *see also* Ex. 56, Coker Dep. 180:20-181:3. |

| Pls' CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | contracts). Further, the other promoters "included restrictive terms in their contracts because Zuffa did so, and would have removed them had Zuffa done so." SR2 ¶¶190, 236-37. Evidence shows that other promoters would have been willing to co-promote MMA events, SR2 ¶¶221-24, and remove other restrictive provisions such as the Right to Match Clause, if Zuffa had done so.  SR2 ¶¶190, 194, 236-37 & n.756; Ex. 59 at -802-03. | Plaintiffs' assertion that other promoters would have removed restrictive provisions if Zuffa did so is based only on speculation and inadmissible hearsay. |
| ¶ 11 | Zuffa used its market power and negotiating leverage—including through coercion—to make its Exclusive Contracts effectively perpetual.  *See* SR1 ¶¶75-91; SR2 ¶¶58, 62-63, 67; CO at 3639.  For instance, Zuffa forced its Fighters to renegotiate before the end of an existing contract's term to prevent the Fighters from ever becoming free agents.  Plaintiff Vera explained how this worked: "Every time a fighter. . . is coming up on his renegotiation period, it was common knowledge in our industry that if you didn't sign the new agreement, that you were going to get frozen out or put on a dark show so that nobody would ever see your last fight." Vera Tr. 118:1-18. Zuffa President White conceded that "most guys never make it to the end of a UFC contract.  They will get within three fights, and then we want to sit back down and start talking, right, to keep them." | CSF ¶ 11 is inadmissible because it improperly relies on experts' opinions as undisputed facts.  Plaintiff Vera's testimony about "common knowledge" lacks foundation and is inadmissible hearsay.  Plaintiffs' CSF ¶¶ 11-12's arguments regarding "coercion, threats, and aggressive" contractual enforcement and impediments to free agency are contradicted by the market facts and are immaterial for the reasons explained in Zuffa's Motion. Mot. 35-36.  There is also no admissible evidence that Zuffa's contracts are "effectively perpetual."  Each Zuffa contract had a defined term and specified provisions that allowed for extensions in a few circumstances, such as injuries.  SUF ¶ 13-14; Ex. 47 § 4.1, 9.2.  It is undisputed that Zuffa offered to re-sign athletes for *more compensation* under new agreements.  Mot. 18, 31-35; SUF ¶¶ 13-14; Ex. 123, Mersch Dep. 359:16-362:3; Ex. 14, Mersch Dep. 476:10-477:11; Ex. 15, Batchvarova Dep. 64:15-65:23; Ex. 4, Topel I ¶ 58. |
| ¶ 12 | Zuffa would do the following to prevent a Fighter from reaching free agency:<br><br>(a) **Move Fighters to unfavorable placement on the fight card for an event or impose unfavorable matchups.** As White described in a 2013 interview: "I can tell you this man, If you f\*\*\*ing call [UFC matchmaker] Joe Silva and turn down a fight, you might as well say f\*\*\*ing rip up my contract.  He's a mean little f\*\*\*er.  You don't call Joe Silva and tell him you don't want to f\*\*\*ing fight anybody man.  You might as well just take the fight because it's going to be worse.  You might as well just do it." PRFA No. 20; *see also* White Tr. 354:6355:21; Ex. 43; Ex. 57.<br><br>(b) **Control the timing of a bout** (*i.e.*, delay Fighters bouts) for Fighters on the last bout of their contract.  Doing so punishes Fighters because they get paid only when they fight. SR1 ¶77.  As Fitch testified, "If you don't get your bout agreement, you don't get paid, you don't get money, you can't feed your children."<br><br>(c) **Delay a Fighter from competing for another promoter** through the Right to Match and Exclusive Negotiation clauses.  Those clauses prevent a Fighter reaching the end of a contract "term" from moving to another promoter for 12 to 15 months—an excessively long period to sit  out given that careers are short and Fighters get paid only when they compete.  Zuffa uses this "compensation gap" to coerce more seasoned Fighters to sign new deals.  The Right to Match and Exclusive Negotiation Clauses, along with the Champions Clause, were effective threats, | Plaintiffs' CSF  ¶¶ 11-12's arguments regarding contractual enforcement and impediments to free agency are contradicted by the market facts and are immaterial for the reasons explained in Zuffa's Motion. Mot.  35-36.  The quote in CSF  ¶ 12(a) is mischaracterized and does not discuss preventing athletes from reaching free agency; instead, what the quote states is that Joe Silva could cut athletes who refuse appropriate matchups, which is immaterial.  The quote in CSF ¶ 12(b) from Plaintiff Fitch is irrelevant, prejudicial, and does not reflect evidence of any withholding of money from Fighters, whether tied to free agency or not.  CSF ¶ 12(c) cites no evidence of athletes prevented from reaching free agency by coercion, and ¶ 12(d) cites no evidence of coercion and instead cites only negotiations to extend a contract.  The citations in CSF ¶ 12 also do not show that Plaintiffs' generalizations about Zuffa's alleged conduct are true. *E.g.* Pl. Ex. 120 (Zuffa willing to offer Mr. Fitch more money and put a different athlete in an easier match-up on his last contract fight "to get him on the winning track"); SUF ¶ 9. |

| Pls'<br>CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | ensuring that Zuffa rarely needed to enforce them formally.<br><br>(d) **Deprive Fighters of title opportunities.** Zuffa's control over title fights gave it leverage because the Scheme has meant that the UFC offers the only titles that matter. *E.g.*, Ex. 50 at - 76; Ex. 121; Ex. 79 at -65; SR1 ¶79; Fitch Tr. 222:3-23; Kingsbury Tr. 51:12-22, 96:17-19, 142:12-143:2. Zuffa also refused to offer bouts for championship titles unless the Fighters were locked-up long-term. *E.g.*, Ex. 120 at -7332 (Silva: "Plus you know I would renegotiate with [Fighter] before giving him a title fight to make sure he is tied up."); Shelby Tr. 32:12-34:5. | |
| ¶ 13 | From 2006-2011, Zuffa enhanced its dominance by acquiring any potential competitor that could have posed a threat and locking in those promoters' top Fighters to exclusive deals. *See* CO at 39-40.  In 2006, Zuffa acquired WEC, which featured top Fighters in lighter weight classes.   Epstein 30(b)(6) Tr. 28:20-25, 33:14-20; SR1 ¶¶41-42.   Zuffa ultimately merged WEC into the UFC. Also in 2006, Zuffa acquired World Fighting Alliance ("WFA") as a "defensive strategy to eliminate a second tier competitive brand operating in the Las Vegas Market. . . . The reason for the acquisition was to control the WFA brand and prevent it from competing with the WEC and UFC." | Plaintiffs' statement regarding Zuffa "enhancing its dominance by acquiring any potential competitor that could have posed a threat" is unsupported by any citation to admissible record evidence.<br><br>For the reasons explained in Zuffa's Mot. 35-36, Plaintiffs' statements regarding Zuffa's acquisitions are immaterial because there is no showing of anticompetitive harm: (1) it is undisputed that Zuffa purchased WEC to bring in new weight classes and increase its output of events by using two different broadcast arrangements, which it successfully did, *see* Pl. Ex. 14, Epstein Acquisitions Dep. 33:13-35:11; (2) after unsuccessful attempts at putting on events, WFA approached Zuffa and asked Zuffa to buy the promotion (Ex. 122, Epstein Acquisitions Dep. 83:20-84:18). It is undisputed that there was no decrease in Zuffa's output and there was an increase in athlete compensation. SUF ¶¶ 7-10.<br><br>Each of the acquisitions cited by Plaintiffs is also immaterial because they occurred before the Class Period. All of the acquisitions are also immaterial because undisputed market facts show that new competitors have entered the market and expanded after these acquisitions. SUF ¶¶ 18-27. |
| ¶ 14 | In 2007, Zuffa acquired its then-most significant competitor, PRIDE.  At that time, PRIDE had 21 of the 28 top Fighters outside of the UFC. *See* Ex. 111 at -140.  Zuffa's PRIDE acquisition had a "strategic/preemptive nature... (i.e., to stop others from buying it)," and Zuffa "seriously contemplated acquiring [PRIDE] only to shut their business down and utilize the fighters in the UFC." Ex. 83 at -44.  Lorenzo Fertitta stated that "this transaction advances Pride and the UFC way beyond and light years ahead of any other MMA organization." PRFA No. 4.  Zuffa shut down PRIDE. White Tr. 167:13-18. After the acquisition, White bragged: "[L]ook at all the contracts we got from Pride and all the guys that came over[.]" *Id.* 313:6-10; *id.* 167:24-168:13 ("Pride is dead, dummy.  I killed them."). | Plaintiffs' statements are immaterial because there is no showing of anticompetitive harm.  *See* Mot. 35-36. Plaintiffs' statements about PRIDE are immaterial because the acquisition occurred before the Class Period, PRIDE is outside Plaintiffs' geographic market and because the quoted material discusses shutting down the use of the PRIDE <u>brand name</u>, and "utilizing the fighters in the UFC." CSF ¶ 14; Pl. Ex. 83.  There was no decrease in Zuffa's output and there was an increase in compensation.  SUF ¶¶ 7-10.<br><br>All of the acquisitions are also immaterial because undisputed market facts show that new competitors have entered the market and expanded after these acquisitions. SUF ¶¶ 18-27. |
| ¶ 15 | In 2009, Zuffa acquired Affliction's Fighter contracts, shut down its promotion and moved its Fighters to the UFC.  *See* Ex. 61 at -50-51; SR1 ¶¶44-46.  On July 24, 2009, Zuffa's Mersch wrote: "Our main rival [Affliction] is done," and, later: | Plaintiffs' statements are immaterial because there is no showing of anticompetitive harm.  *See* Mot. 35-36. Plaintiffs mischaracterize the statements quoted in CSF ¶ 15:   Affliction cancelled an event after an athlete |

| Pls' CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | "Any ramifications are good for us.  We're going to get most of their fighters[.] Things are looking good . . . . This was a big day for the UFC." Ex. 62. | tested positive for performance enhancing drugs and then contacted Zuffa to sell its athletes' contracts, and Mr. Mersch testified that "the general nature of my e-mail was to pass along that the relationship between Affliction and the UFC had apparently been repaired." Ex. 123, Mersch Dep. 445:21-446:14.  The record evidence shows that the Affliction acquisition was "looking good" because Zuffa hoped that it would give it an opportunity to sign MMA superstar Fedor Emelianenko, but Zuffa was unsuccessful in doing so. Pl. Ex. 62; Ex. 122, Epstein Acquisitions Dep. 150:15-151:19.

CSF ¶ 15 is also immaterial because it is undisputed that was no decrease in Zuffa's output and there was an increase in compensation during the Class Period, SUF ¶¶ 7-10, and the Affliction acquisition is also immaterial because it occurred before the Class Period and because undisputed market facts show that new competitors have entered the market and expanded after these acquisitions. SUF ¶¶ 18-27. |
| ¶ 16 | In the wake of these acquisitions, Strikeforce began to amass a roster of top Fighters. Ex. 67 at -19-20.  Strikeforce's head, Scott Coker, testified, "In 2009 and '10, we had more top 10 rated heavyweights than the UFC did.  So arguably we had a better heavyweight division than [UFC] did." Coker Tr. 105:23-25.  After Zuffa acquired Affliction, Coker wrote: "[N]ow its ufc and strikeforce.  [I]f we can['']t battle these guys it[']s over for the [MMA] industry.  [UFC] will be the only one left.  [W]e're the last chance otherwise fighters['] purses will go down if [UFC] is the only one.  [W]e're luke skywalker and [UFC] is darth vader and the death star." Ex. 68 at -04.  By 2011, Strikeforce had emerged as the "second most prominent and recognized . . . MMA organization in the world." Ex. 67 at -06; SR1 ¶47; Coker Tr. 103:17-24; Epstein 30(b)(6) Tr. 170:4-7; Silva Tr. 173:4-10; id. 316:15-18.  Zuffa targeted Strikeforce for acquisition to obtain Strikeforce's Fighters. In January 2011, Zuffa and Strikeforce together had the vast majority of top-ranked Fighters. | Plaintiffs' statements are immaterial because there is no showing of anticompetitive harm.  See Mot. 35-36. Plaintiffs' evidence in CSF ¶ 16 is immaterial because (1) it predates the Class Period and (2) refers to "efforts to obtain Strikeforce's fighters" for the UFC, which undisputed evidence shows resulted in no decrease in Zuffa's output and only a positive effect on competition.  SUF ¶¶ 7-10.

As to the Strikeforce acquisition, the FTC thoroughly investigated that acquisition and concluded in 2012 that "no further action is warranted" in connection with Zuffa's acquisition of Strikeforce. Ex. 117 ("FTC Closing Letter").  Undisputed evidence shows that Strikeforce's owners wanted to sell it because "they no longer wanted to be in the business." Pl. Ex. 14, Epstein Acquisitions Dep. 167:24-168:19.  Scott Coker's deposition testimony cited in CSF ¶¶ 16-17 contains inadmissible hearsay and is contradicted by the undisputed record evidence that athlete compensation—including for former Strikeforce fighters—increased over time. SUF ¶¶ 8-9. All of the acquisitions are also immaterial because undisputed market facts show that new competitors have entered the market and expanded after these acquisitions. SUF ¶¶ 18-27. |
| ¶ 17 | Zuffa eliminated its last potential competition by acquiring Strikeforce in March 2011.  SR1 ¶¶ 47-50.  Coker testified afterwards, "you now had managers call [Coker] and say: Now our [Fighters'] purses are going to go down.  Now there's only one buyer [for MMA talent] and it's not going to be good for MMA as an industry." Coker Tr. 135:10-19.  Managers later confirmed to Coker that Fighter purse offers decreased by about 20%.  Id. 137:14-21. | Plaintiffs' statement in CSF ¶ 17 regarding "eliminat[ing] its last possible competition" is inadmissible because it improperly relies on expert reports to prove facts.  Plaintiffs statements are also immaterial because there is no showing of anticompetitive harm.  See Mot. 35-36. It is undisputed that Zuffa's acquisition of Strikeforce resulted in no decrease in Zuffa's output and only a positive effect on competition.  SUF ¶¶ 7-10.

As to the Strikeforce acquisition, the FTC thoroughly investigated that acquisition and concluded in 2012 that |

| Pls' CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | | "no further action is warranted" in connection with Zuffa's acquisition of Strikeforce. Ex. 117 ("FTC Closing Letter"). Undisputed evidence shows that Strikeforce's owners wanted to sell it because "they no longer wanted to be in the business." Pl. Ex. 14, Epstein Acquisitions Dep. 167:24-168:19. Scott Coker's deposition testimony cited in CSF ¶¶ 16-17 contains inadmissible hearsay and is contradicted by the undisputed record evidence that athlete compensation—including for former Strikeforce fighters—increased over time. SUF ¶¶ 8-9. All of the acquisitions are also immaterial because undisputed market facts show that new competitors have entered the market and expanded after these acquisitions. SUF ¶¶ 18-27. |
| ¶ 18 | Zuffa used its Exclusive Contracts and dominant market power to prevent top Fighters from becoming free agents, foreclosing other promoters' access to a sufficient stable of top Fighters. | Plaintiffs' statement in CSF ¶ 18 is inadmissible because it improperly relies on expert reports to prove facts. Plaintiffs' statement is also contradicted by the undisputed evidence that highly-ranked athletes left the UFC voluntarily for other promoters. SUF ¶¶ 9, 21-24.<br><br>The other cited material provides no support for Plaintiffs' assertions. The cited exhibit and testimony of Joe Silva discusses an athlete who "flat out refused to fight Daniel Cormier" because he "wanted someone easier." Pl. Ex. 40. Nothing in that document indicates that Zuffa prevented the athlete from becoming a free agent at the end of his contract or even extended his contract because he refused to compete. *Id.* Plaintiffs' statement is also immaterial for the reasons discussed in section II and Zuffa's Motion at 22-27. |
| ¶ 19 | Zuffa's supposed evidence of Fighter mobility, ZSF ¶¶16-17, 21-25, merely reflects that it cuts Fighters who no longer meet its standards. *See* SR1 ¶¶66, 80, 266. As the Raine Group, who analyzed the market for Zuffa, explained, "Fighters from UFC that are on Bellator are fighters that could no longer compete at the UFC level." Ex. 113 at -94. Zuffa's Silva echoed that understanding: "WSOF is where all of the fighters that we didn't want or got rid of went." Silva Tr. 177:7-178:21; Ex. 127 at -818. Zuffa admitted in 2016 that "no athlete has left the UFC that the Company wanted to retain." Ex. 115 at 14; *id.* (UFC does not analyze retention rates because it does not lose Fighters it wants to keep); Ex. 66. Zuffa's Scheme allowed it to lock in the vast majority of top Fighters. Silva bragged to White, "We Own MMA," listing the consensus rankings and showing that Zuffa controlled a high ratio of top-ranked Fighters in each weight class. *See* Ex. 84; Silva Tr. 156:25-172:10. | Plaintiffs' statements are immaterial because undisputed market facts show that new competitors have entered the market and successfully outbid Zuffa for fighters. SUF ¶¶ 21-22 (listing examples of Machida, Werdum, Ngannou, Burgos, Pettis, Johnson, Alvarez, Northcutt, Bader, McDonald, Mousasi, Henderson, Koscheck, Jackson, Davis, and Huerta).<br><br>Plaintiffs' record evidence from Raine is an inadmissible statement by a third party and cannot be considered on summary judgment as evidence of Zuffa's intent. *See William Inglis & Sons Baking Co. v. Cont'l Baking Co., Inc.*, 942 F.2d 1332, 1337 n.7 (9th Cir. 1991). Plaintiffs also mischaracterize Pl. Ex. 113, as Raine explained that document included questions from a potential investor "and the answers would have been composed by Raine." Ex. 118, Neville Dep. 87:19-89:6. Raine had no recollection of whether Zuffa had input into the document, *id.*, and there is no record evidence that Zuffa adopted any of the third party's statements. In addition, this inadmissible statement is inaccurate and immaterial, because it is not an antitrust violation to tout the quality of your business. Mot. 15-20; 22-27; 31-32. |
| ¶ 20 | Dr. Singer shows that Zuffa's Scheme foreclosed a large and increasing share of Fighters, especially Headliners (Fighters | Plaintiffs' statement is inadmissible because it improperly relies on expert reports to prove facts. Moreover, as set |

| Pls' CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | ranked in the top 15 of their weight class). SR1 ¶173 & Fig. 3; *see* SR1 ¶¶167-73; *id.* ¶¶306-09. By 2017, Zuffa had foreclosed *at least 90 percent* of Fighters in the relevant markets and between 91-99 percent of Headliners. SR1 ¶¶128-29, 167-73 & Fig. 3; HT1-135:20-157:14 (ECF No. 724). | forth in Zuffa's Motion in Zuffa's *Daubert* Motion to Exclude Certain Opinions of Dr. Hal Singer, Dr. Singer's foreclosure analysis is unreliable flawed, and must be disregarded. ECF No. 878 at 16-20; 22-25; ECF No. 929 at 12-19 (explaining the fatal errors in Dr. Singer's circular reasoning). |
| ¶ 21 | By locking up the "vast majority of top fighters," the Scheme blocked potential competitors from entering or expanding. WME, which purchased Zuffa in 2016, observed: "While technical barriers to entry to host a fight are relatively low, practical barriers to entry are extremely high. UFC controls the best fighters, on staggered contracts." Ex. 118 at -78; *see also* CSF ¶¶3-6. While the "expiration dates" of its contracts almost never apply given Zuffa's exclusive contracts and coercion (*see* CSF ¶¶7-12), even if they did, Zuffa's staggering of its expiration dates, ZSF ¶14, would limit competition. Staggering means that at any given time only a small fraction UFC Fighters have even a theoretical chance at free agency, impairing rivals from obtaining a critical mass of top Fighters. Dr. Topel conceded that Zuffa's control of the "vast majority of top fighters" through its contracts created a barrier to entry and deprived other promoters of what they would have needed to challenge Zuffa's dominance. CSF ¶4. Because Zuffa had locked up the vast majority of top Fighters, other promoters were unable to compete. *E.g.*, Otto Tr. 246:19-247:19; CSF ¶¶18-20. | Plaintiffs' statements are immaterial as undisputed evidence shows that new and existing promoters expanded during the Class Period. SUF ¶¶ 18-20; Mot. 19-21; 23-27. Plaintiffs' statement regarding the effect of "Zuffa's staggering of its expiration dates" is unsupported by any citation. It is also immaterial because the record shows that competitors entered and expanded in the market and had access to talented MMA athletes. SUF ¶¶ 18-24.\n\nPlaintiffs' citation to Professor Topel is incomplete and does not support Plaintiffs' assertion. Pl. Ex. 37, Topel Dep. 437:4-11 (economists use the term "'barriers to entry' in -- in different ways. So to an economist a cost advantage, being better at something can be considered a barrier to entry. It is <u>not an anticompetitive barrier</u> to entry"); *Syufy*, 903 F.2d at 668 (rejecting theory that "Syufy's effectiveness as a competitor creates a structural barrier to entry"). Record evidence does not support Plaintiffs' statement about the number of Zuffa athletes under contract. Plaintiffs' CSF ¶ 21 does not cite to record evidence to support that Zuffa locked up the "vast majority of fighters" and misquotes Prof. Topel's testimony.\n\nPlaintiffs also misquote Kurt Otto's deposition testimony. Otto testified that Zuffa's 2006 and 2007 acquisitions of WEC and WFA—both occurring before the Class Period and therefore irrelevant and inadmissible—limited his chances of getting a fighter who was under contract with another promoter, so Otto would have to "find a new gym rat that has talent and build them up from scratch." Pl. Ex. 16, Otto Dep. 246:19-247:16. Otto did not testify that he (or other promoters) was unable to compete with Zuffa. It is undisputed MMA promoters had the ability to obtain talented MMA athletes during the Class Period. SUF ¶¶ 18-22. |
| ¶ 22 | Through the Scheme, Zuffa dominated MMA from at least 2007 through 2017 (and beyond). Deutsche Bank observed in 2007: "Based on all comparable metrics UFC is clearly the 800 pound gorilla in the MMA industry." Ex. 102 at -304. Zuffa conceded in 2009: "We are 'MMA'; everyone else is just a brand being pulled along in the wake of the UFC oceanliner." Ex. 87 at -95. Moody's found in 2010 that the UFC is the "Largest global MMA Promoter" that "dwarfs any of its competitors." Ex. 49 at -1183. And as Zuffa recognized in 2010, "[UFC] is 95 percent of a billion dollar market," Ex. 94 at -952, and "UFC's annual revenues were more than $250 million in 2008, capturing about 90 percent of total MMA revenue," Ex. 85 at -805. Deutsche Bank echoed this in 2013, finding: "MMA in the United States is dominated by UFC. . . | Plaintiffs' statements are based on inadmissible evidence that predates the Class Period, and expert supposition that contradict market facts. Zuffa's competitors from the Class Period have universally testified that they competed with Zuffa and had all inputs needed to compete. SUF ¶ 25; *see id.* ¶¶ 18-24. Plaintiffs' statements are also immaterial because undisputed evidence also shows competitors entered the market and expanded. SUF ¶¶ 18-25; Mot. 19-27; *Rebel Oil*, 51 F.3d at 1441.\n\nPlaintiffs improperly attempt to rebut Zuffa's statements with pre-Class Period evidence, and statements of puffery or opinion—which are both |

| Pls'<br>CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | . [T]he Company has virtually no competition left." Ex. 97 at -403. Zuffa's owners have long likened the UFC to a monopoly sports league. SR1 ¶137, Fig.2. White touted in 2010: "There is no competition. We're the NFL. . . . There is no other guy." Ex. 139. A Zuffa executive repeated that admission in 2010, stating that "the UFC has no close 2nd place. . . . As the NFL is the defining brand of Football, UFC is the defining brand of mixed martial arts." Ex. 93 at -41. | incapable of creating a genuine issue of material fact. It is not an antitrust violation to tout the quality of your business. Mot. 15-20; 22-27; 31-32. |
| ¶ 23 | Zuffa admitted its Scheme created "extremely high" barriers to entry, Ex. 118 at -78, leaving the UFC with "no major competitors on a domestic or global basis." Ex. 105 at -912. Other promoters have positioned themselves as "feeder" or "minor leagues." White conceded: "I don't look at those guys as competition at all.  They're nowhere near the league that we're in. I need shows like this.  They're the feeder leagues. All the guys who fight in those shows aspire to be in the UFC some day.  They're creating all the UFC talent of tomorrow." White Tr. 194:21-195:5; Ex. 136 at 1. | Plaintiffs' statements are based on inadmissible evidence that predates the Class Period and expert supposition that contradict market facts. Zuffa's competitors from the Class Period have universally testified that they competed with Zuffa and had all inputs needed to compete. SUF ¶ 25. The undisputed evidence also shows these competitors have entered the market and expanded. *Id*. ¶¶ 18-25.<br><br>Plaintiffs statements are also immaterial because they attempt to rebut Zuffa's statements with pre-Class Period evidence, and statements of puffery or opinion—which are both incapable of creating a genuine issue of material fact. It is not an antitrust violation to tout the quality of your business. Mot. 15-20; 22-27; 31-32. |
| ¶ 24 | Zuffa cites certain promoters' boasts that the UFC had not affected their ability to sign Fighters, ZSF ¶¶21-22, 25, but these are not credible. White has explained why: "Nobody ever wants to look at themselves as a feeder league to the UFC. Deal with it.  You're all feeder leagues to the UFC[.] I want them to exist and make money because those guys create the next talent that will end up in our organization someday." PRFA No. 24. Zuffa's citations stand only for the proposition that Zuffa did not foreclose access to *all* Fighters.  That is irrelevant because all Fighters are not the same, CSF ¶¶1-2, Zuffa locked up nearly all current and potential top Fighters, CSF ¶¶4, 19-21, and what is necessary to compete with the UFC is a critical mass of top Fighters, CSF ¶¶3-6.  Zuffa's evidence does not contradict that UFC is the "majors" and other promoters are not.  As White testified, "Whether they like it or not, they're the farm league," White Tr. 192:25-193:14, and "I've said everybody was a feeder league to the UFC," *id*. 242:13-16; Ex. 89 at -195 ("All of the other shows out there act as minor leagues for the UFC.  Guys get their experience and build their confidence in the other shows and if they are successful enough we bring them into the UFC."); CSF ¶23 & n.40. | Plaintiffs' statement is not supported by admissible evidence and is contradicted by sworn testimony cited by Zuffa from MMA competitors during the Class Period about their ability to compete with and access all inputs necessary to compete, including fighters. SUF ¶¶ 21-22, 25.  Plaintiffs improperly attempt to rebut Zuffa's statements with pre-Class Period evidence, and statements of puffery or opinion—which are both incapable of creating a genuine issue of material fact. Plaintiffs' claim that witnesses' sworn testimony is "not credible" is not a proper counterstatement of material facts. *City of Vernon*, 955 F.2d at 1369. |
| ¶ 25 | Contrary to ZSF ¶¶18-25, even the most prominent non-Zuffa promoters have not been substitutes for the UFC, serving instead as feeders.  SR1 ¶¶104-07, 134-40. Market observers, including a consulting firm—the Raine Group—evaluating potential investors for Zuffa, viewed it as dominant in 2016. *Id*. ¶¶134-140; CSF ¶¶21, 23-25 & nn.38-40. The Raine Group stated in 2012 that the UFC has "no competitors on a domestic or global basis." Ex. 112 at -065. Lorenzo Fertitta admitted in 2012, "There never has been a comparable outlet. . . . We've dominated this, this sport, alright? We've dominated the | Plaintiffs' statements are based on inadmissible evidence and expert supposition that contradict market facts. Zuffa's competitors from the Class Period have universally testified that they competed with Zuffa and have all inputs needed to compete. SUF ¶ 25. The undisputed evidence also shows these competitors have entered the market and expanded, during and since the end of the Class Period. *Id.* ¶¶ 18-25; Mot. 19-27; *Rebel Oil*, 51 F.3d at 1441. |

| Pls' CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | space." PRFA No. 17.  None of the promoters that Zuffa identifies, ZSF ¶¶18, 20, limits its dominance:<br><br>A.  **Bellator** is not a direct competitor.  In 2013, Deutsche Bank (with Zuffa's input and approval) represented to investors, "In recent years in MMA, promotions that have tried to position themselves as the UFC's primary competitor, such as Bellator, have always failed. Bellator's most recent event at UC Irvine's Bren Center attracted only 4,000 people... . None of the Bellator fighters are household names." Ex. 97 at -439.  Zuffa's then-CFO, John Mulkey, edited a draft of Moody's 2014 Credit Opinion to describe Bellator as a "distant" competitor. Ex. 45 at -155; Mulkey Tr. 216:13-217:7; *id.* 218:16-219:8.  Coker, head of Bellator starting in June 2014, described it as "a dying brand," because it lacked "star power . . . they didn't have very big names at Bellator." Coker Tr. 166:11-21.   WME's diligence documents before acquiring the UFC in 2016 describe Bellator as a "[s]mall operator." Ex. 118 at -78.  Zuffa's statement that Bellator "successfully outbid Zuffa" for Fighters, ZSF ¶22; *see also id.*  ¶¶23-24, is contradicted by the evidence that "Fighters from the UFC that are on Bellator are Fighters that could no longer compete at the UFC level." Ex. 113 at -794; SR1 ¶134; Silva Tr. 191:12-205:14; White Tr. 299:8-307:17; 309:16-25; 315:6-316:3. In 2016, Bellator's revenue was $18.3M compared to just under $500M for Zuffa in North America.  SR1 Tbl.3. Zuffa cites Bellator's reported up-to-"nine-figure," five-year broadcast deal with DAZN, ZSF ¶18, but that deal was canceled after two years.  SR5 ¶27.  Zuffa notes that by April 2021, Bellator broadcast exclusively on Showtime, ZSF ¶18, but in November, 2023, Showtime announced it would no longer broadcast MMA content, leaving Bellator without a network.  SR5 ¶27.<br><br>B.  **One Championship** ("ONE"), *a promotion that operated exclusively in Asia until May 2023*, began by telling Zuffa that it would be a UFC feeder league. Ex. 54. White testified that ONE was a feeder organization, White Tr. 296:7-9, and UFC matchmaker Sean Shelby has successfully obtained the release from ONE to UFC of top ONE Fighters.  Shelby Tr. 203:9-23.  And the unverified numbers Zuffa quotes, ZSF ¶18, on ONE's financial condition are erroneous.  *See* SR5 ¶27 & n.77.<br><br>C.  **PFL**, the successor to WSOF, does not directly compete with the UFC.  PFL from its inception in 2012 through 2016 never achieved annual gross revenues of even 1% of the UFC's gross revenues.  SR1 Tbl.3.  Zuffa executives have conceded that WSOF does not have top Fighters and that it is a feeder league.  Silva Tr. 177:7-178:21; Ex. 127 at -818 ("WSOF is where all the fighters that we didn't want or got rid of went."); Shelby Tr. 164:11-13; White Tr. 289:17-290:6; *see also* SR1 ¶136 & nn.367-69 (referencing record evidence that WSOF released its top Fighters to the UFC).  Nearly all of Zuffa's discussion of PFL, ZSF ¶18, pertains to events after January 2018.  The current CFO of TKO Group Holdings (which now controls the UFC), just boasted on | Plaintiffs improperly attempt to rebut Zuffa's statements with pre-Class Period evidence, and statements of puffery or opinion—which are both incapable of creating a genuine issue of material fact. It is not an antitrust violation to tout the quality of your business. Mot. 15-20; 22-27; 31-32.  Plaintiffs' claim that other promoters are "not on par with the UFC," CSF ¶ 25 n.39, is irrelevant as the law does not require access to the best inputs, but only the ability to compete. *Gen. Bus. Sys.* v. *N. Am. Philips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983).<br><br>Plaintiffs' cited evidence is also inadmissible, immaterial, and misleading. Plaintiffs' citation to Pl. Ex. 112 omits parts of the Raine document that show it relates to Zuffa's Brazilian operations—outside the alleged geographic market.  Ex. 118, Neville Dep. 37:22-39:16; Ex. 119 (excerpt of RAINE000019 omitted from Pl. Ex. 112). Plaintiffs also misquote a portion of White's deposition and leave out Mr. White's testimony that ONE Championship is "not a minor grassroots organization. They're a monster." Pl. Ex. 32, White Dep. 296:14-23. Plaintiffs' statements are also contradicted by record evidence showing that Bellator, ONE Championship, WSOF, and PFL—along with other competitors—accessed talented MMA athletes and competed with Zuffa during and after the Class Period. SUF ¶¶18-25. |

| Pls' CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | an investor call that PFL (and Bellator) are "pipeline and feeder properties." And White repeatedly mocks PFL's prospects. PFL is not a significant competitor. | |
| ¶ 26 | That Zuffa raised Fighter pay over time, ZSF ¶¶8, 10, or that its dominance allegedly allowed it to pay more than other promotions, ZSF ¶9, is irrelevant because Zuffa's Scheme reduced competition and suppressed Fighter pay below levels that would have prevailed absent the Scheme. Dr. Singer's impact regression shows, for instance, that as there was an increase in the share of Fighters Zuffa locked up (the "Foreclosure Share"), Zuffa paid its Fighters a lower share of its Event Revenues ("Wage Share"), and thus that absent the Scheme Fighter Wage Share, and pay, would be substantially higher. Zuffa concedes that the "share of MMA fighters under contract rose while compensation *as a share of event revenue declined*." TR1 ¶27. Dr. Topel admits the Exclusive Contracts prevent a "transfer of wealth" that would otherwise occur from Zuffa to its Fighters. Zuffa's Fighters would have received between $800 million and $1.6 billion more in pay absent the Scheme. The Scheme also suppressed pay at non-UFC promoters because it impaired their ability to compete. | Plaintiffs statements are inadmissible because they improperly rely on expert opinions to prove facts, and furthermore are immaterial those opinions are contradicted by undisputed market facts. SUF ¶¶ 8-10. Additionally, as set forth in Zuffa's Motion in Zuffa's *Daubert* Motion, Dr. Singer's impact analysis is unreliable fatally flawed and must be disregarded. ECF Nos. 878 and 929.<br><br>Plaintiffs also incorrectly state that Zuffa concedes that Dr. Singer's Wage Share is relevant, citing paragraph in which Prof. Topel's explains that Dr. Singer's regression evidence "is misleading, fatally flawed, and unreliable" including because "his measures of both 'foreclosure' and compensation are economically and econometrically incorrect." Ex. 4, ¶ 27. Undisputed facts show that competitors grew their output and outbid Zuffa for fighters, SUF ¶¶ 21-22; 24-25. Plaintiffs agree that Zuffa pays more than other promoters, which is undisputed and contradicts the premise of Plaintiffs' monopsony power theory. Mot. 16-18; 31-36. |
| ¶ 27 | Zuffa's claim that it and certain other promoters expanded output over time, ZSF ¶¶7, 19, is irrelevant because what matters is restriction of marketwide output compared to competitive levels. *See supra* Sec.I.D & n.76.76 Dr. Singer found that Zuffa's actions "caused industry output of Live MMA Events to fall (both in absolute terms and relative to prior trends) because the output of Live MMA events by non-Zuffa promoters has fallen off sharply, with Zuffa's supply of Live MMA events not increasing by enough to make up for the difference." SR1 ¶204, ¶¶203-206, Figures 4A-4C. Indeed, the total number of live MMA events has actually declined since 2010. *Id.* ¶205; SR2 ¶47. | Plaintiffs statement does not dispute the material parts of Zuffa's fact – that Zuffa increased the number of its events during and since the Class Period, SUF ¶ 7, as did numerous of its competitors. *Id.* ¶ 19. The remaining portion of Plaintiffs' assertion is immaterial because (1) in evaluating market power, the relevant issue is whether "by restricting its own output, Zuffa can restrict marketwide output, and, hence, increase marketwide prices" *Rebel Oil*, 51 F.3d at 1434, and it is undisputed that Zuffa's output went up, SUF ¶7; (2) undisputed evidence shows existing competitors grew and new competitors entered the market and expanded during and since the Class Period, SUF ¶¶ 18-20; and (3) Plaintiffs cite no admissible evidence for their assertion that output fell due to the Scheme.<br><br>Plaintiffs statements are also inadmissible because they improperly rely on expert opinions to prove facts. Furthermore, the statements are immaterial, as those opinions are contradicted by undisputed market facts. Plaintiffs' expert acknowledges he did not run a regression to control for all other factors that might affect marketwide output, he is "simply taking a trend of output at the industry level and projecting it forward from 2010." Ex. 12, Singer Dep. II 604:5-10. Dr. Singer admitted he had no method based on his foreclosure shares to measure or predict a hypothetical expansion in a world without Plaintiffs' Challenged Conduct. *Id.* 605:1-21, 609:17-610:2. |
| ¶ 28 | The Scheme caused output of pay-per-view attendance to fall. Total attendance at Live UFC MMA Events decreased significantly between 2011 and 2015, SR2 ¶¶48-49, as did | Plaintiffs' statements regarding PPV attendance and PPV viewership are immaterial because undisputed evidence shows that both Zuffa and competitors' output increased |

| Pls'<br>CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | PPV viewership. *Id.* Total industry output—as measured by aggregate viewership of PPV events, non-PPV events, and live event attendance—declined in absolute terms from 2011 to 2015. *Id.* Dr. Topel concedes that residential PPV output of the UFC and the market restricted by 17 percent. | during the Class Period.   SUF ¶¶ 7, 19. Moreover, Plaintiffs statements are also inadmissible because they improperly rely on expert opinions to prove facts. Plaintiffs' expert opinions are also immaterial to Plaintiffs' theory of monopsony power because (1) in evaluating market power, the relevant issue is whether "by restricting its own output, Zuffa can restrict marketwide output, and, hence, increase marketwide prices" *Rebel Oil*, 51 F.3d at 1434, and it is undisputed that Zuffa's output went up, SUF ¶ 7;  (2) undisputed evidence shows existing competitors grew and new competitors entered the market and expanded during and since the Class Period, SUF ¶¶ 18-24; and (3) Plaintiffs cite no admissible evidence for their assertion that output fell due to any anticompetitive conduct. Mot. 16-21; 23-26. |
| ¶ 29 | Zuffa's Scheme restricted the supply of Live MMA events through acquisitions and denying rivals "access to the inputs necessary to stage high-quality fights[.]" SR1 ¶268.  Further, as a matter of economics, suppressing pay reduces output. Dr. Topel has admitted that increasing Fighter pay relative to other sports would draw more and better athletes to MMA.  Topel Tr. 475:6-21. Dr. Zimbalist found as pay rose in other sports, output expanded.  See CSF ¶¶30-31 & n.60. | Plaintiffs statements are immaterial and inadmissible because they improperly rely on their experts' opinions as facts, and those opinions are either irrelevant or contradicted by undisputed market facts, which show that competitors entered and expanded in the market and had access to talented MMA athletes.  SUF ¶¶ 18-25; *see* ECF No. 931 at 4-18 (explaining the fatal errors in Dr. Zimbalist's analysis that fails to connect his method to Zuffa's challenged conduct and fails to appropriately measure antitrust damages).<br><br>Plaintiffs also mischaracterize Dr. Topel's deposition testimony, in which he clearly states that "increasing compensation to MMA fighters is what's happened" and "the sport itself has grown" because Zuffa increased fighters' compensation, which is an undisputed fact that Plaintiffs' own expert acknowledges.  SUF ¶ 8; Ex. 12, Singer Dep. II 459:12-460:8. |
| ¶ 30 | Zuffa's Scheme involved the UFC's practice of "shelving," i.e., signing more Fighters to Exclusive Contracts than it was willing to put in productive bouts. Shelving was inexpensive for Zuffa because it paid Fighters only when they fought. *See* SR1 ¶146; ZR2 ¶24; SR1 ¶¶193-196.  One non-UFC MMA promoter executive testified that Fighters at Zuffa were "collecting dust." Otto Tr. 116:12-21.  Silva testified that he kept some Fighters under contract solely to impair "Bellator's ability to put on a successful event."  Zuffa's Scheme also reduced the quality of MMA Events. | Plaintiffs statements regarding "shelving" are immaterial and unsupported by the factual record.  The statements also improperly rely on their experts' opinions as facts.<br><br>Undisputed evidence shows that exclusive contracts enable Zuffa to have enough athletes available to compete in the dozens of UFC events Zuffa promotes each year and to maintain a high quality of events in the face of athlete injury or inability to compete.  SUF ¶ 13.  It is also undisputed that Zuffa's competitors deploy the same types of clauses in their fighter contracts for the same legitimate business reasons.  *Id*.  ¶ 15 (undisputed that Bellator, ONE, WSOF, and pre-acquisition Strikeforce all had exclusive contracts with no significant exceptions).  It is also undisputed that in a world without exclusive, multi-bout contracts, there "would be many, many less fights because no network is going to agree to sign a long-term deal" without some assurance the events can be staffed. Ex. 8, Epstein Dep. 104:1-105:7; Ex. 113, Epstein Decl. ¶ 5<br><br>Plaintiffs' citation to Kurt Otto's deposition testimony is misleading and immaterial because Otto did not testify that he (or other promoters) were unable to compete with |

| Pls' CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | | Zuffa as a result of supposed "shelving" and it is undisputed that promoters had the ability to obtain talented MMA athletes during the Class Period and that highly-ranked athletes voluntarily left Zuffa for other promoters, SUF ¶¶ 16-27, and that competitors had all of the inputs needed to compete.  SUF ¶ 21<br><br>Plaintiffs' statement regarding the supposed reduction in quality of live MMA events due to "decreasing incentives for Fighters to invest in their careers," CSF ¶ 30, n.57, is based only on their experts' speculation that is not supported by any expert analysis or record evidence.  Plaintiffs do not show suppressed wages; they purport to show suppressed wage share. Plaintiffs also misquote Professor Blair's deposition contending that Professor Blair "conceded" certain effects would occur by "suppressing athlete compensation." *Id.* As the record reflects but was omitted by Plaintiffs' Opposition, Professor Blair hypothesized about potential effects that could occur if athletes were paid "substantially below their marginal revenue product." Ex. 120, Blair Dep. 147:2-5.  Plaintiffs' experts have not attempted to calculate marginal revenue product in this case. Ex. 121, Singer Dep. II 433:13-434:1. |
| ¶ 31 | Zuffa provided no evidence that its Scheme had procompetitive effects.  *See* SR1 ¶¶257-90; SR2 ¶¶210-41; SR4 ¶10.  It claims its Exclusive Contracts are necessary to prevent "free riding" on its investment in Fighters' brands. ZSF ¶¶ 1-10.  Not so.  The Fighters themselves, not Zuffa, do most of the investing, especially in training.  ZR2 ¶95 n.168; TR1 ¶87, SR2 ¶220.  And workers increase their investments when they can move freely between jobs.  SR2 ¶217; ZR2 ¶¶99-114. Dr. Zimbalist showed MLB, the NBA, the NFL, the NHL, and boxing all attempted to justify their restrictive athlete contracts on similar grounds, but their revenue, quality, and output all improved with expanded athlete mobility.  ZR1 ¶¶79-80, 83-84, 89-103; ZR2 ¶¶9, 90, 97-114; HT 4-13:17-14:20 (ECF No. 734). | Plaintiffs' statements improperly rely on their experts' opinions as facts but still do not rebut the material fact that Zuffa's contracts allowed it to increase output and fighter compensation throughout the Class Period.  SUF ¶¶ 7-9.  Plaintiffs' expert admits that "ongoing access to a deep pool of talented Fighters is a critical input to the ongoing success of an MMA promotion" because of "the need for a steady supply of appropriately matched Headliners" and "the need to replace Fighters that become unavailable due to injury." Ex. 70, Singer Rep. ¶ 158. Plaintiffs do not dispute that some exclusivity is needed and do not substantiate their claims that exclusivity is unnecessary to prevent free-riding. SUF ¶¶ 13-15; *see* § II.B.<br><br>Plaintiffs' statement "fighters themselves, not Zuffa, do most of the investing" is not supported by any factual evidence and does not rebut Zuffa's explanation of the well-established pro-competitive justifications for exclusive contracts. Mot. 27-30; SUF ¶¶ 13-15.<br><br>Plaintiffs' statements also improperly rely on their expert's opinions as facts and cite restrictive contracts in other sports.  These statements are immaterial because evidence of certain types of restrictive contracts in other sports does not show that Zuffa's specific business justifications are pretextual, and also are inadmissible. ECF No. 931 at 4-18 (explaining the fatal errors in Dr. Zimbalist's analysis that fails to connect his method to Zuffa's challenged conduct and fails to appropriately measure antitrust damages). |
| ¶ 32 | Zuffa claims that long term Exclusive Contracts are necessary to "have enough athletes available" for events.  ZSF ¶13.  But any such alleged benefits could be achieved by less restrictive | Plaintiffs' statements improperly rely on their experts' opinions as facts but still do not rebut the material fact that Zuffa's contracts allowed it to increase output and |

| Pls' CSF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
|  | means, including higher pay, shorter contracts (Zuffa admits booking events only 8-12 weeks in advance), or co-promotion (making a stable of inactive Fighters unnecessary). | fighter compensation throughout the Class Period. SUF ¶¶ 7-9. Plaintiffs' expert admits that "ongoing access to a deep pool of talented Fighters is a critical input to the ongoing success of an MMA promotion" because of "the need for a steady supply of appropriately matched Headliners" and "the need to replace Fighters that become unavailable due to injury." Ex. 70, Singer Rep. ¶ 158 Plaintiffs do not dispute that some exclusivity is needed and do not substantiate their claims that exclusivity is unnecessary to prevent free-riding. SUF ¶¶ 13-15; *see* § II.B. |
| ¶ 33 | By co-promoting fights, Zuffa could create any desired bout even if the Fighters were free agents. Less restrictive contracts would expand investment and output. The early 2000s, when the UFC co-promoted and had less restrictive contracts, coincided with the most rapid growth of the sport. | Plaintiffs' statements improperly rely on their experts' opinions as facts but still do not rebut the material fact that Zuffa's contracts allowed it to increase output and fighter compensation throughout the Class Period. SUF ¶¶ 7-9. Plaintiffs' expert admits that "ongoing access to a deep pool of talented Fighters is a critical input to the ongoing success of an MMA promotion" because of "the need for a steady supply of appropriately matched Headliners" and "the need to replace Fighters that become unavailable due to injury." Ex. 70, Singer Rep. ¶ 158. Plaintiffs do not dispute that some exclusivity is needed and do not substantiate their claims that exclusivity is unnecessary to prevent free-riding. . SUF ¶¶ 13-15; *see* § II.B. |