# EXHIBIT 118

# Excerpts of the Deposition of Colin Neville (Raine)

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
)
      Plaintiffs, )
)
      vs. ) Case No.
) 2:15-cv-01045-RFB-(PAL)
)
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
)
      Defendant. )
_____)

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

COLIN NEVILLE

New York, New York

August 8, 2017

1:38 p.m.

Reported by:
JUDITH CASTORE, CLR
Job No. 51358

```
                                      34                                          36
 1      HIGHLY CONFIDENTIAL - NEVILLE        1      HIGHLY CONFIDENTIAL - NEVILLE
 2   separate research team that you relied   2   discussed with counsel that would
 3   on or anything like that?                3   be privileged.  We can talk about
 4       A   No.  I wish.                     4   it offline if you need to clarify
 5       Q   When you -- when you             5   something.
 6   communicated with -- internally at       6       A   No, the phone call was purely
 7   Raine about Project Basquiat, how were   7   to discuss that we had received this
 8   those communications conducted?  What    8   notice.
 9   methods did you use?                     9           MR. RADICE:  I'm going to
10       A   Typically in-person meetings,   10   hand you Exhibit 2.
11   phone calls, and e-mails.               11           (Declaration of Business
12       Q   Text messaging or no?           12   Record Authenticity for the Raine
13       A   Not that I recall as related    13   Group, LLC, was marked Raine
14   to internal conversations.              14   Exhibit 2, for identification, as
15       Q   When you were -- you -- you     15   of this date.)
16   did mention text messaging in           16       A   Thank you.
17   communications with Zuffa; is that      17       Q   I should have mentioned
18   right?                                  18   before, if you need to take a break at
19       A   Yes.                            19   some point, just let me know.  I would
20       Q   And who were those text         20   ask that you answer the question that's
21   messages between specific individuals   21   pending, if there is a question
22   at both Raine and Zuffa?                22   pending, but -- then go off the record.
23       A   They would have been with       23       A   Thank you.
24   Nikisa Bardarian.                       24       Q   Are you familiar with this
25       Q   And -- and who at Raine?        25   document?
                                      35                                          37
 1      HIGHLY CONFIDENTIAL - NEVILLE        1      HIGHLY CONFIDENTIAL - NEVILLE
 2       A   And myself.                      2       A   Yes.
 3       Q   Do you know whether anyone       3       Q   And it's fair to say that
 4   else at Raine used text messaging to     4   this is a declaration that you executed
 5   communicate with individuals at Zuffa?   5   on behalf of the Raine Group; is that
 6       A   I don't know.                    6   right?
 7       Q   Are you aware that plaintiffs    7       A   That's right.
 8   in this case sent a request for -- it's  8       Q   And this declaration pertains
 9   called a subpoena, but sent a request    9   to certain documents produced by Raine
10   to Raine for certain documents that    10   being authentic documents from Raine's
11   Raine either prepared or had in its    11   files; is that correct?
12   possession concerning this             12       A   That's correct.
13   Project Basquiat?                      13       Q   We're going to talk about a
14       A   Yes.                           14   number of those documents, but I think
15       Q   And did you assist counsel in  15   you could put that aside for right now.
16   collecting those materials?            16           This is signed by you; is
17       A   I did not assist directly,     17   that right?
18   no.                                    18       A   Yes.
19       Q   Did you assist indirectly or   19           MR. RADICE:  I'm going to
20   --                                     20   hand you a document marked
21       A   We had a phone call with       21   Raine 3.
22   counsel and --                         22           (Document, Bates stamped
23           MR. JAIME-BETTAN:  I just      23   RAINE0000019 through 88, was
24   want to jump in and make sure you      24   marked Raine Exhibit 3, for
25   don't reveal anything that you         25   identification, as of this date.)
```

**Page 38**

HIGHLY CONFIDENTIAL - NEVILLE

Q  I will ask you about a couple of specific pages about that, but let me -- let me know when you are ready to --
A  I'm ready.
Q  Are you familiar with this document?
A  Yes.
Q  And this document appears to be from early 2013. It says on this page 1, January 2013, right?
A  That's right.
Q  Okay. This concerns a different project, a project different from Project Basquiat that Raine was working on for Zuffa, right?
A  That's correct.
Q  And was that called Project Buffalo?
A  No.
Q  What was this project called?
A  This was called Project Brady.
Q  Project Brady. Okay.

**Page 39**

HIGHLY CONFIDENTIAL - NEVILLE

And did Zuffa always come up with the names for the projects?
A  It did.
Q  What -- what is this document? It says, Information memorandum on the front obviously, but could you tell me what that is in layman's terms?
A  Sure. This is a document used to market an opportunity to potential investors.
Q  And what was that opportunity?
A  It was to invest in the UFC's Brazilian business.
Q  And this is one of the -- this pertains to one of the deals you mentioned earlier that was not consummated; is that right?
A  That's right.
Q  Who prepared this document?
A  Raine prepared this document. And -- sorry. And Itau had input into preparing the document.

**Page 40**

HIGHLY CONFIDENTIAL - NEVILLE

(Clarification by the reporter.)
Q  Did Zuffa have input into this document?
A  Yes.
Q  If you had to put a percentage on Raine's input versus -- strike that.
    If you had to, say, a portion percentage to each party who participated in creating this document, how would you do that?
    MR. JAIME-BETTAN: Objection. If you can.
Q  If you can.
A  I would say the majority of this was Raine's work product.
Q  And who else -- there was input from Zuffa additionally, right?
A  Yes.
Q  And who else?
A  Itau.
    Sorry. My -- my Brazil --
Q  That's -- that's fine.

**Page 41**

HIGHLY CONFIDENTIAL - NEVILLE

A  -- pronunciation.
    (Clarification by the reporter.)
Q  Can you describe who they are?
A  Sure. Itau, to my knowledge, is an investment bank primarily focused on Brazil and based in Brazil.
Q  So they're located in Brazil, right?
A  I believe -- they have an office in Brazil. I'm not sure where their headquarters are.
Q  Fair enough.
    Did anybody else, to your knowledge, contribute to this document?
A  Not to my --
Q  When I say "anybody," I mean any other group.
A  Not to my knowledge, no.
Q  But most of the work product here is from Raine?
A  Correct.
Q  Who is this document

```
                                        86
 1       HIGHLY CONFIDENTIAL - NEVILLE
 2     Q    -- is that right?
 3          MR. JAIME-BETTAN:  Calls for
 4     speculation.
 5     A    That is one interpretation of
 6  those bullets.  But I didn't prepare
 7  this nor have any context for the
 8  document.
 9     Q    Do you know of any examples
10  where the UFC made an offer to a
11  fighter but the fighter ended up
12  signing with another promoter?  And,
13  again, the time period I'm talking
14  about here is from the beginning of
15  your involvement in 2009 until 2014.
16          MR. JAIME-BETTAN:  I am going
17     to object.
18          I don't really think this is
19     within the scope of what I agreed
20     to with Ms. Lambert.  I will give
21     you a little leeway, but --
22          MR. RADICE:  I only have one
23     question on this.
24          MR. JAIME-BETTAN:  I am
25     sorry?

                                        87
 1       HIGHLY CONFIDENTIAL - NEVILLE
 2          MR. RADICE:  I only have one
 3     question on this.
 4          THE WITNESS:  I'm sorry.
 5     Could you repeat the question?
 6          MR. RADICE:  Sure.  You can
 7     read it back.
 8          (Whereupon, the record was
 9     read.)
10     A    I don't recall individual
11  names of fighters.  But during that
12  time period, I do recall fighters
13  leaving the UFC to go to other
14  organizations broadly speaking in
15  conversations with the UFC.
16     Q    You can put that document to
17  the side.
18          I hand you Raine 7.
19          (Document, Bates stamped
20     RAINE0018791 through 18809, was
21     marked Raine Exhibit 7, for
22     identification, as of this date.)
23     A    Thank you.
24     Q    Do you know who prepared this
25  document?

                                        88
 1       HIGHLY CONFIDENTIAL - NEVILLE
 2     A    The document -- the -- well,
 3  this is -- was prepared by two people,
 4  I believe.  The questions were posed by
 5  China Media Capital, and the answers
 6  would have been composed by Raine.
 7     Q    You mentioned two -- strike
 8  that.
 9          China Media Capital is CMC;
10  is that right?
11     A    That's right.
12     Q    And you said two individuals.
13  Did you mean China Media Capital and
14  Raine that prepared this document?
15     A    That's correct.  That's what
16  I meant.
17     Q    Okay.  And what -- what's the
18  purpose of this document?
19     A    The purpose of this document
20  is to answer questions that CMC had
21  about the UFC and the potential
22  transaction.
23     Q    And who worked on this
24  document at Raine?
25     A    I believe myself, Garrett

                                        89
 1       HIGHLY CONFIDENTIAL - NEVILLE
 2  Gomes, Kenny Lee and Taylor Shim.
 3     Q    And did individuals at Zuffa
 4  have input into the substance of this
 5  document?
 6     A    I don't recall specifically.
 7     Q    Was this document included in
 8  the Project Basquiat data room?
 9     A    This likely would not have
10  been included in the data room.
11     Q    Okay.  Was this an internal
12  Raine document?
13     A    I believe this was a document
14  that we -- answered -- we answered
15  CMC's questions and would have sent
16  this back to them.
17     Q    So am I correct that this
18  would have been sent to CMC but would
19  not have been available to other
20  investors through the data room?
21     A    Correct.
22          MR. JAIME-BETTAN:  Can we go
23     off the record for just a second?
24     Sorry.  This may be something we
25     should talk about.
```

```
                                                   90
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2           VIDEOGRAPHER:  The time is
 3    15:21.  We are off the record.
 4           (Whereupon, a brief recess
 5    was taken.)
 6           VIDEOGRAPHER:  The time is
 7    15:22.  We are on the record.
 8       Q   Did CMC execute an NDA with
 9    Raine?
10       A   Yes, to my knowledge.
11       Q   And was that NDA executed
12    prior to the submission of this
13    document to CMC -- or the transmission,
14    excuse me, of this document to CMC?
15       A   Yes.
16       Q   Was this document updated, do
17    you know?
18       A   I believe it would have had
19    iterations before finalizing it, yes.
20       Q   I would like you to just step
21    back, and if you could, describe for me
22    the diligence process for
23    Project Basquiat specifically.
24       A   So, as to the extent of my
25    memory, we initially had approached
```

```
                                                   91
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2    groups in China in the beginning of --
 3    sorry, excuse me, the end of 2016, in
 4    the beginning of 2017.  We --
 5       Q   Are those dates right?
 6       A   The end -- sorry.  The end
 7    of -- excuse me.  The end of 2015 and
 8    the beginning of 2016.
 9           We would have sent the teaser
10    to those Chinese groups and conducted
11    phone calls and given them access to a
12    limited set of information post the
13    signing of an NDA.
14           We then used the interest
15    from China strategically to -- to
16    generate interest from who we believed
17    were more likely U.S. parties.
18           At that time we would have
19    sent the teaser to the U.S. parties,
20    conducted those same phone calls, and
21    then asked for indications of interest
22    and provide them access to a data room.
23       Q   And by "U.S. parties," you
24    mean U.S. potential investors; is that
25    right?
```

```
                                                   92
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2       A   Correct.
 3       Q   But do you mean something
 4    else?
 5       A   No.  I mean potential buyers.
 6       Q   Were bidders given access to
 7    diligence questions and answers from
 8    other bidders?
 9       A   Can you repeat that?
10       Q   Were all bidders given access
11    to diligence questions and answers from
12    other bidders or potential bidders?
13       A   I don't recall, but I -- it's
14    not typical to provide answers that --
15    the questions that one group asked to
16    another group that hasn't asked those
17    same questions.
18       Q   So -- so this document would
19    have gone to CMC but not to other
20    potential bidders; is that right?
21       A   That is correct, to my
22    knowledge.
23       Q   And if another, you know,
24    Investor X had diligence questions that
25    are responses to those questions would
```

```
                                                   93
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2    have gone to Investor X but not to CMC;
 3    is that your understanding?
 4           MR. JAIME-BETTAN:  Objection.
 5    Calls for speculation.
 6       A   It depends on the question.
 7    A lot of times people ask the same
 8    questions and we would leverage work
 9    done for other investors to answer
10    other questions from different
11    potential buyers.
12       Q   Fair enough.
13           What was the process for
14    responding to diligence requests?
15       A   I believe we offered --
16    initially we offered to answer one set
17    of questions.  It was very specific to
18    each buyer, to my recollection, and
19    then provided them access to the data
20    room.  We would -- again, depending
21    upon the buyer, we would usually set up
22    a phone call to address questions as
23    needed.
24       Q   Did individuals from Zuffa
25    participate in the process?
```

## Page 150

C E R T I F I C A T I O N

STATE OF NEW YORK )
            ) ss.:
COUNTY OF NEW YORK )

I, JUDITH CASTORE, Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That COLIN NEVILLE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that this transcript of such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of August, 2017.

- - - - - - - - - - -
JUDITH CASTORE

## Page 151

### INDEX

| WITNESS | PAGE |
|---|---|
| COLIN NEVILLE | |
| Examination by: | |
| MR. RADICE | 7 |
| MS. LYNCH | 143 |

### EXHIBITS

(Retained by David Feldman Worldwide, Inc.)

| RAINE | | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena to Testify at a Deposition in a Civil Action to The Raine Group, LLC | 10 |
| Exhibit 2 | Declaration of Business Record Authenticity for the Raine Group, LLC | 36 |
| Exhibit 3 | Document, Bates stamped RAINE0000019 through 88 | 38 |
| Exhibit 4 | Document, Bates stamped RAINE0000575 through 595 | 59 |
| Exhibit 5 | Document, Bates stamped RAINE0004398 through 4430 | 67 |
| Exhibit 6 | Document, Bates stamped RAINE0018025 through 18033 | 68 |
| Exhibit 7 | Document, Bates stamped RAINE0018791 through 18809 | 87 |
| Exhibit 8 | Multi-page document, headed Project Basquiat, Diligence Requests, 7/10/2017 | 99 |
| Exhibit 9 | Multi-page document, headed Raine, FountainVest, as of 06/15/2016 | 105 |
| Exhibit 10 | Document, Bates stamped RAINE0022430 through 22434 | 110 |
| Exhibit 11 | Document, Bates stamped RAINE0023834 through 23838 | 115 |
| Exhibit 12 | Document, Bates stamped RAINE0023839 through 23844 | 116 |
| Exhibit 13 | Document, Bates stamped RAINE0023845 through 23851 | 116 |
| Exhibit 14 | Document, Bates stamped RAINE0023852 through 23859 | 117 |

## Page 152

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

## Page 153

E R R A T A

I wish to make the following changes, for the following reasons:

PAGE LINE

___ ___ CHANGE:_____
REASON:_____

___ ___ CHANGE:_____
REASON:_____

___ ___ CHANGE:_____
REASON:_____

___ ___ CHANGE:_____
REASON:_____

___ ___ CHANGE:_____
REASON:_____

___ ___ CHANGE:_____
REASON:_____

_____   _____
WITNESS' SIGNATURE       DATE