# EXHIBIT 121

**Excerpts of the**

**Second Deposition of**

**Dr. Hal J. Singer**

Page 338

        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEVADA
                  -  -  -

CUNG LE, NATHAN QUARRY, JON: CIVIL ACTION
FITCH, BRANDON VERA, LUIS  :
JAVIER VAZQUEZ, and KYLE    :
KLINGSBURY on behalf of     :
themselves an others        :
Similarly situated,         :
          Plaintiffs  : CASE NO.
                      : 2:15-cv-01045-RFB
        vs.           : (PAL)
                      :
ZUFFA, LLC d/b/a ULTIMATE   :
FIGHTING CHAMPIONSHIP and   :
UFC,                        :
          Defendants  :


                -  -  -
        Tuesday, January 23, 2018
                DAY 2
                -  -  -

        Continuation of videotaped

deposition of HAL J. SINGER, Ph.D., taken

pursuant to notice, was held at the

offices of BERGER & MONTAGUE, P.C., 1622

Locust Street, Philadelphia, PA 19103,

commencing at 10:19 a.m., on the above

date, before Lori A. Zabielski, a

Registered Professional Reporter and

Notary Public in and for the Commonwealth

of Pennsylvania.
                -  -  -
          MAGNA LEGAL SERVICES
              866.624.6221
            www.MagnaLS.com



1    levels that I thought a Court
2    would deem at least not
3    anticompetitive based on my
4    understanding of precedent in the
5    similar cases.
6          So I think that that's where
7    the zero, 20 and 30 percent come
8    from, let's just be clear.  It's
9    not -- it's not from anywhere
10   else.  We are trying to find a
11   level of foreclosure that would be
12   deemed not anticompetitive by a
13   Court.
14         So the questions that you
15   asked me in the last five minutes
16   are -- seem like you are looking
17   for an alternative motivation for
18   how I got to zero, 20 and 30
19   percent.  I am telling you what
20   got me to the zero, 20 and 30
21   percent, I was trying to come up
22   with levels that would basically
23   give Zuffa -- would shield Zuffa
24   from liability in exclusive

1    dealing case.
2    BY MR. ISAACSON:
3          Q.   All right.  So I am not here
4    to discuss your motivations about this.
5    I am just here to ask you questions.
6          And my next question is, is
7    there anything in your rebuttal report
8    where you analyze how a but-for world
9    that you have described would achieve a
10   foreclosure rate of 30 percent or lower?
11         A.   I don't think so, but the
12   question, again, has the -- has the
13   causality going in the wrong direction.
14         Q.   All right.  And when you say
15   the causality is going in the wrong
16   direction, by that I am asking you how
17   the but-for world causes a lower
18   foreclosure share.  Are you saying the
19   correct causality is how a lower
20   foreclosure share causes the but-for
21   world?
22         A.   It's closer.  I would say
23   that if what we are trying to do is to --
24   first, we are trying to figure out what

1    the wage effect was from Zuffa taking the
2    foreclosure share from the low digits,
3    low single digits up into the -- up into
4    the 90s, say, over the course of the
5    damages period, for the class period.
6    And I say, okay, let's roll it back,
7    let's see what the relationship was
8    between wage share and foreclosure share
9    and then just roll it back to levels that
10   would -- that would give Zuffa -- that
11   would shield Zuffa from antitrust
12   liability.  Okay.
13         And then the next question
14   is, okay, what are -- what are other --
15   you know, you had asked me during the
16   first deposition, how does Zuffa get
17   there, what would they have to do to
18   their contracts to come into compliance
19   with or to ensure that foreclosure was no
20   higher than 30 percent.  And we went
21   through all sorts of different ways that
22   they could restructure their contracts so
23   that it wouldn't -- so that foreclosure
24   levels wouldn't be above 30 percent.

1          And Dr. Topel says, I want
2    to know more, not just what they'd have
3    to do to come into compliance, but tell
4    me what other elements would look like,
5    would there be -- would there be
6    co-promotion, would there be the
7    right-to-match clause, would there be
8    this and that and the other.
9          And so in this reply report,
10   I am trying to fill in a little more
11   granularity as to what a plausible
12   but-for world would look like that would
13   be consistent with foreclosure shares of
14   zero, 20 and 30 percent.
15         Q.   Now, when you say that the
16   but-for world you describe in paragraph
17   198 is a plausible but-for world, are
18   there other plausible but-for worlds in
19   your opinion that would be consistent
20   with foreclosure shares of 30 percent or
21   lower?
22         A.   Sure.  Remember, in a
23   footnote I say that while co-promotion
24   would be likely based on these proxies,



Page 375

1  it's not -- it's certainly not necessary
2  to engender competitive outcomes so long
3  as the markets are more open, less
4  restrictive and rivals get a foothold and
5  are able to put forward compelling
6  matches for MMA audiences.
7      Q.   Are there -- at this point,
8  following your rebuttal report, is it
9  your opinion that there are many ways to
10  get to a lower foreclosure share that
11  would constitute an appropriate but-for
12  world?
13      A.   Well, remember, all that
14  needs to happen to get to a lower
15  foreclosure share is that Zuffa would
16  need to change the parameters of its
17  contracts with fighters in such a way as
18  to ensure that the cumulative duration of
19  the restrictions don't take you over some
20  level that a Court would deem
21  exclusionary.
22          That's all you need to get
23  the foreclosure share down.  We had
24  talked about whether 30 months -- 36

Page 376

1  months was too long and, you know, what
2  would be a -- what would be a duration
3  that would be acceptable to a Court.
4          That, to me, is really the
5  key element of what you need in a
6  contract to bring the foreclosure share
7  down to levels of zero, 20 or 30 percent.
8  After that, what we are doing here is we
9  are just filling in other aspects of the
10  but-for world that would complement or be
11  consistent with that -- with that
12  outcome.
13      Q.   All right.  So in your
14  opinion, does but-for world have to
15  include contracts that are -- exclusive
16  contracts that are no longer than one
17  year?
18      A.   Well, I think we went
19  through this in the first -- in the first
20  deposition.  But, again, I mean, my
21  answer is not going to change.  It's
22  going to be -- it's going to depend on
23  where -- where the Court would draw the
24  line as to what's considered to be an

Page 377

1  exclusionary arrangement.
2          Now, I have tried to inform
3  the Court based on what I think is the
4  average career span of a fighter and
5  that -- and that when we -- when we
6  figure out how to draw that line, we
7  ought to take into consideration how much
8  of a fighter's remaining career span is
9  left after they sign with Zuffa.
10          But depending on where that
11  line gets drawn, Zuffa could then
12  construct its contracts in such a way as
13  to comply with that -- with that line,
14  and with an important caveat:  So long as
15  30 percent, say, is tolerated, they
16  could -- they could carve off 30 percent
17  or, in fact, more if the market share is
18  not quite 100 percent.  They could carve
19  off a certain portion of their fighters
20  and subject them to potentially longer
21  contracts.
22          So there is not -- there is
23  not a -- there is not one way to get a
24  foreclosure share under 30, as we

Page 378

1  discussed.  There are a lot of ways to
2  get it down.  But these other parameters
3  that I am informing right now are things
4  that help fill in what the but-for world
5  would look like.  They are meant to
6  complement or be consistent with.  But
7  they're -- I think that while we have
8  been going in circles, these other
9  parameters, while important, aren't the
10  levers that are pushing foreclosure down
11  to 30, 20 or zero percent.
12      Q.   Okay.  One simple point I
13  had been wondering about based on the
14  support, you had told me before that
15  there is not one way to get foreclosure
16  share under 30; there are a lot of ways
17  to get it down.
18          That's still your opinion?
19      A.   Oh, sure.  I just gave
20  you -- I just gave you two ways to do it.
21  One could be across the board, every
22  single contract contains the same
23  provision.  That would get you down.
24  Another way to do it would be to do a



Page 379

1    carve-out for a certain set of contracts,
2    but you would have to make sure that
3    those contracts don't account for too
4    large of a share of a market.
5            There are lots of ways that
6    you could restructure the contract, and I
7    have -- of course, I have opinions as to
8    how it could be done to come into
9    compliance with, say, a 30 percent
10   foreclosure requirement.
11       Q.   All right.  And at this
12   point, following your rebuttal report,
13   you are still, depending on your analysis
14   about where the Court draws the line as
15   to what's an exclusionary arrangement.
16       Am I correct about that?
17           MR. CRAMER:  Objection to
18   form.
19           THE WITNESS:  I think that
20   that ultimately would fall to the
21   fact-finder.  I have tried to
22   inform the decision-making based
23   on my experience, my reading of
24   other cases, other economic

Page 380

1        articles and, of course, most
2        importantly, I go back to this,
3        the average career length of a
4        fighter.  I think that all those
5        things should inform what the line
6        should be.
7            I have tried to -- I have
8        tried to offer what I think would
9        be a fair number.  I have -- in
10       fact, in this report, I have
11       pointed to the duration in Zuffa's
12       contracts when it had less market
13       power than it does now as what I
14       think would be a reasonable proxy
15       for the duration of the contract.
16   BY MR. ISAACSON:
17       Q.   All right.  And just to make
18   sure I understand where you are now at
19   the end of your rebuttal report, if the
20   Court were to determine that contracts --
21   exclusive contracts of one year or more
22   were exclusionary, would that -- if --
23   would an appropriate but-for world
24   include one-year contracts or less, plus

Page 381

1    some other parameters or some other
2    possible parameters, as Zuffa said, and
3    that would result in a foreclosure share
4    of 30 percent or lower?
5            MR. CRAMER:  Objection to
6    form.
7            THE WITNESS:  Well, I think
8        we are close.  I think what I am
9        getting tripped up on is you said
10       one year or more would be
11       exclusionary.  And then, of
12       course, if you did it at one year,
13       you wouldn't be in compliance.
14       But how about can we try a
15       different hypothetical or did
16       you -- maybe you meant to do that.
17   BY MR. ISAACSON:
18       Q.   Well, no.  I was not trying
19   to put significance of 365 days versus
20   366.
21           But if the Court drew the
22   line at exclusionary contract of
23   something that's more than one year and
24   instead, that a one-year contract or less

Page 382

1    was not exclusionary --
2        A.   Got it.  Got it.  Sorry.
3    Then I didn't hear that the first time,
4    but I am with you now.
5        Q.   Okay.  With that assumption,
6    in your opinion, would an appropriate
7    but-for world be contracts that were one
8    year or less in duration, plus some other
9    potential parameters that you pointed to
10   in your report and that but-for world
11   result in foreclosure shares of 30
12   percent or less?
13       A.   Well, it's certainly getting
14   closer to what I think would be the
15   appropriate but-for world.  It seems like
16   we could -- we could restructure the
17   contracts by reducing the duration, such
18   that when I went back and calculated
19   foreclosure, it would no longer be in
20   excess of 30 percent, and I think that
21   getting the duration below what the
22   fact-finder deem exclusionary and in
23   violation of the antitrust laws is a
24   smart way to go about it.

MAGNA
LEGAL SERVICES

Page 431

1  saying is that the but-for wages and wage
2  shares that I am estimating are closer to
3  the fighters' marginal revenue product
4  than what they are currently being paid.
5      Q.  But in your opinion, are the
6  but-for wages that you are estimating
7  approximating the marginal revenue
8  product of the fighters?
9      A.  I am getting caught up on
10 the word "approximating."  Can we -- can
11 we agree on something that's a little
12 less strong?  How about we are -- we are
13 getting closer to in the but-for world.
14 The simulation is putting fighters at a
15 wage share and wage level that is closer
16 to their marginal revenue product.  I am
17 not -- I am not prepared to say that it
18 would -- it would approximate or be
19 exactly equal to 100 percent of the
20 but-for wages.
21     Q.  I need to follow up because
22 getting closer to could mean a little
23 closer to or very closer to.  So I could
24 stand in -- at the back of this room and

Page 432

1  take one step forward and get closer to
2  you but still be far away.
3      A.  That's fair.
4      Q.  The -- is the -- are the
5  but-for wages -- but-for wages that you
6  are estimating in your regression, are
7  those close to or -- let me put it this
8  way:  The but-for wages that you are
9  estimating in your regression, how close
10 are they to the marginal revenue product
11 of the fighters in your opinion?
12     A.  I haven't estimated the
13 marginal revenue products, so to answer
14 that question, I would have to -- I would
15 have to engage in a -- in a different
16 exercise than what I did here.
17         But I -- what I -- what I
18 can tell you is that when we take the
19 foreclosure share down to 30 percent, we
20 are eviscerating a large part of Zuffa's
21 market power.  What I am -- what I am
22 hesitant -- what I am hesitating on and
23 what I am reluctant to say is that the 30
24 percent foreclosure completely

Page 433

1  eviscerates Zuffa's market power to the
2  point that Zuffa is forced to pay
3  fighters equal to their marginal revenue
4  product.  That's -- that's quite a
5  statement.
6          And I want to allow for the
7  possibility that with 30 percent
8  foreclosure share, Zuffa could still have
9  some, not as much, but some buying power,
10 such that it could push wages below
11 marginal revenue product, just not to the
12 extent that it's doing today.
13     Q.  Now, you said you haven't
14 estimated the marginal revenue product of
15 the fighters.  If you could estimate
16 those, would that -- would you then use
17 that as the dependent -- a dependent
18 variable in your impact regression?
19     A.  No.  I intentionally did not
20 estimate the marginal revenue product
21 because it would be one unnecessary step
22 in the process, and I didn't want to
23 introduce an unnecessary step.  I did
24 what was needed to be done to simulate

Page 434

1  but-for wage shares.
2      Q.  In your opinion, does the
3  individual marginal revenue product vary
4  among fighters?
5      A.  It could as a matter of
6  theory, yes.
7      Q.  Beyond theory, based on the
8  investigation that you have done in this
9  case, in your opinion, does it actually
10 vary amongst the fighters?
11     A.  Most likely, yes, based on
12 my investigation, I am thinking in
13 particular of a regression in which I
14 estimated the relationship between event
15 revenues and the rank of the highest
16 ranked fighter featured, and it seems to
17 me that so long as rank is capturing
18 productivity, it appears to be that if
19 you put on a fight with a high productive
20 fighter, all things equal, you are going
21 to generate higher event revenue.
22         So that tells me there is
23 going to be variation among the fighters
24 with respect to their ability, basically

MAGNA
LEGAL SERVICES

Page 435

1    their revenue generation capabilities.
2        Q.   And assuming the status quo,
3    current Zuffa contracts and practices, is
4    there a relationship in your opinion
5    between fighters' marginal revenue
6    product and their individual
7    compensation?
8            MR. CRAMER:  Do you mean in
9        the current world?
10           MR. ISAACSON:  Yes.
11           THE WITNESS:  Yes, I think
12       in the current world, all things
13       equal, the more productive you
14       are, the higher you get paid.
15   BY MR. ISAACSON:
16       Q.   And I think you have said
17   this, but I will just confirm.  You do
18   think that what you would describe as a
19   competitive world, there would be a
20   relationship between marginal revenue --
21   individual marginal revenue product and
22   individual compensation?
23       A.   Well, there is always a
24   relationship, right?  There is a

Page 436

1    relationship in the actual world, there
2    is a relationship in the but-for world.
3    That's Labor Theory 101.  The -- what we
4    are trying to figure out is how the
5    challenged conduct affected or thwarted
6    that relationship.
7        Q.   Okay.  And you have said
8    that event revenue is a proxy for the
9    collective marginal revenue product of
10   the fighters of the event.
11           Is there a way of looking at
12   event revenue to use that as proxy for
13   individual fighter marginal revenue
14   product?
15       A.   Well, I think, again, the
16   way that I have constructed my impact
17   regressions, I have -- I have used the
18   individual compensation relative to the
19   event revenue as my dependent variable.
20   So in a sense, I am trying to decompose
21   event revenue that way.
22       Q.   All right.  And when you say
23   you use individual compensation relative
24   to event revenue, as I understand it, you

Page 437

1    are looking -- some fighters are paid
2    more, some are paid less, and you are
3    using their payments relative to one
4    another to see -- and comparing that to
5    event revenue?
6        A.   I wouldn't -- I wouldn't
7    quite put it that way.
8        Q.   Let me try to put it this
9    way:  The -- I am trying to get something
10   simple here.
11       A.   Okay.
12       Q.   You have someone who is
13   being paid a million dollars for a fight
14   and someone who is being paid $50,000 for
15   a fight.
16       A.   Got it.
17       Q.   You are assuming that the
18   person being paid $50,000 is making --
19   has a lower marginal revenue product than
20   the person being paid a million dollars?
21           MR. CRAMER:  Objection to
22       form.
23           THE WITNESS:  I am not
24       assuming anything.  Just to make

Page 438

1        your hypothetical concrete, let's
2        assume they both fought in the
3        same fight.
4            MR. ISAACSON:  Same event.
5            THE WITNESS:  Okay.  You
6        didn't say that, but I am trying
7        to --
8            MR. ISAACSON:  Right.
9            THE WITNESS:  Right.
10       Let's assume that they both
11       fought in the same event.  What my
12       model is trying to do, it's not
13       assuming anything.  It's letting
14       the data explain to us the
15       relationship between the fighters'
16       attributes and how much of the
17       event revenue that fighter was
18       able to take home as compensation.
19   BY MR. ISAACSON:
20       Q.   All right.  But for your
21   dependent variable, the -- you are
22   relying on the -- for your dependent
23   variable, the person earning $50,000
24   would be making less of a contribution

MAGNA
LEGAL SERVICES

Page 603

```
 1   market, estimates the additional live
 2   events that would have taken place if you
 3   eliminated the challenged conduct?
 4        A.   Events that occur -- that
 5   are -- that are implicated or occur
 6   within that ranked definition.  With
 7   that -- with that caveat, yes, we are
 8   comparing -- we are just taking a trend
 9   of events that fall within a certain
10   market definition and comparing it to
11   what actually happened.  And no matter
12   what definition I use, it appears as if
13   there is a drop-off in industry events
14   despite the fact that Zuffa's event are
15   rising.
16        Q.   All right.  And so within
17   the rank -- now, absent the challenged
18   conduct -- we talked about absent the
19   challenged conduct to some -- for quite a
20   while for your regressions and impact
21   analysis.  I don't want to go back over
22   that.
23             Is your but-for world of the
24   absence of challenged conduct for
```

Page 604

```
 1   purposes of Figure 4B the same world
 2   where you have a foreclosure percentage
 3   of 30 percent or below?
 4        A.   I think it's the same
 5   but-for world, but I am not -- I am not
 6   using that same regression model as the
 7   tool or the mechanism that allows me to
 8   make this projection.  I am simply taking
 9   a trend of output at the industry level
10   and projecting it forward from 2010.
11        Q.   All right.  So in Figure 4B,
12   using the ranked definition, you are
13   estimating how many additional bouts
14   would have taken place from 2010 to 2016,
15   assuming that there was foreclosure of
16   30 percent or less?
17        A.   Well, that last part of the
18   question doesn't completely make sense to
19   me.  These are -- there is not a specific
20   but-for foreclosure share that's lurking
21   in the background.  I don't have to
22   specify but-for foreclosure share to
23   calculate an output factor to demonstrate
24   an output effect in this analysis.
```

Page 605

```
 1        Q.   All right.  Let me try it
 2   this way:  In Figure 4B, using the ranked
 3   definition, you are estimating how many
 4   additional bouts would have taken place
 5   from 2010 to 2016, assuming the same
 6   but-for world that would cause a
 7   foreclosure share of 30 percent or less?
 8        A.   So are you asking me what
 9   the implied reduction in output was in
10   the ranked market?
11        Q.   I am just trying to
12   understand your but-for world.
13        A.   Oh, the but-for world is --
14   the but-for world doesn't vary as we move
15   across my analyses.  I am -- I am just
16   telling you we don't -- this analysis
17   that we do here, as you may or may not
18   know, is -- does not depend on my
19   specifying a but-for foreclosure level.
20   This is a trend analysis.  This is a
21   before/after analysis.
22        Q.   I realize that.  But the --
23   your but-for world in Figure 4B is the
24   same but-for world that generates a
```

Page 606

```
 1   foreclosure percentage of 30 percent or
 2   less?
 3        A.   I think that's fair.
 4        Q.   Okay.  And using your trend
 5   analysis, if I am reading this right, in
 6   2016, for Zuffa events, which there were
 7   approximately a little less than 700 in
 8   the actual world, the -- in your
 9   estimation -- no, actually you are not
10   estimating the Zuffa event.
11             So let me -- the total event
12   account.  The total MMA event account --
13   actually, that's kind of confusing.
14             Why is the total MMA account
15   less than the Zuffa account?
16        A.   The Zuffa numbers are on
17   the -- are on the left-hand side.  If you
18   want to read --
19        Q.   I am looking at the blue
20   line and the green line.
21        A.   Mine don't have
22   color-coding, but --
23             MR. CRAMER:  Here.
24             THE WITNESS:  Okay.  If you
```

MAGNA
LEGAL SERVICES

Page 607

1    want to read off the Zuffa event
2    count, you need to go to the axis
3    on the left-hand side.
4  BY MR. ISAACSON:
5    Q.   Yes, I understand that.
6  But -- oh, but the --
7    A.   And if you want to read off
8  the total or the non-Zuffa, you have to
9  go get the relevant curve and then go to
10 the right axis, the second axis.
11   Q.   So -- all right.  So the
12 Zuffa count would be 40-some.  That's
13 right, because you are not going to have
14 hundreds of those.  And for the green --
15 for the total, you are going to have a
16 little over 600?
17   A.   Which part of the -- so I
18 am -- I am following the green.  Which
19 part of the green line -- oh, by 2016,
20 you're right --
21   Q.   2016.
22   A.   -- that in the actual world,
23 what this is telling us is that there
24 were somewhere between 600 and, say, 700

Page 608

1  events that featured someone in the
2  ranked definition, which is fairly broad.
3  Remember, this is anybody in the top 650.
4    Q.   Right.  So -- and in your
5  estimation, in the same world it gets you
6  a 30 percent foreclosure share or less,
7  the amount of total MMA event in 2016
8  would rise from -- some amount over 600
9  to a little over 1,800?
10   A.   If you have -- if you
11 defined your market so broadly as to
12 include anyone in the ranked definition,
13 you have to recall, these are -- these
14 are going to be events that feature
15 fighters who are relatively obscure in
16 MMA.
17       I think there is a reason
18 why I didn't use the same kind of A/B
19 convention in this figure as I did for
20 4A, in part, because I think the ranked
21 definition is likely too broad to get a
22 reliable estimation of the output effect
23 here.  I think -- I think that I would
24 point you to more realistic market

Page 609

1  definitions.
2    Q.   Okay.  But am I right that
3  for the ranked definition which you are
4  projecting as an increase in bouts from
5  over 600 to a little over 1,800?
6    A.   What this graph shows is
7  that had the trend from 2001 --
8    Q.   I am sorry.  That was for
9  2016.
10   A.   What this shows is that had
11 the trend in total events in this market
12 definition, the ranked definition,
13 persisted, the trend that went from 2001
14 to 2010, had it persisted, then by 2016,
15 total events would be somewhere on the
16 order of 1,800.
17   Q.   All right.  And based on
18 that, you reached the opinion that there
19 would be over 1,800 events in the ranked
20 definition in the year 2016 in the
21 absence of the challenged conduct?
22   A.   I don't think that that's
23 the opinion that I reached.  I think that
24 I am trying to be complete with respect

Page 610

1  to every plausible market definition to
2  show that output was restricted here.
3    Q.   All right.  Now, let me see
4  if I can understand -- do you have an
5  opinion as to how many additional bouts
6  there would be within the ranked
7  definition in 2016 in the absence of the
8  challenged conduct?
9    A.   I don't think that I have
10 ever said that I am predicting that
11 exactly 1,800 events would have occurred.
12 I think that what I am saying is that had
13 the trend persisted, the trend from 2001
14 to 2010, then one would predict that by
15 2016, this industry would have grown to
16 something on the order of 1,800 events.
17   Q.   All right.  But based on
18 that trend, are you reaching any opinions
19 about how many events would have taken
20 place within the ranked definition in
21 2016 in the absence of the challenged
22 conduct?
23   A.   I think the opinion that I
24 am willing to make or take based on this



Page 611

1  chart in conjunction with all the other
2  charts that I have is that there was an
3  output effect and that revenue --
4  industry output fell no matter -- from
5  2010, no matter how you define the
6  relative input market.
7      Q.   All right.  But are you able
8  to quantify that output effect within the
9  ranked definition?
10     A.   One could quantify it if one
11 were truly interested in getting a
12 number, but I don't know -- I don't know
13 what the precise number gives you above
14 and beyond that inference that can be
15 drawn by saying that it fell with respect
16 to every way you define the market.
17     Q.   Have you quantified an
18 output effect within the ranked
19 definition of total events from the -- by
20 eliminating the challenged conduct?
21         MR. CRAMER:  Asked and
22     answered.
23         THE WITNESS:  I don't think
24     that I have -- I have quantified

Page 612

1     it.
2  BY MR. ISAACSON:
3      Q.   All right.  Let me go to the
4  tracked definition.
5      A.   Okay.
6      Q.   So here, for the number of
7  bouts, I just look at the left axis; is
8  that correct?
9      A.   Correct.
10     Q.   Okay.  And help me
11 understand the brackets that are the
12 A and B.
13     A.   Sure.
14     Q.   So there is the dotted line
15 that goes to the top of the B bracket.
16         Do you see that?
17     A.   Yes.
18     Q.   Okay.  The -- is that a
19 combination of the Zuffa event and
20 non-Zuffa events reflected in the blue
21 line and the red line?
22     A.   No.  The dotted red is the
23 legend that tells you it's the but-for
24 non-Zuffa event count.  So all we are

Page 613

1  doing is we first plot the non-Zuffa
2  event account, which is the red line,
3  right, through 2010, and then we -- and
4  then we fit a trend line from 2001 to
5  2010 and we extrapolate forward and we
6  say of that trend had persisted, then
7  non-Zuffa events would have continued
8  increasing and would have -- would have
9  reached a certain level by 2016.
10     Q.   All right.  So in Figure 4A,
11 the red dotted line is your trend line
12 for non-Zuffa events; is that correct?
13     A.   Fit -- yes.  But
14 importantly, fit from 2001 to 2010 only.
15     Q.   By "fit," meaning you are
16 projecting the trend for 2010 through
17 2016 by the trend prior to 2010?
18     A.   That's fairly close.  We fit
19 the trend with data from '01 to 2010, and
20 then we project forward through 2016.
21     Q.   All right.  And based on
22 that trend analysis -- well, first of
23 all, in 2016, there is -- for non-Zuffa
24 events, there is -- it looks like there

Page 614

1  is approximately 20 events?
2      A.   In the actual world, yes,
3  2016, it looks like there were about 20
4  non-Zuffa events that are in the tracked
5  definition.
6      Q.   All right.  And in the
7  but-for world, there is a little over 40
8  events?
9      A.   For non-Zuffa, correct.
10     Q.   For non-Zuffa?
11     A.   Correct.
12     Q.   So is it your opinion, based
13 on the trend analysis in Figure 4A, that
14 for the tracked definition, that in the
15 absence of the challenged conduct, the
16 number of non-Zuffa events would have at
17 least doubled in 2016?
18     A.   I think my opinion is that
19 there is evidence here of an output
20 effect, of output suppression.  That --
21 that's my opinion.  Whether I am able to
22 quantify that to any reasonable degree is
23 a related question, and, of course, my
24 best estimate, if you insist, would be

MAGNA
LEGAL SERVICES

Page 647

1    Q.   All right.
2         MR. ISAACSON:  Thank you.  I
3    don't have any more questions.
4         MR. CRAMER:  Very good.
5         THE VIDEOGRAPHER:  Okay.
6    The time is 5:12 p.m.  This is the
7    end of Dr. Hal Singer's
8    deposition.  We are going off the
9    record.
10             - - -
11        (The deposition concluded at
12   5:12 p.m.)
13             - - -
14
15
16
17
18
19
20
21
22
23
24

Page 649

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over
4    carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8         After doing so, please sign the
9    errata sheet and date it.
10   You are signing same subject to the
11   changes you have noted on the errata
12   sheet, which will be attached to your
13   deposition.
14        It is imperative that you return
15   the original errata sheet to the deposing
16   attorney within thirty (30) days of
17   receipt of the deposition transcript by
18   you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Page 648

1         CERTIFICATE
2
3
4         I HEREBY CERTIFY that the
5    witness was duly sworn by me and that
6    the deposition is a true record of
7    the testimony given by the witness.
8
9
10
11
12   _____
13   Lori A. Zabielski
14   Registered Professional Reporter
15   CaseViewNet Reporter
16   Dated:  January 24, 2018
17
18
19
20
21
22        (The foregoing certification
     of this transcript does not apply to any
23   reproduction of the same by any means,
     unless under the direct control and/or
24   supervision of the certifying reporter.)

Page 650

1         - - - - - -
2         E R R A T A
3         - - - - - -
4    PAGE  LINE CHANGE
5    _____ _____ _____
6    _____ _____ _____
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____

