# EXHIBIT 122

## Excerpts of the 30(b)(6) Deposition of Ike Lawrence Epstein on Zuffa Acquisitions (12/2/16)

```
                                                              1
                    UNITED STATES DISTRICT COURT

                         DISTRICT OF NEVADA


    CUNG LE; NATHAN QUARRY, JON    )
    FITCH, on behalf of            )
    themselves and all others      )
    similarly situated,            )
                                   )
              Plaintiffs,          )
                                   )
              vs.                  ) Case No.
                                   ) 2:15-cv-01045-RFB-(PAL)
                                   )
    ZUFFA, LLC, d/b/a Ultimate     )
    Fighting Championship and      )
    UFC,                           )
                                   )
              Defendant.           )
    _____)




                          CONFIDENTIAL

      VIDEO RECORDED 30(b)(6) DEPOSITION OF ZUFFA, LLC

                   BY IKE LAWRENCE EPSTEIN

                       December 2, 2016

                      LAS VEGAS, NEVADA

                         11:29 A.M.


    Reported by:
    Sarah Padilla, CCR NO. 929
    Job No: 47777
```

**Page 82**

1  don't know whether that was something that
2  Mr. Goodman and Mr. Palazzo requested, whether it
3  was done for some sort of tax or other reasons. But
4  it looks like $500,000 is the amount. The reasons
5  for doing this, I don't know.
6      Q   So is it accurate to say that 1 million
7  out of the -- out of -- out of the total acquisition
8  price of the WFA deal was allocated to agreements on
9  behalf of Mr. Goodman and Mr. Palazzo to not compete
10 with Zuffa?
11     A   I don't think that's accurate, because I
12 don't know the reasons why that money was allocated
13 in that way. I'm not saying this is the case. But
14 it would be very easy, for example, if you had other
15 partners in the arrangement and didn't want them to
16 be included in the overall purchase price, that you
17 could ask the larger amount to be assigned to the
18 non-compete that was personal to you so you didn't
19 have to share that money with the other owners of
20 the organization. I'm not saying that's true. I
21 have no idea.
22     And this thing could have been done for
23 tax reasons. It could have been done for some other
24 structure. So I would agree that $500,000 is the
25 amount that is on the document. But the reasons the

**Page 83**

1  deal was structured that way, I don't know.
2      Q   Do you know who at Zuffa would know why
3  the deal was structured the way it was structured?
4      A   I don't. Could be Kirk Hendrick, could be
5  John Mulkey, but I don't know.
6      Q   I would like to refer back to Exhibit 60,
7  which we had been discussing earlier today.
8      A   Okay. Got it.
9      Q   I'm going to direct your attention to the
10 second to last page of Exhibit 60. There's a Bates
11 label at the bottom ZFL-1674073. Are you with me?
12     A   I see it.
13     MS. GRIGSBY: I'm just going to reiterate
14 my objection to this document. It's unclear whether
15 this is a complete document, whether it's a draft,
16 and whether there was anything else that accompanied
17 it in terms of exhibits.
18     THE WITNESS: I've got it in front of me.
19 BY MR. WEILER:
20     Q   I'm going to direct your attention here,
21 middle of the page, second sentence of the middle
22 paragraph, it says, "The purpose of Zuffa's
23 acquisition of the small and little-known WFA was a
24 defensive strategy to eliminate a second tier
25 competitive brand operating in the Las Vegas

**Page 84**

1  market." Is that sentence I just read an accurate
2  characterization?
3      A   No.
4      Q   And what's inaccurate about that sentence?
5      A   I think the entire sentence is inaccurate.
6  The purpose of the acquisition -- well, I guess it
7  was small and little known. That could be true.
8  But it was not a defensive strategy to eliminate a
9  second tier competitive brand operating in the Las
10 Vegas market. As I indicated to you, I don't even
11 know that they did an event in the Las Vegas market.
12 But the principals, Mr. Goodman and Mr. Palazzo,
13 certainly lived in Las Vegas. They put on one or
14 two fights. They were very unsuccessful. They
15 began shopping the business and approached us. So I
16 guess I would agree they were small and little
17 known. But beyond that, I would disagree with the
18 rest of it.
19     Q   Now, directing your attention to the last
20 page of the document, the sentence that starts, "Any
21 value ultimately derived by Zuffa from former WFA
22 fighter contracts would be the result of integration
23 into the UFC-WEC brand and only be realized through
24 future marketing and production efforts. In fact,
25 the terms of any fighter contracts to be exploited

**Page 85**

1  by Zuffa would likely be renegotiated and altered to
2  comply with Zuffa standards and be economically
3  adjusted in accordance with the new brand venue in
4  which the fighter was to perform."
5      Is that sentence that I just read an
6  accurate characterization?
7      MS. GRIGSBY: Objection. Scope. This
8  looks like it relates to fighter contracts, not
9  acquisitions. And I'm going to renew my objection
10 about this document. It looks to be an incomplete
11 document, just for the record. If you notice,
12 there's myriad typos in this document. It's unclear
13 who drafted it.
14     THE WITNESS: There's a lot in here. I
15 guess if I understand it right, what it's saying is
16 we probably enter new agreements with the athlete
17 and pay them more money when they enter the UFC.
18 And I think that's true. We probably would have
19 entered a new agreement with the athletes and paid
20 them more money.
21 BY MR. WEILER:
22     Q   So directing your attention back to the
23 previous page under "Determining Factors," there's a
24 sentence that says, "Company believes that it is
25 appropriate that the entire WFA purchase price,

22 (Pages 82 to 85)

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

146

1 whether it was important to them, I don't -- I
2 assume so.
3   Q   Did Zuffa represent that it would make
4 good faith efforts to continue the Pride brand as
5 part of the Pride acquisition?
6   A   I believe we did.
7   Q   When Zuffa made that representation, did
8 it know that there were questions about Pride's
9 association with the Yakuza organization?
10   A   Well, I mean, the whole reason why Pride
11 was sold is because of the fact there were
12 allegations they were associated with the Yakuza.
13 So everybody was aware about those allegations.
14 Whether any of it was true, it was never proven as
15 far as I know one way or the other.  So of course
16 people were aware, because that's the only reason
17 they sold the business.
18   Q   Did Zuffa ever hold any events under the
19 Pride brand?
20   A   No.
21   Q   Were there any planned Pride events that
22 were canceled as a result of Zuffa's acquisition of
23 Pride?
24   A   You know, I think there certainly were
25 some discussions about doing an event in between the

147

1 closing and the time the business closed down.  Once
2 again, I didn't come on board until August of 2007,
3 so things were not in a good spot by then.  There
4 certainly was a discussion about doing events, as I
5 recall.
6   Q   So there were contemplated events under
7 the Pride brand Zuffa would undertake that did not
8 come to fruition?
9   A   They were contemplated events is my
10 recollection.  There was discussion about events in
11 Japan under the Pride name.
12   Q   Were there any Pride fighters who were cut
13 by Zuffa as a result of the Zuffa acquisition?
14   A   I don't recall fighters being cut, no.  I
15 mean, there may have been.  I mean, I know that when
16 we didn't put on events, fighters were saying, "Hey,
17 I want to fight.  I want to fight."  And ultimately
18 when we closed the down the business, we certainly
19 got them fights in the UFC.  There may have been
20 some fighters that we released, let them fight
21 elsewhere.  But I don't remember anyone being cut.
22   Q   When you said that there may have been
23 some fighters that were released, do you know how
24 many fighters were released?
25   A   I don't recall.

148

1       MR. WEILER:  I'd like to mark as an
2 exhibit, Exhibit 77.  Exhibit 77 bears the Bates
3 label ZUF-00375836 going through 5844.  While the
4 exhibit is being marked I will represent for the
5 record that this appears to be a draft settlement
6 agreement.  And plaintiffs could not find an
7 executed version of this agreement.  And the
8 plaintiffs would request for the record, that if an
9 executed and final version of this agreement exists,
10 that it be produced to plaintiffs.
11   A   All right.  I've got the documents.
12       (Exhibit 77 was marked.)
13 BY MR. WEILER:
14   Q   Do you recognize this document, sir?
15   A   It doesn't ring a bell, no.  I mean, I
16 know we settled with them, so this could be a draft
17 of that agreement.
18   Q   When you say you "settled with them," is
19 that a reference to a settlement between Zuffa and
20 Mr. Sakakibara?
21   A   That's correct.
22   Q   And what's your understanding of the
23 settlement that Zuffa entered into with
24 Mr. Sakakibara?
25   A   I really don't remember the specifics of

149

1 what was paid.  He had sued us.  We had sued him.
2 We reached a settlement.  He had sued Spectrum
3 Gaming, and we ended up reaching a settlement.  I
4 don't remember the exact terms of it.
5   Q   I'd direct your attention to page 2 of the
6 settlement.  There's a reference here to a figure
7 $1,167,000.  167 -- strike that.
8       There is a reference here to a figure
9 under the heading Settlement.  Do you know if this
10 figure that's referenced here was paid to
11 Mr. Sakakibara as part of a settlement with him?
12   A   I don't recall what the number was.
13   Q   Did Zuffa pay some money to Mr. Sakakibara
14 as part of the settlement with him?
15   A   I think so.
16   Q   Did Mr. Sakakibara pay any money to Zuffa
17 as part of that settlement?
18   A   I don't think so.
19   Q   Are you familiar with an MMA or former MMA
20 promoter known as Affliction Entertainment Group?
21   A   Yes.
22   Q   What was Affliction?
23   A   Affliction was primarily a clothing brand,
24 sold T-shirts, jeans, jackets, all sorts of sort of
25 apparel.  And at some point they got into the MMA

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

150

```
 1   promotion business.
 2       Q   Did Zuffa acquire Affliction?
 3       A   Yes.
 4       Q   How did Zuffa come to acquire Affliction?
 5       A   Well, just so we are clear, we acquired
 6   some assets from Affliction. We didn't acquire the
 7   clothing brand or the manufacturing facilities and
 8   all that stuff. We acquired a dozen or so fighter
 9   contracts that had a liability of about a million
10   dollars on them. And that was what we really took
11   over. We got a couple of event-related tapes that
12   contained a couple of events that they had done.
13   But we didn't acquire Affliction, the brand, the
14   apparel brand, obviously.
15       Q   You acquired about a million dollars in
16   liability. Does that refer to an event that
17   Affliction had planned?
18       A   Well, it's not really just an event. It
19   would be the fighter contracts, the liability on the
20   fighter contracts themselves. They were doing an
21   event -- they'd done a couple events. They were
22   doing an event that headlined with Josh Barnett and
23   Fedor Emelianenko.
24           Josh Barnett, who had tested positive for
25   performance enhancing drugs in the past was the
```

151

```
 1   subject of a prefight drug test by the California
 2   Athletic Commission. When that drug test was
 3   returned and it was positive, they refused to issue
 4   Josh Barnett -- and this happened just days before
 5   the event -- a license to participate. And as a
 6   result, Affliction canceled the event.
 7           Shortly thereafter, they contacted --
 8   their lawyer contacted me and said, you know, "We're
 9   looking to get out of this business. Would you be
10   interested in acquiring the assets of the company?"
11   And we said we really weren't that interested in it.
12   And they said, "Well, would you just take over the
13   fighter liability and fighter contracts and we'll
14   give you the library?" And so we decided to do it.
15   We also thought it was an opportunity -- because
16   they couldn't assign any relationship with Fedor to
17   us, we thought it would be an entree to finally sign
18   Fedor and get him into the UFC, but that was
19   unsuccessful.
20       Q   I would like to mark as an exhibit,
21   Exhibit 78, a document that appears to be an article
22   published in Cage Potato MMA called "Affliction UFC
23   Truce Falls Apart, UFC Bans Another Brand."
24       A   All right.
25           MS. GRIGSBY: Counsel, I just want to --
```

152

```
 1   is there a date on this besides the print date?
 2           MR. WEILER: Yeah. I will represent for
 3   the record that this is dated October 23rd, 2008.
 4   But I can't for the life of me tell you how I know
 5   that by looking at this exhibit. For the record, a
 6   number of the comments starting at pages 2 and to
 7   page 7 of the document are dated October 23rd, 2008.
 8           (Exhibit 78 was marked.)
 9   BY MR. WEILER:
10       Q   Sir, I'd like to read you the passage from
11   this document, the first paragraph that says "MMA
12   Weekly reports that UFC and Affliction executives
13   met late last month to build a formal partnership
14   that would allow Affliction to return to the UFC as
15   a major clothing sponsor and work with the UFC to
16   create co-branded apparel. In exchange, Affliction
17   would agree to cease operations as a fight promotion
18   and allow the UFC to buy out several of their
19   fighter contracts." Do you see where it says that?
20       A   Yes.
21       Q   Did the UFC have negotiations with
22   Affliction in October 2008 regarding Affliction
23   ceasing its operations as a fight promotion and
24   becoming a sponsor of the UFC?
25       A   I don't remember the exact dates, but the
```

153

```
 1   problem that we have with Affliction is that they
 2   were essentially advertising an MMA brand within our
 3   organization. So obviously, that didn't make any
 4   sense. We weren't going to allow them to come into
 5   our UFC events and have branding that was associated
 6   with another promotion. So we certainly had a
 7   discussion with them, "Listen, if you guys are in
 8   business of promoting MMA events, you're free to
 9   advertise anywhere in the planet you want. But
10   you're not going to be part of our events. If
11   you're not going to be in that business, then maybe
12   we can work on a deal where were we can work
13   together. But we're not going to advertise a
14   competitive brand in our own product. That makes no
15   sense. And no business would ever do that." Those
16   were the nature of the discussions.
17       Q   I see. Who negotiated the -- strike that.
18           Who was the primary negotiator, if anyone,
19   at Zuffa regarding the Affliction negotiation?
20       A   You know, once again, with a small
21   management group, I think all of us were certainly
22   involved in it. When I say "all of us," myself,
23   Kirk Hendrick, John Mulkey, Lorenzo Fertitta, and
24   Dana White. I certainly had a role in negotiating
25   that deal because I had a relationship with the
```

39 (Pages 150 to 153)

**238**

```
  2    STATE OF _____ )
  3                           ) :ss
  4    COUNTY OF _____ )


  7        I, IKE LAWRENCE EPSTEIN, the witness
  8    herein, having read the foregoing
  9    testimony of the pages of this deposition,
 10    do hereby certify it to be a true and
 11    correct transcript, subject to the
 12    corrections, if any, shown on the attached
 13    page.


 15           _____
 16              IKE LAWRENCE EPSTEIN



 20    Sworn and subscribed to before me,
 21    this _____ day of _____, 2016.

 23    _____
 24           Notary Public
```

**239**

```
  1    STATE OF NEVADA )
                      ) Ss
  2    COUNTY OF CLARK )

  4        I, Sarah Padilla, a duly commissioned and
  5    licensed court reporter, Clark County, State of Nevada,
  6    do hereby certify: That I reported the taking of the
  7    deposition of the witness, IKE LAWRENCE EPSTEIN, commencing
  8    on Friday, December 2, 2016, at 11:39 A.M.; That prior to
  9    being examined, the witness was, by me, duly sworn to testify
 10    to the truth; That thereafter I transcribed my shorthand notes
 11    into typewriting and that the typewritten transcript of said
 12    deposition is a complete, true, and accurate record of said
 13    shorthand notes.  I further certify that I am not a relative
 14    or employee of any attorney or counsel of any of the parties
 15    nor a relative or employee of an attorney or counsel involved
 16    in said action, nor a person financially interested in the
 17    action; that a request [x] has [] has not been made to review
 18    the transcript.
 19        IN WITNESS WHEREOF, I have hereunto set my
 20    hand in the County of Clark, State of Nevada, this 22nd
 21    day of December.


           _____
              SARAH PADILLA, CCR 929
```

**240**

                    INSTRUCTIONS TO WITNESS

   Please read your deposition over carefully
and make any necessary corrections. You should state
the reason in the appropriate space on the errata
sheet for any corrections that are made.
   After doing so, please sign the errata sheet
and date it.
   You are signing same subject to the changes
you have noted on the errata sheet, which will be
attached to your deposition.
   It is imperative that you return the original
errata sheet to the deposing attorney within thirty
(30) days of receipt of the deposition transcript by
you. If you fail to do so, the deposition transcript
may be deemed to be accurate and may be used in court.

**241**

                        E R R A T A


   I wish to make the following changes,
for the following reasons:

PAGE LINE
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE: _____
REASON:_____
___ ___ CHANGE: _____
REASON:_____
___ ___ CHANGE: _____
REASON:_____

_____   _____
 WITNESS' SIGNATURE        DATE