# EXHIBIT 123

# Excerpts of the Deposition of Michael Mersch

333

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

```
CUNG LE; NATHAN QUARRY, JON     )
FITCH, on behalf of             )
themselves and all others       )
similarly situated,             )
                                )
            Plaintiffs,         )
                                )
       vs.                      ) Case No.
                                ) 2:15-cv-01045-RFB-(PAL)
                                )
ZUFFA, LLC, d/b/a Ultimate      )
Fighting Championship and       )
UFC,                            )
                                )
            Defendant.          )
_____)
```

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF

MICHAEL P. MERSCH

AFTERNOON AND EVENING SESSIONS (PAGES 333 to 496)

LAS VEGAS, NEVADA

JULY 14, 2017

4:43 p.m.

Reported by:
Jualitta Stewart, CCR No. 807, RPR
Job No. 51253-B

MICHAEL P. MERSCH - CONFIDENTIAL

### 358

1  negotiated meeting of the minds on a new agreement,
2  then the terms of the -- any previously negotiated
3  agreements would be folded into or superseded by the
4  new agreement, you know, to the best of my
5  knowledge.
6     Q.  And you used the term "almost certainly"
7  in this context, "we will almost certainly begin
8  negotiations on a new agreement." Because, again,
9  as we've seen from other documents and you've
10 testified earlier it was Zuffa's practice to
11 renegotiate with fighters that had wanted to
12 continue having a contractual relationship with
13 before the end of their contractual term; is that
14 right?
15    A.  The -- I think the language that I use
16 there was almost because that would certainly be our
17 hope that we would be able to come to and negotiate
18 a mutually agreeable contract that the fighter was
19 comfortable with, that we were comfortable with, and
20 that was mutually beneficial. Obviously we can't
21 guarantee that and, again, I have no independent
22 recollection of the context or other things that
23 were going on at this time, but that would be my
24 guess as to what I -- what I meant by using that
25 language.

### 359

1     Q.  And that was especially true for top
2  stars like Quinton Rampage Jackson, that Zuffa
3  wanted to make sure that Zuffa had business
4  certainty with regard to its top stars so it would
5  attempt to renegotiate its top fighters' contracts
6  before the end of their term, correct?
7     A.  Again, I think that that is a term that
8  may be applicable to -- first of all, I don't know
9  how you would define, you know, what was a top star
10 or, you know, that's a fairly amorphous term. But I
11 think the term really applies to any fighter where a
12 meeting of the minds could be had between the
13 fighter and the company out of mutual desire to
14 extend the terms or to supply out the terms of an
15 existing deal with a more preferential deal.
16    Q.  Zuffa wanted to ensure that the fighters
17 that it wanted to maintain in its fold never got to
18 the end of the terms of their contracts, correct?
19    A.  Well, frankly, it wasn't -- it wasn't
20 just Zuffa. Oftentimes the fighter himself would
21 call and request that -- that they receive a new
22 contract prior to the end of the term of an
23 agreement because invariably -- well, maybe not
24 invariably. Oftentimes, the new contract that they
25 would receive would have enhanced and increased

### 360

1  levels of compensation which is, of course, was an
2  appealing factor to any fighter.
3     But, you know, whether -- you know, there
4  could be any number of factors that each fighter may
5  have felt that worked to their benefit in giving
6  them the position where they would come to Joe Silva
7  or Dana or Lorenzo or myself or any number of people
8  and say, you know, I believe now based on the body
9  of work that I've delivered that, you know, we feel
10 that it's appropriate to enter into a new contract.
11 And oftentimes Zuffa was amenable to that as well
12 because they felt that it was a mutually beneficial
13 decision that benefitted both the company and the
14 fighter.
15    Q.  So what you're testifying to is that
16 Zuffa, it was in Zuffa's interest to enhance the
17 compensation of certain fighters in exchange for the
18 fighters agreeing to another three or four fight
19 deal, correct?
20    A.  It was a negotiated point. Compensation,
21 of course, is a negotiated point in virtually every
22 contract that I'm aware of or monetary -- you know,
23 the amount of money involved in any contract is, of
24 course, an important point. But that would have
25 been amongst any number of other, you know,

### 361

1  important provisions in the contract that may or may
2  not have been renegotiated between the parties.
3  Again, depending on what was important, depending on
4  the -- all the various factors that could go into
5  any individual negotiation with any individual
6  fighter.
7     Q.  So Zuffa comes to a fighter on the
8  third -- between the third and fourth fights of a
9  four-fight deal and says all right, you can fight
10 your fourth fight at "X" dollars or you can sign
11 this new deal, new four-fight deal at "X" plus "Y"
12 dollars, the fighter then has an option to cancel
13 the old contract and sign a new contract and make
14 more money for that next fight; is that right?
15    A.  There could be circumstances that go both
16 ways where Zuffa may present an offer to the fighter
17 or the fighter may come to Zuffa and present a
18 proposal to the UFC that it hopes the UFC will take
19 into consideration. And sometimes the parties were
20 able to come to a meeting of the minds after
21 independent evaluation and sometimes they weren't.
22    But the -- there was, you know, an ebb
23 and flow that went both directions and oftentimes
24 the driving force behind renegotiation or request
25 for a sub -- a superseding agreement came from the

8 (Pages 358 to 361)

362

1  fighter's side and sometimes it came from the Zuffa
2  side.  It just depended on the context, it depended
3  on, you know, a variety of different factors.
4         MR. CRAMER:  All right.  I'd like to have
5  the court reporter mark as Mersch Exhibit 25 the
6  next document.
7         For the record, Mersch Exhibit 25 is a
8  series of e-mails with a Bates range ZFL 2496215
9  through 6216.  It's a July 2012 e-mail exchange
10 between Mr. Mersch, Tracy Long, and Joe Silva.
11        (Whereupon, Exhibit 25 was
12        marked for identification.)
13 BY MR. CRAMER:
14    Q.   Let me know when you've had a chance to
15 review it, and I have some questions about it.
16    A.   Okay.
17    Q.   So turn to the bottom of the first page.
18 Ms. Long writes an e-mail that says, "This is
19 Rampage's last fight."
20        Do you see that?
21    A.   I do.
22    Q.   And you respond -- then Mr. Silva says,
23 "Send him a six-month extension."
24        Ms. Long says, "He's going to fight his
25 last fight."  And you respond yes.

363

1         Is that right?  I'm just reading up the
2  e-mail chain.
3         Did I read that correctly?
4     A.   It looks like -- if you say so.  I don't
5  have any independent recollection of this e-mail
6  chain or exchange, but I don't doubt that -- I don't
7  dispute that it may have occurred.
8     Q.   Well, it was sent from your e-mail
9  address, correct?
10    A.   As I said, I don't have any independent
11 recollection, but I don't dispute that it occurred.
12    Q.   Okay.
13    A.   So.
14    Q.   So it's fair to say Rampage -- Quinton
15 Rampage Jackson was going to fight his last fight,
16 and he had not agreed, at least at that point, to
17 sign a new contract with the UFC; is that right?
18    A.   Again, I don't have any independent
19 recollection.  I wouldn't know, but I suppose that's
20 the inference that can be drawn from reading that
21 e-mail chain.
22    Q.   Okay.  He rejected Zuffa's offers to
23 renegotiate a new contract?
24    A.   I don't know that there were any
25 negotiations, but if there were, apparently no

364

1  meeting of the minds was reached between the parties
2  and he elected to move on.
3     Q.   He elected to fight his last fight, is
4  that right, on the contract and not --
5     A.   That's --
6     Q.   -- sign a new deal?
7     A.   As I testified, that's what the e-mail
8  reads.
9     Q.   So then Ms. Long, if you read up, says,
10 "Need to know if this will be the main event.
11 Jackson gets Pay-Per-View at main event.  Last fight
12 on the card."
13        Do you see that?
14    A.   I do.
15    Q.   And then you say, "Pretty sure it is, but
16 confirm with Joe."
17        Right?  That's what you said?
18    A.   That's what it says on this piece of
19 paper.
20    Q.   And then Silva says, "Not the main
21 event."
22        Correct?
23    A.   That's what it says on this piece of
24 paper.
25    Q.   So Mr. Silva wanted to ensure that

365

1  Jackson, who was fighting his last fight, was not
2  the main event, right?
3     A.   You would have --
4         MR. WILLIAMS:  Object to the form of the
5  question.
6         THE WITNESS:  You would have to talk to
7  Mr. Silva.
8  BY MR. CRAMER:
9     Q.   And as a result of his last fight being
10 not the main event, he didn't get Pay-Per-View
11 dollars under his contract, correct?
12    A.   Again, you would have to talk to
13 Mr. Silva.  I don't have -- and I don't have the
14 particulars of his contract in front of me.
15 Ms. Long makes a reference to that but whether
16 that's accurate or not, I have no individual or
17 independent knowledge related to that.
18    Q.   So as a result of Rampage refusing to
19 sign his new contract with Zuffa, Zuffa punishes him
20 by making sure that his last fight is not a main
21 event and therefore he does not get Pay-Per View
22 dollars; is that right?
23        MR. WILLIAMS:  Object to the form of the
24 question.
25 ///

9 (Pages 362 to 365)

MICHAEL P. MERSCH - CONFIDENTIAL

```
                                                              442
 1   it was expressed to me that anybody in the UFC's
 2   executive team had any -- felt that the individuals
 3   running the Affliction brand of MMA were a threat to
 4   the UFC.  I don't recall that.  And, again, it was
 5   ten years ago, apparently.  But as I sit here today,
 6   I don't have any independent recollection that that
 7   occurred.
 8       Q.   Did you, at some point, gain the
 9   understanding that either you or someone at Zuffa
10   viewed Affliction at this time as Zuffa's main
11   rival?
12       A.   I never gained that understanding.
13            MR. CRAMER:  All right.  I'd like to mark
14   as Mersch Exhibit 39 the next document.
15            (Whereupon, Exhibit 39 was
16             marked for identification.)
17            THE WITNESS:  To the best of my
18   recollection.  So.
19   BY MR. CRAMER:
20       Q.   Mersch Exhibit 39 is a one-page series of
21   e-mails bearing the Bates Number ZFL-2193553.  It's
22   a July 24 and 25, 2009 e-mail chain between
23   Mr. Mersch and Kevin Mulvey with a subject
24   "Affliction."
25            Let me know when you've completed
```

```
                                                              443
 1   reviewing it.
 2       A.   Okay.
 3       Q.   So at the bottom of the chain, there's an
 4   e-mail from you to Mr. Mulvey and Joe Ricca.
 5       A.   Ricca.
 6       Q.   Ricca.  Who is Mr. Mulvey?
 7       A.   Mr. Mulvey and Mr. Ricca worked for a
 8   government relations firm out of Boston,
 9   Massachusetts called Dewey Square Group.
10       Q.   And they were doing business for Zuffa at
11   the time?
12       A.   At -- again, to the best of my
13   recollection timing-wise, I'm not a hundred percent
14   sure, but it wouldn't surprise me if during this
15   time -- and for many many years, I worked with
16   Mr. Mulvey and Mr. Ricca to bring MMA legalization
17   to the state of Massachusetts which prior to this
18   time only permitted boxing and did not permit the
19   promotion of live professional mixed martial arts
20   sporting events.
21       Q.   So Dewey Square was essentially a
22   lobbyist for Zuffa and the UFC at this time,
23   correct?
24       A.   Correct.
25       Q.   Okay.  And you were -- at the first
```

```
                                                              444
 1   e-mail here, the subject is "Affliction," right?
 2       A.   Yeah.
 3       Q.   That's the subject?
 4       A.   Yes.
 5       Q.   And Affliction is the company we've just
 6   been talking about that was exclusively an apparel
 7   company but then at some point in late 2007 or two
 8   thousand and -- or early 2008 became an MMA
 9   promotion, correct?  That's Affliction, correct?
10       A.   I'm sorry, can you repeat that, I
11   apologize.
12       Q.   That's okay.
13            Affliction is the company that we've just
14   been talking about --
15       A.   Yes.
16       Q.   -- in the last document --
17       A.   Correct.
18       Q.   -- that in late 2007 went from being
19   exclusively an apparel company to an apparel company
20   plus an MMA promotion, right?
21       A.   Correct.
22       Q.   And you say to Mulvey and Ricca in July
23   of 2009, "Our main rival is done."
24            Do you see that?
25       A.   H'm-h'm.
```

```
                                                              445
 1       Q.   And you --
 2       A.   Yes.
 3       Q.   You include a website news article from
 4   Sherdog.com.  Sherdog.com is an MMA website; isn't
 5   that right?
 6       A.   Correct.
 7       Q.   And there's a news item entitled,
 8   "Affliction Clothing Back in UFC Fold."
 9            Do you see that?
10       A.   Yes, sir.
11       Q.   And the Affliction clothing was back in
12   the UFC fold because Affliction had stopped the MMA
13   promotion business, correct?
14       A.   I would assume that that was one of the
15   factors, I don't recall all of the details
16   surrounding why -- what -- what negotiations took
17   place between either Dana, Lorenzo, and -- and --
18   and the people that ran Affliction.  But obviously
19   it appears that -- without reading the article, it
20   appears that at some point that that was agreed to.
21       Q.   And when you said "our main rival is
22   done," you were referring to Affliction as an MMA
23   promotion no longer being an MMA promotion, correct?
24       A.   I spoke with Mr. Mulvey and Mr. Ricca on
25   a fairly regular basis in the -- much of what I was
```

29 (Pages 442 to 445)

MICHAEL P. MERSCH - CONFIDENTIAL

446

1  doing there was keeping them abreast of current
2  events related to the company to make sure that they
3  understood, you know, the business interest of the
4  company that were going on and any major
5  developments that had happened.
6       And, again, I may have been referring to
7  that but, again, I certainly can appreciate what
8  context or other circumstances existed at that time
9  or what I may have been speaking with them about in
10 referring to them in that -- in that -- that regard.
11      But again, I think the general nature of
12 my e-mail was to pass along that the relationship
13 between Affliction and the UFC had apparently been
14 repaired.
15      Q.   Affliction didn't go out of business,
16 correct?
17           MR. WILLIAMS:  Objection to the form of
18 question.
19           THE WITNESS:  I have no knowledge -- not
20 to the best of my knowledge.
21 BY MR. CRAMER:
22      Q.   They continued to be an apparel company,
23 correct?
24      A.   To the best of my knowledge.
25      Q.   Right?  Now they were back in the UFC

447

1  fold, that's what the article reports, correct?
2       A.   As of the date of this e-mail, that would
3  be -- I would believe that would be accurate.
4       Q.   So when you're saying our main rival is
5  done, your mean -- you mean that Affliction was no
6  longer an MMA promotion, it's just a clothing
7  company, right?
8       A.   I think that I would have -- I would
9  characterize it as Affliction elected to stop
10 promoting the sport of mixed martial arts and they
11 negotiated whatever they may have negotiated with
12 either Dana White or Lorenza Fertitta to engender
13 themselves back into being a brand that they were
14 comfortable with sponsoring within the UFC
15 ecosphere.
16      Q.   And this -- you viewed this as great news
17 for the UFC, right?  That Mulvey says to you, Wow,
18 short-term, long-term ramifications."
19           And you say, "Any ramifications are good
20 for us.  We're going to get most of their fighters.
21 They only have 22 fighters."
22           Do you see that?
23      A.   I do.
24      Q.   So as a result of Dana and Lorenzo
25 negotiating with Affliction to have Affliction drop

448

1  their MMA promotion, looks like the UFC is now going
2  to be able to take all of Affliction's fighters,
3  right?
4       A.   Well, apparently, again, I don't have any
5  independent recollection regarding what was
6  happening at this particular time, but apparently
7  the inference that I would draw from reading this
8  e-mail would be that the UFC had entered into an
9  agreement to purchase some or all of the assets of
10 Affliction's MMA-related assets.
11      Q.   And then you say, "The primary reason is
12 to make it easier for us to sign Fedor, the crazy --
13 crazy Russian heavyweight so we can match him
14 against Randy and Brock.
15           Do you see that?
16      A.   I do.
17      Q.   Fedor was Fedor Emelianenko?
18      A.   I'm sure it was.
19      Q.   And Fedor Emelianenko was with
20 Affliction?
21      A.   I would infer that from -- from the
22 context of the e-mail.  I don't -- at that time, I
23 wouldn't know who he was officially, you know,
24 contracted to, but one could infer that.
25      Q.   And Randy and Brock were two UFC

449

1  heavyweight fighters, correct?
2       A.   Yes.  Randy Couture, I believe that would
3  refer to and Brock Lesnar.
4       Q.   And you say a little bit further down,
5  "Things are looking good.  This was a big day for
6  the UFC."
7            Do you see that?
8       A.   I do see that.
9       Q.   And it was a big day for the UFC because
10 their main rival was out of the UFC promotion
11 business and the UFC could get most of their
12 fighters, correct?
13      A.   Honestly, I don't under -- I couldn't
14 possibly understand or tell you what my motivation
15 was for opining that that particular day which was
16 July 25th of 2009, eight years ago, why that was
17 big today or what my -- what -- you know,
18 conclusions or what, you know, information went into
19 my making that, you know, giving that opinion.
20           But, you know, certainly the fact that
21 the UFC was able to negotiate a, you know, an asset
22 purchase agreement for some of the assets of
23 Affliction's MMA business, apparently at that time I
24 thought that that was, in my opinion, good -- good
25 for the overall health of the company.  Because it

30 (Pages 446 to 449)

MICHAEL P. MERSCH - CONFIDENTIAL

490

1   A.   1220 South Commerce Street, Suite 120,
2   Las Vegas, Nevada 89102.
3   Q.   What's the name of the company that you
4   work for?
5   A.   One of the companies that I provide
6   consulting and business services for at that address
7   is called -- well, there are a multitude of
8   companies, there's a variety, but they're
9   generically referred to collectively as the Focus
10  Companies.
11  Q.   And the Focus Companies are located at
12  the address you just gave?
13  A.   That's correct.
14  Q.   And what is the general business purpose
15  of the Focus Companies?
16  A.   There's a variety of business purposes
17  for the companies.  There's about 40 of them that, I
18  think, are registered at that address that cover a
19  variety of different businesses.
20  Q.   Are you an employee or an independent
21  contractor?
22  A.   I am an employee for some -- for one of
23  the companies.
24  Q.   And you're an independent contractor for
25  others?

491

1   A.   I'm an independent contractor for a
2   number of people, correct.
3       MR. CRAMER:  All right.  That's all the
4   questions I have.  Thank you.
5       THE VIDEOGRAPHER:  Questions?
6       MR. CRAMER.  No questions.
7       THE VIDEOGRAPHER:  This concludes today's
8   deposition of Michael Mersch.  Total number of media
9   used is seven.
10      We are off the record at 8:27 p.m.
11      (Thereupon, the taking of the deposition
12           concluded at 8:27 p.m.)

492

1
2   STATE OF _____ )
3                           ) :ss
4   COUNTY OF _____)
5
6
7       I, MICHAEL P. MERSCH, the witness
8   herein, having read the foregoing
9   testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15      _____
16      MICHAEL P. MERSCH
17
18
19
20  Sworn and subscribed to before
21  me, this        day of
22          , 2017.
23
24  _____
25      Notary Public

493

1       REPORTER'S DECLARATION
2   STATE OF NEVADA    )
                       ) ss
3   COUNTY OF CLARK    )
4
5       I, Jualitta Stewart, a duly commissioned
6   Notary Public, Clark County, State of Nevada, do
7   hereby certify:
8       That I reported the taking of the
9   deposition of the witness, MICHAEL P. MERSCH,
10  commencing on Friday, July 14, 2017, at the hour of
11  4:43 p.m.
12      That prior to being examined, the witness
13  was by me duly sworn to testify to the truth, the
14  whole truth, and nothing but the truth.
15      That I thereafter transcribed my said
16  shorthand notes into typewriting and that the
17  typewritten transcript of said deposition is a
18  complete, true, and accurate transcription of said
19  shorthand notes taken down at said time.
20      I further certify that I am not a
21  relative or employee of any party involved in said
22  action, nor a person financially interested in the
23  action.
24      IN WITNESS WHEREOF, I have hereunto set
25  my hand and affixed my official seal in my office in

41 (Pages 490 to 493)

MICHAEL P. MERSCH - CONFIDENTIAL

```
                                            494
 1   the County of Clark, State of Nevada, this 1st day
 2   of August, 2017.
 3
 4
             JUALITTA STEWART, RPR, CCR No. 807
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                            495
 1              INSTRUCTIONS TO WITNESS
 2
 3       Please read your deposition over carefully
 4   and make any necessary corrections. You should state
 5   the reason in the appropriate space on the errata
 6   sheet for any corrections that are made.
 7       After doing so, please sign the errata sheet
 8   and date it.
 9       You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12       It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

```
                                            496
 1                  E R R A T A
 2
 3
 4
 5      I wish to make the following changes,
 6   for the following reasons:
 7
 8   PAGE LINE
 9   ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE:_____
14   REASON:_____
15   ___ ___ CHANGE: _____
16   REASON:_____
17   ___ ___ CHANGE: _____
18   REASON:_____
19   ___ ___ CHANGE: _____
20   REASON:_____
21
22   _____   _____
23      WITNESS' SIGNATURE         DATE
24
25
```

42 (Pages 494 to 496)