Eric L. Cramer (admitted *pro hac vice*)
Michael Dell'Angelo (admitted *pro hac vice*)
Ellen Noteware (admitted *pro hac vice*)
Patrick F. Madden (admitted *pro hac vice*)
Najah Jacobs (admitted *pro hac vice*)
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: +1 (215) 875-3000
Email: ecramer@bm.net
Email: mdellangelo@bm.net
Email: enoteware@bm.net
Email: pmadden@bm.net
Email: njacobs@bm.net

*Co-Lead Counsel for the Bout Class and Attorneys
for Individual and Representative Plaintiffs*

[Additional Counsel Listed on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| **Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,**<br><br>**Defendant.** | **No.: 2:15-cv-01045-RFB-BNW**<br><br><br>**PLAINTIFFS' TRIAL BRIEF** |

The Plaintiffs, by and through undersigned counsel, respectfully submit this Trial Brief, in accordance with the Court's Joint Stipulated Pre-Trial Schedule, ECF No. 967.

## I.    INTRODUCTION

Named Plaintiffs Cung Le, Jon Fitch, Kyle Kingsbury, Javier Vasquez, and Brandon Vera are five professional mixed martial arts ("MMA") fighters ("Representative Plaintiffs"). They bring their claims under Section 2 of the Sherman Act. They claim that the defendant Zuffa, LLC ("Zuffa")—also known as the "Ultimate Fighting Championship" or the "UFC"—has engaged in a scheme (the "Scheme") to acquire and maintain monopsony power in the market for elite professional MMA fighter services.

MMA is a combat sport. It combines techniques from a host of fighting disciplines, including boxing, wrestling, karate, muay thai, Brazilian jujitsu, and judo. As in boxing, fights take place in rounds for which fighters receive points. A bout ends when time expires—at which time one fighter wins on points—or when one fighter is knocked out, submits, loses consciousness (including from a chokehold), or is disqualified.

Like in boxing, MMA fighters are ranked. Those rankings help promoters to make matches, including selecting opponents for championship bouts. Unlike in boxing, no independent sanctioning authority awards championships. The UFC determines its own champions and permits only UFC fighters to compete for its championships.

The Representative Plaintiffs are former MMA fighters who competed for the UFC. They represent a certified class (the "Class") consisting of over 1,200 MMA fighters defined as:

> All persons who competed in one or more live professional UFC-
> promoted MMA bouts taking place or broadcast in the United
> States from December 16, 2010 to June 30, 2017 [the "Class
> Period"]. The [] Class excludes all persons who are not residents

1
2

or citizens of the United States unless the UFC paid such person for competing in a bout fought in the United States.[1]

3   All the facts set forth below relate to events and circumstances before July, 1, 2017. Zuffa
4   is an MMA promoter (or promotion). It hosts and promotes events made up of a series of fights
5   between MMA athletes. Unlike the owners of teams in many other professional sports, it does
6   not have its own arenas, stadiums, TV stations, or cable channels. During the Class Period, it did
7   not own its own training facility. And its fighters are not employees; they are independent
8   contractors. Zuffa is in effect an event-planning and advertising agency.

9   Zuffa nonetheless has been able to dominate the sport of MMA through an unlawful
10  Scheme with three components: (1) acquisitions; (2) exclusive contracts; and (3) coercion.

11  *Acquisitions*. Zuffa has acquired and maintained monopsony power by repeatedly
12  purchasing its actual and potential rivals and shutting them down. That not only eliminated its
13  competition, but also greatly increased the number of fighters it controlled. The executives of
14  promotions Zuffa acquired typically agreed not to compete with it for several years after the
15  acquisition.

16  *Exclusive Contracts*. Zuffa locked up the fighters it controlled in long-term, exclusive
17  contracts, including fighters it acquired by buying other promotions. Zuffa locked up the vast
18  majority of elite MMA fighters in long-term deals. That deprived potential rivals of access to a
19  critical mass of top fighters and thereby prevented other potential MMA promotions from
20  holding equivalent competitive MMA events, and from attracting other elite MMA fighters. Elite
21  MMA fighters advance their careers by competing for titles against other elite MMA fighters.
22  Without access to sufficient elite fighters, and given Zuffa's Scheme, no other promoter could
23  attract the athletes necessary to compete with Zuffa.

24  *Coercion*. Zuffa also coerced its fighters to renew their contracts before they expired,
25  using threats, including that the fighters would lose opportunities to compete, would be offered

26

27  [1] *Le v. Zuffa, LLC*, 2023 WL 5085064, at *1 (D. Nev. 2023).

28

future contracts with unfavorable terms, or would face undesirable—even dangerous—opponents. Zuffa controlled every aspect of a fighter's career and livelihood. It used that leverage to keep fighters locked in. That rendered its exclusive contracts in effect perpetual, lasting as long as Zuffa wanted.

Plaintiffs will offer evidence demonstrating that Zuffa's Scheme violated federal antitrust law and enabled Zuffa to pay its athletes—MMA fighters—far less than their market value. The market value of professional fighters, like other athletes, relates directly to the money they generate when they compete. Plaintiffs seek as financial damages the difference between the amount that Zuffa paid the Class Members during the Class Period and the amount they would have received without its Scheme—for a recovery of between $894 million and $1.6 billion.

## II.    STATUS OF CASE

Trial in this matter is scheduled to begin on April 15, 2024 before the Honorable Richard F. Boulware, United States District Judge, District of Nevada. Plaintiffs anticipate that they can present their case in chief on behalf of the Class in 10 to 12 trial days. Absent any unexpected stipulations from the Defense, the Plaintiffs anticipate calling approximately 25 to 35 witnesses.

Plaintiffs are serving subpoenas on certain of the witnesses they intend to call at trial. Because several witnesses reside outside Nevada or are otherwise unavailable, the Plaintiffs intend to offer into evidence their deposition testimony.

The parties are in the process of meeting and conferring on deposition designations and objections thereto. In Plaintiffs' case in chief, they also intend to offer into evidence (a) the testimony of the Representative Plaintiffs and other fighters, (b) the testimony of Zuffa's current and former executives and employees, (c) the testimony of other witnesses knowledgeable about the industry, the Scheme, and its effects, (d) detailed documentary evidence, including internal email messages, text messages, and memoranda documenting Zuffa's Scheme and its harmful effects on rivals, competition, and the market, (e) videos of mixed martial arts fights, and televised interviews and public statements given by Zuffa's executives, (f) summary evidence, including of Zuffa's fighter contracts and their restrictive and exclusionary terms, pursuant to

Federal Rules of Evidence 1006, and (g) expert testimony, the subject of which the parties have litigated extensively before trial. The parties also anticipate offering into evidence factual stipulations.

By Order of the Court (ECF No. 967), the parties exchanged a list of proposed motions *in limine* ("MILs") on February 12, 2024. They met and conferred about those motions on February 16, 2024 to narrow their disputes. The parties will continue to exchange lists of proposed MILs and to meet and confer. For the unresolved issues, on February 28, 2024, the parties will file a series of MILs with the Court. Responses to MILs are due March 13, 2024.

## III.   ANTICIPATED EVIDENTIARY DISPUTES

At this juncture, Plaintiffs believe the MILs will address the significant evidentiary issues that may arise at trial. That said, Plaintiffs identify the following general issues for the Court:

### A.   Evidence of Events Before the Class Period

#### 1.   Continuing violation doctrine.

Zuffa has indicated that it may seek to exclude evidence of its conduct before the Class Period, including, for example, its various acquisitions of other MMA promoters. But that evidence is admissible under the continuing violation doctrine. It provides that plaintiffs may prove liability based on conduct that pre-dates the statutory period if: (1) a defendant's acts caused new injuries during the statutory period, and (2) those acts operate *in concert*. *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014); *see also See Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 713, 720–21 (W.D. Tenn. 2022) (considering pre-limitations-period acquisitions "because Plaintiffs sufficiently allege a continuing violation of other, non-acquisition, anticompetitive conduct supporting its monopolization and conspiracy claims").

Here, as explained below, Plaintiffs anticipate presenting evidence, including expert testimony, that Zuffa's Scheme caused numerous forms of harm during the Class Period, including degrading the quality of MMA events, inflating prices to consumers, deflating the

number of MMA events, and deflating compensation to fighters. This Court has found that Plaintiffs' evidence can establish that Zuffa's Scheme caused injuries during the Class Period. *Le*, 2023 WL 5085064, at *28-*41.

Further, as also explained below, Plaintiffs intend to present evidence that the three components of Zuffa's Scheme—acquisitions, exclusive contracts, and coercion—operated in concert to lessen competition and injure Class Members. This Court has found that the components of Zuffa's Scheme should be considered as a whole. *Le*, 216 F. Supp. 3d at 1168 (quoting *Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 886 (9th Cir. 2008) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

Under these circumstances, Plaintiffs can rely on *all* of Zuffa's exclusionary conduct in furtherance of the Scheme—including acts that took place before the statutory period—to establish its liability and to prove their damages during the Class Period. *See In re Google Digital Advert. Antitrust Litig.*, No. 20-cv-3556, 2021 WL 2021990, at *5 (N.D. Cal. 2021) (holding plaintiffs can rely on acquisitions that occurred before the statutory period in support of liability provided those "acquisitions were made *in concert with* the company's other anticompetitive conduct") (emphasis added); *see also Oliver*, 751 F.3d at 1086; *Jones*, 618 F. Supp. 3d at 720–21.

### 2. Evidence that Zuffa refused to produce.

Plaintiffs anticipate moving to exclude evidence that Zuffa refused to produce from before the Class Period. In particular, Zuffa refused to search for or produce documents that pre-date January 1, 2005 on various subjects, claiming such discovery "stretches well beyond the period which is the basis of the present action." Defendant's Responses to Plaintiffs' First Set of Requests for Production of Documents. In meet and confer correspondence, Zuffa refused even to preserve documents going back to 2000. *See* Plaintiffs' August 25, 2015 Meet and Confer

Letter. In the hearing on the Relevant Time Period on November 17, 2015, Zuffa told the Court that it had hard copy materials in its possession concerning a "smorgasbord of things" dating back to 2000, but that it would be too burdensome to search for and review such materials of "marginal relevance." ECF No. 200 (Hrg. Tr. at 11). Plaintiffs anticipate moving to exclude the categories evidence from Zuffa that it refused to produce in discovery.

## B.     Evidence of Events after the Class Period

Zuffa has indicated that it may seek to introduce evidence of market conditions after the close of the Class Period. Zuffa has raised this issue before and lost. It has offered no authority for the proposition that Plaintiffs need to show that Zuffa's monopsony power endured after the Class Period to prove their case. *See* ECF Nos. 884 at 10 & 914. Nor do Plaintiffs seek damages for compensation they received after the Class Period. Nor yet do they seek injunctive relief in *Le*. ECF No. 947. This Court has recognized that Plaintiffs do not rely on any evidence about market conditions from after June 2017 to prove their claims in *Le*,[2] and that such evidence must be relevant to be admissible.[3] It is not. This case is like many others in which courts have excluded post-class period evidence as irrelevant.[4]

---

[2] Tr. of Nov. 21, 2023 Hearing at 8 ("If their theories or models as relates to monopsony were based upon years of econometric study that said one of the best ways for us to understand a monopsony is to look two or three afterwards because it affects our lag, that would be one thing. Then there would be potentially a basis for me to consider that. They didn't say that.").

[3] Tr. of Nov. 21, 2023 Hearing at 11 ("The inquiry is during the class period did Zuffa have monopsony power, and to the extent that there's evidence offered outside of the class period, there would have to be relevance for that as it relates to theories about monopsony power related to this case.").

[4] *See e.g., Wade v. WellPoint, Inc*., 892 F. Supp. 2d 1102, 1134 (S.D. Ind. 2012) (holding that events from after the class period "bear no relevance" to the claims and defenses in the case); *Doe v. Stephen*, No. 320CV00005SHLHCA, 2022 WL 4182197, at *4 (S.D. Iowa July 27, 2022) (excluding as irrelevant "evidence . . . that came into existence after the class period"); *Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 278-281 (S.D.N.Y. 2015) (excluding evidence from after the class period as irrelevant). *See also Lawrence E. Jaffe Pension Plan v. Household Int'l Inc*., No. 02 C 5893, 2009 WL 10758412, at *4 (N.D. Ill. Mar. 11, 2009) (barring references at trial to "unsubstantiated post-class period allegations").

### C.      Evidence of Monopoly Power

Zuffa has indicated that it will seek to exclude evidence of Zuffa's monopoly power. Plaintiffs should be permitted to present such evidence because it is relevant to the efficacy of Zuffa's Scheme and its anticompetitive effects. For example, Zuffa's monopoly power confirms its monopsony power, a point on which economists for Plaintiffs and Zuffa agree.[5] Zuffa's monopoly power is relevant—but not necessary—to prove Plaintiffs' antitrust claims based on Zuffa's monopsony power. *O'Bannon v. NCAA*, 802 F.3d 1049, 1070-71 (9th Cir. 2015) (monopsony claim does not require proof of monopoly power); *McNeil v. Nat'l Football League*, 790 F. Supp. 871, 895-96 (D. Minn. 1992) (evidence of monopoly power in professional sports bolsters evidence of monopsony power).

## IV.    LEGAL FRAMEWORK: PLAINTIFFS' ANTITRUST CLAIMS

### A.      Elements of a Section 2 Claim

1.      **Monopsony (or Monopoly) Power**. The first element of a Section 2 claim is monopsony or monopoly power. *Le v. Zuffa, LLC*, 2023 WL 5085064, at *15 (D. Nev. 2023) (citing *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320, 322 (2007); *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997)). Proof of monopsony power alone suffices. *O'Bannon*, 802 F.3d at 1070-71. Plaintiffs can prove such power through direct or indirect (circumstantial) evidence. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Plaintiffs intend to use both forms of evidence.

a.      **Direct evidence**. A buyer has monopsony power if it can pay lower than competitive prices, including lower than competitive compensation to

---

[5] Plaintiffs anticipate that Professor Singer will testify that Zuffa's monopoly power is evidence of its monopsony power. One of Zuffa's economists, Dr. Robert Topel, has conceded that a monopolist in the sport of elite professional MMA would also be a monopsonist. Deposition of Robert Topel (December 5-6, 2017) (Transcript at 464:2-14).

workers. *O'Bannon*, 802 F.3d at 1070-71. Plaintiffs can establish monopsony power by showing anticompetitive effects, including through evidence of deflated pay, output, or quality. *Ind. Fed'n of Dentists*, 476 U.S. at 460-61; *Rebel Oil*, 51 F.3d at 1434. Plaintiffs intend to introduce evidence showing that Zuffa paid fighters less than they would have received without the Scheme, and also evidence of reduced output and quality.

        b.    **Circumstantial evidence**. Plaintiffs can also prove monopsony power through circumstantial (indirect) evidence, including that a buyer has a high market share and that there are high barriers to entry by rivals. *Rebel Oil*, 51 F.3d at 1434. Plaintiffs will seek to introduce evidence showing that Zuffa had a high market share in the market for the purchase of elite MMA fighter services, and that there were high barriers to rivals, most notably created by Zuffa's Scheme. Plaintiffs will introduce evidence of a broader market including promoters with fighters ranked 1-650 in different weight classes and a "headliner" submarket including promoters with fighters ranked 1-15 in different weight classes. Plaintiffs will show that Zuffa had dominant shares in both the broader market and the submarket.

## B.    Anticompetitive Conduct

The second element is anticompetitive conduct. *Le*, 2023 WL 5085064, at \*15 (citing *Weyerhaeuser*, 549 U.S. at 320; *Am. Pro.*, 108 F. 3d at 1151). It is the willful acquisition or maintenance of monopsony power through exclusionary conduct. *Id*. Courts have adopted a burden-shifting model for assessing evidence of anticompetitive conduct. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

        1.    **Anticompetitive: Plaintiffs' Initial Burden**. A plaintiff has an initial burden to show a defendant engaged in anticompetitive conduct that had anticompetitive effects. *Qualcomm*, 969 F.3d at 991. In deciding whether Plaintiffs carry this burden, the Court should consider defendant's conduct as a whole, not each of its components taken in isolation. *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1168 (D. Nev. 2016) (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)); *Costco Wholesale Corp. v. Maleng*, 522

F.3d 874, 886 (9th Cir. 2008); *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992)); *see also Twin City Sportservice, Inc. v. Finley & Co., Inc.*, 676 F.2d 1291, 1302 (9th Cir. 1982). Plaintiffs will seek to introduce evidence showing that Zuffa's Scheme was anticompetitive and had anticompetitive effects.

2.    **Procompetitive: Defendant's Responding Burden**. A defendant then may offer business justifications for its conduct if they are both (i) nonpretextual and (ii) procompetitive. *Qualcomm*, 969 F.3d at 991. The defendant must show its justifications actually motivated it. *Id*. The defendant also must show its conduct actually benefited competition. *Id.*; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992). Zuffa has indicated that it will present evidence that its Scheme had procompetitive effects.

3.    **Pretext, Not Procompetitive, or Balancing: Plaintiffs' Ultimate Burden**. If a defendant asserts procompetitive justifications, a plaintiff then must show: (i) they are pretextual *or* not procompetitive; *or* (ii) the conduct's anticompetitive effects outweighed its procompetitive effects. *Eastman Kodak*, 504 U.S. at 483; *Qualcomm*, 969 F.3d at 991; *Image Tech Servs., Inc. v. Eastman Kodak*, 125 F.3d 1195, 1212-15 (9th Cir. 1997); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001). Plaintiffs intend to offer evidence showing that Zuffa's asserted justifications are not procompetitive, are pretextual, or both. Further, Plaintiffs will offer evidence that Zuffa has not quantified any asserted procompetitive effects of its Scheme, in contrast to its significant anticompetitive effects, which Plaintiffs experts will show deprived fighters of compensation of between $894 million and $1.6 million (among other anticompetitive effects).

C.    **Causation of Antitrust Injury to Plaintiffs**

The third element is causation of antitrust injury to Plaintiffs. *Le*, 2023 WL 5085064, at *15 (citing *Weyerhaeuser*, 549 U.S. at 320; *Am. Pro.*, 108 F.3d at 1151). It suffices that a defendant's anticompetitive conduct enabled it to pay lower than competitive compensation. *O'Bannon*, 802 F.3d at 1070-71. Plaintiffs will offer evidence that Zuffa's Scheme enabled it to

pay fighters compensation that was below competitive levels—that Zuffa paid about 20% of its event revenues to its fighters whereas the Class Members would have received about 50% or more without Zuffa's Scheme.

### D.   Damages.

In addition to establishing a defendant's liability, Plaintiffs must provide a reasonable estimate of their damages. *Le*, 2023 WL 5085064 at *41 (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Plaintiffs will offer evidence that without the Scheme, Zuffa would have paid its Class Members between $894 million and $1.6 billion more than it did during the Class Period.

## V.   STATEMENT OF FACTS

### A.   The Anticompetitive Scheme

Plaintiffs intend to prove that Zuffa's Scheme consists of three anticompetitive components: acquisitions; exclusive contracts; and coercion. Plaintiffs intend to show the Scheme as a whole—*i.e.*, the components taken together—had multiple anticompetitive effects, but one unifies them: they deprived elite MMA fighters of the opportunity to offer their services to multiple reasonably equivalent bidders. The result was the fighters received far lower compensation than they would have without the Scheme.

#### 1.   Acquisitions of Potential Rivals: buy them up to shut them down.

The first prong of Zuffa's Scheme consisted of acquisitions. Zuffa engaged in a string of acquisitions to acquire and maintain monopsony power. Plaintiffs will offer evidence that it did so to shut competitors down and prevent them from posing a competitive threat. As a result of these acquisitions (and other aspects of the Scheme), it accumulated more fighters under exclusive contract than it could offer fights. The result was not to improve MMA—as a sport or as a business—but to eliminate actual or potential competition and to reduce the number of live elite MMA events. A consequence was that top fighters had no choice but to take whatever compensation Zuffa would offer them. There was no credible alternative buyer of their services to drive pay toward the value of the athletes' services in a competitive market.

1    Zuffa's key anticompetitive buying spree ran from 2006 to 2011. The evidence will show

2  it acquired among other MMA promotions:

3         • World Fighter Alliance (WFA) in 2006, which then disappeared into the UFC.

4         • World Extreme Cagefighting (WEC) in 2006, which also then disappeared.

5         • Pride in 2007, which also disappeared.

6         • Strikeforce in 2011, which also disappeared.

7    The evidence will show that Zuffa did not make these acquisitions to strengthen MMA,

8  but instead to stifle competition, including for elite MMA fighter services. For example,

9  Plaintiffs will seek to introduce into evidence an email message from Thomas Paschall, a UFC

10  attorney, discussing the Pride buy-out. It confirms that Zuffa bought Pride strategically to

11  preempt competition, to shut it down, and to lock up more fighters in the UFC's exclusive

12  contracts. Here is the email:



(ZUF-00031544) (PTX-0002)

25    By 2011, Strikeforce was the UFC's only remaining potential rival. It had some top

26  talent, including one of the Representative Plaintiffs, Cung Le. Zuffa acquired Strikeforce too.

Before the sale, Scott Coker, who ran Strikeforce, explained the significance of the potential

acquisition to Shannon Knapp, who ran another small promotion, Invicta FC. That email states:



(ZFL-2469208) (PTX-0039)

Coker's email proved prescient. He was right that the lack of any remaining competition

for the UFC would mean that "fighters purses"—that is, fighter pay—"will go down." With no

comparable promotion available to compete with UFC for elite MMA fighter services, the

fighters had no choice but to accept the purses that UFC offered. Coker identified Strikeforce as

Luke Skywalker and the UFC as Darth Vader and the Death Star. The evidence will show that

Darth Vader won.

Plaintiffs intend to introduce evidence demonstrating that the result was Zuffa came to

dominate MMA through its acquisitions. In 2013, Deutsche Bank, a prominent investment bank

retained by UFC, so observed. In doing so, it was subject to the usual requirements of candor

when it reported the following to investors:



Deutsche Bank Leveraged Finance Credit Report (9/20/13)
(DB-ZUFFA-00006389 at 6403) (PTX-0016 at p.15 of 69)

Zuffa's own bank thus recognized that Zuffa obtained and maintained its dominance in part through acquisitions.

### 2.   Exclusive Contracts.

The second prong of Zuffa's Scheme consisted of long-term, exclusive contracts. Plaintiffs will offer evidence that those contracts contained various provisions that enabled it to extend them for a term longer than most fighters' careers. Further, the contracts were exclusive—they did not allow athletes to fight for other promoters. The relevant contractual provisions include:

*Exclusivity*. Fighters were not permitted to fight for any other promoter—or against athletes in contracts with other promoters—while under contract or in exclusive negotiations with Zuffa.

*Long Initial Term*. The evidence will show that as Zuffa's monopsony power increased, so did the base length of its contracts, routinely lasting well more than three years, considering extensions and other terms listed below. Moreover, the evidence will show

that the higher ranked fighters were locked up in even longer deals. As discussed below, the contracts lasted effectively in perpetuity because of other terms and coercion.

*Extensions*. The contracts allowed Zuffa to extend its contracts under many circumstances, including if a fighter was injured, declined a fight, won a championship, or retired.

*Exclusive Negotiation*. If the term were ever to end, the contracts required that fighters negotiate exclusively with Zuffa for one to three months before even negotiating with another promoter.

*Right to Match*. The contracts also gave Zuffa up to a year after the end of the Exclusive Negotiation Period to match any competing offer from another promoter, delaying a fighter's ability to fight for anyone else and decreasing the incentive for other promoters to bid for fighters' services.

The evidence will show that the ultimate result was that by 2007 Zuffa's contracts lasted longer on average than the average fighter career in the UFC. Professor Singer studied this issue extensively, and produced the following figure to illustrate this point:



Case No.: 2:15-cv-01045-RFB-BNW

PLAINTIFFS' TRIAL BRIEF

Professor Singer, an expert economist, analyzed the average length of fighters' contracts and careers. He created the above graph. It shows that as Zuffa's market share increased—including through acquisitions—elite MMA fighters on average were locked up in contracts that lasted longer than their careers in top level MMA. The evidence will show that champions had somewhat longer careers on average, but they were constrained by Zuffa's championship clause and its other coercive practices, depriving them of any opportunity for competitive bidding for their services. Indeed, as noted above, the higher the rank of the fighter, the longer the typical term of the contract measured in both bouts and years.

### 3.   Coercion.

Zuffa used its extensive leverage over every aspect of fighters' careers to force them to re-sign before they could ever reach the end of their contracts. In this way the contracts lasted forever, if Zuffa wanted them to do so.

Plaintiffs intend to introduce evidence demonstrating that Zuffa coerced fighters to sign new contracts before their old ones expired. The result was that Zuffa's contracts were long on paper and perpetual in practice.

The evidence will show that one form of coercion was forcing athletes to re-sign before the end of their contracts on pain of being forced into undesirable bouts. The following email from one of Zuffa's main matchmakers and contract negotiators, Joseph Silva, to Dana White (the UFC's President) illustrates this point:



## Coercion

> I lowballed them on purpose the first offer knowing they would turn it down. How about I come back with 29+29 32+32 35+35 38+38.
> If they turn it down I put him in a prelim against a really tough guy for his last fight.

(ZFL-1421551) (PTX-0012)

Joseph Silva revealed Zuffa's strategy. It offered relatively low compensation. If a fighter accepted, the result was low pay. If the fighter declined, he or she would be put in a bout on an undesirable part of the card—in the preliminary event rather than the main event—and against an undesirable opponent—"a really tough guy"—who could put the fighter's health at risk.

Dana White later confirmed Silva's use of coercion:

16

## Threat of Retaliation

> "I can tell you this man, **if you call Joe Silva and turn down a f\*\*\*ing fight, you might as well say 'f\*\*\*ing rip up my contract**.' He will … yeah. He's a mean little f\*\*\*cker. You don't call Joe Silva and tell him you don't want to f\*\*\*ing fight anybody man. You might as well just take the fight, 'cuz, **it's gonna be worse if you [refuse]**."
>
> Dana White (2013)

(PTX-0010)

As this statement by Dana White confirms, fighters did not have a viable alternative to re-signing with Zuffa and accepting the fight Joseph Silva offered them. They had no meaningful choice. Silva would punish any resistance.

The same coercion applied with particular force to champions. Michael Mersch, Zuffa's Assistant General Counsel, explained in 2011, in discussing a particular fighter, that as a practical matter Zuffa's contracts never end:

17

## Coercion





(ZFL-1404974 at 976) (PTX-1170 at page 3 of 5)

As the email shows, Zuffa's coercion meant that it contracts lasted as long in practice as it wanted.

The Representative Plaintiffs anticipate testifying at trial about their own personal experiences with Zuffa's coercion. They will explain how Zuffa used its leverage over them with respect to every aspect of their careers to block them from ever leaving against Zuffa's will. They will testify further that the acquisitions, contracts, and coercion prevented them from regularly seeking or receiving offers for their services from multiple equivalent promoters that would have increased their compensation.

Case No.: 2:15-cv-01045-RFB-BNW

PLAINTIFFS' TRIAL BRIEF

Evidence of the ultimate effects of Zuffa's Scheme is found in a 2016 communication between Zuffa and the Raine Group, an investment firm hired by Zuffa. As part of Raine's due diligence process, it asked Zuffa about its ability to retain fighters. Zuffa's response was extraordinary:



(CG-UFC-00000005, Item 204) (PTX-0007, at cell H262)

According to Zuffa, its management did not even bother to analyze its fighter retention because it had never lost an athlete it wanted to keep. By Zuffa's own admission, its Scheme was devastatingly successful.

Zuffa's anticompetitive purpose is evident from a text message from Lorenzo Fertitta, one of Zuffa's owners, to Dana White. It read:

1

2

## UFC Choked Out Competition

3

4



Lorenzo Fertitta text to Dana White on Zuffa's re-signing of
Gilbert Melendez and signing of Eddie Alverez from Bellator
(Feb. 25, 2014)
(ZFL-1872579) (PTX-0068)

12      The evidence will show that Mr. Fertitta was referring to rivals by the term "fuckers" and

13  to fighters as their "oxygen." Mr. Fertitta did not mince words when he said Zuffa should deprive

14  the rivals of the fighters they needed—the oxygen—to force them to tap out. His colorful

15  language captures the brutally anticompetitive nature of Zuffa's conduct.

16      **B.      Monopsony Power**

17      Plaintiffs will introduce evidence that Zuffa's Scheme enabled it to acquire and maintain

18  monopsony power. That evidence will take two forms: direct and indirect (circumstantial).

19              **1.      Direct Evidence.**

20      Plaintiffs will offer direct evidence that is sufficient by itself to establish Zuffa's

21  monopsony power. Plaintiffs intend to prove that Zuffa's fighters would have received

22  substantially more compensation during the Class Period without the Scheme.

23      As evidence, Plaintiffs will rely in part on the testimony of two expert economists,

24  Professors Hal Singer and Andrew Zimbalist. Hal Singer is an economics professor at the

25  University of Utah, where he directs the Utah Project, an interdisciplinary institute dedicated to

26

27

28

the study of antitrust and consumer protection. He is one of the top antitrust economists in the country.

Andrew Zimbalist is the Robert A. Woods Professor Emeritus of Economics at Smith College. He has written twenty-eight books and numerous published articles, many of them on sports economics. He is one of the top sports economists in the country.

Professors Singer and Zimbalist will demonstrate that, in a competitive market absent the Scheme, Zuffa would have paid the Class Members more than twice as much as they actually received during the Class Period.

Professor Singer performed a regression analysis to determine the effects on fighter compensation (measured in wage share[6]) as Zuffa locked up more and more of its fighters in long-term, exclusive contracts. He found that the 1,200 Class Members would have earned about 50% or more of Zuffa's $3.2 billion in event revenues during the Class Period rather than only about 20%, which is what they received.

Prof. Zimbalist conducted a separate damages analysis. He compared Zuffa's pay to athlete compensation in Major League Baseball, the National Basketball Association, the National Football League, the National Hockey League, and boxing. He determined that these sports paid their athletes about 50% or more of revenues once they were forced to compete for athlete services. He found that with similar competition the Class Members would have earned about 50% or more of Zuffa's event revenues rather than about 20% of those event revenues.

## 2.    Indirect (Circumstantial) Evidence.

Plaintiffs will also seek to introduce indirect evidence of monopsony power. That includes evidence of a high market share in a relevant market and high barriers to entry.

Prof. Singer will offer evidence that Zuffa's Scheme allowed it to acquire and maintain a dominant market share. Prof. Singer defined two markets. First, he defined a market of all promotions with fighters ranked 1-650 in multiple weight classes. Second, he defined a

---

[6] Wage share, as the Court is aware, assesses compensation based on a percentage of revenues.

submarket composed of promotions with MMA fighters ranked 1-15 in multiple weight classes. He called the latter his "Headliner Market." The most important fighters for market power are the Headliners, the top ranked MMA fighters.[7] Professor Singer's analysis of the Headliner Market, for example, shows Zuffa's increasing market share:[8]

## Market Shares Headliners



Dr. Hal Singer, Ph.D | January 2024                                    SR1 ¶248, Table 9 (PTX0080); SR 1 ¶250, Table 10 (PTX0081)

As the above figure demonstrates, by the beginning of the Class Period, Zuffa controlled over 90% of the Headliner Market, and during the Class Period it controlled well over 95% of that market.

The Plaintiffs will also demonstrate that the Scheme created high barriers to entry to competition. In particular, Zuffa deprived potential competitors of the fighters needed to

---

[7] "Headliners" are defined as all Fighters ranked one through fifteen according to industry-accepted databases in any of the ten major MMA weight classes.

[8] The impact on market power of control of a fighter depends on how much revenue that fighter generates. As a result, Professor Singer adjusted his analysis to reflect the ability of fighters to generate revenue.

compete. Along these lines, Plaintiffs will offer evidence that an MMA promoter needed a deep stable of top fighters to hold events equivalent to Zuffa's. A small number of top fighters would not suffice.

The evidence will show that fighters need access to numerous elite competitors to climb in the ranks. Deutsch Bank repeatedly conceded this point in assessing Zuffa's business model:

## Critical Mass of Top Fighters Key

"[A] competitor [to the UFC] would need … **a deep line-up of marquee fighters**[.]"

- Deutsche Bank Leveraged Finance Credit Report (2013)
(DB-ZUFFA-0000638)

"[F]or a competing MMA organization to generate revenues comparable to the UFC, … Good matchmaking from a **deep roster of talented fighters under contract is essential**."

- Deutsche Bank Leveraged Finance Credit Report (2013)
(DB-ZUFFA-0000638)

The upshot, as Deutsche Bank admitted in 2009, was that Zuffa's Scheme created high barriers to entry to potential rivals:

23

# Contracts Impaired Competition



"**High Barriers to Entry**: Vast majority of top fighters under multi-fight **exclusive contracts**."

(ZUF-00162347)(PTX-0014)

In sum, Plaintiffs will demonstrate that Zuffa's own internal records acknowledged that it had a high market share and had erected high barriers to entry. That suffices as indirect evidence of monopsony power.

### 3. Qualitative Evidence.

The direct and indirect evidence of Zuffa's monopsony power is confirmed by statements from Zuffa's key officials and consultants. The evidence will show, for example, that in 2011—even before Zuffa had acquired Strikeforce's fighters—Zuffa's matchmaker, Joseph Silva, declared that Zuffa owned MMA:

## UFC: "We Own MMA"
February 2011 (Before Strikeforce Acquisition)





(ZUF00085896) (PTX-0017)

In this email message, Mr. Silva asserted that the *reason* Zuffa dominated MMA is that it had locked up most of the top fighters in all weight classes. In other words, the Scheme was responsible for conferring monopsony power on Zuffa. By 2012, after the Strikeforce acquisition, Zuffa's control extended to nearly all the top 10 and 25 fighters in every weight class.

Zuffa and its advisors recognized its Scheme had reduced all other MMA promoters to "minor" or "feeder" leagues, even though for purposes of litigation Zuffa claims the contrary. Zuffa, for example, has *in this litigation* repeatedly touted Bellator as a rival. As Zuffa admitted, however, by 2016 Bellator retained only those fighters that Zuffa no longer wanted. A Raine document from March 16, 2016 explains: "*Reality TV show:* we noticed several current/ex UFC

fighters are on Bellator's show—how does UFS [sic] look at this? Fighters from UFC that are on Bellator are fighters that could no longer compete at the UFC level." RAINE0018791.

In sum, Plaintiffs intend to introduce extensive evidence that Zuffa had monopsony power.

### C.      Anticompetitive Effects

Plaintiffs will offer evidence that Zuffa's Scheme had anticompetitive effects in its role both as a buyer and as a seller.

*Zuffa as a Buyer*. Some of the evidence relates to Zuffa as a buyer. Zuffa's Scheme enabled it to pay its fighters compensation substantially below competitive levels. In addition, Plaintiffs will introduce evidence that Zuffa's Scheme caused it to contract with more fighters than it needed and then failed to offer them sufficient bouts. Zuffa's aim was to deprive its rivals of fighters, not to hire fighters to meet its own needs.

*Zuffa as a Seller*. As a seller, the evidence will show that Zuffa's Scheme enabled it to: (i) suppress the number of MMA events in the market as a whole; (ii) charge MMA fans inflated prices; and (iii) decrease the quality of MMA events.

Plaintiffs anticipate, for example, that Professor Singer will testify that that the Scheme caused a significant decrease in the total number of MMA events. Zuffa did not increase the number of elite MMA events that it offered at nearly a high enough rate to compensate for all the events that its Scheme eliminated, including by acquiring and shutting down or otherwise impairing other MMA promoters. Professor Singer will similarly testify that Zuffa's Scheme enabled it to increase the prices it charged, for example, for Pay-Per-View events.

Plaintiffs anticipate that Professor Zimbalist will testify that Zuffa's Scheme—like similar conduct in other sports—decreased the quality of MMA events. A major reason is that the quality of a sport depends in significant part on the incentives for athletes to invest their effort and time in training and promotion. Professor Zimbalist will explain that when sports have permitted competition for athlete's services—including MLB, the NBA, the NFL, the NHL, and boxing—the quality of competition on the field or in the ring (or octagon) improved

dramatically. So did overall profits in the sport and its popularity. Professor Zimbalist will establish that the same would be true for MMA if Zuffa had not engaged in its Scheme.

### D.   Lack of Procompetitive Effects or Justifications

Zuffa has indicated that it will offer five procompetitive justifications for its Scheme. Plaintiffs anticipate rebutting them in the following ways.

1.   *Fighter Choice—Not Procompetitive*. Professors Singer and Zimbalist will explain that just because some fighters may have chosen to enter contracts does not make them procompetitive. Because of Zuffa's Scheme, the UFC was the only game in town for elite MMA. Zuffa had the only championship titles that mattered. Zuffa had relegated all other promoters to "feeder" or "developmental" leagues. Fighters who wanted to compete at the top level of MMA had no choice but to sign with the UFC. And the UFC offered "take it or leave it" contracts. Plaintiffs will further explain that Zuffa's long-term, exclusive contracts, taken together and as part of the Scheme, were in fact anticompetitive, as discussed above, and often the product of coercion.

2.   *Higher Pay than Other Promoters—Not Procompetitive*. Professors Singer and Zimbalist will explain that the relevant issue is not whether Zuffa paid fighters more than other promoters that Zuffa's Scheme relegated to minor or feeder league status; it is that Zuffa would have paid fighters a much higher percentage of its event revenues if not for the Scheme. That higher percentage would have translated into many hundreds of millions of additional dollars for the fighters. Further, it is not surprising that Zuffa was able to pay more in absolute terms than promoters its Scheme had undermined. If a dominant player blocks competition by depriving rivals of key input they need, then they will not be able to grow their revenues sufficiently to offer competitive pay. That is what happened here. Zuffa

27

deprived other promoters of a key input—fighters—stunting their revenue growth and preventing them from offering pay comparable to the UFC's. Importantly, these other promoters—including Strikeforce before Zuffa bought it out and shut it down—paid their athletes about 50% of their revenues. So if Zuffa had not impaired those rivals, and the rivals could have increased their revenues, fighter pay would have increased as well.

3.   *Special Sauce—Not Procompetitive*. Professor Singer will explain that Zuffa has provided no evidence that it had some special ability to promote events that explains its dominance, much less that its special promotional abilities improved in a way that could explain changes in the percentage of event revenues it paid its fighters over time. As Professor Singer will further explain, Zuffa's increasing control of over fighters through long-term exclusive contracts explains variations in Zuffa's pay; its purported but unsubstantiated increasing investments in promotion do not. Indeed, Professor Singer used his regression model to test the effects of Zuffa's promotional spending—which *fell* during the Class Period—and other event expenditures. He determined that none of those items undermined the connection between Zuffa's increasing share of fighters locked up in its exclusive contracts and the reduction in share of revenues its fighters received.

4.   *Fighter Availability—Pretextual*. The Plaintiffs intend to introduce evidence showing that Zuffa planned its events only a few months in advance. Professor Singer will explain that Zuffa's fighter contracts could have lasted a year or less and still ensured sufficient fighter availability. Further, Professor Singer will explain that if Zuffa continued to co-promote events with other MMA promoters—as it did before it had acquired so much market power—it would have had plenty of fighters

Case No.: 2:15-cv-01045-RFB-BNW

available for its events without long-term contracts or coercion. Professor Singer will also explain that Zuffa could ensure fighter availability by paying them their market value. It would not then need to lock them into perpetual contracts.

5. *Inability to Pay—Pretextual*. Plaintiffs anticipate introducing evidence both through Mr. Guy Davis, a Certified Public Accountant, and through other witnesses and documents, showing that Zuffa extracted billions of dollars from the company, primarily to benefit three of its owners and executives—the Fertitta brothers and Dana White. Mr. Davis will further explain that Zuffa incurred extravagant business expenses, such as private jets mainly for use by the Fertittas and White. Professor Singer will also testify that, absent the Scheme, the market would have expanded, growing MMA revenues. This evidence all shows that the Class Members could and would have been paid competitive wages absent the Scheme.

6. *Balancing—Anticompetitive Effects Outweigh Any Procompetitive Effects*. Professors Singer and Zimbalist will explain that neither Zuffa nor its experts have quantified any asserted procompetitive effects of its Scheme. In contrast, Professors Singer and Zimbalist quantified the Scheme's significant anticompetitive effects, which they will show deprived fighters of compensation of between $894 million and $1.6 billion. Plaintiffs' experts will also demonstrate that the Scheme reduced the output of live MMA events and the quality of those events. The evidence, then, will establish that the anticompetitive effects of the Scheme outweigh any speculative and unquantified procompetitive effects it may have had.

E.     **Causation of Antitrust Injury and Damages.**

Professors Singer and Zimbalist offer two, complementary methods for calculating Plaintiffs' damages.

29

Professor Singer will testify that he used a regression analysis to assess whether the percentage of revenues that Zuffa paid its fighters varied as it locked up a higher percentage of the fighters. He will further testify that he determined that the higher the percentage of fighters that Zuffa controlled, the lower the percentage of its revenues it paid. Professor Singer will testify that without the Scheme, Zuffa would have paid its fighters about 50% or more of its event revenues rather than about 20% or less. His ultimate conclusion is that Zuffa's Scheme caused the Plaintiffs to receive between $894 million and $1.6 billion less in compensation than they otherwise would have.

Professor Zimbalist will testify that he compared the UFC to other major sports—in particular MLB, the NBA, the NFL, the NHL, and boxing. He will further testify that once these other sports permitted competition for athlete services—after the advent of free agency—they paid about 50% or more of their revenues to their athletes. Based on this comparison, he will testify that Zuffa would have paid its fighters about half of its event revenues without the Scheme—resulting in $981 million in damages.

## VI.    CONCLUSION

At the conclusion of this case, the Plaintiffs respectfully submit that they will have proven that Zuffa violated Section 2 of the Sherman Act and demonstrated that they and the members of the certified class they represent are entitled to damages in the amount of at least $894 million and as much as $1.6 billion.

DATED: February 22, 2024

By:___/s/ Eric L. Cramer_____

Eric L. Cramer (admitted *pro hac vice*)
Michael Dell'Angelo (admitted *pro hac vice*)
Ellen Noteware (admitted *pro hac vice*)
Patrick F. Madden (admitted *pro hac vice*)
Najah Jacobs (admitted *pro hac vice*)
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: +1 (215) 875-3000
Email: ecramer@bm.net
Email: mdellangelo@bm.net
Email: enoteware@bm.net
Email: pmadden@bm.net
Email: njacobs@bm.net

Joshua P. Davis (admitted *pro hac vice*)
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone: +1 (415) 906-0684
Email: jdavis@bm.net

Richard A. Koffman (*pro hac vice*)
Benjamin Brown (*pro hac vice*)
Daniel Silverman (*pro hac vice* forthcoming)
Daniel Gifford
Laura Gevarter Kennedy
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500 East, Tower
Washington, DC 20005
Telephone: +1 (202) 408-4600
Facsimile: +1 (202) 408-4699
Email: rkoffman@cohenmilstein.com
Email: bbrown@cohenmilstein.com
Email: dsilverman@cohenmilstein.com
Email: dgifford@cohenmilstein.com
Email:  lgevarter@cohenmilstein.com

31

Joseph R. Saveri (*pro hac vice*)
Kevin E. Rayhill (*pro hac vice*)
Christopher K. L. Young (*pro hac vice*)
Itak Moradi (*pro hac vice*)
JOSEPH SAVERI LAW FIRM, LLP.
601 California St., Suite 1000
San Francisco, CA 94108
Telephone: +1 (415) 500-6800
Facsimile: +1 (415) 395-9940
Email: jsaveri@saverilawfirm.com
Email: krayhill@saverilawfirm.com
Email: cyoung@saverilawfirm.com
Email: imoradi@saverilawfirm.com

*Co-Lead Counsel for the Class and Attorneys for*
*Individual and Representative Plaintiffs*

Don Springmeyer (Bar No. 1021)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone: + 1 (702) 385-6000
Facsimile: + 1 (702) 385-6001
Email: dspringmeyer@kempjones.com

*Liaison Counsel for the Class and Attorneys for*
*Individual and Representative Plaintiffs*

Robert C. Maysey (pro hac vice)
Jerome K. Elwell (pro hac vice)
WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: +1 (602) 264-7101
Facsimile: +1 (602) 234-0419
Email: rmaysey@warnerangle.com
Email: jelwell@warnerangle.com

Crane Pomerantz
CLARK HILL PLC
1700 Pavilion Center Drive
Suite 500
Las Vegas, NV 89135
Telephone: +1 (702) 697-7545
Email: cpomerantz@clarkhill.com

*Counsel for the Class and Attorneys for Individual and*
*Representative Plaintiffs.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of February, a true and correct copy of PLAINTIFFS' TRIAL BRIEF was filed with the Clerk of the Court by submitting the document listed above to the electronic filing and service system at the United States District Court (CM/ECF), District of Nevada.  CM/ECF will provide copies to all counsel of record registered to receive CM/ECF notifications.

*/s/ Eric L. Cramer*
Eric L. Cramer