1   WILLIAM A. ISAACSON (*Pro hac vice*)
    wisaacson@paulweiss.com
2   JESSICA PHILLIPS (*Pro hac vice*)
    jphillips@paulweiss.com
3   PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
4   2001 K Street, NW
    Washington, DC 20006
5
    DONALD J. CAMPBELL (No. 1216)
6   djc@campbellandwilliams.com
    J. COLBY WILLIAMS (No. 5549)
7   jcw@campbellandwilliams.com
    CAMPBELL & WILLIAMS
8   700 South 7th Street
    Las Vegas, NV 89101
9

    CHRISTOPHER S. YATES (*Pro hac vice*)
    chris.yates@lw.com
    AARON T. CHIU (*Pro hac vice pending*)
    aaron.chiu@lw.com
    LATHAM & WATKINS LLP
    505 Montgomery Street, Suite 2000
    San Francisco, CA 94111

    SEAN M. BERKOWITZ (*Pro hac vice*)
    sean.berkowitz@lw.com
    LATHAM & WATKINS LLP
    330 North Wabash Ave, Suite 2800
    Chicago, IL 60611

    LAURA R. WASHINGTON (*Pro hac vice*)
    laura.washington@lw.com
    LATHAM & WATKINS LLP
    10250 Constellation Blvd, Suite 1100
    Los Angeles, CA 90067

    *Attorneys for Defendant Zuffa, LLC, d/b/a
    Ultimate Fighting Championship and UFC*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, <br><br> Defendant. | Case No.: 2:15-cv-01045-RFB-BNW <br><br> **DEFENDANT ZUFFA, LLC'S TRIAL BRIEF** |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................ 1

II.   PROCEDURAL BACKGROUND.............................................................. 2

III.  APPLICABLE LEGAL STANDARD ....................................................... 10

IV.   SUMMARY OF PLAINTIFFS' CLAIMS ................................................ 20

V.    SUMMARY OF UFC'S KEY ARGUMENTS AND EVIDENCE................................ 21

      A.    UFC Does Not Possess Monopsony Power In Any Properly
            Defined Market ................................................................................ 22

            1.    Plaintiffs Have Not Defined A Proper Relevant Market ........................ 22
            2.    Plaintiffs Have No Direct Evidence Of Monopsony Power ................... 22
            3.    Plaintiffs Have No Indirect Evidence Of Monopsony Power................. 23

      B.    UFC Did Not Engage In Exclusionary Or Anticompetitive Conduct................. 25

            1.    UFC's Exclusive Contracts Are Procompetitive And Do
                  Not Foreclose A Substantial Share Of The Market. ............................... 26
            2.    The Remaining Challenged Conduct Is Not
                  Anticompetitive...................................................................... 30

      C.    UFC Did Not Cause Antitrust Injury ............................................... 31

VI.   ZUFFA'S EXPECTED WITNESSES AND TESTIMONY .......................................... 32

      A.    The Named Plaintiffs ....................................................................... 33

      B.    Zuffa Current Or Former Employee Witnesses ................................. 35

      C.    Fighter Witnesses............................................................................. 38

      D.    Manager Witnesses .......................................................................... 40

      E.    Likely Video Only Witnesses .......................................................... 41

      F.    Expert Witnesses.............................................................................. 44

VII.  RELEVANT PRIOR COURT RULINGS AND FILINGS............................................ 45

      A.    Denial Of Zuffa's Motion To Dismiss ............................................. 45

      B.    Plaintiff's Opposition To Zuffa's Motion To Exclude Expert
            Testimony ........................................................................................ 45

|  | C. | Order Granting In Part And Denying In Part Plaintiffs' Motion To Certify Class | 45 |
|---|---|---|---|
|  | D. | Zuffa's 23(f) Petition | 46 |
|  | E. | Court's Order Denying Summary Judgment | 46 |
| VIII. | | ANTICIPATED EVIDENTIARY ISSUES | 47 |
|  | A. | Limits On Lay Opinion Testimony | 47 |
|  | B. | Speculative Testimony | 47 |
|  | C. | Expert Witnesses | 48 |
|  | D. | Jury Instructions | 48 |
|  | E. | Evidence And Claims Related To Plaintiffs' Uncertified Identity Class | 48 |
|  | F. | Admission Of Evidence Regarding Current Market Conditions | 49 |
|  | G. | Pre-Class Period Evidence | 50 |
|  | H. | Witness Disclosures | 50 |
|  | I. | Misleading Video Excerpts | 56 |
|  | J. | Hearsay And Unauthenticated Bankers' Documents | 57 |
| IX. | | CONCLUSION | 58 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A. H. Cox & Co. v. Star Mach. Co.*,
   653 F.2d 1302 (9th Cir. 1981) ............................................................. 27

*Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*,
   2014 WL 12586105 (C.D. Cal. Jan. 3, 2014) ...................................... 51

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) .............................................................. 18

*Almanza v. Sessions*,
   2018 WL 5263033 (E.D. Tenn. June 15, 2018)................................... 52

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l
   Publ'ns, Inc.*,
   108 F.3d 1147 (9th Cir. 1997) ....................................................... 11, 13

*Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*,
   789 F. Supp. 2d 1201 (C.D. Cal. 2011) ......................................... 18, 31

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994)................................................................... 18

*Beech Aircraft v. Rainey*,
   488 U.S. 153 (1988)............................................................................. 57

*Boardman v. Pac. Seafood Grp.*,
   822 F.3d 1011 (9th Cir. 2016) ............................................................. 11

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
   532 F.3d 1111 (10th Cir. 2008) ........................................................... 11

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) .............................................................. 18

*Cascades Comput. Innovation LLC v. RPX Corp.*,
   2013 WL 6247594 (N.D. Cal. Dec. 3, 2013)................................. 11, 13

*Coach, Inc. v. Citi Trends, Inc.*,
   2019 WL 6354367 (C.D. Cal. Oct. 23, 2019)...................................... 52

*Conrad v. Jimmy John's Franchise, LLC*,
   2021 WL 718320 (S.D. Ill. Feb. 24, 2021)............................................ 9

*CoStar Grp., Inc. v. Com. Real Est. Exch. Inc.*,
2023 WL 2468742 (C.D. Cal. Feb. 23, 2023)........................................................................ 12

*Crowder v. LinkedIn Corp.*,
2023 WL 2405335 (N.D. Cal. Mar. 8, 2023)......................................................................... 19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)................................................................................................................ 4

*Distance Learning Co. v. Maynard*,
2020 WL 2995529 (N.D. Cal. June 4, 2020)........................................................................ 12

*Dreamstime.com, LLC v. Google LLC*,
54 F.4th 1130 (9th Cir. 2022).............................................................................................. 19

*E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, Inc.*,
357 F.3d 1 (1st Cir. 2004)..................................................................................................... 15

*Eastman v. Quest Diagnostics Inc.*,
724 F. App'x 556 (9th Cir. 2018) ......................................................................................... 19

*Epicenter Recognition, Inc. v. Jostens, Inc.*,
81 F. App'x 910 (9th Cir. 2003) ..................................................................................... 14, 24

*Ferguson v. Greater Pocatello Chamber of Com., Inc.*,
848 F.2d 976 (9th Cir. 1988) ............................................................................................... 28

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) ....................................................................................... 12, 20

*FTC v. Qualcomm, Inc.*,
969 F.3d 974 (9th Cir. 2020) ........................................................................... 11, 20, 21, 30

*Ginger Root Off. Assocs. v. Advanced Packaging & Prod.*,
2009 WL 10673918 (C.D. Cal. Feb. 18, 2009)................................................................... 52

*Häagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,
895 F.2d 1417 (9th Cir. 1990) ....................................................................................... 16, 29

*IceMOS Tech. v. Omron Corp.*,
2020 WL 1853343 (D. Ariz. Apr. 13, 2020) ...................................................................... 51

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ...................................................................................... *passim*

*In re Beef Indus. Antitrust Litig.*,
907 F.2d 510 (5th Cir. 1990) ..................................................................................... 13, 20, 22

*In re Capacitors Antitrust Litig.*,
2020 WL 870927 (N.D. Cal. Feb. 21, 2020) ........................................................................ 9

*In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*,
    2021 WL 5816302 (S.D. Ohio Dec. 7, 2021) ........................................................ 47

*In re Google Play Store Antitrust Litig.*,
    2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ........................................................ 9

*In re MacBook Keyboard Litig.*,
    2021 WL 1250378 (N.D. Cal. Apr. 5, 2021) ........................................................ 9

*Indep. Ent. Grp., Inc. v. Nat'l Basketball Ass'n*,
    853 F. Supp. 333 (C.D. Cal. 1994) ........................................................ 16, 17

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ........................................................ 15

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
    2013 WL 1768706 (N.D. Cal. Mar. 29, 2013) ........................................................ 11

*Le v. Zuffa*,
    216 F. Supp. 3d 1154 (D. Nev. 2016) ........................................................ 21, 45

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
    801 F.3d 1150 (9th Cir. 2015) ........................................................ 19

*Malheur Forest Fairness Coal. v. Iron Triangle, LLC*,
    2023 WL 6811871 (D. Or. Oct. 13, 2023) ........................................................ 18

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
    2004 WL 5907538 (C.D. Cal. June 10, 2004) ........................................................ 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................ 19

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
    2016 WL 5817176 (C.D. Ill. Sept. 30, 2016), aff'd, 859 F.3d 408 (7th Cir.
    2017) ........................................................ 15, 26

*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
    909 F.2d 1245 (9th Cir. 1990) ........................................................ 14

*Nationwide Power Sols. Inc. v. Eaton Elec. Inc.*,
    2008 WL 11408997 (C.D. Cal. Oct. 10, 2008) ........................................................ 23

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
    562 F. Supp. 3d 1073 (E.D. Cal. 2021) ........................................................ 11

*Netafirm Irrigation, Inc. v. Jain Irrigation, Inc.*,
    2022 WL 2791201 (E.D. Cal. July 15, 2022) ........................................................ 13

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ............................................................................... 50

*O.S.C. Corp. v. Apple Comput., Inc.*,
    792 F.2d 1464 (9th Cir. 1986) .......................................................................... 16, 29

*Oahu Gas Serv., Inc. v. Pac. Res. Inc.*,
    838 F.2d 360 (9th Cir. 1988) .................................................................................. 16

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ........................................................................................... 12, 16

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) .................................................................................. 17

*Omega Env't, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ......................................................................... *passim*

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010) ............................................................................... 16, 29

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ......................................................................... *passim*

*Safeway Inc. v. Abbott Labs.*,
    761 F. Supp. 2d 874 (N.D. Cal. 2011) ................................................................... 13

*Sterling Merch., Inc. v. Nestlé, S.A.*,
    656 F.3d 112 (1st Cir. 2011) .................................................................................. 16

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F.3d 57 (1st Cir. 2004) ............................................................................... 15, 26

*Ticketmaster Corp. v. Tickets.com Inc.*,
    2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th
    Cir. 2005) .................................................................................................. 15, 27, 28

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .................................................................................. 11

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) ......................................................................... *passim*

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
    914 F.2d 1256 (9th Cir. 1990) .................................................................... 16, 17, 30

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ............................................................................................... 17

*W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
    190 F.3d 974 (9th Cir. 1999) ............................................................... 14

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*,
    549 U.S. 312 (2007)............................................................. 11, 18, 30

**STATUTES**

15 U.S.C. § 2............................................................................ passim

**RULES**

Fed. R. Civ. P. 23(f) ................................................................... 46

Fed. R. Civ. P. 26(a) ............................................................ 44, 51

Fed. R. Civ. P. 26(e) ........................................................ 51, 52, 56

Fed. R. Civ. P. 37(c)(1) ............................................................ 52

Fed. R. Civ. P. 42(a) ................................................................... 6

Fed. R. Evid. 106 ...................................................................... 57

Fed. R. Evid. 602 .............................................................. 35, 47

Fed. R. Evid. 701 .............................................................. 35, 47

Fed. R. Evid. 702 ......................................................... 4, 47, 48

**TREATISES**

Philip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
    Principles and Their Application (5th ed. 2023)............................. 12, 50

## I.  INTRODUCTION

The Ultimate Fighting Championship, under Zuffa, LLC's ownership, has done more to expand opportunities, benefits, and compensation for mixed martial arts athletes than any other company in the world.   Through Zuffa's investment, UFC moved from a near-bankrupt organization, banned from holding events in most states, to a global sports platform with worldwide viewership.  By taking risks others were unwilling to take and relentlessly innovating, UFC legitimized and expanded the MMA industry throughout the world, by consistently growing the number of events and increasing athlete compensation.  The result of these efforts by UFC has been the creation of careers and life-changing opportunities for MMA fighters.  UFC's efforts further paved the way for firms like Bellator, Professional Fighters League ("PFL"), ONE Championship, and others to start and grow their own promotions.  UFC's success story is a hallmark of the economic system protected by the antitrust laws.

At this trial, a handful of disgruntled athletes who agreed to fight for generous cash payments, lost the majority of their fights during the class period between December 2010 and June 2017 ("Class Period"), and who were still paid exactly what they were promised (or more), claim they are entitled to a windfall of additional money.  These six original named plaintiffs—five of whom remain class representatives—do not represent the experiences of the over 1,200 athletes who fought for UFC during the Class Period.  The named plaintiffs are even trying to silence the voices of those other athletes by asking the Court to preclude any fighters other than the named plaintiffs from testifying at trial.  And in doing so, the named plaintiffs seek to misuse the antitrust laws to challenge UFC's compensation structure (one to which they agreed).  The antitrust laws are about protecting competition, not furthering the pecuniary goals of a select number of frustrated individuals.  If the jury is properly instructed on the law, and permitted to hear the actual evidence, UFC is confident that the jury will reject Plaintiffs' distorted views of UFC and MMA competition and understand that Plaintiffs' case is no antitrust case at all, but an attack on success.

Although Plaintiffs attack UFC for a multitude of reasons, all of the damages they claim, according to their expert Dr. Hal Singer, are attributable to UFC's multi-bout contracts that he

characterizes as 30 months in length.  Contracts of this limited duration have repeatedly been held to be procompetitive.  UFC, just like rival MMA promotions, has long used these multi-bout contracts that Plaintiffs now want to end.  Those contracts protect UFC's investment in fighters and ensure that fighters will be available for live and televised events.  When UFC retained fighters, it was not because of contractual provisions, but because fighters wanted to fight for UFC because UFC paid more than rival MMA promoters, and because they believed UFC offered the best opportunities.

After nine years of litigation, this case proceeds to trial on one remaining theory of liability: a claim of monopsonization.  Plaintiffs proceed to trial knowing that the indisputable evidence will show that competitors launched rival MMA promotions during the Class Period and afterwards—which confirms that barriers to entry are low and that nothing UFC did foreclosed those rivals from attracting or signing the MMA athletes they wanted or needed to compete.  Output within the MMA industry has only exploded, and UFC has only *increased* fighter compensation before, during, and after the Class Period.  No monopsonist with the actual power to reduce output and pay below-market wages would voluntarily increase pay, year after year, at levels well above all other competing promoters, as UFC did.  Plaintiffs' case simply defies fundamental economic theory and common sense.  The indisputable evidence that Zuffa will present at trial confirms that UFC is not a monopsonist and that nothing UFC is alleged to have done has harmed competition or caused damages to the named plaintiffs or the Bout Class.

## II.   **PROCEDURAL BACKGROUND**

Jon Fitch, Nathan Quarry, and Cung Le filed their initial complaint in December 2014 asserting a claim of monopolization and monopsonization under Section 2 of the Sherman Act, 15 U.S.C. § 2.  Compl. ¶¶ 163–71, Dkt. 1.  They alleged that UFC monopolized the market for "promoting live Elite Professional MMA bouts in the United States," and monopsonized "the market for live Elite Professional MMA Fighter services."  *Id.* ¶ 165.  They asserted that the relevant geographic market for both of those product markets was limited to "the United States, and in the alternative, North America."  *Id.* ¶ 164.

1    Zuffa moved to dismiss that complaint on several grounds, including that Plaintiffs had

2    failed to adequately define relevant product markets, failed to plead substantial foreclosure in any

3    such markets due to Zuffa's contracts, and failed to allege any other form of anticompetitive

4    conduct.  Def's. Mot. to Dismiss, Dkt. 64.  Plaintiffs argued in opposition that they had properly

5    alleged relevant markets because there is a significant difference between "Elite" and "non-Elite"

6    MMA fighters that is "well understood in the industry."  Pls.' Opp'n to Mot. to Dismiss at 3, Dkt.

7    71.  Specifically, Plaintiffs asserted that "Elite" MMA fighters meant "*all* fighters who succeed in

8    local or regional MMA promotions and who gain public notoriety through other athletic

9    competition."  *Id.* at 7.  Plaintiffs further argued that UFC controlled "the services of virtually all

10   Elite MMA Fighters indefinitely" through its use of multi-bout contracts.  *Id.* at 3.

11   About a year and a half after the completion of briefing on Zuffa's motion to dismiss, the

12   Court denied the motion.  Or., Dkt. 314.  The Court's written decision to permit this case to proceed

13   relied on Plaintiffs' representations, allegations, and argument regarding the existence of a

14   distinguishable market for "Elite" MMA fighters "limited to the United States and, in the

15   alternative, North America," and that Zuffa controlled "virtually all" of it.  *Id.* at 3, 13.  When

16   Plaintiffs filed their amended complaint in December 2015, they continued to allege the same

17   product and geographic markets defined by "Elite" MMA fighters limited to "the United States,

18   and in the alternative, North America."  Am. Compl. ¶¶ 164–65, Dkt. 208.

19   After many months of discovery, Zuffa moved in February 2017 for partial summary

20   judgment as to then-named plaintiff Nathan Quarry.  Def.'s Mot. for Partial Summ. J., Dkt. 347.

21   Although he was named as a plaintiff at the time, Mr. Quarry never fought for UFC during the

22   alleged Class Period that began in December 2010.  Dkt. 208 ¶ 27(c).  Given this and the fact that

23   Mr. Quarry's UFC contracts began far earlier than four years before the filing of this lawsuit, Zuffa

24   sought summary judgment on the ground that his claims are barred by the Clayton-Act's four-year

25   statute of limitations.  Dkt. 347.  When opposing that motion, Plaintiffs continued to assert that

26   UFC allegedly monopsonized a "market for Elite Professional MMA Fighter Services."  Pl.

27   Quarry's Opp'n to Def.'s Mot. for Partial Summ. J. at 1, 4, Dkt. 365.  About 20 weeks after the

28   completion of briefing on Zuffa's motion, the Court entered a docket order denying the motion

without prejudice because it was "premature to rule" as "[t]he arguments raised . . . would be more properly considered with the full set of motions that will be filed at the close of discovery." Min. Or., Dkt. 493.[1]

After the close of discovery in February 2018, Plaintiffs moved to certify this case as a class action. Pls.' Mot. for Class Certification, Dkt. 518. In their class certification motion, Plaintiffs asserted the relevant geographic market is "North America," *id.* at 6, rather than the United States. Noticeably absent from Plaintiffs' motion was any reference to the previously alleged market for "Elite" MMA fighter services. Instead, Plaintiffs referred vaguely to a market "for 'Fighter Services'—an input market in which Fighters sell their services to MMA promoters," and to a market "for 'MMA Events'—an output market in which Promoters sell MMA Events to audiences." *Id.* at 6. Plaintiffs buried the definition of this input market in a footnote, where they indicated that their expert Dr. Hal Singer had defined the market for "Fighter Services" as "the top 650 Fighters in every weight class" ("Ranked" fighters) and as "all MMA Fighters who were tracked by FightMetric, an industry-standard statistics provider" ("Tracked" fighters). *Id.* at 6 n.14. The expert reports and data submitted with this briefing identified over 6,800 "Ranked" fighters, and showed that the number of "MMA promoters associated with Fighters included in the Ranked measure" increased from 83 promoters in 2001 to over 200 promoters by 2016, with over 780 unique promoters during the proposed Class Period. Expert Report of H. Singer, Aug. 31, 2017 ¶ 111, Dkt. 518-3. With respect to both the relevant input and output markets, plaintiffs took the position that the relevant geographic market was "North America." Dkt. 518 at 6.

When Plaintiffs moved to certify a class, Zuffa moved to exclude several of Plaintiffs' designated experts, including Dr. Singer, Dr. Andrew Zimbalist, and Guy Davis under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Def.'s Mot. to Exclude Test. of G. Davis, Dkt. 517; Def.'s Mot. to Exclude the Test. of A. Zimbalist, Dkt. 522; Def.'s Mot. to Exclude the Test. of H. Singer, Dkt. 524. About five months

---

[1] As noted below, the parties have agreed that Mr. Quarry will not be referred to as a "plaintiff" at trial.

1    after briefing was complete on Zuffa's motions to exclude, the Court entered a docket order

2    denying the motions without prejudice, indicating it:

3            will consider the arguments in the Motions and Responses in its
4            review of the Motion to Certify Class, however, the Court is not
             required to determine the admissibility of evidence in ruling on the
5            Motion to Certify Class nor does such evidence have to be
             admissible for consideration by the Court.
6

7    Min. Or., Dkt. 600.

8            With discovery completed, and Plaintiffs' class certification motion fully briefed, Zuffa

9    again moved for summary judgment, but this time on all of Plaintiffs' claims.  Def.'s Mot. for

10   Summ. J., Dkt. 573.  Following the completion of briefing on November 2, 2018, the Court held a

11   hearing on December 14, 2018, and then entered a docket entry denying Zuffa's motion for

12   summary judgment "without prejudice to allow supplement to the record."  Dkt. 628 at 1.

13           Meanwhile, Plaintiffs' February 2018 class certification motion remained pending.

14   Eighteen months later, the Court held a seven-day evidentiary hearing and heard argument in

15   August and September 2019.  The hearing included testimony from expert witnesses from both

16   sides, but no fact witnesses except for a then-former UFC employee previously responsible for

17   arranging matches between certain UFC fighters.  The hearing concluded on September 23, 2019.

18   Min. Or., Dkt. 775.

19           While awaiting the Court's class certification decision, counsel for Plaintiffs filed a second

20   lawsuit on behalf of a putative class of fighters, with the Class Period beginning on July 1, 2017—

21   the day after the close of the Class Period in the present case.  Plaintiffs' counsel represented that

22   the new lawsuit involved "virtually identical factual allegations related to the same series of events,

23   facts, and circumstances, and asserted identical claims for relief" as the present case.  Notice of

24   Related Cases 2, *Johnson, et al. v. Zuffa, LLC, et al.* ("*Johnson*"), No. 21-1189 (July 2, 2021 D.

25   Nev.), Dkt. No. 9.  To avoid "duplication of discovery efforts" if the *Johnson* case survived

26   dismissal, Zuffa requested to consolidate the present case with the *Johnson* case, Defendants'

27   Motion to Dismiss the Class Action Complaint at 16 & n.12, *Johnson*, Dkt. 17, and offered to

28   "outline a proposed schedule in Defendants' forthcoming motion for consolidation, if necessary."

Def.'s Reply to Pls. Opp'n to Mot. to Dismiss at 12 n.9, *Johnson*, Dkt. 48.  Zuffa then provided a proposed schedule on January 14, 2022, and argued that the long delay in this case, and changes in market circumstances, required updated discovery before this case could proceed to trial. Proposed Disc. Plan & Scheduling Or., *Johnson*, Dkt. 51.  For example, Zuffa argued the following:

- "The two actions should be consolidated and discovery should proceed promptly in this action, as well as to bring the discovery in *Le* current." *Id.* at 3.
- "[T]he Court should consolidate this action with *Le* under Rule 42(a) and set a discovery schedule to allow for discovery, applicable in both actions, to update the record for the events following mid-2017 . . . ." *Id.* at 9.
- "[U]pdated discovery is required in *Le* . . . ." *Id.*

Plaintiffs opposed Zuffa's efforts to update a discovery record that was frozen in mid-2017 on the ground that a trial in this case should proceed "without additional discovery." *Id.* at 7.  In a hearing on the dispute in September 2022, Zuffa's counsel explained that "competitors have continued to come into the market, continued to grow, continued to succeed," and evidence of those events "is fundamental to [Zuffa's] defense in the *Le* case," as Zuffa, Plaintiffs, and jurors cannot "pretend that there wasn't competition after the discovery cut-off in 2017." Hr'g Tr. 13:7–10, *Johnson*, Dkt. 69.  Plaintiffs' counsel again objected to any evidence of "current market dynamics" being presented in this trial, insisting on a "discovery cut-off in 2017." *Id.* at 18:12, 20:12.  The Court took no action on Zuffa's discovery request.  The Court explained that its "order on the class certification in *Le* will drive a lot of what would happen in *Johnson*," stayed the *Johnson* case, and instructed that "defendants of course are free to after the stay is lifted raise some of the same issues with the benefit of whatever may be the decision from the appellate courts with respect to the claims that may or may not remain." *Id.* at 30:18–22; *see also* Min., *Johnson*, Dkt. 68.

About five and a half years after Plaintiffs moved to certify a class, the Court issued its written ruling on August 9, 2023.  Or., Dkt. 839.  The Court certified a single "Bout Class" of "[a]ll persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States from December 16, 2010 to June 30, 2017," excluding "all

persons who are not residents or citizens of the United States unless UFC paid such persons for competing in a bout fought in the United States." *Id.* at 79. The class representatives were the named plaintiffs other than Mr. Quarry. *Id.* The Court declined to certify an "Identity Class" that would have included every UFC fighter whose identity was allegedly "expropriated or exploited by UFC, including in UFC Licensed Merchandise and/or UFC Promotional Materials in the United States from December 16, 2010 to June 30, 2017." *Id.* at 1, 75–78.

With respect to Plaintiffs' claims of monopolization, the Court found that "in the course of briefing and arguing their motion for class certification, Plaintiffs have abandoned" the theory in their amended complaint that "liability flows from Defendant's monopoly power in the output market." *Id.* at 20 n.20. Because, the Court found, "Plaintiffs have only maintained their claims regarding Defendant's monopsony power," the Court determined that "the precise definition of the input market is the relevant market to evaluate throughout this order." *Id.* at 26. When defining that market, the Court referred back to its "previous finding in its order on Zuffa's Motion to Dismiss," and solidified that "[t]he relevant input market is 'the market for Elite Professional MMA Fighter services.'" *Id.* Based on Plaintiffs' representations, the Court determined for class certification purposes that "[t]he relevant market is the whole market for elite fighter services and it contains fighters from Zuffa and non-Zuffa MMA promoters." *Id.* at 25. The Court also determined for class certification purposes that "the relevant geographic markets for both the input and output markets are 'the United States, and in the alternative, North America.'" *Id.* at 26 (quoting Dkt. 208 ¶ 164).

Within the class certification opinion, the Court also discussed the motions Zuffa filed in February 2018 to exclude Plaintiffs' designated expert Dr. Singer.[2] Dkt. 839 at 12–15. As to Dr. Singer, the Court characterized Zuffa's *Daubert* challenges as attacking Dr. Singer's choice to apply a regression analysis to "a set of facts in a new market or industry," which the Court ruled "does not alter or undermine the generally accepted nature of their methodological techniques." Dkt. 839 at 12–15. Within that discussion, the Court also ruled that "at this stage"—*i.e.*, class

---

[2]    Although the class certification opinion stated that it would "address[] the substance" of Zuffa's motion to exclude Dr. Zimbalist and Guy Davis as well, Dkt. 839 at 4 n.8, it did not do so.

1    certification—concerns "about the categorization or definitions of data Dr. Singer used" and his

2    variable choices go to "matters of weight and probative value for a jury to evaluate," not to

3    admissibility. *Id.* at 51 (citation omitted).  With respect to future stages, the "Court reiterate[d]

4    that its findings in this order are not meant to be dispositive as to any factual dispute beyond class

5    certification." *Id.* at 21 n.21.  The Court did not resolve any of Zuffa's motions to exclude Dr.

6    Singer, Dr. Zimbalist, or Guy Davis.

7         After certifying the Bout Class, the Court held a hearing on August 21, 2023 on scheduling.

8    Zuffa argued for additional discovery to update the factual record with evidence of advancements

9    in the competitive landscape since the close of fact discovery in June 2017.  Hr'g Tr. 6:2–11:22,

10   21:6–26:12, 30:10–15, Dkt. 846.  After the hearing, the Court set a schedule for Zuffa to file a

11   motion to reopen discovery and a motion for summary judgment by October 24, 2023.  Minutes,

12   Dkt. 847.  Zuffa filed both motions pursuant to the Court's schedule, as well as a motion to treat

13   fact evidence produced in the *Johnson* litigation as if it was produced in the present case.  *See*

14   Def.'s Renewed Mot. for Summ. J., Dkt. 878; Def.'s Mot. to Reopen Disc., Dkt. 884; Def.'s Fact

15   Evid. Mot., Dkt. 885.

16        Approximately one week later, the Court set Zuffa's motions regarding updated discovery

17   for an expedited hearing on November 17, 2023. Or., Dkt. 894.  The Court gave Plaintiffs 20 days

18   to oppose the motions, and permitted Zuffa 60 hours to reply to Plaintiffs' thirty-page brief.  Or.,

19   Dkt. 900.  At the hearing, the Court denied both of Zuffa's motions and ordered that it would

20   "restrict the plaintiffs in this case to using just the discovery from *Le* in their case-in-chief," but

21   also emphasized that it was "not making a categorical decision about admissibility as it relates to

22   trial at this time."  Hr'g Tr. 61:13–62:5, Dkt. 923.

23        Meanwhile, as briefing on Zuffa's renewed motion for summary judgment was underway,

24   on December 8, 2023, Zuffa moved to exclude plaintiffs' experts Dr. Singer, Dr. Zimbalist, and

25   Davis for purposes of summary judgment or trial.  Def.'s Mot. to Exclude Certain Ops. of H.

26   Singer, Dkt. 929; Def.'s Renewed Mot. to Exclude Test. of G. Davis, Dkt. 930; Def.'s Renewed

27   Mot. to Exclude Test. of A. Zimbalist, Dkt. 931.  Zuffa filed these motions both (1) because the

28   Court had stated that the class certification order was "not meant to be dispositive as to any factual

1   dispute beyond class certification[,]" Dkt. 839 at 21 n.21, and (2) given an amendment to the
2   Federal Rule of Evidence governing admissibility of expert testimony that went into effect on
3   December 1, 2023.  And with respect to Dr. Singer, Zuffa's motion alerted the Court to multiple
4   new and recent instances of courts excluding Dr. Singer's opinions as unreliable and unfit for
5   presentation to juries,[3] raised an example of Dr. Singer taking an irreconcilable conflicting position
6   in a recent case,[4] and attached a declaration from expert Dr. Gregory Leonard, who found
7   additional fatal flaws in Dr. Singer's analysis.  Dkts. 929, 930, 931; Def.'s Renewed Mot. to
8   Exclude the Test. of A. Zimbalist Ex. 27, Dkt. 932-28.  Plaintiffs moved to strike those three
9   motions and Dr. Leonard's declaration, but never filed a brief addressing the substance of Zuffa's
10  motions.  Pls.' Mot. to Strike Expert Ops., Dkt. 933.

11          On January 18, 2024, the Court entered a written order and opinion denying Zuffa's
12  renewed summary judgment motion, and motions to exclude Drs. Singer and Zimbalist.  With
13  respect to summary judgment, the Court ruled that "its Certification Order considered the
14  substantive issues in dispute in the Defendant's Motion for Summary Judgment" and that the
15  evidence submitted for summary judgment "is duplicative of the evidence it reviewed for its
16  Certification Order, that the standard at certification was in fact higher than for summary judgment,
17  and that, therefore, its reasoning and findings in its Certification Order would and do apply with
18  equal force to Defendant's Motion for Summary Judgment."  Or. at 6, Dkt. 959.  The Court's order
19  did not upset its class certification finding that "[t]he relevant market is the whole market for elite

20

21  _____

    [3]      *See, e.g.*, *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *8–9 (N.D. Cal.
22  Aug. 28, 2023) (rejecting Dr. Singer's opinions as based on an "unproven assumption," which did
    "not give the jury a sound basis on which to make a reasoned and reasonable judgment about
23  antitrust impact and damages"); *Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 718320,
    at *16–19 (S.D. Ill. Feb. 24, 2021) (rejecting Dr. Singer's opinions because he committed
24  "a methodological flaw" rendering his models "unreliable" and his estimates "inflated"); *In re
    MacBook Keyboard Litig.*, 2021 WL 1250378, at *5 (N.D. Cal. Apr. 5, 2021) (excluding Dr.
25  Singer's model as based on "untenable assumptions"); *In re Capacitors Antitrust Litig.*, 2020 WL
    870927, at *2 (N.D. Cal. Feb. 21, 2020) (excluding Dr. Singer's "qualitative" analysis for lack of
26  "scientific, technical, or other specialized knowledge" (citation omitted)).

27  [4]      *See Conrad*, 2021 WL 718320, at *2–3  (analyzing monopsony wage suppression case by
    comparing "the compensation that each Class Member actually received to the compensation they
28  would have received in the absence of the No-Poach Provision", instead of comparing
    compensation as a percentage of revenue).

1    fighter services," Dkt. 839 at 25, and the "the relevant geographic markets for both the input and

2    output markets are 'the United States, and in the alternative, North America,'" *id.* at 26.

3          With respect to the motions to exclude Drs. Singer and Zimbalist, the Court ruled that its

4    class certification order "resolve[d] the then-pending motions to exclude" their testimony.  Dkt.

5    959 at 2.  The Court acknowledged, however, that the renewed motion to exclude Guy Davis was

6    "properly brought" because the "Court did not unambiguously and fully resolve" the prior motion

7    Zuffa filed in February 2018 to exclude his testimony.  *Id.* at 3–4.  The following day, the Court

8    stated it was "inclined to wait to rule" on the motion until receiving the parties' trial briefs.  Hr'g

9    Tr. 7:15–17, Dkt. 960.   The Court also granted plaintiffs' motion to strike Dr. Leonard's

10   declaration after finding that it was "untimely and unjustified."  Dkt. 959 at 3.

11         In November 2023, Plaintiffs began providing notice to the Bout Class of the pending trial.

12   Dkt. 966 at 2.  Included within that notice was a representation, based on the amended complaint,

13   that, in addition to monetary damages, "Plaintiffs also seek injunctive relief to stop Defendant from

14   continuing to engage in the alleged anticompetitive conduct."  Pls.' Statement Regarding Inj.

15   Relief at 1, Dkt. 947.  However, on December 22, 2023, Plaintiffs filed a notice to the Court stating

16   that they "will not seek certification of a class for purposes of seeking injunctive relief in this

17   matter."  Dkt. 947 at 1.  Zuffa objected to the class notice that inaccurately represented that

18   Plaintiffs would be seeking now-abandoned injunctive relief.  *Id.*  Plaintiffs never amended the

19   notice.[5]

20   **III.    APPLICABLE LEGAL STANDARD**

21         Plaintiffs contend that UFC violated Section 2 of the Sherman Act, 15 U.S.C.A. § 2, by

22   monopsonizing the market for top-level MMA fighter services in the United States—although their

23   market definitions have shifted over time.  Section 2 makes it unlawful to "monopolize, attempt to

24   monopolize, or combine or conspire . . . to monopolize" any part of the nation's interstate or

25   foreign commerce.  *Id.*  "A monopsony occurs when there is 'market power on the buy side of the

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [5]    Given the Court's familiarity with the factual background of this case, Zuffa does not recite
     it here.  A detailed factual background can be found in Zuffa's Renewed Motion for Summary
28   Judgement, which is incorporated by reference.  Dkt. 878.

market.'"   *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320–22 (2007)). The elements of a monopsony claim are identical to that of a monopoly claim, due to "the close theoretical connection between monopoly and monopsony." *Weyerhaeuser*, 549 U.S. at 321–22; *see United States v. Syufy Enters.*, 903 F.2d 659, 663 n.4 (9th Cir. 1990) (describing monopoly and monopsony as "equivalent" (citation omitted)).   To prove monopsonization, Plaintiffs must prove by a preponderance of the evidence: "(1) monopsony power in the relevant market, (2) that was willfully acquired and (3) caused antitrust injury." *Cascades Comput. Innovation LLC v. RPX Corp.*, 2013 WL 6247594, at *16 (N.D. Cal. Dec. 3, 2013) (citing *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997)).

## A.   Plaintiffs Must Prove Monopsony Power In A Properly Defined Relevant Market

First, Plaintiffs must prove that UFC possessed monopsony power in a properly defined relevant market.   The threshold step in any monopsonization claim is therefore to "accurately define the relevant market, which refers to 'the area of effective competition.'" *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (citation omitted).   "[I]n a monopsony situation, 'the market is not the market of competing sellers but of competing buyers.   This market is comprised of buyers who are seen by sellers as being reasonably good substitutes.'" *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001)); *see also Kamakahi v. Am. Soc'y for Reprod. Med.*, 2013 WL 1768706, at *10 (N.D. Cal. Mar. 29, 2013).   And "the relevant geographic market definition captures the area in which sellers are able to turn to other buyers as reasonably good substitutes." *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, 562 F. Supp. 3d 1073, 1082 n.5 (E.D. Cal. 2021) (citing *Todd*, 275 F.3d at 201–02).

## B.   Plaintiffs Must Prove UFC Willfully Acquired Or Maintained Durable Monopsony Power Through Anticompetitive Conduct

Second, Plaintiffs must prove that UFC willfully acquired or maintained durable monopsony power in the alleged market by engaging in anticompetitive conduct.   A firm possesses

monopsony power when it can reduce output and prices (costs in a monopsony) below a competitive level for a significant period of time. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (monopoly power exists when "by restricting its own output, a firm can restrict marketwide output and, hence, increase marketwide prices"); ABA Model Jury Inst. in Civil Antitrust Cases A-104.   Plaintiffs must show *both* reduced output and suppressed compensation to establish monopsony power. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475–76 (9th Cir. 1997) (holding that with "no accompanying showing of restricted output," plaintiffs' evidence that "Sunrise Hospital routinely charged higher prices than other hospitals while reaping high profits" was insufficient "to present direct evidence of market power"); *CoStar Grp., Inc. v. Com. Real Est. Exch. Inc.*, 2023 WL 2468742, at *5 (C.D. Cal. Feb. 23, 2023) (dismissing monopsonization claims for failure to plausibly alleged market power where plaintiffs alleged facts showing increased prices, but failed to "make any allegations regarding restricted output"); *see also* Philip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 575 (5th ed. 2023) ("The monopsonist, like the monopolist, 'exercises' its power by reducing output, in this case in the market in which it purchases.").   There is monopsony power only if a firm's ability to restrict marketwide output and suppress prices is durable: "[i]n evaluating monopoly [or monopsony] power, it is not market share that counts, but the ability to *maintain* market share." *Syufy Enters.*, 903 F.2d at 665–66 (citation omitted).

### 1.      Evidence Of Monopsony Power

Monopsony power can be demonstrated through either:   (1) "direct evidence of the injurious exercise of market power" or (2) "circumstantial evidence pertaining to the structure of the market." *Rebel Oil*, 51 F.3d at 1434.

### a.      Direct Evidence Of Market Power

Direct proof of monopsony power requires Plaintiffs to show that UFC can suppress compensation (prices) by restricting "marketwide output" by "restricting its *own* output[.]" *Distance Learning Co. v. Maynard*, 2020 WL 2995529, at *6 (N.D. Cal. June 4, 2020) (emphasis added) (quoting *Rebel Oil*, 51 F.3d at 1434); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 548 (2018) (rejecting the Government's pricing evidence as direct proof of market power because there

was neither evidence of reduced output nor "that Amex's antisteering provisions are the cause of any increases in merchant fees"); *Rebel Oil*, 51 F.3d at 1434 ("If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power."); *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011) ("To prove monopoly power directly, supracompetitive pricing must be accompanied by restricted output."). Mere proof of "exclusionary conduct is not sufficient to prove" the "power to control prices or exclude competition"—other "proof of market power is required." *Am. Prof'l Testing Serv.*, 108 F.3d at 1154 (citation omitted).  Further, direct proof of one monopsonistic harm, such as wage suppression, is insufficient to establish monopsony power without direct proof of restricted output. *See, e.g.*, *Netafirm Irrigation, Inc. v. Jain Irrigation, Inc.*, 2022 WL 2791201, at *7–8 (E.D. Cal. July 15, 2022) (noting that "deficiency" in allegations of restricted output "alone may preclude a finding of direct evidence of market power").  Such reduced output must additionally be below the competitive level. *In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 516 (5th Cir. 1990).

### b.     Circumstantial Evidence Of Market Power

To demonstrate market power circumstantially, Plaintiffs must show that UFC owned a dominant share of the relevant market, that there are significant barriers to entry, and that existing competitors "lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434.

**Dominant Market Share.**  A "dominant" market share is "generally at least 65 percent." *Cascades Comput. Innovation*, 2013 WL 6247594, at *16 (quoting *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997)); *see also Rebel Oil*, 51 F.3d at 1438 (market shares of less than 50 percent are generally insufficient to sustain monopoly power claims, and courts usually require 65 percent or more).

**Barriers to Entry.**  "A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme." *Rebel Oil*, 51 F.3d at 1437.  Plaintiffs must also prove that "entry barriers" are "capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting." *Id.* at 1439.

1    Where competitors have "expanded output in the recent past, or have the ability to expand output

2    in the future," a defendant lacks monopsony power.  *Id.* at 1441; *Omega Env't, Inc. v. Gilbarco,*

3    *Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997) (successful entry or expansion by a competitor

4    "precludes a finding that exclusive dealing is an entry barrier of any significance.").  Accordingly,

5    Plaintiffs cannot make the requisite showing that UFC had "the ability to exclude competition" if

6    Zuffa can demonstrate expansion of output in the relevant market and the entry and growth of

7    significant competitors.  *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 977

8    (9th Cir. 1999); *see also Epicenter Recognition, Inc.* v. *Jostens, Inc.*, 81 F. App'x 910, 912 (9th

9    Cir. 2003) (defendant lacked market power, despite its "dominant market share" where "existing

10   competitors could easily and quickly expand production and pick up the slack" if the defendant

11   "should attempt to increase prices or decrease quality").

12       ***Competitors' Capacity to Increase Output.***  Further, courts "must consider" events that

13   occurred since "the alleged barriers were in place" because "plaintiff must show that new rivals

14   are barred from entering the market" and liability for monopolization may not exist "[i]f there is

15   undisputed evidence indicating that competitors have expanded output in the recent past, or have

16   the ability to expand output in the future."  *Rebel Oil*, 51 F.3d at 1439–1441.  Where the market is

17   shown to be "more competitive" than before the conduct at issue, a firm lacks monopsony power.

18   *Syufy Enters.*, 903 F.2d at 665.

19                    **2.       Predatory Or Anticompetitive Conduct**

20       After proving monopsony power, Plaintiffs must also prove that UFC maintained its

21   dominant position in the relevant market through "predatory or anticompetitive conduct designed

22   to destroy competition."  *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1255 (9th

23   Cir. 1990).

24                    **a.       Exclusionary Contracts**

25       The thrust of Plaintiffs' claim is that UFC unlawfully acquired monopsony power through

26   the use of multi-bout fighter contracts.  Dr. Singer calculates his foreclosure share and injury as

27   measured by revenue shares to fighters solely as a result of 30-month contracts.  The bar to proving

28   that such exclusive dealing arrangements are anticompetitive is high.  There are "well-recognized

economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition." *Omega Env't, Inc.*, 127 F.3d at 1162.  Exclusive contracts "may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all." *E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 8 (1st Cir. 2004).  Accordingly, "exclusive dealing contracts are not disfavored by the antitrust laws." *Id*.  Instead, such contracts are unlawful only when they (1) "foreclose competition in a substantial share" of the market and (2) lack any legitimate business justification.  *Omega*, 127 F.3d at 1162; *Image Tech.*, 125 F.3d at 1212.

*Foreclosure of Competition.*  Plaintiffs must prove that UFC's exclusionary contracts "foreclose competition in a *substantial share* of the line of commerce effected."  *Omega*, 127 F.3d at 1162 (emphasis added) (citation omitted); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring) ("Exclusive dealing is an unreasonable restraint on trade only when a *significant* fraction of buyers or sellers are frozen out of a market by the exclusive deal." (emphasis added)).  While there is no specific percentage of buyers and sellers that constitutes a "substantial share" of the market, courts typically require a plaintiff to show foreclosure of competion in at least 30 to 40 percent of the market.  *See, e.g.*, *Omega*, 127 F.3d at 1162–65 (no anticompetitive injury where contracts foreclosed 38% of the market); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004); *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016), *aff'd*, 859 F.3d 408 (7th Cir. 2017).  Minor foreclosure of the market for MMA fighters will not suffice to prove that UFC's contracts are anticompetitive; the Ninth Circuit has held that exclusive contracts "allow effective [market] entry if 20 percent of the contracts expire monthly (or even annually)." *Omega*, 127 F.3d at 1164 (citation omitted); *see also Ticketmaster Corp. v. Tickets.com Inc.*, 2003 WL 21397701 at *2, 4 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005) (same result where 16% of Ticketmaster contracts came up for renewal in any given year and the average contract duration was six years).  Further, evidence of new market entry and continued growth of existing competitors is proof that such conduct is procompetitive, not anticompetitive.  *See, e.g.*,

1  *Sterling Merch., Inc. v. Nestlé, S.A.*, 656 F.3d 112, 125 (1st Cir. 2011) (exclusive contracts were

2  not anticompetitive where there was new market entry).

3  ***Lack of Legitimate Business Justifications.***  Plaintiffs must also prove the lack of any

4  legitimate business justifications for UFC's multi-bout contracts.  "When a legitimate business

5  justification supports a monopolist's exclusionary conduct, that conduct does not violate § 2 of the

6  Sherman Act."  *Image Tech.*, 125 F.3d at 1212.  An "antitrust defendant's conduct is redeemed by

7  a legitimate business purpose."  *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d

8  1256, 1258 (9th Cir. 1990).  Accordingly, there can be no "antitrust liability if there was a

9  legitimate business justification."  *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 369 (9th

10  Cir. 1988).

11  There are many types of procompetitive justifications.  For example, a defendant's conduct

12  is justified if undertaken to "enhance[] the quality or attractiveness of a product, increase[]

13  efficiency by reducing costs or otherwise benefit[] consumers."  *Image Tech.*, 125 F.3d at 1220

14  n.12 (quotation marks omitted).  Further, "a different business model" that spurs "competitive

15  innovations," increasing output and "improving the quality of the services" is also procompetitive.

16  *Am. Express Co.*, 138 S. Ct. at 2282.

17  An unquestioned legitimate business justification is hiring high quality, or the best

18  employees or contractors, or to grow a business. *Universal Analytics*, 914 F.2d at 1258–9.  In this

19  case, Plaintiffs' experts have recognized that access to a deep pool of talented fighters is a critical

20  input for any MMA promotion.

21  In addition, "prevent[ing] free-riding" is a well-recognized, "legitimate and lawful"

22  purpose for use of exclusive, multi-bout contracts such as Zuffa's.  *See, e.g.*, *Häagen-Dazs Co. v.*

23  *Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990) (citation omitted);

24  *O.S.C. Corp. v. Apple Comput., Inc.*, 792 F.2d 1464, 1468 (9th Cir. 1986); *Indep. Ent. Grp., Inc.*

25  *v. Nat'l Basketball Ass'n*, 853 F. Supp. 333, 340 (C.D. Cal. 1994) ("Exclusive employment

26  agreements lawfully prevent such free-riding.").  Expanding output has also been accepted as a

27  legitimate business justification for employing exclusive-dealing arrangements.  *See Race Tires*

28  *Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 82 (3d Cir. 2010) (exclusive dealing

1   arrangement justified in part because it increased "car counts" in races and "ma[d]e for a more

2   successful show"); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 378 (7th Cir.

3   1986) ("The monopolist cannot be faulted for wanting to sell *more* output unless he is engaged in

4   some predatory or exclusionary scheme.").

5        Plaintiffs may prevail only if they demonstrate that each of Zuffa's proffered

6   procompetitive justifications is invalid or pretextual. *See Universal Analytics*, 914 F.2d at 1258–

7   59 & n.4 (9th Cir. 1990). Plaintiffs bear the burden of proving that UFC's "conduct [was not]

8   redeemed by a legitimate business purpose." *Id*. at n.9. An assertion that UFC's exclusive contract

9   arrangements were motivated by an intent to exclude competitors is insufficient, the existence of

10   other procompetitive justifications for the conduct in such a case precludes a Section 2 claim.

11   *Indep. Ent. Grp.*, 853 F. Supp. at 340; *cf. Universal Analytics*, 914 F.2d at 1259 (affirming

12   summary judgment where plaintiff failed to show that defendants' "legitimate business reasons for

13   hiring much needed and competent computer programmers" were pretextual, despite internal

14   memorandum stating that one goal of the hiring was to "wound" a competitor).

15        To prove pretext, Plaintiffs must adduce evidence that directly undermines the veracity of

16   Zuffa's proffered justification. *See Image Tech.*, 903 F.2d at 618–19. The Sherman Act "does not

17   give judges carte blanche to insist that a monopolist alter its way of doing business whenever some

18   other approach might yield greater competition." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V.*

19   *Trinko, LLP*, 540 U.S. 398, 415–16 (2004).

20               **b.**    **Other Allegations Of Anticompetitive Conduct**

21        Beyond Plaintiffs' primary focus on exclusionary contracts, they also claim that UFC

22   "locked up" fighters by contracting with more fighters than needed, engaged in coercive

23   contracting practices, improperly acquired smaller promoters, and competed aggressively with

24   rival promoters.

25        ***Predatory Hiring.***  Proof of predatory hiring—or "locking up" the supply of MMA

26   fighters—requires Plaintiffs to show that either UFC hired fighters solely "to harm the competition

27   without helping [itself]," or UFC's "clear nonuse" of the fighters. *Universal Analytics*, 914 F.2d

28   at 1258.

***Coercive Contracting.***  It is not coercive to offer athletes more money to re-sign an exclusive contract.  Indeed, exclusive dealing arrangements "may actually encourage, rather than discourage, competition because the incumbent and other competing . . . groups have a strong incentive continually to improve the [quality] and prices they offer in order to secure the exclusive positions."  *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994).  To prove that UFC acted anticompetitively by paying "too much" for athletes to re-sign their contracts with UFC, the payments must be predatory.  In other words, Plaintiffs must demonstrate that UFC's "higher bidding" on the "buy side" (*i.e.*, UFC's offering of more pay to fighters) resulted in below-cost pricing in the relevant output market (*i.e.*, UFC's offering of sports entertainment to viewers). *See, e.g.*, *Weyerhaeuser*, 549 U.S. at 313, 325; *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2008) ("predator[y] bidding on the [input] side must have caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs" (second alteration in original)); *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 2023 WL 6811871, at *12 (D. Or. Oct. 13, 2023) (dismissing monopsony claim that defendant's outbidding of rivals for inputs constituted anticompetitive conduct because plaintiffs did not show "facts sufficient to establish that Defendant bid in a manner which caused a loss" at any point in the relevant period).

***Acquisition of Competitors.***  Most of the acquisitions Plaintiffs identify occurred long before the Class Period.  Any claim based on those acquisitions is necessarily barred by the statute of limitations.  Moreover, the Strikeforce acquisition was reviewed by antitrust regulators who took no action on the transaction after conducting an investigation.  Nonetheless, Plaintiffs must prove that UFC acted improperly to "drive [competitors] out" to establish that acquisition of other promoters is a basis for anticompetitive conduct. *Syufy Enters.*, 903 F.2d at 672.  The Ninth Circuit recognizes that "in a competitive market, buying out competitors is not merely permissible, it contributes to market stability and promotes the efficient allocation of resources."  *Id*. at 663.  Where a promoter like UFC can demonstrate that it intended to use the contracts from acquired promoters to compete in the market more effectively, such an acquisition is seen as "vigorous competition on the merits of the type that the antitrust laws seek to promote."  *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1210 (C.D. Cal. 2011); *Allied Orthopedic*

1   *Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010) (acquisition lawful

2   where plaintiffs did not present evidence that Tyco's market share and exclusive contracts

3   "foreclosed competition in a substantial share of the market" and vendors of generic sensors

4   "remained able to compete for Tyco's customers by offering their products at better prices.").

5        ***Aggressive Competition with Promoters.***  Evidence of aggressive competition with rivals

6   is not evidence of unlawful, anticompetitive conduct—rather, the Sherman Act is "not directed [at]

7   'conduct which is competitive, even severely so,'" but only "against conduct which unfairly tends

8   to destroy competition itself." *Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 557 (9th Cir.

9   2018) (citation omitted).

10       ***Combined Effect of UFC's Conduct.***  While Plaintiffs may assess the "combined" effect

11  of a number of alleged anticompetitive acts, the "overall combined effect" analysis does not "allow

12  for clearly legal acts to be thrown into the mix" without regard to whether the acts are truly

13  anticompetitive.  *Crowder v. LinkedIn Corp.*, 2023 WL 2405335, at *7 (N.D. Cal. Mar. 8, 2023)

14  (citing *Masimo Corp. v. Tyco Health Care Grp., L.P.*, 2004 WL 5907538, at *5 (C.D. Cal. June

15  10, 2004)).  If Plaintiffs cannot prove that any of the "individual action[s] alleged" rises to

16  "anticompetitive conduct in the relevant market . . . their collective sum likewise does not."

17  *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022).

18       **C.**     **Plaintiffs Must Prove Antitrust Injury Resulting From UFC's Anticompetitive**

19              **Conduct**

20       Finally, Plaintiffs must prove they were injured in their business or property due to UFC's

21  alleged anticompetitive conduct.  To show antitrust injury, Plaintiffs must prove that their loss

22  "flows from an anticompetitive aspect or effect" of UFC's behavior, "since it is inimical to the

23  antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Rebel*

24  *Oil Co. C. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).  Accordingly, if Plaintiffs' injury

25  results from aspects of UFC's conduct that are "beneficial or neutral to competition, there is no

26  antitrust injury." *Id*.  And, where there is no "cognizable injury" to plaintiffs, there is no valid

27  monopsonization claim.  *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574,

28  586 (1986); *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015).

1  **IV.     SUMMARY OF PLAINTIFFS' CLAIMS**

2          What remains of Plaintiffs' case is a theory of liability premised on an allegation that  UFC

3  violated Section 2 of the Sherman Act by monopsonizing the market for "Elite Professional MMA

4  Fighter services" in the United States during the Class Period.

5          Plaintiffs' monopsony power case rests entirely on the notion that evidence of aggregate

6  wage share as a percentage of UFC's revenues, somehow constitutes "direct evidence" of wage

7  suppression.  *See* Pls.' Opp'n to Def.'s Renewed for Summ. J. at 21, Dkt. 926 ("direct proof of one

8  monopsonistic harm—such as wage suppression—establishes monopsony power even in the

9  absence of other such harms").  Wage share is not direct proof of anything, much less monopsony

10 power—and certainly not when the undisputed evidence is that UFC has only ever increased

11 fighter compensation throughout the Class Period.  No monopsonist, with the actual power to

12 reduce the output of labor and thus depress wages below competitive levels, would continually

13 increase athlete compensation as UFC did.  And relying, as Plaintiffs do, on purported wage share

14 evidence further fails, as direct evidence of monopsony power requires *both* proof of a reduction

15 of output and suppressed pricing.  *See e.g.*, *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475-76 (9th

16 Cir. 1997) (a plaintiff must present evidence on **both** output and price in order to show

17 monopoly/monopsony power) (emphasis added).  It is the ability to reduce output below

18 competitive levels that allows a monopsony buyer to depress prices—here fighter compensation.

19 *See In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 516 (5th Cir. 1990); *Rebel Oil Co.*, 51 F.3d at

20 1434.  Beyond the indisputable increase in compensation, because UFC also indisputably has

21 increased output of MMA events throughout the Class Period, Plaintiffs will be unable to prove

22 monopsony power through "direct evidence."

23         Plaintiffs also intend to proceed to trial without a proper definition of the relevant market

24 for MMA fighters – an essential aspect of their Section 2 claim.  *FTC v. Qualcomm, Inc.*, 969 F.3d

25 974, 992 (9th Cir. 2020) ("A threshold step in any antitrust case is to accurately define the relevant

26 market, which refers to 'the area of effective competition.'" (citation omitted)).  Plaintiffs' claimed

27 relevant market fails on all dimensions.  Plaintiffs assert that the relevant market is limited to the

28 United States or North America, even though UFC is a global brand that hires fighters from

1   throughout the world and competes with promoters worldwide.  And, on the product side, Plaintiffs

2   rely on Dr. Singer and his testimony identifying four hypothetical markets:  (1) "Zuffa Only"

3   fighters; (2) "Tracked" fighters; and (3) "Ranked" fighters.[6]  These market definitions have shifted

4   throughout the litigation.  At the outset, Plaintiffs had an entirely different concept of what the

5   relevant markets could be, originally claiming a market consisting of MMA promoters who

6   featured "Elite" fighters, and that is the market appearing in the Court's class certification order.

7   *Le v. Zuffa*, 216 F. Supp. 3d. 1154, 1165–67 (D. Nev. 2016); Dkt. 1 ¶¶ 55–58; Dkt. 839 at 25.

8   Plaintiffs pivoted in their summary judgment opposition and used "top-level" as their new

9   shorthand.  *See, e.g.*, Dkt. 926 at 5, 11, 13.

10      To show antitrust injury, Plaintiffs apparently intend to rely upon expert analysis measuring

11   injury for the average fighter, rather than individual members of the class.  Plaintiffs do not appear

12   to intend to present evidence of a fighter-by-fighter assessment of damages, but instead will argue

13   that UFC has a common compensation structure such that an individualized inquiry is

14   unnecessary—notwithstanding the requirements of Article III and the antitrust laws.  Plaintiffs

15   also maintain that wage share is the appropriate metric by which to calculate damages, apparently

16   intending to draw a comparison between UFC and various major league sports despite the myriad

17   distinctions and major league sports' established history over several generations.

18   **V.    SUMMARY OF UFC'S KEY ARGUMENTS AND EVIDENCE[7]**

19      To establish monopsonization, Plaintiffs will have to prove three elements—that UFC (i)

20   possessed monopsony power in the relevant market; (ii) willfully acquired or maintained that

21   power through exclusionary or anticompetitive conduct; and (iii) caused antitrust injury.

22   *Qualcomm*, 969 F.3d at 990.  Plaintiffs can prove none of these.  The evidence at trial will show

23   that UFC does not possess monopsony power in any properly defined market; that it did not engage

---

[6]      Dr. Singer has at times referred to a *submarket* he calls the "Headliner" submarket.  That is not alleged to be a relevant market that was monopsonized in this case.  No testimony should be permitted in this case regarding any such "sub-market"—which is unalleged and inconsistent with the certified Bout Class—and Zuffa will be filing a motion in limine to preclude it.

[7]      While Zuffa outlines its anticipated arguments and evidence at trial, Zuffa cannot predict the precise nature of Plaintiffs' opening statement and case-in-chief.  As such, Zuffa's anticipated arguments and evidence may change to respond to various arguments, testimony, and evidence presented by Plaintiffs.

1  in any exclusionary or anticompetitive conduct; and that it did not cause Plaintiffs any cognizable

2  antitrust injury.

3        **A.      UFC Does Not Possess Monopsony Power In Any Properly Defined Market**

4              **1.      Plaintiffs Have Not Defined A Proper Relevant Market**

5              Plaintiffs have not identified any evidence to support their operative theory that the relevant

6  input market is one constricted to ranked or "top" fighters, only within the United States or North

7  America.  Of course, as the Court is familiar, UFC, like its competitors, draws talent from a global

8  MMA athlete pool.  UFC also promotes events throughout the world—and competes with

9  promoters globally that also hire MMA fighters, including those who formerly fought for UFC.

10  As discussed above, Plaintiffs seemingly intend to present to the jury various alternative theories

11  to define the relevant market—an approach that is both procedurally improper and likely to confuse

12  the jury

13             **2.      Plaintiffs Have No Direct Evidence Of Monopsony Power**

14             To prove monopsony power, Plaintiffs must show that UFC can reduce wages by

15  decreasing its consumption of labor, thereby decreasing output of events.  *Rebel Oil*, 51 F.3d at

16  1434; *In re Beef Indus. Litig.*, 907 F.2d at 516.  But it is undisputed that UFC *increased* its

17  consumption of athlete services, its athlete compensation, and its output of MMA events during

18  the Class Period.  Statement of Undisputed Facts in Supp. of Renewed Mot. for Summ. J. ¶¶ 5–

19  10, Dkt. 878 ("SUF"); Def.'s Renewed Mot. for Summ. J. Exs.: Ex. 11, Dkt. 879-11; Ex. 8, Epstein

20  Dep. 98:11–99:4, Dkt. 879-8; Ex. 113, Epstein Decl. ¶¶ 3–4, Dkt. 879-113; Ex. 4, Expert Report

21  of R. Topel ¶¶ 93, 169–71 & Exs. 17–18, Dkt. 879-4 ("TRI"); Ex. 12, Singer Dep. II 459:12–

22  460:8, Dkt. 879-12; Ex. 13, Vera Decl. ¶ 3, Dkt. 879-13.

23             Starting with output, UFC went from promoting just seven events in 2002 to 42 events in

24  2022.  SUF ¶ 7, Dkt. 878; Dkt. 879-11; Epstein Decl. ¶ 3, Dkt. 879-113.  During the Class Period

25  alone, UFC increased the number of events it held by nearly 30 percent.  SUF ¶ 7, Dkt. 878; Dkt.

26  879-11.  Even Plaintiffs' expert, Dr. Singer, concluded that UFC expanded its output during the

27  relevant period.  Def.'s Renewed Mot. for Summ. J. Ex. 70, Expert Report of H. Singer ¶¶ 138–

28  39, Fig. 4A, 4B, Dkt. 879-70 ("SRI").  To circumvent their inability to show that UFC restricted

output, Plaintiffs argue that what matters is whether *marketwide* output decreased, not whether *UFC's* did.  Dkt. 926 at 25.  But that runs directly contrary to case law, which requires Plaintiffs to prove that a firm has the power to affect marketwide output "*by restricting its own output*." *Rebel Oil*, 51 F.3d at 1434 (emphasis added); *Nationwide Power Sols. Inc. v. Eaton Elec. Inc.*, 2008 WL 11408997, at *8 (C.D. Cal. Oct. 10, 2008) (rejecting argument that only "total output in the market" matters).  Plaintiffs' total lack of evidence that UFC ever reduced its output during the Class Period is fatal to proving monopsony power by direct evidence.[8]

Plaintiffs likewise lack any evidence that UFC reduced athlete compensation.  To the contrary, the expansion of UFC caused a corresponding *increase* in compensation to fighters. Again, uncontested evidence shows that compensation paid to UFC athletes only ever increased during the Class Period.  SUF ¶¶ 8–10, Dkt. 878; Singer Dep. II 459:12–460:8, Dkt. 879-12; TRI ¶¶ 169-71, Exs. 17–18, Dkt. 879-4.  From 2005 to 2016, UFC's per-bout compensation grew at an average annual rate of 18%.  Def.'s Renewed Mot. for Summ. J. Exs.: Ex. 14, Mersch Dep. 476:10–477:11, Dkt. 879-14; Ex. 15, Batchvarova Dep. 64:15–65:23, Dkt. 879-15; TRI ¶ 58, Dkt. 879-4. And from 2011 to 2016 alone, UFC's top athletes saw their compensation increase by an average of 21%, while its lower-ranked athletes saw increases of approximately 50%.  TRI ¶¶ 44, 58, 169–171, 180–91, Dkt. 879-4.  Plaintiffs have no evidence to the contrary.  Plaintiffs also do not offer evidence that actual compensation would have been higher in the absence of UFC's alleged antitrust violations.  Instead, they rely on Dr. Singer's wage-share analysis, *see generally* SRI, Dkt. 879-70, but that analysis shows only that wages did not grow as fast as UFC's revenue; it says nothing about whether wages were below the competitive level.  Def.'s Renewed Mot. for Summ. J. Ex. 49, Expert Rebuttal Report of R. Topel ¶ 8, Dkt. 879-49 ("TRII"); *see* Dkt. 524 at 12–20. Therefore, Plaintiffs will not be able to show monopsony power by direct evidence.

### 3.    Plaintiffs Have No Indirect Evidence Of Monopsony Power

Plaintiffs will not be able to prove monopsony power with indirect evidence either.  To make this showing, Plaintiffs must demonstrate the existence of "entry barriers . . . capable of

---

[8]       And, actual output increased as well as UFC's competitors promoted more and more events year-over-year.  SUF ¶¶ 18–20, Dkt. 878.

1    constraining the normal operation of the market to the extent that the problem is unlikely to be

2    self-correcting." *Rebel Oil*, 51 F.3d at 1439.  Where, as here, competitors have "expanded output

3    in the recent past, or have the ability to expand output in the future," the defendant lacks

4    monopsony power. *Id.* at 1441; *see also Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164

5    (9th Cir. 1997) (entry or expansion by a competitor "precludes a finding that exclusive dealing is

6    an entry barrier of any significance"); *Epicenter Recognition, Inc. v. Jostens, Inc.*, 81 F. App'x

7    910, 912 (9th Cir. 2003) (defendant lacked market power, despite its "dominant market share,"

8    where "existing competitors could easily and quickly expand production").

9        The evidence at trial will show that barriers to entry were low and competition was robust

10   throughout the Class Period and for many years after it.  Bellator—one of UFC's largest

11   competitors—expanded output from 10 events in 2009 to an average of over 20 each year during

12   the Class Period.  SUF ¶ 18, Dkt. 878; Epstein Decl. ¶ 6, Dkt. 879-113; TRI at Ex. 23, Dkt. 879-

13   4.  Other promoters like PFL, ONE Championship, and Absolute Championship Berkut all entered

14   the market during the Class Period and expanded output.  SUF ¶¶ 18–20, Dkt. 878; Epstein Decl.

15   ¶¶ 8, 11, Dkt 879-113; Def.'s Renewed Mot. for Summ. J. Ex. 72, Dkt. 879-72.  And this trend has

16   only continued after the Class Period.  PFL, for example, now brands itself as "the #1 fastest

17   growing sports league and the #2 MMA company worldwide," attracting significant investment

18   and sponsorships from well-known entities.  SUF ¶ 18, Dkt. 878; Epstein Decl. ¶¶ 8–10, Dkt. 879-

19   113.  Bellator has likewise continued to grow and now has a dedicated channel on Pluto TV.  SUF

20   ¶ 18, Dkt. 878; Epstein Decl. ¶ 6, Dkt. 879-113.

21       Moreover, the market for athlete services is saturated with talent; UFC's competitors

22   frequently outbid UFC when hiring athletes, including during UFC's contractual matching period,

23   and develop their own up-and-coming talent.  SUF ¶¶ 21–25, Dkt. 878; Def.'s Renewed Mot. for

24   Summ. J. Exs.: Ex. 57, C. Silva Dep. 204:23–25, Dkt. 879-57 (affirming WSOF can sign MMA

25   athletes from "a large talent pool"); Ex. 77, Knapp Dep. 226:9–12, Dkt. 879-77 (Invicta has been

26   able to contract with elite MMA athletes); Ex. 80, Expert Report of R. Blair ¶ 37, Fig. 1 & n.61,

27   Dkt. 879-80 ("BRI") (showing hundreds of former UFC athletes competing for other promotions

28   and later returning to UFC); Ex. 79, Campbell Decl. ¶¶ 3–20, Dkt. 879-79.  While UFC paved the

1  way in MMA, and enjoys name recognition and early rewards as a result, UFC's competitors have

2  not been denied the necessary "inputs" to put on successful MMA events.  *See* SUF ¶ 25, Dkt. 878;

3  C. Silva Dep. 205:12–18, Dkt. 879-57; Knapp Dep. 222:5–11, Dkt. 879-77; Def.'s Renewed Mot.

4  for Summ. J. Ex. 88, Hume Decl. ¶ 4, Dkt. 879-88.

5        Plaintiffs will likely focus on communications from UFC executives describing their

6  company as the top MMA promoter.  *See* Dkt. 926 at 26-27.  But the beliefs of UFC's leadership

7  regarding their own promotion is not evidence that other promoters were barred from obtaining

8  the inputs they needed to effectively compete.  The testimony from those competing promoters

9  will confirm otherwise.  *See* SUF ¶ 25, Dkt. 878 (collecting deposition testimony from competing

10  promoters that UFC did not block them from obtaining fighters); *e.g.*, C. Silva Dep. 205:12–18,

11  Dkt. 879-57; Knapp Dep. 222:5-11, Dkt. 879-77; Hume Decl. ¶ 4, Dkt. 879-88.

12       **B.**    **UFC Did Not Engage In Exclusionary Or Anticompetitive Conduct**

13        The evidence at trial will show that UFC's conduct was pro-competitive and did not

14  deprive competing promoters of a substantial share of the supply of MMA fighters.  Witnesses

15  will testify that UFC acquired its dominant market position through substantial investment in

16  building and growing the sport of MMA, including before the start of the Class Period.  Witnesses

17  will also testify that the market for MMA was virtually non-existent when Zuffa purchased UFC,

18  that Zuffa invested tens of millions of dollars in legitimizing the sport and removing bans on MMA

19  events in 36 states, and that Zuffa grew a fanbase for MMA by producing popular television

20  programs like *The Ultimate Fighter*.  SUF ¶¶ 1–6, Dkt. 878; Def.'s Renewed Mot. for Summ. J.

21  Ex. 1, Fertitta Dep. 147:9–25, 197:24–198:17, 295:21–297:15, Dkt. 879-1; Epstein Decl. ¶ 3, Dkt.

22  879-113; TRI ¶¶ 49–51, Dkt. 879-4; Def.'s Renewed Mot. for Summ. J. Ex. 6 at ZFL-1454440,

23  Dkt. 879-6; Epstein Dep. 15:16–20:6, 17:1–18:1, 460:19–461:6, 200:8–202:11, Dkt. 879-8.

24  Witnesses will further testify that UFC's competitors had access to top athletes throughout the

25  Class Period.  Plaintiffs will be unable to present any evidence showing UFC's competitors had

26  insufficient access to such athletes, either by virtue of UFC's exclusive contracts or a grab-bag of

27  other challenged conduct.

28

1   **1.**   **UFC's Exclusive Contracts Are Procompetitive And Do Not Foreclose A Substantial Share Of The Market.**

2

3   **a.**   **Plaintiffs Will Be Unable To Show Substantial Foreclosure**

4   Plaintiffs' case alleging a foreclosure share with an effect on shares of UFC revenues to

5   fighters rests on UFC's multi-bout contracts alleged to be 30 months in average duration.

6   Plaintiffs do not show that these contracts foreclosed any competitor by driving them from the

7   market, limiting their growth, or blocking their entry.

8   UFC's multi-bout, industry-standard contracts did not deprive competitors of a substantial

9   share of MMA athletes.  Approximately 80% of Plaintiffs' alleged Ranked Market was available

10   to contract with UFC's competitors throughout the Class Period.  SUF ¶ 21, Dkt. 878; Def.'s

11   Renewed Mot. for Summ. J. Ex. 99, Dkt. 879-99.  That is significantly lower than the percentage

12   courts typically require to support an exclusive dealing claim.  *See, e.g., Stop & Shop Supermarket*

13   *Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) ("foreclosure levels are

14   unlikely to be of concern where they are less than 30 or 40 percent"); *Methodist Health Servs.*

15   *Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016) ("Courts

16   typically require a plaintiff to make an initial showing of foreclosure from competing in at least 30

17   to 40 percent of a market to proceed with a claim"), *aff'd*, 859 F.3d 408 (7th Cir. 2017); *Omega*,

18   127 F.3d at 1162-65 (no anticompetitive injury where contracts foreclosed 38% of the market).

19   Plaintiffs insist that UFC's foreclosure share is higher, but the only way they reach that

20   higher number is through an improper math trick.  Plaintiffs weight fighters by the revenue

21   generated by their promotors.  SRI ¶¶ 128–29, Dkt. 879-70; Def.'s Renewed Mot. for Summ. J.

22   Ex. 49, Rebuttal Expert Report of H. Singer ¶¶ 59, 128–37, 144-48, Dkt. 879-49, ("SRII").

23   Because UFC was the highest-grossing promoter during the Class Period, its fighters are always

24   weighted more, all else being equal.  Plaintiffs contend that this weighting is necessary to account

25   for differences in fighter skill level.  But "it makes no economic sense to adjust for athletes' quality

26   by weighting them by their promoters' revenue."  TRI ¶ 162, Dkt. 879-4.  Doing so produces

27   nonsensical results, such as the conclusion that the 183rd-ranked athlete in 2017 was worth *17*

28   *times more* than the 3rd-ranked athlete, merely because the former competed for UFC and the latter

for Bellator. *Id.* ¶¶ 162, 221; *see also* Dkt. 878 at 23 (collecting examples). To adjust for skill level, Plaintiffs could have weighted by other, more relevant metrics like rank or experience, but they chose not to do so. That is likely because stratifying the athletes by their ranking actually results in a finding of *no statistically significant correlation* between foreclosure share and wage share. TRI ¶¶ 165–67, Dkt. 879-4.

Moreover, even if a substantial share of fighters were under contract, UFC's agreements did not foreclose sufficient share of the market because their expiration dates were staggered. SUF ¶ 14, Dkt. 878; TRI ¶ 118, Dkt. 879-4. The Ninth Circuit has held that exclusive contracts "allow effective entry if 20 percent of the contracts expire monthly (or even annually)." *Omega*, 127 F.3d at 1164; *see also Ticketmaster Corp. v. Tickets.com Inc.*, 2003 WL 21397701 at *2, 4 (same where 16% expired annually), *aff'd*, 127 F. App'x 346, 348 (9th Cir. 2005). Given that UFC's contracts constantly expired throughout the year, Plaintiffs will not be able to show substantial foreclosure. UFC anticipates that Plaintiffs will argue that staggered contracts make it harder for competing promoters to hire numerous fighters in one fell swoop, *see* Dkt. 926 at 30, but there is no evidence that promoters want to or need to hire a critical mass of fighters all within a certain timeframe. UFC started with just over 60 fighters, successful competitors have started with the same or fewer fighters, and Plaintiffs will have no explanation at trial for why any existing or new competitor promoter could not do the same.

Finally, UFC will present real-world evidence and testimony from competing promoters that confirm UFC did not foreclose a substantial share of the athletes. That evidence will show that athletes can and did frequently move between competing promoters during the Class Period. From 2011 to 2016, at least 230 former UFC athletes competed for other promotions every year. SUF ¶ 21, Dkt. 878. In 2016, as many as 309 former UFC athletes did so. *Id.* While Plaintiffs will attempt to downplay this evidence by casting former UFC athletes as leaving the "major league," the undisputed evidence shows that 182 of the athletes who left UFC to fight for another promotion later came back to fight for UFC again. *Id.* And UFC's own competitors all insist that UFC's contracts (which are industry-standard) *did not and do not prevent them* from hiring the athletes they need. *Id.*; BRI ¶ 37, Fig. 1, Dkt. 879-80; *see A. H. Cox & Co. v. Star Mach. Co.*, 653

1   F.2d 1302, 1308 (9th Cir. 1981) (emphasizing "uncontradicted testimony" from competitors that

2   "competition . . . remained vigorous").

3      Plaintiffs will try to dispute this real-world evidence with Dr. Singer's hypothetical wage-

4   share model, but that model does not show that UFC's contracts substantially foreclose

5   competition.  Dr. Singer admitted that his conclusion that 30-month exclusive dealing contracts

6   are unlawful was not drawn from any empirical assessment, but from his *legal* conclusion as to

7   "what would be a duration that would be acceptable to a Court."   Singer Dep. II 375:7–376:3,

8   Dkt. 879-12; Def.'s Renewed Mot. for Summ. J. Ex. 16, Singer Dep. I 46:20–47:9, 152:1–7, Dkt.

9   879-16.  But courts have repeatedly found contracts more than twice that length to be lawful.  *E.g.*,

10  *Ticketmaster*, 127 F. App'x at 347 (six-year contracts lawful); *Ferguson v. Greater Pocatello*

11  *Chamber of Com., Inc.*, 848 F.2d 976, 982 (9th Cir. 1988) (six-year exclusive lease lawful).  Dr.

12  Singer's unsupported legal conclusion to the contrary is not evidence of substantial foreclose.  Nor

13  can Dr. Singer's conclusion that 30-month contracts result in substantial foreclosure be justified

14  on the length of an athlete's career, which lasts an average of 8.7 years.  SUF ¶ 12, Dkt. 878; TRII

15  ¶¶ 39–40, Dkt. 879-50.  Indeed, several of the named plaintiffs fought for close to 20 years.

16
17   **b.    UFC    Has    Legitimate    And    Procompetitive    Business
     Justifications For The Industry-Standard Contracts Used
     During The Class Period**

18      Notwithstanding substantial foreclosure, Plaintiffs' claims still fail because UFC has

19  legitimate and procompetitive business justifications for its multi-bout contracts.  See Image Tech.,

20  125 F.3d at 1212.  The contracts promote investment in athletes by (1) reducing free-riding, and

21  (2) enabling promoters to expand output by ensuring they have a sufficiently deep roster of athletes

22  to staff each event.

23      The MMA industry relies on the development and maintenance of fighters' brands.  SUF

24  ¶¶ 1–10, Dkt. 878; see, e.g., Def.'s Renewed Mot. for Summ. J. Exs.: Ex. 21, Reinhardt Decl. ¶ 3,

25  Dkt. 879-21 ("Everything is better with UFC than other promotions . . . Not only did my

26  compensation increase, my popularity, my fan base, my recognition, and everything else has

27  increased as well."); Ex. 22, Vera Dep. 233:10–17, 234:21–235:4, Dkt. 879-22 (recognizing

28  Zuffa's promotional ability).  Promoters invest in building a following for their fighters, promoting

1   their stories and their rivalries, and hyping up matches.  SUF ¶ 10, Dkt. 878; *e.g.*, Reinhardt Decl.

2   ¶ 3, Dkt. 879-21.  Without multi-bout contracts, promoters would have little incentive to invest in

3   their fighters, as another promoter could swoop in to capture the benefits of those investments.

4   SUF ¶¶ 11–17, Dkt. 878; Epstein Decl. ¶¶ 4–5, Dkt. 879-113.  Preventing such free-riding is a

5   well-recognized, legitimate business justification.  *E.g., Häagen-Dazs Co. v. Double Rainbow*

6   *Gourmet Ice Creams, Inc.*, 895 F.2d 1417, at *5 (9th Cir. 1990) ("preventing free-riding" is a

7   "legitimate and lawful" purpose); *O.S.C. Corp. v. Apple Comput., Inc.*, 792 F.2d 1464, 1468 (9th

8   Cir. 1986) (same).  Indeed, UFC expects Plaintiffs to *concede* that some degree of exclusivity is

9   necessary in MMA contracts but argue that 12 months would suffice.  *See* SRI ¶ 264, Dkt. 879-

10  70.  But given the typical recovery period of 8 months between bouts, *id.* ¶ 308, a 12-month

11  contract would cover only a single fight—far from sufficient to incentivize promoters to invest in

12  their fighters.

13          Exclusive-dealing arrangements are also essential to growing output because they ensure

14  that promoters have a sufficient pool of athletes to staff events and satisfy media companies in

15  negotiations for media contracts.  SUF ¶¶ 13–15, Dkt. 878; Def.'s Renewed Mot. for Summ. J. Ex.

16  9, Acquisitions Dep. 177:14–178:5, Dkt. 879-9 ("[Y]ou just can't run a business doing 42 or 43

17  events per year without having the athletes exclusive to you"); *see Race Tires Am., Inc. v. Hoosier*

18  *Racing Tire Corp.*, 614 F.3d 57, 82 (3d Cir. 2010) (exclusive dealing arrangement justified in part

19  because it increased "car counts").  Given the nature of MMA, as much as "10 to 40 percent" of

20  UFC's athletes may be injured, on a leave of absence, or otherwise unavailable at any given time.

21  SUF ¶ 14, Dkt. 878; *see also* Renewed Mot. for Summ. J. Ex. 106, Dkt. 879-106 (in 2013 and

22  2014, nearly all of UFC's events had injured athletes that needed to be replaced).  Thus, to grow

23  output, "access to a broad stable of high-quality MMA fighters is essential," as even Plaintiffs'

24  expert, Dr. Singer, admits.  SRI ¶ 152, Dkt. 879-70; *see id.* ¶ 158.

25          That is precisely why UFC's contracts are standard throughout the MMA industry, as UFC

26  will show at trial.  *See* SUF ¶ 15, Dkt. 878 (Bellator and One Championship, and former competitor

27  World Series of Fighting ("WSOF"), all employed exclusive contracts of a similar, if not longer,

28  duration than UFC's during the Class Period); Epstein Decl. ¶¶ 4–5, Dkt. 879-113; TRI Exs. 4 &

5, Dkt. 879-4 (showing that Bellator's contracts contained all the same challenged provisions as UFC's); Renewed Mot. for Summ. J. Exs.: Ex. 90, Dkt. 879-90 (Fitch WSOF multi-bout, exclusive contract); Ex. 60, Dkt. 879-60 (same for Bellator); Ex. 59, Dkt. 879-59 (Vera One multi-bout, exclusive contract).

### 2.     The Remaining Challenged Conduct Is Not Anticompetitive

UFC anticipates that Plaintiffs will also challenge a grab-bag of other conduct, including offering fighters more money to re-sign with UFC early, "locking up" fighters, and acquiring smaller competitors one or two decades ago.  None of this conduct is anticompetitive.

*First*, paying fighters more to extend their contracts is not an "anticompetitive abuse." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 220) (citation omitted).  And Plaintiffs cannot dispute that fighters who re-signed with UFC "early" were paid 21.2% more.  TRI ¶ 122, Dkt. 879-4.  That is why the fighters themselves often sought to renegotiate their contracts before they expired.  *See e.g.*, Reply in Supp. of Renewed Mot. for Summ. J. Ex. 113, Fertitta Dep. 165:23–166:13, Dkt. 951-1; Pls.' Opp'n to Def.'s Renewed Mot. for Summ. J. Ex. 22, J. Silva Dep. 386:8–387:7, Dkt. 926-31.  Moreover, the Supreme Court has held that "higher bidding" for an input like fighter services can "only" serve "as a basis for liability" where that bidding "leads to below-cost pricing in the relevant output market."  *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 325 (2007).  Plaintiffs do not dispute that UFC fighters' compensation increased during the Class Period, that UFC paid more than other promoters, and that there is no evidence that its payments to fighters led to below-cost pricing of UFC's MMA events.  Dkt. 926 ¶ 26; *see* Singer Dep. II 459:12–460:8, Dkt. 879-12.  Given those concessions, Plaintiffs will be unable to show that UFC's strategy of re-negotiating contracts before their termination was anticompetitive.  Nor is this conduct the cause of any claimed damages in this case.

*Second*, Plaintiffs will not be able to show that UFC improperly "locked up" any fighters.  Legally, Plaintiffs cannot make out a "predatory hiring" claim, which is what they seek to do at trial.  A predatory hiring claim requires showing either that UFC hired the athletes solely "to harm the competition without helping itself," or UFC's "clear nonuse" of the athletes.  *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) (per curiam)

1    (citation omitted).  Plaintiffs will not be able to prove either.  As explained above, UFC hired more

2    athletes to grow its business.  SUF ¶ 13, Dkt. 878; *see* SRI ¶ 158, Dkt. 879-70 ("access to a deep

3    pool of talented Fighters is a critical input" for any MMA promotion).  And UFC used all of the

4    athletes it hired, including meeting all of its contractual obligations to provide certain numbers of

5    bouts.  Dr. Singer conceded that he was not aware of a single instance in which an athlete was not

6    offered the contracted-for number of bouts, and Plaintiffs have all but conceded that they have no

7    evidence to the contrary.  Singer Dep. I 316:19–318:24, Dkt. 879-16; Dkt. 926 at 25 n.74 (not

8    disputing that UFC always "placed its Fighters in 'the agreed-upon bouts'").

9         *Third*, Plaintiffs will not be able to show that any complained-of acquisitions were

10   anticompetitive.  It is undisputed that existing and new rival MMA promoters continue to compete

11   with UFC.  SUF ¶¶ 8, 18–25, Dkt. 878; *see, e.g.*, Epstein Decl. ¶¶ 5–15, Dkt. 879-113; Renewed

12   Mot. for Summ. J. Ex. 75, Dkt. 879-75 (annual events by promoter).  And after each acquisition,

13   UFC used the athletes from the acquired promoter to compete—and also *increased* their

14   compensation above what they made previously fighting for the acquired promoter.  Acquisitions

15   are lawful and procompetitive where the acquirer "intended to use the assets [of the acquired

16   company] and has done so to more effectively compete for [the acquired company's former]

17   customers and to meet customer needs."  *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*,

18   789 F. Supp. 2d 1201, 1210 (C.D. Cal. 2011).  That is the case here.  Output has only increased,

19   both in events and competing promotions throughout the Class Period.  Fighter pay has also only

20   increased.  Plaintiffs will not be able to show anticompetitive conduct.

21        **C.    UFC Did Not Cause Antitrust Injury**

22        Finally, UFC did not cause Plaintiffs any cognizable antitrust injury.  UFC anticipates that

23   Plaintiffs will argue that it caused them injury by (1) reducing wages below the competitive level;

24   (2) coercing class members to re-sign for greater pay before the termination of their contracts; and

25   (3) locking up fighters.  But Plaintiffs have no evidence of these alleged injuries.

26        As explained above and in UFC's *Daubert* motion, Dr. Singer's wage-share model suffers

27   from numerous flaws that render it incapable of showing any antitrust injury.  *See* Dkt. 524 at 12–

28   20.  Dr. Singer's model just shows that when UFC's foreclosure share went up, fighters' share of

1   UFC's revenues went down.  But that says nothing about whether fighters' actual compensation

2   decreased below competitive levels.  And when wage share is replaced with actual compensation

3   in Dr. Singer's model, the model shows *no* negative relationship between foreclosure share and

4   compensation.  TRI ¶¶ 28, 146–48, Ex. 13, Dkt. 879-4.  Dr. Singer's model depends on the

5   assumption that UFC should pay its fighters a fixed share of its revenues, but Plaintiffs cite no case

6   holding that the failure to do so constitutes an antitrust injury.  This is for good reason:  revenues

7   often increase faster than compensation for numerous, procompetitive reasons, including because

8   the promoter has increased its investment in marketing and production value.  Def.'s Opp'n to Pls.'

9   Mot. for Class. Certification Ex. 1, Topel Decl. ¶¶ 19–20, Dkt. 540-5; TRI ¶ 133, Dkt. 879-4.

10  Plaintiffs therefore will not be able to prove injury with Dr. Singer's model.

11      UFC anticipates that Plaintiffs' efforts to show injury through allegations that UFC

12  "coerced" or "locked up" fighters will be even weaker.  Plaintiffs have no evidence that any fighter

13  who re-signed with UFC was paid less than he or she would have been entitled to on their original

14  contract.  On the contrary, fighters were uniformly paid an average of 21.2% more.  TRI ¶ 122,

15  Dkt. 879-4.  As for Plaintiffs' suggestion that UFC "locked up" fighters, Plaintiffs have never

16  identified even a single fighter who was not given the number of fights promised in his or her

17  contract or who wanted to and was unable to move from UFC to a competing promoter.  Singer

18  Dep. I 316:19–318:24, Dkt. 879-16 (conceding he could not come up with an example); Dkt. 926

19  at 25 n.74 (similar).

20  **VI.    ZUFFA'S EXPECTED WITNESSES AND TESTIMONY**

21      Below is a list of witnesses that Zuffa may call at trial, and summaries of their anticipated

22  testimony.[9]  This anticipated testimony is subject to change depending on, among other things, the

23  nature of Plaintiffs' opening statement, testimony, and evidence presented during plaintiffs' case-

24

25

26

---

27   [9]     In addition to the individuals listed, Zuffa reserves the right to call any witness listed on
     Plaintiffs' preliminary witness list.  Zuffa also reserves the right to call witnesses not listed for
28   impeachment or rebuttal.

1   in-chief, any cross-examination of Zuffa's witnesses, and the Court's rulings on any pre-trial

2   motions, jury instructions, or other trial rulings.[10]

3       **A.    The Named Plaintiffs**

4       Zuffa intends to examine each of the named plaintiffs as hostile witnesses, including Kyle

5   Kingsbury, Jon Fitch, Cung Le, Javier Vasquez, and Brandon Vera, as well as Nathan Quarry.[11]

6   The scope, direction, and subject matter of Zuffa's examinations will depend, in part, on the

7   testimony that Plaintiffs elicit from these witnesses on direct.   Zuffa can anticipate several

8   categories of testimony that these witnesses will provide in response to Zuffa's questioning.

9       Each of the named plaintiffs, as well as Mr. Quarry, is expected to testify to their lack of

10  first-hand knowledge of Zuffa contracting practices that they complain of.   To this point, Plaintiffs

11  have largely advanced their case with hearsay and foundationless statements that are inadmissible.

12  For example, Plaintiffs' opposition to summary judgment relied on hearsay and foundationless

13  testimony from plaintiff Vera that "it was common knowledge in our industry" that Zuffa would

14  react a certain way if an athlete elected not to renew a contract.  Dkt. 929, at 9.  Mr. Vera admitted

15  in deposition that his testimony was based on "stories" he had heard from unidentifiable sources.

16  Pls.' Opp'n to Def.'s Renewed Mot. for Summ. J. Ex. 19, Vera Dep. 119:15 –18, Dkt. 926-21..

17  While the named plaintiffs complain about the "champion's clause" in UFC's contracts, that clause

18  never applied to them because none was ever a UFC weight class champion.  And though Plaintiffs

19  complain about the injury-extension clause in UFC's contracts, Plaintiff Kingsbury repeatedly

20  requested that UFC apply that clause of his contract so he could heal and improve his fighting

21  skills.  Defendant's Exhibit ("DX") -0167; DX-0741.[12]  Trial testimony will further confirm that

---

23  [10]    As the Court acknowledged during the January 19, 2024 status conference, "there may be
24  things that come in in rebuttal that are not necessarily in the trial brief."  Hr'g Tr. 22:22-23, Dkt.
    960.

25  [11]    While Mr. Quarry is discussed here together with the named plaintiffs, as described *supra*
26  Section II, Mr. Quarry never fought for UFC during the alleged Class Period and is not a member
    of the Bout Class.  As such, the parties have agreed that Mr. Quarry will not be referred to as a
27  "plaintiff" at trial.

28  [12]    Pursuant to the pre-trial schedule, Zuffa will provide the Court copies of the exhibits cited
    in this brief on February 28, 2024.

1    none of the named plaintiffs were ever negatively impacted by the contractual clauses they

2    complain about.

3         The named plaintiffs are also expected to testify about prior statements they have made

4    that directly contradict their allegations in this case.  Plaintiff Le wrote in a May 24, 2012 letter to

5    a California state legislator that "I have representatives and advisors that assist me in negotiating

6    agreements and I do not believe any of the provisions of the agreements contain provisions that

7    are in any manner coercive."   DX-0074.   Plaintiff Vera, as another example, signed a sworn

8    declaration under penalty of perjury in July 2011 stating that "UFC is the best MMA organization

9    to fight in," including because UFC provided him "with the best compensation and incentives,"

10   "expanded the most resources in promoting [him] and the events [he] fought in," and that "the

11   better MMA fighters have lots of options currently," including "any number of new MMA

12   promotions who are entering the field."  DX-0764.   And Mr. Quarry, for example, wrote in a July

13   19, 2011 email that "UFC is what has made me known through the world in the fight game.  And

14   I have no desire to ever fight anywhere else.   You guys have always been very clear and

15   straightforward with me."  DX-0040.

16        The named plaintiffs and Mr. Quarry are further expected to testify that Zuffa dramatically

17   improved their earning potential and opportunities as MMA athletes relative to other promoters

18   and the industry before Zuffa invested millions of dollars and dedicated years of work to

19   professionalize the sport.  For example, Plaintiff Le's bout compensation increased dramatically

20   due to Zuffa's acquisition of Strikeforce, leading him to earn over $2 million to participate in four

21   UFC bouts during the Class Period, two of which he lost.  Similarly, Plaintiff Fitch received almost

22   half a million dollars to participate in four UFC bouts during the Class Period, despite winning

23   only one of those bouts.  At the same time, Mr. Quarry wrote that "I don't care if Jon Fitch wants

24   to fight for free.  No one wants to see him fight."  DX-0014.  And Plaintiff Kingsbury was fighting

25   with a smaller promotion for only $1,000 guaranteed before he joined UFC, after which his

26   guaranteed and total compensation increased immediately—and dramatically.

27        Each of the named plaintiffs and Mr. Quarry is expected to testify that he willingly and

28   knowingly entered into the contracts that he now complains about, after having the opportunity to

review the contracts with his own advisors, managers, lawyers, or family members.  None of the named plaintiffs is expected to testify that Zuffa failed to pay or withheld any of the compensation that these former athletes contracted for.  Indeed, many of them will admit they received bonuses and compensation far in excess of their contracted-for compensation.

Several named plaintiffs are expected to concede that their own poor fighting results during the Class Period led them to earn less than Zuffa would have paid otherwise, thereby affecting their employability beyond Zuffa.  As a collective group, these named plaintiffs competed in 19 UFC bouts during the Class Period, but they collectively won only seven of them.  Nonetheless, multiple of these named plaintiffs still found opportunities to fight for MMA promoters other than UFC, including for Bellator, World Series of Fighting, Professional Fighters League, and ONE Championship.

None of the named plaintiffs is expected to testify that he ever wanted to terminate a bout contract with UFC and requested to terminate his agreement with UFC, but was denied the ability to do so.

At the Court's request, and after pre-trial motions have been resolved, Zuffa is prepared to provide additional information *in camera* regarding its expected testimony of the named plaintiffs during Zuffa's examinations.

### B.    Zuffa Current Or Former Employee Witnesses

Each of Zuffa's current or former employee witnesses is expected to testify about aspects of Zuffa's business operations prior to or during their employment, within the bounds of Federal Rules of Evidence 602 and 701.[13]  Each of these individuals was either deposed, listed in the parties' 2015, 2023, and 2024 disclosures, or some combination thereof.  They may testify about topics covered in those disclosures as well.  The Zuffa witnesses can also confirm the anticipated testimony from Plaintiffs concerning their compensation and opportunities to fight as well as their representation by lawyers, managers, and agents.  Anticipated topics of testimony for these

---

[13]    Zuffa does not represent that each witness can necessarily answer any and all questions about each topic provided for that witness.  Each witness's testimony will be limited to the scope permitted under the Federal Rules of Evidence.

witnesses may include, but are not necessarily limited to the following (witnesses listed in alphabetical order by last name):

1.  <u>Denitza Batchvarova</u>:  At times before and during the Class Period, Ms. Batchvarova was Senior Vice President of Strategy and Vice President of Strategy and Business Ventures at Zuffa.  Ms. Batchvarova is expected to testify about at least the following aspects of Zuffa's business operations: athlete compensation at UFC and other MMA promoters, athlete contract duration, cost and revenue analysis, financial planning and analysis, UFC's fundraising efforts, Zuffa's expansion of MMA events and athlete opportunities, and UFC's athlete outfitting policy.  Plaintiffs are not calling Ms. Batchvarova as a trial witness.

2.  <u>Craig Borsari</u>:  At times before and during the Class Period, Mr. Borsari was Chief Content Officer and Executive Producer at Zuffa.  Mr. Borsari is expected to testify about at least the following aspects of Zuffa's business operations:  UFC video, television, and broadcasting content production, promotion, and distribution efforts and expenses, the procompetitive drivers of UFC's success, and points of differentiation between UFC and other major sports operations.  Plaintiffs are not calling Mr. Borsari as a trial witness.

3.  <u>Peter Dropick</u>:  At times before and during the Class Period, Mr. Dropick was Executive Vice President, Event Development and Operations at Zuffa.  Mr. Dropick is expected to testify about at least the following aspects of Zuffa's business operations:  UFC event production, hosting, and promotion efforts and expenses, points of differentiation between UFC and other major sports operations, and the procompetitive drivers of UFC's success.  Plaintiffs are not calling Mr. Dropick as a trial witness.

4.  <u>Lawrence Epstein</u>:    At times before and during the Class Period, Mr. Epstein was Chief Operating Officer, Senior Executive Vice President, Executive Vice President, and General Counsel at Zuffa.  Mr. Epstein is expected to testify about at least the following aspects of Zuffa's business operations:  financial planning and analysis, Zuffa's costs and revenues, Zuffa's revenue-generation efforts, Zuffa's acquisitions, athlete compensation, athlete contract negotiation and application, Zuffa's lobbying and regulatory efforts, the procompetitive drivers of UFC's success, Zuffa's broadcasting operations, including production, distribution, licensing, and contracting, Zuffa's expansion of MMA events and athlete opportunities, and Plaintiffs' allegations regarding the relevant product and geographic market in this case.  Plaintiffs are not calling Mr. Epstein as a trial witness.

5.  <u>Lorenzo Fertitta</u>:  At times before and during the Class Period, Mr. Fertitta was a founder, Chief Executive Officer, and Chairman of Zuffa.  Mr. Fertitta is expected to testify about at least the following aspects of Zuffa's business operations:  Zuffa's formation, origins, and growth,

competition for MMA athletes and viewership and the ease of competitor entry, the procompetitive drivers of UFC's success, Zuffa's costs and revenues, Zuffa's revenue-generation efforts, Zuffa's acquisitions, athlete compensation, athlete contract negotiation and application, Zuffa's lobbying and regulatory efforts, points of differentiation between UFC and other major sports operations, Zuffa's expansion of MMA events and athlete opportunities, and Plaintiffs' allegations regarding the relevant product and geographic market in this case.  Plaintiffs intend to call Mr. Fertitta as a trial witness.

6.    <u>Tracy Long</u>:  At times before and during the Class Period, Ms. Long was the Vice President of Athlete Compliance and Regulatory, Senior Director of Athlete Compliance and Regulatory, Director of Athlete Relations, and Chief Paralegal at Zuffa.  Ms. Long is expected to testify about at least the following aspects of Zuffa's business operations:  athlete compensation, athlete contract duration, athlete contract negotiation and application, and athlete communications and relations.  Plaintiffs are not calling Ms. Long as a trial witness.

7.    <u>Mick Maynard</u>:  At times before and during the Class Period, Mr. Maynard was a Vice President of Talent Relations and Matchmaker at Zuffa, and before that an owner of Legacy Fighting Championship.  Mr. Maynard is expected to testify about at least the following aspects of Zuffa's business operations:  athlete compensation, athlete contract duration, athlete contract negotiation and application, athlete development, bout scheduling and planning, competition for MMA athletes, Zuffa's expansion of MMA events and athlete opportunities, and the procompetitive drivers of UFC's success.  Mr. Maynard may also testify about aspects of Legacy Fighting Championship's business operations, including: athlete compensation, athlete contract negotiation and application, and competition for MMA athletes.  Plaintiffs' amended complaint also attributes statements to Mr. Maynard, which may also be a subject of his testimony.  Am. Compl. ¶ 143, Dkt. 208.  Plaintiffs are not calling Mr. Maynard as a trial witness.

8.    <u>Marc Ratner</u>:  At times before and during the Class Period, Mr. Ratner was Senior Vice President of Government and Regulatory Affairs at Zuffa.  Mr. Ratner is expected to testify about at least the following aspects of Zuffa's business operations:  Zuffa's lobbying and regulatory efforts, public records of athlete compensation paid by UFC's competitors, protections and benefits Zuffa provided to athletes, and points of differentiation between UFC and boxing.  Plaintiffs are not calling Mr. Ratner as a trial witness.

9.    <u>Sean Shelby</u>:  At times before and during the Class Period, Mr. Shelby was a Director of Talent Relations, Vice President of Talent Relations, and Matchmaker at Zuffa.  Mr. Shelby is expected to testify about at least the following aspects of Zuffa's business operations:  athlete compensation, athlete contract duration, athlete contract negotiation and application, athlete development, bout scheduling and planning, competition for MMA athletes, the procompetitive drivers of UFC's success, Zuffa's expansion of

MMA events and athlete opportunities, and Plaintiffs' allegations regarding the relevant product and geographic market in this case. Plaintiffs intend to call Mr. Shelby as a trial witness.

10. <u>Joe Silva</u>: At times before and during the Class Period, Mr. Silva was a Senior Vice President of Talent Relations, Vice President of Talent Relations, and Matchmaker at Zuffa. Mr. Silva ceased working for Zuffa in December 2016. Mr. Silva is expected to testify about at least the following aspects of Zuffa's business operations: athlete compensation, athlete contract duration, athlete contract negotiation and application, athlete development, bout scheduling and planning, competition for MMA athletes, the procompetitive drivers of UFC's success, Zuffa's expansion of MMA events and athlete opportunities, and Plaintiffs' allegations regarding the relevant product and geographic market in this case. Plaintiffs intend to call Mr. Silva as a trial witness.

11. <u>Dana White</u>: At times before and during the Class Period, Mr. White was the President and Chief Executive Officer at Zuffa. Mr. White is expected to testify about at least the following aspects of Zuffa's business operations: Zuffa's formation, origins, and growth, athlete compensation, athlete contract negotiation and application, athlete development, bout scheduling and planning, competition for MMA athletes and viewership and the ease of competitor entry, points of differentiation between UFC and other major sports organizations, the procompetitive drivers of UFC's success, Zuffa's acquisitions, Zuffa's lobbying and regulatory efforts, Zuffa's revenue-generation efforts, Zuffa's expansion of MMA events and athlete opportunities, and Plaintiffs' allegations regarding the relevant product and geographic market in this case. Plaintiffs intend to call Mr. White as a trial witness.

12. <u>Marshall Zelaznik</u>: At times before and during the Class Period, Mr. Zelaznik was the Executive Vice President and Chief Content Officer at Zuffa. Mr. Zelaznik is expected to testify about at least the following aspects of Zuffa's business operations: UFC content production, promotion, and distribution efforts and expenses, UFC Fight Pass, and policies and practices regarding athlete likeness usages. Plaintiffs are not calling Mr. Zelaznik as a trial witness.

## C.   Fighter Witnesses

Zuffa intends to call as witnesses five MMA athletes that competed for UFC or a rival MMA promoter during the Class Period. These witnesses will demonstrate that the named plaintiffs' characterizations of Zuffa's business practices are inaccurate, and that six named plaintiffs do not reflect the views of all athletes that competed for UFC or a rival promotion during the Class Period. Within this group are weight class champions for UFC, Bellator, Strikeforce, and Cage Warriors, among other promoters. To the extent plaintiffs seek to make representations

about the career opportunities available to "top" MMA fighters, these athletes are far better positioned to provide that perspective than the named plaintiffs.  Because multiple of these witnesses are class members, and because Plaintiffs' counsel have repeatedly sought Court intervention to prevent anyone from contacting class members except for Plaintiffs' counsel, Zuffa's counsel has not been in contact with these witnesses and thus cannot provide specifics regarding their testimony.[14]  (Witnesses listed in alphabetical order by last name.)

1. <u>Michael Bisping</u>: Mr. Bisping is a class member, having fought in at least thirteen UFC bouts during the Class Period.  He is a former UFC middleweight titleholder, and former titleholder for Cage Rage and Cage Warriors.  He defeated named plaintiff Le in a UFC bout in August 2014, after which plaintiff Le tested positive for performance enhancing drugs.  Mr. Bisping is expected to testify about his opportunities as a top MMA athlete, his compensation, his UFC contracts, and his experiences competing for UFC and other MMA promoters.  Plaintiffs are not calling Mr. Bisping as a trial witness.

2. <u>Donald Cerrone</u>: Mr. Cerrone is a class member, having fought over twenty UFC bouts during the Class Period.  He is a former titleholder for Ring of Fire and also fought for World Extreme Cagefighting. Mr. Cerrone is expected to testify about his opportunities as a top MMA athlete, his compensation, his UFC contracts, and his experiences competing for UFC and other MMA promoters.  Plaintiffs are not calling Mr. Cerrone as a trial witness.

3. <u>Michael Chandler</u>: Mr. Chandler is a member of the putative *Johnson* class, having fought for UFC five times since 2021.  During the Class Period in this case, Mr. Chandler fought in over fifteen bouts for Bellator, and several bouts for Strikeforce in 2009 and 2010.  Mr. Chandler is expected to testify about his opportunities as a top MMA athlete, his compensation, his Bellator contracts, his Strikeforce contracts, and his experiences competing for Bellator, Strikeforce, and UFC.  Plaintiffs are not calling Mr. Chandler as a trial witness.

4. <u>Chael Sonnen</u>: Mr. Sonnen is a class member, having fought in at least six UFC bouts during the Class Period.  Mr. Sonnen also fought for Bellator during and after the Class Period, and several promoters before the Class Period, including Bodog Fights, World Extreme Cagefighting, Pancrase, and others.  Mr. Sonnen is expected to testify about his opportunities as a top MMA athlete, his compensation, his UFC contracts, and his experiences

---

[14]    During a February 16, 2024 meet and confer, counsel for Zuffa requested plaintiffs' counsel's permission to contact the four class members in this group.  To date, plaintiffs' counsel has not granted that permission.

competing for UFC and other MMA promoters.  Plaintiffs are not calling Mr. Sonnen as a trial witness.

5. <u>Miesha Tate</u>:  Ms. Tate is a class member, having fought in at least nine UFC bouts during the Class Period, and is the only female MMA athlete on either party's witness list.  She is a former UFC women's Bantamweight champion.  Ms. Tate also fought several bouts for Strikeforce, including bouts both before and after Zuffa acquired Strikeforce in 2011.  Ms. Tate is expected to testify about her opportunities as a top MMA athlete, her compensation, her UFC contracts, her Strikeforce contracts, and her experiences with UFC's acquisition of Strikeforce.  Plaintiffs are not calling Ms. Tate as a trial witness.

**D.   Manager Witnesses**

Zuffa intends to call as witnesses five professional MMA athlete managers that served as agents for multiple class members during the Class Period.  Each of these witnesses managed different Bout Class members with different career opportunities and is expected to testify regarding their individual experiences negotiating contracts with UFC and other MMA promoters, the opportunities available to the MMA fighters that they have represented, and their individual experiences with the challenged Zuffa contract clauses.  (Witnesses listed in alphabetical order by last name.)

1. <u>Ali Abdelaziz</u>:  Mr. Abdelaziz is a founder and Chief Executive Officer of Dominance MMA Management.  During the Class Period, he represented class members evidenced in the documentary record, including Fabricio Werdum, Rafael Natal, Ricard Abreu, Khabib Nurmagomedov, Rafael Dos Anjos, and Nick Catone, among others.   Mr. Abdelaziz was also temporarily an Executive Vice President and Matchmaker at World Series of Fighting.  Plaintiffs have also designated deposition testimony and exhibits about Mr. Abdelaziz to be played at trial, which could be a subject of his expected testimony.  In addition to the topics above, Mr. Abdelaziz can provide his first-hand accounts of obtaining benefits and protections for the MMA athletes he represented using contractual clauses that plaintiffs claim are harmful.  Plaintiffs are not calling Mr. Abdelaziz as a witness.

2. <u>Jason House</u>:  Mr. House is the Chief Executive Officer at Iridium Sports Agency.  During the Class Period, he represented class members evidenced in the documentary record, including Bobby Green, Louis Smolka, Pat Healy, Christos Gragos, Marion Reneau, Lewis Gonzalez, Reuben Duran, among others.  Mr. House managed over 20 Bout Class members during the Class Period, and over 50 athletes competing for other MMA promotions, and thus can provide important perspective into the MMA marketplace.  In addition to the above topics, Mr. House is expected to testify about his

experience managing athletes that moved from UFC, to another promotion, and back to UFC again.  Plaintiffs are not calling Mr. House as a witness.

3. <u>Josh Jones</u>:  Mr. Jones is the Vice President of Sports Marketing and Entertainment at KHI Management.  During the Class Period, Mr. Jones represented class members evidenced in the documentary record, including Donald Cerrone, Miesha Tate, and Rose Namajunas.  In addition to the above topics, Mr. Jones is expected to testify that he never experienced an athlete he represented being stuck in a UFC contract longer than the athlete wanted to fight for UFC.  Plaintiffs are not calling Mr. Jones as a witness.

4. <u>Dan Lambert</u>: Mr. Lambert is an attorney and the owner of American Top Team, where thousands of MMA athletes have trained.  During the Class Period, Mr. Lambert represented class members evidenced in the documentary record, including Antonio Silva, Yves Edwards, Gleison Tibau, and Cole Miller, among others.  Mr. Lambert also submitted a declaration produced in this case regarding his representation of MMA athletes.  DX-0573.  In addition to the above topics, Mr. Lambert can testify to instances when he negotiated early releases from UFC contracts on behalf of athletes that he represented.  Plaintiffs are not calling Mr. Lambert as a witness.

5. <u>Ed Soares</u>:  During the Class Period and prior, Mr. Soares was President of Tough Media Corp.  He has also been President of Resurrection Fighting Alliance, and then of Legacy Fighting Alliance.  In his former role as an athlete agent, Mr. Soares represented class members evidenced in the documentary record, including Anderson Silva, Glover Teixeira, Thales Leites, Alexandre Pantoja, and Junior Dos Santos, among others.  Mr. Soares managed over 30 MMA athletes during the Class Period, including multiple UFC titleholders, and athletes competing at prominent MMA promoters worldwide. Plaintiffs' amended complaint attributes facts and quotes to Mr. Soares, which would also be a subject of his expected testimony.  Dkt. 208 ¶ 141.  Plaintiffs are not calling Mr. Soares as a witness.

**E.    Likely Video Only Witnesses**

Zuffa intends to present testimony obtained during deposition from the following witnesses by video (witnesses listed in alphabetical order by last name):

1. <u>Jeffrey Aronson</u>:  At times before and during the Class Period, Mr. Aronson was Chairman of Alchemist Management and, after that, was the Chief Executive Officer of MMA promoter Titan FC.  Zuffa's deposition designations include Mr. Aronson's testimony about his experience negotiating with multiple MMA promoters on behalf of his client-athletes, the procompetitive drivers of UFC's success, competition for the hiring of MMA athletes, competition for viewership of MMA events, and the resources, costs, and inputs needed to operate an MMA promotion. Plaintiffs did not designate any deposition testimony by Mr. Aaronson.

2. <u>Scott Coker</u>:  At times before and during the Class Period, Mr. Coker was the President, Chief Executive Officer, and Owner of Strikeforce and, after that, became President of Bellator.  Zuffa's deposition designations include Mr. Coker's testimony about competition for the hiring of MMA athletes, competition for viewership of MMA events, and the resources, costs, and inputs needed to operate an MMA promotion, athlete development at Strikeforce and Bellator, athlete contract negotiation and application at Strikeforce and Bellator, Strikeforce's sale to UFC, increased compensation for athletes that moved from Strikeforce to UFC, the demise of MMA promoter Affliction, and the lack of any harm or foreclosure to Bellator from UFC's contracts.  Plaintiffs also designated deposition testimony by Mr. Coker to play at trial.

3. <u>Louis John DiBella</u>:  At times before and during the Class Period, Mr. DiBella was the President of DiBella Entertainment. Zuffa's deposition designations include Mr. DiBella's testimony about compensation within the boxing industry, including compared to compensation for MMA athletes, the economics of promoting boxing events, and athlete cross-over between MMA and boxing.  Plaintiffs also designated deposition testimony by Mr. DiBella to play at trial.

4. <u>Shannon Knapp</u>:  At times before and during the Class Period, Ms. Knapp was responsible for athlete relations for International Fight League, athlete relations and matchmaking at Affliction, athlete relations and matchmaking at Strikeforce, and then was a founder and President of MMA promoter Invicta.  Prior to that she was also an assistant for MMA athletes Randy Couture and Bas Rutten, and also a behind-the-scenes reporter for UFC. Zuffa's deposition designations include Ms. Knapp's testimony about her experience with the demise of MMA promoter Affliction, athlete compensation and contract negotiation and application at Affliction, Strikeforce, and Invicta, Strikeforce's sale to UFC, Strikeforce's sponsorship policies, MMA athlete development, bout scheduling and planning, competition for MMA athletes, competition for viewership of MMA events, and the resources, costs, and inputs needed to operate an MMA promotion, and the lack of any harm or foreclosure to other MMA promoters from UFC's contracts.  Plaintiffs did not designate deposition testimony from Ms. Knapp.

5. <u>Jeremy Lappen</u>:  At times before and during the Class Period, Mr. Lappen was, in relevant part, an attorney who represented MMA fighters, and the President of Fight Operations for MMA promoter Pro Elite / EliteXC. Zuffa's deposition designations include Mr. Lappen's testimony about his representation of MMA-athlete managers in their contract negotiations, and EliteXC's use of exclusive contracts with injury extension, retirement, and termination clauses.  Plaintiffs also designated deposition testimony by Mr. Lappen to play at trial.

6. <u>Leon Margules</u>:  At times before and during the Class Period, Mr. Margules was an attorney and the President of Warriors Boxing Promotion.  Zuffa's

deposition designations include Mr. Margules's testimony about compensation paid to boxers, including as compared to MMA athletes, the need to account for costs when comparing boxer compensation relative to event revenues, the economics of boxing event promotion, and the costs involved in boxing event broadcasting production as compared to MMA broadcasting production.  Plaintiffs also designated deposition testimony by Mr. Margules to play at trial.

7.   Kurt Otto:  At times long before the Class Period, Mr. Otto was a founder and Owner of International Fight League.  Mr. Otto's testimony should be excluded in its entirety as irrelevant, confusing, and unduly prejudicial as it relates to an MMA promoter that ceased to exist in 2008 and whose demise is not shown by any evidence to have caused antitrust injury in any relevant market.  Moreover, portions of his testimony regarding prior litigation should be excluded as barred by the *Noerr-Pennington* doctrine, as explained further in Zuffa's forthcoming motion in limine.  To the extent the Court does not exclude Mr. Otto's testimony in its entirety, Zuffa's deposition designations show that International Fight League used exclusive athlete contracts.  Plaintiffs also designated deposition testimony by Mr. Otto to play at trial.

8.   Brent Richard:   At times during the Class Period, in relevant part, Mr. Richard was the Global Head of Mergers and Acquisitions and Corporate Development at WME-IMG.  Zuffa's deposition designations include Mr. Richard's testimony about competition for MMA athletes and viewership and the ease of competitor entry, analyses regarding UFC's athlete compensation as compared to other sports, the procompetitive drivers of UFC's success, and WME-IMG's projections for the operation of UFC.  Plaintiffs also designated deposition testimony by Mr. Richard to play at trial.

9.   Carlos Silva: At times before and during the Class Period, Mr. Silva was the President of Business Operations at World Series of Fighting ("WSOF").  Zuffa's deposition designations include Mr. Silva's testimony about WSOF's broadcasting and event revenues, WSOF's financial projections, WSOF's sponsors, WSOF's roster of fighters, WSOF's ability to attract and retain MMA athletes, athlete development at WSOF, competition for viewership of MMA events, and the resources, costs, and inputs needed to operate an MMA promotion, the lack of any harm or foreclosure to WSOF from UFC's contracts, WSOF's use of contracts containing clauses that plaintiffs are challenging in this case, and points of differentiation between UFC and other major sports operations.  Plaintiffs also designated deposition testimony by Mr. Silva to play at trial.

10.   Andrew Simon:  At times before and during the Class Period, Mr. Simon was the Chief Executive Officer of AXS TV Fights.  Zuffa's deposition designations include Mr. Simon's testimony regarding the procompetitive drivers of UFC's success, and the output-expanding effect of Zuffa's

lobbying and regulatory efforts.   Plaintiffs also designated deposition testimony by Mr. Simon to play at trial.

**F.     Expert Witnesses**

Zuffa intends to call five expert witnesses, all of whom provided written expert disclosure and were deposed, and several of whom testified before the Court at the class certification evidentiary hearing.  Zuffa reserves the right for these witnesses to testify about any and all matters properly within the scope of their prior disclosures and testimony in this case, as permitted by Federal Rule of Civil Procedure 26(a)(2).  The definitive set of topics that these witnesses may cover at trial is included within those disclosures, but for illustration purposes only Zuffa provides some examples of their expected testimony below.  (Witnesses listed in alphabetical order by last name.)

1.  <u>Prof. Roger Blair</u>:   Professor Blair will provide rebuttal testimony to plaintiffs' designated expert Dr. Zimbalist, as well as offer analysis of UFC's athlete compensation.   Professor Blair's testimony will relate to flaws in Dr. Zimbalist's damages calculation and methodology, the lack of anticompetitive harm from UFC's challenged contractual practices, the procompetitive nature of UFC's challenged contractual practices, and the lack of a predominant pay level for a UFC athlete.

2.  <u>Elizabeth Davis</u>: Ms. Davis is an expert accountant who will provide testimony relating to UFC's compensation paid to athletes, Plaintiffs' expert's claims of damages, Zuffa's inability to have paid the compensation that Plaintiffs' experts identify as damages and still remain profitable, Plaintiffs' experts understating of Zuffa's costs and athlete compensation, the variability of UFC's financial performance, the anticipated use of Zuffa's pre- Class Period credit facilities, differentiation of UFC compared to other sports due to costs of production and promotion, and Strikeforce's and Bellator's financial performance.  Ms. Davis will also provide rebuttal testimony to the rebuttal report of plaintiffs' designated expert Guy Davis, including flaws in Mr. Davis's analysis due to hindsight bias, arbitrary assumptions, and the disconnect between Mr. Davis's analysis and plaintiffs' claim of damages.

3.  <u>Richard Marks</u>: Mr. Marks is an entertainment industry expert who will provide testimony relating to the range of compensation paid to actors, including as a percentage of revenue, which he opines is nowhere close to 50% of a project's gross revenues.

4.  <u>Paul Oyer</u>: Mr. Oyer is an expert economist who will provide testimony relating to the common and economically accepted methods of evaluating compensation, and to his assessment of whether plaintiffs' designated

experts Drs. Singer and Zimbalist's use of fighter pay as a percentage of revenue is consistent with accepted labor economics and supportive of their conclusions.

5.   <u>Robert Topel</u>:  Mr. Topel is an expert economist who has issued multiple reports and declarations in this case that serve as the best sources of his anticipated trial testimony.  Included among those topics are his opinions and analysis relating to the sources of Zuffa's marketplace success, Zuffa's steady and material increases in athlete compensation, Zuffa's expansion of MMA events, the ease of competitor entry and evidence of that entry, including entry and expansion continuing after the close of the Class Period in this case, the procompetitive nature of Zuffa's challenged contracts, the many flaws in Dr. Singer's opinions and analysis, including the assumptions underlying and structure of Dr. Singer's econometric work, Dr. Singer's flawed market definition analysis, Zuffa's lack of monopsony power, the lack of a common compensation structure for all Zuffa athletes, and many other opinions included in Prof. Topel's disclosures in this case.

## VII.   <u>RELEVANT PRIOR COURT RULINGS AND FILINGS</u>

Zuffa summarizes below various Court rulings and filings of the parties relevant to trial.

### A.   **Denial Of Zuffa's Motion To Dismiss**

In its ruling following Zuffa's filing of a motion to dismiss, the Court ruled Plaintiffs have not defended the allegations of their complaint alleging monopoly power over venues, sponsors, and television networks.  *See Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1159 (D. Nev. 2016). Accordingly, Zuffa expects Plaintiffs will be precluded from eliciting testimony about, or arguing in any way, that Zuffa maintained monopoly power over venues, sponsors, or television networks.

### B.   **Plaintiff's Opposition To Zuffa's Motion To Exclude Expert Testimony**

As part of their opposition to Zuffa's motion to exclude the testimony of Dr. Singer, Plaintiffs conceded they are not seeking damages for Zuffa's alleged monopolization.  Dkt. 534 at 37 (stating "Zuffa's monopoly power is not relevant to their theory of injury").  As such, Zuffa expects Plaintiffs will be precluded from arguing in any way to the jury, or seeking to introduce any evidence, relating to the notion that Zuffa ever maintained an illegal monopoly.

### C.   **Order Granting In Part And Denying In Part Plaintiffs' Motion To Certify Class**

As part of the Court's order granting in part and denying in part Plaintiffs' motion for class certification, the Court noted "in the course of briefing and arguing their motion for class

1  certification, Plaintiffs have abandoned their theory raised in the CAC that liability flows from

2  Defendant's monopoly power in the output market." Dkt No. 839 at 20 n.20. Based on this finding

3  from the Court, Zuffa expects Plaintiffs will be precluded from eliciting any testimony, introducing

4  any evidence, or making any argument suggesting Zuffa ever maintained an illegal monopoly.

5           **D.     Zuffa's 23(f) Petition**

6           Following the Court's order granting in part and denying in part Plaintiffs' motion to certify

7  class, UFC filed a petition for appeal to the Ninth Circuit pursuant to Federal Rule of Civil

8  Procedure 23(f). The Ninth Circuit denied Zuffa's petition without evaluating the merits of the

9  Court's certification order. *See* Or., *Le v. Zuffa, LLC*, No. 23-80074 (9th Cir. Nov. 1, 2023), Dkt.

10 11. As such, Zuffa intends to move to decertify the class and to continue arguing, including in any

11 appeal, that no class should have been certified.

12          **E.     Court's Order Denying Summary Judgment**

13          During the January 19, 2024, hearing, and subsequent order of the Court, the Court denied

14 Zuffa's renewed motion for summary judgment. Dkt. 959. In reaching its ruling, the Court

15 specifically incorporated its findings from its prior Class Certification Order. *Id*. at 5 ("the Court

16 finds that its Certification Order reviewed relevant admissible evidence and considered the

17 substantive issues in dispute in the Defendant's Motion for Summary Judgment.") The Court

18 noted "[i]n the earlier Order on Class Certification, the Court found that Plaintiffs had presented

19 sufficient evidence to demonstrate by a preponderance of the evidence that Defendant had

20 committed the alleged Sherman Act violation on a classwide basis.") *Id*. at 6; *see also id*. at 8 ("As

21 review of a near carbon copy record leads to a finding of genuine factual issues by the summary

22 judgment standard, the Court incorporates its reasoning and findings from the Class Certification

23 Order here by reference and finds that that, for the reasons outlined in that Certification Order and

24 viewing the evidence in the light most favorable to the Plaintiffs, Plaintiffs have established

25 genuine disputes for each material fact."); *id*. ("Having carefully considered the parties arguments

26 here, intervening developments, and carefully considered the record and law previously relied

27 upon in the Class Certification Order, the Court finds no reason to deviate from its prior reasoning

28 and findings.")

1    As part of its Order, the Court also found "Plaintiffs had provided sufficient evidence to

2    establish direct evidence of market power by showing Defendant exercised sufficient market

3    power to suppress wages." *Id*. at 9.  The Court went on to note that the mere fact that prices and

4    output both steadily increased throughout the Class Period was not dispositive of monopsony

5    power in the relevant markets.  *Id*.  Citing to its Class Certification Order, the Court also rejected

6    Zuffa's argument that a demonstrable lack of barriers to entry prevents plaintiffs from

7    demonstrating monopsony power through circumstantial evidence.  *Id*.

8    **VIII.   <u>ANTICIPATED EVIDENTIARY ISSUES</u>**

9        **A.   Limits On Lay Opinion Testimony**

10    Given the testimony cited by Plaintiffs throughout the class certification and summary

11    judgment briefing, and in light of Zuffa's familiarity with the named plaintiffs' deposition

12    testimony, Zuffa is particularly concerned Plaintiffs may seek to introduce opinion testimony far

13    beyond what is permissible.  A witness who is "not testifying as an expert" may only testify "in

14    the form of an opinion" provided the opinion is "(a) rationally based on the witness's perception;

15    (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

16    (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule

17    702."  *See* Fed. R. Evid. 701.  Here, the named plaintiffs' depositions are replete with references

18    to their opinions about, for example, the impact of UFC's fighter contracts on fighters' ability to

19    move between promotions.  Opinion testimony is inadmissible where it is not based on the

20    witness's own perception.  *Id*.  As discussed below, *infra* Section VIII(B)-(I), this testimony is also

21    subject to various other evidentiary challenges.

22        **B.   Speculative Testimony**

23    Zuffa anticipates Plaintiffs will attempt to elicit broad, speculative testimony from certain

24    witnesses.  For example, based on the deposition testimony of the named plaintiffs, Zuffa

25    anticipates Plaintiffs may seek to testify to what "all fighters" may have thought or experienced at

26    a relevant time.  Of course, such testimony is inadmissible as these witnesses lack personal

27    knowledge and, in any event, such testimony constitutes inadmissible hearsay.  Under Federal

28    Rule of Evidence 602, "[a] witness may testify to a matter only if evidence is introduced sufficient

to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602; *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, 2021 WL 5816302, at *2 (S.D. Ohio Dec. 7, 2021) ("Defendants may not present testimony or argument purporting to speak on behalf of all doctors or the entire medical community.")

### C.    Expert Witnesses

While Zuffa acknowledges the Court's prior orders, Zuffa continues to object to the admissibility of Plaintiffs' experts Drs. Singer and Zimbalist as neither experts' opinions satisfy *Daubert* or the standards under Federal Rule of Evidence 702.  *See* Def.'s Mots. to Exclude Test. of H. Singer and A. Zimbalist, Dkts. 522, 524 respectively.

### D.    Jury Instructions

Zuffa expects to file various contested jury instructions and verdict forms.  In particular, Zuffa anticipates proposing a set of instructions largely based on the Ninth Circuit and American Bar Association Model Instructions for Civil Antitrust Cases, with the primary exception being to convert those relevant monopolization instructions to monopsony instructions for purposes of the remaining pending claim in this trial.

Similarly, Zuffa expects to file a proposed verdict form carefully detailing the litany of questions and issues the jury will be required to resolve.

### E.    Evidence And Claims Related To Plaintiffs' Uncertified Identity Class

In its order regarding Plaintiffs' motion for class certification, the Court specifically denied certification of a purported "Identity Class," comprising fighters "whose Identity was expropriated or exploited by UFC, including in UFC Licensed Merchandise and/or UFC Promotional Materials in the United States from December 16, 2010 to June 30, 2017."  Dkt. 839, at 1-2.  Given the Court's denial of this class, any evidence regarding the uncertified "Identity Class," and associated claims, is irrelevant, unduly prejudicial, and creates a serious risk of jury confusion.  Plaintiffs have informed Zuffa that they seek to exclude references to the proposed but uncertified "Identity Class" on the grounds that such references are irrelevant and confusing to the jury.  Plaintiffs have also represented that they are not seeking damages based on a theory relating to disputes over athlete likeness rights.  Zuffa anticipates that, notwithstanding these positions, Plaintiffs may

1   attempt to introduce evidence related to athlete likeness rights disputes as relevant to the

2   anticompetitive scheme against the Bout Class.  But given the irrelevance and prejudicial nature

3   of such evidence, Plaintiffs should properly be precluded from referring to claims, arguments, or

4   evidence related to any disputes over fighters' likeness rights, including, among other things, any

5   arguments seeking to use these purported disputes as evidence of control UFC exercises over

6   fighters, as well as any damages based on these claims.

7         **F.**    **Admission Of Evidence Regarding Current Market Conditions**

8         As stated above, *supra* Section III, evidence regarding current market conditions is highly

9   relevant to the disputed issues of monopsony power and anticompetitive effects.  The Court "must

10   consider" events that occurred after "the alleged barriers were in place" because plaintiffs must

11   prove that "new rivals are barred from entering the market."  *Rebel Oil. v. Alt. Richfield Co.*, 51

12   F.3d 1421, 1439–40 (9th Cir. 1995).  If Zuffa is able to demonstrate "undisputed evidence

13   indicating that competitors have expanded output in the recent past, or have the ability to expand

14   output in the future" then there is no liability for monopsonization.  *Id*. at 1441.  Accordingly,

15   Zuffa will seek to admit at trial post-Class Period evidence regarding (1) entry and growth of

16   competitors in the relevant market, and (2) competitors' expansion of output in the relevant

17   market.  This evidence is relevant to the issue of whether Zuffa's alleged monopsony power was

18   durable.  *United States v. Syufy Enters.*, 903 F.2d 659, 665–66 (9th Cir. 1990) (in evaluating

19   monopsony power, "it is not market share that counts, but the ability to *maintain* market

20   share.").  Further, post-Class Period evidence of competitors' ability to emerge and grow in the

21   relevant market is also relevant to plaintiffs' theory that Zuffa's exclusionary contracts are

22   anticompetitive.  Plaintiffs allege that Zuffa has continued to use virtually identical contracts in

23   the time following the Class Period; thus, evidence that other MMA promoters have expanded

24   their presence in the relevant market during this same time period is plainly relevant to the alleged

25   anticompetitive effects of Zuffa's contracts.

26         In the event the Court precludes this evidence, Plaintiffs should correspondingly be barred

27   from raising arguments or eliciting testimony that implicates events after the Class Period, as such

28   evidence would be misleading and prejudicial without the relevant context.

### G.     Pre-Class Period Evidence

Zuffa anticipates various evidentiary disputes related to certain pre-Class Period evidence. First, acquisitions by Zuffa of other MMA promoters that occurred well before the Class Period are inadmissible and cannot be challenged under the applicable statute of limitations. *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 299 (D.C. Cir. 2023) (there is a presumptive four-year statute of limitations for challenging acquisitions). Evidence of such acquisitions is not only insufficient to establish anticompetitive conduct, irrelevant, and unfairly prejudicial, but also time-barred. *See* Phillip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 901a (5th ed. 2023) (the "mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality" under antitrust laws). Second, evidence of pre-Class Period contract negotiation, alleged coercive contracting, and Zuffa's payments to named plaintiffs is similarly irrelevant and unfairly prejudicial. Plaintiffs should be limited to evidence regarding UFC's alleged anticompetitive conduct within the certified Class Period.

Finally, Zuffa has produced numerous documents dating before the Class Period related to Zuffa's efforts to move MMA into the mainstream, legalize the sport, development of UFC events, and establishment of athlete compensation. Such evidence is relevant to the history of Zuffa and UFC, that its contracts are procompetitive rather than anticompetitive, that Zuffa enhanced output and compensation, and that fighters contracted with Zuffa not because of onerous contracts but because of Zuffa's success and compensation, and therefore should be admissible at trial.

### H.     Witness Disclosures

In a transparent attempt to present a false, curated narrative to the jury, Plaintiffs have indicated they intend to move to prevent thirteen of Zuffa's witnesses from testifying. This group of witnesses includes: (1) individuals that Plaintiffs quoted in their amended complaint; (2) individuals that Plaintiffs insisted be made custodians and whose documents and text messages Plaintiffs poured over and have included on their trial exhibit list; and (3) individuals that Plaintiffs repeatedly asked about in depositions, written discovery requests, and even relied upon in their expert reports. And, perhaps most shocking of all, Plaintiffs are seeking to preclude at least four

1   members of the Bout Class—athletes Plaintiffs claim to represent—from telling the jury about

2   their experiences with UFC and its rivals.  These are witnesses that were repeatedly disclosed to

3   Plaintiffs, and many of whom Plaintiffs put at issue in this litigation.  It is time to hear from these

4   witnesses directly, rather than Plaintiffs' characterizations of their testimony.

5           The Court will receive full briefing on this issue as part of the motion in limine process, if

6   Plaintiffs carry through on their threat to bring the motion.  But in light of the importance of the

7   issue for the scope of trial, and the baselessness of Plaintiffs' position, Zuffa previews the issue

8   for the Court now.  Plaintiffs rely on a misconception that a litigant must update its Federal Rule

9   of Civil Procedure 26(e) initial disclosures during discovery to identify any witness it may rely

10  upon at trial—even if disclosed by the adverse party.  The express language of Rule 26(e), the

11  advisory commentary on that Rule, and courts across the country say otherwise.  As Rule 26(e)

12  states, a party need only supplement its Rule 26(a) disclosure "in a timely manner if the party

13  learns that in some material respect the disclosure or response is incomplete or incorrect, ***and if***

14  the additional or corrective information ***has not otherwise been made known*** to the other parties

15  during the discovery process or in writing."  Fed. R. Civ. P. 26(e) (emphasis added).  The advisory

16  committee notes explain this plain language means there is "no obligation to provide supplemental

17  or corrective information that has been otherwise made known to the parties in writing or during

18  the discovery process, as when a witness not previously disclosed is identified during the taking

19  of a deposition." Fed. R. Civ. P. 26(e) advisory committee's notes to 1993 amendment.  Numerous

20  courts have followed this Rule to find that a witness can be "made known" when the witness is

21  listed in the challenging party's own disclosures, referred to in deposition, identified in discovery

22  responses, or included in documents produced in discovery, among myriad other ways a witness

23  may be "made known" to the other side.  *See, e.g.*, *IceMOS Tech. v. Omron Corp.*, 2020 WL

24  1853343, at *2 (D. Ariz. Apr. 13, 2020) (denying motion to strike witness where witness's identity

25  was included in the moving party's "own responses to the Court's mandatory initial discovery

26  requests" and identified "in response to Plaintiffs' interrogatories"); *Alfred E. Mann Found. for*

27  *Sci. Rsch. v. Cochlear Corp.*, 2014 WL 12586105, at *16-17 (C.D. Cal. Jan. 3, 2014) (denying

28  motion to preclude where challenged witnesses were "referenced extensively" in an expert report

1  or discussed in depositions); *Coach, Inc. v. Citi Trends, Inc.*, 2019 WL 6354367, at *4-5 (C.D.

2  Cal. Oct. 23, 2019) (denying motion to preclude where challenged witnesses were "conspicuously

3  mention[ed]" in produced documents); *Almanza v. Sessions*, 2018 WL 5263033, at *3 (E.D. Tenn.

4  June 15, 2018) (denying motion to preclude challenged witnesses who were included on the

5  moving party's initial disclosures or identified in discovery responses).[15]

6          Plaintiffs have long known about all thirteen witnesses that they now seek to exclude, and

7  also their relevance at trial.  Zuffa's May 2015 initial disclosures expressly disclosed its reliance

8  on anyone listed in Plaintiffs' May 2015 initial disclosures, in which multiple of these witnesses

9  were listed by name.  Discovery then made unambiguously clear the identity and relevance of

10 these witnesses, which is more than adequate disclosure under Rule 26(e).  Even though nothing

11 more was required, nearly four months before trial, and six weeks before its initial witness list was

12 due, Zuffa provided Plaintiffs a supplemental disclosure that again stated its reliance on witnesses

13 included in Plaintiffs' May 2015 initial disclosure, and also listed by name the eight other witnesses

14 Plaintiffs are seeking to strike.  These thirteen witnesses were long ago "made known" to Plaintiffs,

15 as a preview of the discovery record below makes clear:

16          1.    <u>Marc Ratner</u>:  Mr. Ratner was Zuffa's Senior Vice President of Government
17                and Regulatory Affairs throughout the Class Period.  Plaintiffs identified
                  him by name as possessing relevant information in their May 2015 and
18                January 2024 disclosures.  Plaintiffs insisted that Zuffa produce Mr.
                  Ratner's records in this case, Dkt. 213, which Zuffa did by providing
19                approximately 20,000 of his documents, including his text messages, to
                  Plaintiffs during the discovery period.  Plaintiffs have included multiple of
20                those documents involving Mr. Ratner on their trial exhibit list.[16]  Mr.
                  Ratner was discussed by name in the depositions of Andrew Simon, Leon
21                Margules, Kirk Hendrick, Lorenzo Fertitta, Michael Mersch, and even
22                named plaintiff Cung Le.

23          2.    <u>Craig Borsari</u>:  Mr. Borsari was Zuffa's Executive Vice President, Event
24                Development and Operations during the Class Period.  Plaintiffs identified

---

15      Even if a witness was not "made known" to the opposing side, exclusion of the witness is
25 still a disfavored remedy that cannot be applied if the failure was "substantially justified" or "is
   harmless."  Fed. R. Civ. P. 37(c)(1); *Ginger Root Off. Assocs. v. Advanced Packaging & Prod.*,
26 2009 WL 10673918, at *3 (C.D. Cal. Feb. 18, 2009) (denying motion to preclude on harmlessness
   grounds where disputed witnesses were included on moving party's witness list).

27
16      *See, e.g.*, Plaintiffs' Trial Exhibit ("PTX") -0119, PTX-1471, PTX-1472, PTX-1663, PTX-
28 1671.

---

him by name as possessing relevant information in their May 2015 and January 2024 disclosures. Plaintiffs insisted that Zuffa produce Mr. Borsari's records in this case, Dkt. 213, which Zuffa did by providing approximately 30,000 of his documents, including text messages, to Plaintiffs during discovery. Plaintiffs asked questions about communications involving Mr. Borsari in the depositions of Dana White, Lorenzo Fertitta, Lawrence Epstein, Kirk Hendrick, Michael Pine, and others. Zuffa identified Mr. Borsari in writing in response to Plaintiffs' 30(b)(6) Deposition Topics 47-51. And Plaintiffs' expert Dr. Singer relied upon, cited, and quoted communications from Mr. Borsari in his August 2017 report.

3. <u>Mick Maynard</u>: Mr. Maynard took over bout matchmaking responsibilities for Joe Silva after Mr. Silva left Zuffa in December 2016, and before that was an owner of MMA promoter Legacy Fighting Championship. Plaintiffs purported to quote Mr. Maynard in their initial complaint filed in 2014 and amended complaint filed in 2015. Dkt. 1, ¶ 143; Dkt. 208, ¶ 143. Plaintiffs identified Mr. Maynard by name as possessing relevant information in their May 2015 and January 2024 disclosures. Mr. Maynard was identified in the depositions of Sean Shelby and Joe Silva as having responsibilities at Zuffa over bout matchmaking and athlete relations. Plaintiffs' expert Dr. Singer relied upon, cited, and quoted communications from Mr. Maynard in his August 2017 report.

4. <u>Ed Soares</u>: Mr. Soares was the President of athlete management company Tough Media Corp. and also the President of MMA promotions Legacy Fighting Alliance and Resurrection Fighting Alliance during the Class Period. Plaintiffs purported to quote from Mr. Soares in their initial complaint filed in 2014 and amended complaint filed in 2015, which identified him as a promotion operator and "a prominent manager of many Elite Professional MMA Fighters currently under contract with UFC." Dkt. 1, ¶ 141; Dkt. 208, ¶ 141. Plaintiffs identified Mr. Soares by name as possessing relevant information in their May 2015 and January 2024 disclosures. Mr. Soares was identified by name in Plaintiffs' deposition questioning of Michael Mersch and Jeremy Lappen as an athlete manager. Plaintiffs also asked questions about text messages involving Mr. Soares in multiple depositions.

5. <u>Ali Abdelaziz</u>: Mr. Abdelaziz is the founder and Chief Executive Officer of Dominance MMA Management, through which he managed many Bout Class members during the Class Period, and was previously an Executive Vice President and matchmaker at World Series of Fighting. Plaintiffs identified Mr. Abdelaziz by name as possessing relevant information in their May 2015 and January 2024 disclosures. Plaintiffs have designated deposition testimony from Carlos Silva regarding Mr. Abdelaziz to play at trial and they included multiple communications with Mr. Abdelziz on their

trial exhibit list.[17]  Zuffa produced many documents in discovery evidencing Mr. Abdelaziz negotiating with UFC on behalf of Bout Class members, including numerous exhibits on Zuffa's trial exhibit list as well.[18]

6.    <u>Dan Lambert</u>:  Mr. Lambert is the owner of mixed martial arts team American Top Team, and an MMA athlete manager.  In discovery, Zuffa produced a declaration from Mr. Lambert setting out his experience as a professional MMA fighter's agent.  DX-0573.  Zuffa produced in discovery many documents evidencing Mr. Lambert negotiating with UFC on behalf of Bout Class members, including Antonio Silva, Cole Miller, Gleison Tibau, and Yves Edwards.[19]  Plaintiffs asked multiple witnesses questions in depositions about communications produced in discovery involving Mr. Lambert, including Dana White, Joe Silva, and Sean Shelby.  In response to Plaintiffs' questions, Mr. Silva identified Mr. Lambert as "the owner of American Top Team and an MMA manager," and described American Top Team as "one of the premier gyms in the world."  Plaintiffs have included at least one of those communications on their trial exhibit list. PTX-0031.

7.    <u>Jason House</u>:  Mr. House manages MMA athletes through Iridium Sports Agency, where he is the Chief Executive Officer.  Zuffa produced in discovery many documents evidencing Mr. House negotiating with UFC on behalf of Bout Class members, including Louis Smolka, Reuben Duran, Antonio McKee, Bobby Green, and many more.[20]  Plaintiffs asked questions about Mr. House in the deposition of Sean Shelby, where Mr. Shelby identified him as "a manager" of Bout Class members.  Plaintiffs' trial exhibit list includes multiple exhibits of text messages between Mr. House and Mr. Shelby that Zuffa produced in discovery.[21]

8.    <u>Josh Jones</u>:  Mr. Jones manages MMA athletes through KHI Management, where he is the Vice President of Sports Marketing.  Zuffa produced in discovery many documents, including text messages, evidencing Mr. Jones

---

[17] *See, e.g.*, PTX-1267, PTX-1268, PTX-1269, PTX-1270, PTX-1271.

[18] *See, e.g.*, DX-0304, DX-0315, DX-0343, DX-0347, DX-0348, DX-0350, DX-0369, DX-0375, DX-0376, DX-0382, DX-0398, DX-0503, DX-0593, DX-0618, DX-0622, DX-0678, DX-0688, DX-0689, DX-0690.

[19] *See, e.g.*, DX-0573, DX-0679, DX-0705, DX-0706, DX-0710, DX-0785.

[20] *See, e.g.*, DX-0290, DX-0317, DX-0319, DX-0324, DX-0478, DX-0616, DX-0617, DX-0621, DX-0631, DX-0671, DX-0673, DX-0674, DX-0676, DX-0678, DX-0680, DX-0682, DX-0684, DX-0685, DX-0686, DX-0702, DX-0704, DX-0709, DX-0712, DX-0773.

[21] *See, e.g.* PTX-0533, PTX-1235, PTX-1240.

negotiating with UFC on behalf of Bout Class members, including Donald Cerrone, Miesha Tate, Rose Namajunas, and others.[22]

9.   Michael Bisping:   Mr. Bisping is a Bout Class member, and thus purportedly represented by Plaintiffs' counsel.   Zuffa produced contracts with Mr. Bisping in discovery, and Plaintiffs have included several of those contracts on their trial exhibit list.[23]   Mr. Bisping fought named plaintiff Cung Le in August 2014, after which Mr. Le retired.   Plaintiffs included on their trial exhibit list a video they intend to play at trial of that fight.   PTX-0129.   Plaintiffs also included on their exhibit list a text message of Mr. Bisping's manager approaching UFC about a new contract.   PTX-0053. Plaintiffs asked repeated questions about Mr. Bisping in written discovery, which Zuffa responded to by May 2017, including 25 requests for admission about Mr. Bisping, as well as an interrogatory about athletes with whom UFC has contracted that repeatedly identified Mr. Bisping.

10.   Donald Cerrone:  Mr. Cerrone is a Bout Class member, and thus purportedly represented by Plaintiffs' counsel.   Zuffa produced contracts with Mr. Cerrone in discovery, and Plaintiffs have included several of those contracts on their trial exhibit list.[24]   Plaintiffs asked repeated questions about Mr. Cerrone in written discovery, which Zuffa responded to by May 2017, including 24 requests for admission about Mr. Cerrone, as well as an interrogatory about athletes with whom UFC has contracted that repeatedly identified Mr. Cerrone.   Plaintiffs also asked questions about Mr. Cerrone in the depositions of Dana White and Joe Silva.

11.   Chael Sonnen:  Mr. Sonnen is a Bout Class member, and thus purportedly represented by Plaintiffs' counsel.   Zuffa produced contracts with Mr. Sonnen in discovery, and Plaintiffs have included several of those contracts on their trial exhibit list.[25]   Both Plaintiffs and Zuffa have designated deposition testimony from Scott Coker to play at trial that refers to Mr. Sonnen by name.   And named plaintiff Nathan Quarry identified Chael Sonnen by name in his deposition to provide an example of what Mr. Quarry claimed were coercive statements by Mr. White.   Plaintiffs asked repeated questions about Mr. Sonnen in written discovery, which Zuffa responded to by May 2017, including 24 requests for admission about Mr. Sonnen, as well as an interrogatory about athletes with whom UFC has contracted that repeatedly identified Mr. Sonnen.

---

[22]   See, e.g., DX-0316, DX-0459, DX-0460, DX-0461, DX-0462, DX-0483, DX-0486, DX-0487, DX-0490, DX-0491, DX-0510, DX-0511, DX-0513, DX-0514.

[23]   See, e.g., PTX-0174, PTX-0175, PTX-0176, PTX-0177, PTX-0178.

[24]   See, e.g., PTX-0166, PTX-0167, PTX-0168, PTX-0169, PTX-0170, PTX-0171, PTX-0172.

[25]   See, e.g., PTX-0157, PTX-0158, PTX-0159, PTX-0160, PTX-0161, PTX-0162, PTX-0163.

12.   <u>Miesha Tate</u>:  Ms. Tate is a Bout Class member, and thus purportedly represented by Plaintiffs' counsel.  Zuffa produced contracts with Ms. Tate in discovery, and Plaintiffs have included several of those contracts on their trial exhibit list.[26]  Ms. Tate was discussed, by name, in the depositions of Lorenzo Fertitta, Scott Coker, Dana White, Sean Shelby, and Lawrence Epstein.  Plaintiffs asked specific questions about Ms. Tate in multiple of those depositions and emphasized Ms. Tate's significance as an athlete that moved to UFC in connection with UFC's acquisition of Strikeforce.  Plaintiffs asked repeated questions about Ms. Tate in written discovery, which Zuffa responded to by May 2017, including 19 requests for admission about Ms. Tate, as well as an interrogatory about athletes with whom UFC has contracted that repeatedly identified Ms. Tate.

13.   <u>Michael Chandler</u>:  Mr. Chandler is a member of the putative *Johnson* class, and fought for Bellator during this Class Period.  Contracts with Mr. Chandler were produced in discovery, and are included on Zuffa's exhibit list.[27]  Joe Silva identified Mr. Chandler in deposition as an example of a "super exciting" Bellator fighter.  Named plaintiff Nathan Quarry also identified Mr. Chandler in deposition as participating in Bellator's debut on Spike in an "exciting fight."  Mr. Quarry also testified about a conversation he supposedly had with Mr. Chandler about whether Mr. Chandler was satisfied fighting at Bellator.

These examples from the discovery record show that Plaintiffs were long ago "made aware" of the identity and relevance of these witnesses, and Zuffa will provide more details in opposition to Plaintiffs' motion in limine, if necessary.  This extensive record demonstrates that, under Federal Rule of Civil Procedure 26(e), there was no obligation for Zuffa to separately list these witnesses in an updated disclosure.  Zuffa nonetheless updated its disclosures months before trial and over a month before it was required to disclose its initial witness list.  Plaintiffs would rather present their case through hearsay and innuendo about many of these same witnesses, but the Court should not entertain that ploy, and should deny Plaintiffs' anticipated motion in limine.

## I.   Misleading Video Excerpts

Plaintiffs' proposed exhibit list contains a number of misleading and incomplete video clips that omit necessary and relevant context.  For example, Plaintiffs intend to admit various video clips that begin or end in the middle of a speaker's sentence, omit the actual question being

---

[26]   *See, e.g.*, PTX-0179, PTX-0180, PTX-0181.

[27]   *See, e.g.*, DX-0086, DX-0087, DX-0088, DX-0089, DX-0090, DX-0091, DX-0092, DX-0093.

1   responded to, or otherwise are presented without the necessary context.  This approach to

2   intentionally curating a video clip to give the jury a distorted view of a witness's testimony is

3   precisely what the rules of evidence are intended to prevent.  Indeed, the "doctrine of

4   completeness," is used to prevent such abuse by making admissible additional portions of a

5   recorded statement to explain an admitted statement, place it in context, or avoid misleading the

6   trier of fact.  *See* Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded

7   statement, an adverse party may require the introduction, at that time, of any other part – or any

8   other writing or recorded statement – that in fairness ought to be considered at the same time.");

9   *Beech Aircraft v. Rainey*, 488 U.S. 153, 172 (1988) (purpose of the rule [Fed. R. Evid. 106] is to

10  avoid "misunderstanding or distortion" that can occur when only one part of a statement or

11  document is introduced).

12        For example, Plaintiffs propose as an exhibit a clip from a December 29, 2016, pre-fight

13  interview of Dana White which cuts off mid-sentence:  "You honor your deal, you know, or you

14  at least get to a point, you know, because most guys never make it to the end of a UFC

15  contract.  They will get within three fights, and then we want to sit back down and start talking,

16  right, to keep them. . . ."  Absent from this excerpt is the question to which Mr. White is responding

17  and the end of his statement.  Plaintiffs propose several other similarly excerpted statements as

18  exhibits that pose an equal risk of misleading and confusing the jury unless the entirety of the

19  conversation is played.

20        Should the Court find that Plaintiffs' proposed video clip exhibits are otherwise admissible,

21  Zuffa will seek to admit the entirety of any  colloquy to ensure the jury is not misled by plaintiffs'

22  intentionally incomplete excerpts.

23        **J.    Hearsay And Unauthenticated Bankers' Documents**

24        Although the parties are still in the process of exchanging and discussing exhibit

25  objections, Zuffa anticipates there will be an evidentiary dispute regarding what appears to be an

26  attempt by Plaintiffs to attribute to Zuffa numerous hearsay and unauthenticated statements within

27  various bankers' documents and even bankers' internal communications.  Zuffa has objected to

28

1  such documents on Plaintiffs' exhibit list and, if not resolved between the parties, will present the

2  issue to the Court for resolution.

3  **IX.**     **CONCLUSION**

4          Courts should not act as central planners of our economy or permit employees who

5  willingly negotiated and signed contracts with the assistance of managers, agents, and lawyers, to

6  misuse the antitrust laws to pursue a windfall beyond the terms of their contracts.  Zuffa looks

7  forward to trying this case before a Las Vegas jury and demonstrating that: (1) its efforts to grow

8  the MMA industry, (2) increase opportunities for fighters, and (3) dramatically increase in pay for

9  UFC fighters are procompetitive.

10

11  Dated: February 22, 2024                         Respectfully Submitted,

12

13                                                                   */s/ Christopher S. Yates*
    WILLIAM A. ISAACSON (*Pro hac vice*)          CHRISTOPHER S. YATES (*Pro hac vice*)
14  wisaacson@paulweiss.com                        chris.yates@lw.com
    JESSICA PHILLIPS (*Pro hac vice*)              AARON T.CHIU (*Pro hac vice pending*)
15  jphillips@paulweiss.com                        aaron.chiu@lw.com
    PAUL, WEISS, RIFKIND, WHARTON &                LATHAM & WATKINS LLP
16  GARRISON LLP                                   505 Montgomery Street, Suite 2000
    2001 K Street, NW                              San Francisco, CA 94111
17  Washington, DC 20006                           Tel: (415) 395-8095

18  BRETTE M. TANNENBAUM (*Pro hac vice*)          SEAN M. BERKOWITZ (*Pro hac vice*)
    btannenbaum@paulweiss.com                      sean.berkowitz@lw.com
19  YOTAM BARKAI (*Pro hac vice*)                  LATHAM & WATKINS LLP
    ybarkai@paulweiss.com                          330 North Wabash Ave, Suite 2800
20  PAUL, WEISS, RIFKIND, WHARTON &                Chicago, IL 60611
    GARRISON LLP
21  1285 Avenue of the Americas                    LAURA WASHINGTON (*Pro hac vice*)
    New York, NY 10019                             laura.washington@lw.com
22                                                 LATHAM & WATKINS LLP
    DONALD J. CAMPBELL (No. 1216)                  10250 Constellation Blvd, Suite 1100
23  djc@campbellandwilliams.com                    Los Angeles, CA 90067
    J. COLBY WILLIAMS (No. 5549)
24  jcw@campbellandwilliams.com                    DAVID L. JOHNSON (*Pro hac vice*)
    CAMPBELL & WILLIAMS                            david.johnson@lw.com
25  700 South 7th Street                           LATHAM & WATKINS LLP
    Las Vegas, Nevada 89101                        555 Eleventh Street NW, Suite 1000
26  Tel: (702) 382-5222                            Washington, D.C. 20004

27                                                 *Attorneys for Defendant Zuffa, LLC, d/b/a*
                                                   *Ultimate Fighting Championship and UFC*
28                                                 *LLC*

1

## **CERTIFICATE OF SERVICE**

2       The undersigned hereby certifies that the foregoing Defendant's Trial Brief was served on

3   February 22, 2024 via the Court's CM/ECF electronic filing system addressed to all parties on the

4   e-service list.

5

6

7                                                          /s/ Christopher S. Yates
                                                           Christopher S. Yates of
8                                                          LATHAM & WATKINS LLP

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28