# EXHIBIT G

```
                                                                 1

                     UNITED STATES DISTRICT COURT

                         DISTRICT OF NEVADA



      CUNG LE; NATHAN QUARRY, JON    )
      FITCH, on behalf of            )
      themselves and all others      )
      similarly situated,            )
                                     )
               Plaintiffs,           )
                                     )
                vs.                  )  Case No.
                                     )  2:15-cv-01045-RFB-(PAL)
                                     )
      ZUFFA, LLC, d/b/a Ultimate     )
      Fighting Championship and      )
      UFC,                           )
                                     )
               Defendant.            )
      _____)


                        HIGHLY CONFIDENTIAL

              VIDEOTAPED DEPOSITION OF ROBERT TOPEL

                         Washington, D.C.

                         December 5, 2017

                            9:34 a.m.




     REPORTED BY:
     Tina Alfaro, RPR, CRR, RMR
     Job No. 52568
```

74

1  BY THE WITNESS:
2       A.  Can pay the worker less than firm B.
3  That's not what we see in this case, but that's
4  true.
5       Q.  By "this case" you mean the Zuffa case?
6       A.  Yes.
7       Q.  Okay.  Let's still talk about the -- about
8  the hypothetical.  It's fair to say that, all
9  things equal, if a firm is able to make it more
10 difficult and expensive for its workers to move
11 from its firm to another firm, the lower it is able
12 to pay its workers; is that right?
13      A.  No.
14      Q.  Why is that wrong?
15      A.  Well, the -- I mean, we're -- you're
16 sneaking up on the rules and -- and contract stuff,
17 and to the extent that those rules make investments
18 more valuable and allow the firm in question to
19 collect on the returns on its investment, those
20 rules can and generally will increase the amount
21 that workers pay.  I mean, if there were zero
22 mobility costs ex post and no restrictions on
23 going, then I -- I as firm A, I'm not investing in
24 these people because it raises their general
25 productivity.  It's like I don't want to train -- I

75

1   don't want to train -- incur the cost of training

2   plumbers for my firm because I make them into good

3   plumbers and they go work somewhere else for the

4   marginal product that I generated.

5       Q.  All right.  Well, I -- I'll move on.

6           Turn to paragraph 200 and in particular

7   I'd like to focus your attention on a part of

8   paragraph 200 that is on page 88.  The second

9   sentence -- or the first full sentence on the page

10  says "In particular the restrictions on athlete

11  mobility address potential market failures due to

12  transaction costs and the free rider problem"; do

13  you see that?

14      A.  Yes, I do.

15      Q.  And by "restrictions on athlete mobility"

16  in this sentence you're referring to the

17  contractual provisions that Plaintiffs are

18  challenging in this case, correct?

19      A.  Generally speaking, yes.

20      Q.  How is it that the -- strike that.

21          Turn to paragraph 68, please.  In

22  paragraph 68 you opine in the first sentence "It

23  may be true that eliminating the challenged

24  contract provisions could promote entry by

25  competing promoters, at least temporarily, because

ROBERT TOPEL - HIGHLY CONFIDENTIAL

76

1  new entrants could expropriate existing Zuffa
2  investments in athletes"; do you see that?
3       A.  Yes, I do.
4       Q.  Could you explain the mechanism by which
5  eliminating challenged contractual provisions could
6  promote entry by competing promoters?
7       A.  Sure.  Zuffa has invested in its athletes,
8  in their personas, in matching them with the right
9  opponents, and so on, things we've discussed
10 elsewhere.  Those are costly investments by Zuffa.
11 The challenged contract provisions partially
12 protect the returns on those investments.  So it
13 makes it worthwhile for Zuffa to makes those
14 investments in the first place.
15           Now, after the investments are made if
16 suddenly you change the rules and say, oh no, all
17 of these restrictions on, you know, right of first
18 refusal, champion's clause, the whole thing are out
19 the window and now you've got these athletes that
20 Zuffa made valuable, raised their productivity.  If
21 they can just leave because somebody else -- this
22 is the plumber example I just gave you -- then they
23 can go somewhere else.  So there would be a
24 transfer of wealth from Zuffa to the athletes, but
25 in equilibrium it's not going to last long because

ROBERT TOPEL - HIGHLY CONFIDENTIAL

77

1   now that everybody can just up and leave nobody's
2   going to invest.  That's what the paragraph is
3   saying.
4       Q.  Okay.  So you're postulating a change from
5   the current world to a world where none of the
6   challenged contractual provisions exist, is that
7   right, in this paragraph?
8       A.  Yes.  And it's -- it's not just a change
9   of two hypotheticals like what if it had been this
10  way forever on one planet and the other way forever
11  on the other planet.  It's in the middle of the
12  existence of this you say no, all the contracts you
13  wrote are out the window.
14      Q.  Okay.  And in that instance with the
15  challenge provisions out of the way, other MMA
16  promoters could immediately retain Zuffa's
17  athletes, right, if they wanted to?
18      A.  Well, they could as long as they're
19  willing to pay up to the value that's been created
20  by Zuffa.  Some of that value's going to be Zuffa
21  specific, but not all of it.
22      Q.  So, in your view, because Zuffa has
23  invested in promoting these athletes they as a
24  group are more valuable, all things equal, to a
25  rival promoter than unranked fighters sitting in an

150

1  Q.  You don't in your report quantify the
2  total amount of promotional investment in athletes
3  that you believe would be lost if the challenged
4  contractual provisions were eliminated, do you?
5  A.  You mean do I have a dollar amount on it?
6  Q.  Correct.
7  A.  We didn't put a dollar amount, no.
8  Q.  You don't quantify in your report the
9  total amount of promotion dollars that the UFC
10 invested in its brand during the class period, do
11 you?
12 A.  Not in my report, no.
13 Q.  And you don't quantify the total amount of
14 promotion dollars that the UFC invested in
15 promoting its fighters separate and apart from
16 promoting its brand in your report, correct?
17 A.  I'm confused by your question.  Are you
18 asking whether I have a number?
19 Q.  Correct.
20 A.  For the amount of promotional resources
21 devoted to augmenting the -- the reputations of
22 fighters as -- as Zuffa fighters?
23 Q.  During the class period.
24 A.  I don't have that number.
25 Q.  And you don't quantify the total amount of

ROBERT TOPEL - HIGHLY CONFIDENTIAL

153

1  promoters get to use these contract restrictions,
2  that's one but-for world.  Or you might say in the
3  but-for world no MMA promoters get to use these
4  contract restrictions.  The -- the implications for
5  the industry, for Zuffa, for Bellator, for fighters
6  are all different in those two but-for worlds.
7      Q.  And it's fair to say that you didn't
8  quantify the amount of promotion dollars that would
9  have been foregone in either of those but-for
10 worlds in your report, correct?
11     A.  I've given you the analysis that says if
12 you can't collect the returns, you're not going to
13 invest.  So the -- there would have been more
14 promotional dollars in a world -- by Bellator in a
15 world where Bellator got to use those contracts and
16 Zuffa didn't than in a world where nobody gets to
17 use the contracts.
18     Q.  Can you show me a table in your report
19 where you quantify the amount of additional
20 promotional dollars that -- I'm sorry -- the amount
21 of promotional dollars that would be lost in either
22 of those two but-for worlds?  Is there a table in
23 your report where I can find that?
24     A.  No.  That's not part of my analysis or
25 part of my opinions.

163

1  Show me which paragraph.
2       A.  There's paragraphs in here that say they
3  wouldn't invest.  That's -- I don't have to
4  quantify because you're going -- you're pulling
5  away -- are you going to pull away one contract
6  restriction, two, three, four, all of them, and for
7  whom?  You never -- you've never specified what the
8  but-for world would be.  So there's no way anybody
9  could put a number on 75 but-for worlds, and I have
10 no idea which one you -- what the -- what you think
11 the market's going to look like.
12      Q.  So it's fair to say that in your report
13 you did not specify any particular but-for world,
14 right?
15      A.  I couldn't.  That's -- that's not my
16 job.
17      Q.  And therefore you didn't compute the
18 amount of lost revenues in any particular but-for
19 world, correct?
20      A.  All I can tell you is that the revenues
21 would be -- produced by the promoters would be
22 lower.
23      Q.  But you didn't compute the amount by which
24 they would be lower, correct?
25      A.  I can't because I don't know what the

165

1    question as compound.
2    BY MR. CRAMER:
3         Q.  Okay.
4         A.  These are the contracts they chose.
5         Q.  I'll move on.
6         A.  They would invest less.
7         Q.  Turn to paragraph 92.  In the last
8    sentence of paragraph 92 on page 40 you say "The
9    reduction in transaction costs achieved by
10   internalizing decisions about upcoming matches" --
11        A.  Wait a minute.  Hold -- hold on.  You're
12   on paragraph 92?
13        Q.  Paragraph 92, page 40, the last --
14        A.  Oh, okay.  Okay.  I'm sorry.  I'm on 30 --
15   it begins on 39.
16        Q.  The last sentence reads "In addition the
17   reduction in transaction costs achieved by
18   internalizing decisions about upcoming matches
19   increases the number of matches thereby expanding
20   output to the benefit of consumers and athletes";
21   do you see that?
22        A.  Yes.
23        Q.  It's fair to say that you did not quantify
24   the additional output that you believe is generated
25   by the reduced transaction costs, correct?

166

1      A.  No.  I'm making a -- a statement about
2  implications of economic analysis.
3      Q.  And you did not -- it's fair to say -- am
4  I correct that you did not quantify the amount of
5  reduced output that -- strike that.
6      You say "Thereby expanding output to the
7  benefit of consumers and athletes."  It's fair to
8  say that you did not quantify the amount of
9  additional output to the benefit and consumers --
10 of consumers and athletes that you believe
11 occurred, correct?
12     MR. ISAACSON:  Objection to form.
13 BY THE WITNESS:
14     A.  Are you asking me -- let me read the
15 entire context of my paragraph here.
16     (Witness reviewing document.)
17 BY THE WITNESS:
18     A.  Yes.  Ask your question again, please.
19     Q.  Did you quantify the amount of expanded
20 output that you referred to in the last sentence of
21 paragraph 92?
22     A.  Relative to some world without those --
23 economic theory tells us -- economic analysis tells
24 us that in the presence of these transaction costs
25 the ability to internalize these things, organize

167

1  matches, promote identities and so on, increases
2  the amount of output of the property measured.  So
3  it benefits consumers and -- and the athletes.
4  So -- and that's what I say here.  Do I have to
5  quantify a number?  Again, relative to what?  All I
6  know from you is less.  All I know from Dr. Singer
7  is less of what we object to, and even in the -- at
8  the level of saying 30 percent rather than some
9  other number he never tells us what less means.  So
10 even if such a calculation were achievable, there's
11 been no specification of what the but-for world
12 would look like other than less.
13      Q.  Did you quantify the amount of expanded
14 output that you referred to in the last sentence of
15 paragraph 92?  Yes or no.  Did you quantify it?
16          MR. ISAACSON:  Don't raise your voice,
17 Eric.
18 BY THE WITNESS:
19      A.  Absent a benchmark of saying what it would
20 be in the absence all I can tell you is that it's
21 lower and the contracts themselves as used by other
22 people are indicative of the procompetitive
23 benefits and this is what economic analysis offers.
24 As to your specific question, since there's no
25 benchmark offered I cannot have offered a number

ROBERT TOPEL - HIGHLY CONFIDENTIAL

168

```
 1   relevant to some benchmark that was never stated.
 2        Q.   So you didn't, correct?  You did not
 3   quantify it, correct?
 4             MR. ISAACSON:  Objection, asked and just
 5   answered.
 6   BY THE WITNESS:
 7        A.   That's what I just said.
 8             MR. CRAMER:  Let's take a -- let's take a
 9   break.
10             THE VIDEOGRAPHER:  Going off the record at
11   2:38.
12                  (A short break was had.)
13             THE VIDEOGRAPHER:  We are going back on
14   the record at 2:55.  This begins disk No. 5.
15   BY MR. CRAMER:
16        Q.   Please turn to paragraph 171 of your
17   report on page 75.
18        A.   Yes.
19        Q.   There you specified a regression that you
20   say in the first sentence of paragraph 171 can
21   "Measure changes in compensation separately for
22   athletes with different rankings"; do you see
23   that?
24        A.   Yes.
25        Q.   And you find with this regression that
```

264

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, TINA M. ALFARO, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 18th day of December, 2017.

My Commission expires October 31, 2020.

_____

NOTARY PUBLIC IN AND FOR THE

DISTRICT OF COLUMBIA