# EXHIBIT H

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA

Cung Le, et al.,

    Plaintiffs,

    v.

Zuffa, LLC D/B/A Ultimate Fighting Championship And UFC,

    Defendant.

Case No. 2:15-cv-01045-RFB-PAL

## Expert Report of Richard Marks

**October 27, 2017**

**I.    Assignment**

1. I, Richard Marks, have been retained by Zuffa, LLC ("Zuffa") in connection with the civil case filed in the United States District Court for the District of Nevada captioned as *Le et al. v. Zuffa, LLC*, Case 2:15-cv-01045-RFB-PAL.

2. My understanding is that Plaintiffs' economist, Dr. Andrew Zimbalist, has asserted that "There are many parallels between the restraints on competition in the UFC's labor market through the challenged conduct and the evolution of free agency in . . . the entertainment industry outside of professional sports."[1]

3. Zuffa has asked me to describe:

    a.    The nature of competition for actor services in the entertainment industry.

    b.    Compensation for actors in the entertainment industry.

**II.    Qualifications**

4. I am an attorney duly licensed to practice law in the State of California, and I have practiced in various sectors of the entertainment industry since 1974. In addition to my years in private practice as a transactional attorney in boutique entertainment law firms as well as a major international firm, I have acted in senior and legal business affairs capacities for a boutique literary agency, major entertainment studios such as Paramount, Disney, and Universal, and leading independent production companies such as The Kushner-Locke Company and Weintraub Entertainment Group. For the past eleven years, I have been of counsel to The Point Media, an entertainment law firm representing clients such as ITV, IMG, Imperative, Electus, WME, Fabrik, Ovation, Mandalay, Beachside, Starz, and many others in connection with the

---

[1] Expert Report of Andrew Zimbalist in Cung Le, et al. v. Zuffa, LLC ¶ 25, Case No. 2:15-cv-01045-RFB-PAL (D. Nev.) (August 30, 2017).

development, production, and exploitation of entertainment content. A true and correct copy of my current curriculum vitae is attached hereto as Appendix A.

5. During my career as a transactional entertainment lawyer, I have worked in a legal and business affairs capacity on and in connection with many independent productions. I have negotiated – on both sides – numerous agreements between talent (such as performers, writers and producers) and television and motion picture studios. I am very familiar with customary provisions included in such agreements, as well as provisions customarily sought by talent and agreed to by studios.

6. During my career, I have consulted in approximately 20 court cases or arbitrations involving the entertainment industry. I have qualified as an expert in this field with various courts and arbitration tribunals, and have testified at trials and hearings therein. In every instance in which I have been proffered as an expert witness, the court or tribunal has qualified me as such. A true and correct copy of my representative expert witness resume for the past four years is attached hereto as Appendix B. My fees in this matter are $750 per hour for analysis as well as deposition and trial testimony, and my compensation is not dependent on the outcome of the litigation. My work is ongoing, and I will supplement it if I become aware of new information that affects my conclusions.

### III. Competition for Actor Services

7. There are numerous companies who compete to sign actors.[2] Below I describe the companies who compete for actor services in the production of content for movies, television, streaming services and other platforms.

---

[2] For purposes of this report, I define actors as talent appearing in content intended for initial exploitation on various platforms including in movie theaters, on broadcast, basic and premium cable television, subscription or free streaming services, or the internet or mobile devices.

3

8.      In the early days of television and film, there was a semi-distinct group of actors who worked in feature films, and a different group of actors who appeared in series or other television shows. The former group felt it was a career step backwards to work in television, while the latter group aspired to work in features as a career advancement. For the past few decades, this distinction has gradually blurred. In the current environment, there are relatively few actors who only appear in movies or only appear in television or other new media. As television has grown more popular and a medium increasingly considered a legitimate outlet for artistic innovation, more actors are interested in going back and forth between movies and television. The lines have blurred even further with the recent advent of streaming content providers, who regularly create both features and series. In the modern era of the explosion of content and platforms, actors are more concerned with the content, platform and deal terms when choosing projects and making deals for their time (because all they have is their time). As a result, with very few exceptions all of these companies compete with each other over the same pool of actors for both scripted and unscripted content.

9.      *Film*: Film studios are commonly divided into the "major" studios, the "mini-major" studios, and independent studios. There are currently six major studios, some mini-major studios, and numerous independent studios.

10.     As shown in the chart below, there were seven major distributors with at least 5% share of gross receipts earned at the domestic box office in 2016.[3] While their share has fluctuated over the past several years, these seven distributers have generally held at least 5% share since 2012.[4]

---

[3] *Market Share for Each Distributor in 2016*, The Numbers, http://www.the-numbers.com/market/2016/distributors.

[4] Gross receipts and market share for the other studios can fluctuate more noticeably. For example, Weinstein Co. had 2015 domestic gross of $303,884,529 and 2.69% share in 2015, ranking number 8, but dropped to 14 in 2016. *Market Share for Each Distributor in 2015*, The Numbers, http://www.the-numbers.com/market/2015/distributors.

| Rank | Distributor | Movies | 2016 Gross | Tickets | Share |
|---|---|---|---|---|---|
| 1 | Walt Disney | 17 | $2,934,895,822 | 339,294,307 | 26.17% |
| 2 | Warner Bros. | 33 | $1,896,882,126 | 219,292,714 | 16.92% |
| 3 | 20th Century Fox | 24 | $1,453,416,586 | 168,025,027 | 12.96% |
| 4 | Universal | 21 | $1,405,785,527 | 162,518,547 | 12.54% |
| 5 | Sony Pictures | 25 | $907,849,787 | 104,953,719 | 8.10% |
| 6 | Paramount Pictures | 18 | $843,739,756 | 97,542,159 | 7.52% |
| 7 | Lionsgate | 26 | $663,570,692 | 76,713,363 | 5.92% |
| 8 | STX Entertainment | 7 | $195,608,870 | 22,613,740 | 1.74% |
| 9 | Focus Features | 9 | $167,711,113 | 19,388,565 | 1.50% |
| 10 | Open Road | 8 | $105,841,222 | 12,235,975 | 0.94% |
| 11 | Roadside Attractions | 10 | $77,010,430 | 8,902,935 | 0.69% |
| 12 | A24 | 19 | $65,885,207 | 7,616,776 | 0.59% |
| 13 | Fox Searchlight | 7 | $50,230,186 | 5,806,955 | 0.45% |
| 14 | Weinstein Co. | 10 | $48,724,775 | 5,632,917 | 0.43% |
| 15 | Broad Green Pictures | 6 | $37,145,331 | 4,294,256 | 0.33% |
| 16 | Bleecker Street | 6 | $32,564,847 | 3,764,720 | 0.29% |
| 17 | Sony Pictures Classics | 20 | $32,090,195 | 3,709,838 | 0.29% |
| 18 | EuropaCorp | 3 | $30,091,506 | 3,478,785 | 0.27% |
| 19 | Focus / Gramercy | 1 | $26,594,261 | 3,074,481 | 0.24% |
| 20 | Pure Flix Entertainment | 4 | $25,264,272 | 2,920,722 | 0.23% |

11. These major studios compete constantly with each other and smaller studios as well as other producers of scripted and unscripted content for actor services. Actors are not

5

normally tied to any particular studio, but are pursued by and may work for any number of studios depending on the project in which they are cast.

12. *Television*: there are three primary categories of entities that compete for actor services in the television world: broadcast networks, cable channels, and subscription services.

13. The four major broadcast networks in the United States are ABC, NBC, CBS, and Fox.[5] Each commands a substantial share of television viewers. For example, in the 2016-2017 season, each network had total average primetime viewership of between 5.8 million and 9.6 million.[6] Broadcast networks generally offer a variety of programming depending on the time of day. National and local news are generally aired in the early morning and early evening. Daytime programming consists of talk shows, soap operas, or game shows. During primetime—which is most often defined as 8:00pm to 11:00pm Eastern—networks generally air either scripted comedy or drama series, unscripted series (*i.e.*, reality television), or sporting events.

14. Over the past several decades, the rise of cable television has led to an explosion in the number of channels and content providers. In 1980, there were 28 cable program networks. In 2014, that number had risen to over 900.[7] Some of these channels focus on a niche topic, while others offer a broader variety of programming. The amount of content that is generated to fill airtime on so many channels is immense, which has led to an ever-expanding group of companies competing for actor services.

15. A third type of television content providers are subscription channels or premium channels like Home Box Office (HBO) or Showtime. Unlike broadcast networks or cable channels, which rely on carriage fees from television service providers and advertising revenue,

---

[5] The CW is also a large broadcast network, but relatively smaller compared to the major four.

[6] Lisa De Moraes, *NBC Wins 2016-17 Season in Ratings Demo; CBS Takes Total Viewers*, Deadline (May 23, 2017, 3:44 PM), http://deadline.com/2017/05/tv-season-network-rankings-2016-2017-nbc-cbs-winners-1202100904/.

[7] *Cable's Story*, NCTA – The Internet & Television Association, https://www.ncta.com/cables-story.

6

subscription channels generate revenues from monthly fees charged directly to consumers. Historically, these subscription channels primarily aired films produced by other entities and sporting events. More recently, they have increasingly relied on creating their own original content to drive subscriptions, as is evidenced by the success of series like The Sopranos and Game of Thrones.

16. *Streaming*: the newest major sources of multimedia content are streaming services like Netflix, Hulu, and Amazon. Like television subscription channels, these services generate revenue through direct fees to consumers. Content is accessed either over the internet or through applications on digital media players or other devices. Streaming services have increasingly produced original content, both for their own content delivery services and/or wider distribution. This original content has been extremely successful, enjoying both popular and critical acclaim. For example, in 2016 Amazon Studios produced Manchester by the Sea, which was released in movie theaters around the country and won two Academy Awards.[8] Netflix won 20 Emmy awards in 2017 (second only to HBO), with Hulu winning an additional ten and Amazon winning two.[9] This success has been driven largely by the streaming services' ability to compete for and sign star (and other well-known) actors. Netflix, Hulu, Amazon, and others have a need for actor services given their aggressive expansion of content, and are able to sign those actors in part because of their willingness to take artistic risks that may be otherwise unavailable to actors on traditional television or film.

---

[8] Devindra Hardawar, *Amazon's 'Manchester by the Sea' Wins Acting and Screenplay Oscars*, Engadget (February 2, 2017), https://www.engadget.com/2017/02/27/amazons-manchester-by-the-sea-wins-acting-and-screenplay-osca/.

[9] Complete Listing of 69th Emmy® Awards Winners (Sept. 17, 2017), http://www.emmys.com/sites/default/files/press/69th-emmy-winners-v1.pdf.

17. As the above discussion makes clear, there are numerous companies on a variety of platforms all competing with each other for actor services. There has never been a time of more competition for actor services than the present.

**IV.     Actor Compensation in the Entertainment Industry**

18. Based on my experience, the range of compensation paid to actors for various projects in various genres and medium is 10-30% of the budget.[10] In television, actors are generally at the lower end of this range, while actors may be at the higher end for features, with some exceptions for extremely popular television series.

19. If a project only earns enough revenue to cover its production costs, then actors would be paid a range of 10-30% of the revenue for that project. Importantly, this would not mean the project "broke even," because the budget only covers the actual costs of production—not advertising, marketing, or other costs associated with promoting the content once complete. If the project earns more revenue than its production costs, then by definition the percentage of revenue paid to actors would go down.

20. A very small number of actors may also receive contingent compensation, which is additional compensation (on top of the up-front fee) based on a percentage of the project's revenue. It is no longer customary in the industry for actors to receive a percentage of the project's gross revenue. Instead, if actors receive any contingent compensation, it is a percentage of a project's net proceeds.

21. The gross revenues that go into the pool available for contingent compensation is defined by contract. For example, revenue from DVD and electronic sales and rentals is often accounted for on a 25% of gross royalty basis in features and television, advertising revenue is

---

[10] In the entertainment industry, "talent" generally refers to actors, directors, producers, and writers. These percentages are for actors only.

excluded from gross revenue in broadcast television, and subscriber fees are excluded for cable television. Some of these excluded revenue streams—for example, advertising revenue for broadcast television—are substantial sources of revenue for those platforms.

22. After excluding certain revenue streams from the pool of gross revenue, financiers then recoup numerous types of costs off the top from the remaining revenue pool, further reducing the revenue subject to contingent compensation. Financiers recover all production costs (which might include bonuses and other deferred compensation paid at various points in time or upon the occurrence of various events after production and during exploitation), as well as distribution fees, an overhead factor on production costs, and other types of fees.

23. After the gross revenues are determined and the financier recoups its costs and fees (some on a continuing basis even after initial "break even"), the remainder would be subject to distribution to contingent compensation participants according to their percentage thereof. It is customary in the industry (if there is any contingent compensation) for the talent to receive between 30-35% of the remaining revenue pool. This includes the writers, directors, producers, and actors. As such, if the actors were able to negotiate any contingent compensation, it would be less than 30% of net proceeds (and far less than 30% of gross revenue).

24. Actors customarily receive little to no contingent compensation from premium television or streaming platforms.

25. Certain actors may also receive residual compensation. Residual compensation is a percentage of revenue received from exploitation of the content in media other than where it is initially exploited. Actors gained the right to residual compensation through the bargaining of the various actors unions with producers. So for example, if a feature film is exploited on television or a television series is exploited on DVD, the Screen Actors Guild ("SAG") actors

9

divide a small percentage of the producer's revenue from the secondary medium of exploitation as set forth in the SAG agreement. Actors customarily do not receive residual compensation from premium television or streaming services, because those platforms perform their own worldwide distribution so there is no secondary exploitation of the content by other companies.

26. Regardless of whether an actor receives residual compensation, it is a central tenet of the entertainment industry that the producer owns the rights to all content in all forms in perpetuity. Actors appearing in features, series, or any other type of content, are not granted any ownership rights in the content in which they appear. The content producer assumes the risk of its creation, and in return for that risk retains all ownership rights in that content forever. This is a standard and uncontroversial provision in every contract between a producer and actor.

27. The range and type of compensation I discuss above generally does not apply for most unscripted series (reality television). On most competition-type shows, only the winner of the competition is paid—all the other contestants are not compensated at all aside from food and lodging, or are given nominal compensation. Because these reality show participants are not members of actor unions, they also do not receive residual compensation. In fact, there are many reality show participants whose sole purpose is to advertise themselves or their business. Given the publicity value created by the show, the participant often agrees to pay the show a percentage of their business' profits after the show is announced or aired. That is, many reality show participants are not only paid nothing, but pay the show for the opportunity to participate.

**V.    Conclusion**

28. The market for actor services is highly competitive and there are myriad companies who compete in that market.

29. Assuming a project at least covers its production costs, actors do not receive anywhere close to 50% of a project's gross revenue.

_____
Richard Marks
October 27, 2017

# Appendix A

**Richard Marks**
350 South Beverly Drive, Suite 170
Beverly Hills, California  90212
310 553 5900
rmarks@thepointmedia.com

**Career History**

**The Point Media** (2006 – Present)
Beverly Hills, California
An Entertainment Law Firm

Of Counsel in all aspects of small boutique entertainment law transactional practice, e.g., business affairs and legal work for development, production and exploitation of content in all media including new and traditional platforms for clients such as: Imperative, IMG, ITV, DirecTV, Electus, Fabrik, FOD, Machinima, Mandalay, Ovation, Starz, WME, Beachside, 3 Feet Under, Lionsgate Digital Studios, UnbeliEVAble.  Engaged as forensic expert witness by clients such as Warner Bros., ICM, HMRC and Celador.

**Greenberg Traurig, LLP** (2004 – 2006)
Santa Monica, California
International Law Firm with over 1500 lawyers in 29 locations

Of Counsel in all aspects of large worldwide entertainment law transactional department, e.g., business affairs and legal work for programming development, production and exploitation in all media including network, syndication, foreign, home entertainment and new media for clients such as: Smith & Wesson, The Gurin Company, Smith & Weed Productions, Linda Ellman Productions, Summit Entertainment, and J. Walter Thompson; "Live 8" carriage agreements with AOL, MTV and domestic and foreign radio and television broadcasters as well as sponsorship agreements; Berry Gordy Jr. for development, production and exploitation of video, television and live theater projects; Downey Studios for leases to producer tenants; Direct TV for development and production of original programming; George Foreman for merchandising agreements; Robert Sillerman for acquisition of "American Idol"; Nat King Cole Estate for development, production and exploitation of television/video tribute project; and Lin TV for talent agreements.

**Nickelodeon Movies** (2003 – 2004)
Los Angeles, California
Business Affairs Consultant *(until outsourcing of legal and business servicing for division).*

Consultant in connection with development, production and distribution in all media of feature films for Paramount Pictures such "Barnyard", "Sponge Bob", and "Nacho Libre".

**Universal Network Television** (2002 – 2004)
Universal City, California
*Vice President of Business & Legal Affairs (until NBC purchase)*

Universal Network Television is a supplier of prime time live action television programming for the major networks.  Supervised legal and business affairs work on network series such as "Mr. Sterling" and "Just Shoot Me" as well as for USA Network development of projects such as "Kojak".

**Nelvana Communications** (2001 – 2002)
Los Angeles, California
*Vice President/LA General Counsel in charge of Business and Legal Affairs (until such operations re-located to Canada)*

Nelvana is a leading independent producer/distributor of animated programming for theatrical, video, and television worldwide exploitation as well as subsidiary and ancillary publishing and merchandising licensing.

- In charge of all business and legal affairs for development, domestic sales and licensing in all media for shows and properties such as "Babar", "Care Bears", "Berenstain Bears", "Little Bear", "Franklin" and "Rolie Polie Olie" to networks such as Nickelodeon, Disney Channel and PBS, toy manufacturers and publishers.
- Supervised in house staff and outside counsel.
- Managed transition of such services to Canadian counsel commencing as of 12/02.

**Kushner-Locke Company** (1993 - 2001)
Los Angeles, California
*Executive Vice President and General Counsel (until ceased operations)*

Kushner-Locke was an independent producer/distributor of feature and direct-to-video films, television series, made-for-television movies, mini-series and animated programming for theatrical, network and cable television worldwide exploitation such as "Pinocchio" starring Martin Landau and Jonathan Taylor Thomas, "Harts of The West", "Gun", "Cracker", "1st & Ten" (first HBO original series).  It ceased operations in 2001.

- Managed all legal and business affairs for all divisions of publicly traded company (KLOC) including development, financing, production, post-production, marketing, advertising and distribution of all production and programming in all media.
- In charge of all personnel and labor issues and disputes and litigation.
- Supervised in house staff and worked with outside counsel on corporate matters including public filings and IPO for US Search.com (SRCH).

**Law Offices of Richard Marks**   (1992 - 1993)
Los Angeles, California
Represented clients in all areas of entertainment law.

**Media Home Entertainment**   (1990 - 1992)
Los Angeles, California
*Senior Vice President and General Counsel (until sale to Fox)*

Media Home Entertainment was one of the first and leading independent distributors
Of home video entertainment product. In 1992, MHE's assets were acquired by Twentieth Century Fox Home Video, and it ceased operations.

- Member of Board of Directors involved in all strategic planning including Fox Acquisition Agreement.
- Negotiated the terms and documentation of all development, production, distribution and acquisition agreements for product such as the "Nightmare on Elm Street" series, "Blue Velvet", Kathy Smith and Jane Fonda exercise videos, NFL Films, and original children's videos such as "Baby Songs".
- In charge of all legal enforcement and administration of copyrights and

2

- trademarks.
- Supervised in house staff and outside counsel in all areas of business and legal affairs.

**Walt Disney Pictures**, Touchstone and Animation   (1990)
Burbank, California
*Of Counsel (during Sr. V.P. Legal's leave of absence)*

Responsible for all development and production legal work and involved in all such business affairs for feature films such as "Beauty & The Beast" and "Rocketeer".

**Weintraub Entertainment Group**, Motion Picture Division (1987 - 1990)
Los Angeles, California
*Vice President in Charge of Business and Legal Affairs (until ceased operations)*

Weintraub Entertainment Group was founded by former manager, motion picture producer and President of United Artists, Jerry Weintraub to compete with the major motion picture studios in the production and distribution of theatrical motion pictures and television series and movies.  WEG ceased operations in 1990.

- Created and administrated all business and legal forms and practices for the Motion Picture Division that produced such films as "Troop Beverly Hills" and "My Stepmother Is An Alien".
- Hired and supervised in house staff and outside counsel in all areas of business and legal affairs for the division.

**Paramount Pictures Corporation**, Motion Picture and Network Television Divisions
(1984 - 1987)
Los Angeles, California
*Senior Counsel*

- Responsible for all legal work and involved in all business affairs from development, production, post-production, marketing and advertising for such feature films as "Beverly Hills Cop II", "Tucker" and "The Golden Child", and such television series as "Cheers" and "Family Ties".

**Law Offices of Richard Marks**   (1983 – 1984)
Los Angeles, California
Represented clients in all areas of Entertainment Law

**Ziegler Agency**   (1978 - 1983)
Los Angeles, California
*Vice President and General Counsel (until closure)*

- The Ziegler Agency was founded and run by Evarts Ziegler until it was acquired in 1983 by International Creative Management and ceased operations. It was one of the premiere boutique literary and talent agencies representing such clients as William Goldman, Sidney Pollack, Pat Conroy and the Estates of Raymond Chandler and John Steinbeck for employment and acquisition agreements.  Packaged literary material from authors such as Irving Wallace and Ray Bradbury with producers such as Dick Berg and David Manson for television development and production.

- In charge of all business and legal affairs for agency including lease and personnel issues, supervising litigation and working with all senior agents and their clients including their outside counsel, managers, publicists, studio and independent employers, and guilds.

**Law Offices of Richard Marks**  (1977 – 1978)
Lost Angeles, California
Represented clients in all areas of Entertainment Law

**Pollock, Rigrod & Bloom**  (1974 – 1977)
Los Angeles, California
Associate Attorney in all aspects of Entertainment Law

**Hahn, Cazier, Thornton, Hough & Leff**  (1973 - 1974)
Los Angeles, California
Associate Attorney in Intellectual Property Litigation

**Education**

**UCLA School of Law**
Juris Doctor 1973

- Chief Justice in Charge of Moot Court Program
- Represented clients at Venice Legal Aid office

**UCLA**
Bachelor of Arts, Magna Cum Laude 1970

- Phi Beta Kappa
- Valedictory Speaker
- Swim Team
- Yell Leader
- Congressional Intern

**Community Service**

- Leo Baeck Temple, Member of Board of Trustees
- Junior Great Books, Shared Inquiry Leader
- Jewish Big Brothers, Member of Board of Directors

**Marathon Athletics**

- Completed 140.6 Mile "Ironman" Triathlon in Kona, Hawaii
- Swam Catalina Channel from Catalina Island to Palos Verdes
- 2nd Place in 28.5 Mile Manhattan Island Marathon Swim
- National Masters 10 Mile Open Water Champion

**Personal**  Married, two daughters

# Appendix B

Richard Marks/Testifying Expert Witness
List of Cases for Last Four Years

1. Peg Yorkin v. Bud Yorkin Productions – AAA Arbitration No. 011600041742 (2016)

2. Jillian Michaels v. Lions Gate Films – Jams Arbitration No. 1220050580 (2016)

3. Frank Darabont v. AMC Networks – NY Supreme Court No. 654328/2013 (2016)

4. Leslie Britton v. Conrad Riggs - L.A. Superior Court Case No. BC 496298 (2015)

5. Confidential AAA Arbitration – (2015)

6. Campbell et al v. Arenas Entertainment, LLC, et al – Nassau County Supreme Court, Case No. 019249/10 (2014)

7. George Litto Productions, Inc., v. L/F Productions, LLC, et al – LA Superior Court, Case No. BC484021 (2014)

8. Atlantique Productions, S.A. v. Ion Media Networks, Inc. – US District Court, Central District of California, Case No. CV 12-08632-DMG (2013)

9. Goodness Films, LLC et al v. TV One LLC, et al – US District Court, Central District of California Case No. CV 12-08688-GW (2013)

10. Eclipse Film Partners No. 35 LLP v. The Commissioners For Her Majesty's Revenue and Customs - In the Upper Tribunal (Tax and Chancery Chamber) FTC/57/2012 (2013)

**Materials Relied Upon**

Expert Report of Andrew Zimbalist in Cung Le, et al. v. Zuffa, LLC, Case No. 2:15-cv-01045-RFB-PAL (D. Nev.) (August 30, 2017)

*Market Share for Each Distributor in 2016*, The Numbers, http://www.the-numbers.com/market/2016/distributors

*Market Share for Each Distributor in 2015*, The Numbers, http://www.the-numbers.com/market/2015/distributors

Lisa De Moraes, *NBC Wins 2016-17 Season in Ratings Demo; CBS Takes Total Viewers*, Deadline (May 23, 2017, 3:44 PM), http://deadline.com/2017/05/tv-season-network-rankings-2016-2017-nbc-cbs-winners-1202100904/

*Cable's Story*, NCTA – The Internet & Television Association, https://www.ncta.com/cables-story

Devindra Hardawar, *Amazon's 'Manchester by the Sea' Wins Acting and Screenplay Oscars*, Engadget (February 2, 2017), https://www.engadget.com/2017/02/27/amazons-manchester-by-the-sea-wins-acting-and-screenplay-osca/

Complete Listing of 69th Emmy® Awards Winners (Sept. 17, 2017), http://www.emmys.com/sites/default/files/press/69th-emmy-winners-v1.pdf

1