# EXHIBIT P

## ZUFFA, LLC
## INTANGIBLE ASSET TREATMENT
## DISCUSSION MEMO

The following discussion examines the nature of the various intangible assets that were acquired by Zuffa, LLC ("Zuffa") in connection with its purchase and rehabilitation of The Ultimate Fighting Championship ("UFC") brand and the company's rationale for their classification and accounting treatment. The initial acquisition of the UFC assets occurred on January 10, 2001 and over the next several years was followed by the acquisition of various additional rights or intangibles related directly to the UFC brand or the sport of mixed martial arts ("MMA") in general. The order of discussion below follows the chronological order of the acquisitions being discussed.

### Initial Purchase of UFC

**General Facts & Circumstances.** On January 10, 2001, Zuffa acquired all of the assets and liabilities related to the operation of the UFC from Semaphore Entertainment Group, SEG International Corp., SEG Sports Corp., and Robert Meyrowitz ("Meyrowitz" and collectively, "SEG") for a total purchase price of $2,000,000. Under SEG's management and at the time of acquisition, the business of the UFC was comprised mainly of the promotion and production of MMA events and the licensing and/or selling of products and rights related to those events. The UFC assets acquired consisted primarily of registered service marks and trademarks, including the UFC brand, copyrights, and licensing agreements with vendors for UFC-related products. Included as part of the purchase price, Zuffa also secured from SEG, and Meyrowitz personally, a five-year covenant not to compete and a one-year consulting agreement. There was a minimal amount of tangible personal property included in the acquisition and it consisted primarily of master video tapes from the approximately 33 UFC events held prior to the acquisition, an octagonal fighting ring, and miscellaneous event and general memorabilia and/or merchandise items. As part of the acquisition, Zuffa also acquired approximately 12 existing fighter contracts, however these were deemed to have little or no value as there was no obligation to pay a fighter until he performed and each UFC event that was conducted during the first year of Zuffa's ownership resulted in losses. Additionally, nearly all of the original contracts were either, performed, cancelled or renegotiated by the end of 2001.

Based on the nature of the assets acquired in connection with the UFC and consistent with the "Allocation of Purchase Price" as determined in connection with the purchase

agreement (see attached as "Exhibit A"), the initial UFC purchase price was originally allocated into the following three categories:

| | | |
|---|---|---|
| Intangible Brand Value | $1,650,000 | 15 year amortization period |
| Non-Compete | $ 250,000 | 5 year amortization period |
| Tangible Personal Property | $ 100,000 | 7 year depreciation period |

**Determining Factors.** The company believes it is appropriate that the portion of the acquisition cost not allocated to the non-compete arrangement and personal property items be classified as intangible brand value. The primary reason for acquiring the UFC rather than starting a new MMA organization from scratch was to enable Zuffa to conduct MMA events under the UFC banner, which was the original and most recognized promoter of MMA events. Zuffa acquired no right to revenue generated prior to the purchase date as the terms of the purchase agreement specified that all unrealized revenue and unpaid liabilities associated with UFC events previously conducted by SEG would accrue to SEG and Zuffa would realize earnings only on a going forward basis. Accordingly, there was no direct economic benefit accruing to Zuffa from the previous operations of the UFC. Additionally, SEG had previously sold UFC licensing rights to third parties for essentially all potentially significant non-event specific revenue streams such as Home Video, Video Game, and Merchandising.

Because the cash advances paid by the licensees to SEG for these categories were fully recoupable before any royalty payments would be due to Zuffa, and because all of the segments were either well under water with respect to such recoupment or were not being exploited at all, there was no determinable or certain value related to these areas of the business at the time of the acquisition. Likewise, the 12 fighter contracts Zuffa acquired were deemed to have no intrinsic value for the reasons previously stated above and were more appropriately considered contingent liabilities. In fact, at the time of the UFC acquisition, it was extremely speculative if Zuffa would ever be able to rehabilitate the brand into an income generating business. The only things certain, were that a significant amount of additional capital would need to be invested into the operation, and that the capital demand of rehabilitating the UFC brand would be less that the alternative cost of developing a new brand under which to promote MMA events. During 2001 and 2002 the Fertitta brothers invested another $19,000,000 to keep the company running and/or to secure further rights and/or protect existing rights related to the brand. **Although Zuffa management originally assigned an amortization period of 15 years to the intangible brand value to be consistent with the tax amortization treatment, it is deemed that a more conservative amortization period of 10 years would be more appropriate and not unusual for an asset of this type.**

The $250,000 amount allocated to the consulting/non-compete obligation of Meyrowitz (and SEG) represented roughly 2/3 of the amount Meyrowitz was drawing from SEG as an annual salary at the time of the purchase. The one-year consulting obligation was not considered to provide much actual value to the company going forward other than for its non-solicitation restrictions, and no actual performance under the agreement was ever

CONFIDENTIAL
FILED UNDER SEAL

ZFL-1240585

requested of Meyrowitz. The more important component of the obligations was deemed to be the non-compete aspect and the amortization period for that value is consistent with the 5 year term of the non-compete covenant. The amount was also negotiated between the parties and should be considered a reflection of market value.

The $100,000 allocated to tangible personal property was the least subjective component of the purchase price and it was based on the minimal amount of such property conveyed in the purchase. In retrospect, since the octagonal fighting ring was only used twice before it was replaced and most of the miscellaneous merchandise items were used as promotional giveaways, the main value resided with the master tapes of SEG events and the miscellaneous associated event memorabilia. Again, any ultimate future value of the event tape library above that assigned at purchase was purely speculative and entirely dependent on Zuffa's ability to develop the brand into a viable income generating business. Due to the insignificant amount involved for this intangible category and the fact that the asset has been amortized down to 6/7 of its original value at 12/31/06, it is deemed to be immaterial for further analysis.

**Conclusion.** It is deemed by Zuffa management that due to the facts and circumstances that existed at the time of the acquisition and during the first year of the operation of the UFC under Zuffa's ownership, that the classification and amortization treatment (as revised per the above discussion) of the acquisition costs were reasonable and appropriate. Zuffa has adjusted its financial records in accordance with the aforementioned revised amortization treatment.

## Acquisition and/or Start Up Costs

**General Facts & Circumstances.** In connection with the initial acquisition of the UFC and prior to the acquisition closing date, Zuffa incurred approximately $318,000 of legal fees and direct costs related to the start up. Approximately $265,000 of these costs represented fees paid to Milbank, Tweed, Hadley & McCloy LLP, and were related to due diligence and transactional activities, trademark and copyright verification, and other various organizational activities.

**Conclusion.** It is deemed by Zuffa management that the appropriate accounting treatment for these costs is to expense them entirely during 2001. Such treatment is in conformance with GAAP and consistent with industry practice.

CONFIDENTIAL
FILED UNDER SEAL

ZFL-1240586

## Lions Gate (formerly Trimark) Rights Reacquisition

**General Facts & Circumstances.** On or about October 22, 2001, Zuffa entered into a Term Sheet Agreement ("LGE Agreement") with Lions Gate Entertainment ("LGE") whereby, effective as of 8/31/01, in exchange for a total payment of $2,000,000 made over the course of two years, Zuffa reacquired and restructured certain rights that SEG had previously licensed to LGE in perpetuity beginning as early as 1994. Most critical among the rights reacquired was the right to develop, license, market, and sell UFC branded merchandise throughout the United States as well as the related reduction of the amount of the profit participation payable to LGE for such activity from 50% to 5% retroactive to 1/10/01. The other significant right that was renegotiated was the reduction of the profit participation payable to LGE on the UFC video game license with Crave Entertainment, Inc. ("Crave") from 50% to 5%, also retroactive to 1/10/01. Under the terms of the LGE Agreement, the 5% profit participation payment obligation by Zuffa for both the merchandise and video game activity continues through the tenth anniversary of the 1/10/01 whereby it then becomes 0%. The LGE Agreement also served to reconfirm and further define certain rights of both parties related to home video production and distribution but left these rights largely unchanged from the previous agreements between SEG and LGE. The payment terms under the LGE agreement for the repurchase of the rights described above was as follows:

| | | |
|---|---|---|
| Payment #1 | $    750,000 | 10/30/01 |
| Payment #2 | $    250,000 | 10/30/02 |
| Payment #3 | $1,000,000 | 10/30/03 |

**Determining Factors.** LGE was primarily in the feature film production and home video production and distribution business. Although they had licensed rights from SEG for many different activities (including home video, motion picture and non-event television production, video games, and all merchandise), their primary focus related to the UFC was limited to home video production and distribution. Under their agreements with SEG, LGE had optioned the domestic home video rights to approximately 31 of the approximately 33 UFC events produced from 1993 through 2000, however their right to continue optioning UFC events for home video had expired prior to Zuffa's acquisition of the UFC. While LGE retained the rights related to the 33 UFC events they had optioned from SEG (LGE also retained the royalty payment obligation after their advances were recouped), Zuffa was free to seek new home video production/distribution relationships or self produce and distribute if they chose at their own time and expense.

At the time of the Zuffa acquisition, LGE had done little or nothing to exploit the UFC merchandise and video game rights they held and had no apparent intention to commit the time and resources to exploit them in the future. In fact, LGE had allowed SEG to reacquire the video game rights as part of a 1999 settlement arrangement, which then allowed SEG to license the rights to Crave but LGE retained the economic right to receive a 50% profit participation. While early in their relationship with SEG, LGE had

CONFIDENTIAL
FILED UNDER SEAL

ZFL-1240587

Case 2:15-cv-01045-RFB-BNW   Document 1000-4   Filed 02/29/24   Page 6 of 9

dabbled in selling merchandise at some of the UFC events but there had been no serious activity in several years and it was clear there was no interest on LGE's part to exploit the category.

As Zuffa's strategic plan to rehabilitate and develop the UFC brand moved forward and the company successfully secured cable PPV distribution starting in September of 2001, it was essential that Zuffa reacquire its rights to these two critical categories and not be required to lose an inequitable amount to a "partner" who was spending no time and money to drive the market. By the middle of 2001, Zuffa had begun to develop and sell merchandise at UFC events and through its website, and newly developed Crave video games were beginning to be released on significant platforms such as Playstation and Xbox.

**Conclusion.** Originally, the payments to LGE were fully expensed in the years that they were paid. However, due to the realization of economic benefit resulting primarily from the reduction in Zuffa's profit split for the merchandise and video game segments (and that split being converted to a finite period), it is deemed more appropriate to match the recognition of the expenditure against the actual profit split savings realized under the renegotiated terms. **In accordance with this methodology, as the 45% reduction in profit split payable to LGE is determined for each semi-annual period, that amount of prepaid asset will be amortized into a contra-revenue account.** Zuffa has adjusted its financial records in accordance with the aforementioned accounting and amortization treatment.

## UFC.com Domain Name Acquisition

**General Facts & Circumstances.** In December of 2005, Zuffa purchased the internet domain name "UFC.com" from its previous owner for $250,000. Since shortly after the acquisition of the UFC, Zuffa had established and primarily used the domain name UFC.tv as the UFC.com domain name was unavailable. During 2001 and 2002, Zuffa had discussed purchasing the UFC.com domain name with its owner but the asking price was too high for a company with significant negative cash flow and more critical uses of its limited liquidity. As the UFC began to grow meaningfully in mid to late 2005, and even though there was no measurable negative impact of not using it to date, it was decided to eliminate any potential domain name confusion and obtain the rights to a more commercially viable ".com" based domain name.

**Conclusion.** It is considered by Zuffa Management reasonable and conservative to amortize this acquisition cost over a 5 year period.

CONFIDENTIAL
FILED UNDER SEAL

ZFL-1240588

## Purchase of WEC

**General Facts & Circumstances.** On October 13, 2006, Zuffa acquired the assets related to the operation of World Extreme Cagefighting (the "WEC") from Scott Adams and Reed Harris, for a total purchase price of $1,500,000. The primary purpose for Zuffa's acquisition of the small, regionally based WEC was to obtain a second brand, separate and distinct from the UFC, which could produce MMA events for non-PPV television distribution. The WEC would also serve as a second tier or "minor league" feeder platform where younger, less experienced, lighter weight, and less well-known fighters could gain public awareness before developing to the point when they can move up to the UFC level of competition. As part of the acquisition, Zuffa retained the ongoing services of the WEC's two former owners, Scott Adams and Reed Harris, and secured covenants not to compete from each of them for a period of 5 years and 3 years respectively. The portion of the total purchase price allocated to the non-compete covenant was $125,000 for each principal and the total Purchase price was allocated into the following three categories:

| | | |
|---|---|---|
| Intangible Brand Value | $1,250,000 | 10 year amortization period |
| Non-Compete - S. Adams | $ 125,000 | 5 year amortization period |
| Non-Compete - R. Harris | $ 125,000 | 3 year amortization period |

**Determining Factors.** The company believes that it is appropriate that the entire WEC purchase price, except for the value associated with the non-compete covenants, be classified as an intangible brand asset and amortized over a period of 10 years, consistent with the treatment afforded the UFC intangible brand asset. The critical element of the acquisition was the right to conduct events under the WEC brand, which already had an identity in the MMA marketplace and held established patents and copyrights that would allow Zuffa to quickly develop and exploit the opportunities available in the marketplace for a second MMA brand. The WEC acquisition was very similar to the earlier purchase of the UFC in that, beyond the brand value and the non-compete covenants of the former owners, there were no additional assets that were deemed to carry any actual value to Zuffa. In the case of the WEC, there was no transfer of tangible personal property other than the pentagonal fighting ring, which Zuffa would not continue to use due to its unacceptable condition and the company's desire to emphasize the octagonal ring as the preferred forum in which to hold MMA contests. The WEC also had no ongoing TV and/or home video distribution contracts or arrangements, and there were no fighter contracts held by the WEC prior to the purchase. While the WEC did own a videotape library of its events, the value of the library to Zuffa is essentially non-existent as WEC production values were substandard and their content would not be suitable for home video (or other) exploitation. The only potential use for historical WEC footage would be the incorporation of clips for the promotion and marketing of fighters or as part of the

production content of future WEC or UFC events. In fact, the WEC production values would be significantly revamped and upgraded to a more UFC-like standard before any events would be conducted under Zuffa's ownership, thus allowing for a higher quality product suitable for the newly negotiated and future envisioned distribution platforms. The WEC also owned a ".tv" based domain name but there was no merchandise activity or other commerce conducted through the website and it was more of an informational site for fans than an aspect that would add any value to the operation other than supporting the brand. Any value realized from the future exploitation of a WEC website would be the result of Zuffa's efforts and funding to build that potential component of the business.

**Conclusion.** It is deemed by Zuffa management, that due to the facts and circumstances described above, the classification and amortization treatment of the acquisition costs related to the WEC are reasonable, appropriate and consistently presented.

### Purchase of the WFA

**General Facts & Circumstances.** On December 6, 2006, Zuffa acquired the assets and liabilities related to the operation of World Fighting Alliance (the "WFA") from Ross C. Goodman and T. Louis Palazzo, for a total purchase price of $3,200,000. The purpose of Zuffa's acquisition of the small and little known WFA was a defensive strategy to eliminate a second tier competitive brand operating in the Las Vegas market. As part of the acquisition, Zuffa secured non-compete covenants from the WFA's two principal owners for a period of 7 years each. The portion of the total purchase price specifically assigned to the non-compete covenant in the purchase agreement was $500,000 for each principal. As such, the total purchase price was allocated into the following three categories:

| | | |
|---|---|---|
| Unspecified Non-Compete Value | $2,200,000 | 7 year amortization period |
| Non-Compete – R. Goodman | $ 500,000 | 7 year amortization period |
| Non-Compete – L. Palazzo | $ 500,000 | 7 year amortization period |

**Determining Factors.** The company believes that it is appropriate that the entire WFA purchase price, including the portion not specified in the purchase agreement as a non-compete component be classified as non-compete assets and amortized over a period of 7 years consistent with the term of the specified non-compete covenants. The reason for the acquisition was to control the WFA brand and prevent it from competing with the WEC and UFC. Zuffa has no current intention of exploiting the WFA brand or conducting events in connection with the brand in the future. In the case of the WFA acquisition, there was no transfer of tangible personal property, they had no ongoing TV and/or home video distribution contracts, and there was no meaningful value attributable

CONFIDENTIAL
FILED UNDER SEAL

ZFL-1240590

to any of the fighter contracts that the WFA held prior to the purchase. Any value ultimately derived by Zuffa from former WFA fighter contracts would be a result of integration into the UFC/WEC brand and only be realized through future marketing and production efforts. In fact, the terms of any fighter contracts to be exploited by Zuffa would likely be renegotiated and altered to comply with Zuffa standards and be economically adjusted in accordance with the new event venue (UFC / WEC) in which the fighter was to perform. The WFA did have a limited videotape library of its events but had only held a total of four events, and therefore the library's value is extremely limited or non-existent.

**Conclusion.** It is deemed by Zuffa management, that due to the facts and circumstances specific to the WFA transaction as described above, the classification and amortization treatment of the acquisition costs of the WFA are reasonable and appropriate as presented.

## General Summation

In order to further clarify the written information concerning the accounting treatment of Zuffa's intangible assets presented above, please find attached as Exhibt B to this memorandum a spreadsheet that presents the numeric details and impact to the financial statements by period. Exibit B will also illustrate the impact of any adjustments necessary to correct any previously differing treatment afforded by the company.

CONFIDENTIAL
FILED UNDER SEAL

ZFL-1240591