# EXHIBIT 1

# Excerpts of Deposition of Dr. Hal Singer

# Sept. 27, 2017

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

| | | |
|---|---|---|
| IN RE: | : | Civil Action |
| | : | DOCKET NO. |
| CUNG LE, NATHAN QUARRY, | : | 2:15-cv-01045-RFB- |
| JON FITCH, BRANDON VERA, | : | (PAL) |
| LUIS JAVIER VAZQUEZ and | : | |
| KYLE KINGSBURG, on behalf | : | CLASS ACTION |
| of themselves and all | : | |
| others similarly | : | |
| situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ZUFFA, LLC, d/b/a | : | |
| ULTIMATE FIGHTING | : | |
| CHAMPIONSHIP and UFC, | : | |
| | : | |
| Defendants. | : | |

- - -
Wednesday, September 27, 2017
- - -

Videotaped deposition of
HAL J. SINGER, Ph.D., taken pursuant to
notice, was held at the law offices of
Berger & Montague, P.C., 1622 Locust
Street, Philadelphia, Pennsylvania 19103,
beginning at 9:24 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public in and for the Commonwealth
of Pennsylvania.

\* \* \*

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



```
                                                   Page 2
 1   A P P E A R A N C E S:
 2   BERGER & MONTAGUE, P.C.
     BY:  ERIC C. CRAMER, ESQUIRE
 3         MARK SUTER, ESQUIRE
     1622 Locust Street
 4   Philadelphia, Pennsylvania 19103
     215.875.3000
 5   ecramer@bm.net
     msuter@bm.net
 6   Counsel for Plaintiffs
 7   JOSEPH SAVERI LAW FIRM, INC.
     BY:  JOSHUA P. DAVIS, ESQUIRE
 8   555 Montgomery Street, Suite 1210
     San Francisco, California  94111
 9   415.500.6800
     davisj@usfca.edu
10   Counsel for Plaintiffs
11   COHEN MILSTEIN SELLERS & TOLL
     BY:  DANIEL SILVERMAN, ESQUIRE
12   190 S. LaSalle Street, Suite 1705
     Chicago, Illinois 60603
13   312.357.0370
     dsilverman@cohenmilstein.com
14   Counsel for Plaintiffs
15   BOIES, SCHILLER & FLEXNER, LLP
     BY:  WILLIAM A. ISAACSON, ESQUIRE
16        NICHOLAS A. WIDNELL, ESQUIRE
     1401 New York Avenue NW
17   Washington, DC  20005
     202.237.2727
18   wisaacson@bsfllp.com
     nwidnell@bsfllp.com
19   Counsel for Defendants
20   BOIES, SCHILLER & FLEXNER, LLP
     BY:  BRENT K. NAKAMURA, ESQUIRE
21   1999 Harrison Street, Suite 900
     Oakland, California  94612
22   510.874.1000
     bnakamura@bsfllp.com
23   Counsel for Defendants
24
```

```
                                                   Page 4
 1                        - - -
                        I N D E X
 2                        - - -
 3   Testimony of: HAL SINGER
 4    By Mr. Isaacson                    8
 5
                          - - -
 6                      E X H I B I T S
                          - - -
 7
     NO.         DESCRIPTION              PAGE
 8
     Exhibit    Expert Report of Hal J.    6
 9   Singer-1   Singer, Ph.D.
10   Exhibit    Errata                     6
     Singer-2
11
     Exhibit    Errata II                  6
12   Singer-3
13   Exhibit    Excel spreadsheet,        72
     Singer-4   Weight Data for
14              Foreclosure Shares
15
16
17
18
19
20
21
22
23
24
```

```
                                                   Page 3
 1        ALSO PRESENT:
 2           Augie Urschel
             Economists, Inc.
 3
             Solange Tran, Video Specialist
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                   Page 5
 1                        - - -
 2             DEPOSITION SUPPORT INDEX
 3                        - - -
 4
 5   Direction to Witness Not to Answer
 6   Page Line       Page Line     Page Line
 7   None
 8
 9
10   Request for Production of Documents
11   Page Line       Page Line     Page Line
12   None
13
14
15   Stipulations
16   Page Line       Page Line     Page Line
17   None
18
19
20   Question Marked
21   Page Line       Page Line     Page Line
22   None
23
24
```



2 (Pages 2 to 5)

Page 6

```
 1        (Exhibit No. Singer-1,
 2   Expert Report of Hal J. Singer,
 3   Ph.D., No. Singer-2, Errata, and
 4   No. Singer-3, Errata II, were
 5   marked for identification.)
 6        THE VIDEOGRAPHER:  We are
 7   now on the record.
 8        This begins videotape No. 1
 9   in the deposition of Hal J. Singer
10   in the matter of Cung Le versus
11   Zuffa, LLC, in the US District
12   Court for the District of Nevada.
13        Today is Wednesday,
14   September 27th, 2017, and the time
15   is 9:24 AM.
16        This deposition is being
17   taken at 1622 Locust Street in
18   Philadelphia, PA 19103 at the
19   request of Boies, Schiller &
20   Flexner, LLP.
21        The videographer is Sol Tran
22   of Magna Legal Services, and the
23   court reporter is Connie Kent of
24   Magna Legal Services.
```

Page 7

```
 1        Will counsel and all parties
 2   present, please state their
 3   appearances and whom they
 4   represent.
 5        MR. CRAMER:  Eric Cramer
 6   from Berger & Montague for the
 7   plaintiffs.
 8        MR. DAVIS:  Joshua Davis on
 9   behalf the Saveri Law Firm for
10   plaintiffs.
11        MR. SILVERMAN:  Dan
12   Silverman, Cohen Milstein Sellers
13   & Toll, on behalf of plaintiffs.
14        MR. SUTER:  Mark Suter,
15   Berger & Montague, on behalf of
16   the plaintiffs.
17        MR. ISAACSON:  Bill
18   Isaacson, Boies, Schiller &
19   Flexner for defendant Zuffa.
20        MR. WIDNELL:  Nicholas
21   Widnell, Boies, Schiller &
22   Flexner, for defendant Zuffa.
23        MR. NAKAMURA:  Brent
24   Nakamura, Boies, Schiller &
```

Page 8

```
 1   Flexner also for defendant Zuffa.
 2        MR. CRAMER:  And on the
 3   phone is Augie --
 4        THE WITNESS:  Augie Urschel.
 5        MR. CRAMER:  Augie Urschel
 6   from Economists, Inc.?
 7        THE WITNESS:  Correct.
 8        MR. CRAMER:  You can spell
 9   his name for the court reporter.
10        THE WITNESS:  I don't know.
11   Maybe Augie can spell his last
12   name, Urschel.
13        MR. URSCHEL:  U-R-S-C-H-E-L.
14        THE WITNESS:  Thanks, Augie.
15        THE VIDEOGRAPHER:  All
16   right.  Will the court reporter
17   please swear in the witness.
18        HAL SINGER, having been
19   first duly sworn, was examined and
20   testified as follows:
21           - - -
22        E X A M I N A T I O N
23           - - -
24   BY MR. ISAACSON:
```

Page 9

```
 1        Q.   So Dr. Singer, for ease of
 2   reference, we're putting in front of you
 3   Exhibits 1, 2 and 3.  Exhibit 1 is your
 4   report, Exhibit 2 is your first errata
 5   and Exhibit 3 is your second errata.  And
 6   I'll be asking questions about those two
 7   today, and if -- when you want to refer
 8   to them, I wanted to make sure you had
 9   them in front of you.
10        A.   Okay.
11        Q.   All right.  Now, I'm going
12   to ask you hopefully some detailed
13   questions about the various models that
14   you've -- that are included in your
15   report, but let me just ask you some high
16   level questions to make sure I understand
17   what models you have in -- in the report.
18        Now, for purposes of
19   damages, your first two damages models
20   are benchmark -- benchmarks against
21   Strikeforce and Bellator based on the
22   percentage of revenue paid to fighters;
23   is that correct?
24        A.   That is correct.
```



Page 250

```
 1       Q.   It even gets confusing, your
 2   Table of Contents doesn't have a 7A.
 3       A.   Right.  So let me --
 4            MR. CRAMER:  I think it
 5   means 2.
 6            THE WITNESS:  Yeah.
 7            MR. ISAACSON:  2A?
 8            THE WITNESS:  Yeah.
 9            MR. CRAMER:  There's a
10   section of the report called --
11   under Roman II called Nature of
12   the Challenged Conduct.
13            MR. ISAACSON:  That would
14   make more sense, yes.
15            THE WITNESS:  You want to
16   strike the V there.
17   BY MR. ISAACSON:
18       Q.   All right.  So II A is the
19   horizontal conduct?
20       A.   Yes.
21       Q.   And so is that the item 3 in
22   your paragraph 2, the other -- the other
23   conduct, is it the horizontal conduct?
24       A.   No.
```

Page 251

```
 1       Q.   Okay.  Would it be
 2   everything in No. II that's -- would
 3   your -- would the -- Roman numeral II,
 4   would that section capture the challenged
 5   conduct?
 6       A.   Roman II captures the
 7   challenged conduct.
 8       Q.   Okay.  Maybe I just got us
 9   another errata.
10            The -- now, the esti- --
11   your challenged conduct includes
12   horizontal conduct and vertical conduct.
13   As I understand it, from what you've said
14   today, that you are not estimating injury
15   or damages from the horizontal conduct;
16   is that right?
17       A.   I think I'm not -- I'm not
18   estimating any -- any impact or damages
19   that flow entirely through the
20   horizontal.  What -- what's important and
21   what drives the damages and the impact in
22   my models are the vertical restraints.
23   They're doing the -- that is the
24   mechanism of harm that I'm capturing,
```

Page 252

```
 1   that I'm measuring.
 2       Q.   All right.  The -- you are
 3   measuring an increase in foreclosure due
 4   to the acquisition of rivals by Zuffa; is
 5   that right?
 6            MR. CRAMER:  Asked and
 7   answered, form.
 8            THE WITNESS:  Conditional on
 9   Zuffa using exclusive contracts of
10   a sufficient duration, then yes,
11   bringing on more fighters and
12   funneling them through that
13   mechanism is causing foreclosure
14   to go up.
15            In contrast, if Zuffa were
16   not using exclusive contracts of a
17   sufficient duration and made a
18   horizontal acquisition, then by my
19   regression model, at least, there
20   would be no increase in
21   foreclosure share and there would
22   be no anticompetitive effects.
23            In other words, the vertical
24   restrictions on fighter mobility
```

Page 253

```
 1   are doing -- is the only necessary
 2   condition, it is doing all the --
 3   all the lifting, if you will,
 4   according to my model.
 5   BY MR. ISAACSON:
 6       Q.   Is it the case that you have
 7   not reached an opinion or whether the
 8   acquisition of Zuffa -- of any of Zuffa's
 9   rivals was anticompetitive in the absence
10   of those fighters subsequently entering
11   exclusive contracts of 30 or more months?
12       A.   So if I'm hearing you right,
13   if you take away -- if you take away the
14   vertical restrictions, I'm not offering
15   an opinion that the horizontal
16   acquisitions were -- were contributing to
17   underpayments or damages or impact per my
18   regression model.
19       Q.   And I'm even going a little
20   broader maybe.
21       A.   Okay.
22       Q.   Is in the absence of
23   30-month contracts, you don't have an
24   opinion about whether any acquisition of
```

Page 254

```
 1   Zuffa of any of its rivals, whether it's
 2   Pride, Strikeforce or Affliction, was
 3   anticompetitive?
 4           MR. CRAMER:  Objection to
 5       form.
 6           THE WITNESS:  I don't offer
 7       an opinion on that -- on that
 8       particular aspect.  I'll leave it
 9       at that.
10   BY MR. ISAACSON:
11       Q.   Fine.  You discuss
12   counter-programming in your report.  I
13   can refer you to that, but if you're
14   general familiar with the topic.
15       A.   Yes.
16       Q.   All right.  You are -- am I
17   correct that you are not attributing any
18   increase in foreclosure percentage to
19   counter-programming or would you know?
20       A.   I'll give you the same
21   answer I just gave you for the
22   acquisitions.  If you strip away the
23   restrictions on the fighter mobility, the
24   exclusive long-term contracts, then the
```

Page 255

```
 1   presence of the counter-programming would
 2   not engender higher foreclosure shares
 3   according to my model, would not generate
 4   the wage effects that -- that my model is
 5   showing.
 6       Q.   Is -- in the absence of
 7   30-month contracts, in your opinion,
 8   would counter-programming be
 9   anticompetitive?
10           MR. CRAMER:  Incomplete
11       hypothetical.
12           THE WITNESS:  It could be,
13       but I don't -- I don't take -- I
14       don't take an opinion on that
15       hypothetical.
16   BY MR. ISAACSON:
17       Q.   All right.  In the absence
18   of the 30-month contracts, do you have an
19   opinion about whether the right to match
20   provisions in the contracts are
21   anticompetitive?
22           MR. CRAMER:  Objection to
23       form.  Incomprehensible.
24           THE WITNESS:  That one --
```

Page 256

```
 1   that one doesn't make sense
 2   because remember the right to
 3   match is one of the contributors
 4   to going over 30 months.
 5   BY MR. ISAACSON:
 6       Q.   Yes.  Okay.  What about
 7   the -- I will come back to that then.
 8           The -- do you consider the
 9   champions clause to be one of the
10   contributors to going over 30 months?
11       A.   I could not attach a
12   specific duration to the champions clause
13   except, of course, in the cases in which
14   it was invoked, so I don't -- I don't --
15   I don't treat it the same way that I
16   treat the other provision that lend
17   themselves to a more natural numerical
18   accounting of duration, so I require it
19   in my definition of what constitutes an
20   exclusionary arrangement, but it is not
21   adding months to my measure of how long
22   the contract is.
23       Q.   You had reached the opinion
24   that the champions clause is
```

Page 257

```
 1   anticompetitive -- is an anticompetitive
 2   act?
 3       A.   I think that the champions
 4   clause, and any of these other things
 5   that we're talking about in conjunction
 6   with what I consider to be the heart of
 7   the -- the driver of the -- the only
 8   necessary condition of the
 9   anticompetitive effects, at least as I
10   measure them here, is -- is contributing
11   at the margin to making things worse and
12   engendering anticompetitive effects.
13       Q.   Would the champions
14   clause -- in the absence of the 30-month
15   or more contracts, would the champion
16   clause, in your opinion, be -- be an
17   anticompetitive act?
18           MR. CRAMER:  Incomplete
19       hypothetical, form.
20           THE WITNESS:  I don't
21       express an opinion on that.
22   BY MR. ISAACSON:
23       Q.   The retirement clause, is
24   that something that causes you to -- that
```

Page 258

1  is part of your analysis of what makes a
2  contract 30 months or longer?
3      A.  No.  No, there are few --
4  the retirement clause and some other
5  tolling provisions were not counted in --
6  when I went to add up the durations.  In
7  that sense, my -- my method is
8  conservative.
9      Q.  All right.  The -- so the
10 retirement clause or another tolling
11 provisions of the contracts, in the
12 absence of contracts that were 30 months
13 or longer, you don't have an opinion
14 about whether they're anticompetitive,
15 correct?
16     A.  On a stand-alone basis, no.
17         And you keep -- you keep
18 saying, just so the record is clear, in
19 the absence of 30 months.  Remember it's
20 exclusive plus duration.
21     Q.  Right.  Understood.
22     A.  Okay.
23     Q.  The -- the exclusive
24 negotiation clause, is that a provision

Page 259

1  that you have taken into account in
2  calculating the 30 months or more?
3      A.  Yes.
4      Q.  Am I correct that -- if my
5  colleague will allow me a compound
6  question to save time -- that items that
7  you have discussed include preventing the
8  use of fighter clips when you move to a
9  new promotion, moving sponsors with you
10 when you move to a new promotion, and
11 warning fighters not to sign over their
12 likenesses to other promoters, those
13 would -- you would not have an opinion
14 about whether those actions were
15 anticompetitive in the absence of
16 exclusive contracts that were 30 or more
17 months?
18     A.  I think that's fair.
19     Q.  Okay.  And do you have an
20 opinion about whether exclusivity
21 provisions with venues, sponsors or
22 broadcasters are anticompetitive in the
23 absence of exclusive contracts of 30 or
24 more months?

Page 260

1      A.  I don't have an opinion.
2      Q.  Okay.  Do you, together with
3  contracts, inclusive contracts that are
4  30 or more months, do the -- is it your
5  opinion that the exclusivity provisions
6  with venues increase the foreclosure
7  share of Zuffa?
8          MR. CRAMER:  Objection to
9      form.
10         THE WITNESS:  I think that
11     in conjunction with the primary
12     restrictions on fighter mobility,
13     the exclusives on the venues can
14     be -- can be considered to be
15     anticompetitive.
16         Whether they contributed to
17     higher foreclosure shares, I'd --
18     I'd have think about it.  I
19     imagine one might construct a
20     story, but I'd have to -- I'd have
21     to think about it some more.
22 BY MR. ISAACSON:
23     Q.  Okay.  Today you don't have
24 an opinion about whether exclusivity

Page 261

1  provisions with venues, even taken
2  together with exclusivity agreements with
3  fighters of 30 or more months, would
4  increase the foreclosure share --
5  increase the foreclosure share?
6      A.  Like I said, I can imagine
7  how they could funnel more fighters into
8  this net and therefore trigger the
9  mechanism that's causing the rate
10 suppression in my -- in my models, but I
11 don't really have an opinion beyond that.
12     Q.  In general, we'll save time
13 if you tell me whether you have opinions
14 as opposed to what you imagine.
15     A.  Okay.
16     Q.  Or could imagine.  I don't
17 mean that as a criticism, I mean that as
18 constructive.
19         MR. CRAMER:  Constructive
20     criticism.
21         MR. ISAACSON:  No, not even
22     that.  A constructive way to get
23     through the day.
24         MR. CRAMER:  Advice.

Magna Legal Services

Page 262

```
 1        MR. ISAACSON:  Yes.
 2   BY MR. ISAACSON:
 3        Q.   The same question for
 4   exclusive agreements between Zuffa and
 5   sponsors such as Bud Light?
 6        A.   Sure.  This is something
 7   else that's at the margin.  Once you
 8   already have the center piece, which is
 9   the exclusive 30-month plus contracts.
10   At the margin this is contributing to
11   erecting a barrier to fighter mobility
12   and therefore generating anticompetitive
13   effects, and to the extent that it's
14   funneling more and more fighters through
15   this mechanism, then that could, as a
16   matter of theory, be -- be increasing the
17   foreclosure share.
18             Does that answer --
19        Q.   Yes.
20        A.   Does that answer the
21   question?
22        Q.   So -- and since all I asked
23   you was the same question, that really
24   wasn't helpful.  But the -- I take it
```

Page 263

```
 1   that with regards to Zuffa's -- any Zuffa
 2   agreements that are exclusive with
 3   sponsors such as Bud Light, that could,
 4   as a matter of theory, be increasing the
 5   foreclosure share when it's combined with
 6   the exclusive contracts with fighters of
 7   30 or more months?
 8        A.   It's certainly possible.
 9        Q.   And is the same true of
10   exclusive agreements with broadcasters,
11   that exclusive agreements with cable
12   companies or other broadcasters could be
13   increasing Zuffa's foreclosure share when
14   combined with 30-month -- 30-month plus
15   exclusive contracts?
16        A.   It's possible.  I think that
17   you're starting to get a bit more
18   tenuous, but anything that's erecting an
19   impediment to fighter mobility could help
20   to funnel more fighters through Zuffa's
21   exclusionary contracts.
22        Q.   And does the renewal of the
23   contract before it comes up by offering
24   the fighter a higher amount of money for
```

Page 264

```
 1   a second contract, together with 30-month
 2   contracts that are exclusive, does that
 3   tend to increase Zuffa's foreclosure
 4   percentage?
 5        MR. CRAMER:  Incomplete
 6   hypothetical.  Objection to form.
 7        THE WITNESS:  To the extent
 8   that -- that strategically
 9   delaying the offer of the last
10   bout until you force the fighter
11   to sign the next one causes more
12   people to say inside of this --
13   this design, then that would --
14   that would tend to push
15   foreclosure share upward.
16   BY MR. ISAACSON:
17        Q.   Going -- going back to
18   counter-programming.  Would counter-
19   programming -- in your opinion, does
20   counter-programming plus exclusive
21   contracts of 30 or more months, increase
22   foreclosure share more than just the
23   contracts -- the exclusive contracts for
24   30 months?
```

Page 265

```
 1        MR. CRAMER:  Asked and
 2   answered.
 3        MR. ISAACSON:  No, we didn't
 4   go over that.
 5        MR. CRAMER:  And objection
 6   to form.
 7        THE WITNESS:  I think that
 8   the story is bit more tenuous
 9   there.
10   BY MR. ISAACSON:
11        Q.   Why do you say the story is
12   more tenuous?
13        A.   Because again, what drives
14   everything in this model are restrictions
15   on fighter mobility, and I'm thinking of
16   how you would construct a story on
17   counter-programming doing that, and I
18   just would have to -- I would have to
19   think about that one some more.  It's not
20   obvious to me what the story would be.
21        Q.   Well, part of what drives
22   the increase in foreclosure share is the
23   increase in Zuffa's market share, right?
24        A.   Correct.
```

Page 266

```
 1       Q.   So any conduct, such as
 2   counter-programming that increases
 3   Zuffa's market share would increase the
 4   foreclosure share and increase damages?
 5          MR. CRAMER:  Objection to
 6      form.
 7          THE WITNESS:  It's a little
 8      more complicated than that because
 9      again you have to -- you have to
10      assume that the -- the contracts
11      that they're coming into are
12      exclusionary.
13          But if you grant me that,
14      then increases in Zuffa's market
15      share by, say, making life so
16      miserable for a rival that they
17      end up folding and losing all
18      their fighters to Zuffa, yes, is
19      going to increase foreclosure
20      share.
21   BY MR. ISAACSON:
22       Q.   Looking at Figure 3, which
23   is page 115?
24       A.   115?
```

Page 267

```
 1       Q.   Yes.
 2       A.   Okay.
 3       Q.   You would not be able to
 4   tell me how much of the foreclosure
 5   shares here are attributable to conduct
 6   such as counter-programming or exclusive
 7   contracts with sponsors, and segregate
 8   that out from the 30-year (sic) contracts
 9   that are exclusive?
10          MR. CRAMER:  Objection to
11      form.
12          THE WITNESS:  You have to
13      tell me whether or not we have
14      exclusive long-term contracts
15      lurking in the background.  That
16      is the only necessary condition.
17          So if you take those away
18      and all you give me is counter-
19      programing, we don't get -- we
20      don't engender foreclosure.
21   BY MR. ISAACSON:
22       Q.   But if you --
23       A.   Let me just finish.
24          If you take those away and
```

Page 268

```
 1      give me the threats or take those away
 2      and give me the horizontal, we don't get
 3      the -- we don't get the foreclosure.
 4          So there's -- there's only
 5      one necessary element according to this
 6      model --
 7       Q.   All right.
 8       A.    -- and that element are the
 9   restrictions of the exclusive --
10   exclusivity plus duration.
11       Q.   So there's one necessary
12   element for a foreclosure effect, and
13   that's the 30-month or more exclusive
14   contracts, correct?
15       A.   Yes.
16       Q.   Okay.  And in terms of the
17   magnitude of the foreclosure effect,
18   which is charted on Figure 3, are you
19   able to segregate out the effect of
20   30-year (sic) exclusive contracts from
21   the other conduct that's been alleged
22   such as counter-programming?
23          MR. CRAMER:  Form,
24      incomprehensible.
```

Page 269

```
 1          THE WITNESS:  And I don't
 2      understand -- let me try it this
 3      way, that -- because there's only
 4      one necessary condition, which are
 5      these -- this 30-month exclusive
 6      provision, if you take them out,
 7      the foreclosure goes away.  So --
 8      so I would, in a sense, think that
 9      that -- that is -- that is what
10      matters and everything else is --
11      is just -- in its presence is
12      contributing -- to the extent it's
13      doing anything, it's contributing
14      through that mechanism.
15   BY MR. ISAACSON:
16       Q.   I understand what matters to
17   you, and you've been very clear about
18   that.  But for example, the foreclosure
19   percentage for the blue and purple lines
20   in 2007 are 30 to 40 percent.
21          Do you see that?
22       A.   Yeah.
23       Q.   All right.  And without the
24   necessary predicate of the 30-year (sic)
```



Page 330

1   restriction in the pay-per-view output of
2   marquee events between 2010 and 2015?
3       A.   Yes.  That's what a
4   pay-per-view event is.  I mean, you're
5   not going to sell a pay-per-view event
6   unless you have headliner fighters in it.
7       Q.   So you're characterizing all
8   of the pay-per-view events as marquee
9   events when you say marquee events?
10      A.   I think that you might be
11  able to find counterexamples, a handful
12  of counterexamples of a pay-per-view that
13  doesn't feature a headliner, but in
14  general it would be really hard to sell
15  it unless it featured a headliner.
16      Q.   Right.  And did the -- and
17  if Zuffa -- if a firm decided that it
18  wanted to move marquee events from
19  pay-per-view to broadcast, would you
20  consider that direct evidence of power to
21  restrict supply?
22          MR. CRAMER:  Incomplete
23      hypothetical, form.
24          THE WITNESS:  Well, you're

Page 331

1   asking me to assume something that
2   I understand to be an unprofitable
3   move.
4           But if -- if your experts
5   can show evidence that these
6   marquee events moved one-for-one
7   from pay-per-view to -- to
8   television, I'd be happy to
9   consider such evidence.  But I
10  don't have an opinion on it right
11  now.
12      Q.   Okay.
13          THE VIDEOGRAPHER:  Excuse
14      me, Counsel.  We're approaching
15      ten minutes left on the disk.
16          MR. ISAACSON:  I think I'm
17      done.
18          Give me one minute, but I
19      think I'm about done for the day.
20          Give us a minute.
21          MR. CRAMER:  Let's go off
22      the record.
23          THE VIDEOGRAPHER:  The time
24      is 4:28 PM.  We are going off the

Page 332

1   record.
2           (Recess.)
3           THE VIDEOGRAPHER:  The time
4   is 4:31 PM.  We have been on the
5   record for five hours and
6   36 minutes.
7           MR. CRAMER:  All right.  We
8   have no questions.
9           MR. ISAACSON:  Thanks.
10          MR. CRAMER:  Let's go off
11  the record.
12          THE VIDEOGRAPHER:  All
13  right.  The time is 4:31 PM.
14          This concludes the
15  deposition and this is the end of
16  Disk 3.
17          (Witness excused.)
18          (Deposition concluded at
19  approximately 4:31 PM.)

Page 333

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, HAL J. SINGER, Ph.D., have the opportunity to read and sign the deposition transcript.

_____
Constance S. Kent, CCR, RPR,
Certified Court Reporter
Registered Professional Reporter
Certified LiveNote Reporter
and Notary Public in and for the
Commonwealth of Pennsylvania
Dated:  October 1, 2017

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

