# EXHIBIT 2

# Excerpts of Deposition of Jon Fitch Feb. 15, 2017

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon Fitch ) Case No: 2:15-cv-01045-RFB(PAL)
Brandon Vera, Luis Javier Vasquez,)
and Kyle Kingsbury on behalf of   )
themselves and all others         )
similarly situated,               )
                                  )
            Plaintiffs,           )
                                  )
vs.                               )
                                  )
Zuffa, LLC, d/b/a Ultimate        )
Fighting Championship and UFC,    )
                                  )
                                  )
            Defendants.           )

VIDEO DEPOSITION OF JON FITCH

taken at, Boies, Schiller & Flexner,

300 South Fourth Street, Suite 800,

Las Vegas, Nevada 89101 beginning at 9:23 A.M.

and ending at 4:54 P.M. on Wednesday, February 15, 2017

Reported by:
Sarah Padilla, CCR NO. 929
Job No.  296624 Pages 1-257



Page 70

```
 1        A   Zinkin Entertainment has handled all of my
 2   fight-related contracts since I signed with them in
 3   2002.
 4        Q   Okay.  At the time that you were
 5   contracting for the Brock Larson fight, who would
 6   you have dealt with at Zinkin Entertainment?
 7             MR. DELL'ANGELO:  Objection to form.
 8             THE WITNESS:  Who would I have dealt with
 9   at Zinkin Entertainment?  The person I would have
10   talked to is Crazy Bob.  Robert Cook would have been
11   the number one person, but DeWayne.  I've also
12   talked to DeWayne extensively.  So it's pretty much
13   those two, and then, yeah, DeWayne's brother is a
14   lawyer and the family has a family business, so they
15   use some of their resources and assets from their
16   family business with the management.
17   BY MR. WIDNELL:
18        Q   So how would contracting play out for you?
19   I'm really just trying to understand the process.
20   You know there's interest or you hear from your
21   manager that there's interest to potentially go
22   fight for the UFC.  What happens after that?
23             MR. DELL'ANGELO:  Objection to form.
24             THE WITNESS:  Okay.  So typical breakdown
25   of how you got your UFC fights.
```

Page 71

```
 1   BY MR. WIDNELL:
 2        Q   Okay.
 3        A   Crazy Bob would call you and say, "Joe
 4   Silva as an opening.  Take it or leave it."
 5        Q   Okay.  And then you make a decision about
 6   whether to take it or leave it?
 7        A   Yup.
 8        Q   Let's say you decide you want to take it.
 9   What happens after that?
10        A   You -- for me I signed the bout agreement,
11   promotional agreement, signed the bout agreements,
12   and then fought.
13        Q   So how did you get the promotional
14   agreement and the bout agreement, just in a can --
15        A   I'm sorry.  I don't know if I remember if
16   I got an extended promotional agreement.  I might
17   have.  I can't remember.  I can't remember.  Because
18   it was just one fight, it might have just been the
19   bout agreement.
20        Q   Okay.
21        A   I don't know if I signed a promotional
22   agreement, necessarily.  I don't remember.
23        Q   Okay.  We can get to what the contracts
24   are exactly, but what I'm after really is just the
25   mechanics of it, who would have -- who would have
```

Page 72

```
 1   sent you whatever agreement you signed?  Would it
 2   have been someone at Zinkin Entertainment?
 3        A   Yes, Crazy Bob would have e-mailed me,
 4   sent it to me like that.
 5        Q   Okay.  When you get the agreement --
 6        A   Or he would have -- a lot of times what
 7   Bob did was not great technically.  He would just
 8   bring the contracts in.  He'd have them printed out,
 9   and he would get them printed at practice and he
10   could go to the office and fax them out from the
11   office.
12        Q   Okay.  So when you say bring the contracts
13   in, into?
14        A   Into the gym in physical printout form.
15        Q   Would this be AKA?
16        A   Yes.
17        Q   So at that point you were at AKA, he would
18   have come to the gym with the contracts?
19        A   Yes.  That was fairly usual procedure,
20   yeah.
21        Q   And when he brought the contracts to you,
22   did you talk with him about the contracts?
23        A   Not really, because the contracts were
24   take it or leave it.  So everybody knew that
25   already.  Bob had 30 other guys in other
```

Page 73

```
 1   organizations all over the place.  He'd seen
 2   everybody's promotions contract and seen what's
 3   going on.  And it was, you want to make money, you
 4   sign it.  That's the only way; there's nowhere else
 5   to go.
 6        Q   So you had no option at all in terms of
 7   changing the contract, as far as you knew?
 8        A   There's no real wiggle room, especially
 9   when you don't have any notoriety and you're just
10   getting in.
11        Q   As you became a more experienced fighter
12   and had fought for the UFC for a longer period of
13   time, does that change?
14        A   When I had fought for them and started
15   winning, Bob would be able to negotiate slight
16   incremental pay increases when the -- the re-up, the
17   resigning contracts would come through.  Like, you
18   got one fight left, they would send a new set of
19   contracts and Bob would have minimal ability to
20   negotiate pay increases.  They're usually only a few
21   thousand dollars increase.
22        Q   Okay.  So --
23        A   So it wasn't really a negotiation.  It's
24   pretty standardized across the board for all the
25   fighters to get the same basic pay.
```



Page 74

1  Q  The basic pay increase, do you mean?
2  A  Yeah. Like they're fairly similar, like
3  the starting amount's like 5,000 with dollar bumps
4  in between wins and reduced to like 3,000. And I
5  don't even know where they're at now.
6  Q  Okay.
7  A  That's the only reason I made so much is I
8  won all the time.
9  Q  Okay. So would your contracts have been
10 -- your contracts, would they have been different
11 from other fighter who didn't win as much as you
12 did?
13 A  The fighters who did not win as much as me
14 would not have gotten pay bumps. Because you have
15 to win to get a pay bump. So if you didn't win as
16 much, you weren't going to make as much as me.
17 Q  Is it your --
18 A  But the language of the contracts is the
19 same.
20 Q  Is it your understanding that if you had
21 won the same number of times, regardless of what
22 kind of fighter you are, you would have the same pay
23 bumps?
24 A  Not necessarily, because there is no
25 meritocracy in the sport. It's kind of hit or miss.

Page 75

1  They like somebody, they pay them more. If somebody
2  is more agreeable to do things outside of their
3  contract, they pay them more. If you're a good
4  company boy, you do what you're told, you get better
5  options, you get more.
6  Q  So is it your understanding that there's a
7  significant variation in terms of what different
8  fighters are paid?
9     MR. DELL'ANGELO:  Objection to form.
10 Misstates the witness's testimony.
11    THE WITNESS:  I wouldn't say that. No.
12 I'd say we have pretty standardized treatment in
13 contract across the board, yet there is like a
14 .00001 percent of the fighters who get maybe special
15 treatment.
16 BY MR. WIDNELL:
17 Q  Okay. And what is that special treatment?
18 A  More title shots, the ability to lose more
19 fights without being released, more opportunities to
20 make money through sponsors and doing paid
21 appearances rather than free appearances where you
22 only get $50 per diem.
23 Q  Are there other examples of special
24 treatment in your mind?
25 A  Certain fighters would get better airline

Page 76

1  flights, better hotels. Certain fighters had
2  trainers or part of their training camp paid for my
3  by Zuffa. I remember recently there was something
4  that was quite public about them paying to help a
5  guy lose weight for a fight.
6  Q  So it sounds to me like you're saying all
7  those kinds of special treatment were things that
8  weren't given to every fighter, it was just fighters
9  who Zuffa liked; is that your understanding?
10    MR. DELL'ANGELO:  Object to the form.
11 Mischaracterizes the witness's testimony.
12    THE WITNESS:  No. It's more along the
13 lines of if you grumbled or complained or fought
14 them on anything, they would punish you. They would
15 punish you. They would give you the feeling that if
16 you questioned them or didn't just say yes, that you
17 would get put on the bench and not get to fight.
18 You would get cut after one loss. You would just
19 not get any preferential treatment at all. You'd
20 get the earliest morning interviews, like stuff
21 that's not really tangible to measure, but there's
22 things that you can feel through their actions.
23 BY MR. WIDNELL:
24 Q  Did that happen to you?
25 A  I believe so, yeah. I was ranked No. 2 in

Page 77

1  the world independently, which can't -- which is a
2  difficult thing to measure. For a long period of
3  time. I won 14 fights in a row before I fought for
4  a title. And I won another five, and they weren't
5  looking to give me another title shot any time soon
6  just because they knew I fought them on things.
7  They didn't want me to have the title because I
8  would have fought them like McGregor is giving them
9  a hard time now.
10 Q  So you were punished because you fought
11 them on what kind of things.
12 A  Mostly -- one of the things I complained
13 about was there's the no meritocracy, there's no
14 merit system. Winning doesn't mean anything for
15 them, and that is not a sport. You know, it's pro
16 wrestling. It doesn't matter if you win or lose.
17 Q  So how did you fight them with respect to?
18 A  Just --
19    MR. DELL'ANGELO:  Wait until he's
20 finished.
21 BY MR. WIDNELL:
22 Q  I apologize I thought that pause meant
23 that you finished, but if you were still saying
24 something, please continue?
25 A  Go ahead. Now I forget what I was.



Page 78

1  Q  So you said you fought them and one of the
2  things you fought them on was that there was no
3  meritocracy; is that correct.
4  A  Yeah.  And to say we fought, it's not like
5  we sat in the room and battled it over.  It's
6  through the press, through interviews and media,
7  giving my open and honest opinion.  That was frowned
8  upon, keep your mouth shut and fight.
9  Q  So can you give me an example of something
10  you said in the press?
11  A  Just calling for title shots.  I had to
12  win eight fights in a row without losing in the UFC
13  to get a title shot.  No one has ever had to do that
14  before.  No one had to win that many fights to get a
15  title shot.  It was 14 undefeated -- or I had 14
16  wins before in a row before I got to the UFC.  So
17  there was -- there was -- if there was a merit
18  system in place, I would have been granted multiple
19  title shots.
20  Q  And because you -- so I think you said
21  that because you spoke about that, then you were
22  punished; is that right?
23  A  Yeah.
24  Q  Okay.  Can you give me an example of how
25  you spoke out about that?

Page 79

1  A  Like I said, just interviews, you know, if
2  I'd get interviewed, I'd speak my mind, I didn't
3  keep mouth shut.
4  Q  Was there anything else -- so how did you
5  know that that's why you were being punished?
6  A  Because I was winning.  I was poplar.  I
7  had a big following.  There was no reason for me not
8  to get title shots and get accolades and get pushed
9  into the public other than they didn't like me or
10  they had a problem with me and the contracts or what
11  I was doing.
12  Q  Did anyone actually -- did anyone at Zuffa
13  specifically tell you that you were being punished
14  because of how you were speaking out?
15  A  Over that, no.
16  Q  Okay.
17  A  The obvious thing I was punished over that
18  they did speak out about -- publicly about, was
19  being fired for refusing to sign the video game
20  rights agreement for my image and likeness forever
21  for zero dollars.
22  Q  Okay.  Is there anything besides the video
23  game instance where they actually spoke to you and
24  communicated to you that you were unhappy with
25  something that you had done?

Page 80

1  A  I received --
2  MR. DELL'ANGELO:  Objection to the form.
3  You can answer.
4  THE WITNESS:  I had received an e-mail
5  once from Joe Silva threatening me about something I
6  said in an interview.
7  BY MR. WIDNELL:
8  Q  Do you recall when you received that
9  e-mail?
10  A  It was sometime before I fought Luigi
11  Fioravanti because they were pulling me in -- or it
12  was I fought on a main card, and then they put me
13  back on the under card and I complained about it.
14  And when I complained about it, Joe Silva sent me a
15  one sentence e-mail said something like "This isn't
16  helping you."  Kind of like, I mean, "You speaking
17  like this sent helping your situation."
18  Q  And you interpreted that e-mail to
19  suggestion --
20  A  It was a threat.
21  Q  -- that they would have punished you, or
22  as a threat?
23  A  That was a threat.  I took it as a threat.
24  Everyone I showed it to took it as a threat.
25  Q  Who did you show it to?

Page 81

1  A  My management; some teammates.
2  Q  Which teammates?
3  A  Thomson, Josh Koscheck, then a couple guys
4  probably would have seen that.  It was a long time
5  ago, though.  I don't remember.  They have their own
6  stories.
7  Q  Is there anything else that you did where
8  someone communicated to you from Zuffa that they
9  were unhappy with what you had done?
10  MR. DELL'ANGELO:  Objection to the form.
11  Overbroad.  Vague.
12  THE WITNESS:  Other than public
13  statements, no, not really anything personal.  You'd
14  have to probably also talk to management about that
15  also.  Because I made sure to -- I tried to always
16  make sure to keep a barrier between me and
17  promoters, because that's what the manager's
18  supposed to do.  He's supposed to be the in between.
19  There shouldn't be a direct connection between the
20  fighter and the promoter, which another tactic that
21  the UFC does a lot is they try to get in between the
22  manager and the fighter and talk to the fighters
23  directly, which usually ends up in bad situations
24  for the fighter.
25


Page 158

1  were other pictures taken there too.  There was some
2  coach book that we had to do pictures in the parking
3  lot before that too.
4      Q   Okay.  So it sounds like you may have been
5  involved in some of the prep work for the video game
6  as early as the fall of 2007.  Does that sound right
7  to you?
8          MR. DELL'ANGELO:  Object to the form.
9          THE WITNESS:  I mean, I guess so.  Yeah.
10 BY MR. WIDNELL:
11     Q   And in terms of how the video game itself
12 came out, were you happy with it?
13     A   No.  I didn't get paid.  I got fired.  I
14 got bullied.  I got my image and likeness taken away
15 from me forever.  I can't do video games now.  No.
16 I was not happy with the video game at all.
17 BY MR. WIDNELL:
18     Q   I meant the video game itself, not how you
19 were treated.
20     A   The video game itself, I do play a lot of
21 video games.  I used to before I had kids, but I was
22 not happy with the game play.  I did not like it.
23 If I was a consumer, I wouldn't have bought it.
24 Other than that -- I won't say that.  As a consumer,
25 I would not have bought it based on the merit of the

Page 159

1  game.  I would have bought it based on the athletes
2  in the game, because I was a fan of the particular
3  athletes in the game.  That's why I would have
4  purchased it.
5      Q   Who's Joanne Spracklen.  Does that name
6  sound familiar to you?
7      A   MMA Girls, yeah.  Yeah, I remember MMA
8  girls.
9      Q   So what is MMA girls?
10     A   She did an online thing years ago.  And
11 she would just go around and talk to fighters and do
12 interviews.  I think we did a cribs episode in my
13 condo.
14     Q   So you remember her interviewing you in
15 your condo at some?
16     A   Yes.
17     Q   Do you recall playing the video game with
18 her?
19     A   Yeah.  I'm sure that I probably did.
20     Q   Was that something that was your doing
21 because it was a promotional thing?
22     A   I mean, yeah.  You learn there's certain
23 things that you need to say are awesome even though
24 you don't like.  Todd Duffee is a perfect example.
25 He was at the airport and some woman started talking

Page 160

1  to him about UFC fighting, because she saw his
2  cauliflower ear, and she brought up the video game.
3  And he made a negative statement about being in the
4  video game because he didn't get paid and whatever,
5  same stuff as I'm saying.  And then he ended up
6  being fired, and disciplined because that woman he
7  was talking to was friends with the Fertittas.
8      Q   When did this occur?
9      A   I cannot remember.  But I can talk to Todd
10 and he would know.  I can send a text message.
11     Q   Do you think the video game helped UFC
12 fighters in terms of gaining more notoriety?
13         MR. DELL'ANGELO:  Objection to the form.
14 Calls for speculation.
15         THE WITNESS:  I would agree that having
16 extra consumable media for fans does help.  But
17 without the athletes, that stuff doesn't even exist.
18 BY MR. WIDNELL:
19     Q   Okay.
20     A   You couldn't sell a UFC video game with no
21 stars in it.  Who are you going to play?  Yourself?
22     Q   I believe when you played in the interview
23 with Joanne Spracklen you played yourself and you
24 beat GSP whom she was playing?  Does that sound
25 familiar to you?

Page 161

1      A   I am a winner.  I like to win, so I'm
2  going to play with the best character, the most
3  handsome character.
4      Q   All right.  So let's go to negotiations.
5  You got this -- you got this announcement, and then
6  you objected.  You said that you wanted a longer
7  time period and then you were cut; is that right?
8      A   Yes.
9      Q   Who told you that you were cut?
10     A   My manager told me.  But it was -- it was
11 everywhere.  It was online.  They made a public
12 statement of it.  It was a public display because
13 they were trying to make an example of me.  They
14 were whipping me to get me to go in line, to make
15 everybody else fall into line.  I was a perfect
16 whipping boy too.  Because I had 14 wins in a row, a
17 Fight of the Night decision loss to GSP, I was in a
18 perfect position to make an example of because I had
19 done all these things.  I was that good.  People
20 could see that somebody this good and wins this much
21 can still be disciplined in this way.  Oh, my God.
22 Scared people.  Terrified people.  I had fighters
23 come up to me and tell me that worried them, that
24 they don't feel safe in their jobs and in their
25 fight contracts anymore, because that happened.

Page 162

```
 1      Q   So you heard about this from public
 2   sources and you also heard about it from your
 3   manager?
 4      A   Yes.  Because -- yeah, the whatever, the
 5   firing papers came through before I think I even
 6   talked to Crazy Bob.  I think he called me and I
 7   checked my e-mail after he called me, and I had my
 8   walking papers.
 9      Q   And did Bob Cook just get your walking
10   papers or did he have a conversation with someone at
11   UFC about it?
12          MR. DELL'ANGELO:  Objection to the form.
13   BY MR. WIDNELL:
14      Q   Actually, let me ask it a slightly
15   different way.  That's a good point.
16          What did Bob Cook tell you, to the extent
17   that you recall, about what he had heard from UFC
18   when he called you?
19          MR. DELL'ANGELO:  Object to the form.
20          THE WITNESS:  It's hard to remember
21   exactly.  But Bob's not a man of many words.  And he
22   just said that you have been released.
23   BY MR. WIDNELL:
24      Q   So did you ask him if there'd been any
25   more of an explanation than that?
```

Page 163

```
 1      A   No.  I mean, we kind of know.  We kind of
 2   knew that it was really ballsy and risky for me to
 3   say that I wasn't going to sign the video agreement,
 4   even ask for something else.  But I couldn't not.
 5   It was too bad of a contract.  There was no way I
 6   could not say anything, so I had to.
 7          It wasn't like it was like completely
 8   unexpected.  But I did feel that -- I felt that I
 9   was a little safe because I had won so much and I
10   had done so well, and I did so well in that GSP
11   fight, and I had a huge level of notoriety.  And
12   that just made me a bigger target to knock down when
13   I stepped out of line, scared a lot of people.
14      Q   So just in terms of timing for this, it
15   sounds like you found out that you were cut from Bob
16   Cook, but then at some point you ended changing your
17   mind, signing the agreement, and being reinstated;
18   is that -- is that correct?
19      A   Well, the reason I changed my mind was
20   because they were threats made against my teammates.
21   Christian Wells was also fired because of my state
22   -- my stance on the video game agreement.  He was
23   fired because he was coming off a loss.  And all the
24   other guys that we had that had not lost yet, Josh
25   Koscheck, Cain Velasquez, and then a number of
```

Page 164

```
 1   Strike Force fighters that are later UFC fighters
 2   and champions, even, they were threatened with being
 3   fired -- threatened with never being hired by the
 4   UFC.
 5          And my management company was threatened
 6   by all of their people that they represent not
 7   having a chance to ever fight in the UFC again and
 8   getting cut.  So I had like 30 people's lives and
 9   careers placed on my shoulders on my decision.
10   Because I was okay with leaving.  I was so
11   frustrated with the treatment from them, I was okay
12   with going to Strike Force at the time.  They had a
13   number of fighters there that I could have fight.
14   It would have been less money, but, at that point, I
15   just wanted to be treated with respect.
16          So when I didn't beg and grovel to be
17   taken back right away when they fired me, they
18   started firing everybody else and threatening
19   everybody else, and it got put on my shoulders to
20   sign, not only the video game agreement, but they
21   piggybacked the merchandising agreement on top of
22   it.  Sign these or you guys are done.  And
23   there's -- there's quotes online, stuff from Dana
24   saying, "Who the 'F' is Cain Velasquez?  They're not
25   going to work with us.  They're gone.  They're
```

Page 165

```
 1   done."
 2          Cain went on to be a heavyweight champ.
 3   Damien Cormier went on to be a light heavyweight
 4   champ.  Luke Rockhold went on to middleweight champ.
 5   All those guys would never have had the opportunity
 6   to fight in the UFC, as I was lead to believe,
 7   unless I signed those contracts.  And most
 8   importantly, that stuff was done publicly so that
 9   every other fighter in the world can see what
10   happens when you step up to the UFC, you're gone.
11      Q   So that's an awful lot that happened
12   between the point when Bob Cook notified you --
13      A   It's like a day and a half.  All this
14   happened in a day and a half.
15      Q   Wow.  So can you kind of walk through?  I
16   mean, you said Bob Cook didn't tell you anything at
17   the time.  But there must have been a lot more that
18   happened after that first call with Bob Cook.  Can
19   you tell me more, kind of walk me through how that
20   all played out?
21          MR. DELL'ANGELO:  Object to the form.
22   Mischaracterizes the witness's testimony.
23          THE WITNESS:  No.  I mean, that was pretty
24   much it.  I mean, it wasn't a lot of conversations.
25
```



Page 166

```
 1  BY MR. WIDNELL:
 2      Q   Okay.  So --
 3      A   It was, this is the way it is.  And then
 4  there was a back-and-forth.  And then later I ended
 5  up having to call Fertitta and just bow down.
 6      Q   Okay, so --
 7      A   This is the agreement.  This is what
 8  everybody has to sign.  Everybody signs the same
 9  thing.  There's nothing special we can do for you.
10  You have to sign this.  And you're going to have to
11  sign the merchandising agreement.
12      Q   Okay.  So what I'd gotten initially was
13  Bob Cook called you and told you that you had been
14  released.
15      A   Uh-huh.
16      Q   When did you find out that others were
17  being threatened?
18      A   Man, we were probably at the gym and we
19  started hearing about people who had -- Christian
20  got fired, he was the first one to go.  And then
21  they started making public statements about it.
22      Q   So when did Christian get fired?
23      A   I mean, all this happened within -- you
24  can pull the files and see when the stuff was sent.
25  But it was within that -- you know, 24-to-48-hour
```

Page 167

```
 1  period all that stuff happened.  Not even 48, it was
 2  probably 36.
 3      Q   So do you know if Christian was fired at
 4  the same time you were fired, or was it?
 5      A   I believe.
 6      Q   That happened at the same time?
 7      A   Like, you're both gone.  They sent out the
 8  letters as far as I'm aware.
 9      Q   Do you know if Christian had agreed to
10  sign the video game agreement?
11      A   Christian was not asked.  He wasn't even a
12  player in it.  He didn't have skin in the game.  And
13  they fired him anyways.  Luckily, he's smart,
14  though.  He became a lawyer.  So he didn't return
15  into one of those sad guys that destroyed themselves
16  getting beat up all the time for pennies just to get
17  by.  He went to join law school.
18      Q   So who else was threatened?  You said Cain
19  Velasquez was threatened?
20      A   Cain Velasquez, well, my whole team.  So
21  anybody who joined under the Banner American
22  Kickboxing Academy.
23      Q   Uh-huh.
24      A   And anybody who was represented by Zinkin
25  Entertainment at that time.  Everybody except for
```

Page 168

```
 1  Mike Swick because Mike Swick had signed the
 2  agreement way earlier already.
 3      Q   Had Cain Velasquez signed the agreement?
 4          MR. DELL'ANGELO:  Object to the form.
 5          THE WITNESS:  I wouldn't know.  I do not
 6  know when he signed it.  But I do know, once I was
 7  forced to sign, that was like the flood gates,
 8  because then everybody else was so scared that they
 9  just started signing the video game agreement and
10  they started signing the merchandising agreement.  I
11  mean, I haven't looked at it, but I'm guessing or
12  I'm speculating that if you look at all those
13  agreements signed, they probably came not too far
14  after my agreement was signed.
15  BY MR. WIDNELL:
16      Q   Did Zuffa ever explain to you why it was
17  important to them to have you sign the agreement?
18      A   Other than the usual PR stuff that they
19  told, like, no.  Dana gave us a speech at our gym,
20  and it was the exact same speech that he gave to
21  some media people, word for word.  Just, yeah.
22      Q   Without your signature, do you think that
23  the UFC or the video game would have gone forward?
24          MR. DELL'ANGELO:  Objection to the form.
25  Calls for speculation.
```

Page 169

```
 1          THE WITNESS:  Without any fighters signing
 2  the agreement, there was no video game.
 3  BY MR. WIDNELL:
 4      Q   Did you think about the effect of not
 5  having a video game on other UFC fighters when you
 6  were making your decision?
 7      A   I mean, I wasn't the only one getting a
 8  screwed -- a bad deal on the agreement.  We all
 9  signed the same crappy agreement to be on a video
10  game, image and likeness forever for no
11  compensation.  That's not a deal.
12      Q   Did anybody get any special benefits to
13  sign the agreement?
14      A   To my knowledge, I do not know.  There
15  were rumors like guys like Chuck got special deals,
16  but I don't know.  I have no way of knowing.
17      Q   How about Mike Swick?
18      A   To my knowledge, I don't know.  Mike Swick
19  is -- he was always a company man.  He always tried
20  his best to do right by the company.  Even though
21  they've turned on him a few times.
22      Q   So I'm handing you an exhibit marked 55.
23          (Exhibit 55 was marked.)
24  BY MR. WIDNELL:
25      Q   This is an article that was on the web
```



Page 194

1      MR. WIDNELL: One second.
2      (Pause in the proceedings.)
3  BY MR. WIDNELL:
4      Q   So we've talked about the video game
5  incident. We've talked about Arlovski and Huerta.
6  Can you give any other examples where someone was
7  threatened or intimidated into signing a contract or
8  contractual provision or agreeing to a contractual
9  provision with UFC?
10     MR. DELL'ANGELO: Objection to the form.
11 Compound.
12     THE WITNESS: Off the top of my head, it
13 would be difficult. Just because it's not coming to
14 me right now, doesn't mean I can't remember. Just
15 nothing's really occurring to me right now.
16 BY MR. WIDNELL:
17     Q   Okay. If you could turn to Exhibit 49?
18     A   Oh, yeah. Randy -- Randy Couture was
19 airbrushed out of a lot of promotional stuff because
20 he wouldn't sign something. That was a form of
21 punishment.
22     Cung Le kind of faced some scrutiny
23 because he was not willing to sign a re-up
24 promotional agreement. I can't think of anything
25 off the top of my head right now. I don't want to

Page 195

1  just sit here and guess forever. But they're out
2  there, and I'm sure if given more time I can compile
3  a list.
4      But the real problem with those aren't the
5  individual disciplinary actions taken against those
6  guys. It's the chilling effect that happens
7  throughout the entire organization because they see
8  some person doing it. They have one person who's
9  punished, and then everybody else gets into line.
10 Nobody else wants to be that guy.
11 BY MR. WIDNELL:
12     Q   Okay. So for the Couture instance, do you
13 have any personal knowledge of that, or is that
14 just -- well, do you have any personal knowledge?
15     A   I don't want to speak for him. He can
16 speak for itself. I know he has explained it a few
17 times, and I've heard it a few times, but I don't
18 want to misquote him. But I know he had contractual
19 issues with him and they ended up airbrushing him
20 out of a lot of stuff.
21     Tito Ortiz is another example where they
22 airbrushed him out, they removed him completely from
23 the organization. He's not -- I don't think he's on
24 the website anymore as a former champ, or whatever.
25 I can't remember. But they've done him once or

Page 196

1  twice where they removed him from their history
2  because they weren't happy with him. And that
3  creates a chilling effect. That scares people.
4      Q   Outside of what you've heard publicly or
5  read about Tito Ortiz, are you aware of anything or
6  do you have any personal knowledge about those
7  disputes?
8      A   I do not have any personal knowledge about
9  that. I have general knowledge from things I've
10 read on the Internet or heard secondhand from people
11 that know him.
12     Q   And with Randy Couture is that the case
13 also, you don't --
14     A   The case with Randy, is I have spoken
15 directly to Randy about his issues. We are members
16 of the Mixed Martial Arts Fighters Association. So
17 we all kind of hash out issues we've had in the
18 past. So I've heard a lot of different stories.
19     Q   So you've spoken to him to him about it
20 directly. When did you talk to him about it?
21     MR. DELL'ANGELO: Objection to the form.
22     THE WITNESS: We actually were in
23 Washington DC recently. And he had told his story
24 told to some representatives, and I was there for
25 that.

Page 197

1  BY MR. WIDNELL:
2      Q   When you say representatives?
3      A   State, government, congress, we were at
4  Congress, House of Representatives.
5      Q   So it was testimony before the House of
6  Representatives?
7      A   Yeah. Because we were meeting with their
8  lobbying.
9      Q   Was it a public statement or was it a
10 private meeting?
11     A   This time it was a private meeting.
12     Q   And who were the representatives?
13     A   We met with several that day. I can't
14 remember all of them. Collins, lobe sack, Mimi -- I
15 can't remember Mimi's last name. Met like four or
16 five that day.
17     Q   Okay. And you said this -- when did this
18 happen?
19     A   This was recently. This year.
20     Q   Okay. So within the last two months?
21     A   Yes.
22     Q   Okay. And with Cung Le?
23     A   It was three weeks after my fight.
24     Q   Three weeks --
25     A   Which was on New Year's.

Page 198

```
 1    Q   Okay.  And with Cung Le, do you have any
 2  personal knowledge about his dispute?
 3         MR. DELL'ANGELO:  Objection to the form.
 4         THE WITNESS:  I am friends with Cung Le
 5  outside of the sport.  He's from the Bay Area.  We
 6  have history together.  He has trained with one of
 7  my old coaches a lot.  So we have a dialect we talk
 8  and I have heard a number of his stories.
 9  BY MR. WIDNELL:
10    Q   Okay.  Do you have any other personal
11  knowledge other than what Cung Le has told you?
12         MR. DELL'ANGELO:  Objection to form.
13         THE WITNESS:  About Cung Le's story, yeah,
14  there's some elements of his story covered by the
15  media.  But I don't know if they have all of the
16  history or all of the details.
17  BY MR. WIDNELL:
18    Q   Okay.  What is your understanding of what
19  happened to him?
20    A   I don't have a very solid understanding
21  other than he was up to have a -- his contract re--
22  Sorry.  I'm misspeaking.  He was towards his last
23  fight.  And he was supposed to re-up and sign for
24  more fights before he fought that last fight.  And
25  he was in a situation where his lawyer was not -- I
```

Page 199

```
 1  don't know if it was the merchandising agreement or
 2  if it was his promotional rights agreement, but they
 3  had a contract that they wanted him to sign.
 4         And his lawyer was out of the country and
 5  could not look over the documents before he fought.
 6  So they were very upset with him going into the
 7  fight not having signed his document.
 8    Q   Okay.
 9    A   It's a very basic explanation of it.  I'm
10  sure it's much more complicated.
11    Q   Okay.  Can you think of any examples where
12  fighters were threatened to -- that they would be
13  punished if they did not stay with the UFC?
14    A   I just looked down at my paper right here,
15  and there's a quote from Dana talking about BJ Penn,
16  when BJ Penn wanted to leave the organization and
17  fight outside the organization.  So, I mean, just
18  looking at that, that's one very high-profile thing.
19  Everybody saw that.  Everybody was affected by
20  that -- "scorched earth -- "scorched earth" was the
21  quote.
22         MR. DELL'ANGELO:  Can you just indicate
23  for the record what paper you're looking at or what
24  exhibit?
25         THE WITNESS:  Yes, page 33 of Exhibit 49.
```

Page 200

```
 1  BY MR. WIDNELL:
 2    Q   Okay.
 3    A   Yeah.  I just happened to look down and it
 4  is at 13 to 19, those lines.
 5    Q   When did you hear about the controversy
 6  between BJ Penn and Dana White?
 7    A   I was -- I was alive and present when that
 8  was going down, so it was hard not to hear about it.
 9  He had beaten Matt Hughes, I believe, was the UFC
10  champ, but then was offered a huge contract for K-1,
11  and he wanted to take it.  And he's punished for a
12  short period of time.  But he is one of those guys
13  who is powerful enough to raise his notoriety
14  where -- or maintain his notoriety.  So you've
15  been -- they ended up eventually taking him back.
16    Q   You said he was punished for a short
17  period of time.  How was he punished?
18    A   He wasn't allowed back in.  Even though he
19  was the welterweight champ, he wasn't allowed to
20  come back for a period.  I can't remember all the
21  specific details, but I remember he had to go.  Like
22  they wouldn't bring him back for a little while.
23    Q   So your understanding is that he couldn't
24  come back because the UFC wouldn't let him back?
25    A   They were mad at him.  And eventually his
```

Page 201

```
 1  notoriety lead -- meant that -- his rising in
 2  notoriety meant that UFC could make a lot of money
 3  off of him, so they kind of got over it, I guess.
 4    Q   So that quote is a quote from BJ Penn's
 5  book.  Have you read his back?
 6    A   I have not read BJ's book.
 7    Q   So in his book he talks about how he went
 8  and signed a contract to fight for K-1, and then he
 9  completed that contract and then he came back and
10  fought for the UFC.  Does that sound like what
11  happened to you?
12         MR. DELL'ANGELO:  Objection to the form.
13         THE WITNESS:  I'm not -- I'm not sure.
14  But I do know there was a lot of insults and
15  intimidation and scaring-type behavior from Dana
16  White other that instance, over that situation.
17  BY MR. WIDNELL:
18    Q   After BJ Penn came back, did he have an
19  opportunity to fight for a considerable period of
20  time with the UFC?
21    A   BJ is a unicorn.  He's the only BJ Penn.
22  He is a unicorn.  I mean, BJ Penn was allowed to do
23  things that no other person was ever allowed to.
24  He's absolutely on the outside spectrum of everyone
25  else, I think.  Part of that reason is because he
```



Page 254

1  promote, and you could fight for those belts from
2  those independent sanctioned bodies.
3      Q   Is it your understanding that all
4  promoters right now basically require you to fight
5  fighters within their promotion?
6          MR. DELL'ANGELO: Objection to the form.
7  Vague.
8          THE WITNESS: To my understanding, most of
9  the time guys are going to be restricted to fighting
10 for one organization. Scott Coker does do some
11 things where he actually co-promotes a little bit.
12 But it's -- it's very, very minimal.
13 BY MR. WIDNELL:
14     Q   Does WSOF co-promote at all?
15     A   I do not believe that they do. But I
16 think I remember -- I think when Ali was the match
17 maker/vice president, he did extend an offer to
18 Bellator to fight champions. But it's very, very
19 unlikely. It doesn't happen often, and, yeah, that
20 was more of a publicity stunt. He was trying to
21 prove his organization was better than Bellator, so
22 he was trying to get fights between champions set
23 up. Boxing, they co-promote all the time. And I
24 think that would be a much better scenario for us.
25     Q   Why do you think smaller promoters don't

Page 255

1  co-promote?
2          MR. DELL'ANGELO: Objection to the form.
3  Calls for speculation.
4          THE WITNESS: In my opinion, the smaller
5  promotions generally are happy being number two to
6  big dog, UFC. And they are mostly fighting against
7  each other for the up-and-coming guys and acting as
8  feeder systems to the UFC rather than competitors
9  of.
10         MR. WIDNELL: Okay. I have no further
11 questions.
12         MR. DELL'ANGELO: Okay. We will read and
13 sign.
14         THE VIDEOGRAPHER: We are now off the
15 record. The time is 4:54 P.M.

---

1   CERTIFICATE OF WITNESS
2   PAGE  LINE  CHANGE         REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20         * * * * *
21      I, Jon Fitch, witness herein, do hereby
    certify and declare under penalty of perjury the within and
22  foregoing transcription to be my deposition in said action;
    that I have read, corrected and do hereby affix my signature
23  to said deposition.
24  _____  _____
    Jon Fitch
25  Witness                            Date

1   STATE OF NEVADA)
         ) ss
2   COUNTY OF CLARK)
3
4       I, Sarah Padilla, a duly commissioned and
5   licensed court reporter, Clark County, State of Nevada,
6   do hereby certify: That I reported the taking of the
7   deposition of the witness, Jon Fitch, commencing on
8   Wednesday, February 15, 2017, at 9:23 A.M.; That prior to
9   being examined, the witness was, by me, duly sworn to
10  testify to the truth; That thereafter I transcribed my
11  shorthand notes into typewriting and that the typewritten
12  transcript of said deposition is a complete, true, and
13  accurate record of said shorthand notes. I further certify
14  that I am not a relative or employee of any attorney or
15  counsel of any of the parties nor a relative or employee of
16  an attorney or counsel involved in said action, nor a person
17  financially interested in the action; that a request
18  [x] has [] has not been made to review the transcript.
19      IN WITNESS WHEREOF, I have hereunto set my
20  hand in the County of Clark, State of Nevada, this __
21  day of _____.
22
23         _____
            SARAH PADILLA, CCR 929

