# EXHIBIT 4

## Excerpts of Deposition

## of Javier Vasquez

## Feb. 14, 2017

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA


Cung Le, Nathan Quarry, Jon Fitch,) Case No: 2:15-cv-01045-RFB(PAL)
Brandon Vera, Luis Javier Vazquez,)
and Kyle Kingsbury on behalf of   )
themselves and all others         )
similarly situated,               )
                                  )
            Plaintiffs,           )
                                  )
vs.                               )
                                  )
Zuffa, LLC, d/b/a Ultimate        )
Fighting Championship and UFC,    )
                                  )
                                  )
            Defendants.           )




VIDEO DEPOSITION OF JAVIER VASQUEZ

taken at, Boies, Schiller & Flexner,

300 South Fourth Street, Suite 800,

Las Vegas, Nevada 89101 beginning at 9:15 A.M.

and ending at 3:46 P.M.on Wednesday, February 14, 2017




Reported by:
Sarah Padilla, CCR NO. 929
Job No. 296624 Pages 1-205



1  fight something like that.
2      Q   When you signed the UFC contract, I'm
3  correct that there were fights remaining on your WEC
4  contract?
5      A   Yeah.  As far as I can recall -- I just --
6      Q   Was -- sorry.  Was that the end of the
7  response?
8      A   Yeah.
9      Q   Okay.  Why not fight out the remaining
10  fights on the WEC contract?
11     A   Didn't have a choice.  There was no WEC.
12  I'm going to fight out a contract on a promotion
13  that no longer exists?
14     Q   So did you have any obligations under the
15  WEC contract --
16         MR. DELL'ANGELO:  Objection -- sorry.
17  BY MR. McSWEENEY:
18     Q   -- when you signed the UFC contract?
19         MR. DELL'ANGELO:  Objection.  Calls for a
20  legal conclusion.
21         THE WITNESS:  To my recollection, as far
22  as I know, it was a handoff.  I have this contract.
23  We now are terminating the show.  Your option is to,
24  A, not fight anymore and still be legally bound to
25  not be able to fight anywhere else because you have

1  the clause in the contract with the WEC or the UFC.
2  They both have the same clauses as far as I can
3  recall.
4          So you can either, A, not fight; or, B,
5  sign this contract which we're not negotiating with
6  you any terms on.  And then you fight in the UFC.
7  That was basically it.  Those are the options.
8  BY MR. McSWEENEY:
9      Q   In what way did the contract prevent you
10  from going through another promoter?
11     A   It says you can't.  It says it right in
12  the contract.
13     Q   What is your understanding of what the
14  contract says about your ability to go with another
15  promoter?
16     A   You can't.
17     Q   What is your understanding of what the
18  duration of the contract was?
19     A   I don't remember the exact length of time,
20  but it was either fights or time.  And once time
21  went out, they still had 60 days you can go
22  negotiate with them.  They still had a matching
23  period, so it didn't matter.  They could have kept
24  you if they wanted you or they could have let you go
25  if they wanted to, but -- but they would freeze it.

1  If you're, like, oh, I'm hurt, freeze, so your time
2  stops.  So you're restricted to stay and do what --
3  what they want you to do.
4      Q   You mentioned that once the time was out,
5  they still had 60 days for a matching period?
6      A   Uh-huh.
7      Q   So can you walk me through what your
8  understanding of the matching period is?
9      A   I -- I can't speak on that just because I
10  never went through a matching period.  So my general
11  understanding of a matching period is, let's say for
12  example a contract's up.  I go to promotion X to see
13  what my market value is, sometimes they might make
14  an offer, sometimes they might not, because if
15  you're coming from a WEC-UFC contract, most -- you
16  know, most promotors understand the restrictions
17  within that contract, and some of them might not
18  even allow you -- won't even allow you an offer,
19  won't even give you an offer because they already
20  know, we can offer you something and then they can
21  just match it.
22         So a lot of people don't even -- they
23  don't even want to touch you.  They're like, you
24  know, it's a waste of our time.  So some people,
25  that's part of the problem that most people, most

1  promoters don't -- wouldn't even touch it just
2  because they understand the restrictions of the
3  contract and they understand the matching period.
4  So why are they going to try to pay you something or
5  give you an offer and negotiate with you or court
6  you in any way, shape, or form, if at the very end,
7  the very last hour, they can match and, poof, you
8  come right back.  Exit was very difficult.
9      Q   And then you say that -- I think you
10  said -- pardon me.  Most promotions understand the
11  restrictions within the Zuffa contract, which
12  promoters are you thinking of?
13     A   It was just a general, general knowledge,
14  I think.  I don't have any specifics.  But it was
15  just a general, people knew.
16     Q   Do you have personal experience with other
17  promotions declining to make an offer because of
18  the -- of Zuffa's ability to make a matching offer?
19     A   Personally, like me dealing with that, no.
20     Q   So what's the basis for your claim that it
21  was general knowledge that other promoters would not
22  make offers to former UFC fighters because of UFC's
23  ability to make a matching offer?
24     A   If you're still on contract, no one's
25  touching you.  The first thing that -- that I was



Page 146

told -- or that I have heard was, when your contract's off, then we're happy to make an offer, you know. As long as you're on contract, no one's going to touch you, no one is going to touch you. You can't be in a UFC contract or WEC contract and go negotiate with somebody else. Nobody will touch you.

Q You say that the first thing that you heard was when your contract is off, then they're happy to make an offer. Do you recall when you heard this?

A No, I don't know.

Q Do you recall from whom you heard this?

A No. It was several years ago, so I do not.

Q Is it your understanding that if during the matching period a competing promoter made an offer that UFC chose to match, the fight was obligated to accept the matching offer?

A I think -- I'm not sure. I'm not sure. I mean, ultimately if -- I am not sure. I'm not sure if you're, you know, I don't think anybody can force you to sign a contract. It's either you sign it or you don't fight. So maybe you didn't get the offer you liked from either one, even though they might

Page 147

have matched it, you're not happy with that offer regardless.

Sometimes you might want to go somewhere else, you know, because maybe their contracts are less restrictive. Some guys might chose to do something like that. But for the most part, people didn't because, you know, whether it's a pay cut or, you know, for whatever reason that they had within themselves, they -- they -- ultimately they can't force you to fight. They can't, you know, make you go fight if you don't want to fight. They can't make you practice law if you don't want to practice law anymore.

Q Tell that to my boss.

A But you get what I am saying. So maybe you went out, shopped it, there was benefits to being in another organization maybe, maybe, who knows. Maybe they're promising you a car, who knows. Anything is possible. And you know, maybe you want to go that way, but, yeah. So once they match it, it's -- I don't believe there's wiggle room to negotiate any more, and it's basically take it or leave it.

Q You said that competing promoters, it was your understanding, the general understanding that

Page 148

competing promoters wouldn't make an offer until you were off of your UFC contract?

A Uh-huh.

Q What is your understanding of when a fighter is off of UFC's contract per provision 13.1?

A I don't know, man. I think in perpetuity, I am assuming if you still have fights on your contract and you go fight somewhere else, it's going to be a problem because they're going to freeze everything because you still owe them fights. The contracts are incredibly restrictive. It is a one-sided contract. Because you sign a five-fight contract, you're not guaranteed five fights. You're guaranteed what you win.

Q Returning to provision 13.1. It reads "Fighter agrees to negotiate exclusively with WEC regarding the extension or renewal of the term for a period of 60 days following the expiration of the term."

A Uh-huh.

Q At the conclusion of the 60-day period of exclusive negotiation following the expiration of the contract term, would it be your understanding that a fighter was still under contract with UFC?

A They have a matching period. So great,

Page 149

you go 60 days, you go and negotiate with somebody else, they still can match. That was my understanding of it.

Q What is the basis for your understanding that -- strike that.

So is it your understanding that the matching period prevents competing promoters from making offers to former UFC fighters?

A I feel so.

Q Do you have examples of that ever happening?

A I personally don't. But I've heard stories and I don't want to speculate on the names, but I've heard the scenario countless times.

Q I appreciate that you don't want to speculate. But are there specific examples of fighters who were made -- who were not -- who had -- strike that.

Are there specific examples of UFC fighters you're aware of who, after the expiration of a 60-day exclusive negotiation period, had entered the matching period and did not receive offers from competing promoters because of the matching period?

A I have no idea. I would be totally

Page 150

1 speculating on that, so I have no idea. I'm not
2 privy to that kind of negotiations with other
3 fighters between them and the other organizations.
4 I have no clue.
5    Q   So if you personally have no experience in
6 the context of your own contract and you don't
7 have -- you're not aware of specific examples of
8 former UFC fighters who did not receive offers from
9 competing promoters because of the matching period,
10 how do you know that the matching period provision
11 prevented competing promoters from making matching
12 offers -- pardon me, strike that -- competing
13 promoters making offers.
14          MR. DELL'ANGELO: Objection to form.
15          THE WITNESS: If the UFC wants to keep
16 you, they'll keep you; if they want to let you go,
17 they'll let you go. Simple as that. If they want
18 to keep you they have a negotiating period and they
19 have a matching period. The only reason that I
20 would guess they would want to let you go is if
21 they're offering you a better deal and they don't
22 want to spend the money to keep you. But it is
23 very, very, very rare that that happens, in my
24 opinion.
25

Page 151

1 BY MR. McSWEENEY:
2    Q   Are you aware of instances where that did
3 happen?
4    A   You know, specific instances, I don't want
5 to speculate, but I know that there are guys that
6 might have signed with somebody else just because
7 they wanted a little bit more freedom.
8    Q   Again, I appreciate not wanting to
9 speculate, but you say you know that there are guys
10 that signed with someone else despite the matching
11 period. Do any specific names come to mind?
12    A   They do not.
13    Q   You're not aware -- or strike that.
14         Do you have any specific basis for making
15 the claim that competing promoters did not make
16 offers to former UFC fighters because of UFC's
17 ability to make a matching offer?
18         MR. DELL'ANGELO: Object to the form.
19         THE WITNESS: Yeah, I didn't say -- that's
20 not exactly what I said. What I said was,
21 basically, if a promoter knows that they're in the
22 matching period, they're not going to make you an
23 offer.
24 BY MR. McSWEENEY:
25    Q   And what is the basis for that claim?

Page 152

1    A   I have experience with my own scenario
2 when I was under contract with a different promotion
3 and the UFC was making me an offer many years
4 before. And they were like, when your contract is
5 up, we'll call you. So that's on the UFC's end.
6 And I believe that they follow the same exact
7 protocol when they're the ones that have you under
8 contract as well. And promoters maybe some had that
9 respect that you're under contract, we're not going
10 to talk to you until you're out of contract.
11    Q   Is it your understanding that the matching
12 period, the provision allowing for a matching period
13 for UFC prevents promoters from making an offer?
14    A   It doesn't prevent them, but I feel that
15 they're less likely to do so.
16    Q   But is it your understanding of the --
17 that the contract itself by its own provisions does
18 not prevent a former fighter from entertaining
19 offers from competing promoters?
20    A   It is kind of an unwritten rule that you
21 don't mess with the UFC fighters until they're under
22 contract -- until they -- because of the way the UFC
23 can be intimidating force, that most promoters don't
24 want to step on any shoes. So promoters
25 understanding that the UFC is a, you know, large

Page 153

1 show, they don't want to ruffle the feathers. So
2 they just kind of -- I'm not saying it's not
3 possible. It is possible, but most people don't
4 want to deal with it.
5    Q   And when did you learn of this unwritten
6 rule?
7    A   General -- common knowledge.
8    Q   Have you discussed this unwritten rule
9 with other fighters outside of the context of this
10 litigation?
11    A   Not particularly. Sometimes I did a lot
12 of listening and not so much talking.
13    Q   Did do you recall other fighters
14 discussing the effects of this unwritten rule?
15    A   Specifically, I don't recall. I mean I
16 remember having conversations, but I don't remember
17 specifics. It was several years ago.
18    Q   So you don't recall a specific fighter
19 with whom you had a conversation or you listened to
20 a conversation where that fighter expressed --
21    A   I don't have specifics, I just kind of
22 generalizations.
23    Q   So beyond just the general knowledge of an
24 unwritten rule that promoters -- it's -- you don't
25 have a basis for knowing that competing promoters



Page 202

1   My memory's a little bit foggy.  So we got here
2   yesterday.  Yesterday was Sunday; right?  Or
3   yesterday was Monday?  No, yesterday was Monday.
4       Q   Yesterday was Monday.  It's a little foggy
5   was well?
6       A   Yeah.  I don't know.  Yesterday we got
7   here and we went to go eat.  I don't know what to
8   tell you.  We got here and went to go eat.
9   Honestly, I don't remember what we talked about at
10  that time.  I'm not even kidding.
11      Q   Why don't we take a short break.  We'll
12  review where we are, and that should probably be
13  close to the end.
14          THE VIDEOGRAPHER:  We are now going off
15  the record.  The time is approximately 3:39 P.M.
16          (A short recess was taken.)
17          THE VIDEOGRAPHER:  We are back on the
18  record.  The time is approximately 3:45 P.M.
19  BY MR. McSWEENEY:
20      Q   Mr. Vazquez, are you aware of something
21  called MMAAA?
22      A   Yes.
23      Q   And can you tell me what your
24  understanding of what the MMAAA is?
25      A   I have no clue, to be honest with you.  I

Page 203

1   don't know what they're doing.  They're supposed to
2   be another fighter organization, not organization,
3   like an association.  I have no clue what the heck
4   they're doing.
5       Q   So I take it you have no involvement in
6   the MMAAA?
7       A   No.
8       Q   Do you have any understanding of how their
9   aims may differ from the MMAFA?
10      A   No.
11          MR. McSWEENEY:  No further questions.
12          MR. DELL'ANGELO:  Okay.  Thank you.  We'll
13  read and sign.
14          MR. McSWEENEY:  Okay.
15          MR. DELL'ANGELO:  I guess just, while
16  we're here, pursuant to the protective order, we're
17  going to claw back lead Plaintiffs 0175299.  Is that
18  exhibit that I think you inadvertently handed out as
19  45 or 48 or whatever it was?  We'll get you a letter
20  on that.
21          MR. McSWEENEY:  We'll look forward to it.
22          THE VIDEOGRAPHER:  This concludes the
23  video deposition of Javier Vazquez.  We are now
24  going off the record.  The time is 3:46 P.M.
25          (TIME NOTED: 3:46 P.M.)

CERTIFICATE OF WITNESS

2   PAGE  LINE  CHANGE              REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20              * * * * *
21      I, Javier Vazquez, witness herein, do hereby
    certify and declare under penalty of perjury the within
22  and foregoing transcription to be my deposition in said
    action; that I have read, corrected and do hereby affix
23  my signature to said deposition.
24  _____  _____
    Javier Vazquez
25  Witness                       Date

STATE OF NEVADA
                )  ss
    COUNTY OF CLARK

    I, Sarah Padilla, a duly commissioned and
licensed court reporter, Clark County, State of Nevada,
do hereby certify:  That I reported the taking of the
deposition of the witness, Javier Vazquez, commencing on
Tuesday, February 14, 2017, at 9:15 A.M.; That prior to
being examined, the witness was, by me, duly sworn to
testify to the truth; That thereafter I transcribed my
shorthand notes into typewriting and that the typewritten
transcript of said deposition is a complete, true, and
accurate record of said shorthand notes.  I further certify
that I am not a relative or employee of any attorney or
counsel of any of the parties nor a relative or employee of
an attorney or counsel involved in said action, nor a person
financially interested in the action; that a request
[x] has [] has not been made to review the transcript.
    IN WITNESS WHEREOF, I have hereunto set my
hand in the County of Clark, State of Nevada, this __
day of _____.

                _____
                SARAH PADILLA, CCR 929

