# EXHIBIT 5

## Excerpts of Deposition
## of Nathan Quarry
## Sept. 30, 2016

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Cung Le, Nathan Quarry, Jon Fitch )Case No:  2:15-cv-01045-RFB(PAL)
Brandon Vera, Luis Javier Vazquez,)
and Kyle Kingsbury on behalf of   )
themselves and all others         )
similarly situated,               )
                                  )
            Plaintiff,            )
                                  )
vs.                               )
                                  )
Zuffa, LLC, d/b/a Ultimate        )
Fighting Championship and UFC,    )
                                  )
                                  )
            Defendants.           )




            VIDEO DEPOSITION OF NATHAN QUARRY

        taken at 300 South Fourth Street, Suite 800,

       Las Vegas, Nevada 89101, beginning at 9:09 A.M.

      and ending at 4:59 P.M. on Friday, September 30, 2016




Reported by:

Sarah Padilla
CCR NO. 929

Job No. 270538                                    1
Pages 1-297



1          MR. ISAACSON:  Yes.
2          MR. CRAMER:  What's the time period of
3    your question?
4    BY MR. ISAACSON:
5      Q    Did you discuss filing a lawsuit against
6    Zuffa with other plaintiffs in this case before you
7    spoke about it with Mr. Macy?
8          MR. CRAMER:  And how are you defining
9    plaintiffs in this case, just so the witness
10   understands what you mean?
11   BY MR. ISAACSON:
12     Q    Do you know who the named plaintiffs are
13   in this case?
14     A    Yes, I know who the named plaintiffs are.
15   Is that what you're asking?
16     Q    Yes.
17     A    Or every single fighter who ever fought.
18   Is that also included in the question?
19     Q    I would call those class members.  They
20   are not plaintiffs in this case.
21     A    Okay.
22     Q    Did you discuss filing a lawsuit against
23   Zuffa with other plaintiffs in this case before you
24   spoke about that with Mr. Macy?
                              14
25         MR. CRAMER:  Objection.  Foundation.

1    Form.  You can answer.
2          THE WITNESS:  I'm thinking.  I don't think
3    so.
4    BY MR. ISAACSON:
5      Q    All right.  Did you discuss filing a
6    lawsuit with other fighters against Zuffa about
7    changing Zuffa's business policies and how they
8    treated fighters before this lawsuit was filed?
9      A    Yes, I'm sure I did.
10     Q    And how many fighters did you discuss that
11   with?
12     A    I don't know.  It's been a lot of years, a
13   lot of fighters.
14     Q    Can you give me an estimate?
15         MR. CRAMER:  Don't speculate.
16         THE WITNESS:  Yeah.  I'd have to
17   speculate.  Generally, every fighter I came in
18   contact with was unhappy with the ways things were
19   done.  Whether or not that resulted in a "somebody
20   should file a lawsuit" conversation or not, I don't
21   recall.
22   BY MR. ISAACSON:
23     Q    All right.  So is it your testimony that
24   before this lawsuit was filed that every fighter
                              15
25   that you spoke to about Zuffa was unhappy with how

1    they were treated?
2      A    Every fighter I spoke to.  I spoke to a
3    lot of fighters over a lot of years.  Not every
4    fighter I spoke to did we engage in a conversation
5    about whether or not they were happy or unhappy of
6    their treatment of employment with Zuffa.  But quite
7    a few were.  It's generally common knowledge that
8    fighters were unhappy with how they were being
9    treated.
10     Q    All right.
11     A    Never once did I talk to a fighter that
12   said, "Man, do I love working for Zuffa.  They treat
13   me great."
14     Q    All right.  Is it your testimony that
15   every fighter that you talked to before this lawsuit
16   was filed about how Zuffa treated fighters was
17   unhappy with how Zuffa treated the fighters?
18         MR. CRAMER:  Asked and answered.  Just
19   answered that question.
20         THE WITNESS:  As I said, I can't speak
21   for -- that would be speculation on the part of what
22   every fighter thought, whether or not they were
23   happy.
24   BY MR. ISAACSON:
                              16
25     Q    No.  I'm not asking you what fighters

1    thought.  When you spoke to fighters about how Zuffa
2    treated fighters, is it your testimony that every
3    one of them told you they were unhappy?
4          MR. CRAMER:  Asked and answered.  He just
5    answered that question.  Objection.
6          THE WITNESS:  As I said, every time I
7    spoke to a fighter about how they were treated, I
8    think generally for the most part they were unhappy.
9    BY MR. ISAACSON:
10     Q    So to be clear, when you spoke to fighters
11   about how Zuffa -- before the lawsuit was filed,
12   when you spoke to fighters about how they were being
13   treated by Zuffa, you think that generally for the
14   most part they were unhappy?
15     A    I'd say --
16         MR. CRAMER:  Asked and answered.
17         THE WITNESS:  I agree.  Generally, they
18   were unhappy.  A lot of times they were uneducated
19   in a lot of ways, so you can be -- if you're a
20   starving man and you're given a crust of bread,
21   you're pretty happy.  So quite often the fighters,
22   whether they were happy or not, they may not have
23   actually understood what the market would allow them
24   to have and how they could be treated in a free
                              17
25   market.

Page 46

```
 1        A   If the association is called upon to help
 2   in such matters, I think having all the fighters
 3   speak with one voice would definitely be helpful as
 4   opposed to each fighter standing alone.
 5        Q   All right.  And am I correct that you --
 6   that one relationship you see between the antitrust
 7   lawsuit and your goal of an association is that if
 8   the antitrust lawsuit is successful, the association
 9   would be a good organization to renegotiate the
10   contracts?
11            MR. CRAMER:  Asked and answered.  Form.
12            THE WITNESS:  It's speculation.  I see in
13   all the other professional leagues that a players'
14   association has been very helpful in helping defend
15   the players' rights.
16            MR. CRAMER:  Do you need a break?
17            THE WITNESS:  No, I'm good.
18            MR. ISAACSON:  That is one of the rules of
19   these things.  Any time you need a break, just say
20   so.
21            THE WITNESS:  Do I need a break?
22            MR. ISAACSON:  No, you're doing great.
23   What he's referring to is when does the coffee hit.
24            MR. CRAMER:  You just looked a little
                            46
25   uncomfortable.
```

Page 47

```
 1            THE WITNESS:  Oh, it's just my back.
 2            MR. CRAMER:  That's why I --
 3            THE WITNESS:  As long as I can move around
 4   I'm okay for the most part.
 5            MR. CRAMER:  Keep moving around, then.
 6   BY MR. ISAACSON:
 7        Q   So if the antitrust lawsuit is successful,
 8   what is your understanding of any benefit you
 9   individually will receive?
10        A   The antitrust lawsuit, me personally, I'm
11   here as a class representative of those that are
12   still fighting and those that will fight in the
13   future.  Our main goal for the lawsuit itself is
14   damages and what would have happened if we would
15   have had a free market where the fighters were able
16   to compete and see what their true value is worth
17   and then change the exclusive contracts that the
18   fighters are forced to be into if they want to fight
19   in the biggest league in the world, especially in
20   the United States, as well as not having to worry
21   about being threatened, blacklisted, punished for
22   not doing what they are told right out the gate.
23            As Joe Silva said one time, "If you don't
24   like the first fight I offer you, you're sure as
                            47
25   shit not going to like the second one."  Those types
```

Page 48

```
 1   of things, when you're trying to work in an
 2   organization and you are trying to think about your
 3   own career, those are things that you should not be
 4   bullied into being forced to do.  Otherwise you are
 5   going to be punished.
 6            My goal for the lawsuit is definitely
 7   damages for everything that has happened in the past
 8   and to change the way Zuffa does business moving
 9   forward.
10   BY MR. ISAACSON:
11        Q   And I'll come back to those points you
12   just made.  But can you tell me what is your
13   understanding of how you will benefit if the
14   antitrust lawsuit is successful?
15        A   How I will benefit if the antitrust
16   lawsuit is successful.  Well, I'm not a part of the
17   bout class.  My fights were outside of that
18   timeline.  I am a part of the identity class.  My
19   fights are shown 24 hours a day on the UFC website.
20   Trading cards are sold, video games are sold.  At
21   the start of every UFC pay-per-view, they show me
22   getting knocked out, so I assume that still has some
23   value to them.  These are things I was never able to
24   negotiate.  No fighter is able to negotiate because
                            48
25   they're all handed the same cookie cutter contract
```

Page 49

```
 1   and forced to sign, and if you don't want to sign
 2   that, you have nowhere else to go since UFC has
 3   bought up all the competition.
 4        Q   All right.  Do you expect that if the
 5   antitrust lawsuit is successful that you would
 6   financially benefit by being -- from your role in
 7   the identity class?
 8        A   I have no idea.  I'm not the -- I don't
 9   know what the numbers would be.
10        Q   All right.  Are you familiar with the
11   concept of class representatives receiving bonus
12   awards or other compensation?
13        A   I have heard that, yes.
14        Q   And have you heard that from anyone other
15   than lawyers?
16        A   At any time?
17        Q   Sure.
18        A   No.  That's not something that comes up in
19   average fighter speak conversations.  We're talking
20   more about kimuras and heel hooks and knock outs.
21        Q   All right.  And what is your understanding
22   of the potential for a class representative in
23   receiving any special award?
24        A   I have no idea.  I don't know how those
                            49
25   things work.  And I sat down and considered joining
```



Page 90

1  talk about it at the time.  The -- in terms of any
2  information you have about UFC engaging in conduct
3  that you consider punishment, blackballing, or
4  threatening, would that information come from
5  conversations you have had from other people, from the
6  complaint, or things you've read in MMA websites or
7  other sources?
8         MR. CRAMER:  Objection to form.
9         THE WITNESS:  I'm sorry.  I don't
10  understand the question.
11  BY MR. ISAACSON:
12     Q   All right.  I'm trying to -- you've talked
13  broadly about that you think the UFC has engaged in
14  punishments, blackballing and threats.  Is the basis
15  for your opinions on that what you've read in the
16  complaint, what you've been told by other people and
17  things that you have read in MMA websites or other
18  sources?
19         MR. CRAMER:  Misstates the testimony.
20  Objection to form.
21         THE WITNESS:  My information about, my
22  feelings about what the UFC have done has come from
23  what I have personally seen, what I've heard, what
24  I've engaged in conversation with other fighters,
                                90
25  with what I've read on websites, I've read in

Page 91

1  forums, and the complaint.
2  BY MR. ISAACSON:
3     Q   Okay.  And in terms of what you've
4  personally seen, of what you would consider
5  punishment, blackballing or threats by UFC, is there
6  anything that you would tell me that you haven't
7  already told me about in this deposition?
8         MR. CRAMER:  Form.  You may answer if you
9  can.
10         THE WITNESS:  Again, the punishment is
11  such a wide range of things.  You have Jon Jones
12  getting into a car wreck with a pregnant woman,
13  fleeing the scene, and then being put on suspension.
14  Or you have Rampage Quinton Jackson doing
15  essentially the same thing.  It's such a variation
16  of everything that's done.
17         Forrest Griffin and Rashad Evans made
18  off-color comments, I think they were tweets or
19  Facebook comments or something, and then someone
20  lower down the rung in the UFC world made a comment
21  as well, no more offensive than what Rashad and
22  Forrest had said, and he was immediately cut, forced
23  to go into -- I think it was a rape awareness class
24  or something like that.  They chose someone lower
                                91
25  down the rung that they could cut who wasn't a draw

Page 92

1  to punish him to make sure all the other fighters
2  knew what would happen to you if you did act
3  inappropriately.
4  BY MR. ISAACSON:
5     Q   All right.  And when you say they chose
6  someone lower down the rung they could cut who
7  wasn't a draw to tell other fighters what would
8  happen if they didn't -- if they acted
9  inappropriately, that was your perception; correct?
10     A   That's common knowledge.  And if you look
11  at -- the UFC will pick and choose who they're going
12  to promote, who they give the TV time to.  I believe
13  the fighter that they cut had been doing well, he'd
14  lost a couple of fights, so it's -- we're all one
15  big group of fighters.  We all sign essentially the
16  same contract.  But the UFC does have people that
17  they pick and choose to treat better or worse.  But
18  we're all just fighters.
19     Q   All right.  Just so I understand your
20  testimony.  When you say that's "common knowledge,"
21  by that do you mean that's something you've talked
22  to a lot of fighters about?
23     A   I think common knowledge is a definition
24  onto itself.  We all know what common knowledge
                                92
25  means.

Page 93

1     Q   Okay.  When you say the term that it's
2  common knowledge that the UFC conducts its business
3  a certain way, what do you mean by common knowledge?
4  Are you basing that on things you are told?  Things
5  you read?  Something else?
6     A   Well, if I said it's rainy in Oregon,
7  people would say that's common knowledge.  You don't
8  have to fly to Oregon, stand in the rain to discover
9  it.  These are just things that you know.  So as
10  you're a fighter and you see how things are done and
11  handled, you have your own perception, and as more
12  and more people get this perception, it's what is
13  known as common knowledge.
14     Q   Right.  And when you're speaking about
15  other people's, other fighter's perceptions, where
16  are you getting that information from?
17     A   It is all the web.  They talk about
18  three -- what is that game where, you know two or
19  three people, you know everyone in the world.  So
20  you talk to one or two fighters, they talk to one or
21  two fighters, they talk to one or two fighters, it
22  becomes kind of a consensus.  Everyone feels the
23  same way and knows how things are done.
24     Q   All right.  And for example, when you said
                                93
25  that the UFC chose someone lower down the rung to



1    packages than MTV2, although I've lost both of them
2    due to Comcast.  Although, I think that showed an
3    investment in wanting to grow Bellator a little
4    more.
5    BY MR. ISAACSON:
6        Q    And when Bellator moved to Spike, did you
7    believe that the fights there were going to be
8    credible fights?
9            MR. CRAMER:  Foundation.  Form.  Vague.
10           THE WITNESS:  I believe they would be
11   better fights.  Well, it all depends on the
12   investment that Spike makes into Bellator -- whoever
13   the owning company is decides to make into Bellator.
14   You can have an incredible fight at your local
15   garage.  I've fought in warehouses and had
16   incredible fights.  It was very subjective.
17   BY MR. ISAACSON:
18       Q    Well, do you recall there was a debut with
19   Mr. Hawn and Mr. Chandler fighting.
20       A    What are their full names?
21       Q    Well, there's Rick Hawn, H-A-W-N.
22       A    Okay, Judo guy.
23       Q    Right.
24       A    Oh, and Michael Chandler, the wrestler?
                                186
25       Q    Yes.

1        A    Uh-huh.
2        Q    And did you have a view as to the
3    significance of their being part of the -- their
4    being part of the debut of Bellator on Spike?
5            MR. CRAMER:  Objection form.  Foundation.
6            THE WITNESS:  I believe I thought that
7    would be a great match up.  I thought it would be an
8    exciting fight.  Chandler ended up beating Hawn
9    really quickly, I think in the first round.  And it
10   is of note that it was Chandler that I spoke to and
11   asked if he was happy in Bellator.  And he told me,
12   no, he wanted to go to the UFC so he could compete
13   up against the best.
14   BY MR. ISAACSON:
15       Q    And when did you speak to Chandler?
16       A    That was during -- he was a guest on my
17   show, MMA Uncensored.  So that would be 2012 at some
18   point.  We were in a bar after the show.
19       Q    And was he contractually precluded from
20   moving from Bellator to UFC?
21       A    I do not know his contracts.  I do not
22   know Bellator's contracts.  I've never fought for
23   Bellator.  I've never seen a Bellator contract.  I
24   do not know what the managers, the agents, the
                                187
25   owners of the company require.

1        Q    Do you know if Bellator treats identity
2    rights differently from UFC in their -- with respect
3    to those two different sets of contracts?
4        A    I know nothing about Bellator contracts; I
5    have never seen a Bellator contract.
6        Q    Do you know if the periods of what you
7    call exclusivity are any different from what you
8    call UFC and Bellator contracts?
9        A    I know nothing about Bellator contracts.
10   I have never seen a Bellator contract.
11       Q    But -- and I've neglected to ask you this.
12   You've referred several times to UFC contracts being
13   "exclusive contracts."  And when you say "an
14   exclusive contract," does that include a contract
15   where you agreed to do one fight for a period of
16   time with UFC and not to fight with someone else?
17           MR. CRAMER:  Objection to form.  Objection
18   to the extent it calls for a legal conclusion.
19           THE WITNESS:  My understanding was with
20   UFC contracts is you are restricted by time period
21   and, more specifically, a number of fights.  That
22   time period never ends, as was shown in my contract.
23   I believe I have two fights left in my contract.
24   When I officially retired a year and a half after my
                                188
25   fight against Jorge Rivera, I retired on Spike TV.

1    Very shortly after that I received an e-mail from
2    the UFC informing me, "We have seen notice of your
3    retirement.  Should you ever choose to come out of
4    retirement, you still owe us fights.  We still have
5    you."
6    BY MR. ISAACSON:
7        Q    All right.  Is it your understanding that
8    the UFC contracts with fighters are perpetual?
9        A    Perpetual meaning moving forward?
10       Q    Forever.
11       A    My understanding with the UFC contracts
12   is, yes, if you don't fulfill your contract to the
13   letter of how they define the contract, it will
14   never end.
15       Q    All right.  And when you refer to
16   exclusivity, are you referring -- and you spoke as
17   to how exclusivity is used to limit competition and
18   control fighters.  Is that exclusivity for any
19   specific period of time that you're referring to?
20       A    The exclusivity would be for the period of
21   time of the contract.
22       Q    So is it your -- when you spoke earlier
23   about the UFC using exclusive contracts as a tool to
24   limit competition and control fighters, were you
                                189
25   basing that on your view that the contracts are

1  perpetual or forever?
2      A   Yes.  If you look at situations such as
3  Cung Le, who decides he no longer wants to fight for
4  the UFC due to the treatment, there is no clause
5  where he can get out of his contract and say, "I was
6  treated poorly; I want to go fight somewhere else."
7  So his continuing never -- his contract never ends,
8  no matter how much money he's offered or what; there
9  is no clause.
10      It's a very one-sided contract.  And in
11  cases where UFC will cut people, it's such a
12  one-sided contract that they will sign you for three
13  fights, eight fights, whatever it may be.  You can
14  never leave, but they can cut you whenever they want
15  to, and they can suspend you if they want to and
16  just put your contract on hold.
17      Someone like John Jones, who I mentioned
18  earlier, gets into a car accident, runs into a
19  pregnant woman, flees the scene, he doesn't get cut,
20  he gets suspended.  Because if he was cut, then he
21  would be on the open market, and being on the open
22  market is a much better thing; it shows the actual
23  true market value of a fighter.
24      Q   All right.  And when you're referring to
190
25  the provisions of Cung Le's contract, you've not

1  actually seen those provisions, have you?
2      A   I have not.  I know that the UFC contracts
3  are mostly cookie cutter contracts.  There's very
4  little variation in all of them.  Much like a cookie
5  cutter, they all look the same.  You may throw a
6  little sprinkles on one, a little frosting on the
7  other, but for the basis, all of the contracts are
8  generally exactly the same.
9      MR. ISAACSON:  All right.  We will mark
10  this as the next number.
11      (Exhibit 14 was marked.)
12      MR. ISAACSON:  That goes to you, Eric.
13      MR. CRAMER:  Thank you.
14      MR. ISAACSON:  What are we up to?
15      THE COURT REPORTER:  14.
16      MR. CRAMER:  Thank you.
17      MR. ISAACSON:  Thank you.
18      Quarry 14 is a -- printed off of the web
19  from Bloody Elbow.com.
20      MR. CRAMER:  Appreciate you did this in
21  color.
22      THE WITNESS:  That's nice.  Can I keep
23  this?
24      MR. ISAACSON:  We'll get you another copy.
191
25

1  BY MR. ISAACSON:
2      Q   This is an interview of you on Bloody
3  Elbow.com.  Did you -- you did do an interview with
4  Bloody Elbow.com around this time?
5      A   It sure looks like me.
6      Q   And did you see it after it came out?
7      A   I don't generally read my interviews or
8  listen to my interviews.
9      Q   All right.  Did you ever have any reason
10  to believe that -- it says "by John Nash."  Do you
11  remember speaking to Mr. Nash?
12      A   I've spoken to Mr. Nash a few times.  I
13  don't recall specifically speaking to him on this
14  occasion.
15      Q   Do you remember doing -- it says,
16  "Recently I had the good fortune to speak at
17  length."
18      Do you remember having a conversation that
19  you understood would be an interview on Bloody
20  Elbow?
21      A   Not specifically.
22      Q   All right.  So on the third page?
23      MR. CRAMER:  If you're going to ask
24  questions about this, you should allow Mr. Quarry to
192
25  have an opportunity to read it.

1      So take your time and review it and read
2  it.
3      THE WITNESS:  Do we know what the date of
4  this interview was?
5  BY MR. ISAACSON:
6      Q   Well, it's posted June 28, 2013.  It's on
7  the first page.
8      A   Oh, okay.  Okay.
9      Q   Okay.  On the third page of the document,
10  where the question is, "So the source of the problem
11  is with the fact that UFC is so big," and you talk
12  about Dana White and him paying for your back
13  surgery, which we talked about before.
14      A   Uh-huh.
15      Q   Do you see that?
16      A   Uh-huh.  Yes.
17      Q   And you say, "I'll always be indebted to
18  Dana White for helping me there.  And I know he's
19  done that over and over again for other guys."
20      That was a true statement; correct?
21      A   That's an assumption.  I believe he's done
22  that for other guys.
23      Q   And now, at this point, by June 2013, you
24  have -- you've already concluded that the UFC is not
193
25  treating its fighters appropriately; correct?

MAGNA
LEGAL SERVICES

Page 294

```
 1      A   I do not recognize Full Combat
 2  Supplements, LaCrosse Footwear.
 3      Q   LaCrosse Footwear?
 4      A   I don't think so.  I think I recognize the
 5  rest.  Gary Ibarra would definitely know more than I
 6  would about sponsors.
 7      Q   And why would you be unfamiliar, or why
 8  would Mr. Ibarra be more familiar with your sponsors
 9  than you?
10      A   Because he was my agent, and he would get
11  me the sponsors, and put them on my gear, and on my
12  banners, and then collect the funds, generally.  So
13  I didn't have to have very much interaction with any
14  this.  The sponsors just wanted to use me as
15  advertising space.
16      Q   All right.  So if you got a complete list
17  of your sponsors during your time of your fighting
18  career, you would not recognize all of the sponsors
19  on there?
20      A   Most likely I would not.
21          MR. ISAACSON:  All right.  Thanks for your
22  time today, sir.
23          MR. CRAMER:  We have no questions.
24          THE VIDEOGRAPHER:  This concludes the
                                                  294
25  video deposition of Nathan Quarry.  We are now going
```

Page 295

```
 1  off the record.  The time is approximately 4:59 P.M.
 2          THE COURT REPORTER:  Are you getting a
 3  copy, Counsel?
 4          MR. CRAMER:  Yes.  Read and sign.
 5          (TIME NOTED: 4:59 P.M.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                                  295
25
```

Page 296

```
 1                CERTIFICATE OF WITNESS
 2  PAGE  LINE  CHANGE          REASON
 3
    _____
 4
    _____
 5
    _____
 6
    _____
 7
    _____
 8
    _____
 9
    _____
10
    _____
11
    _____
12
    _____
13
    _____
14
    _____
15
    _____
16
    _____
17
    _____
18
    _____
19
    _____
20              *  *  *  *  *
21      I, Nathan Quarry, witness herein, do hereby
    certify and declare under penalty of perjury the within
22  and foregoing transcription to be my deposition in said
    action; that I have read, corrected and do hereby affix
23  my signature to said deposition.
24  _____  _____
    Nathan Quarry                        296
25  Witness                    Date
```

Page 297

```
 1      STATE OF NEVADA)
                        ) Ss
 2      COUNTY OF CLARK)
 3
 4          I, Sarah Padilla, a duly commissioned and
 5  licensed court reporter, Clark County, State of Nevada,
 6  do hereby certify:  That I reported the taking of the
 7  deposition of the witness, Nathan Quarry, commencing on
 8  Friday, September 30, 201, at 9:09 A.M.; That prior to
 9  being examined, the witness was, by me, duly sworn to
10  testify to the truth; That thereafter I transcribed my
11  shorthand notes into typewriting and that the typewritten
12  transcript of said deposition is a complete, true, and
13  accurate record of said shorthand notes.  I further
14  certify that I am not a relative or employee of any
15  attorney or counsel of any of the parties nor a relative
16  or employee of an attorney or counsel involved in said
17  action, nor a person financially interested in the
18  action; that a request [x] has [] has not been made to
19  review the transcript.
20          IN WITNESS WHEREOF, I have hereunto set my
21  hand in the County of Clark, State of Nevada, this __ day
22  of _____.
23                      _____
                         SARAH PADILLA, CCR 929
24
                                                  297
25
```

