—2:15-cv-01045-RFB-BNW—

1                      UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4   CUNG LE, et al.,                )
                                    )
5              Plaintiffs,          )  Case No. 2:15-cv-01045-RFB-BNW
                                    )
6         vs.                       )  Las Vegas, Nevada
                                    )  Monday, March 4, 2024
7   ZUFFA, LLC, d/b/a Ultimate      )  1:06 p.m.
    Fighting Championship and       )
8   UFC,                            )  PRETRIAL CONFERENCE
                                    )
9              Defendants.          )
    _____    ___  *C E R T I F I E D   C O P Y*

10

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14           THE HONORABLE RICHARD F. BOULWARE, II,
                  UNITED STATES DISTRICT JUDGE

15

16

17

18

19  APPEARANCES:        See Pages 2 and 3

20

21
    COURT REPORTER:     Patricia L. Ganci, RMR, CRR
22                      United States District Court
                        333 Las Vegas Boulevard South, Room 1334
23                      Las Vegas, Nevada  89101

24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

```
                      2:15-cv-01045-RFB-BNW
```

 1 | APPEARANCES:
   | For the Plaintiffs:
 2 |
   |         **DON SPRINGMEYER, ESQ.**
 3 |         KEMP JONES, LLP
   |         3800 Howard Hughes Parkway, 17th Floor
 4 |         Las Vegas, Nevada 89169
   |         (702) 385-6000
 5 |
   |         **CRANE M. POMERANTZ, ESQ.**
 6 |         CLARK HILL, PLC
   |         3800 Howard Hughes Parkway, 17th Floor
 7 |         Las Vegas, Nevada 89169
   |         (702) 862-8300
 8 |
   |         **ERIC L. CRAMER, ESQ.**
 9 |         **ELLEN T. NOTEWARE, ESQ.**
   |         **MICHAEL C. DELL'ANGELO, ESQ.**
10 |         BERGER & MONTAGUE, P.C.
   |         1818 Market Street, Suite 3600
11 |         Philadelphia, Pennsylvania 19103
   |         (215) 875-3000
12 |
   |         **BENJAMIN D. BROWN, ESQ.**
13 |         COHEN MILSTEIN SELLERS & TOLL, PLLC
   |         1100 New York Avenue, N.W., Suite 500
14 |         Washington, D.C. 20005
   |         (202) 408-4600
15 |
   |         **JOSEPH R. SAVERI, ESQ.**
16 |         **JOSEPH YOUNG, ESQ.**
   |         THE JOSEPH SAVERI LAW FIRM, INC.
17 |         555 Montgomery Street, Suite 1210
   |         San Francisco, California 94111
18 |         (415) 500-6800

19 | For Defendant Zuffa, LLC:

20 |         **J. COLBY WILLIAMS, ESQ.**
   |         **SAMUEL MIRKOVICH, ESQ.**
21 |         CAMPBELL & WILLIAMS
   |         700 South 7th Street
22 |         Las Vegas, Nevada 89101
   |         (702) 382-5222

23 |

24 | /////

25 |

—2:15-cv-01045-RFB-BNW—

1   APPEARANCES CONTINUED:

2   For the Defendant:

3        **WILLIAM A. ISAACSON, ESQ.**
         **JESSICA PHILLIPS, ESQ.**
4        PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
         2001 K Street, NW
5        Washington, DC 20006
         (202) 223-7300

6

         **CHRISTOPHER S. YATES, ESQ.**
7        **AARON T. CHIU, ESQ.**
         LATHAM & WATKINS, LLP
8        505 Montgomery Street, Suite 2000
         San Francisco, California 94111
9        (415) 395-8157

10       **DAVID L. JOHNSON, ESQ.**
         LATHAM & WATKINS, LLP
11       555 Eleventh Street, Suite 1000
         Washington, D.C. 20004
12       (202) 637-2200

13

14

15

16

17

18

19

20

21

22

23

24

25

—2:15-cv-01045-RFB-BNW—

1          LAS VEGAS, NEVADA; MONDAY, MARCH 4, 2024; 1:06 P.M.

2                              --oOo--

3                    P R O C E E D I N G S

4          THE COURT:  Please be seated.

5          (Pause.)

6          COURTROOM ADMINISTRATOR:  The matter now before the

7    Court is Le v. Zuffa, Inc., et al., Case Number

8    2:15-cv-1045-RFB-BNW.  Counsel, please make your appearances

9    beginning with the plaintiffs.

10          MR. CRAMER:  Good afternoon, Your Honor.  Eric Cramer

11    for the plaintiffs.

12          MS. NOTEWARE:  Good afternoon, Your Honor.  Ellen

13    Noteware, also for the plaintiffs.

14          MR. SAVERI:  Good afternoon.  Joseph Saveri for the

15    plaintiffs.

16          MR. DELL'ANGELO:  Good afternoon, Your Honor.  Mike

17    Dell'Angelo for the plaintiffs.

18          MR. SPRINGMEYER:  Good afternoon, Your Honor.  Don

19    Springmeyer for plaintiffs.

20          MR. POMERANTZ:  Good afternoon, Your Honor.  Crane

21    Pomerantz for plaintiffs.

22          THE COURT:  Good afternoon.

23          MR. ISAACSON:  Good afternoon, Your Honor.  Bill

24    Isaacson for the defendant.

25          MR. WILLIAMS:  Hi, Judge.  Colby Williams for the

—2:15-cv-01045-RFB-BNW—

1  defendants.

2          MR. YATES:  Afternoon, Your Honor.  Chris Yates for

3  Zuffa.

4          MR. CHIU:  Good afternoon, Your Honor.  Aaron Chiu for

5  the defendant, Zuffa.

6          MS. PHILLIPS:  Good afternoon, Your Honor.  Jessica

7  Phillips for Zuffa.

8          MR. JOHNSON:  Good afternoon, Your Honor.  David

9  Johnson for Defendant Zuffa.

10          MR. MIRKOVICH:  And good afternoon, Your Honor.  Samuel

11  Mirkovich for the defendants.

12          THE COURT:  Good afternoon.  So we have a few things to

13  work through.  My first question is where are we with the status

14  of, sort of, potential negotiations in this case, Mr. Cramer.

15  And I say this because I want to be perfectly clear about one

16  thing, which is it's very difficult for the Court to schedule

17  these types of cases.  I'm not going to move the trial date,

18  unless I have a signed settlement agreement.  And I'm just

19  saying that so the parties are aware of that.

20          So I sometimes have parties say to me, "We've agreed to

21  things in principle," and frequently that works out, but because

22  of the difficulty of setting this case up for trial, I just want

23  to be clear about what would be the requirement for me to move

24  the trial date as it's currently set.

25          But, Mr. Cramer, you look like you're about to say

——2:15-cv-01045-RFB-BNW——

1  something.

2       MR. CRAMER:  As we reported to Your Honor, we're

3  working with Judge Layn Phillips, the mediator, with the

4  defendant and are in discussions.

5       THE COURT:  Okay.  So as of now the case will be moving

6  forward, I assume, correct?

7       MR. CRAMER:  Yes.

8       THE COURT:  Okay.  Again, I want to confirm that.  And

9  so let's move through some of these motions.  Now, I know that

10 the parties have not necessarily responded to the motion.  So

11 what I'm going to do is I'll bring up the particular motion, and

12 the party that hasn't had a chance to file their respective

13 opposition will be able to respond.  I want to get a sense of

14 some of these.  Some of these I'm going to defer on, but I

15 wanted to get to some these meatier issues right away so we can

16 deal with them, and I will figure out whether or not I need

17 further briefing as it relates to them.

18       So I want to start with Document Number 991, which is

19 Zuffa's motion to admit evidence of specific post-class period

20 market entry and expansion.  Who is going to be arguing that for

21 the plaintiffs?  The opposition at least.

22       MR. CRAMER:  The post 2017?

23       THE COURT:  Yes.  So this is -- again, it's 991, and

24 this is about testimony from athletes that competed for rivals

25 outside the class period, UFC executives on post-class

———2:15-cv-01045-RFB-BNW———

1   competition, and agents who negotiated post-class period

2   contracts, and developments of Bellator and other developments.

3          MR. CRAMER:  Mr. Madden will handle that.

4          THE COURT:  Okay.

5          MR. MADDEN:  Thank you, Your Honor.  Patrick Madden for

6   plaintiffs from Berger Montague.

7          This issue relates to the issue that we've presented to

8   Your Honor some time ago in the context of discovery, and we

9   actually lay out the bulk of our position in our own motion in

10  limine on post-class period discovery.

11         THE COURT:  Right.

12         MR. MADDEN:  It's our position that post-class period

13  facts and circumstances should not come in because they cannot

14  bear on Zuffa's durable monopsony power that we intend to show.

15  It's not relevant.  It would be prejudicial to the jury to show

16  it to them.

17         THE COURT:  So talk to me a little bit -- because this

18  does sort of blend in with this argument about, sort of, this

19  notion of, sort of, durable monopsony power.  I will say that I

20  went back and looked through the expert reports from Zuffa.  I

21  don't ever recall seeing, at least from our search, the word

22  "durable" being used, but it doesn't mean that the concept of

23  the reduction of output may not be something that can be used.

24         And just also so the parties know, I do anticipate at

25  our hearing, to the extent the trial does move forward, on March

1   28th talking about issues that relate to what the experts can

2   say in terms of how they define monopsony versus how the Court

3   will define that in the context of the elements of the claim.

4   Because I think what can be very confusing to the jury is if a

5   respective expert comes up and says, "Economics doesn't

6   recognize, for example, wage share or foreclosure share," or,

7   you know, Dr. Singer saying, "Even though wages may have gone

8   up, that in and of itself doesn't necessarily mean that there's

9   not a monopsony."

10          And so I think one of the things I'm just letting you

11  all know about ahead of time is we're going to have to have a

12  conversation about how we identify to the jurors what is an

13  expert's opinion and what is the Court's determination as to

14  what needs to be demonstrated even in the context of monopsony.

15          I say that to you, Mr. Madden, because it seems to me

16  notwithstanding the fact that the term "durable" hasn't been

17  used, the principles underlying what the defendant's arguments

18  are are not things that they haven't necessarily discussed.

19          And so is it the term "durable" that you're talking

20  about, one, and then to go back as it relates to the events

21  outside of the, sort of, class period, discovery period, what is

22  your position, if anything, beyond just simply the fact that

23  this was not during that period and it shouldn't come in because

24  discovery closed?

25          MR. MADDEN:  So to step back, I believe that the term

 1   "durable" comes from, in part, the case law.  It's not

 2   necessarily --

 3           THE COURT:  Right.

 4           MR. MADDEN:  -- the economic circumstances that

 5   Dr. Singer or Dr. Topel testified to.  And so what Dr. Singer

 6   shows is that during this period that he analyzed wages were

 7   suppressed, and nothing after that period can affect the damages

 8   and the effects that were experienced by fighters during the

 9   period.  And the -- one of the issues that comes not just from

10   the durable monopsony power that Dr. Singer shows is a

11   completeness-of-the-record issue on things that happened after

12   2017.

13           We had this discussion in our prior briefing that you

14   would need to conduct discovery on a wide range of issues to

15   know whether anything changed because of Zuffa's conduct changes

16   or whether it is actually evidence that during the period that

17   Dr. Singer analyzed his conclusions were not valid.

18           And so we would need discovery, and we explained this

19   some months ago, in order to show, and they would need it to

20   show, that there were changes or no changes during the later

21   period that could bear on what happened in the earlier period.

22   There's no evidence in the record.  There's nothing that they've

23   presented in their exhibits that would tend to show that Zuffa's

24   monopsony power could have changed afterwards in a way that

25   would indicate that there was no monopsony power during the

—2:15-cv-01045-RFB-BNW—

1   period.  And so we respectfully submit that it should be

2   excluded.

3              THE COURT:  Okay.  Thank you.

4              And who is going to be arguing this for Zuffa?

5              MR. YATES:  Chris Yates, Your Honor, from Latham and

6   Watkins.

7              THE COURT:  Mr. Yates, I have a slightly different

8   question, which is I thought I had decided this issue.  How is

9   this different than me saying information can't come in outside

10  of the discovery period?  Because I was clear about that in my

11  last order.  So I'm trying to understand how this is different

12  assuming that, right, while you objected to the Court's order,

13  that you accept that that's the law of the case.  How is this

14  different than that?

15             MR. YATES:  So I think -- and we lay this out I think

16  at Page 3 of our Motion in Limine Number 1, Document 991, Your

17  Honor.  Your Honor specifically said that you were not making a

18  categorical decision as to admissibility.  You were making a

19  decision as to whether or not to reopen discovery in the Le case

20  and allow testimony regarding post -- post-class period issues

21  to be discovered.  So there's -- that's obviously a different

22  issue than the issue of whether it should be admissible.

23             And I think one thing I would note is that Your Honor

24  made very clear, to Mr. Cramer, that the door could be opened

25  here.  And the door's been opened --

—2:15-cv-01045-RFB-BNW—

1        THE COURT:  Well, let me ask you a question.

2        I think the door can be opened to an expert opining.  I

3    don't think the door can be opened to facts that were not part

4    of discovery.  So that's two separate things.  So what I want to

5    focus on are those two separate things.

6        MR. YATES:  Sure.

7        THE COURT:  There's a discussion about durable

8    monopsony power, and that's why I say we'll have that discussion

9    when we get closer to trial, because that term may be something

10   that wasn't used.  But that idea is actually certainly a part of

11   what it means to have a monopsony.  I would certainly allow the

12   defendants to talk about that as relates to reduced output or

13   increased output, as the case may be, in terms of the number of

14   fights, for example.

15       But that's different than facts coming in and facts

16   that were relied upon by either expert post-class period.  So

17   tell me about, are you going to be seeking to admit

18   post-discovery facts that were not disclosed or are you simply

19   saying if they open the door to this we want to be able to argue

20   about certain facts that we are aware of later?

21       MR. YATES:  So certainly we would -- we are seeking

22   through our Motion in Limine Number 1 to have, for example,

23   Zuffa executives talk about what has happened in the marketplace

24   since the middle of 2017.  Similarly, we want to ask questions

25   of the fighter plaintiffs about their careers post 2017.  All of

 1  that bears on the issues.  And, frankly, I think that's going to

 2  be challenging for the jury to sit there and try to

 3  compartmentalize things in time and just focus on this one

 4  particular time period when they all know that the marketplace

 5  has been evolving since 2017.

 6          So we're seeking to admit it, but I'll also say the

 7  door has been opened.  If you look at Page 5 of our brief, right

 8  in the middle, the plaintiffs have included videos from after

 9  the class period.  They've included articles from after the

10  class period.  They've included fight rankings from after the

11  class period.

12          So, you know, what's good for the goose is good for the

13  gander, and they have opened that door.

14          THE COURT:  Well, I haven't admitted it.  So, I mean,

15  the door typically is opened, as you know, Mr. Yates, when I

16  admit something or an expert testifies to it.  You actually

17  anticipated a question I was going to ask the plaintiffs'

18  counsel about this.

19          But it sounds to me like what you're saying is if

20  they've opened this door, we should be able to allow these sort

21  of facts in.  Because I will say this, from my perspective, the

22  testimony described would be precluded by my previous order

23  absent them opening the door to this.  So any testimony about

24  what happened post 2017 by any executives, by any witness, I

25  would exclude whoever presented that witness.

―――2:15-cv-01045-RFB-BNW―――

1          But I would leave, and I continue to leave, the

2    possibility open that if there is testimony that would open the

3    door to that, that's something that could be discussed at the

4    time.  Because as I think about it now, certainly there could be

5    some limited discussion, but it's hard to see that when we don't

6    have the trial testimony.

7          But let me ask them about the particular articles,

8    Mr. Yates.  If you had one other point, you can go ahead.

9          MR. YATES:  I did.  I just wanted to -- I just wanted

10   to address the expert point for a moment, Your Honor, because I

11   think Your Honor's absolutely right.  I mean, the word "durable"

12   does not appear in Professor Topel's report, as an example.  And

13   that's because, as Mr. Madden suggested that, you know,

14   that's -- that comes from the jury instruction in many ways.

15         THE COURT:  Right.

16         MR. YATES:  And it comes from the *Rebel Oil* case and

17   other cases.  But the concept is certainly in there because all

18   the concept means is you got to look at the marketplace and you

19   got to understand entry, whether there are barriers to entry,

20   whether competitors are coming in, which is obviously what

21   Dr. Topel discusses.

22         So I think no expert should be using words like

23   "durable monops" -- "durable" or other words that are in the

24   jury instructions because I think that's going to confuse the

25   jury.

—2:15-cv-01045-RFB-BNW—

1          THE COURT:  Right.

2          MR. YATES:  And so hopefully we can -- we can work that

3   out.

4          I will say, I didn't -- I didn't -- I don't believe

5   with respect, Your Honor, that you categorically decided the

6   issue of post-class period discovery.  You were ruling on a

7   motion to reopen.  I accept that Your Honor denied the motion to

8   reopen, but you said you would revisit the issues, you know,

9   essentially closer to trial and while looking at whether or not

10  the plaintiffs had opened the door.  But we certainly believe

11  that the jury will be confused and it will be prejudicial to

12  Zuffa if we cannot present evidence or ask the fighter

13  plaintiffs questions about their careers post 2017.

14          THE COURT:  Okay.  Thank you.

15          MR. YATES:  Thank you.

16          THE COURT:  Are you switching up, Mr. Cramer?

17          MR. CRAMER:  Yes, Your Honor.  I wanted to make some

18  points, if you don't mind.

19          THE COURT:  Well, I don't mind.  The only issue is,

20  again, what Mr. Yates said, what's good for the goose is good

21  for the gander.  If I'm not allowing post period --

22  post-discovery information to come in and post-class period

23  information to come in that wasn't disclosed during discovery, I

24  wouldn't allow it for anyone.  So talk to me a little bit about

25  some of these other exhibits that have been identified that the

─────2:15-cv-01045-RFB-BNW─────

1   plaintiffs are putting forward.

2          MR. CRAMER:  They were put forward by mistake.  We've

3   already pulled, I think, one of them.  Anything else past -- we

4   tried to make sure that there was no article, document, or

5   anything past June 2017.  Some may have fallen through, but we

6   do not intend to introduce any evidence post June 2017

7   affirmatively --

8          THE COURT:  Okay.

9          MR. CRAMER:  -- about facts or circumstances.

10         THE COURT:  Okay.  All right.

11         MR. CRAMER:  The only other point I would make is

12  Dr. Singer shows monopsony power from 2010 to 2017.  He then put

13  in a supplemental declaration that Your Honor reviewed as part

14  of the motion to reopen discovery that showed that Zuffa's

15  monopsony power continued and even rose to the present.

16         Zuffa never countered that.  So the only evidence we

17  have about the current situation after June 2017 is that the

18  monopsony power continued and increased.  That's the only

19  evidence there is.

20         So if they tried to bring in evidence through

21  executives, through anecdotes, that will be totally out of

22  context.  There's no expert testimony to deal with it, and it

23  would be highly prejudicial given that the experts are going to

24  be testifying through June 2017.

25         THE COURT:  Thank you.

2:15-cv-01045-RFB-BNW

1        Well, I'm going to be -- I'm going to be consistent

2   with my prior ruling, which is I'm not going to allow either

3   side to bring in any testimony, evidence, that is post 2017 as I

4   previously ruled.  So I'm going to deny that --

5        MR. CRAMER:  Thank you, Your Honor.

6        THE COURT:  -- motion.

7        Now, I also want to then go to this motion as it

8   relates to witnesses, and I'm not sure who's going to be arguing

9   the opposition to that for the defense.  I'll come back to you,

10  Mr. Cramer.

11       MR. YATES:  That will be me, Your Honor, if I can just

12  get to my notes.

13       THE COURT:  Sure.  I'm sorry.  I know I'm skipping

14  around, Mr. Yates, so take your time.

15       MR. SAVERI:  Excuse me, Your Honor.  Joseph Saveri.  Is

16  this Number 1?

17       THE COURT:  This relates to -- there was two categories

18  of witnesses that were objected to, these sort of undisclosed

19  and late-disclosed witnesses, right --

20       MR. SAVERI:  Right.

21       THE COURT:  -- by the plaintiffs.  And I want to hear

22  more from the defendant about the nature of the disclosure and

23  the timing of the disclosure.

24       MR. SAVERI:  Thank you.

25       THE COURT:  So, Mr. Yates, just I want to clarify.  As

1   I understand it, the defendants have now disclosed the content

2   as relates to what the testimony would be.  Is that right?

3          MR. YATES:  Certainly there -- the witnesses are listed

4   in our -- in our trial witness list, and they were also listed

5   in supplemental disclosures at the end of last year.  And they

6   were also disclosed by plaintiffs.  Some of them were disclosed

7   by plaintiffs going back to 2015.  Others were the subject of

8   RFAs.  This is discussed in our trial brief, and I'll find the

9   pages to point Your Honor to.

10          THE COURT:  Right.  But, Mr. Yates, you are aware of

11  the case law that says disclosure by one party as to a witness

12  doesn't necessarily mean the other party doesn't have to also

13  identify that witness and the information to which they will be

14  testifying.

15          And so my question to you is, why the delay?

16          MR. YATES:  I -- Your Honor, I don't really think there

17  was a delay.  The witnesses were known to the plaintiffs.  If

18  Your Honor looks at Rule 26(e) and if you look at the Advisory

19  Committee notes to Rule 26(e), what they say is that if -- if a

20  witness is disclosed or otherwise known to the other side, then

21  that witness is disclosed for purposes of trial.

22          Here, the plaintiffs listed multiple witnesses on

23  their -- their own disclosures.  They then asked for documents

24  to be produced from those -- from some of those witnesses.  We

25  produced those documents.  And then most remarkably to me, you

2:15-cv-01045-RFB-BNW

1  know, they purport to represent the fighter plaintiffs and, yet,

2  they want to exclude testimony of fighters who they knew about

3  who they asked Zuffa RFA's about.  And, you know, this trial

4  should be about let's hear from the fighters.  Let's hear --

5  let's hear from the fighters beyond the curated set of named

6  plaintiffs that they have brought forward.  Let's hear from the

7  other fighters here.

8          You know, what -- this also relates to --

9          THE COURT:  I have this question for you, Mr. Yates --

10         MR. YATES:  Sure.

11         THE COURT:  -- which is, as far as you're concerned,

12  when you say that these fighters or these witnesses were known,

13  was the nature of what they were going to testify about known?

14  Because that actually is different.  Because it's certainly one

15  thing to say we both have a person on our witness list where the

16  person's known to the opposing party.  The question is, from

17  your perspective is the information that they're going to

18  testify about information that you believe that the plaintiffs

19  were aware they would testify about, and if so, can you point to

20  where in the record you believe that it demonstrates that?

21         MR. YATES:  Sure.  I mean, the plaintiffs asked about

22  fighters and agents in depositions.  And Rule 26(e) makes very

23  clear that that is sufficient disclosure that makes -- makes

24  witnesses otherwise known.

25          And so that -- that --

—2:15-cv-01045-RFB-BNW—

1           THE COURT:  So can you give me an example -- I'm trying

2      to pull up my list here.  Can you give me an example of a

3      witness from that list where you believe what they were going to

4      testify about and there possibly being witnesses was known to

5      the plaintiffs?  I'm just trying to get to my list here.

6           MR. YATES:  Sure.  I mean, let me ... an example would

7      be Mr. Ratner.

8           THE COURT:  Can you spell that for the record.

9           MR. YATES:  R-A-T-N-E-R.

10          So Mr. Ratner was the Vice President of Regulatory

11     Affairs for Zuffa during the class period.  The plaintiffs

12     identified him on their initial disclosures.  The plaintiffs

13     asked for documents from Zuffa.  Documents were -- I think 20 or

14     30,000 documents were produced by Zuffa.  Mr. Ratner, if I

15     recall correctly, was discussed by name in depositions.  And

16     Rule 26(e) and the Advisory Committee notes to Rule 26(e) make

17     clear that that is sufficient -- that is sufficient to -- to

18     identify the witness and provide disclosure to the witness

19     because --

20          THE COURT:  Well, what is he going to be testifying

21     about?

22          MR. YATES:  He's going to be testifying about

23     regulatory affairs.

24          THE COURT:  Okay.  That doesn't -- Mr. Yates, that

25     doesn't give me information.  So when you say "regulatory

————2:15-cv-01045-RFB-BNW————

1    affairs" --

2          MR. YATES:  Sure.

3          THE COURT:  -- give me an example of what you mean by

4    that?

5          MR. YATES:  Sure.  I mean, Zuffa's efforts to get MMA

6    legalized.

7          THE COURT:  Okay.

8          MR. YATES:  Sorry if I used a shorthand, Your Honor.

9          THE COURT:  Well, no, there are different types of

10   regulations.

11         MR. YATES:  Sure, that's fair.

12         THE COURT:  And so I wasn't sure -- I mean, there are

13   other regulations that Zuffa -- that were seeking to comply

14   with.  So is it just that aspect of them seeking to get

15   licensed?  And anything else?  Because that seems like that's

16   fairly straightforward, and so I'm a little confused why there

17   would be some dispute about that.

18         MR. YATES:  Oh, I think there's a big dispute.  I mean,

19   I think that part of our defense on -- on monopsony power -- and

20   this goes exact -- goes right to the jury instruction on

21   monopsony power, is that Zuffa was -- Zuffa was essentially

22   first.  It created -- it created the industry and, therefore, we

23   naturally had a first mover advantage.  But that first mover

24   advantage took a lot of effort.  And the jury should hear from

25   Mr. Ratner and others, Mr. Fertitta, Mr. White, about the

 1  efforts, the efforts to get MMA legalized, including in New York

 2  where the first MMA fight that was legal took place right at the

 3  end of the class period.

 4        THE COURT:  Okay.  And from your perspective this is

 5  information that was known as it relates to the nature of this

 6  testimony, for example, for Mr. Ratner by the plaintiffs?

 7        MR. YATES:  Your Honor, they had -- they had 20 or

 8  30,000 documents from Mr. Ratner.  They knew all about him.  And

 9  if you look at our trial brief, this is I think discussed at

10  Pages 50, 51, and continues onto 56.  But if you look at Page

11  51, Your Honor, it talk -- we quote Rule 26(e) and we quote the

12  Advisory Committee notes there which say that, you know, if

13  you -- if you -- you can make someone known during the discovery

14  process as when a witness not previously disclosed is identified

15  during the taking of a deposition.

16        So this goes far beyond someone who's identified during

17  the taking of a deposition.  This is a witness who was on the

18  plaintiffs' -- the plaintiffs' initial disclosure, which we

19  incorporated.  We expressly incorporated the plaintiffs' initial

20  disclosures, and then we produced -- we produced tens of

21  thousands of documents from that witness's files.  There can be

22  no debate that they knew all about Mr. Ratner.

23        THE COURT:  So I just want to make sure that as I go

24  through this list, is it your position that all of these

25  witnesses were known under Rule 26(e) to the plaintiffs?

—2:15-cv-01045-RFB-BNW—

1          MR. YATES:  Yes.  Absolutely.

2          THE COURT:  And of those witnesses, which of them, like

3   Mr. Ratner, had -- were referenced in a deposition and/or had

4   documents provided about them?  I want to make sure that I have

5   them.

6          MR. YATES:  So, Your Honor, we go through -- we go

7   through and discuss the witnesses in detail in our trial brief

8   at Pages 52, 53, 54, 55 --

9          THE COURT:  Hold on.  Let me pull it up.

10         MR. YATES:  -- and 56.  Yeah.  Please do.

11         (Pause.)

12         THE COURT:  And, I'm sorry, Pages 50 -- you said start

13  at 50?

14         MR. YATES:  52.  The legal argument begins I believe on

15  Page 50, Your Honor, but Your Honor was asking about witnesses

16  and the witnesses are discussed at Pages 52 through 56.

17         THE COURT:  Got it.  Hold on.

18         (Pause.)

19         THE COURT:  Okay.  Thank you, Mr. Yates.  Let me let

20  the plaintiffs respond to that.  Then I may bring you back up.

21  Thank you.

22         MR. CRAMER:  Thank you, Your Honor.

23         There are 1,200 fighters in the class.  We identified

24  123 witnesses on our disclosures.  There are dozens of managers.

25  Zuffa has dozens of employees.  And we had a limited number of

1  depositions that we were allowed to take, including a limited

2  number of Zuffa witnesses.  So we were highly constrained, and

3  what we focussed on were Zuffa's initial disclosures and other

4  disclosures during the case.  They were supposed to identify

5  those people who supported their claims and defenses.  That's

6  the entire purpose of the disclosures.

7           None --

8           THE COURT:  Well, Mr. Cramer, let me ask you this

9  question, which is there are necessarily going to be witnesses

10  on these lists for whom there are not depositions.  And the

11  parties had to make strategic choices about whom to depose and

12  whom to pursue further.  To the extent that these witnesses were

13  known and a choice was made, why would that prevent them from

14  calling these particular witnesses?  What aspect in terms of

15  their testimony --

16           MR. CRAMER:  They believe --

17           THE COURT:  -- was related to a, sort of, late enough

18  disclosure that it is prejudicial to the plaintiffs?

19           MR. CRAMER:  Well, all of these people were disclosed

20  for the first time by Zuffa more than five years after the close

21  of discovery, basically months before trial.  A third of their

22  witness list, 13 of their witnesses, were not disclosed during

23  the fact discovery period.  Zuffa should have and could have

24  disclosed them.  They did not -- they did not say what issues

25  those people were going to testify about or what they were

────2:15-cv-01045-RFB-BNW────

1  knowledgeable about.

2          THE COURT:  So let me ask you -- I'm sorry, Mr. Cramer.

3  I thought they have since done that.

4          MR. CRAMER:  Well, they did that with respect to a few

5  of those within the last month, but we don't have the ability to

6  take depositions.  Depositions are closed.  We have now a third

7  of their witnesses they -- this is trial by ambush, Your Honor.

8  They did not put any of these people on their disclosures.  We

9  took the depositions of the people that they disclosed.

10          For example, Mr. Yates says that Mr. Ratner is going to

11  testify about licensing or regulations, but he also referenced

12  Fertitta and White.  Well, those are witnesses that they put on

13  their list who are on our trial list who can testify about those

14  issues.  They should be restricted to the people that they

15  identified that we focussed on that we took the depositions of

16  because they were -- they identified these people as the people

17  who -- who they were going to use to -- for their claims and

18  defenses.

19          And Your Honor referenced a case and we cited it in our

20  brief, the *Shenwick* case, which says it 's not enough that a

21  witness is on the plaintiff's -- the opposing party's

22  disclosures.  We disclosed 123 people.  And the case says:  "To

23  now hold that the opposing party were supposed to know which of

24  these potential witnesses might be valuable to the

25  late-disclosing party and, therefore, deserving of the opposing

————2:15-cv-01045-RFB-BNW————

1  party's discovery responses would both penalize the opposing

2  party for their efforts to provide an inclusive disclosure and

3  disregard the purpose behind Rule 26.  The opposing party should

4  not have to guess which of these potential witnesses to focus

5  their energies on when the late-disclosing party knows which

6  ones are material."

7         So this is a late-disclosing party.  They know which

8  are material.  It's their duty and burden under Rule 26 to

9  disclose them.  The discovery period went on for years, and they

10  did not disclose them.

11         THE COURT:  So, Mr. Cramer, just again for the record I

12  believe you had identified.  When did you first receive

13  information about what would be the substance of their

14  testimony?

15         MR. CRAMER:  With respect to several of them, it was

16  their trial brief.  So with respect to -- they disclosed in

17  December 2023.  They disclosed eight of them.  With respect to

18  five of them, they disclosed them for the first time in their

19  trial brief.  So December 2023, meaning basically a few months

20  before trial.  That's the first time they disclosed them.

21  Discovery is closed, five years later.  This is trial by ambush.

22         We had strict deposition limits.  And it's really

23  unfair to -- we focussed our discovery on what the defendants

24  were supposed to do.  They were -- defendant was supposed to

25  tell us who was going to support their claims and defenses in

—2:15-cv-01045-RFB-BNW—

1   this case.

2           And on some of these people they even fought us about

3   even producing the documents and producing the information.  One

4   of the people -- and they're also Zuffa's employees.  They knew

5   about these people.  If these people were going to be people who

6   were -- they were going to put up at trial in this case, they

7   should have told us about them.  And now they're putting

8   managers and they're putting fighters on this list.  There are

9   1,200 fighters in the class.  If they had some that were going

10  to testify in support of Zuffa, it was incumbent upon them to

11  tell us so that we can then use the discovery period to take the

12  deposition and get the discovery.

13          Right now with respect to most of these 13, we have no

14  deposition.  We have no documents.  And we're six weeks or five

15  weeks from trial.  It's just -- it's really unfair that a third

16  of their witness list -- bless you -- is made up of people who

17  they just added at the last minute.

18          And, Your Honor, we think it's trial by ambush.  And we

19  think it's unfair and it violates the rules -- the Ninth Circuit

20  rules and Rule 26(a) and the intent of the initial disclosure

21  and the disclosure process.

22          THE COURT:  Thank you, Mr. Cramer.

23          MR. YATES:  May I respond briefly, Your Honor?

24          THE COURT:  Yes, you can, Mr. Yates.

25          So I guess my question, Mr. Yates, is, why not disclose

———2:15-cv-01045-RFB-BNW———

1  them?  I mean, there's no reason that I can see that these

2  witnesses shouldn't have been disclosed earlier.  I don't really

3  understand why you're relying upon Rule 26(e) in this context

4  when these witnesses have information that appears to be

5  straightforward and consistent with what your defense has always

6  been.  But there are -- as Mr. Cramer said, there are lots of

7  potential witnesses in this case.  You all did have a limited

8  number of depositions you could take.  So why weren't they

9  identified earlier?

10        MR. YATES:  So, Your Honor, let me just start by

11  beginning, this is not trial by ambush.  These are people that

12  they disclosed.  Mr. Cramer put them on his witness list.  They

13  asked for documents about them.  We incorporated their

14  disclosures expressly by reference.  That is disclosure.

15        But, more importantly, Rule 26(a) has to be read in

16  harmony with Rule 26(e).  They are --

17        THE COURT:  You're not actually answering my

18  question --

19        MR. YATES:  I apologize.

20        THE COURT:  -- which is just -- I appreciate what your

21  argument is.  That's why I asked Mr. Cramer those questions.

22        It seems straightforward.  Rule 26 does require

23  disclosure of witnesses which relates to their relevant

24  information.  And the reason why them identifying it isn't

25  enough, as the case law says, is they have to know why you're

─────2:15-cv-01045-RFB-BNW─────

 1  calling these witnesses because you could be calling them for a
 2  very different reason.
 3        So that doesn't change the fact that Rule 26 is fairly
 4  clear and the purpose of it is to allow for this type of
 5  information to be disclosed.  Why wasn't it disclosed?
 6        MR. YATES:  So -- because we relied on Rule 26(e), Your
 7  Honor.  Because Rule 26(e) says that if a witness is made
 8  otherwise known in discovery, then you do not need to supplement
 9  your Rule 26(a) disclosures.
10        And if Your Honor looks at the cases that begin on the
11  bottom of Page 51 of our trial brief, you got a case from the
12  District of Arizona denying motion to strike where a witness's
13  identity was included in the moving party's own responses to
14  initial -- the initial disclosures.  That's exactly what we're
15  relying on here.
16        The next case, the *Mann* case from the Central District
17  of California, they're referenced extensively in expert reports.
18  The same is true here.  These fighters are named and they're
19  named in the expert reports of Dr. Singer and Dr. Topel.
20        The *Coach* case, also from the Central District of
21  California.  The witnesses were conspicuously mentioned in
22  produced documents.  And, again, if you go back to the -- if you
23  go back to the language of Rule 26(e), even if the witness is
24  just identified in a deposition, that is sufficient disclosure.
25        And on this notion of trial by ambush, the plaintiffs

 1    took the depositions of 10 people who are not on our initial

 2    disclosures.  They went far beyond the people who are on our

 3    initial disclosures, and they disclosed Mr. Ratner or

 4    Mr. Lambert.  Mr. Lambert, he submitted a declaration in this

 5    case as part of discovery.

 6          The declaration obviously is what he's going to testify

 7    about.  But the most important thing here I think, Your Honor,

 8    you know, the managers.  Managers were disclosed on the

 9    plaintiffs' initial disclosures.

10          And they were then mentioned in discovery and they were

11    mentioned in depositions.  They were mentioned in documents that

12    were part of expert reports and the like.  And then you get the

13    fighters.  And the fighters -- they purport to represent these

14    fighters.  We can't talk to them.  So that's part of the reason

15    we can't talk to them.  There's a certified class.  We can't

16    talk to them.

17          And so -- but those fighters -- we answered dozens and

18    dozens of RFAs about the fighters.  They knew all about them.

19    They knew exactly who these people are.  And, Your Honor, this

20    trial should be about the actual facts, not the curated facts

21    from a couple of handpicked, disgruntled fighters who lost more

22    than they won.  We should be hearing from the people -- the

23    fighters of the UFC who -- who did well, and we should be

24    looking at their contracts.

25          They've also objected to close to 100 fighter contracts

─────2:15-cv-01045-RFB-BNW─────

1   saying they're hearsay or not authentic.  We'll get to that,

2   but, you know, this trial should be about what fighters actually

3   experienced, not the named plaintiffs and what they -- they

4   didn't even experience anything -- what they claimed to have

5   heard in the ether.

6            THE COURT:  Okay.  Thank you.

7            MR. YATES:  Thank you.

8            THE COURT:  Just give me a moment, Mr. Cramer.  I'm

9   just looking up one thing here.

10           (Pause.)

11           (Court conferring with law clerk.)

12           THE COURT:  So there's one thing that I want to look up

13   before I make a decision about this.  So I'm just going to defer

14   on this for now, but you'll have my answer later today.  Let's

15   move on.

16           So we have a few others here.  We also have in that

17   same -- I'm sorry -- in that same document -- we're going to go

18   back and we'll try to go back to these documents in order at

19   least as relates to them for each of the different parties.  The

20   motion in limine by Zuffa to preclude evidence of threats or

21   coercion outside of the class period or preclude evidence of

22   pre-class period acquisitions and preclude evidence of dividends

23   paid prior to the class period.

24           I'm sorry.  Who's going to be arguing this for the

25   plaintiffs?

———2:15-cv-01045-RFB-BNW———

1          MR. CRAMER:  I am.

2          THE COURT:  So I go back to this, my saying what's good

3    for the goose is good for the gander.  Are you planning on

4    offering any of this, Mr. Cramer?

5          MR. CRAMER:  Your Honor, yes.  Our case is a continuing

6    scheme that began in 2004 or 2005, and it's been that way from

7    the very beginning.  Zuffa argues --

8          THE COURT:  So hold on a second.  So let me make sure

9    in terms of what you are going to be arguing outside of the

10   class period.

11         Which aspects -- let's start with threats or coercion

12   outside of the class period and tell me exactly what the nature

13   is of what you want to be able to present on that.

14         MR. CRAMER:  What we want to be able to present is that

15   Zuffa engaged in a scheme involving contracts, acquisitions, and

16   coercion, including threats, that began in 2003 or 2004 and as a

17   scheme continued through 2017.  And Zuffa and we -- and that's a

18   continuing scheme.  And Zuffa argued on the motion to dismiss

19   that everything that happened before four year before we filed

20   should be out, and Your Honor said, no, it's a continuing

21   scheme.  The -- we're only seeking damages for the effects of

22   that scheme within the limitations period.

23         THE COURT:  So let me ask, you are you seeking anything

24   post 2000 -- to include information post 2017?

25         MR. CRAMER:  Nothing post 2017.  We are seeking to

1 include the acquisitions that Your Honor said both in the motion

2 to dismiss and the motion for summary judgment and the class

3 order were part of the continuing scheme, the contracts and the

4 coercion.  All of that built up from 2004 to 2005 through 2017.

5 And Dr. Singer studies the foreclosure share and as it rose

6 during the period -- during the acquisitions and then during the

7 period and relates that foreclosure share to a declining wage

8 share.  And that's been our case since the very beginning.

9        And this is Zuffa's effort to once again relitigate a

10 question that they've lost on the motion to dismiss, they lost

11 at class, and they lost at summary judgment.  It's a continuing

12 scheme.  Your Honor's ruled it was a continuing scheme.  We're

13 not going past 2017.  We are not seeking damages outside of the

14 class period, but we are seeking to show that there was a scheme

15 that began before the class period involving contracts and

16 coercion and acquisitions, and that scheme then had an effect

17 within the class period because it helped them maintain and grow

18 their monopsony power.  And then they used and abused that

19 monopsony power to continue the scheme during the class period

20 and then reduce the pay of the fighters.

21        And that's been our case since 2014 and Zuffa's been

22 attacking it since 2015.  Your Honor's upheld it since 2014.

23 And this is a case of if you -- you know, they're just trying to

24 make the same argument that they lost time and time again.

25        THE COURT:  I just wanted to clarify, though.  So

———2:15-cv-01045-RFB-BNW———

1  there's nothing post 2017?

2          MR. CRAMER:  Correct, nothing.

3          THE COURT:  Okay.  All right.  Thank you, Mr. Cramer.

4          MR. CHIU:  Your Honor, Aaron Chiu, Latham and Watkins.

5  I'll respond to this one.

6          Just as Mr. Cramer is up here saying that post-2017

7  evidence is not relevant to a class that is limited to from 2010

8  to 2017, as you said, what is good for the goose is good for the

9  gander.

10          THE COURT:  But there's separate issues, though, which

11  I think one is I had ruled previously about post 2017 because

12  the discovery had closed.  That's one of the reasons why I

13  wasn't allowing that.  This is not an area where there's not

14  been some discovery and discussion.

15          My other question to you is, if you're going to be

16  arguing about the durability of monopsony, how is this not

17  relevant as relates to evidence that is actually during the

18  period?  Because your experts also looked at the same period.

19  They looked at the reports.  And so this is a slightly different

20  circumstance in terms of the issue of the discovery cut-off.

21  And in particular, if you're going to be arguing about the

22  durability, why isn't this issue relevant also in terms of the

23  buildup to the -- the potential buildup to monopsony power in

24  terms of what the plaintiffs are going to be arguing?

25          MR. CHIU:  Well, if durable -- if the plaintiffs'

—2:15-cv-01045-RFB-BNW—

1   theory is that durable monopsony power -- Zuffa held durable

2   monopsony power in the class period and had the effect -- and,

3   recall, the damages they're seeking is limited to the class

4   period and the effect of that alleged monopsony power is limited

5   to that class period.  They should be able to show that within

6   the class period the -- the evidence that they have of Zuffa's

7   conduct and alleged monopsony power in the class period was

8   enough for it to exert monopsony pricing power, which is what

9   leads to the damages.

10          I will also respond on the continuing violations

11   exception.  Yes, Your Honor ruled on that at the motion to

12   dismiss stage.  That's a pleadings question at that point in

13   time.  But what the continuing violations doctrine actually

14   establishes is it allows plaintiffs to actually bring in

15   evidence and seek damages from what is actually a continuing

16   violation.

17          The case law that they cited and what they try to rely

18   on is that they try to say there was a scheme here.  Well, their

19   trial brief and what we've seen in the evidence that they intend

20   to introduce at trial does not actually establish that all of

21   these components were done in concert.  And that's why actually

22   in the case law it's very clear that, for example,

23   pre-limitations period acquisitions, the continuing violations

24   doctrine does not actually apply to acquisitions that have

25   happened long ago.

1          The *Google* case that they cite in their motion actually

2     goes against them.  That was also a pleadings stage decision.

3     And the Court there said that, "Look, the plaintiffs didn't" --

4          THE COURT:  Counsel, let me ask you this one question.

5     I guess I want to make sure I'm understanding what you would be

6     objecting to.  And, I'm sorry, it's Mister?

7          MR. CHIU:  Chiu.

8          THE COURT:  Chiu.  So, Mr. Chiu, it certainly seems to

9     me that there's some necessity of the plaintiffs, sort of, at

10    least describing the history of how Zuffa got to where it is.

11    And it doesn't sound like to me you're objecting to that.  I

12    want to try to figure out what is your objection exactly.  I

13    mean, they can't just start 2010 without talking about when

14    Zuffa was started, sort of, some history which I think would be

15    allowable.

16         Can you tell me where you think they're going to move

17    beyond that?  Because I would certainly allow that, but tell me

18    where they're going to cross the line where you feel like this

19    is more than they should be permitted to bring in.  Do you

20    understand my --

21         MR. CHIU:  Correct.  I think in our -- in our Motion in

22    Limine Number 2 we have identified examples of

23    pre-limitations -- pre-class period evidence of alleged coercion

24    and threats.  These are one-off examples of alleged threats by

25    Zuffa to fighters, conduct like that to which there is no

—2:15-cv-01045-RFB-BNW—

1   connection through other evidence as some part of overarching

2   scheme by Zuffa to amass monopsony power in those years of

3   one-off things, right.  There's no -- there's no evidence in

4   this case that, you know, there was some grand plan hatched --

5           THE COURT:  What about the contracts?  Because what I

6   want to focus on in my questioning here is about contracts and

7   the nature of the contracts.  Because that's a central part of

8   their argument.  And certainly that's a central part of why the

9   Court allowed the case to move forward was that there's at least

10  an allegation as to the restrictive nature of the contracts.

11          MR. CHIU:  The contracts, Your Honor?

12          THE COURT:  What's that?

13          MR. CHIU:  The contracts, is that --

14          THE COURT:  Yeah, the contracts.

15          MR. CHIU:  Well, I think our position would be, well,

16  if their whole theory is that these contracts and the terms are

17  so exclusive as to give Zuffa enough power to foreclose the

18  number of fighters in the marketplace, why wouldn't the

19  contracts during the class period be the most relevant to

20  establishing whether in that period Zuffa had the power and the

21  effect of that was to cause damages to the fighters?  I mean,

22  that's really -- the idea that you would need pre-limitations

23  period contracts to demonstrate the acquisition of power when

24  they can rely on the evidence of the contracts during the class

25  period --

————2:15-cv-01045-RFB-BNW————

1        THE COURT:  Well, how would they show -- Mr. Chiu, they

2   would have to be able to show to some extent, Mr. Chiu, like,

3   how they got to where they are.  I mean, again, I'm not saying

4   that I would allow for, sort of, one-off examples of coercion

5   because I'm not sure -- unless the door's opened with testimony.

6        But certainly they have to be able to argue as you all

7   are going to be able to argue, "Look, we built up this business.

8   We built it up with our acumen."  Can they say, well,

9   conversely, they built up a business and part of that was based

10  upon these contracts?  I mean, it seems to me that it would be

11  confusing to the jury as if you just start with 2010 and you are

12  sort of plopped in the middle, right --

13        MR. CHIU:  Well --

14        THE COURT:  -- of a market.  You all are going to argue

15  and I would let you argue similarly, right, "We started this

16  with a small amount of money.  We used our business acumen to

17  build it, right.  We do things uniquely and specially," right.

18  That's part of your argument which I will allow you to do for

19  that same period of time, right.  And in fact some of the

20  witnesses that you all want me to allow, right, are going to say

21  exactly that, right.

22        So why wouldn't they be able to say, well, look, as

23  part of them building up this business, it wasn't just built on

24  their acumen; it was built on other aspects of it?  I mean, if

25  I'm going to allow you to do that, why wouldn't I allow them to

———2:15-cv-01045-RFB-BNW———

1    do that as a way to oppose that argument?

2             MR. CHIU:  I think the distinction there, though, is

3    that currently the way their damages model and their expert

4    has -- their expert opinion on damages is not actually linked to

5    any of the pre-limitations period conduct, right.  They're

6    talking about contracts during the -- during the class period

7    that they say foreclosed fighter share and allowed Zuffa to

8    price super competitively to underpay fighters.  It's really

9    about the contracts and it's really -- and that is what when you

10   look at the continuing violations exception -- in true

11   continuing violations cases, what -- what a plaintiff is trying

12   to do is they're trying to say, look, there was a continuing

13   harm that started outside of the limitations period and

14   continued to cause damages and injury.

15            Here, Dr. Singer's whole model is really modeling

16   damages that flow from these so-called exclusive contracts

17   during the class period.  They're seeking class period damages.

18   There's nothing that really connects it to these one-off

19   instances of pre-limitations period conduct.

20            THE COURT:  So you don't think it's relevant if these

21   contacts were being used prior to the class period as a way to

22   build up, for example, market share?  There's a whole question

23   the jury has to deal with, sort of, the market dominance and how

24   the defendant may or may not have established that.  And so --

25   okay.

———2:15-cv-01045-RFB-BNW———

1          (Defense counsel conferring.)

2          THE COURT:  So, Mr. Chiu, my only concern is that I

3   think it would be confusing to the jury not to hear some history

4   and context.  I have to look at to what extent I would limit

5   that, but both sides are going to be arguing that from different

6   perspectives.  And it sounds as if you want them not to discuss

7   certain aspects of the use of these contracts which has been a

8   part of their argument from the beginning.  And I'm just not

9   sure how that balances with you all being able to talk about the

10  entire history of Zuffa as it develops business and the business

11  acumen used to develop the business, which, again, I'm going to

12  allow you to do that from 2004 -- from the beginning of Zuffa.

13         I will allow you to say this started wherever, maybe

14  started in the basement, however you want to describe that.  I'm

15  going to allow you to go through that.  So I'm just not sure how

16  this isn't allowing them to do something that's, sort of,

17  similar, but on the opposite side of that argument?

18         MR. CHIU:  Yeah, I mean, I think the issue comes back

19  to they are trying to introduce pre-limitations period and

20  pre-class period conduct and argue and introduce -- you know,

21  argue that that was part of this continuing anticompetitive

22  scheme.  And there's just no evidence tying that -- you know,

23  their class period damages to that conduct.  It's not only not

24  how the continuing violations exception works; it would also be

25  prejudicial.

—2:15-cv-01045-RFB-BNW—

1      I think it's a question if there's dueling evidence

2 about, oh, how did we build up our business?  Through

3 innovation, right, through business acumen.  And they want to

4 say, "Well, look, along the way there are other things that

5 we -- we dispute that," but I think where it goes too far is the

6 way they're trying to use this pre-limitations period evidence

7 and clearly saying that it's part of some grander

8 anticompetitive scheme when that would have been fine at the

9 pleading stage, but we're at trial now.  And we haven't seen any

10 evidence actually linking those what are otherwise benign acts,

11 right, threats -- alleged threats, coercion.  They are not part

12 of some grand scheme.  They haven't connected it.  Their damages

13 model --

14      THE COURT:  When you say "they haven't connected it,"

15 I'm a little confused by that because --

16      MR. CHIU:  Well, if you look at the --

17      THE COURT:  -- I mean, they've made an argument

18 throughout where they have said this was a part of the way that

19 they enforced the contract.  This is what they did --

20      MR. CHIU:  Well, saying it is a part of a scheme and

21 actually having evidence of all of these elements being taken --

22      THE COURT:  Well, I've already found that they've

23 presented cognizable evidence of their position without ruling

24 on whether that's correct or not, right.  That's not my role,

25 right.  I've already written a fairly large order that says that

—————2:15-cv-01045-RFB-BNW—————

1   there were certain tactics that were used to help reinforce

2   these restrictive contracts allegedly based upon the evidence

3   that was presented.  Why is that not -- what they're asking for

4   not consistent with that?

5          I'm trying to understand how this is different, right,

6   than what the Court found to be a pattern sufficient for the

7   case to go to trial, right, during the class period.

8          MR. CHIU:  Well, again, I think it comes back to -- and

9   I would encourage Your Honor to go back and look at, you know,

10  even the *Google* case that they cite, and if you look at the

11  continuing violations doctrine, it's really about a situation

12  where you have pre-limitations period conduct for which they're

13  seeking continuing injury and damages.  And that's not what

14  they're doing here.  This is really focussed about the

15  contracts, not the pre-limitations period, one-off acts of

16  alleged coercion, or even the acquisitions.

17         THE COURT:  Well, here's what I don't understand.  They

18  have a specific model for damages, whether or not I agree with

19  it or not, right, for the class period.  So I'm not sure how

20  you're arguing --

21         MR. CHIU:  Yeah, but those are linked to the contracts.

22         THE COURT:  What I'm saying to you is there is a

23  difference between them arguing, which I wouldn't let them

24  argue, "Well, we should be compensated for damage that occurred

25  outside the class period" versus saying "There's no doubt about

—————2:15-cv-01045-RFB-BNW—————

1   the fact that this particular alleged conduct started before the

2   class period and it continued into the class period and you can

3   see the pattern that's here."  I mean, the continuing violations

4   doctrine certainly allows that.  It doesn't allow for parties to

5   be compensated, right, for that.

6         And so I guess what I'm trying to understand is the

7   distinction that you're making between them being permitted

8   under the continuing violations doctrine to be able to point to

9   pre-class-period conduct, on the one hand, and then, on the

10  other hand, it sounds like you're saying that they're trying to

11  seek damages for that.  And if you're asking me to limit that,

12  I'm happy to do that, but I thought their model was focussed on

13  the class period.  So I'm not sure that they're seeking to use

14  that for damages outside the class period.

15        MR. CHIU:  I think you're right -- I think you're

16  right, Your Honor, that their damage -- their model is limited

17  to damages within the class period, but our point is that

18  Singer's model does not actually attempt to estimate damages

19  from the pre-limitations period acquisitions or all these things

20  they say are part of the scheme.  It's limited to the contracts.

21        And so from that perspective what they're trying to

22  do -- and that's why the continuing violations doctrine does not

23  apply here.  The continuing violations doctrine is used in cases

24  where the violation is biased nature continuing and there's

25  continue -- continues to accrue injury and damages.  And they're

2:15-cv-01045-RFB-BNW

1  trying to bootstrap prior limitations conduct so they can seek

2  damages within the limitations period.  That just doesn't apply

3  in this case because ultimately the damages they're seeking for

4  the class is limited to the period and from the contracts that

5  are in the class period.

6           THE COURT:  Okay.  Thank you.

7           MR. CHIU:  Yep.

8           THE COURT:  Mr. Cramer?

9           MR. CRAMER:  Your Honor, first of all, they are wrong

10  about Dr. Singer's model.  Dr. Singer's model uses variation

11  both before the class period between foreclosure share and wage

12  share and carries that variation through the class period.  And

13  that variation of foreclosure share and its relationship to wage

14  share begins at the beginning of the model.

15           I mean, we had discovery in this case from 2004.  We

16  have contracts back from 2004.  This case has always gone back

17  that far.  This is not a surprise.  Half of Your Honor's class

18  order is about the acquisitions and other conduct that occurred

19  in advance of the class period.

20           Zuffa is going to be arguing that Zuffa grew to be a

21  dominant force through its own ingenuity and its own great

22  promotion.  And what our case has been from the beginning is

23  that that is not true, is that there is a scheme involving

24  acquisitions, contracts, and coercion, and those three things

25  worked together.  The acquisitions -- what happened was they

1  bought the rival.  Then they took the good fighters from the

2  rival and brought them into the UFC, adding them to the UFC's

3  contracts, and then shut down the rival and then coerced those

4  people to stay within the UFC.

5        And so all three aspects of that scheme worked together

6  beginning in 2004.  And then in 2006 when they bought WEC and

7  WFA and 2008 when they bought Affliction and shut it down, and

8  then in 2010 when they bought Strikeforce and shut it down, each

9  time they took the fighters from those entities into the UFC,

10  built the contract -- put the -- increased their share of the

11  overall foreclosure, right.  And so their foreclosure share grew

12  because they would shut down a rival and add top fighters to

13  their -- to their stable of fighters.  And the foreclosure share

14  grew.  And that scheme continued from 2004 and 2005 into the

15  class period.

16        That's how Dr. Singer's model worked.  That's what he's

17  talked about since the beginning of the case, and that's been

18  our case since the beginning.  And as they recognize, Your

19  Honor's motion to dismiss already found that that was a

20  continuing scheme.  And we've proven over and over and over

21  again that that is exactly how the scheme worked as Your Honor

22  found in the class order.

23        So we're only seeking damages within the class period,

24  but Zuffa built -- our story is Zuffa built up its monopsony

25  power through contracts, coercion, and acquisitions beginning in

———2:15-cv-01045-RFB-BNW———

1   the early days and then into the class period.  And that's the

2   nature of our case.  That's what we're going to tell the jury.

3   And that's what Your Honor found in your -- in the class order.

4           Thank you.

5           THE COURT:  Well, I'm going to deny these motions as

6   relates to this information.  I'm going to allow both sides to

7   be able to bring in information as it relates to the class --

8   pre-class period.  I'm going to allow Zuffa to be able to argue

9   that it developed its position based upon its business acumen

10  and its theories of promotion.  And I'm going to allow the

11  plaintiffs to be able to argue that conversely that this was a

12  position -- a dominant market position built upon what they

13  allege are coercion, acquisition, and restrictive contracts.

14          So let's move onto Document Number 998 which relates to

15  likeness rights.  And I'm not sure if I fully appreciated what

16  it is that we're anticipating is going to come in.  And I don't

17  know, Mr. -- actually, let me hear from the plaintiffs.

18          I mean, having seen this, and I know you haven't

19  responded, but your response to that?  And who's going to be

20  arguing that?

21          (Court reporter clarification.)

22          THE COURT:  Sorry.  I was coughing.  Can you say that

23  again?

24          MR. YOUNG:  My name is Christopher Young.

25          THE COURT:  Okay.  Mr. Young, first of all, my first

─────2:15-cv-01045-RFB-BNW─────

1  question is what evidence of likeness rights are you going to be

2  producing?  Because we can potentially short-circuit this pretty

3  quickly.

4          MR. YOUNG:  Yes.  So there's a couple of episodes

5  involving likeness rights.  The most prominent of which is --

6  involve -- involves Plaintiff Jon Fitch when he was retaliated

7  against and fired by Zuffa.  When Plaintiff Fitch tried to

8  resist the imposition of a likeness identity rights clause in

9  the contract, Zuffa ended up firing Mr. Fitch, started

10 retaliating against members of his gym, AKA, and Mr. Fitch was

11 eventually reinstated once he decided to acquiesce and sign that

12 contract.

13          Now, this goes to several elements or several aspects

14 of plaintiffs' monopsony theory, mainly the contracts aspect and

15 the -- and the coercion aspect because there are elements of

16 Zuffa's exclusive contracts that do deal with identity, likeness

17 rights.  And exercise of Zuffa's power over these fighters are

18 an element --

19          THE COURT:  So, Mr. Young, one of the things I found in

20 my order was that as it related to the likeness rights, right,

21 they were -- and related to identity class, the reason I didn't

22 certify it, is these were very different types of rights and the

23 way that they operated was very different.  And I just think

24 that it would be very confusing to include likeness rights

25 contracts in this case.  I don't see how that wouldn't confuse

———2:15-cv-01045-RFB-BNW———

1  the jury because they don't operate in the same way, right.

2  They don't have the same impact and there's no class.  So why

3  would I allow that?

4       MR. YOUNG:  So, Your Honor, I would say that, you know,

5  at core this case is really about fighter compensation and how

6  fighters get paid for their services.  Now, one of the aspects

7  -- you know, for example, a layperson might understand a

8  professional athlete, not just the MMA, to be able to profit

9  from their success in professional sports is through likeness,

10  sponsorship --

11       THE COURT:  But, Mr. Young, I want to be very clear.  I

12  appreciate that, but we're at a class action.  This is not,

13  right, single individuals.  And one of the issues that I had

14  with the identity class is that these rights and how they were

15  compensated worked very differently for very different class

16  members.  So you're going to try to use this one example as a

17  way to, sort of, argue that potentially it applies to the entire

18  class when I basically found the exact opposite as it relates to

19  likeness rights.  So I'm not sure again why I would allow that

20  now.

21       MR. YOUNG:  Well, Your Honor, I would not say that

22  that's just a single episode, but really the most prominent.

23  And what this really goes towards and kind of, like, the three

24  main aspects of what plaintiffs allege to be the scheme is the

25  coercion aspect because plaintiffs -- several of the plaintiffs

1   -- in fact I think -- I believe almost all of them have had

2   episodes where they tried to capitalize on their notoriety

3   through their identity, whether it's obtaining sponsorships or

4   trying to get compensated for appearing in video games or

5   commercials, and were denied by Zuffa and retaliated against.

6           It's not just related to Plaintiff Fitch.  And I would

7   point you, Your Honor, to defendant's --

8           THE COURT:  But, Mr. Young, my concern isn't about them

9   not being able to receive compensation.  So, in other words, if

10  they want to testify that they didn't have other means of being

11  able to get compensation, fine.  But we're talking about

12  something different where you're saying Zuffa used these

13  likeness -- these likeness and identity, sort of, related

14  contracts as coercion.  That's what I'm talking about, and that

15  seems to me to be inconsistent with my prior ruling.

16          So I'm not going to limit the fighters or anyone from

17  saying, "This was our main source of income.  We didn't have

18  other sources of income.  Zuffa was able to -- for example, they

19  received money from our likeness rights.  We didn't."  They can

20  say that, but it's different to then say, "Well, I didn't sign

21  this one contract, and as a result of this -- of me not signing

22  this likeness contract, that is consistent with the types of

23  retaliation that the Court has found can be argued to the jury

24  in the bout class."  I just don't see how that's appropriate

25  here.

1          MR. YOUNG:  Let me -- let me try this one more time,

2    Your Honor, but I would argue that it really goes to how Zuffa

3    maintains exclusive control over the fighters.  You know, this

4    case is -- I'm glad Your Honor recognized this case is

5    ultimately about compensation -- fighters cannot get

6    compensation elsewhere.  Then, you know, they are even more

7    subject to the control of Zuffa.  And, you know, as Your Honor

8    recognizes, one of the common ways is to -- is these -- you

9    know, capitalizing off of your notoriety, your identity.

10          And what compounds the issue further is that these

11   are -- that Zuffa -- there's evidence in this case that Zuffa

12   exercised its control over the fighters to retaliate and coerce

13   the fighters into further control, which is what -- exactly what

14   happened to Mr. Fitch.  Mr. Fitch refused to sign his contract.

15   They retaliated not only against him and members of his gym.

16          Your Honor, I would also say that, you know -- I would

17   ask for an opportunity to fully brief this issue and, you know,

18   in the alternative I also think this might be more appropriate

19   to be dealt with in the context of trial to see what testimony

20   is actually going to be proffered at the time that it's given.

21   Because it is a little difficult to kind of speak of it in a

22   vacuum given that -- you know, besides, for example, Plaintiff

23   Fitch's testimony that we're going to be discussing which is

24   very prominent, there are other episodes that are described in

25   Zuffa's motion in limine.  And, perhaps, the more appropriate

—2:15-cv-01045-RFB-BNW—

1  course is to deal with them case by case as they come up in

2  trial.

3          THE COURT:  Okay.  Thank you, Mr. Young.

4          I'm not sure who is arguing this for defendant.

5          So, I mean, I think I asked the questions of Mr. Young

6  that I thought were appropriate.  Is there anything else you

7  wanted to add to that, Mr. Yates?

8          MR. YATES:  I don't think so, Your Honor.  I mean, this

9  is -- this would be testimony about a class that was not

10  certified.  I think it would be incredibly confusing for the

11  jury.  There would be a substantial risk that instead of -- you

12  know, we believe that Dr. Singer is wrong and his math and his

13  regressions are completely flawed and inadmissible.  We've made

14  that point.  But on the identity class you get the risk of

15  juries -- you know, a jury seizing on -- and by the way, all the

16  identity evidence is from before 2010, I think.  You know, you

17  get -- you get the risk of a jury seizing on that and disliking

18  Zuffa and awarding damages based upon that.

19          THE COURT:  And you're not really disputing, I just

20  want to make clear, Mr. Yates, a fighter, for example, being

21  able to say, "We didn't get, for example, money from this

22  particular source."  You're not talking about that.  You're

23  talking about a legal dispute over likeness rights, correct?

24          MR. YATES:  Yes, legal disputes over likeness rights.

25  If they want to say, "I think I should have gotten some more

2:15-cv-01045-RFB-BNW

1   money for this," they can say that.  I will say that it's, sort

2   of, one-off anecdotal evidence that is pretty unique to example

3   Mr. Fitch.  I'm not sure it applies class wide.  And so I've

4   got -- I just want to note that I've got real concerns about

5   that in a class action because Your Honor did not certify an

6   identity class.  And so if we get into identity evidence, I'm

7   not sure that we can really talk about that in a class

8   proceeding because the class was not certified.

9          But thank you, Your Honor.

10         THE COURT:  I appreciate that, Mr. Yates.

11         I am going to grant the motion as relates to the

12  likeness rights here.  I do find that it would be confusing to

13  the jury.  I didn't certify that class, and I don't find that

14  the disputes over these rights would be appropriate for

15  consideration by the jury.  So that motion will be granted.

16         Now, we're going to Document Number 998, the same

17  document relates to the issue of Zuffa not sharing content with

18  competitors.  Who's going to be arguing that for the plaintiffs?

19         MR. YOUNG:  Christopher Young for the plaintiffs, Your

20  Honor, if you'll just give me a moment.

21         MR. CRAMER:  Which one is 998, Your Honor?

22         THE COURT:  This is the Motion in Limine Number 6 I

23  believe that relates to motion to exclude evidence or testimony

24  related to Zuffa that clients have shared UFC video content with

25  competitors.  So that's Document 998, and it's their Motion in

———2:15-cv-01045-RFB-BNW———

1   Limine Number 6.

2          Is that you still, Mr. Young?

3          MR. YOUNG:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. YOUNG:  Unless you're sick and tired of me already,

6   Your Honor.

7          THE COURT:  So, okay.  So, Mr. Young, plaintiffs point

8   to the fact that, you know, companies are not required to

9   cooperate with their competitors.  And that's true.  So what

10  would this video be -- this particular practice be used for in

11  the context of the trial?

12         Now, I have certainly addressed in my order the issue

13  of, sort of, counter programming, right, but I'm not really sure

14  how this particular information would be used.

15         MR. YOUNG:  So in the particular -- with this type of

16  evidence, how it would come up in trial is there would be

17  certain fighters who have left the UFC's employ, left Zuffa's

18  employ, to go fight for another promotion.  And because the

19  rival promotion does not have access to the video library of

20  that fighter, they cannot use the fighter's prior fights in

21  order to promote their videos, which kind of leaves the fighter

22  and the rival promotion in a bit of a bind because they cannot

23  -- they cannot advertise this fighter who is destroying their

24  promotions, which fits into the theory because it elevates

25  Zuffa's market control vis-à-vis the fighters as well as the

—2:15-cv-01045-RFB-BNW—

1   other promotions.  It really goes towards the coercion aspect of

2   the scheme.

3          THE COURT:  And so I'll go back and look at the

4   contract.  This was a specific aspect of a contract or you're

5   arguing this was a practice that witnesses are going to be

6   testifying about?  Because --

7          MR. YOUNG:  This is a -- this is a practice.  I believe

8   this will mainly come in the context of Mr. Kutor (phonetic), if

9   it comes up at all, but -- and I'm looking over at my colleagues

10  at the table to see if I've said anything incorrectly.

11         But I do believe that this is not related specifically

12  to the fighter contracts, but it is related to other aspects of

13  the contracts and Zuffa's business practices.

14         THE COURT:  So what you're saying is what would happen

15  is that you would have fighters come in and say, "Even when we

16  left, we couldn't promote ourselves because we couldn't get

17  access to the video"?

18         MR. YOUNG:  Yes.

19         THE COURT:  And that this --

20         MR. YOUNG:  Either us or the promotion that we are now

21  signing for, we can't -- we can't have access to our fight

22  history.  We can't use that for commercials, for advertisements,

23  to -- you know, for example, to promote our next fight or

24  something.

25         THE COURT:  Okay.  I guess the concern that I have here

1   which I think the defendants have is the suggestion that somehow

2   they're required to do that, which they're not, right.  I mean,

3   it seems to me of the allegations of the scheme that may have

4   had the greatest impact on the alleged dominant market share of

5   Zuffa, this doesn't appear to be one that was actually pushed

6   really by the plaintiffs or there is a lot of evidence to

7   support this.

8          Now, there's certainly evidence to support this idea of

9   counter programming, which is different, right.  I'm just not

10  sure about this idea that somehow this was an aspect of their

11  scheme.  And in particular, Mr. Young, my concern is that a jury

12  would be confused into believing that they had to do this,

13  right.  This is different than restrictive contracts or other

14  things, right.

15         And so how would we address that particular confusion

16  or prejudice to the defendants?

17         MR. YOUNG:  So a couple of points, Your Honor.  This

18  case isn't about an anticompetitive refusal to deal, which is

19  what the *Trinko* case talks about as cited in the briefs.  So if

20  that's what we're discussing here, we would appreciate an

21  opportunity to fully brief the issues because we are sensitive

22  that they're not required to --

23         THE COURT:  So how do we address that?  Certainly

24  you're talking about this information wasn't available, but as

25  far as I know, it's not necessarily generally available anyway.

1    Like, even if they weren't engaged in these alleged aspects of

2    this, quote/unquote, scheme, right, they would never be required

3    and I don't know a case that says that that would be a, sort of,

4    touchstone of sorts of anticompetitive behavior.

5            So why would we bring this up in a way that the jury

6    might think that they had to do it when they didn't have to do?

7            MR. YOUNG:  So a couple of points in response to that,

8    Your Honor.  The most -- the easiest way would probably be

9    through an instruction.  There are form instructions that

10   describe it -- that asks the Court to instruct the jury about

11   the nature of the anticompetitive scheme.

12           You know, here, we're alleging a scheme that occurs and

13   has multiple prongs, you know, the acquisitions, the contracts,

14   and the coercion.  And this really fits into the coercion part

15   of that kind of tripartite scheme just broadly.

16           THE COURT:  Because I don't remember, Mr. Young,

17   extensive testimony about this from the fighters.  I mean, there

18   are things that they talked about as coercion.  I don't remember

19   this being actually a central pillar of the argument or the

20   experience of the fighters in this case.

21           So, again, I am concerned about the, sort of, prejudice

22   to the defendants outweighing any probative value of this

23   particular information.

24           MR. YOUNG:  So, Your Honor, I will say that, you know,

25   this is -- this is something that is extracted from the fighters

1  that this -- that Zuffa's control of the fighters' previous --
2  previous fights and the video.  What I would say is that we are
3  sensitive to the prejudice that Your Honor has recognized, but
4  we'd like an opportunity to fully brief this given that this
5  wasn't really touched upon fully in discovery as it seems to be
6  hinted at here.
7          THE COURT:  Well, here's what I will tell you.  You
8  will have to convince me why I should allow it.  I'm perfectly
9  fine with -- and I'll hear from the defendants, but I'm
10  perfectly fine with people saying we didn't have access to this
11  information so we couldn't promote ourselves, but -- I guess.
12  But, again, it seems that I -- it would be inappropriate and
13  prejudicial and misleading to somehow suggest that this was part
14  of a scheme or the scheme that's been alleged.  I don't find
15  that to be a central aspect of the scheme.  I don't find that to
16  be centrally what was discussed in terms of what was put before
17  me.
18          So I am going to grant the motion for now.  But, look,
19  as with many of these motions, as the evidence evolves, I'm
20  always open to reconsidering them, but we'll move on from there.
21  Unless the defendants want to add anything?
22          No.  Okay.
23          MR. YOUNG:  Your Honor, would Your Honor be amenable to
24  briefing on this issue if we were to submit it?
25          THE COURT:  No, I don't think we need any briefing on

——2:15-cv-01045-RFB-BNW——

1  this.  I mean, what will happen, I will tell you all this, we

2  are going to have, as you all know, another hearing on the 28th.

3  That's going to be a long, all-day affair where we just go

4  through and grind out all of this stuff.  This is just to give

5  you some sense of these rulings on these motions so we can shape

6  that argument.  Because that's going to be -- we're all going to

7  have to roll up our sleeves and just go through lists and maybe

8  that involves, sort of, depo excerpts, whatever we're going to

9  do.  That's what we'll do it then.  We'll have some expert

10 testimony, too.

11         So I don't need briefing on this.  Again, I set this

12 hearing after hearing -- after the filing of the motions to

13 avoid exactly that, Mr. Young.  We have enough briefing in this

14 case.  So I appreciate that, but no.  Thank you.

15         MR. YOUNG:  Thank you, Your Honor.

16         THE COURT:  Uh-huh.

17         So let's see.  Another aspect of this same motion,

18 which is I think Number 7, is the argument about precluding the

19 evidence about monopoly power.

20         MR. CRAMER:  Your Honor, this is another effort by

21 Zuffa to make the same argument they've lost before.  We are

22 not -- we are not going to put in evidence of monopoly power to

23 prove a monopoly claim.  We have a monopsony claim.  But as Your

24 Honor recognized in the summary judgment opinion, evidence of

25 monopoly power in this industry can bolster and support evidence

—2:15-cv-01045-RFB-BNW—

1   of monopsony power.

2          THE COURT:  So I guess this comes down to a very basic

3   question, Mr. Cramer.  Are you going to use the word "monopoly"?

4   Because I actually think there's a difference between saying

5   Zuffa dominated the output market, that they had a certain

6   control over that.  The term "monopoly" has very particular

7   meanings to people, even I think lay people.

8          Is it your intention to use that term?  Because I would

9   be a little more concerned about the use of the term than about

10  the description of what it represents.

11         MR. CRAMER:  Well, Dr. Singer in his report uses

12  monopoly power, not necessarily monopoly, monopoly power or

13  market power in the output market.  He defines an output market.

14  He shows Zuffa has over 90 percent of the output market.

15         THE COURT:  Okay.  But, Mr. Cramer, I guess I'll go

16  back to my question.

17         MR. CRAMER:  Yes.

18         THE COURT:  Is the presentation of evidence depending

19  upon use of that particular term?

20         MR. CRAMER:  Does it depend on that?  No, he can use

21  market power instead of monopoly power, but the concept is

22  important because, as Dr. Topel admitted, in this industry if

23  you have a monopoly on the output market, the market for putting

24  on an MMA events, then you have a monopsony in the input market.

25  They're related.

————2:15-cv-01045-RFB-BNW————

1          THE COURT:  I'm concerned about the confusion -- look,

2     this is a complicated case as it is, right, between the experts

3     who don't agree upon a lot of things.  I'm concerned about the

4     use of the term as relates to monopoly power.  I agree that

5     this -- that's not the argument you're putting forth.  And

6     certainly I had put it in my own order that the monopoly power

7     that was exercised allegedly by defendants in the output market

8     be enforced, right, and augmented its monopsony power allegedly,

9     right, and that's fine.

10          I'm just trying to figure out, sort of, how it would be

11     presented.  Let me hear from the defendants, then I might bring

12     you back up.

13          THE COURT:  Let's see.  Is it Ms. Phillips?

14          MS. PHILLIPS:  Phillips.  Yep.  Good afternoon, Your

15     Honor.

16          THE COURT:  So, Ms. Phillips, in my order I talk about

17     there's been sufficient evidence of Zuffa's alleged dominance in

18     the output market reinforcing its monopsony power.  If we do

19     away with the use of the term, how is that not consistent with

20     what I've already written about?

21          MS. PHILLIPS:  Sure.  I think -- I mean, the standard

22     is different, right.  You were talking about summary judgment.

23     Here, we are talking about what can come into evidence.  So

24     we're talking about relevance for 402.  We're talking about

25     prejudice for 403, right.  Completely different standard from

1  what you already considered.

2       So I agree with you.  You started off I think at the

3  403 place, which is that the jury, which is not going to receive

4  any jury instructions whatsoever on a monopoly, they're not

5  going to hear, right, any evidence from fact witnesses about a

6  monopoly.  That's going to be incredibly confusing to them to

7  all of a sudden hear some references to monopoly power.

8       THE COURT:  So what if we just get rid of the term?  I

9  mean, I do think there's been sufficient evidence, relevant

10  evidence, of how the alleged dominant market share of Zuffa in

11  the output market augmented its monopsony power.  So if I simply

12  direct the plaintiffs and experts not to talk about or use the

13  term, I should say, not to use the term "monopoly" in the

14  context of talking about dominant market position and the output

15  market, how does that not address the issue?

16       MS. PHILLIPS:  Sure.  I mean, I think at the end of the

17  day I don't know of any Section II case that says where a

18  monopoly plaintiff was allowed to put forth evidence of monopoly

19  power for the sole purpose of proving monopsony power.

20       THE COURT:  Right, but I've already found that.  So

21  I've already made the determination that they've presented

22  evidence that their experts talked about how that helps to

23  augment their monopsony power.  So I've ruled on that part of

24  it.  But I also understand the concern about the confusion about

25  the type of claim they're presenting.

—2:15-cv-01045-RFB-BNW—

1          So I go back to why wouldn't this be addressed by

2   simply eliminating the term.  Because it sounds like you're

3   asking me to exclude evidence that essentially I actually used

4   in my own summary judgment -- I'm sorry -- my certification

5   order and also incorporated in my summary judgment order.  Why

6   would I change that now?

7          MS. PHILLIPS:  Well, because, again, I still think at

8   the end of the day they originally brought a monopoly power

9   argument, right, or a monopoly argument.  That has since been

10  abandoned.  We're talking about monopsony.  That is the

11  evidence.  Monopsony power is what is relevant here.  And that's

12  what we should focus on.

13         Otherwise, we're going to get into -- right, if they're

14  talking about monopoly power, they're talking about venues and

15  sponsorships.  They're talking about all of these things that

16  we're going to have to get into at trial, and the jury's going

17  to be incredibly confused.  Why are we talking about those

18  things when the argument is the fight for fighter services,

19  right?

20         So I think at the end of the day it's an incredibly --

21  we still believe it's irrelevant, and it will also be incredibly

22  confusing to the jury to hear evidence of this.

23         THE COURT:  So why wouldn't we then just limit the

24  extent of how they talk about this monopoly power?  Because in

25  my ruling as it relates to the certification, I was specifically

—2:15-cv-01045-RFB-BNW—

1  focussed on the expert testimony that opined that that market

2  power augmented the monopsony power.  And I found that to be

3  sufficiently presented that would be -- that can go -- the case

4  can go forward and that the case -- that can go to the jury.

5       So if your concern is about, sort of, a mini trial as

6  it relates to establishing that, we can deal with that in terms

7  of limitation of the evidence that comes in.  So I'm going to

8  allow some portion of that because I found that in my

9  certification order.  If you want to present, and maybe we do

10 this on the 28th, some further argument about what should be the

11 extent of that, I'm happy to consider that because I don't want

12 us to get into a claim about them establishing a monopoly power

13 because I would agree with you that would be confusing and

14 irrelevant.  And I am happy to limit that to the area that I

15 found that they had presented, which is Dr. Singer's argument

16 about that power augmenting the monopsony power.

17       So we can have a further discuss about that --

18       MS. PHILLIPS:  Okay.

19       THE COURT:  -- but I agree with you that I don't think

20 that we need to have a full mini trial, and we shouldn't, about

21 whether or not Zuffa technically, quote/unquote, had a monopoly,

22 one, because that claim has been abandoned, but also it would be

23 very confusing to the jury.

24       So I'll hear from the plaintiffs, but I think we need

25 to come back and sort of clarify this at our March 28th hearing.

————2:15-cv-01045-RFB-BNW————

 1  And I would ask you, Ms. Phillips, to think about what you --

 2  where do you think the line should be.

 3          MS. PHILLIPS:  Okay.  Appreciate it.  Thank you, Your

 4  Honor.

 5          MR. CRAMER:  Your Honor, briefly.  We do not intend to

 6  talk about the monopoly over venues and sponsors.  As Your Honor

 7  knows, Dr. Singer focussed on Zuffa's dominance monopoly power

 8  in the market for live MMA events.  And we showed --

 9          THE COURT:  So how would he talk -- I mean, I've read

10  the -- how is he going to talk about it?  I mean, it's one thing

11  for you to say that to me, but when he gets on the stand, he's

12  going to say a little bit more than that.

13          MR. CRAMER:  Yeah.

14          THE COURT:  And he'll have to, Mr. Cramer --

15          MR. CRAMER:  Right.  So --

16          THE COURT:  -- in order to explain that to the jury.

17          MR. CRAMER:  Right.  So he'll talk about the share that

18  they had, and that that share -- when you have a dominant share

19  of the output market, that bolsters and supplements your power

20  in the input market.  It bolsters your monopsony power.  Because

21  if you're putting on most of the shows with all of the highly

22  ranked fighters, that's where all of the fighters want to go.

23  And that's what Dr. Topel admitted.  Their expert admitted that

24  this is an industry where if you have monopoly power, you also

25  have monopsony power.

—2:15-cv-01045-RFB-BNW—

1          And that's what we're going to talk about, the

2   relationship between the two.  We do not intend to put on a

3   monopoly case.  We tend to put on a monopsony case, but as Your

4   Honor recognized, monopoly power is relevant to the monopsony

5   case.

6          THE COURT:  Okay.  Thank you.

7          Ms. Phillips, I will say this to you because I -- what

8   I actually anticipate is you may actually want to put on more

9   about monopoly power than plaintiffs do, in part, to dispute

10  what they're saying.  So when we come back on the 28th, I want

11  you to also think about that.  Because I would anticipate what

12  you may want to come in and say is we actually didn't have

13  monopoly power, and you have to -- you have to be able to prove

14  that.

15         MS. PHILLIPS:  That's why they abandoned the claim

16  because they didn't develop any evidence of the monopoly power.

17         THE COURT:  Right.

18         Mr. Cramer, you don't need to respond to that.  We're

19  not in trial yet.

20         But I'm saying that to you, Ms. Phillips, because I

21  actually think the party that's going to be presenting more on

22  monopoly power indirectly most likely would be Zuffa

23  specifically to contest the argument.  And so I'm saying that to

24  you because what I don't want to have happen is they are

25  limited, and then you come in and then you present all of this

—2:15-cv-01045-RFB-BNW—

1  evidence which they didn't know you were going to present.  And

2  then we have to bring Dr. Singer back.

3          And so what I want you to think about is how you want

4  to be able to argue that.  I'm going to allow the plaintiffs to

5  talk about dominant market share without using the term

6  "monopoly" in terms of its impact on monopsony power.

7          And so I would anticipate that Zuffa's going to want to

8  argue, one, that that's not true even if there is such dominant

9  market share, but we also didn't have it and here's our evidence

10  that we didn't have it.  And I want you to be able to come back

11  and tell me about that because that to me is where there may be

12  a little bit more back and forth.  Okay?

13          MS. PHILLIPS:  Thank you, Your Honor.

14          THE COURT:  All right.

15          Let's move on.  So basically I'm, sort of, denying that

16  motion in part and granting it in part for the reasons I've

17  stated.

18          Let's talk about Zuffa's other portion, this is the

19  next portion of that same document, which is the motion

20  regarding Zuffa's prior litigation and related legal, sort of,

21  conduct.  Excuse me.

22          And I first want to -- yes, Mr. Cramer?  Are you going

23  to be arguing this?

24          MR. CRAMER:  I would just ask, given that there's some

25  First Amendment issues in there, that we be able to brief this

───────2:15-cv-01045-RFB-BNW───────

 1  issue.

 2          THE COURT:  Well, what would be helpful for me,

 3  Mr. Cramer, the reason why I also am doing this now is to get a

 4  sense of what is it that you're going to be presenting because

 5  it also helps me to prepare.  What would you anticipate, right,

 6  that you would present in terms of prior litigation?

 7          Because, first, I could see the door being opened by a

 8  host of different witnesses potentially by Zuffa just in terms

 9  of the history of the organization.  But that still would

10  present an issue of what is it you are trying to bring up.

11          (Plaintiffs' counsel conferring.)

12          MR. CRAMER:  I'm going to let Mr. Madden answer this

13  question.

14          THE COURT:  Oh, there you go.

15          So, Mr. Madden, what is it you would want to bring up

16  exactly so that helps me to figure this out.

17          MR. MADDEN:  Sure.  So some of the testimony in the

18  case concerns litigation that Zuffa brought against competitors.

19  I know that they sued the International Fight League, the IFL.

20  There was testimony from the IFL's -- I believe his title was

21  president, Kurt Otto, about how that litigation impaired his

22  promotion and ultimately --

23          THE COURT:  So, Mr. Madden, my concern about litigation

24  like this is there are a whole host of reasons that parties may

25  engage in litigation, and they're entitled to do it.  It's no

1    different than my concerns about the issue about the likeness

2    rights.

3          A contract dispute or a dispute about potentially

4    infringing upon whatever rights that Zuffa may have had with a

5    particular athlete or with a particular partner can be construed

6    as part of a scheme, right, and anticompetitive.

7          This, again, is not an aspect of the plaintiffs' case

8    that I saw that there was major support for in terms of the

9    certification or the arguments present related to the scheme.

10   So I'm not sure how there isn't going to be the same issue as it

11   relates to, sort of, prejudice and confusion to the jury, in

12   part, because then we have to get into whether or not the

13   litigation was actually about the alleged scheme.

14         They're going to argue, whether or not I agree with

15   them or not, "Each time we had an independent legal basis to

16   bring litigation."  Then what do we do?  We're in a situation

17   where now you're arguing to this the jury, "In fact, no, this is

18   part of the scheme," and now we have to get into the particular

19   litigation.  And that's completely, to me, confusing to the

20   jury.  And I don't find it to be at that point particularly

21   relevant to the alleged scheme.

22         So why would I let this in?

23         MR. MADDEN:  So the scheme's purpose is to impair

24   rivals and ultimately corner the market, right.  And so what we

25   would introduce it for is as further evidence of the willful

1    acquisition and maintenance of the monopoly or, excuse me,

2    monopsony, recognizing the problems that we just had.

3           And while I recognize that there are a lot of technical

4    issues, First Amendment issues, that's why we're asking to brief

5    this particular --

6           THE COURT:  Yes, but what I'm -- from my standpoint,

7    Mr. Madden, it would be different if, for example, Zuffa had a

8    standard complaint it filed every single time.  And you were

9    going to argue to the jury, "Every time a competitor went into a

10   the market they filed this exact case."  That's actually not

11   what you're arguing here.  You have different cases that have

12   different issues.

13          How is that part of a pattern, right, that can easily

14   be discerned by the jury that wouldn't be confusing to them?

15   Right, because they're entitled to do that.  How is the jury

16   supposed to figure out this is part of a pattern or practice

17   versus a scheme when in fact, I mean, most of us couldn't figure

18   it out and it's not as clear, for example, as the, sort of,

19   alleged argument that we would match people with certain types

20   of fighters as a way to coerce contracts?  That's a fairly

21   straightforward argument.  You know, whether it's true or not,

22   that's a fairly straightforward argument.

23          This seems to me to be incredibly confusing.  I'm not

24   sure how you would get out of that.  How do you get out of that?

25          MR. MADDEN:  Yeah.  Our claim is that Zuffa went to

2:15-cv-01045-RFB-BNW

1   starve its rivals of things that they needed, and one of those

2   things that they needed was capital.  And in this particular

3   situation with the IFL, their lawsuits starved them of capital.

4   And that along with the other aspects of the scheme ultimately

5   put the IFL under.  And so our position would be that we should

6   be permitted to introduce evidence of the ways that Zuffa

7   starved its rivals of the things that they needed to compete

8   with Zuffa.

9           THE COURT:  Okay.  Thank you, Mr. Madden.

10          MR. MADDEN:  Thank you.

11          THE COURT:  I'm not sure who's going to argue this

12  for --

13          MR. JOHNSON:  I will, Your Honor.

14          THE COURT:  Okay.  Mr., who is that, Johnson?

15          MR. JOHNSON:  Yes, David Johnson for Zuffa.

16          THE COURT:  Uh-huh.

17          MR. JOHNSON:  Good afternoon, Your Honor.

18          THE COURT:  Good afternoon.

19          MR. JOHNSON:  Your Honor, I think as you have

20  identified, this is a clear-cut motion for defendants here.

21  It's the *Noerr-Pennington* doctrine.  It directly prohibits them

22  from using this evidence for the exact theory of relevance that

23  Mr. Madden just articulated.  As Your Honor noted, we are

24  entitled to bring these lawsuits.  Thus, we cannot have an

25  adverse inference drawn against us for having brought them.  And

─2:15-cv-01045-RFB-BNW─

1   that's the end of it under 401.

2          Your Honor already identified the incredible unfair

3   prejudice that would also result.  It would be confusing to the

4   jury, misleading.  It would result in a complete waste of time

5   to have a trial within a trial about prior trials that happened

6   in or trial lawsuits that were brought in 2006, 2008.  That's

7   mostly what they're talking about with this International Fight

8   League dispute that Mr. Madden mentioned.

9          So it shouldn't come in.  It cannot come in under

10  *Noerr-Pennington,* and 403 says that it shouldn't as well.

11         THE COURT:  Thank you.

12         MR. JOHNSON:  Thanks, Your Honor.

13         THE COURT:  I agree with that.  I am going to grant

14  this motion.  I think that in this case it will be confusing to

15  the jury and I think it would be prejudicial unfairly to the

16  defendants.  And I think on those bases alone this type of

17  evidence should be precluded.

18         Now, we move onto a new document, Document Number 992.

19         There are a couple of issues here, and I will tell you

20  I am inclined to leave these until the 28th.  Partly, these are

21  very specific issues as it relates to references to aspects of

22  Dr. Singer's report.  But I did have a couple of questions.

23         Who's going to be arguing this for Zuffa?

24         MR. CHIU:  I will be, Your Honor.

25         THE COURT:  Okay.

————2:15-cv-01045-RFB-BNW————

1          Mr. Chiu, I just want to make sure -- and I'm pulling

2    up the document again.

3          MR. CHIU:  And this is the Motion in Limine Number 9?

4          THE COURT:  Yes.

5          Well, there's -- well, there's some related issues.

6          MR. CHIU:  Yeah.

7          THE COURT:  So there's 9, 10, and 11.  But I want to

8    focus mostly on 9 and 10 for now.

9          MR. CHIU:  Okay.

10          THE COURT:  Because these seem to be arguments about,

11    sort of, what terms can be used --

12          MR. CHIU:  Right, I think --

13          THE COURT:  -- or you're talking about arguments?

14    Because the one seems to be just like the term foreclosure

15    share.  Maybe I'm missing something.

16          MR. CHIU:  Correct.  So Motion in Limine Number 9 is

17    really about precluding Dr. Singer from using the term

18    "foreclosure share."  Obviously we had a fight about the

19    admissibility of his analysis.  We lost that, and we're not

20    disputing that.  But really this is about the use of the term

21    "foreclosure share" because that's actually a legal element of

22    the claim, with respect to the exclusive contracts, whether

23    they -- the exclusivity of the multi-bout contracts amounted to

24    an anticompetitive -- you know, caused harm to competition and

25    was an antitrust violation.  The jury instruction on exclusive

1  dealing has the legal term "foreclosure."  That is something the

2  jury has to find so --

3       THE COURT:  So, Mr. Chiu, I guess what I would say to

4  you, which is what I said earlier, which is I anticipate

5  particularly coming back on the 28th having a conversation with

6  you all about the jury instruction to the jury about expert

7  opinion versus what are the legal requirements of the claim.

8  Because this is going -- this particular argument is going to

9  come up all the time, right, because the experts are going to

10  essentially, as they're allowed to, opine on certain aspects of

11  the elements of the claim.  And so we're going to have to figure

12  a way that we explain to the jury however they explain that or

13  whatever their opinion is, whatever terms they use, ultimately

14  it's the province of the jury to determine whether or not

15  there's been evidence presented one way or another to the

16  appropriate standard of the particular element of the claim.

17       Why wouldn't that address this type of an issue for

18  Dr. Singer's report?

19       MR. CHIU:  I think the fact of having plaintiffs'

20  expert say over and over again the term "foreclosure share" in

21  presenting his opinion is essentially opining on the legal

22  conclusion, right, because that's what the jury has to find.  He

23  can present his model and his evidence and say, "Look, what is

24  foreclosure share, is a formula."  He calculated foreclosure

25  share by looking at, you know, the number of Zuffa athletes

─────────2:15-cv-01045-RFB-BNW─────────

1   by -- you know, weighted by --

2        THE COURT:  So what term should he use, Mr. Chiu?  I

3   mean, if he doesn't use that term --

4        MR. CHIU:  He can say percentages.  He can say, "Look,

5   by virtue" --

6        THE COURT:  But it's not a percentage.  That's the

7   thing.  It's --

8        MR. CHIU:  The foreclosure share is a percentage.  He

9   says it's 90 percent.

10       THE COURT:  Okay, but it's not simply percentage.  It

11  is a -- it is a part of his regression analysis.  So it's

12  related to a percentage in terms of what percentage of the

13  market is foreclosed, but it allegedly captures more than that.

14  I'm just trying to think of how he would describe it because I

15  don't think percentage actually is accurate and I think it may

16  be confusing.  So I'm just trying to think of another way that

17  you would propose --

18       MR. CHIU:  Yeah, I mean, I think this is very similar

19  to kind of another issue we were discussing earlier which is the

20  issue of durable monopsony power, for example.

21       THE COURT:  Right.

22       MR. CHIU:  That's a situation where, you know, it would

23  be a similar situation if we had an expert actually saying to

24  the jury over and over again, you know, X party had durable

25  monopsony power.  Actually what goes under that actual economic

——2:15-cv-01045-RFB-BNW——

1   evidence looking at market shares, looking at elements of

2   conduct.

3           THE COURT:  So here's what I think we're going to do

4   because this has brought up something that I think we need to

5   work out, and we're going to come back on the 28th, as you know.

6   I want you all to first meet and confer about this.  I want you

7   to come up with, one, for that particular hearing, right, terms

8   or phrases that you think might be used that you think are too

9   close to a jury instruction where we need to have some way of

10  addressing that.

11          I don't want to do -- I mean, we're going to have to do

12  this individually, but I don't want to do this with just this

13  one back and forth.

14          MR. CHIU:  Fair enough.

15          THE COURT:  This is going to come up all of the time

16  because these experts are saying things that are both stated in

17  terms of aspects of the jury instruction, and we need to figure

18  a way to do this.  And so what I'm going to ask you all to do is

19  by that date -- and we'll have to do it before that date.

20          Let's see.  Get it to me by the 22nd of March.  This is

21  just for the experts, aspects of the reports where -- again,

22  terms.  I don't want you to go through -- I don't want this to

23  be a whole discussion about the legitimacy of the theories.

24  We've already been down that road.

25          MR. CHIU:  No, that's not what this is going to be.

1          THE COURT:  Right.  Monopoly, right, foreclosure.

2  Like, there are going to be terms that they use in their reports

3  that may be objectionable to either side as potentially

4  eclipsing the, sort of, province of the jury.

5          MR. CHIU:  Correct.

6          THE COURT:  And so I want you all to help me figure out

7  where that is going to come up before we get into it where we're

8  not having to do that at the trial.

9          MR. CHIU:  So, Your Honor, just one point on that.  I

10  don't have the precise schedule in front of me.  Would it

11  benefit the Court for us to have submitted proposed jury

12  instructions?  Because a lot of this I think dovetails with

13  that, which is --

14          THE COURT:  Yes, I think that's right.  I'm going to

15  look at that.  I was about to pull that up.  So thank you,

16  Mr. Chiu, because it would be great to work out the jury

17  instructions, actually, on the 28th because I think in this case

18  the jury instructions will obviously be significant, as they are

19  in every case, but particularly in this case as relates to

20  understanding the experts' testimony.

21          MR. CHIU:  Just so we're not briefing this in a vacuum

22  because this dovetails with that.

23          THE COURT:  I have to pull this up, our schedule,

24  again.

25          And if anyone knows the date, you can just yell it out

———2:15-cv-01045-RFB-BNW———

1  because I'm trying to look for the ... jury instruction

2  deadlines.

3           We have that order.  Where is the order?

4           MR. YATES:  Your Honor?

5           THE COURT:  Yes.

6           MR. YATES:  You said yell out, so I'll yell out.

7           THE COURT:  Yes.

8           MR. YATES:  And I -- I got this from Ms. Phillips, so I

9  should probably let her yell out.  But we're supposed to

10 exchange with the plaintiffs, I believe, by March 12th and then

11 submit to the Court on April 1st.

12          THE COURT:  Oh, so we need to -- I think we should

13 probably step that up.  Because I think, honestly, this is going

14 to be something where you all are going to want to have a lot of

15 time back and forth.

16          And so you all are going to exchange on March 12th.

17 Then on April 1st you are going to submit something to me.  And

18 I know you all have a lot of work to do, but you're going to

19 have to do that before the hearing.  So I'm going to move that

20 date from -- up a week from the 1st to March 25th.

21          MR. SAVERI:  I'm sorry.  March 25, Your Honor?

22          THE COURT:  Yes.  Two-five, 25th.

23          MR. YOUNG:  Monday.

24          THE COURT:  Okay.  Because I agree with you, Mr. Chiu,

25 there are going to be a whole group of terms or things we're

———2:15-cv-01045-RFB-BNW———

1  going to have a discussion about, and I want to work that out.

2  And we can talk about it then.

3         MR. CHIU:  Okay.

4         THE COURT:  Mr. Cramer, are you going to add something?

5         MR. CRAMER:  I did just want to comment on this

6  project, if I may.

7         THE COURT:  Yes.

8         MR. CRAMER:  So, as Your Honor knows, in antitrust and

9  antitrust economics there's a lot of overlap, right.  So the

10 jury instructions are going to have relevant market.  The

11 experts are going to talk about relevant market.  It's going to

12 be monopsony power.  The experts are going to talk about

13 monopsony power.  Dr. Topel is going to talk about

14 procompetitive justifications.  We're going to be talking about

15 anticompetitive effects.

16        I do think it would be quite confusing to the jury if

17 we're making up terms that our economists are going to use,

18 economic terms, that are different from the economic terms in

19 the jury instructions.  I think that's going to lead to a lot of

20 confusion.

21        In my experience in antitrust cases, foreclosure share

22 is an economic term.  They're going to cross-examine on

23 foreclosure share --

24        THE COURT:  No, I think, Mr. Cramer, my concern is if

25 the expert's using the term differently.  We have to be very

 1   careful that what the experts don't do is redefine aspects of

 2   the instructions, right.

 3          And so I agree monopsony power is going to be used, but

 4   ultimately I'm the one who tells them what that means.  And we

 5   have to be mindful of the fact that if an expert starts to veer

 6   into an area where it sounds like they're saying you can't have

 7   monopsony power -- this is one of the things that, for example,

 8   in terms of durable, sort of, market power that I would get

 9   concerned about from both sides.

10          Zuffa wants to be able to say, "Look, we increased the

11   absolute value -- absolute number of events."  There's no

12   dispute about that.  And you can't show monopsony power, right,

13   or durable power in the market, right, as it relates to certain

14   aspects unless you're showing the restriction of certain aspects

15   of output, including events and the number of fighters and what

16   they could fight in.  There are absolute increases to that.

17          Well, right, Dr. Singer is going to argue, "Well, yes,

18   but the level of the increases is not what it should have been

19   based upon what would be a competitive market."  We have to come

20   up with a way that we give the juries either instructions or

21   help them understand that when the experts use a term, right,

22   that that is not defining what the legal -- well, the factual

23   determination by the jury using the Court's definition.

24          MR. CRAMER:  So I think that is a good idea if we come

25   up with an instruction that advises the jury that every -- that

—2:15-cv-01045-RFB-BNW—

1    an economist might use a term differently than the jury

2    instructions or the law requires.  I just think it would be very

3    difficult and confusing if the economists can't talk about the

4    things that they normally talk about --

5         THE COURT:  No, I'm not saying that, Mr. Cramer.  What

6    I am saying is that there may be -- I didn't want to go through

7    each of their reports and have each of you come in here, right,

8    a week before trial and say, "We have 20 different ways they

9    talk about this that we disagree with."  What we're going to do

10   is we're going to look through the instruction, we're going to

11   talk about the reports on the 28th, and go through that.

12        But if there are particular phrasings of things,

13   right -- so in this case defendants object to this term

14   "foreclosure share" because they think that it may improperly or

15   inappropriately to -- inappropriately discuss a particular

16   aspect of what the jury has to determine.  I want to know about

17   that, Mr. Cramer, ahead of time.  I don't want to be hit with

18   all of these things when we're in trial.  We have time to be

19   able to work through these issues.

20        So it 's not that I wouldn't anticipate that there's

21   going to be some overlap; it's that I don't want to take a half

22   a day in the middle of the trial to work through this when we

23   could have worked through it previously.

24        MR. CRAMER:  Fair enough.

25        THE COURT:  And so I'm not going to say their experts

1   have to go back and do a word replace for all of the terms that

2   are going to be in the jury instructions.

3            MR. CRAMER:  Right.  Okay.

4            THE COURT:  That would be absurd.  It wouldn't work.

5   I'm not suggesting that.  But there may be ways, Mr. Cramer,

6   that the experts describe things in a very different way, right,

7   than the jury instructions are going to describe them, and they

8   need to know how to resolve that conflict when it occurs at the

9   trial.  And that's what I want to work out, how we're going to

10  go about doing that.  Because you're absolutely right.  It's

11  going to be -- there are going to be a lot of terms, and there's

12  going to be a lot of overlap.  But the jury needs to understand

13  that ultimately they have to follow the Court's instructions and

14  they have to know how to resolve that when it occurs.

15           And there may be instructions that I give to each of

16  you as relates to your experts to say, "You can opine about

17  this, but we want to be very careful about how we describe

18  things," right.  You know, for example, one of the things I get

19  worried about from either side an expert saying, "Well,

20  economics simply doesn't recognize this as a monopsony."  And I

21  am going to say, "That's not really what we're here, right, to

22  decide.  You follow the instructions of the Court as it relates

23  to how that term is defined," right.

24           Not to say that that's not evidence that can be used as

25  it relates to the definition, but the definition of monopsony

─────2:15-cv-01045-RFB-BNW─────

1   will be the definition of monopsony that the Court gives them

2   instructions on.  But that's, for example, something we have to

3   describe.

4          The experts may come in and say, "You have to have this

5   percent for there to be an monopsony, this percentage of

6   control."  We have to figure a way to work through that, right.

7   And I think that's what we need to do on the 28th.  So I'm just

8   putting you all on notice of that particular issue because I

9   fully anticipate you all are going to in trial jump up and say,

10  "Your Honor, he's invading the province of the jury because he's

11  saying or the Court because he's describing what is required

12  legally for a monopsony, and that's not true."  So that's what I

13  want this to be about, Mr. Cramer.

14         MR. CRAMER:  Thank you, Your Honor.

15         THE COURT:  Okay.

16         Any questions about that from the defense?  I know,

17  Mr. Chiu, you were up here, but any questions about that?

18  Because I think that's going to be a real sticky issue that we

19  need to work out ahead of time.  And, again, we'll have the jury

20  instructions on the 25th, but we've been going at this for a

21  minute.  You know, I want to give people a break because we

22  still have a little bit of work to do, which is why we're all

23  here.  So why don't we take a five or 10-minute recess.

24         The other thing I wanted you all to do is, if you don't

25  have a copy, your jury questionnaires.  I have a copy of the

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

1   jury questionnaire.  I may have a few questions about that.  We

2   intend to send the jury questionnaires out at the end of this

3   week.  And so I may have some questions about some of the

4   questions that are in that questionnaire.  So we're going to

5   look at that today, too.  So I'd ask you to print that out and

6   just have a copy of it, whoever is responsible for that, because

7   I may ask you some questions about that, not a lot.  But I just

8   want to give you all a little bit of a heads-up about that.

9   Okay?

10          All right.  Any other questions before we take our

11  break?  So we'll say we'll give it about 15 minutes.  We'll come

12  about 3:10.

13          MR. CRAMER:  Your Honor?

14          THE COURT:  Yes.

15          MR. CRAMER:  I hesitate to ask, but do you have an

16  outline of the next things you want to cover so we can --

17          THE COURT:  I'm taking these motions in limine in -- I

18  tried to take them, although the document numbers aren't exact,

19  in the number.  So we're going to go through all of Zuffa's

20  motions, and then I'm going to turn to plaintiffs' motions.  So

21  I will just tell you now, if you want to know the numbers, I'll

22  give them to you, if that helps.

23          MR. CRAMER:  Okay.

24          THE COURT:  We just did 992.  So then we'll do 994.  We

25  already did the witness -- so that I think would be the end.  Is

—2:15-cv-01045-RFB-BNW—

 1  that going to be the end?  I think that's the end of Zuffa's

 2  motions in limine.  Then for the plaintiffs we did 993 already,

 3  and we'll do 995.  I think we've discussed 996, but we may

 4  review that.  And we'll do 997, 999, and 1000, 1001, 1002, 1003,

 5  in that order.

 6          Okay?  All right.  We will be adjourned.  Thank you.

 7          (Recess taken at 2:58 p.m.)

 8          (Resumed at 3:19 p.m.)

 9          THE COURT:  Okay.  We're back on the record here.

10          Let me say this first.  I'm going to grant the

11  plaintiffs' motion to exclude the witnesses who are not

12  disclosed prior, the 13 witnesses who are on the list.  I find

13  in this case that there is not a sufficient basis for why they

14  weren't properly disclosed pursuant to Rule 26, that it would be

15  prejudicial at this point in time to do so, that not having

16  identified them and the information by which they were

17  testifying puts the plaintiffs at a substantial advantage [sic]

18  if they were permitted to testify.  So they will be excluded

19  from this trial.

20          All right.  Let's move onto the next number.

21          So we hadn't actually addressed Motion in Limine Number

22  11 which related to Professor Singer testifying about promotion

23  capabilities, but that is again something we're going to address

24  at the March 28th hearing so I will leave that for then.

25          And then there's Document 994.  There's Motions 12 and

—2:15-cv-01045-RFB-BNW—

1    13.  Who's going to be arguing those for the plaintiffs?

2           MR. SAVERI:  Good afternoon, Your Honor.  Joseph

3    Saveri.  I'm handling 994.

4           THE COURT:  So I guess my question -- I'm sorry.  Is it

5    Saveri?

6           MR. SAVERI:  It's Saveri.

7           THE COURT:  Saveri.  Mr. Saveri, there's a difference

8    between these witnesses testifying to what they understood

9    versus what they heard and what was commonly believed.  And so,

10   I mean, it's I think a significant difference.  I think

11   certainly witnesses could say, "My understanding of the

12   situation was that these negotiations occurred in a particular

13   way and that's how that happened."

14          And so what would you be seeking to have these

15   witnesses testify beyond that?

16          MR. SAVERI:  Well, Your Honor, there are -- within the

17   scope of the motion there -- it's generally a hearsay -- a

18   series of hearsay objections.  And so generally I think there

19   are a number of statements that our witnesses, our fighters, who

20   are going to be here in trial are going to testify to on the

21   stand based on their personal knowledge.  To the extent they

22   heard something that was told to them by someone at the UFC,

23   those are going to be subject to hearsay exceptions.

24          And so I guess we would generally propose on things

25   like that that we'd deal with those with the witness on the

—2:15-cv-01045-RFB-BNW—

1    stand because we -- we're going to be able to establish the

2    foundation or the exceptions to the hearsay rule.  And rather

3    than deal with that now, we think it makes more sense to deal

4    with it in real time on the stand.

5         So there are probably a host of things that relate to

6    our case that our witnesses heard or were told by UFC.  I'd note

7    that a lot of the questions that the defendants objected to

8    were, in fact, questions that they asked our witnesses at the

9    depositions.  The fact that they asked objectionable --

10   objectionable questions at the deposition doesn't mean that when

11   we have our witnesses here we're not going to be able to elicit

12   admissible testimony.  So that's what I would say on those, Your

13   Honor.

14        THE COURT:  Well, okay.  I tend to agree, but, again, I

15   guess the concern is here, and I'll hear from defendants, are

16   you going to consistently ask certain fighters the same type of

17   question about what was -- what they heard?  I mean, they can

18   talk about their understanding from their own individual

19   perspective.

20        MR. SAVERI:  Absolutely, Your Honor.

21        THE COURT:  Right.  But they can't opine about what

22   other fighters knew or commonly knew.  I think that's a fair

23   point for them to raise.  And it can be a very slippery slope

24   because someone can easily slide into saying that, "Oh, we all

25   knew," and they can't say things like that.

2:15-cv-01045-RFB-BNW

1          MR. SAVERI:  And, Your Honor, we don't -- we

2   wouldn't -- we are not going to elicit that kind of general

3   testimony.  We're going to follow the rules of evidence.  We're

4   going to ask our witnesses what they knew, what they heard, what

5   they had personal knowledge of.  We're not going to ask them

6   general questions about rumors or things that were going around

7   the -- you know, the fighter community.

8          I mean, but, look, if they were somewhere, they were at

9   an event and someone who worked for UFC, one of the defendants

10  in the case, told them and there might be -- we're going to have

11  multiple level of hearsay problems, but we're just going to have

12  to sort through when the witnesses are on the stand.

13         THE COURT:  Well, let me hear from the defendants.

14  Thank you, Mr. -- again, I want to say it --

15         MR. SAVERI:  Saveri.

16         THE COURT:  What's that?

17         MR. SAVERI:  Saveri.

18         THE COURT:  Saveri.  I'll get it before the trial's

19  over.

20         MS. PHILLIPS:  Hi.

21         THE COURT:  All right, Ms. Phillips.  So I do tend to

22  think that these are more, sort of, game-time-type decisions.  I

23  would be concerned, as I said to Mr. Saveri, if there was going

24  to be a question that was asked to all of them, "What did you

25  understand about how this was done commonly?"  I think they can

—2:15-cv-01045-RFB-BNW—

1  talk about their own understanding based upon their

2  experience --

3          MS. PHILLIPS:  And we agree with that, certainly.

4          THE COURT:  -- but I think what you were worried about,

5  which I would agree with, is them being asked to opine about

6  what everyone understood or what everyone knew.  Is that

7  correct?

8          MS. PHILLIPS:  I completely agree with that, and that

9  has to do with how they frame their questions on direct.  But,

10  also, even if you properly frame a question on direct, right, an

11  answer can come back, "Well, everybody knew this" or "Everybody

12  did this" or "I heard that through whatever."

13          THE COURT:  Right.

14          MS. PHILLIPS:  Right.  So that is why instead of just

15  asking you for a blanket ruling without giving you specific

16  examples, we provided you four pages of direct quotations from

17  every single one of these named plaintiffs.  And we're asking

18  you to rule on this exact testimony, this kind of testimony,

19  where they say, right, "Contracts were take it or leave it.

20  Everybody knew that."  I mean, that's not based on personal

21  knowledge at all, right.

22          THE COURT:  Right.  And I think --

23          MS. PHILLIPS:  That's problematic.

24          THE COURT:  Right, I think Mr. Saveri said they're not

25  going to elicit that.  So --

1          MS. PHILLIPS:  Well, but my point is they don't have

2    control necessarily over what they elicit, right.

3          THE COURT:  Well, no one has --

4          MS. PHILLIPS:  They could ask the question properly,

5    and then we have to deal with it.  If you ruled in advance and

6    said, "These kind of examples are exactly what should not be

7    allowed" --

8          THE COURT:  I've been doing trials for many years.  I

9    could give that instruction.  People get on the witness stand --

10         MS. PHILLIPS:  Say what they're going to say.

11         THE COURT:  -- they get nervous.  They say things.  And

12   you know what will happen, I will say to the witness, "Please

13   just testify about what you have personal knowledge of."  And

14   generally in my experience that works, but I can tell you, for

15   both sides, you all may give instructions to your witness.  I

16   guarantee you that your witnesses are not going to follow

17   exactly the instructions that you give them, not because they're

18   bad people, but because it's a difficult thing to do as a

19   witness.

20         But I take your point.  I understand.  I'm glad that

21   this has been brought to my attention because I agree with you

22   generally speaking.  But I think that we'll deal with it as the

23   testimony comes in.

24         MS. PHILLIPS:  Understood.  Thanks, Your Honor.

25         THE COURT:  All right.  Thank you.

2:15-cv-01045-RFB-BNW

1           So I'm just going to, sort of, deny this motion -- this

2     portion of the motion without prejudice to us addressing it as

3     the testimony comes in.  So -- oh, yes, this is what I want to

4     talk to you all about, these video clips.  We've been looking at

5     video clips, my clerk and I, for a little while.  And I'm going

6     to ask you all to, sort of, work some of these things out.

7           But I know, Mr. Cramer, you already talked about some

8     of the things have been pulled.  I don't know if you all have

9     met and conferred about the video clips.  But if there's been

10    any work on these video clips for either side, it would help us

11    a lot to be able to figure this out.

12          MR. SAVERI:  So, Your Honor, to answer your question

13    directly, we haven't really done the work we need to on -- on

14    these video -- well, we're -- we're not talking about video

15    deposition.

16          THE COURT:  No, I'm not talking about that.

17          MR. SAVERI:  We're talking about videos that were

18    exhibits.  We haven't done the work we need to do, candidly,

19    Your Honor.  The defendants have a 106, I guess a

20    rule-of-completeness kind of objection.  I think what we should

21    do is get-together and work and see if we have any issues about

22    that when we're here next.

23          Some of these video clips, just to be clear, are

24    excerpts because they were used as excerpts with witnesses at

25    depositions.  We showed them the excerpt.  They adopted those

——2:15-cv-01045-RFB-BNW——

1    statements they made at depositions.  They are admissions.

2           But to answer your question directly, I think both

3    sides need to get-together and do some more work on that.

4           THE COURT:  Okay.  Because my concern is I don't -- I

5    can't tell who has the full video clip.  Obviously, if there's a

6    full video clip, that should be provided to whatever side.

7    Obviously if the video clip was not previously disclosed, I will

8    tell you now, I'm going to tend not to actually allow it to be

9    offered by either side, unless one witness opens the door to

10   that potentially.

11          But with that sort of direction, I really want to avoid

12   doing video clips today because we've looked at them already and

13   we -- it's a very difficult task to figure them out.  And some

14   of them are, like, 10 seconds, right.  And I would agree that

15   sometimes it appears that the statements may be taken out of

16   context.  You don't even -- sometimes you don't even hear the

17   question, right.

18          So I would like for you all to work that out.  And so

19   on the 28th I would like for us to discuss video clips, but you

20   all need to do some work on both sides.

21          And the main issue, though, is if -- I am going to ask

22   you on the 28th, does the full clip exist?  Because if it

23   doesn't exist, I will tell you I'm going to tend not to allow

24   it, unless the party against whom it's used has somehow adopted

25   it in a way that would be fair for it to be used against them,

1  and not simply because the statement was made because that may

2  not be enough.  There still has to be context because I don't

3  think it is fair for statements to be taken out of context.

4         MR. SAVERI:  Your Honor --

5         THE COURT:  Now, we do have these promotional clips,

6  too, that relate to some of the things that Zuffa did in terms

7  of its promotions.  And there's some hearsay and other things in

8  there.  I want you to get-together on that because obviously

9  hearsay within the video clips is going to be subject to the

10  same issues.  And it may make the video clips so essentially

11  excerpted that it's not particularly useful or relevant.

12         So I would like for you all to get-together on that so

13  we can go over in a more coherent manner the video clips on the

14  28th.

15         MR. SAVERI:  So that's helpful, Your Honor.  I mean,

16  some of these -- some of these video clips come from, you know,

17  shows that were on ESPN or on a network or on YouTube that maybe

18  ran one or two hours, for example.  And we don't think it's

19  necessary under 106 or any other rule to show, you know, the

20  whole show, right.  And so I -- we're going to have to work

21  through that, but I don't know if you have any kind of sense

22  about how you want to handle that.

23         THE COURT:  If you have the whole video, provide the

24  entire video.  If either side decides we don't want to show the

25  other 58 minutes of the ESPN show, then they can decide that,

—2:15-cv-01045-RFB-BNW—

 1  but then they have it.  And then potentially I would have it if

 2  there are issues that come up about context because I'm sure

 3  that there might be.

 4       I think where we're going to have more discussion are

 5  these promotional videos.

 6       MR. SAVERI:  Got it.  Yes, Your Honor.

 7       THE COURT:  And what I will say about those, just to

 8  give you some preliminary guidance, Zuffa has to be allowed to

 9  show how it put things together in a way that demonstrated its

10  acumen.  So to the extent that the video clips promoting fights

11  are used to demonstrate how they uniquely did this and how it

12  developed the industry, I will permit them.

13       To the extent it talks from people who are essentially

14  opining almost as experts about certain aspects of relevant

15  theories of the case, I'm not going to permit that, but I will

16  permit a certain portion of these videos to be admitted as a way

17  to demonstrate how they were able to put videos together as

18  highly contributing to the industry.

19       But, again, what I don't want to have are, sort of,

20  these individuals, sort of, opining about this is how they got

21  to be the number one MMA entity was because they had this great

22  acumen.  That obviously wouldn't come in, but their ability to

23  say, "This is how we put together fights," even to show what it

24  looks like.  I mean, it's helpful I think for the jurors to be

25  able to see what it looks like when you promote an event.  And

—2:15-cv-01045-RFB-BNW—

 1  so they'll be allowed to do that.

 2          MR. SAVERI:  And, Your Honor, so it does sound like we

 3  should go through these things in a -- you know, on a

 4  video-by-video basis to deal with the issues that come up, and

 5  if we have issues on it, we'll come back.  We'll talk about it

 6  when we're here next.

 7          THE COURT:  Okay.  Thank you.

 8          Any further comments from the defense on this?  Okay.

 9          All right.  I actually think -- I think we've covered

10  all of the defendant's motions in limine.  Is that right?

11          MR. YATES:  I believe so, Your Honor.

12          THE COURT:  Okay.  All right.

13          And I think I've already covered the first one for the

14  plaintiffs, which was the witness.

15          Okay.  Then there's Document Number 995.  Who's going

16  to argue this for the defendant?  This is expert testimony.

17          MS. PHILLIPS:  That will be me, sir.

18          THE COURT:  Ms. Phillips.

19          So I guess, Ms. Phillips, my question is I want to make

20  sure.  It sounds like the plaintiffs are saying that you are

21  going to be offering reports and testimony that did not arise

22  during the discovery period.

23          MS. PHILLIPS:  So if I may, my understanding of the

24  motion in limine, of course we haven't fully briefed it, but

25  this might be one that might be best handled on the 28th as well

—2:15-cv-01045-RFB-BNW—

1    for a couple of reasons.  My understanding is the first part of

2    their argument relates to 1006 summaries, and there is a time

3    period set in the pretrial order, right.  The parties haven't

4    exchanged those yet.

5              THE COURT:  Okay.

6              MS. PHILLIPS:  So we haven't put any 1006 summaries on

7    our list.  They haven't done that on their side.  And so we

8    haven't met and conferred about that and had any discussions

9    about the 1006 summaries.  So, you know, it is possible, I don't

10   know because we haven't gotten there yet, whether the 1006

11   summaries from the class cert hearing that they are complaining

12   about may not be on our 1006 summaries now.  That's the first

13   thing I'll say.

14             The second thing I'll say is that my understanding is

15   there's an argument with regard to a -- one of the regressions

16   by Professor Topel.  And, you know, my understanding on that --

17   again, you know, I think it's a little premature to talk about

18   this, but my understanding is that that regression analysis was

19   part of the stipulation that the parties agreed to.  And even if

20   it was untimely, part of the analysis is that it would be

21   harmless to the plaintiffs who have had that regression analysis

22   since 2019 and are objecting to it now.  But they've obviously

23   had multiple years to respond to it and to prepare Dr. Singer

24   and Dr. Zimbalist for responding to it at trial.

25             THE COURT:  Okay.  So let me say this, is if these are

———2:15-cv-01045-RFB-BNW———

1    reports that were provided during the discovery period and were

2    subject to hearings that the Court had, I would generally allow

3    them.  If they occurred afterwards and there's not an agreement,

4    I'm generally not going to allow them, right.  I know that there

5    was an additional expert, for example, that the defendants

6    offered in their motion for summary judgment.  I'm not going to

7    allow him.

8              MS. PHILLIPS:  Understood.

9              THE COURT:  Right.  But if there's some dispute,

10   Ms. Phillips, as you're referencing about whether we had agreed

11   to or stipulated to something and it was disclosed, it's a part

12   of the process for those several days of hearings we had, then

13   we can address that on the 28th.

14             MS. PHILLIPS:  Okay.  Thank you, Your Honor.

15             THE COURT:  Thank you.

16             Any questions about that from the plaintiffs' side?

17             MR. MADDEN:  No, Your Honor.  Patrick Madden for the

18   plaintiffs, for the record.

19             I think it makes sense to handle the summary exhibits

20   with the summary exhibit process, and I believe that we also

21   moved as to Dr. Topel's expert report.  It addresses post-2017

22   issues, the one that they filed in July of 2018.  And so that

23   would be covered by Your Honor's prior ruling about the

24   post-2017 facts.

25             THE COURT:  Well, okay, I want to be clear.  There

—2:15-cv-01045-RFB-BNW—

1    were -- I have to go back and check it.  We had these hearings

2    that occurred obviously well past the class period.

3            MR. MADDEN:  Correct.

4            THE COURT:  I had not ruled up to that time, I don't

5    believe, in the same definitive way about what could be

6    presented at the hearings.  So what I'm saying to you now is

7    that if it's something that an expert was permitted to provide

8    information and evidence on at one of those evidentiary

9    hearings, I'm going to allow it to come into the trial, right.

10   If that included, right, post-class period information, right,

11   we can have a discussion about that, but I'm telling you I'm

12   inclined to allow that if it was part of the back and forth that

13   took place in the course of the Court considering expert

14   discovery.

15           So I wanted to be clear about that, Mr. Madden, because

16   there might have been some testimony that relates to post-class

17   period occurrences at those hearings.  I have not gone through

18   and reviewed that testimony with that specific focus, but if

19   that was something that I considered, it was brought up then,

20   that's something potentially that I would allow.  I'm saying

21   that because that would be potentially an exception to my, sort

22   of, ruling that I have announced repeatedly about no post-2017

23   information.

24           So I want to be clear about that because it's a little

25   bit of a footnote to that particular ruling.  Okay?

—2:15-cv-01045-RFB-BNW—

1            MR. MADDEN:  Understood.  And I just want to be clear

2    about what we believe is in that report, and I don't think it

3    was the subject --

4            THE COURT:  Why don't we just wait?  We can all figure

5    it out.  I mean, we don't have to decide that now.

6            MR. MADDEN:  Okay.

7            THE COURT:  Let's wait until the 28th.  I'm just giving

8    you that, sort of, instruction now so when you come back to me

9    on the 28th -- and we'll have a whole list of things we're going

10   to go through -- I expect that, right, the defendant will say,

11   "Well, we believe that some of this stuff was previously

12   mentioned and should be allowed in."  And you all will say, "No,

13   this wasn't," and we'll go through that.  We don't need to do

14   that now.  I just want to outline for you what I believe will

15   be, sort of, the general parameters in terms of how I would rule

16   on that material.

17           MR. MADDEN:  So on the 28th we will have the

18   opportunity to make arguments about what was or was not covered

19   on the class cert hearing within that scope?

20           THE COURT:  Right.  Well, here's what I would say and

21   I'm going to put the onus on the defendants, which is if you

22   think that there is information in there that is post 2017, but

23   that I allowed to be presented, please identify it because

24   there's no sense of us arguing about material that you're not

25   going to use.

1           So if I allowed, for example, an expert to opine in the

2    course of the hearing about things that happened post 2017,

3    that's information that should be identified and then you all

4    can have -- we can have a back and forth about it.

5           But what I don't want to have happening, Mr. Isaacson

6    and Mr. Yates, is for you all to bring that up in trial and say,

7    "Well, this is part of that exception you carved out."  So that

8    way we can address all of this.

9           I mean, if it's not clear to all of you, one of the

10   things that I want to do with this jury is manage our time in

11   such a way that substantive legal issues get addressed prior to

12   the trial itself.

13          So that's an area where I will allow the defendants the

14   proposed information to be presented that falls into that

15   category.  But, again, Mr. Isaacson and Mr. Yates, you need to

16   identify that before the plaintiffs -- before we come to our

17   hearing so that I can then decide and look at that myself before

18   the trial starts.

19          MR. MADDEN:  And then I just want to clarify further

20   because I understand what you just said to refer generally to

21   the 2018 Topel report.  That's 575.

22          THE COURT:  No, no, not that.

23          MR. MADDEN:  Okay.  That's what I wanted to clarify.

24          THE COURT:  No, we had -- I'll go back.  We had hearing

25   testimony.  Then I allowed supplements.  I allowed additional

———2:15-cv-01045-RFB-BNW———

1  information, and they provided supplements.  I have to go back

2  and look at how that worked.  And so I don't want to, without

3  looking at the record again, make a definitive ruling about that

4  because I did allow for additional information to be submitted

5  to me.  And so any information that was part of that process

6  potentially is information that I would allow in.

7          Now, if it was submitted, for example, in ways that

8  were inconsistent with what I allowed, you can argue to me,

9  "Well, it was submitted, but in fact that's not what you asked

10 for."

11         MR. MADDEN:  Okay.

12         THE COURT:  For example, if that's what happened.  I'm

13 not saying that happened.  If that happened, you can say that.

14         MR. MADDEN:  That was our argument, Your Honor.  So I

15 appreciate it.

16         THE COURT:  But I need to know what it is before I can

17 rule on it.

18         MR. MADDEN:  Okay.

19         THE COURT:  Okay?

20         MR. MADDEN:  Sounds good.  Thank you.

21         THE COURT:  All right.  Uh-huh.

22         Any questions about that from the defense side?

23         Okay.  So, I think I already ruled basically and was

24 just discussing 996, which is excluding post-class period

25 evidence.  I think I've discussed that.

2:15-cv-01045-RFB-BNW

1           So then we have this 997 which relates to various

2   aspects of expert testimony.  So who's going to be arguing this

3   for Zuffa?

4           MS. PHILLIPS:  That will be me again, Your Honor.

5           THE COURT:  Oh.  Okay, Ms. Phillips.

6           So I guess I will start with -- let me pull this up

7   again -- 997, which is Number 4 on my list.  So are you going to

8   say that -- have the experts talk about Zuffa would have spent

9   less money on promoting fighters absent the challenged conduct?

10          MS. PHILLIPS:  Yes, that is -- Dr. Topel has disclosed

11  that opinion, has opined on that opinion, has been deposed on

12  that opinion, and he will offer that opinion.  And obviously the

13  plaintiffs can feel free to cross-examine him on that opinion --

14          THE COURT:  Okay.  But how is that part of his

15  expertise?  Like, how -- I mean, why can't you just say --

16          MS. PHILLIPS:  Sure.

17          THE COURT:  -- have the Zuffa executives say that?

18          MS. PHILLIPS:  Sure.  He --

19          THE COURT:  I mean, they could say, which I would allow

20  them to say, "We would have spent additional money or spent more

21  or less money depending upon fights."  How is this at all within

22  his particular expertise?

23          MS. PHILLIPS:  I think it is squarely within his

24  expertise.  He is an expert -- a speciality in microeconomics.

25  Microeconomics is the study of how firms make decisions with

—2:15-cv-01045-RFB-BNW—

1   regard to their money, what they spend money on.  That is

2   precisely what this --

3         THE COURT:  I understand that, but in this case he's

4   going to be opining about what specific people would decide to

5   do, and I'm not sure how that is microeconomics.  Microeconomics

6   is trends within that particular field.  In this case what

7   you're -- what you would be having him say is, "I know that the

8   Zuffa executives would have spent money on this particular -- in

9   this particular way absent certain conduct."  I don't see how he

10  can testify about that.

11        MS. PHILLIPS:  I mean, again, I think he's -- right,

12  he's a specialty in microeconomics, and that is the study of

13  how -- how firms operate and how they make economic decisions,

14  right.  So if I -- if I am concerned about a fighter that I am

15  investing in leaving because I don't have a contract that

16  ensures he will stay, he is -- this is squarely within his

17  testimony to say that that is -- you know, that that's an issue

18  that then Zuffa is going to invest less in them.

19        The flip side of this, of course, is that he's

20  responding to Dr. Singer's opinion on almost the exact same

21  thing, which is if only the fighters were paid more, they would

22  have then invested more in themselves, right.  So if Dr. -- if

23  Dr. Topel can't testify to this, I don't see how Dr. Singer can

24  testify to fighters then coming in and investing more in

25  themselves if they had been paid more.

2:15-cv-01045-RFB-BNW

1          But I think --

2          THE COURT:  And I would -- and I would agree with that

3    as well.  I don't think that either expert should be opining

4    about what individual decision makers would do.  I think that

5    Dr. Topel could say that, sort of, in terms of how decisions are

6    made profitability can be measured in this way and companies

7    when they invest more in particular goods may spend more on

8    others, generally speaking.  I don't think he can say, "Zuffa

9    would have done X."  I don't think he can say that just like I

10   don't think Dr. Singer can say, "These specific fighters would

11   have done -- spent their money that way."

12          If you want Dr. Topel to be able to say in some form,

13   sort of, the rational decision that could be made would be

14   spending more on this particular investment or if he spent more

15   on the investment, you'd have less money to spend elsewhere,

16   that's fine.

17          MS. PHILLIPS:  As I understand it, that's exactly his

18   testimony.

19          THE COURT:  No, no, no --

20          MS. PHILLIPS:  These contracts --

21          THE COURT:  -- Ms. Phillips.  Hold on.  He can't say,

22   "Zuffa would have done X."  I just want to be clear.  He can't

23   say that.  I'm not going to allow him to say that.  If he wants

24   to talk about what would be a rational economic decision in

25   terms of how you invest your money and that's consistent with a

—2:15-cv-01045-RFB-BNW—

1  pattern, he can say that.

2         MS. PHILLIPS:  Okay.

3         THE COURT:  But what he can't say is, "Zuffa would have

4  spent less money, right, on promoting fighters absent" -- he

5  can't say that.  He can't opine about that specifically with

6  respect to them just like, you are anticipating my argument, I'm

7  not going to let Dr. Singer talk about what the fighters would

8  have done either.  If Zuffa executives want to also come up and

9  say that, they can say that because they were decision makers,

10 right, you know.

11        We can talk about whether or not that's speculation or

12 not, but that's going to come in a little bit anyway so we can

13 go back and forth.  But I would potentially allow Zuffa's

14 executives to talk about that.  I'll potentially allow the

15 fighters to talk about that.  But I'm not going to have the

16 experts opine about what executives would have done or what the

17 fighters would have done.  At most what they can say is if an

18 entity spends more money on this particular type of expenditure,

19 they may have less money to spend on other expenditures and it

20 would be reasonable for that to be the case.  They can say that,

21 but not about that, for either side.

22        MS. PHILLIPS:  Okay.  Understood.

23        THE COURT:  All right?

24        MS. PHILLIPS:  Thank you, Your Honor.

25        THE COURT:  Any question about that from the

———2:15-cv-01045-RFB-BNW———

 1  plaintiffs' side?  Because I'm going to do the same thing with

 2  Dr. Singer, right.  I'm going to restrict the experts to the

 3  things that I think relate to their expertise, and I don't think

 4  speculating about what choices either the fighters would have

 5  made or Zuffa would have made matter.

 6          Anything on the plaintiffs' side?

 7          MR. CRAMER:  No, Your Honor.

 8          THE COURT:  Okay.  All right.

 9          Ms. Phillips, are you still -- are you on Richard

10  Marks, too?

11          MS. PHILLIPS:  Yes, I am.

12          THE COURT:  You know, we should just have you stay

13  there until --

14          MS. PHILLIPS:  Yes.  Sorry.  Sorry.  Just give me -- I

15  apologize.  Just give me a minute to get it right.

16          (Defense counsel conferring.)

17          MS. PHILLIPS:  I apologize, Your Honor.

18          THE COURT:  Take your time.  I mean, we have -- all

19  have to get our notes out.

20          So you've seen this motion.  I want to understand, what

21  is it Mr. Marks is going to be talking about?

22          MS. PHILLIPS:  Sure.

23          So Mr. Marks will testify that the structure of

24  contracts in Hollywood is very comparable, right, the

25  entertainment industry, very comparable to the structure of the

2:15-cv-01045-RFB-BNW

1  contracts at issue here.  And that, right, competition or

2  rather, you know, a lack of competition does not inevitably flow

3  from contracts where the revenue share is at that 18 to 20

4  percent because what --

5        THE COURT:  I'm sorry.  So are you offering him as an

6  expert?  Because I don't know how he talks about this if he's

7  not an expert.

8        MS. PHILLIPS:  We are offering him as an expert, yes.

9  And I don't believe that his expertise has been challenged.

10  There was no Daubert on Mr. Marks.

11        THE COURT:  Okay.  Okay.  Go ahead.  Keep going.

12        So he's going to talk about this structure.  I want to

13  go back.  I want to make sure I'm looking at the right ...

14        MS. PHILLIPS:  Sure.  And if I can help, Your Honor,

15  it's at 997.  It's 8 of 18 is where it begins, I believe.

16        THE COURT:  Right.  Okay.

17        MS. PHILLIPS:  So they have moved to strike him under

18  401 and 403.  They have not argued that he's not an expert, and

19  they have not argued -- have not Dauberted him.

20        THE COURT:  There we go.  Okay.  Go ahead.

21        MS. PHILLIPS:  So he will testify, again, that the

22  structure of the contracts in Hollywood are similar to the

23  structure of the contracts here.  And what he will testify to is

24  that there is a competitive market where there is a lower

25  revenue share, just as there is here, a competitive market with

 1   a lower revenue share.  And that is what he is being proffered

 2   to testify to.

 3          As I understand the argument in the motion in limine,

 4   they argue that he has not demonstrated that the entertainment

 5   industry is a benchmark, but the reason that Dr. Zimbalist talks

 6   about the other professional sports being benchmarks is because

 7   it is their burden under the yardstick theory that they have put

 8   forward in this case with regard to damages.  That's not what

 9   Mr. Marks is going to do.

10          THE COURT:  Okay.

11          All right.  Thank you, Ms. Phillips.

12          MS. PHILLIPS:  No problem.

13          THE COURT:  I'm sorry.  It's Miss?

14          MS. NOTEWARE:  Noteware.  Good afternoon, Your Honor.

15   A fresh face for you.

16          THE COURT:  Okay.  There we go.  Well, I'm glad you all

17   have spread it all out.  I appreciate that.

18          MS. NOTEWARE:  This is completely irrelevant evidence.

19   We're in -- we're talking about sports.  We're talking about the

20   MMA.  We're talking about the UFC.  This is an entertainment

21   lawyer talking about contracts in old Hollywood that has nothing

22   to do with this case.

23          THE COURT:  Okay, Ms. Noteware.  But my question to you

24   is we've had a time for Daubert and other motions.  Is it purely

25   your argument that this is a relevance objection?

2:15-cv-01045-RFB-BNW

1        MS. NOTEWARE:  Yes.  This is relevance, confusion to

2   the jury --

3        THE COURT:  Well --

4        MS. NOTEWARE:  This is two ships passing in the night

5   here.  This is not -- this has nothing to do with the case.

6   It's not a Daubert motion because we're not saying that he isn't

7   a qualified entertainment lawyer.  And if this was a case --

8   perhaps, if this was a case about something else, he would be

9   perfectly able to opine about this.

10        THE COURT:  So then why wouldn't you have moved to

11   exclude him as an expert previously?

12        MS. NOTEWARE:  Because it wasn't a Daubert challenge.

13   It's a relevance challenge.

14        THE COURT:  Well, you know, it's partly a Daubert

15   challenge because you're partly saying that he is not an

16   appropriate yardstick for this industry.  That's something an

17   expert would opine about.  And the question is whether or not he

18   has the expertise to do that, right.  You're essentially saying

19   to me he doesn't have the expertise to opine about this

20   particular industry because he's come from a very different

21   industry.

22        MS. NOTEWARE:  I am -- actually, I'm not saying that,

23   Your Honor.  I'm just saying this is something that would

24   confuse the jury because we're going to have someone get up

25   there who, again, may be a very qualified entertainment lawyer,

—2:15-cv-01045-RFB-BNW—

1  but that's not what he's testifying.  He's testifying in a case

2  that he has no business being in.  And it's going to confuse the

3  jury.  Just like you wouldn't have likeness rights, that would

4  confuse the jury in Your Honor's estimation.  This is something

5  that's just wholly far afield from this case and really has no

6  place here.  And it's not responding to anything from the

7  experts.  It's not responding to testimony from any of the

8  witnesses --

9        THE COURT:  Well, no, it's offering -- it's responding

10  to Dr. Zimbalist's offering particular yardsticks, and he's

11  offering his -- a different version, right, of, you know, a

12  comparator.  I mean, I may or may not agree with that, but

13  that's not really the issue, right.

14        What you're asking me to do is to find that his area of

15  expertise, I guess, is not appropriate in this industry.  And

16  that seems to me to be something that's an area that should have

17  been brought up previously.

18        I just get concerned because we've been through a fair

19  amount of briefing in this case about experts and --

20        MS. NOTEWARE:  I understand.

21        THE COURT:  -- so for me to hear what feels to me like

22  a motion to exclude an expert partly on Daubert grounds because,

23  again, you're going to be arguing that this isn't a proper

24  comparator within the industry.  That's saying an expert's

25  opining about something outside of their expertise or in an area

————2:15-cv-01045-RFB-BNW————

1  that is not appropriate.  It's not that it's just not relevant;

2  he's not an appropriate expert for this particular area.

3  That's -- that to me is a basis for a motion to exclude.

4          So I'm a little concerned about the timing of how this

5  is being brought to me at this point in time.

6          MS. NOTEWARE:  And I can understand that.  That's a

7  fair concern, Your Honor, but this really is not a Daubert

8  motion.  It really is just this --

9          THE COURT:  No, it's not a Daubert motion, but you're

10  excluding -- he's being offered as an expert, right.  We had --

11  both sides had extensive --

12          MS. NOTEWARE:  Absolutely.

13          THE COURT:  -- motions filed about excluding experts.

14  I'm wondering why this particular expert wasn't the subject of

15  those motions.

16          MS. NOTEWARE:  I can't speak to that at this moment as

17  to why that was, but I can tell you that looking at it now

18  there's no good reason for this expert to testify about actor

19  services in this case.  It's just not relevant to anything that

20  we're doing here.

21          THE COURT:  The problem is, Ms. Noteware, is we had

22  hearings about experts, right.  The time to have brought this to

23  my attention so I could have heard him was then.  Then I would

24  be able to make a determination, and now you're asking me to

25  make a determination not having heard him.  I mean, we had a few

————2:15-cv-01045-RFB-BNW————

1   days of experts coming in to testify.  I would have been in a

2   situation where I could have then evaluated to what extent it

3   was inappropriate compared to it.

4        Simply because the nature of the industry might be

5   different doesn't mean that it couldn't align.  We had experts

6   talking about the relevance of Microsoft as relates to

7   determining marginal revenue product.  So that was testimony

8   that I heard.  So I'm a little concerned about the timing of

9   this in the context of this case.

10        Let me hear from the defense, and then I may have you

11   come back up.  Thank you.

12        MS. NOTEWARE:  Okay.  Thank you.

13        THE COURT:  Ms. Phillips.

14        So, Ms. Phillips, notwithstanding what I said to

15   Ms. Noteware, I still have to determine relevance as relates to

16   an expert's testimony.  I'm a little concerned again about the

17   timing of when this was brought to my attention because I would

18   have had more opportunity to be able to prepare and to be able

19   to review the testimony and hear from the witness directly.

20        So I want you to talk to me about, notwithstanding the,

21   sort of, issue of, sort of, the timing of this opposition, why

22   you think this still wouldn't be subject to me having to decide

23   whether or not his expertise would be misleading or confusing to

24   the jury.  Because I would still have to make that

25   determination, right.

2:15-cv-01045-RFB-BNW

1          There's still a 403 analysis and a 401 analysis which

2   can technically be brought at this time.  So explain to me why

3   you believe this wouldn't be confusing.

4          MS. PHILLIPS:  Sure.

5          So Dr. Zimbalist has proffered a number of different

6   yardsticks in the professional sports world, right.  And what

7   Mr. Marks is doing in response to that is giving another kind of

8   yardstick, which is the entertainment industry where the actors

9   are the product just like the plaintiffs here say that the

10  athletes are the product.  And what he testifies to, and he is

11  an expert in this, is that the market for actor services is

12  highly competitive and it is nowhere near 50 percent of a

13  project's gross revenue.  So that's directly relevant to what

14  Dr. Zimbalist argues and what the plaintiffs themselves argue.

15         THE COURT:  Okay.  All right.  Thank you, Ms. Phillips.

16         MS. NOTEWARE:  Your Honor, this is not a case where the

17  defendant is saying that the relevant yardstick is the acting

18  industry.  Nobody is contending that in this case.  And it's

19  just completely irrelevant to what we're doing, and to bring in

20  this other industry into this case just seems like opening up a

21  door to a whole mini trial about the entertainment industry

22  that -- that has no purpose here.

23         THE COURT:  No, they're offering it for a very specific

24  purpose, which is to say we think there is a more comparable

25  yardstick, even though it's not technically within the combat

—2:15-cv-01045-RFB-BNW—

1  sports industry or the sports industry.  But where you have a

2  situation where in the market the particular individual is the

3  product and it's competitive, there's still differential parts.

4       Why can't you simply argue, right, that this is not the

5  same?  You don't have bouts.  You don't have fights.  I mean,

6  you could argue all of that.  I mean, I'm not going to stop you

7  from questioning Mr. Marks and saying, you know, "This is not

8  related to sports in the particular ways, and you don't have any

9  expertise in that," right.  "You haven't studied that as an

10 economist," right.  You could argue all of that, right?

11      MS. NOTEWARE:  We certainly could argue all of that.

12 And obviously we would if this irrelevant evidence comes in, but

13 what is the point of putting something that has nothing to do

14 with this case in front of the jury?

15      THE COURT:  Well, because they think it does and they

16 have to be allowed to be able to present it.  So here's what

17 I'll tell you.

18      MS. NOTEWARE:  But they --

19      THE COURT:  So, Ms. Noteware, for now I will review it.

20 If you have objections to particular aspects of the testimony,

21 you bring that to me on the 28th.  But for now I will allow

22 Mr. Marks to testify.

23      MS. NOTEWARE:  I will -- I will be back on the 28th

24 with this, but I would ask you to look at the expert reports, as

25 I'm sure you have done.  And this --

2:15-cv-01045-RFB-BNW

1          THE COURT:  I have.  I'm sorry.  Go ahead.

2          MS. NOTEWARE:  I'm sorry.  This just responds to a

3    single footnote.  This was an offhand comment that was made

4    about the studio system in the 1940s or something like that.

5    And now they've done this expert report, and we're just -- we're

6    opening a door to just something that has nothing to do with

7    this case.

8          THE COURT:  So let me just be clear, Ms. Noteware.  I'm

9    not going to allow three days of testimony about the

10   entertainment industry.  What seems to me to be something that I

11   would potentially allow at this point is for him to describe a

12   scenario which we had testimony about where you have the

13   individual as the product and to be able to say that it's not

14   always the case that the individual's the product results in a

15   percentage of a particular revenue stream.  To the extent that

16   they're offering the testimony, that's what I will potentially

17   allow it for.

18         So when you would come back on the 28th, you can talk

19   to me about what you think or how that should be limited, but

20   for now I will allow that testimony.  I'm not going to allow

21   days of testimony about the entertainment industry, but for that

22   I will allow it for now.

23         MS. NOTEWARE:  But, again, it's the entertainment

24   industry --

25         THE COURT:  Ms. Noteware, I've already decided we will

—————2:15-cv-01045-RFB-BNW—————

1  come back on the 28th.

2        MS. NOTEWARE:  Thank you, Your Honor.

3        THE COURT:  All right.  Let's see.  Aggregate damages.

4  Oh, Mr. Chiu.  Okay.

5        So, Mr. Chiu, this sort of seems to fall into the

6  conversation we had earlier about how damages should be

7  calculated.  As you know, they're going to get a damages

8  instruction.

9        MR. CHIU:  Yep.

10        THE COURT:  And this relates also to mitigation of

11  damages, right?

12        MR. CHIU:  Right.

13        THE COURT:  And certainly neither expert is going to be

14  able to say, "This is how damages is supposed to be calculated,"

15  right.  You could point to how given the instruction the damages

16  calculation is not appropriate or accurate or reliable, but

17  certainly I'm not going to allow one side to argue this is how

18  you argue or how you determine damages that's inconsistent with

19  what the instructions would be, which is why we will come back

20  and have the instructions --

21        MR. CHIU:  No, I don't think that is what we intend to

22  do with this.  And I want to take the two MILs together, 6 and

23  7, because they're kind of the converse of each other, right.

24  The first one is they're trying to say, "We shouldn't be able to

25  have testimony and argument about the fail -- the failure to

—2:15-cv-01045-RFB-BNW—

1   disaggregate damages."  And then the flip side of that is oddly

2   that we also can't argue that Dr. Singer didn't aggregate

3   damages.

4        But I think the issue here is, first, both our experts

5   disclosed these opinions, and it's not -- it's not the issue

6   about saying this is how you calculate damages.  It is really

7   about the fact that Dr. Singer's offering an opinion and a

8   calculation of damages that he claims is the result of this

9   overarching scheme.

10       And our experts critique that and say, "Look, you know,

11  he has no way of actually discerning which components of the

12  scheme contributed to this overall number."  That is at issue.

13  Those opinions were disclosed.  They never changed those

14  previously, and those should be fair game.

15       THE COURT:  Okay.  Well, let me hear from the

16  plaintiffs on that particular point.

17       So, Mr. Cramer, as I've indicated, I'm going to give

18  instructions on the damages.  The defendants are allowed to say,

19  "In order for the damages to be reliable and reasonable based

20  upon what the standard is, there should be a way to measure how

21  the anticompetitive -- alleged anticompetitive conduct and

22  scheme specifically contributed to the damages."  What's wrong

23  with them saying that?

24       MR. CRAMER:  They can say that.  What they can't --

25  cannot say or should not be able to say is that the plaintiffs

————2:15-cv-01045-RFB-BNW————

1    in a scheme case where all of the conduct is interrelated, as

2    Your Honor found in the class order, the contracts, the

3    acquisitions, and the coercion act together to cause harm, they

4    can't say that there's some defect because plaintiffs' experts

5    didn't separate out the different strands.  It's impossible to

6    separate out the different strands.

7            THE COURT:  So that's going to lead back to one of the

8    things we're going to do homework on the 28th, which is, for

9    example, the experts have different models even for measuring,

10   sort of, what would be a competitive wage, right.  And so we

11   have to find a way where they can challenge, you can challenge,

12   the experts' methodologies as reliable without the jury imputing

13   to those challenges them reflecting the standard that has to be

14   proven.  And that's what we'll have to do on the 28th.

15           I agree with you that they cannot, as you cannot, sort

16   of, argue that there is a particular way in terms of the

17   methodology, in terms of the specific factors to be considered,

18   that damages have to be calculated under the law.  That is not

19   required.

20           But there are standards of reliability and

21   reasonableness that do apply, right, and there are certain

22   factors that the jury has to consider.

23           So I think what we'll have to do is come back and again

24   look at the instructions, and then we'll make that

25   determination.  And then we'll talk about some of that again on

—2:15-cv-01045-RFB-BNW—

1  the 28th in terms of what people will be allowed to say and not

2  say, but that will occur in the context of the jury

3  instructions.  Because I will allow both sides to be able to

4  challenge the reliability of the other sides' experts.  The

5  question is how they say that and how they do that.  So we'll

6  come back and talk about that.

7       MR. CRAMER:  Fair enough.  Thank you, Your Honor.

8       THE COURT:  All right.  Thank you.

9       That also just brings me to a point that you all should

10  be aware of generally in terms of how I run trials.  I give

11  preopening instructions and you will have them.  So you will

12  have a set of instructions that I decide before the opening,

13  before you prepare your openings.  And I will read those to the

14  jury before they hear your opening statement.

15       So there will be -- and we can modify them potentially

16  as the trial comes in, but I will decide the substantive

17  instructions before opening.  You'll have them.  The jurors

18  won't have a copy of them because they're not the final

19  instructions, but I will read them to them.  So before you do

20  your opening, I will go through and read preopening instructions

21  to the jurors.  And I think that's particularly important in a

22  case like this, right.

23       And to a certain extent, and we can talk about this, I

24  will allow you all to reference those instructions prior to your

25  closing arguments as a way to be able to make sure we stay

─2:15-cv-01045-RFB-BNW─

1  within the bounds of what the Court has determined will be the

2  instructions, right.

3         And how that objection comes in will be different, but

4  essentially your objection would be, you know, "Your Honor,

5  objection, invades the province of the Court as relates to the

6  definition of monopsony power or the definition of damages."

7  That's how you would alert me to that, and then we would look at

8  how that's defined.

9         But you all will have that information ahead of time,

10  and then we can talk about, sort of, again how that gets shared.

11  That also brings me to another point.  I have decided in this

12  case that I will allow the jurors to ask questions of at least

13  the experts.  What that looks like is, and I've done this

14  before, at the end of the direct and the cross the jurors will

15  be asked to hand up questions to me.  I will look at them to see

16  if they are an appropriate question.  I will read the question,

17  and then the witness will be asked to answer it.  If it's not an

18  appropriate question, I will not read it and you will not see

19  it.  Okay?

20         And, certainly, if you think for some reason the

21  question's objectionable that I am reading out loud, you can

22  still object to it even though it's me reading it.  So I want to

23  be clear about that.  It's different than me making a ruling on

24  a particular objection from either party, right.

25         And so at least for the experts I will allow these

—2:15-cv-01045-RFB-BNW—

1  questions to be presented.  And most likely, and I'll let you

2  all know by the 28th, I will allow the jurors to ask questions

3  of all of the witnesses, right.  And we can discuss that --

4  Mr. Saveri, yes?

5          MR. SAVERI:  I'm sorry.  When you're done, I have a

6  question about what you just said.

7          THE COURT:  Go ahead.

8          MR. SAVERI:  I'm sorry.  Joseph Saveri, Your Honor.

9          If you have a juror question, it puts us in a very

10  difficult position to object to it after you've asked it.  And

11  so is there a mechanism for dealing with that before the

12  question is asked?

13          THE COURT:  No.

14          MR. SAVERI:  Okay.

15          THE COURT:  Right.  And that's a strategic decision you

16  have to make.  I will tell you, I find it to be a very useful

17  process.  It will add time, but in a case that's this

18  complicated I actually think it will be helpful and add to the

19  process.  But you're right.  You have to make a decision about

20  whether or not you want to object to the question.

21          MR. SAVERI:  100 percent, Your Honor.  And I find the

22  opportunity to have jurors ask these questions even of lay

23  witnesses to be very informative, and that's kind of what we're

24  doing here.  I just wanted to make sure we are clear --

25          THE COURT:  No, you can figure out how you want to

—2:15-cv-01045-RFB-BNW—

1   delicately do that, but you can do it at your own choice.

2          MR. SAVERI:  Thank you, Your Honor.

3          THE COURT:  Okay.  And if you have questions about

4   it -- I don't know if any of you have participated in a trial

5   where that's happen before.  I would hope at this point in time

6   you all have.  If you have questions about the process, as

7   Mr. Saveri did, let me know.  But that's the process.

8          And typically what I also do is ask all of the jurors,

9   even if they don't have a question, to write down "no question"

10  so that there's no indication of who's asking the questions or

11  not.

12         Yes?

13         MR. SAVERI:  I didn't mean to walk away from you when

14  you were still addressing me.

15         THE COURT:  Oh, no, no.  No, no.  That's all right.

16         MR. SAVERI:  That's very helpful.  Thank you, Your

17  Honor.

18         THE COURT:  Okay.  Let's go back to our ...

19         Number -- let's see.  We're at 999.  Who's going to be

20  arguing this for the defendant?  This is the mitigation of

21  damages.

22         MS. PHILLIPS:  Me again.

23         THE COURT:  Okay.

24         So, Ms. Phillips, I'm trying to understand what even

25  mitigation means in this context.

2:15-cv-01045-RFB-BNW

1          MS. PHILLIPS:  Me, too, Your Honor.  Because I think,

2   and my team will correct me if I'm wrong, but we may be ships

3   passing in the night here and this might be a situation where an

4   opposition would have been helpful.  So let me just see if I can

5   do it.

6          What we want to make sure that we can preserve our

7   ability to do is argue about fighter mobility.  Fighters could

8   leave UFC and go to competitor promotions.

9          THE COURT:  Right.

10         MS. PHILLIPS:  And fighters could leave competitor

11  promotions and come to UFC.  We are not planning on, for

12  example -- I'm using this just purely by example.  We are not,

13  you know, going to ask Plaintiff Cung Le, for example, who

14  retired from UFC, "Well, why didn't you go out and get another

15  UFC or another MMA job?"  Right.  We're not going to argue that.

16  We're not going to say you failed to mitigate damages because of

17  that.

18         What we want to be able and we need to be able to

19  argue, which is directly, right, in response to their entire

20  case, is that fighters do freely move between UFC and

21  competitors.

22         THE COURT:  Right.  And the contracts were not

23  restrictive, as they argued.

24         MS. PHILLIPS:  Exactly.  And so, you know, I think

25  based on the way that this ultimately ended up getting written

—2:15-cv-01045-RFB-BNW—

1  and submitted to the Court, we are not trying to make arguments

2  about this kind of mitigation of damages.  We are just saying

3  that we need to be able to introduce evidence of mobility.

4          THE COURT:  Okay.

5          MS. PHILLIPS:  And, again, if I've got that wrong, my

6  team will let me know.

7          THE COURT:  All right.  Perfect.  Thank you.

8          All right.  On the plaintiffs' side?

9          MR. CRAMER:  Sounds like there was a misunderstanding.

10 Obviously we dispute the mobility point.  There's a lot of

11 evidence against that, but that's a separate issue and doesn't

12 have to do with mitigation of damages.

13         THE COURT:  Okay.  Well, is that the same for the

14 reference to the contracts between Universal Strength

15 Headquarters and employees?

16         MR. SAVERI:  We would -- we would -- excuse me, Joseph

17 Saveri.  Your Honor, we think the same logic applies.

18         THE COURT:  Okay.  So, look, I don't think that

19 they're -- from what I've heard that they're not arguing about

20 being able to bring in evidence about individual compensation.

21 I mean, I think they can say that there are other ways people

22 could compensate themselves if there's an argument that says --

23 for example, the plaintiffs argue -- if the plaintiffs argue

24 this was their entire livelihood and they couldn't make money

25 elsewhere, then this would open the door to that.  But other

———2:15-cv-01045-RFB-BNW———

1   than that, I'm not sure how this is relevant.  But let's hear

2   from the defendant to see what they might be offering.

3           MR. JOHNSON:  Yes, Your Honor.  This is David Johnson

4   for the defendant.

5           I just want to make sure.  You're referring to --

6           THE COURT:  Well, hold on.  The court reporter can't

7   hear you unless you're in front of the microphone, Mr. Johnson,

8   so ...

9           I'm sorry.  I'm referring to -- it's plaintiffs'

10  Document 999.  There's a -- they are seeking to exclude evidence

11  or reference to contracts between Universal Strength

12  Headquarters and its employees or between Le and Universal and

13  evidence of plaintiffs' non-UFC businesses.

14          Is there any -- is there going to be, excuse me, any

15  attempt to offer that type of evidence by the defendant?  And to

16  the extent that you are going to be offering it, what's it going

17  to be offered for?

18          MR. JOHNSON:  Yes, Your Honor.  There is very specific

19  types of evidence that would fall into these categories.  I

20  guess I'll address the two motions separately because they

21  relate to different types of evidence.  The first one relating

22  to the Universal Strength contracts, this really doesn't have

23  anything to do with the mitigation MIL that was previously being

24  discussed.  This is an example of named plaintiff, Mr. Le, was

25  managing or running an MMA gym or team.  This is before he began

—————————2:15-cv-01045-RFB-BNW—————————

1   fighting for UFC.

2          And there are two parts of his management of that MMA

3   team that are directly relevant to the issues in this case, one,

4   the types of contracts he entered into with the fighters that

5   were under his management and then, two --

6          THE COURT:  Why is that relevant?  Look, the issue is

7   whether or not in this particular instance, right, Zuffa's

8   contracts were restrictive.  And I actually wrote in my order

9   the fact that other entities might have used similar contracts

10  doesn't actually make the contract less allegedly pro or

11  anticompetitive.  So why would it be relevant?

12         MR. JOHNSON:  Well, Your Honor, maybe this would be a

13  better MIL that we best discuss in the context of the jury

14  instructions when we get there, but one of the jury instructions

15  that we would be arguing for would come directly from the

16  American Bar Association's model for civil antitrust cases.  And

17  within that model it says explicitly that one of the factors

18  that jurors must consider when evaluating the procompetitive or

19  anticompetitive nature of exclusive contracts is, quote, The

20  nature and history of the use of exclusive dealings -- dealing

21  contracts in the industry.

22         So it's something that the jury is going to be told,

23  presumably.  I will discuss jury instructions at the next, you

24  know, proceeding.  But it's in the model instruction and it's in

25  the case law as well.  The use of the challenged contract among

—2:15-cv-01045-RFB-BNW—

1   other industry participants is directly relevant to the

2   legitimate business rationale for the contracting practice in

3   the first place.

4         So we're not arguing that Mr. Le's use of exclusive

5   contracts with his fighters was anticompetitive by Mr. Le.  In

6   fact, we're kind of arguing the opposite.  What we're --

7         THE COURT:  You want to say that that's the industry

8   standard and it's procompetitive.

9         MR. JOHNSON:  We're saying that there are legitimate

10  business rationales for Zuffa to have entered into exclusive

11  agreements just as there are legitimate business rationale for

12  Mr. Le to have entered into exclusive agreements with his

13  fighters under management.  They're likely the exact same

14  rationale.  He's investing his time, his money, his energy into

15  the development of these fighters.  That's exactly what Zuffa

16  did.  It's part of the justification for Zuffa's exclusive

17  contracts.  So that's why it's relevant.

18        Plaintiffs' case in part, as I understand it, is that

19  there were no legitimate justifications for Zuffa to use these

20  contracts.  Maybe I have that wrong, but I believe I've seen

21  that before.

22        And the fact --

23        THE COURT:  Well, look, I think this does raise an

24  issue which we're going to have to deal with which is, as you

25  know, and the experts are going to talk about, the type of

2:15-cv-01045-RFB-BNW

1    conduct you engage in when you don't have market dominance or a

2    significant market share is very different than what you can

3    engage in when you do have it.  And so what might be allowed,

4    right, when you are a startup is not going to be allowed by

5    Microsoft and Google, right, and the law is pretty clear about

6    that.

7            And you're right that raises an issue about how we

8    address that because I do think we have to address the issue of,

9    as Zuffa or as UFC started, there might have been a legitimate

10   basis for doing so.  At a certain point, as you know -- this is

11   unfortunately the way that antitrust law works.  At a certain

12   point when you become dominant enough in an industry, what got

13   you to that point is no longer permissible.

14           So we can address that.  Because I don't disagree with

15   you to the extent that there may be some potential relevance to

16   explaining how these contracts came about in the industry, but

17   we still have to address the issue, Mr. Johnson, of the fact

18   that at a certain point, to the extent it's established, Zuffa

19   couldn't continue to operate in the same way because of its

20   dominant market power.  And so we'd have to figure out how to

21   address that.

22           So I think you're correct, actually, the best way to do

23   this would probably be to look at what the jury instructions

24   say.  But I did want to at least foreshadow that particular

25   issue because I think it's actually also another little sticky

2:15-cv-01045-RFB-BNW

1  issue, which is the way that antitrust law works is what you can

2  do when you're small doesn't necessarily work and is allowable

3  when you get bigger, right.  And no one's really disputing that.

4  The question is how do we allow for the jury to understand that

5  in the context of the evidence they receive.

6        So why don't we wait on this one?  I agree with you on

7  that.

8        MR. JOHNSON:  Okay.  So that was plaintiffs' Motion

9  Number 10, I believe, Your Honor.

10       THE COURT:  Okay.

11       MR. JOHNSON:  The second one was plaintiffs' Motion

12  Number 11.  This is also within Docket Entry 999.  This is the

13  evidence about plaintiffs' non-UFC businesses, and I would like

14  to address that.  I think it's a different category of evidence

15  and --

16       THE COURT:  Yeah.  No.  Yes, I do want you to address

17  that, too.

18       MR. JOHNSON:  So at the outset I'd like to direct the

19  Court's attention, in this motion I think it's the third

20  sentence in plaintiffs' motion.  It's Page 9 of their motion.

21  What plaintiffs write in support of this motion is:  "What

22  plaintiffs or other class members decide to do after they left

23  the UFC is plainly irrelevant to any claim or defense in this

24  case."

25       That cannot be correct.

—2:15-cv-01045-RFB-BNW—

1          THE COURT:  Why?

2          MR. JOHNSON:  If fighters were fighting for UFC and

3   then left to fight for --

4          THE COURT:  Oh, you mean -- you're talking about within

5   the class period?

6          MR. JOHNSON:  Within the class period.

7          THE COURT:  Yes, yes.

8          MR. JOHNSON:  Within the class period, Your Honor.

9   Yes.  The subject of this motion is within the class period.

10          THE COURT:  So if you're talking about the introduction

11   of evidence of fighters' mobility to different promoters or

12   entities involving fighter services, I would agree with that.

13   That's not what I understand them to be trying to exclude.

14          Well, let me ask -- before you go on, Mr. Johnson, let

15   me ask whoever's going to be arguing this for the plaintiffs if

16   that's the issue.  Because if it's simply -- why don't you stay

17   there, Mr. Saveri, so that Mr. Johnson can stay here, and pull

18   that microphone in front of you.  Right.

19          You're not saying that they can't bring in evidence of

20   fighter mobility within the class period, are you?

21          MR. SAVERI:  No, we're not.

22          THE COURT:  Okay.  So then what is it --

23          MR. SAVERI:  The motion goes to conduct that occurred

24   before, including an MMA effort that never even got off the

25   ground in Argentina.  So this is relevancy.  It's beyond the

—2:15-cv-01045-RFB-BNW—

 1   scope.  Within the scope of the class period I don't think we

 2   have any objection to the kind of evidence that they're talking

 3   about.

 4           MR. JOHNSON:  If I may, Your Honor.

 5           THE COURT:  Okay.

 6           MR. JOHNSON:  That should be the end of this motion in

 7   favor of defendant because the conduct that they're complaining

 8   about was during the class period.  They're trying --

 9           THE COURT:  So I'm sorry.  So, Mr. Johnson, then what

10   is it that you want to be offering?  So just so we're all clear.

11           MR. JOHNSON:  I raised the sentence that they included

12   in their motion to show that it was overbroad, the motion.  The

13   specific context -- conduct that they're discussing is from

14   2012.  It's in the heart of the class period.  And what former

15   named plaintiff, I guess Mr. Quarry, who's not a member of the

16   bout class, but is on plaintiffs' witness list and is planning

17   to testify at this trial, when he ceased fighting for UFC, he

18   went and participated in an effort to start a new MMA promotion.

19   It was --

20           THE COURT:  In South America.

21           MR. JOHNSON:  It was in South America.

22           THE COURT:  Okay.  But that was not the defined market

23   that I set up for my order, right.  So how is that relevant?  I

24   mean, I was very clear about -- we had to go through this whole

25   definition of the market, where it is.  It doesn't include

—2:15-cv-01045-RFB-BNW—

1  Russia.  It doesn't include China.  So how is this relevant,

2  South America?

3          MR. JOHNSON:  So, Your Honor, Your Honor said that the

4  relevant geographic market that plaintiffs must prove or their

5  case fails is the United States.  Is that -- is that --

6          THE COURT:  Yes, it's in the order.  It was actually --

7  I mean, it was broader -- a little bit broader.  At certain

8  points I think I talked about North America, but it certainly

9  didn't include South America.

10         MR. JOHNSON:  Okay.  And so if there is a viable

11 employment option for fighters outside of the geographic market

12 that they must prove or their case fails, then their case fails.

13 If we prove that there are employment options outside of the

14 relevant market, it goes directly to their proof of the -- the

15 geographic market being narrower than that.  Just because their

16 theory and what they must convince the jury of is that the

17 relevant geographic market is narrow, in their view I guess the

18 United States or maybe North America, that doesn't mean we don't

19 get to contest that contention.  That's what we will do at the

20 trial.  We'll show that these athletes actually have

21 opportunities to fight for promotions outside of that geographic

22 market and, in fact, multiple of -- or the named plaintiffs did

23 that exact thing.

24         And the effort of Mr. Quarry to go to South America and

25 start an MMA promotion, it is relevant to that geographic market

1   question because his e-mails, which he wrote during the class

2   period, show that when he was attempting to start this MMA

3   promotion, he was considering fighters from all over the world,

4   including fighters in the U.S., including one of the named

5   plaintiffs in this case, Mr. Jon Fitch.  And he wanted to bring

6   them to fight for his promotion in South America.

7          So that's just one of the theories of relevance for

8   this evidence.  It goes to rebutting their claim that the

9   geographic market is so narrow when we believe it's in fact

10  global.  There are additional theories of relevance for this

11  evidence.  In particular, Mr. Quarry, he's participating in this

12  effort to start an MMA promotion in South America.  He writes

13  these documents during the class period, and some of the things

14  he's talking about are, "Oh, who are the fighters that I would,

15  you know, want to bring in to fight for me at this promotion?

16  Are there any fighters available?"

17         In these e-mails he says, "Yes, there are fighters

18  available."  He doesn't say, "Oh, there's no opportunity to

19  bring in ranked or high quality fighters."  He says the

20  opposite.

21         THE COURT:  So, I'm sorry, the argument is going to be

22  that Mr. Quarry's testimony about attempting to start up an MMA

23  promotion or MMA entity in South America demonstrates that, in

24  fact, the definition of the relevant geographic market is

25  inaccurate and that, in fact, there were true opportunities for

—2:15-cv-01045-RFB-BNW—

1    fighters based here in North America to go to South America.

2            MR. JOHNSON:  That's one of the theories of relevance,

3    Your Honor.  It goes directly to that, but it also goes more

4    directly to rebutting plaintiffs' claim that these contracts --

5    Zuffa's use of exclusive agreements has locked up so many

6    fighters that there are not enough fighters available for other

7    promotions.  It goes to barriers to entry.  It goes to fighter

8    mobility.

9            Mr. Quarry's statements that there are fighters

10   available for him to use for his promotion directly undermines

11   plaintiffs' evidence to that point.

12           He also discusses fighter compensation and what would

13   be considered fair for him to pay his fighters if he were to

14   start this promotion.  He also weighs in on the value of a fight

15   performed by a named plaintiff in this case, Mr. Fitch.  At the

16   exact same time that Zuffa is paying Mr. Fitch $100,000 or more

17   for a single fight, Mr. Quarry, when considering what fighters

18   he might want to hire, opines that a Jon Fitch fight is worth

19   absolutely nothing, no one wants to see it.

20           So plaintiffs are claiming that Zuffa underpaid Jon

21   Fitch by giving him $100,000 and an opportunity to earn even

22   more if he won at the exact same time that one of the other

23   plaintiffs is saying, "There's zero value to Jon Fitch fighting.

24   No one wants to see it."

25           It's -- it's directly relevant, Your Honor, to

—2:15-cv-01045-RFB-BNW—

1   rebutting plaintiffs' case --

2        THE COURT:  Well, let me decide that, Mr. Johnson.

3        MR. JOHNSON:  Of course, Your Honor, of course.  You're

4   the ultimate decider of this.

5        THE COURT:  I appreciate your arguments here.  Let me

6   let the plaintiffs respond.

7        MR. JOHNSON:  Yes, Your Honor.

8        MR. SAVERI:  Thank you, Your Honor.  Joseph Saveri

9   again.

10        I think it's fair to say that Mr. Johnson overstated

11   the record a little bit.  I think Your Honor is absolutely

12   correct that this is far outside the relevant market.  I was

13   incorrect when I said it was Argentina.  It was really Uruguay.

14   This was --

15        THE COURT:  So the question I have for you, though,

16   Mr. Saveri is this.  Would the defendants not be permitted to

17   say, for example, let's say it was in the record, "You could

18   travel to Mexico and make twice the money.  So the extent to

19   which there was restriction on fighters, that actually is not

20   the effect because there are readily available options."

21        Now, you could argue potentially, "This never

22   materialized.  That demonstrates the exact opposite."  But why

23   wouldn't they be able to at least argue that?

24        MR. SAVERI:  Well, first, Your Honor, I think that's

25   backwards.  Before they can argue it, there has to be evidence

—2:15-cv-01045-RFB-BNW—

1    of it.  And the evidence --

2         THE COURT:  Well, I'm assuming -- I'm not going to go

3    back through in the record to check right now.  I'm assuming

4    that what Mr. Johnson has represented is essentially accurate in

5    terms of their argument of what those facts allow for in terms

6    of a reasonable inference.  Let's start there.

7         Is your argument that if what he is presenting or

8    proffering is true, he still shouldn't be relevant because it's

9    outside of the relevant market?  Is that your argument?

10        MR. SAVERI:  Well, Your Honor, there was a lot that

11   Mr. Johnson described what this evidence is which is not in fact

12   what the evidence is.

13        THE COURT:  Okay.  Well, but, Mr. Saveri, I want you to

14   get past that part.

15        MR. SAVERI:  Okay.

16        THE COURT:  I'm looking at this particular issue, which

17   is can the defendant present evidence that these fighters could

18   readily fight for another entity, even if it's outside of the

19   United States, and make equal or better compensation?  Can they

20   present evidence of that?

21        MR. SAVERI:  If -- if they have evidence of that, which

22   is -- well, first, Your Honor, we say it 's beyond the scope of

23   the relevant market.  We don't think that evidence is admissible

24   or relevant, and I think it's confusing to the jury for the

25   reasons that you talked about a minute ago.

—2:15-cv-01045-RFB-BNW—

1           So we -- we wouldn't concede that it is admissible.

2   The evidence here that we're talking about, which is entirely

3   speculative -- and maybe what we should do is have a proffer

4   about what that evidence is before we can make this decision,

5   but the -- but the fact that one of our plaintiffs tried to be a

6   fight promoter, not a fighter, the promotion never got off the

7   ground --

8           THE COURT:  Well, why are you even objecting to this?

9   I mean, you could make this -- I'm not even sure why you

10  wouldn't, Mr. Saveri, say, "You know what, this just proves our

11  case.  Even when they went to South America, they still couldn't

12  start an MMA promotion."

13          MR. SAVERI:  But, Your Honor, this is the 403 issue,

14  really, is that there is a point at which evidence has a

15  potential and the likelihood of confusing the jury.  And rather

16  than putting it on and having to argue and say why it doesn't

17  apply, I mean, that's what 403 says.  And so we say, on balance,

18  this evidence is not probative and it's prone to confuse the

19  jury, especially about these technical issues that have to do

20  with relevant market.

21          And if you're going on --

22          THE COURT:  Well, let me ask you this question because

23  I'll have to go back and look, and I want to make sure I'm going

24  back myself and looking at the law on this as relates to the

25  burden of establishing the relevant geographic market.

2:15-cv-01045-RFB-BNW

1          MR. SAVERI:  That's fair, Your Honor.

2          THE COURT:  Because I actually think the plaintiffs

3   have to support that.  The question is at what point does the

4   evidence of a market that's fairly far afield become more

5   confusing than probative for the jury, which is what you're

6   saying.

7          MR. SAVERI:  Yes, Your Honor.

8          THE COURT:  Is there a point at which -- even though

9   they're able to present this technically, it's very confusing.

10  What I'm going to do rather than have us go back and forth is

11  I'm going to go back and look at the burden because I do think

12  the plaintiffs have a burden of establishing this aspect of

13  their case.

14         MR. SAVERI:  And we don't dispute we have the burden.

15         THE COURT:  But the question is at what point even in

16  the context of establishing that can evidence be irrelevant in

17  terms of the geographic market that is being argued.

18         MR. SAVERI:  And --

19         THE COURT:  But again, Mr. Saveri, I have to tell you,

20  I'm not even sure that I -- other than confusion, I don't really

21  see the prejudice.  I mean, if that's what they want to argue

22  and you want to argue the opposite, you can certainly argue

23  that.  It's not as if you wouldn't be able to make arguments

24  about why this particular evidence demonstrated what you are

25  arguing.

2:15-cv-01045-RFB-BNW

1          MR. SAVERI:  That's absolutely true, Your Honor, but we

2   are going to be here in the United States talking about a market

3   that was defined as the United States.  And we think to the

4   extent we're talking about Uruguay or Argentina and a promotion

5   that never got off the ground, it has the potential and the

6   likelihood under 403 to confuse the jury.  But I take your

7   point.

8          THE COURT:  Well, here's what we'll do.  I am going

9   to -- at this point in time I think there's reason enough to

10  allow it, but I'll hear further proffer on the 28th about that.

11  I think that that's fair game in this case.

12          All right.  Let's move on.  Let's see.  Did we address

13  this issue with the identity class or not?  I thought we've

14  already done this.  This is Number 12 and 999.

15          MR. YATES:  I think we did, Your Honor.

16          THE COURT:  Okay.  So Number 13, evidence of economic

17  benefits or charity by Zuffa to the Las Vegas area.

18          MS. PHILLIPS:  Thank you, Your Honor.

19          THE COURT:  So, Ms. Phillips, are you going to be

20  offering this evidence?

21          MS. PHILLIPS:  Yes.

22          THE COURT:  Okay.  And tell me why it's relevant.

23          MS. PHILLIPS:  Sure.

24          So the argument from the plaintiffs is that Zuffa

25  should have paid fighters more money, right.  So we believe we

2:15-cv-01045-RFB-BNW

1  should have the opportunity to introduce evidence of all the

2  other costs that Zuffa has, right.  We have to pay other

3  professionals who helped to run Zuffa.  We have to pay marketing

4  costs.  We have to pay promotional costs.  Charitable giving is

5  among those expenses.

6           They can certainly argue, "Well, that's not a required

7  expense," but we believe we are entitled to say, "These are all

8  of the other costs that we have, and if we had to pay fighters

9  more, that would come" -- right, something else has to give.

10  And they can certainly cross -- you know, cross our witnesses --

11          THE COURT:  So are they going to say, "In order for us

12  to have given the fighters more, we would have had to have

13  donated less to Las Vegas"?  Because, certainly, I'm not going

14  to let them say that.  I mean, that, Ms. Phillips, would be

15  directly prejudicial.

16          And so if the issue is this is a line item in our costs

17  and we have to pull the money from somewhere --

18          MS. PHILLIPS:  Exactly.

19          THE COURT:  -- that's fine.  But I just want to be

20  clear.  They're not going to be able to get up there and say,

21  "Well, you know, in order to pay the fighters more, we would

22  have had to contribute less, right, to the March of Dimes or the

23  Boys Club," right.  That seems to me to be unfairly prejudicial.

24  But if you're saying this is just a line item, that was one of

25  the line items, I don't know that I see any issue with that.

─────2:15-cv-01045-RFB-BNW─────

1   Let me hear from the plaintiffs on that particular portion.

2          MR. CRAMER:  Your Honor, Eric Cramer for the

3   plaintiffs.

4          We believe it would be entirely prejudicial for them to

5   point to a charitable line item and say, "Yeah, it was this

6   particular charity to Las Vegas and to you, jurors, that's where

7   the money would have come from" --

8          THE COURT:  Okay.  So, Mr. Cramer, if I'm understanding

9   this, what you're saying is they can point to charitable

10  donations.  They can't identify entities.  Is that your concern?

11         MR. CRAMER:  The concern is that there's just no --

12  first of all, there's no evidence or no reason to believe that

13  if Zuffa had to pay its fighters more, that they would give less

14  charity.  They obviously give --

15         THE COURT:  Mr. Cramer, I'm not going to let them say

16  that.  The issue is if that's one of the line items in their

17  budget, they should be allowed to say that.  They don't have to

18  identify the entity.  But why can't they say that?  If that's

19  actually one of their expenditures, why can't they include that?

20         MR. CRAMER:  Well, it would be highly prejudicial for a

21  Las Vegas company to talk about the charitable giving that they

22  give.  And the implication is -- the implication that we just

23  heard is that if they had to pay the fighters more, they would

24  give Las Vegas less.  That's the implication they want the jury

25  to get, which is completely unfair and prejudicial.

1        And the fact that they give charity -- there's just no

2   reason to believe that if they had to pay their fighters a

3   competitive wage instead of paying themselves billions of

4   dollars, that they would have given less in charity.  There's

5   just no reason to believe it.  And they're trying to imply that

6   to the jury, and that would be highly prejudicial.

7        THE COURT:  Okay.  Well, I guess I want to hear from

8   the defendants again about what and how this would be presented.

9   Because again, Mr. Cramer, if it's in a spreadsheet where there

10  is a list -- an item, again, I haven't seen the particular

11  exhibit again, that says this is part of what we spent money on,

12  I don't know that they should be prevented from including that

13  in a document that already exists.

14       I take your point about identifying local entities and

15  even identifying whether or not it's local or not, right.  You

16  know, we can talk about that, but I guess let me hear from the

17  defendants about, sort of, what and how they'd present it

18  because it seems to me a lot of this is about the presentation.

19       So, Ms. Phillips, let me first ask the question.  How

20  much are we talking about as relates to a percentage of the

21  overall expenditure?  Do you know?

22       MS. PHILLIPS:  I don't know.

23       THE COURT:  Okay.  Because that's relevant to me, too.

24  If this is like half of a percentage, then that seems to me to

25  be prejudicial.

2:15-cv-01045-RFB-BNW

1          MS. PHILLIPS:  I can certainly bring that information

2  on the 28th, Your Honor.

3          THE COURT:  Right.  I think it would be helpful to know

4  two things on the 28th, what is the actual percentage we're

5  talking about.  Are you trying to present actual entities?

6  Because I am going to tell you now, I won't let that happen.

7  And I'm not even sure that I would allow any geographic location

8  to be identified, but it would be helpful to know where this

9  information is identified.

10          MS. PHILLIPS:  Sure.

11          THE COURT:  And are you going to have witnesses testify

12  about it?  Because I absolutely would not let witnesses say, "We

13  would give less to Las Vegas if we paid the fighters more."

14          MS. PHILLIPS:  Understood.

15          THE COURT:  But I'm not saying that you would say that,

16  but I want to be clear about that.  But I want to see how this

17  would be presented.  I want you to think about how it might come

18  in through witnesses.  Because I definitely think there is a

19  significant potential for prejudice, but I also think the

20  defendants should be able to identify a line item, right.  And I

21  want to see how that would be presented.

22          MS. PHILLIPS:  Sure.  I mean, if I can make one other

23  point, Your Honor, too.  The plaintiffs -- and you've seen this

24  before, but the plaintiffs are going to come in and argue, you

25  know, "Zuffa spent money on other things instead of the

——2:15-cv-01045-RFB-BNW——

 1  fighters."  So, for example, aviation costs is something

 2  that's -- you know, we're going to hear about that at trial and

 3  we're going to dispute that.  And then they'll -- you know,

 4  they'll do whatever they're going to do.

 5       THE COURT:  The difference, though, Ms. Phillips, is

 6  the jurors might be directly implicated in terms of their own

 7  experiences with the donations here locally.  The executives at

 8  Zuffa, to the extent that these things may or may not have

 9  happened, right, it's a very different circumstance than

10  potentially impacting jurors who may or may not be affected

11  directly without us knowing about it by their contributions to

12  local charities in which the jurors may or may not be involved

13  or receive benefits.  And so I think those things are very, very

14  different.

15       MS. PHILLIPS:  Well, I understand your point on, you

16  know, identifying specific Las Vegas-based charities.  But, you

17  know, it does seem that we ought to be able to say, right, if

18  there is a criticism about how we spent corporate money, we

19  ought to be able to demonstrate to the jury how we spent it.

20  And we can say charitable donations and not be specific about

21  which charitable donations or even identifying, you know, that

22  they benefitted Las Vegas specifically as opposed to national

23  charitable organizations.  That seems like something that we

24  ought to be able to introduce evidence of to demonstrate that

25  when we were spending money we weren't overspending money on --

————2:15-cv-01045-RFB-BNW————

1  on, you know, wasteful things.

2         THE COURT:  Okay.  Well, again, I want to hear a little

3  bit more about that when we come back on the 28th.

4         MS. PHILLIPS:  Understood.  Thank you, Your Honor.

5         THE COURT:  All right.  Thank you.

6         Let's see.  So I'm not sure who's going to be arguing

7  Number 14, which is in Document 1000, as it relates to excluding

8  speculation by lay witnesses regarding the financial condition

9  of promoters Zuffa acquired between 2006 and 2011.

10        MS. PHILLIPS:  May I?

11        THE COURT:  Well, let me first hear from them,

12 Ms. Phillips, about what it is specifically that they anticipate

13 is going to be offered.

14        (Defense counsel conferring.)

15        THE COURT:  So who's going to be doing this for the

16 plaintiffs?

17        MR. DELL'ANGELO:  I will, Your Honor.  Michael

18 Dell'Angelo.

19        THE COURT:  Okay.  Come on up, please, Mr. Dell'Angelo.

20        So, Mr. Dell'Angelo, tell me exactly what it is that

21 we're worried about being said.

22        MR. DELL'ANGELO:  The concern, Your Honor, is that the

23 lay witnesses and Dr. Topel in particular as an expert witness

24 would offer unsubstantiated opinions about the financial

25 condition of competitors, you know, identifying them or

—2:15-cv-01045-RFB-BNW—

1  characterizing them as failing or going out of business or

2  losing money, where that testimony is based on speculation or

3  hearsay.

4          THE COURT:  Okay.  Are there specific aspects?  Because

5  when I looked at your -- and I'm looking back through the

6  motion.  It's not clear to me exactly what you expect he's going

7  to say, right.  I mean, can he not say it's not clear that a

8  particular competitor had the financial resources or was

9  successful, I mean, or are you saying that he has no basis for

10  saying that?  I mean, there's -- I have to go back and look and

11  see what information the experts received about the competitors

12  because they did receive some.

13          So I guess I can't tell from what's been argued here

14  what are the specific types of statements, other than what you

15  just described, you're going to be worried about and which

16  businesses he's going to be saying that about.

17          MR. DELL'ANGELO:  Sure.  So if your question to begin,

18  Your Honor, is focussed on Dr. Topel, we do address this.  This

19  is at ECF 1000, Page 5 of the Document 7 of the ECF Document.

20  And the issue that we identify there in the second full

21  paragraph is that what Dr. Topel is relying on is the type of

22  evidence that an expert would not normally rely on which is, for

23  example, unsubstantiated hearsay.  And there are a few examples

24  of that in the motion itself from the lay witnesses.

25          And, you know, one example at the top of the same page

—2:15-cv-01045-RFB-BNW—

1   that I just identified was during the deposition of Mr. Epstein

2   where he says, quote, The business was failing because they

3   couldn't manage it properly, I assume.  Right.  The issue is

4   that -- and it -- you know, Mr. White likewise.  There's some --

5   at Exhibit N to the declaration that supports this motion --

6        THE COURT:  So is the concern here, Mr. Dell'Angelo,

7   that what he's going to say is that the reason why these

8   competitors were not successful has nothing to do with entry

9   barriers or the availability of fighters, but their own

10   mismanagement.  Is that what your concern is?

11        MR. DELL'ANGELO:  Their own mismanagement or that they

12   were losing money or that they were, quote, failing, precisely.

13   But where that testimony for Dr. Topel is based on, again, the

14   type of evidence that an expert wouldn't normally rely on such

15   as unsubstantiated hearsay, and also with respect to the lay

16   witnesses where even if there is the, sort of, appearance of

17   personal knowledge, the personal knowledge isn't really there.

18        And we provided you for an example an instance where

19   Mr. White testifies about a competitor that they -- that the UFC

20   acquired by the name of Pride, right.  And his testimony was,

21   you know, one of the issues or reasons that they were failing is

22   because Pride was really run by Yakuza, which is the equivalent

23   of the Japanese mafia.  "How do you know that?"  "I read it in

24   the newspaper," right.  That's not personal knowledge, and

25   that's the problem.

—2:15-cv-01045-RFB-BNW—

1           But if you have these witnesses in a case where

2   acquiring and shutting down promoters, the rival promoters, and

3   taking their fighters into the UFC, the testimony is not truly

4   personal knowledge, right, or 701-type information, but rather,

5   "Oh, I read it in the newspaper."  And I will tell you, you

6   know, if you look at the very last paragraph of our MIL on this

7   issue, there's plenty of evidence that was produced in the case

8   that suggests just the opposite, right, that these competitors

9   were acquired for reasons that had nothing to do with their

10   financial condition and doesn't substantiate their financial

11   condition.

12           But, really, the central point being is that the

13   evidence that we have doesn't suggest that there is personal

14   knowledge.

15           THE COURT:  Well, so part of the issue,

16   Mr. Dell'Angelo, you've identified I think would be different

17   depending upon who says it.  And I say that because if Mr. White

18   comes in here and says, "I don't think they were -- we didn't

19   acquire them because they were not particularly successful in

20   our view," he can say that, right.  Or, "We acquired them

21   because we thought that they were ripe for the picking because

22   they didn't have any assets from our view," he can say that, I

23   think.

24           I don't know that -- I want to hear more about what

25   Dr. Topel is going to opine about the financial condition of

—2:15-cv-01045-RFB-BNW—

1    other alleged competitors.

2           But I think a witness like, for example, Mr. White who

3    was directly involved with the business decisions of Zuffa in

4    terms of acquisitions could certainly explain why they may or

5    may not have acquired particular entities, and he can give his

6    explanation that he thinks is consistent with Zuffa's theory.

7    And whether or not that's relied-upon information that is

8    speculative, that still forms the basis of his decision and that

9    would still be relevant for the jury to hear.

10          But I take your point that's slightly different if

11   Dr. Topel is describing a business as an expert as failing or

12   going out of business.  And so I'll hear from the defendant

13   about that, but --

14          MR. DELL'ANGELO:  Well, if I may, Your Honor.  I agree

15   with you with respect to Dr. Topel, and I think that that's spot

16   on and will likewise be interested to hear what the defendants

17   have to say.

18          But just to put a sharper point on the concern with

19   respect to the lay witnesses is -- and I don't entirely disagree

20   with your -- with your view of what those witnesses can say when

21   they're involved.  The concern is even when they're involved, if

22   the actual basis for that inform -- for their personal

23   information is speculation or hearsay, that is where it becomes

24   problematic.

25          THE COURT:  But what I'm saying to you is if Mr. White

—2:15-cv-01045-RFB-BNW—

1   is making decisions, even if it's based upon speculation, those

2   decisions would still be relevant and he can describe what he

3   believed.  And certainly we can think about an instruction that

4   speaks to whether or not that's actually accurate or not.  But

5   if that formed the basis for him making a particular decision or

6   recommending a particular course of action, I think that would

7   be something the jurors could hear.

8           But let me hear a little bit more from the defendants,

9   and then I may have more questions.

10          So, Mr. Isaacson, I guess the specific point is, is

11  Dr. Topel going to offer as an expert an evaluation of

12  competitors as being failing or mismanaging based upon

13  statements from other people?

14          MR. ISAACSON:  There will be a combination of evidence

15  on that, including evidence that will have to be put in with the

16  foundation of personal knowledge.  Other than, as you point out,

17  you can -- you can -- you can have an opinion about why you did

18  something and not have it be terribly factually based.  But we

19  are going to put in witnesses -- because we acquired these

20  companies and got their finances.  And they can testify about

21  the financial state for personal knowledge of those companies.

22  Dr. Topel based on that, which is what he did in his report, can

23  testify about whether they were failing firms at the time of

24  acquisition.

25          In addition, could I just --

—2:15-cv-01045-RFB-BNW—

1      THE COURT:  So, Mr. Isaacson --

2      MR. ISAACSON:  There's also -- can I --

3      THE COURT:  Hold on just a second.  I just want to make

4  sure I'm understanding what you're saying.  So you're saying, to

5  the extent that he offers an evaluation of it, it would be based

6  upon from your perspective witnesses who had personal knowledge

7  that was from the entities, and it's not him, for example,

8  making a decision about a business failing because in this one

9  instance of this, quote, The rival is done or the person's out

10  of business, he's not drawing that simply on such a statement.

11      MR. ISAACSON:  That is correct, Your Honor.

12      THE COURT:  Okay.

13      MR. ISAACSON:  And Your Honor raised the issue of,

14  like, the decision of why to acquire.  There's also a decision

15  that plaintiffs put into issue as to why to shut down these

16  firms as independent trademarks such as Pride and just have the

17  fighters fight for the UFC.

18      THE COURT:  Right.

19      MR. ISAACSON:  And so the -- a news report about the

20  Yakuza being involved in one of them doesn't get admitted for

21  the truth, but it affects a decision as to why to shut something

22  down.  And it goes into the input of the decision.  It would

23  not -- that -- no one's going to know and be able to say that

24  that was true or not.

25      THE COURT:  Right.

—2:15-cv-01045-RFB-BNW—

1          MR. ISAACSON:  Okay.  But there were consequences that

2    came from those press reports that went into the decisions that

3    were made.  But these are things that you're going to be able to

4    look at as the evidence comes in at trial.

5          THE COURT:  Okay.

6          Well, I think what I'm going to need some help with

7    then from the plaintiffs is more specific examples,

8    Mr. Dell'Angelo, of exactly what you anticipate would be the

9    problem, right.  Because I do think an expert can rely upon

10   information they receive from what they believe to be a person

11   with personal knowledge.  And so there's going to be I think a

12   continuum of the degree of personal knowledge, the amount of

13   information that's available, and I think you'll have to let me

14   know where you think the line should be.

15         Mr. Isaacson has indicated that there are entities that

16   were acquired where their information was produced and

17   individuals related to the operation of the respective entities

18   provided testimony and will testify.  That from my standpoint

19   would be perfectly acceptable.  Are you taking issue with that?

20         MR. DELL'ANGELO:  To a point, Your Honor.  I think

21   where the complication comes in is that to the extent that

22   Dr. Topel characterized one or more of these rival promotions

23   who were acquired by Zuffa and shut down as failing, that

24   characterization was based on the type of speculative --

25         THE COURT:  No, but what I'm saying is if he received

1   that information from an individual who was involved in the

2   operations of the business, why wouldn't that be appropriate for

3   him to rely upon?

4          MR. DELL'ANGELO:  Well, because the information that an

5   expert would ordinarily rely on is not actually in the report.

6   So what I think Mr. Isaacson in effect said is that the analysis

7   that Dr. Topel should have done in his report will be

8   constructed on the fly in front of the jury, right, during the

9   trial.

10          THE COURT:  I doubt very seriously that that's how

11   Mr. Isaacson would characterize what he just said.

12          MR. DELL'ANGELO:  No, I am sure he would not, but what

13   he said -- what he did say was is that at trial, right, we'll

14   put on witnesses with personal knowledge who will testify to the

15   financial condition, who will rely on the documents.  Those are

16   all the things that Dr. Topel did not do.

17          THE COURT:  So, Mr. Dell'Angelo, why can't you -- that

18   is, like, the subject of cross.  You could have a hardy and

19   robust cross-examination --

20          MR. DELL'ANGELO:  Sure.

21          THE COURT:  -- about you didn't know anything -- I

22   mean, you know.

23          MR. DELL'ANGELO:  It's also the subject of the order of

24   operations, which is that the cross follows the expert report.

25   The expert report doesn't include the information that

2:15-cv-01045-RFB-BNW

1  Mr. Isaacson is saying they essentially now intend to develop at

2  trial.

3          THE COURT:  Well, that's true, but, you know, that's

4  the beauty of going second, right, and having the cross, right?

5  Or, you know, going second like, you know, the Kansas City

6  Chiefs found out the beauty of going second is sometimes you

7  actually win, right.

8          So what I will say to you is this.  Right now I'd have

9  to see this.  Right now I don't see a basis to, sort of, engage

10 or to issue a wholesale order that would require Dr. Topel not

11 to testify about this.  If you have a specific determination

12 about a particular business failing or that no information was

13 provided, you can bring that to my attention.  But for now I'm

14 going to deny that motion.  Thank you.

15         MR. DELL'ANGELO:  Thank you, Your Honor.

16         THE COURT:  Okay.  Now, here's this one about the

17 business school case study.  Who's going to be arguing that for

18 the defendant?

19         Mr. Chiu.

20         MR. CHIU:  Yes, Your Honor.

21         THE COURT:  So what aspect of this being a business

22 school case study are we focussed on?

23         MR. CHIU:  So I think the issue with this document and

24 this topic is that, you know, Mr. Fertitta was actually

25 consulted and, you know, given the opportunity to kind of

1  comment on this case study as part of Harvard Business School.

2  I think it goes directly to the, you know, issues at the heart

3  of this case, which is, you know, the founders of Zuffa where

4  they through business acumen building this business and the fact

5  that, you know, part of this --

6        THE COURT:  Isn't that what the jury's supposed to

7  decide, Mr. Chiu?  And it's great, I mean, that the Harvard

8  Business School potentially decided to use the case study.  But

9  wouldn't that be something that they should decide?  I mean,

10  Mr. Fertitta or whomever I assume is going to tell the jury the

11  same thing that he told them, right, or that would be the same

12  basis for that.  So I'm not sure why it would be relevant that

13  it was a case study when the jurors are going to have that same

14  information to be able to make that same decision.

15        MR. CHIU:  It is relevant, and I don't think we would

16  admit the case study itself, right, for proof of that fact.  But

17  the fact that, you know, Zuffa's executives and their -- you

18  know, their being contacted and giving input on this case study

19  is relevant.

20        And if the plaintiffs are going to, you know, challenge

21  our executives and question them about kind of their motivations

22  and building this business in a legitimate versus an

23  illegitimate way, this is fairly within the ambit of what is

24  relevant and that they should be able to elicit on -- testimony

25  about.

—2:15-cv-01045-RFB-BNW—

1          THE COURT:  Okay.  Thank you.

2          Ms. Noteware, you don't need to argue this to me.  I

3    don't find this to be relevant myself, and so I'm not going to

4    allow for the testimony on this.  Certainly, the executives at

5    Zuffa can talk about their own -- what they believe to be their

6    own special acumen, but I don't think being identified as a

7    business school case study is relevant and I think it would be

8    confusing to the jury.  So I'll grant the motion as relates to

9    that.

10          Now, for 1000 we've already talked about video clips.

11    So I'm not going to do that again.

12          And I think there's another motion here about, moving

13    on, excluding reference to the effect on this case -- excuse

14    me -- to the effect of the verdict in this case on the Las Vegas

15    community.  I'm not sure that the defendants said they're going

16    to offer anything like that.  Is anyone going to be offering

17    anything like that?

18          MS. PHILLIPS:  No, Your Honor.

19          THE COURT:  Okay.  I didn't think so.  So I guess I'll

20    just deny that without prejudice as being moot.

21          And then there's a motion to exclude evidence

22    concerning evidence, conduct, or facts where Zuffa objected to

23    and did not produce discovery.  I'm not really sure what the

24    plaintiffs are getting at here.  So maybe someone can help me

25    understand that.

─────2:15-cv-01045-RFB-BNW─────

1           MR. MADDEN:  Thank you, Your Honor.

2           At the beginning of this case we served requests for

3   production of documents, and immediately after that we had a

4   meet and confer on Zuffa's preservation obligations.  Our

5   request for production of documents asked for material going

6   back to July 1st, 2000, which I believe predates the acquisition

7   of the UFC by Zuffa.

8           They objected to preserving documents going back that

9   far.  They objected to producing documents going that far.  They

10  weren't even really going to search for them, but in the process

11  of our meet and confer they found a bunch of boxes of documents

12  that date back prior to 2005.  And we wanted them to review them

13  and produce them to the extent they were responsive and relevant

14  to the case.

15          They objected to doing that.  Ultimately we had meet

16  and confers.  We fought over it.  And Magistrate Judge Leen set

17  the relevant time period based on Zuffa's objections and our

18  meet and confer at January 1st, 2005.  Documents that they

19  collected, but did not look at remain unreviewed and unproduced

20  in this case concerning that pre-2005 period.

21          And what they did agree to produce that goes back

22  before then and that has been the subject of discovery and that

23  we don't object to including at trial are things like the

24  financials, right.  Guy Davis goes through the history of

25  Zuffa's financials going all the way back.  Fighter contracts,

—2:15-cv-01045-RFB-BNW—

1   we have fighter contracts that go all the way back, and

2   Dr. Singer analyzed them.

3        But outside of that material, we believe that anything

4   that concerns facts and circumstances prior to January 1st of

5   2005 should be excluded from the trial because they didn't

6   participate in discovery on it.

7        THE COURT:  I'm not sure I understand what it is you

8   anticipate they're going to be offering.

9        MR. MADDEN:  Sure.  Well, one, we know that they are

10  going to put at issue their building the UFC from whatever it

11  was when they acquired it seven years or eight years after it

12  started until our relevant time period.  And what we would say

13  is you can introduce what you did after 2005, other than the

14  money that you put in because that's in the financials, but you

15  can't talk about all of the work that you did that made it

16  whatever it is at that point in time.

17       THE COURT:  Well, if I'm going to let you all talk

18  about the history of how they became an alleged monopsony, how

19  do I not let them talk about how they built up the business and

20  based upon their business acumen?

21       MR. MADDEN:  Well, I would start with the fact that

22  they can talk about it as of the time that they started

23  discovery on it, which is 2005, which predates the scheme.

24       THE COURT:  Mr. Madden, I don't agree with that.  I

25  mean, if there's specific documents that you have a concern

—2:15-cv-01045-RFB-BNW—

1  about, then you should bring that to my attention.  I will let

2  both sides talk about how UFC was founded and its development.

3  They are perfectly entitled to have their witnesses talk about

4  how they built this business up from nothing based upon their

5  business acumen.  That is their entire theory in addition to it

6  not being anticompetitive.

7        So I don't -- I don't find this, sort of, artificial

8  2005 deadline to be relevant in the context of that type of

9  testimony.  If there are specific documents that you feel like

10  somehow you were prevented from being able to review or exploit

11  because of their objections, then you can raise that with me.

12  But other than that, they will absolutely, their witnesses, be

13  able to talk about pre 2005 what they did to build up their

14  business.

15        MR. MADDEN:  I just want to say, I think the issue is

16  that I can't identify specific documents to you because they

17  remain unreviewed, likely destroyed, in boxes that they were

18  told they didn't have to produce in this case.  So it's hard for

19  me to --

20        THE COURT:  Well, if your concern is they're

21  referencing a document that they should have kept, that's

22  different.  So if someone comes up and says, "Well, if you look

23  at our 2002 documents, which weren't produced, you would see

24  this," then you can come to me and say, "Let's have this

25  particular instruction about that."

1          But my concern is this motion in particular would

2   essentially prevent them from talking at all about how they

3   built up their business and what they did and how they invested

4   in it.  If you think that there's information in the form of

5   testimony or documents that's going to come in that is based

6   upon information that was not produced, but should have been

7   produced and/or to which you feel like they have some unfair

8   access, let me know when it comes in and I'm happy to rule on it

9   at the time.

10          I just want to be clear both sides will be able to talk

11  about the history of the UFC, how it was founded, and how it

12  developed from its inception.  Okay?

13          MR. MADDEN:  Thank you, Your Honor.

14          THE COURT:  All right.

15          All right.  I don't know if the defendants want to

16  comment on that anymore.

17          MS. PHILLIPS:  No thank you, Your Honor.

18          THE COURT:  Okay.

19          So preclude evidence -- this is Number 19, preclude

20  evidence or reference to regulatory investigations or inaction.

21          So, Mr. Chiu, exactly how would this evidence be

22  presented?

23          MR. CHIU:  Well, I think the evidence would come in --

24  well, first, there's a hearsay exception for closure letters

25  that's been recognized in the law.  And that's really what

—2:15-cv-01045-RFB-BNW—

1  they're focussed on is closure letters from the FTC relating

2  to --

3          THE COURT:  How is this relevant and how is this not

4  confusing?  I mean, the jury has to decide this issue as relates

5  to the issue of monopsony.  I don't -- I'm not sure how this is

6  relevant.

7          MR. CHIU:  It is directly relevant because both the

8  conduct that was investigated by the FTC into the contracting

9  practices and also separately the Strikeforce acquisition are

10 part of the alleged scheme here.

11         THE COURT:  Yes, but they're not dispositive to what

12 the jury is going to decide.  How is the jury not going to be

13 confused into believing, "Well, if FTC decided this, then that's

14 something we should defer to"?  That's exactly the issue here,

15 right.  You're aware of that --

16         MR. CHIU:  The theory --

17         THE COURT:  Hold on.  How do I stop that from being the

18 case?

19         MR. CHIU:  Well, the theory of their case and I imagine

20 what's going to be in the plaintiffs' proposed instruction is

21 that they're alleging something broader than that.  It's an

22 anticompetitive scheme that has these components.  And it is

23 relevant to the jury's determination of whether --

24         THE COURT:  Mr. Chiu, you're not answering my question.

25 The question is confusion for the jury where they believe that

—2:15-cv-01045-RFB-BNW—

1   the issue will be decided because the FTC issued a closure

2   letter, right.  How do I address that potential issue of

3   confusion and prejudice?

4        MR. CHIU:  By an instruction that says what the

5   plaintiffs are alleging is an overarching scheme that has these

6   components that they say together amounted to an unlawful

7   exercise of monopsony power.  We're entitled to kind of test

8   that theory and demonstrate -- you know, introduce evidence that

9   actually a lot of those components the FTC investigated and

10  passed on.  It's central to this issue.

11       And the one other thing I -- you know, I asked about

12  Your Honor is that we haven't had a chance to respond in

13  briefing on this.  And there is case law in this district

14  finding that a closure letter by the FTC is not only admissible

15  under the public records hearsay exception, but also on this

16  issue of prejudice and kind of disentangling this.  So -- and I

17  can give you the case.  We obviously haven't had an opportunity

18  to --

19       THE COURT:  You can give me the case, and you can bring

20  it to me on the 28th.  I will tell you, I'm not inclined to

21  allow this type of evidence in because I think it's very

22  confusing to the jury.  But, again, the door can be opened on

23  some of this.  I think that's the other issue.  A lot of these

24  decisions, I'm telling you now, witnesses get on the stand and

25  they say things.  And then the door can be opened to different

—2:15-cv-01045-RFB-BNW—

1  aspects of testimony.

2         But, for now, I don't see that this is relevant.  I

3  think it's going to be confusing, but I'll allow you to take

4  another shot at it on the 28th.

5         MR. CHIU:  Thank you, Your Honor.

6         THE COURT:  Okay.  This is -- Mr. Saveri, I'm not sure

7  why you're standing up.

8         MR. SAVERI:  Because I wanted to convince you that even

9  on the 29th -- 28th, it's going to be highly prejudicial.

10        THE COURT:  Well, then you can convince me on the 28th,

11  I would say.

12        MR. SAVERI:  Hold that thought, Your Honor.  I'll be

13  back.  Okay.

14        THE COURT:  I'm sure you'll all be back.

15        MR. SAVERI:  All right.  Thank you.

16        THE COURT:  So the last motion we have is excluding

17  reference to purported past relationships between class counsel

18  and their expert witnesses.  So who's going to be arguing this

19  for the plaintiffs?

20        MR. SAVERI:  I am, Your Honor.

21        THE COURT:  Okay.  So, Mr. Saveri, is your concern that

22  they're going to get up here and say, "Dr. Singer, how many

23  times have you been an expert for our firm?"

24        MR. SAVERI:  Yes, and --

25        THE COURT:  And why can't they say that?

2:15-cv-01045-RFB-BNW

1          MR. SAVERI:  Because --

2          THE COURT:  I mean, just like why can't they talk

3    about, like, the cost?  I mean, why can't they talk about that

4    in terms of bias?

5          MR. SAVERI:  Well, they -- bias, well, they can

6    certainly ask Dr. Singer the kind of questions they can

7    cross-examine a witness on ordinarily.  Like, what cases you've

8    testified in --

9          THE COURT:  Mr. Saveri, you're not answering my

10   question.  Why can't they ask that specific question of:  How

11   many times have you testified for plaintiffs?  How many times

12   have you testified or have you been hired by plaintiffs'

13   counsel?  That seems to me perfectly legitimate, like, bias

14   testimony.

15         MR. SAVERI:  So, Your Honor, we -- those questions that

16   you just asked we do not disagree with.  The question that we

17   disagree with which we think would be prejudicial would be:

18   Mr. Singer, how many times has Mr. Saveri hired you?  Do you

19   have a business relationship with Mr. Saveri?  Do you have a

20   business relationship with Mr. Cramer?  Do you have a business

21   relationship with Mr. Brown?  That's -- that's not --

22         THE COURT:  Well, first of all, if they did have a

23   business relationship, why wouldn't that not be -- I mean, I

24   don't know why that also wouldn't be relevant bias --

25         MR. SAVERI:  But, Your Honor, it's different if we've

1  hired him in other cases.  The implication of it is is that

2  he's --

3         THE COURT:  He's a hired gun.  Absolutely.  That's what

4  they're going to say.  That's what you're going to say.  I'm not

5  sure, Mr. Saveri -- like, these are standard things that come up

6  in these types of case.  So I'm confused by this because you'll

7  get to ask the same questions of their witnesses, right.  That

8  happens all the time with experts.  So I'm not sure what the

9  particular dangers you're worried about.

10         MR. SAVERI:  Well, Your Honor, it's about the fact that

11  there is a -- some kind of personal relationship between the

12  experts and plaintiffs' counsel such that it would undercut

13  their testimony.  I've been in lots of cases where the

14  distinction that I'm drawing has been recognized by the Court.

15  And you can certainly ask an expert:  How many -- do you always

16  testify as a plaintiff?

17         THE COURT:  Mr. Saveri, if in fact there was a personal

18  business relationship between plaintiffs' counsel where they

19  were involved in a business, that absolutely would be relevant.

20  So I really am not understanding what your concern is because

21  all the questions that you have said they shouldn't be able to

22  ask I think they can ask.  So I'm going to give you one more

23  chance.  Give me a question that you think they should not be

24  able to ask that you anticipate they might ask.

25         MR. SAVERI:  Mr. Singer ... Mr. Singer, how many cases

2:15-cv-01045-RFB-BNW

1  have you been hired by Mr. Saveri to work in a plaintiffs'

2  antitrust case?  Those -- those questions in other cases have

3  been forbidden.  They're certainly entitled to ask him if

4  he's -- how much he gets paid, how much he got paid in this

5  case, does he tend to do plaintiff's work.

6          THE COURT:  Oh, okay.  I'm not sure that I agree with

7  you on that.  I don't know why that would be unfair or

8  prejudicial in this context.  I don't think it would be helpful

9  for them to go down the table and ask about each lawyer there,

10 but I think if the issue is about firms and which firms that are

11 representing the plaintiffs have been previously hired by

12 Dr. Singer, they can ask that.  If it's about the number of

13 times they've been hired, they can ask that.  I'm not going to

14 preclude them from asking that so --

15         MR. SAVERI:  It's the personal -- it's the

16 personalization of the questions which I think would be unfair

17 and --

18         THE COURT:  So if you want to say -- you want them to

19 be required to say, you know, how many times has the particular

20 firm hired you, again, I'm not sure I understand the real

21 difference as it relates to that.  I'll think about that.  But

22 as it relates to the question to ask Dr. Singer, how many times

23 he's been hired by plaintiffs' counsel --

24         MR. SAVERI:  He's certainly entitled to ask that

25 question.

—2:15-cv-01045-RFB-BNW—

1      THE COURT:  So right now I don't see anything that I'm

2  excluding, but we'll see when they ask the questions.

3      MR. SAVERI:  Your Honor, if I may.  I think there were

4  two in limine motions that we didn't talk about.

5      THE COURT:  Okay.  What are those?

6      MR. SAVERI:  I don't have the docket numbers, but I

7  think one was to exclude the evidence of reference that

8  plaintiffs allegedly failed PED tests.

9      THE COURT:  Oh.

10     MR. SAVERI:  And then there's another one I think it

11  was immediately subsequent to that which was -- no, we dealt

12  with the PED tests.  It's the -- no, the next one, evidence of

13  reference -- no, we dealt with that one, too.  I'm sorry.

14  Maybe --

15     THE COURT:  So we didn't deal with the one --

16     MR. SAVERI:  So my notes were wrong.  I don't think

17  we've done the PED one, Your Honor.  I think we did the

18  following one.

19     THE COURT:  Right.

20     MR. SAVERI:  But it's been a long day.  I may have --

21  my recollection may be fading.

22     THE COURT:  No, we didn't deal with that one.  Yes,

23  that was Number -- that's Number 9.  I skipped over that.

24     So that's Document Number 999.

25     MR. SAVERI:  And I'm going to argue that when you're

—2:15-cv-01045-RFB-BNW—

1   ready for the plaintiffs.

2          THE COURT:  Okay.  Well, let's hear from the defendants

3   first.  I want to figure out what it is they want to offer and

4   why this is relevant.

5          So, Ms. Phillips, the relevance here?

6          MS. PHILLIPS:  Sure.

7          So this is specific to named plaintiff, Jon Fitch.  In

8   2014 he was fighting for the World Series of -- World Series of

9   Fighters?  WSOF?  I got that right.  Thank you.  And he tested

10  positive for PEDs, and he was suspended for nine months.  We

11  think this is directly relevant because of course he left UFC.

12  He went to a competitor fighter.  And to the extent he gets up

13  and says, "Well, I was paid less.  I didn't make enough money at

14  WSOF," we should be able to -- you know, we should be able to

15  cross-examine him and say, "Well, the reason was because you

16  took illegal drugs and you were suspended by WSOF.  So of course

17  they didn't increase your pay and give you more."  That's the

18  argument, Your Honor.

19         THE COURT:  Okay.  Let me again look at the timing of

20  this.  Okay.

21         Mr. Saveri, do you want to respond to or is that --

22  oop.  No.  Mr. Young.

23         MR. YOUNG:  Hello, Your Honor.

24         So we would contend that this -- the evidence of

25  Plaintiff Fitch's allegedly failed PED test, which occurred

1  after his career at the UFC, is not only irrelevant, but highly

2  prejudicial.  And we would point you to the case cited in our

3  MIL, this *Miljas* case which dealt with a professional boxer.

4         THE COURT:  Hold on again, Mr. Young.  I'm pulling this

5  up again.  I want to make sure that I have the correct date as

6  to when he failed this test.

7         MS. PHILLIPS:  Your Honor, I don't believe the date is

8  in their motion in limine, but it is 2014.

9         THE COURT:  Okay.

10        So, Mr. Young, is Mr. Fitch going to get up and say, "I

11 was paid less?"  And because if he gets up and says that, why

12 wouldn't they be able to do exactly as Ms. Phillips indicates?

13        MR. YOUNG:  Because even if it were relevant, it's

14 still highly prejudicial for the reasons as explained in the

15 cases we cite.

16        THE COURT:  Well, it has to be unfairly prejudicial.

17 If he's making a blanket statement that says, "I was making less

18 money" and there's a reason why he's making less money, why are

19 they not entitled to bring that up?

20        Now, it's one thing if he talks about the terms of the

21 contract.  So if he wants to be able to say, "The terms of my

22 contract were this and these terms are better than the other

23 terms," fine.  Then he doesn't necessarily seem to open the door

24 to that.  But I will tell you if he gets on the stand and says,

25 "I was paid less or I was compensated less when I left," right,

1    or, "I was paid less by the UFC and paid more by the rival

2    promoter," and he says it in those, sort of, generic terms, I'm

3    going to let them ask him about it.

4           So the thing to do here I think, Mr. Young, because I

5    don't want to go back and forth with these, is prepare your

6    witness, right, as it relates to the testimony.  If he's just

7    talking about the contract terms, I don't know that he opens the

8    door to that.  If he's talking about compensation generally and

9    what people should or shouldn't be paid or what he was

10   individually paid, then his individual employment history,

11   including suspension, would be relevant.

12          MR. YOUNG:  I do believe that his compensation at WSOF

13   was determined by contract.  It's very similar to what happened

14   at -- with the UFC.  So, loud and clear.  It sounds like if he

15   opens the door to it, that this is coming in.

16          THE COURT:  As with almost all of this, if a witness

17   gets on the stand and opens the door wide, I will let the other

18   side walk right through it.  So all of my rulings are contingent

19   for the most part except for a few of them as relates to

20   discovery on that not happening.  If it does happen, either side

21   is certainly free to come back to me and say, "They've opened

22   the door so we should be able to present this information."

23   Okay?

24          MR. YOUNG:  Understood.  Thank you, Your Honor.

25          THE COURT:  All right.

1          Well, okay, I think we've addressed all of these

2    things.  I know it's been a long day.  It's already after 5

3    here.  And so there are a couple of things that I still want us

4    to address very briefly.

5          (Court conferring with courtroom administrator.)

6          THE COURT:  So for the questionnaires, the jury

7    questionnaires that we have, what I will tell you is I'm

8    probably going to reduce the questionnaire slightly here, and in

9    going through the record, I don't recall whether or not either

10   side's objections to any questions were noted here.  I think

11   this was a joint questionnaire, but, again, I want to go back

12   and look through my notes.  I don't think that I have a list of

13   any objections.  Do you all have objections?  I just want to

14   double-check that.

15         MR. POMERANTZ:  Your Honor, again, Crane Pomerantz.

16         THE COURT:  Yes.  You can come up to the podium,

17   Mr. Pomerantz.

18         MR. POMERANTZ:  Crane Pomerantz for the plaintiffs.

19         Just for purposes of the record, Your Honor, that was a

20   joint submission.  There was a considerable amount of give and

21   take on both sides.

22         THE COURT:  Okay.  Perfect.  Thank you, Mr. Pomerantz.

23         I may make a few edits to that, but I wanted to

24   double-check that.  And the way this will work, they should go

25   out, again, later this week.  I will get them back and review

―――2:15-cv-01045-RFB-BNW―――

 1  them, and you all will get them before we begin our voir dire.

 2          The other thing I will tell you is because I am

 3  concerned potentially about the number of jurors who might be

 4  excused for different reasons because of their participation or

 5  not in various aspects of this business, we will have probably a

 6  two-day voir dire process.  If we get all of the witnesses [sic]

 7  on the first day, then we won't need to bring people back the

 8  second day.  But we're going to call enough witnesses where we

 9  avoid any possibility that we wouldn't be able to seat a jury.

10          Okay.  Any questions about that?

11          So also what I'd like for you all to do, and we're

12  going to create our own list, and you can just submit this as an

13  attachment to a letter jointly so that you all both understand,

14  a joint list of what you understand to be the issues that we're

15  going to discuss on March 28th.  Okay?

16          I think I allowed briefing as it relates to --

17  opposition to one particular motion in limine.  I think I might

18  have resolved all of the other ones, but you can include that,

19  too.

20          I also am going to want Mr. Davis to be available,

21  Mr. Cramer, for that date, the 28th.

22          MR. CRAMER:  Mister?

23          THE COURT:  Guy Davis.

24          MR. CRAMER:  Guy Davis?

25          THE COURT:  Yes.  Because I want to address the issue

1   of what he would be testifying about.  I also would want,

2   Mr. Isaacson, Mr. Marks to be available.  Now, if necessary,

3   they can appear by video if that's easier, so long as they

4   consent to the Court's jurisdiction.  You all know what that

5   means as relates to being sworn as witnesses.  Because I know it

6   can be sometimes difficult to get experts here, and I'm not sure

7   how long I would have them in terms of how many questions I

8   might have.  But given what's been raised, I want them to be

9   available and I wanted you all to be aware of that.  And we can

10  talk about their availability at that time.

11          But, again, what I would like for you all to do again

12  is to submit to me what you understand to be what we will be

13  discussing.  I will give you all a week to provide that to me in

14  a joint letter.  It can simply be sent to my deputy.

15          Mr. Pomerantz.

16          MR. POMERANTZ:  Thank you, Your Honor.

17          As long as we're talking about issues to take up on the

18  28th, if I could put two additional issues on your radar and on

19  the defense radar.

20          The first issue is -- they both relate to how Your

21  Honor intends to conduct a trial.  The first one relates to

22  adverse or hostile witnesses.  There are on our side seven to 10

23  witnesses who are current or former Zuffa employees.  We want to

24  be able to address with the Court our ability to lead them in

25  our case-in-chief.  I'm sure there are witnesses -- in fact, I

—2:15-cv-01045-RFB-BNW—

1  think the defense represented that the -- they would like the

2  opportunity to lead the named plaintiffs.  So we'd like to take

3  that up with the Court.

4      And the second issue we'd like to take up with the

5  Court is just to confirm that when the plaintiffs put on their

6  case-in-chief, that if they call a current Zuffa employee, they

7  call Mr. White, that we conduct our examination.  They conduct

8  their, quote/unquote, cross.  Then we redirect, but then the

9  defendants have the right to call Mr. White in their

10  case-in-chief; that we're not going to wrap everything all up at

11  once.

12      THE COURT:  Yes, I don't usually do it that way,

13  Mr. Pomerantz.

14      MR. POMERANTZ:  Okay.  Perfect.

15      THE COURT:  Usually the witness appears once.  Now, if

16  they're called back, it may be for particular reasons that come

17  up in the context of the trial, but the way that it would work

18  is let's say, for example, Mr. White.  I will let you call him

19  in your case-in-chief, treat him as a hostile witness, for

20  example.  And then they would be able to do their cross of him,

21  right.  Then when that's over, right, they could direct.

22      Now, we just have to have a point at which that's known

23  because, obviously, if their direct moves into a new area which

24  they would be allowed to do, they have to then start asking

25  open-ended questions.

2:15-cv-01045-RFB-BNW

 1          MR. POMERANTZ:  This is the precise concern, Your

 2    Honor.  It's our position that the cross-examine -- we'll use

 3    Mr. White as an example.  That the cross-examination should be

 4    limited in scope to that which has been asked in our

 5    case-in-chief.

 6          And the other issue I'd like to highlight for the Court

 7    is to the extent -- we'll focus on Mr. White as an example.  To

 8    the extent that the defense is permitted to then question him on

 9    direct with nonleading questions, I would submit to the Court

10    that that creates a potential for confusion.  And more to the

11    point, it may be super inefficient in the sense that it gives

12    the defense an incentive to elongate or increase the duration of

13    that direct examination, especially for someone like Mr. White

14    who's local.

15          So we submit that those should be treated separately.

16    If they want to call Mr. White in their case-in-chief, by all

17    means they should have that right --

18          THE COURT:  Mr. Pomerantz, I guess I'm not

19    understanding what the issue is.  I mean, these issues about

20    hostile witness and open-ended questions or leading questions, I

21    mean, this is mostly lawyers speaking.  I don't know that it's

22    going to be confusing for the jury.  The lawyers -- you all are

23    experienced.  The moment I will say or you'll say, "I'm

24    switching to the direct portion of my examination," we will all

25    know what that means, which is typically how that's done in my

———2:15-cv-01045-RFB-BNW———

1  cases.  I indicate that.  "Have you finished your cross?"  And

2  then, "Are you going to switch, you know, Mr. Yates or

3  Mr. Isaacson, or, you know, Ms. Phillips, to the direct

4  portion?"  They say yes.  Now they're asking open questions.

5       So I guess I'm not sure what you anticipate.  And you

6  can certainly object if you think they lead or if you think that

7  they're going outside the scope of the particular, sort of,

8  frame that we're talking about.  But I think we can manage it

9  that way.  Why couldn't we do it that way?

10      MR. POMERANTZ:  So if I understand, Your Honor, you

11  intend to allow the defense to call a witness -- a witness will

12  only be called once in this trial.

13      THE COURT:  Yes.

14      MR. POMERANTZ:  Okay.  And so then the question then is

15  how do we minimize the interruption at trial with regard to the

16  issue of whether somebody is a hostile witness.  We take the

17  position we should be able to cross --

18      THE COURT:  Oh, well, you all will know that before.  I

19  mean, that's not something -- we'll go through the list.  I'm

20  not going to decide that just on the moment.  I mean, the

21  reality of it is in a case like this, unless you all tell me

22  otherwise, I think the witnesses that may be associated with the

23  opposing side, if it's an employee or not, should be treated as

24  a hostile witness, right, I mean.  I think in a case like this

25  that has been so contentious, the record bears that out, right.

2:15-cv-01045-RFB-BNW

1        And so I don't have any -- wouldn't have any concern,

2 for example, of the plaintiffs declaring or finding Mr. White to

3 be a hostile witness.  I mean, that seems to me to be fairly

4 straightforward here.

5        MR. POMERANTZ:  I would agree with you as to Mr. White.

6 I'm not sure my colleagues on the defense side would agree with

7 you as to every witness that we think is a hostile witness.  So

8 if I can give an example.

9        There is a former Assistant General Counsel named

10 Michael Mersch who was deposed in this case.  Mr. Mersch was a

11 long-time Zuffa employee.  He is no longer a Zuffa employee.  In

12 my estimation having read the deposition, he is identified with

13 Zuffa.  He was asked in his deposition, "Mr. Mersch, can you

14 describe the champions clause in the contracts, the fighters

15 contracts?"  And his response was:  "Champions clause?  I don't

16 know what you're talking about.  I've never used that phrase.  I

17 don't know what that phrase is."

18        And then he was confronted with an document, an e-mail

19 that he sent, in which he said -- sent an e-mail which he said,

20 "We are going to enforce the champions clause."

21        It was very clear that he, Joe Silva, the matchmaker,

22 are very much company men.  And so we want to avoid a fight in

23 the middle of trial as to whether those witnesses are hostile

24 witnesses.

25        THE COURT:  So let me say this.  Any current or former

2:15-cv-01045-RFB-BNW

1   employee of Zuffa can be treated as a hostile witness.  Any

2   current or former fighter, right, or someone affiliated or

3   connected with the class can be treated by the defense as a

4   hostile witness.

5        So that's the way that I look at it in this case.  That

6   I think seems to be, again, fairly clear from the record.  If

7   you want to make a special argument for someone who should be

8   treated as a hostile witness, you all can do that with respect

9   to these individuals.  But I am going to essentially assume and

10  will finalize that list that if it's a former or current Zuffa

11  employee, they will be treated as a hostile witness.  If it's a

12  fighter or someone who's associated with the fighters or the

13  fight class, bout class, they will get to treat them as a

14  hostile witness when they're called.

15        MR. POMERANTZ:  Your Honor answered my question.  Thank

16  you.

17        THE COURT:  Uh-huh.

18        Mr. Cramer, did you have something else you wanted to

19  add?

20        MR. CRAMER:  There is a stipulation before Your Honor

21  on the motion to dismiss in the Johnson case.

22        THE COURT:  Yes, I'll grant that.  I know you all are

23  going to be busy.

24        MR. CRAMER:  Thank you.

25        THE COURT:  Let me look at my list here.  I think we've

———2:15-cv-01045-RFB-BNW———

1  done everything that we need to.  The one thing I will also

2  remind you is it's really important I want on the 28th for you

3  all -- I know this is a bit of an added expense, but bring the

4  technical people who are going to be involved with the trial

5  with some samples of exhibits and technology, video clips,

6  whatever, so we can test some of that out.  You know, we

7  generally, knock on wood, have had good luck, but sometimes we

8  don't.  I don't want to wait until a week or so before because

9  if we have to fix something, we need a few weeks to do that.  So

10  I'd rather you all brought someone then to make sure you test

11  all of the different formats and things that you're going to

12  want to do.

13       All right?  Any questions about anything in terms of

14  what we need to do moving forward?

15       Okay.  Wow.  I know it's been a long day.  I appreciate

16  all of your time today.  I know it's been a long day, but I

17  think we've gotten a fair amount accomplished today.  And I look

18  forward to the submissions that you all will be sending to me.

19       We will be adjourned.  I'm going to stay on the bench

20  for a few minutes.  Thank you.

21       (Whereupon the proceedings concluded at 5:29 p.m.)

22                          --oOo--

23               COURT REPORTER'S CERTIFICATE

24

25       I, PATRICIA L. GANCI, Official Court Reporter, United

—2:15-cv-01045-RFB-BNW—

1  States District Court, District of Nevada, Las Vegas, Nevada,

2  certify that the foregoing is a correct transcript from the

3  record of proceedings in the above-entitled matter.

4

5  Date:  March 6, 2024.

6                                    /s/ **Patricia L. Ganci**

7                                    Patricia L. Ganci, RMR, CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25