# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT NEVADA

| | |
|---|---|
| CUNG LE, NATHAN QUARRY, JON FITCH, BRANDON VERA, LUIS JAVIER VAZQUEZ, and KYLE KINGSBURY, On Behalf of Themselves and All Others Similarly Situated, | Case No. 2:15-cv-01045-RFB-BNW |
| Plaintiffs, | |
| v. | |
| ZUFFA, LLC, D/B/A ULTIMATE FIGHTING CHAMPIONSHIP and UFC, | |
| Defendant. | |
| KAJAN JOHNSON and CLARENCE DOLLAWAY, On Behalf of Themselves and All Others Similarly Situated, | Case No. 2:21-cv-01189-RFB-BNW |
| Plaintiffs, | |
| vs. | |
| ZUFFA, LLC, TKO OPERATING COMPANY, LLC F/K/A ZUFFA PARENT LLC (D/B/A ULTIMATE FIGHTING CHAMPIONSHIP and UFC), and ENDEAVOR GROUP HOLDINGS, INC., | |
| Defendants. | |

**JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN, AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT**

Pursuant to the 28 U.S.C. §1746, we, Eric L. Cramer, Richard A. Koffman, and Joseph R. Saveri declare:

1. We are, respectively, partners or shareholders of the law firms of Berger Montague PC ("Berger Montague"), Cohen Milstein Sellers & Toll, PLLC ("Cohen Milstein"), and Joseph Saveri Law Firm, LLP ("JSLF"). Together we have been approved as Co-Lead Class Counsel (ECF No. 839 at 79)[1] (collectively referred to herein as "Co-Lead Class Counsel")[2] for the class certified in *Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship and UFC*, No. 15-cv-01045 (D. Nev.) (the "*Le* Action"). The *Le* Action along with *Johnson, et al. v. Zuffa, LLC, et al.*, No. 21-cv-01189 (D. Nev.) (the "*Johnson* Action"), are collectively referred to as the "Actions." Each of us has been actively involved in developing, prosecuting, and resolving the Actions, is familiar with their proceedings, and has personal knowledge of the facts and circumstances set forth herein. If called upon and sworn as witnesses, each of us would be competent to testify thereto. We respectfully submit this Joint Declaration in Support of the Motion for Preliminary Approval of the Settlement.

2. These Actions began well before the December 16, 2014 filing of the *Le* Action, with extensive pre-filing investigation without the aid of government involvement or compulsory process. In all, from inception through the litigation of *Le*, the filing and litigation of *Johnson*, the Settlement, and if approved, the Settlement and allocation process, Co-Lead Class Counsel, and supporting law firms (Co-Lead Class Counsel and supporting firms collectively referred to as "Class Counsel"), will have devoted well more a decade to these Actions on a fully contingent basis. The law firms involved expended many millions of dollars in out-of-pocket costs and tens of thousands of hours of professional time with no guarantee of a recovery of any kind in a case that involved substantial risk, including the prospect of total or partial loss pre-trial, at trial, or on appeal, and risks associated with delay.

---

[1] All citations to the docket are to the *Le* Action unless expressly indicated otherwise.

[2] On July 31, 2015, the Court appointed Berger Montague, Cohen Milstein, and JSLF as Interim Co-Lead Class Counsel, and Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP ("Wolf Rifkin") as Interim Liaison Counsel for the then-proposed class in the *Le* action. *See* ECF No. 140. In the Order certifying the *Le* Class, the Court appointed Wolf Rifkin as one of the Class Counsel. The lead lawyer at Wolf Rifkin was Don Springmeyer. Mr. Springmeyer changed law firms as of January 1, 2021, and his new law firm, Kemp Jones, LLP ("Kemp Jones"), took over the role of representing Plaintiffs and the *Le* Class. *See* ECF No. 780.

Moreover, the *Le* Class Representatives[3] and Nathan Quarry ("Quarry"), together with the named plaintiffs in the *Johnson* Action (Kajan Johnson, Clarence Dollaway, and Tristan Connelly), collectively devoted thousands of hours in assisting in the prosecution of the Actions.

3. Unless otherwise defined herein, all capitalized terms have the same meanings set forth in the April 24, 2024 Settlement Agreement ("Settlement Agreement") attached as Exhibit 1. Citations to the Settlement Agreement will use the format "SA ¶ __."

4. The Settlement Agreement provides for cash payments totaling $335 million into the UFC Settlement Fund for the benefit of the Settlement Classes, as well as significant prospective relief that would unwind some of the key conduct challenged as anticompetitive in the Actions. SA ¶¶ 5, 6. The Settlement is an excellent result for the Settlement Classes considering (a) the benefits of the Settlement, namely, substantial cash recovery and significant prospective relief, as well as (b) the substantial litigation risks Plaintiffs faced in both Actions, including significant risks associated with delay. An initial estimate of the likely distribution of the Net Settlement Fund indicates that each eligible claimant from the *Le* Class may receive, as an award from the Settlement, as much as 25% (or more) of his or her total earnings from the UFC for bouts fought during the entire *Le* Class Period. Certain claimants from the *Johnson* Settlement Class will receive as much as 10% of their lifetime earnings from the UFC for bouts fought during the *Johnson* Class Period, in addition to benefitting from the prospective relief provided. Accordingly, the Settlement is fair, reasonable, and adequate.

5. Throughout this litigation, Co-Lead Class Counsel have directed and overseen the work of their own attorneys and staff, as well as the attorneys and staff of the few other firms that assisted in this litigation ("Supporting Counsel").[4] Co-Lead Class Counsel have been involved in every aspect of the Actions. Co-Lead Class Counsel have collaborated to develop, initiate, litigate, and resolve the Actions, including conducting extensive pre-filing investigation without the benefit of government involvement or the ability to compel pre-complaint document production. We have overseen extensive

---

[3] The *Le* Class Representatives are Cung Le, Jon Fitch, Kyle Kingsbury, Brandon Vera, and Javier Vazquez.

[4] "Supporting Counsel" refers to all or some of the following firms: Wolf Rifkin, Kemp Jones, Warner Angle, Clark Hill PLC, The Radice Law Firm, and/or Spector Roseman Kodroff & Willis.

2

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

fact and expert discovery, and prepared motions and briefing on multiple dispositive and non-dispositive motions. On the settlement front, the parties retained renowned mediator, and former U.S. District Judge, Hon. Layn Phillips, to preside over the mediation process, which included, *inter alia*, three full day in-person mediation sessions spread over six years (in 2017, 2019, and 2023), and multiple follow-up engagements via phone, video conference, and otherwise. As trial approached in the *Le* Action, the parties' settlement discussions accelerated, ultimately resulting in the Settlement. Co-Lead Class Counsel presided over the Settlement negotiations, participated in drafting and editing the term sheet and long-form settlement agreement, developed the class notice and notice plan, developed the allocation plan (in conjunction with consultants and experts), and prepared all of the necessary papers for seeking preliminary approval of the Settlement. Co-Lead Class Counsel have dedicated substantial time and resources to lead the prosecution of the Actions, collectively spending tens of thousands of hours on the Actions. Supporting Counsel have also dedicated significant time and effort litigating the Actions, collectively spending many thousands of hours as well.

6.      For the reasons set for the below and in the accompanying memorandum of law, the Court should grant preliminary approval of the Settlement.

## PROSECUTION OF THE ACTIONS

### A.  Investigation and Filing of the *Le* Action

7.      Class Counsel's investigation of the UFC's alleged anticompetitive conduct began prior to any inquiry by the Federal Trade Commission ("FTC"). Berger Montague independently initiated an investigation into alleged anticompetitive conduct in the Mixed Martial Arts ("MMA") industry many months before filing a complaint. Berger Montague's initial investigation included analyses of the UFC's acquisition of Strikeforce, the initial FTC inquiry, the UFC's conduct toward Bellator, and the UFC's conduct toward fighters surrounding MMA video games. Berger Montague's investigation continued after the FTC refused to bring an enforcement action against the UFC relating to the UFC's acquisition of Strikeforce.

8.      Beginning in 2014, Cohen Milstein separately initiated an investigation in conjunction with Warner Angle Hallam Jackson & Formanek PLC ("Warner Angle"). Thereafter, Berger Montague, Cohen Milstein, and Warner Angle joined forces to coordinate their efforts in the best

interests of the classes that would ultimately be proposed in the Actions. In total, Berger Montague, Cohen Milstein, and Warner Angle reasonably devoted thousands of hours to the pre-complaint investigation of this litigation. In advance of filing in the Northern District of California, Plaintiffs brought in the Joseph Saveri Law Firm to assist with the litigation of the case.

9.     Plaintiffs Cung Le, Nathan Quarry, and Jon Fitch filed the *Le* Complaint on December 16, 2014, in the United States District Court for the Northern District of California. ECF No. 1. In the next few days, Class Counsel filed two additional complaints in the Northern District of California against Zuffa, LLC ("Zuffa") on behalf of Luis Javier Vazquez in the second action and Brandon Vera in the third action. *See Vazquez v. Zuffa, LLC*, No. 5:14-cv-4491, ECF No. 1 (N.D. Cal. Dec. 22, 2014); *Vera v. Zuffa, LLC*, No. 14-cv-5621, ECF No. 1 (N.D. Cal. Dec. 24, 2014). On February 4, 2015, another firm filed a similar action in the Northern District of California with JSLF serving as local counsel to coordinate that action with Co-Lead Class Counsel's actions. *See Ruediger v. Zuffa, LLC*, No. 5:15-cv-521 (N.D. Cal.). Co-Lead Class Counsel moved to relate each of these later-filed actions to the *Le* Action (*Le* Action, ECF Nos. 9, 13, 49), and then moved to consolidate all four of these actions together for pre-trial purposes.[5] ECF No. 52. After the *Le* Action was transferred to this District, this Court granted consolidation of the various matters into the *Le* Action on June 11, 2015. ECF No. 101.

10.     Following Plaintiffs' filing of the *Le* Action, the FTC again opened an inquiry into Zuffa's conduct in the MMA industry. But after a brief investigation, the FTC sent Zuffa a letter stating that "[u]pon further review of this matter, it now appears that no further action is warranted by the Commission at this time." *See Federal Trade Commission ends second investigation of UFC*, MMA Fighting (Nov. 24, 2015), *available at* https://www.mmafighting.com/2015/11/24/9796478/federal-trade-commission-ends-second-investigation-of-ufc.

**B.  Motions to Dismiss, to Transfer Venue and to Stay Discovery**

11.     On January 30, 2015, Zuffa moved to transfer the *Le* Action from the United States District Court for the Northern District of California (where Plaintiffs had filed and where several

---

[5] On March 20, 2015, Class Counsel filed a fourth complaint on behalf of Kyle Kingsbury as a named plaintiff. *Kingsbury v. Zuffa, LLC*, No. 5:15-cv-1324, ECF No. 1 (N.D. Cal.) ("Kingsbury Action"). Plaintiffs then moved to relate the *Kingsbury* Action to the *Le* Action. *Le* Action, ECF No. 67 (Mar. 23, 2015). The Court granted Plaintiffs' motion. ECF No. 68.

4

plaintiffs resided) to the United States District Court for the District of Nevada, where Zuffa was based. *See* ECF No. 31. Plaintiffs opposed the transfer motion, ECF No. 69, including by collecting and presenting materials properly subject to judicial notice evidencing MMA bouts taking place in the Northern District of California and significant interest in MMA in that District. *See* ECF No. 70. On June 2, 2015, the court granted the transfer motion, resulting in transfer to this Court. ECF No. 93.

12.     While the motion to transfer venue was pending, Zuffa moved to dismiss the complaints, ECF No. 64 (Feb. 27, 2015), relying in part on a Request for Judicial Notice of various records of state agencies that regulate MMA events, a form 10-K from Viacom, Inc. (which then owned the MMA promotion Bellator), and the letter from the FTC closing its inquiry into the Strikeforce acquisition. ECF No. 65 (Feb. 27, 2015). Plaintiffs filed a consolidated opposition brief, ECF No. 71 (Apr. 10, 2015), and Plaintiffs' own Request for Judicial Notice of, *inter alia*, Zuffa's statements on its own website and elsewhere on the internet as well as an analyst report from Moody's Investor Service. ECF No. 72 (Apr. 10, 2015).

13.     After filing its reply briefs in support of its motions to dismiss (ECF No. 82) and transfer (ECF No. 79) in the Northern District of California, Zuffa filed a motion to stay discovery until resolution of the motions to transfer and dismiss. ECF No. 87. Plaintiffs and Zuffa negotiated a stipulation to stay discovery pending resolution of the transfer motion and further stipulated that if the transfer motion were granted, the parties' existing briefing on the motion to dismiss would be sufficient for this Court to adjudicate the issues. ECF No. 91. The Court in the Northern District of California granted the motion to transfer to this District on June 2, 2015. ECF No. 93. Because the motion to transfer was granted, this Court considered Zuffa's motion to dismiss that the parties had briefed in the Northern District of California.

14.     On September 25, 2015, the undersigned counsel from Berger Montague argued Plaintiffs' opposition to Zuffa's motion to dismiss in this Court. *See* ECF No. 186. The Court denied Zuffa's motion from the bench on September 25, 2015, *id.*, issuing a written Order on October 19, 2016. ECF No. 314. The Court ruled that discovery would begin at once, mooting Zuffa's motion to stay. The parties began fact discovery as of September 25, 2015.

15.     Plaintiffs filed their Consolidated Amended Complaint on December 18, 2015, ECF No.

5

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

208, which Zuffa answered on January 19, 2016. ECF No. 212.

**C. Fact Discovery in the *Le* Action**

16.     Co-Lead Class Counsel, along with Supporting Counsel, continued to litigate the case aggressively, focusing on voluminous and complex fact discovery. It was through this discovery that Plaintiffs built the foundations for (a) class certification, (b) Plaintiffs' expert reports, (c) oppositions to Defendants' summary judgment and *Daubert* motions, (d) the presentations of evidence at any jury trial in this matter, and (e) defense of any judgment on appeal that may have arisen.

17.     Co-Lead Class Counsel effectively managed the prosecution of this litigation throughout discovery, holding weekly conference calls among Co-Lead Class Counsel, Liaison Counsel at Wolf Rifkin (later Kemp Jones), and Warner Angle to discuss and organize discovery tasks, monitor progress among tasks, and plan litigation strategy.

18.     In addition, each month, Co-Lead Class Counsel invited Supporting Counsel at the Radice Law Firm and Spector Roseman & Kodroff PC to join the call to share updates on their tasks and to ensure that those firms were up-to-date on strategy and other case matters.

19.     Following that "all-counsel" call each month, Co-Lead Class Counsel, Liaison Counsel, and Warner Angle invited the *Le* Class Representatives and Quarry to join the calls so that the *Le* Class Representatives and Quarry could share their knowledge about relevant facts and be continually apprised of the progress of the litigation.

**i.     Document and Data Preservation Efforts**

20.     Almost immediately upon filing, Plaintiffs took steps to ensure that the UFC and certain third parties preserved relevant electronically stored data and information ("ESI").

21.     On December 17, 2014, JSLF sent a preservation letter to the UFC regarding the need to preserve ESI.

22.     On or about December 18, 2014, Plaintiffs observed that certain social media posts of Dana White that Settlement Class Counsel had reviewed prior to initiating the *Le* Action appeared to become unavailable in the days after filing. JSLF sent a preservation letter to Twitter on December 18, 2014 concerning these and other posts of Dana White and the UFC, and Plaintiffs issued subpoenas to

Twitter (n/k/a X) and Google in January 2015 to ensure that Google and Twitter preserved certain YouTube videos and Twitter posts.

23.     Further, as discussed in more detail *infra*, Berger Montague doggedly pursued discovery material from Zuffa, ultimately ensuring that a significant volume of critical documents that Zuffa had not otherwise retained, and believed had been destroyed, could be located from a third-party document vendor from a separate matter and produced in the *Le* Action.

### ii.     Written Discovery with Zuffa

24.     Plaintiffs and Zuffa held an in-person Fed. R. Civ. P. 26(f) conference on April 13, 2015. During that meet and confer, the parties negotiated terms for a Stipulation concerning ESI (filed at ECF No. 160), and most of the terms of a stipulated Protective Order. However, the parties were unable to agree to certain terms, which resulted in the parties briefing the issues in a joint status report. *See* ECF No. 185. Ultimately, Plaintiffs prevailed, with Magistrate Judge Peggy A. Leen entering an Order in Plaintiffs favor as to the disputed issues. *See* ECF No. 190.

25.     Plaintiffs served their Initial Disclosures pursuant to Fed. R. Civ. P. 26(a)(1) on May 8, 2015. With the assistance of the intensive investigation of supporting counsel at Warner Angle, Plaintiffs identified more than 100 individuals with discoverable information that Plaintiffs believed they may use to prove their claims, including MMA fighters, agents and managers, and rival promoters.

26.     Plaintiffs also served their First Set of Interrogatories on Zuffa on August 11, 2015, focusing the requests on identifying (1) class member fighters, (2) the identity of Zuffa employees, executives, and agents that may have discoverable information, and (3) the identity of online social media, blogs, networks, and other online accounts that Zuffa maintains so that Plaintiffs could try to ensure preservation of materials stored in those locations.

27.     Plaintiffs served their First Set of Requests for Production of Documents on April 26, 2015, and quickly set to work negotiating the scope of Zuffa's document discovery. Berger Montague led the meet and confers with Zuffa, engaging in regular teleconferences and letter exchanges to negotiate the relevant time period applicable to document discovery, the number and identity of custodians, and the search terms to be applied to the documents Zuffa collected.

7

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

28.     Berger Montague worked extensively with Zuffa's counsel to negotiate appropriate search terms that Zuffa would use to cull the documents it collected for production to Plaintiffs.

29.     Zuffa's first offer of search terms was a list of 91 words, apparently drawn only from Plaintiffs' Complaint, and including terms not used in common parlance such as "monopsony" and "class action." To counter Zuffa's proposal, Berger Montague compiled thousands of terms for testing. Berger Montague drew these terms from Zuffa's early production of materials that Zuffa had produced to the FTC in connection with the FTC's 2012 inquiry into the Strikeforce acquisition as well as fighter names and nicknames. Zuffa complained that these terms returned too high of a percentage of the total document collection.

30.     Berger Montague commenced to negotiate the proper terms through an iterative process:

a.   The parties exchanged search term proposals, Zuffa would run the search terms and deliver to Berger Montague for analysis the hit counts of both Zuffa's proposed search terms and Berger Montague's proposed search terms, and the parties would then exchange proposals for next steps.

b.   Berger Montague negotiated the production of limited sets of documents that hit on particular search terms that Zuffa claimed were overbroad and then used the information from those documents to try to narrow the terms Berger Montague proposed for the next round.

c.   Berger Montague reviewed these limited document sets to identify how the terms were applying to draw an overbroad selection. Berger Montague then analyzed how revisions to the Plaintiffs' search term proposals would apply to discriminate between the irrelevant documents Zuffa claimed to want to withhold, while still identifying the relevant and critical discovery the search terms targeted in the first place. Among other things, Berger Montague ran the proposed search terms over the existing production and then some potential revisions to the search terms to identify what proportion of documents would be excluded by a potential revision. Berger Montague then reviewed the results to determine whether documents that Plaintiffs' document reviewers had coded as relevant or "hot" had been excluded by the revision. Berger Montague then developed new revisions as appropriate and re-ran this process until the proposed search terms significantly reduced the number of documents hitting on the terms without losing the important, relevant material.

d.   This process and the related dealings between the parties repeated over the course of several months—from December 2015 to May 2016—and numerous iterations of terms and revisions.

31.     In addition to these direct negotiations, Plaintiffs and Zuffa attended status conferences with the Court during this period, including on September 30, 2015, November 17, 2015, December 8,

8

2015, January 26, 2016, February 23, 2016, and May 17, 2016, as the parties litigated the scope of Zuffa's document production. *See* ECF Nos. 190, 200, 207, 214, 225, 264 (relevant status conference minute orders).

32.     Prior to each of these status conferences, the parties prepared detailed joint status reports to apprise the Court of updates on the parties' negotiations and efforts to locate discovery materials. *See* ECF Nos. 185, 199, 206, 213, 218, 244, 254. These status reports covered hundreds of pages of argument on the status of negotiations and articulated the parties' positions and discovery disputes. Because the parties filed these status reports jointly, the process required significant coordination. To complete the status reports, Berger Montague and Zuffa's counsel first held serial meet and confer teleconferences as the deadlines drew near to try to resolve as many disputed issues as possible. Following these calls, Berger Montague and Zuffa's counsel would exchange detailed meet and confer correspondence confirming the substance of the teleconferences, updating on deliverables promised during the calls, further articulating the parties' positions and responses, and proposing further steps prior to the next call.

33.     Prior to the February 23, 2016 and May 17, 2016 status conferences, the parties engaged experts on document search processes. Plaintiffs retained Charles Kellner to prepare two reports concerning search terms for Zuffa's document collection. *See* ECF Nos. 221, 244-1. Mr. Kellner is a consultant specializing in assisting attorneys with document search processes and methods. *See* ECF No. 221 ¶¶1-8. Berger Montague worked with Mr. Kellner to develop Plaintiffs' arguments and positions in these reports and related briefing. Plaintiffs submitted Mr. Kellner's report to Judge Leen. Following the parties' briefing and expert reports on these search term issues, the Court adopted Plaintiffs' position on June 3, 2016. *See* ECF No. 272.

34.     Plaintiffs expended significant efforts to obtain documents relating to the early portion of the alleged anticompetitive scheme, *i.e.*, from 2005 to 2013. During the parties' initial discussions concerning document preservation and further meet and confers following service of Plaintiffs' RFPs, it became clear that Zuffa's standard document destruction protocols caused the destruction of most documents (in particular, emails and correspondence) from the period before mid-2014. Because Plaintiffs' Complaint alleged that Zuffa's anticompetitive scheme had commenced no later than 2006,

the absence of document discovery from before mid-2014 could have undercut Plaintiffs' ability to prove significant aspects of their case. As a result, Berger Montague focused early discovery efforts on identifying potential custodians who had significant volumes of documents saved and available from this pre-2014 time-period that were outside the scope of Zuffa's document destruction protocol. Berger Montague also repeatedly pressed Zuffa's counsel to take efforts to locate the documents that Zuffa had collected for review and production to the FTC in connection with the FTC's inquiry into Zuffa's acquisition of MMA promoter Strikeforce.

35.     Plaintiffs' efforts yielded a significant volume of documents. Zuffa ultimately produced nearly 500,000 documents dated before January 1, 2014, including almost 300,000 dated before December 31, 2010, and approximately 60,000 documents dated before December 31, 2009. These early case materials comprised critical components of Plaintiffs' expert reports, class certification record, and the ultimate proof of their claims on summary judgment.

36.     Plaintiffs served their Second Set of Requests for Production of Documents on Zuffa on August 8, 2016. These "Second RFPs" sought documents relating to Zuffa's efforts to sell itself in 2016, as well as documents relating to, and analyzing, the sale itself. Further, the Second RFPs sought documents concerning discrete issues that Plaintiffs' First RFPs and third-party subpoenas uncovered.

37.     Ultimately, through Plaintiffs' efforts to obtain document discovery, Zuffa produced more than 775,000 documents comprising more than 3 million pages.

38.     Following a competitive bidding process, Co-Lead Class Counsel engaged a document hosting vendor (CasePoint) to store and manage these documents (as well as documents collected from Plaintiffs and third parties).[6]

39.     Plaintiffs reviewed these documents using a variety of techniques. Plaintiffs applied technology assisted review techniques ("TAR") to sort and categorize the materials and facilitate an efficient review. Plaintiffs segregated various documents reflecting contracts between the UFC and

---

[6] After the August/September 2019 Evidentiary Hearing on Plaintiffs' Motion for Class Certification (discussed *infra*), Co-Lead Class Counsel took the document production and coding offline and stored it on hard drives so as to cease incurring monthly hosting charges. After the Court's Order certifying the *Le* Class in August 2023, Co-Lead Class Counsel engaged a different hosting vendor, Everlaw, to re-load the document production and coding for summary judgment and in preparation for trial.

fighters or others for expert review using these TAR techniques, and further identified critical documents at an early stage to allow Plaintiffs to focus discovery efforts going forward.

40.     Co-Lead Class Counsel organized a document review drawing from internal resources as well as reviewers at Supporting Firms. Co-Lead Class Counsel developed a coding panel for document reviewers and then trained the reviewers in the case and coding instructions. Co-Lead Class Counsel managed the review process, holding regular teleconferences with the document reviewers to ensure that issues the reviewers observed could be timely communicated and discussed among Co-Lead Class Counsel and the reviewers. Warner Angle also kept a log of the documents that document reviewers coded as "hot," and regularly circulated that log to Co-Lead Class Counsel. Co-Lead Class Counsel reviewed the log of "hot" documents and raised issues (such as coding documents as "hot" that were not "hot"), and flagging issues for reviewers to keep in mind as they emerged.

41.     In addition to the foregoing, Plaintiffs issued three additional sets of Interrogatories and five sets of Requests for Admission (totaling 267 Requests for Admission not counting subparts). These materials sought admissions and information on wide-ranging aspects of the case including, without limitation, so-called "contention interrogatories" that sought explication of Zuffa's stated affirmative defenses and also required that Zuffa admit to the authenticity of video clips in which its executives made statements against their interests that were relevant to Plaintiffs' claims and Zuffa's defenses (*see* discussion *infra*).

42.     Among the analytical projects Co-Lead Class Counsel, and Berger Montague in particular, undertook in connection with written discovery from Zuffa was an analysis of the tens of thousands of text messages Zuffa produced. Berger Montague identified the text productions of custodians in the production and compiled those texts for specific analyses, organizing the produced text messages in various ways to identify text messages on similar subject matter based on dates and individuals involved, and for other purposes. Most notably, Berger Montague compiled all text messages Zuffa produced to or from a phone used by UFC President Dana White (Mr. White used multiple phones at any one time). Through this analysis, Berger Montague determined that a significant proportion of the text messages Mr. White sent or received had been deleted or otherwise destroyed. Specifically, of the more than 8,100 texts sent to or from a phone used by UFC President Dana White

in the production, Berger Montague's analysis reflected that more than 1,900 of those texts (nearly 25%) were not collected from Dana White's devices.

43.     In response, Berger Montague initiated a meet and confer process with Zuffa to learn more about Mr. White's cellphone usage. Ultimately, Plaintiffs brought the issue to the Court for resolution. *See* ECF Nos. 395, 397. Although Plaintiffs did not obtain relief for spoliation through that motion, *see* ECF No. 422, litigation of the issue generated compelling evidence for the cross-examination of Dana White regarding spoliation and credibility. By pressing these questions, Plaintiffs (1) caused Dana White to submit a sworn declaration that appeared to be internally inconsistent, (2) examined Mr. White on those alleged inconsistencies at his deposition leading to what Plaintiffs believe was damaging testimony relating to his alleged inability to reconcile those inconsistencies, and (3) created, through that testimony and the absence of the phone records from these cellphones, a basis for arguing spoliation at trial and for potentially substantially undermining Mr. White's credibility before the jury.

### iii.     Third Party Document Subpoenas

44.     In addition to Plaintiffs' efforts to obtain documents directly from Zuffa, Plaintiffs also issued over 50 document subpoenas to third parties. These third parties included: (1) managers and agents for various MMA fighters; (2) MMA promotions and the owners of past MMA promotions (including, without limitation, Strikeforce, Bellator, One Championship, International Fight League, World Series of Fighting, Affliction, World Fighting Alliance, Invicta, Legacy FC, and Titan FC); (3) entities (and their law firms) that sought to acquire Zuffa in 2016, including WME-IMG Endeavor that ultimately did acquire Zuffa in 2016; (4) financial institutions that worked on behalf of Zuffa over the years and those that worked on behalf of the entities that sought to acquire Zuffa in 2016; and (5) Mercer, an entity that undertook a fighter compensation study at Zuffa's behest. We provide the scope of the third parties that Plaintiffs targeted with subpoenas that were actively pursued in the below table:

| # | ENTITY[7] | ENTITY TYPE |
|---|---|---|
| 1 | Affliction | MMA Promoter and MMA Fighter Sponsor |
| 2 | Ali Abdel-Aziz | MMA Fighter Manager and Matchmaker for MMA Promoter |
| 3 | American Top Team | MMA Fighter Manager |
| 4 | AXS TV | MMA Broadcaster and Acquirer of MMA Promotion Assets |
| 5 | Barclays PLC | Financial Institution relating to Potential Zuffa Acquisition |
| 6 | Bellator | MMA Promoter |
| 7 | Bob Meyrowitz | Former owner of the UFC |
| 8 | Brian Butler-Au | Fighter Manager |
| 9 | Brian Hamper | Fighter Manager |
| 10 | Cindy Ortiz | MMA Fan Appearing in Zuffa-Produced Emails |
| 11 | Citibank, N.A. | Financial Institution |
| 12 | Credit Suisse | Financial Institution relating to Potential Zuffa Acquisition |
| 13 | David Martin, Martin Advisory Group, LLC | MMA Fighter Manager |
| 14 | Deutsche Bank Securities, Inc. | Financial Institution; Financial Institution relating to Potential Zuffa Acquisition |
| 15 | Deutsche Bank Trust Co. | Financial Institution |
| 16 | Ed Fishman | MMA Fighter Manager |
| 17 | Ed Soares | MMA Promoter and MMA Fighter Manager |
| 18 | Fighter Tribe Management | MMA Fighter Manager |
| 19 | First Round Management | MMA Fighter Manager |
| 20 | Freshfields Bruckhaus Deringer LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 21 | Gareb Shamus | MMA Promoter |
| 22 | Gary Ibarra | MMA Fighter Manager |
| 23 | George Prajin | MMA Fighter Manager |
| 24 | Glenn Robinson | MMA Fighter Manager and MMA Fighter Sponsor |
| 25 | Goldman Sachs & Co. | Financial Institution relating to Potential Zuffa Acquisition |
| 26 | Greg Jamison | MMA Promoter |
| 27 | Invicta | MMA Promoter |
| 28 | J.P. Mogan Chase & Co. | Financial Institution relating to Potential Zuffa Acquisition |
| 29 | Jeff Clark | MMA Fighter Manager |
| 30 | Jeremy Lappen | MMA Promoter; MMA Fighter Manager |

[7] Note that in some circumstances, Plaintiffs served an entity and certain individuals affiliated with that entity, and in other circumstances, Plaintiffs served only the entity or only individuals.

| # | ENTITY[7] | ENTITY TYPE |
|---|-----------|-------------|
| 31 | Ken Pavia | MMA Fighter Manager |
| 32 | Kirkland & Ellis LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 33 | KKR Capital Markets LLC | Financial Institution relating to Potential Zuffa Acquisition |
| 34 | Kurt Otto | Principal of MMA Promoter |
| 35 | Legacy Fighting Championship | MMA Promoter |
| 36 | Leo Khorolinsky | MMA Fighter Manager |
| 37 | Lex McMahon | MMA Promoter and MMA Fighter Manager |
| 38 | Mercer (US), Inc. | Consultant |
| 39 | Milbank, Tweed, Hadley & McCloy LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 40 | MMA Inc. | MMA Fighter Manager |
| 41 | Monte Cox | MMA Fighter Manager |
| 42 | Moody's Financial Services, Inc. | Financial Rating Institution |
| 43 | MSD Capital L.P. | Financial Institution relating to Potential Zuffa Acquisition |
| 44 | Paul, Weiss, Rifkind, Wharton & Garrison LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 45 | Proskauer Rose LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 46 | Resurrection Fighting Alliance | MMA Promoter |
| 47 | Samuel Spira | Attorney |
| 48 | Sharks Sports & Entertainment | MMA Promoter |
| 49 | Shu Hirata | MMA Fighter Manager |
| 50 | Silver Lake Partners | Potential Zuffa Acquirer |
| 51 | Simpson Thatcher & Bartlett LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 52 | Standard & Poor's Financial Services LLC | Financial Rating Institution |
| 53 | The Blackstone Group L.P. | Potential Zuffa Acquirer |
| 54 | The Raine Group LLC | Consultant relating to Potential Zuffa Acquisition |
| 55 | Titan FC | MMA Promoter |
| 56 | VFD Marketing | MMA Fighter Manager |
| 57 | William Morris Endeavor Entertainment LLC | Potential Zuffa Acquirer |
| 58 | World Series of Fighting | MMA Promoter |
| 59 | Zinkin Entertainment (DeWayne Zinkin & Bob Cook) | MMA Fighter Manager |

45.     Through these subpoenas, Plaintiffs ultimately obtained hundreds of thousands of additional pages of material, including documents from the likes of Deutsche Bank and WME-IMG, which in Plaintiffs' view provided evidence of Zuffa's monopsony and monopoly power and its alleged ability to control fighter compensation. Plaintiffs also uncovered key financials from other MMA promoters that assisted in Plaintiffs' experts' analyses of market share and market power. And

14

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

Plaintiffs received other key correspondence that Plaintiffs believed evidenced Zuffa's alleged coercive negotiation tactics.

46.     Class Counsel tracked down the subpoenaed parties and entities and met and conferred with them to obtain productions of documents. In several cases, Plaintiffs had to litigate with the subpoena recipients to obtain productions. First, AXS TV LLC, an organization that, *inter alia*, purchased the assets of defunct MMA promoter International Fight League ("IFL"), sought to quash Plaintiffs' document subpoena. *See In re: Subpoena to Non-Party AXS TV LLC, Lee [sic] v. Zuffa, LLC*, No. 3:16-mc-12 (N.D. Tex.). Following that motion to quash, JSLF prepared to respond while continuing to negotiate with AXS TV, ultimately agreeing to a "Third Party Production Protocol" that resolved the motion. *See id.* at ECF No. 12. AXS produced almost 9,000 documents pursuant to that protocol.

47.     In addition to fighting the document subpoena, AXS TV LLC also moved to quash Plaintiffs' deposition subpoena of Mark Cuban. *See In re: Subpoena to Non-Party Mark Cuban, Lee [sic] v. Zuffa, LLC*, No. 3:17-mc-27 (N.D. Tex.). JSLF responded to the motion to quash in the action in the United States District Court for the Northern District of Texas. *See id.* at ECF Nos. 8 & 10. Ultimately, the Texas District Court granted the motion to quash without prejudice should the depositions of Andrew Simon (another AXS TV executive) and Dana White not have sufficiently covered the expected subject matter of the Mark Cuban deposition. *Id.* at ECF No. 20.

48.     Bellator also fought Plaintiffs' document subpoena. *See In re Subpoena of Bellator Sport Worldwide, LLC, Le v. Zuffa, LLC*, No. 2:17-mc-16 (C.D. Cal.). Prior to responding, Class Counsel (JSLF in particular) tried to negotiate Bellator's production, including via ten teleconferences, four meet and confer letters, and 79 emails. Through these efforts, Plaintiffs were able to resolve many of the disputed issues concerning Plaintiffs' subpoena, but were unable to reach agreement on documents relating to Bellator's fighter contract documents and related contract negotiation materials and documents relating to Bellator's cost and revenue information. JSLF then drafted and filed a response to Bellator's motion to quash the subpoena. *See id.*, ECF No. 26-1 (Mar. 8, 2017). The subpoena dispute was ultimately transferred to this Court on Zuffa's motion and adjudicated here. *See Le v. Zuffa, LLC*, No. 2:17-cv-849 (D. Nev.). Following argument, at which JSLF presented for

15

Plaintiffs, the Court ordered Bellator to produce a sample of anonymized fighter contracts (20% of Bellator's contracts) as well as Bellator's financials, including profit and loss statements through March 2017. No. 2:17-cv-849, ECF No. 55 (D. Nev. June 13, 2017). The Bellator financials Co-Lead Class Counsel ultimately obtained from Bellator proved critical to Plaintiffs' alleged showing that the most significant of the UFC's purported rivals paled in comparison to the UFC, generating just a fraction of the UFC's revenues and paying a substantially higher proportion of those revenues to fighters.

49.     One Championship, another MMA promoter (located in Singapore), similarly fought Plaintiffs' subpoena and required significant efforts to obtain documents. First, Plaintiffs filed a motion for issuance of Letters Rogatory to Group One Holdings Pte. Ltd. (One Championship's parent in Singapore) in this Court. *See Le v. Zuffa, LLC*, No. 15-cv-1045, ECF No. 433 (D. Nev. June 20, 2017). The Court granted that request, ECF No. 440, and issued the letter, ECF No. 441.[8] While that effort was pending, Plaintiffs filed an action against one of the promoter's domestic agents and One Championship in the United States District Court for the Western District of Washington. *See* Motion to Compel, *In re Subpoenas of Matt Hume, Le v. Zuffa, LLC*, No. 2:17-cv-1104, ECF No. 1 (W.D. Wash. July 19, 2017). Plaintiffs then successfully moved to transfer the litigation of the action back to this Court. *Id.* at ECF Nos. 24, 25; *see also Le v. Zuffa, LLC*, No. 15-cv-1045, ECF No. 506 (D. Nev. Oct. 13, 2017) (*Le* Plaintiffs' Notice of Related Case alerting the Court that the matter had been transferred). On November 16, 2017, JSLF argued in support of the motion to compel and in opposition to the domestic agent's motion to quash. *See In re Subpoenas of Matt Hume, Le v. Zuffa, LLC*, No. 2:17-cv-2657, ECF No. 41 (D. Nev. Dec. 2, 2017). The Court denied Plaintiffs the requested documents and limited the scope of the requested deposition. *Id.* at 41-42.

50.     Boxing promoter Top Rank, Inc. also fought to quash Plaintiffs' subpoenas for documents and for the deposition of Top Rank President Robert Arum. *See* ECF No. 470 & 497. Supporting counsel at Warner Angle, in consultation with Co-Lead Class Counsel, drafted the motion to compel concerning the document subpoena and the deposition subpoena, and then met and conferred with counsel from Top Rank to resolve the issue without Court intervention.

---

[8] Ultimately, the Supreme Court of Singapore denied the request. *See In re Subpoenas of Matt Hume, Le v. Zuffa, LLC*, No. 2:17-cv-2657, ECF No. 41, at 5 (D. Nev. Dec. 2, 2017).

#### iv.        Litigating Privilege and Work Product Claims

51.        Zuffa sought to withhold numerous documents, and redact many others, based on assertions of attorney-client privilege and the attorney work product doctrine. Plaintiffs disputed Zuffa's decision to withhold or redact many documents on these grounds.

52.        After Zuffa first produced its privilege log in this case (containing more than 30,000 entries) on April 7, 2017, Berger Montague analyzed the log and pursued a meet and confer via letter concerning deficiencies in the log's description of documents. *See* ECF No. 443-3 (describing the deficiencies). In response to Berger Montague's letter, Zuffa removed its privilege assertions over certain entries and amended its privilege log for other entries. *See* ECF No. 443-4. JSLF then analyzed the subsequent iteration of the privilege log (which also contained tens of thousands of entries). JSLF argued the issues with the privilege log to the Court. ECF No. 502. Through this meet and confer process, Zuffa produced more than 10,000 documents that had either been withheld in full or redacted.

53.        In addition to Plaintiffs' work regarding the privilege log, Plaintiffs litigated several challenges to Zuffa's efforts to claw back and/or shield specific materials from production.

54.        Early on in discovery, Berger Montague discovered a production error by Zuffa: certain documents had slipsheets in the production reflecting that the documents had been withheld on the basis of privilege, but the OCR-ed text of the documents had nevertheless been produced to Plaintiffs. Plaintiffs quickly alerted Zuffa of the error. However, in the process of Plaintiffs' discovery of the issue, Plaintiffs noted that one of the documents was not properly subject to protection of the attorney-client privilege. Specifically, Plaintiffs identified an email from Zuffa's outside counsel concerning the business purposes behind Zuffa's acquisition of Pride, another MMA promotion. *See generally* ECF No. 229 (motion to challenge the privilege designation of the email). Berger Montague then led a meet and confer in an effort to persuade Zuffa not to withhold the document. When the parties reached an impasse, JSLF prepared a motion to challenge the privilege designation. *Id.* Plaintiffs prevailed on that motion. *See* ECF No. 270. This document ultimately featured prominently in one of Plaintiffs' key expert economic reports, *see* Expert Report of Hal J. Singer, Ph.D., ECF No. 926-3, ¶43, Plaintiffs' motion for class certification, ECF No. 518 at 10, and Plaintiffs' summary judgment oppositions, ECF No. 596 at 10 & ECF No. 926 at 10.

17

55.     Plaintiffs challenged other of Zuffa's privilege assertions as well.

56.     On August 31, 2016, JSLF drafted, with Berger Montague's assistance, a motion to challenge Zuffa's assertion of work product protection over documents relating to a consultant Zuffa engaged to study its fighter compensation. *See* ECF No. 282 & 303. Plaintiffs prevailed on the motion, resulting in the production of the fighter compensation study and various drafts. *See* ECF No. 422. These compensation study documents featured prominently in Plaintiffs' proof and briefing, given that, in them, Zuffa's consultant Mercer compared the percentage of revenues paid to athletes by other sports organizations to the percentage of revenues Zuffa paid to UFC fighters. Plaintiffs' sports economics expert, Prof. Andrew Zimbalist, discussed and cited prominently the Mercer fighter compensation study that Plaintiffs received only because of this work product challenge. *See, e.g.*, Expert Report of Andrew Zimbalist, ECF No. 596-7, ¶108, Expert Rebuttal Report of Andrew Zimbalist, ECF No. 596-8, ¶56 & n.104. And Plaintiffs relied on these materials, *inter alia*, in opposing Zuffa's *Daubert* motions, *see, e.g.*, ECF No. 534 at 53. In particular, Plaintiffs cited to the Mercer study, among other materials, to support their argument that wage share was an appropriate metric and that certain other professional sports organizations were not appropriate comparators.

57.     On December 15, 2016, JSLF led Plaintiffs' briefing of a challenge to Zuffa's assertion of privilege over a group of documents discussing Zuffa's contract negotiations with MMA fighters. ECF Nos. 320 & 334. JSLF then argued these motions before the Court on February 7, 2017. *See* ECF No. 353. The Court granted Plaintiffs' motion as to the majority of the challenged documents. *Id.*; ECF No. 359.

### v.     Fact Depositions

58.     Co-Lead Class Counsel, as well as firms acting under our direction, collectively examined nearly 30 individual fact witnesses in depositions (in addition to seven days of testimony of Zuffa's Rule 30(b)(6) designees). Plaintiffs took the first fact deposition in November 2016 (a deposition pursuant to Fed. R. Civ. P. 30(b)(6)) and the last fact deposition in August 2017. Almost all of these depositions lasted for a full business day or longer; the deposition of Mr. White lasted two days. An additional challenge in taking these depositions was that certain fact witnesses were also

designated as 30(b)(6) witnesses, requiring preparation to identify and deploy documents and ask questions in both the witness's individual and corporate capacities.

59. In preparation for the many important fact depositions in this case, Co-Lead Class Counsel (a) identified key documents to be used at each deposition, (b) prepared extensive deposition outlines, (c) reviewed publicly available information, including hundreds of hours of videos, interviews, podcasts and other materials featuring the witnesses or related matters, and (d) and coordinated deposition strategy and questioning with Co-Lead Counsel, experts, and the *Le* Class Representatives and Quarry.

### a. Depositions of Zuffa's Current and Former Employees

60. The fact depositions of Zuffa's witnesses are set forth in the below table, including the witness's name, deposition date(s), and the participating attorneys (and attorney roles):

| # | WITNESS | DATE(S) | PRIMARY PLAINTIFFS' ATTORNEY EXAMINING | SUPPORTING ATTORNEY (IF ANY) | LOCATION |
|---|---|---|---|---|---|
| 1 | Denitza Batchvarova | 1/25/2017 | Daniel Silverman Cohen Milstein | Kevin Rayhill JSLF | Las Vegas, NV |
| 2 | Nakisa Bidarian | 5/5/2017 | Matthew Weiler JSLF | | Las Vegas, NV |
| 3 | Peter Dropick (30(b)(6)) | 12/1/2016 | Daniel Silverman Cohen Milstein | Patrick F. Madden Berger Montague | Las Vegas, NV |
| 4 | Peter Dropick (30(b)(1)) | 5/4/2017 | Joseph Saveri JSLF | Matthew Weiler JSLF | Las Vegas, NV |
| 5 | Ike Lawrence Epstein (30(b)(6)) | 12/2/2016 | Matthew Weiler JSLF | Patrick F. Madden Berger Montague | Las Vegas, NV |
| 6 | Ike Lawrence Epstein (30(b)(1)) | 5/26/2017 | Joseph Saveri JSLF | Matthew Weiler JSLF | Las Vegas, NV |
| 7 | Ike Lawrence Epstein (30(b)(6)) | 7/21/2017 | Daniel Silverman Cohen Milstein | | Las Vegas, NV |
| 8 | Ike Lawrence Epstein (30(b)(6)) | 8/15/2017 | Kevin Rayhill JSLF | Jiamie Chen JSLF | Las Vegas, NV |
| 9 | Lorenzo Fertitta | 3/23/2017 | Michael C. Dell'Angelo Berger Montague | Patrick F. Madden Berger Montague | Las Vegas, NV |
| 10 | Kirk Hendrick (30(b)(6)) | 11/29/2016 11/30/2016 | Eric L. Cramer Berger Montague | Patrick F. Madden Berger Montague | Las Vegas, NV |
| 11 | Kirk Hendrick (30(b)(1)) | 7/17/2017 | Patrick F. Madden Berger Montague | | Las Vegas, NV |
| 12 | John Hertig | 4/27/2017 | Matthew Weiler JSLF | Kevin Rayhill JSLF | Las Vegas, NV |
| 13 | Tracy Long | 1/26/2017 | Kevin Rayhill JSLF | Matthew Weiler JSLF | Las Vegas, NV |
| 14 | Michael Mersch | 7/15/2017 | Eric L. Cramer Berger Montague | Patrick F. Madden Berger Montague | Las Vegas, NV |

19

| # | WITNESS | DATE(S) | PRIMARY PLAINTIFFS' ATTORNEY EXAMINING | SUPPORTING ATTORNEY (IF ANY) | LOCATION |
|---|---|---|---|---|---|
| 15 | Michael Mossholder (30(b)(6)) | 11/30/2016 12/1/2016 | Daniel Silverman Cohen Milstein | Patrick F. Madden Berger Montague | Las Vegas, NV |
| 16 | John Mulkey | 4/19/2017 | Matthew Weiler JSLF | Kevin Rayhill JSLF | Las Vegas, NV |
| 17 | Michael Pine | 2/7/2017 | Daniel Silverman Cohen Milstein | | Nashville, TN |
| 18 | Jeff Quinn (30(b)(6)) | 7/27/2017 | Patrick F. Madden Berger Montague | Michael C. Dell'Angelo Berger Montague | Las Vegas, NV |
| 19 | Sean Shelby | 4/12/2017 | Patrick F. Madden Berger Montague | Robert Maysey Warner Angle | Las Vegas, NV |
| 20 | Joseph Silva | 6/7/2017 | Eric L. Cramer Berger Montague | Patrick F. Madden Berger Montague | Richmond, VA |
| 21 | Dana White | 8/9/2017 8/10/2017 | Michael C. Dell'Angelo Berger Montague | Richard Koffman Cohen Milstein | Las Vegas, NV |
| 22 | Marshall Zelaznik | 2/8/2017 | Kevin Rayhill JSLF | Matthew Weiler JSLF | Las Vegas, NV |

**b. Depositions of Third Parties**

61. The fact depositions of third-party witnesses are set forth in the below table, including the witness's name, affiliation, deposition date(s), and the participating attorneys (and attorney roles):

| # | WITNESS | AFFILIATION | DATE(S) | PRIMARY PLAINTIFFS' ATTORNEY EXAMINING | SUPPORTING ATTORNEY (IF ANY) | LOCATION |
|---|---|---|---|---|---|---|
| 1 | Jeffrey Aronson | Titan FC | 4/25/2017 | Daniel Silverman Cohen Milstein | | Palm Beach Gardens, FL |
| 2 | Robert Arum | Top Rank, Inc. | 10/17/2017 | Robert Maysey Warner Angle | Daniel Silverman Cohen Milstein | Los Angeles, CA |
| 3 | Thomas Atencio | Affliction | 2/9/2017 2/10/2017 | Robert Maysey Warner Angle | James Valletta Warner Angle | Costa Mesa, CA |
| 4 | Scott Coker | Strikeforce, Bellator | 8/3/2017 | Michael C. Dell'Angelo Berger Montague | Kevin Rayhill JSLF  Robert Maysey Warner Angle | Los Angeles, CA |
| 5 | Louis DiBella | DiBella Entertainment | 8/29/2017 | Daniel Silverman Cohen Milstein | Robert Maysey Warner Angle | New York, NY |
| 6 | Drew Goldman (30(b)(6)) | Deutsche Bank Securities, Inc. | 4/28/2017 | Patrick F. Madden Berger Montague | | New York, NY |
| 7 | Shannon Knapp | Invicta | 4/11/2017 | Kevin Rayhill JSLF | | Kansas City, MO |
| 8 | Jeremy Lappen | Elite XC, MMA Fighter Manager | 2/28/2017 | Kevin Rayhill JSLF | | Los Angeles, CA |
| 9 | Leon Margules | Warriors Boxing Promotion | 7/11/2017 | Daniel Silverman Cohen Milstein | Robert Maysey Warner Angle | Fort Lauderdale, FL |
| 10 | Colin Neville | The Raine Group | 8/8/2017 | John Radice Radice Law Firm | | New York, NY |

20

| # | WITNESS | AFFILIATION | DATE(S) | PRIMARY PLAINTIFFS' ATTORNEY EXAMINING | SUPPORTING ATTORNEY (IF ANY) | LOCATION |
|---|---------|-------------|---------|----------------------------------------|------------------------------|----------|
| 11 | Kurt Otto | International Fight League | 2/6/2017 | Eric L. Cramer Berger Montague | Mark Suter Berger Montague

Robert Maysey Warner Angle | New York, NY |
| 12 | Brent Richard | WME-IMG Endeavor | 7/20/2017 | Michael C. Dell'Angelo Berger Montague | | New York, NY |
| 13 | Carlos Silva | World Series of Fighting | 4/18/2017 | Robert Maysey Warner Angle | Tara Nordquist Warner Angle | Las Vegas, NV |
| 14 | Andrew Simon | AXS TV, HDNet | 7/19/2017 | Kevin Rayhill JSLF | | Dallas, TX |

### vi.   Searching for Publicly Available Evidence

62.   Co-Lead Class Counsel also undertook a comprehensive search through publicly available materials in search of relevant evidence.

63.   For example, Berger Montague undertook to search through thousands of hours of video clips (and transcripts of video clips) of interviews of Zuffa employees and executives, Scott Coker (an executive at Strikeforce and later Bellator), and other MMA promoters.

64.   Berger Montague identified and preserved these materials, and then clipped the videos for use at depositions and other proceedings.

65.   Berger Montague then endeavored to lay the foundation to authenticate and use these materials at trial by, *inter alia*, issuing Requests for Admission concerning certain videos featuring Zuffa executives and using video clips at the depositions of Dana White, Lorenzo Fertitta, Scott Coker, and Robert Arum.

66.   Berger Montague and Cohen Milstein then continually monitored, preserved, and searched for new videos and statements of UFC executives as well as reviewing voluminous filings with the Securities and Exchange Commission, up to the settlement of this matter.

### vii.   Written Discovery from the *Le* Class Representatives and Quarry

67.   The *Le* Class Representatives, Cung Le, Jon Fitch, Brandon Vera, Javier Vasquez, and Kyle Kingsbury, as well as Nathan Quarry, had significant participation in discovery.

68.     Zuffa served each of the *Le* Class Representatives and Quarry with written discovery, including Requests for Production of Documents ("Zuffa's RFPs"), Interrogatories (requiring both individual and collective responses), and 71 Requests for Admission (requiring a collective response).

69.     Each of the *Le* Class Representatives and Quarry worked with Co-Lead Class Counsel and supporting counsel at Warner Angle to identify sources of documents that were responsive to Zuffa's RFPs. Co-Lead Class Counsel and Warner Angle then worked with a vendor to collect ESI from those sources. In addition, Warner Angle wrote letters (with input from Co-Lead Counsel) requesting that the *Le* Class Representatives' and Quarry's managers and agents provide any documents in the *Le* Class Representatives' and Quarry's control so that Plaintiffs could produce those materials, sending letters to twenty different managers and agents who represented the *Le* Class Representatives and Quarry over time.

70.     Through these efforts, Co-Lead Class Counsel collected more than 600,000 documents from the *Le* Class Representatives and Quarry consisting of more than 800,000 pages. Class Counsel then reviewed these materials for relevance and responsiveness to Zuffa's RFPs.

71.     As to the Interrogatories, Co-Lead Class Counsel and supporting counsel at Warner Angle worked with the *Le* Class Representatives and Quarry to develop and write their answers to Zuffa's Interrogatories. The *Le* Class Representatives and Quarry then reviewed these answers to ensure their accuracy, before certifying the answers and allowing Co-Lead Class Counsel to serve the answers on Zuffa.

**viii.    Depositions of the *Le* Class Representatives and Quarry**

72.     Co-Lead Class Counsel and supporting counsel from Warner Angle worked with the *Le* Class Representatives and Quarry to prepare them for their depositions, and then defended those depositions.

73.     Prior to each deposition, Co-Lead Class Counsel responsible for defending the deposition reviewed the *Le* Class Representatives' (or Quarry's) document production and prepared outlines to address the likely areas of questioning at the deposition.

74.     Co-Lead Class Counsel then met with the *Le* Class Representatives (and Quarry) prior to the depositions to go over (1) the basics of testifying at deposition, (2) Plaintiffs' theories of liability,

22

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

(3) class certification and related issues, and (4) the likely Plaintiff-specific areas of questioning, including their substantial document productions and extensive publicly available materials such as videos and social media postings. These preparation sessions lasted several hours with each *Le* Class Representative and Quarry. In addition, some *Le* Class Representatives attended the depositions of other *Le* Class Representatives, and/or watched video clips from Quarry's deposition to prepare for their own depositions.

75.     Each *Le* Class Representative and Quarry then sat for a full-day deposition. Co-Lead Class Counsel collectively defended the six depositions of the *Le* Class Representatives and Quarry. Each of these depositions, including witness names, deposition date, and the defending/participating Co-Lead Class Counsel and supporting firm attorneys, is listed in the chart below:

| # | WITNESS | DATE(S) | PRIMARY PLAINTIFFS' FIRM/ ATTORNEY DEFENDING | SUPPORTING ATTORNEY(S) (IF ANY) | LOCATION |
|---|---------|---------|-----------------------------------------------|---------------------------------|----------|
| 1 | Jon Fitch | 2/15/2017 | Michael C. Dell'Angelo Berger Montague | Robert Maysey Warner Angle | Las Vegas, NV |
| 2 | Kyle Kingsbury | 2/17/2017 | Michael C. Dell'Angelo Berger Montague | Robert Maysey Warner Angle<br><br>Richard Koffman Cohen Milstein | Las Vegas, NV |
| 3 | Cung Le | 4/11/2017 | Michael C. Dell'Angelo Berger Montague | Robert Maysey Warner Angle | Las Vegas, NV |
| 4 | Nathan Quarry | 9/30/2016 | Eric Cramer Berger Montague | Don Springmeyer Kemp Jones[9] | Las Vegas, NV |
| 5 | Javier Vasquez | 2/14/2017 | Michael C. Dell'Angelo Berger Montague | Robert Maysey Warner Angle<br><br>Richard Koffman Cohen Milstein | Las Vegas, NV |
| 6 | Brandon Vera | 2/16/2017 | Michael C. Dell'Angelo Berger Montague<br><br>Richard Koffman Cohen Milstein | Robert Maysey Warner Angle | Las Vegas, NV |

76.     Each of these depositions transpired over the course of approximately a full day in Las Vegas, Nevada. At the time of the depositions, none of the *Le* Class Representatives nor Quarry resided

---

[9] At the time of the deposition, Mr. Springmeyer was with Wolf Rifkin.

23

in Nevada, and attending these depositions required travel, in some cases significant travel. For example, Brandon Vera resides in Guam, and his attendance at his deposition and other events required more than 24 hours of travel; Quarry resides in and traveled from Oregon to hearings, preparation sessions, mediations, meetings, and his deposition; and Kyle Kingsbury resides in and traveled from Texas for to hearings, preparation sessions, mediations, meetings, and his deposition.

### ix. Other Participation of the *Le* Class Representatives and Quarry

77. In addition to the foregoing, the *Le* Class Representatives and Quarry had consistent involvement throughout the case.

78. As noted above, the *Le* Class Representatives and Quarry joined monthly teleconferences to stay current with case developments.

79. The *Le* Class Representatives and/or Quarry attended court hearings, including the 2015 Motion to Transfer hearing in San Francisco, California, as well as the 2015 Motion to Dismiss hearing, the September 2017 hearing on Zuffa's motion for summary judgment as to Quarry's claims, the December 2018 motion for summary judgment hearing, the seven-day 2019 Evidentiary Hearing on Plaintiffs' Motion for Class Certification, and several other hearings and status conferences.

80. The *Le* Class Representatives and Quarry also travelled to attend the three in-person mediation sessions (in 2017 (Newport Beach, CA), 2019 (New York, NY), and 2023 (New York, NY)).

81. Further, prior to trial, the *Le* Class Representatives and Quarry attended multiple preparation sessions for their direct and cross examinations at trial. These sessions each took several hours. The sessions involved interviews by Co-Lead Class Counsel and Supporting Counsel to identify any areas of testimony that had not yet been covered by prior interviews and preparation sessions earlier in the case. The sessions involved the review of documents that could be used on cross-examination and documents that would be used during direct examination. And the sessions involved mock direct and cross examinations to prepare the *Le* Class Representatives and Quarry for their trial appearances.

### D. Expert Discovery in the *Le* Action

82. Co-Lead Class Counsel oversaw an extensive and protracted expert discovery effort in the *Le* Action.

83.     Given the importance of economic issues in this case, Co-Lead Class Counsel retained three economic experts: Hal J. Singer, Ph.D., Professor Andrew Zimbalist, and Professor Alan Manning. Co-Lead Class Counsel spent significant time strategizing during discovery and briefing, working with Dr. Singer and his team to assess whether economic analyses and evidence common to members of the *Le* Class (SA ¶ 1(p)) would be capable of addressing, *inter alia*, (i) monopsony power, (ii) substantial foreclosure, (iii) common impact, (iv) anticompetitive effects, (v) alleged procompetitive justifications, and (vi) aggregate damages to the Bout Class and proposed Identity Rights Class. Co-Lead Class Counsel worked with Professor Zimbalist on his report concerning the history of free agency in major professional sports and the effects of free agency on athlete compensation, as well as a yardstick damages analysis. Co-Lead Counsel retained Professor Alan Manning after Zuffa's opposition reports criticized certain aspects of Dr. Singer's analysis, including in particular Dr. Singer's use of wage share as the main metric of analysis. Prof. Manning is a Professor at the London School of Economics and Political Science. He wrote a key book on monopsony power that was favorably cited by Zuffa's own economists. He testified that wage share was indeed appropriate for use in this case involving professional athletes.

84.     Co-Lead Class Counsel also retained a forensic accounting expert, Guy Davis. Mr. Davis submitted two reports totaling 156 pages.

85.     Dr. Singer submitted four reports in the *Le* Action consisting of 526 pages inclusive of appendices.[10] Professor Zimbalist submitted two reports consisting of 231 pages, inclusive of appendices. Professor Manning's rebuttal report totaled 17 pages.

86.     To assist the experts, Co-Lead Class Counsel collectively spent hundreds of hours over the course of several months: (1) ensuring that the experts received and understood the transactional data, reflecting (among many other data points) the compensation to each fighter for each bout, documents produced by Zuffa and by non-parties, and party and non-party depositions; (2) analyzing draft reports; and (3) meeting with the experts.

---

[10] Later, Dr. Singer also offered a declaration as part of Plaintiffs' effort to bar Zuffa from introducing material into the *Le* Action trial that post-dated the June 30, 2017 end of the Class Period in *Le*. *See* ECF No. 914-2.

87.     Co-Lead Class Counsel invested substantial time and effort related to expert discovery in this case—including the work of senior shareholders/partners—that was critical to proving the allegations that the challenged conduct foreclosed competition, caused anticompetitive effects, and harmed the members of the proposed classes.

88.     The need for extensive expert discovery is reflective of the complexities of the *Le* Action, which required Co-Lead Class Counsel to grapple with and overcome numerous obstacles, including by proving some or all of the following using evidence common to the Classes:

      a.   that Zuffa had monopsony power;

      b.   that the challenged conduct foreclosed a substantial share of competition;

      c.   that the challenged conduct suppressed compensation for UFC fighters below competitive levels;

      d.   that the challenged conduct had significant anticompetitive effects;

      e.   that the challenged conduct had no valid procompetitive justifications that could outweigh the anticompetitive effects, and,

      f.   aggregate damages suffered by the *Le* Classes as a whole.

### i.     Expert Work of Hal J. Singer, Ph.D.

89.     Co-Lead Class Counsel had initially engaged Hal J. Singer, Ph.D. to perform certain analyses prior to filing the Complaint in the *Le* Action.

90.     Following the receipt of Zuffa's production of its Promotional and Ancillary Rights Agreements ("PAR Agreements") and compensation data, Co-Lead Class Counsel worked with Dr. Singer to develop and commence a comprehensive review and categorization of the PAR Agreements that Zuffa produced, identifying potentially anticompetitive contract terms and their prevalence and effects over time. To facilitate that review, Co-Lead Class Counsel identified and segregated the PAR Agreements in the document production database using a TAR algorithm, and Dr. Singer's staff performed the review and analyses.

91.     Throughout discovery, Co-Lead Class Counsel and Dr. Singer and his staff stayed in regular communication to discuss developing factual issues that could be important to Dr. Singer's analyses and to monitor the progress of the PAR Agreement review.

26

92.     Co-Lead Class Counsel worked closely with Dr. Singer as Dr. Singer developed the model he used to assess impact and damages, including by helping to identify discovery materials that Dr. Singer and his team believed would be relevant to Dr. Singer's work. Co-Lead Class Counsel served Dr. Singer's opening Expert Report on August 31, 2017. ECF No. 518-3.

93.     Following service of Dr. Singer's opening Expert Report, Co-Lead Class Counsel began to prepare Dr. Singer for his deposition. Co-Lead Class Counsel held multiple preparation sessions with Dr. Singer, each lasting several hours.

94.     On September 27, 2017, Dr. Singer sat for his first deposition in the *Le* Action, with Berger Montague defending, supported by attorneys with JSLF and Cohen Milstein.

95.     On October 27, 2017, Zuffa served expert reports from three economic experts (Dr. Robert Topel, Dr. Roger Blair, and Dr. Paul Oyer) critiquing the work and opinions of Plaintiffs' economic experts.

96.     Co-Lead Class Counsel, led by Berger Montague and JSLF, then set to work with Dr. Singer to provide Dr. Singer and his staff the information he needed to prepare his Rebuttal Expert Report. Plaintiffs served Dr. Singer's Rebuttal Expert Report on January 12, 2018.

97.     Following service of Dr. Singer's Rebuttal Expert Report, Co-Lead Class Counsel, led by Berger Montague and JSLF, prepared Dr. Singer for his second deposition in the *Le* Action, including teleconferences and an in-person preparation session lasting several hours.

98.     On January 23, 2018, Dr. Singer sat for his second deposition in the *Le* Action, with Berger Montague defending and supported by attorneys with JSLF and Cohen Milstein.

99.     Although, based on the Court-approved schedule in the *Le* Action, expert discovery closed following Dr. Singer's second deposition, Zuffa continued to try to supplement its arguments concerning Dr. Singer's testimony.

100.    A few weeks after expert discovery had closed, Zuffa served Plaintiffs with a "Sur-Rebuttal Expert Report of Prof. Robert H. Topel," dated February 12, 2018. Co-Lead Class Counsel directed Dr. Singer to prepare a report in response. Berger Montague and JSLF worked with Dr. Singer to complete and serve the Supplemental Expert Report of Hal J. Singer Ph.D., dated April 3, 2018 (*see* ECF No. 534-3).

27

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

101.     Then, when Zuffa filed its Opposition to Plaintiffs' Motion for Class Certification, Zuffa attached a new "Declaration of Robert Topel," dated April 6, 2018. *See* ECF No. 540-5. Co-Lead Class Counsel asked Dr. Singer to prepare a response to that declaration as well, which Berger Montague and JSLF again worked with Dr. Singer to compile.

102.     Following the filing of this second unauthorized report of Dr. Topel, Co-Lead Class Counsel met and conferred with Zuffa in an effort to obtain an agreement to close the expert discovery record. Co-Lead Class Counsel obtained such an agreement and worked with Zuffa to draft and file the Joint Motion to Supplement Expert Reports, ECF No. 545 (which the Court granted, ECF No. 628). Pursuant to that Court-endorsed agreement, Zuffa was permitted to serve one further report of Dr. Topel with its Reply in support of Zuffa's motion to exclude Dr. Singer's testimony, and Plaintiffs were permitted to file one further report of Dr. Singer. *Id.*

103.     As a result, Co-Lead Class Counsel directed Dr. Singer to continue to prepare his response to the Declaration of Robert Topel and incorporate that into his then forthcoming final report in the *Le* Action.

104.     After Zuffa served Dr. Topel's "Reply to the Supplemental Expert Report of Hal J. Singer, Ph.D." (dated May 7, 2018), Berger Montague and JSLF worked with Dr. Singer to prepare and finalize his fourth report. Dr. Singer finalized the "Second Supplemental Reply Report of Hal J. Singer, Ph.D." on May 28, 2018, and Plaintiffs served that report with the Reply in support of Plaintiffs' Motion for Class Certification. *See* ECF No. 554-3.

### ii.     Expert Work of Professor Andrew Zimbalist

105.     During fact discovery, Co-Lead Class Counsel identified the potential need for an economist who had focused on the study of sports. Co-Lead Class Counsel commenced a search for a sports economist, ultimately retaining Professor Andrew Zimbalist to perform the work.

106.     Cohen Milstein, supported by Berger Montague and JSLF, took the lead in working with Professor Zimbalist to prepare his opening report. Co-Lead Class Counsel worked with Professor Zimbalist to identify key materials in support of his opinions, including, without limitation, record evidence and publicly available materials concerning other sports leagues and organizations, as well as

28

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

consulting with Professor Zimbalist on Cohen Milstein's depositions of boxing promoters and collection of public materials concerning those promoters.

107.    Co-Lead Class Counsel worked with Professor Zimbalist to finalize his opening Expert Report on August 30, 2017, and then served that report on August 31, 2017.

108.    Cohen Milstein then began to prepare Professor Zimbalist for his deposition, supported by Berger Montague and JSLF. Co-Lead Class Counsel held multiple preparation sessions with Professor Zimbalist, each lasting several hours.

109.    On September 25, 2017, Professor Zimbalist sat for his first deposition in the *Le* Action, with Berger Montague defending and supported by attorneys with JSLF and Cohen Milstein.

110.    Once Plaintiffs received Zuffa's expert reports, in particular the Expert Report of Dr. Roger Blair (an economist), Cohen Milstein then took the lead in working with Professor Zimbalist to prepare the Expert Rebuttal Report of Andrew Zimbalist and to respond to Dr. Blair's critiques of Professor Zimbalist's work.

111.    Following service of Dr. Zimbalist's rebuttal report, Cohen Milstein again took the lead in preparing him for his second deposition, with assistance from Co-Lead Class Counsel. Again, preparations took many hours as Co-Lead Class Counsel worked to prepare Professor Zimbalist for Zuffa's lines of questioning and attacks.

112.    On January 26, 2018, Professor Zimbalist sat for his second deposition in the case. Berger Montague defended the deposition with support from JSLF and Cohen Milstein.

### iii.    Expert Work of Guy Davis

113.    During fact discovery, Co-Lead Class Counsel identified the need for an accounting expert to analyze Zuffa's finances. Plaintiffs discovered that Zuffa had taken out hundreds of millions of dollars in debt that appeared to be used to pay dividends to Zuffa's owners. Co-Lead Class Counsel sought an expert qualified to analyze Zuffa's finances and these distributions as well as the valuation and sale of Zuffa in late 2016.

114.    Co-Lead Class Counsel conducted a search for an accounting expert, ultimately retaining Guy Davis, CPA, CIRA, CDBV, CFE.

115.    Berger Montague took the lead in working with Guy Davis to develop his report on Zuffa's financials. Berger Montague collected financials and related materials for Guy Davis and consulted with him on other materials he needed for his work.

116.    Co-Lead Class Counsel, Berger Montague in particular, helped Guy Davis to finalize his report and serve it on August 31, 2017.

117.    Then, Berger Montague and Cohen Milstein worked with Mr. Davis to prepare him for his first deposition. Berger Montague and Cohen Milstein prepared Mr. Davis for approximately 10-15 hours. Cohen Milstein then defended Mr. Davis's deposition, with Berger Montague supporting on September 19, 2017.

118.    Upon receipt of Zuffa's expert reports, in particular the Expert Report of Elizabeth Kroger Davis (an accounting expert), Berger Montague worked with Guy Davis to respond to Ms. Davis's opinions. Berger Montague provided support to Mr. Davis in preparing the Rebuttal Expert Report of Guy A. Davis, CPA, CIRA, CDBV, CFE, finalizing that report, and serving it on January 12, 2018.

119.    Following service of Guy Davis's second report, Co-Lead Class Counsel began to prepare him for his second deposition.

120.    Guy Davis sat for his second deposition in the *Le* Action on January 30, 2018. Cohen Milstein defended the deposition.

### iv.    Expert Work of Prof. Alan Manning

121.    When Plaintiffs received Zuffa's expert reports, Co-Lead Class Counsel noted that in claiming that wage share was an inappropriate metric, Zuffa's expert Dr. Paul Oyer relied in part on a labor economist named Prof. Alan Manning at the London School of Economics and Politics. *See* Expert Report of Paul Oyer, ¶¶22-24, 26. Dr. Oyer cited as one basis for his opinion that wage share was inappropriate the fact that Professor Manning did not use wage share in his work. *Id.*; *see also id.* ¶5. Dr. Oyer proclaimed that Professor Manning is "a recognized expert and leader … in analysis of monopsony in labor markets," who is "particularly authoritative." *See* ECF No. 534-9.

122.    Co-Lead Class Counsel agreed that Prof. Manning was an authoritative source regarding the proper methods for analyzing monopsony power in labor markets and reached out to Professor

30

Manning to have him analyze Dr. Singer's approach and opine on the appropriateness of Dr. Singer's regression modeling choices.

123.    Berger Montague and JSLF took the lead in working with Professor Manning to facilitate his understanding of Dr. Singer's model and the preparation of Prof. Manning's report endorsing Dr. Singer's model. Plaintiffs served the Expert Rebuttal Report of Professor Alan Manning on January 12, 2018.

124.    Co-Lead Class Counsel then began to prepare Professor Manning for his deposition, including by holding a preparation session with Professor Manning.

125.    Professor Manning traveled from his home in the United Kingdom to sit for his deposition on February 8, 2018 in Philadelphia, PA. Berger Montague defended the deposition with support from JSLF. Professor Manning likewise traveled from his home in the United Kingdom to Las Vegas to testify at the Evidentiary Hearing on Plaintiffs' Motion for Class Certification (discussed *infra*).

**v.    Defending Plaintiffs' Expert Witness Depositions**

126.    All of the depositions of Plaintiffs' experts, including expert witness names, deposition dates, and the participating attorneys (and their roles), are as follows:

| # | EXPERT WITNESS | DATE(S) | PRIMARY PLAINTIFFS' FIRM/ ATTORNEY DEFENDING | SUPPORTING FIRM/ ATTORNEY (IF ANY) | LOCATION |
|---|---|---|---|---|---|
| 1 | Hal J. Singer (First and Second Depositions) | 9/27/2017 1/23/2018 | Eric L. Cramer Berger Montague | Mark Suter Berger Montague<br><br>Daniel Silverman Cohen Milstein<br><br>Joshua P. Davis JSLF[11] | Philadelphia, PA |
| 2 | Andrew Zimbalist (First Deposition) | 10/6/2017 | Eric L. Cramer Berger Montague | Daniel Silverman Cohen Milstein<br><br>Joshua P. Davis JSLF | Northampton, MA |

---

[11] Josh Davis was at JSLF for a significant portion of the case. He joined Berger Montague as a Shareholder on January 1, 2023.

| # | EXPERT WITNESS | DATE(S) | PRIMARY PLAINTIFFS' FIRM/ ATTORNEY DEFENDING | SUPPORTING FIRM/ ATTORNEY (IF ANY) | LOCATION |
|---|---|---|---|---|---|
| 3 | Andrew Zimbalist (Second Deposition) | 1/26/2018 | Eric L. Cramer Berger Montague | Daniel Silverman Cohen Milstein<br><br>Richard Koffman Cohen Milstein<br><br>Joshua P. Davis JSLF | New York, NY |
| 4 | Guy Davis (First Deposition) | 11/29/2017 | Richard Koffman Cohen Milstein | Eric L. Cramer Berger Montague<br><br>Patrick F. Madden Berger Montague | Philadelphia, PA |
| 5 | Guy Davis (Second Deposition) | 1/30/2018 | Richard Koffman Cohen Milstein | | Washington, D.C. |
| 6 | Alan Manning | 2/8/2018 | Eric L. Cramer Berger Montague | Mark Suter Berger Montague<br><br>Richard Koffman Cohen Milstein<br><br>Joshua P. Davis JSLF | Philadelphia, PA |

### vi.     Co-Lead Class Counsel's Work Concerning Zuffa's Experts

127.    Co-Lead Class Counsel also analyzed the reports produced by Zuffa's five experts: Dr. Robert H. Topel, Dr. Paul Oyer, Dr. Roger Blair, Richard Marks, and Elizabeth Kroger Davis, who collectively produced reports totaling 650 pages.[12]

128.    Additionally, Co-Lead Class Counsel took the depositions of Zuffa's expert witnesses. Co-Lead Class Counsel's preparation for each of these depositions was painstaking, involving extensive discussion with and feedback from Plaintiffs' experts, review of Zuffa's expert reports and the materials relied upon, and review of significant portions of the record in this case.

129.    All of the depositions of Zuffa's experts, including expert witness names, deposition dates, and the participating attorneys (and their roles), examined by Co-Lead Class Counsel, are as follows:

---

[12] Additionally, Co-Lead Class Counsel analyzed the belated expert report of Gregory Leonard filed by Zuffa in December 2023 prior to Plaintiffs' successful motion to strike that report. *See* ECF No. 933 (Plaintiffs' Motion to Strike); ECF No. 959 (Order on Plaintiffs' Motion to Strike).

32

| # | EXPERT WITNESS | DATE(S) | PRIMARY PLAINTIFFS' FIRM/ ATTORNEY EXAMINING | SUPPORTING FIRM/ ATTORNEY (IF ANY) | LOCATION |
|---|---|---|---|---|---|
| 1 | Robert Topel | 12/5/2017 12/6/2017 | Eric L. Cramer Berger Montague | Mark Suter Berger Montague | Washington, D.C. |
| 2 | Roger Blair | 12/8/2017 12/9/2017 | Daniel Silverman Cohen Milstein | Patrick F. Madden Berger Montague | Orlando, FL |
| 3 | Paul Oyer | 11/29/2017 | Josh Davis JSLF | Eric L. Cramer Berger Montague | Washington, D.C. |
| 4 | Richard Marks | 11/30/2017 | Michael C. Dell'Angelo Berger Montague | | Washington, D.C. |
| 5 | Elizabeth Kroger Davis | 11/28/2017 | Richard Koffman Cohen Milstein | | Washington, D.C. |

130.   In addition to the foregoing experts, Zuffa introduced what Plaintiffs claimed was untimely expert material in the form of its Summary Exhibits, discussed *supra* and in ECF No. 658, as well as the Declaration of Gregory K. Leonard (ECF No. 932-28), which Plaintiffs did not address substantively, but successfully moved to strike, *see* ECF No. 959.

**E. Class Certification and *Daubert* Proceedings in the *Le* Action**

     **i.**    **Class Certification Briefing**

131.   Following the completion of fact and expert discovery in the *Le* Action, Co-Lead Class Counsel prepared a class certification motion and brief along with supporting materials. Berger Montague and JSLF took the lead on drafting the motion and brief. Co-Lead Class Counsel drew on the extensive expert record they had developed and their expertise in the law concerning worker-side antitrust cases to develop their case for class certification. Berger Montague took the lead in finalizing and filing Plaintiffs' Motion for Class Certification and all the supporting papers, as well as a motion to provisionally seal the brief and supporting evidence, on February 16, 2018. ECF Nos. 518, 519.

132.   Following Zuffa's opposition to class certification, filed on April 6, 2018 (ECF No. 540), Co-Lead Counsel, again with Berger Montague and JSLF taking the lead, drafted Plaintiffs' Reply in Support of Plaintiffs Motion for Class Certification. Berger Montague finalized and filed that Reply on May 30, 2018. *See* ECF No. 554.

33

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN, AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT

### ii.    Zuffa's First *Daubert* Briefing

133.    On the same day that Plaintiffs' filed their Motion for Class Certification (February 16, 2018), Zuffa filed three motions to exclude Plaintiffs' experts Hal J. Singer, Ph.D. (ECF No. 524), Professor Andrew Zimbalist (ECF No. 522), and Guy Davis (ECF No. 517).

134.    Due to the overlap of Zuffa's arguments as to Professor Zimbalist and Dr. Singer, Plaintiffs drafted a consolidated opposition to the motions to exclude those experts. Co-Lead Class Counsel jointly worked to develop that opposition, with Berger Montague finalizing and filing that brief and the related motion to seal on April 6, 2018. *See* ECF No. 534.

135.    Cohen Milstein took the lead in drafting the opposition to the motion to exclude the testimony of Guy Davis, Plaintiffs' accounting expert. Plaintiffs filed that opposition and the related motion to seal on April 6, 2018. ECF No. 535.

### iii.    The Evidentiary Hearing on Class Certification

136.    After the parties fully briefed Plaintiffs' Motion for Class Certification, Zuffa's *Daubert* Motions, and one of Zuffa's Motions for Summary Judgment (discussed *infra*), the parties prepared for argument on these motions and the Court set a hearing for December 14, 2018. *See* ECF No. 616. At that hearing, the Court announced its intent to hold an evidentiary hearing on Plaintiffs' Motion for Class Certification ("Evidentiary Hearing") and requested briefing on (1) the legal standard for class certification, and (2) confidentiality issues relating to the evidence to be presented at the upcoming hearing. The Court also denied Zuffa's Motion for Summary Judgment (ECF No. 573) at that time, without prejudice, announcing that Zuffa could re-raise summary judgment after the Court held the class certification hearing and resolved class certification. ECF No. 628.

137.    Berger Montague took the lead on drafting the briefing concerning the use of material designated as confidential under the protective order in the case. ECF Nos. 631, 639. JSLF took the lead on drafting the class certification standards briefing for Plaintiffs, with assistance from other Co-Lead Class Counsel. ECF Nos. 633, 640.

138.    At the ensuing hearing on the standard for class certification and to discuss the upcoming Evidentiary Hearing, Berger Montague handled arguments concerning the hearing process

and the Court's questions concerning the potential use of an independent expert, and JSLF handled argument on issues relating to class certification standards. *See* ECF No. 651.

139.    Over the next several months, the parties met and conferred on a variety of issues relating to the Evidentiary Hearing, including exchanging exhibits and preparing exhibit lists. Berger Montague led these meet and confers and processes.

140.    During these pre-Evidentiary Hearing processes, Zuffa produced a set of new purported "Summary Exhibits" and indicated its intention to rely on other purported "Summary Exhibits" it had attached to its opposition to Plaintiffs' Motion for Class Certification. Plaintiffs objected to these exhibits as untimely expert testimony that lacked appropriate foundation. Plaintiffs briefed those objections, with Berger Montague taking the lead in the briefing and argument. *See* ECF No. 658.

141.    Zuffa also objected to certain of Plaintiffs' proposed exhibits. Cohen Milstein took the lead on responding to Zuffa's objections on Plaintiffs' behalf. *See* ECF No. 674.

142.    Furthermore, as part of the confidentiality issues the parties worked to resolve in advance of the Evidentiary Hearing, the parties provided notice to the various third parties where such third parties (1) produced discovery materials that appeared on the parties' exhibit lists, and (2) the third parties designated such materials as confidential or highly confidential under the protective order.

143.    Following the objections of some of these third parties, Co-Lead Class Counsel, in particular Berger Montague and JSLF, took the lead in drafting Plaintiffs' briefing concerning the use of these materials at the Evidentiary Hearing. *See* ECF Nos. 676 & 677.

144.    In addition to these matters relating to evidence, standards, and confidentiality, throughout 2019 leading up to the August/September 2019 Evidentiary Hearing, Co-Lead Class Counsel prepared to examine the seven witnesses requested by the Court (the parties' six economic experts and former UFC matchmaker Joseph Silva). Berger Montague took the lead in preparing Dr. Singer for his direct examination, assisted by JSLF and Cohen Milstein. Berger Montague also prepared the cross examination of Dr. Topel. JSLF prepared the direct examination of Dr. Alan Manning, assisted by Berger Montague. JSLF also prepared the cross examination of Dr. Oyer, assisted by Berger Montague. Cohen Milstein prepared the direct examination of Dr. Zimbalist, assisted by

35

Berger Montague and JSLF. And Cohen Milstein prepared the cross examination of Dr. Blair, assisted by other Co-Lead Class Counsel. Finally, Berger Montague prepared the examination of Joseph Silva.

145. During the in-person Evidentiary Hearing, the Co-Lead Class Counsel who led the preparation of the examinations then put on or crossed the witnesses at the Hearing over the course of the six days of expert testimony in Las Vegas, ECF Nos. 724, 726, 730, 734, 741, 745 (August 26-28, 30, 2019, September 12-13, 2019), and the single day of testimony from Joseph Silva in Richmond, Virginia, ECF No. 829 (September 23, 2019).

146. Overnight between the second and third days of testimony during the Evidentiary Hearing, Zuffa served new regression analyses on Plaintiffs. *See* ECF No. 728. Berger Montague worked with Dr. Singer to understand these regressions, then prepared to argue to the Court concerning the inappropriateness of consideration of these regressions, all while also preparing the cross examination of Dr. Topel and analyzing the effect of these regressions on Dr. Singer's rebuttal testimony. *See* ECF No. 730 (transcript containing argument on the regressions).

147. Additionally, during the Evidentiary Hearing, the Court requested supplemental briefing on Plaintiffs' Motion for Class Certification, including any citations to the Evidentiary Hearing testimony. *See* ECF No. 737. Berger Montague, with assistance from Cohen Milstein, drafted, finalized, and filed that brief. *See* ECF No. 744. Finally, toward the close of the hearing, the Court asked the parties to give closing arguments on the final day of the hearing. JSLF, assisted by Berger Montague, prepared for that argument, and JSLF handled that argument before the Court. Berger Montague also handled procedural matters before the Court as they arose during the Hearing.

### iv. Post-Hearing Proceedings on Class Certification

148. Following the Evidentiary Hearing, Zuffa moved for reconsideration of the Court's rulings striking certain testimony of Joseph Silva. ECF No. 748. Berger Montague drafted the opposition to that motion. ECF No. 751. The Court denied Zuffa's motion. ECF No. 764.

149. Over the next few years (2019-2023), Co-Lead Class Counsel attended multiple status conferences, ECF Nos. 768, 781, 814. At the second of these status conferences, on December 10, 2020, the Court announced its intention to grant Plaintiffs' Motion for Class Certification as to the Bout Class but deny certification of the proposed Identity Rights Class. *See* ECF No. 775.

150.     Following the December 10, 2020 status conference, the Court Ordered the parties to file a joint list of all exhibits or portions of exhibits or briefs that remain sealed or redacted. ECF No. 772. Berger Montague worked with Zuffa's counsel to compile and prepare that list for submission to the Court. ECF No. 778.

151.     Also following that December 10, 2020 status conference, on April 6, 2021, a Ninth Circuit panel vacated a district court order certifying three classes in a price fixing case. *Olean Wholesale Grocery Co-Op v. Bumble Bee Foods LLC*, No. 19-56514 (9th Cir. Apr.6, 2021). Zuffa submitted that decision to this Court on April 8, 2021. ECF No. 803. Co-Lead Class Counsel, led by Berger Montague and JSLF, drafted a response to contextualize *Olean*'s applicability to this litigation. *See* ECF No. 804 (Apr. 9, 2021). The Ninth Circuit then vacated the panel Order and took the matter up *en banc*, *Olean Wholesale Grocery Co-Op v. Bumble Bee Foods LLC*, No. 19-56514, ECF No. 128 (9th Cir. Aug. 3, 2021), a development Plaintiffs submitted to this Court on August 3, 2021 (ECF No. 818). Then on April 8, 2022, the Ninth Circuit filed its opinion in *Olean* reversing the panel decision and affirming the district court's certification of three classes, which Plaintiffs submitted to this Court that same day (ECF No. 821). When the Supreme Court denied *certiorari* in *Olean* on November 14, 2022, Co-Lead Class Counsel submitted that development to this Court the same day. *See* ECF No. 832.

152.     On August 9, 2023, the Court issued its Order granting in part Plaintiffs' Motion for Class Certification, certifying the proposed Bout Class. ECF No. 839.

153.     JSLF and Berger Montague took the lead in drafting the notice to the certified Class in the *Le* Action as well as the Motion for Approval of Class Notice Plan. *See* ECF No. 916. Prior to that Motion, Berger Montague sought bids from multiple vendors providing claims administration and notice services, analyzed those bids, and selected Angeion Group as presenting the best bid for notice to the class. The Court granted the motion, approving the notice plan, ECF No. 921, and Co-Lead Class Counsel oversaw the issuance of notice to the Class. Notably, no members of the *Le* Class opted out.

**v.      Zuffa's Rule 23(f) Appeal**

154.     Zuffa filed a petition pursuant to Fed. R. Civ. P. 23(f) ("23(f) Petition"), seeking to appeal the Court's Order certifying the Bout Class. *See Le v. Zuffa, LLC*, No. 23-80074, ECF No. 2 (9th Cir. Aug. 23, 2023).

155.    Berger Montague drafted and filed Plaintiffs' opposition to Zuffa's 23(f) Petition. No. 23-80074, ECF No. 4 (9th Cir. Sept. 5, 2023). Berger Montague also drafted and filed a response opposing Zuffa's request for a reply brief, and Plaintiffs' proposed sur-reply in the event Zuffa's reply brief was allowed. No. 23-80074, ECF Nos. 8 & 10 (9th Cir. Sept. 22, 2023).

156.    The Ninth Circuit denied Zuffa's 23(f) Petition on November 1, 2023.

**vi.      The Improper Solicitation of Absent Class Members**

157.    Following the second post-Evidentiary Hearing status conference of December 10, 2020, wherein the Court announced its intention to certify the Bout Class, Plaintiffs became aware that another firm (Sparacino PLLC or "Sparacino") had been sending potentially misleading solicitations to UFC fighters attempting to persuade these fighters to sign retainers with Sparacino and opt out of the Bout Class. Co-Lead Class Counsel immediately commenced an effort to meet and confer with Sparacino to get the firm to cease these activities. Co-Lead Class Counsel was initially unable to convince Sparacino to cease its efforts.

158.    Co-Lead Class Counsel drafted and filed an emergency Motion to Compel Sparacino to cease communicating with absent class members. ECF No. 796. Co-Lead Class Counsel also drafted and filed a reply brief addressing Sparacino's arguments in opposition. ECF No. 813. After the Court denied the emergency motion as moot based on Sparacino's representations that the challenged activity was no longer occurring, ECF No. 831, Co-Lead Class Counsel became aware of additional information that Co-Lead Class Counsel believed required further action by the Court. On August 17, 2023, Co-Lead Class Counsel raised these issues with the Court via a Pre-Conference Statement. ECF No. 842 at 7. At the ensuing status conference, on August 21, 2023, the Court directed Co-Lead Class Counsel to meet and confer with Sparacino and submit further briefing. Co-Lead Class Counsel complied with that Order, endeavoring to meet and confer, first following that August 21, 2023 hearing and again with subsequent outreach. But Sparacino rebuffed those efforts and filed a motion for sanctions against Co-Lead Class Counsel. ECF No. 849. Cohen Milstein led the responsive briefing for Plaintiffs. ECF Nos. 859, 860. After Sparacino served its reply brief featuring new matter and arguments, Cohen Milstein prepared a surreply. *See* ECF No. 868. Cohen Milstein also prepared an affirmative motion seeking an Order prohibiting Sparacino from continuing what Co-Lead Class

38

Counsel believed were improper solicitations and to remedy past allegedly improper solicitations (*e.g.*, allowing fighters who signed retainer agreements with Sparacino to terminate those agreements without penalty or financial obligation to Sparacino). ECF Nos. 875, 876. Cohen Milstein then argued these motions before the Court on behalf of Plaintiffs and the Class. *See* ECF No. 895. Subsequent to that hearing, Sparacino filed papers with the Court announcing that it had terminated its representation with the remaining UFC fighters who had signed retention letters and would not communicate with any absent class members going forward. ECF No. 925.

### F. Zuffa's Motions for Summary Judgment in the *Le* Action

159.    Zuffa filed three separate motions for summary judgment.

160.    First, during discovery, Zuffa filed a motion for partial summary judgment seeking to dismiss as untimely Quarry's claims relating to identity rights. ECF No. 347 (D. Nev. Feb. 1, 2017). JSLF took the lead in drafting Plaintiffs' Opposition, with assistance from Berger Montague. ECF No. 365. Berger Montague then argued Plaintiffs' opposition. *See* ECF No. 494. The Court ultimately denied the motion for summary judgment as to Quarry's identity rights claims without prejudice (Quarry did not claim to have timely bout claims). ECF No. 493.

161.    Following briefing on Plaintiffs' Motion for Class Certification (ECF No. 518) and Zuffa's motions to exclude Plaintiffs' experts (ECF Nos. 517, 522, 524), Zuffa filed another motion for summary judgment. ECF No. 573 (July 30, 2018). For Plaintiffs' Opposition, Berger Montague undertook to draft the opposition to Zuffa's statement of undisputed facts, as well as parts of the opposition brief, and JSLF led the drafting of other components of the brief with contributions from Cohen Milstein. Berger Montague then finalized the brief and filed it. ECF No. 596 (Sept. 21, 2018). Berger Montague then prepared to argue the motion for summary judgment at the December 2018 hearing, but the Court ultimately denied the motion without argument and without prejudice. ECF No. 628.

162.    Following the Court's Class Certification Order, ECF No. 839 (Aug. 9, 2023), Zuffa renewed its motion for summary judgment. *See* ECF No. 878 (Oct. 24, 2023). Cohen Milstein and Berger Montague led Plaintiffs' drafting of their opposition to the renewed motion, including a voluminous set of exhibits. ECF No. 926 (Nov. 30, 2023).

163.    On January 18, 2024, the Court denied Zuffa's renewed motion for summary judgment. ECF No. 959.

### G. The Investigation and Filing of the *Johnson* Action, Litigating the Motion to Dismiss in *Johnson*, and Preliminary Fact Discovery in *Johnson*

164.    While awaiting the Court's Order certifying the Bout Class in the *Le* Action, Co-Lead Class Counsel, with supporting counsel at Warner Angle, were retained by Plaintiffs Kajan Johnson and Clarence Dollaway to file a new action on behalf of UFC fighters who appeared in bouts for the UFC from July 1, 2017 to the present. This "*Johnson* Action" thus covered the period after the end of the *Le* Action's Class Period (which ran from December 16, 2010 through June 30, 2017).

165.    Co-Lead Class Counsel's investigation into the *Johnson* Action focused on (1) establishing a sufficient basis for alleging that Zuffa's conduct alleged in the *Le* Action continued beyond June 30, 2017, and (2) analyzing how the conduct was affected by the sale of Zuffa in 2016 to WME-IMG Endeavor ("Endeavor"), including by reviewing corporate documents and other publicly available materials evidencing actions Endeavor took on Zuffa's behalf that may have contributed to the alleged anticompetitive scheme.

166.    Co-Lead Class Counsel named both Zuffa and Endeavor Group Holdings, Inc. as defendants when filing the initial complaint in the *Johnson* Action. *Johnson v. Zuffa, LLC*, No. 2:21-cv-1189, ECF No. 1 (D. Nev. June 23, 2021). Co-Lead Class Counsel then sought to have the Court coordinate (but not consolidate) the *Johnson* Action with the *Le* Action for efficiency purposes, which the Court did. *Id.*, ECF No. 9 (July 2, 2021) (Notice of Related Cases); *see also* ECF No. 11 (Transfer Order).

167.    Zuffa and Endeavor Group Holdings, Inc. moved to dismiss the *Johnson* Action. *Johnson v. Zuffa, LLC*, No. 2:21-cv-1189, ECF No. 17 (D. Nev. Sept. 10, 2021). Berger Montague led the drafting of Plaintiffs' Opposition to the motion to dismiss. *See id.*, ECF No. 41 (Oct. 22, 2021). The Court denied the motion to dismiss without prejudice on September 30, 2022. *See* ECF No. 68.

168.    Endeavor renewed its motion to dismiss on December 1, 2023. *See Johnson*, No. 2:21-cv-1189, ECF No. 112.

169.    In response to Endeavor's renewed motion to dismiss, Co-Lead Class Counsel sought to

amend the complaint. Co-Lead Class Counsel, with assistance from supporting counsel at Warner Angle, performed further investigation into the changes in the corporate structure around the UFC. Co-Lead Class Counsel analyzed publicly available materials concerning the formation of the new, publicly traded corporation TKO Group Holdings, Inc. and its involvement in the conduct Plaintiffs alleged in the *Johnson* Action. Berger Montague then drafted and filed the Amended Complaint in the *Johnson* Action, adding TKO Group Holdings, Inc. as a defendant and adding a new plaintiff, Tristan Connelly. *Johnson*, No. 2:21-cv-1189, ECF No. 118.

170.    Co-Lead Class Counsel then negotiated a briefing schedule for any further motion to dismiss that Defendants (Zuffa, Endeavor Inc., and/or TKO Group Holdings, Inc.), might choose to file. *Id*., ECF No. 119.

171.    Zuffa and TKO Group Holdings, Inc. filed an Answer on February 5, 2024. *See id.*, ECF No. 129. Endeavor filed a motion to dismiss. *Id.*, ECF No. 128.

172.    The Settlement in the Actions was reached prior to the date on which Plaintiffs' opposition to Endeavor's third motion to dismiss was due.

173.    Prior to Settlement in the Actions, discovery in the *Johnson* Action had commenced. On October 14, 2023, Co-Lead Class Counsel prepared and served Requests for Production of Documents to Defendants. Co-Lead Class Counsel also received Defendants' Requests for Production of Documents served on Plaintiffs and drafted and served objections and responses to those Requests. Co-Lead Class Counsel, in particular Cohen Milstein, worked with supporting counsel at Warner Angle to collect potentially responsive documents from the Plaintiffs in the *Johnson* Action for production to Defendants.

**H.  Confidentiality Issues**

174.    Zuffa and most third parties producing documents in the *Le* Action designated all or nearly all of their productions as "Confidential" or "Highly Confidential" pursuant to the protective order in this case. ECF No. 217.

175.    Throughout the litigation, whenever Plaintiffs filed something containing material designated as "Confidential" or "Highly Confidential," Plaintiffs were compelled by the protective order to file such materials under seal, creating a separate "public" version of the filed materials

41

redacting the designated material. As a result, most key filings required substantial additional work by counsel (1) to scrub through the filing and ensure that designated material was redacted, (2) to prepare a motion to seal the material, and (3) to perform two filings, one of the public version and one of the redacted version, for each motion, brief, or opposition (and related attachments).

176.    As the parties reached the class certification and summary judgment stages of the case, the rote process of conducting these dual filings and motions to seal began to break down. The public Evidentiary Hearing on class certification would result in material previously filed only under seal being presented publicly. As discussed *supra*, this led to significant briefing and argument on confidentiality standards applicable to these materials.

177.    Following the Court's Order certifying the Bout Class in the *Le* Action, the Court directed the parties to identify any materials that should remain under seal that had been filed in the case.

178.    After the Court's instructions at the August 21, 2023 status conference, Co-Lead Class Counsel commenced to undertake a review of the entirety of the filed record in the *Le* Action and identify any materials that could remain sealed under the Court's direction or any other legitimate basis.

179.    Berger Montague engaged in multiple meet and confer teleconferences with Zuffa's counsel to discuss whether any materials could properly remain under seal. Ultimately, upon receiving direction from the Court, the parties reached agreement as to the treatment of all materials filed in the case.

180.    Co-Lead Class Counsel prepared three filings addressing the three categories of such materials. Co-Lead Class Counsel filed two of these three filings. *See* ECF Nos. 946, 948. Co-Lead Class Counsel then sent the third filing Co-Lead Class Counsel had prepared for Zuffa to file. ECF No. 949.

**I.   Pre-Trial Proceedings in the *Le* Action and Related Discovery issues in the *Johnson* Action**

   **i.   Scheduling Trial in the *Le* Action.**

181.   Fewer than two weeks after the Court certified the Bout Class in the *Le* Action, the Court held a status conference. *See* ECF No. 847. Berger Montague took the lead in drafting a Pre-Conference Statement setting forth Plaintiffs' proposal for proceeding to trial in the *Le* Action. *See* ECF No. 842.

182.   In the Pre-Conference Statement, Plaintiffs proposed that the *Le* Action proceed to trial on liability and damages but that the Court should defer consideration of injunctive relief in both *Le* and *Johnson* until after trial in the *Johnson* Action. ECF No. 842 at 1-3, 4-7.[13]

183.   At the status conference on August 21, 2023, the Court announced a trial on liability and damages in the *Le* Action to take place in March or April 2024. ECF No. 847. Berger Montague led the Plaintiffs' presentation at the status conference.

184.   The Court later informed the parties by email that the trial would be set to start on April 8, 2024. On September 29, 2023, Zuffa requested to postpone trial for months based on a conflict with Zuffa's counsel's schedule. ECF No. 861. Co-Lead Class Counsel responded on October 3, 2023 that the trial should proceed as scheduled, or else be delayed by only one week. ECF No. 864. The Court re-set the trial for liability and damages in the *Le* Action for April 15, 2024. ECF No. 961.

   **ii.   Zuffa's efforts to reopen discovery in the *Le* Action and/or use discovery in the *Johnson* Action at trial in the *Le* Action.**

185.   Plaintiffs filed a Pre-Conference Statement after the Court's Order certifying the Bout Class in the *Le* Action, ECF No. 842 (Aug. 17, 2023), to which Zuffa responded. Zuffa's response announced its intention to seek further discovery prior to trial in the *Le* Action. ECF No. 843. Zuffa then argued for such discovery at the status conference on August 21, 2023. *See* ECF Nos. 847, 847.

---

[13] The Pre-Conference Statement also addressed other issues, including Plaintiffs' request that the Class Certification record in the *Le* Action be unsealed in its entirety (ECF No. 842 at 8); Plaintiffs' allegation that Sparacino had continued its improper communications with *Le* Class Members (*id.* at 7); and whether a Fed. R. Civ. P. 23(b)(3) class may pursue injunctive relief (*id.* at 3-4).

Berger Montague argued against that position at the status conference. The Court permitted Zuffa to file a motion seeking to reopen discovery in the *Le* Action. *See* ECF No. 847.

186.     On September 21, 2023, prior to Zuffa's motion to reopen discovery, Co-Lead Class Counsel, led by Berger Montague, and counsel for Defendants in the *Johnson* Action met and conferred pursuant to Fed. R. Civ. P. 26(f) and submitted a Joint Proposed Discovery Plan and Scheduling Order ("Discovery Plan"). *See Johnson*, No. 2:21-cv-1189, ECF No. 80. In connection with that Discovery Plan and further meet and confers thereafter, the parties endeavored to reach an agreement concerning how discovery in one of the Actions could be used in the other, but were unable to reach agreement. *See Le* Action, ECF No. 870.

187.     On October 26, 2023, Zuffa filed two motions. First, Zuffa filed a Motion to Reopen Discovery and Amend Scheduling Order. ECF No. 884 (Oct. 26, 2023). Second, Zuffa filed a Motion to Treat Fact Evidence Produced in the *Johnson* Action as if it Was also Produced in *Le* Action. ECF No. 885 (Oct. 26, 2023).

188.     While Plaintiffs worked on their opposition briefs to these motions, the Court issued an Order setting a hearing on the Motion to Reopen Discovery for November 17, 2023, ECF No. 894, four days before Plaintiffs' Opposition was due. *See* ECF No. 871.

189.     Given the overlap in the underlying issues, Berger Montague met and conferred with Zuffa to reach an agreement on a consolidated opposition brief and appropriate deadlines. When the parties were unable to agree on these issues, Zuffa filed a motion to consolidate the briefing and amend the schedule. *See* ECF No. 896 (Nov. 6, 2023). Berger Montague drafted a response, which Plaintiffs filed the same day as Zuffa's motion. *See* ECF No. 897 (Nov. 6, 2023). The Court largely adopted Plaintiffs' position on the issues in an Order issued later that day. *See* ECF No. 900 (Nov. 6, 2023).

190.     Berger Montague drafted a consolidated response to Zuffa's two motions (ECF Nos. 884 & 885) relating to the new discovery Zuffa sought to take and utilize in the upcoming *Le* trial and filed it on November 13, 2023. *See* ECF No. 914. At a hearing on November 17, 2023, Berger Montague argued Plaintiffs' opposition to Zuffa's two motions (ECF Nos. 884 & 885) relating to the new discovery Zuffa sought to take and utilize in the upcoming *Le* Action trial. The Court denied Defendants' motions from the bench. *See* ECF No. 922.

191.     At the November 17, 2023 hearing on Zuffa's two motions (ECF Nos. 884 & 885), the Court addressed Plaintiffs' position that injunctive relief in the *Le* Action could be resolved in a proceeding to follow a jury trial in the *Johnson* Action. *See* ECF No. 923, at 31-45. Plaintiffs acknowledged that to establish the *Le* Class's entitlement to injunctive relief, additional discovery regarding current market conditions would be necessary. *See, e.g.*, id. at 33, 37. The Court stated that Plaintiffs "may have to make a choice about how much injunctive relief [Plaintiffs] seek for the *Le* class," to the extent Plaintiffs sought to hold the injunctive relief proceedings on behalf of the *Le* Class after discovery in *Johnson*. *Id.* at 41. The Court described waiting to hold injunctive relief proceedings until a year or more after trial on liability and damages in the *Le* Action as "problematic" and stated that the Court was "not sure that [it] would permit an injunctive relief claim to move forward for the *Le* class." *Id.* at 42-43. In response to the Court's concerns on this issue, and to keep the April 2024 trial date in place, Co-Lead Class Counsel elected to defer all injunctive relief proceedings to the *Johnson* Action, and not seek injunctive relief in the *Le* Action. See ECF No. 947.

### iii.   Pretrial Tasks and Work

#### a.   Witness Lists and Deposition Designations

192.     Toward the end of 2023, as the *Le* Action sped toward trial, Co-Lead Class Counsel, with assistance from supporting counsel at Warner Angle, Kemp Jones, and Clark Hill PLC ("Clark Hill"),[14] engaged intensely in various pretrial tasks.

193.     Each Co-Lead Class Counsel firm undertook responsibility for review of the deposition transcripts in the case to identify the witnesses most relevant to the potential trial presentation. Co-Lead Class Counsel noted initial deposition designations for each transcript while determining which witnesses would appear on Plaintiffs' trial witness list and awaiting Zuffa's own trial witness list.

---

[14] As it became clear that the *Le* Action would go to trial, Co-Lead Class Counsel decided to engage an experienced Las Vegas trial attorney, Crane Pomerantz of Clark Hill. Prior to entering private practice as a litigator, Mr. Pomerantz was a federal prosecutor for fourteen years in the United States Attorney's Office for the District of Nevada where he successfully prosecuted several complex and high-profile cases as lead trial counsel and earned a number of awards from the Department of Justice and the prosecuting agencies with which he worked. Mr. Pomerantz was deeply involved in trial preparation in the *Le* Action and figured to play a prominent role in the trial.

45

194.     During this deposition review and initial designation process, Berger Montague also undertook to ensure Plaintiffs' Rule 26(a) disclosures were complete and current, submitting a new version to Zuffa that was updated to reflect (1) the additional witnesses who had been deposed in the case, and (2) the damages models that Plaintiffs intended to present at trial.

195.     Once Co-Lead Class Counsel completed their initial deposition review and designations, Co-Lead Counsel and supporting counsel at Warner Angle, Kemp Jones, and Clark Hill analyzed the deposition summaries and compiled Plaintiffs' initial trial witness list.

196.     Co-Lead Class Counsel served that initial witness list as well as Plaintiffs' deposition designations on Zuffa on February 2, 2024. Plaintiffs' deposition designations covered 10 Zuffa witnesses and 11 third-party witnesses, including designations across 25 separate deposition transcripts.

197.     When Plaintiffs received Zuffa's deposition designations, Co-Lead Class Counsel commenced to review each designation and (1) record objections to the designation where appropriate, and (2) consider whether any counter-designations were appropriate. Zuffa's affirmative designations covered 10 third-party witnesses and one former Zuffa employee, and Plaintiffs interposed objections to these designations and noted counter-designations where appropriate. Plaintiffs then exchanged these counter-designations and objections with Zuffa on February 23, 2024.

198.     Following the exchange of counter-designations and objections, Co-Lead Class Counsel commenced to respond to Zuffa's objections to Plaintiffs' initial deposition designations. Zuffa asserted multiple bases for objecting to nearly all of Plaintiffs' deposition designations. Between receiving Zuffa's objections and counter-designations on February 23, 2024, and the deadline for responding to those objections and objecting to the counter designations (February 28, 2024), Co-Lead Class Counsel, for each of the 11 third-party witnesses, (1) drafted responses to each objection to Plaintiffs' initial designations, (2) drafted objections where appropriate to Zuffa's counter-designations, and (3) proposed counters to Zuffa's counter-designations where applicable.

**b.  Further Review of Publicly Available Videos for Use at Trial**

199.     In addition to the efforts described above, Co-Lead Class Counsel undertook a further investigation into hundreds of hours of third-party video and audio footage involving Zuffa, its executives, its competitors, and Plaintiff fighters, as well as certain third parties expected to appear at

46

trial as witnesses. Co-Lead Class Counsel sought to update its prior review of publicly available video footage and ensure that video clips had not previously been missed during discovery that would be useful during direct and/or cross examination of witnesses at trial.

200.    Co-Lead Class Counsel collected a universe of videos including pre- and post-fight press conferences for more than 230 events during the *Le* Class Period (December 16, 2010 to June 30, 2017), television, YouTube, and podcast interviews featuring potential trial witnesses, and potential trial witnesses' podcast episodes. In all, the total amount of potentially relevant, publicly available audio and video content involving Zuffa's executives alone likely exceeded one thousand hours, and other potential trial witness video and audio files represented hundreds more hours. For certain videos, transcripts were available for searches, but for many of the videos, no such transcripts were available and a real-time review was required (and Co-Lead Class Counsel performed such reviews).

201.    Co-Lead Class Counsel's collection and review was not limited to video and audio files featuring Zuffa and third-party witnesses. Co-Lead Class Counsel also reviewed many hours of podcasts and video content produced by the *Le* Class Representatives and Quarry to facilitate preparation for the *Le* Class Representatives' and Quarry's cross examinations.

202.    Once collected with the relevant excerpts identified, Co-Lead Class Counsel commenced to generate nearly 100 relevant clips for use at trial, either during direct or cross examinations, and prepared additional clips for use in preparing trial witnesses.

### c.  Exhibit Lists

203.    Simultaneously with the work on deposition designations, Co-Lead Class Counsel prepared Plaintiffs' trial exhibit list. Berger Montague oversaw the collection of materials for the list with contributions from other Co-Lead Class Counsel and Warner Angle. These materials included the documents identified in Plaintiffs' prior briefing on class certification, *Daubert*, and Zuffa's motions for summary judgment; materials relied upon in Plaintiffs' expert reports; depositions; and materials attorneys representing Plaintiffs had identified in their preparations for trial. Co-Lead Class Counsel, led by Berger Montague, went through the approximately 1,700 proposed exhibits, culling nearly 500 of those proposed exhibits prior to serving the list on Zuffa on February 8, 2024.

204.    Upon receipt of Zuffa's exhibit list on February 8, 2024, Co-Lead Class Counsel divided

47

up review of the exhibits on the list. Zuffa's exhibit list included more than 960 entries, including lengthy videos and documents. Co-Lead Class Counsel considered and drafted objections as applicable for each of these exhibits, serving those objections on February 22, 2024. Co-Lead Class Counsel also reviewed Zuffa's exhibit list to ascertain whether and how any exhibit or groups of exhibits raised issues appropriate for motions *in limine* (discussed in more detail below).

205.    When the parties exchanged their objections to each other's exhibit lists, Co-Lead Class Counsel commenced work on responding to Zuffa's (often multiple) objections to each of the more than 1,200 entries on Plaintiffs' exhibit list. Plaintiffs served these responses to Zuffa's objections on February 27, 2024.

206.    In addition to the foregoing, Co-Lead Class Counsel also worked with Zuffa's counsel to identify those materials appearing on both sides' exhibit lists to identify which exhibits would be "joint exhibits."

### d.  Motions *in Limine*

207.    During January and February, Co-Lead Class Counsel considered and researched the appropriateness of various motions *in limine*. Co-Lead Class Counsel reviewed the discovery record in this case, briefing submitted by the parties on various issues, and other indicators of matters that could come up at trial that would be properly addressed by a pretrial motion.

208.    For example, following Zuffa's service of its preliminary trial witness list, Co-Lead Class Counsel identified the presence of 13 witnesses who had not been disclosed by Zuffa during the discovery period as required by Fed. R. Civ. P. 26(a)(1). Berger Montague researched the issue and determined that Plaintiffs were on firm ground to object to these witnesses. Berger Montague commenced a meet and confer concerning these witnesses via email on February 5, 2024. Plaintiffs sought to expedite the briefing on whether these witnesses would be permitted to testify at trial. Zuffa objected to briefing the issue early and stood firm on its position that the witnesses were properly disclosed. Plaintiffs ultimately included this issue as one of Plaintiffs' motions *in limine*.

209.    On February 12, 2024, the parties exchanged their preliminary lists of motions *in limine.* Plaintiffs' list included motions on 20 issues, and Zuffa's list included motions on 11 issues. Co-Lead Class Counsel then undertook to analyze Zuffa's identified motions *in limine*.

210.    The parties met and conferred on each other's motions *in limine* on February 16, 2024.

211.    Following the meet and confer, the parties exchanged letters and proposals to resolve certain of the motions *in limine* asserted by the other side. Co-Lead Class Counsel also continued to research the viability of Zuffa's proposed motions.

212.    Co-Lead Class Counsel then commenced to draft their motions *in limine* for filing. On February 29, 2024, Plaintiffs filed twenty motions *in limine*. *See* ECF Nos. 993, 995, 996 & 1001 (drafted by Berger Montague), 997 (Omnibus filing containing four motions drafted by Berger Montague and Cohen Milstein), 999 & 1000 (Omnibus filings each containing five motions, including motions drafted by each Co-Lead Class Counsel firm), 1002 (drafted by Cohen Milstein), 1003 (drafted by JSLF).

213.    Also on February 29, 2024, Zuffa filed its eleven motions *in limine*. Co-Lead Class Counsel then divided up responsibility for responding to and arguing these motions.

214.    Co-Lead Class Counsel, along with supporting counsel at Kemp Jones and Clark Hill, attended a hearing on March 4, 2024, at which the Court heard argument on motions *in limine*. At that hearing, Berger Montague and JSLF argued each of the eleven motions *in limine* brought by Zuffa and the twenty motions *in limine* brought by Plaintiffs.

215.    Plaintiffs won critical motions *in limine* at that March 4 hearing, including the motion seeking to strike the 13 late-disclosed witnesses on Zuffa's witness list (ECF No. 993) and evidence from after the June 30, 2017 close of the class period (ECF No. 996). *See* ECF No. 1010.

**e.  Jury Questionnaire**

216.    Kemp Jones and Clark Hill took the lead in devising a proposed jury questionnaire.

217.    Co-Lead Class Counsel, with JSLF taking the lead, reviewed the draft jury questionnaire provided by Kemp Jones and Clark Hill, and exchanged it with Zuffa.

218.    JSLF then worked with Plaintiffs' jury consultant to consolidate the drafts and propose revisions to Zuffa. JSLF then led the meet and confer to finalize the document for submission to the Court.

219.    Through these efforts, the parties were ultimately able to submit an agreed-upon jury questionnaire to the Court for consideration and use.

### f.   Trial Brief and Fact Stipulations

220.    Berger Montague, with assistance from Clark Hill, led the drafting of Plaintiffs' Trial Brief, filed on February 22, 2024. ECF No. 978.

221.    Incident to that drafting, Berger Montague reviewed various materials, including briefing on Zuffa's renewed motion for summary judgment (*see* ECF Nos. 878, 926, 951), summaries of key testimony from the witnesses on Plaintiffs' witness list as prepared by Co-Lead Class Counsel and Warner Angle for Berger Montague's review and consideration in drafting the trial brief, and other key exhibits and planned expert testimony.

222.    Co-Lead Class Counsel also developed and drafted proposed stipulations of fact for the trial in the *Le* Action. Co-Lead Class Counsel reviewed Zuffa's Answer to the Complaint in the *Le* Action, ECF No. 212, Zuffa's responses to Plaintiffs' Requests for Admission, Zuffa's Rule 30(b)(6) testimony, and Zuffa's motions for summary judgment to identify potential areas for stipulations. The parties then exchanged proposed fact stipulations on February 26, 2024. Co-Lead Class Counsel then commenced to review Zuffa's proposed fact stipulations to identify potential areas of agreement. Co-Lead Class Counsel were preparing to respond to Zuffa's proposed fact stipulations the same day that this Settlement was reached.

### g.   Preparation of Trial Presentations

223.    Co-Lead Class Counsel further led all aspects of the preparation of Plaintiffs' evidence at trial.

224.    Berger Montague drafted an opening argument, which went through multiple revisions prior to a mock presentation to Co-Lead Class Counsel, Warner Angle, Kemp Jones, and Clark Hill. Following that mock presentation, the other firms submitted comments and suggestions for Berger Montague's consideration. On February 17, 2024, Berger Montague delivered a version of the opening argument (along with other evidence and argument) to a mock jury for further feedback. After review of the mock jury's deliberations, Berger Montague again revised the opening and presented it to a second mock jury on February 18, 2024. In the weeks that followed, Berger Montague continued to work on the opening argument and began to build out the closing argument.

225.    Co-Lead Class Counsel and Clark Hill divided up responsibilities for the presentation of

50

Plaintiffs' witnesses and for crossing Zuffa's witnesses.

226.    Berger Montague and Clark Hill, with assistance from Warner Angle, took the lead in preparing the *Le* Class Representatives and Quarry for their direct and cross examinations. Berger Montague collected materials for preparing those direct examinations through additional interviews of *Le* Class Representatives and Quarry, a further review of the *Le* Class Representatives' and Quarry's document productions in the case, review of important documents previously identified in Zuffa's and third parties' productions, and research of publicly available sources describing events and occurrences in the *Le* Class Representatives' and Quarry's careers. Berger Montague then commenced to draft the direct examination for each *Le* Class Representative and Quarry. Additionally, Clark Hill and Berger Montague drafted and delivered mock cross examinations to prepare the *Le* Class Representatives and Quarry for potential ways in which Zuffa would likely attack their testimony at trial. These in-person and remote mock sessions took place in January and February 2024, as Plaintiffs developed their trial plan.

227.    Berger Montague and JSLF also undertook to consider how to cull the designated testimony for third-party witnesses who would not appear at trial. Because such testimony would be delivered via video, JSLF and Berger Montague went through the deposition transcripts to identify the most critical testimony Plaintiffs would present to the jury and plan how to work with Zuffa to shorten the ultimate presentation of such video evidence.

228.    JSLF led the process of issuing subpoenas to trial witnesses. JSLF sought Zuffa's consent to accept service of subpoenas for witnesses on Plaintiffs' trial witness list that Zuffa's counsel represented. JSLF also issued notice to Zuffa of Plaintiffs' intention to subpoena third-party witnesses on Plaintiffs' witness list. Berger Montague, Warner Angle, and Clark Hill worked with representatives of certain third-party witnesses to try to get them to appear live voluntarily, holding multiple in-person meetings and teleconferences incident to that effort.

229.    Co-Lead Class Counsel and Clark Hill also prepared direct examinations for the fact witnesses assigned to them. Each Co-Lead Class Counsel firm and Clark Hill took responsibility for assignments relating to the witnesses on Plaintiffs' and Zuffa's trial witness lists and began preparing direct and/or cross examinations for those witnesses.

230.    Co-Lead Class Counsel, in particular Berger Montague and Cohen Milstein, took the lead in preparing Plaintiffs' experts for their direct and cross examinations. Berger Montague held multiple full-day preparation sessions with Plaintiffs' expert economist, Dr. Hal Singer, drilling down on the specifics of his testimony. Cohen Milstein, with Berger Montague's support, met with Plaintiffs' expert economist Prof. Andrew Zimbalist to prepare him for his direct and cross examinations through multiple sessions. Cohen Milstein and Berger Montague likewise commenced to prepare for the direct examinations of Plaintiffs' other experts, Guy Davis and Alan Manning, respectively.

## THE SETTLEMENT

231.    On March 7, 2024, just weeks prior to the start of trial, Co-Lead Class Counsel and counsel for Defendants reached an agreement-in-principle to settle the Actions. By the time the Settlement occurred, more than nine years of hard-fought litigation had passed, extensive fact and expert discovery was complete, and the parties were on the eve of trial in the *Le* Action.

232.    Prior to the Settlement, the parties had participated in significant settlement negotiations, including full-day mediations several years apart (in 2017, 2019, and 2023). Each mediation session was followed by continued discussions with the mediator, the Hon. Layn Phillips.

233.    After the December 2023 mediation session and as the parties prepared for trial in *Le* Action, they continued to discuss the possibility of a settlement of the Actions. After extensive arm's-length negotiations between experienced counsel over the course of several years, the parties ultimately reached an agreement-in-principle that led to the Settlement Agreement currently being presented to the Court. After reaching the agreement to settle the Actions, the parties negotiated over seven weeks the precise language of the Settlement Agreement.

234.    On April 24, 2024, Co-Lead Class Counsel and Defendants executed the Settlement Agreement. The Settlement provides for Defendants to pay $335 million in cash for the benefit of members of the Settlement Classes (SA ¶ 1(x)), and to institute significant prospective relief.

235.    Based on Plaintiffs' experts' evaluation of the data, the *Le* Class has approximately 1,140 members and the *Johnson* Settlement Class has approximately 1,290 members, with some individuals being a member of both the *Le* Class (SA ¶ 1(p)) and the *Johnson* Class (SA ¶ 1(n)). Given that some individuals are members of both the *Le* Class and the *Johnson* Settlement Class, there are

52

approximately 1,950 Fighters across the two classes. As noted in the Declaration of Hal J. Singer, Ph.D. In Support of Plan of Allocation (attached as Exhibit 3), Zuffa paid all fighters in the *Le* Class $556.5 million for participation in bouts between December 16, 2010 and June 30, 2017, and Zuffa paid all fighters in the *Johnson* Settlement Class $457.9 million (who did not sign contracts with arbitration clauses) for participation in bouts during the period between July 1, 2017 and April 13, 2023. Thus, even without considering the substantial prospective relief, the settlement amount reflects a significant portion of all compensation the UFC paid to fighters in the Settlement Classes who are not subject to arbitration agreements. Further, the Settlement Fund represents a significant portion of the overcharges computed by Plaintiffs' expert economist (Dr. Singer) in his report that was submitted during the expert discovery period in the *Le* Action.

236.    An initial estimate of the likely distribution of the Net Settlement Fund indicates that each eligible claimant from the *Le* Class may receive an award from the Settlement equaling 25% (or more) of his or her total earnings from bouts from the UFC during the entire *Le* Class Period. Certain claimants from the *Johnson* Settlement Class will receive as much as 10% of their lifetime bout earnings from the UFC during the *Johnson* Class Period, in addition to benefitting from the prospective relief provided.

237.    The prospective relief set forth in the Settlement is substantial, and locks in the following benefits to fighters for the five (5) years after final approval:[15]

   a. Zuffa will not impose as a term of its Promotional and Ancillary Rights Agreements an Exclusive Negotiation Period longer than 30 days. *See* SA ¶6(a).

   b. Zuffa will not impose as a term of its Promotional and Ancillary Rights Agreements a Right to Match Period following the expiration of the Exclusive Negotiation Period of longer than four (4) months. *See* SA ¶6(b).

   c. Zuffa will limit any extension of the term of its Promotional and Ancillary Rights Agreements in the event a UFC fighter turns down a bout with an opponent Zuffa designates

---

[15] As Co-Lead Class Counsel understands it, Defendants implemented certain of these contractual changes at some point after the *Le* Class Period (December 16, 2010 to June 30, 2017) had ended but before the *Johnson* Action was filed. Given the timing, it is likely that Defendants made these changes, at least in part, as a response to the *Le* Action. As discussed *infra*, absent these provisions in the Settlement, Defendants would be free to revert to their prior practices in the event the *Le* Class lost at trial and/or the Settlement did not require these changes going forward.

53

(regardless whether because the fighter is unable or unwilling to accept the bout), to the longer of the length of time sufficient to find a new opponent or for six (6) months. *See* SA ¶6(c).

d.   Zuffa will change the way its "Retirement Clause" operates. Pursuant to the Settlement Agreement, if a UFC Fighter announces his or her retirement, Zuffa may, at its election, (i) suspend the Term for the period of such retirement or disability (such suspension not to exceed four (4) years, the "Maximum Suspension Period"), (ii) declare that Zuffa has satisfied their obligations to promote all future Bouts to be promoted by the UFC under the Promotional and Ancillary Rights Agreement, without any compensation due to the fighter therefor, and/or (iii) provide the fighter with notice of termination in accordance with the Promotional and Ancillary Rights Agreement. At the expiration of the Maximum Suspension Period, if the Fighter remains in retirement or such disability continues, the Promotional and Ancillary Rights Agreement shall automatically terminate. *See* SA ¶6(d).

e.   Zuffa agrees that UFC fighters shall retain the right to use their own identities, including by way of illustration and not limitation, fighters' names, images, voices and likenesses, in connection with the creation, development, manufacture, distribution, marketing and sale directly or by third parties of Merchandise. SA ¶6(e).

f.   Zuffa agrees to provide fighters up to three (3) still images of the fighter, the licensing of which shall be governed by a licensing application to and approval by Getty Images. SA ¶6(e).

238.   The significance of some of the elements of the prospective relief is supported by record evidence. For instance, Zuffa's then-Chief Legal Officer, Kirk Hendrick, testified as Zuffa's designee pursuant to Fed. R. Civ. P. 30(b)(6) concerning the Exclusive Negotiation Period. Hendrick confirmed that prior to around 2011, Zuffa had a 60-day Exclusive Negotiation Period, but then around the time the FTC opened its inquiry in 2011, Zuffa ceased to include an Exclusive Negotiation Period in its Promotional and Ancillary Rights Agreements. After the FTC closed that inquiry, Zuffa reinstated the Exclusive Negotiation Period, but increased its duration from 60-days to 90-days. Hendrick testified on Zuffa's behalf that the reason Zuffa reinstated the Exclusive Negotiation Period was that:

[D]uring that interim period [without an Exclusive Negotiation Period] that some athletes, and to their credit, they would say to their managers or us, 'I don't want to talk about my contract right now. I'm preparing for a big fight, a fight that's coming up in a month or two months or whatever, and I don't want to deal with my contract. What would happen then to our ability to negotiate is that we wouldn't have that window of opportunity before their last fight, and so we decided that we need that short window of opportunity after their last fight.

Deposition of Kirk Hendrick (Rule 30(b)(6)) Vol. I, 250:12-23 (Nov. 29, 2016).

239.   Mr. Hendrick's testimony bears upon the value of a part of the prospective relief

54

afforded by the Settlement. First, it shows that, absent the Settlement, there was a realistic possibility that Zuffa would have reinstated some of the challenged contractual provisions. Second, the episode reflects how even minor changes in the challenged provisions can have tangible benefits for the Fighters. In the Settlement, Zuffa agreed to maintain the reduction in the Exclusive Negotiation Period that had prevailed through the class period in *Le* (90-days) to 30-days.

240.    That the prospective relief locks in the reduction in the length of the Right to Match Period that Zuffa implemented after the *Le* class period ended is also significant. Multiple witnesses attested to the challenges that the Right to Match Period created for UFC fighters who wanted to leave for another promotion, but whom the UFC wanted to retain. At least up through the end of the *Le* Class Period (June 30, 2017), UFC fighters had a 12-month Right to Match Period. For a fighter who wanted to leave the UFC (but whom the UFC wanted to retain), such a fighter could not risk obtaining an offer from a rival MMA promoter and allowing Zuffa to match it. As a result, such a fighter would have to wait out the Exclusive Negotiation Period and the Right to Match Period before obtaining and accepting an offer from a rival MMA promoter. *See* Deposition of Joe Silva, 186:4-12 (June 7, 2017) ("Q. Would you agree with me that if there was a UFC fighter who no longer wanted to fight with the UFC for some reason and the UFC was determined to match any offer, that that fighter would need to wait the 90 days of the exclusive negotiation period and then the 12 months of the right to match; correct? A. That's my understanding."). The difference between 15 months (90-day Exclusive Negotiation Period and 12-month Right to Match Period) prevailing prior to and during the bulk of the *Le* Action's relevant time period (from January 2005 through June 2017) and the maximum five months (30-day Exclusive Negotiation Period and 4-month Right to Match Period) permitted by the Settlement Agreement is not insignificant. As Mr. Hendrick testified: "[i]f [a fighter is] ready, willing and able to fight and they want to fight, 12 months I would say is a time period that is significant for a fighter's career." Deposition of Kirk Hendrick (Rule 30(b)(6)) Vol. I, 267:10-13 (Nov. 29, 2016).

241.    The limitation on the length of contract extensions Zuffa may impose on fighters who are unable or unwilling to accept bouts is likewise beneficial to the fighters. Throughout the record in the *Le* Action are documents that reflect significantly longer extensions than six months (the maximum extension permissible under the Settlement Agreement for a fighter unable or unwilling to compete).

55

Maintaining a hard limit of six months on these extensions will be beneficial to fighters seeking to escape the UFC's contracts.

242.     Based on, *inter alia*, Dr. Singer's analyses finding that the median career length for an MMA Fighter was brief, just 41 months, *see, e.g.,* Expert Report of Hal J. Singer, Ph.D., ¶¶20, 88-91 (ECF No. 518-3), Co-Lead Class Counsel believe this prospective relief is significant. As Dr. Singer opined, the long duration of UFC Promotional and Ancillary Rights Agreements, coupled with the challenged provisions that allow Zuffa to extend the term and or retain exclusive negotiation or matching rights thereafter for 12-15 months, was capable of coercing MMA Fighters to re-sign with the UFC for suppressed compensation. Going forward, the prospective relief at issue here can help reduce Zuffa's considerable leverage over UFC Fighters.

243.     Co-Lead Class Counsel does not believe that this Settlement solves all of the antitrust problems this litigation sought to address, nor would it eliminate or fully ameliorate key contractual provisions that Plaintiffs had challenged. Indeed, the Settlement Agreement states explicitly that "Plaintiffs' agreement to the prospective relief provisions [in the Settlement Agreement] shall not be deemed or considered a concession that Defendants' promotion or other agreements, or any parts thereof, are procompetitive or are not anticompetitive." SA ¶7. The cash and prospective relief provided by the Settlement nevertheless represents an extraordinary result given the litigation risk discussed *infra*.

244.     Co-Lead Class Counsel have collectively prosecuted numerous antitrust class actions as lead counsel or in other leadership positions. We have each personally negotiated many class and non-class litigation settlements. In our opinion, the Settlement Agreement with Defendants in the Actions is more than fair, reasonable, and adequate. The Settlement avoids the delay and uncertainly of continued protracted litigation against Defendants. It provides substantial benefits to members of the Settlement Classes through significant compensation and the potential amelioration of some of the key conduct that Plaintiffs had challenged as anticompetitive.

245.     Furthermore, Co-Lead Class Counsel have consulted with Prof. Eric Posner concerning the quality of results achieved through this Settlement. Prof. Posner is the Kirkland and Ellis Distinguished Service Professor at the University of Chicago Law School, who has extensive academic

56

experience and expertise in antitrust law and its application to labor markets, and who has served as Counsel to the Assistant Attorney General of the Antitrust Division at the Department of Justice. He observes that "claims against employers for anticompetitive behavior in labor markets are relatively rare and difficult in comparison to other types of antitrust claims, and that labor-side section 2 claims of this type have been vanishingly rare." *See* Declaration of Professor Eric A. Posner in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement (attached hereto as Exhibit 2), ¶1. Moreover, as part of Prof. Posner's academic research, he has found that *Le v. Zuffa* "is the first such claim ever to survive summary judgment, reach class certification, or even survive a motion to dismiss." *Id.* These findings further support Co-Lead Class Counsel's opinion that the Settlement provides an excellent result for the Settlement Classes.

## LITIGATION RISK

246.    The Actions presented significant litigation risks that could have resulted in no recovery for the Settlement Classes nor any prospective relief. The substantial relief obtained was achieved without the benefit of a governmental investigation or intervention, but instead proceeded solely through the initiative, investigation, and resources of private parties and counsel (and despite the FTC twice declining to challenge the UFC's allegedly anti-competitive conduct).

247.    The FTC twice investigated the UFC's conduct and twice declined to pursue it. Solely through the considerable and combined efforts and investment of Co-Lead Class Counsel, Supporting Counsel at Warner Angle, Kemp Jones, Clark Hill, and others, along with the *Le* and *Johnson* Class Representatives and Quarry, this Settlement stands to provide significant relief to the members of the Settlement Classes now and going forward.

248.    Defendants asserted multiple challenges to the merits of Plaintiffs' claims. For instance, Defendants argued that Zuffa and its conduct made the industry what it is today, creating opportunities (not thwarting them) for MMA fighters; that Zuffa pays more than any other MMA promoter; that Zuffa has consistently increased the absolute level of compensation paid to fighters throughout the relevant period; and that Zuffa needs the challenged contract provisions to ensure that it can put on all of its planned events (and to increase the number of MMA events that Zuffa puts on each year, as Zuffa allegedly had throughout the period at issue).

249.     Defendants retained expert economists who opined that the challenged conduct was procompetitive, not anticompetitive, and that Plaintiffs' methods of proving impact and damages to the proposed classes were unreliable and thus that (i) the proposed classes could not be certified for litigation purposes, and (ii) Plaintiffs could not prove they or Class Members suffered any harm from the challenged conduct.

250.     Zuffa aggressively fought class certification (including a petition to appeal to the Ninth Circuit pursuant to Fed. R. Civ. P. 23(f)). While Plaintiffs prevailed on their motion to certify the *Le* Class, certifying a litigation class in the *Johnson* Action would not have been certain. Zuffa changed its contracts after the close of the relevant time-period in the *Le* Action (*i.e.*, post-June 2017). Because Plaintiffs' methods of proving key class issues related to the length of time of certain contractual provisions that Defendants have now shortened, these changes had the potential to require Plaintiffs to use a different model to show class-wide impact and damages to obtain a litigation class in the *Johnson* Action. Further, the Ninth Circuit's denial of Zuffa's petition for interlocutory review was without prejudice to Zuffa's ability to re-raise its challenge to class certification in the *Le* Action after any verdict in a trial in the *Le* Action.

251.     While Plaintiffs have aggressively disputed Defendants' arguments and positions throughout these Actions, as with all complex antitrust litigation, there was substantial risk of adverse outcomes on these and other issues, in addition to the possibility of lengthy delays (including from appeals after trial in *Le* and after class certification and/or trial in *Johnson*). Antitrust class actions are "arguably the most complex action(s) to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome." *In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *19 (E.D. Mich. Dec. 13, 2011) ("*Packaged Ice II*") (quoting *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003)); *see also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 533 (E.D. Mich. 2003) ("*Cardizem II*") ("Antitrust class actions are inherently complex").

252.     Critically, the April 2024 trial was limited to the *Le* Action and offered the potential only of monetary relief, without any available injunctive/prospective relief. And even such potential monetary relief was both substantially uncertain and likely a long way from any distribution. While Plaintiffs were confident of their ability to prevail before a Nevada jury in the *Le* Action, any jury

58

award of damages would still have been subject to a lengthy appellate process. As noted *supra*, such an appeal would likely challenge both the Order certifying the *Le* Class as well as various aspects of the merits of the litigation. Any appeal would create both risk of undoing any monetary relief awarded and necessarily would create substantial additional delay.

253.    Further, Co-Lead Class Counsel made the difficult decision not to pursue injunctive relief on behalf of the *Le* Class, and instead pursue such relief only on behalf of the proposed class in the *Johnson* Action. Pursuing injunctive relief in the *Le* Action would have required relinquishing the April 2024 trial date and re-opening discovery in the *Le* Action, and would have caused considerable additional delay to any monetary recovery or other relief for the *Le* Class as the parties continued to litigate discovery issues for potentially years to come. Indeed, the *Le* Class has been awaiting this trial for nearly a decade since the filing of the *Le* Action, and a significant proportion of the *Le* Class has not fought an MMA bout for many years. Co-Lead Class Counsel thus determined that the *Le* Class should go to trial expeditiously.

254.    Moreover, Defendants would have asserted various arguments and defenses at the *Le* trial, which could have resonated with at least one juror—potentially causing a hung jury and requiring that the case be re-tried. While Co-Lead Class Counsel were confident in Plaintiffs' ability to obtain a unanimous verdict in favor of Plaintiffs, the risk that one or more jurors would not side with Plaintiffs could not be dismissed out of hand.

255.    As to the proposed *Johnson* Class, the *Le* trial also posed substantial risk. While an unfavorable verdict in the *Le* trial would not be binding on the members of the proposed *Johnson* Class, such result would have a practical impact on the potential relief the proposed *Johnson* Class could obtain in the near and long term. Defendants would have little incentive to negotiate anywhere close to the relief available to the proposed *Johnson* Settlement Class as part of this Settlement if Plaintiffs had lost the *Le* trial, and there would be significant questions as to whether continuing to litigate the *Johnson* Action following an unfavorable verdict in *Le* would have been viable. Thus, in many respects, the fate of the proposed *Johnson* Settlement Class was tied to the fate of the *Le* Action, even though the members of the *Johnson* Settlement Class had no direct stake in the *Le* Action.

256.    Furthermore, at some point during the time-period relevant to the *Johnson* Action (*i.e.*,

59

after July 1, 2017), the UFC began to require UFC Fighters to sign Promotional and Ancillary Rights Agreements containing a provision that purports to (1) require the fighters to arbitrate any claims against Defendants ("Arbitration Provision"), and (2) waive fighters' right to pursue their claims on a class action basis ("Class Waiver Provision"; together with the Arbitration Provisions, "the Arbitration Clauses"). According to data produced by the UFC, approximately 55% of the *Johnson* Settlement Class has Arbitration Clauses in their Promotional and Ancillary Rights Agreements with the UFC. Although the validity of the Arbitration Clauses has not yet been litigated, UFC Fighters with the Arbitration Clauses bear significant risk that their claims could not be litigated in federal court and could not be litigated on a class basis at all. Additionally, as the *Le* Action reflects, bringing the *Johnson* Action through trial would require millions of dollars in out-of-pocket costs and tens of millions of dollars' worth of attorney time. If the class action mechanism was deemed unavailable to the *Johnson* Settlement Class members signing the Arbitration Clauses following litigation of the validity of those clauses, those *Johnson* Settlement Class members would likely recover nothing. Moreover, in the event the Court (or an arbitrator) determined the Arbitration Clauses to be valid, the potential recovery to the *Johnson* Settlement Class as a whole would have become significantly lower because only 46% of the *Johnson* Settlement Class does not have Arbitration Clauses in their Promotional and Ancillary Rights Agreements with the UFC.

## NOTICE TO THE SETTLEMENT CLASSES

257.     In connection with the Motion for Preliminary Approval, Co-Lead Class Counsel proposes a "Notice Plan" comparable to the successful notice provided in connection with certification of the *Le* Class. See ECF No. 916 & 920 (Plaintiffs' Unopposed Motion for Approval of Class Notice Plan); ECF No. 921 (Order granting Plaintiffs' Unopposed Motion for Approval of Class Notice Plan); ECF No. 966 (Plaintiffs' Notice of: (1) Effectuation of Class Notice Plan, and (2) No Exclusions from Bout Class).

258.     Pursuant to the proposed Notice Plan, the proposed Claims Administrator (Angeion Group) will issue notice to the members of the Settlement Classes through substantially similar means as used to issue notice to the *Le* Class, including both print and email notice as well as poster notices posted at MMA gyms. Through these mechanisms, the Claims Administrator will provide notice of the

60

Settlement to the members of both Settlement Classes.

259.     Following approval of the Settlement, members of the Settlement Classes will be able to submit claim forms to establish their entitlement to their shares of the monetary relief afforded by the Settlement. Members of the Settlement Class will benefit from the prospective relief afforded by the Settlement regardless of whether they submit a claim form.

**EXHIBITS TO JOINT DECLARATION OF ERIC L. CRAMER,**
**RICHARD A. KOFFMAN, AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT**

260.     Attached as Exhibit 1 is a true and correct copy of the Settlement Agreement and its exhibit, dated April 24, 2024.

261.     Attached as Exhibit 2 is a true and correct copy of the Declaration of Professor Eric A. Posner in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement and its exhibit, dated May 13, 2024.

262.     Attached as Exhibit 3 is a true and correct copy of the Plan of Allocation.

263.     Attached as Exhibit 4 is a true and correct copy of the Declaration of Hal J. Singer, Ph.D. in Support of Plan of Allocation, dated May 15, 2024.

264.     Attached as Exhibit 5 is a true and correct copy of the Declaration of Steven Weisbrot, Esq. of Angeion Group LLC Re the Settlement Notice Plan and its exhibits, dated May 20, 2024.

**CONCLUSION**

265.     For the reasons set forth above and in the accompanying Memorandum of Law, we respectfully submit that under Fed. R. Civ. P. 23(e), the Settlement's terms are fair, reasonable, and adequate in all respects and should be preliminarily approved.

61

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

I certify under penalty of perjury that the foregoing is true and correct. Executed on May 21, 2024, in Philadelphia, PA.

>*/s/ Eric L. Cramer*
>Eric L. Cramer*
>**BERGER MONTAGUE PC**
>1818 Market Street, Suite 3600
>Philadelphia, PA 19106
>Tel: (215) 875-3000
>ecramer@bm.net

I certify under penalty of perjury that the foregoing is true and correct. Executed on May 21, 2024, in Washington, DC.

>*/s/ Richard A. Koffman*
>Richard A. Koffman*
>**COHEN MILSTEIN SELLERS & TOLL
>    PLLC**
>1100 New York Ave., N.W.
>Suite 500 East, Tower
>Washington, DC 20005
>Telephone: +1 (202) 408-4600
>Email: rkoffman@cohenmilstein.com

I certify under penalty of perjury that the foregoing is true and correct. Executed on May 21, 2024, in San Francisco, CA.

>*/s/ Joseph R. Saveri*
>Joseph R. Saveri*
>**JOSEPH SAVERI LAW FIRM, LLP**
>601 California St., Suite 1000
>San Francisco, CA 94108
>Telephone: +1 (415) 500-6800
>Email: jsaveri@saverilawfirm.com

>*Admitted *pro hac vice*

62