# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated,

        Plaintiffs,

   v.

Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,

        Defendant.

No.: 2:15-cv-01045-RFB-BNW

---

Kajan Johnson, Clarence Dollaway, and Tristan Connelly, on behalf of themselves and all others similarly situated,

        Plaintiffs,

   vs.

Zuffa, LLC, TKO Operating Company, LLC f/k/a Zuffa Parent LLC (d/b/a Ultimate Fighting Championship and UFC) and Endeavor Group Holdings, Inc.,

        Defendants.

No.: 2:21-cv-1189-RFB BNW

## DECLARATION OF HAL J. SINGER, PH.D.

## IN SUPPORT OF PLAN OF ALLOCATION

## TABLE OF CONTENTS

**Page**

**BACKGROUND, ASSIGNMENT, AND SUMMARY OF CONCLUSIONS** ................................................. 2

**I.   SETTLEMENT FUND ALLOCATION BETWEEN THE *LE* AND *JOHNSON* SETTLEMENT CLASSES** ........................................................................................................ 5

**II.  ALLOCATION OF THE *LE* CLASS TRANCHE AMONGST *LE* CLAIMANTS** ............................ 8

**III. ALLOCATION OF THE *JOHNSON* SETTLEMENT CLASS TRANCHE AMONGST *JOHNSON* CLAIMANTS** ........................................................................................... 9

**CONCLUSION** ........................................................................................................................ 11

## BACKGROUND, ASSIGNMENT, AND SUMMARY OF CONCLUSIONS

1. I understand that the plaintiffs in *Le, et al. v. Zuffa, LLC*, No. 2:15-cv-1045 (D. Nev.) (the "*Le* Case") and *Johnson, et al. v. Zuffa, LLC, et al.*, No. 2:21-cv-1189 (D. Nev.) (the "*Johnson* Case") (collectively, the "Actions") resolved the Actions with Defendants Zuffa, LLC, TKO Operating Company, LLC, Endeavor Group Holdings, Inc. (collectively, "Defendants") for $335 million plus certain non-monetary relief relating to business practices (the "Settlement"). I further understand that Cung Le, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury (the "*Le* Class Representatives") are prosecuting the *Le* Case on their own behalf and on behalf of the *Le* Class (defined below), and plaintiffs Kajan Johnson, Clarence Dollaway, and Tristan Connelly (the "*Johnson* Settlement Class Representatives") are prosecuting the *Johnson* Case on their own behalf and on behalf of the *Johnson* Settlement Class (defined below).

2. I have served as an expert economist for Plaintiffs in the *Le* Case since 2014. I provided economic analyses on, *inter alia*, monopoly and monopsony power, substantial foreclosure, common impact, aggregate damages, and anticompetitive effects. I submitted four reports and one declaration analyzing and addressing these and related issues.[1] In my most recent Declaration, dated November 13, 2023, I addressed competitive issues in the MMA marketplace from 2017 through November 13, 2023, which covers most of the relevant period in *Johnson*. I also testified at the Class Certification Hearing in this case in August 2019. I am fully familiar with the facts and circumstances of *Le* Case and sufficiently familiar with the facts of the *Johnson* Case for purposes of my analysis in this Declaration.

3. The Plaintiffs in *Le* alleged that defendant Zuffa LLC ("Zuffa"), doing business as Ultimate Fighting Championship, implemented an anticompetitive scheme to acquire, maintain, and enhance its monopoly power in the market for promoting professional MMA bouts, and its monopsony power over the fighters appearing in those bouts.[2] The Plaintiffs in *Le* further alleged that Zuffa's anticompetitive scheme had foreclosed potential rival MMA promoters, thereby maintaining and enhancing Zuffa's monopoly and monopsony power, causing anticompetitive effects, and resulting in antitrust injury and damages (in the form of artificially reduced "Event Compensation" for participation in live MMA bouts) to Plaintiffs and the *Le* Class.[3] Based on my review of the Complaint in the *Johnson* Case, it appears that the allegations in *Johnson* are similar in material respects to those of *Le*.

4. I am a Managing Director at Econ One Research, Inc. ("Econ One") and a professor at the University of Utah College of Social & Behavioral Science, where I teach antitrust economics to graduate economic students and economics and the law to undergraduate economic students. I also serve as executive director of the Utah Project, an interdisciplinary center dedicated to the study of antitrust and consumer protection issues.[4] My testifying experience has focused on antitrust and

---

1. All Singer Reports or declarations are noted SR#. SR1 (August 31, 2017), SR2 (January 12, 2018), SR3 (April 3, 2018), SR4 (May 28, 2018), SR5 (November 13, 2023).
2. SR1 ¶1
3. SR2 ¶2.
4. *See Utah Project on Antitrust and Consumer Protection,* THE UNIVERSITY OF UTAH, https://utahproject.utah.edu/ (last visited Mar. 3, 2023).

consumer protection matters, with a special emphasis in assessing common impact in class action litigation.

5. I am an applied microeconomist with an emphasis on industrial organization and regulation. In an academic capacity, I have published several books and book chapters, spanning a range of industries and topics, and my articles have appeared in dozens of legal and economic journals. My competition-related articles have appeared in multiple American Bar Association (ABA) Antitrust Section journals, and I have been a panelist at several ABA Antitrust events. In a consulting capacity, I have been nominated for antitrust practitioner of the year among economists by the American Antitrust Institute (AAI) for my work in *Tennis Channel v. Comcast*. AAI named me as Co-Honoree in the same category in 2018 for my work *In Re Lidoderm Antitrust Litigation*. AAI also named me as Honoree in the same category in 2023 for my work in the *Le* Case.

6. I have testified as an economic expert in state and federal courts, as well as before regulatory agencies. I also have testified before the House Judiciary Subcommittee on Antitrust and the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on the interplay between antitrust and sector-specific regulation. I have served as an expert for both plaintiffs seeking class certification and defendants opposing class certification. Federal courts have relied on my work in certifying ten classes in antitrust matters (including the *Le* Case),[5] and five classes in consumer protection matters.[6] I also have testified many times before Congress on competition policy.[7] In antitrust litigation, I have served as an expert to the Federal Trade Commission, the Competition Bureau Canada, and to several state Attorneys General in antitrust

---

5. *See Meijer, Inc. v. Abbott Laboratories*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) (Granting Plaintiffs' Motion for Class Certification); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl., Ltd.*, 262 F.R.D. 58 (D. Mass. 2008) (Granting Motion to Certify Class); *Southeast Missouri Hospital and St. Francis Medical Center v. C.R. Bard*, No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sep. 22, 2008) (Granting in Part Motion for Class Certification); *Johnson v. Arizona Hosp. and Healthcare Assoc.* No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009) (Granting in Part Motion for Class Certification); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 665 (N.D. Ga. 2016) (Granting Motion to Certify Class); *In re Lidoderm Antitrust Litig.*, No. 12-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) (Granting Motions for Class Certifications and Denying *Daubert* Motions); *Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship*, 2:15-cv-01045-RFB-BNW, ECF No. 839 (D. Nev. Aug. 9, 2023) (Order Granting in part Plaintiffs' Motion for Class Certification); *In Re: Pork Antitrust Litigation*, No. 0:18-cv-01776, ECF No. 1887 (D. Minn. Mar. 29, 2023) (Granting Motion to Certify Class); *Simon and Simon, PC d/b/a City Smiles and VIP Dental Spas v. Align Technology, Inc.*, No. 20-cv-03754-VC (N.D. Cal. Nov. 29, 2023) (Order Granting in Part and Denying in Part the Motions for Class Certification; Denying Motions to Exclude Dr. Singer and Dr. Vogt); *In Re: Broiler Chicken Growing Antitrust Litigation (No. II)*, 6:20-MD-02977-RJS-CMR, ECF No. 798 (E.D. Okla. May 8, 2024) (Order Granting Plaintiffs' Motion For Class Certification And Denying Defendant's Motion To Exclude).

6. *See In re MacBook Keyboard Litigation,* Case No. 5:18-cv-02813-EJD, 2021 WL 1250378 (N.D. Cal. Mar. 8, 2021); *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO, ECF No. 3327 (N.D. Cal. Jun. 28, 2022); *In Re: Pepperdine University Tuition and Fees Covid-19 Refund Litigation*, Master File No. 2:20-cv-04928-DMG, ECF No. 115 (C.D. Cal. Sept. 26, 2023); *In Re: University of Southern California Tuition and Fees COVID-19 Refund Litigation,* Case No. 2:20-cv-4066-DMG, ECF No. 213 (C.D. Cal. Sep. 29, 2023); *Michael Miazza, et al. v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College*, Case No. C-696918 (Parish of East Baton Rouge May 19, 2023) (Granting Motion to Certify Class).

7. "Reviving Competition, Part 1: Proposals to Address Gatekeeper Power and Lower Barriers to Entry Online," held by the House Subcommittee on Antitrust, Feb. 23, 2021; "Breaking the News – Journalism, Competition, and the Effects of Market Power on a Free Press," held by the Senate Subcommittee on Competition Policy, Antitrust, and Consumer Rights, Feb. 2, 2022; "(Im)Balance of Power: How Market Concentration Affects Worker Compensation and Consumer Prices," Testimony to the House Committee on Economic Disparity and Fairness in Growth, Apr. 6, 2022.

Case 2:15-cv-01045-RFB-BNW   Document 1024-7   Filed 05/21/24   Page 6 of 13

matters. Specific to settlement allocation, I have designed and proposed allocation plans similar to that proposed herein in two other cases.[8]

7. I have been asked by Co-Lead Class Counsel in *Le* and proposed Settlement Class Counsel in *Johnson* to assist in devising a plan of allocation to distribute the net proceeds from the Settlement, after deduction of any Court approved attorneys' fees, expenses, or other costs (the "Net Settlement Fund") to the members of the two "Settlement Classes" defined as follows:

- *Le* **Class:** All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States from December 16, 2010, through June 30, 2017. Excluded from the *Le* Class are all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought in the United States.

- *Johnson* **Settlement Class:** All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States from July 1, 2017 to the date of preliminary approval of the Settlement. Excluded from the *Johnson* Settlement Class are all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought or broadcast in the United States.

8. From my review of the data and other information, it is clear that there are several fighters who are members of both the *Le* Class and the *Johnson* Settlement Class. This plan proposes that such fighters, who submit valid and timely claim forms for both cases, would be entitled to recover from both the portion of the Net Settlement Fund allocated to the *Le* Class (the "*Le* Class Tranche") and the portion of the Net Settlement Fund allocated to the *Johnson* Settlement Class (the "*Johnson* Settlement Class Tranche"). Each such dual Claimant would be entitled to recover his or her allocation from both the *Le* Class Tranche and the *Johnson* Settlement Class Tranche combined.

9. This declaration is organized as follows. In Part I, I explain the allocation of the Net Settlement Fund as between the two Settlement Classes, which establishes a pool of funds for those members of the *Le* Class (*i.e.*, the *Le* Class Tranche) who submit valid claims ("*Le* Claimants"), and a separate pool of funds for those members of the *Johnson* Settlement Class (*i.e.*, the *Johnson* Settlement Class Tranche) who submit valid claims ("*Johnson* Claimants"). In Parts II and III, I explain how the pool of funds available to each of the Settlement Classes, respectively, can be allocated using event-level transaction data I have available to me for these Actions.[9] Based on my prior impact and damages analyses from my reports in the *Le* Case, and my knowledge of the similar allegations in the *Johnson* Case, I conclude that the allocation methodologies proposed herein as between the two Settlement Classes, and within each of the Settlement Classes, are reasonable and consistent with the facts as I understand them, basic economic theory, equity, and my damages model. My staff and I are willing and able to assist the claims administrator in calculating the pro rata distributions described in this declaration.

---

8. *Fusion Elite All Stars, et al. v. Varsity Brands, LLC et al.*, Case No. 2:20-CV-03390 (SHL-tmp) (W.D. Tenn.); *In re Lidoderm Antitrust Litig.*, No. 12-md-02521, 2017 WL 679367 (N.D. Cal.).

9. SR1 ¶¶293, 299, 304-305 (discussing the Zuffa event-level datasets).

## I. SETTLEMENT FUND ALLOCATION BETWEEN THE *LE* AND *JOHNSON* SETTLEMENT CLASSES

10.  As I understand it, the Settlement Class Counsel propose, initially, to divide the Net Settlement Fund into two tranches as follows: 75 percent allocated to the *Le* Class Tranche, and 25 percent allocated to the *Johnson* Settlement Class Tranche. Due to the particularities of the *Johnson* Settlement Class, the 25 percent allocation to the *Johnson* Settlement Class represents a maximum value. In the event the calculated allocations to the *Johnson* Claimants do not equal the full value of the *Johnson* Settlement Class Tranche under the methodology proposed below, any remaining funds would be reallocated to the *Le* Class Tranche. In that situation, the final allocation to the *Le* Class could exceed 75 percent, and the final allocation to the *Johnson* Settlement Class could be less than 25 percent. I explain this possibility in detail below.

11.  I believe the allocation proposal is equitable and consistent with the facts and economics of each case for the following reasons: (1) the *Le* Case is much older and includes class members who fought in the UFC further back in time, and thus on a "time value of money" basis should be entitled to more relative to *Johnson*; (2) the *Le* Case was fully litigated and the *Johnson* Case had not yet begun discovery at the time of settlement; (3) the UFC made changes to its fighter contracts seemingly in response to the *Le* Case, which benefitted the *Johnson* Settlement Class fighters and would potentially have complicated the litigation of the *Johnson* Case; and (4) I understand that the many of the class members in the *Johnson* Case may be subject to arbitration clauses and provisions banning participation in class actions, meaning that (as I understand it) these claims have limited value.

12.  Starting with the available data, Table 1 below summarizes the total bout compensation paid to each of the Settlement Classes during their respective Class Periods. The *Le* Class earned a total of $556.5 million in Event Compensation from bouts during the *Le* Class Period.[10] The *Johnson* Settlement Class not subject to arbitration clauses or class action waivers earned approximately $457.9 million from bouts during the *Johnson* Settlement Class Period.[11]

---

10.  I calculate that Zuffa paid *Le* Class Members $556.5 million in Event Compensation during the *Le* Class Period (December 16, 2010 through June 30, 2017). *See* SR1 ¶283 (explaining compensation data comes from ZFL-0000003, ZFL-2603701, and ZFL-2764800). This figure includes all fight compensation including win and show money, as well as any and all discretionary bonuses. SR1 ¶180 ("For any given bout in any given event, the total compensation each Fighter in the Bout Class receives can be decomposed into four categories; these are (1) show and win purses, (2) discretionary/performance pay, (3) PPV royalties, and (4) letters of agreement. I define a Fighter's total event-level compensation ("Event Compensation") as the sum across these four categories.").

11.  Zuffa has produced an estimate for the approximate number of fighters in Johnson to an arbitration clause, which I used to compute the share of all *Johnson* Settlement Class members subject to these provisions. That share was 55.2 percent. I used that figure for these calculations by multiplying the share of fighters in the *Johnson* Settlement Class not subject to these provisions by the total bout compensation paid to *Johnson* Settlement Class members during the *Johnson* Class Perio ($1,022.2 * (1-0.552) = $457.9). This result likely understates the share of all compensation during the Johnson Settlement Class Period not subject to arbitration provisions given that, as I understand it, Zuffa began near universally applying these provisions to new fighter contracts in or about 2020, and it is likely that the more highly paid fighters are the ones that fought more bouts over a longer period of time and thus would be more likely to have continued to be fighting into the period during which Zuffa was more universally imposing such provisions. I understand that Zuffa will, in the coming months, produce data and information that specifically identifies those fighters who executed contracts with arbitration clauses and class action waivers. This evidence will allow me to make a more precise estimate of the share of fighter pay that was paid to *Johnson* Settlement Class members not subject to arbitration clauses. Further, as reflected in Table 1 below, the data available to me at this time ends on April 13, 2023, but the *Johnson* Settlement

TABLE 1 – NOMINAL CLASS COMPENSATION

|  | *Le* Class | *Johnson* Settlement Class |
|---|---|---|
| Class Period | 12/16/2010 - 6/30/2017 | 7/1/2016 - 4/13/2023 |
| Fighters | 1,140 | 1,297 |
| **Event Compensation (millions)** | **$556.5** | **$1,022.2** |
| Fighters with Arbitration Clauses | 0 | 716 |
| Percent in Arbitration | 0% | 55.2% |
| **Non-Arbitration Event Compensation (millions)** | **$556.5** | **$457.9** |

*Source:* ZFL-0000003, ZFL-2603701, ZFL-2764800, 20240430, "Fighter Purse Report 2017 to current.xlsx," and "20240506 Fighter Purse Report UFC 214.xlsx"

13. To compare the relative claim value between the two Settlement Classes, I next account for the "time value of money."[12] Intuitively, a dollar today is more valuable than a dollar a year from now—compensation foregone by Settlement Class members in the past could have been invested for a larger value today. Accordingly, when considering the allocation between the Settlement Classes, a dollar damage caused ten years ago should be weighted more than a dollar of damage caused yesterday. The standard method for addressing the time value of money is to perform a "future value" calculation, whereby funds in one period are scaled to a future period using an interest rate.[13] For the purposes of this comparison I use a seven percent interest rate to estimate the present value of the compensation for both Settlement Classes.[14] Doing so yields the present value of the Settlement Classes' compensation in Table 2 below.

---

Class Period will run to the date of preliminary approval. As a result, I expect to have updated compensation figures for the *Johnson* Settlement Class prior to distribution to reflect compensation paid through the end of the *Johnson* Settlement Class Period.

12. STEPHEN ROSS, RANDOLPH WESTERFIELD & BRADFORD JORDAN, FUNDAMENTALS OF CORPORATE FINANCE 121 (McGraw-Hill 8th ed. 2007) ("In the most general sense, the phrase time value of money refers to the fact that a dollar in hand today is worth more than a dollar promised at some time in the future. On a practical level, one reason for this is that you could earn interest while you waited; so a dollar today would grow to more than a dollar later. The trade-off between money now and money later thus depends on, among other things, the rate you can earn by investing.").

13. *Id.* at 122 ("Future value (FV) refers to the amount of money an investment will grow to over some period of time at some given interest rate. Put another way, future value is the cash value of an investment at some time in the future.") $FV = \$ * (1 + r)^t$, where $ is the initial investment (here, damages incurred at time t), $r$ is the per-period interest rate, and $t$ is the number of periods. *Id.* at 123.

14. This discount rate is halfway between a "risk-free" investment such as the U.S. 10-year treasury, (2.4% average annual return during the *Le* Class Period), and the average return on the S&P 500 during the same period (11.6% average annual return). 11.6% + 2.4% / 2 = 7%. *See* https://www.macrotrends.net/2526/sp-500-historical-annual-returns; https://www.macrotrends.net/2016/10-year-treasury-bond-rate-yield-chart.

TABLE 2 – PRESENT VALUE OF CLASS COMPENSATION

|  | *Le* Class | *Johnson* Settlement Class |
|---|---|---|
| Event Compensation | $556.5 | $457.9 |
| Average Years Since Payment | 9.8 | 3.3 |
| Discount Rate | 7% | 7% |
| **Present Value of Compensation** | **$1,075.2** | **$568.0** |

*Source:* ZFL-0000003, ZFL-2603701, ZFL-2764800, 20240430, "Fighter Purse Report 2017 to current.xlsx," and "20240506 Fighter Purse Report UFC 214.xlsx"

14. If the two Actions had *identical* fact patterns, including identical per-fighter damages as a percentage of compensation, then Table 2 would imply a split of 65/35 between *Le* Class Tranche and the *Johnson* Settlement Class Tranche. However, the fact patterns between the two Actions are not identical. Considering the factors below, I believe it is appropriate to give a greater weight to the *Le* Class Tranche than the *Johnson* Settlement Class Tranche given the additional two factors:

   a) The *Le* Case has been fully litigated to the brink of trial, while the *Johnson* Case has not yet begun discovery. Economic theory would dictate that the *Le* Case is thus a much more valuable negotiation tool that counsel for Plaintiffs would have used to negotiate this Settlement.[15]

   b) The *Johnson* Settlement Class likely has lower per-fighter damages (as a percentage of compensation) relative to the *Le* Class. While I was able to compute the degree of harm to the *Le* Class members in my reports, I was not provided the necessary data and contracts to make this same calculation for the *Johnson* Settlement Class. However, I understand that Zuffa made certain adjustments to the allegedly foreclosing contracts that drove my *Le* Class damages analysis starting in in or about 2019 or 2020.[16] These changes to the *Johnson* Settlement Class contracts, which at least superficially appear to lower the total amount of time a fighter is under contract with the UFC, would have at least potential benefits, on the margins, for members of the *Johnson* Settlement Class and thus could have resulted in a lower degree of per-

---

15. FISHER, ROGER, WILLIAM L. URY, AND BRUCE PATTON. GETTING TO YES: NEGOTIATING AGREEMENT WITHOUT GIVING IN, 102-104 (Penguin 3rd ed. 2011) ("What is your BATNA—your Best Alternative To a Negotiated Agreement? *That* is the standard against which any proposed agreement should be measured. That is the only standard that can protect you both from accepting terms that are too unfavorable and from rejecting terms it would be in your interest to accept . . . The better your BATNA, the greater your power. People think of negotiating power as being determined by resources determined by resources like wealth, political connections, physical strength, friends, and military might. In fact, the relative negotiating power of two parties depends primarily upon how attractive to each is the option of not reaching agreement."). Here, the BATNA for the *Le* Class was the impending trial.

16. These changes included changes to the term lengths of some of the contractual provisions I discussed in my initial report (SR1 ¶¶66-73). It appears as if those changes were made in response to the *Le* action. I also understand that the settlement locks certain of those changes in for 5 years. Specifically, I understand those changes to include: (1) a reduction in the Right to Match Period from 12 to 4 months, (2) a reduction in the Exclusive Negotiation Period from 90 days to 40 days, (3) a modification to the injury tolling provision.

fighter damages to the *Johnson* Settlement Class relative to *Le* Class using my *Le* Class damages methodology.[17]

15. While there is no method to give a precise quantification of the value for each of the above factors, it would nonetheless be consistent with basic economic theory to overweight the *Le* Class relative to the *Johnson* Settlement Class because of them. Therefore, I find it reasonable to increase the proportion of the Net Settlement Fund awarded to the *Le* Class from 65 percent (as implied by Table 2) to 75 percent in light of these two factors.

## II. ALLOCATION OF THE *LE* CLASS TRANCHE AMONGST *LE* CLAIMANTS

16. The 75 percent of the Net Settlement Fund allocated to the *Le* Class, namely the *Le* Class Tranche, is to be distributed among *Le* Claimants according to the method set for the below. Assuming the Court grants the Fee and Expense Award akin to that set forth in the Class Notice, this would result in a total net recovery for the *Le* Class of approximately **$161.25M**,[18] which would represent a *minimum* of 29 percent of total Event Compensation Zuffa paid to *Le* Class Members over the *Le* Class Period in the (unlikely event) that all eligible *Le* Class Members were to submit valid and timely claims.[19] I propose that the Net Settlement Fund will be distributed to *Le* Claimants based on two *pro rata* factors, with a minimum recovery for any *Le* Claimant set to $8,000:

   a) 80 percent of the *Le* Class Tranche (approximately $129.0M) to be distributed on the basis of each *Le* Claimant's *pro rata* share of all Event Compensation[20] earned by *Le* Claimants during the *Le* Class Period.

   b) 20 percent of the *Le* Class Tranche (approximately $32.25M) to be distributed on the basis of each *Le* Claimant's *pro rata* share of all *Le* Claimants' bouts fought during the *Le* Class Period.[21]

17. In my first expert report, I determined that all or nearly all *Le* Class Members were impacted by the Challenged Conduct in the case,[22] and that each Class Member's damages was a

---

17. I considered fighters as foreclosed if their contracts (A) contained a Champion's Clause, and (B) exceeded 30 months in total duration, including the length of the exclusive negotiation period and right to match period. If a sufficient number of the *Johnson* Settlement Class member Contracts were of a shorter duration due to the contract changes in or about 2018 or 2019, then my analysis as performed in the *Le* case would potentially consider fewer fighters as foreclosed. For instance, as I understand it, the changes shortened the right to match period from one year to four months. Thus, absent alteration to account for new facts and circumstances in *Johnson*, a simple application of my damages analysis from *Le* to *Johnson* could yield lower damages to the *Johnson* Settlement Class.

18. The Settlement involves total payments of $335M. The Net Settlement Fund after all potential deductions (of potential Court awarded fees and costs, as well as costs of administration) is approximately $215M. $215 * 75% (share to *Le* Class Tranche) = $161.25M. This is a minimum value. As explained in Part III, should the *Johnson* Settlement Class Tranche have any remaining funds after computation of the distributions to *Johnson* Claimants under the method set for the below, any excess funds would be added to the *Le* Class Tranche.

19. $161.3 / $556.5 = 29%.

20. As explained in SR1 ¶180, a fighter's total event-level compensation ("Event Compensation") is the sum of (1) show and win purses, (2) discretionary/performance pay, (3) PPV royalties, and (4) letters of agreement.

21. This method results in the following equation, applied to each claiming fighter in the data: $Fighter's\ \$\ Recovery = \left(\frac{Fighter's\ Bouts}{All\ Bouts} * 20\% * \$161.3M\right) + \left(\frac{Fighter's\ Comp}{All\ Compensation} * 80\% * \$161.3M\right)$. In this equation, "All Bouts" and "All Compensation" refer to all *Le* Claimants who submit timely and valid claims.

22. SR1 ¶¶209-232. I also reviewed record evidence of a wage structure that would have transmitted wage suppression across the *Le* Class. SR1 ¶215.

function of his or her actual compensation compared to his or her but-for compensation.[23] In particular, I estimated a regression model that mapped characteristics of the fight and the fighter, alongside a measure of the share of fighters foreclosed from rivals ("foreclosure share"), into a fighter's share of the event's proceeds (the "wage share").[24] After fitting the model to the data, I predicted the fighter's but-for wage with all factors held constant except for the foreclosure share, which was reduced to 30 percent in the but-for world.[25] If a fighter's predicted but-for wage share exceeded his or her actual wage share for any event, I considered that fighter to have suffered injury. Accordingly, all *Le* Class Members should be principally awarded on the basis of their actual compensation earned.

18. However, it would be incorrect to assume that the rates of compensation in a but-for world would be exactly the same as they were the same as the actual world. Stated differently: In a more competitive but-for world, Zuffa may have increased its lower paid fighter payments proportionally more than it would have increased its payments to top fighters, particularly as top fighter compensation is driven by Pay-Per-View revenue shares. All else equal, I would expect the most popular fighters may have enjoyed a modicum of countervailing bargaining power to offset Zuffa's alleged misconduct. Even if they could not leave Zuffa, they may have agitated for themselves more aggressively given their popularity. Allocating 20 percent of the compensation by the share of bouts fought (as opposed to basing allocation simply on total compensation earned) recognizes that certain journeymen fighters with less name recognition may have been harmed more as a proportion of their compensation than the more popular fighters.

19. The data produced by Zuffa in this case contains the names and exact compensation amounts of each member of the *Le* Class. Using this data, the settlement administrator can populate the *Le* Class claim form for each *Le* Claimant.[26]

### III. ALLOCATION OF THE *JOHNSON* SETTLEMENT CLASS TRANCHE AMONGST *JOHNSON* CLAIMANTS

20. The 25 percent of the Net Settlement Fund allocated to the *Johnson* Settlement Class, namely the *Johnson* Settlement Class Tranche, is to be distributed amongst *Johnson* Claimants under the method set for the below. Making the same assumptions about the requested Fee and Expense Award and other costs, this would result in a total net recovery for the *Johnson* Settlement Class of approximately **$53.75M**.[27] The *Johnson* Settlement Class Tranche, under these assumptions, would represent 11.7 percent of total Event Compensation Zuffa paid to *Johnson* Settlement Class Members who were not subject to arbitration clauses or class action waivers over the *Johnson* Settlement Class Period.[28] As just indicated, within the *Johnson* Settlement Class, there are two

---

23. SR1 ¶230 ("I used the regression models…to predict the but-for compensation share for each Fighter in each event in the but-for world. I then compared the predicted but-for compensation share with the share of Event Revenue that the Fighter actually received in that event.").

24. SR1 ¶¶180-181.

25. SR1 ¶230.

26. To the extent that a potential class member fails to submit a claim, the portion of the allocated amount to which he or she would have been entitled under this method would be allocated to the other Claimants in the appropriate Tranche based on the equations above.

27. The Settlement is for $335M. The Net Settlement Fund after all deductions is $215M. $215 * 25% = $53.75M. This is a minimum value. As explained in Part III, should the *Johnson* Settlement Class Tranche have any remaining funds after assessing *Johnson* Claimants, any excess funds would be added to the *Le* Class Tranche.

28. $53.75 / $457.92 = 11.7%

major sub-grouping of Settlement Class Members: (1) fighters whose contracts contained arbitration clauses and/or other clauses that ban participation in a class action lawsuit, and (2) fighters without such restrictive clauses.

21. For fighters *without* arbitration clauses or class action waivers in their fighter contracts, I propose that the funds will be distributed on two *pro rata* factors as follows:

   a) 80 percent of the *Johnson* Settlement Class Tranche (approximately $43.0M) to be distributed on the basis of each *Johnson* Claimant's *pro rata* share of all Event Compensation Zuffa paid to the subset of *Johnson* Claimants not subject to arbitration clauses or class action waivers during the *Johnson* Settlement Class Period.

   b) 20 percent of the *Johnson* Settlement Class Tranche (approximately $10.75M) to be distributed on the basis of each *Johnson* Claimant's *pro rata* share of all bouts fought by *Johnson* Settlement Class Claimants without arbitration clauses or class action waivers during the *Johnson* Settlement Class Period.[29]

22. To ensure fairness between *Le* and *Johnson* cases given the factors set out above in Section I, individual awards from the *Johnson* Settlement Class Tranche provided to Claimants *without* arbitration clauses or class action waivers will be capped at 10 percent of each *Johnson* Claimant's Event Compensation during the *Johnson* Settlement Class Period, or $7,000, whichever is higher.

23. Claimants *with* arbitration clauses or class action waivers, whose claims have little value, will receive a flat $5,000 award, regardless of total compensation or number of bouts fought during the *Johnson* Settlement Class Period.

24. After making these calculations, any monies left over in the *Johnson* Settlement Class Tranche shall be allocated to the *Le* Class Tranche and distributed to *Le* Claimants pursuant to the methods set forth in Section II above.

25. Zuffa has produced for settlement purposes its compensation data that contains the names, number of bouts, and exact compensation amounts of each member of the *Johnson* Settlement Class through April 13, 2023. Zuffa has also produced an estimate for the approximate number of fighters in the *Johnson* Settlement Class subject to an arbitration clause, which I used for my calculations above. I also understand that Zuffa will, in the coming months, produce data and information that identifies those fighters who executed contracts with arbitration clauses and class action waivers. Using this data, the claims administrator can populate the *Johnson* Settlement Class claim form for each *Johnson* Settlement Class Member.[30]

26. Any *Le* Claimant who is also *Johnson* Claimant will receive an award equal to the sum of the amount he or she would be entitled to under the formula set forth in Section II (for the

---

29. This method results in the following equation, applied to each claiming fighter in the data: $Fighter's\ \$\ Recovery = \left(\frac{Fighter's\ Bouts}{All\ Bouts} * 20\% * \$53.8M\right) + \left(\frac{Fighter's\ Comp}{All\ Compensation} * 80\% * \$53.8M\right)$. In this equation, "All Bouts" and "All Compensation" refer to all *Johnson* Claimants who submit claims.

30. To the extent that a potential Settlement Class member fails to submit a claim, the portion of the Net Settlement Fund to which he or she would have been entitled would be allocated to the other Claimants in the appropriate Tranche based on the equations above.

-11-

*Le* Class) and the total amount he or she would be entitled to under the formula set forth in Section III (for the *Johnson* Settlement Class).

## CONCLUSION

27.	Based on my prior economic and econometric analyses in this case, I conclude that the proposed Plan of Allocation is reasonable, equitable, and consistent with basic economic theory, and my damages models in the case.

\*   \*   \*

Hal J. Singer, Ph.D.:

*[signature]*

Executed on May 15, 2024