# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT NEVADA

CUNG LE, NATHAN QUARRY, JON FITCH, BRANDON VERA, LUIS JAVIER VAZQUEZ, and KYLE KINGSBURY, On Behalf of Themselves and All Others Similarly Situated,

        Plaintiffs,

    v.

ZUFFA, LLC, D/B/A ULTIMATE FIGHTING CHAMPIONSHIP and UFC,

        Defendant.

Case No. 2:15-cv-01045-RFB-BNW

---

KAJAN JOHNSON and CLARENCE DOLLAWAY, On Behalf of Themselves and All Others Similarly Situated,

        Plaintiffs,

    vs.

ZUFFA, LLC, TKO OPERATING COMPANY, LLC F/K/A ZUFFA PARENT LLC (D/B/A ULTIMATE FIGHTING CHAMPIONSHIP and UFC), and ENDEAVOR GROUP HOLDINGS, INC.,

        Defendants.

Case No. 2:21-cv-01189-RFB-BNW

## SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT

## TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY ...................................................................1

II.    THE REVISED PLAN OF ALLOCATION......................................................3

III.   THE SETTLEMENT WOULD PROVIDE "LIFE CHANGING" MONEY TO MANY HUNDREDS OF FIGHTERS AND THEIR FAMILIES..................................................4

IV.   THE SETTLEMENT IS SUPERIOR BY ALL TRADITIONAL METRICS .................7

      A.    The Settlement Compares Favorably to Other Antitrust Class Actions Where Settlements Occurred on the Brink of, or During, Trial ........................................7

      B.    This Settlement Compares Favorably to Dozens of Recent Antitrust Class Action Settlements ..........................................................................................9

      C.    Antitrust Class Actions Pose Significant Trial and Appellate Risk....................13

      D.    The Law of Class Action Settlements Advises Deference to Class Action Counsel, Reflecting a Recognition of the Risks of Antitrust Class Actions........16

V.     CONCLUSION ...............................................................................................17

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*,
1987 WL 7030 (S.D.N.Y. Feb. 13, 1987) ............................................................... 14

*Castro v. Sanofi Pasteur Inc.*,
2017 WL 4776626 (D.N.J. Oct. 23, 2017) ............................................................... 12

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ............................................................... 17

*Eisen v. Carlisle & Jacquelin*,
479 F.2d 1005 (2d Cir. 1973) ............................................................... 14

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) ............................................................... 14

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ............................................................... 17

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ............................................................... 11

*In re Auto. Refinishing Paint Antitrust Litig.*,
2004 WL 1068807 (E.D. Pa. May 11, 2004) ............................................................... 10

*In re Blue Cross Blue Shield Antitrust Litig.*,
85 F.4th 1070 (11th Cir. 2023) ............................................................... 12

*In re Blue Cross Blue Shield Antitrust Litig.*,
2022 WL 4587618 (N.D. Ala. Aug. 9, 2022) ............................................................... 12

*In re Broiler Chicken Antitrust Litig.*,
2022 WL 1720468 (N.D. Ill. May 27, 2022) ............................................................... 15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) ............................................................... 11, 17

*In re Checking Acct. Overdraft Litig.*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ............................................................... 11

*In re Domestic Air Transp. Antitrust Litig.*,
148 F.R.D. 297 (N.D. Ga. 1993) ............................................................... 12

*In re Endosurgical Prod. Direct Purchaser Antitrust Litig.*,
2008 WL 11504857 (C.D. Cal. Dec. 31, 2008) ............................................................... 10

*In re High-Tech Emp. Antitrust Litig.*,
2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) ............................................................... 12, 17

*In re Korean Ramen Antitrust Litig.*,
2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ............................................................... 15

*In re Linerboard Antitrust Litig.*,
   292 F. Supp. 2d 631 (E.D. Pa. 2003) ................................................................. 14

*In re Lithium Ion Batteries Antitrust Litig.*,
   2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ..................................................... 14

*In re Lithium Ion Batteries Antitrust Litig.*,
   2022 WL 16959377 (9th Cir. Nov. 16, 2022) ..................................................... 14

*In re Packaged Ice Antitrust Litig.*,
   2011 WL 6209188 (E.D. Mich. Dec. 13, 2011) ................................................... 10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ................................................ 10, 17

*In re Prandin Direct Purchaser Antitrust Litig.*,
   2015 WL 1396473 (E.D. Mich. Jan. 20, 2015) ................................................... 12

*In re Processed Egg Prod. Antitrust Litig.*,
   881 F.3d 262 (3d Cir. 2018) .............................................................................. 15

*In re Remeron End-Payor Antitrust Litig.*,
   2005 WL 2230314 (D.N.J. Sept. 13, 2005) ........................................................ 17

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
   2020 WL 6193857 (E.D.N.Y. Oct. 7, 2020) ....................................................... 13

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
   2024 WL 815503 (E.D. Pa. Feb. 27, 2024) ......................................................... 12

*In re Tableware Antitrust Litig.*,
   2007 WL 4219394 (N.D. Cal. Nov. 28, 2007) .................................................... 11

*In re Titanium Dioxide Antitrust Litig.*,
   959 F. Supp. 2d 799 (D. Md. 2013) ................................................................. 9, 11

*In re Titanium Dioxide Antitrust Litig.*,
   2013 WL 5182093 (D. Md. Sept. 12, 2013) ..................................................... 9, 11

*In re Wellbutrin SR Antitrust Litig.*,
   2011 WL 13392296 (E.D. Pa. Nov. 21, 2011) ................................................ 11, 12

*In re Wholesale Grocery Prod. Antitrust Litig.*,
   2017 WL 4876277 (D. Minn. Oct. 24, 2017) ...................................................... 15

*Lazy Oil Co. v. Witco Corp.*,
   95 F. Supp. 2d 290 (W.D. Pa. 1997) ................................................................... 11

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998) ...................................................................... 16, 17

*MCI Communications Corp. v. American Tel. & Tel. Co.*,
   708 F.2d 1081 (7th Cir. 1983) ............................................................................ 14

*Meijer, Inc. v. 3M*,
   2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) ...................................................... 10

*Meijer, Inc. v. Abbott Labs.*,
   2011 WL 13392313 (N.D. Cal. Aug. 11, 2011) ................................................ 8, 13

iii

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
   2010 WL 11693979 (D. Mass. Mar. 12, 2010) ...................................................... 9, 12, 13

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ...................................................................................... 17

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ...................................................................................... 16, 17

*Rodriguez v. W. Publg. Corp.*,
   563 F.3d 948 (9th Cir. 2009) ...................................................................................... 16, 17

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011) ................................................................................................ 13

*Tawfilis v. Allergan, Inc.*,
   2018 WL 4849716 (C.D. Cal. Aug. 27, 2018) .............................................................. 11

*United States Football League v. National Football League*,
   644 F. Supp. 1040 (S.D.N.Y. 1986) ................................................................................ 14

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ................................................................................................ 14

**Rules**

Fed. R. Civ. P. 23 .................................................................................................................... 3

PLAINTIFFS' OPPPOSITION TO ZUFFA'S RENEWED MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION AND SUMMARY

Plaintiffs in two class actions, *Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship and UFC*, No. 2:15-cv-01045 (D. Nev.) (the "*Le* Action"), and *Johnson, et al. v. Zuffa, LLC, et al.*, No. 2:21-cv-1189 (D. Nev.) (the "*Johnson* Action") (collectively, the "Actions"), on behalf of themselves and the proposed Settlement Classes (the *Le* Class and the *Johnson* Settlement Class),[1] submit this supplemental memorandum in support of their motion for preliminary approval of the Settlement. This Supplemental Memorandum directly responds to concerns raised by the Court, and requests from the Court, at the June 14, 2024 status conference. Plaintiffs provide the following supplemental information in support of the Settlement:

**(1) a <u>Revised</u> Plan of Allocation** (attached as Exh. A hereto and summarized below). The Revised Plan of Allocation ("Revised Plan") would distribute 90% of the $335 million monetary recovery to the *Le* Class and 10% to the *Johnson* Settlement Class. Under the Revised Plan, the Settlement would result in the *Le* Class (and the 485 individuals who are members of both the *Le* Class and the *Johnson* Settlement Class) recovering over $300 million (90% x $335M = $301.5M). The Revised Plan ensures that the *Le* Class members would recover through the Settlement ***over 30% of the total amount of single damages available to them at trial***. As confirmed by the long-list of class action cases cited below, this result would be far superior to many other antitrust class action settlements— including those that both settled on the brink of or during trial *and* involved less pathbreaking factual and legal underpinnings than these Actions.[2]

**(2) Supplemental Data Reflecting that Many Settlement Class Members Would Receive "Life Changing" Money from the Settlement.** Simultaneously with this submission, Plaintiffs are providing specific information from Plaintiffs' expert economist (*in camera* due to the sensitivity of the

---

[1] Unless noted otherwise, all capitalized terms use the same definitions as those set forth in Plaintiffs' May 21, 2024 submission in support of preliminary approval of the Settlement. *See* ECF Nos. 136 through 136-9.

[2] Plaintiffs are also submitting a revised proposed preliminary approval order, which reflects that if the Court is amenable, it would approve the Revised Plan of Allocation, and that the forms of notice to the Settlement Classes would be amended to reflect the changes to the Plan of Allocation set forth in the Revised Plan.

information), setting forth data requested by the Court relating to, *inter alia*, the projected net

recoveries for each member of the Settlement Classes (including the 485 Fighters who are in both the

*Le* Class and *Johnson* Settlement Class) based on the Revised Plan. Plaintiffs also provide *in camera* a

second spreadsheet identifying, for each Fighter in one or both Settlement Classes, the number of UFC

bouts, the date of each bout, and the compensation earned from each bout.[3] (The Fighters who are in

both Settlement Classes are highlighted in blue in both spreadsheets).

This information makes clear that the Settlement would, in the words of the Court, provide "life

changing" money to Fighters who have waited through ten years of litigation to receive some measure

of compensation for the alleged wrongs addressed by these Actions. As detailed below, of the

approximately 1,500 Fighters who are members of the Settlement Classes (and who did not sign

contracts with an arbitration clause), **nearly one-third (494 Fighters) will receive a total net

allocation of more than $100,000 *each***. Every single Fighter in *Le* will receive at least $13,000—a

significant sum for many people struggling to get by. The average award for *Le* Class members will

approach $200,000 and the median award will exceed $73,000. By any measure, this is a significant

amount of money that will be meaningful to well more than one thousand Fighters and their families.

This money would be sorely missed if the Settlement were not approved and Plaintiffs either lost at

trial, or simply incurred many more years of delay through trial, post-trial motions, and appeals after

which the result would be uncertain.

**(3) Multiple Cases Demonstrating That the Settlement Compares Favorably with Other

Antitrust Class Action Resolutions, Including Those Resolved at or Just Prior to Trial**. Plaintiffs

set forth below a lengthy list of judicial opinions addressing the following topics: (a) antitrust class

action settlements involving far lower shares of available single damages than Plaintiffs achieved here,

including those that were settled during trial *and* that involved less "pathbreaking," and more standard,

antitrust claims than at issue here; (b) addressing the standards for approval of class action settlements

---

[3] To be clear, **only** the Court is receiving hard copies of the two spreadsheets *in camera* due to the
sensitive information contained in the spreadsheets. Plaintiffs are not submitting the two documents to
the ECF clerk or any party in any format (hard copy or electronic), nor are Plaintiffs filing the
spreadsheets via the electronic ECF docketing system (*i.e.*, the spreadsheets are not being filed on the
docket under seal).

and, in particular, the importance of the judgment of experienced class counsel; and (c) the complexity and risks associated with litigating, trying antitrust class actions to judgment, and appeals of such judgments.

## II.    THE **REVISED** PLAN OF ALLOCATION

As reflected in the attached <u>Revised</u> Plan (Exh. A) in response to concerns raised by the Court at the June 14, 2024 status conference, Plaintiffs are amending the previously submitted Plan of Allocation in three material ways: (1) changing the allocation as between the *Le* Class Tranche and *Johnson* Class Tranche so that the split is more heavily weighted in favor of *Le* (instead of 75%/25% in *Le*/*Johnson*, the split will be 90%/10% *Le*/*Johnson*); (2) within each Class Tranche the allocation is adjusted so that the number of bouts per claimant is weighted 30% (instead of 20%) and the total compensation per claimant is weighted 70% (instead of 80%); and (3) the minimum recovery for *Le* Claimants (defined below) will now be $10,000 (instead of $8,000),[4] the minimum recovery for *Johnson* Claimants (defined below) without arbitration clauses will be $6,000 (instead of $7,000), and the flat recovery for *Johnson* Claimants with arbitration clauses will be $3,000 (instead of $5,000).

The proposed revised allocation between the *Le* Class and the *Johnson* Settlement Class—with *Le* getting 90% of the proceeds—is justified on, at least, four grounds. First, the *Le* Action is much older and covers an earlier class period. Accordingly, on a "time value of money basis," the *Le* Class members who have been subject to more delay in compensation for the alleged misconduct are entitled to a significantly higher recovery, all things equal, relative to members of the *Johnson* Settlement Class. Second, the *Le* Action was certified pursuant to Fed. R. Civ. P. 23(b)(3) and was fully litigated up to the eve of trial, while the *Johnson* Action was in the early stage of discovery (a motion to dismiss the operative Amended Complaint had not yet been filed) at the time of Settlement. Thus, plaintiffs and the certified Class in the *Le* Action had more leverage in settlement negotiations than the plaintiffs in the *Johnson* Action. Third, the UFC appears to have made certain potentially helpful changes to its Fighter contracts after the *Le* Action, which benefitted the *Johnson* Settlement Class members, and some members of the *Le* Class who, for instance, had not been able to retire officially. Fourth, more

---

[4] Under the formula for allocation, as it turns out the lowest amount any member of the *Le* Class will receive exceeds $13,000.

than half of the *Johnson* Settlement Class members—accounting for over 75% of all bout compensation the UFC paid to UFC Fighters during the *Johnson* Class Period—are subject to arbitration clauses and provisions that waive participation in class actions. If these clauses were upheld, they would significantly reduce the overall value of the claims brought by the *Johnson* Settlement Class.

The proposed allocation of 10% of the Settlement amount to *Johnson* (a material amount to be sure) recognizes that the *Le* Class benefitted from the presence of *Johnson*. As an initial matter, the presence of *Johnson* provided both additional leverage to the Plaintiffs to close the deal, but also allowed Plaintiffs to offer the Defendants finality and global peace through the date of the Settlement. Moreover, and importantly, ***there are 485 Fighters who are members of both the Le Class and Johnson Settlement Class***. Thus, a significant portion of the monies allocated to the *Johnson* Settlement Class will offer *an additional benefit* to the many *Le* Class members who continued to fight under the UFC banner after the *Le* Class Period ended in June 2017.

Finally, while it is certainly true that the members of the *Johnson* Settlement Class will benefit more directly from the prospective relief that is part of the Settlement, the *Le* Class Representatives—to a man—and many *Le* Class members, believe strongly that one of the goals of the Actions was to improve the sport for current and future MMA Fighters. To the extent that the Settlement provides benefits to more current fighters in *Johnson*—and the prospective relief certainly does—that outcome itself results in an intangible benefit, but an important benefit nonetheless, to the members of the *Le* Class.

## III. THE SETTLEMENT WOULD PROVIDE "LIFE CHANGING" MONEY TO MANY HUNDREDS OF FIGHTERS AND THEIR FAMILIES

Plaintiffs have provided the Court (*in camera* due to the sensitivity of the information) two spreadsheets prepared by our experts that provide granular information regarding the impact of the Settlement on the lives of the members of the Settlement Classes. The first spreadsheet, titled *Le v. Zuffa/Johnson v. Zuffa*: Fighter Allocation Spreadsheet, sets forth the projected *net* recoveries for (a) each member of the *Le* Class, (b) each member the *Johnson* Settlement Class, and (c) for those 485 Fighters in both Settlement Classes, the combined net recoveries from both Settlement Tranches.

Plaintiffs also provide *in camera* a second spreadsheet titled *Le v. Zuffa/Johnson v. Zuffa*: Fighter Event List Spreadsheet, identifying for each Fighter in one or both Settlement Classes, the number of UFC bouts fought, the dates of each bout, and the compensation each earned from each bout. The 485 Fighters in both Settlement Classes are highlighted in blue in both spreadsheets. Taken together, this information makes clear that the Settlement would, in the words of the Court, provide "life changing" amounts of money to hundreds of Fighters who have waited through ten years of litigation, and as long as fourteen years from the earliest fights in the *Le* Class Period, to receive some measure of compensation for the alleged wrongs addressed by these Actions.

**The *Le* Class**: Assuming the Court grants the Fee and Expense Award akin to that set forth in the Class Notice, the Settlement under the Revised Plan would result in a total ***net* recovery** for the *Le* Class of approximately **$193.5M**,[5] which would represent approximately 35 percent of total Event Compensation that Zuffa paid to *Le* Class Members over the *Le* Class Period (*i.e.*, the Settlement would act as a 35% raise above what Fighters were paid during their careers).

Under the methodology reflected in the Revised Plan, and conservatively assuming a 90 percent claims rate, the average net recovery from the *Le* Class Tranche for *Le* Claimants would be $198,000 ***and the typical (median) recovery would exceed $73,000 per Fighter***. Moreover, 485 of these *Le* Class members (who are members of both Settlement Classes) would also recover from the *Johnson* Class Tranche, increasing each *Le* Class member's award by at least $6,000 (without an arbitration clause) and potentially significantly more (the average *Johnson* Settlement Class member recovery would be over $25,000).

**The *Johnson* Settlement Class:** Under the Revised Plan, making the same assumptions as for the *Le* Class (regarding Court awarded fees and costs), would result in a total *net* recovery for the *Johnson* Settlement Class of approximately **$21.5M**.[6] The *Johnson* Settlement Class Tranche, under

---

[5] The Settlement involves total payments of $335M. The Net Settlement Fund after all potential deductions (of potential Court-awarded fees and costs, as well as costs of administration) is approximately $215M. $215 * 90% (share to *Le* Class Tranche under the <u>Revised</u> Plan of Allocation) = $193.5M.

[6] The Settlement is for $335M. The Net Settlement Fund after all deductions is $215M. $215 * 10% = $21.5M.

these assumptions, would represent almost 15 percent of total Event Compensation Zuffa paid to *Johnson* Settlement Class Members who were not subject to arbitration clauses or class action waivers over the *Johnson* Settlement Class Period. The average recovery by a *Johnson* Settlement Class member from the *Johnson* Settlement Class Tranche would be over $25,000 and the typical (median) recovery would be over $13,000 per Fighter. For the many *Johnson* Settlement Class members who would also recover in *Le*, the combined amount would be even more significant.[7]

**Net Recoveries For Settlement Class Members Are Significant:** There is significant overlap between the two Settlement Classes. Of the 1,500 Fighters that are members of one or both Settlement Classes (and who did not sign an arbitration clause), **nearly one-third (494 Fighters) will receive a total net allocation from both Settlement Classes of more than $100,000 *each***; more than 15% (226 Fighters) will receive in excess of $200,000 each; nearly 10% (143 Fighters) will receive in excess of $300,000 each; more than 6% (104 Fighters) will receive in excess of $400,000 each; more than 5% (86) will receive in excess of $500,000 each; more than 4% (67 Fighters) will receive in excess of $600,000 each; more than 3.5% (54 Fighters) will receive in excess of $700,000 each; more than 3% (46 Fighters) will receive in excess of $800,000 each; more than 2.5% (41 Fighters) will receive in excess of $900,000 each; ***and 36 Fighters will receive in excess of $1 million each***. And, under the Revised Plan, every single Fighter in *Le* will receive ***at least $13,000***—including those Fighters who only fought once. These amounts are significant sums for most people, including many who may well be living from paycheck to paycheck.[8]

---

[7] For instance, there are Fighters who would receive $39,000 from *Le* and $115,000 combined; $52,000 from *Le* and $126,000 combined; $49,000 from *Le* and $142,000 combined; $75,000 from *Le* and $129,000 combined. *See Le v. Zuffa/Johnson v. Zuffa*: Fighter Allocation Spreadsheet (*in camera* submission).

[8] In 2022, median annual income in the United States was less than $75,000. *See* www.bls.gov/news.release/pdf/wkyeng.pdf ("Median weekly earnings of the nation's 119.2 million full-time wage and salary workers were $1,139 in the first quarter of 2024 (not seasonally adjusted), the U.S. Bureau of Labor Statistics reported today."). According to a survey by bankrate.com, only 44% of U.S. adults would be able to pay an emergency expense of $1,000 or more from their savings, as of December 2023 polling. *See* https://www.bankrate.com/banking/savings/emergency-savings-report/.

6

By any measure, these distributions would be meaningful to many hundreds of Fighters and their families—and would be sorely missed if the Settlement were not approved and Plaintiffs either lost at trial, or simply incurred many more years of delay through trial, post-trial motions, and appeals.

## IV.    THE SETTLEMENT IS SUPERIOR BY ALL TRADITIONAL METRICS

By all traditional metrics, the Settlement is an excellent result for the Settlement Classes— especially in comparison to other prominent antitrust class action settlements in recent years. As discussed above, the Settlement, if approved, would result in a gross recovery to the *Le* Class (and those members of the *Johnson* Settlement Class who also recover in *Le*) of over $300 million (90% x $335M = $301.5M). Plaintiffs' experts had several damages models with a median result of $981.8 million.[9] Accordingly, ***the Settlement would allow the Le Class to recover over 30% of the amount of their single damages***.

### A.    The Settlement Compares Favorably to Other Antitrust Class Actions Where Settlements Occurred on the Brink of, or During, Trial

The Settlement compares favorably to other class action cases resolved after courts had certified the classes, found the plaintiffs' economic experts (and their respective damages models) reliable, and denied summary judgment.

***First***, earlier this year plaintiffs in five separate class actions in different jurisdictions settled the *Realtor Commissions* case with five defendants for approximately $972.5M on behalf of multiple classes. *See Burnett, et al. v. NAR, et al.*, No. 19-cv-332, ECF No. 1478, at 6 (E.D. Mo. May 6, 2024). One of the classes that folded into this settlement had previously gone to trial *and prevailed*, obtaining a jury verdict for nearly $1.8 billion *before trebling*. *See Burnett, et al. v. NAR, et al.*, No. 19-cv-332, ECF No. 1294 (E.D. Mo. Oct. 31, 2023) (verdict form). The combined alleged damages in these actions were immense—in addition to the $1.8 billion jury verdict, another one of the several classes that folded into this collective sub-$1 billion settlement had *by itself* claimed over $13 billion in single

---

[9] Dr. Singer's Strikeforce Model: $1.4 billion (SR1 ¶248 & tbl.9); Dr. Singer's Bellator Model: $811.2 million; Dr. Singer's regression model results, included $894.3 million (SR1 ¶250 & tbl.10) and $1.6 billion (SR1 ¶252 & tbl.11); Prof. Zimbalist's model: $981.8 million (ZR1 ¶126).

damages. *See Moehrl, et al. v. NAR, et al.*, No. 19-cv-1610, ECF No. 324-5, at 5 (N.D. Ill. June 7, 2022). Thus, even with a large and favorable jury verdict, and combined single damages in the tens of billions of dollars, the total settlement amount was less than $1 billion, *i.e.*, likely below 5% of the total available single damages. This result reflects counsel's assessment of the very real risks of antitrust trials and appeals from even the most favorable of verdicts.

**Second**, in *Meijer, Inc. v. Abbott Labs.*, 2011 WL 13392313, at *2 (N.D. Cal. Aug. 11, 2011), the plaintiff class in an antitrust class action settled on the third day of trial for $52 million. In *Meijer*, the class had been certified, summary judgment had been denied, and the plaintiffs were trying an antitrust monopolization claim relating to an AIDS drug. Plaintiffs' expert economist, Dr. Hal Singer, had computed damages ranging from $210 million up to $1.2 billion, and as here the court found his models reliable and admissible. In other words, this case settled *at trial* for between 4% and 25% of available single damages. And it was undoubtedly a good thing for the plaintiffs that they settled. A non-class co-plaintiff did not settle, continued with the same trial in front of the same jury that would have decided the class's fate—and received a defense verdict because the jury disagreed with the plaintiffs' proposed relevant market.[10]

**Third**, in another cautionary tale, the plaintiffs in *In re Opana ER Antitrust Litig.*, No. 14-cv-10150, ECF No. 1085 (N.D. Ill. Nov. 3, 2022), settled an antitrust class action with one of two defendants on the first day of trial for $145 million. That amount represented about one-quarter of single damages of between $514 million to $590 million. *See* ECF No. 1081, at 1 (plaintiffs' final approval brief); ECF No. 895, at 18 (N.D. Ill. May 24, 2022) (joint pretrial order discussing damages). At the time of settlement, the court had granted class certification, denied summary judgment, and denied *Daubert*. However, the plaintiffs were unable to settle with the second defendant and so continued to a jury verdict—and lost. ECF No. 1002 (N.D. Ill. July 1, 2022) (jury verdict for non-settling defendant). With only a single defendant in *Le*, Plaintiffs here do not have the luxury of a

---

[10] *See also Meijer, Inc. v. Abbott Labs.*, No. 07-cv-5985, ECF No. 512, at 8 (N.D. Cal. July 13, 2011) (plaintiffs' final approval brief providing damages estimates), ECF No. 501, at 6-7 (N.D. Cal. Apr. 8, 2011) (plaintiffs' preliminary approval brief providing litigation background).

partial settlement to guarantee some recovery for class members in the event of a loss at trial or on appeal.

**Fourth**, *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 5182093, at *2 (D. Md. Sept. 12, 2013), was a price-fixing case brought under Section 1 of the Sherman Act. The plaintiffs there entered into a class settlement totaling $163.5 million after class certification had been granted, summary judgment and *Daubert* denied, and on the eve of trial. The resolution represented a mere 6-8% of estimated single damages, which had ranged from $2.1-2.7 billion. *Id.*; *see also In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 818 (D. Md. 2013) (plaintiffs' expert found "Defendants' price increases resulted in aggregate [single] overcharges of between $2.1 and $2.7 billion").

**Fifth**, in *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 2010 WL 11693979, at *2 (D. Mass. Mar. 12, 2010), the plaintiffs settled an antitrust class action for $32.5 million after class certification had been granted, summary judgment and *Daubert* denied, and during trial. The settlement represented 17.6% of the $184.7 million in estimated single damages. *Id.*; *see also Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, No. 05-cv-12024, ECF No. 401, at 1, 4, 22 (D. Mass. Feb. 23, 2010) (plaintiffs' final approval brief providing litigation background and damages estimates).

In short, the Settlement here compares quite favorably to other antitrust class actions in similar litigation postures, including those with multiple defendants proceeding with less pathbreaking claims.

**B.   This Settlement Compares Favorably to Dozens of Recent Antitrust Class Action Settlements**

As shown by the long list of cases set forth below, the Settlement would *far surpass* the typical antitrust class action settlement—including those with fewer elements and lower burdens of proof, such as *per se* illegal price-fixing and other cases brought under Section 1 of the Sherman Act. In considering the Settlement, the Court should consider that the *Le* and *Johnson* Actions have been brought by workers under Section 2 of the Sherman Act. As Professor Eric Posner of the University of Chicago Law School has observed, the *Le* Action "is the first [labor-side claim under Section 2 of the Sherman Act] ever to survive summary judgment, reach class certification, or even survive a motion to dismiss." *See* Declaration of Prof. Eric A. Posner in Support of Plaintiffs' Motion for Preliminary

9

Approval of the Settlement ("Posner Decl.").[11] Plaintiffs' case—and the Settlement—are remarkable,

ground-breaking achievements, especially when compared with other antitrust class action results.

Federal dockets are replete with antitrust class actions in which courts (including many in this

Circuit) have approved settlements reflecting a *much* lower percentage of estimated single damages:

### Antitrust Class Action Settlements for 2% or Less of Estimated Single Damages

- *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *28 (E.D.N.Y. Dec. 16, 2019) (after summary judgment briefing and the Second Circuit vacating a prior settlement, court approved $6.32 billion antitrust class action settlement representing less than 1.4% of the low end of estimated damages of $463.8 billion).

- *In re Endosurgical Prod. Direct Purchaser Antitrust Litig.*, 2008 WL 11504857, at *6 (C.D. Cal. Dec. 31, 2008) (preliminary approval of $13 million cash settlement of antitrust class action where court stated that "[a]ssuming the settlement is worth approximately 1.7% of relevant sales,[12] the Court finds this percentage within the range of settlements approved in similar cases when alleged monopolists were sued first by competitors, and then by purchasers"); *see also In re Endosurgical Prod. Direct Purchaser Antitrust Litig.*, No. 05-cv-8809, ECF No. 193-2, at 2 (C.D. Cal. Apr. 27, 2009) (plaintiffs' final approval brief noting that prior to settlement, defendants had prevailed against a different plaintiff, and that another plaintiff in a related action before a different court subsequently settled its claims for $11 million where it had alleged $1.8 billion in single damages).

- *Meijer, Inc. v. 3M*, 2006 WL 2382718, at *2, *16 (E.D. Pa. Aug. 14, 2006) (following class certification briefing, court approved $28.9 million antitrust class action settlement representing approximately 2% of class member sales to defendant).

- *In re Auto. Refinishing Paint Antitrust Litig.*, 2004 WL 1068807, at *2 (E.D. Pa. May 11, 2004) (after federal government disbanded grand jury investigation of the anticompetitive conduct alleged in plaintiffs' complaint, court approved antitrust class action settlements with two defendants totaling $48 million, which represented approximately 2% of class member sales to defendants); *see also In re Auto. Refinishing Paint Antitrust Litig.*, No. 10-md-1426, ECF No. 124, at 3, 18-19 (E.D. Pa. June 30, 2004) (plaintiffs' final approval brief providing damages estimates).

- *In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *11 (E.D. Mich. Dec. 13, 2011) (for the direct purchaser plaintiff class in this antitrust class action, after class certification briefing, the court granted final approval of settlement with one defendant, finding the "$12.5 million cash settlement … represents approximately 2.2% of Arctic Glacier's United States

---

[11] The Posner Decl. is attached as Exhibit 2 (ECF No. 136-5) to the Joint Decl. submitted with the Preliminary Approval Motion.

[12] A settlement measured against a defendant's sales during the class period compares less favorably to single damages because damages are calculated as a portion of sales, and typically amount to a small fraction of the defendant's total sales.

sales of Packaged Ice during the proposed Settlement Class Period”).

- *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 9266493, at *5 (N.D. Cal. Dec. 17, 2015) (following summary judgment briefing, court approved $9.75 million antitrust class action settlement where plaintiffs’ maximum recovery “could exceed two billion dollars,” and where settlement represented 0.49% of maximum possible recovery).

### Antitrust Class Action Settlements for 5% or Less of Estimated Damages

- *In re Tableware Antitrust Litig.*, 2007 WL 4219394, at *2 (N.D. Cal. Nov. 28, 2007) (court approved antitrust class action settlement of $500,000, which represented 4% of estimated damages of $12.5 million with one defendant).

- *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 308, 319 (W.D. Pa. 1997) (court approved antitrust class action settlement of $14.5 million with the last two of three defendants, which settlement represented 5.35% of the estimated damages of $271 million).

### Antitrust Class Action Settlements for 15% or Less of Estimated Damages

- *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 5182093, at *2 (D. Md. Sept. 12, 2013) (approving antitrust settlement of $163.5 million after class certification was granted, summary judgment and *Daubert* denied, and on the eve of trial, representing 6-8% of estimated single damages ranging from $2.1-2.7 billion); *see also In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 818 (D. Md. 2013) (plaintiffs’ expert found “Defendants’ price increases resulted in aggregate [single] overcharges of between $2.1 and $2.7 billion”).

- *Tawfilis v. Allergan, Inc.*, 2018 WL 4849716, at *1, *4 (C.D. Cal. Aug. 27, 2018) (antitrust class action settlement reached after court granted in part plaintiffs’ *Daubert* motion, and denied defendant’s *Daubert* motion, where $13,450,000 settlement represented approximately 8.36% of single damages); *see also Tawfilis v. Allergan, Inc.*, No. 15-cv-0307, ECF No. 388, at 8-9 (C.D. Cal. Mar. 8, 2018) (preliminary approval order discussing amount of alleged overcharges).

- *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) ($410 million settlement against one defendant in an antitrust class action where the settlement represented as little as 9% percent of total potential single damages depending on which measure of damages a jury adopted, and where the court emphasized that “standing alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims”).

- *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3077396, at *9 (E.D.N.Y. Sept. 25, 2009) (final approval of antitrust class action settlement of “$85 million equal[ing] approximately 10.5% of Lufthansa’s surcharges during the Settlement Class period”).

- *In re Wellbutrin SR Antitrust Litig.*, 2011 WL 13392296, at *2, *3 (E.D. Pa. Nov. 21, 2011) (final approval of antitrust class action settlement of $49 million, reached after summary judgment briefing (including renewed summary judgment motion by defendant) and extensive trial preparation, which represented 5.7% to 10.7% of estimated single damages ranging from $457 million to $839 million); *see also In re Wellbutrin SR Antitrust Litig.*, No. 04-cv-5525,

ECF No. 409, at 18 (Oct. 14, 2011) (plaintiffs' final approval brief providing damages estimates).

- *In re Prandin Direct Purchaser Antitrust Litig.*, 2015 WL 1396473, at *1-*3 (E.D. Mich. Jan. 20, 2015) (approving $19 million antitrust class action settlement representing approximately 12% of estimated single damages); *see also In re Prandin Direct Purchaser Antitrust Litig.*, No. 10-cv-12141, ECF No. 67, at 14 (E.D. Mich. Dec. 16, 2014) (plaintiffs' final approval brief providing damages estimates).

- *Castro v. Sanofi Pasteur Inc.*, 2017 WL 4776626, at *1-*2, *6 (D.N.J. Oct. 23, 2017) (approving antitrust class action settlement of $61.5 million, reached after class certification was granted and *Daubert* was denied, which represented approximately 14% of the estimated damages of $439 million).

- *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5159441, at *2-*4 (N.D. Cal. Sept. 2, 2015) (approving antitrust class action settlement of $435 million, reached with all seven deep-pocketed defendants while the parties were engaged in trial preparation, where the settlement represented 14% of single damages of $3.1 billion).

- *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2024 WL 815503, at *2, *9 (E.D. Pa. Feb. 27, 2024) (approving antitrust class action settlement of $385 million, which was reached after class certification had been granted, after the court denied various *Daubert* motions, and where the settlement represented 12% to 14% of estimated damages of $2.6 billion and $3.2 billion).

- *In re Blue Cross Blue Shield Antitrust Litig.*, 2022 WL 4587618, at *2, *20 (N.D. Ala. Aug. 9, 2022) (final approval of $2.67 billion antitrust class action settlement reached after nine years of litigation and following several rounds of summary judgment, as well as class certification motions pending at time of settlement, where settlement represented between 7.3% to 14.3% of the estimated damage ranging from $18.6 billion to $36.1 billion, which the court concluded "easily falls within the range of reasonable recoveries").[13]

- *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 305, 308-10, 323, 325 (N.D. Ga. 1993) (court approved antitrust class action settlement with a $50 million cash amount plus discount travel certificates with a face value of $408 million, which together the court found had an economic value between $254-$356 million, and where the court concluded that "the settlement in this action amounts to approximately 12.7-15.3% of the estimated $2 billion minimum possible untrebled recovery").

### *Antitrust Class Action Settlements for 25% or Less of Estimated Damages*

- *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 2010 WL 11693979, at *2 (D. Mass. Mar. 12, 2010) (final approval of $32.5 million antitrust class action settlement reached during trial, where the settlement represented 17.6% of best possible recovery of $184.66 million in estimated single damages; other damages models estimated $109.25 million and $175.52 million respectively); *see also Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, No. 05-cv-12024, ECF No. 401, at 1, 4, 22 (D. Mass. Feb. 23, 2010) (plaintiffs' final approval

---

[13] *Affirmed sub nom. In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070 (11th Cir. 2023).

brief providing litigation background and damages estimates).

- *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 2020 WL 6193857, at *1 (E.D.N.Y. Oct. 7, 2020) (final approval of $51.25 million antitrust class action settlement, reached after class certification briefing, which represented 5-20% of range of estimated damages ranging from $255 million to $709 million); *see also In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, No. 18-md-2719, ECF No. 544, at 16, 21 (E.D.N.Y. Sept. 15, 2020) (plaintiffs' final approval brief providing litigation background and damages estimates).

- *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 285, 287-88, 324-25 (3d Cir. 2011) (Third Circuit affirmed two settlements: (i) an indirect purchaser plaintiff settlement of $272.5 million, which represented estimated 10.9% of estimated $2.5 billion single damages; and (ii) a direct purchaser plaintiff settlement of $22.5 million, which represented less than 22.5% of the estimated $100 million single damages; *settlements were reached after default judgment entered against defendants*, who rejected that the court had jurisdiction; Third Circuit held there was "no abuse in the District Court's conclusion that the proposed settlement offered a reasonable recovery").

- *In re Dental Supplies Antitrust Litig.*, No. 16-cv-0696, ECF No. 341 (E.D.N.Y. June 24, 2019) (final approval order of $80 million antitrust class action settlement, reached after class certification and *Daubert* motions were briefed, where settlement represented 2.5-21% of estimated single damages); *see also In re Dental Supplies Antitrust Litig.*, No. 16-cv-0696, ECF No. 335-1, at 13, 17 (E.D.N.Y. May 24, 2019) (plaintiffs' final approval brief providing litigation background and damages estimates).

- *Meijer, Inc. v. Abbott Labs.*, 2011 WL 13392313, at *2 (N.D. Cal. Aug. 11, 2011) (final approval order for $52 million antitrust class action settlement reached during trial, where plaintiffs' estimated damages ranged from $210 million to $423 million, and up to $1.2 billion in most optimistic scenario; settlement represented 25%, 12%, and 4% respectively of potential recovery scenarios; trial continued with an individual plaintiff where the jury returned a verdict for defendant); *see also Meijer, Inc. v. Abbott Labs.*, No. 07-cv-5985, ECF No. 512, at 8 (N.D. Cal. July 13, 2011) (plaintiffs' final approval brief providing damages estimates), ECF No. 501, at 6-7 (N.D. Cal. Apr. 8, 2011) (plaintiffs' preliminary approval brief providing litigation background).

- *In re Opana ER Antitrust Litig.*, No. 14-cv-10150, ECF No. 1085 (N.D. Ill. Nov. 3, 2022) (final approval of antitrust class action settlement of $145 million on behalf of direct purchasers, reached just prior to trial, who sought damage ranging between $514 million to $590 million, which represented 25% to 28% of estimated damages; jury subsequently returned verdict in favor of non-settling defendant); *see also ECF No. 1081, at 1 (plaintiffs' final approval brief); ECF No. 895, at 18 (N.D. Ill. May 24, 2022) (joint pretrial order discussing damages); ECF No. 1002 (N.D. Ill. July 1, 2022) (jury verdict for non-settling defendant).

**C.    Antitrust Class Actions Pose Significant Trial and Appellate Risk**

The law recognizes that even where an expert's testimony about damages is deemed admissible

13

and reliable, Plaintiffs still face the risk of being unable to prove at trial the existence, and extent, of damages or the other elements of their claims. "Antitrust cases are particularly risky, challenging, and widely acknowledge[d] to be among the most complex actions to prosecute." *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020);[14] *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("Federal antitrust cases are complicated, lengthy, and bitterly fought."); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003) ("An antitrust class action is arguably the most complex action to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome.").

It is unsurprising, if unfortunate, that the annals of antitrust litigation history are littered with examples of plaintiffs receiving little or no damages despite having engaged in extensive litigation— even when such plaintiffs succeeded in establishing the defendants' liability.[15]

One such well-known example is the monopolization case brought by the United States Football League against the National Football League where the jury, after a ten-week trial, returned unanimous verdicts against the defendant but concluded the plaintiff had suffered only $1.00 in damages. *United States Football League v. National Football League*, 644 F. Supp. 1040, 1041-42 (S.D.N.Y. 1986).[16]

There are numerous other instances reflecting the uncertainty of prevailing in an antitrust trial.

---

[14] *Affirmed*, No. 21-15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022).

[15] *See Wal-Mart Stores*, 396 F.3d at 118 ("Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1166-67 (7th Cir. 1983) (antitrust judgment was remanded for new trial and damages); *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973), *vac'd*, 417 U.S. 156 (1974) (after two trips to the Second Circuit and one to the Supreme Court, plaintiff and the putative class recovered nothing in this antitrust class case); *Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*, 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987) ("There is a substantial risk that the plaintiff might not be able to establish liability at all and, even assuming a favorable jury verdict, if the matter is fully litigated and appealed, any recovery would be years away.").

[16] This case is so well known that a plaque commemorating it is emblazoned on the wall of the attorneys' lounge on 3rd floor of Lloyd D. George Federal District Courthouse in Las Vegas.

In nearly all of these cases, the plaintiffs had rejected significant settlement offers, opting for a jury trial instead. In the following recent cases, that choice proved disastrous for the plaintiffs:

- *In re HIV Antirust Litig.*, No. 19-cv-02573 (N.D. Cal.): Antitrust class action alleging that defendants violated the antitrust laws by agreeing to delay the entry of generic versions of certain brand drugs used to treat the Human Immunodeficiency Virus ("HIV"). The end purchaser plaintiffs in this antitrust class action litigation went to trial and the jury returned a verdict in favor of the defendants. A different group of plaintiffs chose instead to settle their case before trial for $246.75 million, which represented approximately 11.9% of the expert's estimated single damages. *See* ECF No. 2141, at 12-13 (final approval brief).

- *In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115 (N.D. Cal.): Antitrust class action plaintiffs sought approximately $246 million in single damages for antitrust claims alleging defendants engaged in a conspiracy to fix the price of ramen noodle products (*In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *6 (N.D. Cal. Jan. 19, 2017)), where jury returned a verdict in favor of two defendants when it found that plaintiffs had not proven there was a conspiracy (ECF No. 920).

- *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637 (N.D. Ill.): Plaintiffs in this class action alleging overcharges on approximately $37 billion in broiler chicken sales for antitrust claims alleging defendants conspired to fix the price of broiler chickens. *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *15 (N.D. Ill. May 27, 2022). After obtaining settlements totaling $284 million—a tiny fraction of single damages—with thirteen defendants (*see, e.g.*, ECF Nos. 6926-28; 7172, at 3), plaintiffs went to trial against one defendant and the jury rendered a verdict in favor of the defendant (ECF No. 7014).

- *In re Nexium (Esomeprazole) Antitrust Litig.*, No. 12-md-02409 (D. Mass): Litigation involving consolidated antitrust class actions brought on behalf of direct purchasers, end-payer purchasers, and individual retailer plaintiffs alleging defendants violated the antitrust laws by agreeing to delay the entry of generic versions of the prescription drug Nexium, where direct purchasers claimed damages in the billions of dollars. *See* ECF No. 1559, at 17 (plaintiffs' final approval brief). Approximately one month into trial, all plaintiffs settled with one defendant for $24 million and the jury subsequently returned a verdict in favor of the remaining defendants. *See id.* at 2, 15-16.

- *In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-md-02090 (D. Minn.): Antitrust class action where direct purchaser plaintiffs brought claims alleging $226 million in damages asserting defendants engaged in a conspiracy to restrict competition by dividing territories and customers along geographic lines (*In re Wholesale Grocery Prod. Antitrust Litig.*, 2017 WL 4876277, at *6 (D. Minn. Oct. 24, 2017)), where the jury returned a verdict in favor of two defendants (ECF No. 1233).

- *In re Processed Egg Products Antitrust Litig.*, No. 08-md-02002 (E.D. Pa.): Antitrust class action plaintiffs went to trial asserting damages in excess of $111 million (*In re Processed Egg Prod. Antitrust Litig.*, 881 F.3d 262, 266 (3d Cir. 2018)) for a conspiracy to fix the prices of eggs by agreeing to reduce egg supply where the jury found the defendants had not participated in the alleged conspiracy (ECF No. 2090).

15

In many, if not all, of these cases, the class counsel rejected settlement offers, opting for the undoubtedly important right to take the case before a jury. Those decisions may well have been correct at the time they were made. No one can see the future. But there is little doubt that rejecting significant settlements involves taking on real risks for counsel's clients and the class for whom they are fiduciaries.

### D. The Law of Class Action Settlements Advises Deference to Class Action Counsel, Reflecting a Recognition of the Risks of Antitrust Class Actions

The Ninth Circuit has held that because "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements[, a] proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)) (emphasis in original). It is for these reasons that "voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation ...." *Officers for Justice*, 688 F.2d at 625.

In *Rodriguez v. W. Publg. Corp.*, 563 F.3d 948 (9th Cir. 2009), a case involving an antitrust claim brought on behalf of a class that purchased bar review courses, the Ninth Circuit rejected an argument brought by objectors to a proposed settlement that "the court should have specifically weighed the merits of the class's case against the settlement amount and quantified the expected value of fully litigating the matter." *Rodriguez*, 563 F.3d at 965. Instead, the Ninth Circuit explained that "[w]e put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution." *Id.*

The Ninth Circuit also rejected the *Rodriguez* objectors' argument that the district court should have measured the settlement against the value of potential treble damages. *Id.* at 964-65. While the court observed it has never precluded considering treble damages figures, it stated that "[i]t is our impression that *courts generally determine fairness of an antitrust class action settlement based on how it compensates the class for past injuries, without giving much, if any, consideration to treble*

16

*damages.*" *Id.* at 964 (emphasis added). The court again highlighted that "[e]xperienced counsel such as those representing all the parties in this case will certainly be aware of exposure to treble damages in an antitrust action. Likewise, the mediator in this case." *Id.* at 965. The Ninth Circuit emphasized that:

> the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

*Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998)). The court concluded that "[i]n this case, the negotiated amount is fair and reasonable no matter how you slice it. There is no evidence of fraud, overreaching, or collusion. Even considering the trebling effect, the settlement amount represents approximately ten percent of the class's estimate of its own trebled damages and more than twice that estimated by" defendants. *Id.*

The above analysis illustrates why "it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) (citing *Linney*, 151 F.3d at 1242); *see also CRT*, 2015 WL 9266493, at *5 (same); *Officers for Just.*, 688 F.2d at 628 ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair.").[17]

## V.    CONCLUSION

In sum, the Settlement is an excellent result for the Settlement Classes by all traditional measures. The case is nearly 10 years old. The struggle for MMA Fighter justice long preceded this case and will continue after this case. All of the previous battles for fairness by professional athletes

---

[17] *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5159441, at *4 (N.D. Cal. Sept. 2, 2015) ("[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *29 (E.D.N.Y. Dec. 16, 2019) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974)), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) (same); *In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, at *24 (D.N.J. Sept. 13, 2005) ("an antitrust class action settlement may be approved even if the settlement amounts to a small percentage of the single damages sought, if the settlement is reasonable relative to other factors").

were hard-won, over many years, multiple litigations, and through many different modes of protest and activism: litigation, governmental intervention, political organizing, unionization, etc. This Settlement, if approved, would be a significant step towards ameliorating past wrongs, and forcing more competitive conduct by the UFC and other powerful entities. As Professor Posner wrote, "the plaintiffs secured important judicial opinions that will help litigants and future courts adjudicate Section 2 [Sherman Act] labor antitrust cases." Posner Decl. ¶22. The relief here would be immediate, significant, and real for many hundreds of Fighters and their families. And, as shown above, this result is extraordinary when compared to other antitrust class actions—many with more leverage than Plaintiffs here (including cases that settled after trial victories or defendant defaults), but which settled for a far lower share of estimated single damages.

The law recognizes that antitrust class actions are complex and involve significant trial and appellate risks that class counsel must consider in deciding whether to accept a settlement. Plaintiffs' counsel and the class representatives fought this battle for over ten years. After exhaustively weighing all the costs and benefits—and having been assisted in this process by an experienced and well-respected mediator who was a U.S. District Court Judge—class counsel and class representatives concluded that it was in the best interests of the Settlement Classes to accept the hard-won terms of this Settlement. We ask this Court, respectfully, to accept that carefully considered decision and preliminarily approve the Settlement so that the Settlement Class members themselves can review its terms and assess the results for themselves.[18]

---

[18] At this juncture, Plaintiffs seek only *preliminary* approval, permitting notice to the Settlement Classes of the proposed settlement and affording members of the Settlement Classes the opportunity to object to its terms should they so choose.

18

Dated: June 24, 2024                          Respectfully submitted,


                                              /s/ *Eric L. Cramer*
                                              Eric L. Cramer (pro hac vice)
                                              Michael Dell'Angelo (pro hac vice)
                                              Ellen T. Noteware (pro hac vice)
                                              Patrick F. Madden (pro hac vice)
                                              Najah Jacobs (pro hac vice)
                                              BERGER MONTAGUE PC
                                              1818 Market St., Suite 3600
                                              Philadelphia, PA 19103
                                              Telephone: +1 (215) 875-3000
                                              Email: ecramer@bm.net
                                              Email: mdellangelo@bm.net
                                              Email: enoteware@bm.net
                                              Email: pmadden@bm.net
                                              Email: njacobs@bm.net


                                              Joshua P. Davis (pro hac vice)
                                              BERGER MONTAGUE PC
                                              505 Montgomery Street, Suite 625
                                              San Francisco, CA 94111
                                              Telephone: +1 (415) 906-0684
                                              Email: jdavis@bm.net

                                              Richard A. Koffman (pro hac vice)
                                              Benjamin Brown (pro hac vice)
                                              Daniel Silverman (pro hac vice)
                                              Daniel L. Gifford (pro hac vice)
                                              COHEN MILSTEIN SELLERS & TOLL
                                                  PLLC
                                              1100 New York Ave., N.W.
                                              Suite 500 East, Tower
                                              Washington, DC 20005
                                              Telephone: +1 (202) 408-4600
                                              Facsimile: +1 (202) 408-4699
                                              Email: rkoffman@cohenmilstein.com
                                              Email: bbrown@cohenmilstein.com
                                              Email: dsilverman@cohenmilstein.com
                                              Email: dgifford@cohenmilstein.com

Joseph R. Saveri (pro hac vice)
Kevin E. Rayhill (pro hac vice)
Christopher Young (pro hac vice)
Itak Moradi (pro hac vice)
JOSEPH SAVERI LAW FIRM, LLP
601 California St., Suite 1505
San Francisco, CA 94108
Telephone: +1 (415) 500-6800
Facsimile: +1 (415) 395-9940
Email: jsaveri@saverilawfirm.com
Email: krayhill@saverilawfirm.com
Email: cyoung@saverilawfirm.com
Email: imoradi@saverilawfirm.com

*Co-Lead Counsel for the Le Class, Settlement
Class Counsel for the Le Settlement Class and
the Johnson Settlement Class and Attorneys
for Individual and Representative Plaintiffs
Cung Le, Nathan Quarry, Jon Fitch, Brandon
Vera, Luis Javier Vazquez, Kyle Kingsbury,
Kajan Johnson, Clarence Dollaway, and
Tristan Connelly*

Don Springmeyer (Bar No. 1021)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone: + 1 (702) 385-6000
Facsimile: + 1 (702) 385-6001
Email: dspringmeyer@kempjones.com

*Liaison Counsel for the Le Class, Settlement
Class Counsel for the Le Settlement Class and
the Johnson Settlement Class and Attorneys
for Individual and Representative Plaintiffs
Cung Le, Nathan Quarry, Jon Fitch, Brandon
Vera, Luis Javier Vazquez, Kyle Kingsbury,
Kajan Johnson, Clarence Dollaway, and
Tristan Connelly*

Robert C. Maysey (pro hac vice)
Jerome K. Elwell (pro hac vice)
WARNER ANGLE HALLAM JACKSON
   & FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: +1 (602) 264-7101
Facsimile: +1 (602) 234-0419
Email: rmaysey@warnerangle.com
Email: jelwell@warnerangle.com

Crane M. Pomerantz
CLARK HILL PLC
1700 Pavilion Center Dr., Suite 500
Las Vegas, NV 89135
Telephone: +1 (702) 697-7545
Email: cpomerantz@clarkhill.com
NV Bar No. 14103

*Additional Counsel for the Le Settlement Class and the Johnson Settlement Class and Attorneys for Individual and Representative Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, Kyle Kingsbury, Kajan Johnson, Clarence Dollaway, and Tristan Connelly*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of June, 2024, a true and correct copy of Plaintiffs' Supplemental Brief In Support of Motion for Preliminary Approval of the Settlement and supporting papers and exhibits were served via the U.S. District Court of Nevada's ECF System to all counsel of record who have enrolled in the ECF System.


*/s/ Eric L. Cramer*
Eric L. Cramer