# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT NEVADA

CUNG LE, NATHAN QUARRY, JON FITCH, BRANDON VERA, LUIS JAVIER VAZQUEZ, and KYLE KINGSBURY, On Behalf of Themselves and All Others Similarly Situated,

            Plaintiffs,

        v.

ZUFFA, LLC, D/B/A ULTIMATE FIGHTING CHAMPIONSHIP and UFC,

            Defendant.

Case No. 2:15-cv-01045-RFB-BNW

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT, PRELIMINARY APPROVAL OF THE PLAN OF ALLOCATION, APPROVAL OF THE NOTICE PLAN, AND APPROVAL OF THE <u>PROPOSED SCHEDULE FOR COMPLETING THE SETTLEMENT PROCESS</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................. iii

INTRODUCTION ............................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................... 8

    A.    Investigation and Filing of the Action ................................. 8

    B.    Motions to Transfer and Dismiss ........................................ 8

    C.    Fact Discovery ................................................................... 9

    D.    Expert Discovery .............................................................. 9

    E.    Class Certification and *Daubert* Proceedings ..................... 10

        1.    Class Certification and *Daubert* Briefing. ............... 10

        2.    The Evidentiary Hearing on Class Certification. ..... 10

        3.    Post-Hearing Proceedings on Class Certification. .... 10

        4.    Notice of Class Certification to the Class. ................ 11

    F.    Zuffa's Motions for Summary Judgment ............................ 11

    G.    Pre-Trial Proceedings ....................................................... 11

        1.    Scheduling Trial. .................................................. 11

        2.    Pretrial Tasks and Work. ....................................... 11

    H.    Prior Settlement and Return to Trial Preparation ............... 12

THE AUGMENTED SETTLEMENT ................................................................. 13

ARGUMENT .................................................................................................. 13

I.    Standards for Preliminary Approval of the Settlement ..................... 13

II.    The Settlement Satisfies the Elements for Preliminary Approval ...... 15

    A.    The Settlement Classes Have Been Adequately Represented ... 15

    B.    The Settlement Was Reached Through Arm's-Length Negotiations ... 15

    C.    The Relief Provided by the Settlement Is More Than Adequate ... 16

i

1. The Costs, Risks, and Delay of Trial and Appeal. ....................................16

2. The Proposed Plan of Allocation Is Fair and Effective. ..........................19

3. Co-Lead Class Counsel's Request for Fees and Expenses, and Service Awards for the Class Representatives Is Reasonable..............................21

4. The Settlement Provides a Significant Monetary Benefit to the Class. ....24

D. The Settlement Treats Class Members Equitably..................................................35

E. The Extent of Discovery Completed and the Stage of Proceedings....................36

F. Risk of Maintaining Class Action Status Through Trial......................................36

G. The Experience and Views Of Counsel ...............................................................36

III. Notice of the Settlement Should be Approved.................................................................37

IV. The Court Should Appoint Angeion as Claims Administrator ........................................39

V. The Court Should Appoint Huntington as Escrow Agent ...............................................39

VI. The Final Approval Hearing Should Be Scheduled ........................................................39

CONCLUSION.............................................................................................................................40

ii

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abadilla v. Precigen, Inc.,*
    2023 WL 7305053 (N.D. Cal. Nov. 6, 2023) ........................................................16

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
    2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ..................................................... 32

*Allapattah Servs., Inc. v. Exxon Corp.,*
    454 F. Supp. 2d 1185 (S.D. Fla. 2006)...............................................................23

*Allen v. Bedolla,*
    787 F.3d 1218 (9th Cir. 2015) ...........................................................................13

*Alvarez v. Sirius XM Radio Inc.,*
    2021 WL 1234878 (C.D. Cal. Feb. 8, 2021) ..........................................................6

*Andrews v. Plains All Am. Pipeline L.P.,*
    2022 WL 4453864 (C.D. Cal. Sept. 20, 2022) ....................................................23

*In re Auto. Refinishing Paint Antitrust Litig.,*
    2004 WL 1068807 (E.D. Pa. May 11, 2004)........................................................31

*Barbosa v. Cargill Meat Sols. Corp.,*
    297 F.R.D. 431 (E.D. Cal. 2013) ...................................................................6, 24

*In re Blue Cross Blue Shield Antitrust Litig.,*
    2022 WL 4587618 (N.D. Ala. Aug. 9, 2022)...................................................... 33

*In re Blue Cross Blue Shield Antitrust Litig.,*
    85 F.4th 1070 (11th Cir. 2023)......................................................................... 33

*In re Broiler Chicken Antitrust Litig.,*
    2021 WL 5578878 (N.D. Ill. Nov. 30, 2021) ......................................................23

*In re Broiler Chicken Antitrust Litig.,*
    2022 WL 1720468 (N.D. Ill. May 27, 2022) ...................................................... 18

*Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.,*
    1987 WL 7030 (S.D.N.Y. Feb. 13, 1987).......................................................... 18

iii

*Castillo v. ADT LLC*,
   2016 WL 6441614 (E.D. Cal. Nov. 1, 2016)...................................................................22

*Castro v. Sanofi Pasteur Inc.*,
   2017 WL 4776626 (D.N.J. Oct. 23, 2017) ................................................................... 32

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2015 WL 9266493 (N.D. Cal. Dec. 17, 2015)..........................................................25, 31

*In re Checking Acct. Overdraft Litig.*,
   *830 F. Supp. 2d 1330 (S.D. Fla. 2011)* ........................................................................32

*Chen-Oster v. Goldman Sachs & Co.*,
   2023 WL 7325264 (S.D.N.Y. Nov. 7, 2023)..................................................................23

*In re Citric Acid Antitrust Litig.*,
   145 F. Supp. 2d 1152 (N.D. Cal. 2001)........................................................................19

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ...................................................................................... 25

*Cottle v. Plaid Inc.*,
   340 F.R.D. 356 (N.D. Cal. 2021)..................................................................................22

*In re Domestic Air Transp. Antitrust Litig.*,
   148 F.R.D. 297 (N.D. Ga. 1993) ................................................................................ 33

*In re Endosurgical Prod. Direct Purchaser Antitrust Litig.*,
   2008 WL 11504857 (C.D. Cal. Dec. 31, 2008)........................................................... 31

*Eisen v. Carlisle & Jacquelin*,
   479 F.2d 1005 (2d Cir. 1973) .....................................................................................18

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ....................................................................................................18

*Garner v. State Farm Mut. Auto. Ins. Co.*,
   2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ..............................................................17

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ..............................................................................*passim*

*Harris v. Marhoefer*,
   24 F.3d 16 (9th Cir. 1994) ...........................................................................................23

iv

*Hefler v. Pekoc*,
    802 F. App'x 285 (9th Cir. 2020) .................................................................21

*Hefler v. Wells Fargo & Co.*,
    2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ...............................................21, 24

*In re Heritage Bond Litig.*,
    2005 WL 1594403 (C.D. Cal. June 10, 2005) ....................................................23

*In re High-Tech Emp. Antitrust Litig.*,
    2015 WL 12991307 (N.D. Cal. Mar. 3, 2015) ...............................................14, 16

*In re High-Tech Emp. Antitrust Litig.*,
    2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) ................................................25, 33

*Ingram v. Coca-Cola Co.*,
    200 F.R.D. 685 (N.D. Ga. 2001) ........................................................................23

*In re Korean Ramen Antitrust Litig.*,
    2017 WL 235052 (N.D. Cal. Jan. 19, 2017) .......................................................18

*Lazy Oil Co. v. Witco Corp.*,
    95 F. Supp. 2d 290 (W.D. Pa. 1997) ..................................................................32

*In re Lidoderm Antitrust Litig.*,
    2018 WL 4620695 (N.D. Cal. Sep. 20, 2018) ....................................................22

*Linney v. Cellular Alaska Partn.*,
    151 F.3d 1234 (9th Cir. 1998) ..............................................................................6

*In re Lithium Ion Batteries Antitrust Litig.*,
    2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ....................................................17

*In re Lithium Ion Batteries Antitrust Litig.*,
    2022 WL 16959377 (9th Cir. Nov. 16, 2022). ....................................................17

*Loeza v. JPMorgan Chase Bank, NA*,
    2015 WL 13357592 (S.D. Cal. Aug. 18, 2015) ..................................................21

*Low v. Trump Univ., LLC*,
    881 F.3d 1111 (9th Cir. 2018) ............................................................................38

*Mandalevy v. BofI Holding, Inc.*,
    2022 WL 1556160 (S.D. Cal. May 17, 2022)....................................................22

v

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ..................................................................36

*MCI Communications Corp. v. American Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) ............................................................... 18

*Meijer, Inc. v. 3M*,
    2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) .......................................31

*Meijer, Inc. v. Abbott Labs.*,
    2011 WL 13392313 (N.D. Cal. Aug. 11, 2011) ..............................23, 35

*Metrow v. Liberty Mut. Managed Care LLC*,
    2018 WL 6265085 (C.D. Cal. June 14, 2018) .......................................15

*Moorer v. StemGenex Med. Grp., Inc.*,
    2021 WL 4993054 (S.D. Cal. Oct. 26, 2021) ............................ 13, 16, 37

*Musgrove v. Jackson Nurse Pros., LLC*,
    2022 WL 2092656 (C.D. Cal. Jan. 11, 2022) ........................................38

*In re NFL "Sunday Ticket" Antitrust Litig.*,
    2024 WL 3628118 (C.D. Cal. Aug. 1, 2024) ........................................ 34

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ................................................*passim*

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ...........................................................25, 38

*Olean Wholesale Grocery Co-Op v. Bumble Bee Foods LLC*,
    993 F.3d 774 (9th Cir. 2021) ................................................................10

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008)..................................................36

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ...........................................................37, 38

*In re Packaged Ice Antitrust Litig.*,
    2011 WL 6209188 (E.D. Mich. Dec. 13, 2011) ...............................17, 31

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019)...................................25, 31

vi

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ...................................................................................37

*In re Prandin Direct Purchaser Antitrust Litig.*,
    2015 WL 1396473 (E.D. Mich. Jan. 20, 2015) ...................................... 32

*In re Processed Egg Prod. Antitrust Litig.*,
    881 F.3d 262 (3d Cir. 2018) ................................................................ 19

*In re Remeron End-Payor Antitrust Litig.*,
    2005 WL 2230314 (D.N.J. Sept. 13, 2005) .......................................... 25

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    2020 WL 6193857 (E.D.N.Y. Oct. 7, 2020) .......................................... 33

*Rodriguez v. Nike Retail Servs., Inc.*,
    2022 WL 254349 (N.D. Cal. Jan. 27, 2022) ...................................22, 23

*Rodriguez v. W. Publg. Corp.*,
    563 F.3d 948 (9th Cir. 2009) ...........................................................*passim*

*Roes 1-2 v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ............................................................38

*Stephens v. US Airways Grp., Inc.*,
    102 F. Supp. 3d 222 (D.D.C. 2015) ......................................................4

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    2024 WL 815503 (E.D. Pa. Feb. 27, 2024) ......................................23, 33

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011) ................................................................ 33

*Szymborski v. Ormat Techs., Inc.*,
    2012 WL 4960098 (D. Nev. Oct. 16, 2012) ..........................................14

*In re Tableware Antitrust Litig.*,
    484 F. Supp. 2d 1078 (N.D. Cal. 2007)................................................37

*In re Tableware Antitrust Litig.*,
    2007 WL 4219394 (N.D. Cal. Nov. 28, 2007) ...................................... 32

*Tawfilis v. Allergan, Inc.*,
    2018 WL 4849716 (C.D. Cal. Aug. 27, 2018).................................23, 32

vii

*In re Titanium Dioxide Antitrust Litig.*,
   959 F. Supp. 2d 799 (D. Md. 2013) ........................................................................... 32

*In re Titanium Dioxide Antitrust Litig.*,
   2013 WL 5182093 (D. Md. Sept. 12, 2013) ............................................................... 32

*Trombley v. Nat'l City Bank*,
   826 F. Supp. 2d 179, 195 (D.D.C. 2011) ..................................................................... 4

*Trosper v. Stryker Corp.*,
   2015 WL 5915360 (N.D. Cal. Oct. 9, 2015) ...............................................................23

*United States Football League v. National Football League*,
   644 F. Supp. 1040 (S.D.N.Y. 1986) ........................................................................... 18

*In re Urethane Antitrust Litig.*,
   2016 WL 4060156 (D. Kan. July 29, 2016) ................................................................23

*Vasquez v. Coast Valley Roofing, Inc.*,
   266 F.R.D. 482 (E.D. Cal. 2010) ...........................................................................22, 23

*Victorino v. FCA US LLC*,
   2023 WL 3296155 (S.D. Cal. May 5, 2023) ...............................................................16

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Li*ab. Litig.,
   229 F. Supp. 3d 1052 (N.D. Cal. 2017)......................................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ...................................................................................................14

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ...................................................................................17, 18

*In re Wellbutrin SR Antitrust Litig.*,
   2011 WL 13392296 (E.D. Pa. Nov. 21, 2011) ........................................................... 32

*In re Wholesale Grocery Prod. Antitrust Litig.*,
   2017 WL 4876277 (D. Minn. Oct. 24, 2017)............................................................. 19

*In re Zillow Grp., Inc. Sec. Litig.*,
   2023 WL 2766264 (W.D. Wash. Apr. 3, 2023)..........................................................38

**Rules**

Fed. R. Civ. P. 23 ...........................................................................................*passim*

**Statutes**

Internal Revenue Code Section 468B ........................................................ 40

**Other Authorities**

2 McLaughlin on Class Actions, § 6:21 (20th ed. 2023) ...........................................38

*Newberg on Class Actions*, § 11:50 (4th ed. 2002).................................................. 17

Connor and Lande, Not Treble Damages: Cartel Recoveries Are Mostly Less Than Single
   Damages, 100 Iowa L. Rev. 1997 (2015) ............................................................. 5

**INTRODUCTION**

Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury ("Plaintiffs") brought the above-captioned action against one defendant, Zuffa, LLC ("Zuffa" or "Defendant") ("Plaintiffs and Zuffa, together, the "Parties").[1] Plaintiffs seek preliminary approval of a renewed, hard-fought, and materially improved proposed class settlement (the "Settlement"). Under the terms of the September 26, 2024 Settlement Agreement,[2] Zuffa has agreed to make cash payments totaling $375 million for the benefit of the *Le* Class *only*.[3] The Settlement would, if approved, affect *only* this case (*i.e.*, the "*Le* Action" or the "Action") and would *not* resolve any claims being pursued in *Johnson, et al. v. Zuffa, LLC, et al.*, No. 2:21-cv-1189 (D. Nev.) (the "*Johnson* Action"). In short, the Settlement would provide immediate and consequential cash relief to the more than one-thousand members of the *Le* Class while also preserving the ability of the members of the proposed class in *Johnson*, which includes hundreds of members of the *Le* Class, to pursue additional damages *and* also significant injunctive relief from this Court in the *Johnson* Action. The augmented Settlement should be preliminarily approved.

As the Court is aware, the Parties had previously reached a settlement (dated April 24, 2024), which sought to resolve the *Le* Action together with the *Johnson* Action for $335 million plus prospective relief (the "Prior Settlement"). The Court denied preliminary approval of the Prior

---

[1] On August 9, 2023, the Court certified the "bout class" in the Action (the "Class" or the "*Le* Class") and appointed all the Plaintiffs in the Action, other than Nathan Quarry, as the class representatives for the Class (the "Class Representatives"). *See* ECF No. 839, at 74-75, 78-79. Plaintiff Nathan Quarry was proffered as a class representative for the "Identity Rights Class," which the Court did not certify. *See* ECF No. 839, at 75-78. The Class Representatives together with Mr. Quarry are collectively referred to as "Plaintiffs."

[2] Citations to the Settlement Agreement will use the format "SA ¶ _." Unless otherwise defined herein, all capitalized terms have the same meanings set forth in the Settlement Agreement, attached as Exhibit 1 to the Joint Supplemental Declaration of Eric L. Cramer, Richard Koffman, and Joseph R. Saveri in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement (the "Supp. Joint Decl."). All citations to the "Prior Joint Decl." are to the declaration submitted on May 21, 2024 in support of the prior settlement (*see* ECF No. 1024-2).

[3] The Class is defined to include all persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the U.S. from December 16, 2010 to June 30, 2017 (the "Class Period"), but excludes all persons who are not residents or citizens of the U.S. unless the UFC paid such persons for competing in a bout fought in the U.S. *See* ECF No. 839, at 79.

1

Settlement for the reasons the Court summarized on the record at the August 19, 2024 status conference. *See* Tr. 5-8 (ECF No. 1039) (the "Denial").

After the Denial, Plaintiffs in the *Le* Action began working on two distinct tracks: (1) vigorous preparation for the trial in the *Le* Action now set for February 3, 2025; and (2) exploring whether the concerns raised by the Court regarding the Prior Settlement could be cured with a new and materially improved settlement.[4] Plaintiffs have succeeded in both endeavors.

Because it is a material improvement over the Prior Settlement—and because it satisfies each of the applicable standards governing class settlements—the Settlement should be preliminarily approved, and notice should be sent to the Class Members to allow this group of highly-trained professional athletes to decide for themselves whether it is satisfactory. As discussed below, in a highly unusual show of support for a class action settlement, more than fifty members of the Class have—before any class notice has been sent out—submitted declarations affirmatively voicing unambiguous support for the Settlement. These ex-UFC fighters view this proposed result as the best of both worlds: it would provide immediate life-changing and significant cash to members of the Class (many of whom are in desperate and urgent need now), while also preserving the ability to pursue injunctive relief and additional damages in the *Johnson* Action.

The Settlement is a precedent-setting result for the Class. According to Professor Eric Posner of the University of Chicago Law School, it is, by far, the largest settlement in a Section 2 monopsony class action in the history of American jurisprudence. Further, and importantly, by including materially more cash for the *Le* Class members, and by leaving the *Johnson* Action in place to be litigated, the Settlement cures each of the issues the Court identified with the Prior Settlement at the August 19,

---

[4] The plaintiffs in the *Johnson* Action took immediate steps to add new and experienced class counsel—the law firm of Lockridge Grindal Nauen, PLLP (www.locklaw.com)—to assist with litigating the matter as well as to serve as an independent voice overseeing any settlement discussions that may occur in that case. The *Johnson* plaintiffs and defendants negotiated a pre-trial schedule for the *Johnson* Action and submitted a status report on September 20, 2024 (*Johnson* Action, ECF No. 155), setting out each side's scheduling proposals. The Court set a Status Conference in the *Johnson* Action for October 22, 2024. There have been no settlement discussions in the *Johnson* Action since the Denial.

2024 Status Conference. *See* Tr. 5-8 (ECF No. 1039).[5]

First, the Settlement would offer members of the *Le* Class a significant amount of money compared to the recoverable damages and considering the real risks of loss or significant delay inherent in the trial and appeal of an antitrust class action. The Court should consider the following facts about the Settlement:

- $375 million for the *Le* Action *alone* is $40 million more than the Prior Settlement included for both *Le* and *Johnson combined*.

- Plaintiffs had initially proposed to allocate 75% of the Prior Settlement to the *Le* Class (75% of $335 million is $251.25 million), and thus this Settlement would increase the amount going to the *Le* Class by $123.75 million. Plaintiffs subsequently proposed to allocate 90% of the Prior Settlement to the *Le* Class (90% of $335 million is $301.5 million), and in that light, this Settlement involves $73.5 million more for the *Le* Class (the "Increased Amount"). In addition to the Increased Amount, this Settlement also preserves the ability of those in both the *Le* and *Johnson* classes to attempt to obtain additional damages and injunctive relief in the *Johnson* Action.

- Class Counsel intend to ask the Court for a reduced fee on the Increased Amount. As a result of that fact, and of the additional funds in this Settlement, *Le* Class Members would recover, on net, 25% more money than under the Prior Settlement.

- The gross Settlement equates to nearly 70% of the total compensation the UFC paid to its entire roster of fighters during the whole *Le* Class Period, *i.e.*, from December 2010 to June 30, 2017 ($375 million out of $538 million). This is an incredible result by any historical measure.

- Under the Settlement, the average *Le* Class Member would recover, after all fees and costs are deducted, ***$250,000***. Thirty-five Class Members would net over $1 million; nearly 100 fighters would net over $500,000; more than 200 fighters would recover over $250,000; over 500 fighters

---

[5] These reasons were: (i) the amount to be allocated to members of the *Le* Class and the proposed class in the *Johnson* Action was too small; (ii) this Action and the *Johnson* Action have distinct litigation postures, where this case has a certified Class and is on the brink of trial, whereas *Johnson* is in early discovery; (iii) the Class Members in this Action seek damages but not injunctive relief, whereas the *Johnson* Action seeks both monetary and injunctive relief; and (iv) members of the proposed *Johnson* include some subject to arbitration provisions and some who are not. *See* Tr. 5-8 (ECF No. 1039).

would net more than $100,000; and nearly 800 would recover over $50,000.

- To date, fifty-six (56) ex-UFC fighters have submitted declarations supporting the Settlement, or otherwise have authorized Class Counsel to confirm their support. *See* Supp. Joint Decl. Exhibits 5-58.[6] This group of 56 collectively comprises 336 bouts during the *Le* Class Period. *Id.* ¶11. The number of affirmative supporters was limited only by the amount of time Class Counsel had to canvass the Class. Given the unprecedented outpouring of support to date—and the lack of a whisper of disapproval from any Class Member—Class Counsel are confident that the vast majority of Class Members endorse the Settlement. As the unprecedented declarations make clear, the Settlement, if approved, would have an immediate, substantial, and positive impact on hundreds upon hundreds of Class Members and their families. Many declarants state that the Settlement is far more appealing than the possibility of more money several years from now—especially considering the real risk that there could be no recovery at all if this Settlement is rejected. This case has been pending for a decade. If the Court turns down the Settlement, even if Plaintiffs were to win at trial, succeed in obtaining the entry of a judgment, and then uphold the judgment on appeal, Class Members would need to wait many more years before they have a chance of seeing one cent from this case.[7] These are risks that Class Members do not want to take, and time Class Members do not want to lose. This wealth of support from the Class is the strongest possible factor in favor of preliminary approval.

- The Settlement amounts to a significant share of the total damages computed by Plaintiffs' economists—more than any prior settlement of a Section 2 class action and likely in the 95th percentile of all antitrust class action settlements in recent memory. Dr. Hal Singer computed

---

[6] Fifty-four ex-fighters have executed declarations in support of the Settlement, including three of the five class representatives and plaintiff Nate Quarry. Further, the two remaining class representatives have affirmed their support but not yet had time to complete declarations. *See* Supp. Joint Decl. ¶11.

[7] "[T]he delay in providing relief to the class if this case were to be litigated is a factor strongly supporting the compromise reached by the parties." *See, e.g., Stephens v. US Airways Grp., Inc.,* 102 F. Supp. 3d 222, 227 (D.D.C. 2015) (quotation omitted)); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 195 (D.D.C. 2011) (same).

4

damages to the Class ranging from $811 million to $1.6 billion.[8] One of Dr. Singer's median models yielded damages of $894 million. *See* SR1 ¶250 & Table10. Plaintiffs' other economic expert, Prof. Andrew Zimbalist, calculated damages of $981.8 million.[9] Given that Prof. Zimbalist's sole estimate aligns with the middle of the range of Dr. Singer's estimates, a reasonable jury that sided with Plaintiffs on every other issue and element in the case could conclude that the damages number would be around $900 million, *i.e.*, the only figure that both of Plaintiffs' experts would justify. In that case, **the $375 million payment would amount to more than 40% of the estimated single damages and 14% of treble damages**.[10]

Given this array of facts, under binding law, this Settlement should be approved. The Ninth Circuit has made clear that in cases like this one, where experienced attorneys negotiate an arm's-length deal, with the aid of a preeminent mediator, it is not the Court's role to "weigh[] the merits of the class's case against the settlement amount and quantified the expected value of fully litigating the matter." *Rodriguez v. W. Publg. Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). In *Rodriguez*, a case involving an antitrust claim brought on behalf of a class that purchased bar review courses, the Ninth Circuit explained that "[w]e put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution." *Id.* The Ninth Circuit also rejected the argument that the district court should

---

[8] *See* Expert Report of Hal J. Singer, Ph.D., August 31, 2017 ("SR1"), ECF No. 518-3, at ¶252 & Table 11; ¶250 & Table10; ¶248 & Table 9 (Bellator model with $811.2 million single damages).

[9] *See* Expert Report of Andrew Zimbalist in *Cung Le, et al. v. Zuffa, LLC*, August 30, 2017 ("ZR1"), ECF No. 518-5, ¶140(c).

[10] Antitrust class actions invariably settle based on the potential single damages—otherwise the defendant might as well take the case to trial. That is true even in horizontal price-fixing cases that are easier to prove (and for juries to understand) than monopsony cases. *See* Connor and Lande, Not Treble Damages: Cartel Recoveries Are Mostly Less Than Single Damages, 100 Iowa L. Rev. 1997 (2015) (reporting median settlements of 37% of claimed single damages across a sample of 71 antitrust cartel cases).

have measured the settlement against the value of potential treble damages. *Id.* at 964-65.[11]

Indeed, settlements are the product of negotiations and compromise, and thus courts have long held that it is not relevant to ask "whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate, and free from collusion." *Hanlon v. Chrystler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 338 (2011). In short, the recovery here—which would net Class Members 25% more than the Prior Settlement and a material portion of available damages—falls well in the range of reasonable recovery and should be approved for that reason alone.

*Second*, the Settlement resolves this Action and only this Action. *See* SA § 10(a) & p.3 ("WHEREAS, this Settlement, if it receives Final Approval, will resolve the Action in full, but will have no effect on the *Johnson* Action, which will be separately litigated"). The *Johnson* Action is unaffected by the Settlement, and litigation seeking damages and injunctive relief will continue in that case. Nearly all the issues the Court identified as impediments to approval of the Prior Settlement— whether as to the amount of the monetary component allocated to the *Johnson* case; that *Johnson* was in its early stages; the availability and nature of any injunctive relief; and any issues associated with arbitration clauses that relate only to members of the proposed *Johnson* class—have been removed as potential impediments to resolution.

*Third*, at the time of the Settlement, the Parties were fully informed about the strengths, weaknesses, and risks of the Action given that Plaintiffs had: (a) completed a lengthy pre-filing investigation without the assistance of any governmental enforcement action (*see* Prior Joint Decl. ¶¶7- 10); (b) engaged in many years of detailed fact and expert discovery, motion practice, and trial preparation (*see generally id.* ¶¶16-230); and (c) undertook multiple efforts to settle the matter,

---

[11] *See also Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) (citing *Linney v. Cellular Alaska Partn.*, 151 F.3d 1234, 1242 (9th Cir. 1998) (it is "well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial"); *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("[a]lthough a larger award was theoretically possible, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes'"); *Alvarez v. Sirius XM Radio Inc.,* 2021 WL 1234878, at *7 (C.D. Cal. Feb. 8, 2021) ("a full recovery is often not possible in a settlement . . . and a partial recovery does not render a settlement unreasonable" (internal quotation marks omitted)).

including three full-day mediation sessions with Hon. Layn Phillips (ret.) spread over a series of years (in 2017, 2019, and 2023) (*see id.* ¶¶5, 231-32), and an additional mediation session with Judge Phillips following the Denial (*see* Supp. Joint Decl. ¶9). Ultimately, the improved Settlement was reached when both sides accepted a mediator's proposal. *See* Supp. Joint Decl. ¶9.

*Fourth*, the Settlement is a substantial achievement. Worker-side antitrust class actions brought under Section 2 of the Sherman Act are both rare and important. In connection with the earlier settlement, Plaintiffs solicited input from a highly regarded expert in the application of antitrust law to labor markets, Prof. Eric Posner of the University of Chicago Law School. He observed, based on his research, that the Action "is the first [labor-side claim under Section 2 of the Sherman Act] ever to survive summary judgment, reach class certification, or even survive a motion to dismiss."[12] He continued by stating that a settlement of the Action is significant, in part, because it "will encourage more plaintiffs to bring cases to enforce an important but neglected policy embodied in the antitrust laws—that of ensuring that labor markets, and not just product markets, are competitive." *Id.*

In short, the Settlement here reflects an important resolution of a long-running, hard-fought, and complex case against a large and powerful company in one of the country's most popular sports. Prof. Posner's observations made as to the Prior Settlement are even more relevant as to the new and augmented Settlement. Because it leaves the *Johnson* Action unaffected, the Settlement preserves the ability of several hundred members of the *Le* Class to attempt to recover additional damages in the *Johnson* Action; allows for the further adjudication of the enforceability of the arbitration clauses and class action bans in fighter agreements; opens up the possibility for members of the proposed *Johnson* class to obtain significant monetary relief; allows the pursuit of significant prospective relief; and immediately provides a significant life-changing amount of cash to hundreds of Class Members—many of whom are struggling right now to meet the urgent needs of themselves and their families. As the dozens of declarations of the ex-UFC fighters make clear, many of these Class Members do not have three or more years to spare, nor do they wish to risk $375 million now for an uncertain outcome at trial

---

[12] Declaration of Prof. Eric A. Posner in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement ("Posner Decl.") ¶1; Prior Joint Decl. ¶245. The Posner Decl. is attached as Exhibit 2 to the Prior Joint Decl.

or on appeal.

As detailed below, the Settlement is fair, reasonable, and adequate. Accordingly, Plaintiffs request that the Court preliminarily approve the Settlement, direct that notice be provided to the Class, and grant other relief essential to effectuating the Settlement, including setting a date for a Fairness Hearing. Counsel for Defendant has reviewed Plaintiffs' motion and proposed order and certain other related supporting papers and joins in the relief requested.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.       Investigation and Filing of the Action

Co-Lead Class Counsel[13] and Supporting Counsel[14] opened investigations into potentially anticompetitive conduct in the Mixed Martial Arts ("MMA") industry well-before filing the Action and without the benefit of a governmental enforcement action. *See* Prior Joint Decl. ¶¶7-8. Co-Lead Counsel and Supporting Counsel, in conjunction with the Plaintiffs, devoted thousands of hours to the pre-complaint investigation of this matter. *Id.*

### B.       Motions to Transfer and Dismiss

On January 30, 2015, Zuffa moved to transfer the Action from the United States District Court for the Northern District of California to this District, and the California Court granted that motion on June 2, 2015. *Id.* ¶¶11, 13. While the motion to transfer was pending, Zuffa moved to dismiss the complaints. *Id.* ¶12. On September 25, 2015, after briefing and oral argument, the Court denied Zuffa's motion to dismiss from the bench, issuing a written Order on October 19, 2016. *Id.* ¶14.

---

[13] Co-Lead Class Counsel refers to Berger Montague PC, Cohen Milstein Sellers & Toll PLLC, and the Joseph Saveri Law Firm LLP.

[14] Supporting Counsel refers to all or some of the following firms: Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP, Kemp Jones, LLP, Warner Angle Hallam Jackson & Formanek PLC, Clark Hill PLC, The Radice Law Firm, and Spector Roseman Kodroff & Willis. On July 31, 2015, the Court appointed Berger Montague, Cohen Milstein, and JSLF as Interim Co-Lead Class Counsel, and Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP ("Wolf Rifkin") as Interim Liaison Counsel for the then-proposed class in the Action. *See* ECF No. 140. In the Order certifying the Class, the Court appointed Wolf Rifkin as one of the Class Counsel. *See* ECF No. 839. The lead lawyer at Wolf Rifkin was Don Springmeyer. Mr. Springmeyer changed law firms as of January 1, 2021, and his new law firm, Kemp Jones, LLP ("Kemp Jones"), took over the role of representing Plaintiffs and the Class. *See* ECF No. 780.

8

### C. Fact Discovery

Co-Lead Class Counsel, along with Supporting Counsel, continued to litigate the case aggressively, proceeding with voluminous and complex fact discovery. *See id.* ¶¶16-76. Plaintiffs' fact discovery work included ensuring that the UFC and certain third parties preserved relevant electronically stored data and information ("ESI"), *id.* ¶¶20-23; pursuing focused written discovery from Zuffa and third parties (including by litigating the scope of productions and purported work product and privilege claims), *id.* ¶¶24-57; taking nearly 30 depositions of fact witnesses (in addition to seven days of testimony of Zuffa's Rule 30(b)(6) designees), *id.* ¶¶58-61; scouring publicly available sources of relevant information and evidence (including data and videotaped statements of key witnesses in the case), *id.* ¶¶62-66; collecting and reviewing document productions from the Class Representatives, *id.* ¶¶67-71; and preparing the Class Representatives for their depositions and defending those depositions. *Id.* ¶¶72-76.[15]

### D. Expert Discovery

Co-Lead Class Counsel retained three economic experts: Hal J. Singer, Ph.D., Professor Andrew Zimbalist, and Professor Alan Manning, as well as a forensic accounting expert, Guy Davis. *Id.* ¶¶82-84. Co-Lead Class Counsel collectively spent substantial time and effort working with these experts to facilitate their understanding of the case and the record; their preparation of their expert reports; and their preparation for testimony at their depositions, at the class certification hearing, and at the anticipated April 2024 trial. *Id.* ¶87; *see also id.* ¶¶82-125. In addition, Co-Lead Class Counsel also analyzed the reports produced by Zuffa's five experts, who collectively produced reports totaling 650 pages. Plaintiffs deposed each of Zuffa's experts in 2017. *See id.* ¶¶127-30.

---

[15] In addition to the Class Representatives' participation in the collection of documents in their possession, custody, and control, as well as preparing and sitting for their depositions, they were actively involved in the case, attending: (1) regular teleconferences throughout the fact discovery period to stay current with case developments; (2) numerous court hearings, including for the motion to transfer, motion to dismiss, motion for summary judgment, motion for class certification, and several other hearings and status conferences; (3) three mediation sessions; and (4) preparation sessions for their trial testimony. *Id.* ¶¶77-81.

### E.   Class Certification and *Daubert* Proceedings

#### 1.   Class Certification and *Daubert* Briefing.

Following the completion of fact and expert discovery, Co-Lead Class Counsel prepared a class certification motion and brief along with supporting materials, followed by a reply brief that responded to Zuffa's opposition brief arguments. *Id.* ¶¶131-32. On the same day that Plaintiffs filed their Motion for Class Certification (February 16, 2018), Zuffa moved to exclude all of Plaintiffs' experts. Co-Lead Class Counsel successfully opposed those motions, and Zuffa's subsequent renewal of those motions. *See id.* ¶¶133-35.

#### 2.   The Evidentiary Hearing on Class Certification.

The Court held a seven-day evidentiary hearing on Plaintiffs' Motion for Class Certification on August 26, August 27, August 28, August 30, September 12, September 13, and September 23, 2019. *See id.* ¶145, *see also id.* ¶¶136-47. On September 12, 2019, at the Court's request, the Parties submitted supplemental relating to class certification. *Id.* ¶147.

#### 3.   Post-Hearing Proceedings on Class Certification.

Over the next few years, Co-Lead Class Counsel attended multiple status conferences, some by videoconference due to the coronavirus pandemic. *Id.* ¶148. At the second of these status conferences, on December 10, 2020, the Court announced its intention to grant Plaintiffs' Motion for Class Certification as to the Bout Class. *Id.* ¶149.[16] On August 9, 2023, the Court granted in part Plaintiffs'

---

[16] Following that December 10, 2020 status conference, on April 6, 2021, a Ninth Circuit panel vacated a district court order certifying three classes in a price-fixing case. *Olean Wholesale Grocery Co-Op v. Bumble Bee Foods LLC*, No. 19-56514, 993 F.3d 774 (9th Cir. 2021). Zuffa raised that decision to this Court on April 8, 2021. Prior Joint Decl. ¶151. Co-Lead Class Counsel filed a response to contextualize *Olean*'s applicability to this litigation. *Id.* The Ninth Circuit subsequently vacated the panel order and took the matter up *en banc. Id.* Then on April 8, 2022, the Ninth Circuit filed its opinion in *Olean* reversing the panel decision and affirming the district court's certification of three classes. *Id.* (citing *reh'g en banc*, 31 F.4th 651 (9th Cir. 2022)). The Supreme Court denied certiorari in *Olean* on November 14, 2022. Prior Joint Decl. ¶151.

10

Motion for Class Certification, certifying the proposed Bout Class (and denying certification of the proposed identity rights class). *Id.* ¶152.[17]

### 4.    Notice of Class Certification to the Class.

After the Ninth Circuit denied Zuffa's Rule 23(f) petition, Co-Lead Class Counsel solicited bids from claims administration vendors and selected Angeion Group to issue notice to the Class. Prior Joint Decl. ¶153. Co-Lead Class Counsel worked with Angeion to develop a Notice Plan and effectuate notice to the Class. *Id.* Not a single member of the Class opted out. *Id.*

### F.    Zuffa's Motions for Summary Judgment

Zuffa filed three separate motions for summary judgment. *Id.* ¶159. First, during discovery, Zuffa filed a motion for partial summary judgment seeking to dismiss as untimely Quarry's claims relating to identity rights. *Id.* ¶160. Plaintiffs opposed the motion, and the Court ultimately denied it without prejudice. *Id.* Second, following briefing on Plaintiffs' Motion for Class Certification and Zuffa's motions to exclude Plaintiffs' experts, Zuffa filed another motion for summary judgment seeking summary dismissal of the entire case, which Plaintiffs opposed. *Id.* ¶161. The Court denied that motion without prejudice. *Id.* Third, following the Court's Class Certification Order, Zuffa renewed its motion for summary judgment. Plaintiffs opposed the motion, and the Court denied it on January 18, 2024. *Id.* ¶¶162-63.

### G.    Pre-Trial Proceedings

### 1.    Scheduling Trial.

At a status conference on August 21, 2023, the Court announced that a trial on liability and damages in the Action would take place in March or April of 2024, later informing the Parties that trial would commence on April 8, 2024. *Id.* ¶¶183-84. The Court later re-set the trial for April 15, 2024. *Id.* Subsequently, after the Denial, the Court reset the trial date to February 3, 2025. *See* ECF No. 1040.

### 2.    Pretrial Tasks and Work.

As the Action sped toward the then April trial, Class Counsel engaged intensely in preparation.

---

[17] Zuffa filed a petition pursuant to Fed. R. Civ. P. 23(f), seeking to appeal the Court's Order certifying the Bout Class. Prior Joint Decl. ¶¶154-156. Co-Lead Class Counsel opposed Zuffa's petition, filed a response opposing Zuffa's request for a reply brief, and filed a proposed sur-reply. *Id.* The Ninth Circuit denied Zuffa's 23(f) Petition on November 1, 2023. *Id.*

11

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT, PRELIMINARY APPROVAL OF THE PLAN OF ALLOCATION, APPROVAL OF THE NOTICE PLAN, AND APPROVAL OF THE PROPOSED SCHEDULE FOR COMPLETING THE SETTLEMENT PROCESS

Prior Joint Decl. ¶192, ¶¶196-218, 226-33. On March 4, 2024, the Court heard argument on the motions *in limine*. *Id.* ¶214. Plaintiffs prevailed on certain important motions *in limine* at that hearing, including on a motion seeking to strike 13 allegedly late-disclosed witnesses from Zuffa's witness list and to strike evidence from after the June 30, 2017 close of the *Le* Class Period. *Id.* ¶215. The Parties filed Trial Briefs on February 22, 2024. *Id.* ¶¶220-21.

### H.    Prior Settlement and Return to Trial Preparation

On May 21, 2024, Plaintiffs moved for preliminary approval of the Prior Settlement (dated April 24, 2024), proposing to resolve the claims in both this Action and in the *Johnson* Action. Trial preparation work ceased while Plaintiffs prepared for a June 14, 2024 conference with the Court. *See* Supp. Joint Decl. ¶7. At that conference, the Court directed Plaintiffs to submit a supplemental brief addressing certain concerns the Court raised about the Prior Settlement. *Id.* Plaintiffs submitted their supplemental brief on June 24, 2024 responding to the Court's concerns and providing a revised plan of allocation.[18] *Id.* Plaintiffs also supplied additional detailed information about the proposed distribution of the net settlement funds for *in camera* review on June 24, 2024 and July 8, 2024. *See* ECF Nos. 1030, 1035. The Court held a second status conference on July 12, 2024 to address the issues covered by the Supplemental Brief, and on July 30, 2024, the Court denied preliminary approval of the Prior Settlement (the "Denial"). *See* ECF Nos. 1037, 1038.

On August 19, 2024, the Court held another conference where it reset the trial date to February 3, 2025. ECF No. 1040. Plaintiffs had already returned to the process of preparing for trial following the Denial. *Id.* ¶8. Trial preparations have included work on preparing exhibits, reaching out to Plaintiffs and other witnesses to secure availability for trial, initiating meet and confer discussions with Defendant on various subjects, and returning to other projects necessary for trial that were in-process at the time the Prior Settlement was reached. *Id.* Because the Court made clear that it would not stay the case or move the trial date unless and until it granted preliminary approval, trial preparations remain ongoing. *Id.*; *see also* ECF No. 1042.

---

[18] *See* Supplemental Brief in Support of Motion for Preliminary Approval of the Settlement, ECF No. 1029, at 5 (June 24, 2024) (the "Supplemental Brief"). Plaintiffs incorporate by reference the Supplemental Brief as if fully set forth in this memorandum. Portions of the Supplemental Brief appear in Parts II.C.1, II.C.4, and II.G *infra*.

**THE AUGMENTED SETTLEMENT**

Concurrently with these trial preparation activities described above, the Parties in this Action, without the involvement of the *Johnson* Action parties, renewed settlement discussions. *Id.* ¶9. As with the Prior Settlement, these discussions also involved a mediator, the Hon. Layn Phillips (ret.). *Id.* The Parties revisited the strengths and weaknesses of their respective claims and defenses, the risks of trial and appeals, *and* gave careful consideration to the Court's stated reasons for the Denial. *Id.* Through these arms'-length negotiations, the Parties executed the improved Settlement. *Id.*

The Settlement Agreement provides valuable economic relief to the Class in the amount of $375 million in cash to be distributed to eligible Class Members. *See* SA ¶5. The cash payment comprises a significant percentage of damages sought by Plaintiffs and will provide compensation to the members of the Class in the form of a large percentage of the amount of money these fighters earned during their UFC fighting careers. *See* Supp. Joint Decl. ¶12. The Settlement increases each *Le* Class Member's net recovery as compared to the Prior Settlement by 25%. *Id.* The Settlement also leaves the *Johnson* Action unaffected. *Id.* ¶9. There has been a groundswell of support from Class Members in support of the Settlement. *Id.* ¶¶10-11.

**ARGUMENT**

**I.      Standards for Preliminary Approval of the Settlement**

Governing law supports preliminary approval. There is "'a strong judicial policy' that favors class action settlements." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 229 F. Supp. 3d 1052, 1061 (N.D. Cal. 2017) (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015)); *Moorer v. StemGenex Med. Grp., Inc.*, 2021 WL 4993054, at *2 (S.D. Cal. Oct. 26, 2021) ("Voluntary conciliation and settlement are the preferred means of dispute resolution in complex class action litigation."); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("Unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.").[19]

A class action settlement requires Court approval pursuant to Fed. R. Civ. P. 23(e). This Rule

---

[19] All references to internal quotations or cases cited are omitted from the citations in this memorandum except where expressly provided.

requires the Court to consider whether: (a) the class was adequately represented; (b) the settlement was negotiated at arm's-length; (c) the relief provided to the class is adequate; and (d) the proposal treats class members equitably. *See* Fed. R. Civ. P. 23(e)(2). Later in the process, at the final approval stage, the Ninth Circuit has traditionally identified the following factors for a court's analysis, which overlap with the Rule 23(e)(2) requirements: "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining a class action status throughout the trial; the amount offered in the settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Szymborski v. Ormat Techs., Inc.*, 2012 WL 4960098, at *2 (D. Nev. Oct. 16, 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).[20]

To grant preliminary approval, the Court does not have to undertake an in-depth consideration of all the relevant factors necessary for final approval. The issue to be resolved now is only whether "the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1). The "[c]ourt need only find [the settlement] falls within 'the range of reasonableness.'" *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 12991307, at *1 (N.D. Cal. Mar. 3, 2015). Preliminary approval is viewed as an "'initial evaluation' of the fairness of the proposed settlement made by the court on the basis of written submissions and informal presentation from the settling parties." *Id.* (citing Manual § 21.632).

The Settlement satisfies the elements of Rule 23(e)(2), as well as those additional factors identified in *Hanlon* that do not overlap with the Rule 23(e)(2) elements (extent of discovery completed and stage of proceedings, risk of maintaining class actions status, and experience and views of Class

---

[20] Overruled on other grounds by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

Counsel).[21] Accordingly, notice of the Settlement should be issued to the Class pursuant to the plan of notice (the "Notice Plan"), as discussed in more detail at Part III *infra*.

## II.     The Settlement Satisfies the Elements for Preliminary Approval

### A.  The Settlement Classes Have Been Adequately Represented

Plaintiffs satisfy the first requirement of Rule 23(e)(2), which asks whether "the class representatives and class counsel have adequately represented the class[.]" Fed R. Civ. P. 23(e)(2)(A). Determining adequacy requires "[r]esolution of two questions . . . : (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Both favor preliminary approval here.

There are no conflicts of interest among the Class Representatives and Class Counsel with the members of the Class. The Court already found Class Counsel and the Class Representatives adequate when it certified the Class. *See* ECF No 839, at 17-18, 78-79. The extent and breadth of Class Counsel's efforts in litigating the Action is described in the Prior Joint Decl. (¶¶7-230), as well as the Supp. Joint Decl. (¶¶7-8).

### B.  The Settlement Was Reached Through Arm's-Length Negotiations

The Settlement further satisfies the second element of Rule 23(e)(2), which requires that the Settlement result from arm's-length negotiations. *See* Fed. Civ. P. Rule 23(e)(2)(B). Class settlements are presumed fair when they are reached "following sufficient discovery and genuine arm's-length negotiation." *DIRECTV*, 221 F.R.D. at 528. "That the settlement was reached with the assistance of an experienced mediator further suggests that the settlement is fair and reasonable."

---

[21] The *Hanlon* factors addressing the strength of plaintiffs' case, the risks and costs of further litigation, and the amount of settlement generally overlap with Rule 23(e)(2)(C) addressing the adequacy of the relief obtained via settlement. Two of the factors the Ninth Circuit lists in *Hanlon* are not pertinent to preliminary approval here: (i) there was no involvement of a government participant in the litigation to examine (although that the Settlement was obtained without any benefit of government assistance weighs in favor of preliminary approval (*see*, *e.g.*, *Metrow v. Liberty Mut. Managed Care LLC*, 2018 WL 6265085, at *9 (C.D. Cal. June 14, 2018) (absence of government participant in the action favors approval)); and (ii) evaluating the reaction of the class is conducted at the final approval stage following notice, *see Hanlon*, 150 F.3d at 1026, though the outpouring of support for the Settlement is a strong indication that it should be preliminarily approved.

*Moorer*, 2021 WL 4993054, at *5. Each of these elements is present here.

 *First*, the Parties engaged in significant discovery, both fact and expert, and analysis of that discovery through to the eve of trial. *See* Prior Joint Decl. ¶¶16-130; Supp. Joint Decl. ¶¶7-8. That familiarity with the record enabled Class Counsel to develop a comprehensive understanding of the claims, the litigation risks, and the value of the claims prior to settling the Action.[22]

 *Second*, the Parties reached the Settlement through arm's-length negotiations undertaken in good faith by highly experienced counsel, including full day mediations held years apart (in 2017, 2019, and 2023), as well as an additional mediation session where the Parties carefully considered the Court's stated reasons for the Denial. *See* Prior Joint Decl. ¶¶231-34; Supp. Joint Decl. ¶9. After each mediation session, the Parties continued discussions through the highly experienced mediator.[23] *See id.* And, indeed, the ultimate resolution involved the Parties' acceptance of the recommendation of one of the country's most experienced and highly respected mediators. *See* Supp. Joint Decl. ¶9.

### C. The Relief Provided by the Settlement Is More Than Adequate

 The Settlement satisfies the third requirement of Rule 23(e), namely that the relief provided by the Settlement is adequate. Fed. R. Civ. P. 23(e)(2)(C). The rule directs the Court to consider four factors as part of this analysis: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of distributing relief to the class; (iii) the terms and timing of attorneys' fees; and (iv) any related agreements. *Id.* at Rule 23(e)(2)(C)(i)-(iv). A related factor in the Ninth Circuit is the amount offered in the settlement. *See Hanlon*, 150 F.3d at 1026. Each of these factors supports preliminary approval.

#### 1. The Costs, Risks, and Delay of Trial and Appeal.

 "[U]nless the settlement is clearly inadequate, its acceptance and approval are preferable to

---

[22] *See DIRECTV*, 221 F.R.D. at 527 (settlement after discovery approved "because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case"); *Victorino v. FCA US LLC*, 2023 WL 3296155, at *5 (S.D. Cal. May 5, 2023) (preliminary approval where "Plaintiff thoroughly investigated and researched the claims in litigating this action and preparing [for] trial").

[23] *Id*; *see Abadilla v. Precigen, Inc.*, 2023 WL 7305053, at *3 (N.D. Cal. Nov. 6, 2023) (settlement mediated before J. Phillips (ret.) preliminary approved); *High-Tech Emp.*, 2015 WL 12991307, at *1 (same); *Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al.*, No. 20-cv-2600, ECF No. 336 (W.D. Tenn. Apr. 25, 2023) (same (citing preliminary approval brief identifying J. Phillips as mediator)).

16

lengthy and expensive litigation with uncertain results." *DIRECTV*, 221 F.R.D. at 526 (quoting *Newberg on Class Actions*, § 11:50, at 155 (4th ed. 2002)). The Court "may presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery." *Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010). While Co-Lead Class Counsel believe that the claims asserted in the Action are meritorious, the continued prosecution of the Action would pose significant risks, substantial delay, and additional costs. *See generally* Prior Joint Decl. ¶¶246-56. Zuffa has vigorously asserted multiple challenges to the merits of Plaintiffs' claims, and defended by arguing, among many other things, that fighters and the sport more generally benefited from the challenged conduct, that UFC fighter pay rose significantly over time, that the UFC's acquisitions saved failing promotions, and that the UFC's success was due to procompetitive and not anticompetitive conduct. *See* Prior Joint. Decl. ¶¶248-49. While the Class was certified and its petition for interim appellate review denied, Zuffa would still have had the ability to challenge certification on appeal after trial. *Id.* ¶250.

Trial also presents real risks. Even with beneficial rulings finding Plaintiffs' expert testimony on damages to be admissible and reliable, Plaintiffs still face the risk of proving at trial the existence and extent of damages, as well as the other elements of their claims. "Antitrust cases are particularly risky, challenging, and widely acknowledge[d] to be among the most complex actions to prosecute." *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020);[24] *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("Federal antitrust cases are complicated, lengthy, and bitterly fought."); *In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *19 (E.D. Mich. Dec. 13, 2011) (Antitrust trials are "arguably the most complex action[] to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome.").

The annals of antitrust litigation history are littered with examples of plaintiffs receiving little or no damages despite having engaged in extensive litigation—even when such plaintiffs succeeded in

---

[24] *Affirmed*, No. 21-15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022).

17

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT, PRELIMINARY APPROVAL OF THE PLAN OF ALLOCATION, APPROVAL OF THE NOTICE PLAN, AND APPROVAL OF THE PROPOSED SCHEDULE FOR COMPLETING THE SETTLEMENT PROCESS

establishing the defendants' liability.[25] One such well-known example is the monopolization case brought by the United States Football League against the National Football League where the jury, after a ten-week trial, returned unanimous verdicts against the defendant but concluded the plaintiff had suffered only $1.00 in damages. *See United States Football League v. National Football League*, 644 F. Supp. 1040, 1041-42 (S.D.N.Y. 1986). Risking trial in the face of substantial settlement proposals is particularly concerning in Section 2 cases like this one, where there is typically only a single defendant, and thus only one chance to succeed, and no ability to hedge against total loss or endless delays.

There are numerous instances, such as those describe in the below bullet points, involving plaintiffs who declined significant settlement offers in favor of the risk of an antitrust trial where that choice proved disastrous for the class:

- *In re HIV Antirust Litig.*, No. 19-cv-02573 (N.D. Cal.): Antitrust class action alleging that defendants violated the antitrust laws by agreeing to delay the entry of generic versions of certain brand drugs used to treat the Human Immunodeficiency Virus. The end purchaser plaintiffs in this antitrust class action litigation went to trial, beginning on May 24, 2023, and the jury returned a verdict in favor of the defendants. A different group of plaintiffs chose instead to settle their case before trial for $246.75 million, which represented approximately 11.9% of the expert's estimated single damages. *See* ECF No. 2141, at 12-13 (final approval brief).

- *In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115 (N.D. Cal.): Antitrust class action plaintiffs sought approximately $246 million in single damages for claims alleging defendants engaged in a conspiracy to fix the price of ramen noodle products (*In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *6 (N.D. Cal. Jan. 19, 2017)). The trial commenced on November 13, 2018, and ended when the jury returned a verdict in favor of two defendants (ECF No. 920).

- *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637 (N.D. Ill.): Plaintiffs alleged overcharges on approximately $37 billion in broiler chicken sales for antitrust claims alleging defendants conspired to fix the price of broiler chickens. *See In re Broiler Chicken*

---

[25] *See Wal-Mart Stores*, 396 F.3d at 118 ("Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1166-67 (7th Cir. 1983) (antitrust judgment was remanded for new trial and damages); *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973), *vac'd*, 417 U.S. 156 (1974) (after two trips to the Second Circuit and one to the Supreme Court, plaintiff and the putative class recovered nothing in this antitrust class case); *Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*, 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987) ("There is a substantial risk that the plaintiff might not be able to establish liability at all and, even assuming a favorable jury verdict, if the matter is fully litigated and appealed, any recovery would be years away.").

*Antitrust Litig.*, 2022 WL 1720468, at *15 (N.D. Ill. May 27, 2022). After obtaining settlements totaling $284 million—a tiny fraction of single damages—with thirteen defendants (*see, e.g.*, ECF Nos. 6926-28; 7172, at 3), plaintiffs went to trial against one defendant, which commenced on September 12, 2023, and the jury rendered a verdict in favor of the defendant (ECF No. 7014).

- *In re Nexium (Esomeprazole) Antitrust Litig.*, No. 12-md-02409 (D. Mass): Litigation involving consolidated antitrust class actions brought on behalf of direct purchasers, endpayers, and individual retailer plaintiffs alleging defendants violated the antitrust laws by agreeing to delay the entry of generic versions of the prescription drug Nexium, where direct purchasers claimed damages in the billions of dollars. *See* ECF No. 1559, at 17 (plaintiffs' final approval brief). Approximately one month into trial that began on October 20, 2014, all plaintiffs settled with one defendant for $24 million. The jury subsequently returned a verdict in favor of the remaining defendants. *See id.* at 2, 15-16.

- *In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-md-02090 (D. Minn.): Antitrust class action where direct purchaser plaintiffs brought claims alleging $226 million in damages asserting defendants engaged in a conspiracy to restrict competition by dividing territories and customers along geographic lines (*In re Wholesale Grocery Prod. Antitrust Litig.*, 2017 WL 4876277, at *6 (D. Minn. Oct. 24, 2017)), where the trial started on April 9, 2018 and the jury returned a verdict in favor of two defendants (ECF No. 1233).

- *In re Processed Egg Products Antitrust Litig.*, No. 08-md-02002 (E.D. Pa.): Antitrust class action plaintiffs went to trial asserting damages in excess of $111 million (*In re Processed Egg Prod. Antitrust Litig.*, 881 F.3d 262, 266 (3d Cir. 2018)) for a conspiracy to fix the prices of eggs by agreeing to reduce egg supply. The jury found at the end of a trial that started on October 31, 2019 that the defendants had not participated in the alleged conspiracy (ECF No. 2090).

What these cases highlight is that rejecting a meaningful settlement involves taking on real risks. The Class Members here deserve to have their wishes affirmed, which is to lock in the significant result achieved to date and not gamble it away on an uncertain future of trial, appeals, and delay.

### 2. The Proposed Plan of Allocation Is Fair and Effective.

Preliminary approval is further justified because the proposed method of distributing relief to the Class is equitable, efficient, and effective. *See, e.g.*, Fed. R. Civ. P. 23(e)(2)(C)(ii); *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001) (a plan of allocation must be "fair, reasonable, and adequate"). The proposed Plan of Allocation (the "Plan"), attached to the Supp. Joint Decl. at Exhibit 2—is essentially the same allocation program developed with input from Plaintiffs' economic expert, Dr. Singer, in connection with the Prior Settlement. The main difference, of course, between the Plan in the Prior Settlement and this one is that now the entire distribution will be made to

19

*Le* Class Members. The Plan, importantly, treats each of the Class Members fairly and equitably.[26] As Dr. Singer explained in the context of the Prior Settlement, he developed the Plan "[b]ased on my prior impact and damages analyses from my reports in the *Le* Case," Singer Decl. ¶9, and from his analysis of Zuffa's bout pay data provided by Zuffa. *See id.* ¶¶12, 17, 19, 25. The data Zuffa provided in the Action will be used to determine the *pro rata* distributions described below, as well as to permit the Claims Administrator to pre-populate claim forms with information needed to complete the form (and thus make the claims process streamlined and efficient for the Class Members). *See id.* ¶¶19, 25.

The Plan allocates money to Class Members who submit timely, valid claims ("Claimants") based on two *pro rata* factors: (i) 70% of the Net *Le v. Zuffa* Settlement Fund is to be distributed on the basis of each Claimant's *pro rata* share of all Event Compensation[27] earned by Claimants during the Class Period; and (ii) 30% of the Net *Le v. Zuffa* Settlement Fund is to be distributed on the basis of each Claimant's *pro rata* share of all Claimants' UFC bouts fought during the Class Period. Plan ¶4.[28] Under the Plan, each Claimant will receive at least a minimum distribution amount of $15,000 (though the vast majority would receive many multiples of that amount). *Id.*

The 70/30 weighting between total Event Compensation and number of bouts fought provides an important means of ensuring that the distributions reasonably reflect the extent of each Claimant's injuries. *See id.* ¶5. Dr. Singer previously explained that the mid-level journeymen fighters may have had their compensation squeezed to a greater degree than top or bottom-level fighters. *See* Singer Decl. ¶18. It is possible that, while Zuffa's alleged misconduct harmed all fighters, the top fighters may have enjoyed some countervailing bargaining power that the mid-level fighters did not have. *See id.* Allocating 30% of Settlement funds to distribute *pro rata* based on the number of bouts fought, as opposed to relying solely on Event Compensation, recognizes that the mid-level fighters without as

---

[26] *See generally* Declaration of Hal J. Singer, Ph.D. In Support of Plan of Allocation ("Singer Decl.") (ECF No. 1024-7), attached as Exhibit 4 to the Prior Joint Decl.

[27] The term "Event Compensation" refers to a fighter's total event-level compensation from the UFC that is the sum of (1) show and win purses, (2) discretionary/performance pay, (3) PPV royalties, and (4) letters of agreement. *See* Singer Decl. p. 8 n.20.

[28] Notably, this 70/30 split is not a term of the Settlement Agreement. Class Counsel are proposing it based on their judgment and on the recommendation of their experts. Should the Court believe a different approach would be warranted, Class Counsel could certainly adjust.

much name recognition may have been relatively better off in the but-for world as compared to the more popular fighters. *See id.* In short, allocating most of the funds in proportion to compensation amounts, but also allocating at least some portion of the funds based on number of bouts fought, strikes a fair balance. This proposal will help ensure that the distributions from the Net *Le v. Zuffa* Settlement Fund will correlate with the degree of harm each Claimant suffered. This type of distribution on a *pro rata* basis, with distributions correlating with harm, has been deemed fair, adequate, and reasonable.[29]

Finally, the Plan includes procedures to encourage and facilitate Class Member participation, including mailing pre-populated claim forms setting out critical information necessary for computation of the claim (where the information is available) (Plan ¶¶1-2), communication and resolution procedures for any deficient or late claims (Plan ¶¶7-8), a procedure for managing challenged claims (Plan ¶¶10-12), and a fair dispute resolution process (Plan ¶¶17-18). The Plan will be managed by an experienced claims administrator (Plaintiffs propose Angeion, *see* Part IV *infra*) with assistance from Dr. Singer's consulting firm, Econ One, and Co-Lead Class Counsel.

### 3. Co-Lead Class Counsel's Request for Fees and Expenses, and Service Awards for the Class Representatives Is Reasonable.

Co-Lead Class Counsel intend to ask the Court for an award of attorneys' fees from the *Le v. Zuffa* Settlement Fund (plus interest), and reimbursement of litigation expenses of no more than $12 million (to be documented and supported in Plaintiffs' fee petition filed later in the process). With respect to the fee award, Class Counsel will request an award of fees based on two computations. The first is one-third of $301.5 million (or $100.5 million), where the $301.5 million amount corresponds to the 90% of the $335 million ($335 million x 0.9 = $301.5 million) from the Prior Settlement that would have been allocated to the *Le* Class had it been approved. The second is one-fifth of the remaining $73.5 million from the $375 million *Le v. Zuffa* Settlement Fund. The two computations total $115.2 million. In other words, Class Counsel will seek an award of attorneys' fees not to exceed $115.2 million (30.7% of the Settlement amount) (plus interest), which is approximately $10 million less than

---

[29] *See Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *12 (N.D. Cal. Dec. 18, 2018); *Loeza v. JPMorgan Chase Bank, NA*, 2015 WL 13357592, at *8 (S.D. Cal. Aug. 18, 2015) ("the funds will be distributed on a weighted *pro rata* basis, which guarantees equal treatment of class members"). *Affirmed sub nom. Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020).

what would have resulted from a request of one-third of the entire settlement amount.[30]

For current purposes, the Court need not evaluate the merits of Plaintiffs' intended fee and expense requests, but merely approve the notices that will identify these requests so that Class Members may evaluate them.[31] While Class Counsel is no longer seeking a fee award of one-third of the gross amount, such a request would nevertheless have been reasonable considering the significant amount of work Class Counsel performed in developing and litigating the Action, the length of time the case was pending, the fact that counsel prosecuted and funded the case on a complete contingency basis, the work Class Counsel performed after the Denial, and in light of the significant results achieved in the Settlement.[32] The typical range for attorneys' fees is generally considered to be 20% to 33 1/3%, and the percentage award "varies depending on the facts of the case, and in 'most common fund cases, the award exceeds [25%].'" *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 491 (E.D. Cal. 2010). Many courts have approved a fee award of one-third in common fund cases like this one where the results are significant for class members. *See*, *e.g.*, *In re Lidoderm Antitrust Litig.*, 2018

---

[30] Further, because the Court took issue with the provision in the Prior Settlement that had barred Defendant from contesting Class Counsel's fee and expense petition absent a request by the Court, the Parties have removed that provision from the Settlement Agreement.

[31] *See*, *e.g.*, *Mandalevy v. BofI Holding, Inc.*, 2022 WL 1556160, at *10 (S.D. Cal. May 17, 2022) ("Court need not determine at the preliminary approval stage whether it will ultimately approve an award"); *Cottle v. Plaid Inc.*, 340 F.R.D. 356, 378 (N.D. Cal. 2021) ("court does not award fees at the preliminary approval stage"); *Castillo v. ADT LLC*, 2016 WL 6441614, at *9 (E.D. Cal. Nov. 1, 2016) ("court will therefore not evaluate the fee award at length here in considering whether the settlement is adequate").

[32] *See Rodriguez v. Nike Retail Servs., Inc.*, 2022 WL 254349, at *6 (N.D. Cal. Jan. 27, 2022) (approving one-third fee award "especially in light of the significant amount of work Class Counsel performed in this case, … and the excellent results achieved"); *see also* Prior Joint Decl. ¶¶7-230 (describing Settlement Class Counsel's work); *id.* ¶¶ 231-45 (discussing the Settlement benefits); Supp. Joint Decl. ¶¶7-8.

WL 4620695, at *1-*2 (N.D. Cal. Sep. 20, 2018) (antitrust class action approving 33% fee award).[33]

Similarly, courts will review and approve a request for reasonable expenses as part of the final approval process. Courts recognize that Class Counsel are permitted to recoup "reasonable expenses that would typically be billed to paying clients in non-contingency matters," such as those costs "incidental and necessary to the effective representation of the Class." *Trosper v. Stryker Corp.*, 2015 WL 5915360, at *1 (N.D. Cal. Oct. 9, 2015) (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)). Class Counsel will also seek service awards of $250,000 each for the Class Representatives. *See Andrews v. Plains All Am. Pipeline L.P.*, 2022 WL 4453864, at *4 (C.D. Cal. Sept. 20, 2022) ("Incentive awards are fairly typical in class action cases."). These requests are on the high end for such awards but is in line with other cases with significant results where courts have granted high service awards.[34] The Class Representatives collectively have devoted thousands of hours assisting in the Action, *see* Prior Joint Decl. ¶¶2, 72-81, and as will be explained in more detail at final approval, these requested service awards are appropriate here given the extraordinary services of the Class

[33] *See also Meijer, Inc. v. Abbott Labs.*, 2011 WL 13392313, at *2 (N.D. Cal. Aug. 11, 2011) (same); *Tawfilis v. Allergan, Inc.*, 2018 WL 4849716, at *7 (C.D. Cal. Aug. 27, 2018) (same); *In re Heritage Bond Litig.*, 2005 WL 1594403, at *19 (C.D. Cal. June 10, 2005) (class action approving 33% fee award); *Vasquez*, 266 F.R.D. at 492 (same); *Rodriguez*, 2022 WL 254349, at *6 (same) *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *4 (D. Kan. July 29, 2016) (antitrust class action approving 33% fee award); *In re Broiler Chicken Antitrust Litig.*, 2021 WL 5578878, at *4 (N.D. Ill. Nov. 30, 2021) (same); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2024 WL 815503, at *16 (E.D. Pa. Feb. 27, 2024) (same); *In re Opana ER Antitrust Litigation*, No. 14-cv-10150, ECF No. 1085, ¶15 (N.D. Ill. Nov. 03, 2022) (approving 36% fee award).

[34] *See, e.g.*, *Chen-Oster v. Goldman Sachs & Co.*, 2023 WL 7325264, at *6 (S.D.N.Y. Nov. 7, 2023) (awarding $250,000 service award "to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a named plaintiff, and any other burdens sustained by the plaintiffs"); *McReynolds v. Merrill Lynch*, No. 05-cv-6583, ECF No. 616 at 5 (N.D. Ill. Dec. 6, 2013) (awarding $250,000 to each class representatives); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1242 (S.D. Fla. 2006) (awarding $1.767 million to each class representatives); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding $300,000 to each class representatives).

Representatives in this Action.[35]

### 4.  The Settlement Provides a Significant Monetary Benefit to the Class.

To determine whether a settlement agreement is substantively fair to the class, courts are guided by the general principle that "[a]lthough a larger award was theoretically possible, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.'" *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013). It is "well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *DIRECTV*, 221 F.R.D. at 527.

The Ninth Circuit has made clear that where experienced attorneys negotiate an arms' length deal it is not the Court's role to "weigh[] the merits of the class's case against the settlement amount and quantified the expected value of fully litigating the matter." *Rodriguez*, 563 F.3d at 965. In *Rodriguez*, a case involving an antitrust claim brought on behalf of a class that purchased bar review courses, the Ninth Circuit explained that "[w]e put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution." *Id.* The Ninth Circuit also rejected the argument that the district court should have measured the settlement against the value of potential treble damages. *Id.* at 964-65. The court observed further that "[i]t is our impression that courts generally determine fairness of an antitrust class action settlement based on how it compensates the class for past injuries, *without giving much, if any, consideration to treble damages." Id.* at 964 (emphasis added). The court again highlighted that "[e]xperienced counsel such as those representing all the parties in this case will certainly be aware of exposure to treble damages in an antitrust action. Likewise, the mediator in this

---

[35] The fourth factor of Rule 23(e)(C)(2) requires the Court to examine any other agreements that are related to the proposed settlement. Fed. R. Civ. P. 23(e)(C)(2)(iv). This provision is aimed at "related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." Fed. R. Civ. P. 23(e), advisory committee notes 2003 amendments. Here, the parties entered into a Confidential Supplement to Settlement Agreement, which sets forth certain conditions under which Defendant has the option to terminate the Settlement. The parties agreed to maintain the confidentiality of this agreement because publicizing it could give leverage to actors seeking to blow up the Settlement for personal gain. Therefore, the parties agreed that this separate agreement would not be provided to the Court unless it so requests, and if so, it would be provided only *in camera*. This type of agreement is common in class actions, did not involve any tradeoffs that would render the Settlement improper, and does not render a settlement unfair. *See Hefler*, 2018 WL 6619983, at *7.

case." *Id*. at 965. The Ninth Circuit emphasized that:

> the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

*Id.* (quoting *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1027 (9th Cir. 1998)); *see also In re Cathode Ray Tube (CRT) Antitrust Litig*, 2015 WL 9266493, at *5 (N.D. Cal. Dec. 17, 2015); *Officers for Just*., 688 F.2d 615, 628 (9th Cir. 1982) ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair.").[36]

The Settlement here is an excellent result for the Class. The $375 million all cash recovery provides a swift and significant payment to the Class against the delay, costs, and risks of a trial and appeals. As discussed above, Plaintiffs had initially proposed to allocate 75% of the Prior Settlement to the *Le* Class (75% of $335 million is $251.25 million), and thus this Settlement would increase the amount going to the *Le* Class by $123.75 million. Plaintiffs subsequently proposed to allocate 90% of the Prior Settlement to the *Le* Class (90% of $335 million is $301.5 million), and in that light, this Settlement involves $73.5 million more for the *Le* Class (the "Increased Amount"). The Settlement also preserves the ability of those *Le* Class members who straddle the classes in both the *Le* and *Johnson* classes to obtain even more damages, and also to pursue injunctive relief in *Johnson*. Indeed, given the Increased Amount, plus the fact that Class Counsel intend to ask the Court for a reduced fee on the Increased Amount, *Le* Class members would recover 25% more than under the Prior Settlement. The Settlement amounts to nearly 70% of the total compensation the UFC paid to its entire roster of fighters during the full *Le* Class Period.

---

[36] *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5159441, at *4 (N.D. Cal. Sept. 2, 2015) ("[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *29 (E.D.N.Y. Dec. 16, 2019) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974)), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) (same); *In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, at *24 (D.N.J. Sept. 13, 2005) ("an antitrust class action settlement may be approved even if the settlement amounts to a small percentage of the single damages sought, if the settlement is reasonable relative to other factors").

Moreover, under the Settlement, *Le* Class members would recover (on average), after all fees and costs are deducted, ***$250,000***. Thirty-five Class members would net over $1 million; nearly 100 fighters would net over $500,000; more than 200 fighters would recover over $250,000; over 500 fighters would net in excess of $100,000; and nearly 800 would recover over $50,000. By any reasonable measure, the Settlement, if approved, would put "life changing" cash into the hands of the families of several hundred fighters *now*.

All of the named Plaintiffs support the Settlement for themselves and the Class they represent. To date, Plaintiffs and Class Counsel have collectively communicated with nearly one hundred members of the Class, each of whom uniformly supports the Settlement and many of whom are counting on the Settlement proceeds to meet critical and urgent needs for themselves and their families. It is the uniform view of the members of the Class with whom Class Counsel has communicated that the Settlement achieves the best of both worlds: it gets money into the hands of Class members now, while also preserving the ability to attempt to obtain additional damages *and* injunctive relief for current fighters through the *Johnson* Action.

To date, fifty-six (56) ex-UFC fighters have submitted declarations in support of the Settlement or have otherwise authorized Class Counsel to indicate support for the Settlement.[37] These 56 fighters account for 336 UFC bouts during the *Le* Class Period. These declarations highlight the groundswell of support for the Settlement and the urgency of the need for the proceeds to reach the Class Members. Class Counsel continue to collect Class Member declarations in support the Settlement—and expect to continue to file many more with this Court in advance of any hearing relating to the Settlement.

---

[37] To date, the following ex-UFC fighters have submitted declarations in support of the Settlement: Sean Spencer, Fernando Bruno, Iuri Alcantara, Johnny Eduardo, Luis Ramos, Wanderlei Silva, Cung Le, Shane Carwin, John Howard, Heather Jo Clark, Todd Duffee, Jorge Rivera,  Nathan Quarry, Thales Leites, Vagner Rocha, Ildemar Alcantara, Mark Bocek, Ross Pearson, Ronny Markes, Willamy Freire, Joe Stevenson, Joe Soto, Cat Zingano, Fabio Maldonado, Gray Maynard, Matt Brown, Nate Marquardt, Hacran Dias, Caio Magalhaes, Cristiano Marcello, Daniel Sarafian Gatman, Amilcar Alves, Luis Javier Vazquez, Mike McDonald, Jamie Varner, Adriano Martins, Spencer Fisher, John Fitch, Kajan Johnson, Ed Herman, John Olav Einemo, Patrick Cote, Kevin Casey, Hugo Viana, Diego Sanchez, Leonardo Santos, Ivan Jorge, Vinny Magalhaes, Fabricio Camoes, Pablo Garza, Chris Leben, Sage Northcutt, Mike Pierce, and Edimilson Souza. *See* Supp. Joint Decl. Exhibits 5-58. Two additional Class Representatives have also affirmed their support for the Settlement.

The Settlement, if approved, would lift many out of poverty and otherwise materially improve the lives of hundreds of Class Members and their families. The fighters understand that Plaintiffs' expert economists estimated that the potential damages are roughly 2.5 times the settlement amount, and that any award by the jury would be trebled. *See*, *e.g.*, Spencer Decl. ¶10; Howard Decl. ¶7. They also know that the UFC could prevail at trial with no reward or that the jury could award an amount less than the economists estimated. The fighters understand that any victory for the Class at trial would be subject to lengthy appeals by Defendant and that "a significant recovery in the near future is much more appealing than the possibility of a larger recovery several years from now, especially in light of the possibility that there would be no recovery at all if this settlement were not approved." *See*, *e.g.*, Spencer Decl. ¶12; Howard Decl. ¶9.

The fighters have "a deep interest in and concern for the future of the sport of mixed martial arts," and they view the combination of monetary relief from the Settlement with potential for injunctive relief in the *Johnson* Action to present a "best of both worlds" scenario where the "fighters can recover now for injuries in *Le* going back nearly fourteen years, while also preserving the possibility of obtaining changes to the UFC's business practices going forward." *See*, *e.g.*, Spencer Decl. ¶13; Howard Decl. ¶10. They see the Settlement as "an enormously successful result [that] would make a significant difference in my life and my financial stability." *See*, *e.g.*, Spencer Decl. ¶14; Howard Decl. ¶11.

These declarations also reveal how the Settlement, if approved, would materially improve the lives of Class Members, many of whom are contending with: chronic medical conditions, serious financial difficulties, and the lack of access to necessary healthcare to treat injuries sustained during their fighting careers. Many cannot meet basic needs or are teetering on the verge of bankruptcy. Still others are unable to create opportunities for themselves and their families. The Settlement would, in a very real way, have a material and urgent impact on the lives of hundreds of Class Members. Excerpts from some of the fighter declarations below make clear that the Settlement would be life altering for hundreds of people:

- "I need urgent medical attention and treatment now including physical therapy, chiropractic therapy, counseling and neurological treatment. I have not been receiving the necessary care to maintain my health due to the expenses of health care which I

27

cannot afford. In addition to healthcare expenses, I face serious challenges in meeting basic everyday expenses for food, shelter, and transportation. My family has endured times without electricity and other utilities due to my struggles with mental health, and I have not been able to provide the financial support that my eight-year-old and two toddlers need. My wife and I just had our 4th child and it's been extremely challenging to focus on my mental health, my physical health, and especially my financial health to take care of my family properly. My wife deserves better. **My family deserves a healthier me and I desperately need help now—not years from now**. **This would truly be life-changing money for me and for other members of the class**." Spencer Decl. ¶¶7-9 (emphasis added) (attached at Exhibit 5 to the Supp. Joint Decl.).

- "While fighting for the UFC, I suffered a significant injury to my knee during a bout that was never fixed. My knee and leg are still crooked and do not have full range of motion, and it still causes incredible and debilitating pain. My insurance does not cover pre-existing injuries, and **I desperately needs [sic] these funds to alleviate unbearable pain I live with daily**. I also live in Beijing, China, far away from my daughter in Brazil, and care for my elderly mother in Brazil. Funds from this settlement will make it easier for me to visit my daughter and to provide a better life for her." Declaration of Fernando Bruno, at ¶6 (attached at Exhibit 6 to the Supp. Joint Decl.).

- "**I do not have health insurance and have not been receiving the necessary care to maintain my health due to the expenses of health care which I cannot afford**…. I have 5 children including two sets of twins and take care of my elderly parents in Brazil. Funds from this settlement would also enable me to start a social project in Brazil teaching Brazilian jiu-jitsu to underprivileged children." Declaration of Iuri Alcantara, at ¶¶6-7 (attached at Exhibit 7 to the Supp. Joint Decl.).

- "I do not have health insurance, and my family does not have health insurance. During the pandemic, without the support of our trainer, my family would have been without basic necessities including food. **My family desperately need these funds now**." Declaration of Johnny Eduardo, at ¶7 (attached at Exhibit 8 to the Supp. Joint Decl.).

- "Currently, **I face serious challenges in meeting basic everyday expenses for food, shelter, and transportation and I am living paycheck to paycheck**. I travel around teaching Brazilian jiu-jitsu and my income is unstable and unpredictable.  The funds from this settlement would assist me in living day to day. These funds may also enable me to buy a small property to leave for my children." Declaration of Luis Ramos, at ¶6 (attached at Exhibit 9 to the Supp. Joint Decl.).

- "While fighting for the UFC, I suffered many significant injuries, including concussions. I fear that during my career I have suffered traumatic brain injury (TBI) and am noticing symptoms common with TBI and CTE including depression, mood swings, and irritability…. I suffer from sleep apnea and have difficulty sleeping and breathing. That I can recall, I have had four surgeries on my nose, 1 on my face, 2 on my left knee, 1 on my right knee and 1 on my elbow…. **These funds would also allow me to obtain the healthcare I need and keep a roof over my head and food on my table. The sad reality is that funds years from now may be of no use to me. I can use and enjoy**

28

these funds with my family now." Declaration of Wanderlei Silva, at ¶¶6-7 (attached at Exhibit 10 to the Supp. Joint Decl.).

- "Due to the strain of my current health limiting my everyday activity from working consistently, I've been relying on a friend who, through God's provision, has generously sponsored my essential needs, including food and shelter, while I await the settlement of this case. **Without this support, I would likely need to file bankruptcy and apply for disability to manage my basic living and healthcare needs.**" Declaration of Cung Le, at ¶10 (attached at Exhibit 11 to the Supp. Joint Decl.) (*Le* Class Representative).

- "Despite having a degree in engineering from the Colorado School of Mines, I have been unable to maintain adequate focus to hold down an engineering job. I face serious challenges in meeting basic everyday expenses for food, shelter, and transportation and in basic life skills necessary to function…. These funds would also allow me to obtain the healthcare I need and keep a roof over my head and food on my table. **The sad reality is that funds years from now may be of no use to me. I desperately need these funds now.**" Declaration of Shane Carwin, at ¶¶7-8 (attached at Exhibit 12 to the Supp. Joint Decl.).

- "Last year, my daughter was the victim of gun violence that will require substantial long-term care for her survival and well-being. **My family needs the funds from this settlement desperately to care for our daughter and to assist in day-to-day living expenses.**" Howard Decl. ¶6 (attached at Exhibit 13 to the Supp. Joint Decl.).

- "While fighting for the UFC, I suffered many significant injuries including … concussions which later ended my career. I fear that during my career I have suffered traumatic brain injury (TBI) and am noticing symptoms common with TBI including depression, headaches, mood swings, and irritability…. **Funds from this settlement would enable me to focus on restoring my brain health and I would acquire a hyperbolic chamber and look to purchase a home.**" Declaration of Heather Jo Clark, at ¶7 (attached at Exhibit 14 to the Supp. Joint Decl.).

- "The funds received from this settlement will allow me to obtain the physical therapy and medical treatment I need after substantial damage incurred while competing at the highest level." Declaration of Todd Duffee, at ¶¶6-7 (attached at Exhibit 15 to the Supp. Joint Decl.).

- "**I do not have health insurance and have not been receiving the necessary care to maintain my health due to the expenses of health care which I cannot afford.**" Declaration of Jorge Rivera, at ¶6 (attached at Exhibit 16 to the Supp. Joint Decl.).

- "Without medical insurance provided by the State of Oregon, I would be unable to afford my significant medical expenses. I understand that many class members, whose MMA careers likewise took a toll on their bodies, lack medical insurance." Declaration of Nathan Quarry, at ¶6 (attached at Exhibit 17 to the Supp. Joint Decl.) (*Le* Plaintiff).

- Numerous fighters stated that the funds from the Settlement would provide important and meaningful opportunities for themselves and their families including providing for

29

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT, PRELIMINARY APPROVAL OF THE PLAN OF ALLOCATION, APPROVAL OF THE NOTICE PLAN, AND APPROVAL OF THE PROPOSED SCHEDULE FOR COMPLETING THE SETTLEMENT PROCESS

college educations for their children, caring for elderly parents, investing in their businesses (*e.g.*, opening martial arts gyms), covering healthcare insurance costs, owning a home, planning for retirement, and overall better financial footing.[38]

This case has been pending for a decade. If the Settlement is rejected, even if Plaintiffs win at trial, succeed in obtaining the entry of a judgment, and then uphold the judgment on appeal—all of which present significant risks that the Class will receive no compensation at all—Class Members would need to wait many more years before they have a chance of seeing any recovery from this case. As these declarations show, mindful that the case could potentially recover more if litigated to its ultimate conclusion, the Class Members have opted for the immediate and life-changing benefits now, while preserving the ability to reform the sport and, for many, to obtain additional damages, in *Johnson*.

Further, the Settlement amounts to a significant share of the total damages computed by Plaintiffs' economists. Dr. Singer computed damages ranging from $811 million to $1.6 billion.[39] One of Dr. Singer's models yielded damages of $894 million. *See* SR1 ¶250 & Table10. Plaintiffs' other damages expert, Prof. Zimbalist, calculated damages of $981.8 million.[40] Given that Prof. Zimbalist's estimate aligns with the middle of the range of Dr. Singer's estimates, a reasonable jury could conclude that where Plaintiffs have satisfied every element of their claims, the damages number would reasonably fall where both of Plaintiffs' experts fall: around $900 million. In that case, the $375 million payment would amount to more than 40% of the estimated single damages.

The Ninth Circuit made clear in *Rodriguez* that in cases like this, the views of experienced class counsel—and not rigorous comparison with the best possible result at trial and on appeal—should be the court's guiding principle in deciding whether the Settlement falls within the range of reasonableness. 563 F.3d at 964-65. Nevertheless, this Settlement, if approved, would amount to nearly 40% of single damages—which is better than any other worker-side monopsonization case in the

---

[38] *See* Ex-UFC Fighter Declarations attached at Exhibits 5-58 to the Supp. Joint Decl.

[39] *See* Expert Report of Hal J. Singer, Ph.D., August 31, 2017 ("SR1"), ECF No. 518-3, at ¶252 & Table 11; ¶250 & Table10; ¶248 & Table 9 (Bellator model with $811.2 million single damages).

[40] *See* Expert Report of Andrew Zimbalist in *Cung Le, et al. v. Zuffa, LLC*, August 30, 2017 ("ZR1"), ECF No. 518-5, ¶140(c).

history of class action jurisprudence in this country—and compares favorably to the vast majority of other antitrust class action settlements ever achieved.

There are numerous antitrust class actions where courts (including many in this Circuit) approved settlements reflecting a *much* lower percentage of estimated single damages than the 42% achieved here, including the following examples:

***Antitrust Class Action Settlements for 2% or Less of Estimated Single Damages***

- *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *28 (E.D.N.Y. Dec. 16, 2019) (after summary judgment briefing and the Second Circuit vacating a prior settlement, court approved an antitrust class action settlement representing less than 1.4% of the low end of estimated damages).

- *In re Endosurgical Prod. Direct Purchaser Antitrust Litig.*, 2008 WL 11504857, at *6 (C.D. Cal. Dec. 31, 2008) (preliminary approval of $13 million cash settlement of antitrust class action where court stated that "[a]ssuming the settlement is worth approximately 1.7% of relevant sales,[41] the Court finds this percentage within the range of settlements approved in similar cases when alleged monopolists were sued first by competitors, and then by purchasers").

- *Meijer, Inc. v. 3M*, 2006 WL 2382718, at *2, *16 (E.D. Pa. Aug. 14, 2006) (following class certification briefing, court approved $28.9 million antitrust class action settlement representing approximately 2% of class member sales to defendant).

- *In re Auto. Refinishing Paint Antitrust Litig.*, 2004 WL 1068807, at *2 (E.D. Pa. May 11, 2004) (after federal government disbanded grand jury investigation of the anticompetitive conduct alleged in plaintiffs' complaint, court approved antitrust class action settlements with two defendants totaling $48 million, which represented approximately 2% of class member sales to defendants); *see also In re Auto. Refinishing Paint Antitrust Litig.*, No. 10-md-1426, ECF No. 124, at 3, 18-19 (E.D. Pa. June 30, 2004) (plaintiffs' final approval brief providing damages estimates).

- *In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *11 (E.D. Mich. Dec. 13, 2011) (for the direct purchaser plaintiff class in this antitrust class action, after class certification briefing, the court granted final approval of settlement with one defendant, finding the "$12.5 million cash settlement … represents approximately 2.2% of Arctic Glacier's United States sales of Packaged Ice during the proposed Settlement Class Period").

- *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 9266493, at *5 (N.D. Cal. Dec. 17, 2015) (following summary judgment briefing, court approved $9.75 million antitrust class action settlement where plaintiffs' maximum recovery "could exceed two billion dollars," and where settlement represented 0.49% of maximum possible recovery).

---

[41] A settlement measured against a defendant's sales during the class period compares less favorably to single damages because damages are calculated as a portion of sales, and typically amount to a small fraction of the defendant's total sales.

***Antitrust Class Action Settlements for 5% or Less of Estimated Single Damages***

• *In re Tableware Antitrust Litig.*, 2007 WL 4219394, at *2 (N.D. Cal. Nov. 28, 2007) (approving antitrust class action settlement of $500,000, representing 4% of damages).

• *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 308, 319 (W.D. Pa. 1997) (court approved antitrust class action settlement of $14.5 million with the last two of three defendants, which settlement represented 5.35% of the estimated damages of $271 million).

***Antitrust Class Action Settlements for 15% or Less of Estimated Single Damages***

• *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 5182093, at *2 (D. Md. Sept. 12, 2013) (approving antitrust settlement of $163.5 million after class certification was granted, summary judgment and *Daubert* denied, and on the eve of trial, representing 6-8% of estimated single damages ranging from $2.1-2.7 billion); *see also In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 818 (D. Md. 2013) (plaintiffs' expert found "Defendants' price increases resulted in aggregate [single] overcharges of between $2.1 and $2.7 billion").

• *Tawfilis v. Allergan, Inc.*, 2018 WL 4849716, at *1, *4 (C.D. Cal. Aug. 27, 2018) (antitrust class action settlement reached after court granted in part plaintiffs' *Daubert* motion, and denied defendant's *Daubert* motion, where $13,450,000 settlement represented approximately 8.36% of single damages); *see also Tawfilis v. Allergan, Inc.*, No. 15-cv-0307, ECF No. 388, at 8-9 (C.D. Cal. Mar. 8, 2018) (preliminary approval order discussing amount of alleged overcharges).

• *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) ($410 million settlement against one defendant in an antitrust class action where the settlement represented as little as 9% percent of total potential single damages, and where the court emphasized that "standing alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims").

• *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3077396, at *9 (E.D.N.Y. Sept. 25, 2009) (final approval of antitrust class action settlement of "$85 million equal[ing] approximately 10.5% of Lufthansa's surcharges during the Settlement Class period").

• *In re Wellbutrin SR Antitrust Litig.*, 2011 WL 13392296, at *2, *3 (E.D. Pa. Nov. 21, 2011) (final approval of antitrust class action settlement of $49 million, reached after summary judgment briefing (including renewed summary judgment motion by defendant) and extensive trial preparation, which represented 5.7% to 10.7% of estimated single damages ranging from $457 million to $839 million); *see also In re Wellbutrin SR Antitrust Litig.*, No. 04-cv-5525, ECF No. 409, at 18 (Oct. 14, 2011) (plaintiffs' final approval brief providing damages estimates).

• *In re Prandin Direct Purchaser Antitrust Litig.*, 2015 WL 1396473, at *1-*3 (E.D. Mich. Jan. 20, 2015) (approving $19 million antitrust class action settlement representing approximately 12% of estimated single damages); *see also In re Prandin Direct Purchaser Antitrust Litig.*, No. 10-cv-12141, ECF No. 67, at 14 (E.D. Mich. Dec. 16, 2014) (plaintiffs' final approval brief providing damages estimates).

• *Castro v. Sanofi Pasteur Inc.*, 2017 WL 4776626, at *1-*2, *6 (D.N.J. Oct. 23, 2017) (approving antitrust class action settlement of $61.5 million, reached after class certification was granted and

*Daubert* was denied, which represented approximately 14% of the estimated damages of $439 million).

- *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5159441, at *2-*4 (N.D. Cal. Sept. 2, 2015) (approving antitrust class action settlement of $435 million, reached with all seven defendants while the parties were engaged in trial preparation, where the settlement represented 14% of single damages of $3.1 billion).

- *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2024 WL 815503, at *2, *9 (E.D. Pa. Feb. 27, 2024) (approving antitrust class action settlement of $385 million, which was reached after class certification had been granted, after the court denied various *Daubert* motions, and where the settlement represented 12% to 14% of estimated damages of $2.6 billion and $3.2 billion).

- *In re Blue Cross Blue Shield Antitrust Litig.*, 2022 WL 4587618, at *2, *20 (N.D. Ala. Aug. 9, 2022) (final approval of $2.67 billion antitrust class action settlement reached after nine years of litigation and following several rounds of summary judgment, as well as class certification motions pending at time of settlement, where settlement represented between 7.3% to 14.3% of the estimated damage ranging from $18.6 billion to $36.1 billion, which the court concluded "easily falls within the range of reasonable recoveries").[42]

- *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 305, 308-10, 323, 325 (N.D. Ga. 1993) (court approved antitrust class action settlement with a $50 million cash amount plus discount travel certificates with a face value of $408 million, which together the court found had an economic value between $254-$356 million, and where the court concluded that "the settlement in this action amounts to approximately 12.7-15.3% of the estimated $2 billion minimum possible untrebled recovery").

### Antitrust Class Action Settlements for 25% or Less of Estimated Single Damages

- *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 2020 WL 6193857, at *1 (E.D.N.Y. Oct. 7, 2020) (final approval of $51.25 million antitrust class action settlement, reached after class certification briefing, which represented 5-20% of range of estimated damages ranging from $255 million to $709 million); *see also In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, No. 18-md-2719, ECF No. 544, at 16, 21 (E.D.N.Y. Sept. 15, 2020) (plaintiffs' final approval brief providing litigation background and damages estimates).

- *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 285, 287-88, 324-25 (3d Cir. 2011) (Third Circuit affirmed two settlements: (i) an indirect purchaser plaintiff settlement of $272.5 million, which represented estimated 10.9% of estimated $2.5 billion single damages; and (ii) a direct purchaser plaintiff settlement of $22.5 million, which represented less than 22.5% of the estimated $100 million single damages; *settlements were reached after default judgment entered against defendants*, who rejected that the court had jurisdiction; Third Circuit held there was "no abuse in the District Court's conclusion that the proposed settlement offered a reasonable recovery").

- *In re Dental Supplies Antitrust Litig.*, No. 16-cv-0696, ECF No. 341 (E.D.N.Y. June 24, 2019)

---

[42] *Affirmed sub nom. In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070 (11th Cir. 2023).

33

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT, PRELIMINARY APPROVAL OF THE PLAN OF ALLOCATION, APPROVAL OF THE NOTICE PLAN, AND APPROVAL OF THE PROPOSED SCHEDULE FOR COMPLETING THE SETTLEMENT PROCESS

(final approval order of $80 million antitrust class action settlement, reached after class certification and *Daubert* motions were briefed, where settlement represented 2.5-21% of estimated single damages); *see also In re Dental Supplies Antitrust Litig.*, No. 16-cv-0696, ECF No. 335-1, at 13, 17 (E.D.N.Y. May 24, 2019) (plaintiffs' final approval brief providing litigation background and damages estimates).

This trend of antitrust class actions resolving for small fractions of potential single damages has continued into the present. Indeed, earlier this year, the plaintiffs in five separate class actions in different jurisdictions settled the *Realtor Commissions* case with five defendants for approximately $972.5M on behalf of multiple classes. *See Burnett, et al. v. NAR, et al.*, No. 19-cv-332, ECF No. 1478, at 6 (E.D. Mo. May 6, 2024). One of the classes that folded into this settlement had previously gone to trial *and prevailed*, obtaining a jury verdict for nearly $1.8 billion *before trebling. See Burnett, et al. v. NAR, et al.*, No. 19-cv-332, ECF No. 1294 (E.D. Mo. Oct. 31, 2023) (verdict form). The combined alleged damages in these actions were immense—in addition to the $1.8 billion jury verdict, another one of the several classes that folded into this collective sub-$1 billion settlement had *by itself* claimed over $13 billion in single damages. *See Moehrl, et al. v. NAR, et al.*, No. 19-cv-1610, ECF No. 324-5, at 5 (N.D. Ill. June 7, 2022). Even with a large and favorable jury verdict and combined single damages in the tens of billions of dollars, the total settlement amount was less than $1 billion, *i.e.*, likely below 5% of the total available single damages. This result reflects counsel's assessment of the very real risks of antitrust trials and appeals from even the most favorable of verdicts.

One reason that antitrust class actions typically settle for a far smaller share of single damages than the Settlement in this case would represent, is that these cases pose significant risks of jury confusion and error. For instance, in August of this year, after a lengthy trial in the antitrust class action styled *In re: NFL "Sunday Ticket" Antitrust Litig.*, No. ML 15-02668 PSG (SKX), 2024 WL 3628118, at *11 (C.D. Cal. Aug. 1, 2024), the district court overturned a $4.7 billion jury verdict that had been awarded to two classes, and granted the defendants judgment as a matter of law. Despite the jury's findings, the district court concluded post-trial that the plaintiffs' class damages experts had offered unreliable testimony based on speculation relating to class-wide injury and damages, and thus the jury's verdict had to be set aside. The outcome of *NFL "Sunday Ticket"* reflects that there is risk on proceeding to trial in an antitrust class action even if a significant jury verdict is achieved.

34

In another recent cautionary tale, the plaintiffs in *In re Opana ER Antitrust Litig.*, No. 14-cv-10150, ECF No. 1085 (N.D. Ill. Nov. 3, 2022), settled an antitrust class action with one of two defendants on the first day of trial for $145 million. That amount represented about one-quarter of single damages of between $514 million to $590 million. *See* ECF No. 1081, at 1 (plaintiffs' final approval brief); ECF No. 895, at 18 (N.D. Ill. May 24, 2022) (joint pretrial order discussing damages). At the time of settlement, the court had granted class certification, denied summary judgment, and denied *Daubert*. However, the plaintiffs were unable to settle with the second defendant and so continued to a jury verdict—and lost. ECF No. 1002 (N.D. Ill. July 1, 2022) (jury verdict for non-settling defendant). With only a single defendant here, Plaintiffs here do not have the luxury of a partial settlement to guarantee some recovery for Class Members in the event of a loss at trial or on appeal.

Finally, in *Meijer, Inc. v. Abbott Labs.*, 2011 WL 13392313, at *2 (N.D. Cal. Aug. 11, 2011), the plaintiff class in an antitrust class action settled on the third day of trial for $52 million. In *Meijer*, the class had been certified, summary judgment had been denied, and the plaintiffs were trying an antitrust monopolization claim relating to an AIDS drug. Plaintiffs' expert economist in that case—the same Dr. Hal Singer that is an expert here—had computed single damages ranging from $210 million *up to $1.2 billion*, and as here the court found his models reliable and admissible. Yet *Meijer* settled during trial for about 4% of the upper end of available single damages. It was undoubtedly a good thing for the plaintiffs that they settled. A non-class co-plaintiff did not settle, continued with the same trial in front of the same jury that would have decided the class's fate—and received a defense verdict because the jury disagreed with the plaintiffs' proposed relevant market.[43]

The above cautionary tales show that the Settlement here compares quite favorably to other antitrust class actions in similar litigation postures, including those with multiple defendants proceeding with less pathbreaking claims.

### D.    The Settlement Treats Class Members Equitably

The Settlement treats Class Members equitably for the same reasons the Plan of Allocation is

---

[43] *See also Meijer, Inc. v. Abbott Labs.*, No. 07-cv-5985, ECF No. 512, at 8 (N.D. Cal. July 13, 2011) (plaintiffs' final approval brief providing damages estimates), ECF No. 501, at 6-7 (N.D. Cal. Apr. 8, 2011) (plaintiffs' preliminary approval brief providing litigation background).

fair, reasonable, and adequate, as discussed in Part II.C.2 *supra*.

### E.    The Extent of Discovery Completed and the Stage of Proceedings

The extent of the discovery completed in the Action weighs in favor of preliminary approval. The Action completed all fact and expert discovery and was on the eve of trial when an agreement to settle was reached. Where, as here, a case has completed discovery and reached an advance stage of litigation, courts have found preliminary approval warranted because these are "indicators of Lead Counsel's familiarity with the case and of Plaintiffs having enough information to make informed decisions." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008). Indeed, the Ninth Circuit has explained that "[i]n the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).

### F.    Risk of Maintaining Class Action Status Through Trial

While the Court had certified the Class (ECF No. 839), there remained a risk that Zuffa could renew its challenge to class certification post-trial. *See* Prior Joint Decl. ¶250. Whether class certification could be maintained through any post-trial appeal proceedings is by no means guaranteed.

### G.    The Experience and Views of Counsel

Class Counsel believe the Settlement is an excellent result for the Class. Prior Joint Decl. ¶¶244-45. "'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *DIRECTV*, 221 F.R.D. at 528. "This is because '[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation.'" *Id.* When the Court appointed class counsel for the Class, it noted that "through the course of this litigation, [counsel] have demonstrated that they have extensive experience and knowledge with antitrust, class action litigation." *Id.* at 79.

Where, as here, counsel are experienced litigators who understand the claims and defenses and class action issues of the litigation, the Court can rely on that experience as a factor favoring

preliminary approval.[44] Supplementing Co-Lead Class Counsel's own views, Plaintiffs previously elicited (in connection with the Prior Settlement) a declaration from a leading antitrust professor, Prof. Posner, who observed that "plaintiffs' challenge to the defendant's labor monopsony in an important sports and entertainment market has played a pioneering role in this effort, particularly in showing how an employer with power in a labor market can be challenged under section 2 of the Sherman Act." Posner Decl. ¶24. This further bolsters the case for preliminary and ultimately final approval.

### III. Notice of the Settlement Should be Approved

The Notice Plan is described in the accompanying Declaration of Steven Weisbrot, Esq. of Angeion Group LLC re the Settlement Notice Plan ("Weisbrot Decl."), dated October 7, 2024, attached as Exhibit 4 to the Supp. Joint Decl., which attaches three proposed forms of notice. *See* Weisbrot Decl. & Exs. A (Long Form Notice), B (Short Form Notice), C (Poster Notice). It is the same plan the Court approved for notice of certification to the Class, *see* ECF No. 921, but the notices have been amended to include information about the Settlement.

An adequate notice should describe "the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). The Notice Plan achieves this objective with notice documents that use plain, easy to understand language about the Action, the Settlement, and Class Members' rights. The Long Form Notice provides information about: the nature and status of the Action; the amount of the Settlement; the amount Settlement Class Counsel will request in fees, litigation expenses, and service awards for the Class Representatives to be paid from the Settlement; how Class Members can submit claims later in the process; Class Members' rights to object and attend the Fairness Hearing; the important deadlines; and how to obtain additional information, including using a website dedicated to the

---

[44] *See Moorer*, 2021 WL 4993054, at *5 ("Given Plaintiffs' counsels' experience with similar class action litigation, the Court finds that affording deference to their decision to settle the case, as well as the terms of that settlement, is appropriate."); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (preliminarily approving settlement where "experienced counsel on both sides, each with a comprehensive understanding of the strengths and weaknesses of each party's respective claims and defenses, negotiated this settlement").

Settlement or to contact the Claims Administrator. Notice containing the above information satisfies Fed. R. Civ. P. 23(c) and due process of law. *See Online DVD-Rental*, 779 F.3d at 946.

Plaintiffs further propose that Class Members do not require another chance to opt out.[45] Class Members were previously provided an opportunity to exclude themselves and none elected to do so.[46] The notices that previously issued to Class Members in connection with class certification informed them that they would not have another opportunity to opt out.[47] In these circumstances, the law provides that a second opportunity to request exclusion is not warranted in connection with notice of the Settlement.[48] Of course, should the Court desire a second opt-out period, Plaintiffs would provide one.

Plaintiffs' proposed Notice Plan satisfies the fairness standards set forth in Fed. R. Civ. P. 23. Each form of notice clearly presents all required categories of information in plain English. *See Officers for Justice*, 688 F.2d at 624; Fed. R. Civ. P. 23(c)(2)(B). The Notice Plan employs numerous means and media to provide the best notice practicable. *See Roes 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1947 (9th Cir. 2019) (recognizing value of publication notice and use of other media as supplement to direct notice). The proposed Notice Plan is the best notice that is practicable under the circumstances. It fully comports with due process and is compliant with Fed. R. Civ. P. 23. Plaintiffs respectfully request the Court approve the Notice Plan.

---

[45] *See* Prior Joint Decl. ¶153; Declaration of Steven Weisbrot, Esq. of Angeion Group, LLC re Implementation of Notice Plan and Report on Exclusions Received, ECF No. 966-1 (Feb. 5, 2024).

[46] *See id.*

[47] *See* Short Form Notice at 2-3, ECF No. 916-1 ("If you do not exclude yourself from the Bout Class, you will not be able to sue on your own, or continue to sue on your own, the Defendant with respect to any of the claims asserted or issues decided in this Action."); Long Form Notice at 4 ("However, if you stay in the Bout Class at this time, you may not have another opportunity to request exclusion (or opt-out) of the Action, and you will be unable to pursue claims against the Defendant that are being litigated in this Action separate from the Bout Class.").

[48] *See Low v. Trump Univ., LLC*, 881 F.3d 1111, 1121-22 (9th Cir. 2018) (holding no second opportunity to opt-out at settlement stage); *Musgrove v. Jackson Nurse Pros., LLC*, 2022 WL 2092656, at *7 (C.D. Cal. Jan. 11, 2022) (no second opportunity to opt-out); *In re Zillow Grp., Inc. Sec. Litig.*, 2023 WL 2766264, at *4 (W.D. Wash. Apr. 3, 2023) (same); 2 McLaughlin on Class Actions § 6:21 (20th ed. 2023) (collecting cases rejecting second opt-out).

### IV.   The Court Should Appoint Angeion as Claims Administrator

The Court should appoint Angeion Group LLC ("Angeion") as the claims administrator. Angeion was previously appointed by the Court as the notice administrator for the Class. ECF No 921, ¶1. It is knowledgeable about the Action, the composition of the Class, and the information relating to noticing the Class Members, including having obtained and/or researched current address information for Class Members. Angeion is an experienced settlement and claims administration firm with sophisticated technological capabilities and is staffed by personnel well-versed in antitrust issues and class action litigation.[49] Additionally, Plaintiffs' economic expert, Dr. Singer, and his firm, Econ One, will assist Angeion with calculating the *pro rata* distributions to Claimants. *See* Singer Decl. ¶9.

### V.   The Court Should Appoint Huntington as Escrow Agent

Plaintiffs request that The Huntington National Bank ("Huntington") be appointed as the Escrow Agent. Huntington is a highly respected bank providing consumers, corporations, and others with a broad range of financial services. Huntington has served as escrow agent in many other antitrust class actions and should also be appointed as Escrow Agent here.[50]

### VI.   The Final Approval Hearing Should Be Scheduled

To ensure efficient management of the Settlement, Plaintiffs' respectfully request that the Court direct that the below settlement schedule be implemented:

| DATE | EVENT |
|---|---|
| Within 30 days after preliminary approval | Settlement Administrator to (i) provide direct mail notice of the Settlement to the Class and (ii) commence the multi-tiered, robust media campaign publication notice plan. |

---

[49] *See* Declaration of Steven Weisbrot of Angeion Group, LLC re Angeion Qualifications and the Proposed Notice Plan, ¶¶ 3-16 & Exhibit D, ECF No. 916-1 (November 15, 2023).

[50] *See, e.g.*, *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practice and Antitrust Litig.*, No. 17-md-2785, ECF No. 2594 (D. Kan. Mar. 11, 2022); (order granting preliminary approval motion and appointing Huntington Bank as an escrow agent); *In re Opana ER Antitrust Litig.*, No. 14-cv-10150, ECF No. 1069 (N.D. Ill. Aug. 24, 2022) (same).

| DATE | EVENT |
|---|---|
| Within 60 days after preliminary approval | Co-Lead Class Counsel shall file a motion for attorneys' fees, unreimbursed litigation costs and expenses, and service awards for the Class Representatives, pursuant to the terms of the Settlement Agreement. |
| Within 90 days after preliminary approval | Class Members may submit any objection to the proposed Settlement or to Class Counsel's request for attorneys' fees, unreimbursed litigation costs and expenses, and service awards to the Class Representatives. |
| Within 21 days after the objection deadline | No later than 21 days after the expiration of the deadline for members of the Class to object to the proposed Settlement and/or attorneys' fees, expenses and service awards, or Plan of Allocation, Co-Lead Class Counsel shall file all briefs and materials in support of final approval of the Settlement. |
| At least 30 days after the objection deadline[51] | Final Settlement Fairness Hearing |

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an order substantially in the form of the proposed Order: (i) granting preliminary approval of the Settlement Agreement; (ii) reaffirming the Court's finding that the requirements of Fed. R. Civ. P. 23 are satisfied for the Class, including for purposes of settlement and judgment; (iii) reaffirming the appointment of Co-Lead Class Counsel under Fed. R. Civ. P. 23(g); (iv) authorizing dissemination of notice of the Settlement to the Class; (v) preliminarily approving the Plan of Allocation; (vi) appointing Angeion Group LLC as Settlement Claims Administrator; (vii) appointing The Huntington National Bank as Escrow Agent and approving the Custodian/Escrow Agreement; (viii) approving the *Le v. Zuffa* Settlement Fund as a qualified settlement fund pursuant to Internal Revenue Code Section 468B; and (ix) approving the proposed Settlement schedule, including setting a date for a final Fairness Hearing.

---

[51] Under the proposed schedule, the earliest date a Fairness Hearing could likely take place is 106 days from preliminary approval.

40

Dated: October 7, 2024

Respectfully submitted,

*/s/ Eric L. Cramer*
Eric L. Cramer (pro hac vice)
Michael Dell'Angelo (pro hac vice)
Ellen T. Noteware (pro hac vice)
Patrick F. Madden (pro hac vice)
Najah Jacobs (pro hac vice)
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: +1 (215) 875-3000
Email: ecramer@bm.net
Email: mdellangelo@bm.net
Email: enoteware@bm.net
Email: pmadden@bm.net
Email: njacobs@bm.net

Joshua P. Davis (pro hac vice)
Robert Maysey (pro hac vice)
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone: +1 (415) 906-0684
Email: jdavis@bm.net
Email: rmaysey@bm.net

Richard A. Koffman (pro hac vice)
Benjamin Brown (pro hac vice)
Daniel Silverman (pro hac vice)
Daniel L. Gifford (pro hac vice)
COHEN MILSTEIN SELLERS & TOLL
    PLLC
1100 New York Ave., N.W.
Suite 500 East, Tower
Washington, DC 20005
Telephone: +1 (202) 408-4600
Facsimile: +1 (202) 408-4699
Email: rkoffman@cohenmilstein.com
Email: bbrown@cohenmilstein.com
Email: dsilverman@cohenmilstein.com
Email: dgifford@cohenmilstein.com

Joseph R. Saveri (pro hac vice)
Kevin E. Rayhill (pro hac vice)
Christopher Young (pro hac vice)
Itak Moradi (pro hac vice)
JOSEPH SAVERI LAW FIRM, LLP
601 California St., Suite 1505
San Francisco, CA 94108
Telephone: +1 (415) 500-6800
Facsimile: +1 (415) 395-9940
Email: jsaveri@saverilawfirm.com
Email: krayhill@saverilawfirm.com
Email: cyoung@saverilawfirm.com
Email: imoradi@saverilawfirm.com

*Co-Lead Counsel for the Le Class and
Attorneys for Individual and Representative
Plaintiffs Cung Le, Nathan Quarry, Jon Fitch,
Brandon Vera, Luis Javier Vazquez,* and *Kyle
Kingsbury*

Don Springmeyer (Bar No. 1021)
Michael Gayan (Bar No. 11135)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone: + 1 (702) 385-6000
Facsimile: + 1 (702) 385-6001
Email: dspringmeyer@kempjones.com
Email: m.gayan@kempjones.com

*Liaison Counsel for the Class and Plaintiffs
Cung Le, Nathan Quarry, Jon Fitch, Brandon
Vera, Luis Javier Vazquez, and Kyle
Kingsbury*

Crane M. Pomerantz
CLARK HILL PLC
1700 Pavilion Center Dr., Suite 500
Las Vegas, NV 89135
Telephone: +1 (702) 697-7545
Email: cpomerantz@clarkhill.com

*Additional Counsel for the Class and
Plaintiffs Cung Le, Nathan Quarry, Jon Fitch,
Brandon Vera, Luis Javier Vazquez, and Kyle
Kingsbury*