# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT NEVADA**

| | |
|---|---|
| CUNG LE, NATHAN QUARRY, JON FITCH, BRANDON VERA, LUIS JAVIER VAZQUEZ, and KYLE KINGSBURY, On Behalf of Themselves and All Others Similarly Situated, | Case No. 2:15-cv-01045-RFB-BNW |
| Plaintiffs, | |
| v. | |
| ZUFFA, LLC, D/B/A ULTIMATE FIGHTING CHAMPIONSHIP and UFC, | |
| Defendant. | |
| KAJAN JOHNSON and CLARENCE DOLLAWAY, On Behalf of Themselves and All Others Similarly Situated, | Case No. 2:21-cv-01189-RFB-BNW |
| Plaintiffs, | |
| vs. | |
| ZUFFA, LLC, TKO OPERATING COMPANY, LLC F/K/A ZUFFA PARENT LLC (D/B/A ULTIMATE FIGHTING CHAMPIONSHIP and UFC), and ENDEAVOR GROUP HOLDINGS, INC., | |
| Defendants. | |

**JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN, AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT**

1  | Pursuant to the 28 U.S.C. §1746, we, Eric L. Cramer, Richard A. Koffman, and Joseph

2  | R. Saveri declare:

3  | 1.   We are, respectively, partners or shareholders of the law firms of Berger Montague PC

4  | ("Berger Montague"), Cohen Milstein Sellers & Toll, PLLC ("Cohen Milstein"), and Joseph Saveri

5  | Law Firm, LLP ("JSLF"). Together we have been approved as Co-Lead Class Counsel (ECF No. 839 at

6  | 79)[1] (collectively referred to herein as "Co-Lead Class Counsel")[2] for the class certified in *Le, et al. v.*

7  | *Zuffa, LLC d/b/a Ultimate Fighting Championship and UFC*, No. 15-cv-01045 (D. Nev.) (the "*Le*

8  | Action"). The *Le* Action along with *Johnson, et al. v. Zuffa, LLC, et al.*, No. 21-cv-01189 (D. Nev.)

9  | (the "*Johnson* Action"), are collectively referred to as the "Actions." Each of us has been actively

10 | involved in developing, prosecuting, and resolving the Actions, is familiar with their proceedings, and

11 | has personal knowledge of the facts and circumstances set forth herein. If called upon and sworn as

12 | witnesses, each of us would be competent to testify thereto. We respectfully submit this Joint

13 | Declaration in Support of the Motion for Preliminary Approval of the Settlement.

14 | 2.   These Actions began well before the December 16, 2014 filing of the *Le* Action, with

15 | extensive pre-filing investigation without the aid of government involvement or compulsory process. In

16 | all, from inception through the litigation of *Le*, the filing and litigation of *Johnson*, the Settlement, and

17 | if approved, the Settlement and allocation process, Co-Lead Class Counsel, and supporting law firms

18 | (Co-Lead Class Counsel and supporting firms collectively referred to as "Class Counsel"), will have

19 | devoted well more a decade to these Actions on a fully contingent basis. The law firms involved

20 | expended many millions of dollars in out-of-pocket costs and tens of thousands of hours of professional

21 | time with no guarantee of a recovery of any kind in a case that involved substantial risk, including the

22 | prospect of total or partial loss pre-trial, at trial, or on appeal, and risks associated with delay.

23 |

24 | [1] All citations to the docket are to the *Le* Action unless expressly indicated otherwise.

25 | [2] On July 31, 2015, the Court appointed Berger Montague, Cohen Milstein, and JSLF as Interim Co-

26 | Lead Class Counsel, and Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP ("Wolf Rifkin") as Interim Liaison Counsel for the then-proposed class in the *Le* action. *See* ECF No. 140. In the Order certifying the *Le* Class, the Court appointed Wolf Rifkin as one of the Class Counsel. The lead lawyer at Wolf

27 | Rifkin was Don Springmeyer. Mr. Springmeyer changed law firms as of January 1, 2021, and his new law firm, Kemp Jones, LLP ("Kemp Jones"), took over the role of representing Plaintiffs and the *Le*

28 | Class. *See* ECF No. 780.

---

Moreover, the *Le* Class Representatives[3] and Nathan Quarry ("Quarry"), together with the named plaintiffs in the *Johnson* Action (Kajan Johnson, Clarence Dollaway, and Tristan Connelly), collectively devoted thousands of hours in assisting in the prosecution of the Actions.

    3.    Unless otherwise defined herein, all capitalized terms have the same meanings set forth in the April 24, 2024 Settlement Agreement ("Settlement Agreement") attached as Exhibit 1. Citations to the Settlement Agreement will use the format "SA ¶ ___."

    4.    The Settlement Agreement provides for cash payments totaling $335 million into the UFC Settlement Fund for the benefit of the Settlement Classes, as well as significant prospective relief that would unwind some of the key conduct challenged as anticompetitive in the Actions. SA ¶¶ 5, 6. The Settlement is an excellent result for the Settlement Classes considering (a) the benefits of the Settlement, namely, substantial cash recovery and significant prospective relief, as well as (b) the substantial litigation risks Plaintiffs faced in both Actions, including significant risks associated with delay. An initial estimate of the likely distribution of the Net Settlement Fund indicates that each eligible claimant from the *Le* Class may receive, as an award from the Settlement, as much as 25% (or more) of his or her total earnings from the UFC for bouts fought during the entire *Le* Class Period. Certain claimants from the *Johnson* Settlement Class will receive as much as 10% of their lifetime earnings from the UFC for bouts fought during the *Johnson* Class Period, in addition to benefitting from the prospective relief provided. Accordingly, the Settlement is fair, reasonable, and adequate.

    5.    Throughout this litigation, Co-Lead Class Counsel have directed and overseen the work of their own attorneys and staff, as well as the attorneys and staff of the few other firms that assisted in this litigation ("Supporting Counsel").[4] Co-Lead Class Counsel have been involved in every aspect of the Actions. Co-Lead Class Counsel have collaborated to develop, initiate, litigate, and resolve the Actions, including conducting extensive pre-filing investigation without the benefit of government involvement or the ability to compel pre-complaint document production. We have overseen extensive

---

[3] The *Le* Class Representatives are Cung Le, Jon Fitch, Kyle Kingsbury, Brandon Vera, and Javier Vazquez.

[4] "Supporting Counsel" refers to all or some of the following firms: Wolf Rifkin, Kemp Jones, Warner Angle, Clark Hill PLC, The Radice Law Firm, and/or Spector Roseman Kodroff & Willis.

fact and expert discovery, and prepared motions and briefing on multiple dispositive and non-dispositive motions. On the settlement front, the parties retained renowned mediator, and former U.S. District Judge, Hon. Layn Phillips, to preside over the mediation process, which included, *inter alia*, three full day in-person mediation sessions spread over six years (in 2017, 2019, and 2023), and multiple follow-up engagements via phone, video conference, and otherwise. As trial approached in the *Le* Action, the parties' settlement discussions accelerated, ultimately resulting in the Settlement. Co-Lead Class Counsel presided over the Settlement negotiations, participated in drafting and editing the term sheet and long-form settlement agreement, developed the class notice and notice plan, developed the allocation plan (in conjunction with consultants and experts), and prepared all of the necessary papers for seeking preliminary approval of the Settlement. Co-Lead Class Counsel have dedicated substantial time and resources to lead the prosecution of the Actions, collectively spending tens of thousands of hours on the Actions. Supporting Counsel have also dedicated significant time and effort litigating the Actions, collectively spending many thousands of hours as well.

6.      For the reasons set for the below and in the accompanying memorandum of law, the Court should grant preliminary approval of the Settlement.

## PROSECUTION OF THE ACTIONS

### A. Investigation and Filing of the *Le* Action

7.      Class Counsel's investigation of the UFC's alleged anticompetitive conduct began prior to any inquiry by the Federal Trade Commission ("FTC"). Berger Montague independently initiated an investigation into alleged anticompetitive conduct in the Mixed Martial Arts ("MMA") industry many months before filing a complaint. Berger Montague's initial investigation included analyses of the UFC's acquisition of Strikeforce, the initial FTC inquiry, the UFC's conduct toward Bellator, and the UFC's conduct toward fighters surrounding MMA video games. Berger Montague's investigation continued after the FTC refused to bring an enforcement action against the UFC relating to the UFC's acquisition of Strikeforce.

8.      Beginning in 2014, Cohen Milstein separately initiated an investigation in conjunction with Warner Angle Hallam Jackson & Formanek PLC ("Warner Angle"). Thereafter, Berger Montague, Cohen Milstein, and Warner Angle joined forces to coordinate their efforts in the best

interests of the classes that would ultimately be proposed in the Actions. In total, Berger Montague, Cohen Milstein, and Warner Angle reasonably devoted thousands of hours to the pre-complaint investigation of this litigation. In advance of filing in the Northern District of California, Plaintiffs brought in the Joseph Saveri Law Firm to assist with the litigation of the case.

9.      Plaintiffs Cung Le, Nathan Quarry, and Jon Fitch filed the *Le* Complaint on December 16, 2014, in the United States District Court for the Northern District of California. ECF No. 1. In the next few days, Class Counsel filed two additional complaints in the Northern District of California against Zuffa, LLC ("Zuffa") on behalf of Luis Javier Vazquez in the second action and Brandon Vera in the third action. *See Vazquez v. Zuffa, LLC*, No. 5:14-cv-4491, ECF No. 1 (N.D. Cal. Dec. 22, 2014); *Vera v. Zuffa, LLC*, No. 14-cv-5621, ECF No. 1 (N.D. Cal. Dec. 24, 2014). On February 4, 2015, another firm filed a similar action in the Northern District of California with JSLF serving as local counsel to coordinate that action with Co-Lead Class Counsel's actions. *See Ruediger v. Zuffa, LLC*, No. 5:15-cv-521 (N.D. Cal.). Co-Lead Class Counsel moved to relate each of these later-filed actions to the *Le* Action (*Le* Action, ECF Nos. 9, 13, 49), and then moved to consolidate all four of these actions together for pre-trial purposes.[5] ECF No. 52. After the *Le* Action was transferred to this District, this Court granted consolidation of the various matters into the *Le* Action on June 11, 2015. ECF No. 101.

10.      Following Plaintiffs' filing of the *Le* Action, the FTC again opened an inquiry into Zuffa's conduct in the MMA industry. But after a brief investigation, the FTC sent Zuffa a letter stating that "[u]pon further review of this matter, it now appears that no further action is warranted by the Commission at this time." *See Federal Trade Commission ends second investigation of UFC*, MMA Fighting (Nov. 24, 2015), *available at* https://www.mmafighting.com/2015/11/24/9796478/federal-trade-commission-ends-second-investigation-of-ufc.

**B. Motions to Dismiss, to Transfer Venue and to Stay Discovery**

11.      On January 30, 2015, Zuffa moved to transfer the *Le* Action from the United States District Court for the Northern District of California (where Plaintiffs had filed and where several

---

[5] On March 20, 2015, Class Counsel filed a fourth complaint on behalf of Kyle Kingsbury as a named plaintiff. *Kingsbury v. Zuffa, LLC*, No. 5:15-cv-1324, ECF No. 1 (N.D. Cal.) ("Kingsbury Action"). Plaintiffs then moved to relate the *Kingsbury* Action to the *Le* Action. *Le* Action, ECF No. 67 (Mar. 23, 2015). The Court granted Plaintiffs' motion. ECF No. 68.

4

1   plaintiffs resided) to the United States District Court for the District of Nevada, where Zuffa was based.

2   *See* ECF No. 31. Plaintiffs opposed the transfer motion, ECF No. 69, including by collecting and

3   presenting materials properly subject to judicial notice evidencing MMA bouts taking place in the

4   Northern District of California and significant interest in MMA in that District. *See* ECF No. 70. On

5   June 2, 2015, the court granted the transfer motion, resulting in transfer to this Court. ECF No. 93.

6          12.    While the motion to transfer venue was pending, Zuffa moved to dismiss the complaints,

7   ECF No. 64 (Feb. 27, 2015), relying in part on a Request for Judicial Notice of various records of state

8   agencies that regulate MMA events, a form 10-K from Viacom, Inc. (which then owned the MMA

9   promotion Bellator), and the letter from the FTC closing its inquiry into the Strikeforce acquisition.

10  ECF No. 65 (Feb. 27, 2015). Plaintiffs filed a consolidated opposition brief, ECF No. 71 (Apr. 10,

11  2015), and Plaintiffs' own Request for Judicial Notice of, *inter alia*, Zuffa's statements on its own

12  website and elsewhere on the internet as well as an analyst report from Moody's Investor Service. ECF

13  No. 72 (Apr. 10, 2015).

14         13.    After filing its reply briefs in support of its motions to dismiss (ECF No. 82) and

15  transfer (ECF No. 79) in the Northern District of California, Zuffa filed a motion to stay discovery until

16  resolution of the motions to transfer and dismiss. ECF No. 87. Plaintiffs and Zuffa negotiated a

17  stipulation to stay discovery pending resolution of the transfer motion and further stipulated that if the

18  transfer motion were granted, the parties' existing briefing on the motion to dismiss would be sufficient

19  for this Court to adjudicate the issues. ECF No. 91. The Court in the Northern District of California

20  granted the motion to transfer to this District on June 2, 2015. ECF No. 93. Because the motion to

21  transfer was granted, this Court considered Zuffa's motion to dismiss that the parties had briefed in the

22  Northern District of California.

23         14.    On September 25, 2015, the undersigned counsel from Berger Montague argued

24  Plaintiffs' opposition to Zuffa's motion to dismiss in this Court. *See* ECF No. 186. The Court denied

25  Zuffa's motion from the bench on September 25, 2015, *id.*, issuing a written Order on October 19,

26  2016. ECF No. 314. The Court ruled that discovery would begin at once, mooting Zuffa's motion to

27  stay. The parties began fact discovery as of September 25, 2015.

28         15.    Plaintiffs filed their Consolidated Amended Complaint on December 18, 2015, ECF No.

5

208, which Zuffa answered on January 19, 2016. ECF No. 212.

**C. Fact Discovery in the *Le* Action**

16.     Co-Lead Class Counsel, along with Supporting Counsel, continued to litigate the case aggressively, focusing on voluminous and complex fact discovery. It was through this discovery that Plaintiffs built the foundations for (a) class certification, (b) Plaintiffs' expert reports, (c) oppositions to Defendants' summary judgment and *Daubert* motions, (d) the presentations of evidence at any jury trial in this matter, and (e) defense of any judgment on appeal that may have arisen.

17.     Co-Lead Class Counsel effectively managed the prosecution of this litigation throughout discovery, holding weekly conference calls among Co-Lead Class Counsel, Liaison Counsel at Wolf Rifkin (later Kemp Jones), and Warner Angle to discuss and organize discovery tasks, monitor progress among tasks, and plan litigation strategy.

18.     In addition, each month, Co-Lead Class Counsel invited Supporting Counsel at the Radice Law Firm and Spector Roseman & Kodroff PC to join the call to share updates on their tasks and to ensure that those firms were up-to-date on strategy and other case matters.

19.     Following that "all-counsel" call each month, Co-Lead Class Counsel, Liaison Counsel, and Warner Angle invited the *Le* Class Representatives and Quarry to join the calls so that the *Le* Class Representatives and Quarry could share their knowledge about relevant facts and be continually apprised of the progress of the litigation.

**i.     Document and Data Preservation Efforts**

20.     Almost immediately upon filing, Plaintiffs took steps to ensure that the UFC and certain third parties preserved relevant electronically stored data and information ("ESI").

21.     On December 17, 2014, JSLF sent a preservation letter to the UFC regarding the need to preserve ESI.

22.     On or about December 18, 2014, Plaintiffs observed that certain social media posts of Dana White that Settlement Class Counsel had reviewed prior to initiating the *Le* Action appeared to become unavailable in the days after filing. JSLF sent a preservation letter to Twitter on December 18, 2014 concerning these and other posts of Dana White and the UFC, and Plaintiffs issued subpoenas to

6

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

Twitter (n/k/a X) and Google in January 2015 to ensure that Google and Twitter preserved certain YouTube videos and Twitter posts.

23.     Further, as discussed in more detail *infra*, Berger Montague doggedly pursued discovery material from Zuffa, ultimately ensuring that a significant volume of critical documents that Zuffa had not otherwise retained, and believed had been destroyed, could be located from a third-party document vendor from a separate matter and produced in the *Le* Action.

### ii.     Written Discovery with Zuffa

24.     Plaintiffs and Zuffa held an in-person Fed. R. Civ. P. 26(f) conference on April 13, 2015. During that meet and confer, the parties negotiated terms for a Stipulation concerning ESI (filed at ECF No. 160), and most of the terms of a stipulated Protective Order. However, the parties were unable to agree to certain terms, which resulted in the parties briefing the issues in a joint status report. *See* ECF No. 185. Ultimately, Plaintiffs prevailed, with Magistrate Judge Peggy A. Leen entering an Order in Plaintiffs favor as to the disputed issues. *See* ECF No. 190.

25.     Plaintiffs served their Initial Disclosures pursuant to Fed. R. Civ. P. 26(a)(1) on May 8, 2015. With the assistance of the intensive investigation of supporting counsel at Warner Angle, Plaintiffs identified more than 100 individuals with discoverable information that Plaintiffs believed they may use to prove their claims, including MMA fighters, agents and managers, and rival promoters.

26.     Plaintiffs also served their First Set of Interrogatories on Zuffa on August 11, 2015, focusing the requests on identifying (1) class member fighters, (2) the identity of Zuffa employees, executives, and agents that may have discoverable information, and (3) the identity of online social media, blogs, networks, and other online accounts that Zuffa maintains so that Plaintiffs could try to ensure preservation of materials stored in those locations.

27.     Plaintiffs served their First Set of Requests for Production of Documents on April 26, 2015, and quickly set to work negotiating the scope of Zuffa's document discovery. Berger Montague led the meet and confers with Zuffa, engaging in regular teleconferences and letter exchanges to negotiate the relevant time period applicable to document discovery, the number and identity of custodians, and the search terms to be applied to the documents Zuffa collected.

28.     Berger Montague worked extensively with Zuffa's counsel to negotiate appropriate search terms that Zuffa would use to cull the documents it collected for production to Plaintiffs.

29.     Zuffa's first offer of search terms was a list of 91 words, apparently drawn only from Plaintiffs' Complaint, and including terms not used in common parlance such as "monopsony" and "class action." To counter Zuffa's proposal, Berger Montague compiled thousands of terms for testing. Berger Montague drew these terms from Zuffa's early production of materials that Zuffa had produced to the FTC in connection with the FTC's 2012 inquiry into the Strikeforce acquisition as well as fighter names and nicknames. Zuffa complained that these terms returned too high of a percentage of the total document collection.

30.     Berger Montague commenced to negotiate the proper terms through an iterative process:

    a.  The parties exchanged search term proposals, Zuffa would run the search terms and deliver to Berger Montague for analysis the hit counts of both Zuffa's proposed search terms and Berger Montague's proposed search terms, and the parties would then exchange proposals for next steps.

    b.  Berger Montague negotiated the production of limited sets of documents that hit on particular search terms that Zuffa claimed were overbroad and then used the information from those documents to try to narrow the terms Berger Montague proposed for the next round.

    c.  Berger Montague reviewed these limited document sets to identify how the terms were applying to draw an overbroad selection. Berger Montague then analyzed how revisions to the Plaintiffs' search term proposals would apply to discriminate between the irrelevant documents Zuffa claimed to want to withhold, while still identifying the relevant and critical discovery the search terms targeted in the first place. Among other things, Berger Montague ran the proposed search terms over the existing production and then some potential revisions to the search terms to identify what proportion of documents would be excluded by a potential revision. Berger Montague then reviewed the results to determine whether documents that Plaintiffs' document reviewers had coded as relevant or "hot" had been excluded by the revision. Berger Montague then developed new revisions as appropriate and re-ran this process until the proposed search terms significantly reduced the number of documents hitting on the terms without losing the important, relevant material.

    d.  This process and the related dealings between the parties repeated over the course of several months—from December 2015 to May 2016—and numerous iterations of terms and revisions.

31.     In addition to these direct negotiations, Plaintiffs and Zuffa attended status conferences with the Court during this period, including on September 30, 2015, November 17, 2015, December 8,

2015, January 26, 2016, February 23, 2016, and May 17, 2016, as the parties litigated the scope of Zuffa's document production. *See* ECF Nos. 190, 200, 207, 214, 225, 264 (relevant status conference minute orders).

32.     Prior to each of these status conferences, the parties prepared detailed joint status reports to apprise the Court of updates on the parties' negotiations and efforts to locate discovery materials. *See* ECF Nos. 185, 199, 206, 213, 218, 244, 254. These status reports covered hundreds of pages of argument on the status of negotiations and articulated the parties' positions and discovery disputes. Because the parties filed these status reports jointly, the process required significant coordination. To complete the status reports, Berger Montague and Zuffa's counsel first held serial meet and confer teleconferences as the deadlines drew near to try to resolve as many disputed issues as possible. Following these calls, Berger Montague and Zuffa's counsel would exchange detailed meet and confer correspondence confirming the substance of the teleconferences, updating on deliverables promised during the calls, further articulating the parties' positions and responses, and proposing further steps prior to the next call.

33.     Prior to the February 23, 2016 and May 17, 2016 status conferences, the parties engaged experts on document search processes. Plaintiffs retained Charles Kellner to prepare two reports concerning search terms for Zuffa's document collection. *See* ECF Nos. 221, 244-1. Mr. Kellner is a consultant specializing in assisting attorneys with document search processes and methods. *See* ECF No. 221 ¶¶1-8. Berger Montague worked with Mr. Kellner to develop Plaintiffs' arguments and positions in these reports and related briefing. Plaintiffs submitted Mr. Kellner's report to Judge Leen. Following the parties' briefing and expert reports on these search term issues, the Court adopted Plaintiffs' position on June 3, 2016. *See* ECF No. 272.

34.     Plaintiffs expended significant efforts to obtain documents relating to the early portion of the alleged anticompetitive scheme, *i.e.*, from 2005 to 2013. During the parties' initial discussions concerning document preservation and further meet and confers following service of Plaintiffs' RFPs, it became clear that Zuffa's standard document destruction protocols caused the destruction of most documents (in particular, emails and correspondence) from the period before mid-2014. Because Plaintiffs' Complaint alleged that Zuffa's anticompetitive scheme had commenced no later than 2006,

9

the absence of document discovery from before mid-2014 could have undercut Plaintiffs' ability to prove significant aspects of their case. As a result, Berger Montague focused early discovery efforts on identifying potential custodians who had significant volumes of documents saved and available from this pre-2014 time-period that were outside the scope of Zuffa's document destruction protocol. Berger Montague also repeatedly pressed Zuffa's counsel to take efforts to locate the documents that Zuffa had collected for review and production to the FTC in connection with the FTC's inquiry into Zuffa's acquisition of MMA promoter Strikeforce.

35.     Plaintiffs' efforts yielded a significant volume of documents. Zuffa ultimately produced nearly 500,000 documents dated before January 1, 2014, including almost 300,000 dated before December 31, 2010, and approximately 60,000 documents dated before December 31, 2009. These early case materials comprised critical components of Plaintiffs' expert reports, class certification record, and the ultimate proof of their claims on summary judgment.

36.     Plaintiffs served their Second Set of Requests for Production of Documents on Zuffa on August 8, 2016. These "Second RFPs" sought documents relating to Zuffa's efforts to sell itself in 2016, as well as documents relating to, and analyzing, the sale itself. Further, the Second RFPs sought documents concerning discrete issues that Plaintiffs' First RFPs and third-party subpoenas uncovered.

37.     Ultimately, through Plaintiffs' efforts to obtain document discovery, Zuffa produced more than 775,000 documents comprising more than 3 million pages.

38.     Following a competitive bidding process, Co-Lead Class Counsel engaged a document hosting vendor (CasePoint) to store and manage these documents (as well as documents collected from Plaintiffs and third parties).[6]

39.     Plaintiffs reviewed these documents using a variety of techniques. Plaintiffs applied technology assisted review techniques ("TAR") to sort and categorize the materials and facilitate an efficient review. Plaintiffs segregated various documents reflecting contracts between the UFC and

---

[6] After the August/September 2019 Evidentiary Hearing on Plaintiffs' Motion for Class Certification (discussed *infra*), Co-Lead Class Counsel took the document production and coding offline and stored it on hard drives so as to cease incurring monthly hosting charges. After the Court's Order certifying the *Le* Class in August 2023, Co-Lead Class Counsel engaged a different hosting vendor, Everlaw, to re-load the document production and coding for summary judgment and in preparation for trial.

10

fighters or others for expert review using these TAR techniques, and further identified critical documents at an early stage to allow Plaintiffs to focus discovery efforts going forward.

40.     Co-Lead Class Counsel organized a document review drawing from internal resources as well as reviewers at Supporting Firms. Co-Lead Class Counsel developed a coding panel for document reviewers and then trained the reviewers in the case and coding instructions. Co-Lead Class Counsel managed the review process, holding regular teleconferences with the document reviewers to ensure that issues the reviewers observed could be timely communicated and discussed among Co-Lead Class Counsel and the reviewers. Warner Angle also kept a log of the documents that document reviewers coded as "hot," and regularly circulated that log to Co-Lead Class Counsel. Co-Lead Class Counsel reviewed the log of "hot" documents and raised issues (such as coding documents as "hot" that were not "hot"), and flagging issues for reviewers to keep in mind as they emerged.

41.     In addition to the foregoing, Plaintiffs issued three additional sets of Interrogatories and five sets of Requests for Admission (totaling 267 Requests for Admission not counting subparts). These materials sought admissions and information on wide-ranging aspects of the case including, without limitation, so-called "contention interrogatories" that sought explication of Zuffa's stated affirmative defenses and also required that Zuffa admit to the authenticity of video clips in which its executives made statements against their interests that were relevant to Plaintiffs' claims and Zuffa's defenses (*see* discussion *infra*).

42.     Among the analytical projects Co-Lead Class Counsel, and Berger Montague in particular, undertook in connection with written discovery from Zuffa was an analysis of the tens of thousands of text messages Zuffa produced. Berger Montague identified the text productions of custodians in the production and compiled those texts for specific analyses, organizing the produced text messages in various ways to identify text messages on similar subject matter based on dates and individuals involved, and for other purposes. Most notably, Berger Montague compiled all text messages Zuffa produced to or from a phone used by UFC President Dana White (Mr. White used multiple phones at any one time). Through this analysis, Berger Montague determined that a significant proportion of the text messages Mr. White sent or received had been deleted or otherwise destroyed. Specifically, of the more than 8,100 texts sent to or from a phone used by UFC President Dana White

11

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

1   in the production, Berger Montague's analysis reflected that more than 1,900 of those texts (nearly

2   25%) were not collected from Dana White's devices.

3       43.     In response, Berger Montague initiated a meet and confer process with Zuffa to learn

4   more about Mr. White's cellphone usage. Ultimately, Plaintiffs brought the issue to the Court for

5   resolution. *See* ECF Nos. 395, 397. Although Plaintiffs did not obtain relief for spoliation through that

6   motion, *see* ECF No. 422, litigation of the issue generated compelling evidence for the cross-

7   examination of Dana White regarding spoliation and credibility. By pressing these questions, Plaintiffs

8   (1) caused Dana White to submit a sworn declaration that appeared to be internally inconsistent, (2)

9   examined Mr. White on those alleged inconsistencies at his deposition leading to what Plaintiffs

10  believe was damaging testimony relating to his alleged inability to reconcile those inconsistencies, and

11  (3) created, through that testimony and the absence of the phone records from these cellphones, a basis

12  for arguing spoliation at trial and for potentially substantially undermining Mr. White's credibility

13  before the jury.

14          **iii.     Third Party Document Subpoenas**

15      44.     In addition to Plaintiffs' efforts to obtain documents directly from Zuffa, Plaintiffs also

16  issued over 50 document subpoenas to third parties. These third parties included: (1) managers and

17  agents for various MMA fighters; (2) MMA promotions and the owners of past MMA promotions

18  (including, without limitation, Strikeforce, Bellator, One Championship, International Fight League,

19  World Series of Fighting, Affliction, World Fighting Alliance, Invicta, Legacy FC, and Titan FC); (3)

20  entities (and their law firms) that sought to acquire Zuffa in 2016, including WME-IMG Endeavor that

21  ultimately did acquire Zuffa in 2016; (4) financial institutions that worked on behalf of Zuffa over the

22  years and those that worked on behalf of the entities that sought to acquire Zuffa in 2016; and (5)

23  Mercer, an entity that undertook a fighter compensation study at Zuffa's behest. We provide the scope

24  of the third parties that Plaintiffs targeted with subpoenas that were actively pursued in the below table:

25

26

27

28

                                                                                            12

| # | ENTITY[7] | ENTITY TYPE |
|---|---|---|
| 1 | Affliction | MMA Promoter and MMA Fighter Sponsor |
| 2 | Ali Abdel-Aziz | MMA Fighter Manager and Matchmaker for MMA Promoter |
| 3 | American Top Team | MMA Fighter Manager |
| 4 | AXS TV | MMA Broadcaster and Acquirer of MMA Promotion Assets |
| 5 | Barclays PLC | Financial Institution relating to Potential Zuffa Acquisition |
| 6 | Bellator | MMA Promoter |
| 7 | Bob Meyrowitz | Former owner of the UFC |
| 8 | Brian Butler-Au | Fighter Manager |
| 9 | Brian Hamper | Fighter Manager |
| 10 | Cindy Ortiz | MMA Fan Appearing in Zuffa-Produced Emails |
| 11 | Citibank, N.A. | Financial Institution |
| 12 | Credit Suisse | Financial Institution relating to Potential Zuffa Acquisition |
| 13 | David Martin, Martin Advisory Group, LLC | MMA Fighter Manager |
| 14 | Deutsche Bank Securities, Inc. | Financial Institution; Financial Institution relating to Potential Zuffa Acquisition |
| 15 | Deutsche Bank Trust Co. | Financial Institution |
| 16 | Ed Fishman | MMA Fighter Manager |
| 17 | Ed Soares | MMA Promoter and MMA Fighter Manager |
| 18 | Fighter Tribe Management | MMA Fighter Manager |
| 19 | First Round Management | MMA Fighter Manager |
| 20 | Freshfields Bruckhaus Deringer LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 21 | Gareb Shamus | MMA Promoter |
| 22 | Gary Ibarra | MMA Fighter Manager |
| 23 | George Prajin | MMA Fighter Manager |
| 24 | Glenn Robinson | MMA Fighter Manager and MMA Fighter Sponsor |
| 25 | Goldman Sachs & Co. | Financial Institution relating to Potential Zuffa Acquisition |
| 26 | Greg Jamison | MMA Promoter |
| 27 | Invicta | MMA Promoter |
| 28 | J.P. Mogan Chase & Co. | Financial Institution relating to Potential Zuffa Acquisition |
| 29 | Jeff Clark | MMA Fighter Manager |
| 30 | Jeremy Lappen | MMA Promoter; MMA Fighter Manager |

---

[7] Note that in some circumstances, Plaintiffs served an entity and certain individuals affiliated with that entity, and in other circumstances, Plaintiffs served only the entity or only individuals.

13

| # | ENTITY[7] | ENTITY TYPE |
|---|-----------|-------------|
| 31 | Ken Pavia | MMA Fighter Manager |
| 32 | Kirkland & Ellis LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 33 | KKR Capital Markets LLC | Financial Institution relating to Potential Zuffa Acquisition |
| 34 | Kurt Otto | Principal of MMA Promoter |
| 35 | Legacy Fighting Championship | MMA Promoter |
| 36 | Leo Khorolinsky | MMA Fighter Manager |
| 37 | Lex McMahon | MMA Promoter and MMA Fighter Manager |
| 38 | Mercer (US), Inc. | Consultant |
| 39 | Milbank, Tweed, Hadley & McCloy LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 40 | MMA Inc. | MMA Fighter Manager |
| 41 | Monte Cox | MMA Fighter Manager |
| 42 | Moody's Financial Services, Inc. | Financial Rating Institution |
| 43 | MSD Capital L.P. | Financial Institution relating to Potential Zuffa Acquisition |
| 44 | Paul, Weiss, Rifkind, Wharton & Garrison LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 45 | Proskauer Rose LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 46 | Resurrection Fighting Alliance | MMA Promoter |
| 47 | Samuel Spira | Attorney |
| 48 | Sharks Sports & Entertainment | MMA Promoter |
| 49 | Shu Hirata | MMA Fighter Manager |
| 50 | Silver Lake Partners | Potential Zuffa Acquirer |
| 51 | Simpson Thatcher & Bartlett LLP | Law Firm subpoenaed relating to Potential Zuffa Acquisition |
| 52 | Standard & Poor's Financial Services LLC | Financial Rating Institution |
| 53 | The Blackstone Group L.P. | Potential Zuffa Acquirer |
| 54 | The Raine Group LLC | Consultant relating to Potential Zuffa Acquisition |
| 55 | Titan FC | MMA Promoter |
| 56 | VFD Marketing | MMA Fighter Manager |
| 57 | William Morris Endeavor Entertainment LLC | Potential Zuffa Acquirer |
| 58 | World Series of Fighting | MMA Promoter |
| 59 | Zinkin Entertainment (DeWayne Zinkin & Bob Cook) | MMA Fighter Manager |

45.      Through these subpoenas, Plaintiffs ultimately obtained hundreds of thousands of additional pages of material, including documents from the likes of Deutsche Bank and WME-IMG, which in Plaintiffs' view provided evidence of Zuffa's monopsony and monopoly power and its alleged ability to control fighter compensation. Plaintiffs also uncovered key financials from other MMA promoters that assisted in Plaintiffs' experts' analyses of market share and market power. And

14

1  Plaintiffs received other key correspondence that Plaintiffs believed evidenced Zuffa's alleged coercive

2  negotiation tactics.

3      46.    Class Counsel tracked down the subpoenaed parties and entities and met and conferred

4  with them to obtain productions of documents. In several cases, Plaintiffs had to litigate with the

5  subpoena recipients to obtain productions. First, AXS TV LLC, an organization that, *inter alia*,

6  purchased the assets of defunct MMA promoter International Fight League ("IFL"), sought to quash

7  Plaintiffs' document subpoena. *See In re: Subpoena to Non-Party AXS TV LLC, Lee [sic] v. Zuffa,*

8  *LLC*, No. 3:16-mc-12 (N.D. Tex.). Following that motion to quash, JSLF prepared to respond while

9  continuing to negotiate with AXS TV, ultimately agreeing to a "Third Party Production Protocol" that

10  resolved the motion. *See id.* at ECF No. 12. AXS produced almost 9,000 documents pursuant to that

11  protocol.

12      47.    In addition to fighting the document subpoena, AXS TV LLC also moved to quash

13  Plaintiffs' deposition subpoena of Mark Cuban. *See In re: Subpoena to Non-Party Mark Cuban, Lee*

14  *[sic] v. Zuffa, LLC*, No. 3:17-mc-27 (N.D. Tex.). JSLF responded to the motion to quash in the action

15  in the United States District Court for the Northern District of Texas. *See id.* at ECF Nos. 8 & 10.

16  Ultimately, the Texas District Court granted the motion to quash without prejudice should the

17  depositions of Andrew Simon (another AXS TV executive) and Dana White not have sufficiently

18  covered the expected subject matter of the Mark Cuban deposition. *Id.* at ECF No. 20.

19      48.    Bellator also fought Plaintiffs' document subpoena. *See In re Subpoena of Bellator*

20  *Sport Worldwide, LLC, Le v. Zuffa, LLC*, No. 2:17-mc-16 (C.D. Cal.). Prior to responding, Class

21  Counsel (JSLF in particular) tried to negotiate Bellator's production, including via ten teleconferences,

22  four meet and confer letters, and 79 emails. Through these efforts, Plaintiffs were able to resolve many

23  of the disputed issues concerning Plaintiffs' subpoena, but were unable to reach agreement on

24  documents relating to Bellator's fighter contract documents and related contract negotiation materials

25  and documents relating to Bellator's cost and revenue information. JSLF then drafted and filed a

26  response to Bellator's motion to quash the subpoena. *See id.*, ECF No. 26-1 (Mar. 8, 2017). The

27  subpoena dispute was ultimately transferred to this Court on Zuffa's motion and adjudicated here. *See*

28  *Le v. Zuffa, LLC*, No. 2:17-cv-849 (D. Nev.). Following argument, at which JSLF presented for

15

1   Plaintiffs, the Court ordered Bellator to produce a sample of anonymized fighter contracts (20% of

2   Bellator's contracts) as well as Bellator's financials, including profit and loss statements through March

3   2017. No. 2:17-cv-849, ECF No. 55 (D. Nev. June 13, 2017). The Bellator financials Co-Lead Class

4   Counsel ultimately obtained from Bellator proved critical to Plaintiffs' alleged showing that the most

5   significant of the UFC's purported rivals paled in comparison to the UFC, generating just a fraction of

6   the UFC's revenues and paying a substantially higher proportion of those revenues to fighters.

7         49.    One Championship, another MMA promoter (located in Singapore), similarly fought

8   Plaintiffs' subpoena and required significant efforts to obtain documents. First, Plaintiffs filed a motion

9   for issuance of Letters Rogatory to Group One Holdings Pte. Ltd. (One Championship's parent in

10  Singapore) in this Court. *See Le v. Zuffa, LLC*, No. 15-cv-1045, ECF No. 433 (D. Nev. June 20, 2017).

11  The Court granted that request, ECF No. 440, and issued the letter, ECF No. 441.[8] While that effort

12  was pending, Plaintiffs filed an action against one of the promoter's domestic agents and One

13  Championship in the United States District Court for the Western District of Washington. *See* Motion

14  to Compel, *In re Subpoenas of Matt Hume, Le v. Zuffa, LLC*, No. 2:17-cv-1104, ECF No. 1 (W.D.

15  Wash. July 19, 2017). Plaintiffs then successfully moved to transfer the litigation of the action back to

16  this Court. *Id.* at ECF Nos. 24, 25; *see also Le v. Zuffa, LLC*, No. 15-cv-1045, ECF No. 506 (D. Nev.

17  Oct. 13, 2017) (*Le* Plaintiffs' Notice of Related Case alerting the Court that the matter had been

18  transferred). On November 16, 2017, JSLF argued in support of the motion to compel and in opposition

19  to the domestic agent's motion to quash. *See In re Subpoenas of Matt Hume, Le v. Zuffa, LLC*, No.

20  2:17-cv-2657, ECF No. 41 (D. Nev. Dec. 2, 2017). The Court denied Plaintiffs the requested

21  documents and limited the scope of the requested deposition. *Id.* at 41-42.

22        50.    Boxing promoter Top Rank, Inc. also fought to quash Plaintiffs' subpoenas for

23  documents and for the deposition of Top Rank President Robert Arum. *See* ECF No. 470 & 497.

24  Supporting counsel at Warner Angle, in consultation with Co-Lead Class Counsel, drafted the motion

25  to compel concerning the document subpoena and the deposition subpoena, and then met and conferred

26  with counsel from Top Rank to resolve the issue without Court intervention.

27   

28  [8] Ultimately, the Supreme Court of Singapore denied the request. *See In re Subpoenas of Matt Hume, Le v. Zuffa, LLC*, No. 2:17-cv-2657, ECF No. 41, at 5 (D. Nev. Dec. 2, 2017).

### iv.   Litigating Privilege and Work Product Claims

51.    Zuffa sought to withhold numerous documents, and redact many others, based on assertions of attorney-client privilege and the attorney work product doctrine. Plaintiffs disputed Zuffa's decision to withhold or redact many documents on these grounds.

52.    After Zuffa first produced its privilege log in this case (containing more than 30,000 entries) on April 7, 2017, Berger Montague analyzed the log and pursued a meet and confer via letter concerning deficiencies in the log's description of documents. *See* ECF No. 443-3 (describing the deficiencies). In response to Berger Montague's letter, Zuffa removed its privilege assertions over certain entries and amended its privilege log for other entries. *See* ECF No. 443-4. JSLF then analyzed the subsequent iteration of the privilege log (which also contained tens of thousands of entries). JSLF argued the issues with the privilege log to the Court. ECF No. 502. Through this meet and confer process, Zuffa produced more than 10,000 documents that had either been withheld in full or redacted.

53.    In addition to Plaintiffs' work regarding the privilege log, Plaintiffs litigated several challenges to Zuffa's efforts to claw back and/or shield specific materials from production.

54.    Early on in discovery, Berger Montague discovered a production error by Zuffa: certain documents had slipsheets in the production reflecting that the documents had been withheld on the basis of privilege, but the OCR-ed text of the documents had nevertheless been produced to Plaintiffs. Plaintiffs quickly alerted Zuffa of the error. However, in the process of Plaintiffs' discovery of the issue, Plaintiffs noted that one of the documents was not properly subject to protection of the attorney-client privilege. Specifically, Plaintiffs identified an email from Zuffa's outside counsel concerning the business purposes behind Zuffa's acquisition of Pride, another MMA promotion. *See generally* ECF No. 229 (motion to challenge the privilege designation of the email). Berger Montague then led a meet and confer in an effort to persuade Zuffa not to withhold the document. When the parties reached an impasse, JSLF prepared a motion to challenge the privilege designation. *Id.* Plaintiffs prevailed on that motion. *See* ECF No. 270. This document ultimately featured prominently in one of Plaintiffs' key expert economic reports, *see* Expert Report of Hal J. Singer, Ph.D., ECF No. 926-3, ¶43, Plaintiffs' motion for class certification, ECF No. 518 at 10, and Plaintiffs' summary judgment oppositions, ECF No. 596 at 10 & ECF No. 926 at 10.

17

55. Plaintiffs challenged other of Zuffa's privilege assertions as well.

56. On August 31, 2016, JSLF drafted, with Berger Montague's assistance, a motion to challenge Zuffa's assertion of work product protection over documents relating to a consultant Zuffa engaged to study its fighter compensation. *See* ECF No. 282 & 303. Plaintiffs prevailed on the motion, resulting in the production of the fighter compensation study and various drafts. *See* ECF No. 422. These compensation study documents featured prominently in Plaintiffs' proof and briefing, given that, in them, Zuffa's consultant Mercer compared the percentage of revenues paid to athletes by other sports organizations to the percentage of revenues Zuffa paid to UFC fighters. Plaintiffs' sports economics expert, Prof. Andrew Zimbalist, discussed and cited prominently the Mercer fighter compensation study that Plaintiffs received only because of this work product challenge. *See, e.g.*, Expert Report of Andrew Zimbalist, ECF No. 596-7, ¶108, Expert Rebuttal Report of Andrew Zimbalist, ECF No. 596-8, ¶56 & n.104. And Plaintiffs relied on these materials, *inter alia*, in opposing Zuffa's *Daubert* motions, *see, e.g.*, ECF No. 534 at 53. In particular, Plaintiffs cited to the Mercer study, among other materials, to support their argument that wage share was an appropriate metric and that certain other professional sports organizations were not appropriate comparators.

57. On December 15, 2016, JSLF led Plaintiffs' briefing of a challenge to Zuffa's assertion of privilege over a group of documents discussing Zuffa's contract negotiations with MMA fighters. ECF Nos. 320 & 334. JSLF then argued these motions before the Court on February 7, 2017. *See* ECF No. 353. The Court granted Plaintiffs' motion as to the majority of the challenged documents. *Id.*; ECF No. 359.

### v. Fact Depositions

58. Co-Lead Class Counsel, as well as firms acting under our direction, collectively examined nearly 30 individual fact witnesses in depositions (in addition to seven days of testimony of Zuffa's Rule 30(b)(6) designees). Plaintiffs took the first fact deposition in November 2016 (a deposition pursuant to Fed. R. Civ. P. 30(b)(6)) and the last fact deposition in August 2017. Almost all of these depositions lasted for a full business day or longer; the deposition of Mr. White lasted two days. An additional challenge in taking these depositions was that certain fact witnesses were also

designated as 30(b)(6) witnesses, requiring preparation to identify and deploy documents and ask questions in both the witness's individual and corporate capacities.

59.     In preparation for the many important fact depositions in this case, Co-Lead Class Counsel (a) identified key documents to be used at each deposition, (b) prepared extensive deposition outlines, (c) reviewed publicly available information, including hundreds of hours of videos, interviews, podcasts and other materials featuring the witnesses or related matters, and (d) coordinated deposition strategy and questioning with Co-Lead Counsel, experts, and the *Le* Class Representatives and Quarry.

### a.  Depositions of Zuffa's Current and Former Employees

60.     The fact depositions of Zuffa's witnesses are set forth in the below table, including the witness's name, deposition date(s), and the participating attorneys (and attorney roles):

| #  | WITNESS | DATE(S) | PRIMARY PLAINTIFFS' ATTORNEY EXAMINING | SUPPORTING ATTORNEY (IF ANY) | LOCATION |
|----|---------|---------|------------------------------------------|-------------------------------|----------|
| 1  | Denitza Batchvarova | 1/25/2017 | Daniel Silverman Cohen Milstein | Kevin Rayhill JSLF | Las Vegas, NV |
| 2  | Nakisa Bidarian | 5/5/2017 | Matthew Weiler JSLF | | Las Vegas, NV |
| 3  | Peter Dropick (30(b)(6)) | 12/1/2016 | Daniel Silverman Cohen Milstein | Patrick F. Madden Berger Montague | Las Vegas, NV |
| 4  | Peter Dropick (30(b)(1)) | 5/4/2017 | Joseph Saveri JSLF | Matthew Weiler JSLF | Las Vegas, NV |
| 5  | Ike Lawrence Epstein (30(b)(6)) | 12/2/2016 | Matthew Weiler JSLF | Patrick F. Madden Berger Montague | Las Vegas, NV |
| 6  | Ike Lawrence Epstein (30(b)(1)) | 5/26/2017 | Joseph Saveri JSLF | Matthew Weiler JSLF | Las Vegas, NV |
| 7  | Ike Lawrence Epstein (30(b)(6)) | 7/21/2017 | Daniel Silverman Cohen Milstein | | Las Vegas, NV |
| 8  | Ike Lawrence Epstein (30(b)(6)) | 8/15/2017 | Kevin Rayhill JSLF | Jiamie Chen JSLF | Las Vegas, NV |
| 9  | Lorenzo Fertitta | 3/23/2017 | Michael C. Dell'Angelo Berger Montague | Patrick F. Madden Berger Montague | Las Vegas, NV |
| 10 | Kirk Hendrick (30(b)(6)) | 11/29/2016 11/30/2016 | Eric L. Cramer Berger Montague | Patrick F. Madden Berger Montague | Las Vegas, NV |
| 11 | Kirk Hendrick (30(b)(1)) | 7/17/2017 | Patrick F. Madden Berger Montague | | Las Vegas, NV |
| 12 | John Hertig | 4/27/2017 | Matthew Weiler JSLF | Kevin Rayhill JSLF | Las Vegas, NV |
| 13 | Tracy Long | 1/26/2017 | Kevin Rayhill JSLF | Matthew Weiler JSLF | Las Vegas, NV |
| 14 | Michael Mersch | 7/15/2017 | Eric L. Cramer Berger Montague | Patrick F. Madden Berger Montague | Las Vegas, NV |

19

| # | WITNESS | DATE(S) | PRIMARY PLAINTIFFS' ATTORNEY EXAMINING | SUPPORTING ATTORNEY (IF ANY) | LOCATION |
|---|---------|---------|------------------------------------------|-------------------------------|----------|
| 15 | Michael Mossholder (30(b)(6)) | 11/30/2016 12/1/2016 | Daniel Silverman Cohen Milstein | Patrick F. Madden Berger Montague | Las Vegas, NV |
| 16 | John Mulkey | 4/19/2017 | Matthew Weiler JSLF | Kevin Rayhill JSLF | Las Vegas, NV |
| 17 | Michael Pine | 2/7/2017 | Daniel Silverman Cohen Milstein | | Nashville, TN |
| 18 | Jeff Quinn (30(b)(6)) | 7/27/2017 | Patrick F. Madden Berger Montague | Michael C. Dell'Angelo Berger Montague | Las Vegas, NV |
| 19 | Sean Shelby | 4/12/2017 | Patrick F. Madden Berger Montague | Robert Maysey Warner Angle | Las Vegas, NV |
| 20 | Joseph Silva | 6/7/2017 | Eric L. Cramer Berger Montague | Patrick F. Madden Berger Montague | Richmond, VA |
| 21 | Dana White | 8/9/2017 8/10/2017 | Michael C. Dell'Angelo Berger Montague | Richard Koffman Cohen Milstein | Las Vegas, NV |
| 22 | Marshall Zelaznik | 2/8/2017 | Kevin Rayhill JSLF | Matthew Weiler JSLF | Las Vegas, NV |

**b. Depositions of Third Parties**

61.     The fact depositions of third-party witnesses are set forth in the below table, including the witness's name, affiliation, deposition date(s), and the participating attorneys (and attorney roles):

| # | WITNESS | AFFILIATION | DATE(S) | PRIMARY PLAINTIFFS' ATTORNEY EXAMINING | SUPPORTING ATTORNEY (IF ANY) | LOCATION |
|---|---------|-------------|---------|------------------------------------------|-------------------------------|----------|
| 1 | Jeffrey Aronson | Titan FC | 4/25/2017 | Daniel Silverman Cohen Milstein | | Palm Beach Gardens, FL |
| 2 | Robert Arum | Top Rank, Inc. | 10/17/2017 | Robert Maysey Warner Angle | Daniel Silverman Cohen Milstein | Los Angeles, CA |
| 3 | Thomas Atencio | Affliction | 2/9/2017 2/10/2017 | Robert Maysey Warner Angle | James Valletta Warner Angle | Costa Mesa, CA |
| 4 | Scott Coker | Strikeforce, Bellator | 8/3/2017 | Michael C. Dell'Angelo Berger Montague | Kevin Rayhill JSLF  Robert Maysey Warner Angle | Los Angeles, CA |
| 5 | Louis DiBella | DiBella Entertainment | 8/29/2017 | Daniel Silverman Cohen Milstein | Robert Maysey Warner Angle | New York, NY |
| 6 | Drew Goldman (30(b)(6)) | Deutsche Bank Securities, Inc. | 4/28/2017 | Patrick F. Madden Berger Montague | | New York, NY |
| 7 | Shannon Knapp | Invicta | 4/11/2017 | Kevin Rayhill JSLF | | Kansas City, MO |
| 8 | Jeremy Lappen | Elite XC, MMA Fighter Manager | 2/28/2017 | Kevin Rayhill JSLF | | Los Angeles, CA |
| 9 | Leon Margules | Warriors Boxing Promotion | 7/11/2017 | Daniel Silverman Cohen Milstein | Robert Maysey Warner Angle | Fort Lauderdale, FL |
| 10 | Colin Neville | The Raine Group | 8/8/2017 | John Radice Radice Law Firm | | New York, NY |

20

| # | WITNESS | AFFILIATION | DATE(S) | PRIMARY PLAINTIFFS' ATTORNEY EXAMINING | SUPPORTING ATTORNEY (IF ANY) | LOCATION |
|---|---------|-------------|---------|----------------------------------------|------------------------------|----------|
| 11 | Kurt Otto | International Fight League | 2/6/2017 | Eric L. Cramer Berger Montague | Mark Suter Berger Montague<br><br>Robert Maysey Warner Angle | New York, NY |
| 12 | Brent Richard | WME-IMG Endeavor | 7/20/2017 | Michael C. Dell'Angelo Berger Montague | | New York, NY |
| 13 | Carlos Silva | World Series of Fighting | 4/18/2017 | Robert Maysey Warner Angle | Tara Nordquist Warner Angle | Las Vegas, NV |
| 14 | Andrew Simon | AXS TV, HDNet | 7/19/2017 | Kevin Rayhill JSLF | | Dallas, TX |

### vi.    Searching for Publicly Available Evidence

62.     Co-Lead Class Counsel also undertook a comprehensive search through publicly

available materials in search of relevant evidence.

63.     For example, Berger Montague undertook to search through thousands of hours of video

clips (and transcripts of video clips) of interviews of Zuffa employees and executives, Scott Coker (an

executive at Strikeforce and later Bellator), and other MMA promoters.

64.     Berger Montague identified and preserved these materials, and then clipped the videos

for use at depositions and other proceedings.

65.     Berger Montague then endeavored to lay the foundation to authenticate and use these

materials at trial by, *inter alia*, issuing Requests for Admission concerning certain videos featuring

Zuffa executives and using video clips at the depositions of Dana White, Lorenzo Fertitta, Scott Coker,

and Robert Arum.

66.     Berger Montague and Cohen Milstein then continually monitored, preserved, and

searched for new videos and statements of UFC executives as well as reviewing voluminous filings

with the Securities and Exchange Commission, up to the settlement of this matter.

### vii.    Written Discovery from the *Le* Class Representatives and Quarry

67.     The *Le* Class Representatives, Cung Le, Jon Fitch, Brandon Vera, Javier Vasquez, and

Kyle Kingsbury, as well as Nathan Quarry, had significant participation in discovery.

21

68.     Zuffa served each of the *Le* Class Representatives and Quarry with written discovery, including Requests for Production of Documents ("Zuffa's RFPs"), Interrogatories (requiring both individual and collective responses), and 71 Requests for Admission (requiring a collective response).

69.     Each of the *Le* Class Representatives and Quarry worked with Co-Lead Class Counsel and supporting counsel at Warner Angle to identify sources of documents that were responsive to Zuffa's RFPs. Co-Lead Class Counsel and Warner Angle then worked with a vendor to collect ESI from those sources. In addition, Warner Angle wrote letters (with input from Co-Lead Counsel) requesting that the *Le* Class Representatives' and Quarry's managers and agents provide any documents in the *Le* Class Representatives' and Quarry's control so that Plaintiffs could produce those materials, sending letters to twenty different managers and agents who represented the *Le* Class Representatives and Quarry over time.

70.     Through these efforts, Co-Lead Class Counsel collected more than 600,000 documents from the *Le* Class Representatives and Quarry consisting of more than 800,000 pages. Class Counsel then reviewed these materials for relevance and responsiveness to Zuffa's RFPs.

71.     As to the Interrogatories, Co-Lead Class Counsel and supporting counsel at Warner Angle worked with the *Le* Class Representatives and Quarry to develop and write their answers to Zuffa's Interrogatories. The *Le* Class Representatives and Quarry then reviewed these answers to ensure their accuracy, before certifying the answers and allowing Co-Lead Class Counsel to serve the answers on Zuffa.

### viii.    Depositions of the *Le* Class Representatives and Quarry

72.     Co-Lead Class Counsel and supporting counsel from Warner Angle worked with the *Le* Class Representatives and Quarry to prepare them for their depositions, and then defended those depositions.

73.     Prior to each deposition, Co-Lead Class Counsel responsible for defending the deposition reviewed the *Le* Class Representatives' (or Quarry's) document production and prepared outlines to address the likely areas of questioning at the deposition.

74.     Co-Lead Class Counsel then met with the *Le* Class Representatives (and Quarry) prior to the depositions to go over (1) the basics of testifying at deposition, (2) Plaintiffs' theories of liability,

(3) class certification and related issues, and (4) the likely Plaintiff-specific areas of questioning, including their substantial document productions and extensive publicly available materials such as videos and social media postings. These preparation sessions lasted several hours with each *Le* Class Representative and Quarry. In addition, some *Le* Class Representatives attended the depositions of other *Le* Class Representatives, and/or watched video clips from Quarry's deposition to prepare for their own depositions.

75.     Each *Le* Class Representative and Quarry then sat for a full-day deposition. Co-Lead Class Counsel collectively defended the six depositions of the *Le* Class Representatives and Quarry. Each of these depositions, including witness names, deposition date, and the defending/participating Co-Lead Class Counsel and supporting firm attorneys, is listed in the chart below:

| # | WITNESS | DATE(S) | PRIMARY PLAINTIFFS' FIRM/ ATTORNEY DEFENDING | SUPPORTING ATTORNEY(S) (IF ANY) | LOCATION |
|---|---------|---------|---------------------------------------------|---------------------------------|----------|
| 1 | Jon Fitch | 2/15/2017 | Michael C. Dell'Angelo Berger Montague | Robert Maysey Warner Angle | Las Vegas, NV |
| 2 | Kyle Kingsbury | 2/17/2017 | Michael C. Dell'Angelo Berger Montague | Robert Maysey Warner Angle<br><br>Richard Koffman Cohen Milstein | Las Vegas, NV |
| 3 | Cung Le | 4/11/2017 | Michael C. Dell'Angelo Berger Montague | Robert Maysey Warner Angle | Las Vegas, NV |
| 4 | Nathan Quarry | 9/30/2016 | Eric Cramer Berger Montague | Don Springmeyer Kemp Jones[9] | Las Vegas, NV |
| 5 | Javier Vasquez | 2/14/2017 | Michael C. Dell'Angelo Berger Montague | Robert Maysey Warner Angle<br><br>Richard Koffman Cohen Milstein | Las Vegas, NV |
| 6 | Brandon Vera | 2/16/2017 | Michael C. Dell'Angelo Berger Montague<br><br>Richard Koffman Cohen Milstein | Robert Maysey Warner Angle | Las Vegas, NV |

76.     Each of these depositions transpired over the course of approximately a full day in Las Vegas, Nevada. At the time of the depositions, none of the *Le* Class Representatives nor Quarry resided

---

[9] At the time of the deposition, Mr. Springmeyer was with Wolf Rifkin.

in Nevada, and attending these depositions required travel, in some cases significant travel. For example, Brandon Vera resides in Guam, and his attendance at his deposition and other events required more than 24 hours of travel; Quarry resides in and traveled from Oregon to hearings, preparation sessions, mediations, meetings, and his deposition; and Kyle Kingsbury resides in and traveled from Texas for to hearings, preparation sessions, mediations, meetings, and his deposition.

### ix.    Other Participation of the *Le* Class Representatives and Quarry

77.    In addition to the foregoing, the *Le* Class Representatives and Quarry had consistent involvement throughout the case.

78.    As noted above, the *Le* Class Representatives and Quarry joined monthly teleconferences to stay current with case developments.

79.    The *Le* Class Representatives and/or Quarry attended court hearings, including the 2015 Motion to Transfer hearing in San Francisco, California, as well as the 2015 Motion to Dismiss hearing, the September 2017 hearing on Zuffa's motion for summary judgment as to Quarry's claims, the December 2018 motion for summary judgment hearing, the seven-day 2019 Evidentiary Hearing on Plaintiffs' Motion for Class Certification, and several other hearings and status conferences.

80.    The *Le* Class Representatives and Quarry also travelled to attend the three in-person mediation sessions (in 2017 (Newport Beach, CA), 2019 (New York, NY), and 2023 (New York, NY)).

81.    Further, prior to trial, the *Le* Class Representatives and Quarry attended multiple preparation sessions for their direct and cross examinations at trial. These sessions each took several hours. The sessions involved interviews by Co-Lead Class Counsel and Supporting Counsel to identify any areas of testimony that had not yet been covered by prior interviews and preparation sessions earlier in the case. The sessions involved the review of documents that could be used on cross-examination and documents that would be used during direct examination. And the sessions involved mock direct and cross examinations to prepare the *Le* Class Representatives and Quarry for their trial appearances.

### D.    Expert Discovery in the *Le* Action

82.    Co-Lead Class Counsel oversaw an extensive and protracted expert discovery effort in the *Le* Action.

24

83.     Given the importance of economic issues in this case, Co-Lead Class Counsel retained three economic experts: Hal J. Singer, Ph.D., Professor Andrew Zimbalist, and Professor Alan Manning. Co-Lead Class Counsel spent significant time strategizing during discovery and briefing, working with Dr. Singer and his team to assess whether economic analyses and evidence common to members of the *Le* Class (SA ¶ 1(p)) would be capable of addressing, *inter alia*, (i) monopsony power, (ii) substantial foreclosure, (iii) common impact, (iv) anticompetitive effects, (v) alleged procompetitive justifications, and (vi) aggregate damages to the Bout Class and proposed Identity Rights Class. Co-Lead Class Counsel worked with Professor Zimbalist on his report concerning the history of free agency in major professional sports and the effects of free agency on athlete compensation, as well as a yardstick damages analysis. Co-Lead Counsel retained Professor Alan Manning after Zuffa's opposition reports criticized certain aspects of Dr. Singer's analysis, including in particular Dr. Singer's use of wage share as the main metric of analysis. Prof. Manning is a Professor at the London School of Economics and Political Science. He wrote a key book on monopsony power that was favorably cited by Zuffa's own economists. He testified that wage share was indeed appropriate for use in this case involving professional athletes.

84.     Co-Lead Class Counsel also retained a forensic accounting expert, Guy Davis. Mr. Davis submitted two reports totaling 156 pages.

85.     Dr. Singer submitted four reports in the *Le* Action consisting of 526 pages inclusive of appendices.[10] Professor Zimbalist submitted two reports consisting of 231 pages, inclusive of appendices. Professor Manning's rebuttal report totaled 17 pages.

86.     To assist the experts, Co-Lead Class Counsel collectively spent hundreds of hours over the course of several months: (1) ensuring that the experts received and understood the transactional data, reflecting (among many other data points) the compensation to each fighter for each bout, documents produced by Zuffa and by non-parties, and party and non-party depositions; (2) analyzing draft reports; and (3) meeting with the experts.

---

[10] Later, Dr. Singer also offered a declaration as part of Plaintiffs' effort to bar Zuffa from introducing material into the *Le* Action trial that post-dated the June 30, 2017 end of the Class Period in *Le*. *See* ECF No. 914-2.

87. Co-Lead Class Counsel invested substantial time and effort related to expert discovery in this case—including the work of senior shareholders/partners—that was critical to proving the allegations that the challenged conduct foreclosed competition, caused anticompetitive effects, and harmed the members of the proposed classes.

88. The need for extensive expert discovery is reflective of the complexities of the *Le* Action, which required Co-Lead Class Counsel to grapple with and overcome numerous obstacles, including by proving some or all of the following using evidence common to the Classes:

    a. that Zuffa had monopsony power;

    b. that the challenged conduct foreclosed a substantial share of competition;

    c. that the challenged conduct suppressed compensation for UFC fighters below competitive levels;

    d. that the challenged conduct had significant anticompetitive effects;

    e. that the challenged conduct had no valid procompetitive justifications that could outweigh the anticompetitive effects, and,

    f. aggregate damages suffered by the *Le* Classes as a whole.

**i.  Expert Work of Hal J. Singer, Ph.D.**

89. Co-Lead Class Counsel had initially engaged Hal J. Singer, Ph.D. to perform certain analyses prior to filing the Complaint in the *Le* Action.

90. Following the receipt of Zuffa's production of its Promotional and Ancillary Rights Agreements ("PAR Agreements") and compensation data, Co-Lead Class Counsel worked with Dr. Singer to develop and commence a comprehensive review and categorization of the PAR Agreements that Zuffa produced, identifying potentially anticompetitive contract terms and their prevalence and effects over time. To facilitate that review, Co-Lead Class Counsel identified and segregated the PAR Agreements in the document production database using a TAR algorithm, and Dr. Singer's staff performed the review and analyses.

91. Throughout discovery, Co-Lead Class Counsel and Dr. Singer and his staff stayed in regular communication to discuss developing factual issues that could be important to Dr. Singer's analyses and to monitor the progress of the PAR Agreement review.

92.     Co-Lead Class Counsel worked closely with Dr. Singer as Dr. Singer developed the model he used to assess impact and damages, including by helping to identify discovery materials that Dr. Singer and his team believed would be relevant to Dr. Singer's work. Co-Lead Class Counsel served Dr. Singer's opening Expert Report on August 31, 2017. ECF No. 518-3.

93.     Following service of Dr. Singer's opening Expert Report, Co-Lead Class Counsel began to prepare Dr. Singer for his deposition. Co-Lead Class Counsel held multiple preparation sessions with Dr. Singer, each lasting several hours.

94.     On September 27, 2017, Dr. Singer sat for his first deposition in the *Le* Action, with Berger Montague defending, supported by attorneys with JSLF and Cohen Milstein.

95.     On October 27, 2017, Zuffa served expert reports from three economic experts (Dr. Robert Topel, Dr. Roger Blair, and Dr. Paul Oyer) critiquing the work and opinions of Plaintiffs' economic experts.

96.     Co-Lead Class Counsel, led by Berger Montague and JSLF, then set to work with Dr. Singer to provide Dr. Singer and his staff the information he needed to prepare his Rebuttal Expert Report. Plaintiffs served Dr. Singer's Rebuttal Expert Report on January 12, 2018.

97.     Following service of Dr. Singer's Rebuttal Expert Report, Co-Lead Class Counsel, led by Berger Montague and JSLF, prepared Dr. Singer for his second deposition in the *Le* Action, including teleconferences and an in-person preparation session lasting several hours.

98.     On January 23, 2018, Dr. Singer sat for his second deposition in the *Le* Action, with Berger Montague defending and supported by attorneys with JSLF and Cohen Milstein.

99.     Although, based on the Court-approved schedule in the *Le* Action, expert discovery closed following Dr. Singer's second deposition, Zuffa continued to try to supplement its arguments concerning Dr. Singer's testimony.

100.    A few weeks after expert discovery had closed, Zuffa served Plaintiffs with a "Sur-Rebuttal Expert Report of Prof. Robert H. Topel," dated February 12, 2018. Co-Lead Class Counsel directed Dr. Singer to prepare a report in response. Berger Montague and JSLF worked with Dr. Singer to complete and serve the Supplemental Expert Report of Hal J. Singer Ph.D., dated April 3, 2018 (*see* ECF No. 534-3).

27

101.     Then, when Zuffa filed its Opposition to Plaintiffs' Motion for Class Certification, Zuffa attached a new "Declaration of Robert Topel," dated April 6, 2018. *See* ECF No. 540-5. Co-Lead Class Counsel asked Dr. Singer to prepare a response to that declaration as well, which Berger Montague and JSLF again worked with Dr. Singer to compile.

102.     Following the filing of this second unauthorized report of Dr. Topel, Co-Lead Class Counsel met and conferred with Zuffa in an effort to obtain an agreement to close the expert discovery record. Co-Lead Class Counsel obtained such an agreement and worked with Zuffa to draft and file the Joint Motion to Supplement Expert Reports, ECF No. 545 (which the Court granted, ECF No. 628). Pursuant to that Court-endorsed agreement, Zuffa was permitted to serve one further report of Dr. Topel with its Reply in support of Zuffa's motion to exclude Dr. Singer's testimony, and Plaintiffs were permitted to file one further report of Dr. Singer. *Id.*

103.     As a result, Co-Lead Class Counsel directed Dr. Singer to continue to prepare his response to the Declaration of Robert Topel and incorporate that into his then forthcoming final report in the *Le* Action.

104.     After Zuffa served Dr. Topel's "Reply to the Supplemental Expert Report of Hal J. Singer, Ph.D." (dated May 7, 2018), Berger Montague and JSLF worked with Dr. Singer to prepare and finalize his fourth report. Dr. Singer finalized the "Second Supplemental Reply Report of Hal J. Singer, Ph.D." on May 28, 2018, and Plaintiffs served that report with the Reply in support of Plaintiffs' Motion for Class Certification. *See* ECF No. 554-3.

**ii.     Expert Work of Professor Andrew Zimbalist**

105.     During fact discovery, Co-Lead Class Counsel identified the potential need for an economist who had focused on the study of sports. Co-Lead Class Counsel commenced a search for a sports economist, ultimately retaining Professor Andrew Zimbalist to perform the work.

106.     Cohen Milstein, supported by Berger Montague and JSLF, took the lead in working with Professor Zimbalist to prepare his opening report. Co-Lead Class Counsel worked with Professor Zimbalist to identify key materials in support of his opinions, including, without limitation, record evidence and publicly available materials concerning other sports leagues and organizations, as well as

consulting with Professor Zimbalist on Cohen Milstein's depositions of boxing promoters and collection of public materials concerning those promoters.

107.    Co-Lead Class Counsel worked with Professor Zimbalist to finalize his opening Expert Report on August 30, 2017, and then served that report on August 31, 2017.

108.    Cohen Milstein then began to prepare Professor Zimbalist for his deposition, supported by Berger Montague and JSLF. Co-Lead Class Counsel held multiple preparation sessions with Professor Zimbalist, each lasting several hours.

109.    On September 25, 2017, Professor Zimbalist sat for his first deposition in the *Le* Action, with Berger Montague defending and supported by attorneys with JSLF and Cohen Milstein.

110.    Once Plaintiffs received Zuffa's expert reports, in particular the Expert Report of Dr. Roger Blair (an economist), Cohen Milstein then took the lead in working with Professor Zimbalist to prepare the Expert Rebuttal Report of Andrew Zimbalist and to respond to Dr. Blair's critiques of Professor Zimbalist's work.

111.    Following service of Dr. Zimbalist's rebuttal report, Cohen Milstein again took the lead in preparing him for his second deposition, with assistance from Co-Lead Class Counsel. Again, preparations took many hours as Co-Lead Class Counsel worked to prepare Professor Zimbalist for Zuffa's lines of questioning and attacks.

112.    On January 26, 2018, Professor Zimbalist sat for his second deposition in the case. Berger Montague defended the deposition with support from JSLF and Cohen Milstein.

### iii.    Expert Work of Guy Davis

113.    During fact discovery, Co-Lead Class Counsel identified the need for an accounting expert to analyze Zuffa's finances. Plaintiffs discovered that Zuffa had taken out hundreds of millions of dollars in debt that appeared to be used to pay dividends to Zuffa's owners. Co-Lead Class Counsel sought an expert qualified to analyze Zuffa's finances and these distributions as well as the valuation and sale of Zuffa in late 2016.

114.    Co-Lead Class Counsel conducted a search for an accounting expert, ultimately retaining Guy Davis, CPA, CIRA, CDBV, CFE.

29

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

115.    Berger Montague took the lead in working with Guy Davis to develop his report on Zuffa's financials. Berger Montague collected financials and related materials for Guy Davis and consulted with him on other materials he needed for his work.

116.    Co-Lead Class Counsel, Berger Montague in particular, helped Guy Davis to finalize his report and serve it on August 31, 2017.

117.    Then, Berger Montague and Cohen Milstein worked with Mr. Davis to prepare him for his first deposition. Berger Montague and Cohen Milstein prepared Mr. Davis for approximately 10-15 hours. Cohen Milstein then defended Mr. Davis's deposition, with Berger Montague supporting on September 19, 2017.

118.    Upon receipt of Zuffa's expert reports, in particular the Expert Report of Elizabeth Kroger Davis (an accounting expert), Berger Montague worked with Guy Davis to respond to Ms. Davis's opinions. Berger Montague provided support to Mr. Davis in preparing the Rebuttal Expert Report of Guy A. Davis, CPA, CIRA, CDBV, CFE, finalizing that report, and serving it on January 12, 2018.

119.    Following service of Guy Davis's second report, Co-Lead Class Counsel began to prepare him for his second deposition.

120.    Guy Davis sat for his second deposition in the *Le* Action on January 30, 2018. Cohen Milstein defended the deposition.

### iv.    Expert Work of Prof. Alan Manning

121.    When Plaintiffs received Zuffa's expert reports, Co-Lead Class Counsel noted that in claiming that wage share was an inappropriate metric, Zuffa's expert Dr. Paul Oyer relied in part on a labor economist named Prof. Alan Manning at the London School of Economics and Politics. *See* Expert Report of Paul Oyer, ¶¶22-24, 26. Dr. Oyer cited as one basis for his opinion that wage share was inappropriate the fact that Professor Manning did not use wage share in his work. *Id.*; *see also id.* ¶5. Dr. Oyer proclaimed that Professor Manning is "a recognized expert and leader … in analysis of monopsony in labor markets," who is "particularly authoritative." *See* ECF No. 534-9.

122.    Co-Lead Class Counsel agreed that Prof. Manning was an authoritative source regarding the proper methods for analyzing monopsony power in labor markets and reached out to Professor

30

Manning to have him analyze Dr. Singer's approach and opine on the appropriateness of Dr. Singer's regression modeling choices.

123.    Berger Montague and JSLF took the lead in working with Professor Manning to facilitate his understanding of Dr. Singer's model and the preparation of Prof. Manning's report endorsing Dr. Singer's model. Plaintiffs served the Expert Rebuttal Report of Professor Alan Manning on January 12, 2018.

124.    Co-Lead Class Counsel then began to prepare Professor Manning for his deposition, including by holding a preparation session with Professor Manning.

125.    Professor Manning traveled from his home in the United Kingdom to sit for his deposition on February 8, 2018 in Philadelphia, PA. Berger Montague defended the deposition with support from JSLF. Professor Manning likewise traveled from his home in the United Kingdom to Las Vegas to testify at the Evidentiary Hearing on Plaintiffs' Motion for Class Certification (discussed *infra*).

### v.    Defending Plaintiffs' Expert Witness Depositions

126.    All of the depositions of Plaintiffs' experts, including expert witness names, deposition dates, and the participating attorneys (and their roles), are as follows:

| # | EXPERT WITNESS | DATE(S) | PRIMARY PLAINTIFFS' FIRM/ ATTORNEY DEFENDING | SUPPORTING FIRM/ ATTORNEY (IF ANY) | LOCATION |
|---|---|---|---|---|---|
| 1 | Hal J. Singer (First and Second Depositions) | 9/27/2017 1/23/2018 | Eric L. Cramer Berger Montague | Mark Suter Berger Montague<br><br>Daniel Silverman Cohen Milstein<br><br>Joshua P. Davis JSLF[11] | Philadelphia, PA |
| 2 | Andrew Zimbalist (First Deposition) | 10/6/2017 | Eric L. Cramer Berger Montague | Daniel Silverman Cohen Milstein<br><br>Joshua P. Davis JSLF | Northampton, MA |

---

[11] Josh Davis was at JSLF for a significant portion of the case. He joined Berger Montague as a Shareholder on January 1, 2023.

| # | EXPERT WITNESS | DATE(S) | PRIMARY PLAINTIFFS' FIRM/ ATTORNEY DEFENDING | SUPPORTING FIRM/ ATTORNEY (IF ANY) | LOCATION |
|---|---|---|---|---|---|
| 3 | Andrew Zimbalist (Second Deposition) | 1/26/2018 | Eric L. Cramer Berger Montague | Daniel Silverman Cohen Milstein<br><br>Richard Koffman Cohen Milstein<br><br>Joshua P. Davis JSLF | New York, NY |
| 4 | Guy Davis (First Deposition) | 11/29/2017 | Richard Koffman Cohen Milstein | Eric L. Cramer Berger Montague<br><br>Patrick F. Madden Berger Montague | Philadelphia, PA |
| 5 | Guy Davis (Second Deposition) | 1/30/2018 | Richard Koffman Cohen Milstein | | Washington, D.C. |
| 6 | Alan Manning | 2/8/2018 | Eric L. Cramer Berger Montague | Mark Suter Berger Montague<br><br>Richard Koffman Cohen Milstein<br><br>Joshua P. Davis JSLF | Philadelphia, PA |

**vi.    Co-Lead Class Counsel's Work Concerning Zuffa's Experts**

127.    Co-Lead Class Counsel also analyzed the reports produced by Zuffa's five experts: Dr. Robert H. Topel, Dr. Paul Oyer, Dr. Roger Blair, Richard Marks, and Elizabeth Kroger Davis, who collectively produced reports totaling 650 pages.[12]

128.    Additionally, Co-Lead Class Counsel took the depositions of Zuffa's expert witnesses. Co-Lead Class Counsel's preparation for each of these depositions was painstaking, involving extensive discussion with and feedback from Plaintiffs' experts, review of Zuffa's expert reports and the materials relied upon, and review of significant portions of the record in this case.

129.    All of the depositions of Zuffa's experts, including expert witness names, deposition dates, and the participating attorneys (and their roles), examined by Co-Lead Class Counsel, are as follows:

---

[12] Additionally, Co-Lead Class Counsel analyzed the belated expert report of Gregory Leonard filed by Zuffa in December 2023 prior to Plaintiffs' successful motion to strike that report. *See* ECF No. 933 (Plaintiffs' Motion to Strike); ECF No. 959 (Order on Plaintiffs' Motion to Strike).

32

| # | EXPERT WITNESS | DATE(S) | PRIMARY PLAINTIFFS' FIRM/ ATTORNEY EXAMINING | SUPPORTING FIRM/ ATTORNEY (IF ANY) | LOCATION |
|---|---|---|---|---|---|
| 1 | Robert Topel | 12/5/2017 12/6/2017 | Eric L. Cramer Berger Montague | Mark Suter Berger Montague | Washington, D.C. |
| 2 | Roger Blair | 12/8/2017 12/9/2017 | Daniel Silverman Cohen Milstein | Patrick F. Madden Berger Montague | Orlando, FL |
| 3 | Paul Oyer | 11/29/2017 | Josh Davis JSLF | Eric L. Cramer Berger Montague | Washington, D.C. |
| 4 | Richard Marks | 11/30/2017 | Michael C. Dell'Angelo Berger Montague | | Washington, D.C. |
| 5 | Elizabeth Kroger Davis | 11/28/2017 | Richard Koffman Cohen Milstein | | Washington, D.C. |

130.    In addition to the foregoing experts, Zuffa introduced what Plaintiffs claimed was untimely expert material in the form of its Summary Exhibits, discussed *supra* and in ECF No. 658, as well as the Declaration of Gregory K. Leonard (ECF No. 932-28), which Plaintiffs did not address substantively, but successfully moved to strike, *see* ECF No. 959.

**E.  Class Certification and *Daubert* Proceedings in the *Le* Action**

**i.      Class Certification Briefing**

131.    Following the completion of fact and expert discovery in the *Le* Action, Co-Lead Class Counsel prepared a class certification motion and brief along with supporting materials. Berger Montague and JSLF took the lead on drafting the motion and brief. Co-Lead Class Counsel drew on the extensive expert record they had developed and their expertise in the law concerning worker-side antitrust cases to develop their case for class certification. Berger Montague took the lead in finalizing and filing Plaintiffs' Motion for Class Certification and all the supporting papers, as well as a motion to provisionally seal the brief and supporting evidence, on February 16, 2018. ECF Nos. 518, 519.

132.    Following Zuffa's opposition to class certification, filed on April 6, 2018 (ECF No. 540), Co-Lead Counsel, again with Berger Montague and JSLF taking the lead, drafted Plaintiffs' Reply in Support of Plaintiffs Motion for Class Certification. Berger Montague finalized and filed that Reply on May 30, 2018. *See* ECF No. 554.

ii.     **Zuffa's First *Daubert* Briefing**

133.     On the same day that Plaintiffs' filed their Motion for Class Certification (February 16, 2018), Zuffa filed three motions to exclude Plaintiffs' experts Hal J. Singer, Ph.D. (ECF No. 524), Professor Andrew Zimbalist (ECF No. 522), and Guy Davis (ECF No. 517).

134.     Due to the overlap of Zuffa's arguments as to Professor Zimbalist and Dr. Singer, Plaintiffs drafted a consolidated opposition to the motions to exclude those experts. Co-Lead Class Counsel jointly worked to develop that opposition, with Berger Montague finalizing and filing that brief and the related motion to seal on April 6, 2018. *See* ECF No. 534.

135.     Cohen Milstein took the lead in drafting the opposition to the motion to exclude the testimony of Guy Davis, Plaintiffs' accounting expert. Plaintiffs filed that opposition and the related motion to seal on April 6, 2018. ECF No. 535.

iii.    **The Evidentiary Hearing on Class Certification**

136.     After the parties fully briefed Plaintiffs' Motion for Class Certification, Zuffa's *Daubert* Motions, and one of Zuffa's Motions for Summary Judgment (discussed *infra*), the parties prepared for argument on these motions and the Court set a hearing for December 14, 2018. *See* ECF No. 616. At that hearing, the Court announced its intent to hold an evidentiary hearing on Plaintiffs' Motion for Class Certification ("Evidentiary Hearing") and requested briefing on (1) the legal standard for class certification, and (2) confidentiality issues relating to the evidence to be presented at the upcoming hearing. The Court also denied Zuffa's Motion for Summary Judgment (ECF No. 573) at that time, without prejudice, announcing that Zuffa could re-raise summary judgment after the Court held the class certification hearing and resolved class certification. ECF No. 628.

137.     Berger Montague took the lead on drafting the briefing concerning the use of material designated as confidential under the protective order in the case. ECF Nos. 631, 639. JSLF took the lead on drafting the class certification standards briefing for Plaintiffs, with assistance from other Co-Lead Class Counsel. ECF Nos. 633, 640.

138.     At the ensuing hearing on the standard for class certification and to discuss the upcoming Evidentiary Hearing, Berger Montague handled arguments concerning the hearing process

and the Court's questions concerning the potential use of an independent expert, and JSLF handled argument on issues relating to class certification standards. *See* ECF No. 651.

139.    Over the next several months, the parties met and conferred on a variety of issues relating to the Evidentiary Hearing, including exchanging exhibits and preparing exhibit lists. Berger Montague led these meet and confers and processes.

140.    During these pre-Evidentiary Hearing processes, Zuffa produced a set of new purported "Summary Exhibits" and indicated its intention to rely on other purported "Summary Exhibits" it had attached to its opposition to Plaintiffs' Motion for Class Certification. Plaintiffs objected to these exhibits as untimely expert testimony that lacked appropriate foundation. Plaintiffs briefed those objections, with Berger Montague taking the lead in the briefing and argument. *See* ECF No. 658.

141.    Zuffa also objected to certain of Plaintiffs' proposed exhibits. Cohen Milstein took the lead on responding to Zuffa's objections on Plaintiffs' behalf. *See* ECF No. 674.

142.    Furthermore, as part of the confidentiality issues the parties worked to resolve in advance of the Evidentiary Hearing, the parties provided notice to the various third parties where such third parties (1) produced discovery materials that appeared on the parties' exhibit lists, and (2) the third parties designated such materials as confidential or highly confidential under the protective order.

143.    Following the objections of some of these third parties, Co-Lead Class Counsel, in particular Berger Montague and JSLF, took the lead in drafting Plaintiffs' briefing concerning the use of these materials at the Evidentiary Hearing. *See* ECF Nos. 676 & 677.

144.    In addition to these matters relating to evidence, standards, and confidentiality, throughout 2019 leading up to the August/September 2019 Evidentiary Hearing, Co-Lead Class Counsel prepared to examine the seven witnesses requested by the Court (the parties' six economic experts and former UFC matchmaker Joseph Silva). Berger Montague took the lead in preparing Dr. Singer for his direct examination, assisted by JSLF and Cohen Milstein. Berger Montague also prepared the cross examination of Dr. Topel. JSLF prepared the direct examination of Dr. Alan Manning, assisted by Berger Montague. JSLF also prepared the cross examination of Dr. Oyer, assisted by Berger Montague. Cohen Milstein prepared the direct examination of Dr. Zimbalist, assisted by

Berger Montague and JSLF. And Cohen Milstein prepared the cross examination of Dr. Blair, assisted by other Co-Lead Class Counsel. Finally, Berger Montague prepared the examination of Joseph Silva.

145.     During the in-person Evidentiary Hearing, the Co-Lead Class Counsel who led the preparation of the examinations then put on or crossed the witnesses at the Hearing over the course of the six days of expert testimony in Las Vegas, ECF Nos. 724, 726, 730, 734, 741, 745 (August 26-28, 30, 2019, September 12-13, 2019), and the single day of testimony from Joseph Silva in Richmond, Virginia, ECF No. 829 (September 23, 2019).

146.     Overnight between the second and third days of testimony during the Evidentiary Hearing, Zuffa served new regression analyses on Plaintiffs. *See* ECF No. 728. Berger Montague worked with Dr. Singer to understand these regressions, then prepared to argue to the Court concerning the inappropriateness of consideration of these regressions, all while also preparing the cross examination of Dr. Topel and analyzing the effect of these regressions on Dr. Singer's rebuttal testimony. *See* ECF No. 730 (transcript containing argument on the regressions).

147.     Additionally, during the Evidentiary Hearing, the Court requested supplemental briefing on Plaintiffs' Motion for Class Certification, including any citations to the Evidentiary Hearing testimony. *See* ECF No. 737. Berger Montague, with assistance from Cohen Milstein, drafted, finalized, and filed that brief. *See* ECF No. 744. Finally, toward the close of the hearing, the Court asked the parties to give closing arguments on the final day of the hearing. JSLF, assisted by Berger Montague, prepared for that argument, and JSLF handled that argument before the Court. Berger Montague also handled procedural matters before the Court as they arose during the Hearing.

### iv.     Post-Hearing Proceedings on Class Certification

148.     Following the Evidentiary Hearing, Zuffa moved for reconsideration of the Court's rulings striking certain testimony of Joseph Silva. ECF No. 748. Berger Montague drafted the opposition to that motion. ECF No. 751. The Court denied Zuffa's motion. ECF No. 764.

149.     Over the next few years (2019-2023), Co-Lead Class Counsel attended multiple status conferences, ECF Nos. 768, 781, 814. At the second of these status conferences, on December 10, 2020, the Court announced its intention to grant Plaintiffs' Motion for Class Certification as to the Bout Class but deny certification of the proposed Identity Rights Class. *See* ECF No. 775.

36

150.     Following the December 10, 2020 status conference, the Court Ordered the parties to file a joint list of all exhibits or portions of exhibits or briefs that remain sealed or redacted. ECF No. 772. Berger Montague worked with Zuffa's counsel to compile and prepare that list for submission to the Court. ECF No. 778.

151.     Also following that December 10, 2020 status conference, on April 6, 2021, a Ninth Circuit panel vacated a district court order certifying three classes in a price fixing case. *Olean Wholesale Grocery Co-Op v. Bumble Bee Foods LLC*, No. 19-56514 (9th Cir. Apr.6, 2021). Zuffa submitted that decision to this Court on April 8, 2021. ECF No. 803. Co-Lead Class Counsel, led by Berger Montague and JSLF, drafted a response to contextualize *Olean*'s applicability to this litigation. *See* ECF No. 804 (Apr. 9, 2021). The Ninth Circuit then vacated the panel Order and took the matter up *en banc*, *Olean Wholesale Grocery Co-Op v. Bumble Bee Foods LLC*, No. 19-56514, ECF No. 128 (9th Cir. Aug. 3, 2021), a development Plaintiffs submitted to this Court on August 3, 2021 (ECF No. 818). Then on April 8, 2022, the Ninth Circuit filed its opinion in *Olean* reversing the panel decision and affirming the district court's certification of three classes, which Plaintiffs submitted to this Court that same day (ECF No. 821). When the Supreme Court denied *certiorari* in *Olean* on November 14, 2022, Co-Lead Class Counsel submitted that development to this Court the same day. *See* ECF No. 832.

152.     On August 9, 2023, the Court issued its Order granting in part Plaintiffs' Motion for Class Certification, certifying the proposed Bout Class. ECF No. 839.

153.     JSLF and Berger Montague took the lead in drafting the notice to the certified Class in the *Le* Action as well as the Motion for Approval of Class Notice Plan. *See* ECF No. 916. Prior to that Motion, Berger Montague sought bids from multiple vendors providing claims administration and notice services, analyzed those bids, and selected Angeion Group as presenting the best bid for notice to the class. The Court granted the motion, approving the notice plan, ECF No. 921, and Co-Lead Class Counsel oversaw the issuance of notice to the Class. Notably, no members of the *Le* Class opted out.

### v.     Zuffa's Rule 23(f) Appeal

154.     Zuffa filed a petition pursuant to Fed. R. Civ. P. 23(f) ("23(f) Petition"), seeking to appeal the Court's Order certifying the Bout Class. *See Le v. Zuffa, LLC*, No. 23-80074, ECF No. 2 (9th Cir. Aug. 23, 2023).

155.   Berger Montague drafted and filed Plaintiffs' opposition to Zuffa's 23(f) Petition. No. 23-80074, ECF No. 4 (9th Cir. Sept. 5, 2023). Berger Montague also drafted and filed a response opposing Zuffa's request for a reply brief, and Plaintiffs' proposed sur-reply in the event Zuffa's reply brief was allowed. No. 23-80074, ECF Nos. 8 & 10 (9th Cir. Sept. 22, 2023).

156.   The Ninth Circuit denied Zuffa's 23(f) Petition on November 1, 2023.

**vi.**   **The Improper Solicitation of Absent Class Members**

157.   Following the second post-Evidentiary Hearing status conference of December 10, 2020, wherein the Court announced its intention to certify the Bout Class, Plaintiffs became aware that another firm (Sparacino PLLC or "Sparacino") had been sending potentially misleading solicitations to UFC fighters attempting to persuade these fighters to sign retainers with Sparacino and opt out of the Bout Class. Co-Lead Class Counsel immediately commenced an effort to meet and confer with Sparacino to get the firm to cease these activities. Co-Lead Class Counsel was initially unable to convince Sparacino to cease its efforts.

158.   Co-Lead Class Counsel drafted and filed an emergency Motion to Compel Sparacino to cease communicating with absent class members. ECF No. 796. Co-Lead Class Counsel also drafted and filed a reply brief addressing Sparacino's arguments in opposition. ECF No. 813. After the Court denied the emergency motion as moot based on Sparacino's representations that the challenged activity was no longer occurring, ECF No. 831, Co-Lead Class Counsel became aware of additional information that Co-Lead Class Counsel believed required further action by the Court. On August 17, 2023, Co-Lead Class Counsel raised these issues with the Court via a Pre-Conference Statement. ECF No. 842 at 7. At the ensuing status conference, on August 21, 2023, the Court directed Co-Lead Class Counsel to meet and confer with Sparacino and submit further briefing. Co-Lead Class Counsel complied with that Order, endeavoring to meet and confer, first following that August 21, 2023 hearing and again with subsequent outreach. But Sparacino rebuffed those efforts and filed a motion for sanctions against Co-Lead Class Counsel. ECF No. 849. Cohen Milstein led the responsive briefing for Plaintiffs. ECF Nos. 859, 860. After Sparacino served its reply brief featuring new matter and arguments, Cohen Milstein prepared a surreply. *See* ECF No. 868. Cohen Milstein also prepared an affirmative motion seeking an Order prohibiting Sparacino from continuing what Co-Lead Class

38

Counsel believed were improper solicitations and to remedy past allegedly improper solicitations (*e.g.*, allowing fighters who signed retainer agreements with Sparacino to terminate those agreements without penalty or financial obligation to Sparacino). ECF Nos. 875, 876. Cohen Milstein then argued these motions before the Court on behalf of Plaintiffs and the Class. *See* ECF No. 895. Subsequent to that hearing, Sparacino filed papers with the Court announcing that it had terminated its representation with the remaining UFC fighters who had signed retention letters and would not communicate with any absent class members going forward. ECF No. 925.

### F.  Zuffa's Motions for Summary Judgment in the *Le* Action

159.    Zuffa filed three separate motions for summary judgment.

160.    First, during discovery, Zuffa filed a motion for partial summary judgment seeking to dismiss as untimely Quarry's claims relating to identity rights. ECF No. 347 (D. Nev. Feb. 1, 2017). JSLF took the lead in drafting Plaintiffs' Opposition, with assistance from Berger Montague. ECF No. 365. Berger Montague then argued Plaintiffs' opposition. *See* ECF No. 494. The Court ultimately denied the motion for summary judgment as to Quarry's identity rights claims without prejudice (Quarry did not claim to have timely bout claims). ECF No. 493.

161.    Following briefing on Plaintiffs' Motion for Class Certification (ECF No. 518) and Zuffa's motions to exclude Plaintiffs' experts (ECF Nos. 517, 522, 524), Zuffa filed another motion for summary judgment. ECF No. 573 (July 30, 2018). For Plaintiffs' Opposition, Berger Montague undertook to draft the opposition to Zuffa's statement of undisputed facts, as well as parts of the opposition brief, and JSLF led the drafting of other components of the brief with contributions from Cohen Milstein. Berger Montague then finalized the brief and filed it. ECF No. 596 (Sept. 21, 2018). Berger Montague then prepared to argue the motion for summary judgment at the December 2018 hearing, but the Court ultimately denied the motion without argument and without prejudice. ECF No. 628.

162.    Following the Court's Class Certification Order, ECF No. 839 (Aug. 9, 2023), Zuffa renewed its motion for summary judgment. *See* ECF No. 878 (Oct. 24, 2023). Cohen Milstein and Berger Montague led Plaintiffs' drafting of their opposition to the renewed motion, including a voluminous set of exhibits. ECF No. 926 (Nov. 30, 2023).

163.     On January 18, 2024, the Court denied Zuffa's renewed motion for summary judgment. ECF No. 959.

### G. The Investigation and Filing of the *Johnson* Action, Litigating the Motion to Dismiss in *Johnson*, and Preliminary Fact Discovery in *Johnson*

164.     While awaiting the Court's Order certifying the Bout Class in the *Le* Action, Co-Lead Class Counsel, with supporting counsel at Warner Angle, were retained by Plaintiffs Kajan Johnson and Clarence Dollaway to file a new action on behalf of UFC fighters who appeared in bouts for the UFC from July 1, 2017 to the present. This "*Johnson* Action" thus covered the period after the end of the *Le* Action's Class Period (which ran from December 16, 2010 through June 30, 2017).

165.     Co-Lead Class Counsel's investigation into the *Johnson* Action focused on (1) establishing a sufficient basis for alleging that Zuffa's conduct alleged in the *Le* Action continued beyond June 30, 2017, and (2) analyzing how the conduct was affected by the sale of Zuffa in 2016 to WME-IMG Endeavor ("Endeavor"), including by reviewing corporate documents and other publicly available materials evidencing actions Endeavor took on Zuffa's behalf that may have contributed to the alleged anticompetitive scheme.

166.     Co-Lead Class Counsel named both Zuffa and Endeavor Group Holdings, Inc. as defendants when filing the initial complaint in the *Johnson* Action. *Johnson v. Zuffa, LLC*, No. 2:21-cv-1189, ECF No. 1 (D. Nev. June 23, 2021). Co-Lead Class Counsel then sought to have the Court coordinate (but not consolidate) the *Johnson* Action with the *Le* Action for efficiency purposes, which the Court did. *Id.*, ECF No. 9 (July 2, 2021) (Notice of Related Cases); *see also* ECF No. 11 (Transfer Order).

167.     Zuffa and Endeavor Group Holdings, Inc. moved to dismiss the *Johnson* Action. *Johnson v. Zuffa, LLC*, No. 2:21-cv-1189, ECF No. 17 (D. Nev. Sept. 10, 2021). Berger Montague led the drafting of Plaintiffs' Opposition to the motion to dismiss. *See id.*, ECF No. 41 (Oct. 22, 2021). The Court denied the motion to dismiss without prejudice on September 30, 2022. *See* ECF No. 68.

168.     Endeavor renewed its motion to dismiss on December 1, 2023. *See Johnson*, No. 2:21-cv-1189, ECF No. 112.

169.     In response to Endeavor's renewed motion to dismiss, Co-Lead Class Counsel sought to

40

amend the complaint. Co-Lead Class Counsel, with assistance from supporting counsel at Warner Angle, performed further investigation into the changes in the corporate structure around the UFC. Co-Lead Class Counsel analyzed publicly available materials concerning the formation of the new, publicly traded corporation TKO Group Holdings, Inc. and its involvement in the conduct Plaintiffs alleged in the *Johnson* Action. Berger Montague then drafted and filed the Amended Complaint in the *Johnson* Action, adding TKO Group Holdings, Inc. as a defendant and adding a new plaintiff, Tristan Connelly. *Johnson*, No. 2:21-cv-1189, ECF No. 118.

170.    Co-Lead Class Counsel then negotiated a briefing schedule for any further motion to dismiss that Defendants (Zuffa, Endeavor Inc., and/or TKO Group Holdings, Inc.), might choose to file. *Id.*, ECF No. 119.

171.    Zuffa and TKO Group Holdings, Inc. filed an Answer on February 5, 2024. *See id.*, ECF No. 129. Endeavor filed a motion to dismiss. *Id.*, ECF No. 128.

172.    The Settlement in the Actions was reached prior to the date on which Plaintiffs' opposition to Endeavor's third motion to dismiss was due.

173.    Prior to Settlement in the Actions, discovery in the *Johnson* Action had commenced. On October 14, 2023, Co-Lead Class Counsel prepared and served Requests for Production of Documents to Defendants. Co-Lead Class Counsel also received Defendants' Requests for Production of Documents served on Plaintiffs and drafted and served objections and responses to those Requests. Co-Lead Class Counsel, in particular Cohen Milstein, worked with supporting counsel at Warner Angle to collect potentially responsive documents from the Plaintiffs in the *Johnson* Action for production to Defendants.

**H. Confidentiality Issues**

174.    Zuffa and most third parties producing documents in the *Le* Action designated all or nearly all of their productions as "Confidential" or "Highly Confidential" pursuant to the protective order in this case. ECF No. 217.

175.    Throughout the litigation, whenever Plaintiffs filed something containing material designated as "Confidential" or "Highly Confidential," Plaintiffs were compelled by the protective order to file such materials under seal, creating a separate "public" version of the filed materials

41

redacting the designated material. As a result, most key filings required substantial additional work by counsel (1) to scrub through the filing and ensure that designated material was redacted, (2) to prepare a motion to seal the material, and (3) to perform two filings, one of the public version and one of the redacted version, for each motion, brief, or opposition (and related attachments).

176. As the parties reached the class certification and summary judgment stages of the case, the rote process of conducting these dual filings and motions to seal began to break down. The public Evidentiary Hearing on class certification would result in material previously filed only under seal being presented publicly. As discussed *supra*, this led to significant briefing and argument on confidentiality standards applicable to these materials.

177. Following the Court's Order certifying the Bout Class in the *Le* Action, the Court directed the parties to identify any materials that should remain under seal that had been filed in the case.

178. After the Court's instructions at the August 21, 2023 status conference, Co-Lead Class Counsel commenced to undertake a review of the entirety of the filed record in the *Le* Action and identify any materials that could remain sealed under the Court's direction or any other legitimate basis.

179. Berger Montague engaged in multiple meet and confer teleconferences with Zuffa's counsel to discuss whether any materials could properly remain under seal. Ultimately, upon receiving direction from the Court, the parties reached agreement as to the treatment of all materials filed in the case.

180. Co-Lead Class Counsel prepared three filings addressing the three categories of such materials. Co-Lead Class Counsel filed two of these three filings. *See* ECF Nos. 946, 948. Co-Lead Class Counsel then sent the third filing Co-Lead Class Counsel had prepared for Zuffa to file. ECF No. 949.

**I.**   **Pre-Trial Proceedings in the *Le* Action and Related Discovery issues in the *Johnson* Action**

**i.**   **Scheduling Trial in the *Le* Action.**

181.    Fewer than two weeks after the Court certified the Bout Class in the *Le* Action, the Court held a status conference. *See* ECF No. 847. Berger Montague took the lead in drafting a Pre-Conference Statement setting forth Plaintiffs' proposal for proceeding to trial in the *Le* Action. *See* ECF No. 842.

182.    In the Pre-Conference Statement, Plaintiffs proposed that the *Le* Action proceed to trial on liability and damages but that the Court should defer consideration of injunctive relief in both *Le* and *Johnson* until after trial in the *Johnson* Action. ECF No. 842 at 1-3, 4-7.[13]

183.    At the status conference on August 21, 2023, the Court announced a trial on liability and damages in the *Le* Action to take place in March or April 2024. ECF No. 847. Berger Montague led the Plaintiffs' presentation at the status conference.

184.    The Court later informed the parties by email that the trial would be set to start on April 8, 2024. On September 29, 2023, Zuffa requested to postpone trial for months based on a conflict with Zuffa's counsel's schedule. ECF No. 861. Co-Lead Class Counsel responded on October 3, 2023 that the trial should proceed as scheduled, or else be delayed by only one week. ECF No. 864. The Court re-set the trial for liability and damages in the *Le* Action for April 15, 2024. ECF No. 961.

**ii.**   **Zuffa's efforts to reopen discovery in the *Le* Action and/or use discovery in the *Johnson* Action at trial in the *Le* Action.**

185.    Plaintiffs filed a Pre-Conference Statement after the Court's Order certifying the Bout Class in the *Le* Action, ECF No. 842 (Aug. 17, 2023), to which Zuffa responded. Zuffa's response announced its intention to seek further discovery prior to trial in the *Le* Action. ECF No. 843. Zuffa then argued for such discovery at the status conference on August 21, 2023. *See* ECF Nos. 847, 847.

---

[13] The Pre-Conference Statement also addressed other issues, including Plaintiffs' request that the Class Certification record in the *Le* Action be unsealed in its entirety (ECF No. 842 at 8); Plaintiffs' allegation that Sparacino had continued its improper communications with *Le* Class Members (*id.* at 7); and whether a Fed. R. Civ. P. 23(b)(3) class may pursue injunctive relief (*id.* at 3-4).

43

1    Berger Montague argued against that position at the status conference. The Court permitted Zuffa to

2    file a motion seeking to reopen discovery in the *Le* Action. *See* ECF No. 847.

3        186.    On September 21, 2023, prior to Zuffa's motion to reopen discovery, Co-Lead Class

4    Counsel, led by Berger Montague, and counsel for Defendants in the *Johnson* Action met and conferred

5    pursuant to Fed. R. Civ. P. 26(f) and submitted a Joint Proposed Discovery Plan and Scheduling Order

6    ("Discovery Plan"). *See Johnson*, No. 2:21-cv-1189, ECF No. 80. In connection with that Discovery

7    Plan and further meet and confers thereafter, the parties endeavored to reach an agreement concerning

8    how discovery in one of the Actions could be used in the other, but were unable to reach agreement.

9    *See Le* Action, ECF No. 870.

10       187.    On October 26, 2023, Zuffa filed two motions. First, Zuffa filed a Motion to Reopen

11   Discovery and Amend Scheduling Order. ECF No. 884 (Oct. 26, 2023). Second, Zuffa filed a Motion

12   to Treat Fact Evidence Produced in the *Johnson* Action as if it Was also Produced in *Le* Action. ECF

13   No. 885 (Oct. 26, 2023).

14       188.    While Plaintiffs worked on their opposition briefs to these motions, the Court issued an

15   Order setting a hearing on the Motion to Reopen Discovery for November 17, 2023, ECF No. 894, four

16   days before Plaintiffs' Opposition was due. *See* ECF No. 871.

17       189.    Given the overlap in the underlying issues, Berger Montague met and conferred with

18   Zuffa to reach an agreement on a consolidated opposition brief and appropriate deadlines. When the

19   parties were unable to agree on these issues, Zuffa filed a motion to consolidate the briefing and amend

20   the schedule. *See* ECF No. 896 (Nov. 6, 2023). Berger Montague drafted a response, which Plaintiffs

21   filed the same day as Zuffa's motion. *See* ECF No. 897 (Nov. 6, 2023). The Court largely adopted

22   Plaintiffs' position on the issues in an Order issued later that day. *See* ECF No. 900 (Nov. 6, 2023).

23       190.    Berger Montague drafted a consolidated response to Zuffa's two motions (ECF Nos. 884

24   & 885) relating to the new discovery Zuffa sought to take and utilize in the upcoming *Le* trial and filed

25   it on November 13, 2023. *See* ECF No. 914. At a hearing on November 17, 2023, Berger Montague

26   argued Plaintiffs' opposition to Zuffa's two motions (ECF Nos. 884 & 885) relating to the new

27   discovery Zuffa sought to take and utilize in the upcoming *Le* Action trial. The Court denied

28   Defendants' motions from the bench. *See* ECF No. 922.

44

191.     At the November 17, 2023 hearing on Zuffa's two motions (ECF Nos. 884 & 885), the Court addressed Plaintiffs' position that injunctive relief in the *Le* Action could be resolved in a proceeding to follow a jury trial in the *Johnson* Action. *See* ECF No. 923, at 31-45. Plaintiffs acknowledged that to establish the *Le* Class's entitlement to injunctive relief, additional discovery regarding current market conditions would be necessary. *See, e.g.*, id. at 33, 37. The Court stated that Plaintiffs "may have to make a choice about how much injunctive relief [Plaintiffs] seek for the *Le* class," to the extent Plaintiffs sought to hold the injunctive relief proceedings on behalf of the *Le* Class after discovery in *Johnson*. *Id.* at 41. The Court described waiting to hold injunctive relief proceedings until a year or more after trial on liability and damages in the *Le* Action as "problematic" and stated that the Court was "not sure that [it] would permit an injunctive relief claim to move forward for the *Le* class." *Id.* at 42-43. In response to the Court's concerns on this issue, and to keep the April 2024 trial date in place, Co-Lead Class Counsel elected to defer all injunctive relief proceedings to the *Johnson* Action, and not seek injunctive relief in the *Le* Action. See ECF No. 947.

### iii. Pretrial Tasks and Work

#### a. Witness Lists and Deposition Designations

192.     Toward the end of 2023, as the *Le* Action sped toward trial, Co-Lead Class Counsel, with assistance from supporting counsel at Warner Angle, Kemp Jones, and Clark Hill PLC ("Clark Hill"),[14] engaged intensely in various pretrial tasks.

193.     Each Co-Lead Class Counsel firm undertook responsibility for review of the deposition transcripts in the case to identify the witnesses most relevant to the potential trial presentation. Co-Lead Class Counsel noted initial deposition designations for each transcript while determining which witnesses would appear on Plaintiffs' trial witness list and awaiting Zuffa's own trial witness list.

---

[14] As it became clear that the *Le* Action would go to trial, Co-Lead Class Counsel decided to engage an experienced Las Vegas trial attorney, Crane Pomerantz of Clark Hill. Prior to entering private practice as a litigator, Mr. Pomerantz was a federal prosecutor for fourteen years in the United States Attorney's Office for the District of Nevada where he successfully prosecuted several complex and high-profile cases as lead trial counsel and earned a number of awards from the Department of Justice and the prosecuting agencies with which he worked. Mr. Pomerantz was deeply involved in trial preparation in the *Le* Action and figured to play a prominent role in the trial.

45

194.    During this deposition review and initial designation process, Berger Montague also undertook to ensure Plaintiffs' Rule 26(a) disclosures were complete and current, submitting a new version to Zuffa that was updated to reflect (1) the additional witnesses who had been deposed in the case, and (2) the damages models that Plaintiffs intended to present at trial.

195.    Once Co-Lead Class Counsel completed their initial deposition review and designations, Co-Lead Counsel and supporting counsel at Warner Angle, Kemp Jones, and Clark Hill analyzed the deposition summaries and compiled Plaintiffs' initial trial witness list.

196.    Co-Lead Class Counsel served that initial witness list as well as Plaintiffs' deposition designations on Zuffa on February 2, 2024. Plaintiffs' deposition designations covered 10 Zuffa witnesses and 11 third-party witnesses, including designations across 25 separate deposition transcripts.

197.    When Plaintiffs received Zuffa's deposition designations, Co-Lead Class Counsel commenced to review each designation and (1) record objections to the designation where appropriate, and (2) consider whether any counter-designations were appropriate. Zuffa's affirmative designations covered 10 third-party witnesses and one former Zuffa employee, and Plaintiffs interposed objections to these designations and noted counter-designations where appropriate. Plaintiffs then exchanged these counter-designations and objections with Zuffa on February 23, 2024.

198.    Following the exchange of counter-designations and objections, Co-Lead Class Counsel commenced to respond to Zuffa's objections to Plaintiffs' initial deposition designations. Zuffa asserted multiple bases for objecting to nearly all of Plaintiffs' deposition designations. Between receiving Zuffa's objections and counter-designations on February 23, 2024, and the deadline for responding to those objections and objecting to the counter designations (February 28, 2024), Co-Lead Class Counsel, for each of the 11 third-party witnesses, (1) drafted responses to each objection to Plaintiffs' initial designations, (2) drafted objections where appropriate to Zuffa's counter-designations, and (3) proposed counters to Zuffa's counter-designations where applicable.

### b. Further Review of Publicly Available Videos for Use at Trial

199.    In addition to the efforts described above, Co-Lead Class Counsel undertook a further investigation into hundreds of hours of third-party video and audio footage involving Zuffa, its executives, its competitors, and Plaintiff fighters, as well as certain third parties expected to appear at

46

trial as witnesses. Co-Lead Class Counsel sought to update its prior review of publicly available video footage and ensure that video clips had not previously been missed during discovery that would be useful during direct and/or cross examination of witnesses at trial.

200.     Co-Lead Class Counsel collected a universe of videos including pre- and post-fight press conferences for more than 230 events during the *Le* Class Period (December 16, 2010 to June 30, 2017), television, YouTube, and podcast interviews featuring potential trial witnesses, and potential trial witnesses' podcast episodes. In all, the total amount of potentially relevant, publicly available audio and video content involving Zuffa's executives alone likely exceeded one thousand hours, and other potential trial witness video and audio files represented hundreds more hours. For certain videos, transcripts were available for searches, but for many of the videos, no such transcripts were available and a real-time review was required (and Co-Lead Class Counsel performed such reviews).

201.     Co-Lead Class Counsel's collection and review was not limited to video and audio files featuring Zuffa and third-party witnesses. Co-Lead Class Counsel also reviewed many hours of podcasts and video content produced by the *Le* Class Representatives and Quarry to facilitate preparation for the *Le* Class Representatives' and Quarry's cross examinations.

202.     Once collected with the relevant excerpts identified, Co-Lead Class Counsel commenced to generate nearly 100 relevant clips for use at trial, either during direct or cross examinations, and prepared additional clips for use in preparing trial witnesses.

**c.  Exhibit Lists**

203.     Simultaneously with the work on deposition designations, Co-Lead Class Counsel prepared Plaintiffs' trial exhibit list. Berger Montague oversaw the collection of materials for the list with contributions from other Co-Lead Class Counsel and Warner Angle. These materials included the documents identified in Plaintiffs' prior briefing on class certification, *Daubert*, and Zuffa's motions for summary judgment; materials relied upon in Plaintiffs' expert reports; depositions; and materials attorneys representing Plaintiffs had identified in their preparations for trial. Co-Lead Class Counsel, led by Berger Montague, went through the approximately 1,700 proposed exhibits, culling nearly 500 of those proposed exhibits prior to serving the list on Zuffa on February 8, 2024.

204.     Upon receipt of Zuffa's exhibit list on February 8, 2024, Co-Lead Class Counsel divided

47

up review of the exhibits on the list. Zuffa's exhibit list included more than 960 entries, including lengthy videos and documents. Co-Lead Class Counsel considered and drafted objections as applicable for each of these exhibits, serving those objections on February 22, 2024. Co-Lead Class Counsel also reviewed Zuffa's exhibit list to ascertain whether and how any exhibit or groups of exhibits raised issues appropriate for motions *in limine* (discussed in more detail below).

205.   When the parties exchanged their objections to each other's exhibit lists, Co-Lead Class Counsel commenced work on responding to Zuffa's (often multiple) objections to each of the more than 1,200 entries on Plaintiffs' exhibit list. Plaintiffs served these responses to Zuffa's objections on February 27, 2024.

206.   In addition to the foregoing, Co-Lead Class Counsel also worked with Zuffa's counsel to identify those materials appearing on both sides' exhibit lists to identify which exhibits would be "joint exhibits."

### d. Motions *in Limine*

207.   During January and February, Co-Lead Class Counsel considered and researched the appropriateness of various motions *in limine*. Co-Lead Class Counsel reviewed the discovery record in this case, briefing submitted by the parties on various issues, and other indicators of matters that could come up at trial that would be properly addressed by a pretrial motion.

208.   For example, following Zuffa's service of its preliminary trial witness list, Co-Lead Class Counsel identified the presence of 13 witnesses who had not been disclosed by Zuffa during the discovery period as required by Fed. R. Civ. P. 26(a)(1). Berger Montague researched the issue and determined that Plaintiffs were on firm ground to object to these witnesses. Berger Montague commenced a meet and confer concerning these witnesses via email on February 5, 2024. Plaintiffs sought to expedite the briefing on whether these witnesses would be permitted to testify at trial. Zuffa objected to briefing the issue early and stood firm on its position that the witnesses were properly disclosed. Plaintiffs ultimately included this issue as one of Plaintiffs' motions *in limine*.

209.   On February 12, 2024, the parties exchanged their preliminary lists of motions *in limine*. Plaintiffs' list included motions on 20 issues, and Zuffa's list included motions on 11 issues. Co-Lead Class Counsel then undertook to analyze Zuffa's identified motions *in limine*.

48

210. The parties met and conferred on each other's motions *in limine* on February 16, 2024.

211. Following the meet and confer, the parties exchanged letters and proposals to resolve certain of the motions *in limine* asserted by the other side. Co-Lead Class Counsel also continued to research the viability of Zuffa's proposed motions.

212. Co-Lead Class Counsel then commenced to draft their motions *in limine* for filing. On February 29, 2024, Plaintiffs filed twenty motions *in limine*. *See* ECF Nos. 993, 995, 996 & 1001 (drafted by Berger Montague), 997 (Omnibus filing containing four motions drafted by Berger Montague and Cohen Milstein), 999 & 1000 (Omnibus filings each containing five motions, including motions drafted by each Co-Lead Class Counsel firm), 1002 (drafted by Cohen Milstein), 1003 (drafted by JSLF).

213. Also on February 29, 2024, Zuffa filed its eleven motions *in limine*. Co-Lead Class Counsel then divided up responsibility for responding to and arguing these motions.

214. Co-Lead Class Counsel, along with supporting counsel at Kemp Jones and Clark Hill, attended a hearing on March 4, 2024, at which the Court heard argument on motions *in limine*. At that hearing, Berger Montague and JSLF argued each of the eleven motions *in limine* brought by Zuffa and the twenty motions *in limine* brought by Plaintiffs.

215. Plaintiffs won critical motions *in limine* at that March 4 hearing, including the motion seeking to strike the 13 late-disclosed witnesses on Zuffa's witness list (ECF No. 993) and evidence from after the June 30, 2017 close of the class period (ECF No. 996). *See* ECF No. 1010.

**e. Jury Questionnaire**

216. Kemp Jones and Clark Hill took the lead in devising a proposed jury questionnaire.

217. Co-Lead Class Counsel, with JSLF taking the lead, reviewed the draft jury questionnaire provided by Kemp Jones and Clark Hill, and exchanged it with Zuffa.

218. JSLF then worked with Plaintiffs' jury consultant to consolidate the drafts and propose revisions to Zuffa. JSLF then led the meet and confer to finalize the document for submission to the Court.

219. Through these efforts, the parties were ultimately able to submit an agreed-upon jury questionnaire to the Court for consideration and use.

49

**f.   Trial Brief and Fact Stipulations**

220.    Berger Montague, with assistance from Clark Hill, led the drafting of Plaintiffs' Trial Brief, filed on February 22, 2024. ECF No. 978.

221.    Incident to that drafting, Berger Montague reviewed various materials, including briefing on Zuffa's renewed motion for summary judgment (*see* ECF Nos. 878, 926, 951), summaries of key testimony from the witnesses on Plaintiffs' witness list as prepared by Co-Lead Class Counsel and Warner Angle for Berger Montague's review and consideration in drafting the trial brief, and other key exhibits and planned expert testimony.

222.    Co-Lead Class Counsel also developed and drafted proposed stipulations of fact for the trial in the *Le* Action. Co-Lead Class Counsel reviewed Zuffa's Answer to the Complaint in the *Le* Action, ECF No. 212, Zuffa's responses to Plaintiffs' Requests for Admission, Zuffa's Rule 30(b)(6) testimony, and Zuffa's motions for summary judgment to identify potential areas for stipulations. The parties then exchanged proposed fact stipulations on February 26, 2024. Co-Lead Class Counsel then commenced to review Zuffa's proposed fact stipulations to identify potential areas of agreement. Co-Lead Class Counsel were preparing to respond to Zuffa's proposed fact stipulations the same day that this Settlement was reached.

**g.   Preparation of Trial Presentations**

223.    Co-Lead Class Counsel further led all aspects of the preparation of Plaintiffs' evidence at trial.

224.    Berger Montague drafted an opening argument, which went through multiple revisions prior to a mock presentation to Co-Lead Class Counsel, Warner Angle, Kemp Jones, and Clark Hill. Following that mock presentation, the other firms submitted comments and suggestions for Berger Montague's consideration. On February 17, 2024, Berger Montague delivered a version of the opening argument (along with other evidence and argument) to a mock jury for further feedback. After review of the mock jury's deliberations, Berger Montague again revised the opening and presented it to a second mock jury on February 18, 2024. In the weeks that followed, Berger Montague continued to work on the opening argument and began to build out the closing argument.

225.    Co-Lead Class Counsel and Clark Hill divided up responsibilities for the presentation of

50

1    Plaintiffs' witnesses and for crossing Zuffa's witnesses.

2         226.   Berger Montague and Clark Hill, with assistance from Warner Angle, took the lead in

3    preparing the *Le* Class Representatives and Quarry for their direct and cross examinations. Berger

4    Montague collected materials for preparing those direct examinations through additional interviews of

5    *Le* Class Representatives and Quarry, a further review of the *Le* Class Representatives' and Quarry's

6    document productions in the case, review of important documents previously identified in Zuffa's and

7    third parties' productions, and research of publicly available sources describing events and occurrences

8    in the *Le* Class Representatives' and Quarry's careers. Berger Montague then commenced to draft the

9    direct examination for each *Le* Class Representative and Quarry. Additionally, Clark Hill and Berger

10   Montague drafted and delivered mock cross examinations to prepare the *Le* Class Representatives and

11   Quarry for potential ways in which Zuffa would likely attack their testimony at trial. These in-person

12   and remote mock sessions took place in January and February 2024, as Plaintiffs developed their trial

13   plan.

14        227.   Berger Montague and JSLF also undertook to consider how to cull the designated

15   testimony for third-party witnesses who would not appear at trial. Because such testimony would be

16   delivered via video, JSLF and Berger Montague went through the deposition transcripts to identify the

17   most critical testimony Plaintiffs would present to the jury and plan how to work with Zuffa to shorten

18   the ultimate presentation of such video evidence.

19        228.   JSLF led the process of issuing subpoenas to trial witnesses. JSLF sought Zuffa's

20   consent to accept service of subpoenas for witnesses on Plaintiffs' trial witness list that Zuffa's counsel

21   represented. JSLF also issued notice to Zuffa of Plaintiffs' intention to subpoena third-party witnesses

22   on Plaintiffs' witness list. Berger Montague, Warner Angle, and Clark Hill worked with representatives

23   of certain third-party witnesses to try to get them to appear live voluntarily, holding multiple in-person

24   meetings and teleconferences incident to that effort.

25        229.   Co-Lead Class Counsel and Clark Hill also prepared direct examinations for the fact

26   witnesses assigned to them. Each Co-Lead Class Counsel firm and Clark Hill took responsibility for

27   assignments relating to the witnesses on Plaintiffs' and Zuffa's trial witness lists and began preparing

28   direct and/or cross examinations for those witnesses.

51

230.    Co-Lead Class Counsel, in particular Berger Montague and Cohen Milstein, took the lead in preparing Plaintiffs' experts for their direct and cross examinations. Berger Montague held multiple full-day preparation sessions with Plaintiffs' expert economist, Dr. Hal Singer, drilling down on the specifics of his testimony. Cohen Milstein, with Berger Montague's support, met with Plaintiffs' expert economist Prof. Andrew Zimbalist to prepare him for his direct and cross examinations through multiple sessions. Cohen Milstein and Berger Montague likewise commenced to prepare for the direct examinations of Plaintiffs' other experts, Guy Davis and Alan Manning, respectively.

**THE SETTLEMENT**

231.    On March 7, 2024, just weeks prior to the start of trial, Co-Lead Class Counsel and counsel for Defendants reached an agreement-in-principle to settle the Actions. By the time the Settlement occurred, more than nine years of hard-fought litigation had passed, extensive fact and expert discovery was complete, and the parties were on the eve of trial in the *Le* Action.

232.    Prior to the Settlement, the parties had participated in significant settlement negotiations, including full-day mediations several years apart (in 2017, 2019, and 2023). Each mediation session was followed by continued discussions with the mediator, the Hon. Layn Phillips.

233.    After the December 2023 mediation session and as the parties prepared for trial in *Le* Action, they continued to discuss the possibility of a settlement of the Actions. After extensive arm's-length negotiations between experienced counsel over the course of several years, the parties ultimately reached an agreement-in-principle that led to the Settlement Agreement currently being presented to the Court. After reaching the agreement to settle the Actions, the parties negotiated over seven weeks the precise language of the Settlement Agreement.

234.    On April 24, 2024, Co-Lead Class Counsel and Defendants executed the Settlement Agreement. The Settlement provides for Defendants to pay $335 million in cash for the benefit of members of the Settlement Classes (SA ¶ 1(x)), and to institute significant prospective relief.

235.    Based on Plaintiffs' experts' evaluation of the data, the *Le* Class has approximately 1,140 members and the *Johnson* Settlement Class has approximately 1,290 members, with some individuals being a member of both the *Le* Class (SA ¶ 1(p)) and the *Johnson* Class (SA ¶ 1(n)). Given that some individuals are members of both the *Le* Class and the *Johnson* Settlement Class, there are

52

approximately 1,950 Fighters across the two classes. As noted in the Declaration of Hal J. Singer, Ph.D. In Support of Plan of Allocation (attached as Exhibit 3), Zuffa paid all fighters in the *Le* Class $556.5 million for participation in bouts between December 16, 2010 and June 30, 2017, and Zuffa paid all fighters in the *Johnson* Settlement Class $457.9 million (who did not sign contracts with arbitration clauses) for participation in bouts during the period between July 1, 2017 and April 13, 2023. Thus, even without considering the substantial prospective relief, the settlement amount reflects a significant portion of all compensation the UFC paid to fighters in the Settlement Classes who are not subject to arbitration agreements. Further, the Settlement Fund represents a significant portion of the overcharges computed by Plaintiffs' expert economist (Dr. Singer) in his report that was submitted during the expert discovery period in the *Le* Action.

236.    An initial estimate of the likely distribution of the Net Settlement Fund indicates that each eligible claimant from the *Le* Class may receive an award from the Settlement equaling 25% (or more) of his or her total earnings from bouts from the UFC during the entire *Le* Class Period. Certain claimants from the *Johnson* Settlement Class will receive as much as 10% of their lifetime bout earnings from the UFC during the *Johnson* Class Period, in addition to benefitting from the prospective relief provided.

237.    The prospective relief set forth in the Settlement is substantial, and locks in the following benefits to fighters for the five (5) years after final approval:[15]

    a.  Zuffa will not impose as a term of its Promotional and Ancillary Rights Agreements an Exclusive Negotiation Period longer than 30 days. *See* SA ¶6(a).

    b.  Zuffa will not impose as a term of its Promotional and Ancillary Rights Agreements a Right to Match Period following the expiration of the Exclusive Negotiation Period of longer than four (4) months. *See* SA ¶6(b).

    c.  Zuffa will limit any extension of the term of its Promotional and Ancillary Rights Agreements in the event a UFC fighter turns down a bout with an opponent Zuffa designates

---

[15] As Co-Lead Class Counsel understands it, Defendants implemented certain of these contractual changes at some point after the *Le* Class Period (December 16, 2010 to June 30, 2017) had ended but before the *Johnson* Action was filed. Given the timing, it is likely that Defendants made these changes, at least in part, as a response to the *Le* Action. As discussed *infra*, absent these provisions in the Settlement, Defendants would be free to revert to their prior practices in the event the *Le* Class lost at trial and/or the Settlement did not require these changes going forward.

53

(regardless whether because the fighter is unable or unwilling to accept the bout), to the longer of the length of time sufficient to find a new opponent or for six (6) months. *See* SA ¶6(c).

d.   Zuffa will change the way its "Retirement Clause" operates. Pursuant to the Settlement Agreement, if a UFC Fighter announces his or her retirement, Zuffa may, at its election, (i) suspend the Term for the period of such retirement or disability (such suspension not to exceed four (4) years, the "Maximum Suspension Period"), (ii) declare that Zuffa has satisfied their obligations to promote all future Bouts to be promoted by the UFC under the Promotional and Ancillary Rights Agreement, without any compensation due to the fighter therefor, and/or (iii) provide the fighter with notice of termination in accordance with the Promotional and Ancillary Rights Agreement. At the expiration of the Maximum Suspension Period, if the Fighter remains in retirement or such disability continues, the Promotional and Ancillary Rights Agreement shall automatically terminate. *See* SA ¶6(d).

e.   Zuffa agrees that UFC fighters shall retain the right to use their own identities, including by way of illustration and not limitation, fighters' names, images, voices and likenesses, in connection with the creation, development, manufacture, distribution, marketing and sale directly or by third parties of Merchandise. SA ¶6(e).

f.   Zuffa agrees to provide fighters up to three (3) still images of the fighter, the licensing of which shall be governed by a licensing application to and approval by Getty Images. SA ¶6(e).

238.   The significance of some of the elements of the prospective relief is supported by record evidence. For instance, Zuffa's then-Chief Legal Officer, Kirk Hendrick, testified as Zuffa's designee pursuant to Fed. R. Civ. P. 30(b)(6) concerning the Exclusive Negotiation Period. Hendrick confirmed that prior to around 2011, Zuffa had a 60-day Exclusive Negotiation Period, but then around the time the FTC opened its inquiry in 2011, Zuffa ceased to include an Exclusive Negotiation Period in its Promotional and Ancillary Rights Agreements. After the FTC closed that inquiry, Zuffa reinstated the Exclusive Negotiation Period, but increased its duration from 60-days to 90-days. Hendrick testified on Zuffa's behalf that the reason Zuffa reinstated the Exclusive Negotiation Period was that:

> [D]uring that interim period [without an Exclusive Negotiation Period] that some athletes, and to their credit, they would say to their managers or us, 'I don't want to talk about my contract right now. I'm preparing for a big fight, a fight that's coming up in a month or two months or whatever, and I don't want to deal with my contract. What would happen then to our ability to negotiate is that we wouldn't have that window of opportunity before their last fight, and so we decided that we need that short window of opportunity after their last fight.

Deposition of Kirk Hendrick (Rule 30(b)(6)) Vol. I, 250:12-23 (Nov. 29, 2016).

239.   Mr. Hendrick's testimony bears upon the value of a part of the prospective relief

54

afforded by the Settlement. First, it shows that, absent the Settlement, there was a realistic possibility that Zuffa would have reinstated some of the challenged contractual provisions. Second, the episode reflects how even minor changes in the challenged provisions can have tangible benefits for the Fighters. In the Settlement, Zuffa agreed to maintain the reduction in the Exclusive Negotiation Period that had prevailed through the class period in *Le* (90-days) to 30-days.

240.    That the prospective relief locks in the reduction in the length of the Right to Match Period that Zuffa implemented after the *Le* class period ended is also significant. Multiple witnesses attested to the challenges that the Right to Match Period created for UFC fighters who wanted to leave for another promotion, but whom the UFC wanted to retain. At least up through the end of the *Le* Class Period (June 30, 2017), UFC fighters had a 12-month Right to Match Period. For a fighter who wanted to leave the UFC (but whom the UFC wanted to retain), such a fighter could not risk obtaining an offer from a rival MMA promoter and allowing Zuffa to match it. As a result, such a fighter would have to wait out the Exclusive Negotiation Period and the Right to Match Period before obtaining and accepting an offer from a rival MMA promoter. *See* Deposition of Joe Silva, 186:4-12 (June 7, 2017) ("Q. Would you agree with me that if there was a UFC fighter who no longer wanted to fight with the UFC for some reason and the UFC was determined to match any offer, that that fighter would need to wait the 90 days of the exclusive negotiation period and then the 12 months of the right to match; correct? A. That's my understanding."). The difference between 15 months (90-day Exclusive Negotiation Period and 12-month Right to Match Period) prevailing prior to and during the bulk of the *Le* Action's relevant time period (from January 2005 through June 2017) and the maximum five months (30-day Exclusive Negotiation Period and 4-month Right to Match Period) permitted by the Settlement Agreement is not insignificant. As Mr. Hendrick testified: "[i]f [a fighter is] ready, willing and able to fight and they want to fight, 12 months I would say is a time period that is significant for a fighter's career." Deposition of Kirk Hendrick (Rule 30(b)(6)) Vol. I, 267:10-13 (Nov. 29, 2016).

241.    The limitation on the length of contract extensions Zuffa may impose on fighters who are unable or unwilling to accept bouts is likewise beneficial to the fighters. Throughout the record in the *Le* Action are documents that reflect significantly longer extensions than six months (the maximum extension permissible under the Settlement Agreement for a fighter unable or unwilling to compete).

55

1   Maintaining a hard limit of six months on these extensions will be beneficial to fighters seeking to

2   escape the UFC's contracts.

3        242.   Based on, *inter alia*, Dr. Singer's analyses finding that the median career length for an

4   MMA Fighter was brief, just 41 months, *see, e.g.,* Expert Report of Hal J. Singer, Ph.D., ¶¶20, 88-91

5   (ECF No. 518-3), Co-Lead Class Counsel believe this prospective relief is significant. As Dr. Singer

6   opined, the long duration of UFC Promotional and Ancillary Rights Agreements, coupled with the

7   challenged provisions that allow Zuffa to extend the term and or retain exclusive negotiation or

8   matching rights thereafter for 12-15 months, was capable of coercing MMA Fighters to re-sign with the

9   UFC for suppressed compensation. Going forward, the prospective relief at issue here can help reduce

10  Zuffa's considerable leverage over UFC Fighters.

11       243.   Co-Lead Class Counsel does not believe that this Settlement solves all of the antitrust

12  problems this litigation sought to address, nor would it eliminate or fully ameliorate key contractual

13  provisions that Plaintiffs had challenged. Indeed, the Settlement Agreement states explicitly that

14  "Plaintiffs' agreement to the prospective relief provisions [in the Settlement Agreement] shall not be

15  deemed or considered a concession that Defendants' promotion or other agreements, or any parts

16  thereof, are procompetitive or are not anticompetitive." SA ¶7. The cash and prospective relief

17  provided by the Settlement nevertheless represents an extraordinary result given the litigation risk

18  discussed *infra*.

19       244.   Co-Lead Class Counsel have collectively prosecuted numerous antitrust class actions as

20  lead counsel or in other leadership positions. We have each personally negotiated many class and non-

21  class litigation settlements. In our opinion, the Settlement Agreement with Defendants in the Actions is

22  more than fair, reasonable, and adequate. The Settlement avoids the delay and uncertainly of continued

23  protracted litigation against Defendants. It provides substantial benefits to members of the Settlement

24  Classes through significant compensation and the potential amelioration of some of the key conduct

25  that Plaintiffs had challenged as anticompetitive.

26       245.   Furthermore, Co-Lead Class Counsel have consulted with Prof. Eric Posner concerning

27  the quality of results achieved through this Settlement. Prof. Posner is the Kirkland and Ellis

28  Distinguished Service Professor at the University of Chicago Law School, who has extensive academic

experience and expertise in antitrust law and its application to labor markets, and who has served as Counsel to the Assistant Attorney General of the Antitrust Division at the Department of Justice. He observes that "claims against employers for anticompetitive behavior in labor markets are relatively rare and difficult in comparison to other types of antitrust claims, and that labor-side section 2 claims of this type have been vanishingly rare." *See* Declaration of Professor Eric A. Posner in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement (attached hereto as Exhibit 2), ¶1. Moreover, as part of Prof. Posner's academic research, he has found that *Le v. Zuffa* "is the first such claim ever to survive summary judgment, reach class certification, or even survive a motion to dismiss." *Id.* These findings further support Co-Lead Class Counsel's opinion that the Settlement provides an excellent result for the Settlement Classes.

**LITIGATION RISK**

246. The Actions presented significant litigation risks that could have resulted in no recovery for the Settlement Classes nor any prospective relief. The substantial relief obtained was achieved without the benefit of a governmental investigation or intervention, but instead proceeded solely through the initiative, investigation, and resources of private parties and counsel (and despite the FTC twice declining to challenge the UFC's allegedly anti-competitive conduct).

247. The FTC twice investigated the UFC's conduct and twice declined to pursue it. Solely through the considerable and combined efforts and investment of Co-Lead Class Counsel, Supporting Counsel at Warner Angle, Kemp Jones, Clark Hill, and others, along with the *Le* and *Johnson* Class Representatives and Quarry, this Settlement stands to provide significant relief to the members of the Settlement Classes now and going forward.

248. Defendants asserted multiple challenges to the merits of Plaintiffs' claims. For instance, Defendants argued that Zuffa and its conduct made the industry what it is today, creating opportunities (not thwarting them) for MMA fighters; that Zuffa pays more than any other MMA promoter; that Zuffa has consistently increased the absolute level of compensation paid to fighters throughout the relevant period; and that Zuffa needs the challenged contract provisions to ensure that it can put on all of its planned events (and to increase the number of MMA events that Zuffa puts on each year, as Zuffa allegedly had throughout the period at issue).

57

249.    Defendants retained expert economists who opined that the challenged conduct was procompetitive, not anticompetitive, and that Plaintiffs' methods of proving impact and damages to the proposed classes were unreliable and thus that (i) the proposed classes could not be certified for litigation purposes, and (ii) Plaintiffs could not prove they or Class Members suffered any harm from the challenged conduct.

250.    Zuffa aggressively fought class certification (including a petition to appeal to the Ninth Circuit pursuant to Fed. R. Civ. P. 23(f)). While Plaintiffs prevailed on their motion to certify the *Le* Class, certifying a litigation class in the *Johnson* Action would not have been certain. Zuffa changed its contracts after the close of the relevant time-period in the *Le* Action (*i.e.*, post-June 2017). Because Plaintiffs' methods of proving key class issues related to the length of time of certain contractual provisions that Defendants have now shortened, these changes had the potential to require Plaintiffs to use a different model to show class-wide impact and damages to obtain a litigation class in the *Johnson* Action. Further, the Ninth Circuit's denial of Zuffa's petition for interlocutory review was without prejudice to Zuffa's ability to re-raise its challenge to class certification in the *Le* Action after any verdict in a trial in the *Le* Action.

251.    While Plaintiffs have aggressively disputed Defendants' arguments and positions throughout these Actions, as with all complex antitrust litigation, there was substantial risk of adverse outcomes on these and other issues, in addition to the possibility of lengthy delays (including from appeals after trial in *Le* and after class certification and/or trial in *Johnson*). Antitrust class actions are "arguably the most complex action(s) to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome." *In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *19 (E.D. Mich. Dec. 13, 2011) ("*Packaged Ice II*") (quoting *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003)); *see also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 533 (E.D. Mich. 2003) ("*Cardizem II*") ("Antitrust class actions are inherently complex").

252.    Critically, the April 2024 trial was limited to the *Le* Action and offered the potential only of monetary relief, without any available injunctive/prospective relief. And even such potential monetary relief was both substantially uncertain and likely a long way from any distribution. While Plaintiffs were confident of their ability to prevail before a Nevada jury in the *Le* Action, any jury

58

award of damages would still have been subject to a lengthy appellate process. As noted *supra*, such an appeal would likely challenge both the Order certifying the *Le* Class as well as various aspects of the merits of the litigation. Any appeal would create both risk of undoing any monetary relief awarded and necessarily would create substantial additional delay.

253.    Further, Co-Lead Class Counsel made the difficult decision not to pursue injunctive relief on behalf of the *Le* Class, and instead pursue such relief only on behalf of the proposed class in the *Johnson* Action. Pursuing injunctive relief in the *Le* Action would have required relinquishing the April 2024 trial date and re-opening discovery in the *Le* Action, and would have caused considerable additional delay to any monetary recovery or other relief for the *Le* Class as the parties continued to litigate discovery issues for potentially years to come. Indeed, the *Le* Class has been awaiting this trial for nearly a decade since the filing of the *Le* Action, and a significant proportion of the *Le* Class has not fought an MMA bout for many years. Co-Lead Class Counsel thus determined that the *Le* Class should go to trial expeditiously.

254.    Moreover, Defendants would have asserted various arguments and defenses at the *Le* trial, which could have resonated with at least one juror—potentially causing a hung jury and requiring that the case be re-tried. While Co-Lead Class Counsel were confident in Plaintiffs' ability to obtain a unanimous verdict in favor of Plaintiffs, the risk that one or more jurors would not side with Plaintiffs could not be dismissed out of hand.

255.    As to the proposed *Johnson* Class, the *Le* trial also posed substantial risk. While an unfavorable verdict in the *Le* trial would not be binding on the members of the proposed *Johnson* Class, such result would have a practical impact on the potential relief the proposed *Johnson* Class could obtain in the near and long term. Defendants would have little incentive to negotiate anywhere close to the relief available to the proposed *Johnson* Settlement Class as part of this Settlement if Plaintiffs had lost the *Le* trial, and there would be significant questions as to whether continuing to litigate the *Johnson* Action following an unfavorable verdict in *Le* would have been viable. Thus, in many respects, the fate of the proposed *Johnson* Settlement Class was tied to the fate of the *Le* Action, even though the members of the *Johnson* Settlement Class had no direct stake in the *Le* Action.

256.    Furthermore, at some point during the time-period relevant to the *Johnson* Action (*i.e.*,

59

after July 1, 2017), the UFC began to require UFC Fighters to sign Promotional and Ancillary Rights Agreements containing a provision that purports to (1) require the fighters to arbitrate any claims against Defendants ("Arbitration Provision"), and (2) waive fighters' right to pursue their claims on a class action basis ("Class Waiver Provision"; together with the Arbitration Provisions, "the Arbitration Clauses"). According to data produced by the UFC, approximately 55% of the *Johnson* Settlement Class has Arbitration Clauses in their Promotional and Ancillary Rights Agreements with the UFC. Although the validity of the Arbitration Clauses has not yet been litigated, UFC Fighters with the Arbitration Clauses bear significant risk that their claims could not be litigated in federal court and could not be litigated on a class basis at all. Additionally, as the *Le* Action reflects, bringing the *Johnson* Action through trial would require millions of dollars in out-of-pocket costs and tens of millions of dollars' worth of attorney time. If the class action mechanism was deemed unavailable to the *Johnson* Settlement Class members signing the Arbitration Clauses following litigation of the validity of those clauses, those *Johnson* Settlement Class members would likely recover nothing. Moreover, in the event the Court (or an arbitrator) determined the Arbitration Clauses to be valid, the potential recovery to the *Johnson* Settlement Class as a whole would have become significantly lower because only 46% of the *Johnson* Settlement Class does not have Arbitration Clauses in their Promotional and Ancillary Rights Agreements with the UFC.

## NOTICE TO THE SETTLEMENT CLASSES

257.    In connection with the Motion for Preliminary Approval, Co-Lead Class Counsel proposes a "Notice Plan" comparable to the successful notice provided in connection with certification of the *Le* Class. See ECF No. 916 & 920 (Plaintiffs' Unopposed Motion for Approval of Class Notice Plan); ECF No. 921 (Order granting Plaintiffs' Unopposed Motion for Approval of Class Notice Plan); ECF No. 966 (Plaintiffs' Notice of: (1) Effectuation of Class Notice Plan, and (2) No Exclusions from Bout Class).

258.    Pursuant to the proposed Notice Plan, the proposed Claims Administrator (Angeion Group) will issue notice to the members of the Settlement Classes through substantially similar means as used to issue notice to the *Le* Class, including both print and email notice as well as poster notices posted at MMA gyms. Through these mechanisms, the Claims Administrator will provide notice of the

60

Settlement to the members of both Settlement Classes.

259.    Following approval of the Settlement, members of the Settlement Classes will be able to submit claim forms to establish their entitlement to their shares of the monetary relief afforded by the Settlement. Members of the Settlement Class will benefit from the prospective relief afforded by the Settlement regardless of whether they submit a claim form.

**EXHIBITS TO JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN, AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT**

260.    Attached as Exhibit 1 is a true and correct copy of the Settlement Agreement and its exhibit, dated April 24, 2024.

261.    Attached as Exhibit 2 is a true and correct copy of the Declaration of Professor Eric A. Posner in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement and its exhibit, dated May 13, 2024.

262.    Attached as Exhibit 3 is a true and correct copy of the Plan of Allocation.

263.    Attached as Exhibit 4 is a true and correct copy of the Declaration of Hal J. Singer, Ph.D. in Support of Plan of Allocation, dated May 15, 2024.

264.    Attached as Exhibit 5 is a true and correct copy of the Declaration of Steven Weisbrot, Esq. of Angeion Group LLC Re the Settlement Notice Plan and its exhibits, dated May 20, 2024.

**CONCLUSION**

265.    For the reasons set forth above and in the accompanying Memorandum of Law, we respectfully submit that under Fed. R. Civ. P. 23(e), the Settlement's terms are fair, reasonable, and adequate in all respects and should be preliminarily approved.

I certify under penalty of perjury that the foregoing is true and correct. Executed on May 21, 2024, in Philadelphia, PA.

*/s/ Eric L. Cramer*
Eric L. Cramer*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19106
Tel: (215) 875-3000
ecramer@bm.net

I certify under penalty of perjury that the foregoing is true and correct. Executed on May 21, 2024, in Washington, DC.

*/s/ Richard A. Koffman*
Richard A. Koffman*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., N.W.
Suite 500 East, Tower
Washington, DC 20005
Telephone: +1 (202) 408-4600
Email: rkoffman@cohenmilstein.com

I certify under penalty of perjury that the foregoing is true and correct. Executed on May 21, 2024, in San Francisco, CA.

*/s/ Joseph R. Saveri*
Joseph R. Saveri*
**JOSEPH SAVERI LAW FIRM, LLP**
601 California St., Suite 1000
San Francisco, CA 94108
Telephone: +1 (415) 500-6800
Email: jsaveri@saverilawfirm.com

*Admitted *pro hac vice*

JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN,
AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE SETTLEMENT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT NEVADA**

| | |
|---|---|
| CUNG LE, NATHAN QUARRY, JON FITCH, BRANDON VERA, LUIS JAVIER VAZQUEZ, and KYLE KINGSBURY, On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ZUFFA, LLC, D/B/A ULTIMATE FIGHTING CHAMPIONSHIP and UFC,<br><br>Defendant. | Case No. 2:15-cv-01045-RFB-BNW |
| KAJAN JOHNSON and CLARENCE DOLLAWAY, On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ZUFFA, LLC, TKO OPERATING COMPANY, LLC F/K/A ZUFFA PARENT LLC (D/B/A ULTIMATE FIGHTING CHAMPIONSHIP and UFC), and ENDEAVOR GROUP HOLDINGS, INC.,<br><br>Defendants. | Case No. 2:21-cv-01189-RFB-BNW |

**INDEX OF EXHIBITS TO JOINT DECLARATION OF ERIC L. CRAMER, RICHARD A. KOFFMAN, AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT**

Pursuant to Local Civil Rule IA 10-3(d), Plaintiffs submit this Index of Exhibits to the Declaration of Eric L. Cramer, Richard A. Koffman, and Joseph R. Saveri in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement:

| Exhibit Number | Description |
|---|---|
| 1 | Settlement Agreement and its exhibit (April 24, 2024) |
| 2 | Declaration of Professor Eric A. Posner in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement and its exhibit (May 13, 2024) |
| 3 | Plan of Allocation |
| 4 | Declaration of Hal J. Singer, Ph.D. in Support of Plan of Allocation (May 15, 2024) |
| 5 | Declaration of Steven Weisbrot, Esq. of Angeion Group LLC Re the Settlement Notice Plan and its exhibits (May 20, 2024) |

INDEX OF EXHIBITS TO JOINT DECLARATION OF ERIC L. CRAMER,
RICHARD A. KOFFMAN, AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT

Dated: May 21, 2024

Respectfully submitted,

/s/ *Eric L. Cramer*

Eric L. Cramer (pro hac vice)
Michael Dell'Angelo (pro hac vice)
Ellen T. Noteware (pro hac vice)
Patrick F. Madden (pro hac vice)
Najah Jacobs (pro hac vice)
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: +1 (215) 875-3000
Email: ecramer@bm.net
Email: mdellangelo@bm.net
Email: enoteware@bm.net
Email: pmadden@bm.net
Email: njacobs@bm.net

Joshua P. Davis (pro hac vice)
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone: +1 (415) 906-0684
Email: jdavis@bm.net

Richard A. Koffman (pro hac vice)
Benjamin Brown (pro hac vice)
Daniel Silverman (pro hac vice)
Daniel L. Gifford (pro hac vice)
COHEN MILSTEIN SELLERS & TOLL
    PLLC
1100 New York Ave., N.W.
Suite 500 East, Tower
Washington, DC 20005
Telephone: +1 (202) 408-4600
Facsimile: +1 (202) 408-4699
Email: rkoffman@cohenmilstein.com
Email: bbrown@cohenmilstein.com
Email: dsilverman@cohenmilstein.com
Email: dgifford@cohenmilstein.com

INDEX OF EXHIBITS TO JOINT DECLARATION OF ERIC L. CRAMER,
RICHARD A. KOFFMAN, AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT

Joseph R. Saveri (pro hac vice)
Kevin E. Rayhill (pro hac vice)
Christopher Young (pro hac vice)
Itak Moradi (pro hac vice)
JOSEPH SAVERI LAW FIRM, LLP
601 California St., Suite 1505
San Francisco, CA 94108
Telephone: +1 (415) 500-6800
Facsimile: +1 (415) 395-9940
Email: jsaveri@saverilawfirm.com
Email: krayhill@saverilawfirm.com
Email: cyoung@saverilawfirm.com
Email: imoradi@saverilawfirm.com

*Co-Lead Counsel for the Le Class, Settlement
Class Counsel for the Le Settlement Class and
the Johnson Settlement Class and Attorneys
for Individual and Representative Plaintiffs
Cung Le, Nathan Quarry, Jon Fitch, Brandon
Vera, Luis Javier Vazquez, Kyle Kingsbury,
Kajan Johnson, Clarence Dollaway, and
Tristan Connelly*

Don Springmeyer (Bar No. 1021)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone: + 1 (702) 385-6000
Facsimile: + 1 (702) 385-6001
Email: dspringmeyer@kempjones.com

*Liaison Counsel for the Le Class, Settlement
Class Counsel for the Le Settlement Class and
the Johnson Settlement Class and Attorneys
for Individual and Representative Plaintiffs
Cung Le, Nathan Quarry, Jon Fitch, Brandon
Vera, Luis Javier Vazquez, Kyle Kingsbury,
Kajan Johnson, Clarence Dollaway, and
Tristan Connelly*

INDEX OF EXHIBITS TO JOINT DECLARATION OF ERIC L. CRAMER,
RICHARD A. KOFFMAN, AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT

Robert C. Maysey (pro hac vice)
Jerome K. Elwell (pro hac vice)
WARNER ANGLE HALLAM JACKSON
      & FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: +1 (602) 264-7101
Facsimile: +1 (602) 234-0419
Email: rmaysey@warnerangle.com
Email: jelwell@warnerangle.com

Crane M. Pomerantz
CLARK HILL PLC
1700 Pavilion Center Dr., Suite 500
Las Vegas, NV 89135
Telephone: +1 (702) 697-7545
Email: cpomerantz@clarkhill.com

*Additional Counsel for the Le Settlement
Class and the Johnson Settlement Class and
Attorneys for Individual and Representative
Plaintiffs Cung Le, Nathan Quarry, Jon Fitch,
Brandon Vera, Luis Javier Vazquez, Kyle
Kingsbury, Kajan Johnson, Clarence
Dollaway, and Tristan Connelly*

INDEX OF EXHIBITS TO JOINT DECLARATION OF ERIC L. CRAMER,
RICHARD A. KOFFMAN, AND JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT

# EXHIBIT 1

(The full version of Exhibit 1 to the May 21, 2024 Joint Declaration is available at ECF No. 1024-4)

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>     v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>        Defendant. | No.: 2:15-cv-01045-RFB-BNW |
| Kajan Johnson, Clarence Dollaway, and Tristan Connelly, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>     vs.<br><br>Zuffa, LLC, TKO Operating Company, LLC f/k/a Zuffa Parent LLC (d/b/a Ultimate Fighting Championship and UFC) and Endeavor Group Holdings, Inc.,<br><br>        Defendants. | No.: 2:21-cv-1189-RFB BNW |

**DECLARATION OF PROFESSOR ERIC A. POSNER IN SUPPORT
OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE
SETTLEMENT IN BOTH ABOVE-CAPTIONED MATTERS**

**I.      INTRODUCTION**

1.      I have been asked by the plaintiffs in the above-captioned cases to provide context for the proposed class settlement by explaining the litigation risks faced by plaintiffs when they filed their claim and the significance of the settlement for enforcement of the antitrust laws. My understanding is that the plaintiffs settled these cases for $335 million in addition to certain prospective relief relating to the challenged practices. Below, I explain that antitrust claims

1
                                         Case Nos.: 2:15-cv-1045; 2:21-cv-01189

DECLARATION OF PROFESSOR ERIC A. POSNER IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT
IN BOTH ABOVE-CAPTIONED MATTERS

against employers for anticompetitive behavior in labor markets are relatively rare and difficult

in comparison to other types of antitrust claims, and that labor-side section 2 claims of this type

have been vanishingly rare. As far as I have discovered in my research, *Le v. Zuffa* is the first

such claim ever to survive summary judgment, reach class certification, or even survive a motion

to dismiss. The settlement will encourage more plaintiffs to bring cases to enforce an important

but neglected policy embodied in the antitrust laws—that of ensuring that labor markets, and not

just product markets, are competitive.

## II.   QUALIFICATIONS

2.      I am the Kirkland and Ellis Distinguished Service Professor at the University of

Chicago Law School. Before joining the Chicago faculty in 1998, I taught at the University of

Pennsylvania Law School. I was educated at Yale College and Harvard Law School.

3.      I have extensive academic experience and expertise in antitrust law and its

application to labor markets. I have taught classes, given lectures, and written frequently about

this topic. In addition to numerous articles on antitrust in labor markets in academic journals, I

published a book on the topic in 2021 entitled How Antitrust Failed Workers (Oxford University

Press).

4.      I worked on labor and antitrust issues while serving as Counsel to the Assistant

Attorney General of the Antitrust Division in the Department of Justice from 2022 to 2023.

5.      I have substantial practical experience in antitrust law. From 2010 to 2016, I was

counsel at Boies, Schiller, and Flexner, where I participated in antitrust cases.[1] From 2018 to

---

[1] I recently learned that Boies, Schiller, and Flexner represented Zuffa in this matter during my
final years as counsel to the firm. I did not play any role in that litigation and, indeed, I was
unaware of the representation at the time.

Case Nos.: 2:15-cv-1045; 2:21-cv-01189

2022 and from February 2024 to the present, I have been counsel at MoloLamken, where I have litigated antitrust cases. I am a member of the bar of the states of Illinois and Maryland.

6.     I have testified or made presentations on the application of antitrust law to labor markets before the Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law, U.S. House of Representatives; the Federal Trade Commission; the Department of Justice; the National Association of Attorneys General; and various practitioner and academic groups.

7.     I am a member of the American Academy of Arts and Sciences and the Council of the American Law Institute.

8.     My most recent curriculum vitae is appended to this report.

## III.    ANALYSIS

### A.     Background on Labor Antitrust

9.     While the Supreme Court has recognized that antitrust law protects workers from anticompetitive behavior since the 1920s, "labor-side" antitrust cases or "labor antitrust" cases, as they are sometimes called, have been rare.[2] In *Anderson v. Shipowners Association*, the Court held that employees of ship transport companies could bring an antitrust claim against those companies for fixing wages and agreeing not to poach workers.[3] In 2021, in *NCAA v. Alston*, the Court held that student athletes may bring antitrust claims against universities that bought their

---

[2] I use the terms "labor-side antitrust" or "labor antitrust" to refer to antitrust cases in which employees or independent contractors allege that a firm has engaged in anticompetitive actions in a labor market in violation of the antitrust laws. To avoid confusion, I will use the term "worker" to refer to individuals who supply labor to a firm in return for compensation, regardless of whether they are formally classified as employees or independent contractors.

[3] *Anderson v. Shipowners Ass'n*, 272 U.S. 359 (1926).

DECLARATION OF PROFESSOR ERIC A. POSNER IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT
IN BOTH ABOVE-CAPTIONED MATTERS

labor.[4] Along the way, various lower courts also recognized labor-side antitrust claims.[5] But such cases have always been rare. One reason for the relative sparsity of such claims is that, historically, economists and antitrust experts have generally assumed that labor markets were competitive. In addition, labor advocates may have believed that unions should take the lead in protecting workers from abusive employment conditions.[6]

10.    Developments over the last fifteen years have shattered these assumptions.

11.    First, as employment data became more available and statistical methods improved, economists learned that labor markets are in fact often highly concentrated.[7] For example, one prominent study found that 60% of labor markets have HHIs greater than 2,500, and a quarter of labor markets have HHIs greater than 7,200—in the latter case, implying thousands of firms that employ more than 80% of the workers in a labor market.[8]  Labor markets are also frequently burdened by employer-imposed restraints on labor market competition, including no-poach agreements and covenants not to compete.[9] Recent studies have found that hundreds of franchises used no-poach agreements to restrict mobility of their workers among

---

[4] *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021).

[5] See, e.g., *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001).

[6] ERIC A. POSNER, HOW ANTITRUST FAILED WORKERS (2021); Eric A. Posner, *The New Labor Antitrust*, ANTITRUST L.J. (forthcoming, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4575258.

[7] See, e.g., José Azar, Ioana Marinescu, & Marshall Steinbaum, *Labor Market Concentration*, 57 J. HUM. RES. S167 (2022); David Berger, Kyle Herkenhoff, & Simon Mongey, *Labor Market Power*, 112 AM. ECON. REV. 1147 (2022).

[8] *See* José Azar, Ioana Marinescu, Marshall Steinbaum, & Bledi Taska, *Concentration in US Labor Markets: Evidence from Online Vacancy Data*, 66 LABOR. ECON. 1018 (2020).

[9] See Alan B. Krueger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, 57 J. HUM. RES. S324 (2022); Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 ILR REV. 783 (2019).

4

Case Nos.: 2:15-cv-1045; 2:21-cv-01189

DECLARATION OF PROFESSOR ERIC A. POSNER IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT
IN BOTH ABOVE-CAPTIONED MATTERS

franchisees.[10] Thousands of firms overuse covenants not to compete, which cover tens of millions of workers.[11]

12.    Second, whether or not unions adequately protected workers, union membership has declined significantly since the 1950s.[12] This has been due to a variety of factors out of the control of workers, including globalization, technological changes, the advance of union-busting strategies, the growing practice of characterizing workers as "independent contractors," and changes in labor law.[13] As a result, the vast majority of workers lack union representation.

13.    Recent economic research has found that labor market concentration, mergers, no-poach agreements, covenants not to compete, and related restraints on labor market competition are responsible for a range of economic harms—including lower wages, lower economic output, reduced worker mobility, worse job conditions, and reduced innovation.[14] Lower-income workers have been particularly hard-hit by employment restraints, which, in addition to being inefficient, transfer economic surplus from workers to usually wealthier shareholders and other

---

[10] See, e.g., Brian Callaci, Matthew Gibson, Sergio Pinto, Marshall Steinbaum, & Matthew Walsh, *The Effect of No-poaching Restrictions on Worker Earnings in Franchised Industries* (July 2023), ssrn.com/abstract=4155577.

[11] Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Employment Restrictions on Resource Transferability and Value Appropriation from Employees* (2023), papers.ssrn.com/abstract=3814403.

[12] Anna Stansbury & Lawrence H. Summers, *The Declining Worker Power Hypothesis: An Explanation for the Recent Evolution of the American Economy* (Nat'l Bureau of Econ. Rsch., Working Paper No. 27193, 2020).

[13] See *id.*; Posner, *supra* note 6.

[14] See, e.g., Elena Prager & Matt Schmitt, *Employer Consolidation and Wages: Evidence from Hospitals*, 111 AM. ECON. REV 397 (2021) (mergers); Mark K. Meiselbach & Matthew D. Eisenberg, Labor Market Concentration and Employee Health Benefits (unpub., 2023), ssrn.com/abstract=4499203 (impact on health benefits). Additional sources are discussed in Posner, *New Labor Antitrust*, *supra* note 6.

DECLARATION OF PROFESSOR ERIC A. POSNER IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT
IN BOTH ABOVE-CAPTIONED MATTERS

owners of capital.[15] While unions sometimes ameliorate these impacts, only six percent of private-sector employees are unionized.[16]

14.     Taking note of these developments, the Department of Justice and the Federal Trade Commission ramped up enforcement of the antitrust laws in labor markets. They issued a Human Resources Guidance in 2016 that warned employers that no-poach agreements and other labor restraints were illegal and potentially criminal,[17] updated the Merger Guidelines in 2023 to include a section laying out their approach to evaluating the labor market effects of mergers,[18] began challenging mergers based on labor market effects,[19] and initiated or intervened in labor-side antitrust litigation against employers.[20] The Department of Justice also brought several criminal cases,[21] while the FTC recently issued a rule banning covenants not to compete and related anticompetitive employment restraints.[22]

15.     While this activity has raised the profile of employer abuse in labor markets and spurred private litigation, labor antitrust cases remain rare. There are three reasons for this. First,

---

[15] Ihsaan Bassier, Arindrajit Dube, & Suresh Naidu, *Monopsony in Movers: The Elasticity of Labor Supply to Firm Wage Policies*, 57 J. HUM. RES. S50 (2022) (finding that monopsonistic competition is widespread even in low-wage, high-turnover sectors).

[16] See Paul D. Romero & Julie M. Whittaker, *A Brief Examination of Union Membership Data*, Congressional Research Service Report No. R47596, June 16, 2023.

[17] U.S. DEP'T OF JUST. & FED. TRADE COMM'N, ANTITRUST GUIDANCE FOR HUMAN RESOURCE PROFESSIONALS (2016).

[18] U.S. DEP'T OF JUST. & FED. TRADE COMM'N, MERGER GUIDELINES (2023).

[19] *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 32 (D.D.C. 2022); *Fed. Trade Comm'n v. Kroger Co.*, No. 3:2024cv00347 (D. Or. filed Feb. 26, 2024).

[20] See, e.g., *Prudential Sec.*, FTC No. 2210026 (2023); *United States v. Cargill Meat Solutions Corp.* et al., 2022 WL 3083615.

[21] See, e.g., *United States v. Jindal*, No. 4:20-cr-00358, 2021 WL 5578687 (E.D. Tex. 2021).

[22] FED. TRADE COMM'N, NON-COMPETE CLAUSE RULE, 89 FR 38342-01 (May 7, 2024).

Case Nos.: 2:15-cv-1045; 2:21-cv-01189

DECLARATION OF PROFESSOR ERIC A. POSNER IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT
IN BOTH ABOVE-CAPTIONED MATTERS

there is relatively little precedent that lawyers can use to predict case outcomes so that they can provide guidance to clients and calculate the odds of success in litigation. Second, because employee compensation is relatively hidden as compared to the prices of goods and services, workers often do not know they are underpaid and lawyers have trouble obtaining evidence for class actions. Third, creating classes of workers is sometimes more complex than creating classes of consumers.[23]

16.     The labor antitrust cases that have been brought by private plaintiffs have almost always involved section 1 of the Sherman Act. These are cases in which independent employers collude by fixing wages, agreeing not to poach one another's employees, and engaging in similar activities. Section 1 labor cases are easier to bring than section 2 cases against monopsonists because section 1 cases involve agreements among multiple firms and those agreements are often public and may be per se illegal. The various lawsuits brought against sports leagues for anticompetitive behavior, for example, have benefitted from the public nature of the rules that leagues use to restrain competition.[24]

17.     The current case, *Le v. Zuffa*, is the first section 2 labor antitrust claim that has ever resulted in an opinion, as far as I know,[25] even though labor monopsony is extremely common. See ¶ 11, above.

---

[23] See Posner, *New Labor Antitrust*, *supra* note 6.

[24] *NCAA v. Alston*; *House v. Nat'l Collegiate Athletic Ass'n*, 545 F.3d 804 (N.D. Cal. 2021); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, No. 324CV00033DCLCDCP, 2024 WL 464164 (E.D. Tenn. Feb. 6, 2024); *Smart v. NCAA*, No. 2:22-cv-02125 WBS KJN (E.D.Cal. 2023); *State of Ohio v. Nat'l Collegiate Athletic Ass'n*, No. 1:23-cv-00100 (N.D. W. Va. Dec. 7, 2023).

[25] Posner, *supra* note 6, at 11. I have reviewed and updated my searches of case law databases for this report.

Case Nos.: 2:15-cv-1045; 2:21-cv-01189

18.    By contrast, section 2 cases in product markets are relatively common. Several such cases are among the most important landmarks of antitrust law. Section 2 was the basis of the breakups of Standard Oil in 1911[26] and AT&T in 1982,[27] and the successful government lawsuit against Microsoft twenty years ago.[28] Section 2 cases have recently been brought against Meta, Google, Apple, and Amazon.[29]

19.    The contrast between rare section 2 labor cases and common section 2 product-market cases underlines the pathbreaking nature of *Le v. Zuffa*. The achievement of the significant settlement in this case—involving a payment of $335 million plus prospective relief—will encourage victims of employer monopsony to bring meritorious antitrust lawsuits against employer monopsonies.

### B.    The *Le v. Zuffa* Settlement

20.    The plaintiff class filed its initial complaint on December 16, 2014, almost ten years ago, well before the modern wave of labor antitrust cases.[30] The Court certified a class[31] and denied the defendant's motion for summary judgment.[32] After considerable investment of time, money, and effort, the parties settled on the eve of trial.

---

[26] *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911).

[27] *United States v. AT&T*, 552 F. Supp. 131 (1982).

[28] *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).

[29] *Fed. Trade Comm'n v. Meta Platforms Inc.*, 1:20-cv-03590, (D.D.C. 2020); *United States v. Google LLC*, 1:20-cv-03010 (D.D.C. 2020); *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va. 2023); *United States v. Apple Inc.*, 2:24-cv-04055, (D.N.J. 2024); *Fed. Trade Comm'n. v. Amazon.com Inc*, 2:23-cv-01495 (W.D. Wash. 2023).

[30] *Le v. Zuffa, LLC*, No. 2:15-cv-01045-RFB-BNW, 2023 WL 5085064 (D. Nev. Aug. 9, 2023) at ECF No. 1.

[31] *Id*. at ECF No. 839 (certifying class).

[32] *Id*. at ECF No. 959 (denying summary judgment).

21.     This Court held that plaintiffs properly alleged a section 2 violation of the antitrust laws and showed a genuine dispute of material fact.[33] The plaintiffs had alleged that the defendant had engaged in a variety of anticompetitive actions to achieve a monopsony over the market for Elite Professional Mixed Martial Arts Fighter services in the United States.

22.     In addition to stating a valid claim and demonstrating that there were genuine disputes of material fact as to their allegations, the plaintiffs secured important judicial opinions that will help litigants and future courts adjudicate section 2 labor antitrust cases. As the first opinions in such a case, they provide valuable guidance to future courts and litigants for, among other things, labor market definition, identification of anticompetitive actions in labor markets, the use of data and statistical techniques by experts to determine compensation levels and shares for certain types of workers, and considerations for certifying a class of workers in a labor antitrust case.

23.     The case will also provide valuable guidance for litigants and judges in other labor antitrust cases brought under section 1 of the Sherman Act, section 7 of the Clayton Act,[34] and other provisions of the antitrust laws. Many of the issues addressed by this Court, for example, labor market definition, remain a matter of contention in other areas of antitrust law, and the Court's discussion and resolution of these issues will help courts and litigants navigate the law in future litigation. Indeed, *Le v. Zuffa* was cited for its analysis of labor market definition in *United*

---

[33] *Id.*

[34] For example, adjudication of an important recent merger challenge brought by the FTC under section 7 of the Clayton Act will benefit from the opinions issued by this Court. That case involves allegations that the merger of two large grocery chains will produce anticompetitive effects in multiple labor markets. See *Federal Trade Comm'n, In the Matter of The Kroger Company and Albertsons Companies, Inc.*, Docket No. D-9428 (2024).

9

*States v. Bertelsmann*, the first case in which a court blocked a merger because of its impact on labor markets.[35]

### III.   CONCLUSION

24.     Anticompetitive behavior by employers is widespread and labor market concentration is often extreme, but historically the antitrust laws have rarely been used to address these problems. Only in the last ten years has there been a concerted effort to remedy this deficiency. The plaintiffs' challenge to the defendant's labor monopsony in an important sports and entertainment market has played a pioneering role in this effort, particularly in showing how an employer with power in a labor market can be challenged under section 2 of the Sherman Act. The judicial opinions it produced and the settlement for the class members will spur other private plaintiffs to pursue meritorious claims in this important but neglected area of the law.

Executed this 13th of May, 2024 in Germantown, New York.

_____

Eric A. Posner

---

[35] See *Bertelsmann*, 646 F. Supp. 3d at 32 (citing *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1159, 1165–66 (D. Nev. 2016)).

Case Nos.: 2:15-cv-1045; 2:21-cv-01189

DECLARATION OF PROFESSOR ERIC A. POSNER IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT
IN BOTH ABOVE-CAPTIONED MATTERS

# Appendix to the Declaration of Professor Eric A. Posner in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement

**CURRICULUM VITAE**

**Eric A. Posner**                                                                                   **May 2024**

**Address**          University of Chicago Law School
                     1111 E. 60th St.
                     Chicago, IL 60637
                     (773)702-0425
                     eposner@uchicago.edu

**Professional Experience**

| | |
|---|---|
| 2013-present | Kirkland & Ellis Distinguished Service Professor of Law, University of Chicago |
| Fall 2016 | Visiting Professor of Law, Columbia Law School |
| 2003-2012 | Kirkland & Ellis Professor of Law, University of Chicago |
| Fall 2008 | Visiting Professor of Law, NYU Law School |
| 1998-2003 | Professor of Law, University of Chicago |
| 1998 | Professor of Law, University of Pennsylvania |
| Fall 1997 | Visiting Assistant Professor of Law, University of Chicago |
| 1993-1998 | Assistant Professor of Law, University of Pennsylvania |
| 1992-1993 | Attorney Adviser, Office of Legal Counsel, U.S. Department of Justice |
| 1991-1992 | Law Clerk, Judge Stephen F. Williams, U.S. Court of Appeals, D.C. Circuit |

**Books**

Law and Social Norms: Harvard University Press (2000)
    Japanese edition (Bokutakusha, 2002)
    Chinese edition (China University of Political Science and Law Publishing House, 2005)
    Taiwanese edition (Angle Publishing Company, 2006)
    South Asia edition (Universal Law Publishing Company, 2009)

Chicago Lectures in Law and Economics (editor): Foundation Press (2000)

Cost-Benefit Analysis: Legal, Philosophical, and Economic Perspectives (editor, with Matthew Adler): University of Chicago Press (2001)

The Limits of International Law (with Jack Goldsmith): Oxford University Press (2005)
    Chinese edition (Law Press of Beijing)
    Macedonian edition

New Foundations of Cost-Benefit Analysis (with Matthew Adler): Harvard University Press (2006)
    Arabic edition (Institute of Public Administration, Saudi Arabia, 2010)

Terror in the Balance: Security, Liberty and the Courts (with Adrian Vermeule): Oxford University Press (2007)

Social Norms, Nonlegal Sanctions, and the Law (editor): Edward Elgar (2007)

The Perils of Global Legalism: University of Chicago Press (2009)
    Chinese edition (Law Press China, 2016)

Climate Change Justice (with David Weisbach): Princeton University Press (2010)
    Korean edition (Sogan Hawoo, 2016)

Law and Happiness (editor, with Cass R. Sunstein): University of Chicago Press (2010)

The Economics of Public International Law (editor): Edward Elgar (2010)

The Executive Unbound: After the Madisonian Republic (with Adrian Vermeule): Oxford University Press (2011)
      German edition (Duncker & Humblot, 2014)

Contract Law and Theory: Aspen (2011)
      Second edition (2016)

Economic Foundations of International Law (with Alan Sykes): Harvard University Press (2013)
      Georgian edition (Labyrinth Publishing House, 2014)

The Twilight of Human Rights Law: Oxford University Press (2014)
      Excerpt republished in Harper's, October 2014

Last Resort: The Financial Crisis and the Future of Bailouts: University of Chicago Press (2018)
      Chinese edition (Truth and Wisdom Press, 2022)
      A Financial Times Book of the Year, 2018

Radical Markets: Uprooting Property and Democracy for a Just Society (with E. Glen Weyl): Princeton University Press (2018)
      Korean edition (Bookie Publishing House, forthcoming)
      Japanese edition (Toyo Keizai, forthcoming)
      Chinese edition (Beijing Huazhang Graphics and Information Co. Ltd., forthcoming)
      Spanish edition (Antoni Bosch, 2019)
      Brazilian edition (Companhia das Letras, forthcoming)
      German edition (WBG, 2019 )
      Chinese (complex) edition (Gusa Press, forthcoming)
      Italian edition (LUISS University Press, forthcoming)
      Paperback edition, 2019
      An Economist Book of the Year, 2018

The Demagogue's Playbook: All Points Books (2020)
      Chinese edition (Truth and Wisdom Press)

How Antitrust Failed Workers: Oxford University Press (2021)

**Articles and Book Chapters**

Contract Law in the Welfare State: A Defense of Usury Laws, the Unconscionability Doctrine, and Related Limitations on the Freedom to Contract, 24 J. Legal Stud. 283 (1995)

The Regulation of Groups: The Influence of Legal and Nonlegal Sanctions on Collective Action, 63 U. Chi. L. Rev. 133 (1996)

Law, Economics, and Inefficient Norms, 144 U. Pa. L. Rev. 1697 (1996)

The Legal Regulation of Religious Groups, 2 Legal Theory 33 (1996)

Altruism, Status, and Trust in the Law of Gifts and Gratuitous Promises, 1997 Wisc. L. Rev. 567 (1997)

The Political Economy of the Bankruptcy Reform Act of 1978, 96 Mich. L. Rev. 47 (1997) (reprinted in part in Bankruptcy Anthology (Charles J. Tabb ed. 2001)

The Parol Evidence Rule, the Plain Meaning Rule, and the Principles of Contractual Interpretation, 146 U. Pa. L. Rev. 533 (1998)

Symbols, Signals, and Social Norms in Politics and the Law, 27 J. Legal Stud. 765 (1998) (reprinted in Law and Economics (Nicholas Mercuro ed., Routledge Press, 2007); Foundations of Law and Economics (Robert Cooter & Francesco Parisi, eds., Edward Elgar, 2010))

The Strategic Basis of Principled Behavior: A Critique of the Incommensurability Thesis, 146 U. Pa. L. Rev. 1185 (1998)

The Demand for Human Cloning, in Clones and Clones: Facts and Fantasies About Human Cloning (Martha C. Nussbaum and Cass R. Sunstein, eds.): W.W. Norton (1998) (with Richard A. Posner) (Reprinted, with a postscript, in 27 Hofstra L. Rev. 579 (1999))

A Positive Theory of Chapter 11, 74 NYU Law Rev. 161 (1999) (with Kevin A. Kordana)

The Decline of Formality in Contract Law, in The Fall and Rise of Freedom of Contract (Frank Buckley, ed.): Duke University Press (1999)

Family Law and Social Norms, in The Fall and Rise of Freedom of Contract (Frank Buckley, ed.): Duke University Press (1999)

Shaming White Collar Criminals under the Federal Sentencing Guidelines, 42 J. Law & Econ. 365 (1999) (With Dan M. Kahan)

Arbitration and the Harmonization of International Commercial Law: A Defense of *Mitsubishi*, 39 Va. J. Inter'l Law 647 (1999)

Should Debtors Be Forced into Chapter 13?, 32 Loyola of Los Angeles L. Rev. 965 (1999)

A Theory of Customary International Law, 66 U. Chi. L. Rev. 1113 (1999) (with Jack L. Goldsmith)

Rethinking Cost-Benefit Analysis, 109 Yale L.J. 165 (1999) (with Matthew Adler) (Reprinted in part in Jurisprudence: Contemporary Readings, Narratives, and Problems (Robert Hayman et al., ed., 2d ed. 2002))

Contract Remedies: Foreseeability, Precaution, Causation, and Mitigation, in The Encyclopedia of Law and Economics (Boudewijn Bouckaert and Gerrit De Geest, eds.): Edward Elgar (2000)

A Theory of Contract Law Under Conditions of Radical Judicial Error, 94 Nw. U. L. Rev. 749 (2000)

Understanding the Resemblance Between Modern and Traditional Customary International Law, 40 Va. J. Int'l Law 639 (2000) (with Jack L. Goldsmith), excerpted in Edward M. Wise, International Criminal Law: Cases and Materials (3d ed. 2009)

Implementing Cost-Benefit Analysis When Preferences Are Distorted, 29 J. Legal Stud. 1105 (2000) (with Matthew Adler)

Introduction to the Conference on Cost-Benefit Analysis, 29 J. Legal Stud. 837 (2000) (with Matthew Adler)

Agency Models in Law and Economics, in *Chicago Lectures in Law and Economic* (Eric A. Posner ed., 2000), reprinted in *Game Theory and the Law* (Eric B. Rasmussen ed., 2007)

The Design and Interpretation of Contracts: Why Complexity Matters, 95 Nw. U.L. Rev. 91 (2000) (with Karen Eggleston and Richard Zeckhauser)

Law and Social Norms: The Case of Tax Compliance, 86 Va. L. Rev. 1781 (2000), excerpt reprinted in *Tax Controversies: Practice and Procedure* (forthcoming)

Cost-Benefit Analysis as a Solution to a Principal-Agent Problem, 53 Admin. L. Rev. 289 (2001)

Law and the Emotions, 89 Georgetown L.J. 1977 (2001), reprinted in Law and Neuroscience (Owen D. Jones, Jeffrey D. Schall, and Francis X. Shen, eds., Wolters Kluwer, 2nd ed. forthcoming)

Controlling Agencies with Cost-Benefit Analysis: A Positive Political Theory Perspective, 68 U. Chi. L. Rev. 1137 (2001)

The Law and Economics of Consumer Finance, 4 Amer. Law & Econ. Rev. 162 (2002) (with Richard Hynes)

Legislative Entrenchment: A Reappraisal, 111 Yale L.J. 1665 (2002) (with Adrian Vermeule)

Fear and the Regulatory Model of Counterterrorism, 25 Harv. J.L. & Pub. Pol. 681 (2002)

Controlling Agencies with Net Benefit Accounts: A Thought Experiment, 150 U. Pa. L. Rev. 1473 (2002)

Moral and Legal Rhetoric in International Relations: A Rational Choice Perspective , 31 J. Legal Stud. S115 (2002) (with Jack Goldsmith)

Interring the Nondelegation Doctrine, 69 U. Chi. L. Rev. 1721 (2002) (with Adrian Vermeule), republished in translation, Revista De Direito Administrativo, 282(1), 15–61 (2023)

Economic Analysis of Contract Law After Three Decades: Success or Failure?, 112 Yale L.J. 829 (2003), reprinted in Economics of Contract Law (Douglas Baird ed. 2007) and Law in Society: Nature, Functions and Limits (Robert Hillman ed., forthcoming)

Four Economic Perspectives on American Labor Law and the Problem of Social Conflict, 159 J. Inst'l & Theoretical Econ. 101 (2003)

The Jurisprudence of Greed, 151 U. Pa. L. Rev. 1097 (2003)

International Agreement: A Rational Choice Approach, 44 Va. J. Int'l L. 113 (2003) (with Jack Goldsmith)

Reparations for Slavery and Other Historical Injustices, 103 Colum. L. Rev. 689 (2003) (with Adrian Vermeule)

A Theory of the Laws of War, 70 U. Chi. L. Rev. 297 (2003)

Do States Have a Moral Obligation to Comply with International Law?, 55 Stan. L. Rev. 1901 (2003)

Accommodating Emergencies, 56 Stan. L. Rev. 605 (2003) (with Adrian Vermeule), reprinted in The Constitution in Wartime 55 (Mark Tushnet, editor, 2005)

Transfer Regulations and Cost-Effectiveness Analysis, 53 Duke L.J. 1067 (2003)

Probability Errors: Implications for Tort and Contract Law, 11 Sup. Ct. Econ. Rev. 125 (2004), reprinted in The Law and Economics of Irrational Behavior 456 (Francesco Parisi and Vernon Smith, eds., 2005); and in Law and Economics of Uncertainty (Joshua C. Teitelbaum, ed., forthcoming)

Transitional Justice as Ordinary Justice, 117 Harv. L. Rev. 761 (2004) (with Adrian Vermeule)

The Political Economy of State Bankruptcy Exemptions, 47 J. Law & Econ. 19 (2004) (with Richard Hynes and Anup Malani)

Judicial Independence in International Tribunals, 93 Calif. L. Rev. 1 (2005) (with John Yoo)

Optimal War and *Jus ad Bellum*, 93 Georgetown L.J. 993 (2005) (with Alan Sykes)

International Law and the Disaggregated State, 32 Fla. St. U. L. Rev. 797 (2005)

Dollars and Death, 72 U. Chi. L. Rev. 537 (2005) (with Cass Sunstein)

Is the International Court of Justice Biased?, 34 J. Legal Stud. 599 (2005) (with Miguel de Figueiredo)

Political Trials in Domestic and International Law, 55 Duke L. J. 75 (2005)

Should Coercive Interrogation Be Legal?, 104 Mich. L. Rev. 671 (2006) (with Adrian Vermeule)

Holding Internet Service Providers Accountable, 14 Sup. Ct. Econ. Rev. 221 (2006) (with Douglas Lichtman), reprinted in The Law and Economics of Cybersecurity (Mark F. Grady and Francesco Parisi eds. 2006)

The Decline of the International Court of Justice, in International Conflict Resolution 111 (Stefan Voigt, Max Albert, and Dieter Schmidtchen eds. 2006).

International Law: A Welfarist Approach, 73 U. Chi. L. Rev. 487 (2006)

International Law and the Rise of China, 7 Chi. J. Int'l L. 1 (2006) (with John Yoo)

Emergencies and Democratic Failure, 92 Va. L. Rev. 1091 (2006) (with Adrian Vermeule)

There Are No Penalty Default Rules in Contract Law, 33 Fla. St. U. L. Rev. 563 (2006)

The Law of Other States, 59 Stan. L. Rev. 131 (2006) (with Cass Sunstein), reprinted in *Comparative Constitutional Law*, edited by Mark Tushnet (Edward Elgar, forthcoming)

Chevronizing Foreign Relations, 116 Yale L.J. 1171 (2007) (with Cass Sunstein), reprinted in Curtis A. Bradley, Foreign Relations Law (Edward Elgar, forthcoming)

Signing Statements and Executive Power, 23 Constitutional Commentary 307 (2007) (with Curtis Bradley)

The Second-Order Structure of Immigration Law, 59 Stan. L. Rev. 809 (2007) (with Adam Cox)

Social Norms and Economic Analysis of the Law, in Economic Analysis of Law: A European Perspective (Aristides N. Hatzis ed., 2007)

An Economic Analysis of State and Individual Responsibility Under International Law, 9 Amer. L. & Econ. Rev. 72 (2007) (with Alan Sykes)

The Credible Executive, 74 U. Chi. L. Rev. 865 (2007) (with Adrian Vermeule)

The Case for For-Profit Charities, 93 Va. L. Rev. 2017 (2007) (with Anup Malani)

Timing Rules and Legislative Action, 121 Harv. L. Rev. 543 (2007) (with Jacob Gersen)

Climate Change and International Human Rights Litigation: A Critical Appraisal, 155 U. Pa. L. Rev. 1925 (2007), reprinted in Human Rights and the Environment (Svitlana Kravchenko, John E. Bonine, & Don Anton eds., 2008); Environment and Health: Issues and Implications (L. Lakshmi ed., 2008)

A Critique of the Odious Debt Doctrine, 70 Law & Contemp. Probs. 33 (2007) (with Albert Choi)

The International Protection of Cultural Property: Some Skeptical Observations, 8 Chi. J. Int'l L. 213 (2007)

Constitutional Showdowns, 156 U. Pa. L. Rev. 991 (2008) (with Adrian Vermeule)

Climate Change Justice, 96 Georgetown L.J. 1565 (2008) (with Cass Sunstein), excerpted or reprinted in Cases and Materials on Environmental Law (Daniel A. Farber, ed., forthcoming); Reflecting on Nature: Readings in Environmental Ethics and Philosophy (Lori Gruen, Dale Jamieson, and Christopher Schlottmann eds., 2d ed., Oxford, 2012); Ethics, Environmental Justice and Climate Change (by Paul G. Harris ed., Edward Elgar, forthcoming); The Ethical Life, by Russ Shafer-Landau (Oxford, forthcoming); Introducing Ethics and Contemporary Moral Issues, by Russ Shafer-Landau (Oxford, forthcoming)

Does Political Bias in the Judiciary Matter?: Implications of Judicial Bias Studies for Legal Reform, 75 U. Chi. L. Rev. 853 (2008)

Happiness Research and Cost-Benefit Analysis, 37 J. Legal Stud. S253 (2008) (with Matthew Adler)

Human Welfare, Not Human Rights, 108 Colum. L. Rev. 1758 (2008)

Soft Law: Lessons from Congressional Practice, 61 Stanford L. Rev. 573 (2008) (with Jacob E. Gersen)

Should Greenhouse Gas Permits Be Allocated on a Per Capita Basis?, 97 Calif. L. Rev. 51 (2009) (with Cass R. Sunstein), republished with modifications in Post-Kyoto International Climate Policy 343 (Joseph E. Aldy and Robert N. Stavins, eds. 2010).

Are Judges Overpaid?, 1 J. Legal Analysis 47 (2009) (with Stephen J. Choi and G. Mitu Gulati)

Erga Omnes Norms, Institutionalization, and Constitutionalism in International Law, 165 J. Institutional & Theoretical Econ. 5 (2009)

Judicial Evaluations and Information Forcing: Ranking State High Courts and Their Judges, 58 Duke L.J. 1313 (2009) (with Stephen J. Choi and Mitu Gulati)

Fault in Contract Law, 107 Mich. L. Rev. 1431 (2009), reprinted in Fault in American Contract Law (Omri Ben-Shahar & Ariel Porat eds., 2010)

Crisis Governance in the Administrative State: 9/11 and the Financial Meltdown of 2008, 76 U. Chi. L. Rev. 1613 (2009) (with Adrian Vermeule)

A Loan Modification Approach to the Housing Crisis, 11 Amer. L. & Econ. Rev. 579 (2009) (with Luigi Zingales)

6

The Rights of Migrants: An Optimal Contract Framework, 84 NYU L. Rev. 1403 (2009) (with Adam B. Cox), reprinted in Immigration and Nationality Law Review (forthcoming); reprinted in Law and Economics of Migration (Howard F. Chang, ed., forthcoming)

Professionals or Politicians?: The Uncertain Empirical Case for an Elected Judiciary, 26 J. Law, Econ., & Org. 290 (2010) (with Stephen Choi and Mitu Gulati)

Against Feasibility Analysis, 77 U. Chicago L. Rev. 657 (2010) (with Jonathan Masur)

Subconstitutionalism, 62 Stanford L. Rev. 1583 (2010) (with Tom Ginsburg)

*ProCD v. Zeidenberg* and Cognitive Overload in Contractual Bargaining, 77 U. Chicago L. Rev. 1181 (2010)

Economic Foundations of the Law of the Sea, 104 Amer. J. Inter'l L. 569 (2010) (with Alan Sykes)

Divide and Conquer, 2 J. Legal Analysis 417 (2010) (with Kathryn Spier and Adrian Vermeule)

Universal Exceptionalism in International Law, 52 Harv. J. Int'l L. 1 (2011) (with Anu Bradford)

The Limits of Constitutional Convergence, 11 Chicago J. Int'l L. 399 (2011) (with Rosalind Dixon)

The Right to Withdraw in Contract Law, 40 J. Legal Stud. 115 (2011) (with Omri Ben-Shahar)

The Flaws of Foreign Affairs Legalism, 51 Va. J. Int'l L. 507 (2011) (with Daniel Abebe)

Constitutional Possibility and Constitutional Evolution, in Law, Economics and Evolutionary Theory (Peer Zumbansen and Gralf-Peter Calliess eds. 2011)

Judging Women, 8 J. Empirical Legal Stud. 504 (2011) (with Stephen J. Choi, Mitu Gulati, and Mirya Holman)

Pricing Terms in Sovereign Debt Contracts: A Greek Case Study With Implications for the European Crisis Resolution Mechanism, 6 Capital Markets L.J. 163 (2011) (with Stephen J. Choi and Mitu Gulati)

Climate Regulation and the Limits of Cost-Benefit Analysis, 99 California L. Rev. 1557 (2011) (with Jonathan Masur)

Efficient Breach of International Law: Optimal Remedies, "Legalized Noncompliance," and Related Issues, 110 Mich. L. Rev. 243 (2011) (with Alan Sykes)

Deference to The Executive in the United States After September 11: Congress, the Courts, and the Office of Legal Counsel, 35 Harv. J.L. & Pub. Pol'y 213 (2012)

Tyrannophobia, in *Comparative Constitutional Design* (Tom Ginsburg, ed. 2012) (with Adrian Vermeule)

What Do Federal District Judges Want?: An Analysis of Publications, Citations, and Reversals, 28 J. Law, Econ., & Org. 518 (2012) (with Stephen J. Choi and Mitu Gulati)

The Evolution of Contractual Terms in Sovereign Bonds, 4 J. Legal Analysis 131 (2012) (with Stephen J. Choi and Mitu Gulati)

Unemployment, Regulation, and Cost-Benefit Analysis, 98 Va. L. Rev. 579 (2012) (with Jonathan Masur)

Aggregation and the Law, 122 Yale L.J. 2 (2012) (with Ariel Porat)

Human Rights, the Laws of War, and Reciprocity, 6 L. & Ethics of Human Rights 148 (2012)

Delegation in Immigration Law, 79 U. Chicago L. Rev. 1285 (2012) (with Adam Cox)

International Paretianism: A Defense, 13 Chicago J. Int'l L. 347 (2013) (with David Weisbach)

The Questionable Basis of the Common European Sales Law: The Role of an Optional Instrument in Jurisdictional Competition, 50 Common Market L. Rev. 261 (2013)

The Institutional Structure of Immigration Law, 80 U. Chicago L. Rev. 289 (2013)

Benefit-Cost Analysis for Financial Regulation,  103 Amer. Econ. Rev.: Papers & Proceedings 393 (2013) (with E. Glen Weyl), reprinted in Economics of Financial Law (Geoffrey P. Miller, ed., Edward Elgar, forthcoming)

The Law and Policy of Judicial Retirement: An Empirical Study, 42 J. Legal Stud. 111 (2013) (with Stephen J. Choi and Mitu Gulati)

The Dynamics of Contract Evolution, 88 NYU L. Rev. 1 (2013) (with Stephen J. Choi and Mitu Gulati)

An FDA for Financial Innovation: Applying the Insurable Interest Doctrine to 21st-Century Financial Markets, 107 Northwestern U. L. Rev. 1307 (2013) (with E. Glen Weyl)

International Law and the Limits of Macroeconomic Cooperation, 86 S. Cal. L. Rev. 1025 (2013) (with Alan Sykes)

Inside or Outside the System?, 80 U. Chicago L. Rev. 1743 (2013) (with Adrian Vermeule)

How Well Do Measures of Judicial Ability Predict Judicial Performance?: A Case Study Using Securities Class Actions, 33 Inter'l Rev. L. & Econ. 37 (2013) (with Stephen J. Choi and Mitu Gulati)

Quadratic Voting as Efficient Corporate Governance, 81 U. Chicago L. Rev. 251 (2014) (with E. Glen Weyl)

Voting Rules in International Organizations,15  Chicago J. Int'l L. 195 (2014) (with Alan O. Sykes), reprinted in The Law and Politics of International Organizations (Kenneth W. Abbott, ed., Edward Elgar, forthcoming)

Offsetting Benefits, 100 Va. L. Rev. 1165 (2014) (with Ariel Porat)

Unemployment and Regulatory Policy, in *Does Regulation Kill Jobs?* (edited by Cary Coglianese and Adam M. Finkel, 2014) (with Jonathan Masur)

Benefit-Cost Paradigms in Financial Regulation, 43 J. Legal Stud. S1 (2014) (with E. Glen Weyl)

Altruism Exchanges and the Kidney Shortage, 77 Law & Contemp. Probs. 289 (2014) (with Mitu Gulati & Stephen J. Choi), excerpted in part in The Law of Bioethics: Individual Autonomy and Social Regulation (Marsha Garrison, ed., West Publishing, 3d ed., forthcoming 2015)

Voting Squared: Quadratic Voting in Democratic Politics, 68 Vand. L. Rev. 441 (2015) (with E. Glen Weyl)

Cost-Benefit Analysis of Financial Regulations: A Response to Criticisms, 124 Yale L.J. F. 246 (2015) (with E. Glen Weyl)

The Role of Competence in Promotions from the Lower Federal Courts, 44 J. Legal Stud. S107 (2015) (with Stephen J. Choi and Mitu Gulati)

How Do Bank Regulators Determine Capital-Adequacy Requirements?, 82 U. Chicago L. Rev. 1853 (2015)

An Empirical Study of Political Bias in Legal Scholarship, 44 J. Legal Stud. 277 (2015) (with Adam Chilton)

A Framework for Bailout Regulation, 91 Notre Dame L. Rev. 479 (2015) (with Anthony Casey)

Toward a Pigouvian State, 164 U. Penn. L. Rev. 93 (2015) (with Jonathan Masur)

Institutional Flip-Flops, 94 Tex. L. Rev. 485 (2016) (with Cass Sunstein)

The Law, Economics, and Psychology of Manipulation, 1 J. Marketing Behavior 267 (2016)

Should Human Rights Law Play a Role in Development?, World Bank Econ. Rev. (2016)

The Votes of Other Judges, 105 Georgetown L.J. 159 (2016) (with Adrian Vermeule)

The Influence of History on States' Compliance with Human Rights Obligations, 56 Va. J. Int'l L. 216 (2016) (with Adam Chilton)

The Constitution of the Roman Republic, in Roman Law and Economics (Giuseppe Dari-Mattiacci ed., Oxford University Press, 2020).

Unquantified Benefits, 102 Cornell L. Rev. 87 (2016) (with Jonathan Masur)

Supreme Court Justices' Loyalty to the President, 45 J. Legal Stud. 401 (2016) (with Lee Epstein)

What Legal Authority Does the Fed Need During a Financial Crisis?, 101 Minn. L. Rev. 1529 (2017)

Demystifying Schmitt, in the Oxford Handbook of Carl Schmitt (Jens Meierhenrich & Oliver Simons, eds., 2017) (with Adrian Vermeule)

Martti Koskenniemi on Human Rights: An Empirical Perspective, in The Law of International Lawyers 121 (Wouter Werner, Marieke de Hoon, & Alexi Galan eds. 2017)

Quadratic Election Law, 172 Public Choice 265 (2017) (with Nicholas Stephanopoulos)

Property Is Only Another Name for Monopoly, 9 J. Legal Analysis 51 (2017) (with Glen Weyl)

Moral Commitments in Cost-Benefit Analysis, 103 Va. L. Rev. 1809 (2017) (with Cass R. Sunstein)

A Proposal to Limit the Anticompetitive Power of Institutional Investors, 81 Antitrust L.J. 669 (2017) (with Fiona Scott Morton & Glen Weyl)

Should Regulation Be Countercyclical?, 34 Yale J. Reg. 857 (2018) (with Jonathan S. Masur)

The Dictator's Handbook, U.S. Edition, in Can It Happen Here?: Authoritarianism in America (Cass Sunstein ed., 2018)

Country-Specific Investments and the Rights of Non-Citizens, 57 Va. J. Int'l L. 575 (2018) (with Adam Chilton)

Cost-Benefit Analysis and the Judicial Role, 85 U. Chicago L. Rev. 935 (2018) (with Jonathan Masur)

The Decline of Supreme Court Deference to the President, 166 U. Pa. L. Rev. 829 (2018) (with Lee Epstein)

Presidential Obstruction of Justice, 106 Calif. L. Rev. 1277 (2018) (with Daniel J. Hemel)

The Trump Presidency: A Constitutional Crisis in the United States?, in Constitutional Democracy in Crisis? (Mark A. Grabler, Sanford Levinson, and Mark Tushnet, eds., Oxford University Press, 2018)

A Proposal for Protecting Low-Income Workers from Monopsony and Collusion, Hamilton Project (2018) (with Alan B. Krueger)

Antitrust Remedies for Labor Market Power, 132 Harvard L. Rev. 536 (2018) (with Suresh Naidu and E. Glen Weyl), winner Antitrust Writing Awards, Best Academic Article, 2019

Treaties and Human Rights: The Role of Long-Term Trends, 81 L. & Contemp. Probs. 1 (2018) (with Adam S. Chilton)

A Proposal to Enhance Antitrust Protection Against Labor Market Monopsony, Roosevelt Institute Working Paper (2019) (with Ioana Marinescu)

Norming in Administrative Law, 68 Duke L.J. 1383 (2019) (with Jonathan Masur)

Rule-of-Law Objections to the Lender of Last Resort, in *Constitutions in Times of Financial Crisis* (Tom Ginsburg, Mark D. Rosen, and Georg Vanberg, eds., 2019)

Why Has Antitrust Law Failed Workers?, 104 Cornell L. Rev. 1453 (2020) (with Ioana Marinescu), awarded Jerry S. Cohen Memorial Fund Writing Award for Best Article of 2020 on Labor Antitrust

Antitrust-Plus: Evaluating Additional Policies to Tackle Labor Monopsony, Roosevelt Institute (May 2020) (with Suresh Naidu)

The Antitrust Challenge to Covenants Not to Compete in Employment Contracts, 83 Antitrust L.J. 165 (2020)

Policy Implications of the Common Ownership Debate, 65 Antitrust Bulletin (2021)

Ownership and Rent Stigma: Two Experiments, 7 Behavioral Public Policy 353 (2020) (with Tamar Kricheli-Katz)

Labor Monopsony and European Competition Law, Concurrences, No. 4-2020 (2020) (with Cristina A. Volpin)

Chevronizing Around Cost-Benefit Analysis, 70 Duke Law Journal 1109 (2021) (with Jonathan Masur)

The Economic Basis of the Independent Contractor / Employee Distinction, 100 Texas L. Rev. 353 (2021)

The Boundaries of Normative Law and Economics, 38 Yale J. Reg. 657 (2021)

*The Limits of International Law* Fifteen Years Later, 22 Chicago J. Int'l L. 110 (2021) (with Jack L. Goldsmith)

Labor Monopsony and the Limits of the Law, 57 J. Hum. Resources S284 (2022) (with Suresh Naidu)

The Roberts Court and the Transformation of Constitutional Protections for Religion: A Statistical Portrait, 2022 Sup. Ct. Rev. 315 (forthcoming, 2022) (with Lee Epstein)

Antitrust and Labor Markets: A Reply to Richard Epstein, 15 NYU J. Law & Liberty 389 (2022)

Antitrust and Inequality, 2 Amer. J. L. & Equality 190 (2022) (with Cass R. Sunstein)

Constitutional Challenges to Public Health Orders in Federal Courts during the COVID-19 Pandemic, 102 B.U. L. Rev. 1729 (2022) (with Kenny Mok)

The Political Economy of the Decline of Antitrust Enforcement, 85 Antitrust L.J. 441 (2023) (with Filippo Lancieri and Luigi Zingales)

Horizontal Collusion and Parallel Wage-Setting in Labor Markets, 90 U. Chi. L. Rev. 545 (2023) (with Jonathan Masur), Winner, 2023 Antitrust Writing Awards: Academic Articles, Concerted Practices

The Real Political Question Doctrine, 75 Stanford L. Rev. 1031 (2023) (with Curtis Bradley)

Market Power, Not Consumer Welfare: A Return to the Foundations of Merger Law, Antitrust L.J. (forthcoming)

Enforcement of U.S. Antitrust Law in Labour Markets, J. Antitrust Enforcement (2023)

No-poach Agreements: An Overview of EU and National Case Law, Concurrences (May 4, 2023) (with Cristina Volpin)

Labor Market Traps, Behavioural Public Policy (forthcoming 2024)

**Book Reviews, Comments, Opinion Pieces, Replies, and Other Short Pieces**

Norms, Formalities, and the Statute of Frauds: A Comment, 144 U. Pa. L. Rev. 1971 (1996)

Standards, Rules, and Social Norms, 21 Harv. J.L. & Pub. Policy 101 (1997)

Efficient Norms, in The New Palgrave Dictionary of Economics and the Law (Peter Newman, ed.): Macmillan (1998)

Notes Toward a Theory of Customary International Law, 92 ASIL Proceedings 53 (1998) (with Jack L. Goldsmith)

Law and Regret (Review of *Changing Your Mind* by E. Allan Farnsworth), 98 Mich. L. Rev. 1468 (2000)

Review of *The New Palgrave Dictionary of Economics and the Law*, edited by Peter Newman, 110 Econ J. 824 (2000)

Law and Economics for the Masses (Review of *Law's Order* by David Friedman), Jurist (2000)

Strategies of Constitutional Scholarship (Review of *The Strategic Constitution* by Robert D. Cooter), 26 Law & Social Inquiry 529 (2001)

Review of *The Jurisprudential Foundations of Corporate and Commercial Law*, edited by Jody S. Kraus and Steven D. Walt, 112 Ethics 626 (2002)

Review of *Law and Market Economy*, by Robin Paul Malloy, 18 Economics and Philosophy 183 (2002)

The Signaling Model of Social Norms: Further Thoughts, 36 U. Rich. L. Rev. 465 (2002)

Further Thoughts on Customary International Law, 23 Mich. J. Inter'l L. 191 (2002) (with Jack Goldsmith)

Introduction to a Conference on Rational Choice and International Law, 31 J. Legal Stud. S1 (2002)

Comment on Jean Braucher's Means Testing Consumer Bankruptcy, 7 Fordham J. Corp & Fin. L. 457 (2002)

When Reforming Accounting, Don't Forget Regulation. Policy Matters 02-35, AEI-Brookings Joint Center (August 2002)

Forward to the Japanese Edition of Law and Social Norms (Ota Shozo et al. trans. 2002)

Crimes and Punishment, Wall Street Journal, April 11, 2003, p. A10 (with Adrian Vermeule)

Tobacco Regulation or Litigation? (Review of *Smoke-Filled Rooms* by W. Kip Viscusi), 70 U. Chi. L. Rev. 1141 (2003)

The Nondelegation Doctrine: A Postmortem, 70 U. Chi. L. Rev. 1331 (2003) (with Adrian Vermeule)

The Patriot Act Under Fire, Wall Street Journal, December 9, 2003, p. A10 (with John Yoo)

Bankruptcy Act of 1978, in Major Acts of Congress (Brian K. Landsberg ed., 2003), vol. 1, p. 59

Reign of Terror, Chicago Tribune, January 18, 2004 (with John Yoo)

Evaluating Transfer Regulations, 26 Regulation 42 (2004)

International Court of Hubris, Wall Street Journal, April 7, 2004, p. A18 (with John Yoo)

Bring Back the Baathists, The New York Times, April 28, 2004, p. A23

Emergencies and Political Change: A Reply to Tushnet, 56 Stan. L. Rev. 1593 (2004) (with Adrian Vermeule)

A "Torture" Memo and Its Tortuous Critics, The Wall Street Journal, July 6, 2004, p. A22 (with Adrian Vermeule)

Remarks on the Alien Tort Claims Act and Transitional Justice, 98 Am. Soc'y Int'l L. Proc. 56 (2004)

Transnational Legal Process and the Supreme Court's 2003-2004 Term: Some Skeptical Observations, 12 Tulsa Journal of Comparative and International Law 23 (2004)

Terrorism and the Laws of War, 5 Chi. J. Int'l L. 423 (2005)

Contract Theory, in The Blackwell Guide to the Philosophy of Law and Legal Theory 138 (Martin P. Golding and William A. Edmundson eds. 2005)

Law, in The Encyclopedia of Social Measurement 463 (Kimberly Kempf-Leonard ed. 2005)

All Justice, Too, Is Local, The New York Times, December 30, 2004, p. A23

All Hail...King George?, Foreign Policy Online, http://www.foreignpolicy.com/story/files/story2814.php (March 2005)

The International Court of Justice: Voting and Usage Statistics, ASIL Papers and Proceedings 130 (2005).

Where's the Old Bolton When We Need Him?, Los Angeles Times, April 19, 2005, p. B13 (with John Yoo)

Judicial Clichés On Terrorism, The Washington Post, August 8, 2005, p. A15 (with Adrian Vermeule)

Justice Within Limits, The New York Times, September 26, 2005, p. A20

The Politics of Saddam's Trial, openDemocracy.net, October 31, 2005, republished in German translation as Recht in Verlegenheit, Süddeutsche Zeitung, Nov. 28, 2005, p. 15

Reply to Helfer and Slaughter, 93 Cal. L. Rev. 957 (2005) (with John Yoo)

Sins of the Fatherland, The Boston Globe, March 5, 2006, E4

The New International Law Scholarship, 34 Ga. J. Inter'l & Comp. L. 463 (2006)

A Threat That Belongs Behind Bars, The New York Times, June 25, 2006, s. 4, p. 12

Apply the Golden Rule to al Qaeda?, The Wall Street Journal, July 15, 2006, p. A9

Signing Statements: It's a President's Right, The Boston Globe, August 3, 2006 (with Curtis Bradley)

A Better Way on Detainees, The Washington Post, August 4, 2006, p. A17 (with Jack Goldsmith)

Review of *Terrorism and the State: Rethinking the Rules of State Responsibility*, by Tal Becker, 121 Pol. Sci. Q. 505 (2006)

The Humanitarian War Myth, The Washington Post, October 1, 2006, p. B7

On Learning from Others, 59 Stan. L. Rev. 1309 (2007) (with Cass Sunstein)

What the Cold War Taught Us, The Wall Street Journal, April 21, 2007, p. A9

Agencies Should Ignore Distant-Future Generations, 74 U. Chi. L. Rev. 139 (2007)

Review of Robert E. Scott and Paul B. Stephan, *The Limits of Leviathan: Contract Theory and the Enforcement of International Law*, 101 Amer. J. Int'l L. 509 (2007)

The New Race for the Arctic, The Wall Street Journal, August 3, 2007, p. A8

Pay China to Cut Emissions, The Financial Times, August 5, 2007, p. 11 (with Cass Sunstein)

Originalism and Emergencies: A Reply to Lawson, 87 B.U. L. Rev. 313 (2007) (with Adrian Vermeule)

The Great Divide, The New Republic.com, December 20, 2007 http://tnr.com/politics/story.html?id=86d685dd-948a-43db-b496-260027868950 (with Cass Sunstein)

Review of *Law without Nations?: Why Constitutional Government Requires Sovereign States*, by Jeremy A. Rabkin, 4 Perspectives on Politics 432 (2007)

Out of Commission, Slate, February 13, 2008 (with Jack Goldsmith)

The Ethics of Climate Change, 31 Regulation 14 (2008) (with Cass Sunstein)

Policy by Reflex, Review of Stephen Holmes, *The Matador's Cape: America's Reckless Response to Terrorism*, 70 Review of Politics 513 (2008)

Diplomacy, Arbitration, and International Courts, in The Role of International Courts (Carl Baudenbacher & Erhard Busek eds., German Law Publishers, 2008)

Review of Benjamin Wittes, *Law and the Long War*, New York Post, July 27, 2008

Does Europe Believe in International Law?, Wall Street Journal, November 25, 2008 (with Jack Goldsmith)

Destructive Technologies Require Us to Reassess Civil Liberties, Boston Review, December 10, 2008

Introduction to the Conference on Law and Happiness, 37 J. Legal Stud. S1 (2008) (with Cass Sunstein)

An Argument Against Legal Extremism, Review of Philip K. Howard, *Life Without Lawyers: Liberating Americans From Too Much Law*, The Daily Beast, February 17, 2009 (with Robert Silver)

The Better, Cheaper Mortgage Fix, Slate, March 2, 2009 (with Luigi Zingales)

New Foundations of Cost–Benefit Analysis: A Reply to Professors Sinden, Kysar, and Driesen, 3 Regulation & Governance 72 (2009) (with Matthew Adler)

Outcomes, Outcomes, Review of Jack M. Balkin & Reva B. Siegel, eds., *The Constitution in 2020*, The New Republic, August 12, 2009, p. 43 (with Adrian Vermeule)

Do Women Make Better Judges?, Slate, October 2, 2009 (with Stephen Choi, Mitu Gulati, and Mirya Holman)

The Decider, Review of Frank J. Colluci, *Justice Kennedy's Jurisprudence: The Full and Necessary Meaning of Liberty*, The New Republic, The Book, January 11, 2010

Executive Decision, Review of Benjamin Kleinerman, *The Discretionary President: The Promise and Peril of Executive Power*, The New Republic, The Book, March 30, 2010

Garzon and the Trouble With International Law, Wall Street Journal, April 14, 2010

The Limits of Limits, Review of Kal Raustiala, *Does the Constitution Follow the Flag?: The Evolution of Territoriality in American Law*, The New Republic, May 5, 2010, p. 36

The Case for Electing Judges in Missouri, Newsweek, May 17, 2010

The Prudent and the Imprudent, Review of Gabriel Schoenfeld, *Necessary Secrets: National Security, the Media, and the Rule of Law*, The New Republic, The Book, May 17, 2010

Europe's Missing Identity, Wall Street Journal, European Edition, June 4, 2010

The Gaza Blockade and International Law, Wall Street Journal, June 4, 2010, p. A19

Echoes of Subprime Ring Out Across Greek Debt Crisis, Financial Times, June 28, 2010 (with Mitu Gulati)

The Four Tops, Review of Noah Feldman, *Scorpions: The Battles and Triumphs of FDR's Great Supreme Court Justices*, The New Republic, The Book, October 14, 2010

POTUS-Phobia, Review of Bruce Ackerman, *The Decline and Fall of the American Republic*, The New Republic November 11, 2010, p. 33

How Not To Solve the European Debt Crisis, Slate, December 2, 2010 (with Mitu Gulati)

14

Introduction, in The Economics of Public International Law (Eric A. Posner, ed.): Edward Elgar (2010)

Evaluating the Effects of International Law: Next Steps, 1 Global Policy 334 (2010),

One Side Now, Review of Erwin Chemerinsky, *The Conservative Assault on the Constitution*, The New Republic, The Book, January 2, 2011

Why Is Originalism So Popular?, The New Republic, January 14, 2011, online

Obama's Cost-Benefit Revolution, The New Republic, January 22, 2011, online

Huck and Jim and Law, Review of Ethan J. Leib, *Friend v. Friend: The Transformation of Friendship and What the Law Has to Do with it*, The New Republic, The Book, February 21, 2011

Dockets of War, The National Interest, March-April 2011

The Court of Literature, Review of Kenji Yoshino, *A Thousand Times More Fair: What Shakespeare's Plays Tell Us About Justice*, The New Republic, The Book, April 14, 2001

The Lying Game, Review of James Stewart, *Tangled Webs: How False Statements are Undermining America: From Martha Stewart to Bernie Madoff*, The New Republic, The Book, May 29, 2011

The Beginning and the End, Review of Elizabeth Price Foley, *The Law of Life and Death*, The New Republic, The Book, June 23, 2011

Libyan Legal Limbo, Slate, June 27, 2011 (with Adrian Vermeule)

Stop Complaining About Harold Koh's Interpretation of the War Powers Act, The New Republic, July 1, 2011

Shooting It Out, Review of Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America*, The New Republic, The Book, July 6, 2011

Obama Should Raise the Debt Ceiling on His Own, The New York Times, July 22, 2011 (with Adrian Vermeule)

Casual with the Court, Review of Kevin J. McMahon, *Nixon's Court: His Challenge to Judicial Liberalism and Its Political Consequences*, The New Republic, The Book, October 24, 2011

Outside the Law, Foreign Policy, October 25, 2011

Liberalism and Concealment, Review of Anita Allen, *Unpopular Privacy: What Must We Hide?*, The New Republic, The Book, December 13, 2011

Newt and His Surprising Liberal Allies, Slate, December 20, 2011

Review of Larry May, *Global Justice and Due Process*, 25 Ethics & Inter'l Aff. 481 (2011)

The Longest Battle, Review of Mary Dudziak, *War Time*, The New Republic, The Book, February 6, 2012

A Minimalist Reparations Regime for the International Criminal Court, Human Rights and International Criminal Law Online Forum, February 2012, reprinted in *Contemporary Issues Facing the International Criminal Court* (Richard H. Steinberg ed., Brill Nijhoff)

15

An FDA for Securities Could Help Avert Crises, Bloomberg, April 2, 2012 (with Glen Weyl)

Not Worth the Gamble, Slate, April 4, 2012 (with Glen Weyl)

How Do We Know?, Review of Jim Manzi, Uncontrolled: The Surprising Payoff of Trial-and-Error for Business, Politics, and Society, The New Republic, The Book, April 25, 2012

How Low Can We Go?, Review of Daniel Gross, Better, Stronger, Faster: The Myth of American Decline ... and the Rise of a New Economy, The New Republic, The Book, May 17, 2012

Transitional Prudence: A Comment on David Dyzenhaus, *Leviathan as a Theory of Transitional Justice*, 51 NOMOS 218 (2012)

Perils and Privileges, Review of Ananda Rose, Showdown in the Sonoran Desert: Religion, Law, and the Immigration Controversy, The New Republic, The Book, June 11, 2012

The Absurd International Criminal Court, Wall Street Journal, June 11, 2012, at A13

The Imperial President of Arizona, Slate, June 26, 2012

Capitalism *Is* Regulation, Review of Edward Conard, Unintended Consequences: Why Everything You've Been Told about the Economy Is Wrong, The New Republic, The Book, July 5, 2012

Some Skeptical Comments on Beth Simmons's Mobilizing for Human Rights, 44 NYU J. Inter'l Law & Politics 819 (2012)

The Other Value of Life, Review of Kenneth R. Feinberg, Who Gets What: Fair Compensation After Tragedy and Financial Upheaval, The New Republic, The Book, July 31, 2012

Assange's London Bunker, Wall Street Journal, August 21, 2012, at A13

The Lincoln Laws, Review of John Fabian Witt, Lincoln's Code, Slate, August 28, 2012

The World Doesn't Love the First Amendment, Slate, September 25, 2012

Overruled: How Conservative Was Chief Justice Rehnquist?, Review of John A. Jenkins, The Partisan: The Life of William Rehnquist, The New Republic, The Book, October 2, 2012

Obama's Drone Dilemma, Slate, October 8, 2012

The Drones Are Coming to Libya, Slate, October 17, 2012

Why Amnesty Should Lose at the Supreme Court, Slate, October 26, 2012

*Citizens United* Is Still Worth Hating, Slate, November 9, 2012

Don't Worry About the Voting Rights Act, Slate, November 20, 2012 (with Nicholas Stephanopoulos)

Is Israel or Hamas Breaking International Law in Gaza?, Slate, November 27, 2012

The War on Terror Will Be Ever With Us, Slate, December 11, 2012

Why the U.S. Shouldn't Sign On to Empty Human Rights Treaties, Slate, December 21, 2012

Against Casino Finance, National Affairs, No. 14, p. 58, Winter 2013 (with Glen Weyl)

The President Has the Power to Raise the Debt Ceiling on His Own, Slate, January 4, 2013

The Danger Lurking Behind the Platinum Coin, Slate, January 10, 2013

How Aaron Swartz's Cause Wins in the End, Slate, January 22, 2013

There's No Such Thing as an Illegal Immigrant, Slate, February 4, 2013

Benefit-Cost Analysis for Financial Regulation, HLS Forum on Corporate Governance and Financial Regulation, February 4, 2013 (with Glen Weyl)

President Obama Can Do Anything He Wants To Fight Terrorism, Slate, February 5, 2013

Ronald Dworkin's Error, Slate, February 19, 2013

The Mother of DNA Databases, Slate, March 5, 2013

Indefinite Articles, Slate, March 19, 2013

The Real Problem With Law Schools, Slate, April 2, 2013

Introduction to Symposium on Immigration Law and Institution Design, 80 U. Chicago L. Rev. 1 (2013) (with Adam B. Cox and Richard A. Epstein)

Fool's Gold, Slate, April 11, 2013

The New Law We Need in Order to Deal With Dzhokhar Tsarnaev, Slate, April 22, 2013

The United States Can't Be the World's Courthouse, Slate, April 24, 2013

President Obama Can Shut Guantanamo Whenever He Wants, Slate, May 2, 2013

Shareholder Democracy Needs People To Pay for Their Votes, Financial Times, May 13, 2013 (with Glen Weyl)

The Killer Robot War Is Coming, Slate, May 15, 2013

Secrets and Scoops, Slate, May 17, 2013 (exchange with Emily Bazelon)

President Ruthless, Slate, May 23, 2013

The Good Way to Buy Votes, Slate, June 5, 2013

Quadratic Vote Buying, Square Root Voting, and Corporate Governance, HLS Forum on Corporate Governance and Financial Regulation, June 6, 2013 (with Glen Weyl)

Secrecy and Freedom, New York Times Room for Debate, June 9, 2013 (exchange with Jameel Jaffer)

Supreme Court 2013: Year in Review, Slate, June 20-27, 2013 (with Emily Bazelon, Walter Dellinger, and Richard Posner)

Why Won't Anyone Take Edward Snowden?, Slate, July 3, 2013

Wrong Number, Slate, July 9, 2013

How to Make Poison Pills Palatable, New York Times DealBook, July 17, 2013

Secrets and Scoops, Part 2, Slate, July 22, 2013 (exchange with Emily Bazelon)

The Best Rescue Plan for Detroit, Slate, July 23, 2013

Square Root Voting: A New Approach to Regulation of Chaebol, Keiretsu, and Other Conglomerate Organizations in Asia, The CLS Blue Sky Blog, July 24, 2013 (with E. Glen Weyl and Sang-Seung Yi)

The Virtues of Government Secrecy, Slate, August 5, 2013

Frisk Aversion, Slate, August 21, 2013

The U.S. Has No Legal Basis to Intervene in Syria, Slate, August 28, 2013

Obama Is Only Making His War Powers Mightier, Slate, September 3, 2013

The U.S. Ignores the U.N. Charter Because It's Broken, Slate, September 9, 2013

Assad and the Death of the International Criminal Court, Slate, September 19, 2013

On the Debt Ceiling, at Least, Congress Will Blink, Slate, September 30, 2013

Emergency Powers Let the President Borrow, New York Times Room for Debate, October 2, 2013

Three Ways Obama Could Raise the Debt Ceiling On His Own, The New Republic, online, October 7, 2013

If He Has to, Obama Should Raise the Debt Ceiling Unilaterally, Slate, October 11, 2013 (with Emily Bazelon)

Never Again, Slate, October 16, 2013

A Solution to the Collective Action Problem in Corporate Reorganization, HLS Forum on Corporate Governance and Financial Regulation, October 23, 2013 (with Glen Weyl)

Is the Constitution Written Like the Da Vinci Code?, Slate, October 31, 2013

The Paradox of Secrecy, Review of Rahul Sagar, Secrets and Leaks, The New Republic, November 11, 2013, at p. 52

Keep Spying on Foreigners, NSA, Slate, November 14, 2014

You Can Have Either Climate Justice or a Climate Treaty, Slate, November 19, 2014

Benefit-Cost Paradigms in Financial Regulation, HLS Forum on Corporate Governance and Financial Regulation, November 20, 2013 (with Glen Weyl)

Centrists Should Mourn the Demise of the Filibuster, Slate, November 22, 2013

Bitcoin's Bandwagon Has Never Been More Crowded, The New Republic, online, December 3, 2013

How to Make Sure the Volcker Rule Survives in Court, Bloomberg View, December 10, 2013

Stop Fussing Over Personhood, Slate, December 11, 2013

The NSA's Metadata Program Is Perfectly Constitutional, Slate, December 30, 2013

Forget the Framers, Slate, January 8, 2014

The Case for Cost-Benefit Analysis in Financial Regulation, 36 Regulation 30, Winter 2013-2014

Make Journalists Testify, Slate, January 16, 2014

Let's Make a Deal with Snowden, Slate, January 27, 2014

A Powerful Tool to Use With Caution, New York Times, Room for Debate, January 29, 2014

The Presidency Comes With Executive Power. Deal With It, The New Republic, online, February 3, 2014

Socialized Law Would Be a Massive, Unworkable Nightmare, The New Republic, online, February 4, 2014

Now That Boehner Has Backed Down, Let's Fix The Debt Ceiling For Good, The New Republic, online, February 11, 2014

The Paranoid Libertarian and His Enemy, the Angry Liberal, Slate, February 14, 2014

Why Are China and Japan Inching Toward War Over Five Tiny Islands?, Slate, February 25, 2014

Let Crimea Go, Slate, March 10, 2014

What to Do About Crimea? Nothing, Slate, March 27, 2014

In Defense of GM, Slate, April 10, 2014

The Puzzle of Paying Amy, Slate, April 25, 2014

The U.S. Constitution Is Impossible to Amend, Slate, May 5, 2014

Sorry, America, the New World Order Is Dead, Foreign Policy, May 6, 2014

We All Have the Right to Be Forgotten, Slate, May 14, 2014

China Can Sink All the Boats in the South China Sea, Slate, May 28, 2014

Rappers v. Scotus, Slate, June 12, 2014

Supreme Court 2014: Year in Review, Slate, June 25-July 1, 2014 (with Emily Bazelon, Walter Dellinger, Dahlia Lithwick, Richard Posner, and Larry Tribe)

Boehner's Lawsuit Against Obama Is a Loser, Slate, July 11, 2014

Why and How the Government Should Assess the Costs and Benefits of Financial Regulations, 13 Review of Financial Regulation Studies 4 (Summer 2014) (with E. Glen Weyl)

19

We Don't Need to End "Too Big to Fail," Slate, July 28, 2014

Thomas Piketty Is Wrong: America Will Never Look Like a Jane Austen Novel, The New Republic, July 31, 2014

Obama Is Legally Allowed to Enforce—or Not Enforce—the Law, The New Republic, August 3, 2014

Yes, Obama Can Stop Millions of Deportations, Slate, August 12, 2014

Treaty-ish, Slate, August 28, 2014

Let Scotland Go Free, Slate, September 11, 2014

Obama Can Bomb Pretty Much Anything He Wants To, Slate, September 23, 2014

Eric Holder's Legacy, Slate, September 25, 2014

How Do Bank Regulators Determine Capital Adequacy Requirements?, Harvard Law School Forum on Corporate Governance and Financial Regulation, October 15, 2014.

A Moral Market, Slate, October 17, 2014

Legacy Time, Slate, November 6, 2014

A Radical Solution to Global Income Inequality: Make the U.S. More Like Qatar, The New Republic, November 6, 2014 (with Glen Weyl)

The Human-Rights Charade, The Chronicle of Higher Education, November 17, 2014

The President's Constitutional Authority Is Clear, New York Times Room For Debate, November 18, 2014

Obama's Immigration Plan Is Perfectly Constitutional, Slate, November 20, 2014

Obama's Immigration Order Is a Gift to Future Republican Presidents, The New Republic, November 23, 2014

The Twilight of Human Rights Law, openDemocracy.net, November 25, 2014

Prosecuting Dictators Is Futile, Slate, December 3, 2014

The Case Against Human Rights, The Guardian, December 4, 2014

Why Obama Won't Prosecute Torturers, Slate, December 9, 2014

The Year of the Dictator, Slate, December 22, 2014

Have Human Rights Treaties Failed?, New York Times Room for Debate, December 28, 2014 (with Kenneth Roth)

Why Uber Will—and Should—Be Regulated, Slate, January 5, 2015

Let's Admit It: Human Rights Law Is a Complete Failure, Washington Post, January 14, 2015

Why Do Judges and Politicians Flip-Flop?, Slate, January 26, 2015

Universities Are Right—and Within Their Rights—to Crack Down on Speech and Behavior, Slate, February 12, 2015

Faithfully Executed, Slate, February 19, 2015

Exchanges No One Can Use?, Slate, March 2, 2015

The Silence of the Law, Review of *Scrap of Paper: Breaking and Making International Law During the Great War*, by Isabel V. Hull, New Rambler Review, March 4, 2015

Should Charity Be Logical?, Slate, March 26, 2015

A Terrible Shame, Slate, April 9, 2015

Mutual Funds' Dark Side, Slate, April 16, 2015

Citizenship for Sale, Slate, May 13, 2015

A Fractious Majority, Slate, June 30, 2015

It's Not Donating. It's Selling, Slate, July 29, 2015

The Strangest Campaign Pledge, Slate, August 13, 2015

Trump Is the Only Candidate Talking About a Taboo Subject, Slate, August 25, 2015

The Spectrum of Suffering, Slate, September 8, 2015

Is America Heading Toward Dictatorship?, Slate, October 23, 2015

Bernanke's Biggest Blunder, Slate, October 29, 2015

Has Obama Upheld the Rule of Law, Slate, November 9, 2015

Why Are People So Scared of Syrian Refugees, Slate, November 20, 2015

The Republican-Democratic Divide on Civil Liberties, Slate, December 7, 2015

Potemkin Power?, New Rambler Review, December 9, 2015

ISIS Gives Us No Choice but to Consider Limits on Speech, Slate, December 16, 2015

How Can Banks Get Away With Charging Such High Fees?, Slate, January 7, 2016

Campus Free Speech Problems Are Less Than Meets the Eye, Cato Unbound, January 8, 2016

Warren's Wrong: Bank Rules Need Cost-Benefit Test, BloombergView, February 3, 2016

Ted Cruz Is Not Eligible to Be President, Slate, February 8, 2016

The Tragedy of Antonin Scalia, Slate, February 16, 2014

Merrick Garland Would Shift the Court Decisively Leftward, Slate, March 17, 2016

What Should We Expect From the Supreme Court's Showdown Over Immigration?, New York Times Magazine, April 18, 2016 (with Emily Bazelon)

Review of *The Future of Law and Economics: Essays in Reform and Recollection* by Guido Calabresi, 54 J. Econ. Lit. 600 (2016)

Presidential Leadership and the Separation of Powers, Daedalus 35 (summer 2016)

Citizens Can't Sue the Government for Laws They Don't Like, The New York Times, May 23, 2016

And if Elected: What President Trump Could or Couldn't Do, The New York Times, June 4, 2016

New York Times Magazine Discussion of the Supreme Court at End of Term, Part I, June 24, 2016

New York Times Magazine Discussion of the Supreme Court at End of Term, Part II, June 27, 2016

Are There Limits to Trump's Power?, The New York Times, November 10, 2016

Review of *The Court and The World: American Law and the New Global Realities*, by Stephen Breyer, 126 Yale L.J. 504 (2016)

A Monopoly Donald Trump Can Pop, The New York Times, December 7, 2016 (with Glen Weyl and Fiona Scott Morton)

How Antonin Scalia's Ghost Could Block Donald Trump's Wall, The New York Times, January 25, 2017 (with Daniel Hemel and Jonathan Masur)

Gorsuch Must Condemn Trump's Attack on Judge, The New York Times, February 4, 2017

Judges v. Trump: Be Careful What You Wish For, The New York Times, February 15, 2017

Coase Theorem, in Economic Ideas You Should Forget (Bruno S. Frey & David Iselin, eds., 2017)

The Government Gorsuch Wants to Undo, The New York Times, April 1, 2017 (with Emily Bazelon)

Introduction, in the Timing of Lawmaking (Frank Fagan & Saul Levmore, eds., 2017)

Will the Presidency Survive this President?, The New York Times, May 21, 2017 (with Emily Bazelon)

The Case for Obstruction Charges, The New York Times, June 15, 2017 (with Daniel Hemel)

Quadratic Voting and the Public Good: Introduction, 172 Public Choice 1 (2017) (with E. Glen Weyl)

If Trump Pardons, It Could Be a Crime, The New York Times, July 21, 2017 (with Daniel Hemel)

The Obstruction of Justice Case Against Donald Trump, Slate, July 27, 2017 (with Daniel Hemel)

A Better Way to Protect Robert Mueller, The New York Times, August 7, 2017 (with Daniel Hemel)

Trump Could Be Removed for Political Incompetence—Using the 25th Amendment, The Washington Post, September 12, 2017

Why the Trump Team Should Fear the Logan Act, The New York Times, December 4, 2017 (with Daniel Hemel)

The Logan Act and its Limits, Lawfare, December 7, 2017 (with Daniel J. Hemel)

America Is Nowhere Near a Constitutional Crisis, Foreign Policy, December 16, 2017

It's Time to Audit America's Secrets, Foreign Policy, February 2, 2018

Trump Has Plenty of Bark. His Predecessors Had More Bite, Washington Post, February 2, 2018

How Congress Can Protect Mueller, The New York Times, February 4, 2018

Sponsor an Immigrant Yourself, Politico, February 13, 2018

Corporate America Is Suppressing Wages for Many Workers, The New York Times, February 28, 2018 (with Alan B. Krueger)

More and More Companies Have Monopoly Power Over Workers' Wages. That's Killing the Economy. Vox, April 6, 2018

Want Our Personal Data? Pay for It, The Wall Street Journal, April 20, 2018 (with E. Glen Weyl)

The Real Villain Behind Our New Gilded Age, The New York Times, May 1, 2018 (with Glen Weyl)

Neoliberalism and Human Rights, Lawfare, May 1, 2018

How Economists Became So Timid, Chronicle, May 7, 2018

A Radical Proposal for Resolving Cases Like Masterpiece Cakeshop—Outside The Courts, Vox, June 4, 2018

A Radical Proposal for Improving Capitalism, Barron's, June 15, 2018 (with E. Glen Weyl)

If the Supreme Court is Nakedly Political, Can It Be Just?, New York Times, July 9, 2018 (with Lee Epstein)

Who Is Brett Kavanaugh?, New York Times, September 3, 2018 (with Emily Bazelon)

The Far-Reaching Threats of a Conservative Court, New York Times, October 23, 2018

Why the FTC Should Focus on Labor Monopsony, Pro-Market, November 5, 2018

House Democrats Can Constrain Trump. They Can Also Overreach, New York Times, November 7, 2018

Liberty versus Monopoly, J. Amer. Affairs, November 20, 2018 (with Glen Weyl)

Bill Barr Just Argued Himself Out of a Job, New York Times, December 21, 2018 (with Daniel Hemel)

Yes, Bill Barr's Memo Really is Wrong About Obstruction of Justice, Lawfare, December 26, 2018 (with Daniel Hemel)

The President Is Still Subject to Generally Applicable Criminal Laws: A Response to Barr and Goldsmith, Lawfare, January 8, 2019 (with Daniel Hemel)

The Surprising Place Mueller Found Resistance to Trump, New York Times, April 23, 2019 (with Daniel Hemel)

23

Keep Increasing Pressure Against Noncompetes, Law360, May 7, 2019

The Anti-monopoly Backlash Reaches the Supreme Court, The Atlantic, May 15, 2019

What Antitrust Attorneys Need to Know About Labor Monposony, Law360, May 24, 2019

House Democrats Have More Potent Options Than Impeachment, The Atlantic, May 29, 2019

The Administration's Plan to Redefine "Human Rights" Along Conservative Lines, Washington Post, June 14, 2019

The Trouble Starts If Facebook's New Currency Succeeds, The Atlantic, June 25, 2019

Milton Friedman Was Wrong, The Atlantic, August 22, 2019

The Meritocracy Muddle, Project Syndicate, September 13, 2019

The Impeachment Trap, Project Syndicate, October 1, 2019

The Anticompetitive Effects of Covenants Not to Compete, CPI Antitrust Chronicle, January 2020

The Executive Unbound, Pandemic Edition, Lawfare, March 23, 2020

Governors Might Not Be Able to Save Us, but They Can Raise Hell, New York Times, April 2, 2020 (with Emily Bazelon)

Public Health in the Balance: Judicial Review of Pandemic-Related Government Restrictions, Lawfare, April 20, 2020

Cost-Benefit Analysis Supports Continuing the National Shutdown, Regulatory Review, April 20, 2020 (with Jonathan Masur)

The Limits of the World Health Organization, Lawfare, April 21, 2020

You Can Sue to Stop Lockdowns, But You Can't Sue to Get Them, Washington Post, May 4, 2020

Protect the Justice Department From the President, New York Times, May 13, 2020 (with Emily Bazelon)

Why Some Republican Leaders Are Defecting to Biden, Newsweek, July 3, 2020

What Could Trump Do or Not Do in a Second Term?, New York Times, July 13, 2020

Trump Has the Worst Record at the Supreme Court of Any Modern President, Washington Post, July 20, 2020

Climate Change and Human Rights, in Climate Change, Justice and Human Rights 21 (David Ismangil, Karen van der Schaaf, and Lars van Troost, eds., Amnesty International, 2020)

Avoiding the Trump Trap, Project Syndicate, August 10, 2020

How the Religious Right Has Transformed the Supreme Court, New York Times, September 22, 2020

What the U.S. Election Is Really About, Project Syndicate, October 14, 2020

Legal Assaults on Coronavirus Shutdowns Threaten To Undermine the Liberal State, Washington Post, October 15, 2020

Is the Long-Awaited Constitutional Crisis at Hand?, Project Syndicate, October 21, 2020

Biden's Precarious Victory, Project Syndicate, November 6, 2020

Why Prosecuting Trump Is a Very Bad Idea, New York Times, December 3, 2020

America Passed the Trump Stress Test, Project Syndicate, December 7, 2020

The Trump Paradox, Project Syndicate, December 22, 2020

The Effort to Disqualify Trump Is Worth It, Project Syndicate, January 12, 2021

Why Joe Biden Must Not Shy Away From the Full Power of the Presidency, New York Times, January 21, 2021

Why Try Trump?, Project Syndicate, February 20, 2021

Antitrust Is Back in America, Project Syndicate, March 12, 2021

Senator Klobuchar's Antitrust Bill Doesn't Go Far Enough, ProMarket, March 22, 2021

The End of Amateur Hour for the NCAA, Project Syndicate, April 7, 2021

Long Live the Imperial President?, Project Syndicate, May 12, 2021

Biden's Antitrust Revolutionaries, Project Syndicate, June 18, 2021

The Supreme Court's NCAA Ruling Has Huge Implications Outside of Sports, Washington Post, June 22, 2021

The Antitrust War's Opening Salvo, Project Syndicate, July 21, 2021

COVID and the Conservative Economic Crack-up, Project Syndicate, August 24, 2021

In Emergencies, Judges Usually Defer to Politicians. Not during the Pandemic, Washington Post, August 24, 2021

America's Return to Realism, Project Syndicate, September 3, 2021

You Deserve a Bigger Paycheck. Here's How You Might Get It, New York Times, September 23, 2021

The Justices Doth Protest Too Much, Project Syndicate, October 7, 2021

Facebook's Foreign Disasters, Project Syndicate, November 5, 2021

Antitrust's Labor Market Problem, ProMarket, November 8, 2021

The Rise of the Labor-Antitrust Movement, Competition Policy International, November 29, 2021

Introduction to the Conference on Labor Market Power, 90 U. Chicago L. Rev. 261 (2023)

Toward a Market Power Standard for Merger Review, ProMarket, April 7, 2023

The Whig History of the Merger Guidelines, ProMarket, May 31, 2023

The Trump Indictment and America's Political Order, Project Syndicate, June 14, 2023

The Revised Merger Guidelines Will Restore Principle of Competition to Merger Review, ProMarket, July 20, 2023

The Politics of the Trump Trials, Project Syndicate, August 9, 2023

Comment on Merger Guidelines Submitted to DOJ and FTC, August 17, 2023 (with David W. Berger, Thomas Hasenzagl, Kyle F. Herkenhoff, Simon Mongey)

The Role of Consumer Welfare in Merger Enforcement, ProMarket, September 7, 2023

Banning Trump, Project Syndicate, September 18, 2023

The Strange Case of Sam Bankman-Fried, Project Syndicate, October 12, 2023

No-Poach Antitrust Litigation in the United States, Concurrences (November 2023) (with Sarah Roberts)

Review of *The Problem of Twelve: When a Few Financial Institutions Control Everything* by John Coates, Journal of Economic Literature (forthcoming)

The Monopolists Fight Back, Project Syndicate, November 24, 2023

A Trump Dictatorship Won't Happen, Project Syndicate, December 7, 2023

The AI Octopus, Project Syndicate, January 8, 2024

Will Trump Be Disqualified?, Project Syndicate, February 5, 2024

The Future of Work in the AI Era, Project Syndicate, April 11, 2024

What to Look for in Trump's First Trial, Project Syndicate, April 22, 2024

Why Noncompete Clauses Should Be Banned, Project Syndicate, May 3, 2024

The FTC Noncompete Bank Is Legal, ProMarket, May 8, 2024

**Testimony**

Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, U.S. House of Representatives: H.R. 833, The Bankruptcy Reform Act of 1999, March 16, 1999

Committee on the Judiciary, U.S. Senate: Special Counsels and the Separation of Powers, September 26, 2017

Federal Trade Commission, Competition and Consumer Protection in the 21st Century: Labor Markets and Antitrust Policy, October 16, 2018

Federal Trade Commission, Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues, January 9, 2020

Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law, U.S. House of Representatives: Reviving Competition, Part 4: 21st Century Antitrust Reforms and the American Worker, September 28, 2021

Department of Justice and Federal Trade Commission Workshop on Draft Merger Guidelines, University of Chicago Law School, November 3, 2023

**Education**

Harvard Law School. J.D., magna cum laude, 1991

Yale University. B.A., M.A. in philosophy, summa cum laude, 1988

**Professional Organizations**

Maryland Bar Association (admitted 1991)

Illinois Bar Association (admitted 2018)

American Law and Economics Association (board member, various times)

American Law Institute

**Grants, Fellowships, and Awards**

John M. Olin fellowship, University of Southern California (3/95)

University Research Foundation grant, University of Pennsylvania (6/96)

Olin Fellow, University of Virginia Law School (9/02)

Simon Visiting Scholar, Florida State University College of Law (3/18/04)

Fellow, American Academy of Arts and Sciences (elected 2010)

Sloan Grant for Conference on Benefit-Cost Analysis and Financial Regulation (2013) (with Glen Weyl)

Economist Book of the Year, for *Radical Markets* (2018)

Financial Times Book of the Year, for *Last Resort* (2018)

Bloomberg 50, for *Radical Markets* (2018)

Antitrust Writing Award, for Antitrust Remedies for Labor Market Power (2019)

American Antitrust Institute Jerry S. Cohen Memorial Fund Writing Award, for Antitrust Remedies for Labor Market Power (2019)

Lawdragon 500 Leading Lawyers in America (2019, 2020)

**Teaching**

Contracts; Secured Transactions; Bankruptcy; Corporate Reorganization; Seminar on Contract Theory; Seminar on Game Theory and the Law; Employment and Labor Law; Public International Law; International Human Rights Law; Foreign Relations Law; International Law Workshop; European Union Law; Seminar on the Financial Crisis of 2008-2009; Banking Law; Financial Regulation; Seminar on the Federal Reserve Board; Seminar on Executive Power; Seminar on Originalism and Its Critics; Corporate Finance

## Other Professional Activities

Counsel to the Assistant Attorney General, Antitrust Division, Department of Justice (2022-2023)

Counsel, MoloLamken (2018-2021)

Counsel, Boies, Schiller & Flexner (2010-2016)

Cofounder and editor, New Rambler Review (2015-2017)

Member (elected 2014), Council Member (elected 2021); American Law Institute

Columnist, Slate Magazine (2012-2016)

Editor, Journal of Legal Studies (1998-2010)

Adviser, Restatement (Third) of Restitution, American Law Institute

Referee for Journal of Law and Economics, Journal of Economic Literature, Oxford University Press, Harvard University Press, Edward Elgar, Quarterly Journal of Economics, National Science Foundation, Law and Social Inquiry, American Economic Review, Journal of Law, Economics, & Organization, American Law and Economics Review, International Review of Law and Economics, American Journal of Political Science, Law and Society Review, Journal of Policy Analysis and Management, Journal of the European Economics Association, Health Affairs, University of Chicago Press, Canada Council for the Arts, World Politics, Supreme Court Economic Review, Law and Philosophy, Ethics and International Affairs, Institute of Medicine, Israel Science Foundation, Conflict Management and Peace Science, Smith Richardson Foundation, Yale University Press, Hart Publishing, Journal of Peace Research, British Journal of Political Science, National Academy of Sciences, Social Theory and Practice, Politics, Philosophy and Economics, Journal of Global Ethics, Climate Policy, Political Science Quarterly, Journal of Benefit-Cost Analysis, Journal of Legal Analysis, European Journal of International Law

Member, Editorial Board, Law & Social Inquiry (2000-2001)

Member, Board of Directors, American Law and Economics Association (2000-2003; 2013-2016)

Member, Board of University Publications, University of Chicago (2001-2004)

Member, Editorial Board, Review of Law and Economics (2004-)

Member, Oxford University Press Legal Education Advisory Board (2006-)

Member, Editorial Board, Journal of Benefit-Cost Analysis (2009-)

Short-Term Consultant, World Bank (2007)

Participant in Simulated Canada-United States Negotiation Over the Northwest Passage, sponsored by ArcticNet (Ottawa, February 2008)

Member, Faculty Steering Committee, Milton Friedman Institute (2008-2010)

Member, International Advisory Board, the Centre for Law, Economics and Society, University College London (2013-)

Member, Editorial Board, Economic Analysis of Law Review (2014-)

Sympatic Inc., Advisory Board (2019-)

Member, Committee on International Relations, University of Chicago (2003-)

# EXHIBIT 3

(The full version of Exhibit 3 to the May 21, 2024 Joint Declaration is available at ECF No. 1024-6)

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

Cung Le, Nathan Quarry, Jon Fitch, Brandon
Vera, Luis Javier Vazquez, and Kyle
Kingsbury, on behalf of themselves and all
others similarly situated,

                Plaintiffs,

    v.

Zuffa, LLC, d/b/a Ultimate Fighting
Championship and UFC,

                Defendant.

No.: 2:15-cv-01045-RFB-BNW

---

Kajan Johnson, Clarence Dollaway, and
Tristan Connelly, on behalf of themselves and
all others similarly situated,

                Plaintiffs,

    vs.

Zuffa, LLC, TKO Operating Company, LLC
f/k/a Zuffa Parent LLC (d/b/a Ultimate
Fighting Championship and UFC) and
Endeavor Group Holdings, Inc.,

                Defendants.

No.: 2:21-cv-1189-RFB BNW

**DECLARATION OF HAL J. SINGER, PH.D.**

**IN SUPPORT OF PLAN OF ALLOCATION**

-i-

# TABLE OF CONTENTS

**Page**

BACKGROUND, ASSIGNMENT, AND SUMMARY OF CONCLUSIONS ................................................ 2

I.   SETTLEMENT FUND ALLOCATION BETWEEN THE *LE* AND *JOHNSON*
     SETTLEMENT CLASSES ................................................................................................ 5

II.  ALLOCATION OF THE *LE* CLASS TRANCHE AMONGST *LE* CLAIMANTS ............................. 8

III. ALLOCATION OF THE *JOHNSON* SETTLEMENT CLASS TRANCHE AMONGST
     *JOHNSON* CLAIMANTS ................................................................................................ 9

CONCLUSION ................................................................................................................ 11

-2-

### BACKGROUND, ASSIGNMENT, AND SUMMARY OF CONCLUSIONS

1.     I understand that the plaintiffs in *Le, et al. v. Zuffa, LLC*, No. 2:15-cv-1045 (D. Nev.) (the "*Le* Case") and *Johnson, et al. v. Zuffa, LLC, et al*., No. 2:21-cv-1189 (D. Nev.) (the "*Johnson* Case") (collectively, the "Actions") resolved the Actions with Defendants Zuffa, LLC, TKO Operating Company, LLC, Endeavor Group Holdings, Inc. (collectively, "Defendants") for $335 million plus certain non-monetary relief relating to business practices (the "Settlement"). I further understand that Cung Le, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury (the "*Le* Class Representatives") are prosecuting the *Le* Case on their own behalf and on behalf of the *Le* Class (defined below), and plaintiffs Kajan Johnson, Clarence Dollaway, and Tristan Connelly (the "*Johnson* Settlement Class Representatives") are prosecuting the *Johnson* Case on their own behalf and on behalf of the *Johnson* Settlement Class (defined below).

2.     I have served as an expert economist for Plaintiffs in the *Le* Case since 2014. I provided economic analyses on, *inter alia*, monopoly and monopsony power, substantial foreclosure, common impact, aggregate damages, and anticompetitive effects. I submitted four reports and one declaration analyzing and addressing these and related issues.[1] In my most recent Declaration, dated November 13, 2023, I addressed competitive issues in the MMA marketplace from 2017 through November 13, 2023, which covers most of the relevant period in *Johnson*. I also testified at the Class Certification Hearing in this case in August 2019. I am fully familiar with the facts and circumstances of *Le* Case and sufficiently familiar with the facts of the *Johnson* Case for purposes of my analysis in this Declaration.

3.     The Plaintiffs in *Le* alleged that defendant Zuffa LLC ("Zuffa"), doing business as Ultimate Fighting Championship, implemented an anticompetitive scheme to acquire, maintain, and enhance its monopoly power in the market for promoting professional MMA bouts, and its monopsony power over the fighters appearing in those bouts.[2] The Plaintiffs in *Le* further alleged that Zuffa's anticompetitive scheme had foreclosed potential rival MMA promoters, thereby maintaining and enhancing Zuffa's monopoly and monopsony power, causing anticompetitive effects, and resulting in antitrust injury and damages (in the form of artificially reduced "Event Compensation" for participation in live MMA bouts) to Plaintiffs and the *Le* Class.[3] Based on my review of the Complaint in the *Johnson* Case, it appears that the allegations in *Johnson* are similar in material respects to those of *Le*.

4.     I am a Managing Director at Econ One Research, Inc. ("Econ One") and a professor at the University of Utah College of Social & Behavioral Science, where I teach antitrust economics to graduate economic students and economics and the law to undergraduate economic students. I also serve as executive director of the Utah Project, an interdisciplinary center dedicated to the study of antitrust and consumer protection issues.[4] My testifying experience has focused on antitrust and

---

1.     All Singer Reports or declarations are noted SR#. SR1 (August 31, 2017), SR2 (January 12, 2018), SR3 (April 3, 2018), SR4 (May 28, 2018), SR5 (November 13, 2023).
2.     SR1 ¶1
3.     SR2 ¶2.
4.     *See Utah Project on Antitrust and Consumer Protection,* THE UNIVERSITY OF UTAH, https://utahproject.utah.edu/ (last visited Mar. 3, 2023).

consumer protection matters, with a special emphasis in assessing common impact in class action litigation.

5.     I am an applied microeconomist with an emphasis on industrial organization and regulation. In an academic capacity, I have published several books and book chapters, spanning a range of industries and topics, and my articles have appeared in dozens of legal and economic journals. My competition-related articles have appeared in multiple American Bar Association (ABA) Antitrust Section journals, and I have been a panelist at several ABA Antitrust events. In a consulting capacity, I have been nominated for antitrust practitioner of the year among economists by the American Antitrust Institute (AAI) for my work in *Tennis Channel v. Comcast*. AAI named me as Co-Honoree in the same category in 2018 for my work *In Re Lidoderm Antitrust Litigation*. AAI also named me as Honoree in the same category in 2023 for my work in the *Le* Case.

6.     I have testified as an economic expert in state and federal courts, as well as before regulatory agencies. I also have testified before the House Judiciary Subcommittee on Antitrust and the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on the interplay between antitrust and sector-specific regulation. I have served as an expert for both plaintiffs seeking class certification and defendants opposing class certification. Federal courts have relied on my work in certifying ten classes in antitrust matters (including the *Le* Case),[5] and five classes in consumer protection matters.[6] I also have testified many times before Congress on competition policy.[7] In antitrust litigation, I have served as an expert to the Federal Trade Commission, the Competition Bureau Canada, and to several state Attorneys General in antitrust

---

5.     *See Meijer, Inc. v. Abbott Laboratories*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) (Granting Plaintiffs' Motion for Class Certification); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl., Ltd.*, 262 F.R.D. 58 (D. Mass. 2008) (Granting Motion to Certify Class); *Southeast Missouri Hospital and St. Francis Medical Center v. C.R. Bard*, No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sep. 22, 2008) (Granting in Part Motion for Class Certification); *Johnson v. Arizona Hosp. and Healthcare Assoc.* No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009) (Granting in Part Motion for Class Certification); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 665 (N.D. Ga. 2016) (Granting Motion to Certify Class); *In re Lidoderm Antitrust Litig.*, No. 12-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) (Granting Motions for Class Certifications and Denying *Daubert* Motions); *Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship*, 2:15-cv-01045-RFB-BNW, ECF No. 839 (D. Nev. Aug. 9, 2023) (Order Granting in part Plaintiffs' Motion for Class Certification); *In Re: Pork Antitrust Litigation*, No. 0:18-cv-01776, ECF No. 1887 (D. Minn. Mar. 29, 2023) (Granting Motion to Certify Class); *Simon and Simon, PC d/b/a City Smiles and VIP Dental Spas v. Align Technology, Inc.*, No. 20-cv-03754-VC (N.D. Cal. Nov. 29, 2023) (Order Granting in Part and Denying in Part the Motions for Class Certification; Denying Motions to Exclude Dr. Singer and Dr. Vogt); *In Re: Broiler Chicken Growing Antitrust Litigation (No. II)*, 6:20-MD-02977-RJS-CMR, ECF No. 798 (E.D. Okla. May 8, 2024) (Order Granting Plaintiffs' Motion For Class Certification And Denying Defendant's Motion To Exclude).

6.     *See In re MacBook Keyboard Litigation,* Case No. 5:18-cv-02813-EJD, 2021 WL 1250378 (N.D. Cal. Mar. 8, 2021); *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO, ECF No. 3327 (N.D. Cal. Jun. 28, 2022); *In Re: Pepperdine University Tuition and Fees Covid-19 Refund Litigation*, Master File No. 2:20-cv-04928-DMG, ECF No. 115 (C.D. Cal. Sept. 26, 2023); *In Re: University of Southern California Tuition and Fees COVID-19 Refund Litigation,* Case No. 2:20-cv-4066-DMG, ECF No. 213 (C.D. Cal. Sep. 29, 2023); *Michael Miazza, et al. v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College*, Case No. C-696918 (Parish of East Baton Rouge May 19, 2023) (Granting Motion to Certify Class).

7.     "Reviving Competition, Part 1: Proposals to Address Gatekeeper Power and Lower Barriers to Entry Online," held by the House Subcommittee on Antitrust, Feb. 23, 2021; "Breaking the News – Journalism, Competition, and the Effects of Market Power on a Free Press," held by the Senate Subcommittee on Competition Policy, Antitrust, and Consumer Rights, Feb. 2, 2022; "(Im)Balance of Power: How Market Concentration Affects Worker Compensation and Consumer Prices," Testimony to the House Committee on Economic Disparity and Fairness in Growth, Apr. 6, 2022.

-4-

matters. Specific to settlement allocation, I have designed and proposed allocation plans similar to that proposed herein in two other cases.[8]

7.      I have been asked by Co-Lead Class Counsel in *Le* and proposed Settlement Class Counsel in *Johnson* to assist in devising a plan of allocation to distribute the net proceeds from the Settlement, after deduction of any Court approved attorneys' fees, expenses, or other costs (the "Net Settlement Fund") to the members of the two "Settlement Classes" defined as follows:

- ***Le* Class:** All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States from December 16, 2010, through June 30, 2017. Excluded from the *Le* Class are all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought in the United States.

- ***Johnson* Settlement Class:** All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States from July 1, 2017 to the date of preliminary approval of the Settlement. Excluded from the *Johnson* Settlement Class are all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought or broadcast in the United States.

8.      From my review of the data and other information, it is clear that there are several fighters who are members of both the *Le* Class and the *Johnson* Settlement Class. This plan proposes that such fighters, who submit valid and timely claim forms for both cases, would be entitled to recover from both the portion of the Net Settlement Fund allocated to the *Le* Class (the "*Le* Class Tranche") and the portion of the Net Settlement Fund allocated to the *Johnson* Settlement Class (the "*Johnson* Settlement Class Tranche"). Each such dual Claimant would be entitled to recover his or her allocation from both the *Le* Class Tranche and the *Johnson* Settlement Class Tranche combined.

9.      This declaration is organized as follows. In Part I, I explain the allocation of the Net Settlement Fund as between the two Settlement Classes, which establishes a pool of funds for those members of the *Le* Class (*i.e.*, the *Le* Class Tranche) who submit valid claims ("*Le* Claimants"), and a separate pool of funds for those members of the *Johnson* Settlement Class (*i.e.*, the *Johnson* Settlement Class Tranche) who submit valid claims ("*Johnson* Claimants"). In Parts II and III, I explain how the pool of funds available to each of the Settlement Classes, respectively, can be allocated using event-level transaction data I have available to me for these Actions.[9] Based on my prior impact and damages analyses from my reports in the *Le* Case, and my knowledge of the similar allegations in the *Johnson* Case, I conclude that the allocation methodologies proposed herein as between the two Settlement Classes, and within each of the Settlement Classes, are reasonable and consistent with the facts as I understand them, basic economic theory, equity, and my damages model. My staff and I are willing and able to assist the claims administrator in calculating the pro rata distributions described in this declaration.

---

8.    *Fusion Elite All Stars, et al. v. Varsity Brands, LLC et al.*, Case No. 2:20-CV-03390 (SHL-tmp) (W.D. Tenn.); *In re Lidoderm Antitrust Litig.*, No. 12-md-02521, 2017 WL 679367 (N.D. Cal.).

9.    SR1 ¶¶293, 299, 304-305 (discussing the Zuffa event-level datasets).

-5-

## I. SETTLEMENT FUND ALLOCATION BETWEEN THE *LE* AND *JOHNSON* SETTLEMENT CLASSES

10.    As I understand it, the Settlement Class Counsel propose, initially, to divide the Net Settlement Fund into two tranches as follows: 75 percent allocated to the *Le* Class Tranche, and 25 percent allocated to the *Johnson* Settlement Class Tranche. Due to the particularities of the *Johnson* Settlement Class, the 25 percent allocation to the *Johnson* Settlement Class represents a maximum value. In the event the calculated allocations to the *Johnson* Claimants do not equal the full value of the *Johnson* Settlement Class Tranche under the methodology proposed below, any remaining funds would be reallocated to the *Le* Class Tranche. In that situation, the final allocation to the *Le* Class could exceed 75 percent, and the final allocation to the *Johnson* Settlement Class could be less than 25 percent. I explain this possibility in detail below.

11.    I believe the allocation proposal is equitable and consistent with the facts and economics of each case for the following reasons: (1) the *Le* Case is much older and includes class members who fought in the UFC further back in time, and thus on a "time value of money" basis should be entitled to more relative to *Johnson*; (2) the *Le* Case was fully litigated and the *Johnson* Case had not yet begun discovery at the time of settlement; (3) the UFC made changes to its fighter contracts seemingly in response to the *Le* Case, which benefitted the *Johnson* Settlement Class fighters and would potentially have complicated the litigation of the *Johnson* Case; and (4) I understand that the many of the class members in the *Johnson* Case may be subject to arbitration clauses and provisions banning participation in class actions, meaning that (as I understand it) these claims have limited value.

12.    Starting with the available data, Table 1 below summarizes the total bout compensation paid to each of the Settlement Classes during their respective Class Periods. The *Le* Class earned a total of $556.5 million in Event Compensation from bouts during the *Le* Class Period.[10] The *Johnson* Settlement Class not subject to arbitration clauses or class action waivers earned approximately $457.9 million from bouts during the *Johnson* Settlement Class Period.[11]

---

10.  I calculate that Zuffa paid *Le* Class Members $556.5 million in Event Compensation during the *Le* Class Period (December 16, 2010 through June 30, 2017). *See* SR1 ¶283 (explaining compensation data comes from ZFL-0000003, ZFL-2603701, and ZFL-2764800). This figure includes all fight compensation including win and show money, as well as any and all discretionary bonuses. SR1 ¶180 ("For any given bout in any given event, the total compensation each Fighter in the Bout Class receives can be decomposed into four categories; these are (1) show and win purses, (2) discretionary/performance pay, (3) PPV royalties, and (4) letters of agreement. I define a Fighter's total event-level compensation ("Event Compensation") as the sum across these four categories.").

11.  Zuffa has produced an estimate for the approximate number of fighters in Johnson subject to an arbitration clause, which I used to compute the share of all *Johnson* Settlement Class members subject to these provisions. That share was 55.2 percent. I used that figure for these calculations by multiplying the share of fighters in the *Johnson* Settlement Class not subject to these provisions by the total bout compensation paid to *Johnson* Settlement Class members during the *Johnson* Class Perio ($1,022.2 * (1-0.552) = $457.9). This result likely understates the share of all compensation during the Johnson Settlement Class Period not subject to arbitration provisions given that, as I understand it, Zuffa began near universally applying these provisions to new fighter contracts in or about 2020, and it is likely that the more highly paid fighters are the ones that fought more bouts over a longer period of time and thus would be more likely to have continued to be fighting into the period during which Zuffa was more universally imposing such provisions. I understand that Zuffa will, in the coming months, produce data and information that specifically identifies those fighters who executed contracts with arbitration clauses and class action waivers. This evidence will allow me to make a more precise estimate of the share of fighter pay that was paid to *Johnson* Settlement Class members not subject to arbitration clauses. Further, as reflected in Table 1 below, the data available to me at this time ends on April 13, 2023, but the *Johnson* Settlement

-6-

TABLE 1 – NOMINAL CLASS COMPENSATION

|  | *Le* Class | *Johnson* Settlement Class |
|---|---|---|
| Class Period | 12/16/2010 - 6/30/2017 | 7/1/2016 - 4/13/2023 |
| Fighters | 1,140 | 1,297 |
| **Event Compensation (millions)** | **$556.5** | **$1,022.2** |
| Fighters with Arbitration Clauses | 0 | 716 |
| Percent in Arbitration | 0% | 55.2% |
| **Non-Arbitration Event Compensation (millions)** | **$556.5** | **$457.9** |

*Source:* ZFL-0000003, ZFL-2603701, ZFL-2764800, 20240430, "Fighter Purse Report 2017 to current.xlsx," and "20240506 Fighter Purse Report UFC 214.xlsx"

13.     To compare the relative claim value between the two Settlement Classes, I next account for the "time value of money."[12] Intuitively, a dollar today is more valuable than a dollar a year from now—compensation foregone by Settlement Class members in the past could have been invested for a larger value today. Accordingly, when considering the allocation between the Settlement Classes, a dollar damage caused ten years ago should be weighted more than a dollar of damage caused yesterday. The standard method for addressing the time value of money is to perform a "future value" calculation, whereby funds in one period are scaled to a future period using an interest rate.[13] For the purposes of this comparison I use a seven percent interest rate to estimate the present value of the compensation for both Settlement Classes.[14] Doing so yields the present value of the Settlement Classes' compensation in Table 2 below.

---

Class Period will run to the date of preliminary approval. As a result, I expect to have updated compensation figures for the *Johnson* Settlement Class prior to distribution to reflect compensation paid through the end of the *Johnson* Settlement Class Period.

12.   STEPHEN ROSS, RANDOLPH WESTERFIELD & BRADFORD JORDAN, FUNDAMENTALS OF CORPORATE FINANCE 121 (McGraw-Hill 8th ed. 2007) ("In the most general sense, the phrase time value of money refers to the fact that a dollar in hand today is worth more than a dollar promised at some time in the future. On a practical level, one reason for this is that you could earn interest while you waited; so a dollar today would grow to more than a dollar later. The trade-off between money now and money later thus depends on, among other things, the rate you can earn by investing.").

13.   *Id.* at 122 ("Future value (FV) refers to the amount of money an investment will grow to over some period of time at some given interest rate. Put another way, future value is the cash value of an investment at some time in the future.") $FV = \$ * (1 + r)^t$, where $\$$ is the initial investment (here, damages incurred at time t), $r$ is the per-period interest rate, and $t$ is the number of periods. *Id.* at 123.

14.   This discount rate is halfway between a "risk-free" investment such as the U.S. 10-year treasury, (2.4% average annual return during the *Le* Class Period), and the average return on the S&P 500 during the same period (11.6% average annual return). 11.6% + 2.4% / 2 = 7%. *See* https://www.macrotrends.net/2526/sp-500-historical-annual-returns; https://www.macrotrends.net/2016/10-year-treasury-bond-rate-yield-chart.

-7-

TABLE 2 – PRESENT VALUE OF CLASS COMPENSATION

|  | *Le* **Class** | *Johnson* **Settlement Class** |
|---|---|---|
| Event Compensation | $556.5 | $457.9 |
| Average Years Since Payment | 9.8 | 3.3 |
| Discount Rate | 7% | 7% |
| **Present Value of Compensation** | **$1,075.2** | **$568.0** |

*Source:* ZFL-0000003, ZFL-2603701, ZFL-2764800, 20240430, "Fighter Purse Report 2017 to current.xlsx," and "20240506 Fighter Purse Report UFC 214.xlsx"

14.    If the two Actions had *identical* fact patterns, including identical per-fighter damages as a percentage of compensation, then Table 2 would imply a split of 65/35 between *Le* Class Tranche and the *Johnson* Settlement Class Tranche. However, the fact patterns between the two Actions are not identical. Considering the factors below, I believe it is appropriate to give a greater weight to the *Le* Class Tranche than the *Johnson* Settlement Class Tranche given the additional two factors:

   a)   The *Le* Case has been fully litigated to the brink of trial, while the *Johnson* Case has not yet begun discovery. Economic theory would dictate that the *Le* Case is thus a much more valuable negotiation tool that counsel for Plaintiffs would have used to negotiate this Settlement.[15]

   b)   The *Johnson* Settlement Class likely has lower per-fighter damages (as a percentage of compensation) relative to the *Le* Class. While I was able to compute the degree of harm to the *Le* Class members in my reports, I was not provided the necessary data and contracts to make this same calculation for the *Johnson* Settlement Class. However, I understand that Zuffa made certain adjustments to the allegedly foreclosing contracts that drove my *Le* Class damages analysis starting in or about 2019 or 2020.[16] These changes to the *Johnson* Settlement Class contracts, which at least superficially appear to lower the total amount of time a fighter is under contract with the UFC, would have at least potential benefits, on the margins, for members of the *Johnson* Settlement Class and thus could have resulted in a lower degree of per-

---

15. FISHER, ROGER, WILLIAM L. URY, AND BRUCE PATTON. GETTING TO YES: NEGOTIATING AGREEMENT WITHOUT GIVING IN, 102-104 (Penguin 3rd ed. 2011) ("What is your BATNA—your Best Alternative To a Negotiated Agreement? *That* is the standard against which any proposed agreement should be measured. That is the only standard that can protect you both from accepting terms that are too unfavorable and from rejecting terms it would be in your interest to accept . . . The better your BATNA, the greater your power. People think of negotiating power as being determined by resources determined by resources like wealth, political connections, physical strength, friends, and military might. In fact, the relative negotiating power of two parties depends primarily upon how attractive to each is the option of not reaching agreement."). Here, the BATNA for the *Le* Class was the impending trial.

16.  These changes included changes to the term lengths of some of the contractual provisions I discussed in my initial report (SR1 ¶¶66-73). It appears as if those changes were made in response to the *Le* action. I also understand that the settlement locks certain of those changes in for 5 years. Specifically, I understand those changes to include: (1) a reduction in the Right to Match Period from 12 to 4 months, (2) a reduction in the Exclusive Negotiation Period from 90 days to 40 days, (3) a modification to the injury tolling provision.

-8-

fighter damages to the *Johnson* Settlement Class relative to *Le* Class using my *Le* Class damages methodology.[17]

15.     While there is no method to give a precise quantification of the value for each of the above factors, it would nonetheless be consistent with basic economic theory to overweight the *Le* Class relative to the *Johnson* Settlement Class because of them. Therefore, I find it reasonable to increase the proportion of the Net Settlement Fund awarded to the *Le* Class from 65 percent (as implied by Table 2) to 75 percent in light of these two factors.

## II.   ALLOCATION OF THE *LE* CLASS TRANCHE AMONGST *LE* CLAIMANTS

16.     The 75 percent of the Net Settlement Fund allocated to the *Le* Class, namely the *Le* Class Tranche, is to be distributed among *Le* Claimants according to the method set for below. Assuming the Court grants the Fee and Expense Award akin to that set forth in the Class Notice, this would result in a total net recovery for the *Le* Class of approximately **$161.25M**,[18] which would represent a *minimum* of 29 percent of total Event Compensation Zuffa paid to *Le* Class Members over the *Le* Class Period in the (unlikely event) that all eligible *Le* Class Members were to submit valid and timely claims.[19] I propose that the Net Settlement Fund will be distributed to *Le* Claimants based on two *pro rata* factors, with a minimum recovery for any *Le* Claimant set to $8,000:

   a)  80 percent of the *Le* Class Tranche (approximately $129.0M) to be distributed on the basis of each *Le* Claimant's *pro rata* share of all Event Compensation[20] earned by *Le* Claimants during the *Le* Class Period.

   b)  20 percent of the *Le* Class Tranche (approximately $32.25M) to be distributed on the basis of each *Le* Claimant's *pro rata* share of all *Le* Claimants' bouts fought during the *Le* Class Period.[21]

17.     In my first expert report, I determined that all or nearly all *Le* Class Members were impacted by the Challenged Conduct in the case,[22] and that each Class Member's damages was a

---

17. I considered fighters as foreclosed if their contracts (A) contained a Champion's Clause, and (B) exceeded 30 months in total duration, including the length of the exclusive negotiation period and right to match period. If a sufficient number of the *Johnson* Settlement Class member Contracts were of a shorter duration due to the contract changes in or about 2018 or 2019, then my analysis as performed in the *Le* case would potentially consider fewer fighters as foreclosed. For instance, as I understand it, the changes shortened the right to match period from one year to four months. Thus, absent alteration to account for new facts and circumstances in *Johnson*, a simple application of my damages analysis from *Le* to *Johnson* could yield lower damages to the *Johnson* Settlement Class.

18. The Settlement involves total payments of $335M. The Net Settlement Fund after all potential deductions (of potential Court awarded fees and costs, as well as costs of administration) is approximately $215M. $215 * 75% (share to *Le* Class Tranche) = $161.25M. This is a minimum value. As explained in Part III, should the *Johnson* Settlement Class Tranche have any remaining funds after computation of the distributions to *Johnson* Claimants under the method set for below, any excess funds would be added to the *Le* Class Tranche.

19. $161.3 / $556.5 = 29%.

20. As explained in SR1 ¶180, a fighter's total event-level compensation ("Event Compensation") is the sum of (1) show and win purses, (2) discretionary/performance pay, (3) PPV royalties, and (4) letters of agreement.

21. This method results in the following equation, applied to each claiming fighter in the data: $Fighter's\ \$\ Recovery = \left(\frac{Fighter's\ Bouts}{All\ Bouts} * 20\% * 161.3M\right) + \left(\frac{Fighter's\ Comp}{All\ Compensation} * 80\% * 161.3M\right)$. In this equation, "All Bouts" and "All Compensation" refer to all *Le* Claimants who submit timely and valid claims.

22. SR1 ¶¶209-232. I also reviewed record evidence of a wage structure that would have transmitted wage suppression across the *Le* Class. SR1 ¶215.

function of his or her actual compensation compared to his or her but-for compensation.[23] In particular, I estimated a regression model that mapped characteristics of the fight and the fighter, alongside a measure of the share of fighters foreclosed from rivals ("foreclosure share"), into a fighter's share of the event's proceeds (the "wage share").[24] After fitting the model to the data, I predicted the fighter's but-for wage with all factors held constant except for the foreclosure share, which was reduced to 30 percent in the but-for world.[25] If a fighter's predicted but-for wage share exceeded his or her actual wage share for any event, I considered that fighter to have suffered injury. Accordingly, all *Le* Class Members should be principally awarded on the basis of their actual compensation earned.

18.     However, it would be incorrect to assume that the rates of compensation in a but-for world would be exactly the same as they were the same as the actual world. Stated differently: In a more competitive but-for world, Zuffa may have increased its lower paid fighter payments proportionally more than it would have increased its payments to top fighters, particularly as top fighter compensation is driven by Pay-Per-View revenue shares. All else equal, I would expect the most popular fighters may have enjoyed a modicum of countervailing bargaining power to offset Zuffa's alleged misconduct. Even if they could not leave Zuffa, they may have agitated for themselves more aggressively given their popularity. Allocating 20 percent of the compensation by the share of bouts fought (as opposed to basing allocation simply on total compensation earned) recognizes that certain journeymen fighters with less name recognition may have been harmed more as a proportion of their compensation than the more popular fighters.

19.     The data produced by Zuffa in this case contains the names and exact compensation amounts of each member of the *Le* Class. Using this data, the settlement administrator can populate the *Le* Class claim form for each *Le* Claimant.[26]

## III.     ALLOCATION OF THE *JOHNSON* SETTLEMENT CLASS TRANCHE AMONGST *JOHNSON* CLAIMANTS

20.     The 25 percent of the Net Settlement Fund allocated to the *Johnson* Settlement Class, namely the *Johnson* Settlement Class Tranche, is to be distributed amongst *Johnson* Claimants under the method set for the below. Making the same assumptions about the requested Fee and Expense Award and other costs, this would result in a total net recovery for the *Johnson* Settlement Class of approximately **$53.75M**.[27] The *Johnson* Settlement Class Tranche, under these assumptions, would represent 11.7 percent of total Event Compensation Zuffa paid to *Johnson* Settlement Class Members who were not subject to arbitration clauses or class action waivers over the *Johnson* Settlement Class Period.[28] As just indicated, within the *Johnson* Settlement Class, there are two

---

23.  SR1 ¶230 ("I used the regression models…to predict the but-for compensation share for each Fighter in each event in the but-for world. I then compared the predicted but-for compensation share with the share of Event Revenue that the Fighter actually received in that event.").

24.  SR1 ¶¶180-181.

25.  SR1 ¶230.

26.  To the extent that a potential class member fails to submit a claim, the portion of the allocated amount to which he or she would have been entitled under this method would be allocated to the other Claimants in the appropriate Tranche based on the equations above.

27.  The Settlement is for $335M. The Net Settlement Fund after all deductions is $215M. $215 * 25% = $53.75M. This is a minimum value. As explained in Part III, should the *Johnson* Settlement Class Tranche have any remaining funds after assessing *Johnson* Claimants, any excess funds would be added to the *Le* Class Tranche.

28.  $53.75 / $457.92 = 11.7%

major sub-grouping of Settlement Class Members: (1) fighters whose contracts contained arbitration clauses and/or other clauses that ban participation in a class action lawsuit, and (2) fighters without such restrictive clauses.

21.     For fighters *without* arbitration clauses or class action waivers in their fighter contracts, I propose that the funds will be distributed on two *pro rata* factors as follows:

a)  80 percent of the *Johnson* Settlement Class Tranche (approximately $43.0M) to be distributed on the basis of each *Johnson* Claimant's *pro rata* share of all Event Compensation Zuffa paid to the subset of *Johnson* Claimants not subject to arbitration clauses or class action waivers during the *Johnson* Settlement Class Period.

b)  20 percent of the *Johnson* Settlement Class Tranche (approximately $10.75M) to be distributed on the basis of each *Johnson* Claimant's *pro rata* share of all bouts fought by *Johnson* Settlement Class Claimants without arbitration clauses or class action waivers during the *Johnson* Settlement Class Period.[29]

22.     To ensure fairness between *Le* and *Johnson* cases given the factors set out above in Section I, individual awards from the *Johnson* Settlement Class Tranche provided to Claimants *without* arbitration clauses or class action waivers will be capped at 10 percent of each *Johnson* Claimant's Event Compensation during the *Johnson* Settlement Class Period, or $7,000, whichever is higher.

23.     Claimants *with* arbitration clauses or class action waivers, whose claims have little value, will receive a flat $5,000 award, regardless of total compensation or number of bouts fought during the *Johnson* Settlement Class Period.

24.     After making these calculations, any monies left over in the *Johnson* Settlement Class Tranche shall be allocated to the *Le* Class Tranche and distributed to *Le* Claimants pursuant to the methods set forth in Section II above.

25.     Zuffa has produced for settlement purposes its compensation data that contains the names, number of bouts, and exact compensation amounts of each member of the *Johnson* Settlement Class through April 13, 2023. Zuffa has also produced an estimate for the approximate number of fighters in the *Johnson* Settlement Class subject to an arbitration clause, which I used for my calculations above. I also understand that Zuffa will, in the coming months, produce data and information that identifies those fighters who executed contracts with arbitration clauses and class action waivers. Using this data, the claims administrator can populate the *Johnson* Settlement Class claim form for each *Johnson* Settlement Class Member.[30]

26.     Any *Le* Claimant who is also *Johnson* Claimant will receive an award equal to the sum of the amount he or she would be entitled to under the formula set forth in Section II (for the

---

29. This method results in the following equation, applied to each claiming fighter in the data: $Fighter's \$ Recovery = \left(\frac{Fighter's\ Bouts}{All\ Bouts} * 20\% * \$53.8M\right) + \left(\frac{Fighter's\ Comp}{All\ Compensation} * 80\% * \$53.8M\right)$. In this equation, "All Bouts" and "All Compensation" refer to all *Johnson* Claimants who submit claims.

30.  To the extent that a potential Settlement Class member fails to submit a claim, the portion of the Net Settlement Fund to which  he or she would have been entitled would be allocated to the other Claimants in the appropriate Tranche based on the equations above.

*Le* Class) and the total amount he or she would be entitled to under the formula set forth in Section III (for the *Johnson* Settlement Class).

-11-

## CONCLUSION

27.    Based on my prior economic and econometric analyses in this case, I conclude that the proposed Plan of Allocation is reasonable, equitable, and consistent with basic economic theory, and my damages models in the case.

\*    \*    \*

Hal J. Singer, Ph.D.:

Executed on May 15, 2024

# EXHIBIT 5

(The full version of Exhibit 5 to the May 21, 2024 Joint Declaration is available at ECF No. 1024-8)