# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT NEVADA

CUNG LE, NATHAN QUARRY, JON FITCH, BRANDON VERA, LUIS JAVIER VAZQUEZ, and KYLE KINGSBURY, On Behalf of Themselves and All Others Similarly Situated,

          Plaintiffs,

     v.

ZUFFA, LLC, D/B/A ULTIMATE FIGHTING CHAMPIONSHIP and UFC,

          Defendant.

Case No. 2:15-cv-01045-RFB-BNW

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF THE SETTLEMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

I.      INTRODUCTION ................................................................................................... 1

II.     RELEVANT PROCEDURAL BACKGROUND ..................................................... 7

III.    THE SETTLEMENT ............................................................................................. 9

IV.     ARGUMENT ....................................................................................................... 11

        A.      Standards for Final Approval of the Settlement ..................................... 11

        B.      The Settlement Satisfies the Rule 23(e) Factors for
                Final Approval ...................................................................................... 13

                1.      The Class Has Been Adequately Represented. ............................ 13

                2.      The Settlement Was Reached Through Arm's-Length Negotiations. ....... 13

                3.      The Relief Provided by the Settlement Is More Than Adequate. .............. 14

                4.      The Settlement Treats Class Members Equitably. ...................... 26

        C.      The Extent of Discovery Completed and the Stage of Proceedings ..................... 27

        D.      Risk of Maintaining Class Action Status Through Trial ......................... 27

        E.      The Experience and Views of Counsel ................................................... 27

        F.      The Class Overwhelmingly Supports the Settlement ............................. 28

V.      NOTICE OF THE SETTLEMENT COMPLIED WITH THE COURT'S
        PRELIMINARY APPROVAL ORDER AND APPLICABLE LAW .............................. 37

VI.     CONCLUSION .................................................................................................... 40

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abadilla v. Precigen, Inc.*,
No. 20-cv-06936, 2023 WL 7305053 (N.D. Cal. Nov. 6, 2023)................................. 14

*Aldapa v. Fowler Packing Co. Inc.*,
No. 15-cv-00420, 2023 WL 3853482 (E.D. Cal. June 6, 2023)................................. 28

*Allen v. Bedolla*,
787 F.3d 1218 (9th Cir. 2015) ............................................................................. 12

*Alvarez v. Sirius XM Radio Inc.*,
No. 18-cv-8605, 2021 WL 1234878 (C.D. Cal. Feb. 8, 2021) ................................. 5

*Barbosa v. Cargill Meat Sols. Corp.*,
297 F.R.D. 431 (E.D. Cal. 2013)............................................................ 4, 5, 21, 32

*Briseño v. Henderson*,
998 F.3d 1014 (9th Cir. 2021) .................................................................. 11, 12, 21

*Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*,
No. 85-cv-3048, 1987 WL 7030 (S.D.N.Y. Feb. 13, 1987) ................................... 16

*Castro v. Sanofi Pasteur Inc.*,
No. 11-cv-7178, 2017 WL 4776626 (D.N.J. Oct. 23, 2017) ................................... 24

*Churchill Vill., L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004) ............................................................................... 29

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ................................................................................ 22

*Eisen v. Carlisle & Jacquelin*,
479 F.2d 1005 (2d Cir. 1973) .............................................................................. 16

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) ........................................................................................... 16

*Fernandez v. Victoria Secret Stores, LLC*,
No. 06-cv-04149, 2008 WL 8150856 (C.D. Cal. July 21, 2008) ............................. 30

*Garner v. State Farm Mut. Auto Ins. Co.*,
No. 08-cv-1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ......................... 12, 15

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ....................................................................*Passim*

ii

*Hefler v. Wells Fargo & Co.*,
   No. 16-cv-5479, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ........................................ 19, 20

*Hester v. Vision Airlines, Inc.*,
   No. 09-cv-00117, 2014 WL 3547643 (D. Nev. July 17, 2014).......................................... 4, 28

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   No. 06-md-1775, 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ........................................ 24

*In re Blue Cross Blue Shield Antitrust Litig.*,
   85 F.4th 1070 (11th Cir. 2023) ........................................................................................ 24

*In re Blue Cross Blue Shield Antitrust Litig.*,
   No. 13-cv-20000, 2022 WL 4587618 (N.D. Ala. Aug. 9, 2022)........................................ 24

*In re Broiler Chicken Antitrust Litig.*,
   No. 16-cv-8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) ........................................... 17

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 14-cv-2058, 2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) ................................... 21, 23

*In re Checking Acct. Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011)............................................................................. 23

*In re Citric Acid Antitrust Litig.*,
   145 F. Supp. 2d 1152 (N.D. Cal. 2001) ............................................................................ 17

*In re Domestic Air Transp. Antitrust Litig.*,
   148 F.R.D. 297 (N.D. Ga. 1993) ...................................................................................... 24

*In re High-Tech Emp. Antitrust Litig.*,
   No. 11-cv-02509, 2015 WL 12991307 (N.D. Cal. Mar. 3, 2015) ...................................... 14

*In re High-Tech Emp. Antitrust Litig.*,
   No. 11-cv-02509, 2015 WL 5159441 (N.D. Cal. Sept. 2, 2015)................................... 22, 24

*In re Korean Ramen Antitrust Litig.*,
   No. 13-cv-04115, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ......................................... 16

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-md-2420, 2020 WL 7264559 (N.D. Cal. Dec. 10, 2020)........................................ 15

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 21-cv-15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022)....................................... 15

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ........................................................................................... 27

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008).............................................................................. 27

iii

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) ....................................................................... 38, 39

*In re Packaged Ice Antitrust Litig.*,
  No. 08-md-1952, 2011 WL 6209188 (E.D. Mich. Dec. 13, 2011) ........................... 15

*In re Packaged Seafood Prods. Antitrust Litig.*,
  No. 15-md-2670, 2024 WL 4875246 (S.D. Cal. Nov. 22, 2024) ............................. 28

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  No. 05-md-1720, 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ........................ 22, 23

*In re Prandin Direct Purchaser Antitrust Litig.*,
  No. 10-cv-12141, 2015 WL 1396473 (E.D. Mich. Jan. 20, 2015) .......................... 24

*In re Processed Egg Prod. Antitrust Litig.*,
  881 F.3d 262 (3d Cir. 2018) ................................................................................. 17

*In re Remeron End-Payor Antitrust Litig.*,
  No. 02-cv-2007, 2005 WL 2230314 (D.N.J. Sept. 13, 2005)................................. 22

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
  No. 18-cv-677, 2020 WL 6193857 (E.D.N.Y. Oct. 7, 2020) ................................. 25

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
  No. 13-md-2445, 2024 WL 815503 (E.D. Pa. Feb. 27, 2024) ............................... 24

*In re Tableware Antitrust Litig.*,
  484 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................................................... 28

*In re Tableware Antitrust Litig.*,
  No. 04-cv-3514, 2007 WL 4219394 (N.D. Cal. Nov. 28, 2007)............................ 23

*In re Titanium Dioxide Antitrust Litig.*,
  959 F. Supp. 2d 799 (D. Md. 2013)...................................................................... 23

*In re Titanium Dioxide Antitrust Litig.*,
  No. 10-cv-0318, 2013 WL 5182093 (D. Md. Sept. 12, 2013) .............................. 23

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  229 F. Supp. 3d 1052 (N.D. Cal. 2017)................................................................ 12

*In re Wellbutrin SR Antitrust Litig.*,
  No. 04-cv-5525, 2011 WL 13392296 (E.D. Pa. Nov. 21, 2011)............................ 24

*In re Wholesale Grocery Prod. Antitrust Litig.*,
  No. 09-md-2090, 2017 WL 4876277 (D. Minn. Oct. 24, 2017) ............................ 17

*Lazy Oil Co. v. Witco Corp.*,
  95 F. Supp. 2d 290 (W.D. Pa. 1997) .................................................................... 23

iv

*Linney v. Cellular Alaska*,
 151 F.3d 1234 (9th Cir. 1998) ................................................................. 5

*Loeza v. JPMorgan Chase Bank, NA*,
 No. 13-cv-0095, 2015 WL 13357592 (S.D. Cal. Aug. 18, 2015) ............ 19

*Low v. Trump Univ., LLC*,
 246 F. Supp. 3d 1295 (S.D. Cal. 2017) ................................................... 28

*Low v. Trump Univ., LLC*,
 881 F.3d 1111 (9th Cir. 2018) ............................................................... 28

*MCI Communications Corp. v. American Tel. & Tel. Co.*,
 708 F.2d 1081 (7th Cir. 1983) ............................................................... 16

*Meijer, Inc. v. Abbott Labs.*,
 No. 07-cv-5985, 2011 WL 13392313 (N.D. Cal. Aug. 11, 2011) ............. 26

*Moorer v. StemGenex Med. Grp., Inc.*,
 No. 16-cv-02816, 2021 WL 4993054 (S.D. Cal. Oct. 26, 2021) ......... 12, 14, 28

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*,
 221 F.R.D. 523 (C.D. Cal. 2004) ....................................................*Passim*

*Officers for Justice v. Civil Serv. Comm'n of San Francisco*,
 688 F.2d 615 (9th Cir. 1982) ........................................................ 12, 21, 39

*Phillips Petroleum Co. v. Shutts*,
 472 U.S. 797 (1985) ............................................................................... 38

*Rodriguez v. West Publishing Corp.*,
 563 F.3d 948 (9th Cir. 2009) ........................................................*Passim*

*Roes 1-2 v. SFBSC Mgmt., LLC*,
 944 F.3d 1035 (9th Cir. 2019) ............................................................... 39

*Stephens v. US Airways Grp., Inc.*,
 102 F. Supp. 3d 222 (D.D.C. 2015) ......................................................... 4

*Sullivan v. DB Invs., Inc.*,
 667 F.3d 273 (3d Cir. 2011) ................................................................... 25

*Szymborski v. Ormat Techs., Inc.*,
 No. 10-cv-0132, 2012 WL 4960098 (D. Nev. Oct. 16, 2012) ................. 11

*Tawfilis v. Allergan, Inc.*,
 No. 15-cv-0307, 2018 WL 4849716 (C.D. Cal. Aug. 27, 2018) ............. 23

*Trombley v. Nat'l City Bank*,
 826 F. Supp. 2d 179 (D.D.C. 2011) ......................................................... 4

v

*United States Football League v. National Football League*,
    644 F. Supp. 1040 (S.D.N.Y. 1986) ........................................................ 16

*Victorino v. FCA US LLC*,
    No. 16-cv-1617, 2023 WL 3296155 (S.D. Cal. May 5, 2023) .................. 14

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ............................................................... 30

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .............................................................................. 11

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ............................................................. 15, 16

**Statutes**

28 U.S.C. § 1715 .......................................................................................... 40

**Rules**

Federal Rule of Civil Procedure 23 ...............................................................*Passim*

Nevada Rules of Professional Conduct 5.4 ................................................. 32

**Other Authorities**

*Newberg on Class Actions*, § 11:41 (4th ed. 2002)...................................... 12

*Newberg on Class Actions*, § 11:50 (4th ed. 2002)...................................... 15

Connor and Lande, Not Treble Damages: Cartel Recoveries Are Mostly Less Than Single
    Damages, 100 Iowa L. Rev. 1997 (2015)............................................... 3

vi

## I.    INTRODUCTION

Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury ("Plaintiffs") brought the above-captioned action against one defendant, Zuffa, LLC ("Zuffa" or "Defendant") ("Plaintiffs and Zuffa, together, the "Parties") in December 2014.[1] Plaintiffs seek final approval of the hard-fought class settlement (the "Settlement") in this long-running antitrust class action. Under the terms of the September 26, 2024 Settlement Agreement,[2] Zuffa has agreed to make cash payments totaling $375 million for the benefit of the *Le* Class.[3] The Settlement would, if approved, affect only this case (*i.e.*, the "*Le* Action" or the "Action") and would not resolve any claims being pursued in *Johnson, et al. v. Zuffa, LLC, et al.*, No. 2:21-cv-1189 (D. Nev.) (the "*Johnson* Action"). In short, the Settlement would provide immediate and consequential cash relief to the more than one thousand members of the *Le* Class. It would also preserve the ability of the hundreds of the members of *Le* Class who overlap with the proposed class in *Johnson*[4] to pursue additional damages and also injunctive relief in the *Johnson* Action.

The Settlement is an outstanding result for the Class. It was preceded by more than a decade of litigation, including extensive factual and expert discovery; involved voluminous motion practice; and

---

[1] On August 9, 2023, the Court certified the "Bout Class" in the Action (the "Class" or the "*Le* Class") and appointed all the Plaintiffs in the Action, other than Nathan Quarry, as the class representatives for the Class (the "Class Representatives"). *See* ECF No. 839, at 74-75, 78-79. Plaintiff Nathan Quarry was proffered as a class representative for the "Identity Rights Class," which the Court did not certify. *See* ECF No. 839, at 75-78. The Class Representatives together with Mr. Quarry are collectively referred to as "Plaintiffs."

[2] Citations to the Settlement Agreement will use the format "SA ¶_." Unless otherwise defined herein, all capitalized terms have the same meanings set forth in the Settlement Agreement, attached as Exhibit 1 to the Joint Supplemental Declaration of Eric L. Cramer, Richard Koffman, and Joseph R. Saveri in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement, filed on October 7, 2024 (the "October 2024 Decl."). *See* ECF Nos. 1045-2 (the declaration), 1045-4 (the Settlement Agreement).

[3] The Class is defined to include all persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the U.S. from December 16, 2010 to June 30, 2017 (the 'Class Period'), but excludes all persons who are not residents or citizens of the U.S. unless the UFC paid such persons for competing in a bout fought in the U.S. *See* ECF No. 839, at 79.

[4] The proposed class in the *Johnson* Action is defined as: "All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States during the period July 1, 2017 to the present ("Class Period"). The Class excludes all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought or broadcast in the United States." *See* Case No. 21-cv-1189, ECF No. 1, ¶34.

1

was executed only after multiple mediation sessions presided over by mediator Hon. Layn Phillips (ret.) on the brink of trial. There are numerous reasons that the Settlement warrants final approval, including: (i) the substantial and much-needed benefit to the Class provided by the $375 million cash payment; (ii) that the Settlement is the product of arm's-length negotiations, involving mediator Hon. Layn Phillips (ret.), by knowledgeable counsel on both sides; (iii) the Settlement represents a precedent-setting result; and (iv) the overwhelming support for the Settlement from the Class and groups who advocate for MMA Fighters. As to the last point, there was a single untimely objection,[5] brought by a Class member who herself *strongly supports the Settlement*. As the objector stated in her declaration submitted in support of the Settlement: "the $375 million settlement currently before the Court would be an enormously successful result. It would make a significant difference in my life and my financial stability. I enthusiastically support this settlement, and I sincerely hope for its swift approval."[6] The objection should also be overruled on the merits for the reasons set forth in Section IV.F below.

The Settlement would offer members of the *Le* Class a significant amount of money compared to the recoverable damages and considering the real risks of loss or significant delay. For instance:

- The gross Settlement represents nearly 70% of the total compensation the UFC paid to its entire roster of Fighters during the whole *Le* Class Period.
- Under the proposed Plan of Allocation,[7] the anticipated average Class Member recovery is

---

[5] *See* Objection of Carla Lomeli (formerly Esparza), filed (and received by the Clerk's office) on January 22, 2025, ECF No. 1056. Attached as Ex. F to the Declaration of Bach-Viet Nguyen of Angeion Group, LLC re Implementation of Settlement Notice Plan and Report on Objection Received (the "Nguyen Decl."). Ms. Lomeli's objection relates only to (a) one relatively minor aspect of the sought attorneys' fee, and (b) the source of the funds provided to settle plaintiff Quarry's identity rights claim. As shown below, the objection is invalid because it is without merit and also because it was filed after the January 21, 2025 deadline. *See* Preliminary Approval Order ¶¶15-16, 21(c) (ECF No. 1053) (setting deadline 90 days from the date of the Preliminary Approval Order (i.e., 90 days from October 23, 2024); *see also* Long Form Notice at 13 (Nguyen Decl. Ex. B) (Under heading "Objecting to the Settlement" at response to Question 17: "You cannot make an objection by telephone or email. You must do so in writing and file your objection with the Clerk of Court and mail your objection to the following address **to be received by January 21, 2025**: … If you don't timely and validly submit your objection, your view will not be considered by the Court or any court on appeal.") (emphasis added).

[6] *See* Declaration of Carla Esparza, dated October 15, 2024, ECF No. 1049-32 (Ex. 141 to the Supplemental Declaration of Eric L. Cramer in Further Support of Plaintiffs' Motion for Preliminary Approval of the Settlement, dated October 18, 2024 (the "Cramer Supp. Decl.")).

[7] Attached as Exhibit 2 to the October 2024 Decl. *See* ECF No. 1045-5.

$250,000. Thirty-five Class Members would net over $1 million; nearly 100 Fighters would net over $500,000; more than 200 Fighters would recover over $250,000; over 500 Fighters would net in excess of $100,000.

- The Settlement amounts to a significant share of the total damages computed by Plaintiffs' economists—more than any prior settlement of a Section 2 class action. Dr. Hal Singer computed damages to the Class ranging from $811 million to $1.6 billion.[8] One of Dr. Singer's median models yielded damages of $894 million. *See* SR1 ¶250 & Table10. Plaintiffs' other economic expert, Prof. Andrew Zimbalist, calculated damages of $981.8 million.[9] Given that Prof. Zimbalist's sole estimate aligns with the middle of the range of Dr. Singer's estimates, a reasonable jury that sided with Plaintiffs on every other issue and element in the case could well conclude that the damages number would be around $900 million, *i.e.*, the only figure that both of Plaintiffs' experts would justify. In that case, the $375 million payment would amount to more than 40% of the estimated single damages and 14% of treble damages.[10] *See also* Section IV.B.3.d *infra* (discussing numerous antitrust class action cases settling for 25% or less of single damages).

- Compared to the earlier rejected settlement (dated April 24, 2024), which sought to resolve the *Le* Action together with the *Johnson* Action for $335 million plus prospective relief (the "Prior Settlement"), the $375 million for the *Le* Action *alone* is a significant improvement.

- As noted above, the Settlement does not release any of the claims in the *Johnson* Action, thereby permitting hundreds of members of the *Le* Class, as well as the other members of the proposed *Johnson* class, to obtain more damages and injunctive relief in the ongoing *Johnson* Action.[11]

*See* Joint Decl. ¶¶2, 4.[12]

---

[8] *See* Expert Report of Hal J. Singer, Ph.D., August 31, 2017 ("SR1"), ECF No. 518-3, at ¶252 & Table 11; ¶250 & Table10; ¶248 & Table 9 (Bellator model with $811.2 million single damages).

[9] *See* Expert Report of Andrew Zimbalist in *Cung Le, et al. v. Zuffa, LLC*, August 30, 2017 ("ZR1"), ECF No. 518-5, ¶140(c).

[10] Antitrust class actions invariably settle based on the potential single damages—otherwise the defendant might as well take the case to trial. That is true even in horizontal price-fixing cases that are easier to prove (and for juries to understand) than monopsony cases. *See* Connor and Lande, Not Treble Damages: Cartel Recoveries Are Mostly Less Than Single Damages, 100 Iowa L. Rev. 1997 (2015) (reporting median settlements of 37% of claimed single damages across a sample of 71 antitrust cartel cases).

[11] Following the Court's denial of the Prior Settlement, the plaintiffs in the *Johnson* Action took immediate steps to add new and experienced class counsel—the law firm of Lockridge Grindal Nauen, PLLP (www.locklaw.com)—to assist with litigating the matter as well as to serve as an independent voice overseeing any settlement discussions that may occur in that case. The *Johnson* Action is being actively litigated at present.

[12] The terms "Joint Declaration" or "Joint Decl." refer to the Joint Declaration of Eric L. Cramer, Richard Koffman, and Joseph R. Saveri in Support of Plaintiffs' Motion for an Award of Attorneys' Fees, for Reimbursement of Expenses, and for Service Awards for the Class Representatives, filed on December 20, 2024. ECF No. 1055-2.

3

*Second*, there has been an outpouring of support from Class Members and other members of the MMA community endorsing the Settlement. *Id.* ¶3; *see also* ECF Nos. 1045, 1047, 1049 (attaching and discussing declarations). One hundred and fifty four ex-UFC Fighter Class Members, plus a non-Class Member named plaintiff (Quarry) and a non-Class Member Fighter manager, submitted declarations supporting the Settlement. *Id.* Additionally, two of the leading organizations advocating on behalf of MMA Fighters have submitted supporting declarations, stressing the importance of the monetary relief recovered by this Settlement for the Fighters. *Id.* As these declarations make clear, the Settlement, if approved, would have an immediate, substantial, and positive impact on hundreds upon hundreds of Class Members and their families. *Id.* Many declarants state that the Settlement is far more appealing than the possibility of more money several years from now—especially considering the real risk that there could be no recovery at all if this Settlement is rejected. *Id.* This case has been pending for more than a decade. If the Court turns down the Settlement, even if Plaintiffs were to win at trial, succeed in obtaining the entry of a judgment, and then uphold the judgment on appeal, Class Members would need to wait many more years before they have a chance of seeing one cent from this case.[13] "Where a settlement agreement enjoys overwhelming support from the class, this lends weight to a finding that the settlement agreement is fair, adequate, and reasonable." *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 448 (E.D. Cal. 2013).

Furthermore, after implementation of the Court-approved notice program—including direct communications with class members via email, direct mail, and phone; a social media campaign (in English, Spanish, and Portuguese); Court-approved notices posted at MMA Gyms; a settlement website and toll-free number operated by the claims administrator—there has been a single, late-filed, objection raising two collateral issues. Notably, the objector herself, in her own words, "*enthusiastically support[s]*" the Settlement. *See, e.g., Hester v. Vision Airlines, Inc.*, No. 09-cv-00117, 2014 WL 3547643, at *10 (D. Nev. July 17, 2014) ("fact that there are no objectors . . . to the Settlement Agreement demonstrates the fairness, reasonableness, and adequacy of the Settlement"). As to the

---

[13] "[T]he delay in providing relief to the class if this case were to be litigated is a factor strongly supporting the compromise reached by the parties." *See, e.g., Stephens v. US Airways Grp., Inc.*, 102 F. Supp. 3d 222, 227 (D.D.C. 2015); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 195 (D.D.C. 2011) (same).

untimely objection, not only was it filed late by someone who supports the Settlement, it did not criticize (i) the adequacy or fairness of the Settlement, (ii) the Plan of Allocation, (iii) the requests for reasonable litigation expenses, and (iv) the requested service awards for the Class Representatives. This untimely objection—which is based on incorrect factual and legal premises—should be overruled for the reasons discussed in more detail at Section IV.F *infra*.

*Third*, at the time of the Settlement, the Parties were fully informed about the strengths, weaknesses, and risks of the Action given that Plaintiffs had: (a) completed a lengthy pre-filing investigation without the assistance of any governmental enforcement action (*see* Joint Decl. ¶¶7, 11-14); (b) engaged in many years of detailed fact and expert discovery, motion practice, and trial preparation (*see generally id.* ¶¶20-226); and (c) undertaken multiple efforts to settle the matter, including three full-day mediation sessions with Hon. Layn Phillips (ret.) spread over a series of years (in 2017, 2019, and 2023) (*see id.* ¶¶8, 227-31), and an additional mediation session with Judge Phillips following the denial of the earlier proposed settlement (*see id.* ¶¶8, 232). Ultimately, this improved Settlement was reached when both sides accepted a mediator's proposal. *Id.* ¶¶8, 232.

The Ninth Circuit has made clear that in cases like this one, where experienced attorneys negotiate an arm's-length deal, with the aid of a preeminent mediator, it is not the Court's role to "weigh[] the merits of the class's case against the settlement amount and quantified the expected value of fully litigating the matter." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). In *Rodriguez*, a case involving an antitrust claim brought on behalf of a class that purchased bar review courses, the Ninth Circuit explained that "[w]e put a good deal of stock in the product of an arm's-length, non-collusive, negotiated resolution." *Id.* The Ninth Circuit also rejected the argument that the district court should have measured the settlement against the value of potential treble damages. *Id.* at 964-65.[14] Indeed, settlements are the product of negotiations and compromise, and thus courts have

---

[14] *See also Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) (citing *Linney v. Cellular Alaska Partn.*, 151 F.3d 1234, 1242 (9th Cir. 1998) (it is "well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial"); *Barbosa*, 297 F.R.D. at 447 ("[a]lthough a larger award was theoretically possible, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes'"); *Alvarez v. Sirius XM Radio Inc.*, No. 18-cv-8605, 2021 WL 1234878, at *7 (C.D. Cal. Feb. 8, 2021) ("a full recovery is often not possible in a

long held that it is not relevant to ask "whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate, and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 338 (2011). In short, the negotiated recovery here, as discussed above, falls well in the range of reasonable recovery and should be approved.

*Fourth*, the Settlement is a substantial achievement. Worker-side antitrust class actions brought under Section 2 of the Sherman Act are both rare and important. In connection with the earlier settlement, Plaintiffs solicited input from a highly regarded expert in the application of antitrust law to labor markets, Prof. Eric Posner of the University of Chicago Law School. He observed, based on his research, that the Action "is the first [labor-side claim under Section 2 of the Sherman Act] ever to survive summary judgment, reach class certification, or even survive a motion to dismiss."[15] He continued by stating that a settlement of the Action is significant, in part, because it "will encourage more plaintiffs to bring cases to enforce an important but neglected policy embodied in the antitrust laws—that of ensuring that labor markets, and not just product markets, are competitive." *Id*.

In short, the Settlement here reflects an important resolution of a long-running, hard-fought, and complex case against a large and powerful company in one of the country's most popular sports. Prof. Posner's observations made as to the Prior Settlement are even more relevant as to the new and augmented Settlement. Because it leaves the *Johnson* Action unaffected, the Settlement preserves the ability of several hundred members of the *Le* Class to attempt to recover additional damages in the *Johnson* Action; allows for the further adjudication of the enforceability of the arbitration clauses and class action bans in fighter agreements; opens up the possibility for members of the proposed *Johnson* class to obtain significant monetary relief; allows the pursuit of significant prospective relief; and immediately provides a significant life-changing amount of cash to hundreds of Class Members—many

---

settlement . . . and a partial recovery does not render a settlement unreasonable" (internal quotation marks omitted)).

[15] Declaration of Prof. Eric A. Posner in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement ("Posner Decl.") ¶1; Prior Joint Decl. ¶245. The Posner Decl. is attached as Exhibit 2 to the Joint Declaration of Eric L. Cramer, Richard Koffman, and Joseph R. Saveri in Support of Plaintiffs' Motion for Preliminary Approval of the Settlement, filed on dated May 21, 2024 (the "May 2024 Decl."). *See* ECF No. 1024-2.

of whom are struggling right now to meet the urgent needs of themselves and their families. As the 154 Fighter declarations make clear, many of these Class Members do not have three or more years to spare, nor do they wish to risk $375 million now for an uncertain outcome at trial or on appeal.

The Settlement is fair, reasonable, and adequate under the factors set forth in Fed. R. Civ. P. 23(e) and applicable law. Accordingly, Plaintiffs request that the Court approve the Settlement, approve the Plan of Allocation, and enter a Final Judgment and Order terminating this litigation between Plaintiffs and Defendant (a proposed order is filed with this motion).

## II.    RELEVANT PROCEDURAL BACKGROUND

The history of the litigation and Class Counsel's[16] work in reaching this Settlement is described in detail in the Joint Declaration. Plaintiffs will not repeat that extensive history here and instead highlight some of the key information bearing on final approval of the Settlement.

More than a decade ago, Class Counsel opened investigations into potentially anticompetitive conduct in the Mixed Martial Arts ("MMA") industry, well before the December 16, 2014 filing of the initial complaint in the Action and without the benefit of a governmental enforcement action. *See* Joint Decl. ¶¶11-12. Following transfer to this Court, related motion practice, and the Court's Order denying Zuffa's motion to dismiss on October 19, 2016, the Parties began a period of comprehensive and hotly contested fact discovery. *See generally id.* ¶¶18, 20-80. Plaintiffs' fact discovery work included: ensuring that the UFC and certain third parties preserved relevant electronically stored data and information, *id.* ¶¶24-27; pursuing focused written discovery from Zuffa and third parties (including by litigating the scope of productions and purported work product and privilege claims), *id.* ¶¶28-61;

---

[16] The term "Class Counsel" refers to both Co-Lead Class Counsel and Supporting Counsel. The term "Co-Lead Class Counsel" refers to Berger Montague PC, Cohen Milstein Sellers & Toll PLLC, and the Joseph Saveri Law Firm LLP. The term "Supporting Counsel" refers to all or some of the following firms: Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP, Kemp Jones, LLP, Warner Angle Hallam Jackson & Formanek PLC, Clark Hill PLC, The Radice Law Firm, and Spector Roseman Kodroff & Willis. On July 31, 2015, the Court appointed Berger Montague, Cohen Milstein, and JSLF as Interim Co-Lead Class Counsel, and Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP ("Wolf Rifkin") as Interim Liaison Counsel for the then-proposed class in the Action. *See* ECF No. 140. In the Order certifying the Class, the Court appointed Wolf Rifkin as one of the Class Counsel. *See* ECF No. 839. The lead lawyer at Wolf Rifkin was Don Springmeyer. Mr. Springmeyer changed law firms as of January 1, 2021, and his new law firm, Kemp Jones, LLP ("Kemp Jones"), took over the role of representing Plaintiffs and the Class. *See* ECF No. 780.

taking nearly 30 depositions of fact witnesses (in addition to seven days of testimony of Zuffa's Rule 30(b)(6) designees), *id.* ¶¶62-65; scouring publicly available sources of relevant information and evidence (including data and videotaped statements of key witnesses in the case), *id.* ¶¶66-70; collecting and reviewing document productions from the Class Representatives, *id.* ¶¶71-75; and preparing the Class Representatives for their depositions and defending those depositions. *Id.* ¶¶76-80.

The Parties also presided over extensive expert discovery. Co-Lead Class Counsel retained three economic experts: Hal J. Singer, Ph.D., Professor Andrew Zimbalist, and Professor Alan Manning, as well as a forensic accounting expert, Guy Davis. *Id.* ¶¶87-88. Co-Lead Class Counsel collectively spent substantial time and effort working with these experts to facilitate their understanding of the case and the record; their preparation of their expert reports; and their preparation for testimony at their depositions, at the class certification hearing, and at the anticipated February 2025 trial. *Id.* ¶92; *see also id.* ¶¶86-129. In addition, Co-Lead Class Counsel also analyzed the reports produced by Zuffa's five experts, who collectively produced reports totaling 650 pages. Plaintiffs deposed each of Zuffa's experts in 2017. *See id.* ¶¶131-34.

Following the completion of fact and expert discovery, the Court granted in part Plaintiffs' Motion for Class Certification, certifying the proposed Bout Class (and denying certification of the proposed identity rights class), which decision the Court reached after holding a seven-day evidentiary hearing (on August 26, August 27, August 28, August 30, September 12, September 13, and September 23, 2019) and following supplemental briefing. *See id.* ¶¶140-50, 151. Following the Court's certification of the Class, Angeion Group LLC ("Angeion") was selected as the claims administrator. Joint Decl. ¶157. Co-Lead Class Counsel worked with Angeion to develop a Notice Plan and effectuate notice to the Class. *Id.* Angeion effectuated the Court-approved notice program informing the members of the Class that the Court had certified the Bout Class beginning in or about December 2023. *See* ECF No. 966, at 2. *Not a single member of the Class opted out*. Joint Decl. ¶157.

As the Parties litigated the Action through discovery and toward summary judgment and trial, they also pursued settlement discussions. On the eve of trial, which had been set to commence on April 15, 2024 (*id.* ¶¶180-81), the Parties in this Action and the *Johnson* Action reached the Prior Settlement. *Id.* ¶227. Class Counsel moved for preliminary approval of the Prior Settlement on May 21, 2024 (ECF

No. 1024), at which point trial preparation in the Action ceased. *Id.* ¶230. Following two status conferences and additional supplemental briefing, on July 30, 2024, the Court denied preliminary approval of the Prior Settlement and gave its reasons for the denial on the record. *Id.* (citing ECF Nos. 1037, 1038, 1039).

The Court reset the trial date for February 3, 2025 and Class Counsel renewed the intense and time-consuming process of preparing for trial. *Id.* ¶231. Concurrently, the Parties renewed settlement discussions for the *Le* case only. *Id.* ¶232. As with the Prior Settlement, Class Counsel led these discussions, which also involved the mediator (Hon. Layn Phillips). *Id.* As part of the negotiations, Class Counsel and counsel for Zuffa revisited the strengths and weaknesses of their respective claims and defenses, the risks of trial and appeals, and gave careful consideration to the Court's stated reasons for the denial. *Id.*; *see also* ECF No. 1039 (Tr. 5-8).[17] Through these negotiations, the Parties reached the Settlement after nearly three additional months of trial preparation. *Id.*

## III.   THE SETTLEMENT

The Settlement provides valuable economic relief to the Class in the amount of $375 million in cash. *See* SA ¶5; Joint Decl. ¶232. The cash payment represents nearly 70% of the total compensation the UFC paid to its Fighters during the *Le* Class Period and a significant percentage of damages sought by Plaintiffs. *See* Joint Decl. ¶¶2, 4. If approved, it would provide immediate and consequential cash relief to the more than one-thousand members of the *Le* Class. Under the *pro rata* distribution procedure set forth in the proposed Plan of Allocation (discussed in more detail at Section IV.B.3.b *infra*), the anticipated average Class Member recovery is $250,000. Thirty-five Class Members would net over $1 million; nearly 100 Fighters would net over $500,000; more than 200 Fighters would net over $250,000; and over 500 Fighters would net in excess of $100,000. *See id.* ¶2.

The Settlement also preserves the rights of those *Le* Class Members who are also members of the proposed *Johnson* class to obtain more damages and injunctive relief in the ongoing *Johnson*

---

[17] These reasons were: (i) the amount to be allocated to members of the *Le* Class and the proposed class in the *Johnson* Action was too small; (ii) this Action and the *Johnson* Action have distinct litigation postures, where this case has a certified Class and is on the brink of trial, whereas *Johnson* is in early discovery; (iii) the Class Members in this Action seek damages but not injunctive relief, whereas the *Johnson* Action seeks both monetary and injunctive relief; and (iv) members of the proposed *Johnson* Class include some subject to arbitration provisions and some who are not. *See* Tr. 5-8 (ECF No. 1039).

9

Action. *Id.*

On October 23, 2024, as part of its preliminary approval of the Settlement, the Court also approved the Notice Plan[18] and directed Angeion to effectuate notice of the Settlement to the Class. ECF No. 1053 (the "Preliminary Approval Order"), ¶¶15-16. Starting on November 22, 2024, Angeion began sending the Long Form Notice (by mail) and the Short Form Notice (by email) to Class Members. *See* Nguyen Decl. at ¶¶8, 10 (attaching the Short Form Notice and Long Form Notice that were distributed as Exs. A & B). On the same day, Angeion also initiated a comprehensive media campaign to alert Class Members about the Settlement, which included: targeted social media notice via Facebook, Instagram, and X; a paid search campaign via Google; and a press release via PR Newswire. *See id.* ¶¶12-16. Angeion also mailed the Poster Notice to 48 professional MMA Gyms with a request that the Poster Notice be placed in a prominent location where Class Members are likely to see it. *Id.* ¶17 (attaching a true and correct copy of the Poster Notice that was actually distributed as Ex. E). Additionally, the dedicated website for the Action, www.UFCFighterClassAction.com, was updated to include information about the Settlement, including a set of Frequently Asked Questions about the Settlement (with an option to contact Angeion via email), and downloadable copies of the Notice and other important documents about the Settlement and the Action. *Id.* ¶18. Since some Class Members are non-native English speakers, the website includes copies of the Long Form Notice translated into Spanish, Japanese, Portuguese, and Russian, and translators are available to provide responses to Class Member inquiries in these languages as well. *Id.* ¶19. Class Counsel also held three separate translated Zoom information sessions about the Settlement with many dozens of Class members in Japanese, Russian, and Portuguese. Finally, Angeion maintains a toll-free number that Class Members may use to obtain information about the Settlement. *Id.* ¶21.

Importantly, there has been a groundswell of support from Plaintiffs, Class Members, and groups that advocate for the interests of Fighters. *See* Joint Decl. ¶¶2-3, 233-34. These statements make clear that the Settlement would bring real, material, and tangible monetary benefits to Class Members—many of whom need immediate relief. The Court set a submission deadline of January 21,

---

[18] The Notice Plan is described in the Declaration of Steven Weisbrot, Esq. of Angeion Group LLC re the Settlement Notice Plan, dated October 7, 2024. *See* ECF No. 1045-7.

2025 for the filing of objections, Preliminary Approval Order ¶21(c) (ECF No. 1053), which deadline was set forth in all three forms of notice approved by the Court and distributed to Class members. *See* Nguyen Decl. Exs. A (Short Form Notice), B (Long Form Notice, at Question 17), E (Poster Notice). Not a single Class Member timely objected to any aspect of the Settlement, the Plan of Allocation, or the fee and expense request of Class Counsel. *See* Nguyen Decl. ¶22. And the concerns of the single (untimely) objector, who otherwise supports the Settlement, are based on legal and factual misunderstandings.

## IV.    ARGUMENT

### A.    Standards for Final Approval of the Settlement

The Settlement should be approved. Courts may grant final approval of a settlement "after a hearing and on finding that it is fair, reasonable and adequate." Fed. R. Civ. P. 23(e). Under this Rule, courts are to consider whether: (a) the class was adequately represented; (b) the settlement was negotiated at arm's-length; (c) the relief provided to the class is adequate; and (d) the proposal treats class members equitably. *See* Fed. R. Civ. P. 23(e)(2). Prior to December 2018, when Rule 23(e) was amended to include these four factors, courts in the Ninth Circuit traditionally considered the following factors (the "*Hanlon* factors"): "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining a class action status throughout the trial; the amount offered in the settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Szymborski v. Ormat Techs., Inc.*, No. 10-cv-0132, 2012 WL 4960098, at *2 (D. Nev. Oct. 16, 2012) (quoting *Hanlon*, 150 F.3d at 1026).[19] The *Hanlon* factors were judicially crafted guidelines to assist a court in determining the fairness of a proposed settlement. The Ninth Circuit now instructs courts to go beyond the *Hanlon* factors, requiring courts also to consider the factors expressly enumerated in Rule 23(e). *Briseño v. Henderson*, 998 F.3d 1014, 1025-26 (9th Cir. 2021).

The "decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is 'exposed to the litigants, and their strategies, positions and proof.'" *Hanlon*, 150

---

[19] Overruled on other grounds by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

F.3d at 1026 (quoting *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 626 (9th Cir. 1982)).[20] The Court's analysis is guided by several important policy considerations. The first is that there is "'a strong judicial policy' that favors class action settlements." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 229 F. Supp. 3d 1052, 1061 (N.D. Cal. 2017) (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015)).[21] Indeed, the Ninth Circuit has "repeatedly noted that there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Henderson*, 998 F.3d at 1030.

Further, when exercising its discretion, the Court should also give "proper deference to the private consensual decision of the parties" because:

> [T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

*Hanlon*, 150 F.3d at 1027. The focus is not "whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate, and free from collusion." *Id.* at 1026.

Finally, the Ninth Circuit has also explained that "[w]e put a good deal of stock in the product of an arm's-length, non-collusive, negotiated resolution." *Rodriguez v. W. Publg. Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Where, as here, "a settlement is the product of arm's-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a presumption that the settlement is fair and reasonable." *Garner v. State Farm Mut. Auto Ins. Co.*, No. 08-cv-1365, 2010 WL 1687832, at *13 (N.D. Cal. Apr. 22, 2010) (citing 4 *Newberg on Class Actions*, § 11:41).

As Plaintiffs show below, the Settlement should be approved because it satisfies all the Rule 23(e) factors, as well as those additional *Hanlon* factors that are not otherwise encompassed by the

---

[20] All references to internal quotations or cases cited are omitted from the citations in this memorandum except where expressly provided.

[21] *See also Moorer v. StemGenex Med. Grp., Inc.*, No. 16-cv-02816, 2021 WL 4993054, at *2 (S.D. Cal. Oct. 26, 2021) ("Voluntary conciliation and settlement are the preferred means of dispute resolution in complex class action litigation."); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("Unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.").

December 2018 amendments to Rule 23(e).[22] Indeed, at the preliminary approval stage, the Court considered all of these factors, and found the Settlement likely complies with Rule 23(e). *See* ECF No. 1053, ¶¶6-8. That finding has only strengthened following the conclusion of the notice program given that not a single Class Member timely objected to the Settlement. *See* Nguyen Decl. ¶22. And the only objection was not only untimely but was also submitted by a person who herself "enthusiastically" supports the Settlement. The Settlement enjoys overwhelming support from the Class, complies with both Rule 23(e) and prior applicable law, and merits final approval.

### B.    The Settlement Satisfies the Rule 23(e) Factors for Final Approval

#### 1.    The Class Has Been Adequately Represented.

Plaintiffs satisfy the first requirement of Rule 23(e)(2), which asks whether "the class representatives and class counsel have adequately represented the class[.]" Fed R. Civ. P. 23(e)(2)(A). Determining adequacy requires "[r]esolution of two questions . . . : (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Both favor approval here.

There are no conflicts of interest. The Court already found Class Counsel and the Class Representatives adequate when it certified the Class. *See* ECF No. 839, at 17-18, 78-79. The extent and breadth of Class Counsel's efforts in litigating the Action are described in the Joint Decl. ¶¶11-237.

#### 2.    The Settlement Was Reached Through Arm's-Length Negotiations.

The Settlement satisfies the second factor of Rule 23(e)(2), which requires that the Settlement result from arm's-length negotiations. *See* Fed R. Civ. P. Rule 23(e)(2)(B). Class settlements are presumed fair when they are reached "following sufficient discovery and genuine arm's-length negotiation." *DIRECTV*, 221 F.R.D. at 528. "That the settlement was reached with the assistance of an

---

[22] The non-overlapping *Hanlon* factors are: (i) the risk of maintaining a class action status throughout the trial; (ii) the extent of discovery completed and the stage of the proceedings; (iii) the experience and views of counsel; (iv) the presence of a governmental participant; and (v) the reaction of the class members to the proposed settlement. These factors are separately addressed at Sections IV.C-F *infra*, except for the factor regarding government participation, as Plaintiffs have explained above that this Action was brought without the benefit of government assistance (*see* Joint Decl. ¶¶11-12) and, therefore, this factor also favors approval of the Settlement.

experienced mediator further suggests that the settlement is fair and reasonable." *Moorer*, 2021 WL 4993054, at *5; *see also Rodriguez*, 563 F.3d at 965. Each of these elements is present here.

*First*, the Parties engaged in significant discovery, both fact and expert, and analysis of that discovery through to the eve of trial. *See* Joint Decl. ¶¶7, 11-12, 20-134. That familiarity with the record enabled Class Counsel to develop a comprehensive understanding of the claims, the litigation risks, and the value of the claims prior to settling the Action.[23]

*Second*, the Parties reached the Settlement through arm's-length negotiations undertaken in good faith by highly experienced counsel, including three full day mediations held years apart (in 2017, 2019, and 2023), as well as an additional mediation session where the Parties carefully considered the Court's stated reasons for the Denial. *See* Joint Decl. ¶¶8, 228-29, 232. After each mediation session, the Parties continued discussions through the highly experienced mediator.[24] *See id.* And, indeed, the ultimate resolution involved the Parties' acceptance of the recommendation of one of the country's most experienced and highly respected mediators. *See* Joint Decl. ¶¶8, 237.

### 3. The Relief Provided by the Settlement Is More Than Adequate.

The Settlement satisfies the third requirement of Rule 23(e), namely that the relief provided by the Settlement is adequate. Fed. R. Civ. P. 23(e)(2)(C). The rule directs the Court to consider four additional factors as part of this analysis: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of distributing relief to the class; (iii) the terms and timing of attorneys' fees; and (iv) any related agreements. *Id.* at Rule 23(e)(2)(C)(i)-(iv). A related factor in the Ninth Circuit is the amount offered in the settlement. *See Hanlon*, 150 F.3d at 1026. Each of these factors supports approval.

---

[23] *See DIRECTV*, 221 F.R.D. at 527 (settlement after discovery approved "because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case"); *Victorino v. FCA US LLC*, No. 16-cv-1617, 2023 WL 3296155, at *5 (S.D. Cal. May 5, 2023) (preliminary approval where "Plaintiff thoroughly investigated and researched the claims in litigating this action and preparing [for] trial").

[24] *Id.*; *see Abadilla v. Precigen, Inc.*, No. 20-cv-06936, 2023 WL 7305053, at *3 (N.D. Cal. Nov. 6, 2023) (settlement mediated before J. Phillips (ret.) preliminary approved); *High-Tech Emp.*, No. 11-cv-02509, 2015 WL 12991307, at *1 (N.D. Cal. Mar. 3, 2015) (same); *Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al.*, No. 20-cv-2600, ECF No. 336 (W.D. Tenn. Apr. 25, 2023) (same) (citing preliminary approval brief identifying J. Phillips as mediator).

14

### a.   The Costs, Risks, and Delay of Trial and Appeal.

"[U]nless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *DIRECTV*, 221 F.R.D. at 526 (quoting *Newberg on Class Actions*, § 11:50, at 155 (4th ed. 2002)). The Court "may presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery." *Garner.*, 2010 WL 1687832, at *9. While Co-Lead Class Counsel believe that the claims asserted in the Action are meritorious, the continued prosecution of the Action through trial and appeal would pose significant risks, substantial delay, and additional costs. *See generally* Joint Decl. ¶¶238-46. Zuffa has vigorously asserted multiple challenges to the merits of Plaintiffs' claims, and defended by arguing, among many other things, that Fighters and the sport more generally benefited from the challenged conduct; that UFC Fighter pay rose significantly over time; that the UFC's acquisitions saved failing promotions; and, that the UFC's success was due to procompetitive and not anticompetitive conduct. *See id.* ¶240. While the Class was certified and Zuffa's petition for interim appellate review denied, Zuffa would still have had the ability to challenge certification on appeal after trial. *Id.* ¶242.

Trial also presents real risks. Even with beneficial rulings finding Plaintiffs' expert testimony on damages to be admissible and reliable, Plaintiffs still face the risk of proving at trial the existence and extent of damages, as well as the other elements of their claims. "Antitrust cases are particularly risky, challenging, and widely acknowledge[d] to be among the most complex actions to prosecute." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020);[25] *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("Federal antitrust cases are complicated, lengthy, and bitterly fought."); *In re Packaged Ice Antitrust Litig.*, No. 08-md-1952, 2011 WL 6209188, at *19 (E.D. Mich. Dec. 13, 2011) (Antitrust trials are "arguably the most complex action[] to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome.").

The annals of antitrust litigation history are littered with examples of plaintiffs receiving little or

---

[25] *Affirmed*, Appeal No. 21-15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022).

no damages despite having engaged in extensive litigation—even when such plaintiffs succeeded in establishing liability.[26] One such well-known example is the monopolization case brought by the United States Football League against the National Football League where the jury, after a ten-week trial, returned unanimous verdicts against the defendant but concluded the plaintiff had suffered only $1.00 in damages. *See United States Football League v. National Football League*, 644 F. Supp. 1040, 1041-42 (S.D.N.Y. 1986). Risking trial in the face of substantial settlement proposals is particularly concerning in Section 2 cases like this one, where there is typically only a single defendant, and thus only one chance to succeed, and no ability to hedge against total loss or lengthy delays.

There are numerous instances, such as those described in the below bullet points, involving plaintiffs who declined significant settlement offers in favor of the risk of an antitrust trial where that choice proved disastrous for the class:

- *In re HIV Antitrust Litig.*, No. 19-cv-02573 (N.D. Cal.): Antitrust class action alleging that defendants violated the antitrust laws by agreeing to delay the entry of generic versions of certain brand drugs used to treat the Human Immunodeficiency Virus. The end purchaser plaintiffs in this antitrust class action litigation went to trial, beginning on May 24, 2023, and the jury returned a verdict in favor of the defendants. A different group of plaintiffs chose instead to settle their case before trial for $246.75 million, which represented approximately 11.9% of the expert's estimated single damages. *See* ECF No. 2141, at 12-13 (final approval brief).

- *In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115 (N.D. Cal.): Antitrust class action plaintiffs sought approximately $246 million in single damages for claims alleging defendants engaged in a conspiracy to fix the price of ramen noodle products (*In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115, 2017 WL 235052, at *6 (N.D. Cal. Jan. 19, 2017)). The trial commenced on November 13, 2018, and ended when the jury returned a verdict in favor of two defendants (ECF No. 920).

- *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637 (N.D. Ill.): Plaintiffs alleged overcharges on approximately $37 billion in broiler chicken sales for antitrust claims

---

[26] *See Wal-Mart Stores*, 396 F.3d at 118 ("Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1166-67 (7th Cir. 1983) (antitrust judgment was remanded for new trial on damages); *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973), *vac'd*, 417 U.S. 156 (1974) (after two trips to the Second Circuit and one to the Supreme Court, plaintiff and the putative class recovered nothing in this antitrust class case); *Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*, No. 85-cv-3048, 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987) ("There is a substantial risk that the plaintiff might not be able to establish liability at all and, even assuming a favorable jury verdict, if the matter is fully litigated and appealed, any recovery would be years away.").

alleging defendants conspired to fix the price of broiler chickens. *See In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637, 2022 WL 1720468, at *15 (N.D. Ill. May 27, 2022). After obtaining settlements totaling $284 million—a tiny fraction of single damages—with thirteen defendants (*see, e.g.*, ECF Nos. 6926-28; 7172, at 3), plaintiffs went to trial against one defendant, which commenced on September 12, 2023, and the jury rendered a verdict in favor of the defendant (ECF No. 7014).

- *In re Nexium (Esomeprazole) Antitrust Litig.*, No. 12-md-02409 (D. Mass): Litigation involving consolidated antitrust class actions brought on behalf of direct purchasers, endpayers, and individual retailer plaintiffs alleging defendants violated the antitrust laws by agreeing to delay the entry of generic versions of the prescription drug Nexium, where direct purchasers claimed damages in the billions of dollars. *See* ECF No. 1559, at 17 (plaintiffs' final approval brief). Approximately one month into trial that began on October 20, 2014, all plaintiffs settled with one defendant for $24 million. The jury subsequently returned a verdict in favor of the remaining defendants. *See id.* at 2, 15-16.

- *In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-md-02090 (D. Minn.): Antitrust class action where direct purchaser plaintiffs brought claims alleging $226 million in damages asserting defendants engaged in a conspiracy to restrict competition by dividing territories and customers along geographic lines (*In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-md-2090, 2017 WL 4876277, at *6 (D. Minn. Oct. 24, 2017)), where the trial started on April 9, 2018 and the jury returned a verdict in favor of two defendants (ECF No. 1233).

- *In re Processed Egg Products Antitrust Litig.*, No. 08-md-02002 (E.D. Pa.): Antitrust class action plaintiffs went to trial asserting damages in excess of $111 million (*In re Processed Egg Prod. Antitrust Litig.*, 881 F.3d 262, 266 (3d Cir. 2018)) for a conspiracy to fix the prices of eggs by agreeing to reduce egg supply. The jury found at the end of a trial that started on October 31, 2019 that the defendants had not participated in the alleged conspiracy (ECF No. 2090).

What these cases highlight is that rejecting a meaningful settlement involves taking on real risks. The Class Members here deserve to have their wishes affirmed, which is to lock in the significant result achieved to date and not gamble it away on an uncertain future of trial, appeals, and delay. The reaction of the Class affirms this key point, as over 150 Class Members submitted declarations *prior* to preliminary approval and notice of the Settlement urging its approval and, post notice, no Class Member has timely objected (only one submitted an untimely objection, which does not challenge the Settlement itself and is invalid for the reasons discussed in Section IV.F below).

### b. The Proposed Plan of Allocation Is Fair and Effective.

Approval of the Settlement is further justified because the proposed method of distributing relief to the Class is equitable, efficient, and effective. *See*, *e.g.*, Fed. R. Civ. P. 23(e)(2)(C)(ii); *In re*

17

*Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001) (a plan of allocation must be "fair, reasonable, and adequate"). The proposed Plan of Allocation (the "Plan")[27] was developed with input from Plaintiffs' primary economic expert, Dr. Singer. The Plan treats each of the Class Members fairly and equitably.[28] As Dr. Singer explained, he developed the Plan "[b]ased on my prior impact and damages analyses from my reports in the *Le* Case," Singer Decl. ¶9, and from his analysis of Zuffa's bout pay data provided by Zuffa. *See id.* ¶¶12, 17, 19, 25. The data Zuffa provided in the Action will be used to determine the *pro rata* distributions described below, as well as to permit the Claims Administrator to pre-populate claim forms with information needed to complete the form (and thus make the claims process streamlined and efficient for the Class Members). *See id.* ¶¶19, 25.

The Plan allocates money to Class Members who submit timely, valid claims ("Claimants") based on two *pro rata* factors: (i) 70% of the Net *Le v. Zuffa* Settlement Fund is to be distributed on the basis of each Claimant's *pro rata* share of all Event Compensation[29] earned by Claimants during the Class Period; and (ii) 30% of the Net *Le v. Zuffa* Settlement Fund is to be distributed on the basis of each Claimant's *pro rata* share of all Claimants' UFC bouts fought during the Class Period. Plan ¶4. Under the Plan, each Claimant will receive at least a minimum distribution amount of $15,000 (though the vast majority would receive many multiples of that amount). *Id.*

The 70/30 weighting between total Event Compensation and number of bouts fought provides an important means of ensuring that the distributions reasonably reflect the extent of each Claimant's alleged antitrust injuries. *See id.* ¶5. Dr. Singer previously explained that the mid-level journeymen Fighters may have had their compensation squeezed to a greater degree than top or bottom-level Fighters. *See* Singer Decl. ¶18. It is possible that, while Zuffa's alleged misconduct harmed all Fighters, the top Fighters may have enjoyed some countervailing bargaining power that the mid-level

---

[27] The Plan of Allocation is attached as Exhibit 2 to the October 2024 Decl. *See* ECF No. 1045-5.

[28] *See generally* Declaration of Hal J. Singer, Ph.D. In Support of Plan of Allocation ("Singer Decl."), attached as Exhibit 4 to the May 2024 Decl. *See* ECF No. 1024-7. Note that the Singer Decl. was executed in support of the Prior Settlement. The Plan here is essentially the same except that it is for the *Le* Class only.

[29] The term "Event Compensation" refers to a Fighter's total event-level compensation from the UFC that is the sum of (1) show and win purses, (2) discretionary/performance pay, (3) PPV royalties, and (4) letters of agreement. *See* Singer Decl. p. 8 n.20.

18

Fighters did not have. *See id.* Allocating 30% of Settlement funds to distribute *pro rata* based on the number of bouts fought, as opposed to relying solely on Event Compensation, recognizes that the mid-level Fighters without as much name recognition may have been relatively better off in the but-for world as compared to the more popular Fighters. *See id.* In short, allocating most of the funds in proportion to compensation amounts, but also allocating at least some portion of the funds based on number of bouts fought, strikes a fair balance. This proposal will help ensure that the distributions from the Net *Le v. Zuffa* Settlement Fund will correlate with the degree of harm each Claimant suffered. This type of distribution on a *pro rata* basis, with distributions correlating with harm, has been deemed fair, adequate, and reasonable.[30]

Finally, the Plan includes procedures to encourage and facilitate Class Member participation, including mailing pre-populated claim forms setting out critical information necessary for computation of the claim (where the information is available) (Plan ¶¶1-2); communication and resolution procedures for any deficient or late claims (Plan ¶¶7-8); a procedure for managing challenged claims (Plan ¶¶10-12); and a fair dispute resolution process (Plan ¶¶17-18). The Plan will be managed by Angeion, the experienced claims administrator approved by the Court (*see* Preliminary Approval Order ¶9 (ECF No. 1053)), with assistance from Dr. Singer's consulting firm, Econ One, and Co-Lead Class Counsel. Accordingly, both the Settlement and the Plan merit approval.

Finally, Plaintiffs respectfully request approval of the following schedule for implementing the Plan of Allocation:

- The Settlement Claims Administrator will commence sending Claim Forms[31] to Class Members no later than 60 days after this Order granting final approval of the Plan of Allocation. *See* Plan ¶1.

- The deadline for Class Members to submit their executed Claim Forms to the Settlement Claims Administrator is 105 days after this Order granting final approval of the Plan of Allocation. *See* Plan ¶3.

- No later than 180 days after this Order granting final approval of the Plan of Allocation, Co-

---

[30] *See Hefler v. Wells Fargo & Co.*, No. 16-cv-5479, 2018 WL 6619983, at *12 (N.D. Cal. Dec. 18, 2018), *affirmed sub nom. Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020); *Loeza v. JPMorgan Chase Bank, NA*, No. 13-cv-0095, 2015 WL 13357592, at *8 (S.D. Cal. Aug. 18, 2015) ("the funds will be distributed on a weighted *pro rata* basis, which guarantees equal treatment of class members").

[31] The term "Claim Form" is defined in the Plan of Allocation at Paragraph 1. *See* ECF No. 1045-5, at 2-3.

Lead Class Counsel shall provide a report to the Court on the status of the claims administration, with the goal of allocating funds to Class Members no later than September 30, 2025. *See* Plan ¶13.

### c. Co-Lead Class Counsel's Request for Fees and Expenses, and Service Awards for the Class Representatives Is Reasonable.

Rule 23(e)(2)(C)(iii) requires the Court to consider the relief provided to the Class, taking into account any terms concerning the amount of and timing for the payment of attorneys' fees. There are no such terms in the Settlement.[32] On December 20, 2024, Class Counsel separately submitted a Motion for an Award of Attorneys' Fees, For Reimbursement of Expenses, and For Service Awards for the Class Representatives, along with supporting papers. *See* ECF Nos. 1055 to 1055-14. Class Counsel requested an award of attorneys' fees of 30.72% of the $375 million *Le v. Zuffa* Settlement Fund, plus accrued interest (or $115.2 million plus interest), the reimbursement of litigation expenses in the amount of $9,572,685.17, and service awards of $250,000 for each of the five Class Representatives. *See id.*[33] Class Counsel set forth in great detail the legal and factual support demonstrating that the requested awards are appropriate and reasonable under Fed. R. Civ. P. 23(h) in light of the extraordinary, precedent-setting achievement of the Settlement, as well as customary and appropriate in

---

[32] The fourth factor of Rule 23(e)(C)(2) also requires the Court to examine any other agreements that are related to the proposed settlement. Fed. R. Civ. P. 23(e)(C)(2)(iv). This provision is aimed at "related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." Fed. R. Civ. P. 23(e), advisory committee notes 2003 amendments. Here, the Parties entered into a Confidential Supplement to Settlement Agreement, which sets forth certain conditions under which Defendant has the option to terminate the Settlement. The Parties agreed to maintain the confidentiality of this agreement because publicizing it could give leverage to actors seeking to blow up the Settlement for personal gain. This provision is moot given that zero Class Members opted out. This type of agreement is common in class actions, did not involve any tradeoffs that would render the Settlement improper, and does not render a settlement unfair. *See Hefler*, 2018 WL 6619983, at *7.

[33] The Settlement also includes a payment of $250,000 from Zuffa to Plaintiff Nathan Quarry, which payment is in exchange for Mr. Quarry's release of his individual identity rights claim against Zuffa. *See* SA § 5(d). Mr. Quarry was one of the initial Plaintiffs in the case, who served as a proposed Class representative for the Identity Rights Class. While the Court declined to certify the Identity Rights Class, Mr. Quarry continued to pursue his individual Identity Rights Claim. *See, e.g.*, ECF No. 493 (Court Order denying Zuffa's motion for summary judgment relating to Mr. Quarry's identity rights claim without prejudice); ECF No. 628 (Court Order denying Zuffa's renewed motion for summary judgment relating to Mr. Quarry's identity rights claim without prejudice). Zuffa never moved again for summary judgment relating to Mr. Quarry's Identity Rights Claim. Plaintiffs respond to the objector's challenge to the source of funds for this part of the Settlement in Section IV.F below.

the context of other complex antitrust class actions.[34] *See id.* Plaintiffs respond to the objector's

assertion regarding one aspect of the fee computation below. *See* Section IV.F *infra*.

### d. The Settlement Provides a Significant Monetary Benefit to the Class.

To determine whether a settlement agreement is substantively fair to the Class, courts are

guided by the general principle that "[a]lthough a larger award was theoretically possible, 'the very

essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.'"

*Barbosa*, 297 F.R.D. at 447. It is "well-settled law that a proposed settlement may be acceptable even

though it amounts to only a fraction of the potential recovery that might be available to the class

members at trial." *DIRECTV*, 221 F.R.D. at 527. The Ninth Circuit has also rejected the argument that

a district court should measure the settlement against the value of potential treble damages. *Rodriguez*,

563 F.3d at 964-65. The court observed that "[i]t is our impression that courts generally determine

fairness of an antitrust class action settlement based on how it compensates the class for past injuries,

*without giving much, if any, consideration to treble damages." Id*. at 964 (emphasis added). The court

again highlighted that "[e]xperienced counsel such as those representing all the parties in this case will

certainly be aware of exposure to treble damages in an antitrust action. Likewise, the mediator in this

case." *Id*. at 965; *see also In re Cathode Ray Tube (CRT) Antitrust Litig*, No. 14-cv-2058, 2015 WL

9266493, at *5 (N.D. Cal. Dec. 17, 2015); *Officers for Just.*, 688 F.2d at 628 ("It is well-settled law that

a cash settlement amounting to only a fraction of the potential recovery will not per se render the

---

[34] There is no aspect of either the Settlement or the request for reasonable attorneys' fees or litigation expenses that raises any concerns about the reasonableness, fairness, or adequacy of the Settlement. Such concerns only arise where, unlike here, a court observes "subtle signs that class counsel have allowed pursuit of their own self-interests ... to infect the negotiations." *Henderson*, 998 F.3d at 1023. The Ninth Circuit has identified three such warning signs: (i) whether class counsel receives a disproportionate share of the settlement; (ii) is there a "clear sailing arrangement" where defendants agree not to object to attorneys' fees; and (iii) does the settlement include a "kicker" or "reverter" clause that returns unclaimed funds to defendant. *Id.* These warning signs are all absent here. Class Counsel do not seek a disproportionate amount of the Settlement—as noted, the requested fee award is comparable to those awarded in similar complex antitrust cases. *See* ECF No. 1055-1, at 16-18 (Class Counsel's fee brief citing and discussing cases). Defendant is not barred from objecting to the requested fee (*see generally* Settlement Agreement), nor does it have any right to any unclaimed Settlement funds.

settlement inadequate or unfair.").[35]

The Settlement here is an excellent result for the Class. The $375 million all-cash recovery provides a swift and significant payment to the Class that avoids the delay, costs, and risks of a trial and appeals. The Settlement amounts to nearly 70% of the total compensation the UFC paid to its entire roster of Fighters during the full *Le* Class Period while also preserving the ability of those *Le* Class members who straddle the classes in both the *Le* and *Johnson* cases to obtain even more damages and potential injunctive relief in *Johnson*. Further, the Settlement has overwhelming support from the Class, including more than 150 Fighter declarations submitted in support of the Settlement *prior* to preliminary approval (with zero timely objections).

As noted above, under the Settlement, *Le* Class members would recover (on average), after all fees and costs are deducted, $250,000. Thirty-five Class members would net over $1 million; nearly 100 fighters would net over $500,000; more than 200 fighters would net over $250,000; over 500 fighters would net in excess of $100,000; and nearly 800 would net over $50,000. Joint Decl. ¶2. By any practical measure, the Settlement, if approved, would put "life changing" cash into the hands of the families of several hundred Fighters *now*. And as described in Section I, the Settlement amounts to a significant share of the total damages computed by Plaintiffs' economists. Given the experts' analyses of the potential damages, a reasonable jury could conclude that if they find that Plaintiffs have satisfied every other element of their claims, the damages number would reasonably fall where both of Plaintiffs' experts converge: around $900 million. In that case, the $375 million payment would amount to more than 40% of the estimated single damages ($375 million / $900 million = 41.67%)— which is better than any other worker-side monopsonization case in this country's history.

---

[35] *In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-02509, 2015 WL 5159441, at *4 (N.D. Cal. Sept. 2, 2015) ("[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-md-1720, 2019 WL 6875472, at *29 (E.D.N.Y. Dec. 16, 2019) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974)), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) (same); *In re Remeron End-Payor Antitrust Litig.*, No. 02-cv-2007, 2005 WL 2230314, at *24 (D.N.J. Sept. 13, 2005) ("an antitrust class action settlement may be approved even if the settlement amounts to a small percentage of the single damages sought, if the settlement is reasonable relative to other factors").

The Settlement also compares favorably to the vast majority of other antitrust class action settlements ever achieved. There are numerous antitrust class actions where courts (including many in this Circuit) approved settlements reflecting a *much* lower percentage of estimated single damages than the 42% achieved here, including the following examples:

***Antitrust Class Action Settlements for 2% or Less of Estimated Single Damages***

- *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-md-170, 2019 WL 6875472, at *28 (E.D.N.Y. Dec. 16, 2019) (after summary judgment briefing and the Second Circuit vacating a prior settlement, court approved an antitrust class action settlement representing less than 1.4% of the low end of estimated damages).

- *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 14-cv-2058, 2015 WL 9266493, at *5 (N.D. Cal. Dec. 17, 2015) (following summary judgment briefing, court approved $9.75 million antitrust class action settlement where plaintiffs' maximum recovery "could exceed two billion dollars," and where settlement represented 0.49% of maximum possible recovery).

***Antitrust Class Action Settlements for 5% or Less of Estimated Single Damages***

- *In re Tableware Antitrust Litig.*, No. 04-cv-3514, 2007 WL 4219394, at *2 (N.D. Cal. Nov. 28, 2007) (approving antitrust class action settlement of $500,000, representing 4% of damages).

- *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 308, 319 (W.D. Pa. 1997) (court approved antitrust class action settlement of $14.5 million with the last two of three defendants, which settlement represented 5.35% of the estimated damages of $271 million).

***Antitrust Class Action Settlements for 15% or Less of Estimated Single Damages***

- *In re Titanium Dioxide Antitrust Litig.*, No. 10-cv-0318, 2013 WL 5182093, at *2 (D. Md. Sept. 12, 2013) (approving antitrust settlement of $163.5 million after class certification was granted, summary judgment and *Daubert* denied, and on the eve of trial, representing 6-8% of estimated single damages ranging from $2.1-2.7 billion); *see also In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 818 (D. Md. 2013) (plaintiffs' expert found "Defendants' price increases resulted in aggregate [single] overcharges of between $2.1 and $2.7 billion").

- *Tawfilis v. Allergan, Inc.*, No. 15-cv-0307, 2018 WL 4849716, at *1, *4 (C.D. Cal. Aug. 27, 2018) (antitrust class action settlement reached after court granted in part plaintiffs' *Daubert* motion, and denied defendant's *Daubert* motion, where $13,450,000 settlement represented approximately 8.36% of single damages); *see also Tawfilis v. Allergan, Inc.*, No. 15-cv-0307, ECF No. 388, at 8-9 (C.D. Cal. Mar. 8, 2018) (preliminary approval order discussing amount of alleged overcharges).

- *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) ($410 million settlement against one defendant in an antitrust class action where the settlement represented as little as 9% percent of total potential single damages, and where the court emphasized that "standing alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims").

23

- *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1775, 2009 WL 3077396, at *9 (E.D.N.Y. Sept. 25, 2009) (final approval of antitrust class action settlement of "$85 million equal[ing] approximately 10.5% of Lufthansa's surcharges during the Settlement Class period").

- *In re Wellbutrin SR Antitrust Litig.*, No. 04-cv-5525, 2011 WL 13392296, at *2, *3 (E.D. Pa. Nov. 21, 2011) (final approval of antitrust class action settlement of $49 million, reached after summary judgment briefing (including renewed summary judgment motion by defendant) and extensive trial preparation, which represented 5.7% to 10.7% of estimated single damages ranging from $457 million to $839 million); *see also In re Wellbutrin SR Antitrust Litig.*, No. 04-cv-5525, ECF No. 409, at 18 (Oct. 14, 2011) (plaintiffs' final approval brief providing damages estimates).

- *In re Prandin Direct Purchaser Antitrust Litig.*, No. 10-cv-12141, 2015 WL 1396473, at *1-*3 (E.D. Mich. Jan. 20, 2015) (approving $19 million antitrust class action settlement representing approximately 12% of estimated single damages); *see also In re Prandin Direct Purchaser Antitrust Litig.*, No. 10-cv-12141, ECF No. 67, at 14 (E.D. Mich. Dec. 16, 2014) (plaintiffs' final approval brief providing damages estimates).

- *Castro v. Sanofi Pasteur Inc.*, No. 11-cv-7178, 2017 WL 4776626, at *1-*2, *6 (D.N.J. Oct. 23, 2017) (approving antitrust class action settlement of $61.5 million, reached after class certification was granted and *Daubert* was denied, which represented approximately 14% of the estimated damages of $439 million).

- *In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-02509, 2015 WL 5159441, at *2-*4 (N.D. Cal. Sept. 2, 2015) (approving antitrust class action settlement of $435 million, reached with all seven defendants while the parties were engaged in trial preparation, where the settlement represented 14% of single damages of $3.1 billion).

- *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-md-2445, 2024 WL 815503, at *2, *9 (E.D. Pa. Feb. 27, 2024) (approving antitrust class action settlement of $385 million, which was reached after class certification had been granted, after the court denied various *Daubert* motions, and where the settlement represented 12% to 14% of estimated damages of $2.6 billion and $3.2 billion).

- *In re Blue Cross Blue Shield Antitrust Litig.*, No. 13-cv-20000, 2022 WL 4587618, at *2, *20 (N.D. Ala. Aug. 9, 2022) (final approval of $2.67 billion antitrust class action settlement reached after nine years of litigation and following several rounds of summary judgment, as well as class certification motions pending at time of settlement, where settlement represented between 7.3% to 14.3% of the estimated damage ranging from $18.6 billion to $36.1 billion, which the court concluded "easily falls within the range of reasonable recoveries").[36]

- *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 305, 308-10, 323, 325 (N.D. Ga. 1993) (court approved antitrust class action settlement with a $50 million cash amount plus discount travel certificates with a face value of $408 million, which together the court found had an economic value between $254-$356 million, and where the court concluded that "the settlement in this action amounts to approximately 12.7-15.3% of the estimated $2 billion minimum possible untrebled recovery").

---

[36] *Affirmed sub nom. In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070 (11th Cir. 2023).

24

***Antitrust Class Action Settlements for 25% or Less of Estimated Single Damages***

- *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, No. 18-cv-677, 2020 WL 6193857, at *1 (E.D.N.Y. Oct. 7, 2020) (final approval of $51.25 million antitrust class action settlement, reached after class certification briefing, which represented 5-20% of range of estimated damages ranging from $255 million to $709 million); *see also In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, No. 18-md-2719, ECF No. 544, at 16, 21 (E.D.N.Y. Sept. 15, 2020) (plaintiffs' final approval brief providing litigation background and damages estimates).

- *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 285, 287-88, 324-25 (3d Cir. 2011) (Third Circuit affirmed two settlements: (i) an indirect purchaser plaintiff settlement of $272.5 million, which represented estimated 10.9% of estimated $2.5 billion single damages; and (ii) a direct purchaser plaintiff settlement of $22.5 million, which represented less than 22.5% of the estimated $100 million single damages; *settlements were reached after default judgment entered against defendants*, who rejected that the court had jurisdiction; Third Circuit held there was "no abuse in the District Court's conclusion that the proposed settlement offered a reasonable recovery").

- *In re Dental Supplies Antitrust Litig.*, No. 16-cv-0696, ECF No. 341 (E.D.N.Y. June 24, 2019) (final approval order of $80 million antitrust class action settlement, reached after class certification and *Daubert* motions were briefed, where settlement represented 2.5-21% of estimated single damages); *see also In re Dental Supplies Antitrust Litig.*, No. 16-cv-0696, ECF No. 335-1, at 13, 17 (E.D.N.Y. May 24, 2019) (plaintiffs' final approval brief providing litigation background and damages estimates).

This trend of antitrust class actions resolving for small fractions of potential single damages has continued into the present. Indeed, just last year, the plaintiffs in five separate class actions in different jurisdictions settled the *Realtor Commissions* case with five defendants for approximately $972.5 million on behalf of multiple classes. *See Burnett, et al. v. NAR, et al.*, No. 19-cv-332, ECF No. 1478, at 6 (E.D. Mo. May 6, 2024). One of the classes that folded into this settlement had previously gone to trial and prevailed, obtaining a jury verdict for nearly $1.8 billion before trebling. *See Burnett, et al. v. NAR, et al.*, No. 19-cv-332, ECF No. 1294 (E.D. Mo. Oct. 31, 2023) (verdict form). The combined alleged damages in these actions were immense—in addition to the $1.8 billion jury verdict, another one of the several classes that folded into this collective sub-$1 billion settlement had *by itself* claimed over $13 billion in single damages. *See Moehrl, et al. v. NAR, et al.*, No. 19-cv-1610, ECF No. 324-5, at 5 (N.D. Ill. June 7, 2022). Even with a large and favorable jury verdict and combined single damages in the tens of billions of dollars, the total settlement amount was less than $1 billion, *i.e.*, likely below 5% of the total available single damages. This result reflects counsel's assessment of the very real risks

of antitrust trials and appeals from even the most favorable of verdicts.

One reason that antitrust class actions typically settle for a far smaller share of single damages than the Settlement in this case would represent, is that these cases pose significant risks of jury confusion and error. In a recent cautionary tale, the plaintiffs in *In re Opana ER Antitrust Litig.*, No. 14-cv-10150, ECF No. 1085 (N.D. Ill. Nov. 3, 2022), settled an antitrust class action with one of two defendants on the first day of trial for $145 million. That amount represented about one-quarter of single damages of between $514 million to $590 million. *See* ECF No. 1081, at 1 (plaintiffs' final approval brief); ECF No. 895, at 18 (N.D. Ill. May 24, 2022) (joint pretrial order discussing damages). At the time of settlement, the court had granted class certification, denied summary judgment, and denied *Daubert*. However, the plaintiffs were unable to settle with the second defendant and so continued to a jury verdict—and lost. ECF No. 1002 (N.D. Ill. July 1, 2022) (jury verdict for non-settling defendant). With only a single defendant, Plaintiffs here do not have the luxury of a partial settlement to guarantee some recovery for Class Members in the event of a loss at trial or on appeal.

Finally, in *Meijer, Inc. v. Abbott Labs.*, No. 07-cv-5985, 2011 WL 13392313, at *2 (N.D. Cal. Aug. 11, 2011), the plaintiff class in an antitrust class action settled on the third day of trial for $52 million. In *Meijer*, the class had been certified, summary judgment had been denied, and the plaintiffs were trying an antitrust monopolization claim relating to an AIDS drug. Plaintiffs' expert economist in that case—the same Dr. Hal Singer that is an expert here—had computed single damages ranging from $210 million *up to $1.2 billion*, and as here the court found his models reliable and admissible. Yet *Meijer* settled during trial for about 4% of the upper end of available single damages. It was undoubtedly a good thing for the plaintiffs that they settled. A non-class co-plaintiff did not settle, continued with the same trial in front of the same jury that would have decided the class's fate—and received a defense verdict because the jury disagreed with the plaintiffs' proposed relevant market.[37]

### 4. The Settlement Treats Class Members Equitably.

The Settlement treats Class Members equitably in view of the *pro rata* Plan of Allocation,

---

[37] *See also Meijer, Inc. v. Abbott Labs.*, No. 07-cv-5985, ECF No. 512, at 8 (N.D. Cal. July 13, 2011) (plaintiffs' final approval brief providing damages estimates), ECF No. 501, at 6-7 (N.D. Cal. Apr. 8, 2011) (plaintiffs' preliminary approval brief providing litigation background).

which is fair, reasonable, and adequate, as discussed in Section IV.B.3.b *supra*.

## C.  The Extent of Discovery Completed and the Stage of Proceedings

The extent of the discovery completed in the Action weighs in favor of approval. The Action completed all fact and expert discovery; the litigation Class was certified; summary judgment was denied; and the case was on the eve of trial when an agreement to settle was reached. Where, as here, a case has completed discovery and reached an advance stage of litigation, courts have found approval warranted because these are "indicators of Lead Counsel's familiarity with the case and of Plaintiffs having enough information to make informed decisions." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008). Indeed, the Ninth Circuit has explained that "[i]n the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).

## D.  Risk of Maintaining Class Action Status Through Trial

While the Court had certified the Class (ECF No. 839), there remained a risk that Zuffa could renew its challenge to class certification post-trial. *See* Joint Decl. ¶242. Whether class certification could be maintained through any post-trial appeal proceedings is by no means guaranteed.

## E.  The Experience and Views of Counsel

Class Counsel believe the Settlement is an excellent result for the Class. Joint Decl. ¶¶236-37. "'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *DIRECTV*, 221 F.R.D. at 528. "This is because '[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation.'" *Id.* When the Court appointed class counsel for the Class, it noted that "through the course of this litigation, [counsel] have demonstrated that they have extensive experience and knowledge with antitrust, class action litigation." *Id.* at 79.

Where, as here, counsel are experienced litigators who understand the claims and defenses and class action issues of the litigation, the Court can rely on that experience as a factor favoring

approval.[38] Supplementing Co-Lead Class Counsel's own views, Plaintiffs previously elicited (in connection with the Prior Settlement) a declaration from a leading antitrust professor, Professor Posner, who observed that "plaintiffs' challenge to the defendant's labor monopsony in an important sports and entertainment market has played a pioneering role in this effort, particularly in showing how an employer with power in a labor market can be challenged under section 2 of the Sherman Act." Posner Decl. ¶24.

## F.    The Class Overwhelmingly Supports the Settlement

There is tremendous support for the Settlement by the Class. When the Class was certified and notice was issued, not a single Class Member opted out. *See* Joint Decl. ¶157. Likewise, when the deadline for Class Members to file objections to the Settlement expired on January 21, 2025, there were zero timely objections (as discussed below, a single objection was received and filed on January 22, 2025). *See* Nguyen Decl. ¶22. Courts have regularly held that "the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members" and that this presumption "is particularly strong when there is an absence of a single objection to a proposed class action settlement." *Aldapa v. Fowler Packing Co. Inc.*, No. 15-cv-00420, 2023 WL 3853482, at *7 (E.D. Cal. June 6, 2023); *see also DIRECTV*, 221 F.R.D. at 529 ("The complete absence of Class Member objections to the Proposed Settlement speaks volumes with respect to the overwhelming degree of support for the Proposed Settlement among the Class Members."); *Hester*, 2014 WL 3547643, at *10 ("fact that there are no objectors or opt-outs to the Settlement Agreement demonstrates the fairness, reasonableness, and adequacy of the Settlement"); *Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1304 (S.D. Cal. 2017), *aff'd*, 881 F.3d 1111 (9th Cir. 2018) (one objection out of 8,253 potential Class Members "is indicative of the fairness, adequacy, and reasonableness of the Settlement"); *In re Packaged Seafood Prods.*

---

[38] *See Moorer*, 2021 WL 4993054, at *5 ("Given Plaintiffs' counsels' experience with similar class action litigation, the Court finds that affording deference to their decision to settle the case, as well as the terms of that settlement, is appropriate."); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (preliminarily approving settlement where "experienced counsel on both sides, each with a comprehensive understanding of the strengths and weaknesses of each party's respective claims and defenses, negotiated this settlement").

*Antitrust Litig.*, No. 15-md-2670, 2024 WL 4875246, at *7 (S.D. Cal. Nov. 22, 2024) (reaction of class favors settlement approval where there are no objections).[39] The absence of timely objections reveals strong support for approval of the Settlement under Rule 23(e).

Ms. Lomeli filed a single, untimely, objection on January 22, 2025. ECF No. 1056 ("Lomeli Objection") (attached at Ex. F to the Nguyen Decl.). The Lomeli Objection does *not* relate to (a) the adequacy or fairness of the Settlement, (b) the Plan of Allocation, (c) the request for reimbursement of reasonable litigation expenses, or (d) the service awards for the Class Representatives. *See* Lomeli Objection. As pointed out above, Ms. Lomeli had earlier submitted a declaration in support of the Settlement, declaring that: "the $375 million settlement currently before the Court would be an enormously successful result. It would make a significant difference in my life and my financial stability. I enthusiastically support this settlement, and I sincerely hope for its swift approval."[40]

Ms. Lomeli's objection relates only to (a) one aspect of the computation of the sought attorneys' fee, and (b) the source of the funds provided to settle plaintiff Quarry's identity rights claim. The objection should be overruled for multiple reasons.

First, it was filed late. The deadline for receipt of all objections was January 21, 2025. *See* Preliminary Approval Order ¶¶15-16, 21(c), ECF No. 1053 ¶¶15-16, 21(c) (setting deadline for receipt of objections 90 days from October 23, 2024); Nguyen Decl. ¶22 & Exhibits B (Long Form Notice, under heading "Objecting to the Settlement" at response to Question 17: "You cannot make an objection by telephone or email. You must do so in writing and file your objection with the Clerk of Court and mail your objection to the following address **to be received by January 21, 2025**: … If you don't timely and validly submit your objection, your view will not be considered by the Court or any court on appeal.") (emphasis supplied), A (Short Form Notice: "You may Object to the terms of the Settlement by **January 21, 2025**.") (bold in original), E (Poster Notice: "You may Object to the terms

---

[39] In fact, courts have approved settlements where, unlike here, there were dozens of objections filed by class members. *See, e.g.*, *Rodriguez*, 563 F.3d at 967 (affirming approval of a class action settlement where there were 54 objections out of 376,301 notices sent); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming final approval of settlement where there were 500 optouts and 45 objections out of approximately 90,000 class members notified).

[40] *See* Declaration of Carla Esparza (now Lomeli), dated October 15, 2024, ECF No. 1049-32 (Ex. 141 to the Cramer Supp. Decl.).

of Settlement by **January 21, 2025**.") (bold in original). Ms. Lomeli's objection, which appeared on the docket on January 24, 2025, indicates that it was filed with the Clerk on January 22, 2025.[41] It is therefore untimely.

Second, Ms. Lomeli challenges Class Counsel's basis for the portion of Class Counsel's fee request relating to the $40 million difference between the prior settlement ($335 million) and the existing Settlement ($375 million) (the "Augmented Value"). She asserts that any fee flowing from the Augmented Value should be justified solely based on the lodestar Class Counsel expended between denial of preliminary approval on July 31, 2024 and the new Settlement date of September 26, 2024. With respect, that contention is not consistent with the facts or the law, nor would its reasoning justify any adjustment to the sought fee even if implemented.

As more fully set forth in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for an Award of Attorneys' Fees, For Reimbursement of Expenses, and For Service Awards for the Class Representatives ("Fee Brief"), at pp. 6-21 (ECF No. 1055-1), Class Counsel seeks a fee based on their body of work as a whole—and as a percentage of the Settlement Fund—not primarily based on their lodestar. The lodestar multiplier is simply a cross-check to ensure the fairness of the fee based on other factors. *See id.* at 19 (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("while the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award"); *Fernandez v. Victoria Secret Stores, LLC*, No. 06-cv-04149, 2008 WL 8150856, at *14 (C.D. Cal. July 21, 2008) ("lodestar calculation serves as a point of comparison by which to assess the reasonableness of a percentage award")). Plaintiffs cited numerous cases providing for a one-third fee in analogous cases, and yet Class Counsel here are seeking a fee on the gross Settlement Amount of 30.72%. *See* Fee Brief at 17-18 & nn.17-18. Moreover, Class Counsel's sought fee on the Augmented Amount is only 20%. *See id.* at n.11 (showing components of the requested fee award; note that the Augmented Amount is included within the second component computation of 20% of $73.5 million). And the basis for the fee request is the excellent result, the risks taken, and resources expended on behalf of the Class, and the quality of the lawyering.

---

[41] The Clerk's office confirms that the objection was "received" and "filed" on the same day: January 22, 2025.

And even if the multiplier were the only factor, Plaintiffs are asking for a multiplier of 1.6, well below the level deemed reasonable and appropriate for a case as complicated and time-consuming as this one was. *See id.* at 20-21 & n.22 (citing cases).

Furthermore, Ms. Lomeli's objection undervalues the amount of work that Class Counsel did after the denial of the first settlement. When the Court denied preliminary approval of the first settlement on July 31, 2024, the Court set a new trial date (February 3, 2025), and informed the Parties that it would not stay the trial unless and until it granted preliminary approval of another settlement. *See* ECF No. 1039, at Tr. 8-9; *see also* ECF No. 1040 (setting new trial date). As a result, the Parties not only began renegotiating a new settlement, but also plunged headlong back into intense trial preparations on July 31, 2024. That extensive work on trial preparation did not come to a close until October 23, 2024, when the Court granted preliminary approval of the instant Settlement. ECF No. 1053. So Class Counsel spent all of August, all of September, and most of October attempting to settle the case *while also aggressively preparing for trial*. That three-month interregnum involved some of the most intense three-months of the ten-year old case—and reasonably required the accrual of millions of dollars in lodestar by Class Counsel. By Ms. Lomeli's own logic, namely that the fee on the Augmented $40 million should be based solely on the lodestar between the denial and Preliminary Approval, that would more than justify Class Counsel's sought fee of 20% of the $40 million Augmented Value (or $8 million). Additionally, Class Counsel did not end its work at preliminary approval. Class Counsel has been aggressively working on the Settlement approval process, overseeing notice, holding multiple information sessions with Class members in three different languages *to this very day*—and will continue to be involved in overseeing the allocation process until Ms. Lomeli and the other Class Members get paid. In other words, Class Counsel's work in this case did not end at preliminary approval, and will not end even at final approval. All of the 100,000 (plus) hours of professional time, combined with the excellent result, more than justifies the 30.72% fee request on the total Settlement Amount in this long-running case.

One final point about the fee computation objection: it presupposes that the $40 million increase (*i.e.*, the Augmented Value), by itself, fully accounts for the improvement as between the old and new settlements. Not so. In fact, the prior settlement resolved two cases; the Settlement now before the

Court resolves only one. In short, the Settlement now resolves *a single case for more money*. That could well bring significantly more value for the Fighters who straddle both classes, especially because the second case has the possibility of seeking significant injunctive relief.

Ms. Lomeli's objection to the $250,000 settlement of Mr. Quarry's individual identity rights claim should also be overruled. First, Mr. Quarry has an individual claim, separate and apart from the Class. Zuffa and Mr. Quarry agreed to settle that individual claim for $250,000. *See* SA §5(d) ("In consideration for the release of his claims as set forth in Paragraph 10 below, individual Plaintiff Nathan Quarry shall receive a payment of $250,000 from the *Le v. Zuffa* Settlement Fund."); §10(b) ("Class Representatives, Nathan Quarry, and Defendant acknowledge, and Class Members shall be deemed by operation of any Final Judgment and Order of Dismissal to have acknowledged, that the foregoing waivers and releases were separately bargained for and a key element of this Settlement Agreement, of which these releases are part."). Accordingly, even if her objection had been timely, it would have no basis. In addition, Ms. Lomeli's suggestion that Mr. Quarry's efforts were "not relevant to the success of the case" is simply incorrect. Mr. Quarry was one of the initial plaintiffs who stepped forward to bring the first case; attended multiple hearings and mediation sessions; sat for a deposition; produced hundreds of documents; prepared to be a witness at trial; participated in countless calls with Class Counsel to provide insight and guidance with regard to litigating the case; and performed multiple other services on behalf of the Class. Zuffa's settlement of Mr. Quarry's claim is fully justified.[42]

Next, the Settlement received *active* support from the Class, including before the Court granted preliminary approval and directed notice of the Settlement to the Class. "Where a settlement agreement enjoys overwhelming support from the class, this lends weight to a finding that the settlement agreement is fair, adequate, and reasonable." *Barbosa*, 297 F.R.D. at 448. 154 ex-UFC Fighters have submitted declarations supporting the Settlement. *See* ECF Nos. 1045, 1047, 1049. These declarations

---

[42] Ms. Lomeli appears not to object to the amount of Zuffa's settlement with Mr. Quarry. Instead, she suggests that Class Counsel should take some of its anticipated fee award and offer it to Mr. Quarry in exchange for Mr. Quarry's agreement to release his identity rights claim against Zuffa. This proposal is likely prohibited by the Nevada Rules of Professional Conduct. *See* Nevada Rules of Professional Conduct 5.4(a) ("A lawyer or law firm shall not share legal fees with a nonlawyer.").

highlight the groundswell of support for the Settlement and the urgency of the need for the proceeds to reach the Class Members. The Settlement, if approved, would lift many out of poverty and otherwise materially improve the lives of hundreds of Class Members and their families. The Fighters understand that Plaintiffs' expert economists estimated that the potential damages are roughly 2.5 times the settlement amount, and that any award by the jury would be trebled. *See*, *e.g.*, Spencer Decl. ¶10; Howard Decl. ¶7.[43] They also know that the UFC could prevail at trial or that the jury could award an amount less than the economists estimated. The Fighters understand that any victory for the Class at trial would be subject to lengthy appeals by Defendant and that "a significant recovery in the near future is much more appealing than the possibility of a larger recovery several years from now, especially in light of the possibility that there would be no recovery at all if this settlement were not approved." *See*, *e.g.*, Spencer Decl. ¶12; Howard Decl. ¶9.

The Fighters have "a deep interest in and concern for the future of the sport of mixed martial arts," and they view the combination of monetary relief from the Settlement with potential for injunctive relief in the *Johnson* Action to present a "best of both worlds" scenario where the "fighters can recover now for injuries in *Le* going back nearly fourteen years, while also preserving the possibility of obtaining changes to the UFC's business practices going forward." *See*, *e.g.*, Spencer Decl. ¶13; Howard Decl. ¶10. They see the Settlement as "an enormously successful result [that] would make a significant difference in my life and my financial stability." *See*, *e.g.*, Spencer Decl. ¶14; Howard Decl. ¶11.

These declarations also reveal how the Settlement, if approved, would materially improve the lives of Class Members, many of whom are contending with: chronic medical conditions, serious financial difficulties, and the lack of access to necessary healthcare to treat injuries sustained during their fighting careers. Many cannot meet basic needs or are teetering on the verge of bankruptcy. Still others are unable to create opportunities for themselves and their families. The Settlement would, in a very real way, have a material and immediate impact on the lives of hundreds of Class Members. Excerpts from some of the Fighter declarations below make clear that the Settlement would be life

---

[43] Co-Lead Class Counsel cite here the Declaration of Sean Spencer (ECF No. 1045-8) and the Declaration of John Howard (ECF No. 1045-16) as representative exemplars.

altering for hundreds of people:

- "I need urgent medical attention and treatment now including physical therapy, chiropractic therapy, counseling and neurological treatment. I have not been receiving the necessary care to maintain my health due to the expenses of health care which I cannot afford. In addition to healthcare expenses, I face serious challenges in meeting basic everyday expenses for food, shelter, and transportation. My family has endured times without electricity and other utilities due to my struggles with mental health, and I have not been able to provide the financial support that my eight-year-old and two toddlers need. My wife and I just had our 4th child and it's been extremely challenging to focus on my mental health, my physical health, and especially my financial health to take care of my family properly. My wife deserves better. **My family deserves a healthier me and I desperately need help now—not years from now**. **This would truly be life-changing money for me and for other members of the class**." Spencer Decl. ¶¶7-9 (emphasis added).

- "While fighting for the UFC, I suffered a significant injury to my knee during a bout that was never fixed. My knee and leg are still crooked and do not have full range of motion, and it still causes incredible and debilitating pain. My insurance does not cover pre-existing injuries, and **I desperately needs [sic] these funds to alleviate unbearable pain I live with daily**. I also live in Beijing, China, far away from my daughter in Brazil, and care for my elderly mother in Brazil. Funds from this settlement will make it easier for me to visit my daughter and to provide a better life for her." Declaration of Fernando Bruno, at ¶6 (ECF No. 1045-9).

- "**I do not have health insurance and have not been receiving the necessary care to maintain my health due to the expenses of health care which I cannot afford**…. I have 5 children including two sets of twins and take care of my elderly parents in Brazil. Funds from this settlement would also enable me to start a social project in Brazil teaching Brazilian jiu-jitsu to underprivileged children." Declaration of Iuri Alcantara, at ¶¶6-7 (ECF No. 1045-10).

- "I do not have health insurance, and my family does not have health insurance. During the pandemic, without the support of our trainer, my family would have been without basic necessities including food. **My family desperately need these funds now**." Declaration of Johnny Eduardo, at ¶7 (ECF No. 1045-11).

- "Currently, **I face serious challenges in meeting basic everyday expenses for food, shelter, and transportation and I am living paycheck to paycheck**. I travel around teaching Brazilian jiu-jitsu and my income is unstable and unpredictable.  The funds from this settlement would assist me in living day to day. These funds may also enable me to buy a small property to leave for my children." Declaration of Luis Ramos, at ¶6 (ECF No. 1045-12).

- "While fighting for the UFC, I suffered many significant injuries, including concussions. I fear that during my career I have suffered traumatic brain injury (TBI) and am noticing symptoms common with TBI and CTE including depression, mood swings, and

irritability…. I suffer from sleep apnea and have difficulty sleeping and breathing. That I can recall, I have had four surgeries on my nose, 1 on my face, 2 on my left knee, 1 on my right knee and 1 on my elbow…. **These funds would also allow me to obtain the healthcare I need and keep a roof over my head and food on my table. The sad reality is that funds years from now may be of no use to me. I can use and enjoy these funds with my family now**." Declaration of Wanderlei Silva, at ¶¶6-7 (ECF No. 1045-13).

- "Due to the strain of my current health limiting my everyday activity from working consistently, I've been relying on a friend who, through God's provision, has generously sponsored my essential needs, including food and shelter, while I await the settlement of this case. **Without this support, I would likely need to file bankruptcy and apply for disability to manage my basic living and healthcare needs**." Declaration of Cung Le, at ¶10 (*Le* Class Representative) (ECF No. 1045-14).

- "Despite having a degree in engineering from the Colorado School of Mines, I have been unable to maintain adequate focus to hold down an engineering job. I face serious challenges in meeting basic everyday expenses for food, shelter, and transportation and in basic life skills necessary to function…. These funds would also allow me to obtain the healthcare I need and keep a roof over my head and food on my table. **The sad reality is that funds years from now may be of no use to me. I desperately need these funds now**." Declaration of Shane Carwin, at ¶¶7-8 (ECF No. 1045-15).

- "Last year, my daughter was the victim of gun violence that will require substantial long-term care for her survival and well-being. **My family needs the funds from this settlement desperately to care for our daughter and to assist in day-to-day living expenses**." Howard Decl. ¶6.

- "While fighting for the UFC, I suffered many significant injuries including … concussions which later ended my career. I fear that during my career I have suffered traumatic brain injury (TBI) and am noticing symptoms common with TBI including depression, headaches, mood swings, and irritability…. **Funds from this settlement would enable me to focus on restoring my brain health and I would acquire a hyperbolic chamber and look to purchase a home**." Declaration of Heather Jo Clark, at ¶7 (ECF No. 1045-17).

- "The funds received from this settlement will allow me to obtain the physical therapy and medical treatment I need after substantial damage incurred while competing at the highest level." Declaration of Todd Duffee, at ¶¶6-7 (ECF No. 1045-18).

- **"I do not have health insurance and have not been receiving the necessary care to maintain my health due to the expenses of health care which I cannot afford**." Declaration of Jorge Rivera, at ¶6 (ECF No. 1045-19).

- "Without medical insurance provided by the State of Oregon, I would be unable to afford my significant medical expenses. I understand that many class members, whose MMA careers likewise took a toll on their bodies, lack medical insurance." Declaration of Nathan Quarry, at ¶6 (*Le* Plaintiff) (ECF No. 1045-20).

- **"This would truly be life-changing money for me and for other members of the class. Funds from this settlement will enable me to seek the necessary medical attention to address my diminishing vision, and it would also provide me with funds to stabilize my life. My transition following my post-UFC career has been extremely difficult and I have struggled with no stable income.** Unfortunately, due to the toll this career takes on your body and the scars and injuries fighters are left with, it is very difficult to transition into normal careers." Declaration of Bethe Correia, ¶7 (ECF No. 1047-31).

- "Throughout my UFC fight career, I was going into debt and borrowing money from family to fund fight camps and then paying off this debt with my purses. As a result of this debt, I and other peers frequently take fights while injured to pay off the debt from training camp that was already incurred. I was never ahead financially during my entire fighting career with the UFC.... **I do not currently have health insurance and these funds would allow me to obtain the surgery and medical attention that I need but have not received because I cannot currently afford it**." Declaration of Junior Assuncao, ¶¶6-7 (ECF No. 1047-34).

- "During my MMA career, I suffered some significant injuries 6 surgeries on my knees, 2 surgeries on my hands, surgery on my elbow, and a procedure on my shoulder. My injuries still require physical therapy and treatment. **I need the money now to address immediate medical concerns for myself and my family. This would truly be life-changing money for me and many class members, and I fully support those who desperately need the funds now**. I would use these funds to take care of my family and children, to pay my mortgage, and to pay medical expenses." Declaration of Thiago Santos, ¶¶6-7 (ECF No. 1049-12).

- Numerous fighters stated that the funds from the Settlement would provide important and meaningful opportunities for themselves and their families including providing for college educations for their children, caring for elderly parents, investing in their businesses (*e.g.*, opening martial arts gyms), covering healthcare insurance costs, owning a home, planning for retirement, and overall better financial footing.[44]

In addition to these Fighter declarations, Class Counsel also received a declaration from a Fighter manager and two organizations who advocate on behalf of MMA fighters: the Fighting Foundation and the MMAFA. Alessandro Gelke, who has been a fighter "manager in the combat sports industry for more than 22 years," urged approval of the Settlement to provide much needed financial assistance to Fighters, many of whom continued to fight past their prime to support their families. *See* ECF No. 1047-54, ¶¶2, 5-9. The Fighting Foundation is a 501(c)(3) charitable organization founded by

---

[44] *See* Ex-UFC Fighter Declarations attached at ECF Nos. 1045-8 to -62, 1047-3 to -53, and 1049-3 to -52.

Rose Gracie, whose family originally created the UFC. *See* ECF No. 1049-53. From her deep

experience in the fighting world, Ms. Gracie describes the challenges and difficulties fighters face

where she notes that "[m]any fighters retire with nothing—physically broken and financially

devastated" and that "[f]or some, this money represents a second chance." *See id.* ¶¶4-12. She states

that the "settlement offers crucial, immediate financial relief to these fighters." *Id.* ¶18. The MMAFA is

an organization whose "mission is to establish improvements in the economic, physical and security

conditions of mixed martial artists." ECF No. 1049-55, ¶3. It was members of the MMAFA who

initiated this Action. *Id.* ¶4. The MMAFA states that "[m]any fighters in this class desperately need

these funds to pay for badly needed medical services and health insurance[,] to pay basic living

expenses, and to secure stable housing." *Id.* ¶5. The organization states that many Fighters support the

Settlement, but they are reluctant to provide a public declaration for fear of retaliation by the UFC. *Id.*

¶7. Some of the Fighters who contacted MMAFA about the Settlement "were in tears and incredibly

thankful that after a decade of litigation they will gain some measure of relief." *Id.* ¶10.

If the Settlement is rejected, even if Plaintiffs win at trial, succeed in obtaining the entry of a

judgment, and then uphold the judgment on appeal—all of which present significant risks that the Class

will receive no compensation at all—Class Members would need to wait many more years before they

have a chance of seeing any recovery from this case. As these declarations show, mindful that the case

could potentially recover more if litigated to its ultimate conclusion, the Class Members have opted for

the immediate and life-changing benefits now, while preserving the ability to reform the sport and, for

many, to obtain additional damages, in *Johnson*.

The reaction of the Class strongly favors final approval of the Settlement.

## V. NOTICE OF THE SETTLEMENT COMPLIED WITH THE COURT'S PRELIMINARY APPROVAL ORDER AND APPLICABLE LAW

The notice provided to the Class complied with Court's preliminary approval order and

applicable law. Rule 23 requires that prior to final approval, "[t]he court must direct notice in a

reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23

(e)(1). For classes certified under Rule 23 (b)(3), "the court must direct to class members the best

notice that is practicable under the circumstances, including individual notice to all members who can

37

be identified through reasonable effort." Fed. R. Civ. P. 23 (c)(2)(B). The Rule provides that "notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." *Id*.

Angeion has effectuated a thorough notice campaign, consistent with the Notice Plan approved by the Court (*see* ECF No. 1053, ¶¶15-20), which was substantially the same plan the Court had approved (and which was effectuated) for notice of certification to the Class, *see* ECF No. 921, with the exception that the notices were amended to include information about the Settlement, the proposed Plan of Allocation, and that Class Counsel sought fees and expenses, as well as service awards for the Class Representatives. As described in detail in the accompanying Nguyen Declaration (filed concurrently with this motion), the Notice Plan achieved its objective to inform Class Members about "the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

Starting on November 22, 2024, Angeion began sending the Long Form Notice (by mail) and the Short Form Notice (by email) to Class Members. *See* Nguyen Decl. ¶¶8, 10. The Long Form Notice set forth all information required by Rules 23(c)(2)(B) and 23(e)(1), and informed the Class about: the nature and status of the Action; the amount of the Settlement; the amount Settlement Class Counsel will request in fees, litigation expenses, and service awards for the Class Representatives to be paid from the Settlement; how Class Members can submit claims later in the process; Class Members' rights to object and attend the Fairness Hearing; the important deadlines; and how to obtain additional information, including using a website dedicated to the Settlement or contacting Angeion. *See* Nguyen Decl. Ex. B; *see also* Preliminary Approval Order, ECF No. 1053 ¶¶15-16; ECF No. 1045-7 at Exhibit A (Long Form Notice).[45] Because some Class Members are non-native English speakers, the Long Form Notice was also translated into Spanish, Japanese, Portuguese, and Russian, and translators are available to provide responses to Class Member inquiries in these languages as well. Nguyen Decl. ¶19.

---

[45] The Short Form Notice and the Poster Notice provided summary information about the Action and the Settlement, and directed Class Members to view the dedicated website or contact Angeion for more information about the Settlement. *See* Nguyen Decl. at Exhibits A (Short Form Notice) & E (Poster Notice).

A notice containing the above information satisfies Fed. R. Civ. P. 23(c) and due process of law. *See Online DVD-Rental*, 779 F.3d at 946.

Also starting on November 22, 2024, Angeion implemented a multifaceted media campaign that included targeted social media notice via Facebook, Instagram, and X; a paid search campaign via Google; and a press release via PR Newswire. Nguyen Decl. ¶¶12-16. The Poster Notice was mailed to 48 professional MMA Gyms with instructions to place it in a prominent location. *Id.* ¶17. The dedicated website for the Action, www.UFCFighterClassAction.com, was updated to include information about the Settlement, including: an FAQ with important information about the Settlement and, if approved, the future procedure for submitting a claim; the deadline (and procedure) for submitting an objection[46] and the date of the fairness hearing; and downloadable copies of the Notice and other important documents about the Settlement and the Action. *See id.* ¶18. In addition to these methods of notice, Angeion also maintains a toll free number that Class Members may use to obtain information about the Settlement. *Id.* ¶21.

Under the Notice Plan, and pursuant to the Preliminary Approval Order (ECF No. 1053 ¶21(c)), the deadline for Class Members to submit any objections to the Settlement, the proposed Plan of Allocation, and Class Counsel's motion for an award of attorneys' fees, reimbursement of litigation expenses, and for service awards to the Class Representatives was January 21, 2025. As of that date, Angeion had not received any objections filed by Class Members. Nguyen Decl. ¶22. Nor were any timely objections docketed with the Clerk of the Court; only the one untimely objection, as discussed above. *See also id.*

As explained above, the Notice Plan met the fairness standards set forth in Fed. R. Civ. P. 23. Each form of notice clearly presented all required categories of information in plain English, as well as translated into several languages for the benefit of non-English speaking Class Members. *See Officers for Justice*, 688 F.2d at 624; Fed. R. Civ. P. 23(c)(2)(B). The Notice Plan employed numerous means and media to provide the best notice practicable under the circumstances. *See Roes 1-2 v. SFBSC*

---

[46] In its preliminary approval order, the Court found that following certification of the Bout Class, the Class Members were reasonably informed about their rights to participate in or opt out of the Class and, therefore, no second opportunity to request exclusion from the Class was warranted in connection with notice of the Settlement. *See* ECF No. 1053, ¶¶19-20.

*Mgmt., LLC*, 944 F.3d 1035, 1947 (9th Cir. 2019) (recognizing value of publication notice and use of other media as supplement to direct notice). Accordingly, the content of and method for dissemination of the notice fulfilled the requirements of Federal Rule of Civil Procedure 23 and due process.

Finally, as set forth in its letters to the Court, dated December 19, 2024 (ECF No. 1054) and January 29, 2025 (ECF No. 1059), Defendant issued notices to all state and federal officials required by the Class Action Fairness Act, 28 U.S.C. § 1715(b), by December 16, 2024 (except to the Attorney General of Wisconsin, which was resent on January 29, 2025).

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) grant final approval of the Settlement Agreement pursuant to Federal Rule of Civil Procedure 23(e); (ii) approve the Plan of Allocation, which provides a fair and reasonable method of determining each Class Member's allocated share of the Net *Le v. Zuffa* Settlement Fund, including the schedule for the claims process proposed herein; and (iii) enter a Final Judgment and Order terminating the litigation between Plaintiffs and Defendant. Plaintiffs have attached a proposed Final Judgment and Order, which includes a schedule for the claims process, for the Court's convenience.

Dated: January 30, 2025                         Respectfully submitted,

                                                /s/ *Eric L. Cramer*
                                                Eric L. Cramer (pro hac vice)
                                                Michael Dell'Angelo (pro hac vice)
                                                Patrick F. Madden (pro hac vice)
                                                BERGER MONTAGUE PC
                                                1818 Market St., Suite 3600
                                                Philadelphia, PA 19103
                                                Telephone: +1 (215) 875-3000
                                                Email: ecramer@bm.net
                                                Email: mdellangelo@bm.net
                                                Email: pmadden@bm.net

40

Joshua P. Davis (pro hac vice)
Robert Maysey (pro hac vice)
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone: +1 (415) 906-0684
Email: jdavis@bm.net
Email: rmaysey@bm.net

Richard A. Koffman (pro hac vice)
Benjamin Brown (pro hac vice)
Daniel Silverman (pro hac vice)
Daniel L. Gifford (pro hac vice)
COHEN MILSTEIN SELLERS
     & TOLL PLLC
1100 New York Ave., N.W.
Suite 500 East, Tower
Washington, DC 20005
Telephone: +1 (202) 408-4600
Facsimile: +1 (202) 408-4699
Email: rkoffman@cohenmilstein.com
Email: bbrown@cohenmilstein.com
Email: dsilverman@cohenmilstein.com
Email: dgifford@cohenmilstein.com

Joseph R. Saveri (pro hac vice)
Kevin E. Rayhill (pro hac vice)
Christopher Young (pro hac vice)
Itak Moradi (pro hac vice)
JOSEPH SAVERI LAW FIRM, LLP
601 California St., Suite 1505
San Francisco, CA 94108
Telephone: +1 (415) 500-6800
Facsimile: +1 (415) 395-9940
Email: jsaveri@saverilawfirm.com
Email: krayhill@saverilawfirm.com
Email: cyoung@saverilawfirm.com
Email: imoradi@saverilawfirm.com

*Co-Lead Counsel for the Le Class and Attorneys for Individual and Representative Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez,* and *Kyle Kingsbury*

Don Springmeyer (Bar No. 1021)
Michael Gayan (Bar No. 11135)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone: + 1 (702) 385-6000
Facsimile: + 1 (702) 385-6001
Email: dspringmeyer@kempjones.com
Email: m.gayan@kempjones.com

*Liaison Counsel for the Class and Plaintiffs*
*Cung Le, Nathan Quarry, Jon Fitch, Brandon*
*Vera, Luis Javier Vazquez, and Kyle*
*Kingsbury*

Crane M. Pomerantz
CLARK HILL PLC
1700 Pavilion Center Dr., Suite 500
Las Vegas, NV 89135
Telephone: +1 (702) 697-7545
Email: cpomerantz@clarkhill.com

*Additional Counsel for the Class and*
*Plaintiffs Cung Le, Nathan Quarry, Jon Fitch,*
*Brandon Vera, Luis Javier Vazquez, and Kyle*
*Kingsbury*

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF THE SETTLEMENT